

**AMERICAN ARBITRATION ASSOCIATION®** | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

**COMMERCIAL ARBITRATION RULES**
**DEMAND FOR ARBITRATION**

*For Consumer or Employment cases, please visit* **www.adr.org** *for appropriate forms.*

You are hereby notified that a copy of our arbitration agreement and this demand are being filed with the American Arbitration Association with a request that it commence administration of the arbitration. The AAA will provide notice of your opportunity to file an answering statement.

| | |
|---|---|
| Name of Respondent: Forall USA Inc. | Name of Representative (if known): Stephen J. Brown |
| Address:<br><br>Seven Sutton Place | Name of Firm (if applicable): Bleakley Platt |
| | Representative's Address: One N Lexington Avenue |
| City: Brewster    State: NY    Zip Code: 10509 | City: White Plains    State: NY    Zip Code: 10601 |
| Phone No.:    Fax No.: | Phone No.: 914-949-2700    Fax No.: 914-683-6956 |
| Email Address: | Email Address: sbrown@bpslaw.com |

The named claimant, a party to an arbitration agreement which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

Brief Description of the Dispute:

See Statement of Facts and Claims, attached hereto and made a part hereof.

| | |
|---|---|
| Dollar Amount of Claim: $ | Other Relief Sought:<br>☑ Attorneys Fees  ☐ Interest  ☑ Arbitration Costs<br>☐ Punitive/ Exemplary  ☐ Other |
| Amount enclosed: $ 3,250.00 | In accordance with Fee Schedule: ☐ Flexible Fee Schedule  ☑ Standard Fee Schedule |

Please describe the qualifications you seek for arbitrator(s) to be appointed to hear this dispute:

Commercial business dispute and contract litigators or former commercial law judges

Hearing locale:  New York, New York          *(check one)* ☐ Requested by Claimant  ☑ Locale provision included in the contract

| | |
|---|---|
| Estimated time needed for hearings overall:<br>8          hours or          days | Type of Business:  Claimant:  retail store operator<br>Respondent:  men's clothing manufacturer and distributor |

Are any parties to this arbitration, or their controlling shareholder or parent company, from different countries than each other?  No

| | |
|---|---|
| Signature (may be signed by a representative): | Date: January 12, 2018 |
| Name of Claimant:  Sarah LLC, and individuals named in Statement of Facts | Name of Representative:  Anthony J. Nasharr |
| Address (to be used in connection with this case):<br><br>Use c/o counsel address adjacent to the right | Name of Firm (if applicable):  Polsinelli PC |
| | Representative's Address:  150 N Riverside Plaza - Suite 3000 |
| City:    State:    Zip Code: | City: Chicago    State: IL    Zip Code: 60606 |
| Phone No.:    Fax No.: | Phone No.: 312-873-3611    Fax No.: 312-803-0028 |
| Email Address: | Email Address: anasharr@polsinelli.com |

To begin proceedings, please send a copy of this Demand and the Arbitration Agreement, along with the filing fee as provided for in the Rules, to: American Arbitration Association, Case Filing Services, 1101 Laurel Oak Road, Suite 100 Voorhees, NJ 08043. At the same time, send the original Demand to the Respondent.

*Please visit our website at www.adr.org if you would like to file this case online. AAA Case Filing Services can be reached at 877-495-4185.*

*Sarah LLC, Hala Subh, Suhad Albasha, Bachar Hamad, and Amar Hamad*

*vs.*

*Forall USA, Inc.*

AAA Case No. _____

## STATEMENT OF FACTS AND CLAIMS

### Introduction

This cause arises out of a business venture consisting of a retail menswear clothing store operated at The Forum Shops at Caesar's Palace in Las Vegas, Nevada ("The Forum Shops") between September 2011 and August 2016 by three successive operators. Beginning in or around early 2011, the parties, Sarah LLC (Sarah LLC") and Forall USA, Inc., ("Forall") commenced discussions and negotiations for the conduct of a retail menswear clothing boutique (the "Pal Zileri Store") under license from Forall which would supply "Pal Zileri" branded menswear suits, shirts and formal wear to the initial operations of Sarah LLC. Forall is the wholly-owned U.S. subsidiary of the Italy based manufacturer and distributor of Pal Zileri branded menswear. The Pal Zileri Store at The Forum Shops opened for business on or about September 2011. After nearly two years of operations, Sarah LLC had lost in excess of $2 million in the operation of the Pal Zileri Store. In its effort to save the Pal Zileri Store, Forall encouraged and brokered a transaction whereby Sarah LLC sold all of its assets, inventory and operating rights to a third party sourced and promoted by Forall. That third-party was Italnord Forum LV, LLC ("Italnord"). Subsequently, Italnord ceased operation of the Pal Zileri Store on or about February 2015, and thereafter Forall itself took over direct operation of the Pal Zileri

Store, until Forall defaulted on rent payments to the Landlord of The Forum Shops at Caesar's Palace and thereby lost the store location in an eviction action by the Landlord.

At the present time, more than four years after brokering the sale of the Pal Zileri Store in 2013, and three years after taking over operations of the Store itself in 2015, Forall is claiming sums due for future "minimum product purchases" from Sarah LLC and the individual Claimants named herein.  Such "minimum product purchase" claims of Forall are wrongful and meritless for reasons presented below.

### Factual Background

1.     On or about March ____, 2011, Sarah LLC and Forall entered into that certain License and Retail Operator Agreement, a copy of which is attached hereto as **Exhibit A** (the "License Agreement").

2.     Concurrent with the execution of the License Agreement, Sarah LLC entered into a certain retail Lease Agreement with The Forum Shops LLC, as Landlord, a copy of said retail Lease is attached hereto as **Exhibit B** (the "Forum Lease").

3.     In addition to the License Agreement, Sarah LLC executed and provided a Collateral Assignment of Lease to Forall, giving Forall rights to take over and occupy the leased Pal Zileri Store location in the event of Sarah LLC's default.   A copy of the Collateral Assignment of Lease is attached hereto as **Exhibit C.**

4.     Further, and concurrent with the License Agreement, Hala Subh, Suhad Albasha, Bachar Hamad and Amar Hamad executed a certain Guaranty, dated March ____, 2011, a copy of which is attached hereto as **Exhibit D.**

2

5.      During the course of operating the Pal Zileri Store, Sarah LLC experienced several operating problems which were directly contributed to by Forall due to Forall's failure to timely and fully reimburse Sarah LLC for Forall's share of store build out expenses and Forall's failure to provide the full inventory purchase discounts provided for and agreed to under the License Agreement and as otherwise provided for during operation of the Pal Zileri Store by Sarah LLC.  Despite the significant efforts of Sarah LLC and its principals, Sarah LLC had experienced operating loss of in excess of $2 million by the summer of 2013.

6.      In or about 2013, Sarah LLC became aware that prior to 2011, Forall had previously franchised or licensed the operation of a Pal Zileri menswear retail store in Las Vegas, Nevada, and that such store had failed to operate profitably and had been shut down and closed by its operating franchisee/licensee.  These facts had been withheld and concealed by Forall in its negotiations with Sarah LLC in 2011 to open the Pal Zileri Store at The Forum Shops.

7.      During the time that Sarah LLC operated the Pal Zileri Store, from September 2011 through September 2013, Forall repeatedly failed to provide advertising support for the Pal Zileri brand and the Pal Zileri Store.  Furthermore, Forall was consistently late in shipping menswear and products ordered and paid for by Sarah LLC, such that the late shipments cut into the seasonal selling periods that are a basic operational necessity of a retail clothing store.  The late seasonal shipments by Forall were a material contributing factor to the poor financial performance of the Pal Zileri Store during Sarah LLC's operation of the store from September 2011 to September 2013.

8.      During the summer of 2013, Forall presented Sarah LLC with the opportunity to sell the Pal Zileri Store to a third party, which third party was an existing operator of Pal Zileri

3

stores in other cities outside the United States. Forall made introduction of Italnord and its principal, Alfonso Intebi, to Sarah LLC and discussions ensued for Italnord's purchase of all assets, inventory and operating rights of Sarah LLC for the Pal Zileri Store at The Forum Shops at Caesar's Palace. The discussions concluded with the parties entering into that certain Asset Purchase Agreement, dated September 10, 2013 and Italnord taking over operations of the Pal Zileri Store with the full support, guidance and consent of Forall. Italnord effectively took over the Pal Zileri Store assets, obligations, and operations on or about September 10, 2013. Forall was integrally involved in the transfer of the Pal Zileri Store operations to Italnord. A copy of the Asset Purchase Agreement, dated September 10, 2013 is attached hereto as **Exhibit E.**

9.     Due to the fact that Italnord did not have credit with the Landlord of The Forum Shops, and in order to maintain the Forum Lease in effect for the Pal Zieri Store, the parties entered into an agreement styled "Management Agreement", whereby Italnord would occupy the leased premises as a manager of the Pal Zileri Store and the Forum Lease would be maintained as an obligation of Sarah LLC but with all rent due under the Forum Lease being paid for by Italnord to The Forum Shops Landlord as and when due under the Forum Lease. The Management Agreement style of maintaining the Forum Lease, which would otherwise not be assigned or sublet by Sarah LLC to Italnord, was proposed and encouraged by Forall. A copy of the Management Agreement, dated September 10, 2013 is attached hereto as **Exhibit F.**

10.     Itlanord operated the Pal Zileri Store at The Forum Shops from September 2013 to and until on or about February 2015, at which time Forall took over and assumed full operations of the Pal Zileri Store. In order to continue with the Forum Lease, and maintain the location of the Pal Zileri Store at The Forum Shops, Forall requested that Sarah LLC provide a further Management Agreement in the style Forall previously requested for Italnord. On or

about February 9, 2015, Forall and Sarah LLC entered into that certain Management Agreement, a copy of which is attached hereto as **Exhibit G.**  Under the Management Agreement, Forall assumed full responsibility for the Pal Zileri Store business and the Forum Lease.

11.     From March 2015 through August 2016, Forall itself operated the Pal Zileri Store. During this period of Forall's operations, Forall was chronically late in making rent payments as and when due to the Landlord of The Forum Shops.

12.     On information and belief, Forall's operational performance with the Pal Zileri Store from March 2015 to August 2016 was poor at best, and led to chronic losses that had likewise been experienced by Sarah LLC during its operations from September 2011 to September 2013.

13.     On or about August 2016, and despite having assumed full responsibility for the Pal Zileri Store business and the Forum Lease, Forall had defaulted in its payment of monthly rent to the Landlord.  In consequence of Forall's default and failure to pay monthly rents under the Forum Lease, the Landlord commenced eviction action and terminated the Forum Lease for the Pal Zileri Store then operated and occupied by Forall.

14.     In excess of one year after Forall had effectively lost the Forum Lease at The Forum Shops, due to its failure to pay monthly rents due the Landlord, thereby causing the Landlord to terminate the Lease by eviction action, Forall, by its attorney, sent a letter dated November 3, 2017 to Sarah LLC's counsel demanding payment of $4,500,000 for "minimum product purchases" under the License Agreement dated March ___, 2011, and further asserted certain individual liability under the Guaranty (**Exhibit D** hereto).  The letter dated November 3, 2017 from Forall's counsel is attached hereto as **Exhibit H** ("2017 Letter").  The 2017 Letter demands payment for "minimum product purchases", despite the fact that the Pal Zileri Store

61515367.3

had been sold by Sarah LLC to Italnord in September 2013 in a deal brokered and encouraged by Forall. Furthermore, following Italnord's purchase of the Pal Zileri Store, Forall itself took over operations of the business on or about February 2015 and carried on the business through August 2016 until Forall itself defaulted under the Forum Lease at The Forum Shops, thereby resulting in its eviction and termination of the Forum Lease.

### Claims

A.     Declaratory Judgment and Finding of Release and Waiver of Guaranty – Italnord Transfer. By the conduct and actions of Forall, including without limitation, in brokering and encouraging the sale of the Paul Zileri Store to Italnord in September 2013, the Guaranty was released and waived as a continuing liability or obligation of the individuals Hala Subh, Sudah Albasha, Bachar Hamad and Amar Hamad.

B.     Declaratory Judgment and Finding of Release and Waiver of License Agreement – Italnord Transfer. By the conduct and actions of Forall, including, without limitation in brokering and encouraging the sale of the Pal Zileri Store to Italnord in September 2013, the License Agreement was released and waived as continuing liability or obligation of Sarah LLC.

C.     Declaratory Judgment and Finding of Novation – Italnord Transfer. A novation occurs when one of the initial parties to a contract is substituted for a new party with the assent and approval of the other original party to the contract. Concurrent with the transfer of the Pal Zileri Store to Italnord in September 2013, as brokered and encouraged by Forall, a novation of Sarah LLC's obligations and any liability of the individuals under the Guaranty occurred, and thereafter Italnord replaced Sarah LLC as the obligor under the License Agreement with Forall.

D.     Declaratory Judgment and Finding of Release and Waiver of Guaranty – Forall Transfer. By the conduct and actions of Forall in taking over the operations of the Paul Zileri

61515367.3

Store itself and assuming responsibility for the business and the Forum Lease pursuant to the Management Agreement (**Exhibit G** hereto) in February 2015, the Guaranty was released and waived as a liability or obligation of the individuals Hala Subh, Sudah Albasha, Bachar Hamad and Amar Hamad.

E.     <u>Declaratory Judgment and Finding of Release and Waiver of License Agreement – Forall Transfer</u>.  By the conduct and actions of Forall in taking over operations of the Pal Zileri Store itself and assuming responsibility for the business and the Forum Lease pursuant to the Management Agreement (**Exhibit G** hereto) in February 2015, the License Agreement was released and waived as continuing liability or obligation of Sarah LLC.

F.     <u>Declaratory Judgment and Finding of Novation – Forall Transfer</u>.  A novation occurs when one of the initial parties to a contract is substituted for a new party with the assent and approval of the other original party to the contract.  Concurrent with the transfer of the Pal Zileri Store to Forall, on February 2015, a novation of Sarah LLC's obligations and any liability of the individuals under the Guaranty occurred, thereby extinguishing any such obligations or liabilities thereafter.

G.     <u>Breach of Contract</u>.  The License Agreement is a valid and enforceable contract supported by good and sufficient consideration, and Sarah LLC performed all applicable conditions, obligations, and covenants reasonably required of it under the License Agreement before Forall brokered the sale of the Pal Zileri Store to Italnord in September 2013, and later took over operations of the Store itself in February 2015.  Forall breached its obligations under the License Agreement by its failure to fully and timely satisfy its obligations under Article 5 of the License Agreement to provide fifty (50%) percent of the remodeling costs for construction and build out of the Pal Zileri Store.  Such breach by Forall was a material contributing factor to

7

the poor financial performance of the Pal Zileri Store and thereby caused direct and consequential damages to Sarah LLC.

H.  <u>Breach of Covenant of Good Faith and Fair Dealing</u>.  Under the laws of New York, which govern the License Agreement (see Section 17.1 of **Exhibit A**), within every contract is an implied covenant of good faith and fair dealing.  The covenant is breached when a party acts in a manner that deprives the other party of the right to receive benefits under their agreement.  Forall's actions, omissions and conduct in failing to fully and timely satisfy its obligations under the License Agreement, constituted breaches of the implied covenant of good faith and fair dealing and directly and materially contributed to the losses suffered by Sarah LLC in its operation of the Pal Zileri Store from September 2011 to September 2013.

I.  <u>Breach of Indemnity</u>.  The Management Agreement dated February 9, 2015 (**Exhibit G** hereto) between Forall and Sarah LLC was required by Forall to allow it to occupy and operate the Pal Zileri Store due to the fact that the Lease could not be assigned or sublet to Forall at that time.  The Management Agreement provided, in pertinent part, as follows:

> "Section 1.1.  Company appoints Manager, and Manager accepts the appointment, on the terms and conditions hereinafter provided as the exclusive managing agent for Company and the Business. Forall or its affiliate and/or subsidiary shall be the Manager and operator of the Pal Zileri store located at The Forum Shops at Caesars II, Las Vegas. Forall shall assume exclusive management and control of the Business and Premises, effective no later than March 15, 2015, for the term set forth in this Agreement. Forall will assume responsibility the operations of the Business and Lease."

> "Section 7.2   Forall shall indemnify and hold Sarah harmless for any losses, claims and/or liability caused by or arising in connection with Forall's operation of the Business during the term of Management Agreement, except to the extent that any losses, claims and/or liability is caused by Sarah's own conduct."

On or about August 2015 Forall failed to timely pay monthly rents due to the Landlord of The Forum Shops at Caesar's Palace, and in direct consequence of such failure by Forall, the

8

Landlord commenced and prosecuted an eviction action against Sarah LLC and Forall, and effectively terminated the Forum Lease.  Forall has breached its obligations to indemnify and hold harmless Sarah LLC from all losses, claims or liability caused by or arising in connection with Forall's operation of the Pal Zileri Store, including without limitation, Forall's failure to fully and timely pay all rents due under the Forum Lease, which directly resulted in loss of the Forum Lease and the Pal Zaleri Store business in or about August 2015.

61515367.3

## SCHEDULE OF EXHIBITS

| Exhibit | Document |
|---------|----------|
| A | License and Retail Operator Agreement, dated March __, 2011 |
| B | Lease with Forum Shops LLC, dated May 18, 2011 |
| C | Collateral Assignment of Lease, Dated March __, 2011 |
| D | Guaranty, dated March __, 2011 |
| E | Asset Purchase Agreement [with Italnord], dated September 10, 2013 |
| F | Management Agreement [with Italnord], dated September 10, 2013 |
| G | Management Agreement [with Forall], dated February 9, 2015 |
| H | Letter dated November 3, 2017 [Forall's counsel to Sarah LLC's counsel] |

A

# License and Retail Operator Agreement

## Between

## FORALL U.S.A, INC.
## AND
## SARAH, LLC

Prepared by: James J. Veneruso, Esq.
Dated: March_____, 2011

## TABLE OF CONTENTS

| | |
|---|---|
| ARTICLE 1 | Definitions |
| ARTICLE 2 | Grant and Acceptance of the Right, License and Privilege and Term |
| ARTICLE 3 | Marks |
| ARTICLE 4 | Ordering apparel, licensed Products and Discounts |
| ARTICLE 5 | Remodeling Costs of New Store |
| ARTICLE 6 | Marketing and Sales Methods |
| ARTICLE 7 | Personnel Standards and Training |
| ARTICLE 8 | Advertising and Promotion |
| ARTICLE 9 | Insurance and Records |
| ARTICLE 10 | Additional Duties and Covenants of Operator |
| ARTICLE 11 | Default and Termination |
| ARTICLE 12 | Transferability of Interests |
| ARTICLE 13 | Independent Contractor |
| ARTICLE 14 | Option Regarding the Cities of New York and Chicago |
| ARTICLE 15 | Right of First Refusal Areas other than Cities of New York and Chicago |
| ARTICLE 16 | Forall's Right to Operate Stores |
| ARTICLE 17 | General Provisions |
| ARTICLE 18 | Caveat |

## LICENSE AND RETAIL OPERATOR AGREEMENT
### BETWEEN
### FORALL U.S.A., INC.
### AND
### SARAH, LLC

This Franchise Agreement (the "Agreement") is made as of the ___ day of March 2011, by and between Forall U.S.A., Inc., a New York corporation ("Forall"), with its principal office located  Seven Sutton Place, Brewster, New York 10509, and Sarah, LLC, a Limited Liability Company formed in the State of Illinois, (herein "Operator") with a principal office located at 1717 Midwest Club Parkway, Oakbrook, IL. 60523.

## W I T N E S S E T H:

1.  Forall has developed a distinctive system (the "System") for the establishment and operation of a retail operation for the sale and presentation of "Pal Zileri" brand clothing and other licensed products (as defined herein, the "Licensed Products") consistent with the uniform worldwide image of its tradename by using distinctive facilities, décor, operating procedures, merchandising strategies and advertising programs;

2.  Pursuant to a license from Forall Confezioni S.P.A. ("Parent"), Forall has the sole right to use and to grant others the right to use the trademarks PAL ZILERI (represented by the PAL ZILERI, PAL ZILERI CONCEPT, PAL ZILERI SARTORIALE, PAL ZILERI CERIMONIA collections) and LAB.Pal Zileri (collectively, the "Marks") in connection with retail operations in the United States and to develop, use and control the Marks for the benefit and use of itself and its licensees and to represent the System's high standards of quality and service;

3.  Operator acknowledges the distinctiveness and value of the System, and Licensed Products and the Marks and desires to obtain the right, license and privilege and Forall to employ the System to establish and operate a retail operation at The Forum Shops at Caesars Palace, _____ , 3500 Las Vegas Blvd. South, Las Vegas, NV 89109 (the "Store"), to use the Marks at the Store, and to purchase the Licensed Products from the authorized licensees of Parent specified herein, all under the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Forall Operator hereby agree as follows:

# ARTICLE 1. DEFINITIONS

1.1     The term "Apparel" shall mean clothing and accessories produced by Parent and affixed with a label bearing one or more of the Marks.

1.2     The term "Licensed Products" shall mean Apparel, and any other clothing and accessories and any other products produced by or for an authorized licensee of Parent as designated by Forall to the Operator and affixed with one or more of the Marks.

1.3     The term "Member"" refers individually to Hala Subh and Suhad Albasha who each own a fifty (50%) interest in Operator.

1.4     "Territory" shall mean within the City of Las Vegas, Nevada,or any other geographic area which pursuant to Article 14 herein. Multi-brand dept. store and specialty store are excluded.

1.5     Guarantors refers collectively to Hala Subh, Suhad Albasha, Dr. Bashar Damad and Ammar Hammad.

# ARTICLE 2.  GRANT AND ACCEPTANCE OF THE RIGHT, LICENSE
## AND PRIVILEGE AND TERM

2.1     Forall hereby grants to Operator, during the term of this Agreement, the exclusive right, license and privilege to employ the System, to establish and obtain Apparel and other Licensed Products for display and sale at the Store within the Territory, all in accordance with this Agreement.

2.2     The right, license and privilege granted in Section 2.1 excludes any right, license or privilege to sell Licensed Products for resale, to sell in the Store any clothing, accessories or other products other than the Licensed Products, without the prior written approval of Parent or to use the Marks in association with any logos, trade names, trademarks or service marks other than the Marks, to use the Marks in association with any other than Licensed Products or any services other than sales services of the Licensed Products in the Store.

2.3     Operator accepts the right, license and privilege set forth in Section 2.1 and agrees to adhere to the exclusions set forth in Section 2.2.  Operator undertakes the obligation to operate the Store in conformity with the System and in accordance with this Agreement for the duration of the term of this Agreement.

2.4     The rights granted by Forall to Operator pursuant to this Agreement are not transferable by Operator, in whole or in part, to any site other than the Store or to any person, firm or entity other than Operator.  Operator is not entitled to grant any sublicenses, assignments or partial assignments pursuant to this Agreement.

2.5.    As further consideration and security for the rights granted hereunder, Operator agrees as follows:

A. For the First season A/W 2011-2012 Operator shall pay to Forall, at execution of this Agreement, $398,238.00, by bank check or wire transfer, representing the total discounted cost of Licensed Products ordered for the Store.

B. For the Second Season, Spring/Summer 2012 and in no event later than August 30, 2011 Operator shall pay to Forall a security deposit in the amount of $200,000.00.  The security deposit shall be held in escrow in an interest bearing account for the term of this Agreement.   In the event Operator defaults in the payment of any order for the Store, Forall in its sole and absolute discretion shall have the right to use the security deposit to pay the amounts past due.

C.  For orders placed from August 2011 and thereafter, Operator shall either (i). pay for the order in advance ; or (ii). Open a 90 day Letter of Credit.

D. If Operator chooses to provide a letter of credit in accordance with Section C above, Forall does not have to accept any orders if at any time inventory purchases for the Store exceeds, or in the reasonable estimation of Forall will exceed, the letter of credit amount and Forall shall promptly notify Operator should this occur. Forall  shall not be obligated to accept additional orders or ship orders already received unless and until Operator increases the amount of the letter of credit to an amount sufficient to collateralize inventory purchases.  Forall shall have no liability whatsoever to Operator or any third party due to or arising out of Foralls refusal to accept additional orders or ship orders already received in the event that the letter of credit does not comply with the terms herein.

2.6   The parties acknowledge that Operator has not paid any fee to Forall directly or indirectly in order to obtain the license or other rights granted herein.  Operator is obligated to pay for the licensed Products it purchases from Forall.

2.7   The term of this Agreement is ten (10) years from the date of this Agreement, unless sooner terminated in accordance with this Agreement.

## ARTICLE 3. MARKS

3.1   Operator shall affix the Marks inside and outside the Store in accordance with the specifications approved by Forall.

3.2   Operator expressly acknowledges and agrees that the Marks and the goodwill attached thereto are valuable property owned solely by Forall its licensor and all past, present and future goodwill associated with the Marks,  including any directly or exclusively to the benefit of Forall and its licensor.  Operator expressly covenants the Operator shall not at any time directly or indirectly contest or aid in contesting the validity of the Marks or Forall's and its licensor's ownership of the Marks.

3.3     Operator shall not use or allow others to use any of the Marks as part of the corporate name or other business name of Operator or any entity owned or controlled by it. Operator understands and agrees that its License to use the Marks is non-exclusive and Forall has the right to use the Marks and to grant other licensees the right to use the Marks on any terms and conditions other than grants expressly excluded by this Agreement.

3.4     In the event any person, or entity uses without authority or otherwise infringes the Marks or any apparent challenger to Operators use of any Mark, Forall shall control all litigation, and shall determine, in its sole discretion, whether or not any other action should be taken. Operator agrees to notify promptly Forall of any such use or infringement of which it becomes aware or of any litigation involving the Marks instituted by any person, firm, corporation or governmental agency against Operator or of which Operator has knowledge. If Forall, in its sole discretion, undertakes the defense or prosecution of any litigation or administrative proceeding involving or affecting the Marks, Operator agrees to do such acts and things as may, in the opinion of counsel for Forall, be necessary to carry out such defense or prosecution, whether in the name of Forall, its licensor or Operator, as Forall or its licensor shall elect.

3.5     Forall agrees to indemnify and defend Sarah for all damages for which Sarah is held liable or any claim or proceeding referred to in Section 3.4 hereof provided Sarah's use of the Marks was authorized pursuant to and in compliance with this Agreement and for all costs reasonably incurred by Sarah in the defense of any such claim brought against Sarah or any such proceeding in which Sarah is named as a party, provided that Operator has timely notified Forall of such claim or proceeding, have given Forall sole control of the defense (including selection of attorneys to represent Sarah) and settlement of any such proceeding, and have otherwise complied with this Agreement.

3.6     In order to maintain uniformity, to preserve the integrity of the Marks and to enhance the reputation and goodwill associated with the Marks, Operator agrees:

3.6.1   To use the Marks only at the Store or in advertising and promotional material employed in connection with the sale of Licensed Products and operation of the Store; and

3.6.2   To operate the store in accordance with the System and as may be otherwise mutually agreed in writing between Forall and Operator. Forall reserves the right to promulgate such additional reasonable standards and obligations concerning the use of the Marks or the products and services offered thereunder as Forall may, deem necessary to preserve and protect the use, goodwill and integrity of the Marks.

3.7     Forall its agents shall at all reasonable times have the right to enter and inspect the Store and observe the manner in which Operator is selling Apparel and rendering services.

## ARTICLE 4.  ORDERING APPAREL, LICENSED PRODUCTS AND DISCOUNTS

4.1    Subject to the terms of this Agreement, Operator shall purchase all Apparel from Forall pursuant to such terms and conditions as Forall may establish.

4.2    Operator shall place a minimum order of Four Hundred Thousand ($400,000.00) Dollars for Spring/Summer and Five Hundred Thousand ($500,000.00) Dollars for Fall/Winter for a total of Nine Hundred Thousand ($900,000.00) Dollars per calendar year.

4.3    Orders must be placed in Italy at Pal Zileris' Quinto Vicentino's show room.

4.4    Operator hereby undertakes to maintain at all times an adequate stock of Apparel within the limits of sound business management.  Within these limits, Operator shall have in stock all the categories of Apparel offered by Forall, including current collection of Apparel

4.5    Foralls pricing for Products purchased by Operator shall be based on a Pricing Schedule which is uniform worldwide.

4.6    Forall hereby grants: a twenty (20%) percent discount for the first year (first and second season) and a ten (10%) percent discount for the second year (third and fourth season).  This discount applies to any new store open during the term of this agreement.

## ARTICLE 5.  REMODELING COSTS OF NEW STORE

5.1    <u>In addition to the discounts specified in Article 4.</u> Section 6 of this Agreement, Forall agrees to provide fifty (50%) percent of the remodeling costs for Operator's store opened during the term of this Agreement subject to the following terms and conditions:

      a.    The location of the store is to be mutually agreed upon by Forall and Operator.

      b.    The budget for the renovations shall be mutually agreed upon by Forall and the Operator.

      c.    Forall's contribution for remodeling costs shall be accomplished by providing a twenty (20%) percent discount on all orders until such discounts equal fifty (50%) percent of the costs of remodeling.

      d.    Operator shall be solely responsible for paying all of the costs of remodeling.  By way of example, if:

            i.    Total Renovation Cost of $800,000'

            ii.    Operator's total orders for the first two (2) years equals $2,000,000.

            iii.    20% of $2,000,000 = $400,000.

e. The twenty (20%) percent discount shall end upon reaching the fifty (50%) percent "renovation cost" obligation.

f. Design of internal/external lay-out shall be obtained by the Parent, at its expense.

g. All contracts for the renovations shall require the prior written approval of Forall.

h. Upon request any and all records relating to the renovation shall be provided to Forall.

## ARTICLE 6.  MARKETING AND SALES METHODS

6.1   From time to time Forall will consult with Operator and provide suggestions regarding various marketing methods.

6.2   Operator shall not permit at, in or on the Store any advertising or merchandising of products other than Licensed Products, or services other than sales services of Licensed Products without the prior approval of an authorized officer of Forall.

6.3   Operator shall meet Forall's requirements regarding merchandising and image. Window displays shall conform to Forall's requirements.  It is Forall's intention that the Store be maintained to the highest standards.

6.4   Sales may take place seasonally a/w, s/s twice a year. Sale Dates to be approved by Forall.

6.5   Store mark ups shall be between 2.3 to 3.0.  Any deviation requires Forall's prior written consent.

6.6   Operator shall not employ any manager not approved in advance by Forall.

6.7   Operator may sell unsold merchandise at the end of each season through an outlet store within the territory.

## ARTICLE 7.  PERSONNEL STANDARDS AND TRAINING

7.1   Operator shall be responsible for ensuring that sufficient trained staff are available at all times to provide service to commensurate with a discerning clientele.   During business hours, the shirts, trousers, jackets, suits, ties and other visible apparel of the staff shall consist exclusively of Forall Apparel.  The staff's clothing, appearance and advice shall always accord with the Forall image. Forall at its sole cost and expense will provide the following apparel to Operator which apparel shall be worn by Operator's employees during business hours: one (1) suit, one(1) shirt, one (1) tie (once a season) while one (1) pair of shoes (once a year).  Forall shall provide the foregoing for up to nine (9) employees per year. Operator shall be responsible for apparel and shoe costs incurred for more than nine (9) employees in any given year.

7.2     Operator and Principal shall devote full time and effort to the supervision, management and operation of the Store; provided, however, that if Operator or Principal is involved with any other Forall retail operation pursuant to a separate Franchise Agreement, such party shall devote its time between this Store and other retail operations in such a manner to ensure that all such retail operations, including the Store, are operated in compliance with their respective Agreements, including this Agreement, and in a profitable manner.   Operator shall hire competent persons as employees and shall cause all of its employees to complete such training programs as Forall may from time to time reasonably require in order that Operator's employees may be fully trained and instructed on a continuing basis in the various aspects of the System.  The manager of the Store must be approved by Forall prior to being hired, which shall not be unreasonable withheld.

## ARTICLE 8.  ADVERTISING AND PROMOTION

8.1     Forall shall furnish Operator with approved illustrations, photographs, layout and copy for use in such advertising.  Operator shall obtain Forall's specific prior written approval before displaying, placing or otherwise using any advertisement or material bearing the Marks or advertising or promoting the Licensed Products or the Store;

    8.1.1   Advertising material used in the Store's premises and windows shall be current approved material.  All Licensed Product advertisements must comply with the approved Forall worldwide advertising concept.   In particular, the latest approved layout must be employed; any modification of the approved layout must be approved in writing by Forall; and

    8.1.2   Operator is not permitted to advertise both Apparel and other Licensed Products in the same advertisement without Forall's prior written approval. Illustrations and photographs furnished by Forall may be employed in advertisements only in conjunction with the Marks.  In no event shall Operator use the illustrations, photographs, designs or any other materials provided by Forall in connection with the promotion or advertisement of any goods or services other than a Licensed Product or the Store.

8.3 In no event may Operator display, publish or distribute advertising or promotional materials that are not approved by Forall.

8.4 Advertising: During the first (1st ) year of this Agreement Operator agrees to spend Twenty- Seven Thousand ($27,000.00) Dollars (3% of $900,000.00) for advertising and promotion.  Forall, will also match up to Twenty-Seven Thousand ($27,000.00) for advertising and promotion for the Store.  Thereafter, Operator agrees to spend three (3%) percent of Gross Purchases per season for advertising and promotion and Forall shall match such amount.  If for any reason the total amount of purchases in any year falls below $900,000.00 per year, in addition to all other rights under this agreement, Forall shall have the absolute right to either not contribute to advertising and promotion costs or to partially contribute to such costs.

## ARTICLE 9.  INSURANCE AND RECORDS

9.1 During the term hereof, Operator shall obtain and maintain insurance coverage with insurance carriers acceptable to Forall.  The coverage shall commence when the site for the Store is secured by Operator, shall comply with the requirements of Operator's lease, if any, for the Store and shall include coverage for public liability, including products liability, in the amount of at least Five Million and 00/100 ($5,000,000.00) Dollars and of at least One Million and 00/100 ($1,000,000) Dollars for the contents of the Store.  Operator also shall carry fire and extended coverage insurance with endorsements of vandalism and malicious mischief, covering the building, structures, improvements and the contents thereof in and at the Store, on a full replacement cost basis, insuring against all risks of direct physical loss except for such unusual perils as nuclear attack, earth movement and war, and business interruption insurance for actual losses sustained covering the rental of the facility, previous profit margins, maintenance of competent personnel and other fixed expenses.  Operator also shall carry such workers' compensation insurance and such other insurance as may be required by applicable law.  In connection with any construction, refurbishment or remodeling of the Store, Operator shall maintain builders' insurance and performance and completion bonds in forms and amounts, and written by a carrier or carriers, acceptable to Forall.

9.2 Forall shall be named as additional insured on all of the insurance policies described in Section 9.1 above to the extent of each of their interests and shall be provided with certificates of insurance evidencing such coverage.  All public liability and property damage policies shall contain a provision that each of Forall , although named as an insured, shall nevertheless be entitled to recover under such policies on any loss occasioned to it, its affiliates, agents and employees by reason of the negligence of Operator, its principals, contractors, agents and employees.  All policies shall provide Forall   with at least thirty (30) days' notice of cancellation or termination of coverage.  Forall reserves the right to specify reasonable changes in the types and amounts of insurance coverage required by Section 9.1 above and this Section 9.2.  Should Operator fail or refuse to procure the required insurance coverage form an insurance carrier acceptable to Forall or the maintain it throughout the term of this Agreement, including any renewal term, Forall may, at its sole discretion, obtain such coverage for Operator, in which event Operator agrees to pay the required premiums or to reimburse Forall therefor immediately.  Failure to maintain the insurance coverage required herein or to promptly reimburse Forall for any premiums paid by Forall on Operator's behalf shall constitute a breach of this Agreement.

9.5 To enable Operator and Forall to best ascertain Operator's costs and to maintain an economical method of operation, Operator agrees to keep and preserve, for at least six (6) years from the date of their preparation, full, complete and accurate

books and accounts in accordance with generally accepted accounting principles and in the form and manner as may be prescribed by Forall.

9.6     Operator shall submit an unaudited income statement to Forall within forty-five (45) days following each calendar quarter during the term, which shall set forth quarterly cash flow, total gross receipts and itemized expenses. Additionally, Operator shall, at its expense, submit to Forall within ninety (90) days of the end of each calendar year during the term of this Agreement, a full set of Financial statements for such calendar year including a balance sheet as of the last date of such year, an income statement and a statement of case flow which have been audited by a certified public accountant acceptable to Forall certified as true by Operator.

9.7     Operator shall submit to Forall monthly sales reports and such other periodic reports, copies of purchase orders, forms, information and records as may be requested from time to time by Forall.

9.8     Operator shall keep true, complete and correct records of each transaction of any activity affecting sales, revenues or purchase, including advertising. Forall's representatives shall have the right to inspect and copy at all reasonable times and with reasonable notice, Operator's books, records, inventory and cash control devices or systems. Further, within sixty (60) days of Forall's written request, Operator shall, at Operator's expense, supply Forall with a full, certified audit of Operator's affairs made by an independent certified public accountant acceptable to Forall in accordance with generally accepted accounting principles. Failure to follow any accounting procedure required herein shall constitute a breach of this Agreement.

9.9     Operator acknowledges that nothing contained herein constitutes an agreement of Forall, Parent, any other purveyor of licensed Products or any other party to extend credit to or otherwise finance Operator. Further, Operator acknowledges that its failure to pay all amounts when due shall constitute grounds for termination of this Agreement, as provided in Section 12.2 hereof.

9.10    Operator shall permit Forall, at Forall's expense, to install and operate on-line communications equipment in the Store which is compatible with Operator's point-of-sale equipment in order to permit Forall to monitor and track sales and purchases of Apparel on a daily basis.

## ARTICLE 10.  ADDITIONAL DUTIES AND COVENANTS OF OPERATOR

10.1    Operator shall not at any time, without Forall's prior written consent, copy, duplicate, record or otherwise reproduce Information which Forall has designated as Confidential Information, in whole or in part, nor otherwise make the same available to any unauthorized person. The parties agree that Forall's pricing methods, mark down and margin policies all constitute Confidential Information.

10.2    Operator acknowledges and agrees that Operator acquires no interest in Confidential Information other than the right to utilize it in the development and operation of the Store during the term, and the use or duplication of Confidential Information by any unauthorized person or firm or in any other business would

constitute an unfair method of completion and a violation of this Agreement. Operator acknowledges and agrees that Confidential Information is a trade secret of Forall that Operator, including Principal and all of Operator's employees, directors, officers, agents and shareholders:

10.2.1 Shall not use Confidential Information in any other business or capacity;

10.2.2 Shall at all times maintain the absolute confidentiality of Confidential Information;

10.2.3 Shall adopt and implement all reasonable procedures prescribed from time to time by Forall to prevent unauthorized use or disclosure of Confidential Information, including restrictions on disclosure thereof to employees of the business and the requirement of written nondisclosure and non-competition agreements with Operator's officers, directors, shareholders, agents and employees who may have access to Confidential Information.

10.3    Operator acknowledges that the Marks are associated with high quality, prestige products and that marketing any of the Licensed Products in the Store at prices substantially below prices Operator normally charges for the licensed Products could substantially diminish the value and prestige of the Marks.   Operator therefore agrees not to hold a clearance sale, going-out-of-business sale, store-wide reduction sale, liquidation sale or other sale outside the ordinary course of business without obtaining the prior written approval of Forall.

## ARTICLE 11  DEFAULT AND TERMINATION

11.1    Forall may, in its sole discretion, elect to either (I) terminate this Agreement or (ii) manage the operation of this Store for the account of Forall pursuant to the provisions of this Agreement, effective immediately upon delivery of notice of termination to Operator, in either case (a) if Forall notifies Operator of an event of default and Operator fails to cure any such default susceptible to being cured within thirty (30) days after written notice of default is delivered to Operator or (b) if Forall notifies Operator of an event of default and such default is not susceptible to being cured.  An event of default shall be deemed to occur if Operator or an officer, director, shareholder or employee of Operator or Principal:

11.1.1 Fails to develop and equip the Store as provided herein;

11.1.2 Has made any material misrepresentation or omission in applying for the business governed by this Agreement or in any budget and business plan previously provided to Forall by Operator;

11.1.3 Is convicted of or pleads no contest to a felony or other crime or offense that is likely to adversely affect the reputation of Forall, the Apparel, the System, the Marks or the Store;

11.1.4 Makes any unauthorized use, copy or disclosure of the Confidential Information;

11.1.5 Abandons or fails to operate, or refuses actively to operate, the Store for 15 business days in any twelve-month period, unless the Store has been closed for a purpose approved by Forall, or fails to relocate the Store to a premise approved by Forall within thirty (30) days following expiration or termination of the lease for the premises of the Store;

11.1.6 Becomes insolvent, is or will be unable to pay its obligations as they mature by reason of its inability to pay its debts as they mature or makes an assignment for the benefit of creditors or an admission of its inability to pay its obligations as they become due;

11.1.7 Fails to retain Principal as chief executive officer of Operator or Principal does not hold a majority interest in Operator;

11.1.8 Fails on three or more separate occasions within any twelve month period to submit when due reports or other information or supporting records;

11.1.9 Fails or refuses to make payments of any amounts due Forall or its licensees or affiliates for purchases from Forall's or its affiliates or any other amounts due to Forall or its affiliates, and Operator does not correct such failure or refusal within five (5) days after written notice of such failure is delivered to Operator;

11.1.10 Fails or refuses to comply with any provision of this Agreement, or a Specification. ; or

11.2   Operator agrees to pay to Forall or its licensee or affiliate within ten (10) days after the effective date of termination or expiration of this Agreement for any reason, or such later date that the amounts due are determined, such amounts owed for purchases of Licensed Products from Forall's licensee or affiliate, interest due on the foregoing and all other amounts owed to Forall  its licensees and affiliates which are then unpaid.

11.3   Operator agrees that after the termination or expiration of this Agreement for any reason, Operator and its officers, directors, shareholders, and Principal shall:

11.3.1 Not directly or indirectly at any time or in any manner advertise, promote or represent in similar fashion Operator or any business or it as a current or former Forall retail operation, business or franchise, or as a franchisee, licensee or dealer of or as otherwise associated with Forall, or use Marks, any colorable imitation thereof or other indicia of a Forall retail operation, in any manner or for any purpose (except as is necessary to comply with law or to identify simply or concisely on occupational history), or utilize for any purpose any logo, trade name, trademark, service mark or other commercial symbol that is confusingly similar to a Mark or suggests or

indicates a connection or association with Parent, Forall, its distributees or licensees;

11.3.2 Cease to use and promptly return to Forall all catalogs, advertising materials, forms, invoices and other materials containing any Marks or otherwise identifying or relating to Forall retail operation (including all Confidential Information, but excluding signs and sign faces which Operator shall retain, but not use, or destroy) and allow Forall, without liability, to remove all such items from the Store; and

11.3.3 Promptly take such action as may be required to cancel all fictitious or assumed name or equivalent registrations relating to its use of any Marks.

11.3.4 Continue to comply with the provisions of Article 10 of this Agreement regarding the non-disclosure of Confidential Information.

11.4 This Agreement and the obligations of the parties hereunder shall survive termination or expiration of the Agreement except to the extent expressly otherwise provided herein.

11.5 In the event of the death or incapacity of a Guarantor or any Member owning fifty (50%) percent or more of the capital stock of Operator, the heirs, beneficiaries, devisees or legal representatives of said Guarantor or Member shall, within one hundred twenty (120) days of such event:

11.5.1 Apply to Forall for the right to Operator to continue to operate the Store for the duration of the term of this Agreement and any renewals hereof, which right shall be granted in Forall's sole discretion; or

11.5.2 Sell, assign, transfer, or convey Operator's interest in compliance with the provisions of Article 11 hereto; provided, however, in the event a proper and timely application for the right to continue to operate has been made and rejected, the one hundred twenty (120) day period to sell, assign, transfer or convey shall be computed from the date of said rejection.

11.6 In the event of the death or incapacity of a Guarantor or any Member owning fifty (50%) percent or more of the capital stock of Operator where the provisions of Article 11.5 hereto have been fulfilled within the time provided, all rights licensed to Operator under this Agreement shall, at the option of Forall, terminate forthwith and automatically revert to Forall  Forall shall make payment to Operator or such Members of the fair market value of Operator's remaining rights under this Agreement upon the determination, by mutual agreement, as to the fair market value of such interest.  If the parties cannot agree on the fair market value within forty-five (45) days after such election, an independent appraiser shall be designated by Forall  the appraiser's determination shall be conclusive and binding on both parties.  The appraisal shall exclude any value for goodwill.

11.7 In order to prevent any interruption of the business which would cause harm and impair the value thereof, Operator authorizes Forall, in the event Principal is

absent, incapacitated or departs from the business of the Operator by reason of illness, death or otherwise and Operator is not, therefore, in the sole reasonable judgment of Forall, able to operate the business hereunder, to operate said business for so long as Forall reasonably deems necessary and practical, and without waiver of any other rights or remedies Forall may have under this Agreement or otherwise.  All monies from the operation of the business during such period of operation by Forall shall be kept in a separate account and the expenses of the business, including reasonable compensation and expenses for Forall's representative, shall be charged to said account.  If, as herein provided, Forall temporarily operates for Operator the business licensed herein, Operator agrees to indemnify and hold harmless Forall  any representatives or Forall who may act hereunder, from any and all claims arising from the acts and omissions of Forall  its representatives, excepting the willfully unlawful or grossly negligent acts or omissions of Forall or such representative.  Forall is not required or obliged pursuant to this Section11.7 to operate the business in the event of the absence, disability, death or departure of Principal, and shall do so only in Forall's sole discretion.

11.8    If this Agreement is terminated, Forall has the right, but not the obligation, to buy from Operator and Operator shall have the obligation to sell all or part of the merchandise in stock at the time of termination at eighty (80%) percent of the wholesale price paid for current season merchandise, seventy (70%) percent for merchandise from the season before and forty (40%) percent for merchandise from two (2) seasons before or older.  Foralls cost for such merchandise shall be offset by any funds owed by Operator to Forall.

11.9    Upon the occurrence of an event of default as described in Sections 11.1.2, 11.1.4, 11.1.5, 11.1.6, 11.1.7 or 11.1.10 of this Agreement, Forall may elect to manage the operation of the Store for the account of Forall.

       11.9.1 If Forall so elects, the Agreement shall be deemed to be terminated and Forall shall immediately commence management of the operation of the Store for the account of Forall.  Following the date of such election, Forall shall be obligated to  acquire the merchandise in stock at the time of the election at the prices set forth in Section 11.8 of this Agreement.

       11.9.2 All revenues generated by Store shall be for the benefit of Forall from the date of such election.  Forall shall be responsible for the payment of all operating expenses incurred from the date of such election, but Operator shall remain liable for, and shall indemnify and hold harmless Forall from any claims related to or arising from, any expenses or obligations incurred prior to the date of such election or following the date upon which Forall ceases to manage the operation of the Store for the account of Forall.

11.9.3 Operator agrees to cooperate fully with Forall to facilitate the transfer of management of the Store in the event of such election including, without limitation, transfer of utilities, notification to employees and assignment of all materials contracts and leases. Operator agrees to require its landlord to include in its lease for the Store a provision pursuant to which the landlord agrees to permit Operator, in the event of such an election, to grant Forall a license to lease the Store at the rental rate set forth in the lease for the period of time that Forall is managing the operation of the Store for the account of Forall.

11.9.4 If Forall elects to operate the Store in accordance with this Article 11, the lease for the Store shall be immediately assigned to Forall without any further action required by either party. Operator agrees, that in the event required, it will fully cooperate, and within two (2) business days execute the Assignment of Lease.
The parties acknowledge Landlord has granted consent to such assignment pursuant to Section 13.1 of Operator's lease with The Forum Shops, LLC.

## ARTICLE 12  TRANSFERABILITY OF INTERESTS

12.1    This Agreement and all rights hereunder may be assigned and transferred by Forall , if so, shall be binding upon and inure to the benefit of Forall's successors and assigns.

12.2    Operator's interest in this Agreement or in the business conducted hereunder shall not be pledged, transferred or assigned to or assumed by any other person, firm or entity (the "assignee" or "transferee"), in whole or in part, by sale, lease, management agreement, gift or otherwise, including involuntarily or by operation of law, or at the election of a receiver or trustee in bankruptcy, without the prior written consent of Forall.

12.3    Any change in the Control of Sarah shall be deemed a transfer for the purposes Of this Agreement. Any purported assignment or transfer of members not having prior written Consent of Forall shall be null and void and shall constitute a material breach of this Agreement for which Forall may immediately terminate this Agreement without notice. For the purposes of this Agreement the term change in the Control of Operator shall mean any event or occurance resulting in less than 100% of the membership interest of Operator owners by someone or some entity other than Hala Subh, Suhad Albasha, Dr. Bachar Hamad and Ammar Hammad.

## ARTICLE 13.  INDEPENDENT CONTRACTOR

13.1    Operator shall neither have nor exercise any authority , express, implied or apparent, to act on behalf of or as an agent of Forall or any of its affiliates or subsidiaries for any purpose, and shall take no action which might tend to create an apparent employer-employee or agency relationship between Forall Operator. No fiduciary relationship exists between Forall  Operator.  Operator is,

and shall remain, an independent contractor responsible for all obligations and liabilities of, and for all loss or damage to, the Store and its business and for all claims and demands based on damages or destruction of property or based on an injury, illness or death of any person or persons, directly or indirectly arising from or in connection with the operation of the Store or to manage the business of the Store or to hire, fire, or discipline persons employed by the Operator or at the Store.  Operator acknowledges that Operator is solely responsible for control, management and business of the Store, including hiring and discharging employees and setting and paying wages and benefits of employees, and that Forall shall have no responsibility, liability or power in respect to Operator's pricing, hiring (except as otherwise provided herein), setting and paying of wages or related matters.

13.2   Under no circumstances shall Forall be liable for any act, omission, debt or any other obligation of Operator.  Operator shall indemnify and hold Forall its licensor harmless against and from all loss and damage, including the legal fees and expenses of defending against such claims, experienced by Forall or by Forall's licensor as a result of any act, omission or obligation arising directly from, or as a result of or in connection with, Operator's operation of the Store or Operator's failure to comply with this Agreement.

## ARTICLE 14.  OPTION REGARDING CITIES OF NEW YORK AND CHICAGO

14.1   Subject to terms herein and provided Operator is not in default with the terms of this Agreement, Operator shall have the exclusive option to acquire a license to operate a store in the areas noted herein, upon the same terms and conditions contained in this Agreement, except as modified by this Article.

14.2   For a two year period commencing on the earlier of date the Las Vegas store opens for business or September 1, 2011, Operator shall have the right to have the City of New York and/or City of Chicago ("New Store") included within the "Territory" as defined in section 1.4 of this Agreement to open one store in each city.  All of the terms of this Agreement shall apply to such "New Store" except as modified by this Article.

14.3   The term of this Agreement as it relates to such New Stores shall coincide with the lease term of such store but in no event shall such term be more than ten (10) years.
> For example: Operator exercised option to have New York included in the Territory on June 10, 2012.  The New York store lease commences October 1, 2012, the term of this agreement as it relates to such store would expire September 20, 2022.

14.4   The maximum amount which Forall will reimburse Operator (through discount formula contained in Article 5 of this Agreement) store buildout for a New Store shall be fifty (50%) percent of the cost.

14.5   Until Foral receives written notice of Operators exercise of option rights, Forall shall have the right to enter into a License & Retail Operator Agreement or Franchise Agreement with any other person or entity provided Forall gives fifteen (15) days prior

written notice of its intention to enter into such agreement. Operator shall then have a fifteen (15) day period in which to elect to operate a store in New York City or Chicago upon the terms and conditions stated in Foralls notice. If Operator fails to provide such written notice to Forall within such fifteen (15) day period, Forall shall have the absolute right to enter into a License & Operators Agreement or a Franchise Agreement with such third party. From the date the Las Vegas Store opens for business or September 1, 2011 whichever is earlier, Operator has the exclusive right to open a store in New York or Chicago.

**ARTICLE 15.      RIGHT OF 1ST REFUSAL IN AREAS OTHER THAN THE CITIES OF LAS VEGAS, NEW YORK OR CHICAGO**

Subject to the terms of this provision Forall shall have the right to enter into a License/Operator Agreement, or a Franchise Agreement with any other person or entitiy but shall first give written notice to operator. Operator shall then have a fifteen (15) day period from receipt of such notice in which to notify Forall that it elects to Operate a store in such city upon the terms and conditions stated in Foralls notice. If Operator fails to provide such written notice to Forall within such fifteen (15) day period, Forall shall have the absolute right to enter into a License & Retail Operators Agreement or a Franchise Agreement with such third party. This right of first refusal shall expire two (2) years from the date the Las Vegas Store opens for business.

**ARTICLE 16.  FORALL'S RIGHT TO OPERATE STORES**

Nothing contained herein shall be construed to limit Foralls absolute right to establish and directly operate stores worldwide, except the territories in which Operator has a Store in operation.

**ARTICLE 17.  GENERAL PROVISIONS**

17.1    <u>Applicable Law</u>. This Agreement was accepted in The State of New York and shall be governed by the laws thereof which laws shall prevail, except to the extent preempted by the United States Trademark Act (Lanham Act, 15 U.S.C. Section 1051 et seq.) and other federal law.

17.2    <u>Arbitration</u>. Except as otherwise specifically provided below, and excluding controversies and payments relating to the use, ownership, or infringement of the Marks, all actions, disputes, claims and controversies heretofore or hereafter arising out of or directly or indirectly relating to: (a) this Agreement and/or any renewals, extensions, changes, amendments, addenda, additions or modifications hereto, or the breach, invalidity or termination hereof;(b) any subsequent agreements entered into between the parties hereto; (c) any pervious agreement entered into between the parties hereto; (d) any relationship or business dealings between the parties hereto; and/or (e) the transaction contemplated by this Agreement or any previous or subsequent agreement between the parties hereto, shall be settled by binding arbitration, to be

conducted in Westchester County, New York, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Nothing in this Agreement shall be constructed to prevent either party's use of any prejudgment or provisional action or remedy to enforce any party's rights under this or any other agreement, or under applicable law. This institution and maintenance of an action for judicial relief of any party, including the plaintiff, to compel arbitration of any disputes subject to arbitration as provided herein. If, however, either party brings any other action for judicial relief with respect to any disputes that the parties have agreed to arbitrate under the terms of this Agreement, the party who bought such action shall be liable for and will immediately pay to the other party all of the other party's costs and expenses (including attorney's fees) incurred by the other party to stay such action and remove or defer such disputes to arbitration.

Any award, judgment or order rendered by the arbitrator(s) pursuant to the terms of this Agreement may be entered and enforced by either party in any state or federal court having competent jurisdiction. Any award, judgment or order rendered by the arbitrator(s) pursuant to such arbitration will be included in a written decision signed by the arbitrator(s) joining therein, which will specify the reasons why the award, judgment or order was based.

If either party brings legal action to vacate or modify the arbitrator's (s') award and such party does not prevail, such party will pay all costs and expenses, including attorney's fees, incurred by the other party in defending such action. Such costs and expenses will also be assessed against the petitioning party who does not prevail in any subsequent appellate action.

17.3    <u>Jurisdiction and Venue</u>. Expect as provided in Section 14.2 regarding arbitration proceedings, if a claim is asserted in legal proceeding by Operator or Forall in connection with this Agreement, Operator and Forall irrevocably agree to submit to the exclusive jurisdiction of the courts of the State of New York and the U.S. District Court for the Southern District of New York, and irrevocably agree that venue for any such action proceeding shall be exclusively in New York County, New York. Both parties waive any objection to the jurisdiction of these courts or to venue in New York City, New York. **FORALL OPERATOR ACKNOWLEDGE THAT THE RIGHT OF TRIAL BY JURY IS CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED. EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THEIR MUTUAL BENEFIT, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION REGARDING THE PERFORMANCE OR ENFORCEMENT OF, OR IN ANY WAY RELATED TO, THIS AGREEMENT.**

17.4    <u>Equitable Relief</u>. Operator acknowledges that a violation of any covenant in Article 5, 11, 12 and 13 will cause irreparable damage to Forall, the exact amount of which may no be subject to reasonable or accurate ascertainment, and therefore, notwithstanding any arbitration commenced by either party, Operator does hereby consent that, in the event such violation, Forall shall as a matter of right be entitled to injunctive relief to restrain or require specific performance of

Operator (including all its shareholders), or anyone acting for or on its behalf, to prevent or cease violation of such covenants, or any of them.  Such remedies, however, shall be cumulative and in addition to any other remedies to which Forall may be entitled.  In the event Forall prevails in  any suit to enforce any provision hereof, Forall shall be entitled to receive from Operator, in addition to any relief or remedy granted, the costs of bringing such suit, including reasonable attorney fees.  The covenants set forth in this Section 15.4 shall survive the termination, transfer, nonrenewal and expiration of this Agreement.

17.5   <u>Non-Waiver</u>.  No failure of Forall to exercise any power reserved to it hereunder, or to insist upon strict compliance by Operator with any obligation or condition hereunder, and no custom or practice of the parties at variance with the terms hereof, shall constitute a waiver of Forall's right to demand exact compliance the terms hereof. Waiver by Forall of any particular default by Operator shall not be binding unless in writing and executed by Forall  shall not affect or impair Forall's rights in respect to any subsequent default of the same or a different nature; nor shall any delay, waiver, forbearance, or omission of Forall to exercise any power or rights arising out of any breach or default by Operator's rights nor shall such a waiver by Forall of any right hereunder or of the right to declare any subsequent breach or default.  Subsequent acceptance of Forall of any payment due to it hereunder shall not be deemed to be a wavier by Forall of any proceeding breach by Operator of any terms, covenants or conditions of this Agreement.

17.6   <u>Notices</u>.  Any and all notices required or permitted under this Agreement shall be in writing and shall be sent by hand or by courier or certified or registered mail or by facsimile transmission or overnight courier to the respective parties at the following addresses unless and until a different address has been designated by written notice to the other party.  Notice shall be effective upon receipt, if sent by hand, courier or mail or upon receipt of a confirmation if sent by facsimile transmission.  Either party may change the name and address for notices by a written notification served on the other party in accordance with this Section 14.6.

|  |  |
|---|---|
| Notices to Forall: | Forall U.S.A, Inc.<br>Seven Sutton Place<br>Brewster, NY 10509 |
| Copy to: | James J. Veneruso, Esq.<br>Veneruso, Curto Schwartz & Curto  LLP<br>35 East Grassy Sprain Road, Suite 400<br>Yonkers, New York 10710 |
| Notices to Operator: | Sarah, LLC<br>1717 Midwest Club Parkway<br>Oakbrook, IL 60523 |

Copy to:     Mr . Lee Levin, Esq.
                  7250 North Cicero Avenue, Suite 200
                  Lincolnwood, Illinois 60712-1693

17.7   <u>Entire Agreement</u>. This Agreement shall constitute the entire full and complete agreement between the parties concerning the subject matter hereof. No other representation has been relied upon by Operator or its directors, officers or shareholders, or induced Operator to execute this Agreement and there are no representations, inducements, promises, or agreements, oral or otherwise, between the parties not embodied herein , which are of any force or effect with reference to this Agreement or otherwise. No amendment, change or variance from this Agreement shall be binding unless executed in writing.

17.8   <u>Severability</u>. Each section, subsection, term and provision of this Agreement shall be considered severable, and if for any reason, any section, subsection, term or provision herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation, such shall not impair the operation of or affect the remaining portions, sections, subsections, terms and provisions of the Agreement, and the latter will continue to be given full force and effect and bind the parties hereto; and said invalid sections, subsections, terms or provisions shall be deemed not part of this Agreement.

17.9   <u>Parties</u>. Anything to the contrary herein notwithstanding, nothing in this Agreement is intended, nor shall be deemed to confer upon any person or legal entity other than Forall or Operator as a third party beneficiary hereto, and such of their respective successors and assigns as may be contemplated by this Agreement, any right or remedies under or by reason of this Agreement.

17.10  <u>Captions</u>. All captions herein are intended solely for the convenience of the parties, and none shall be deemed to affect the meaning or construction of any provision hereof.

17.11  <u>Counterparts</u>. This Agreement may be executed in multiple copies, and each copy executed shall be deemed an original.

## ARTICLE 18 CAVEAT

18.1   Operator acknowledges that it has entered into this Agreement after making an independent investigation of Forall's operations and not in reliance upon or as a result of a representation as to gross revenues, volume, potential earnings or profits which Operator in particular might be expected to realize, nor has anyone made any other representation which is not expressly set forth herein, on which Operator or its shareholders, officers or directors relied to induce Operator to accept and execute this Agreement. Forall does not make any representation, warranty or guaranty, express or implied, as to the potential success of the business venture contemplated hereby.

18.2   In order to induce Forall U.S.A. Inc. to enter into this Agreement Hala Subh and Suhad Albasha, each owning a 50% interest in Operator, and their husbands Bachar Hamad and Ammar Hamad have executed, a Guaranty of even date herewith attached hereto at Exhibit A and the effectiveness of this Agreement is conditioned upon the execution of said Guaranty.

18.3   The effectiveness of this agreement is predicated upon Operator (a). executing and delivering to Forall a collateral assignment of the lease for the store, attached hereto at Exhibit A, (b). copy of the filing receipt and Operating Agreement of Sarah, LLC; (d). copy of the fully executed Store lease.  In the event the foregoing documents are not provided by April 1, 2011 Forall shall have the absolute right to cancel this Agreement by giving written notice to Operator.

THE BALANCE OF THIS PAGE INTENTIONALLY LEFT BLANK

**IN WITNESS WHEREOF,** the parties hereto execute this Agreement under seal by their duly authorized representatives as of the date first above written.

Attest:                                    Forall U.S.A., Inc.

_____          By: _____
Witness                                    Its: _____

Attest:                                    **Sarah, LLC., Operator**

_____          By: _____
Witness                                         Hala subh

                                           Its: Member as to a 50% interest

                                           By: _____
                                                Suhad albasha

                                           Its: Member as to a 50% interest

STATE OF  ILLINOIS        )
                          ) ss.:
COUNTY OF  DuPage         )

        On the 19 day of MARCH_____ in the year 2011 before me, the undersigned personally appeared **Hala subh** personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
(signature and office of individual taking acknowledgment)

"OFFICIAL SEAL"
Sarah E. Botka
Notary Public, State of Illinois
Will County
My Commission Expires 06-08-2014

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF _Westchester_      )


On the _16th_ day of November in the year 2011 before me, the undersigned personally appeared Palma Settimi personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.


_Michelena Biancamano_
(signature and office of individual taking acknowledgment)

                    Michelina Biancamano
                 Notary Public - State of New York
                      No. 01BI5084186
                 Qualified in Westchester County
               My Commission Expires Sept 2, 2012

STATE OF ILLINOIS )
) ss.:
COUNTY OF DuPage )

On the 19 day of MARCH in the year 2011 before me, the undersigned personally appeared **Suhad albasha** personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_Sarah E. Botka_
(signature and office of individual taking acknowledgment)

"OFFICIAL SEAL"
Sarah E. Botka
Notary Public, State of Illinois
Will County
My Commission Expires 06-08-2014

# EXHIBIT A

## Collateral Assignment of Lease

## COLLATERAL ASSIGNMENT OF LEASE

**THIS COLLATERAL ASSIGNMENT OF LEASE** ("Assignment"), made as of the __ day of March, 2011 by and among Sarah, LLC, a Limited Liability Company formed in the State of Illinois, having an address at c/o Palma Settimi Inc., Seven Sutton Place, Brewster, New York ("Assignor or Tenant" ), and Forall U.S.A. a corporation organized and existing under the laws the State of New York with an address at Seven Sutton Place, Brewster, New York 10509, ("Assignee");

## W I T N E S S E T H:

**WHEREAS,** Assignor is the tenant under a Lease Agreement (together with all amendments and modifications thereto, the "Lease") dated as of _____, 2010 for the Store located at The Forum Shops at Caesars Palace, Space G19, 3500 Las Vegas Blvd. South, Las Vegas, NV 89109; and

**WHEREAS,** as a condition to Landlord letting the Premises to Tenant, Landlord required that the Assignee guarantee the obligations of Tenant pursuant to the terms of the Lease;

**WHEREAS,** Assignee is willing to provide said guarantee to Landlord in consideration of Tenant executing this Collateral Assignment of Lease giving Assignor the option to take over the Premises from Tenant should the Landlord call on Assignee to perform pursuant to any provision of its guarantee.

**NOW THEREFORE,** in consideration of the foregoing and the mutual covenants hereinafter contained, the parties hereto agree as follows:

1. **Grant of Security Interest and Assignment.** Assignor hereby grants a security interest in, assigns, transfers, conveys and sets over to Assignee, all of Assignor's estate, title and interest in and to the Lease (the entirety of such estate, title and interest, and all rights, powers, privileges, options and other benefits of Assignor pursuant thereto, including the proceeds thereof, are hereinafter referred to collectively as the "Assignor's Interests"). The assignment of, and grant of a security interest in, Assignor's Interests shall be absolute and unconditional, and shall be effective upon the execution of this Assignment.

2. **Collateral Security.** The grant of the security interest, assignment, transfer and conveyance effected by Section 1 hereof is made by Assignor for the purpose of securing the performance of Assignor's obligations pursuant to the terms of the lease.

3.      **Representations, Warranties and Covenants of Assignor.**

Assignor represents and warrants to, and covenants with, Assignee as follows:

(a)  Assignor is the tenant under the Lease and no other party has any right, title or interest as a tenant, undertenant or assignee under the Lease.

(b)  Assignor has full right, power and authority to assign and transfer to Assignee the Assignor's Interests, free and clear of all liens, claims or encumbrances of any kind whatever, and this Assignment is effective to do so. The execution and delivery of this Assignment and the performance and observance of the obligations of Assignor hereunder will not violate the provisions of any agreement between Assignor and the Landlord under the Lease, or any other party or any other agreement of any kind to which Assignor is a party or by the terms of which Assignor is bound.

(c)  There will be no defaults under the Lease.

(d)  So long as this Assignment remains in effect, Assignor will not, without Assignee's prior written consent, sell, assign, convey, pledge, encumber or otherwise transfer to any other person, firm or entity any interest in the Lease.

4.      **Default and Remedy.** If Assignor breaches any of the representations, warranties or covenants herein contained, or if a default under the Lease or an Event of Default shall occur and Landlord calls upon Assignee to honor its guarantee, or if Assignor shall make an assignment for the benefit of creditors, be adjudged bankrupt or have filed in its behalf or against it any type of bankruptcy or insolvency proceeding, or if a trustee or receiver shall be appointed for Assignor or any of its property (the foregoing hereinafter referred to as an "Event of Default"), then, and in any such event, Assignee shall have the absolute right, without notice or demand, to succeed to the rights of Assignor as tenant under the Lease in accordance with the assignment evidenced hereby.

5. **Non-inclusive Remedy.** Should a default under the Lease or an Event of Default occur, and Assignee is called upon by Landlord to honor its guarantee, in addition to succeeding to the rights of Assignee as tenant under the Lease, Assignee may also at its election proceed directly and personally against Assignor to collect any and all damages incurred by reason of such default or Event of Default, including, but not limited to, any

sums paid to Landlord rightfully owed by Assignor, attorneys fees and any other expenses or damages incurred by Assignor in connection with honoring its guarantee.

**6. Waiver of Certain Laws.** Assignor agrees, to the full extent permitted by law, that upon the occurrence of any default or Event of Default, neither Assignor nor anyone claiming by or under Assignor shall or will set up, claim or seek to take advantage of laws now or hereafter in force in order to prevent or hinder the enforcement of this Assignment, and Assignor, for Assignor and all who may at any time claim through or under Assignor, hereby expressly waives to the full extent that Assignor may lawfully do so, the benefit of any such laws.

**7. Recording and Filing.** A counterpart of this Assignment and/or one or more UCC-1 financing statements may be recorded or filed, at the option of Assignee, in such offices as may be provided by law or as Assignee may deem appropriate. Assignor agrees to execute and deliver to Assignee any financing statements required under the Uniform Commercial Code as enacted in any state in which such recordation and filing would be appropriate. The costs of all such recordings and filings shall be borne by Assignor.

**8. Notices.** Each notice required or permitted hereunder shall be deemed to have been properly given or served by the deposit of same in the United States Mail, designated as registered or certified mail, return receipt requested, bearing adequate postage, and addressed as hereinafter provided:

| | |
|---|---|
| If to Assignor, to | Sarah, LLC<br>1717 Midwest Club Parkway<br>Oakbrook, IL 60523 |
| with a copy to | Mr. Adams<br>Bardier & Adams |
| If to Assignee, to | Forall, U.S.A.<br>Seven Sutton Place<br>Brewster, New York |
| with a copy to | James J. Veneruso, Esq.<br>Veneruso, Curto, Schwartz & Curto LLP<br>35 East Grassy Sprain Road, Suite 400<br>Yonkers, New York 10710 |

Each notice shall be effective upon being deposited as aforesaid, and rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given shall be deemed to be receipt of the notice sent.

9. **Assignment Irrevocable; Supplemental Instruments**. Assignor agrees that the assignment, transfer and conveyance made hereby is irrevocable, and that Assignor will not, while this Assignment is in effect, take any action that is inconsistent with this Assignment, or make any other assignment or conveyance of Assignor's Interests (other than to Assignee) without Assignee's prior written consent, and that any such assignment or conveyance without such consent shall be void and of no effect. Assignor will from time to time, upon request of Assignee, execute all instruments of further assurance and all supplemental instruments necessary to effect the transactions contemplated hereby as Assignee may specify.

10. **Amendment**.  This Assignment may be amended or modified only in a writing specifically referring to this Assignment and executed by each of the parties hereto.

11. **Governing Law**.  This Assignment shall be construed and enforced in accordance with the internal laws of the State of Nevada.  The invalidity, illegality or unenforceability of any provision of this Note shall not affect or impair the validity, legality or enforceability of the remainder of this Note, and to this end, the provisions of this Note are declared to be severable.

12. **Counterparts**. This Assignment may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

13. **Jurisdiction and Venue.** Assignor hereby consents to the jurisdiction of the courts of the State of Nevada in the County wherein the Store is located and the United States District Court for the District wherein the Store is located, as well as to the jurisdiction of all courts from which an appeal shall be taken from such courts, for the purpose of any suit, action or other proceeding arising out of any of its obligations arising under this Assignment or with respect to the transactions contemplated hereby, and expressly waives any and all objections it may have as to venue in any of such courts.

14. **Waiver of Trial by Jury.** ASSIGNOR AND ASSIGNEE HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDINGS, CLAIMS OR COUNTER-CLAIMS, WHETHER IN CONTRACT OR TORT, AT LAW OR IN EQUITY, ARISING OUT OF OR IN ANY WAY RELATING TO THIS AGREEMENT.

15. **Miscellaneous.** The section and paragraph headings contained in this Assignment are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Assignment. When used herein, the singular shall include the plural, and vice versa, and the use of the masculine, feminine or neuter gender shall include all other genders, as the context may require.

IN WITNESS WHEREOF, the parties hereto have executed this Assignment or have caused this Assignment to be duly executed as of the date first above written.

Sarah, LLC

By: _____
Name: Hala subh
Title: Member

By: _____
Name: Suhad albasha
Title: Member

Forall U.S.A.

By:_____
Name:
Title:

LANDLORD:

By:_____

-5-

STATE OF ILLINOIS )
                  ) ss.:
COUNTY OF DuPage )

On the 19 day of MARCH in the year 2011 before me, the undersigned personally appeared **Hala subh** personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_Sarah E Botka_

(signature and office of individual taking acknowledgment)

"OFFICIAL SEAL"
Sarah E. Botka
Notary Public, State of Illinois
Will County
My Commission Expires 06-08-2014

STATE OF ILLINOIS )
                  ) ss.:
COUNTY OF DuPage )

On the 19 day of MARCH in the year 2011 before me, the undersigned personally appeared **Suhad albasha** personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_Sarah E Botka_

(signature and office of individual taking acknowledgment)

"OFFICIAL SEAL"
Sarah E. Botka
Notary Public, State of Illinois
Will County
My Commission Expires 06-08-2014

-6-

STATE OF       )
           ) ss.:
COUNTY OF      )

   On the ___ day of _____ in the year 2011 before me, the undersigned personally appeared _____ personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____

(signature and office of individual taking acknowledgment)

STATE OF       )
           ) ss.:
COUNTY OF      )

   On the ___ day of _____ in the year 2011 before me, the undersigned personally appeared _____ personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____

(signature and office of individual taking acknowledgment)

B

LEASE

BY AND BETWEEN

FORUM SHOPS, LLC,

a Delaware limited liability company

AND

SARAH, LLC

02/09/11

FORUM SHOPS AT CAESARS

## LEASE

THIS LEASE made this *18th* day of *MAY*, 20*11*, by and between FORUM SHOPS, LLC, a Delaware limited liability company, FEIN 36-4541963 ("Landlord"), and SARAH, LLC ("Tenant");

WHEREAS, Landlord occupies the land on which a shopping complex is located under a certain Ground Lease by and between Caesars Palace Realty Corp., a Nevada Corporation, as landlord ("Ground Lessor"), and Landlord, as tenant, made as of June 1, 1990 (the "Ground Lease"), as the same may be amended from time to time, and

WHEREAS, Tenant desires to sublease from Landlord and Landlord desires to sublease to Tenant certain retail space within the Center (as hereinafter defined) pursuant to the terms and provisions of this Lease.

WITNESSETH THAT, in consideration of the rents, covenants and agreements hereinafter set forth, such parties enter into the following agreement:

## ARTICLE I

### BASIC LEASE INFORMATION AND DEFINITIONS

Section 1.1.     Basic Lease Information.
This Article I is an integral part of this Lease and all of the terms hereof are incorporated into this Lease in all respects. In addition to the other provisions which are elsewhere defined in this Lease, the following, whenever used in this Lease, shall have the meanings set forth in this Section:

(a)     Center: Forum Shops at Caesars, situated in the City of Las Vegas, County of Clark, State of Nevada.

(b)     Premises: Room K8.   Landlord shall have the right to change the room designation upon written notice to Tenant.

(c)     Store Floor Area: 2,536 square feet.

(d)     Lease Term: Commencing on the Commencement Date and continuing until the last day of ~~January next following the end of~~ the tenth (10th) Lease Year.

(e)     Commencement Date:  The earlier of (i) the date the Tenant opens for business, or (ii) the Required Completion Date.

(f)     Required Completion Date: The earlier of (i) the *90th* day after the earlier of (a) the date specified in such notice as the date when Tenant can commence Tenant's Work or (b) the date Landlord has notified Tenant that the Premises are ready for commencement of Tenant's Work or (ii) October 1, 2011.  *Landlord shall deliver possession of the Premises to Tenant on July 1, 2011.*

(g)     Minimum Annual Rent: A Minimum Annual Rent of $220.00 per square foot of Store Floor Area, or Five Hundred Fifty-Seven Thousand Nine Hundred Twenty and 00/100 Dollars ($557,920.00) per annum (based on the Store Floor Area), payable in equal monthly installments, in advance upon the first day of each and every month commencing upon the Commencement Date and continuing thereafter through and including the last day of the first (1st) Lease Year;

A Minimum Annual Rent of $226.60 per square foot of Store Floor Area, or Five Hundred Seventy-Four Thousand Six Hundred Fifty-Seven and 60/100 Dollars ($574,657.60) per annum (based on the Store Floor Area), payable in equal monthly installments, in advance upon the first day of each and every month during the second (2nd) Lease Year of the Lease Term;

A Minimum Annual Rent of $233.40 per square foot of Store Floor Area, or Five Hundred Ninety-One Thousand Nine Hundred Two and 40/100 Dollars ($591,902.40) per annum (based on the Store Floor Area), payable in equal monthly installments, in advance upon the first day of each and every month during the third (3rd) Lease Year of the Lease Term; ~~and~~

A Minimum Annual Rent of $240.40 per square foot of Store Floor Area, or Six Hundred Nine Thousand Six Hundred Fifty-Four and 40/100 Dollars ($609,654.40) per annum (based on the Store Floor Area), payable in equal

-1-

monthly installments, in advance upon the first day of each and every month during the fourth (4th) Lease Year of the Lease Term;

A Minimum Annual Rent of $247.61 per square foot of Store Floor Area, or Six Hundred Twenty-Seven Thousand Nine Hundred Thirty-Eight and 96/100 Dollars ($627,938.96) per annum (based on the Store Floor Area), payable in equal monthly installments, in advance upon the first day of each and every month during the fifth (5th) Lease Year of the Lease Term;

A Minimum Annual Rent of $255.04 per square foot of Store Floor Area, or Six Hundred Forty-Six Thousand Seven Hundred Eighty-One and 44/100 Dollars ($646,781.44) per annum (based on the Store Floor Area), payable in equal monthly installments, in advance upon the first day of each and every month during the sixth (6th) Lease Year of the Lease Term;

A Minimum Annual Rent of $262.69 per square foot of Store Floor Area, or Six Hundred Sixty-Six Thousand One Hundred Eighty-One and 84/100 Dollars ($666,181.84) per annum (based on the Store Floor Area), payable in equal monthly installments, in advance upon the first day of each and every month during the seventh (7th) Lease Year of the Lease Term;

A Minimum Annual Rent of $270.57 per square foot of Store Floor Area, or Six Hundred Eighty-Six Thousand One Hundred Sixty-Five and 52/100 Dollars ($686,165.52) per annum (based on the Store Floor Area), payable in equal monthly installments, in advance upon the first day of each and every month during the eighth (8th) Lease Year of the Lease Term;

A Minimum Annual Rent of $278.69 per square foot of Store Floor Area, or Seven Hundred Six Thousand Seven Hundred Fifty-Seven and 84/100 Dollars ($706,757.84) per annum (based on the Store Floor Area), payable in equal monthly installments, in advance upon the first day of each and every month during the ninth (9th) Lease Year of the Lease Term; and

A Minimum Annual Rent of $287.05 per square foot of Store Floor Area, or Seven Hundred Twenty-Seven Thousand Nine Hundred Fifty-Eight and 80/100 Dollars ($727,958.80) per annum (based on the Store Floor Area), payable in equal monthly installments, in advance upon the first day of each and every month commencing upon the tenth (10th) Lease Year of the Lease Term and continuing thereafter through and including the last month of the Lease Term.

(h)     Percentage Rent Rate: Six percent (6%).

(i)     Sales Breakpoint: $9,298,666.67 per annum for each Lease Year from the Commencement Date through and including the expiration of the first (1st) Lease Year;
$9,577,626.67 per annum during the second (2nd) Lease Year;
$9,856,040.00 per annum during the third (3rd) Lease Year;
$10,160,906.67 per annum during the fourth (4th) Lease Year;
$10,465,649.33 per annum during the fifth (5th) Lease Year;
$10,779,690.67 per annum during the sixth (6th) Lease Year;
$11,103,030.67 per annum during the seventh (7th) Lease Year;
$11,436,092.00 per annum during the eighth (8th) Lease Year;
$11,779,297.33 per annum during the ninth (9th) Lease Year; and
$12,132,646.67 per annum for each Lease Year during the remainder of the Lease Term (prorated for any Partial Lease Year).

(j)     Taxes:  Calculated as set forth in Section 4.5.

(k)     Operating Cost Charge ("OC Charge"): Provided Tenant's Commencement Date occurs on or before December 31, 2011 Tenant's Base Year OC Charge shall be: Forty-Seven and 11/100 Dollars ($47.11) per square foot of Store Floor Area per annum (computed on an annualized basis for any partial calendar year), subject to adjustment as set forth herein. In the event Tenant's Commencement Date is January 1, 2012 or thereafter, Tenant's Base Year OC Charge shall be increased in accordance with the following.  For and with respect to each and every calendar year or partial calendar year after the 2011 Base Year, the annual OC Charge shall be increased on the first day of each such calendar year or partial calendar year by an annual amount equal to five percent (5%) of the OC Charge payable by Tenant to Landlord for the immediately preceding calendar year (computed on an annualized basis for any partial calendar year).

-2-

(l)     Central Plant Charge: One and 23/100 Dollars ($1.23) per square foot of Store Floor Area per annum, subject to adjustment as set forth herein (Section 7.2).  *No costs in determining the OC Charge and the Central Plant Charge will be duplicated.*

(m)     Trade Name: PAL ZILERI.

(n)     Permitted Use: The Premises shall be occupied and used by Tenant solely for the purpose of conducting therein the business of the retail sale of menswear and accessories, and Tenant shall not use or permit or suffer the use of the Premises for any other business or purpose.

(o)     Marketing Fund Fixed Contribution: The greater of Two and 50/100 Dollars ($2.50) per square foot of Store Floor Area per annum, or $1,000.00, subject to adjustment as set forth herein (Section 14.1).

(p)     Media Fund Charge: The greater of Two and 50/100 Dollars ($2.50) per square foot of Store Floor Area per annum, or $1,000.00, subject to adjustment as set forth herein (Section 14.3).

(q)     Security Deposit: *INTENTIONALLY DELETED* (Section 15.1).

(r)     Notice Address:

|            |      |                                      |
|------------|------|--------------------------------------|
| Landlord   |      | FORUM SHOPS, LLC                     |
|            | c/o  | M.S. Management Associates Inc.      |
|            |      | 225 West Washington Street           |
|            |      | Indianapolis, Indiana  46204-3438    |

Tenant          SARAH, LLC.
                c/o Bachar Hamad M.D.
                729 Heath Court
                Westmont, Illinois  60559

With a copy to:     Lee Levin
                    Kamensky Rubinstein Hochman & Delott, LLP.
                    7250 North Cicero Avenue, Suite 200
                    Lincolnwood, Illinois  60712

All notices from Tenant to Ground Lessor required or permitted hereunder shall be directed, until further notice, as follows:

Caesars Palace Realty
c/o Harrah's Entertainment, Inc.
One Caesars Palace Drive
Las Vegas, Nevada 89109-8969
Attn:  General Counsel

(s)     Remittance Address:     FORUM SHOPS, LLC
                                7070 Reliable Parkway
                                Chicago, Illinois 60686-7070

Section 1.2.     Definitions.
        (a)     The Center includes all existing and future improvements, together with the rights granted pursuant to that certain Parking Agreement and Grant of Reciprocal Easements and Declaration of Covenants dated as of June 1, 1990, and recorded July 6, 1990 as Instrument 00864 in the Official Records of the Recorder of Clark County, Nevada (hereinafter "REA") in connection with the "Hotel Parcel".  The Hotel Parcel is immediately adjacent to the Center and includes, but is not limited to a hotel ("Hotel") and the Adjacent Land, which Adjacent Land includes parking facilities ("Parking Facility") constructed by the Ground Lessor on the property designated on Exhibit "E".  The Adjacent Land is the Hotel Parcel excluding the land within the outer perimeter of the Hotel buildings and related structures thereon, such as, but not limited to, stadiums and tennis courts, as they may exist from time to time.

        (b)     Exhibit "A" depicts that area of the Center upon which is located the space herein leased to Tenant.  This Exhibit is provided for informational purposes only, and shall not be deemed to be a warranty, representation or agreement by Landlord that the Center or buildings and/or any stores will be exactly as indicated on the Exhibit, or that the other tenants which may be drawn on

-3-

said Exhibit will be occupants in the Center. Landlord reserves unto itself the unlimited right to modify the configuration of the Center at any time for the purpose of incorporating Major Tenants and other buildings within the Center.

## ARTICLE II
## LEASED PREMISES AND TERM

**Section 2.1.        Leased Premises.**

Landlord hereby leases to Tenant and Tenant hereby rents from Landlord the Premises as depicted on Exhibit "A". The Store Floor Area shall be measured to the center line of all party or adjacent tenant walls, to the exterior faces of all other walls and to the building line where there is no wall. The parties agree that Landlord's determination of the Store Floor Area shall be final, binding and conclusive.

**Section 2.2.        Roof and Walls.**

Landlord shall have the exclusive right to use all or any part of the side and rear walls of the Premises and the roof for any purpose, including but not limited to erecting signs or other structures on or over all or any part of the same, erecting scaffolds and other aids to the construction and installation of the same, and installing, maintaining, using, repairing and replacing pipes, ducts, conduits and wires leading through, to or from the Premises and serving other parts of the Center in locations which do not materially interfere with Tenant's use of the Premises. Tenant shall have no right whatsoever in the exterior of exterior walls of the Premises or the roof or any portion of the Center outside the Premises, except as provided in Exhibit "B" hereof.

**Section 2.3.        Lease Term.**

The term of this Lease (hereinafter called "Lease Term") shall commence upon the Commencement Date and shall thereafter end on the last day of ~~January next following~~ the number of Lease Years set forth in Article I unless sooner terminated as herein provided.

**Section 2.4.        Lease Year Defined.**

"Lease Year," as used herein, means a period of twelve (12) consecutive months during the Lease Term, the first full Lease Year commencing on the Commencement Date and continuing through the twelfth (12th) full calendar month occurring on or after the Commencement Date. "Partial Lease Year" means that portion of the Lease Term prior to the first full Lease Year or following the last full Lease Year.

**Section 2.5.        Relocation of Premises.**

A. In the event Landlord shall add additional buildings to the Center or expand any of the buildings currently contained therein or renovate or reconfigure any part of the Center in the vicinity of the Premises, Landlord shall have the right, subject to Landlord's and Tenant's right of termination as set forth in subparagraph (B), to require Tenant to relocate its operation, at *Landlord's* ~~Tenant's~~ expense, to other premises (the "New Premises") in another part of the Center or building in accordance with the following:

(i)        Landlord shall notify Tenant, at least one hundred fifty (150) days prior to the proposed relocation date, of Landlord's intention to relocate Tenant's operation to the New Premises;

(ii)        The proposed relocation date and the size, configuration and location of the New Premises shall be set forth in Landlord's notice; ~~and~~

(iii)        The New Premises shall be substantially the same in size and configuration as the Premises described in the Lease *and shall be located in the Relocation Zone cross-hatched on Exhibit "A"*;

*(iv)        In the event this Lease is terminated in accordance with this Section 2.5.B., Landlord shall pay to Tenant the unamortized value of Tenant's initial permanently affixed leasehold improvements in the Premises. For purposes hereof, Tenant's permanently affixed leasehold improvements shall be amortized on a straight-line basis over the Lease Term. It shall be a condition precedent to Landlord's obligation to pay for the cost of the construction of the New Premises that Tenant submit to Landlord within sixty (60) days of the Commencement Date an affidavit from Tenant or its general contractor stating the original cost of Tenant's cost of performing Tenant's Work in the Premises along with a reasonably detailed breakdown of such costs and supporting documentation and invoices for the same; and*

*(v)        Landlord, at Landlord's expense, will deliver possession of the New Premises to Tenant in substantially the same condition as the Premises were in immediately prior to the relocation excluding Tenant's fixtures, furnishings, equipment, personal property and inventory.*

B. In the event the New Premises described in Landlord's relocation notice are unacceptable to Tenant, Tenant shall have the right, exercisable by written notice to Landlord, given *sixty (60)* days following receipt of Landlord's relocation notice, to terminate this Lease, such termination to be effective as of the proposed relocation date as set forth in Landlord's notice. Failure by Tenant to timely exercise such right shall be deemed a waiver with respect thereto and confirmation that the New Premises are acceptable to Tenant. In addition, if Tenant fails to exercise such right of termination by written notice to Landlord given within *sixty (60)* days following receipt of Landlord's relocation notice or to accept the New Premises in writing by written notice to Landlord given within thirty (30) days following receipt of Landlord's relocation notice, then Landlord shall have the right, at any time thereafter, to terminate this Lease effective the later of (a) thirty (30) days following Tenant's receipt of Landlord's notice of termination or (b) the proposed relocation date as set forth in Landlord's relocation notice. Tenant shall have the right to accept the New Premises only for the unexpired term of this Lease.

-4-

05/12/11

C.  In the event Landlord requires the relocation of Tenant's operation for any other reason, then Landlord reserves the right at any time during the Lease Term hereof to require Tenant to relocate to the New Premises upon the following terms and conditions: (a) the New Premises shall contain a Store Floor Area which shall not vary more than ten percent (10%) from the Store Floor Area contained in the Premises; (b) Landlord shall notify Tenant not less than ninety (90) days prior to the date Tenant is required to surrender possession of the Premises; (c) Landlord shall, at Landlord's cost and expense, complete the leasehold improvements in the New Premises, in accordance with the plans and specifications approved by Landlord with respect to Tenant's original work in the Premises; (d) Tenant shall, within fifteen (15) days after possession of the New Premises has been tendered to Tenant, open for business in the New Premises; and (e) Tenant shall surrender possession of the Premises to Landlord in accordance with the provisions of Section 9.3 within fifteen (15) days after possession of the New Premises has been tendered to Tenant.

D.  The New Premises shall be subject to the same terms, conditions and covenants as the Premises except that if the Store Floor Area of the New Premises differs from the Store Floor Area of the Premises, then the Minimum Rent and Sales Breakpoint shall be proportionately adjusted.  Upon the occurrence of any relocation pursuant to this Section 2.5, the parties hereto shall promptly execute an amendment to this Lease reflecting such relocation of Tenant and, if applicable, any adjustment to the Minimum Rent and Sales Breakpoint.

E.  Landlord has made no representation as to any additional improvements or stores or any existing stores in the Center and this provision does not create any rights of option, first refusal or otherwise with respect to any present or future space in the Center.

Section 2.6.      Modifications to the Center.
      Notwithstanding anything in this Lease contained, Landlord reserves the right to change or modify and add to or subtract from the size and dimensions of the Center or any part thereof, the number, location and dimensions of buildings and stores, the size and configuration of the parking areas, entrances, exits and parking aisle alignments, dimensions of hallways, malls and corridors, the number of floors in any building, the location, size and number of tenants' spaces and kiosks which may be erected in or fronting on any mall or otherwise, the identity, type and location of other stores and tenants, and the size, shape, location and arrangement of Common Areas (hereinafter defined), and to design and decorate any portion of the Center as it desires, but the general character of the Center and the approximate location of the Premises in relation to the Hotel shall not be substantially changed.

      If at any time (a) Landlord is required by any laws, ordinances, rules or regulations of any governmental agency having jurisdiction over the Center to provide additional parking on Landlord's Tract, or (b) Landlord proposes to increase the total rentable floor area within the Center which would require additional parking in the Center, Landlord may elect to provide such additional parking by constructing deck or elevated or subterranean parking facilities, hereinafter referred to as "Deck Parking".  In the event Landlord so elects, Tenant shall pay its proportionate share of the capital expense of providing such Deck Parking.  Tenant's proportionate share shall be determined by (a) multiplying the total capital expense of providing such Deck Parking by a fraction, the numerator of which is the Store Floor Area of the Premises and the denominator of which is the total rentable floor area in Landlord's Tract, either existing, or proposed by Landlord, as the case may be, at the time of providing such Deck Parking; and (b) multiplying the figure derived pursuant to the foregoing subsection (a) by a fraction, the numerator of which is the number of full calendar months remaining in the term of the Lease, and the denominator of which shall be the greater of (i) the number of months required to amortize the permanent financing obtained by Landlord to finance the capital expense of providing such Deck Parking, or (ii) fifteen (15) years.  Tenant shall pay its proportionate share of the capital expense of providing such Deck Parking in equal monthly installments commencing upon the date the Deck Parking is open for public use and continuing thereafter on the first day of every calendar month during the remaining term hereof, plus interest thereon at the rate of nine percent (9%) per annum.

ARTICLE III

TENANT'S WORK

Section 3.1.      Tenant's Work.
      Tenant agrees to accept the Premises in its present "as is" condition.  Further alterations of this room will be at the Tenant's sole expense and deemed to be Tenant's Work, including, but not limited to, all work designated as Tenant's Work in Exhibit "B", and Tenant shall do and perform all Tenant's Work diligently and promptly and in accordance with the following provisions.

Section 3.2.      Tenant's Obligations Before Commencement Date.
      As soon as reasonably possible hereafter, Landlord shall deliver to Tenant the Tenant Information Package and the same shall become a part hereof by this reference as Exhibit "B-1" (hereinafter referred to as "Tenant Information Package").  Within forty five (45) days after the date of this Lease or the date of receipt of a drawing of the Premises and Tenant Information Package, whichever is later, Tenant will submit to Landlord one (1) reproducible set (sepia) and three (3) copies of plans and specifications, prepared by a registered architect or engineer, of all Tenant's Work to be done within the Premises (hereinafter called "Tenant's Plans"), prepared in conformity with Exhibit "B" and the Tenant Information Package.  Within thirty (30) days after receipt of Tenant's Plans, Landlord shall notify Tenant of any failures of Tenant's Plans to conform to Exhibit "B", the Tenant Information

-5-

Package or otherwise to meet with Landlord's approval.  Tenant shall within fifteen (15) days after receipt of any such notice cause Tenant's Plans to be revised to the extent necessary to obtain Landlord's approval and resubmitted for Landlord's approval.  When Landlord has approved the original or revised Tenant's Plans, Landlord shall sign and return (which signature and return may be transmitted electronically) one (1) set of approved Tenant's Plans to Tenant and the same shall become a part hereof by this reference as Exhibit "B-2".  Approval of plans and specifications by Landlord shall not constitute the assumption of any responsibility by Landlord for their accuracy or sufficiency or conformity with applicable laws (including but not limited to the Americans with Disabilities Act of 1990 and the Williams-Steiger Occupational Safety and Health Act), and Tenant shall be solely responsible for such plans and specifications.  Tenant shall not commence any of Tenant's Work until Landlord has approved Exhibit "B-2," unless prior Landlord approval has been obtained in writing.

Landlord shall notify Tenant not less than fifteen (15) days in advance of the time when Tenant can commence Tenant's Work; and Tenant shall commence such work not later than the date specified in such notice (although Landlord may not have completed Landlord's Work on such date and may be in the Premises concurrently with Tenant), complete the same in strict accordance with Exhibits "B" and "B-2," install all store and trade fixtures, equipment, stock in trade, merchandise and inventory, and open for business therein not later than the Required Completion Date.  Tenant hereby releases Landlord and its contractors from any claim whatsoever for damages against Landlord or its contractors for any delay in the date on which the Premises shall be ready for delivery to Tenant.  In the event possession of the Premises is not delivered to Tenant within two (2) years of the date of this Lease, then this Lease automatically shall become null and void and neither party shall have any liability or obligation to the other hereunder.

Section 3.3.    Failure of Tenant to Perform.

Because of the difficulty or impossibility of determining Landlord's damages resulting from Tenant's failure to open for business fully fixtured, stocked and staffed on the Commencement Date, including, but not limited to, damages from loss of Percentage Rent (hereinafter defined) from Tenant and other tenants, diminished saleability, leasability, mortgageability or economic value of the Center or Landlord's Tract, if Tenant fails to commence Tenant's Work within the time provided above and proceed with the same diligently, or to open for business fully fixtured, stocked and staffed on or before the Commencement Date or to perform any of its obligations to be performed prior to the Required Completion Date, Landlord may, without notice or demand, in addition to the right to exercise any other remedies and rights herein or at law provided, collect rent from the Commencement Date in an amount equal to the Minimum Annual Rent (hereinafter defined) and other additional rent and other amounts payable by Tenant hereunder, and, in addition thereto, *if Tenant is not open within thirty (30) days after the Required Completion Date*, an amount equal to *twenty-five percent (25%)* of 1/365ths of the Minimum Annual Rent for each day that Tenant has failed to open for business on and after the Commencement Date, which latter amount shall be in lieu of Percentage Rent that might have been earned had Tenant opened in timely fashion.  In addition, *if Tenant is not open within sixty (60) days after the Required Completion Date*, Landlord may terminate this Lease, in which event Landlord shall have the right to recover, as liquidated damages and not as a penalty, a sum equal to the Minimum Annual Rent payable for *six (6) months*.  ~~Lease Year, plus all expenses incurred by Landlord pursuant to this Section, plus the cost of any alterations or repairs which Landlord in its sole discretion deems advisable to relet the Premises.~~  In the event that Tenant fails to make timely submission of Tenant's Plans as provided in this Lease, then Landlord shall have the right, in addition to its other rights and remedies as herein provided, to collect from Tenant a sum which shall be One Hundred and 00/100 Dollars ($100.00) per calendar day for each day that Tenant's Plans are not so submitted.  All remedies in this Lease or at law provided shall be cumulative and not exclusive.

Section 3.4.    Condition of Premises.

Tenant's taking possession of the Premises shall be conclusive evidence of Tenant's acceptance thereof in good order and satisfactory condition.  Tenant shall acknowledge taking possession of the Premises in writing.  Tenant agrees that Landlord has made no representations as to conformance with applicable laws respecting the condition of the Premises or the presence or absence of Hazardous Materials (hereinafter defined) in, at, under or abutting the Premises or the environment.  Tenant also agrees that no representations respecting the condition of the Premises, no warranties or guarantees, expressed or implied, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, with respect to workmanship or any defects in material, and no promise to decorate, alter, repair or improve the Premises either before or after the execution hereof, have been made by Landlord or its agents to Tenant unless the same are contained herein.

Section 3.5.    Certification.

Within fifteen (15) days after the date Tenant opens for business in the Premises, Tenant shall deliver to Landlord the following: (a) Tenant's affidavit stating that the work to be performed by Tenant pursuant to the terms of this Lease has been completed in strict compliance with Exhibit "B" and Tenant's Plans, as approved by Landlord, and that no security interest under the Uniform Commercial Code or chattel mortgages are outstanding or have been filed, it being intended that any such affidavit may be relied upon by Landlord and that any deliberate misstatement by Tenant shall constitute an event of default hereunder; (b) an affidavit of any general contractor performing Tenant's Work stating that all subcontractors, laborers and material men who have performed work on or furnished materials to the Premises (whose names and addresses shall be recited in the affidavit) have been paid in full and that all liens therefor that have or might be filed have been discharged of record or waived; (c) a complete release and waiver of lien with respect to the Premises from any general contractor and all subcontractors who have performed work on or

-6-

furnished material to the Premises, or in lieu thereof, an attorney's certification that the lien period for the work performed on Tenant's behalf in the Premises has expired and that no liens in connection therewith have been filed; (d) Tenant's written acceptance of the Premises stating that Landlord has completed all of Landlord's Work, if any, required to be performed by Landlord pursuant to the terms of this Lease and that Tenant reserves no claims, offsets or backcharges, or stating those claimed; (e) any monies owing to Landlord for the cost of any work done for or on behalf of Tenant, as set forth in Exhibit "B" annexed hereto or otherwise; and (f) all certificates and approvals with respect to the work performed by Tenant or on Tenant's behalf that may be required by any governmental authorities as a condition for the issuance of an occupancy certificate for the Premises together with a copy of any occupancy certificate issued by the proper governmental authority for the Premises.

ARTICLE IV

RENT

Section 4.1.      Minimum and Percentage Rent.

Tenant covenants and agrees to pay to Landlord, without notice or demand, at the Remittance Address, the Minimum Rent set forth in Article I, in advance upon the first day of each and every month of the Lease Term. If actual Store Floor Area is modified in accordance with Section 2.1, the Minimum Annual Rent and the Sales Breakpoint shall be deemed automatically increased or decreased based upon the Store Floor Area as thus determined, and any overpayments or underpayments of Minimum Monthly Rent and Percentage Rent to Landlord thus calculated shall be adjusted accordingly. The failure of Tenant to object to any statement, invoice, or billing presented by Landlord, within thirty (30) days after receipt of such statement, invoice, or billing based on Store Floor Area, shall constitute Tenant's acquiescence to the actual Store Floor Area as so determined by Landlord.

In addition to the payment of Minimum Rent, Tenant covenants and agrees to pay to Landlord, without notice or demand, at the Remittance Address, an amount, if any, equal to the Percentage Rent Rate applied against that portion of Tenant's Adjusted Gross Sales during each Lease Year or Partial Lease Year in excess of the Sales Breakpoint for such period (hereinafter referred to as "Percentage Rent"). In the event of a Partial Lease Year, the Sales Breakpoint shall be determined by multiplying the Sales Breakpoint for the full Lease Year, by a fraction, the numerator of which shall be the number of days contained in such Partial Lease Year and the denominator of which shall be 365 days. If Minimum Rent for any Lease Year or Partial Lease Year is reduced or abated for any reason, the Sales Breakpoint shall be reduced in direct proportion to the reduction or abatement of Minimum Rent for the period of time that such reduction or abatement of Minimum Rent is in effect. If the Sales Breakpoint changes during a Lease Year, the Sales Breakpoint for that Lease Year shall be appropriately adjusted.

Section 4.2.      Miscellaneous Rent Provisions.

If Tenant shall fail to pay any installment of Minimum Rent, Percentage Rent or any item of additional rent within five (5) days after the date the same became due and payable, then Tenant shall pay to Landlord a late payment service charge ("Late Charge") covering administrative and overhead expenses equal to the greater of (a) $250.00 or (b) 5¢ per each dollar so overdue. Provision herein for payment of the Late Charge shall not be construed to extend the date for payment of any sums required to be paid by Tenant hereunder or to relieve Tenant of its obligation to pay all such sums at the times herein stipulated. If the Commencement Date is other than the first day of a month, Tenant shall pay on the Commencement Date a prorated partial Minimum Monthly Rent for the period prior to the first day of the next calendar month, and thereafter Minimum Monthly Rent payments shall be made not later than the first day of each calendar month. For purposes of this Lease, a "Major Tenant" is herein defined as a single tenant occupying at least 25,000 contiguous square feet of floor area. If any Major Tenants are added to the Center or an existing Major Tenant is replaced by a Major Tenant of higher quality, the Minimum Annual Rent and Minimum Monthly Rent herein provided for shall automatically be increased ten percent (10%) at the time each additional or higher quality Major Tenant opens for business. In addition to the foregoing, if Landlord shall, at any time during the term of this Lease, renovate or expand the Center, the cost of which exceeds Ten Million Dollars ($10,000,000.00), the Minimum Rent herein provided for shall automatically be increased ten percent (10%) upon the first day of the month following the completion of such renovation or expansion.

Section 4.3.      Percentage Rent.

Tenant shall (i) not later than the fifth (5th) day after the close of each calendar month, deliver to Landlord at the Center office a written statement certified under oath by Tenant or an officer of Tenant, showing Gross Sales and Adjusted Gross Sales made in such calendar month; and (ii) not later than thirty (30) days after the end of each Lease Year or Partial Lease Year, deliver to Landlord at the Center office a statement of Gross Sales and Adjusted Gross Sales for such Lease Year or Partial Lease Year the correctness of which is certified to by Tenant or an officer of Tenant. If Tenant fails to prepare and deliver any statement of Gross Sales and Adjusted Gross Sales required hereunder, within the time or times specified above, then Landlord shall have the right, in addition to the other rights and remedies set forth in this Lease, (a) to collect from Tenant a sum which shall be $250.00 which shall be deemed liquidated damages for administrative and overhead expenses resulting from such failure, and (b) to estimate Tenant's Adjusted Gross Sales for any non-reported period and bill Tenant's Percentage Rent accordingly. Landlord reserves the right, at Landlord's option, to adjust Percentage Rent billings when actual Adjusted Gross Sales reports are received.

-7-

Percentage Rent shall become due and payable in each Lease Year on the fifteenth (15th) day of the month immediately following the month during which Adjusted Gross Sales exceed the Sales Breakpoint for such Lease Year, and thereafter shall be paid monthly on all additional Adjusted Gross Sales made during the remainder of such Lease Year, such payments to be made concurrently with the submission by Tenant to Landlord of the written statement of monthly Adjusted Gross Sales as provided for herein.

Tenant will preserve for at least three (3) years at Tenant's notice address all original books and records disclosing information pertaining to Gross Sales and Adjusted Gross Sales and such other information respecting Gross Sales and Adjusted Gross Sales as Landlord requires, including, but not limited to, cash register tapes, sales slips, sales checks, gross income and sales tax returns, bank deposit records, sales journals and other supporting data including itemized records of permitted exclusions. Landlord and its agents shall have the right during business hours to examine and audit such books and records preserved by Tenant. If such examination or audit discloses a liability for Percentage Rent three percent (3%) or more in excess of the Percentage Rent paid by Tenant for any period and at least $500.00 of Percentage Rent is owed as the result of such audit, or if Tenant's Gross Sales and Adjusted Gross Sales cannot be verified due to the insufficiency or inadequacy of Tenant's records, or if Tenant shall have failed to furnish Landlord any monthly statement of Gross Sales and Adjusted Gross Sales during any Lease Year, Tenant shall promptly pay Landlord the cost of said audit. Tenant shall, in any event, pay to Landlord the amount of any deficiency in rents which is disclosed by such audit. If such examination or audit discloses an overpayment of Percentage Rent, then the excess, less the cost of such examination or audit, shall be credited to Tenant's account. Tenant's obligation to preserve all original books and records shall survive the expiration of the Lease Term or the earlier termination of this Lease.

Ground Lessor shall have the right at all times, during business hours, to examine and audit Tenant's books and records or otherwise to verify any amounts paid by Tenant to Landlord pursuant to this Lease.

<u>Section 4.4.</u>        <u>Gross Sales and Adjusted Gross Sales Defined.</u>

As used herein, Gross Sales means the sale prices of all goods, wares and merchandise sold and the charges for all services performed by Tenant or any other person or entity in, at, or from the Premises for cash, credit or otherwise, without reserve or deduction for uncollected amounts; including but not limited to sales and services (i) where the orders originate in, at or from the Premises, regardless from whence delivery or performance is made, (ii) pursuant to mail, telephone, telegraph, catalogue, facsimile, internet, electronic, video and computer orders, and orders by means of other technology-based systems whether now existing or hereafter developed, and other orders received, placed or filled at the Premises, (iii) resulting from transactions originating in, at or from the Premises, and (iv) deposits not refunded to customers. Excluded from Gross Sales in order to determine Adjusted Gross Sales shall be: (i) exchanges of merchandise between Tenant's stores made only for the convenient operation of Tenant's business and not to consummate a sale made in, at or from the Premises, (ii) returns to manufacturers; (iii) refunds to customers (but only to the extent included in Gross Sales); (iv) sales of fixtures, machinery and equipment after use in Tenant's business in the Premises, and (v) sales, excise or similar tax imposed by governmental authority and collected from customers and paid out by Tenant. No other taxes shall be deducted from Gross Sales.

<u>Section 4.5.</u>        <u>Taxes.</u>
A.        <u>Definition.</u>  Landlord shall pay or cause to be paid, upon the discretion of Landlord but before delinquent, all Taxes (as hereinafter defined) levied, assessed, imposed, become due and payable, or liens arising in connection with the use, occupancy or possession of or become due and payable out of or for, the Center (and any other Taxes which Landlord may be obligated to pay in respect of the Adjacent Land) or any part thereof during the Lease Term. As used in this Section 4.5 the term "Taxes" shall mean and include all property taxes, both real and personal, public and governmental charges and assessments, and all other taxes which Landlord is obligated to pay with respect to the development of the Center, including all extraordinary or special assessments or assessments against any of Landlord's personal property now or hereafter located in the Center, all costs and expenses including, but not limited to consulting, appraisal and attorneys' fees incurred by Landlord in researching, reviewing, evaluating, contesting, appealing or negotiating with public authorities (Landlord having the sole authority to conduct such a contest or enter into such negotiations) as to any of the same and all sewer, water and other utility taxes and impositions, but shall not include taxes on Tenant's machinery, equipment, inventory or other personal property or assets of Tenant, Tenant agreeing to pay all taxes upon or attributable to such excluded property without apportionment.

Taxes shall not include interest and penalties due on delinquent Taxes, but shall include interest on Taxes withheld by virtue of Landlord making partial payment under protest in the event such partial payment is permitted in connection with a tax appeal proceeding.

B.        <u>Tenant's Share.</u>  Tenant shall pay to Landlord, as additional rent, its proportionate share of all calendar year or fiscal year Taxes upon the Center (and any other Taxes which Landlord may be obligated to pay in respect to the Adjacent Land) which become due or payable during the Lease Term, such proportionate share to be prorated for periods at the beginning and end of the Lease Term which do not constitute full calendar months or years. Tenant's proportionate share of any such Taxes shall be that portion of such taxes which bears the same ratio to the total Taxes as the Store Floor Area bears to the average rentable floor area rented or occupied in the Center (hereinafter called "Rented Floor Area") during the calendar year or fiscal year in which such Taxes

-8-

02/09/11

constitute a lien upon the Center.  The floor area of (i) Major Tenant spaces whether such spaces are vacant or occupied, (ii) any tenant in a free standing premises, (iii) theaters, (iv) restaurants, (v) kiosks, (vi) storage spaces, (vii) any tenant with no frontage on the enclosed mall of the Center, and (viii) Common Areas, as hereinafter defined, shall not be included in the Rented Floor Area or rentable floor area, and any contributions to Taxes received by Landlord from such tenants (less any tax payments recaptured against any other rents or payments due Landlord) shall be deducted from Taxes prior to the calculation of Tenant's proportionate share.

      C.      **Payment by Tenant**.  Tenant's proportionate share of Taxes shall be paid in monthly installments commencing with the Commencement Date, in amounts initially estimated by Landlord, one (1) such installment being due on the first day of each full or partial month during the Lease Term.  Upon notice from Landlord, such monthly installments shall increase or decrease from time to time to reflect the then current estimate of the amount of any Taxes due.  When the actual amount of any such Taxes is determined by Landlord, Landlord will notify Tenant of such actual amount (in a format to be determined by Landlord) and of any excess or deficiency in the amount theretofore paid by Tenant as its share of such Taxes.  Any such excess will be credited to Tenant's account.  Tenant will pay the amount of any deficiency to Landlord within ten (10) days following Landlord's notice thereof.  Tenant acknowledges and stipulates that Landlord has made no representations or agreement of any kind as to the total dollar amount of such Taxes, actual or estimated, or Tenant's dollar share thereof.

      D.      **Other Taxes**.  Tenant's proportionate share of any governmental tax or charge (other than income tax) levied, assessed, or imposed on account of the payment by Tenant or receipt by Landlord, or based in whole or in part upon, the rents in this Lease reserved or upon the Center or the value thereof shall be paid by Tenant including any new direct or indirect tax or surcharge against the Center, the parking areas, or the number of parking spaces in the Center or any new direct or indirect tax or surcharge in addition to or by way of substitution for any existing tax or assessment which Landlord becomes obligated to pay with respect to the Center.

      E.      **Larger Parcel**.  If the land under the Center is a part of a larger parcel of land for assessment purposes (the "Larger Parcel"), the taxes and assessments allocable to the land in the Center for the purpose of determining Taxes under this Section shall be deemed a fractional portion of the taxes and assessments levied against the Larger Parcel, the numerator of which is the acreage in the Center and the denominator of which is the acreage in the Larger Parcel.

**Section 4.6.**      **Additional Rent**.
All amounts required or provided to be paid by Tenant under this Lease other than Minimum Annual Rent and Percentage Rent shall be deemed additional rent and Minimum Annual Rent, Percentage Rent and additional rent shall in all events be deemed rent.

**Section 4.7.**      **Landlord's Expenses**.
If Landlord pays any monies or incurs any expense to correct a breach of this Lease by Tenant or to do anything in this Lease required to be done by Tenant, or incurs any expense (including, but not limited to, attorneys' fees and court costs), as a result of Tenant's failure to perform any of Tenant's obligations under this Lease, all amounts so paid or incurred shall, on notice to Tenant, be considered additional rent payable by Tenant with the first Minimum Monthly Rent installment thereafter becoming due and payable, and may be collected as provided by law in the case of rent.

**ARTICLE V**

**PARKING AND COMMON AREAS AND FACILITIES**

**Section 5.1.**      **Common Areas**.
All parking areas, access roads and facilities furnished, made available or maintained by Landlord in or near the Center, including employee parking areas, truck ways, driveways, loading docks and areas, delivery areas, multi-story parking facilities (if any), package pickup stations, elevators, escalators, pedestrian sidewalks, malls, including the enclosed mall (as indicated for identification purposes on Exhibit "A"), and Food Court, if any, courts and ramps, landscaped areas, retaining walls, stairways, bus stops, first-aid and comfort stations, lighting facilities, sanitary systems, utility lines, water filtration and treatment facilities, those areas within and adjacent to the Center for ingress and egress to and from the Center including, without limitation, the Temple, and the tunnel/roadway system under the Center, which from time to time may be provided by Landlord or others for the convenience, use or benefit of the tenants of the Center, Landlord, Ground Lessor, the owners and occupants of the Hotel and their respective concessionaires, agents, employees, customers, invitees and licensees, those areas, if any, upon which temporary or permanent off-site utility systems or parking facilities serving the Center may from time to time be located and other areas and improvements provided by Landlord for the general use in common of tenants and their customers and Major Tenants (if any) in the Center (all herein called "Common Areas") shall at all times be subject to the exclusive control and management of Landlord or the Owner of the Hotel Parcel (as defined in the REA), and Landlord or such Owner shall have the right, from time to time, to establish, modify and enforce reasonable rules, regulations and requirements with respect to all Common Areas, and  Tenant agrees to comply with, and to cause its employees and contractors to comply with, all rules, regulations and all reasonable amendments thereto and any and all rules, regulations, requirements and amendments thereto adopted pursuant to the REA.

-9-

Landlord and the Owner of the Hotel Parcel shall have the right from time to time to: change or modify and add to or subtract from the sizes, locations, shapes and arrangements of parking areas, entrances, exits, parking aisle alignments and other Common Areas; designate parking areas for Ground Lessor, Landlord, the owner of the Hotel Parcel and/or their employees and tenants and/or tenants of Landlord, and/or limit the total number of such employee spaces; restrict parking by Tenant's employees to designated areas (which may be at the far rear of the Adjacent Land); construct surface, sub-surface or elevated parking areas and facilities; establish and from time to time change the level or grade of parking surfaces; add to or subtract from the buildings in the Center; eliminate such access as may from time to time be available between the Center and the Hotel or any retail or commercial business in an adjoining or neighboring building; and do and perform such other acts in and to said Common Areas as Landlord in its sole discretion, reasonably applied, deems advisable for the use thereof by tenants and their customers or as such Owner is permitted to do pursuant to the REA. Tenant acknowledges that owners of other areas in and adjoining the Center may similarly alter, enlarge, reduce or relocate the improvements from time to time located thereon. Tenant further acknowledges that this Section 5.1 shall be for the benefit of and directly enforceable by Landlord and the Owner of the Hotel Parcel.

In the event that Landlord determines, in its sole discretion, to provide parking or transportation facilities for the Center, Landlord may charge a fee to users thereof and may impose and enforce such rules and regulations concerning the use thereof (including a prohibition of use by Tenant's employees) as Landlord may in its discretion deem desirable, provided that any fee will be waived for users receiving a validation from the casino on the Hotel Parcel. Landlord shall have the right at any and all times to utilize portions of Common Areas for promotions, exhibits, entertainments, product and other shows, displays, the leasing of kiosks or food facilities, or such other uses as may in Landlord's judgment tend to attract the public or benefit the Center. Except as specifically otherwise provided in any Operating Agreement, the Owner of the Hotel Parcel may do such other acts in and to the Hotel and those Common Areas located on the Adjacent Land as in its reasonable judgment may be desirable, including, but not limited to, the conversion of portions thereof to other uses.

Section 5.2.        Use of Common Areas.

Tenant and its business invitees, employees and customers shall have the nonexclusive right, in common with Landlord, the Ground Lessor, the owner of the Hotel Parcel and all others to whom Landlord, the Ground Lessor or any other party under the REA which is entitled to grant such rights has granted or may hereafter grant rights, to use the Common Areas for ingress, egress and parking subject to such reasonable regulations as Landlord or such other person may from time to time impose and the rights of Landlord set forth above. Tenant and Tenant's customers shall also have a non-exclusive right to walk through the Hotel in order to gain ingress to and egress from the Center. Pedestrian access between the Center and the Hotel shall be solely through that connecting point so designated on Exhibit "B-3" hereto. Tenant shall pay Landlord, upon demand, $10.00 for each day on which a car of Tenant, a concessionaire, employee or agent of Tenant is parked outside any area designated by Landlord for employee parking. Tenant authorizes Landlord to cause any such car to be towed from the Common Areas and Tenant shall reimburse Landlord for the cost thereof upon demand, and otherwise indemnify and hold Landlord harmless with respect thereto. Tenant shall abide by all rules and regulations and cause its concessionaires, officers, employees, agents, customers and invitees to abide thereby. Landlord or the Owner of the Hotel Parcel may at any time close temporarily any Common Areas to make repairs or changes, prevent the acquisition of public rights therein, discourage noncustomer parking, or for other reasonable purposes. Tenant shall furnish Landlord license numbers and descriptions of cars used by Tenant and its concessionaires, officers and employees. Tenant shall not interfere with Landlord's or other permitted users' rights to use any part of the Common Areas.

ARTICLE VI

COST TO OPERATE THE CENTER

Section 6.1.        Expense of Operating the Center.

Landlord will operate, manage, maintain and repair or cause to be operated, managed, maintained or repaired, the Center, to the extent the same is not done by any Major Tenant.

-10-

02/09/11

**Section 6.2.**    Tenant's Share of Operating Costs.

In consideration of Landlord's operation, management, maintenance and repair of the Center as provided herein, Tenant shall pay to Landlord, as additional rent, for and with respect to each and every calendar year during the Lease Term (prorated for any partial calendar year), in equal monthly installments due and payable in advance on the first day of each and every month during the Lease Term commencing with the Commencement Date, the OC Charge as calculated pursuant to Section 1.1 herein. Tenant acknowledges and agrees that, because the OC Charge is an amount agreed to by the parties, Tenant shall have no right to audit Landlord's books and records concerning the OC Charge.

## ARTICLE VII

## UTILITIES AND SERVICES

**Section 7.1.**    Utilities.

Tenant shall not install any equipment which can exceed the capacity of any utility facilities and if any equipment installed by Tenant requires additional utility facilities, the same shall be installed at Tenant's expense in compliance with all code requirements and plans and specifications which must be approved in writing by Landlord. Tenant shall be solely responsible for and promptly pay all charges for use or consumption of sewer, gas, electricity, water and all other utility services. Subject to the applicable rules and regulations of the Nevada Public Service Commission, Landlord may make electrical service available to the Premises, and so long as Landlord continues to provide such electrical service Tenant agrees to purchase the same from Landlord and pay Landlord for the electrical service (based upon Landlord's determination from time to time of Tenant's consumption of electricity), as additional rent, on the first day of each month in advance (and prorated for partial months), commencing on the Commencement Date at the same cost as would be charged to Tenant from time to time by the utility company which otherwise would furnish such services to the Premises if it provided such services and metered the same directly to the Premises, but in no event at a cost which is less than the cost Landlord must pay in providing such electrical service. Landlord may supply water or other utilities to the Premises, and so long as Landlord continues to provide water or such other utilities Tenant shall pay Landlord for same at the same cost as would be charged to Tenant by the utility company which otherwise would furnish such service to the Premises if it provided such service and metered the same directly to the Premises, but in no event at a cost which is less than the cost Landlord must pay in providing such service, and in no event less than the minimum monthly charge which would have been charged by the utility company in providing such service. Subject to the applicable rules and regulations of the State Public Service Commission, Landlord may provide a shared tenant telephone service to the Premises and so long as Landlord continues to provide such telephone service Tenant agrees to purchase the same from Landlord and pay Landlord for the telephone service at the same cost as would be charged to Tenant by the utility company which otherwise would furnish such service to the Premises if it provided such service directly to the Premises, but in no event at a cost which is less than the cost Landlord must pay in providing such telephone service. Landlord shall have the right to designate an alternate third party utility company or provider to provide any such utility service to the Premises and/or the Center.

Tenant shall operate its heating and air conditioning so that the temperature in the Premises will be the same as that in the adjoining mall, and set Tenant's thermostat at the same temperature as that thermostat in the mall which is nearest the Premises. Tenant shall be responsible for the installation, maintenance, repair and replacement of ~~air-conditioning, heating and ventilation systems within and specifically for the Premises, including~~ all *HVAC* components such as air handling units, air distribution systems, motors, controls, grilles, thermostats, filters and all other components *within and specifically for the Premises*. Tenant shall contract for, in its own name, and shall pay for a qualified service contractor to periodically inspect, adjust, clean and repair such systems, including changing filters on a quarterly basis. Tenant shall promptly furnish a copy of each inspection and service report to the Center manager. Tenant shall operate ventilation so that the relative air pressure in the Premises will be the same as or less than that in the adjoining mall as required by the Landlord. If Tenant's use of the Premises results in special exhaust requirements, Tenant shall have the exhaust fans interlocked with the make-up air units. If Tenant's use of the Premises requires a grease trap, Tenant shall contract for, in its own name, and shall pay for a qualified service contractor to inspect, clean and repair such grease trap at such intervals as may be required by Tenant's use, but in no event less frequently than once a month. Tenant shall promptly furnish a copy of the inspection and service report to the Center manager. In the event such grease trap services Tenant and other tenants in the Center, Landlord may elect to perform such inspection, cleaning and repairing, and Tenant shall pay to Landlord its proportionate share of the cost thereof based upon the number of tenants serviced by such grease trap. Tenant's proportionate share of such cost shall be due and payable within ten (10) days after billings therefor are rendered to Tenant.

In the event Tenant requires the use of telecommunication services, including, but not limited to, credit card verification and/or other data transmission, then Tenant shall contract for such services with one of the service providers available at the Center.

**Section 7.2.**    Air Conditioning of Premises.

Landlord will provide and maintain a central plant and a system of chilled media to the Premises installed at a point determined by Landlord. Tenant agrees to purchase the chilled media services from Landlord and pay Landlord annually therefor, as additional rent, in equal monthly installments, in advance on the first day of each month the Central Plant Charge set forth in Article I, increased in the manner hereinafter provided.

-11-

The Central Plant Charge shall be recalculated from time to time on dates selected by the Landlord (but no less often than annually, each time the Landlord's utility costs are changed, and/or each time field verification indicates that Tenant's use of the system has changed.)

The current Adjusted Central Plant Charge shall be calculated by multiplying the original Central Plant Charge by a series of adjusting multipliers as follows:

$$\text{Adjusted Central Plant Charge} = \text{Central Plant Charge} \times M_1 \times M_2 \times M_3 \times M_4$$

(a)     $M1$ = Capacity Multiplier

The Capacity Multiplier shall be the greater of 1 or the multiplier arrived at by applying the following formula:

$$M_1 = 1 + [0.90[\text{BTUH}/30 - 1]]$$

The factor "BTUH" shall mean Tenant's BTUH/per Sq. Ft. of Store Floor Area and shall be the calculated peak design total heat gain as determined in accordance with ASHRAE procedures. Tenant's outdoor air or exhaust that is derived via the Landlord's system, and total heat gain from the roof, lights, fan motors and other items, shall be included in calculating the BTUH/per Sq. Ft. factor of this section for purposes of determining the capacity multiplier. The peak total heat gain shall be calculated using the same sun time hour as is used by Landlord in determining the peak building heat gain; typically 1600 hours.

(b)     $M_2$ = Hours Multiplier

The Hours Multiplier shall be the greater of 1 or the multiplier arrived at by applying the following formula:

$$M_2 = 1 + [\text{Extra Hours}/\text{Regular Hours}]$$

The term "Extra Hours" shall mean Tenant's hours use of system during times other than the originally established regular weekly hours of the Center. The term "Regular Hours" shall mean originally established regular weekly hours of the Center.

(c)     $M_3$ = Utility Cost Multiplier

The Utility Cost Multiplier shall be the greater of 1 or the multiplier arrived at by applying the following formula:

$$M_3 = 1 + [0.90 [\text{Current Cost}/\text{Original Cost} - 1]]$$

The term "Current Cost" shall mean "Utility Cost" based on rates in effect on the selected date. The term "Original Cost" shall mean Utility Cost based on rates in effect on August 31, 2009. The term "Utility Cost" shall mean the cost to Landlord of the utilities necessary for furnishing chilled media to the Premises, including all charges made to Landlord by the public utilities furnishing the same and based on the original consumption and demands estimated for the central HVAC system and building.

(d)     $M_4$ = Maintenance Cost Multiplier

The Maintenance Cost Multiplier shall be the greater of 1 or the multiplier arrived at by applying the following formula:

$$M_4 = 1 + [0.10 [\text{Current CPI}/\text{Original CPI} - 1]]$$

The term "Current CPI" shall mean the "Consumer Price Index" on the selected date. The term "Original CPI" shall mean the "Consumer Price Index" for October 15, 2009. The term "Consumer Price Index" as used in this Section 7.2 herein shall mean "United States City Average All Items for All Urban Consumers (CPI-U, 1982-84=100)" published by the Bureau of Labor Statistics of the U.S. Department of Labor. If the publication of the Consumer Price Index of the U.S. Bureau of Labor Statistics is discontinued, comparable statistics on the purchasing power of the consumer dollar published by a responsible financial periodical selected by Landlord shall be used for making such computations.

-12-

Section 7.3.    Enforcement and Termination.

In the event of any default by Tenant, Landlord reserves the right, in addition to all other rights and remedies available to Landlord, to cut off and discontinue, without notice or liability to Tenant, any utilities or services provided in accordance with the provisions of this Article VII.  Landlord shall not be liable to Tenant in damages or otherwise if any utilities or services, whether or not furnished by Landlord hereunder, are interrupted or terminated because of repairs, installation or improvements, or any cause beyond Landlord's reasonable control, nor shall any such termination relieve Tenant of any of its obligations under this Lease.  Tenant shall operate the Premises in such a way as shall not waste fuel, energy or natural resources.  Tenant shall cooperate with Landlord's reasonable directives to reduce energy consumption, including installation of new energy efficient equipment or the modification or replacement of existing equipment, as the case may be.  If any governmental authority shall order mandatory energy conservation or if Landlord elects voluntarily to cooperate in energy conservation at the request of any governmental authority, including, without limitation, a reduction in operating hours or lighting usage, then Tenant shall comply with such requirements.  Landlord may cease to furnish any one or more of said utilities or services to Tenant without liability for the same, and no discontinuance of any utilities or services shall constitute a constructive eviction.

## ARTICLE VIII

## CONDUCT OF BUSINESS BY TENANT

Section 8.1.    Use of Premises.

The Premises shall be occupied and used by Tenant solely for the Permitted Use set forth in Article I.  Tenant expressly understands and acknowledges that its Permitted Use is nonexclusive, and that other tenants may sell items identical or similar to those sold by Tenant, and in no event shall this Lease grant any exclusive use rights with respect to the Hotel Parcel or with respect to any merchandise currently or in the future sold at the store located in the Center leased to and operated by Ground Lessor.  Tenant hereby warrants that it has the full and unfettered right to use the Trade Name, set forth in Article I, for the entire Lease Term and that such use will not in any way infringe on the rights of others.  The Permitted Use is a material consideration to Tenant entering into this Lease so as to permit Landlord to maintain an appropriate tenant mix, or balance, both to the quality and quantity of sales, within the Center in order to achieve the maximum gross sales for all tenants and to assure the continued operation of a full service regional shopping center development.

The Premises shall not be used, whether by Tenant or any other party, for any of the following activities: (a) operation of an automated teller machine (ATM) or any other machine or device performing any of the functions typically performed by ATM's; (b) operation of one or more antennae or other transmission device for the purpose of distributing wireless frequency into the Common Areas of the Center; (c) display of signs, billboards or other advertising media not directly related to the conduct of Tenant's primary business; (d) operation of vending machines of any kind or character, unless (i) access to such machines is strictly limited to Tenant's employees only, and (ii) such machines are not visible to Tenant's customers or the public; or (e) any other activity that is not directly or integrally related to the conduct of Tenant's primary business activity or activities as described in Article I (Permitted Use) hereof.

Section 8.2.    Prompt Occupancy and Use.

Tenant will occupy the Premises upon the Commencement Date and thereafter continuously operate and conduct in one hundred percent (100%) of the Premises during each hour of the entire Lease Term when Tenant is required under this Lease to be open for business the business permitted under Section 8.1 hereof, with a full staff and full stock of merchandise, using only such minor portions of the Premises for storage and office purposes as are reasonably required.  The parties agree that:  Landlord has relied upon Tenant's occupancy and operation in accordance with the foregoing provisions; because of the difficulty or impossibility of determining Landlord's damages which would result from Tenant's violation of such provisions, including but not limited to damages from loss of Percentage Rent from Tenant and percentage rent from other tenants, and diminished saleability, mortgageability and economic value, Landlord shall be entitled to liquidated damages if it elects to pursue such remedy; therefore for any day that Tenant does not fully comply with the provisions of this Section 8.2 the Minimum Annual Rent, prorated on a daily basis, shall be increased by twenty-five percent (25%), such increased sum representing the damages which the parties agree Landlord will suffer by Tenant's noncompliance.  In addition to all other remedies, Landlord shall have the right to obtain specific performance by Tenant upon Tenant's failure to comply with the provisions of this Section 8.2.

Section 8.3.    Conduct of Business.

Such business shall be conducted under the Trade Name set forth in Article I unless another name is previously approved in writing by the Landlord and in such manner as shall assure the transaction of a maximum volume of business in and at the Premises.  Tenant's store shall be and remain open on Sunday through Thursday from 10:00 A.M. until 11:00 P.M., on Friday and Saturday from 10:00 A.M. until midnight, and on such other days, nights and hours as shall be set from time to time by Landlord.

Section 8.4.    Operation by Tenant.

Tenant covenants and agrees that it will:  not place or maintain any merchandise, vending machines or other articles in any vestibule or entry of the Premises or outside the Premises; store garbage, trash, rubbish and other refuse in rat-proof and insect-proof

-13-

02/09/11

containers inside the Premises, and remove the same frequently and regularly and, if directed by Landlord, by such means and methods and at such times and intervals as are designated by Landlord, all at Tenant's costs, including a pre-stocking charge for the removal of trash prior to the Commencement Date, and, upon Landlord's request, provide a Waste Profile Sheet or equivalent information concerning contents of trash; not permit any sound system audible or objectionable advertising medium visible outside the Premises; keep all mechanical equipment free of vibration and noise and in good working order and condition; not commit or permit waste or a nuisance upon the Premises; not permit or cause odors to emanate or be dispelled from the Premises; not solicit business in the Common Areas nor distribute advertising matter to, in or upon any Common Area; not permit the loading or unloading or the parking or standing of delivery vehicles outside any area designated therefor, nor permit any use of vehicles which will interfere with the use of any Common Areas; comply with all laws, recommendations, ordinances, rules and regulations of governmental, public, private and other authorities and agencies, including those with authority over insurance rates, with respect to the use or occupancy of the Premises, and including but not limited to the Americans with Disabilities Act of 1990 and the Williams-Steiger Occupational Safety and Health Act; light the show windows of the Premises and all signs each night of the year for not less than one (1) hour after the Premises is permitted to be closed; not permit any noxious, toxic or corrosive fuel or gas, dust, dirt or fly ash on the Premises; not place a load on any floor in the Center which exceeds the floor load per square foot which such floor was designed to carry; store in the Premises only merchandise which Tenant intends to sell at, in or from the Premises, within a reasonable time after receipt thereof.

Landlord may make additional services, including but not limited to, music systems, pest control, trash removal, and/or trash compactor, cleaning, maintenance, and security, available to the Premises and, in such event, Tenant shall utilize such services, at Tenant's expense.

Section 8.5.      Emissions and Hazardous Materials.

    A.      Emissions.  Tenant shall not, without the prior written consent of Landlord:

    (i)      make, or permit to be made, any use of the Premises or any portion thereof which emits, or permits the emission of an unreasonable amount of dust, sweepings, dirt, cinders, fumes or odors into the atmosphere, the ground or any body of water, whether natural or artificial (including rivers, streams, lakes, ponds, dams, canals, or flood control channels), or which emits, or permits the emission of dust, sweepings, dirt, cinders, fumes or odors into the atmosphere, the ground or any body of water, whether natural or artificial (including rivers, streams, lakes, ponds, dams, canals, or flood control channels) which is in violation of any federal, state or local law, ordinance, order, rule, regulation, code or any other governmental restriction or requirement;

    (ii)      permit any vehicle on the Premises to emit exhaust which is in violation of any federal, state or local law, ordinance, order, rule, regulation, code or any other governmental restriction or requirement;

    (iii)      create, or permit to be created, any sound pressure level which will interfere with the quiet enjoyment of any real property adjacent to the Premises, or which will create a nuisance or violate any federal, state or local law, ordinance, order, rule, regulation, code or any other governmental restriction or requirement;

    (iv)      transmit, receive, or permit to be transmitted or received any electromagnetic, microwave or other radiation which is harmful or hazardous to any person or property in, on or about the Premises, or anywhere else, or which interferes with the operation of any electrical, electronic, telephonic or other equipment wherever located, whether on the Premises or anywhere else;

    (v)      create, or permit to be created, any ground vibration that is discernible outside the Premises; or

    (vi)      produce or permit to be produced any intense glare, light or heat except within an enclosed or screened area and then only in such manner that the glare, light or heat shall not be discernible outside the Premises.

    B.      Hazardous Material.

Tenant shall not, without the prior written consent of Landlord, cause or permit, knowingly or unknowingly, any Hazardous Material (hereinafter defined) to be brought or remain upon, kept, used, discharged, treated, or emitted in or about, or treated at the Premises.  As used in this Lease, "Hazardous Material(s)" shall mean any hazardous, toxic or radioactive substance, material, matter or waste which is or becomes regulated by any federal, state or local law, ordinance, order, rule, regulation, code or any other governmental restriction or requirement, and shall include asbestos, petroleum products and the terms "Hazardous Substance" and "Hazardous Waste" as defined in the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), as amended, 42 U.S.C. 9601 et seq., the Resource Conservation and Recovery Act ("RCRA"), as amended, 42 U.S.C. 6901 et seq.  To obtain Landlord's consent, Tenant shall have an "Environmental Audit" prepared by a Qualified Engineer or Environmental Professional for Landlord's review to be relied upon by Landlord and for Landlord's use.  Such Environmental Audit shall list:  (1) the name(s) of each Hazardous Material and a Material Safety Data Sheet (MSDS) as required by the Occupational Safety and Health Act; (2) the volume proposed to be used, stored and/or treated at the Premises (monthly); (3) the purpose of such

-14-

02/09/11

Hazardous Material; (4) the proposed on-premises storage location(s); (5) the type and description of such storage area(s); (6) the location of sanitary and storm drains; (7) the name(s) of the proposed off-premises disposal entity; and (8) an emergency preparedness plan in the event of a release. Additionally, the Environmental Audit shall include copies of all required federal, state, and local permits concerning or related to the proposed use, storage, or treatment of Hazardous Materials at the Premises. Tenant shall submit a new Environmental Audit whenever it proposes to use, store, or treat a new Hazardous Material at the Premises or when the volume of existing Hazardous Materials to be used, stored, or treated at the Premises expands by ten percent (10%) during any thirty (30) day period. If Landlord in its reasonable judgment finds the Environmental Audit acceptable, then Landlord shall deliver to Tenant Landlord's written consent. Notwithstanding such consent, Landlord may revoke its consent upon: (1) Tenant's failure to remain in full compliance with applicable environmental permits and/or any other requirements under any federal, state, or local law, ordinance, order, rule, regulation, code or any other governmental restriction or requirement (including but not limited to CERCLA and/or RCRA), related to environmental safety, human health, or employee safety; (2) the Tenant's business operations pose or potentially pose a human health risk to other tenants; or (3) the Tenant expands its use, storage, or treatment of Hazardous Materials in a manner inconsistent with the safe operation of a shopping center. Should Landlord consent in writing to Tenant bringing, using, storing or treating any Hazardous Material in or upon the Premises, Tenant shall strictly obey and adhere to any and all federal, state or local laws, ordinances, orders, rules, regulations, codes or any other governmental restrictions or requirements (including but not limited to CERCLA and/or RCRA), which in any way regulates, governs or impacts Tenant's possession, use, storage, treatment or disposal of said Hazardous Material. In addition, Tenant represents and warrants to Landlord that: (1) Tenant shall apply for and remain in compliance with applicable RCRA and state permits; (2) Tenant shall report to applicable governmental authorities any release of reportable quantities of a hazardous substance(s) as mandated by Section 103(a) of CERCLA; (3) Tenant, within five (5) days of receipt, shall send to Landlord a copy of any notice, order, inspection report, or other document issued by any governmental authorities relevant to the Tenant's compliance status with environmental or health and safety laws; and (4) Tenant shall remove from the Premises all Hazardous Materials at the termination of this Lease.

In addition to, and in no way limiting, Tenant's duties and obligations as set forth in Section 11.6 of this Lease, should Tenant breach any of its duties and obligations as set forth in this Section 8.5 of this Lease, or if the presence of any Hazardous Material on the Premises results in contamination of the Premises, the Center, any land other than the Center, the atmosphere, or any water or waterway (including groundwater), or if contamination of the Premises or of the Center by any Hazardous Material otherwise occurs for which Tenant is otherwise legally liable to Landlord for damages resulting therefrom, Tenant shall indemnify, save harmless and, at Landlord's option and with attorneys approved in writing by Landlord, defend Landlord, and its contractors, agents, employees, partners, officers, directors, and mortgagees, if any, from any and all claims, demands, damages, expenses, fees, costs, fines, penalties, suits, proceedings, actions, causes of action, and losses of any and every kind and nature (including, without limitation, diminution in value of the Premises or the Center, damages for the loss or restriction on use of the rentable or usable space or of any amenity of the Premises or the Center, damages arising from any adverse impact on marketing space in the Center, and sums paid in settlement of claims and for attorney's fees, consultant fees and expert fees, which may arise during or after the Lease Term or any extension thereof as a result of such contamination). This includes, without limitation, costs and expenses, incurred in connection with any investigation of site conditions or any cleanup, remedial, removal or restoration work required by any federal, state or local governmental agency or political subdivision because of the presence of Hazardous Material on or about the Premises or the Center, or because of the presence of Hazardous Material anywhere else which came or otherwise emanated from Tenant or the Premises. Without limiting the foregoing, if the presence of any Hazardous Material on or about the Premises or the Center caused or permitted by Tenant results in any contamination of the Premises or the Center, Tenant shall, at its sole expense, promptly take all actions and expense as are necessary to return the Premises and/or the Center to the condition existing prior to the introduction of any such Hazardous Material to the Premises or the Center; provided, however, that Landlord's approval of such actions shall first be obtained in writing.

Section 8.6.     Painting, Decorating, Displays, Alterations.
Tenant will not paint, decorate or change the architectural treatment of any part of the exterior of the Premises nor any part of the interior of the Premises visible from the exterior nor make any structural alterations, additions or changes in the Premises without Landlord's written approval thereto, and will promptly remove any paint, decoration, alteration, addition or changes applied or installed without Landlord's approval and restore the Premises to an acceptable condition or take such other action with respect thereto as Landlord directs.

Tenant will install and maintain at all times, subject to the other provisions of this Section 8.6, merchandise displays in any show windows on the Premises; the arrangement, style, color and general appearance thereof and of displays in the interior of the Premises which are visible from the exterior, including, but not limited to, window displays, advertising matter, signs, merchandise and store fixtures, shall be maintained in keeping with the character and standards of the Center.

Section 8.7.     Other Operations.
If during the Lease Term Tenant directly or indirectly operates, manages or has any interest whatsoever in any other store or business operated for a purpose or business similar to or in competition with all or part of the business permitted under Section 1.1 hereof within *eight (8)* miles of any boundary line of the Center, it will injure Landlord's ability and right to receive Percentage Rent (such ability and right being a major consideration for this Lease and the construction of the Center). Accordingly, if Tenant

-15-

operates, manages or has such interest in any such store or business within such area (a "Radius Violation"), then, at Landlord's option, either (i) Tenant's Effective Rent (as defined below) shall be automatically increased by fifty percent (50%) calculated on a per diem basis for so long as the Radius Violation continues, such increase representing liquidated damages and not a penalty or (ii) one hundred percent (100%) of all sales made from any such other store or business shall be included in the computation of Gross Sales and Adjusted Gross Sales for the purpose of determining Percentage Rent under this Lease as though said Gross Sales and Adjusted Gross Sales had actually been made at, in or from the Premises. "Effective Rent" shall be Tenant's Minimum Annual Rent plus the highest Percentage Rent payable under the Lease by Tenant during the three (3) Lease Years immediately preceding the Radius Violation. Landlord shall have all rights of inspection of books and records with respect to such stores or businesses as it has with respect to the Premises; and Tenant shall furnish to Landlord such reports with respect to Gross Sales and Adjusted Gross Sales from such other store or business as it is herein required to furnish with respect to the Premises.

Section 8.8.        Sales and Dignified Use.

Tenant shall continuously and without interruption, throughout the Lease Term in good faith, actively use, occupy and operate the entire Premises, with fixtures and decor, an inventory of goods and merchandise and a staff of sales personnel adequate, sufficient and appropriate to operate the Premises as a "first-class", "high-quality", "fashionable" store or business (as opposed to a "general", "promotional" or "self-service" store or business) as those standards of operation may be interpreted from time to time during the Lease Term. The foregoing description is intended only as a description of the general quality of the merchandise or services Tenant may sell and the general quality of customer service, merchandising, fixturing and decor Tenant must maintain in the operation of the Premises. The foregoing description is not intended by Landlord and will not be enforced to affect the retail selling price of Tenant's merchandise or services. Tenant shall operate its business at the Premises in a respectable, reputable, tasteful, competent and dignified manner in order to enhance the image of the Center as a whole and its reputation as a dignified and desirable place to shop and to achieve the maximum volume of sales so that Landlord will receive the maximum amount of Percentage Rent from Tenant or percentage rent from other tenants and occupants of the Center. No public or private auction or any fire, "going out of business," bankruptcy or similar sales or auctions shall be conducted in or from the Premises and the Premises shall not be used in a disreputable or immoral manner or in violation of national, state or local laws.

Section 8.9.        Rules and Regulations.

Tenant shall comply with the following rules and regulations and any amendments thereto as developed by Center management: (i) Tenant shall advise and cause its vendors to deliver all merchandise before noon on Mondays through Fridays, not at other times; (ii) all deliveries are to be made to designated service or receiving areas and Tenant shall request delivery trucks to approach their service or receiving areas by designated service routes and drives; (iii) tractor trailers which must be unhooked or parked must use steel plates under dolly wheels to prevent damage to the asphalt paving surface. In addition, wheel blocking must be available for use. Tractor trailers are to be removed from the loading areas after unloading. No parking or storing of such trailers will be permitted in the Center; (iv) except for small parcel packages, no deliveries will be permitted through the malls unless Tenant does not have a rear service door. In such event, prior arrangements must be made with the Mall Manager for delivery. Merchandise being received shall immediately be moved into Tenant's Premises and not be left in the service or receiving areas; (v) Tenant is responsible for storage and removal of its trash, refuse and garbage. Tenant shall not dispose of the following items in sinks or commodes: plastic products (plastic bags, straws, boxes); sanitary napkins; tea bags; cooking fats, cooking oils; any meat scraps or cutting residue; petroleum products (gasoline, naphtha, kerosene, lubricating oils); paint products (thinner, brushes); or any other item which the same are not designed to receive. All Store Floor Area of Tenant, including vestibules, entrances and returns, doors, fixtures, windows and plate glass, shall be maintained in a safe, neat and clean condition; (vi) other than as permitted under the provisions of the Lease, Tenant shall not permit or suffer any advertising medium to be placed on mall walls, on Tenant's mall or exterior windows, on standards in the mall, on the sidewalks or on the parking lot areas or light poles. No permission, expressed or implied, is granted to exhibit or display any banner, pennant, sign, and trade or seasonal decoration of any size, style or material within the Center, outside the Premises; (vii) Tenant shall not permit or suffer the use of any advertising medium which can be heard or experienced outside of the Premises, including, without limiting the generality of the foregoing, flashing lights, searchlights, loud speakers, phonographs, radios or television. No radio, television, or other communication antenna equipment or device is to be mounted, attached, or secured to any part of the roof, exterior surface, or anywhere outside the Premises, unless Landlord has previously given its written consent; (viii) Tenant shall not permit or suffer merchandise of any kind at any time to be placed, exhibited or displayed outside its Premises, nor shall Tenant use the exterior sidewalks or exterior walkways of its Premises to display, store or place any merchandise. No sale of merchandise by tent sale, truck load sale or the like, shall be permitted on the parking lot or other Common Areas; (ix) Tenant shall not permit or suffer any portion of the Premises to be used for lodging purposes, nor conduct or permit any unusual firing, explosion or other damaging or dangerous hazard within the Premises or the Common Areas; (x) Tenant shall not permit or suffer any portion of the Premises to be used for any warehouse operation, or any assembling, manufacturing, distilling, refining, smelting, industrial, agricultural, drilling or mining operation, adult bookstore or cinema, peepshow, entertainment or sale of products of an obscene or pornographic nature or predominately sexual nature; and (xi) Tenant shall not, in or on any part of the Common Areas: (a) vend, peddle or solicit orders for sale or distribution of any merchandise, device, service, periodical, book, pamphlet or other matter whatsoever; (b) exhibit any sign, placard, banner, notice or other written material, except for activities as approved in writing by Landlord; (c) distribute any circular, booklet, handbill, placard or other material, except for activities as approved in writing by Landlord; (d) solicit membership in any organization, group or association or contribution for any purpose; (e) create a public or private nuisance; (f) use any Common Areas (including the

-16-

enclosed mall) for any purpose when none of the other retail establishments within the Center is open for business or employment, except for activities as approved in writing by Landlord; (g) throw, discard or deposit any paper, glass or extraneous matter of any kind except in designated receptacles, or create litter or hazards of any kind; or (h) deface, damage or demolish any sign, light standard or fixture, landscaping materials or other improvement within the Center, or (i) the property of customers, business invitees or employees situated within the Center.

**Section 8.10.**     Gaming Authorities.

If at any time (i) Tenant or any person associated in any way with Tenant is denied a license, found unsuitable, or is denied or otherwise unable to obtain any other Approval (as defined herein) with respect to the Premises. the Center or the Hotel by the Nevada Gaming Commission or any other agency or subdivision of the State of Nevada. the State of New Jersey or any other agency or subdivision thereof or any other government regulating gaming (collectively "Gaming Authorities"). is required by any Gaming Authority to apply for an Approval and does not apply within any required time limit, as the same may be extended by such Gaming Authority, withdraws any application for Approval other than upon a determination by the applicable Gaming Authority that such Approval is not required. and if the result of the foregoing has or would have an adverse effect on Landlord or Ground Lessor or any Affiliate (as defined herein) of Landlord or Ground Lessor or does or would materially delay obtaining any Approval; or (ii) any Gaming Authority commences or threatens to commence any suit or proceeding against Landlord or Ground Lessor or any Affiliate of Landlord or Ground Lessor or to terminate or deny any Approval of Landlord or Ground Lessor or any Affiliate of Landlord or Ground Lessor as a result of Tenant or any person associated with Tenant (all of the foregoing events described in (i) and (ii) above are collectively referred to as a "Denial"). Landlord or Ground Lessor may terminate this Lease by written notice to Tenant; provided. however, that if Landlord or Ground Lessor exercises its right to terminate this Lease pursuant to this Section solely as the result of an association of Tenant or any person associated with Tenant which is not the subject of a Denial, this Lease shall not terminate if Tenant ends such association within thirty (30) days of such notice of termination or within such longer period of time, if any. as the Gaming Authority gives for terminating such association. Tenant and all such persons associated with Tenant shall promptly, and in all events within any time limit established by law, regulation or such Gaming Authority. furnish each Gaming Authority any information requested by such Gaming Authority and shall otherwise fully cooperate with all Gaming Authorities.  A person shall be deemed associated with Tenant if that person directly or indirectly owns any equity interest in Tenant. any equity interest in such person is directly or indirectly owned by Tenant. any equity interest in such person is directly or indirectly owned by a person directly or indirectly having any equity interest in Tenant (all of the foregoing are hereinafter referred to as "Tenant Affiliates"), such person is employed by Tenant or a Tenant Affiliate, is an officer, director or agent of Tenant or a Tenant Affiliate, has any contractual relationship with Tenant or a Tenant Affiliate, furnishes services or property to Tenant or a Tenant Affiliate, or has the power to exercise a significant influence over Tenant or a Tenant Affiliate.  Tenant represents to Landlord that neither Tenant, nor, to the best of Tenant's knowledge, any person associated with Tenant, is unwilling to file all necessary applications to obtain whatever Approvals may be required of such persons in connection with this lease.  To the best of Tenant's knowledge, neither Tenant nor any person associated with Tenant has ever engaged in any conduct or practices which any of the foregoing persons should reasonably believe would cause such person or entity to be denied any Approval. The term "Affiliate" of any specified person means any other person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified person or any officer, director, trustee or general partner of either of such persons.  For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such person, whether through the ownership of voting securities or by agreement or otherwise.  "Approval" means any license, finding of suitability or any other approval or permit by or from the Gaming Authorities. Tenant is aware that Ground Lessor has the right to terminate the Ground Lease should any matter occur with respect to Landlord which would permit the Ground Lessor or Landlord to terminate this Lease pursuant to this Section 8.10 if such matter occurred with respect to Tenant.

**Section 8.11.**     Entertainment Uses.

In the event that Tenant or any subtenant in the Center presents entertainment covered by the Labor Agreement between the Hotel and the International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators of the United States and Canada, Local 720, Las Vegas, Nevada ("Labor Agreement") or the Center is determined to be covered by the Labor Agreement, for any activity presented by or on behalf of Tenant or any subtenant in the Center, Tenant shall, and shall require any such subtenants to, comply with all wages, benefits, terms and conditions of employment contained in the Labor Agreement that may be imposed upon Tenant and its subtenants, by virtue of the Labor Agreement. Nothing in this Section 8.11 shall be deemed to permit Tenant or any subtenant to present any entertainment except as specifically otherwise permitted in this Lease.  Nothing herein shall be deemed to imply that the parties hereto believe that the Labor Agreement is applicable to the Center.

## ARTICLE IX

## MAINTENANCE OF LEASED PREMISES

**Section 9.1.**     Maintenance by Landlord.

Landlord shall keep or cause to be kept the foundations, roof and structural portions of the walls of the Premises in good order, repair and condition except for damage thereto due to the acts or omissions of Tenant, its agents, employees or invitees.  The

-17-

02/09/11

foregoing provision shall not prejudice Landlord's right to include the cost of maintaining the roof over the Premises within the provisions of Article VI of this Lease. Landlord shall commence required repairs as soon as reasonably practicable after receiving written notice from Tenant thereof. This Section 9.1 shall not apply in case of damage or destruction by fire or other casualty or condemnation or eminent domain, in which events the obligations of Landlord shall be controlled by Articles XVI and XVII. Except as provided in this Section 9.1 Landlord shall not be obligated to make repairs, replacements or improvements of any kind upon the Premises, or to any equipment, merchandise, stock in trade, facilities or fixtures therein, all of which shall be Tenant's responsibility, but Tenant shall give Landlord prompt written notice of any accident, casualty, damage or other similar occurrence in or to the Premises or the Common Areas of which Tenant has knowledge.

Section 9.2.     Maintenance by Tenant.

Tenant shall at all times, at Tenant's sole cost and expense, keep the Premises (including all entrances and vestibules) and all partitions, window and window frames and mouldings, glass, store fronts, doors, door openers, fixtures, equipment and appurtenances thereof (including lighting, heating, electrical, plumbing, waterproofing, ventilating and air conditioning fixtures and systems and other mechanical equipment and appurtenances) and all parts of the Premises, and parts of Tenant's Work not on the Premises, not required herein to be maintained by Landlord, in good order, condition and repair and clean, orderly, sanitary and safe, damage by unavoidable casualty excepted, (including but not limited to doing such things as are necessary to cause the Premises to comply with applicable laws, ordinances, rules, regulations and orders of governmental and public bodies and agencies, such as but not limited to the Americans with Disabilities Act of 1990 and the Williams-Steiger Occupational Safety and Health Act). If replacement of equipment, fixtures and appurtenances thereto is necessary, Tenant shall replace the same with new or completely reconditioned equipment, fixtures and appurtenances, and repair all damages done in or by such replacement. If Tenant fails to perform its obligations hereunder, Landlord without notice may, but shall not be obligated to, perform Tenant's obligations or perform work resulting from Tenant's acts, actions or omissions and add the cost of the same to the next installment of Minimum Monthly Rent due hereunder.

Section 9.3.     Surrender of Premises.

At the expiration of the Lease Term, Tenant shall surrender the Premises in the same condition as they were required to be in on the Required Completion Date, reasonable wear and tear and damage by unavoidable casualty excepted, and deliver all keys for, and all combinations on locks, safes and vaults in, the Premises to Landlord at Landlord's notice address as specified in Section 1.1 or, at Landlord's option, to the office of the Center's general manager.

ARTICLE X

ALTERATIONS AND TENANTS LIENS

Section 10.1.     Fixtures.

At least once during the Lease Term, upon the request of Landlord, but in any event no later than the end of the fifth (5th) Lease Year, Tenant shall refurbish all or any portion of the interior of the Premises so that the furnishings, furniture, flooring, wall fixtures and coverings, equipment and other appurtenances in the Premises shall be in keeping with current industry standards and in accordance with plans and specifications prepared by Tenant and approved by Landlord.

Section 10.2.     Removal and Restoration by Tenant.

All alterations, changes and additions and all improvements, including leasehold improvements, made by Tenant whether part of Tenant's Work or not, shall immediately upon installation attach to the fee and become Landlord's property and shall not be removed unless replaced by like property. If Tenant fails to remove any shelving, decorations, equipment, trade fixtures or personal property from the Premises prior to the end of the Lease Term, they shall become Landlord's property and Tenant shall repair or pay for the repair of any damage done to the Premises resulting from removing same but not for painting or redecorating the Premises.

Section 10.3.     Tenant's Liens.

A.     Tenant shall not suffer any mechanics' or materialmen's lien to be filed against the Premises or the Center by reason of work, labor, services or materials performed or furnished to Tenant or anyone holding any part of the Premises under Tenant. If any such lien shall at any time be filed as aforesaid, Tenant may contest the same in good faith, but, notwithstanding such contest, Tenant shall, within fifteen (15) days after the filing thereof *either (i)* cause such lien to be released of record by payment, bond, order of a court of competent jurisdiction, or otherwise, *or (ii) provide security as is reasonably acceptable to Landlord's lender or title insurer, such as but not necessarily limited to, the posting of a bond, while the lien is contested by Tenant*. In the event of Tenant's failure to release of record any such lien within the aforesaid period, Landlord may remove said lien by paying the full amount thereof or by bonding or in any other manner Landlord deems appropriate, without investigating the validity thereof, and irrespective of the fact that Tenant may contest the propriety or the amount thereof, and Tenant, upon demand, shall pay Landlord the amount so paid out by Landlord in connection with the discharge of said lien, together with interest thereon at the rate of twelve percent (12%) per annum and reasonable expenses incurred in connection therewith, including reasonable attorneys' fees, which amounts are due and payable to Landlord as additional rent on the first day of the next following month. Landlord shall have the right to deduct the expenses incurred by Landlord pursuant to this Section 10.3 from Landlord's Contribution towards Tenant's Work,

-18-

if any.  Nothing contained in this Lease shall be construed as a consent on the part of Landlord to subject Landlord's estate in the Premises to any lien or liability under the lien laws of the State where the Center is located.  Tenant's obligation to observe and perform any of the provisions of this Section 10.3 shall survive the expiration of the Lease Term or the earlier termination of this Lease.

B.        Tenant shall not create or suffer to be created a security interest or other lien against any improvements, additions or other construction made by Tenant in or to the Premises or against any equipment or fixtures installed by Tenant therein (other than Tenant's property), and should any security interest be created in breach of the foregoing, Landlord shall be entitled to discharge the same by exercising the rights and remedies afforded it under paragraph A of this Section.

ARTICLE XI

INSURANCE

Section 11.1.        By Landlord.
Landlord shall carry commercial general liability insurance (either through the purchase of insurance or a self-insurance plan) on those portions of the Common Areas included in Landlord's Tract providing coverage of not less than $5,000,000.00 against liability for bodily injury including death and personal injury for any one (1) occurrence and $1,000,000.00 property damage insurance, or combined single limit insurance in the amount of $5,000,000.00.

Landlord shall also carry insurance for fire, extended coverage, vandalism, malicious mischief and other endorsements deemed advisable by Landlord, insuring all improvements on Landlord's Tract, including the Premises and all leasehold improvements thereon and appurtenances thereto (excluding Tenant's merchandise, trade fixtures, furnishings, equipment, personal property and excluding plate glass) for the full insurable value thereof, with such deductibles as Landlord deems advisable, such insurance coverage to include improvements provided by Tenant as set forth in Exhibits "B" and "B-2" as Tenant's Work (excluding wall covering, floor covering, carpeting and drapes) and Landlord's Work as defined in Exhibit "B".

Section 11.2.        By Tenant.
Tenant agrees to carry commercial general liability insurance on the Premises during the Lease Term, covering the Tenant and naming the Landlord, Simon Property Group, Inc., Ground Lessor and Owner of the Hotel Parcel, and the property management company as additional insureds with terms and companies satisfactory to Landlord, on an Occurrence form with a limit of not less than $1,000,000.00 for any one (1) occurrence. Tenant shall also carry Umbrella or Excess insurance in an amount of not less than $2,000,000.00. Tenant's insurance will include contractual liability coverage, recognizing this Lease, products and completed operations liability and providing that Landlord and Tenant shall be given a minimum of sixty (60) days written notice by the insurance company prior to cancellation, termination or change in such insurance. Tenant also agrees to carry insurance against fire and such other risks as are from time to time required by Landlord, including, but not limited to, a standard "All Risk" policy of property insurance protecting against all risk of physical loss or damage, including without limitation, sprinkler leakage coverage and plate glass insurance covering all plate glass in the Premises (including store fronts), in amounts not less than the actual replacement cost, covering all of Tenant's merchandise, trade fixtures, furnishing, wall covering, floor covering, carpeting, drapes, equipment and all items of personal property of Tenant located on or within the Premises.  Upon the Commencement Date and annually thereafter, Tenant shall provide Landlord with certificates or, at Landlord's request, copies of the policies, evidencing that such insurance is in full force and effect and stating the terms thereof, including all endorsements at the following address (or such other address as Landlord may notify Tenant): Donald P. Pipino Company, Ltd., 7600 Market Street, PO Box 3849, Youngstown, Ohio 44513-3849. The minimum limits of the commercial general liability policy of insurance shall in no way limit or diminish Tenant's liability under Section 11.6 hereof and shall be subject to increase at any time, and from time to time, after the commencement of the fifth (5th) year of the Lease Term if Landlord in the exercise of its reasonable judgment shall deem same necessary for adequate protection. Within thirty (30) days after demand therefor by Landlord, Tenant shall furnish Landlord with evidence that it has complied with such demand.  Prior to the Commencement Date, Tenant's insurance coverage shall be governed by the provisions of Exhibit "B".

Notwithstanding the above mentioned commercial general liability insurance policy limit for Tenant, if Tenant after obtaining Landlord's prior written consent, does or intends to bring, possess, use, store, treat or dispose any Hazardous Material (herein defined) in or upon the Premises or Center, Landlord shall have the right, as a condition to such consent, to require Tenant to purchase additional public liability insurance with coverage of no less than Five Million and 00/100 Dollars ($5,000,000.00) and to purchase environmental impairment liability insurance with coverage of no less than Five Million and 00/100 Dollars ($5,000,000.00) with a deductible of no greater than Fifty Thousand and 00/100 Dollars ($50,000.00) to insure that anything contaminated with or by the Hazardous Material be removed from the Premises and/or the Center, and that the Premises and/or the Center be restored to a clean, neat, attractive, healthy, sanitary and non-contaminated condition.

Section 11.3.        Mutual Waiver of Subrogation Rights.
Landlord and Tenant and all parties claiming, by, through or under them mutually release and discharge each other from all claims and liabilities arising from or caused by any casualty or hazard covered or required hereunder to be covered in whole or in

-19-

02/09/11

part by property insurance on the Premises or in connection with property on or activities conducted on the Premises, and waive any right of subrogation which might otherwise exist in or accrue to any person on account thereof and further agree to evidence such waiver by endorsement to the required insurance policies, provided that such release shall not operate in any case where the effect is to invalidate or increase the cost of such insurance coverage (provided that in the case of increased cost, the other party shall have the right, within thirty (30) days following written notice, to pay such increased cost thereby keeping such release and waiver in full force and effect).

Section 11.4.    Waiver.

Landlord, its agents and employees, shall not be liable for, and Tenant waives all claims for, loss or damage, including but not limited to consequential damages, to person, property or otherwise, sustained by Tenant or any person claiming through Tenant resulting from any accident, casualty or occurrence in or upon any part of the Center including, but not limited to, claims for damage resulting from:  (a) any equipment or appurtenances becoming out of repair; (b) Landlord's failure to keep any part of the Center in repair; (c) injury done or caused by wind, water, or other natural element; (d) any defect in or failure of plumbing, heating or air conditioning equipment, electric wiring or installation thereof, gas, water, and steam pipes, stairs, porches, railings or walks; (e) broken glass; (f) the backing up of any sewer pipe or downspout; (g) the bursting, leaking or running of any tank, tub, washstand, water closet, waste pipe, drain or any other pipe or tank in, upon or about the Premises; (h) the escape of steam or hot water; (i) water, snow or ice upon the Premises; (j) the falling of any fixture, plaster or stucco; (k) damage to or loss by theft or otherwise of property of Tenant or others; (l) acts or omissions of persons in the Premises, other tenants in the Center, occupants of nearby properties, or any other persons; and (m) any act or omission of owners of adjacent or contiguous property, or of Landlord, its agents or employees.  All property of Tenant kept in the Premises shall be so kept at Tenant's risk only and Tenant shall save Landlord harmless from claims arising out of damage to the same, including subrogation claims by Tenant's insurance carrier.  *The provisions of this Section 11.4 shall not apply to the intentional acts or negligence of Landlord or Landlord's agents.*

Section 11.5.    Insurance - Tenant's Operation.

Tenant will not do or suffer to be done anything which will contravene Landlord's insurance policies or prevent Landlord from procuring such policies in amounts and companies selected by Landlord.  If anything done, omitted to be done or suffered to be done by Tenant in, upon or about the Premises shall cause the rates of any insurance effected or carried by Landlord on the Premises or other property to be increased beyond the regular rate from time to time applicable to the Premises for use for the purpose permitted under this Lease, or such other property for the use or uses made thereof, Tenant will pay the amount of such increase promptly upon Landlord's demand and Landlord shall have the right to correct any such condition at Tenant's expense.  In the event that this Lease so permits and Tenant engages in the preparation of food or packaged foods or engages in the use, sale or storage of inflammable or combustible material, Tenant shall install chemical extinguishing devices (such as ansul) approved by Underwriters' laboratories and Factory Mutual and the installation thereof must be approved by the appropriate local authority.  Tenant shall keep such devices under service as required by such organizations.  If gas is used in the Premises, Tenant shall install gas cut-off devices (manual and automatic).

Section 11.6.    Indemnification.

Tenant shall save harmless, indemnify, and at Landlord's option, defend Landlord, Ground Lessor, Owner of the Hotel Parcel and their respective agents and employees, and mortgagee, if any, from and against any and all liability, liens, claims, demands, damages, expenses, fees, costs, fines, penalties, suits, proceedings, actions and causes of action of any and every kind and nature arising or growing out of or in any way connected with Tenant's use, occupancy, management or control of the Premises or Tenant's operations, conduct or activities in the Center.  *The provisions of this Section 11.6 shall not apply to the intentional acts or gross negligence of Landlord or Landlord's agents.*

ARTICLE XII

OFFSET STATEMENT, ATTORNMENT, SUBORDINATION

Section 12.1.    Offset Statement.

Within ten (10) days after Landlord's written request Tenant shall deliver, executed in recordable form, a declaration to any person designated by Landlord: (a) ratifying this Lease; (b) stating the commencement and termination dates; and (c) certifying (i) that this Lease is in full force and effect and has not been assigned, modified, supplemented or amended (except by such writings as shall be stated); (ii) that all conditions under this Lease to be performed by Landlord have been satisfied (stating exceptions, if any), (iii) that no defenses or offsets against the enforcement of this Lease by Landlord exist (or stating those claimed), (iv) as to advance rent, if any, paid by Tenant, (v) the date to which rent has been paid, (vi) as to the amount of security deposited with Landlord, and (vii) such other information as Landlord reasonably requires.  Persons receiving such statements shall be entitled to rely upon them.

Section 12.2.    Attornment.

A.    Tenant shall, in the event of a sale or assignment of Landlord's interest in the Premises or the building in which the Premises is located or this Lease or the Center, or if the Premises or such building comes into the hands of a mortgagee, ground lessor or any other person whether because of a mortgage foreclosure, exercise of a power of sale under a mortgage, termination of

-20-

02/09/11

the ground lease, or otherwise, attorn to the purchaser or such mortgagee or other person and recognize the same as Landlord hereunder. Tenant shall execute, at Landlord's request, any attornment agreement required by any mortgagee, ground lessor or other such person to be executed, containing such provisions as such mortgagee, ground lessor or other person requires.

      B.      In the event of a termination of the Ground Lease prior to the expiration of the Lease Term (other than upon a termination by reason of condemnation or the election of Landlord to terminate and not reconstruct as provided in Article XVI hereof except a termination of the Ground Lease as a result of condemnation or casualty and the election of Ground Lessor to recognize this Lease), Tenant shall attorn to Ground Lessor or its successors or assigns and then, provided that Tenant has so attorned, except as otherwise provided herein, Ground Lessor shall recognize the attornment of Tenant and thereby allow the continuation of this Lease in effect on the same terms and conditions as set forth herein, but as a direct lease, subject to the payment, when due, of all rentals payable for any period after termination of the Ground Lease and compliance on the part of Tenant with each and every term and condition of this Lease; provided, however, that this Lease shall be in compliance with the provisions of Section 12.8 of the Ground Lease and otherwise permitted thereunder. Notwithstanding anything to the contrary contained herein: (i) Ground Lessor shall not be required to recognize the attornment of any tenant of the Center under a lease not on an arm's length basis; (ii) Ground Lessor shall not be liable or subject to offset for any matter accruing prior to termination of the Ground Lease, (iii) Ground Lessor shall not be required to recognize any prepaid rent, security deposits or other items except to the extent actually received by Ground Lessor and in any event, not more than one (1) month's rent, plus the Security Deposit, if any, not to exceed two (2) months' rent, theretofore actually prepaid by Tenant to Landlord. Within ten (10) days of any demand therefor by Ground Lessor, if Tenant is entitled to have this Lease recognized by Ground Lessor, then Tenant will execute and deliver to Ground Lessor and/or its designee, a recordable certificate stating that Tenant has attorned to Ground Lessor, that attached thereto is a true, complete and correct copy of this Lease, that this Lease is unmodified and in full force and effect, such defenses or offsets as may be claimed by Tenant, if any, the date to which all rentals have been paid, and such other information concerning this Lease, the Premises and Tenant as Ground Lessor or its designee may request. Ground Lessor's recognition of Tenant's attornment shall be conditioned upon Tenant's compliance with all of the terms, covenants and conditions of this Section 12.2. In the event that this Lease does not comply with the standards herein for automatic recognition by Ground Lessor of Tenant's attornment, then such attornment may be terminated by Ground Lessor without cause upon thirty (30) days written notice given at any time after the date of the termination of the Ground Lease.

Section 12.3.     Subordination.

      A.      Mortgage. This Lease shall be secondary, junior and inferior at all times to the lien of any mortgage and to the lien of any deed of trust or other method of financing or refinancing (hereinafter collectively referred to as "mortgage") now or hereafter existing against all or a part of the Center, and to all renewals, modifications, replacements, consolidations and extensions thereof, and Tenant shall execute and deliver all documents requested by any mortgagee or security holder to effect such subordination. Tenant shall execute, at Landlord's request, any subordination agreement required by any mortgagee, ground lessor or other such person to be executed, containing such provisions as such mortgagee, ground lessor or other person requires *which do not conflict with the material terms of this Lease*.

      B.      Construction, Operation and Reciprocal Easement Agreements. This Lease is subject and subordinate to one (1) or more construction, operation, reciprocal easement or similar agreements (hereinafter referred to as "Operating Agreements") entered into or hereafter to be entered into between Landlord and other owners or lessees of real estate (including but not limited to owners and operators of department stores) within or near the Center (which Operating Agreements have been or will be recorded in the official records of the County wherein the Center is located) and to any and all easements and easement agreements which may be or have been entered into with or granted to any persons heretofore or hereafter, whether such persons are located within or upon the Center or not, and Tenant shall execute such instruments as Landlord requests to evidence such subordination.

Section 12.4.     Ground Lease.

      Tenant acknowledges and agrees that this Lease is subject to the terms of the Ground Lease, including, but not limited to, Section 5 with respect to the use of the Center and in particular, Section 5.11 dealing with competing businesses and Section 5.15 dealing with gaming. Tenant further agrees to comply with and be bound by all of the terms, covenants and conditions of the Ground Lease and in the event of any conflict between the terms and conditions of this Lease on the one hand and those of the Ground Lease on the other, the terms and conditions of the Ground Lease shall control.

Section 12.5.     Failure to Execute Instruments.

      Tenant's failure to execute instruments or certificates *properly prepared and* provided for in this Article XII within fifteen (15) days after the mailing by Landlord of a written request shall be a default under this Lease.

-21-

## ARTICLE XIII

### ASSIGNMENT, SUBLETTING AND CONCESSIONS

Section 13.1.      Consent Required.

Tenant shall not sell, assign or in any manner transfer this Lease or any interest therein, nor sublet all or any part of the Premises, nor license concessions nor lease departments therein, without Landlord's prior written consent in each instance. Under no circumstances shall Tenant mortgage, pledge or otherwise collaterally transfer its interest in this Lease. *Landlord hereby acknowledges its consent to the assignment of this Lease to Tenant's Franchisor (being the US corporate entity of Pal Zileri) in the event such transfer is required pursuant to the terms of the franchise agreement between such entities.* Consent by Landlord to any assignment or subletting shall not waive the necessity for consent to any subsequent assignment or subletting. This prohibition shall include a prohibition against any subletting or assignment by operation of law. If this Lease is assigned or the Premises or any part sublet or occupied by anybody other than Tenant, Landlord may collect rent from the assignee, subtenant or occupant and apply the same to the rent herein reserved, but no such assignment, subletting, occupancy or collection of rent shall be deemed a waiver of any restrictive covenant contained in this Section 13.1 or the acceptance of the assignee, subtenant or occupant as tenant, or a release of Tenant from the performance by Tenant of any covenants on the part of Tenant herein contained. Any assignment: (a) as to which Landlord has consented; or (b) which is required by reason of a final nonappealable order of a court of competent jurisdiction; or (c) which is made by reason of and in accordance with the provisions of any law or statute, including, without limitation, the laws governing bankruptcy, insolvency or receivership shall be subject to all terms and conditions of this Lease, and shall not be effective or deemed valid unless, at the time of such assignment:

1.      Each assignee or sublessee shall agree, in a written agreement satisfactory to Landlord, to assume and abide by all of the terms and provisions of this Lease, including those which govern the Permitted Uses of the Premises as described in Article 1 herein;

2.      Each assignee or sublessee has submitted a current financial statement, audited by a certified public accountant, showing a net worth and working capital in amounts determined by Landlord to be sufficient to assure the future performance by such assignee or sublessee of Tenant's obligations hereunder;

3.      Each assignee or sublessee has submitted, in writing, evidence satisfactory to Landlord of substantial retailing experience in shopping centers of comparable size to the Center and in the sale of merchandise and services permitted under Article 1 of this Lease;

4.      The business reputation of each assignee or sublessee shall meet or exceed generally acceptable commercial standards;

5.      The use of the Premises by each assignee or sublessee shall not violate, or create any potential violation of applicable laws, codes or ordinances, nor violate any other agreements affecting the Premises, Landlord or other tenants in the Center; and

6.      Tenant shall pay Landlord an Assignment Fee as reimbursement to Landlord for administrative and legal expenses incurred by Landlord in connection with any assignment or subletting. The Assignment Fee initially will be One Thousand and 00/100 Dollars ($1,000.00) and shall increase by One Hundred and 00/100 Dollars ($100.00) at the end of each full Lease Year of the Lease Term.

In the event of any assignment or subletting as provided above, there shall be paid to Landlord, in addition to the Minimum Annual Rent and other charges due Landlord pursuant to this Lease, such additional consideration as shall be attributable to the right of use and occupancy of the Premises, whenever the same is receivable by Tenant, together with, as additional rent, the greatest of (i) the excess, if any, of the rent and other charges payable by the assignee or sublessee over the Minimum Annual Rent and other charges payable under the Lease to Landlord by Tenant pursuant to this Lease, (ii) the highest Percentage Rent payable under the Lease by Tenant during the three (3) Lease Years immediately preceding such assignment or subletting, or (iii) the increase in the Consumer Price Index (as defined below) since the Commencement Date. Such additional rent shall be paid to Landlord concurrently with the payments of Minimum Annual Rent required under this Lease, and Tenant shall remain primarily liable for such payments. Notwithstanding any assignment or subletting, Tenant shall remain fully liable on this Lease and for the performance of all terms, covenants and provisions of this Lease.

Neither Tenant nor any other person having an interest in the possession, use, occupancy or utilization of the Premises shall enter into any lease, sublease, license, concession, assignment or other agreement for use, occupancy or utilization for space in the Premises which provides for rental or other payment for such use, occupancy, or utilization based in whole or in part on the net income or profits derived by any person from the part leased, used, occupied or utilized (other than an amount based on a fixed

-22-

02/09/11

percentage or percentages of receipts or sales), and that any such proposed lease, sublease, license, concession, assignment or other agreement shall be absolutely void and ineffective as a conveyance of any right or interest in the possession, use, occupancy or utilization of any part of the Premises.

The term "Consumer Price Index" as used in this Lease shall mean "United States City Average All Items for All Urban Consumers (CPI-U, 1982-84=100)" published by the Bureau of Labor Statistics of the U.S. Department of Labor. If the publication of the Consumer Price Index of the U.S. Bureau of Labor Statistics is discontinued, comparable statistics on the purchasing power of the consumer dollar published by a responsible financial periodical selected by Landlord shall be used for making such computations.

Section 13.2.    Change in Ownership.

If Tenant or the guarantor of this Lease, if any, is a corporation the stock of which is not traded on any national securities exchange (as defined in the Securities Exchange Act of 1934, as amended), then the following shall constitute an assignment of this Lease for all purposes of this Article XIII: (i) the merger, consolidation or reorganization of such corporation; and/or (ii) the sale, issuance, or transfer, cumulatively or in one transaction, of any voting stock, by Tenant or the guarantor of this Lease or the stockholders of record of either as of the date of this Lease, which results in a change in the voting control of Tenant or the guarantor of this Lease, except any such transfer by inheritance or testamentary disposition to Tenant's heirs at law. If Tenant or the guarantor of this Lease, if any, is a joint venture, partnership or other association, then for all purposes of this Article XIII, the sale, issuance or transfer, cumulatively or in one transaction, of either voting control or of a twenty-five percent (25%) interest, or the termination of any joint venture, partnership or other association, shall constitute an assignment, except any such transfer by inheritance or testamentary disposition to Tenant's heirs at law.

Section 13.3.    Restrictions on Assignment.

Notwithstanding anything to the contrary contained herein, in no event may Tenant assign this Lease or allow the Premises to be used for a service establishment other than a bank, shoe repair, travel agency, real estate agency or insurance agency.

Notwithstanding anything to the contrary contained herein, any assignment or sublease of the Premises for the purpose of any restaurant other than a Signature Restaurant (as defined herein) or a restaurant currently operated on the Premises and permitted pursuant to the terms of this Lease shall be subject to Ground Lessor's right of first negotiation contained in Section 5.13 of the Ground Lease and shall not be effective without Landlord's and Ground Lessor's prior written approval. A "Signature Restaurant" means a restaurant other than a "fast food" restaurant (defined as a restaurant that does not provide waiter or waitress table service). that is unique and/or not practicably capable of being duplicated because of: (i) its existing highly favorable reputation; (ii) the highly favorable reputation in the restaurant community of its chef; (iii) the highly favorable reputation of the restaurant developer either with the restaurant community or with a reasonably sophisticated public; or (iv) a combination of elements that together would beneficially complement the aura of the Center.

Section 13.4.    Right of Recapture.

If Tenant agrees to assign this Lease or to sublet all or any portion of the Premises, Tenant shall deliver to Landlord executed counterparts of any such agreement and all ancillary agreements with the proposed assignee or subtenant prior to the effective date thereof (the "Effective Date"). Landlord shall have the right to do any of the following by giving Tenant written notice thereof within thirty (30) days after receiving all of the foregoing documents:

1.   With respect to a proposed assignment of this Lease or a proposed subletting of the entire Premises, Landlord shall have the right to terminate this Lease on the Effective Date as if such date were the expiration date of the Lease Term; and

2.   With respect to a proposed subletting of less than the entire Premises, Landlord shall have the right to terminate this Lease as to the portion of the Premises affected by such subletting on the Effective Date as if such date were the expiration date of the Lease Term, in which case Tenant shall promptly execute and deliver to Landlord an appropriate amendment of this Lease and other documentation in form satisfactory to Landlord in all respects.

If Landlord terminates this Lease as to only a portion of the Premises pursuant to this Section 13.4, then the Minimum Annual Rent and additional rent shall be adjusted by Landlord in proportion to the area of the Premises affected by such partial termination. If Landlord exercises any of its rights under this Section 13.4, Landlord may thereafter lease the Premises or any portion thereof to Tenant's proposed assignee or subtenant, as the case may be, without any liability to Tenant. If Landlord does not exercise its rights under this Section 13.4 within such thirty (30) day period, such rights shall be deemed waived, but Tenant shall nevertheless be required to fulfill all of the other requirements of this Lease, including Tenant's obligation to obtain Landlord's consent to such proposed assignment or sublease pursuant to this Article XIII. Landlord's rights under this Section 13.4 shall apply to any further subletting or assignment notwithstanding Landlord's consent to any proposed assignment or sublease. If Tenant subleases or assigns any interest in the Premises without the consent of Landlord as required herein, Landlord shall be entitled,

-23-

without waiving any of Landlord's other rights or remedies hereunder, to all economic consideration received by Tenant as a result thereof.

ARTICLE XIV

MARKETING FUND AND ADVERTISING

**Section 14.1.     Provisions Relating to Marketing Fund.**

Landlord may, at its option, create and maintain a marketing fund (hereinafter referred to as the "Fund"), the primary purpose of which is to provide sums necessary for professional marketing services which benefit the tenants in the Center. In the event the Landlord does create and maintain the Fund, Tenant agrees to contribute to such Fund, beginning upon the later to occur of (a) the Commencement Date, or (b) the date the Fund is created, the Marketing Fund Fixed Contribution set forth in Article I, payable in equal monthly installments, in advance, on the first day of each and every month (pro rated for partial months). The Marketing Fund Fixed Contribution shall be increased on the first day of each calendar year or partial calendar year after the Commencement Date by an amount equal to three percent (3%) of the Marketing Fund Fixed Contribution payable by Tenant to Landlord for the immediately preceding calendar year (computed on an annualized basis for any partial calendar year). In addition to its other obligations contained herein, Tenant agrees that it shall participate and cooperate in all special sales and promotions sponsored by the Fund. The failure of any other tenant or any Major Tenant to contribute to the Fund shall not affect Tenant's obligations hereunder.

Landlord may, at its option, create and maintain an advertising and promotional fund (hereinafter referred to as the "Fund"), the primary purpose of which is to provide sums necessary for professional advertising and promotional services which benefit the tenants in the Center. In the event the Landlord does create and maintain the Fund, Tenant agrees to contribute to such Fund, beginning upon the later to occur of (a) the Commencement Date, or (b) the date the Fund is created, the Promotional Fund Fixed Contribution set forth in Article I, payable in equal monthly installments, in advance, on the first day of each and every month (pro rated for partial months). The Promotional Fund Fixed Contribution shall be increased. In addition to its other obligations contained herein, Tenant agrees that it shall participate and cooperate in all special sales and promotions sponsored by the Fund. The failure of any other tenant or any Major Tenant to contribute to the Fund shall not affect Tenant's obligations hereunder.

**Section 14.2.     Advertising. *INTENTIONALLY DELETED.***

**Section 14.3.     Media Fund.**

Landlord may, at its option, create and maintain a Media Fund, the primary purpose of which shall be to pay all costs and expenses associated with the purchase of electronic, print or outdoor advertising which benefit the tenants in the Center. In the event Landlord does create and maintain the Media Fund, Tenant agrees to contribute to such Fund, beginning upon the later to occur of (a) the Commencement Date or (b) the date the Media Fund is created, the Media Fund Charge set forth in Article I, payable in equal monthly installments, in advance, on the first day of each and every month (pro rated for partial months).

The Media Fund Charge shall be increased on the first day of each calendar year or partial calendar year after the Commencement Date by an amount equal to three percent (3%) of the Media Fund Charge payable by Tenant to Landlord for the immediately preceding calendar year (computed on an annualized basis for any partial calendar year). Following the close of each calendar year, Landlord shall furnish Tenant a statement for the preceding calendar year showing the amounts expended by Landlord for media advertising. Tenant hereby authorizes Landlord to use Tenant's Trade Name and a brief description of Tenant's business in connection with any media advertising purchased pursuant to this Section.

**Section 14.4.     Promotion.**

Tenant shall refer to the Center under the name " (The) Forum at Caesars" or "Forum Shops at Caesars" as Landlord may elect (the "Name", except that should Ground Lessor or any Affiliate or Ground Lessor delete the word "Caesars" from the name of the Hotel, the new name of the Hotel shall be substituted for "Caesars" in the Name) in designating the location of the Premises in all newspaper and other advertising and in all other references to the location of the Premises, and list this location first in such advertising and include in all its newspaper advertising during the thirty (30) day period prior to the Commencement Date the designation in bold type that the Tenant is opening for business in the Center. Notwithstanding anything to the contrary contained herein, Tenant may not use the name, picture or representation of the Hotel, except that, to the extent that Ground Lessor has permitted the name of the Hotel to be used as part of the Name, such name shall be used in referring to the Center. The rights granted herein to the Name do not include the right to use any of the "Caesars" trademarks and/or service marks, including but not limited to "Caesars Palace," nor shall Tenant be permitted to use the Name in any manner other than as the name and address of the Center. In particular, but not by way of limitation, Tenant shall not have the right to use the Name to market or make any product that has the Name on the product. The Caesar's logo style, illustrated in Exhibit "C" attached hereto and made a part hereof, shall be used by Tenant whenever Tenant is entitled to use the Name hereunder, except that, when the Name is being used solely as an address, another style may be used. However, the Greco-Roman style of such logo shall not otherwise be used by Tenant except as part of the Name. All signage and literature of or on behalf of Tenant using the Name shall be submitted to Landlord and Ground

-24-

Lessor for their prior written approval as to form and content, such approval to be at the reasonable discretion of Landlord and Ground Lessor. Landlord and Ground Lessor shall either approve such usage or provide the reasons for disapproval within twenty (20) days of such submission. Landlord's and Ground Lessor's failure to disapprove within such twenty (20) day period shall be deemed approval. Neither Landlord nor Ground Lessor makes any representation of any kind and gives no warranty of any kind, express or implied, as to the right of Tenant to use the Name or any portion thereof. It is expressly agreed and understood by the parties hereto that any claim by any third party regarding the Name shall be the sole and complete responsibility of Tenant and neither Landlord nor Ground Lessor shall have any obligation of any kind, including, but not limited to, any obligation to defend Tenant or to assist Tenant in its defense of any action with said third party. Further, Tenant shall have no rights to register the Name or take any action against third parties regarding an alleged infringement of the Name or any part thereof. The rights granted to Tenant pursuant to this Section 14.4 shall terminate upon termination of the Ground Lease, the expiration of the Lease Term or the earlier termination for breach of this Lease or Landlord's cessation of the use of the Name or termination of Landlord's right to use the Name as provided in the Ground Lease. The rights granted herein shall not be assigned or sublicensed to any third party, other than in accordance with the provisions of this Section 14.4 or to the assignee or sublessee of Tenant's interest in this Lease pursuant to a permitted assignment or sublease. Should Landlord or Ground Lessor reasonably determine that any advertising by Tenant adversely affects the image, reputation or operation of the Center or Hotel, or promotes any competitor of Ground Lessor or its Affiliates in the gaming and/or hotel business, Tenant shall cease such advertising promptly upon receipt of notice to do so from Landlord or Ground Lessor. Tenant shall not use with respect to the Center a name the same or substantially the same as a name then used by Ground Lessor or its Affiliates at the Hotel (or any other facility owned and operated by Ground Lessor or its Affiliates on June 30, 1989, which names are listed on Exhibit "D" attached hereto and made a part hereof). The prohibitions set forth in this Section 14.4 are for the benefit of and directly enforceable by Ground Lessor.

## ARTICLE XV

## SECURITY DEPOSIT

Section 15.1.    Amount of Deposit. *INTENTIONALLY DELETED.*

## ARTICLE XVI

## DAMAGE AND DESTRUCTION

Section 16.1.    Damage and Destruction. If the Premises are hereafter damaged or destroyed or rendered partially untenantable for their permitted use by fire or other casualty insured under the coverage which Landlord is obligated to carry pursuant to Section 11.1 hereof, Landlord shall promptly repair the same to substantially the condition which they were in immediately prior to the happening of such casualty (excluding stock in trade, fixtures, furniture, furnishings, carpeting, floor covering, wall covering, drapes and equipment), and from the date of such casualty until the Premises are so repaired and restored, only the Minimum Monthly Rent payments payable hereunder shall abate in such proportion as the part of said Premises thus destroyed or rendered untenantable bears to the total Premises; PROVIDED, HOWEVER, that Landlord shall not be obligated to repair and restore if such casualty is not covered by the insurance which Landlord is obligated to carry pursuant to Section 11.1 hereof or is caused directly or indirectly by the negligence of Tenant, its agents, and employees and in either of such events, no portion of the Minimum Monthly Rent and other payments payable hereunder shall abate, and PROVIDED, FURTHER, that Landlord shall not be obligated to expend for any repair or restoration an amount in excess of the insurance proceeds received by Landlord therefor, and provided, further, that if the Premises be damaged, destroyed or rendered untenantable for their accustomed uses by fire or other casualty to the extent of more than fifty percent (50%) of the cost to replace the Premises during the last three (3) years of the Lease Term, then *either* Landlord *or Tenant* shall have the right to terminate this Lease effective as of the date of such casualty by giving to *the other party,* ~~Tenant,~~ within sixty (60) days after the happening of such casualty, written notice of such termination. If such notice be given, this Lease shall terminate and Landlord shall promptly repay to Tenant any rent theretofore paid in advance which was not earned at the date of such casualty. Any time that Landlord repairs or restores the Premises after damage or destruction, then Tenant shall promptly repair or replace its stock in trade, fixtures, furnishings, furniture, carpeting, wall covering, floor covering, drapes, equipment and Premises to the same condition as they were in immediately prior to the casualty, and if Tenant has closed its business, Tenant shall promptly reopen for business upon the completion of such repairs.

Notwithstanding anything to the contrary set forth herein, in the event all or any portion of the Center shall be damaged or destroyed by fire or other cause (notwithstanding that the Premises may be unaffected thereby), to the extent the cost of restoration thereof would exceed fifteen percent (15%) of the amount it would have cost to replace the Center in its entirety at the time such damage or destruction occurred, then *either* Landlord *or Tenant* may terminate this Lease by giving *the other* ~~Tenant~~ thirty (30) days prior notice of *their* ~~Landlord's~~ election to do so, which notice shall be given, if at all, within ninety (90) days following the date of such occurrence. In the event of the termination of this Lease as aforesaid, this Lease shall cease thirty (30) days after such notice is given, and the rent and other charges hereunder shall be adjusted as of that date.

02/09/11

ARTICLE XVII

EMINENT DOMAIN

Section 17.1.    Condemnation.

If any portion of the Premises or fifteen percent (15%) or more of the Center shall be acquired or condemned by right of eminent domain or transferred by agreement in lieu of condemnation for any public or quasi public use or purpose, or if an Operating Agreement is terminated as a result of such an acquisition or condemnation, then Landlord at its election may terminate this Lease by giving notice to Tenant of its election, and in such event rentals shall be apportioned and adjusted as of the date of termination. If the Lease shall not be terminated as aforesaid, then it shall continue in full force and effect, and Landlord shall within a reasonable time after possession is physically taken (subject to delays due to shortage of labor, materials or equipment, labor difficulties, breakdown of equipment, government restrictions, fires, other casualties or other causes beyond the reasonable control of Landlord) repair or rebuild what remains of the Premises for Tenant's occupancy; and a just proportion of the Minimum Annual Rent shall be abated, according to the nature and extent of the injury to the Premises until such repairs and rebuilding are completed, and thereafter for the balance of the Lease Term.

Section 17.2.    Damages.

Landlord reserves, and Tenant assigns to Landlord, all rights to damages on account of any taking or condemnation or any act of any public or quasi public authority for which damages are payable. Tenant shall execute such instruments of assignment as Landlord requires, join with Landlord in any action for the recovery of damages, if requested by Landlord, and turn over to Landlord any damages recovered in any proceeding. If Tenant fails to execute instruments required by Landlord, or undertake such other steps as requested, Landlord shall be deemed the duly authorized irrevocable agent and attorney-in-fact of Tenant to execute such instruments and undertake such steps on behalf of Tenant.  However, Landlord does not reserve any damages payable for trade fixtures installed by Tenant at its own cost which are not part of the realty *or Tenant's pursuit of its own condemnation award so long as Tenant does not pursue an award relating specifically to the Center or the Premises.*

ARTICLE XVIII

DEFAULT BY TENANT

Section 18.1.    Right to Re-Enter.

The following shall be considered for all purposes to be defaults under and breaches of this Lease:  (a) any failure of Tenant to pay any rent or other amount when due hereunder; (b) any failure by Tenant to perform or observe any other of the terms, provisions, conditions and covenants of this Lease for more than ten (10) days after written notice of such failure; (c) a determination by Landlord that Tenant has submitted any false report required to be furnished hereunder; (d) anything done by Tenant upon or in connection with the Premises or the construction of any part thereof which directly or indirectly interferes in any way with, or results in a work stoppage in connection with, construction of any part of the Center or any other tenant's space; (e) the bankruptcy or insolvency of Tenant or the filing by or against Tenant of a petition in bankruptcy or for reorganization or arrangement or for the appointment of a receiver or trustee of all or a portion of Tenant's property, or Tenant's assignment for the benefit of creditors; (f) if Tenant abandons or vacates or does not do business in the Premises; (g) this Lease or Tenant's interest herein or in the Premises or any improvements thereon or any property of Tenant are executed upon or attached; (h) the Premises come into the hands of any person other than expressly permitted under this Lease; or (i) any claim or lien is asserted or recorded against the interest of Landlord in the Premises or Center, or any portion thereof, on the account of, or extending from any improvement or work done by or at the instance, or for the benefit of Tenant, or any person claiming by, through or under Tenant or from any improvement or work the cost of which is the responsibility of Tenant.  In any such event, and without grace period, demand or notice (the same being hereby waived by Tenant), Landlord, in addition to all other rights or remedies it may have, shall have the right thereupon or at any time thereafter to terminate this Lease by giving notice to Tenant stating the date upon which such termination shall be effective, and shall have the right, either before or after any such termination, to re-enter and take possession of the Premises, remove all persons and property from the Premises, store such property at Tenant's expense, and sell such property if necessary to satisfy any deficiency in payments by Tenant as required hereunder, all without notice or resort to legal process and without being deemed guilty of trespass or becoming liable for any loss or damage occasioned thereby.  Nothing herein shall be construed to require Landlord to give any notice before exercising any of its rights and remedies provided for in Section 3.3 of this Lease.  Notwithstanding anything to the contrary herein contained, if Tenant commits any default hereunder for or precedent to which or with respect to which notice is herein required, and commits such defaults within twelve (12) months thereafter, no notice shall thereafter be required to be given by Landlord as to or precedent to any such subsequent default during such twelve (12) month period (as Tenant hereby waives the same) before exercising any or all remedies available to Landlord.

Section 18.2.    Right to Relet.

If Landlord re-enters the Premises as above provided, or if it takes possession pursuant to legal proceedings or otherwise, it may either terminate this Lease, but Tenant shall remain liable for all obligations arising during the balance of the original stated term as hereafter provided as if this Lease had remained in full force and effect, or it may, from time to time, without terminating this

-26-

Lease, make such alterations and repairs as it deems advisable to relet the Premises, and relet the Premises or any part thereof for such term or terms (which may extend beyond the Lease Term) and at such rentals and upon such other terms and conditions as Landlord in its sole discretion deems advisable; upon each such reletting all rentals received by Landlord therefrom shall be applied, first, to any indebtedness other than rent due hereunder from Tenant to Landlord; second, to pay any costs and expenses of reletting, including brokers and attorneys' fees and costs of alterations and repairs; third, to rent due hereunder, and the residue, if any, shall be held by Landlord and applied in payment of future rent as it becomes due hereunder.

If rentals received from such reletting during any month are less than that to be paid during that month by Tenant hereunder, Tenant shall immediately pay any such deficiency to Landlord. No re-entry or taking possession of the Premises by Landlord shall be construed as an election to terminate this Lease unless a written notice of such termination is given by Landlord.

Notwithstanding any such reletting without termination, Landlord may at any time thereafter terminate this Lease for any prior breach or default. If Landlord terminates this Lease for any breach, or otherwise takes any action on account of Tenant's breach or default hereunder, in addition to any other remedies it may have, it may recover from Tenant all damages incurred by reason of such breach or default, including the cost of recovering the Premises, brokerage fees and expenses of placing the Premises in rentable condition, attorneys' fees, and an amount equal to the difference between the Minimum Rent and all items of additional rents reserved hereunder for the period which otherwise would have constituted the balance of the Lease Term and the then present rental value of the Premises for such period, both discounted in accordance with accepted financial practice to the then present worth, at the average rate established and announced for United States Treasury Bills, with a maturity of thirteen (13) weeks at the four (4) weekly auctions held immediately prior to the date of such termination [the four (4) week average bill rate], all of which shall immediately be due and payable by Tenant to Landlord. In determining the rental value of the Premises, the rental realized by any reletting, if such reletting be accomplished by Landlord within a reasonable time after the termination of this Lease, shall be deemed prima facie to be the rental value, but if Landlord shall not undertake to relet or having undertaken to relet, has not accomplished reletting, then it will be conclusively presumed that the Minimum Rent and all items of additional rent reserved under this Lease represent the rental value of the Premises for the purposes herein (in which event Landlord may recover from Tenant, the full total of all Minimum Rent and all items of additional rent due hereunder, discounted to present value as hereinbefore provided). Landlord shall, however, account to Tenant for the Minimum Rent and additional rents received from persons using or occupying the Premises during the period representing that which would have constituted the balance of the Lease Term, but only at the end of said period, and only if Tenant shall have paid to Landlord its damages as provided herein, and only to the extent of sums recovered from Tenant as Landlord's damages, Tenant waiving any claim to any surplus. Nothing herein contained, however, shall limit or prejudice the right of Landlord to prove and obtain as damages by reason of such termination, an amount equal to the maximum allowed by any statute or rule of law in effect at the time when, and governing the proceedings in which, such damages are to be proved. Tenant's obligation to reimburse Landlord for attorneys' fees as referred to in this Lease shall include all legal costs, fees and expenses arising out of (i) Tenant's default in the performance or observance of any of the terms, covenants, conditions or obligations contained in this Lease and Landlord places the enforcement of all or any part of this Lease, the collection of any rent due or to become due or the recovery of possession of the Premises in the hands of an attorney or (ii) Landlord's incurring any fees or out of pocket costs in any litigation, negotiation or transaction in which Tenant causes Landlord to be involved or concerned, in either event regardless of whether or not suit is actually filed.

In the event of any breach or threatened breach by Tenant of any of the terms and provisions of this Lease, Landlord shall have the right to injunctive relief as if no other remedies were provided for herein for such breach.

Any rights and remedies reserved by, or granted to, Landlord under this Lease, at law or in equity, are distinct, separate and cumulative, and the exercise of any one of them shall not be deemed to preclude, waive or prejudice Landlord's right to exercise any or all others.

Tenant expressly waives any right to assert a defense based on merger and agrees that neither the commencement of any action or proceeding, nor the settlement thereof, nor the entry of judgment therein, shall bar Landlord from bringing any subsequent actions or proceedings from time to time.

Wherever in this Lease Landlord has reserved or is granted the right of "reentry" into the Premises, the use of such word is not intended, nor shall it be construed, to be limited to its technical legal meaning.

Tenant waives and releases any claim arising out of or related to the payment of percentage rent by any successor tenant in the Premises, to whom Landlord may relet the Premises, but nothing contained herein shall obligate Landlord to relet if Tenant shall default hereunder.

Except as otherwise specifically required by this Lease, Tenant waives any and all statutory and legal notice requirements.

-27-

Any action, suit or proceeding relating to, arising out of or in connection with the terms, conditions and covenants of this Lease may be brought by Landlord against Tenant in the Circuit or Superior Court of Marion County, Indiana. Tenant hereby waives any objection to jurisdiction or venue in any proceeding before said Court. Nothing contained herein shall affect the right of Landlord to bring any action, suit or proceeding against Tenant in the courts of any other jurisdictions.

**Section 18.3.    Counterclaim.**

If Landlord commences any proceedings for non-payment of rent (Minimum Annual Rent, Percentage Rent or additional rent), Tenant will interpose any compulsory or mandatory counterclaim required by the applicable procedural rules of the Court. The covenants to pay rent and other amounts hereunder are independent covenants and Tenant shall have no right to hold back, offset or fail to pay any such amounts for default by Landlord or any other reason whatsoever.

**Section 18.4.    Waiver of Rights of Redemption.**

To the extent permitted by law, Tenant waives any and all rights of redemption granted by or under any present or future laws if Tenant is evicted or dispossessed for any cause, or if Landlord obtains possession of the Premises due to Tenant's default hereunder or otherwise.

**Section 18.5.    Waiver of Trial by Jury.**

To the extent permitted by applicable law, Tenant hereby waives trial by jury in any action, proceeding or counterclaim brought by either party against the other on any matter whatsoever arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant created hereby, Tenant's use or occupancy of the Premises or any claim or injury or damage.

**Section 18.6.    Bankruptcy.**

A.    **Assumption of Lease.**  In the event Tenant shall become a Debtor under Chapter 7 of the Bankruptcy Code ("Code") or a petition for reorganization or adjustment of debts is filed concerning Tenant under Chapters 11 or 13 of the Code, or a proceeding is filed under Chapter 7 and is transferred to Chapters 11 or 13, the Trustee or Tenant, as Debtor and as Debtor-In-Possession, may not elect to assume this Lease unless, at the time of such assumption, the Trustee or Tenant has:

1.    Cured or provided Landlord "Adequate Assurance" (as defined below) that:

(a)    Within ten (10) days from the date of such assumption the Trustee or Tenant will cure all monetary defaults under this Lease and compensate Landlord for any actual pecuniary loss resulting from any existing default, including without limitation, Landlord's reasonable costs, expenses, accrued interest and attorneys' fees incurred as a result of the default;

(b)    Within thirty (30) days from the date of such assumption the Trustee or Tenant will cure all non-monetary defaults under this Lease; and

(c)    The assumption will be subject to all of the provisions of this Lease.

2.    For purposes of this Section 18.6, Landlord and Tenant acknowledge that, in the context of a bankruptcy proceeding of Tenant, at a minimum "Adequate Assurance" shall mean:

(a)    The Trustee or Tenant has and will continue to have sufficient unencumbered assets after the payment of all secured obligations and administrative expenses to assure Landlord that the Trustee or Tenant will have sufficient funds to fulfill the obligations of Tenant under this Lease, and to keep the Premises stocked with merchandise and properly staffed with sufficient employees to conduct a fully-operational, actively promoted business in the Premises;

(b)    The Bankruptcy Court shall have entered an Order segregating sufficient cash payable to Landlord and/or the Trustee or Tenant shall have granted a valid and perfected first lien and security interest and/or mortgage in property of Trustee or Tenant acceptable as to value and kind to Landlord, to secure to Landlord the obligation of the Trustee or Tenant to cure the monetary and/or non-monetary defaults under this Lease within the time periods set forth above; and

(c)    The Trustee or Tenant at the very least shall deposit a sum equal to one (1) month's rent to be held by Landlord (without any allowance for interest thereon) to secure Tenant's future performance under the Lease.

B.    **Assignment of Lease.**  If the Trustee or Tenant has assumed the Lease pursuant to the provisions of this Section 18.6 for the purpose of assigning Tenant's interest hereunder to any other person or entity, such interest may be assigned only after the Trustee, Tenant or the proposed assignee have complied with all of the terms, covenants and conditions of Section 13.1 herein,

-28-

02/09/11

including, without limitation, those with respect to additional rent and the use of the Premises only as permitted in Article I herein; Landlord and Tenant acknowledging that such terms, covenants and conditions are commercially reasonable in the context of a bankruptcy proceeding of Tenant. Any person or entity to which this Lease is assigned pursuant to the provisions of the Code shall be deemed without further act or deed to have assumed all of the obligations arising under this Lease on and after the date of such assignment. Any such assignee shall upon request execute and deliver to Landlord an instrument confirming such assignment.

      C.    <u>Adequate Protection</u>.  Upon the filing of a petition by or against Tenant under the Code, Tenant, as Debtor and as Debtor-in-Possession, and any Trustee who may be appointed agree to adequately protect Landlord as follows:

      (1)    To perform each and every obligation of Tenant under this Lease until such time as this Lease is either rejected or assumed by Order of the Bankruptcy Court;

      (2)    To pay all monetary obligations required under this Lease, including without limitation, prorated from the date of filing until the date of rejection or assumption of the Lease or the payment of Minimum Monthly Rent, and such other additional rent charges payable hereunder which is considered reasonable compensation for the use and occupancy of the Premises;

      (3)    Provide Landlord a minimum thirty (30) days prior written notice, unless a shorter period is agreed to in writing by the parties, of any proceeding relating to any assumption of this Lease or any intent to abandon the Premises, which abandonment shall be deemed a rejection of this Lease; and

      (4)    To perform to the benefit of Landlord otherwise required under the Code.

      The failure of Tenant to comply with the above shall result in an automatic rejection of this Lease.

      D.    <u>Accumulative Rights</u>.  The rights, remedies and liabilities of Landlord and Tenant set forth in this Section 18.6 shall be in addition to those which may now or hereafter be accorded, or imposed upon, Landlord and Tenant by the Code.

ARTICLE XIX

DEFAULT BY LANDLORD

<u>Section 19.1.</u>    <u>Default Defined; Notice</u>.
      Landlord shall in no event be charged with default in any of its obligations hereunder unless and until Landlord shall have failed to perform such obligations within thirty (30) days (or such additional time as is reasonably required to correct any such default) after written notice to Landlord by Tenant, specifically describing such failure.

<u>Section 19.2.</u>    <u>Notice to First Mortgagee</u>.
      If the holder of the first mortgage covering the Premises shall have given written notice to Tenant of the address to which notices to such holder are to be sent, Tenant shall give such holder written notice simultaneously with any notice given to Landlord of any default of Landlord, and if Landlord fails to cure any default asserted in said notice within the time provided above, Tenant shall notify such holder in writing of the failure to cure, and said holder shall have the right but not the obligation, within thirty (30) days after receipt of such second notice, to cure such default before Tenant may take any action by reason of such default.

ARTICLE XX

TENANT'S PROPERTY

<u>Section 20.1.</u>    <u>Taxes on Leasehold</u>.
      Tenant shall be responsible for and shall pay before delinquent all municipal, county, federal or state taxes coming due during or after the Lease Term against Tenant's interest in this Lease or against personal property of any kind owned or placed in, upon or about the Premises by Tenant.

<u>Section 20.2.</u>    <u>Assets of Tenant</u>.
      To secure the performance of Tenant's obligations under this Lease, Tenant hereby grants to Landlord a security interest in and an express contractual lien upon all of Tenant's equipment, furniture, furnishings, appliances, goods, trade fixtures, inventory, chattels and personal property which will be brought upon the Premises by Tenant, and all after-acquired property, replacements and proceeds. Landlord is authorized to prepare and file financing statements signed only by Landlord (as secured party) covering the security described above (but Tenant hereby agrees to sign the same upon request). Upon any default under this Lease by Tenant as defined in Section 18.1 hereof, any or all of Tenant's obligations to Landlord secured hereby shall, at Landlord's option, be immediately due and payable without notice or demand. In addition to all rights or remedies of Landlord under this Lease and the

-29-

law, including the right to a judicial foreclosure, Landlord shall have all the rights and remedies of a secured party under the Uniform Commercial Code of the State where the Center is located.  Landlord's security interest shall be subordinate to the lien or security interest of any vendor or lessor of equipment or chattels upon the Premises or of any lender taking or succeeding to a purchase money security interest thereon, and upon Tenant's written request, if no default exists hereunder, Landlord shall execute Landlord's standard instrument confirming such subordination.  Should Tenant or Tenant's lender or equipment lessor require modifications to such instrument, Tenant shall pay a Documentation Fee of One Hundred and 00/100 Dollars ($100.00).  This security agreement and the security interest hereby created shall survive the termination of this Lease if such termination results from Tenant's default.  The above-described security interest and lien are in addition to and cumulative of the Landlord's lien provided by the laws of the State where the Center is located.

## ARTICLE XXI

## ACCESS BY LANDLORD

Section 21.1.     Right of Entry.
        Landlord and Ground Lessor and their agents and employees shall have the right to enter the Premises from time to time at reasonable times, including, but not limited to, the right of immediate entry at any time in the case of an emergency or to protect access to the Hotel, to examine the same, show them to prospective purchasers and other persons, and to post notices as Landlord or Ground Lessor may deem reasonably necessary or appropriate for protection of Landlord or Ground Lessor, their interests or the Premises.  Landlord and Ground Lessor and their respective agents and employees shall have the further right to enter the Premises from time to time at reasonable times to make such repairs, alterations, improvements or additions to the Premises or other portions of the Center or Hotel Parcel as Landlord or the Ground Lessor deems desirable.  Rent shall not abate while any such repairs, alterations, improvements, or additions are being made.  During the last six (6) months of the Lease Term, Landlord may exhibit the Premises to prospective tenants and maintain upon the Premises notices deemed advisable by Landlord.  In addition, during any apparent emergency, Landlord, Ground Lessor or their agents may enter the Premises forcibly without liability therefor and without in any manner affecting Tenant's obligations under this Lease.  Nothing herein contained, however, shall be deemed to impose upon Landlord any obligation, responsibility or liability whatsoever, for any care, maintenance or repair except as otherwise herein expressly provided or to impose upon Ground Lessor any obligation, responsibility or liability whatsoever, for any care, maintenance or repair.

## ARTICLE XXII

## HOLDING OVER; SUCCESSORS

Section 22.1.     Holding Over.
        If Tenant holds over or occupies the Premises beyond the Lease Term (it being agreed there shall be no such holding over or occupancy without Landlord's written consent), no tenancy or interest in the Premises shall result therefrom but such holding over shall be subject to immediate eviction and removal, and Tenant shall pay Landlord for each day of such holding over a sum equal to the greater of (a) twice the Minimum Monthly Rent prorated for the number of days of such holding over, or (b) Minimum Annual Rent plus Percentage Rent prorated for the number of days of such holding over, plus, whichever of (a) or (b) is applicable, a prorata portion of all other amounts which Tenant would have been required to pay hereunder had this Lease been in effect.

Section 22.2.     Successors.
        All rights and liabilities herein given to or imposed upon the respective parties hereto shall bind and inure to the several respective heirs, successors, administrators, executors and assigns of the parties and if Tenant is more than one (1) person, they shall be bound jointly and severally by this Lease except that no rights shall inure to the benefit of any assignee or subtenant of Tenant unless the assignment or sublease was approved by Landlord in writing as provided in Section 13.1 hereof.  Landlord, at any time and from time to time, may make an assignment of its interest in this Lease and, in the event of such assignment, Landlord and its successors and assigns (other than the assignee of Landlord's interest in this Lease) shall be released from any and all liability thereafter accruing hereunder.

## ARTICLE XXIII

## QUIET ENJOYMENT

Section 23.1.     Landlord's Covenant.
        If Tenant pays the rents and other amounts herein provided, observes and performs all the covenants, terms and conditions hereof, Tenant shall peaceably and quietly hold and enjoy the Premises for the Lease Term without interruption by Landlord or any person or persons claiming by, through or under Landlord, subject, nevertheless, to the terms and conditions of this Lease, the Ground Lease, and any Operating Agreements made between Landlord and persons owning or occupying all or any portion of the Adjacent Land or any buildings adjacent to the Center.

-30-

ARTICLE XXIV

MISCELLANEOUS

Section 24.1.    Waiver.

No waiver by Landlord or Tenant of any breach of any term, covenant or condition hereof shall be deemed a waiver of the same or any subsequent breach of the same or any other term, covenant or condition. The acceptance of rent by Landlord shall not be deemed a waiver of any earlier breach by Tenant of any term, covenant or condition hereof, regardless of Landlord's knowledge of such breach when such rent is accepted. No covenant, term or condition of this Lease shall be deemed waived by Landlord or Tenant unless waived in writing.

Section 24.2.    Accord and Satisfaction.

Landlord is entitled to accept, receive and cash or deposit any payment made by Tenant for any reason or purpose or in any amount whatsoever, and apply the same at Landlord's option to any obligation of Tenant and the same shall not constitute payment of any amount owed except that to which Landlord has applied the same. No endorsement or statement on any check or letter of Tenant shall be deemed an accord and satisfaction or otherwise recognized for any purpose whatsoever. The acceptance of any such check or payment shall be without prejudice to Landlord's right to recover any and all amounts owed by Tenant hereunder and Landlord's right to pursue any other available remedy.

Section 24.3.    Entire Agreement.

There are no representations, covenants, warranties, promises, agreements, conditions or undertakings, oral or written, between Landlord and Tenant other than herein set forth. Except as herein otherwise provided, no subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless in writing and signed by them. Tenant acknowledges that it has independently investigated the potential for the success of its operations in the Center and has not relied upon any inducements or representations on the part of Landlord or Landlord's representatives, other than those contained in the Lease. Tenant also acknowledges and agrees that, to the extent any projections, materials or discussions have related to Tenant's projected or likely sales volume, customer traffic or profitability, Tenant understands that any and all such projections, materials and discussions are based solely upon Landlord's experiences at other properties or upon standardized marketing studies, and that such projections, materials and discussions shall not be construed as a promise or guarantee that Tenant will realize the same or similar results.

Section 24.4.    No Partnership.

Landlord does not, in any way or for any purpose, become a partner, employer, principal, master, agent or joint venturer of or with Tenant.

Section 24.5.    Force Majeure.

If either party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure material, failure of power, restrictive governmental laws or regulations, riots, insurrection, war, environmental remediation work whether ordered by any governmental body or voluntarily initiated or other reason of a like nature not the fault of the party delayed in performing work or doing acts required under this Lease, the period for the performance of any such act shall be extended for a period equivalent to the period of such delay. Notwithstanding the foregoing, the provisions of this Section 24.5 shall at no time operate to excuse Tenant from the obligation to open for business on the Commencement Date, except in the event of an industry wide strike, nor any obligations for payment of Minimum Annual Rent, Percentage Rent, additional rent or any other payments required by the terms of this Lease when the same are due, and all such amounts shall be paid when due.

Section 24.6.    Submission of Lease.

Submission of this Lease to Tenant does not constitute an offer to lease; this Lease shall become effective only upon execution and delivery thereof by Landlord and Tenant. Upon execution of this Lease by Tenant, Landlord is granted an irrevocable option for sixty (60) days to execute this Lease within said period and thereafter return a fully executed copy to Tenant. The effective date of this Lease shall be the date filled in on Page 1 hereof by Landlord, which shall be the date of execution by the last of the parties to execute the Lease.

Section 24.7.    Notices.

All notices to be given hereunder by either party shall be written and sent by registered or certified mail, return receipt requested, postage pre-paid or by an express mail delivery service or by an electronic transmission, addressed to the party intended to be notified at the address set forth in Article I. Either party may, at any time, or from time to time, notify the other in writing of a substitute address for that above set forth, and thereafter notices shall be directed to such substitute address. Notice given as aforesaid shall be sufficient service thereof and shall be deemed given as of the date received or the date on which delivery is first

-31-

refused, as evidenced by the return receipt of the registered or certified mail or the express mail delivery receipt, as the case may be. A duplicate copy of all notices from Tenant shall be sent to any mortgagee as provided for in Section 19.2.

Section 24.8.        Captions and Section Numbers.
        This Lease shall be construed without reference to titles of Articles and Sections, which are inserted only for convenience of reference.

Section 24.9.        Number and Gender.
        The use herein of a singular term shall include the plural and use of the masculine, feminine or neuter genders shall include all others.

Section 24.10.        Objection to Statements.
        Tenant's failure to object to any statement, invoice or billing rendered by Landlord within a period of thirty (30) days after receipt thereof shall constitute Tenant's acquiescence with respect thereto.

Section 24.11.        Representation by Tenant.
        If Tenant is or will be a corporation, the persons executing this Lease on behalf of Tenant hereby covenant and warrant that Tenant is a duly qualified corporation authorized to do business in the State where the Center is located, that all franchise and corporate taxes have been paid to date and all future forms, reports, fees and other documents necessary to comply with applicable laws will be filed when due, and the person signing this Lease on behalf of the corporation is an officer of Tenant, and is duly authorized to sign and execute this Lease.

        Tenant hereby represents and warrants that: (a) there are no proceedings pending or so far as Tenant knows threatened before any court or administrative agency that would materially adversely affect the financial condition of Tenant, the ability of Tenant to enter into this Lease or the validity or enforceability of this Lease; (b) there is no provision of any existing mortgage, indenture, contract or agreement binding on Tenant which would conflict with or in any way prevent the execution, delivery or performance of the terms of this Lease; (c) the financial statement of Tenant provided to Landlord in connection with this Lease are complete and correct and fairly present the financial condition of Tenant as of the date and for the period referred to therein and have been prepared in accordance with generally accepted accounting principles consistently applied; and (d) there has been no material adverse change in the financial condition of Tenant since the date of such financial statement and to the knowledge of Tenant, no such material adverse changes are pending or threatened.   Tenant acknowledges that Landlord is executing this Lease in reliance upon the foregoing representation and warranty and that such representation and warranty is a material element of the consideration inducing Landlord to enter into and execute this Lease.

Section 24.12.        Joint and Several Liability.
        If Tenant is a partnership or other business organization the members of which are subject to personal liability, the liability of each such member shall be deemed to be joint and several.

Section 24.13.        Limitation of Liability.
        Anything to the contrary herein notwithstanding, no general or limited partner of the Landlord, or any general or limited partner of any partner of the Landlord, or any shareholder of any corporate partner of any partner of the Landlord, or any other holder of any equity interest in the Landlord, or in any entity comprising the Landlord or its partners, shall be personally liable with respect to any of the terms, covenants, conditions and provisions of this Lease, or the performance of Landlord's obligations under this Lease, nor shall Landlord or any of said constituent parties have any liability to Tenant for any consequential damages such as, but not limited to, lost profits. The liability of Landlord for Landlord's obligations under this Lease shall be limited to Landlord's interest in the Center, and Tenant shall look solely to the interest of Landlord, its successors and assigns, in the Center, for the satisfaction of each and every remedy of Tenant against Landlord.  Tenant shall not look to any of Landlord's other assets seeking either to enforce Landlord's obligations under this Lease, or to satisfy any money or deficiency judgment for Landlord's failure to perform such obligations, such exculpation of personal liability is and shall be absolute and without any exception whatsoever.

        The term "Landlord" shall mean only the owner at the time in question of the present Landlord's interest in the Center.  In the event of a sale or transfer of the Center (by operation of law or otherwise) or in the event of the making of a lease of all or substantially all of the Center, or in the event of a sale or transfer (by operation of law or otherwise) of the leasehold estate under any such lease, the grantor, transferor or lessor, as the case may be, shall be and hereby is (to the extent of the interest or portion of the Center or leasehold estate sold, transferred or leased) automatically and entirely released and discharged, from and after the date of such sale, transfer or leasing of all liability with respect of the performance of any of the terms of this Lease on the part of Landlord thereafter to be performed; provided that the purchaser, transferee or lessee (collectively, "Transferee") shall be deemed to have assumed and agreed to perform, subject to the limitations of this Section (and without further agreement between the other parties hereto, or among such parties and the Transferee) and only during and in respect of the Transferee's period of ownership of the Landlord's interest under this Lease, all of the terms of this Lease on the part of Landlord to be performed during such period of

-32-

ownership, it being intended that Landlord's obligations hereunder shall, as limited by this Section, be binding on Landlord, its successors and assigns only during and in respect of their respective, successive periods of ownership.

Section 24.14.    Broker's Commission.

Each party represents and warrants that it has caused or incurred no claims for brokerage commissions or finder's fees in connection with the execution of this Lease, and each party shall indemnify and hold the other harmless against and from all liabilities arising from any such claims caused or incurred by it (including without limitation, the cost of attorneys' fees in connection therewith).

Section 24.15.    Partial Invalidity.

If any provision of this Lease or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Lease, or the application of such provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby and each provision of this Lease shall be valid and enforceable to the fullest extent permitted by law; provided, however, if Tenant's obligation to pay Percentage Rent or Tenant's obligation to continuously operate its business in the Premises is deemed invalid or unenforceable as determined by Landlord based upon the then applicable statutes or case law, then Landlord may, at any time thereafter, terminate this Lease by giving Tenant notice of its election, and this Lease shall terminate and become null and void thirty (30) days after said notice.

Section 24.16.    Recording.

The parties agree not to place this Lease of record but each party shall, at the request of the other, execute and acknowledge so that the same may be recorded a Short Form Lease or Memorandum of Lease, indicating the Lease Term, but omitting rent and other terms, and an Agreement specifying the date of commencement and termination of the Lease Term; provided, however, that the failure to record said Short Form Lease, Memorandum of Lease or Agreement shall not affect or impair the validity and effectiveness of this Lease. Tenant shall pay all costs, taxes, fees and other expenses in connection with or prerequisite to recording.

Section 24.17.    Applicable Law.

This Lease shall be construed under the laws of the State where the Center is located.

Section 24.18.    Mortgagee's Approval.

If any mortgagee of the Center requires any modification of the terms and provisions of this Lease as a condition to such financing as Landlord may desire, then Landlord shall have the right to cancel this Lease if Tenant fails or refuses to approve and execute such modification(s) within thirty (30) days after Landlord's request therefor, provided said request is made at least thirty (30) days prior to delivery of possession. Upon such cancellation by Landlord, this Lease shall be full and void and neither party shall have any liability either for damages or otherwise to the other by reason of such cancellation. In no event, however, shall Tenant be required to agree, and Landlord shall not have any right of cancellation for Tenant's refusal to agree, to any modification of the provisions of this Lease relating to: the amount of rent or other charges reserved herein; the size and/or location of the Premises; the duration and/or Commencement Date of the Lease Term; or reducing the improvements to be made by Landlord to the Premises prior to delivery of possession.

Section 24.19.    Reservation of Air Rights.

There has been no representation or warranty by the Landlord and Tenant acknowledges that there is no inducement or reliance to lease the Premises on the basis that the existing access to light, air and views from the Premises would continue unabated. Tenant acknowledges and understands that it shall have no rights to the airspace above the Premises and the Center and those rights shall be the sole property of Landlord. Landlord reserves the right to construct, cause to be constructed or permit the construction of mezzanines over the Premises.

Section 24.20.    Delay in Delivery.

Notwithstanding anything to the contrary contained in this Lease, Landlord shall not be liable in any manner to Tenant for damages or any other claim resulting from failure to deliver the Premises or for any delay in commencing or completing any work Landlord is to perform or is authorized by Tenant to perform under Exhibit "B", or with respect to the Center, and Tenant hereby waives all such liability provided that in the event that the Commencement Date shall not have occurred within two (2) years after the effective date of this Lease (unless such failure shall be due to Tenant's fault), then this Lease at Landlord's option shall become null and void (except that items which have been theretofore accrued and not yet paid shall remain outstanding), and if Landlord so terminates the Lease both parties hereto shall be relieved of all obligations hereunder, in which event each party will, at the other's request, execute an instrument in recordable form containing a release and surrender of all right, title and interest in and to this Lease.

Section 24.21.    Unrelated Business Taxable Income.

A.    If at any time and from time to time during the Lease Term, Landlord is advised by its counsel or counsel to a tax exempt partner of the managing partner of Landlord that any provision of this Lease, including without limitation the provisions relating to the payment of rent and additional rent, or the absence of any provision might give rise to unrelated business taxable income within the meaning of section 512 of the Internal Revenue Code of 1986, as amended, or the regulations issued thereunder,

-33-

or may jeopardize the tax-exempt status of any partner in Landlord or any partner in a partnership that is a partner in Landlord, or may prevent any such partner from obtaining such tax-exempt status, then this Lease may be unilaterally amended by Landlord in such manner as shall meet the requirements specified by counsel for Landlord and Tenant agrees that it will execute all documents or instruments necessary to effect such amendments, provided that no such amendment shall result ~~on an estimated basis~~ in Tenant having to pay in the aggregate more on account of its occupancy of the Premises than it would be required to pay under the terms of this Lease, or having to receive fewer services or services of lesser quality than it is presently entitled to receive under this Lease.

B.      Any services which Landlord is required to furnish pursuant to the provisions of this Lease may, at Landlord's option, be furnished from time to time, in whole or in part, by employees of Landlord or the managing agent of the Center or its employees or by one or more third persons hired by Landlord or the managing agent of the Center.  Tenant agrees that upon Landlord's written request it will enter into direct agreements with the managing agent of the Center or other parties designated by Landlord for the furnishing of any such services required to be furnished by Landlord herein, in form and content approved by Landlord, provided, however, that no such contract shall result ~~on an estimated basis~~ in Tenant having to pay in the aggregate more money on account of its occupancy of the Premises under the terms of this Lease, or having to receive fewer services or services of a lesser quality than it is presently entitled to receive under this Lease.

Section 24.22.      Anti-Terrorism Law.

A.      Tenant represents and warrants to Landlord as follows:

(1)     Neither Tenant, its constituents or affiliates nor any of their respective agents (collectively, the "Tenant Parties") is in violation of any law relating to terrorism or money laundering, including, but not limited to, Executive Order No. 13224 on Terrorist Financing, the U.S Bank Secrecy Act, as amended by the Patriot Act, the Trading with the Enemy Act, the International Emergency Economic Powers Act and all regulations promulgated thereunder, all as amended from time to time (collectively, "Anti-Terrorism Law").

(2)     No action, proceeding, investigation, charge, claim, report, or notice has been filed, commenced, or threatened against any of the Tenant Parties alleging any violation of any Anti-Terrorism Law.

(3)     None of the Tenant Parties has, after due inquiry, knowledge of any fact, event, circumstance, situation or condition which could reasonably be expected to result in any action, proceeding, investigation, charge, claim, report, notice or penalty being filed, commenced, threatened or imposed against any of them relating to any violation of or failure to comply with any Anti-Terrorism Law.

(4)     None of the Tenant Parties is a "Prohibited Person": A Prohibited Person means any of the following:

(a)     A person or entity that is "specially designated" on the most current list published by the U.S. Treasury Department Office of Foreign Asset Control or which is owned, controlled by or acting for or on behalf of any such person or entity;

(b)     A person or entity with whom Landlord is prohibited from dealing by any Anti-Terrorism Law;

(c)     A person or entity that commits, threatens, or conspires to commit or supports "terrorism", as defined in any Anti-Terrorism Law.

(5)     None of the Tenant Parties:

(a)     Conducts any business or transactions or makes or receives any contribution of funds, goods, or services in violation of any Anti-Terrorism Law;

(b)     Engages in or conspires to engage in any transaction that evades or avoids, has the purpose of evading or avoiding or attempts to violate any of the prohibitions of any Anti-Terrorism Law.

B.      Tenant covenants that it shall not:

(1)     Conduct any business or transaction or make or receive any contribution of funds, goods, or services in violation of any Anti-Terrorism Law;

(2)     Engage in or conspire to engage in any transaction that evades or avoids, has the purpose of evading or avoiding or attempts to violate any of the prohibitions of any Anti-Terrorism Law.

-34-

C.        Tenant agrees promptly to deliver to Landlord (but in any event within ten [10] days of Landlord's written request) any certification or other evidence requested from time to time by Landlord, in its reasonable discretion, confirming Tenant's compliance with the foregoing.

**Section 24.23.**        *Landlord's Contribution Toward Tenant's Work.*

*Notwithstanding anything herein to the contrary, Tenant may retain, as Landlord's contribution towards Tenant's alterations, improvements, fixtures and equipment that become part of or attached or affixed to the Premises (hereinafter called "Permanent Improvements"), but excluding trade fixtures, furniture and furnishings or other personal property, one hundred percent (100%) of the Minimum Rent and additional rent otherwise payable to Landlord until such time as the total sum retained equals $116,000.00; provided, however, Tenant shall pay all additional rent during such period. Thereafter, no other sums otherwise payable as Minimum Rent or additional rent may be retained by Tenant. The Permanent Improvements are the property of Landlord and shall remain so after the expiration of the Lease. Upon Tenant's completion of such work, Tenant shall furnish an affidavit to Landlord stating that Landlord's contribution was used solely for such Permanent Improvements.*

05/12/11

IN WITNESS WHEREOF, Landlord and Tenant have signed and sealed this Lease as of the day and year first above written.

(LANDLORD)

FORUM SHOPS, LLC, a Delaware limited liability company
By:    FORUM DEVELOPERS LIMITED
        PARTNERSHIP, a Nevada limited
        partnership, its sole member
        By:    SIMON PROPERTY GROUP,
            L.P., a Delaware limited
            partnership, its general partner
            By:    SIMON PROPERTY
                GROUP, INC., a
                Delaware corporation, its
                general partner

By: _____
    John Rulli, Executive Vice President and
        Chief Administrative Officer

(TENANT)

SARAH, LLC

By: _____Hala subH_____

Its: _____Italy_____

Suhad Albasha

X. SALBASH

"OFFICIAL SEAL"
Sarah E. Botka
Notary Public, State of Illinois
Will County
My Commission Expires 06-08-2014

Sarah E Botka
3-21-11

## GUARANTY

FOR VALUE RECEIVED, and in consideration of the execution of a certain Lease of even date herewith and concurrently herewith covering certain premises in the Forum Shops at Caesars, the creation of the tenancy under said Lease and the extension of credit by FORUM SHOPS, LLC, a Delaware limited liability company (Landlord) to SARAH, LLC (Tenant), and for the purpose of inducing Landlord to enter into such Lease, BACHAR HAMAD (Guarantor), does hereby absolutely and unconditionally guarantee to Landlord, its successors and assigns, the full and prompt payment when due, of all rents, charges and additional sums coming due under said Lease, together with the performance of all covenants and agreements of the Tenant therein contained and together with the full and prompt payment of all damages that may arise or be incurred by Landlord in consequence of Tenant's failure to perform such covenants and agreements (all such obligations hereinafter collectively referred to as "Liabilities"), and Guarantor further agrees to pay all expenses, including attorneys' fees and legal expenses, paid or incurred by Landlord in endeavoring to collect or enforce the Liabilities or any part thereof and in enforcing this guaranty, such payment and performance to be made or performed by Guarantor forthwith upon a default by Tenant.

In the event of the death, incompetency, dissolution, bankruptcy or insolvency of Tenant, or the inability of Tenant to pay debts as they mature, or an assignment by Tenant for the benefit of creditors, or the institution of any bankruptcy or other proceedings by or against Tenant alleging that Tenant is insolvent or unable to pay debts as they mature, or Tenant's default under this Lease, and if such event shall occur at a time when any of the Liabilities may not then be due and payable, Guarantor agrees to pay to Landlord upon demand, the full amount which would be payable hereunder by Guarantor if all Liabilities were then due and payable.

This Guaranty shall be an absolute and unconditional guaranty and shall remain in full force and effect as to Guarantor during the *first three (3) Lease Years of the* demised term of said Lease, and any renewal or extension thereof, and thereafter so long as any Liabilities *accruing during such first three (3) Lease Years* remain due and payable even though the demised term or any renewal or extension thereof shall have expired. An Assignment of said Lease or any subletting thereunder shall not release or relieve Guarantor from its liability hereunder. *After the end of the third (3rd) Lease Year, the undersigned's liabilities shall be limited to an amount equal to one (1) year's Minimum Rent, Percentage Rent and additional rent based upon the Minimum Rent, Percentage Rent and additional rent in effect at the time Tenant defaults under the terms of this Lease.*

Landlord may, from time to time, without notice to Guarantor: (a) retain or obtain a security interest in any property to secure any of the Liabilities or any obligation hereunder, (a) retain or obtain the primary or secondary liability or any party or parties, in addition to Guarantor, with respect to any of the Liabilities, (b) extend or renew for any period (whether or not longer than the original period), alter or exchange said Lease or any of the Liabilities, (c) release, waive or compromise any liability of the Guarantor hereunder or any liability of any other party or parties primarily or secondarily liable on any of the Liabilities, (d) release or impair any security interest or lien, if any, in all or any property securing any of the Liabilities or any obligation hereunder and permit any substitution or exchange for any such property, and (e) resort to Guarantor for payment of any of the Liabilities, whether or not Landlord shall have resorted to any property securing any of the Liabilities or any obligation hereunder or shall have proceeded against the Guarantor or against Tenant or any other party primarily or secondarily liable on any of the Liabilities. No such action or failure to act by Landlord shall affect Guarantor's liability hereunder in any manner whatsoever. Any amount received by Landlord from whatsoever source and applied by it toward the payment of the Liabilities shall be applied in such order of application as Landlord may from time to time elect.

Guarantor hereby expressly waives: (a) notice of the acceptance of this Guaranty, (b) notice of the existence, creation, amount, modification, amendment, alteration or extension of the Lease or all or any of the Liabilities, whether or not such notice is required to be given to Tenant under the terms of the Lease, (c) presentment, demand, notice of dishonor, protest, and all other notices whatsoever, (d) any benefit of valuation, appraisement, homestead or other exemption law, now or hereafter in effect in any jurisdiction in which enforcement of this Guaranty is sought, and (e) all diligence in collection, perfection or protection of or realization upon the Liabilities or any thereof, any obligation hereunder, or any security for any of the foregoing.

No delay on the part of Landlord in the exercise of any right or remedy shall operate as a waiver thereof, and no final or partial exercise by Landlord of any right or remedy shall preclude other or further exercises thereof or the exercises of any other right or remedy.

The validity of this Guaranty and the obligations of Guarantor hereunder shall not be terminated, affected or impaired by reason of any action which Landlord may take or fail to take against Tenant or by reason of any waiver of, or failure to enforce, any of the rights or remedies reserved to Landlord in said Lease, or otherwise, or by reason of the bankruptcy or insolvency of Tenant and whether or not the term of said Lease shall terminate by reason of said bankruptcy or insolvency.

This Guaranty shall be binding upon Guarantor, and upon the heirs, legal representatives, successors and assigns of Guarantor and shall be governed by the laws of the State of *Nevada*. ~~Indiana.~~

-37-

02/09/11

If this Guaranty is executed by a corporation, association, partnership (general or limited), joint venture, syndicate, trust or any other type of organization other than individuals, the individual signatories hereto represent and warrant that they, and each of them, are duly authorized to execute this Guaranty for and on behalf of such organization and that such organization is the sole owner of all ownership interest in the Tenant.

-38-

02/09/11

IN WITNESS WHEREOF, Guarantor has executed this instrument, or caused this instrument to be executed by its officers, duly authorized in the premises, on this __8__ day of _March_, 20_11_.

GUARANTOR

Attest

_Karen A. Sellers_

By: _Bichar Hamad_
Bachar Hamad

_333 n. Madison_
Residence Address

_1717 Midwest club_
Residence Address

_Joliet IL 60435_
City       State       Zip

_Oak Brook, IL 60523_
City       State       Zip

LANDLORD

**"OFFICIAL SEAL"**
**Karen A Sellers**
**Notary Public, State of Illinois**
**Commission Expires 2/28/2012**

FORUM SHOPS, LLC, a Delaware limited
liability company
By: FORUM DEVELOPERS LIMITED
    PARTNERSHIP, a Nevada limited
    partnership, its sole member
    By: SIMON PROPERTY GROUP, L.P., a
        Delaware limited partnership, its
        general partner
        By: SIMON PROPERTY GROUP,
            INC., a Delaware corporation, its
            general partner

By: _____
    John Rulli, Executive Vice President and
    Chief Administrative Officer

TENANT

SARAH, LLC

By: _Bichamad._

_Hala subH_

_Hala_

_Suhad ALbasha_
_X S. ALBasha._



**RELOCATION ZONE**

# FORUM SHOPS AT CAESARS

TSD# K08-1
Level: CASINO

## SIMON
Simon Property Group
225 W. WASHINGTON ST.
INDIANAPOLIS,   IN 46204

Structural Element, must be field verified by tenant.

| DBA Name: | Date: 08/09/2010 15:29 |
|---|---|
| Unit No.   K08 | Scale: 1" = 20' |
| Leasing Agent: | Corp. No.  1145 |

EXHIBIT "A"

02/09/11

## DESCRIPTION OF TENANT'S WORK

I.  **TENANT'S WORK** – Unless otherwise specifically identified as Landlord's Work, Tenant shall complete all work required to place the Premises in a finished condition ready to open for business at the Tenant's own expense. Tenant's Work includes, but is not limited to, the following:

A.  GENERAL PROVISIONS: All work done by Tenant shall be governed in all respects by, and be subject to the following:

1.  <u>Payment and Performance Bonds</u>.  Landlord shall have the right to require Tenant to furnish payment and performance bonds or other security in form satisfactory to Landlord for the prompt and faithful performance of Tenant's Work, assuring completion of Tenant's Work and conditioned that Landlord will be held harmless from payment of any claim either by way of damages or liens on account of bills for labor or material in connection with Tenant's Work.

2.  <u>Tenant's Work Standards</u>. All Tenant's Work shall conform to the more stringent of applicable statutes, ordinances, regulations, codes, all requirements of Landlord's insurance carrier, all rating bureaus, and the Tenant Information Package (Exhibit "B-1") which contains the basic architectural, electrical and mechanical information necessary for the preparation of Tenant's Plans, and which by this reference is incorporated into and made a part of this Lease. Landlord reserves the right to require changes in Tenant's Work when necessary by reason of the aforementioned standards. No approval by Landlord shall be deemed valid unless in writing and signed by Landlord. Tenant shall obtain all permits arising out of Tenant's Work including, but not limited to, building permits and any sewer connection charges assessed by applicable governmental authorities.

3.  <u>Insurance Requirements</u>. Prior to commencement of Tenant's Work and until completion thereof, or commencement of the Lease Term, whichever is the last to occur, Tenant shall effect and maintain Builder's Risk Insurance covering Landlord, Landlord's general contractor, Tenant, Tenant's contractors and Tenant's subcontractors, as their interest may appear against loss or damage by fire, vandalism and malicious mischief and such other risks as are customarily covered by a standard "All Risk" policy of insurance protecting against all risk of physical loss or damage to all Tenant's Work in place and all materials stored at the site of Tenant's Work, and all materials, equipment, supplies and temporary structures of all kinds incidental to Tenant's Work, and equipment, all while forming a part of or contained in such improvements or temporary structures, or while on the Premises or within the Center, all to the actual replacement cost thereof at all times on a completed value basis. In addition, Tenant agrees to indemnify and hold Landlord harmless against any and all claims for injury to persons or damage to property by reason of the use of the Premises for the performance of Tenant's Work, and claims, fines, and penalties arising out of any failure of Tenant or its agents, contractors and employees to comply with any law, ordinance, code requirement, regulations or other requirement applicable to Tenant's Work and Tenant agrees to require all contractors and subcontractors engaged in the performance of Tenant's Work to effect and maintain and deliver to Tenant and Landlord, certificates evidencing the existence of, and covering Landlord, Tenant and Tenant's contractors, prior to commencement of Tenant's Work and until completion thereof, the following insurance coverages:

a.  Workmen's Compensation and Occupational Disease insurance in accordance with laws of the State in which the property is located and Employer's Liability Insurance with limits of not less than $1,000,000.00 per occurrence.

b.  Commercial General Liability Insurance affording protection for bodily injury, death, personal injury and property damage, and including coverage for contractual liability, independent contractors, completed operations and products liability with limits of not less than $3,000,000.00 combined single limit per occurrence.

c.  Comprehensive Automobile Liability Insurance, including coverage for "non-owned" automobiles, for property damage, bodily injury, including death resulting therefrom with limits of not less than $1,000,000.00 for any one occurrence combined single limit.

d.  Owners and contractors protective liability coverage for an amount not less than $1,000,000.00.

4.     Reasonable Easement.   Landlord specifically reserves the right (and Tenant shall permit Landlord or its employees, agents or contractors reasonable access to the Premises for the purpose of exercising such rights), to install, maintain, repair and replace in the ceiling space and/or under the concrete slab in the Premises, all such electrical, plumbing, HVAC and other system components that may be required to service the Common Areas or other tenants in the Center. Adequate access panels or doors shall be incorporated into Tenant's Work for inspection, service and replacement of both Landlord and Tenant equipment.

5.     Tenant agrees that the contract of every contractor, subcontractor, mechanic, journeyman, laborer, material supplier or other person or entity performing labor upon, or furnishing materials or equipment to, the Premises in connection with Tenant's Work shall contain the following provision:

"Contractor acknowledges that this provision is required under Tenant's lease of the premises to be improved under this Contract (Lease Premises) from Forum Developers Limited Partnership (Lease). In consideration of Tenant's engagement of Contractor to perform the work hereunder, and as an inducement to Tenant to enter into this Contract with Contractor. Contractor acknowledges, covenants and agrees that any mechanic's lien which it may hereafter file, claim, hold or assert with respect to the work hereunder (i) shall attach only to Tenant's interest in the Lease Premises under the Lease and (ii) shall be subject, subordinate and inferior to the lien of any mortgage(s) now or hereafter held upon and against the Forum Developers Limited Partnership by any lender(s) now or hereafter providing funds for the financing for the Forum Developers Limited Partnership, notwithstanding that any such mortgage(s) may be recorded after the commencement of the work hereunder and that Contractor's mechanic's lien otherwise might be entitled to priority over any such mortgage(s).   For such purposes, Contractor also shall execute, acknowledge and deliver a separate subordination agreement upon request by Tenant, Forum Developers Limited Partnership, or any such lender(s), prior to making any application or request for payment hereunder and as a condition precedent to Contractor's right to receive any payment hereunder.   Contractor likewise shall cause the liens and lien rights of all subcontractors, sub-subcontractors, materialmen, suppliers, laborers and all other persons furnishing work, labor, materials, equipment and services on or in connection with the Lease Premises to be limited to the Tenant's interest in the Lease Premises under the Lease and to be subordinated to such mortgage(s), and Contractor shall obtain and deliver to Tenant a similar subordination agreement duly executed and acknowledged by each such subcontractor, sub-subcontractor, materialman, supplier, laborer and other person prior to making any application or request for payment hereunder and as a condition precedent to Contractor's right to receive any payment hereunder.   Contractor shall indemnify, defend and hold harmless Tenant, Forum Developers Limited Partnership, Forum Developers' lessor, the Owner of Caesars Palace Hotel and such lender(s) from and against any and all loss, costs, damage, expense (including, without limitation, reasonable attorney fees), liability, suits, actions and judgments arising or resulting from Contractor's failure to cause all such mechanic's and materialmen's liens to be limited to Tenant's interest in the Lease Premises under the Lease and to be subordinated to said mortgage(s) as herein provided, in addition to all other indemnities contained herein with respect to such liens."

Tenant shall indemnify, defend and hold harmless Landlord, Ground Lessor. the Owner of the Hotel Parcel and such lender(s) from and against any and all loss, costs, damage, expense (including, without limitation. reasonable attorney fees), liability, suits, action and judgments arising or resulting from Tenant's failure to cause all such mechanic's and materialmen's liens to be limited to Tenant's interest in the Premises under this Lease and to be subordinated to said mortgage(s) as herein provided, in addition to all other indemnities contained herein with respect to such liens.

6.     If Landlord or Ground Lessor in the sole and absolute discretion of either of them determines that the Center, the Hotel or the Adjacent Land or the businesses conducted thereon would otherwise be adversely affected, any or all work shall be done by recognized union labor.

B.     TENANT'S PLANS.   Tenant shall, at Tenant's expense, prepare and submit to Landlord for Landlord's approval, all drawings required (including signage) for the completion of the Premises as provided for herein ("Tenant's Plans").   Tenant's Plans shall indicate all proposed demolition, modification or reuse of existing improvements or equipment (if applicable), delineate all proposed new improvements or equipment including minimum of one (1) toilet room, be to scale, be prepared, stamped and signed by an architect or engineer licensed to do business in the state in which the Center is located and be in accordance with:  the Federal Occupational Safety and Health Act (OSHA) and regulations promulgated thereunder; all laws, ordinance and regulations of governing authorities having jurisdiction over the premises and utility companies; the overall design and

construction standards of the Center contained in Exhibit "B-1"; and the requirements of Landlord's fire and casualty insurer and/or the criteria of this Exhibit, whichever is more stringent.

Tenant shall not submit plans, shop drawings or specifications which have been prepared by contractors, subcontractors or suppliers (unless otherwise specifically required in Exhibit "B-1") as such plans, shop drawings or specifications shall not be given consideration by Landlord and shall not serve to satisfy the obligations of Tenant provided for herein.

1. Landlord's Approval of Tenant's Plans.

   a. Approval of plans and specifications by Landlord shall not constitute the assumption of any responsibility by Landlord for their accuracy or sufficiency or conformity with applicable laws (including but not limited to the Americans with Disabilities Act of 1990 and the Williams-Steiger Occupational Safety and Health Act), and Tenant shall be solely responsible for such plans and specifications. Tenant shall indemnify and hold Landlord harmless from and against any and all errors and omissions contained in Tenant's Plans, and any losses, costs, damages or claims of whatever nature (including, but not limited to attorneys' fees and costs of any kind), arising out of or in connection with such compliance. Landlord shall not be liable for any loss to Tenant's property or the property of any other person during construction.

   b. Should any conflict arise between any of Tenant's Plans and the Lease such that, in Landlord's sole opinion, the integrity or code compliance of any existing Landlord or adjacent tenant improvements and construction is jeopardized, the applicable portion(s) of the Lease shall be determinative. Any modification of such existing improvements or construction must receive the prior written approval of Landlord and all work shall be specifically stated in writing. Landlord's approval of Tenant's Plans will in no way alter, amend or waive the requirements or criteria of this Exhibit.

2. Existing Conditions.

   a. Prior to the preparation of Tenant's Plans, Tenant shall visit the Premises to verify existing conditions and construction to ensure that none of Tenant's Work shall be in conflict with any existing Landlord or adjacent tenant improvements and construction. In addition, if the Premises' concrete slab is not on grade (compacted soil), Tenant shall remove all previous floor penetrations not intended to be re-used, and patch and repair the floor to original condition, and re-seal all floor penetrations to be re-used utilizing Landlord's waterproofing specifications.

   b. In the event Tenant's store design requires revisions to Landlord's building, mechanical, electrical or HVAC system(s), Tenant shall request, in writing, approval for such revision(s) and, if approved by Landlord, Landlord shall perform the necessary work to accommodate Tenant's request. Tenant shall reimburse Landlord for the cost of such work as provided herein.

3. Utility Services. All utility services are subject to the limitation and capacities of existing Center facilities and equipment and the availability of service from the local serving utilities. Tenant shall, at Tenant's expense and subject to Landlord's prior written approval, provide and install any equipment necessary to adapt such existing services to Tenant's requirements.

4. Roof. Tenant shall provide any required supports, blocking, temporary flashing, counterflashing or other work necessary to complete installation of Tenant's equipment on Landlord's roof. Cant strips and weatherproofing shall be done only by contractor designated by Landlord. Tenant will be required to supplement existing construction to achieve assembly ratings, thermal values or additional criteria as required by Tenant's Work.

5. Fire Protection. Modifications to Tenant's automatic fire sprinkler system shall be performed by a contractor designated by Landlord. The work shall conform to Landlord's requirements and may include, but not be limited to, the cost of preparing engineered sprinkler shop drawings and the submission of such drawings to Landlord's fire insurance underwriter for approval, the relocating, re-sizing, and adding sprinkler piping or heads, draining the system and fire watch during system down-time.

6. HVAC Criteria.

   a. Restaurants, food service, pet shops, beauty salons, barber shops and any other occupancies which, in the sole opinion of the Landlord, produce odors or produce a high level of humidity,

shall provide an exhaust system which will prevent such odors or moisture from entering the enclosed mall, other tenant spaces or any other portion of the Center. If, in the sole opinion of the Landlord, any of Tenant's roof mounted equipment accumulates grease, Tenant shall, at Tenant's expense, furnish and install grease collection and elimination facilities in accordance with Landlord's requirements (which may include the use of a Grease Guard collection pan).

    b.   In the event that Tenant elects to reuse all or a portion of any existing HVAC system(s), Tenant shall indicate same on Tenant's drawings for Landlord's review. In the event Landlord permits Tenant to reuse said systems, Tenant shall employ a qualified contractor to verify, by written confirmation to Landlord, that such HVAC system(s) is fully operable and in conformance with Landlord's design criteria as provided in Landlord's drawings (said written confirmation shall include, but not be limited to, an air balance report completed by an AABC certified air balance contractor and shall indicate, at a minimum, any discrepancies between design quantities and tested quantities). If any portion of Tenant's HVAC system(s) is not fully operable or does not conform to Landlord's design criteria, Tenant shall, at Tenant's expense, have its contractor repair or replace same to comply therewith and thereafter provide Landlord with written confirmation thereof.

7.    <u>Construction Deposit</u>.  Prior to commencement of construction in the Premises, Tenant's contractor shall deliver a damage deposit in the form of a cashier's check in the amount of $5,000.00 made payable to Landlord. Landlord shall have the right to use all or any part of said damage deposit as reimbursement for any debris clean-up or damage caused by Tenant's Contractor(s) to any Common Areas.

8.    <u>Materials and Services</u>:  Prior to commencement of construction in the Premises, Tenant's contractor shall deliver a cashier's check, made payable to Landlord, as payment for materials issued to or services provided for Tenant's contractor by Landlord or for work performed by Landlord for Tenant's contractor at the request of Tenant's contractor. Such items are itemized in the Tenant Information Package and may include (but not be limited to): entrance floor tile; service door, frame and hardware; smoke detectors; temporary utilities; temporary sprinkler system (standard grid); sheetrock; temporary toilets; dumpster and trash removal; final connection and testing to Landlord's fire system; and governmental fees.

9.    <u>Construction Rules</u>.  Tenant will abide by and cause its contractors, subcontractors, agents and employees to abide by rules and regulations published by Landlord from time to time, including, but not limited to, those pertaining to parking, toilet facilities, safety conduct, delivery of materials and supplies, employee egress to the Center, trash storage or collection or removal, and cooperation with Landlord's architect, general contractor and subcontractors or other agents.

10.    <u>Storefront Barricade</u>.  If, in the sole opinion of the Landlord, a temporary storefront barricade is required for the Premises, Landlord shall install same at Tenant's expense.

11.    <u>Signage</u>.  Tenant shall provide and install a storefront identification sign for the Premises which may include, at Landlord's discretion, multiple signs (depending upon Tenant's storefront configuration) and Tenant's established national logo or insignia, if any. Storefront identification signs shall be limited to Tenant's Trade Name as approved in this Lease or as otherwise approved in writing by Landlord. The storefront sign shall be illuminated (unless otherwise specifically approved, in writing, by Landlord). Landlord's approval of Tenant's storefront signage shall be based on the size and style of the sign and lettering, the location of the sign within the storefront, and the cohesive integration of the sign into the overall storefront design. Prohibited storefront signage includes, but is not limited to, signage which advertises or describes products, services, vendors, or departments or is informational or directional in nature, regardless if such signage is attached as a tagline to, or is included as part of, Tenant's Trade Name.

12.    <u>Waterproofing</u>.  If the Premises' concrete slab is not on grade (compacted soil), Tenant shall install a waterproofing barrier membrane, in accordance with Landlord's specifications, in all areas that may be exposed to fluids or liquids including, but not limited to, restrooms, food preparation and service areas; shampoo and wash areas, laundry and dry cleaning areas, and photo processing areas.

C.    CLOSE-OUT REQUIREMENTS.  Tenant's Work shall be deemed completed at such time as Tenant, at its sole expense and without cost to Landlord, shall provide:

EXHIBIT "B"<br>Page -4-

1.   <u>Proof of Payment</u>.   Furnish evidence satisfactory to Landlord that all of Tenant's Work has been completed and paid for in full (and that such work has been accepted by Landlord), including the costs for Tenant's Work that may have been done by Landlord and the costs for any other work done by Landlord which Landlord may be entitled to payment in accordance with the provisions of this Exhibit "B", the Tenant Information Package, or elsewhere in the Lease, that any and all liens therefor that have been or might be filed have been discharged of record or waived, and that no security interests relating thereto are outstanding.

2.   <u>Tenant's Affidavit</u>.   Furnish an affidavit from Tenant listing all contractors and any material suppliers in the employ of said Tenant who have provided goods or services for the completion of Tenant's Work in the Premises.

3.   <u>Tenant Contractor's Affidavit</u>.   Furnish an affidavit from Tenant's general contractor listing all parties who have furnished materials or labor or services to that contractor for completion of Tenant's Work in the Premises.

4.   <u>Certificate of Occupancy</u>.   Furnish all certificates and other approvals with respect to Tenant's Work that may be required from any governmental authority and any board of fire underwriter's or similar body for the use and occupancy of the Premises.

5.   <u>Record Drawings</u>.   Furnish Landlord with one set of reproducible record drawings of the Premises showing any changes made during construction.

6.   <u>Estoppel Certificate</u>.   Furnish a Tenant-executed estoppel certificate as may be required by Landlord or Landlord's mortgagee.

02/09/11



EXHIBIT "B-3"

EXHIBIT "B-3"



CAESARS PALACE

EXHIBIT "C"

02/09/11

FORUM AT CAESARS

FACILITY NAMES

EXHIBIT "D"

*__DINING / LOUNGE__*
Palace Court
Primavera
Bacchanal
Spanish Steps Steak & Seafood House
Ah'So Restaurant
Empress Court
Cafe' Roma
The Palatium
Post-Time Snack Bar
Cleopatra's Barge
Olympic Lounge
Galleria Bar
Discus Bar
Palace Court Lounge
Ah'So Lounge
Empress Court Lounge
Neptune Bar
Palatium Bar
Primavera Lounge
Spanish Steps Lounge
Forum Lounge

The Olympiad Race and Sports Book
Caesars Palace Poker Room
Omnimax Theatre
Caesars Adventure Arcade
Olympic Casino
Palace Court Casino
Forum Casino
Caesars Palace Sports Pavilion
Caesars Palace Sports Shop
Brahma Shrine
Garden of the Gods
Cleopatra's Beauty Salon & Spa
Circus Maximum Showroom
Caesars Exclusively Shops
Champagne Brunch
Appian Way
The World of Caesar
Olympiad Plaza (the area under the exterior of the Omnimax)
The Olympiad Club Parking
Il Palazzo
Olympic Tower
Centurion Tower
Romas Tower
Via Suites
Villa Suites
Olympic Tower Suites
Caesars Boulevard
Diana's Dome
The Piazza

Colosseum Complex
Emperors Complex
   (convention rooms, if needed)
Caligula
Vitellius
Vespesian
Julius
Augustus
Tiberius
Claudius
Nero
Galba
Titus
Forum I
Forum II
Magestium
Regalium
Senate I
Senate II
Senate III
Romulus
Remus
Colosseum I
Colosseum II
Colosseum III
Colosseum IV
Colosseum V
Colosseum VI
Colosseum VII

| *Restaurants* | *Entertainment* |
|---|---|
| Le Posh | Cascade Showroom |
| The Broiler Room | Caesars Cabaret |
| Empress Court | Caesars Outdoor Arena |
| Primavera | |
| Cafe Roma | |
| Evergreen Buffet | |
| Post Time Snack Bar | |

| *Bars / Lounges* | *Other* |
|---|---|
| Fireside Lounge | Sweet Suite (Dessert Shop) |
| Spooner Bar | Caesars Spa |
| Post Time Bar | Caesars Tahoe Convention Center |
| | Caesars Galleria (shops) |
| | Promenade |
| | Race and Sports Book |
| | Arcade (video games for "kids") |
| | Caesars Exclusively |
| | Caesars Yogurt Palace |

EXHIBIT "D"
Page -2-

02/09/11



EXHIBIT "E"

EXHIBIT "E"

C

## COLLATERAL ASSIGNMENT OF LEASE

THIS COLLATERAL ASSIGNMENT OF LEASE ("Assignment"), made as of the __ day of March, 2011 by and among Sarah, LLC, a Limited Liability Company formed in the State of Illinois, having an address at c/o Palma Settimi Inc., Seven Sutton Place, Brewster, New York ("Assignor or Tenant" ), and Forall U.S.A. a corporation organized and existing under the laws the State of New York with an address at Seven Sutton Place, Brewster, New York 10509, ("Assignee");

### W I T N E S S E T H:

WHEREAS, Assignor is the tenant under a Lease Agreement (together with all amendments and modifications thereto, the "Lease") dated as of _____, 2010 for the Store located at The Forum Shops at Caesars Palace, Space G19, 3500 Las Vegas Blvd. South, Las Vegas, NV 89109; and

WHEREAS, as a condition to Landlord letting the Premises to Tenant, Landlord required that the Assignee guarantee the obligations of Tenant pursuant to the terms of the Lease;

WHEREAS, Assignee is willing to provide said guarantee to Landlord in consideration of Tenant executing this Collateral Assignment of Lease giving Assignor the option to take over the Premises from Tenant should the Landlord call on Assignee to perform pursuant to any provision of its guarantee.

NOW THEREFORE, in consideration of the foregoing and the mutual covenants hereinafter contained, the parties hereto agree as follows:

1. **Grant of Security Interest and Assignment.** Assignor hereby grants a security interest in, assigns, transfers, conveys and sets over to Assignee, all of Assignor's estate, title and interest in and to the Lease (the entirety of such estate, title and interest, and all rights, powers, privileges, options and other benefits of Assignor pursuant thereto, including the proceeds thereof, are hereinafter referred to collectively as the "Assignor's Interests"). The assignment of, and grant of a security interest in, Assignor's Interests shall be absolute and unconditional, and shall be effective upon the execution of this Assignment.

2. **Collateral Security.** The grant of the security interest, assignment, transfer and conveyance effected by Section 1 hereof is made by Assignor for the purpose of securing the performance of Assignor's obligations pursuant to the terms of the lease.

3.    **Representations, Warranties and Covenants of Assignor.**

Assignor represents and warrants to, and covenants with, Assignee as follows:

(a)  Assignor is the tenant under the Lease and no other party has any right, title or interest as a tenant, undertenant or assignee under the Lease.

(b)  Assignor has full right, power and authority to assign and transfer to Assignee the Assignor's Interests, free and clear of all liens, claims or encumbrances of any kind whatever, and this Assignment is effective to do so. The execution and delivery of this Assignment and the performance and observance of the obligations of Assignor hereunder will not violate the provisions of any agreement between Assignor and the Landlord under the Lease, or any other party or any other agreement of any kind to which Assignor is a party or by the terms of which Assignor is bound.

(c)  There will be no defaults under the Lease.

(d)  So long as this Assignment remains in effect, Assignor will not, without Assignee's prior written consent, sell, assign, convey, pledge, encumber or otherwise transfer to any other person, firm or entity any interest in the Lease.

4.    **Default and Remedy.** If Assignor breaches any of the representations, warranties or covenants herein contained, or if a default under the Lease or an Event of Default shall occur and Landlord calls upon Assignee to honor its guarantee, or if Assignor shall make an assignment for the benefit of creditors, be adjudged bankrupt or have filed in its behalf or against it any type of bankruptcy or insolvency proceeding, or if a trustee or receiver shall be appointed for Assignor or any of its property (the foregoing hereinafter referred to as an "Event of Default"), then, and in any such event, Assignee shall have the absolute right, without notice or demand, to succeed to the rights of Assignor as tenant under the Lease in accordance with the assignment evidenced hereby.

5. **Non-inclusive Remedy.** Should a default under the Lease or an Event of Default occur, and Assignee is called upon by Landlord to honor its guarantee, in addition to succeeding to the rights of Assignee as tenant under the Lease, Assignee may also at its election proceed directly and personally against Assignor to collect any and all damages incurred by reason of such default or Event of Default, including, but not limited to, any

sums paid to Landlord rightfully owed by Assignor, attorneys fees and any other expenses or damages incurred by Assignor in connection with honoring its guarantee.

6. **Waiver of Certain Laws.** Assignor agrees, to the full extent permitted by law, that upon the occurrence of any default or Event of Default, neither Assignor nor anyone claiming by or under Assignor shall or will set up, claim or seek to take advantage of laws now or hereafter in force in order to prevent or hinder the enforcement of this Assignment, and Assignor, for Assignor and all who may at any time claim through or under Assignor, hereby expressly waives to the full extent that Assignor may lawfully do so, the benefit of any such laws.

7. **Recording and Filing.** A counterpart of this Assignment and/or one or more UCC-1 financing statements may be recorded or filed, at the option of Assignee, in such offices as may be provided by law or as Assignee may deem appropriate. Assignor agrees to execute and deliver to Assignee any financing statements required under the Uniform Commercial Code as enacted in any state in which such recordation and filing would be appropriate. The costs of all such recordings and filings shall be borne by Assignor.

8. **Notices.** Each notice required or permitted hereunder shall be deemed to have been properly given or served by the deposit of same in the United States Mail, designated as registered or certified mail, return receipt requested, bearing adequate postage, and addressed as hereinafter provided:

| | |
|---|---|
| If to Assignor, to | Sarah, LLC<br>1717 Midwest Club Parkway<br>Oakbrook, IL 60523 |
| with a copy to | Mr. Adams<br>Bardier & Adams |
| If to Assignee, to | Forall, U.S.A.<br>Seven Sutton Place<br>Brewster, New York |
| with a copy to | James J. Veneruso, Esq.<br>Veneruso, Curto, Schwartz & Curto LLP<br>35 East Grassy Sprain Road, Suite 400<br>Yonkers, New York 10710 |

-3-

Each notice shall be effective upon being deposited as aforesaid, and rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given shall be deemed to be receipt of the notice sent.

9. **Assignment Irrevocable; Supplemental Instruments**. Assignor agrees that the assignment, transfer and conveyance made hereby is irrevocable, and that Assignor will not, while this Assignment is in effect, take any action that is inconsistent with this Assignment, or make any other assignment or conveyance of Assignor's Interests (other than to Assignee) without Assignee's prior written consent, and that any such assignment or conveyance without such consent shall be void and of no effect. Assignor will from time to time, upon request of Assignee, execute all instruments of further assurance and all supplemental instruments necessary to effect the transactions contemplated hereby as Assignee may specify.

10. **Amendment**.  This Assignment may be amended or modified only in a writing specifically referring to this Assignment and executed by each of the parties hereto.

11. **Governing Law**.  This Assignment shall be construed and enforced in accordance with the internal laws of the State of Nevada.  The invalidity, illegality or unenforceability of any provision of this Note shall not affect or impair the validity, legality or enforceability of the remainder of this Note, and to this end, the provisions of this Note are declared to be severable.

12. **Counterparts**. This Assignment may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

13. **Jurisdiction and Venue**. Assignor hereby consents to the jurisdiction of the courts of the State of Nevada in the County wherein the Store is located and the United States District Court for the District wherein the Store is located, as well as to the jurisdiction of all courts from which an appeal shall be taken from such courts, for the purpose of any suit, action or other proceeding arising out of any of its obligations arising under this Assignment or with respect to the transactions contemplated hereby, and expressly waives any and all objections it may have as to venue in any of such courts.

14. **Waiver of Trial by Jury**. ASSIGNOR AND ASSIGNEE HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDINGS, CLAIMS OR COUNTER-CLAIMS, WHETHER IN CONTRACT OR TORT, AT LAW OR IN EQUITY, ARISING OUT OF OR IN ANY WAY RELATING TO THIS AGREEMENT.

15. **Miscellaneous.** The section and paragraph headings contained in this Assignment are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Assignment. When used herein, the singular shall include the plural, and vice versa, and the use of the masculine, feminine or neuter gender shall include all other genders, as the context may require.

IN WITNESS WHEREOF, the parties hereto have executed this Assignment or have caused this Assignment to be duly executed as of the date first above written.

Sarah, LLC

By:＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
Name: Hala subh
Title: Member

By:＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
Name:  Suhad albasha
Title:  Member

Forall U.S.A.

By:＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
Name:
Title:

LANDLORD:

By:＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

STATE OF ILLINOIS )
                     ) ss.:
COUNTY OF DuPage )

On the 19 day of MARCH in the year 2011 before me, the undersigned personally appeared **Hala subh** personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_Sarah E Botka_
(signature and office of individual taking acknowledgment)

"OFFICIAL SEAL"
Sarah E. Botka
Notary Public, State of Illinois
Will County
My Commission Expires 06-08-2014

STATE OF ILLINOIS )
                     ) ss.:
COUNTY OF DuPage )

On the 19 day of MARCH in the year 2011 before me, the undersigned personally appeared **Suhad albasha** personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_Sarah E Botka_
(signature and office of individual taking acknowledgment)

"OFFICIAL SEAL"
Sarah E. Botka
Notary Public, State of Illinois
Will County
My Commission Expires 06-08-2014

STATE OF                      )
                                  ) ss.:
COUNTY OF                 )

On the ___ day of _____ in the year 2011 before me, the undersigned personally appeared _____ personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
(signature and office of individual taking acknowledgment)

STATE OF                      )
                                  ) ss.:
COUNTY OF                 )

On the ___ day of _____ in the year 2011 before me, the undersigned personally appeared _____ personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
(signature and office of individual taking acknowledgment)

D

## Guaranty

The undersigned, in order to induce Forall U.S.A., Inc. ("Company") to enter into a License and Retail Operator Agreement ("Operator Agreement"), dated the         day of March 2011 with  Sarah, LLC ("Operator"), **Hala subh, Suhad albasha, Bacher Hamad and Ammar Hamad** (each individually as a "Guarantor") unconditionally, jointly and severally, guarantees to Company, its successors or assigns, the prompt full payment and performance of all obligations of Operator which are or may become due and owing to Company under the Franchise Agreement and all obligations arising out of any other agreement (whether or not in effect on the date hereof) between Operator and Company, including but not limited to any other franchise agreement, security agreement, purchase agreement, sublease or promissory note, and all extensions or renewals thereof, and the payment of all attorney's fees, costs and other expenses incurred by Company to enforce this Guaranty (collectively, with the License and Retail Operator Agreement, the "Agreements") in the same manner as if Agreements were executed between Company and the undersigned directly, as Operator.

The undersigned expressly waive(s): (a) notice of the acceptance by Company of this Guaranty, (b) demands of payment, presentation and protest, (c) all rights to assert or plead any statute of limitations as to or relating to this Guaranty, (d) any right to require Company to proceed against any other Guarantor, if any, or any other person or entity liable to Company, (e) any right to require Company to proceed under any other remedy Company may have before proceeding against Guarantor, or any other Guarantor, and (f) any right of subrogation. This Guaranty shall not be affected by the modification, amendment, extension, release or renewal of any agreement between Company and Operator, the taking of a note or other obligation from Operator or others, the taking of security for payment, the granting of extension of time for payment, the filing by or against Operator of bankruptcy, insolvency, reorganization or other debtor's relief afforded by the Federal Bankruptcy Act or any other state or federal statute or by the decision of any court, or any other matter whether similar or dissimilar to any of the foregoing, and this Guaranty shall cover the terms and obligations of any such modifications, notes, security agreements, extensions, or renewals. The obligations of the undersigned shall be unconditional notwithstanding any defect in the genuineness, validity, regularity or enforceability of the Operator's obligations or liability to Company or any other circumstances whether or not referred to herein which might otherwise constitute a legal or equitable discharge of a surety or guarantor.

This is an irrevocable, unconditional and absolute guaranty of payment and performance and the undersigned agree(s) that this liability or their liability of this Guaranty shall be immediate and shall not be contingent upon the exercise or enforcement by Company of whatever remedy

it may have against the Operator or others, or the enforcement of any lien or realization upon any security Company may at any time possess.

The undersigned covenant(s) and agree(s) that any indebtedness by the Operator to the undersigned, for any reason, currently existing, or which might hereafter arise, shall at all times be inferior and subordinate to any indebtedness owed by the Operator to Company

The undersigned further covenant(s) and agree(s) that as long as the Operator owes any monies to Company the Operator will not pay and the undersigned will not accept payment of any part of any indebtedness owed by the Operator to any one of the undersigned, either directly or indirectly, without the consent of Company.

This Guaranty shall remain in full force and effect until all obligations arising out of and pursuant to the Agreements including all renewals, modifications, amendments and extensions thereof, are fully paid and satisfied.

This Guaranty shall be governed by and interpreted in accordance with the laws of the State of New York without regards to its conflicts of laws principles. Any dispute arising out of or under this Guaranty not settled by arbitration shall be resolved in accordance with the dispute resolution process set forth in the Agreement

SIGNATURE PAGE TO FOLLOW

8/3/2016

**IN WITNESS THEREOF**, the undersigned have constituted this Agreement on the date set forth below.

Dated: March_____, 2011

**GUARANTOR(S)**

Hala subh

Address: 1717 Midwest Club, Oak Brook IL 60523    Social Security # 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

Drivers License # 5103-3206-491 State of Issuance: IL

Suhailalbasha

Address: 1 Andrew Ct Burr Ridge IL 60527    Social Security # 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

Drivers License # A112-780-173 State of Issuance:

Bachar Hamad

Address: 1717 Midwest Club Pk IL 60523    Social Security # 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

Drivers License # _____ State of Issuance:   IL

Ammar Hamad

Address: 1 Andrew Ct Burr Ridge IL 60527    Social Security # 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

Drivers License # H530-002-1247 State of Issuance:   IL

STATE OF ILLINOIS       )
                        ) SS.
COUNTY OF DuPage        )

On this 9 day of March in the year 2011 before me, the undersigned, personally appeared Hala subh personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
(signature and office of individual taking acknowledgment)

E

W:\CASES\016374\00003\00027388.DOC
9/10/13a

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** ("Agreement") is made this 10th day of September 2013, by and among **SARAH, LLC,** a Nevada limited liability company ("Seller") and **ITALNORD FORUM LV, LLC,** a Florida limited liability company ("Purchaser").

## R E C I T A L S

A.      Seller owns and operates a retail store primarily selling goods with the Pal Zileri brand name (the "Business") located at The Forum Shops at Caesar's Palace, 3500 Las Vegas Blvd. South, Suite K-8, Las Vegas, Nevada (the "Premises").

B.      Seller desires to sell to Purchaser, and Purchaser desires to purchase from Seller, substantially all of the assets of the Business, on the terms and conditions set forth below.

C.      Accordingly, for the mutual promises and covenants contained in this Agreement, and other good and valuable consideration, the parties hereto agree as follows:

## ARTICLE I
## PURCHASE AND SALE OF ASSETS

**1.1      Purchase and Sale of Business Assets.**  Subject to the terms and conditions set forth in this Agreement, on the Closing Date (which is defined in Section 2.1 of this Agreement) Seller shall sell to Purchaser, and Purchaser shall purchase, certain of Seller's assets comprising or relating to the Business (collectively, the "Business Assets") to Purchaser, but excluding the Excluded Assets (as defined in Section 1.2).   Business Assets of Seller include, without limitation, the following:

(a)      All furniture, fixtures, equipment and other tangible personal property used in conducting the Business on the Closing Date, including, but not limited to, those items listed on Schedule 1.1(a), which is attached hereto and made a part hereof by this reference;

(b)      All intangible property now or hereafter owned or used by Seller in connection with the Business or otherwise comprising a portion of the assets, properties and/or business of the Business, including, but not limited to:

(i)      The proprietary information and other intellectual property of the Business;

    (ii)    A license to use, during the Term (as defined in Section 4.4 of this Agreement), all contracts of Seller utilized in the operation of the Business which are exclusive to Seller, which are assignable by Seller and accepted by Purchaser, including, but not limited to, the Seller's License and Retail Operations Agreement with Forall U.S.A., Inc. ("Forall") which provides Seller with the right to sell goods with the Pal Zileri name and utilize that name in its operations and advertising (the "License Agreement") and those contracts that are listed on Schedule 1.1(c)(iv), but not including; Seller's lease of the Premises (the "Lease"); and

    (iii)    All of employee records, business billing and insurance information; and

(c)    All goodwill of the Business which is being sold to Purchaser under the terms set forth in this Agreement.

**1.2    Excluded Assets.** Notwithstanding the provisions of Section 1.1 of this Agreement, the following (the "Excluded Assets") shall be excluded from the Business Assets sold by Seller to Purchaser hereunder:

(a)    All of Seller's accounts receivables accruing prior to the Closing Date plus any receivable created by Seller's sale of any Excluded Assets, and cash, checkbooks, canceled checks, correspondence and business records with respect to the Business in existence prior to the Closing Date;

(b)    All of Seller's employees' personal effects, including but not limited to, personal photographs, pictures, books, diplomas, certificates, memorabilia, artifacts, mementos and similar personal items;

(c)    All books of account and tax records of Seller other than records of the nature described in Section 1.1(c) (v);

(d)    All of Seller's rights under this Agreement;

(e)    Those items of furniture, fixtures and equipment set forth in Schedule 1.2(e);

(f)    All inventory owned by Seller; and

(g)    The Lease; however, the parties recognize that Purchaser shall be provided the right and obligation to manage the Premises under the Management Agreement (as defined in Section 4.4).

**1.3    Purchase Price.**

(a)    The purchase price for the Business Assets shall be One Hundred Forty Thousand Dollars ($140,000), hereinafter referred to as the "Purchase Price." 

2

(b)    The parties agree to file all appropriate Internal Revenue Service forms, including Form 8594, with their respective Federal income tax returns for their respective tax years in which the Closing Date occurs based upon the foregoing allocations.

**1.4    Lease Deposit and Forall Payment.** In addition to the Purchase Price, Purchaser shall:

(a)    Provide Seller with a refundable deposit equal to Sixty Five Thousand Dollars ($65,000), representing one month's rent of the Premises under the Lease (the "Lease Deposit"). Seller shall return the Lease Deposit to Purchaser within five (5) business days of Seller's receipt of proof that all rent and other charges under the Lease, if any, due to the landlord of the Premises for the period October 1, 2013 through the expiration of the Term (as same may be extended); and

(b)    Pay to Seller Thirty-Eight Thousand Dollars ($38,000) which is due from Forall to Seller (the "Forall Payment"). Purchaser shall seek reimbursement of the Forall Payment from Forall.

**1.5    Payment of Purchase Price, Lease Deposit, and Forall Payment.** Payment of the Purchase Price, Lease Deposit, and Forall Payment shall be paid by Purchaser to Seller as follows:

(a)    Ninety-Three Thousand Dollars ($93,000) shall be paid to Seller within five (5) business days after the Closing Date by cash, certified check, wire transfer or other immediately available funds (the "First Payment"); followed by

(b)    Three (3) payments to Seller of Fifty Thousand Dollars ($50,000) each, shall be due October 1, 2013, November 1, 2013 and December 2, 2013, each made by cash, certified check, wire transfer or other immediately available funds.

The parties acknowledge and agree that Sixty Five Thousand Dollars ($65,000) of the First Payment shall constitute the Lease Deposit, required by and governed pursuant to the terms of Section 1.4 shall be secured by Purchaser's pledge of the Business Assets in the manner set forth in the form of Security Agreement attached as Exhibit A.

On the Payment Date, Purchaser shall also pay to Seller 20/30ths of the September 2013 rent for the Premises under the Lease.

**1.6    Offsets, Credits and Prorations.** All taxes, rents, utilities, insurance premiums and other costs and expenses of owning or operating the Business Assets or conducting the Business shall be prorated, with Seller responsible for the cost of all such items which relate to the period before the Closing Date and Purchaser bearing the cost of all such items which relate to the period on and after the Closing Date. All credits other than reimbursement described in subsection 1.1(d) shall remain the property of the Seller.



3

**1.7    No Assumption of Obligations.**  Except for obligations under the Lease arising during the Term (with the exception of any of such obligations retained by Seller hereunder or for which Seller has agreed to indemnify Purchaser), the License Agreement and the obligations set forth in the Management Agreement and any other obligations specifically described in this Agreement, Purchaser shall not assume or agree to pay, perform or discharge any debt, obligation, liability or contract of Seller, and Purchaser's obligations assumed under the Lease are for post-Closing obligations only.  Notwithstanding anything in this Agreement to the contrary, Purchaser is not assuming the Lease or the License Agreement in full; it is only assuming Seller's performance and payment obligations during the Term (as defined in Section 4.4 of this Agreement) under the Lease, License Agreement, and other operational contracts listed on Schedule 1.1(c)(iv).

**ARTICLE II**
**CLOSING**

**2.1    Time and Place.**  The Closing shall take place on or before midnight on September 10, 2013, or such other date and time as the parties shall mutually agree (the "Closing Date").  The Closing shall take place on the Closing Date at such place as may be agreed upon by the parties in writing.

**2.2    Seller's Deliveries at Closing.**

(a)    At the Closing, Seller shall deliver (or cause to be delivered) to Purchaser the following duly executed instruments and other documents in form and substance reasonably satisfactory to Purchaser and Purchaser's counsel:

    (i)    A Bill of Sale and a General Assignment in the forms set forth on Exhibits "B" and "C", attached hereto and made a part hereof by this reference, duly executed by Seller;

    (ii)    Such other instruments of assignment, transfer, conveyance, endorsement, direction or authorization as will be sufficient or requisite to vest in Purchaser full, complete, legal and equitable title in and to all of the Business Assets;

    (iii)    A closing statement duly executed by Seller ("Closing Statement");

    (iv)    A signed Management Agreement;

    (v)    Exclusive possession of the Premises, and all keys, access codes, and parking cards (if any) used in connection with the Premises;

    (vi)    Operational manuals and maintenance instructions for all equipment (including, without limitation, air conditioning, fire prevention, security alarm, and "cash register" equipment) used in the operation of the Business and/or the Premises, to the extent in Seller's possession or control; and



4

(vi)    Such other instruments or documents as may reasonably be required by Purchaser and/or Purchaser's counsel, including such consents from third parties as may be necessary to transfer the Purchase Assets at Closing, plus consents of Seller's shareholders and directors, approving the transactions described herein.

**2.3**    **Purchaser's Deliveries at Closing.**  At the Closing, Purchaser shall deliver (or cause to be delivered) to Seller, as applicable, the following instruments and other documents in form and substance reasonably satisfactory to Seller's counsel:

(a)    The Security Agreement executed by Purchaser;

(b)    The General Assignment executed by Purchaser;

(c)    Resolutions of the [directors and shareholders of] Purchaser approving this Agreement and the transactions described herein;

(d)    The Closing Statement duly executed by Purchaser;

(e)    A signed Management Agreement; and

(f)    Such other instruments or documents as may reasonably be required by Seller and/or Seller's counsel.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

**3.1**    **Representations and Warranties of Seller.**  Seller represents and warrants to Purchaser, that the following are true and correct as of the date hereof and shall be true and correct as of the Closing Date, and Seller hereby acknowledges that Purchaser is relying on such representations and warranties in connection with the transactions contemplated under this Agreement:

(a)    The execution, delivery and performance of this Agreement, including any Exhibit hereto, by Seller does not and will not immediately, or with the passage of time, the giving of notice or otherwise:

(i)    result in any material breach of or conflict with any of the terms, conditions or provisions of any agreement, indenture, mortgage, lease or other instrument to which Seller is a party or by which Seller is bound or give rise to any right of termination by any party; or

(ii)    materially conflict with any judgment, order, injunction, decree or award of any court, administrative agency or governmental body by which Seller, or any of the Business Assets is bound or subject.

5

(b)     Seller is (and upon the execution and delivery by Seller to Purchaser of the documents set forth in Section 2.2, Purchaser will be) vested with good and marketable title to the Business Assets, none of which is or shall be subject to any lien, charge, claim or encumbrance.

(c)     Neither Seller nor any of the Business Assets is subject to:

    (1)     any pending, or to Seller's knowledge, any threatened, claim, action, suit, proceeding, inquiry or investigation at law or in equity or before any court, arbitrator, public board or body; or

    (2)     any order of any court, arbitrator or governmental authority which would be materially violated by its transfer to Purchaser.

(d)     This Agreement has been duly executed and delivered by Seller, and upon execution and delivery, the other agreements and transactions contemplated under this Agreement to which Seller is a party will be the legal, valid and binding obligations of Seller enforceable in accordance with their terms, subject to the effect of: (X) any applicable bankruptcy, insolvency, reorganization, fraudulent conveyance or other law relating to or affecting creditors' right generally; and (Y) the availability of certain remedies which may be subject to equitable principals and to the discretion of the court before which any proceeding therefore may be brought.

(e)     All Business Assets are being sold, "as is, where is" and all warranties, including fitness and merchantability, are hereby excluded.

(f)     Seller is not in material default under any contract, lease, agreement or other instrument with regard to the Business.

(g)     Seller has not retained a broker who is or would be entitled to a commission related to the sale of the Business Assets.

(h)     Neither Seller, nor the Premises, nor or any bonding company or surety, is subject to any claim, or potential claim, for compensation or amounts owed relative to materials, services, or labor in connection with the improvement of the Premises. Seller shall indemnify, defend, and save Purchaser harmless from any and all costs, liabilities, damages, lawsuits, and obligations related to any and all such claims or threatened claims.

(i)     There is no representation or warranty by Seller in this Agreement or in any certificate, schedule, statement, document or instrument furnished or to be furnished to Purchaser pursuant to the Agreement or in connection with the negotiation, execution or performance of this Agreement, that contains or will contain any untrue statement of material fact or that omits to state any material fact required to be stated herein or therein necessary to make any such representation or warranty not misleading.

6



**3.2** **Representations and Warranties of Purchaser.** Purchaser represents and warrants to Seller that the following are true and correct as of the date hereof and shall continue to be true and correct as of the Closing Date, and Purchaser hereby acknowledges that Seller is relying on such representations and warranties in connection with the transactions contemplated under this Agreement:

(a) Purchaser is a Florida limited liability company, and is in good standing, qualified to do business in Nevada.

(b) The execution, delivery and performance of this Agreement, including any Exhibit hereto, by Purchaser does not and will not immediately, or with the passage of time, the giving of notice or otherwise:

(i) result in any breach of or conflict with any of the terms, conditions or provisions of any agreement, indenture, mortgage, lease or other instrument to which Purchaser is a party or by which Purchaser is bound or give rise to any right of termination by any party; or

(ii) violate or conflict with any judgment, order, injunction, decree or award of any court, administrative agency or governmental body by which Purchaser or any of its assets is bound or subject.

(c) Purchaser is not subject to:

(i) any pending or to Purchaser's knowledge, any threatened, claim, action, suit, proceeding, inquiry or investigation at law or in equity or before any court, arbitrator, public board or body; or

(ii) any order of any court, arbitrator or governmental authority which would be materially violated by the transfer of the Business Assets to Purchaser.

(d) This Agreement has been duly executed and delivered by Purchaser, and upon execution and delivery, the other agreements and transactions contemplated under this Agreement to which Purchaser is party will be the legal, valid and binding obligations of Purchaser enforceable in accordance with their respective terms, subject to the effect of: (A) any applicable bankruptcy, insolvency, reorganization, fraudulent conveyance or other law relating to or affecting creditors' rights generally; and (B) the availability of certain remedies which may be subject to equitable principle and to the discretion of the court before which any proceeding therefore may be brought.



7

(e)     The execution, delivery and performance of this Agreement have been duly authorized by Purchaser. Purchaser has the complete and unrestricted power and authority, and Purchaser has taken all corporate action necessary, to enter into, execute and deliver this Agreement, to perform all of its obligations hereunder and to consummate all transactions contemplated under this Agreement.

(f)     Purchaser has not retained a broker who is or would be entitled to a commission related to the sale of the Business Assets.

(g)     Purchaser has not as of the Closing Date borrowed money or received any other financial accommodation from any institutional lender seeking a security interest in the Purchaser's assets that will be the subject of the Security Agreement.

## ARTICLE IV
## COVENANTS OF SELLER AND PURCHASER

**4.1     Seller's Pre-Closing Covenants.** From the date hereof through the Closing Date, Seller covenants as follows:

(a)     Seller shall not intentionally take any action or omit to take any action that would render any representation and warranty or obligation of Seller set forth in this Agreement or any Exhibit or Schedule hereto materially inaccurate as of the Closing Date.

(b)     Seller shall operate the Business in its customary and ordinary course and in all material respects in accordance with applicable provisions of federal, state and local laws. To the extent Seller desires to hire or fire any personnel, it may do so only after consulting with Purchaser. In addition, in the event Seller enters into any discussions with the landlord regarding the lease for the Premises, Purchaser shall be given the opportunity to participate in all such discussions.

(c)     Seller shall use reasonable good faith efforts and cooperate with Purchaser with respect to the transfer of the Business Assets to Purchaser and the consummation of the transactions contemplated under this Agreement.

**4.2     Pre-Closing Covenants of Purchaser.** From the date hereof through the Closing Date, Purchaser covenants as follows:

(a)     Purchaser shall refrain from intentionally taking any action or omitting to take any action that would render any representation and warranty of Purchaser set forth in this Agreement or any exhibit or schedule hereto inaccurate as of the Closing Date.

(b)     Purchaser shall use reasonable good faith efforts and cooperate with Seller with respect to the transfer of the Business Assets to Purchaser and the consummation of the transactions contemplated under this Agreement.

8



**4.3     Retention of Records.**  Purchaser will take possession of all purchased records and shall retain such records in accordance with the provisions of this Section 4.3.  Upon written notice from Seller, Purchaser shall allow Seller reasonable access and an opportunity to review such records to institute or defend litigation or to respond to governmental inquiries and shall retain such records for the same length of time it retains the records created in its operation of the Business following the Closing Date.  By way of example and not by limitation, if Purchaser's customary practice is to retain a record created after the Closing Date for ten (10) years, and it had received, as part of the sale of Business Assets, as set of records created two (2) years prior to the Closing Date, then Purchaser shall retain that acquired set of records for eight (8) years following the Closing Date.

**4.4     Premises, Lease and Operation of the Business.**  For the period beginning September 10, 2013, and ending January 31, 2015 (the "Term"), Purchaser and Seller shall enter into a Management Agreement in the form set forth in the attached Exhibit 4.4, which is incorporated into this Agreement by this reference (the "Management Agreement"), which shall permit Purchaser to operate the Business through Seller at the Premises and shall provide that Purchaser shall, in its own name, be responsible for incurring and paying each and every debt and/or obligation created during the Term, in connection with the operation of the Business, including, without   limitation, employee salaries and benefits, inventory, advertising, all operating expenses.  The Management Agreement shall provide for extension of the "term" of the Management Agreement; if such term is extended, same shall automatically extend the Term of this Agreement on a per diem basis, to be coterminous with the term of the Management Agreement.  In addition to the foregoing, the parties acknowledge that Seller shall maintain the Lease, but Purchaser shall pay, on Seller's behalf, the payment of rent for the Premises and utilities during the Term and all expenses incurred in the maintenance of Sarah, LLC during the Term as a limited liability company in good standing.  The payment of rent includes all other charges associated with the Lease of the Premises, and all rent increases during the Term.  In order to effectuate Purchaser's obligation to pay the rent on behalf of Seller, Purchaser shall either deliver payment of the rent to Seller by the first of the month or provide proof to Seller that the rent due has been paid by the first of the month.  While the Management Agreement is in effect, Purchaser shall maintain in its name and on behalf of Seller usual and customary amounts and types of insurance on the Premises and Business and the Purchaser shall have the absolute right to operate the Business in such manner as Purchaser deems proper and to the extent requested by Purchaser, the members and mangers of Seller shall execute any and all documentation necessary to allow Purchaser to operate the Business in this manner and make all necessary filings.  During the week of December 15, 2014, Purchaser shall inform Seller of its desire to take over the Business from Seller or to cease managing the Business, in either event, with such decision to be effective January 31, 2015.  In the event that Purchaser elects to cease managing the Business, then no later than January 31, 2015, Purchaser shall provide to Seller all company records relating to Seller that have been created and/or maintained from and after September 10, 2013 and to provide Seller with such necessary ingress and egress to the Premises from and after the date of such election to allow Seller to attempt to make a proper disposition of the Premises as Seller deems fit.

In the event that Purchaser elects to continue to operate the Business from and after January 31, 2015, then at such time Purchaser shall seek and obtain either: (i) an assignment of the lease governing the Premises then in effect from the landlord of the Premises, which such

9



assignment shall then set forth the landlord's representation that all amounts due under the Premises Lease, along with a statement by the landlord that Seller shall have no further liability under the Lease from and after the effective date of the assignment; or (ii) obtaining a new lease for the Premises upon such terms and conditions as the landlord of the Premises and Purchaser may agree. Seller agrees to provide all reasonable assistance to help Purchaser effectuate the desired result under (i) or (ii) of the foregoing sentence, but the parties agree that such assistance shall not include a guarantee by Seller or its principals of Purchaser's assigned lease or new lease. In either event, indemnifications provided by Purchaser regarding the operation of the Business and the maintenance of Seller as an entity in good standing shall continue in effect Seller's members and managers shall be permitted to dissolve Seller at any time of their choosing after January 31, 2015 (the cost of same after the Term shall be solely that of Seller).

## ARTICLE V
## CONDITIONS PRECEDENT

**5.1   Conditions Precedent to Purchaser's Obligations.** The obligations of Purchaser under this Agreement are subject to the conditions precedent (any of which may be waived by Purchaser in whole or in part) that, on the Closing Date:

(a)     All material terms and conditions of this Agreement to be complied with or performed by Seller on or before the Closing Date shall have been fully complied with and performed in all material respects.

(b)     All representations, warranties and covenants of Seller contained in this Agreement, shall be true and correct as of the date of this Agreement and shall be true and correct in all material respects as of the Closing Date with the same effect as though made at such time.

(c)     Purchaser has requested and has been provided with the information of Seller relating to Seller's conduct of the Business requested by Purchaser.

(d)     The Purchaser shall have received an executed Management Agreement.

(e)     Seller shall have provided Purchaser with proof that the September 1, 2013 rent payment for the Premises has been paid.

**5.2   Conditions Precedent to Seller's Obligations.**  The obligations of Seller under this Agreement are subject to the conditions precedent (any of which may be waived by Seller in whole or in part) that, on the Closing Date:

(a)     All material terms and conditions of this Agreement to be complied with and to be performed by Purchaser on or before the Closing Date shall have been fully complied with and performed in all material respects.

(b)     All representations, warranties and covenants of Purchaser contained in this Agreement or in any schedule, exhibit, certificate or document delivered in



10

connection with this transaction shall be true and correct in all material respects on and as of the Closing Date with the same effect as though made at such time.

(c)     Purchaser has delivered a copy of its Articles of Organization to Seller.

(d)     Forall, U.S.A. has waived its rights to acquire Seller's inventory pursuant to that certain License Agreement dated _____, 2010 and releases Seller's members from any liability of Seller for obligations accruing before or after September 10, 2013.

(e)     Seller shave have received a signed Management Agreement from Purchaser.

## ARTICLE VI
## REMEDIES

**6.1    Survival.**  All representations and warranties, as well as all other covenants, of each party set forth in this Agreement shall continue to the end of the applicable statutes of limitations periods.

**6.2    Indemnification by Seller.**  Seller agrees to and does hereby indemnify, defend, save and hold Purchaser and its agents, employees, officers, directors, shareholders, successors and assigns harmless from and against each and every claim, demand, loss, liability, damage or expense (including, without limitation, any settlement payment, reasonable attorneys' fees and other expenses incurred in litigation or settlement of any claims) based upon, arising out of or in connection with:

(a)     the conduct of the Business prior to the Closing Date, including, without limitation, any third party claims, suits, investigations or charges asserted as a result of the conduct of the Business prior to the Closing Date;

(b)     debts or other obligations of Seller that are not assumed by Purchaser pursuant to this Agreement; and

(c)     any breach of representation, warranty, covenant or agreement of Seller contained in this Agreement.

**6.3    Indemnification by Purchaser.**  Purchaser agrees to and does hereby indemnify, defend, save and hold Seller and its agents, employees, shareholders, officers, directors, successors and assigns harmless from and against each and every claim, demand, loss, liability, damage or expense (including, without limitation, any settlement payment, reasonable attorneys' fees and other expenses incurred in litigation or settlement of any claims) based upon, arising out of or in connection with arising and accruing after the Closing Date (and not pertaining to the period prior to the Closing Date):

(a)     the conduct of the Business after the Closing Date, including, without limitation, any third party claims, suits, investigations or charges asserted as a result of the conduct of the Business after the Closing Date through Seller (but not arising out



of: [i] Seller's members' negligence or willful misconduct, or [ii] the operation of the Company) and further including Purchaser's payment of all Lease obligations arising after Closing;

(b)     the liabilities assumed pursuant to this Agreement and all other debts or other obligations of Purchaser; and

(c)     any breach of representation, warranty, covenant or agreement of Purchaser contained in this Agreement.

**6.4     Notice of Claim.**  In the event that any claim is asserted against any party entitled to indemnification pursuant to this Article VI (an "Indemnified Party"), the Indemnified Party shall promptly after learning of such claim notify the other party (the "Indemnifying Party") thereof in writing.  Notwithstanding the foregoing, the failure of the Indemnified Party to give prompt notice of such claim shall not relieve the obligation of the Indemnifying Party to indemnify with respect to such claim, provided, however, that the Indemnifying Party shall not be responsible for amounts which could have been avoided upon prompt notice.

**6.5     No Negation of Insurance Coverage.**  In no event shall a party's obligations with respect to indemnification pursuant to this Article apply to the extent (if any) that such application would nullify any insurance coverage of such party or as to that portion of any claim or loss in which the insurer is obligated to defend or satisfy.

**6.6     Set Off.**  In addition to any rights of set off or other rights that the Purchaser may have at common law or otherwise, the Purchaser shall have the right to withhold and deduct any sum that may be owed to Purchaser under this Agreement or any other agreement between Purchaser and Seller from any amount otherwise payable to Seller under this Agreement.  The withholding and deduction of any such sum shall operate for all purposes as a complete discharge (to the extent of such sum so set off) of the obligation to pay the amount from which such sum was withheld and deducted.

**ARTICLE VII**
**SELLER'S EMPLOYEES**

Effective as of Closing on the Closing Date, Seller shall terminate the employment of all employees who are employed by Seller with respect to the conduct of the Business and the Seller shall be responsible for the payment of all accrued salaries, benefits, taxes and other obligations and liabilities associated with the employment of those employees through the time of Closing on the Closing Date.  Purchaser shall have the option, but shall not be obligated, to employ any of the employees of Seller after the time of Closing on the Closing Date on such terms as Purchaser elects to extend to the employees it seeks to hire.  Upon the execution of this Agreement, Purchaser shall be permitted ·to interview such of Seller's employees as Purchaser deems necessary to assess Purchaser's hiring needs, provided, that Seller may be present at such interview and such interview shall take place at such time and in such manner as is non-disruptive to the Business.  Seller will cooperate with Purchaser in notifying those employees of Seller that Purchaser desires to retain.

12

## ARTICLE VIII
## MISCELLANEOUS PROVISIONS

**8.1    Expenses.**  Except as otherwise provided for herein, whether or not the transactions contemplated by this Agreement are consummated, each of the parties hereto shall pay the fees and expenses incurred by such party with respect to his, her or its counsel, accountants, other experts and all other expenses incurred by such party incidental to the negotiation, preparation and execution of this Agreement.

**8.2    Binding Effect.**  This Agreement shall be binding upon and inure to the benefit of all of the parties hereto, their heirs, executors, administrators, successors and assigns.

**8.3    Amendments.**  This Agreement may be amended in whole or in part at any time only by a written instrument setting forth such changes and signed by each of the parties hereto.

**8.4    Entire Agreement.**  This Agreement and the Exhibits attached hereto set forth the entire understanding among the parties relating to the transactions described herein, there being no terms, conditions, warranties or representations other than those contained herein.

**8.5    Counterparts.**  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

**8.6    Choice of Law.**  This Agreement shall be subject to and governed by the laws of the State of Nevada without regard to its laws of conflicts and venue shall be in Clark County, Nevada.

**8.7    Headings.**  The headings contained herein are for reference only, are not a part of this Agreement and shall have no substantive meaning.

**8.8    Notices.**  Any and all notices given in connection with this Agreement shall be deemed adequately given only if in writing and personally delivered, sent by nationally recognized overnight courier or sent registered or certified mail, postage prepaid, to the party or parties for whom such notices are intended.  A written notice shall be deemed to have been given to the recipient party on the earlier of:

(a)    the date it shall be delivered to the intended recipient or to the address required by this Agreement;

(b)    the date delivery shall have been refused at the address required by this Agreement; or

(c)    with respect to notices sent by mail but not delivered, the date as of which the postal service shall have indicated such notice to be undeliverable at the address required by this Agreement.

13



Any and all notices referred to in this Agreement or which any party desires to give to another, shall be addressed as follows:

To Seller:                          _____
                                    _____
                                    _____
                                    Attn: Bachar Hamad, M.D.

with a copy to:                     Kamensky Rubinstein Hochman
                                      & Delott, LLP
                                    7250 North Cicero Avenue, Suite 200
                                    Lincolnwood, Illinois 60712
                                    Attn: Lee Levin

To Purchaser:                       Italnord Forum LV, LLC
                                    c/o Jorge R. Gutierrez
                                    100 Almeria Avenue
                                    Suite 340
                                    Coral Gables, FL 33134

with a copy to:                     Gutierrez Yelin & Boulris, PLLC
                                    100 Almeria Avenue
                                    Suite 340
                                    Coral Gables, FL 33134
                                    Attn: Jorge R. Gutierrez

A party may change its address for notice by delivery of written notice to the other parties of its new address for notice.

**8.9    Pronouns.**   Unless the context indicates otherwise, any pronouns used in this Agreement shall include the corresponding masculine, feminine, neuter, singular or plural pronouns, as the case may be.

**8.10    Further Deliveries and Assurances.**   Each party shall, at its sole expense, perform such actions (including, without limitation, executing and delivering appropriate documents) as reasonably requested by any party hereto, or the permitted successors or assigns of such party, in order to implement this Agreement and the transactions contemplated under this Agreement.



14

**8.11   Confidentiality.** Except as otherwise required by law, each party agrees to keep this Agreement and its contents confidential and not to disclose the same to any third party except for receiving party's attorneys, accountants, financial advisers and lenders and except to applicable governmental agencies in connection with any required notification or application for approval or exemption therefrom without the written consent of the other parties. With respect to information provided by or obtained from a party in connection with and relative to this transaction, the receiving party agrees not to use such information, directly or indirectly, for any purpose other than to evaluate this transaction, and to keep all such information confidential which is not in the public domain, exercising the same care in handling such information as they would exercise with similar information of their own and, if required, to return any such written information to the disclosing party promptly upon its demand. In addition, the receiving party agrees (a) to inform all of his representatives, attorneys, accountants, financial advisors and lenders who receive any of such information of the confidential nature of such information and to direct all such persons to treat such information confidentially and not to use it other than for the purpose of analyzing and evaluating the Agreement, and (b) to make all reasonable, necessary and appropriate efforts to safeguard such information from disclosure to anyone other than as permitted hereby.

**8.12   Survival.** The provisions of this Agreement which are intended to survive the Closing Date shall survive for the periods specified therein.

**8.13   Seller's Attorneys.** The parties acknowledge and understand that Seller's attorneys, Kamensky Rubinstein Hochman & Delott, Ltd., prepared this document and the Exhibits on behalf of Seller and do not represent Purchaser. Purchaser acknowledge and understand that they have had the opportunity to have this Agreement and all documents related thereto reviewed by legal counsel of their own choosing if they so desired prior to execution.

**IN WITNESS WHEREOF,** the parties hereto have signed this Agreement this 10th day of September 2013.

SELLER:                                     PURCHASER:

SARAH, LLC                                  ITALNORD FORUM LV, LLC

By: _____
                                            Alfonso Entebi
_____

Its: _____              As its:  Manager

15

## LIST OF EXHIBITS AND SCHEDULES

### EXHIBITS

| | |
|---|---|
| Exhibit A | Security Agreement |
| Exhibit B | Bill of Sale |
| Exhibit C | Assignment and Assumption Agreement |
| Exhibit D | Management Agreement |

### SCHEDULES

| | |
|---|---|
| Schedule 1.1(a) | List of Tangible Assets |
| Schedule 1.1(c)(iv) | List of Contracts to be Assumed |
| Schedule 1.2(e) | Excluded Furniture, Fixtures & Equipment |

## EXHIBIT A

## SECURITY AGREEMENT

**THIS SECURITY AGREEMENT** ("Agreement") is made effective the tenth (10th) day of September 2013, by and between **ITALNORD FORUM LV, LLC**, a Florida limited liability company ("Debtor"), and **SARAH, LLC** ("Secured Party"), to induce Secured Party to accept future payment of the "Purchase Price" and the "Lease Deposit" set forth in that certain Asset Purchase Agreement executed by Debtor and Secured and dated on or about even date herewith (the "APA") and to recite the agreement between the parties as follows:

1.  To secure payment to Secured Party of the Purchase Price and the Lease Deposit pursuant to the APA, the Debtor hereby grants a security interest (subject to any interests of any institutional lender provided financing secured by any of the following) in, and mortgages to the Secured Party all of Debtor's assets, now existing or hereinafter created, and all proceeds therefrom which include, but are not limited to all of Purchaser's equipment, inventory (subject to any rights of Forall U.S.A., Inc. and/or Pal Zileri), accounts, documents, general intangibles, instruments, chattel paper, consumer goods, deposit accounts, software, and tangible chattel paper as such classes of collateral are identified and deferred under the Uniform Commercial Code. (collectively, the "Collateral").

2.  The Debtor hereby represents, warrants and covenants to the Secured Party that:

    (a)  The Collateral shall not be subject to any additional liens, claims, or encumbrances, other than those created by this Agreement and those which were in existence as of the date of this Agreement (the "Liens") and except for the Liens, there are no restrictions upon the transfer of the Collateral.  Except for the Liens, the Debtor has good and marketable title and the full right and power to transfer the Collateral free and clear of any and all liens, claims or encumbrances;

    (b)  Secured Party shall have the right, during the Debtor's normal business hours, to inspect and examine the Collateral and any books and records related thereto or the financial statements noted hereafter which are in the Debtor's possession or under its control and Debtor shall provide, upon reasonable request by Secured Party, any and all financial statements, including balance sheets, profit and loss statements, and change of condition statements of Debtor from time to time;

    (c)  Debtor will not, without the prior written consent of Secured Party, other than in the ordinary course of business, sell, lease, assign, pledge, or otherwise dispose of, move, relocate or transfer any of the Collateral;

    (d)  To the best of Debtor's knowledge and belief, Debtor is not in violation of any applicable statute, rule, regulation or ordinance of any federal, state or local



governmental entity ("Law"), which would materially and adversely affect the Collateral.

(e) The entry into this Agreement, Debtor's delivery of the APA to Secured Party and the pledge of the Collateral to Secured Party shall not result in a default in any agreement, instrument or note between Debtor and any third party whose obligation(s) are secured by one or more of the Liens, and will not cause acceleration of any of the indebtedness due under any such agreement, instrument or note.

3.  Secured Party shall be entitled to file on behalf of Debtor a UCC-1 Financing Statement, plus all other amendments, termination statements and other filings permitted by law related to the pledge of the Collateral described herein to Secured Party and may use a super generic description of the Collateral when following the UCC-1.

4.  Upon payment in full by Debtor of the Purchase Price and the Lease Deposit under the APA, Secured Party shall terminate the lien that it has placed on the Collateral hereunder and surrender and transfer to Debtor all rights received as a result of its lien as granted hereunder.  Notwithstanding anything herein to the contrary, this Agreement shall expire and become null and void unless Secured Party, within the "Term" as defined in the APA, notifies Debtor in writing of a default by Debtor with respect to the Obligations (defined below).

5.  Upon the occurrence of any default by Debtor under the APA (as defined therein), this Agreement, or under any other documents evidencing or relating to the obligations described in the APA (the "Obligations"), Secured Party shall have the right to accelerate any or all Obligations and shall have all of the rights and remedies provided to a secured creditor under the Uniform Commercial Code including, but not by way of limitation, the right of Secured Party to sell, assign, or otherwise dispose of the Collateral, or any part thereof, by public or private proceedings or sale, or contact Debtor's account debtors and direct payment of the amount due to Debtor directly by Secured Party. The net proceeds realized upon any sale or other disposition of the Collateral, after deducting expenses of the sale or other handling or disposition and reasonable attorney's fees, costs, and expenses incurred by Secured Party, shall be applied to the payment of the Obligations. Secured Party shall account to Debtor for any surplus realized on such disposition. Debtor shall remain liable for any deficiency remaining on the Obligations after application of the Collateral sale proceeds as described above, which Debtor agrees to pay forthwith upon demand.  Debtor agrees to give Secured Party written notice of the occurrence of any of the following events within five (5) calendar days of the occurrence of any such event: any change in the ownership of Debtor, transaction outside the usual course of Debtor's business, default in any material obligation owed by Debtor to any third party under any contract, loan, order or judgment, the borrowing by Debtor of any funds, any notice to Debtor from any court or federal, state or local governmental body regarding any violation of Law, any lawsuit against Debtor or notice of nonrenewal or cancellation of Debtor's lease of its premises or of any insurance policy covering the Collateral.

18



6.   Secured Party shall not be deemed to have waived any rights under this Agreement, under the Obligations or under any related documents, unless such waiver is in writing and signed by the Secured Party. No delay or omission on the part of the Secured Party in exercising any right shall operate as a waiver of such right or any other right. No prior waiver, nor any course of dealing between Secured Party and Debtor, shall constitute a waiver of Secured Party's rights or the Debtor's obligations as to any future transactions. Whenever consent by Secured Party is required in this Agreement, the granting of such consent by Secured Party in any instance shall not constitute a continuing consent to subsequent instances where such consent is required.

7.   All notices required to be given by any party to any other party or parties under this Agreement shall be in writing and shall be effective when actually delivered or three (3) business days after deposited in the United States Mail, First Class, postage prepaid, return receipt requested, addressed to the other party or parties at the addresses as each party may designate to the other parties in writing.

8.   Debtor agrees that this Agreement shall be construed and governed in accordance with the laws of the State of Nevada and shall be binding upon Debtor and its successors and permitted assigns. If this Agreement contains any blanks when executed by Debtor, the Secured Party is hereby authorized, without notice to Debtor, to complete any such blanks according to the terms upon which the Collateral is pledged. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or be invalid under such law, such provision shall be considered severable and be ineffective to the extent of such prohibition or invalidity, without invalidating the remaining provisions of this Security Agreement.

9.   Debtor agrees that unless it obtains the prior written consent of the Secured Party, it will keep the Collateral free from any adverse lien, security interest or encumbrance, other than the Liens, and in good order and repair, and shall not waste or destroy the Collateral or any part thereof, and shall not use the Collateral in violation of any statute, ordinance or policy of insurance thereon.

10.   Debtor will pay promptly when due all taxes and assessments upon the Collateral or for its use or operation or upon any Notes evidencing the Obligations. Debtor shall at all times maintain commercially reasonable general liability insurance covering its business and the Collateral with an insurance company having limits not less than the amount of unpaid Obligations. Promptly upon request, Debtor shall provide Secured Party with certificates of insurance evidencing the existence of all such coverages.

11.   At Secured Party's option, the Secured Party may discharge taxes, liens or security interests or other encumbrances at any time levied or placed on the Collateral, may place and pay for insurance on the Collateral upon the failure by the Debtor, after being requested to do so with such expense incurred to be added to the principal of the APA.

19



12.    The rights and remedies of Secured Party under this Agreement shall be cumulative with any rights and remedies available to Secured Party under the APA.  The selection of any remedy by Secured Party shall not limit Secured Party's right to pursue any other remedy which may be available to Secured Party.

13.    If any portion or portions of this Agreement shall be, for any reason, invalid or unenforceable, the remaining portion or portions shall nevertheless be valid, enforceable, and carried into effect, unless to do so would clearly violate the present legal and valid intentions of the parties hereto.

        **IN WITNESS WHEREOF**, the parties hereto have each executed this Agreement on the day and year first above written.

                                                DEBTOR:

WITNESS:                                        ITALNORD FORUM LV, LLC

_____         By: _____
                                                Alfonso Entebi, as its Manager

                                                SECURED PARTY:

                                                SARAH, LLC

ATTEST:

_____         By: _____
Secretary                                       Its: _____

20

## EXHIBIT B

## BILL OF SALE

Seller, **SARAH, LLC**, an Illinois professional corporation having its principal place of business at The Forum Shops at Caesar's Palace, 3500 Las Vegas Blvd. South, Suite K-8, Las Vegas, Nevada (the "Business"), in consideration of Ten and no/100 Dollars ($10.00), receipt whereof is hereby acknowledged, does hereby sell, assign, transfer and set over to **ITALNORD FORUM LV, LLC**, a Florida limited liability company ("Purchaser") the following described personal property, to-wit:

> The tangible Business Assets identified in that certain Asset Purchase Agreement dated September 10, 2013, entered into by and among Seller and Purchaser.

Seller hereby represents and warrants to Purchaser, that Seller is the absolute owner of said property, that said property is free and clear of all liens, charges and encumbrances, and that Seller has full rights, power and authority to sell said personal property and to make this Bill of Sale.

**IN WITNESS WHEREOF**, Seller has caused this Bill of Sale to be signed this 10th day of September 2013.

SARAH, LLC

_____

Its: _____



STATE OF NEVADA      )
                             ) ss

COUNTY OF CLARK    )

      I, the undersigned, a Notary Public in and for the County and State aforesaid, **DO HEREBY CERTIFY** that _____, personally known to me to be the _____ of **SARAH, LLC**, whose names were subscribed to the foregoing instrument, appeared before me this day in person and signed and delivered the said instrument as their free and voluntary act, and as the free and voluntary act and deed, for the uses and purposes therein set forth.

      **GIVEN UNDER MY HAND AND NOTARIAL SEAL** this 10th day of September 2013.

                                    _____

                                    **Notary Public**

                                    **My Commission Expires:**

                                    _____

## EXHIBIT C

## ASSIGNMENT AND ASSUMPTION AGREEMENT

**THIS ASSIGNMENT AND ASSUMPTION AGREEMENT** (the "Agreement") is made, executed and delivered this 10th day of September 2013, by and between **SARAH, LLC** ("Seller") and **ITALNORD FORUM LV, LLC,** a Florida limited liability company ("Purchaser"), to be effective September 10, 2013.

## R E C I T A L S

**WHEREAS,** pursuant to an Asset Purchase Agreement by and among the Seller, Sarah, LLC and the Purchaser dated September 10, 2013 ("Purchase Agreement"), Seller agreed to sell the Business Assets (as defined in the Purchase Agreement) to Purchaser pursuant to an Agreement and Assumption Agreement in a form acceptable to the parties (except as otherwise defined herein capitalized terms shall have the same meaning as in the Purchase Agreement); and

**WHEREAS,** this Agreement is intended to serve as such agreement.

**NOW, THEREFORE,** in consideration of the premises and mutual covenants contained herein, the parties hereto agree as follows:

1.     <u>Preambles</u>. The preambles to this Agreement are incorporated herein and made a part hereof by this reference.

2.     <u>Agreement</u>. Seller hereby assigns, transfers, grants, bargains, sells, conveys, sets over and delivers to Purchaser all of the intangible Business Assets.

3.     <u>Acceptance by Purchaser</u>. Purchaser hereby accepts the transfer and assignment of the Business Assets and Liabilities.

4.     <u>Binding Effect</u>. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.



5.       Cooperation.      Seller and Purchaser agree to execute such other documents and take such other actions as may be reasonably necessary or desirable to confirm or effectuate the assignments and assumptions contemplated hereby.

**IN WITNESS WHEREOF**, this Agreement has been duly executed to be effective as of the date first above written.

**SARAH, LLC**

_____

Its: _____

24



## SCHEDULE 1.1 (a)

### LIST OF TANGIBLE ASSETS

## SCHEDULE 1.1(c)(iv)

LIST OF CONTRACTS TO BE ASSUMED

**License Agreement**

SCHEDULE 1.2(e)

EXCLUDED FURNITURE, FIXTURES AND EQUIPMENT

F

W:\CASES\016374\00003\00027093.DOC
9/10/13

## MANAGEMENT AGREEMENT

THIS MANAGEMENT AGREEMENT ("Agreement") is made this 10th day of September 2013, by and between **ITALNORD FORUM LV, LLC**, a Florida limited liability company (the "Manager") and **SARAH, LLC**, a Nevada limited liability company (the "Company") to be effective as of September 10, 2013 (the "Effective Date").

### WITNESSETH:

**WHEREAS**, Company is in the business (the "Business") of selling men's attire and accessories primarily bearing the name "Pal Zileri" pursuant to a License Agreement ("License Agreement") with Forall, U.S.A., Inc. ("Forall"), from its current location at the Forum Shops at Caesar's, Las Vegas, Nevada (the "Location"); and

**WHEREAS**, Company desires to retain the services of a manager to manage all aspects of the Business; and

**WHEREAS**, Manager is willing to assume such duties on the terms and conditions contained in this Agreement.

**NOW, THEREFORE**, for good and valuable consideration, including the mutual promises contained herein, the parties agree as follows:

### ARTICLE I
### EMPLOYMENT

**Section 1.1.** Company appoints Manager, and Manager accepts the appointment, on the terms and conditions hereinafter provided as the exclusive managing agent for Company.

**Section 1.2.** Manager will be in compliance at all times with Company's obligations under its lease of the Location ("the Lease") and these acts and their respective regulations. Notwithstanding anything in this Agreement to the contrary, Manager is not, by this Agreement or otherwise, assuming the Lease.

**Section 1.3.** Manager will make all decision affecting the Business, and will confer fully and freely with Company as such times as it deems necessary and relating to the Business.

### ARTICLE II
### TERM

**Section 2.1.** This Agreement shall be effective from the Effective Date, and shall continue until January 31, 2015 (the "Expiration Date"). The period between the Effective Date and the Expiration Date (as same may be extended, as set forth below) is referred to herein as the "Term." If Manager assumes the Lease within the Term, this Agreement shall terminate. If Manager does not assume the Lease prior to the expiration of the Term, Manager may, but shall

not have the obligation to, extend the Term for an additional twelve (12)-month period by delivering written notice of same to Company prior to the expiration of the Term.

**ARTICLE III**
**COMPENSATION**

**Section 3.1.** In consideration for the services to be provided pursuant to this Agreement during each calendar year, Company shall pay Manager a fee ("Administrative Fee") equal to the profit of the Business, commencing from the Effective Date through the end of the Term. For purposes of this Agreement, the term "profit" means total revenue generated from the operation of the Business, less all expenses of the Business (including, without limitation, rent and other payments under the Lease, payments to suppliers and vendors, licensing fees, franchise fees (if any), insurance premiums, taxes, and depreciation and all other expenses of Company which are not specifically excluded under this Article III. Expenses of the Business do not include any of the following (all of which shall be the sole obligation of the Company, and none of which shall be deducted from total revenue): taxes and assessments attributable to the Excluded Assets (as defined in the Asset Purchase Agreement, defined in Section 4.3 below), expenses incurred by Company without the knowledge or consent of the Manager, and salaries and fringe benefits for principals, executives, and employees of the Company (except relating to employees who are hired by Manager), all of which shall be the sole obligation of the Company. Revenue and expenses of the Business shall be prorated on a per diem, accrual (rather than cash) basis, with Manager being responsible for same accruing during the Term, and the Company being responsible for same accruing prior to and after the Term. During the Term, Manager shall prepare, and the Company shall promptly file, all sales and excise tax returns and filings, and employment tax returns and filings, related to the Business; payments with respect to these returns shall be expenses of the Business (except as provided above in this Section 3.1 with respect to employees of the Company not hired by Manager).

**Section 3.2.** The Administrative Fee shall be paid by Company to Manager at Manager's discretion provided, however, that the Administrative Fee shall be paid by Company to Manager no less often than annually and no more often than monthly. In no event shall any administrative fee, distribution, or other compensation be owed or paid to the Company with respect to the Business during the Term.

**ARTICLE IV**
**MANAGER'S DUTIES**

**Section 4.1.** Manager shall provide or cause to be provided all services necessary to operate the day to day management of Company which shall include those services which, in Manager's sole discretion, may be reasonably necessary for the successful operation of the Business, and shall include, but shall not be limited to, the services set forth on Schedule 4.1 attached to this Agreement and made a part of this Agreement by this reference.

**Section 4.2.** Manager may retain or hire on behalf of Company any employees, independent contractors or agents Manager deems necessary to accomplish the purposes set forth in Section 4.1 above. All such persons or entities so retained or hired shall be considered

2

retained or hired by Company, but the salaries, fees, commissions, costs and expenses incurred in retaining and compensating such employees, independent contractors and agents shall be borne entirely by Manager.

**Section 4.3**.  The parties acknowledge and understand that Manager has purchased all of the furniture, fixtures and equipment of Company, effective as of the Effective Date, pursuant to that certain Asset Purchase Agreement of even date herewith (the "Asset Purchase Agreement"). As a result, Manager shall provide during the Term all of the furniture, fixtures and equipment so acquired by Manger for the benefit of Company's operations of the Business at the Location at no charge to Company during the Term.   In addition, Manager shall be responsible for purchasing, at Manager's cost, all inventory necessary for the successful operation of the Business.  Manager shall also be responsible for paying any and all other overhead incurred by Company in the normal course of its operations, such as but not limited to accounting, legal fees (to the extent necessary as determined by Manager on behalf of Company) and business license fees; it being the goal of Manager and Company that neither Company nor Company's principals shall have to come out of pocket for the payment of any Company-related expenses; it being understood that Manager shall, as additional consideration for entering into this Agreement, be entitled to all receipts and revenue generated from the Business in exchange for Manager's agreement to pay expenses as set forth in this Agreement.   Manager understands and acknowledges that the receipts from the Business may be lower than Manager's expense obligations hereunder and Manager agrees that Manager shall be solely responsible for covering any shortfall so resulting.

**Section 4.4**.  The rights, duties and obligations of each of Company and Manager under this Agreement shall not be modified or amended without the express written consent of the party to be charged.

## ARTICLE V
## RESPONSIBILITIES AND COOPERATION

**Section 5.1**.  Everything done by Manager under the provisions of Article IV hereof shall be done as an agent of Company.  Every liability or obligation of the Business for the account of Company accruing after the Effective Date shall be borne by Manager, excluding, however, any of same related to Company's acts or omissions.  Manager agrees to pay promptly all obligations properly incurred by Manager on behalf of Company.

**Section 5.2**.  Manager's responsibilities pursuant to this Agreement may be performed by Manager or any employee, subagent or other representative of Manager.

**Section 5.3**.  Company shall cause its principals to cooperate with Manager in the execution of any documentation reasonably necessary to continue Company's existence, including, but not limited to, submission of annual reports, the execution of consents and any other documentation reasonably determined by Manager to be necessary to be signed by Company; provided, however, that in seeking such consent Manager shall continue to assume ultimate responsibility for any liabilities created therein and Company's principals shall not be required to personally guarantee any liabilities not currently guaranteed by them.

3

**Section 5.4**.  As a material inducement for Manager to enter into this Agreement, the Company shall not, during the Term, as same may be extended:  (a) enter into any agreement to sell all or any portion of the Business, or to assign or otherwise transfer any interest in the Lease, or to sublet all or any portion of the Premises, or (b) collaterally assign or pledge any interest in the Business or the Lease (the "Prohibited Transactions").   Notwithstanding the foregoing, Company shall be permitted to undertake any one or more of the Prohibited Transactions prior to the end of the Term if both: (i) Manager expressly informs Company, in a manner in compliance with the provisions of Section 4.4 of the Asset Purchase Agreement, of its unwillingness to take over the Business effective at the Term; and (ii) the effective date of the closing of the Prohibited Transactions is after the expiration of the Term (as same may be extended).

## ARTICLE VI
## COMPANY'S RESPONSIBILITIES

**Section 6.1**.  Company shall provide Manager with all necessary information concerning its operation and will be responsible to Manager for any additional information reasonably necessary to enable Manager to carry out his responsibilities under this Agreement.

**Section 6.2**.  To ensure the reasonable and proper functioning of Company the parties agree that Company shall not contract, borrow funds, deposit or withdraw funds and incur debts without prior notice and prior approval by Manager.

## ARTICLE VII
## INDEMNIFICATION

**Section 7.1**.  Manager shall be liable to Company for all losses and damages with respect to the Business incurred by Company accruing during the Term, which are not related to Company's acts or omissions occurring prior to the Effective Date.  Manager shall indemnify, defend and hold Company harmless from the following accruing and arising after the Effective Date (which are not related to Company's acts or omissions occurring prior to the Effective Date), to the extent not related to Company's negligence or willful malfeasance: (a) any liability, damage, cost, and expense, including reasonable attorneys' fees sustained or incurred from injury to any person or property in, about and in connection with the Business accruing during the Term from any cause whatsoever, unless such injury shall be caused by Company's failure to comply with its obligations hereunder; (b) any liability, damage, penalty, cost and expense, statutory or otherwise for all acts properly performed by Company pursuant to the instructions of Manager.  Notwithstanding anything in this Agreement to the contrary, unless caused by Manager's acts or omissions Manager will not be liable for the Location's noncompliance with applicable laws, statutes, ordinances, rules, codes, regulations, orders, and interpretations of all federal, state, and other governmental or quasi-governmental authorities having jurisdiction over the Location, including, without limitation, any zoning laws and the Americans with Disabilities Act of 1990, as the same may be amended; the costs to cure any of same shall be solely those of the Company, and shall not be expenses of the Business deducted from total revenue.



4

## ARTICLE VIII
## NOTICES

**Section 8.1**.  Any written notice to either party to this Agreement required or permitted by this Agreement shall be given by facsimile, nationally recognized overnight courier, or certified mail with return receipt requested, postage prepaid, to such party. Any and all notices referred to in this Agreement or which any party desires to give to another, shall be addressed as follows:

To Company:

_____
_____
_____
Attn: Bachar Hamad, M.D.

with a copy to:

Kamensky Rubinstein Hochman
&Delott, LLP
7250 North Cicero Avenue, Suite 200
Lincolnwood, Illinois 60712
Attn:  Lee Levin

To Purchaser:

Italnord Forum LV, LLC
c/o Gutierrez Yelin & Boulris, PLLC
100 Almeria Avenue
Suite 340
Coral Gables, FL 33134
Attn:  Alfonso Entebi

with a copy to:

Gutierrez Yelin & Boulris, PLLC
100 Almeria Avenue
Suite 340
Coral Gables, FL 33134
Attn: Jorge R. Gutierrez

**Section 8.2**.  A party may change its address for notice by delivery of at least ten (10) days' prior written notice to the other party of its new address for notice.

**Section 8.3**.  Any notice given by mail shall be deemed delivered upon receipt or upon delivery being deemed refused or undeliverable as determined by the postal authorities.

## ARTICLE IX
## BINDING EFFECT

5

**Section 9.1**.  This Agreement has been executed under the laws of the State of Nevada and shall be binding upon the respective heirs, successors, assigns and legal representatives of the parties.

**Section 9.2**.  It is the intention of the parties hereto that this Agreement and the performance hereunder and all suits and special proceeds hereunder be construed in accordance with the laws of the State of Nevada, regardless of whether one party may become a resident of another state.  Any action, special proceeding or other proceedings that may be brought arising out of, or in connection with, or by reason of this Agreement the laws of the State of Nevada shall be applicable and shall govern to the exclusion of the laws of any other forum, without regard to the jurisdiction in which any action or special proceeding may be instituted.

**ARTICLE X**
**ENTIRE AGREEMENT**

**Section 10.1**.  The parties acknowledge that this Agreement shall constitute the entire agreement between the parties and no variance or modification hereof shall be valid and enforceable except by supplemental agreement, in writing, executed and approved by both parties hereto.

**Section 10.2**.  The parties stipulate that neither of them has made any representations with respect to the subject matter of this Agreement, including the execution and delivery hereof, except such representations as are specifically set forth herein and each of the parties hereto acknowledges that each has relied on his or her own judgment in entering into this Agreement.

**ARTICLE XI**
**MISCELLANEOUS PROVISIONS**

**Section 11.1**.  All agreements and covenants contained herein are severable, and in the event any of them shall be held to be invalid by any competent court, this Agreement shall be interpreted as if such invalid provisions or covenants were not contained herein, in order to give the remaining provisions full and legally binding meaning.

**Section 11.2**.  This Agreement may not be assigned by either Company or Manager without the other party's prior written consent.

**Section 11.3**.  Failure of any party hereto to assist upon strict compliance with any of the terms, covenants and conditions hereof shall not be deemed a waiver or relinquishment of such terms, covenants and conditions of any similar right or power hereunder at any subsequent time.

**Section 11.4**.  The provisions of this Management Agreement, are subject to and to be interpreted consistently with the provisions of Section 4.4 of the Asset Purchase Agreement.



6

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first above written.

COMPANY:

SARAH, LLC

By:_____
    President

ATTEST:

_____

MANAGER:

ITALNORD FORUM LV, LLC

By:_____
    Alfonso Entebi, as Manager

FOR VALUE RECEIVED, for the period beginning on the Effective Date and ending January 31, 2015, the undersigned agrees to look solely to Manager for the performance of the Company's obligations under the License Agreement during the Term. The undersigned represents and warrants to Company and Manager that it will personally benefit by its Agreement to be so bound and recognizes that the parties would not enter into this Agreement to the benefit of the undersigned without the undersigned's agreements to the terms set forth in this paragraph.

FORALL, U.S.A, INC.

_____
_____

7

## SCHEDULE 4.1 TO MANAGEMENT AGREEMENT

1.    Hire and fire all personnel.
2.    Review personnel performances.
3.    Schedule personnel.
4.    Coordinate all activities of personnel.
5.    Purchase inventory and stock the shelves of the location.
6.    Schedule vacation time.
7.    Review all business done by Company as to procedures, consultations, business aspects and collections.
8.    Supervise all staff.
9.    Set prices for inventory.
10.   Set all wages, services and bonuses.
11.   Maintain and purchase all equipment and supplies.
12.   Strategic planning for Company.
13.   Arrange for timely filing of tax reports for Company and be a liaison with the accountant and attorneys.
14.   Assign work to personnel and coordinate the efficient performance of that work.
15.   Write all checks and manage bank accounts.
16.   Maintain adequate cash flow for Company.
17.   Undertake all marketing and advertising.
18.   Coordinate purchases of insurance and workmen's compensation coverage for Company.
19.   Monitor the paperwork of the organization, ensuring proper cash flow and adequate capital.
20.   Maintain overhead for Company to be within reasonable limits and prevent undue expenses to Company from timely researching of inventory purchased and services used by Company.
21.   Reviewing and approving all contracts that Company may contract with.
22.   Ensure an adequate supply of materials and equipment for Company for smooth functioning.
23.   Any other functions that may pertain to the above from a coordinating, managing and supervisory level, it being understood that Manager shall have complete authority to operate the Business.

8

G

## MANAGEMENT AGREEMENT

**THIS MANAGEMENT AGREEMENT** ("Agreement") is made this ⁴ᵗʰ day of February, 2015, by and between **FORALL USA, INC.,** a New York corporation (herein "Forall" or the "Manager") and **SARAH, LLC,** a Nevada limited liability company (the "Company") to be effective as of March 15, 2015 (the "Effective Date").

Forall and Sarah are sometimes collectively referred to herein as "parties".

## WITNESSETH:

**WHEREAS,** Company is in the business (the "Business") of selling men's attire and accessories primarily bearing the name "Pal Zileri" pursuant to a License Agreement ("License Agreement") with Forall, U.S.A., Inc. ("Forall"), at its current location at the Forum Shops at Caesar's, Las Vegas, Nevada (the "Premises"); and

**WHEREAS,** the Company operates the Business and Location subject to a certain of Premises dated May 18, 2011, between Sarah LLC and Forum Shops, LLC ("Landlord");

**WHEREAS,** Company desires to retain the services of a manager to manage all aspects of the Business for the term and conditions set forth herein; and

**WHEREAS,** Manager, by and through its assigns, affiliate and or subsidiary, is willing to assume such duties on the terms and conditions contained in this Agreement.

**NOW, THEREFORE,** for good and valuable consideration, including the mutual promises contained herein, the parties agree as follows:

## ARTICLE I
## MANAGEMENT

1.1.    Company appoints Manager, and Manager accepts the appointment, on the terms and conditions hereinafter provided as the exclusive managing agent for Company and the Business.  Forall or its affiliate and/or subsidiary shall be the Manager and operator of the Pal Zileri store located at the Forum Shops at Caesars II, Las Vegas.  Forall shall assume exclusive management and control of the Business and Premises, effective no later than March 15, 2015, for the term set forth in this Agreement.  Forall will assume responsibility the operations of the Business and Lease.

## ARTICLE II
## TERM

2.1.    Forall shall assume exclusive management of and control of the Business, effective no later than March 15, 2015 ("Start Date"), for a term of eighteen (18) months ("Initial Term").  Forall shall, at its sole discretion, advise Sarah on or before March 1, 2016, whether it



intends to take over the Lease and Business and/or otherwise terminate the Management Agreement at the end of the Initial Term.

2.2.    Notwithstanding the foregoing provision 2.1, Forall, at its option and written notice to Company (said notice may be by email notwithstanding anything to the contrary in this agreement), may elect and take over management of the Business and possession of the Premises as early as February 22, 2015 ("Early Start Date"), upon which, as an incentive, Sarah will pay the rent on the Premises and all other expenses associated with the Premises, up and through March 7, 2015.  If Forall elects to take over management of the Business after February 22, but before March 1, 2015, Sarah will pay the rent on the Premises up and through March 7, 2015, less the number of days after February 22, 2015 that Forall assumed management.  To illustrate, if Forall takes over the Business on February 26, Sarah shall pay the rent on the Premises through March 3, 2015 (March 7th less 4 days).  If Forall elects to take over management of the Business after March 1 but before March 15, Company shall pay half or 50% of the days prioar to March 15th on a pro rata basis of the March rent for the number of days prior to March 15th that Forall is operating the Business; however, at no such time will Forall be responsible for any rent or other obligation prior to the date it actually commences management of the Business.  To illustrate the foregoing, if Forall takes over management of the Business on March 8, Company is responsible for rent for March 1 through March 7, plus half of the days between March 8 and March 15, or 3.5 days of rent.

2.3.    Forall shall have the right at the expiration of the Initial Term to take over the Lease for the remainder of the duration of the Lease or to terminate this Agreement.  Forall shall so advise the Company on or before March 1, 2016, of its intentions with respect to whether to take over the Lease and/or terminate this Agreement at the end of the Initial Term. Notwithstanding anything to the contrary in this Agreement, should Forall so choose to take over the Lease, the parties agree and acknowledge that this Management Agreement shall terminate upon the expiration of the Initial Term and Forall shall assume the operation and ownership of the Business at that point in time without further consideration due and owing to Company.

2.4.    Sarah hereby assigns and provides Forall with the option to assume and take over the Lease upon the expiration of the Initial Term at Forall's election.  Forall shall provide notice to Sarah on or before March 1, 2016, of its intent to take over the Lease.  Sarah shall obtain and otherwise assist with obtaining the Landlord's approval, if necessary, for any transfer or assignment of the Lease.

2



## ARTICLE III
## OPERATION OF THE BUSINESS AND PREMISES

3.1.    The Manager shall operate the Business and be responsible for and otherwise entitled to all revenue, profits, losses and other opportunities arising from the Business during the Term.   Forall shall assume responsibility for the operation and management of the Business, the payment of the lease during the Term, taxes, and all operational expenses associated with the Business directly to the Landlord with the Landlord's approval, as required.  Forall shall not owe or otherwise pay any monies to Sarah under the Management Agreement or in connection with the Business.  Forall shall retain all profits and losses associated with the operation of the Business.

3.2.    Forall, at its option, may establish a stand-alone entity for the management of the Business and assign this Agreement and the rights and obligations hereunder to the affiliate or subsidiary company.

3.3.    Any unusual charges arising under the Lease not arising as a result of or in connection with the Manager's use of the Premises shall continue to be the responsibility of Sarah.

3.4.    The Company shall maintain commercial and premises insurance on the Premises and shall add Forall as an additional insured under said policies and shall provide Forall with a certificate of insurance upon fifteen (15) days request.  The insurance premiums shall be paid by Forall in accordance with Section 4.3.  Forall reserves the right to pay all insurance premiums directly and to obtain its own commercially reasonable insurance as it deems fit and that complies with the obligations under the Lease.

3.5.    Forall reserves the right to make all rent payments under the Lease directly to the Landlord.  The Company will timely provide all notices and rent payments under the Lease to Forall, and at no time later than two (2) business days after receipt.

3.6.    Sarah shall obtain any and all necessary consent(s) from the Landlord for this Management Agreement.  Sarah shall indemnify and hold Forall harmless from any loss or liability incurred by Forall that arises from the October 23, 2014 Letter Agreement between Sarah and the Landlord.

## ARTICLE IV
## MANAGER'S REPRESENTATIONS AND OBLIGATIONS

3



4.1.     Manager shall provide or cause to be provided all services necessary to operate the day to day management of the Business which shall include those services which, in Manager's sole discretion, may be reasonably necessary for the successful operation of the Business.

4.2.     Manager may retain or hire any employees, independent contractors or agents Manager deems necessary to accomplish the purposes set forth in Section 4.1 above. All such persons or entities so retained or hired shall be and corresponding salaries, fees, commissions, costs and expenses incurred in retaining and compensating such employees, independent contractors and agents shall be borne entirely by Manager.

4.3.     Manager shall also be responsible for paying any and all other overhead incurred by the Business in the normal course of its operations, such as but not limited to accounting, legal fees (to the extent necessary as determined by Manager) and business license fees; it being the goal of Manager and Company that neither Company nor Company's principals shall have to come out of pocket for the payment of any Business-related expenses; it being understood that Manager shall, as additional consideration for entering into this Agreement, be entitled to all receipts generated from the Business in exchange for Manager's agreement to pay all expenses. Manager understands and acknowledges that the receipts from the Business may be lower than Manager's expense obligations hereunder and Manager agrees that Manager shall be solely responsible for covering any shortfall so resulting.

4.4.     Manager's responsibilities pursuant to this Agreement may be performed by Manager or any employee, subagent or other representative, affiliate or subsidiary of Manager.

**ARTICLE V**
**COMPANY'S REPRESENTATIONS AND OBLIGATIONS**

5.1.     Company shall provide Manager with all necessary information concerning its operation and will be responsible to Manager for any additional information reasonably necessary to enable Manager to carry out the responsibilities under this Agreement.

5.2.     Company shall assign, provide and otherwise ensure that all assets, furniture, fixtures, equipment, machinery, product, inventory, books, records and other items necessary and/or otherwise located at and used in connection with operations of the Business at the Premises ("Business Assets") at no charge to Forall. To the extent that any of the Business Assets are not owned by the Company, Company shall pay for, secure and otherwise purchase the furniture, fixtures, and equipment at no expense to Forall. For the avoidance of doubt, the Business Assets include but are not limited to computers, point of sale equipment, showroom and office furniture, lighting, shelving, displays, signage, and other store equipment.

5.3.     Company shall cause its principals to cooperate with Manager in the execution of any documentation reasonably necessary to continue Company's existence, including, but not limited to, submission of annual reports, the execution of consents and any other documentation reasonably determined by Manager to be necessary to be signed by Company; provided, however, that in seeking such consent Manager shall continue to assume ultimate responsibility

4



for any liabilities created therein and Company's principals shall not be required to personally guarantee any liabilities not currently guaranteed by them.

5.4.    The Company shall, at its sole expense, fix all the fixtures, doors, furniture, lights, equipment, etc. that are not in perfect working condition.

5.5.    The Company shall, at its sole expense, provide Forall use of and access to a portion of the store prior to the Effective Date, for purposes of Forall's entertaining and marketing to Forall and fashion clients during Magic fashion event in Las Vegas during the week of February 16 through February 20, 2015.

5.6.    The Company shall, free of charge, provide Forall use of and access to the stock room at least two weeks prior to the Start Date.

5.7.    The Company agrees to allow Forall to close the store for two (2) days prior to the Start Date in order to make renovations, stock inventory and other such work in preparation of opening the store under Forall management.

5.8.    The Company shall, free of charge, allow Forall to store merchandise in the stock room at least two weeks prior to the Start Date

5.9.    At the expiration of the Initial Term, at Forall's sole option, Sarah shall assign all of its right and interest in the Lease to Forall at no additional cost to Forall.  Sarah shall obtain and otherwise assist with obtaining the Landlord's approval, if necessary, for any transfer or assignment of the Lease.

5.10.    The Management Agreement shall not alter or amend the parties' rights and obligations under the License and Retail Operating Agreement between Sarah and Forall dated March 2011 and Sarah's obligations under the Lease, except that Forall shall assume all lease payments during the Term.

5.11.    The Company shall cooperate fully with Forall's due diligence review of this proposed transaction.  Sarah shall provide Forall with access to all Business records, financial statements, employee records, etc., and shall allow Forall and its representatives to access and monitor the Business and the store Premises during this due diligence period.  Sarah shall continue to operate the Business in the normal course and manner until Forall assumes the operations under the Management Agreement and Sarah shall assist Forall in the transition of the Business.

5.12.    The Company shall not transfer or surrender the Lease without Forall's prior written consent and agreement.  If Forall has exercised the option set forth in Section 2.3, this obligation shall survive the termination of this Agreement.

5.13.    The Company shall obtain the written consent of the Landlord to this Management Agreement to the extent that said consent is required at any point in time.  Forall shall, at its option, have the right to terminate this Agreement to the extent that the Company

5



fails to obtain the consent of the Landlord on any required matter under the Lease. Notwithstanding the foregoing, Forall shall not affirmatively approach the Landlord to discuss the Management Agreement; however nothing herein shall prevent Forall and/or its representatives from otherwise contacting or discussing the Business and/or Lease with the Landlord as may be required in the course of business.

5.14.   The Company hereby represents and covenants to Forall that the Company is not in default of any material provision of the License and Lease Agreements.

5.15.   Except as specifically set forth herein, nothing shall act as to waive, limit or otherwise alter any obligation or liability that the Company and/or its principals, owners, members, and/or guarantors are subject to or arising from the License and Retail Operator Agreement, the Lease Agreement, and/or any Guaranty, undertaking or promise thereunder.

## ARTICLE VI
## TERMINATION

6.1.   This Agreement may be terminated as follows:

i.      by mutual written consent of Company and Manager;

ii.     by Manager, if at any time, the Company is in default of the Lease or materially defaults under the License Agreement, provided, that the default is not caused by Manager acting on behalf of Company unless Manager was acting at Company's direction;

iii.    by Manager, if there has been a material breach by Company of any of its representations, warranties, covenants or agreements contained in this Agreement and such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured within ten (10) Business Days after written notice thereof shall have been provided to Company by Manager.

iv.     by Company, if there has been a material breach by Manager of any of its representations, warranties, covenants or agreements contained in this Agreement and such breach shall not have been cured within ten (10) Business Days after written notice thereof shall have been provided to Manager by Company.

6.2.   In the event of any termination pursuant to this Article VI, written notice thereof setting forth the reasons therefor shall promptly be given by the terminating Party to the other Party and the transactions contemplated by this Agreement shall be terminated, without farther action by any Party.

## ARTICLE VII
## INDEMNIFICATION

7.1.   Sarah shall indemnify and hold harmless Forall for any losses, claims, and/or liability, including a reasonable attorneys' fees, that arises as a result of or in connection with the operation and/or management of the Business and/or Premises, including but not limited to all

6



liability arising from the store, Lease, employee matters, taxes for the time period prior to the Start Date of the Management Agreement.

7.2.    Forall shall indemnify and hold Sarah harmless for any losses, claims and/or liability caused by or arising in connection with Forall's operation of the Business during the term of Management Agreement, except to the extent that any losses, claims and/or liability is caused by Sarah's own conduct.   Notwithstanding anything to the contrary in this Agreement, neither Forall nor any of its assigns, affiliates, or subsidiaries shall have any responsibility for nor make any representations or provide any indemnification concerning any liabilities and/or obligations related to or arising from the any predecessor company or person operating the Business or Lease prior to the effective date of this Agreement, including any acts or conduct by Sarah LLC, or any of its owners, shareholders, officers, employees, agents or representatives.

## ARTICLE VIII
## NOTICES

8.1.    Any notice, request, instruction, correspondence or other document to be given hereunder by any Party to another (herein collectively called "notice") shall be in writing and delivered personally or mailed by registered or certified mail, postage prepaid and return receipt requested, or by facsimile, as follows:

| If to Manager: | Name: | Forall USA, LLC |
|---|---|---|
| | Address: | Fuller Building |
| | | 595 Madison Avenue – Suite 605 |
| | | New York, New York   10022 |
| | Attn: | Paolo Torello-Viera |
| | | CEO - President Americas, |
| | Facsimile: | (212) 751- |
| with a copy to: | Name: | Stephen J. Brown, Esq. |
| | | Veneruso, Curto, Schwartz & Curto, LLP |
| | Address: | 35 East Grassy Sprain Road, Suite 400 |
| | | Yonkers, New York 10710 |
| | Facsimile: | (914) 779-0369 |
| If to Company: | Name: | Bachar Hamad, MD |
| | | Sarah, LLC |
| | Address: | 1717 Midwest Club Parkway |
| | | Oakbrook, IL 60523 |
| | Facsimile: | |
| with a copy to: | Name: | David Hochman, Esq. |
| | | Kamensky Rubenstein Hochman & Delott, LLP |

7



Address:    7250 N. Cicero Avenue
                  Lincolnwood, IL 60712

Facsimile:   (847) 982-1776

Each of the above addresses for notice purposes may be changed by providing appropriate notice hereunder. Notice given by personal delivery or registered mail shall be effective upon actual receipt. Notice given by facsimile shall be effective upon actual receipt if received during the recipient's normal business hours, or at the beginning of the recipient's next normal Business Day after receipt if not received during the recipient's normal business hours. All notices by facsimile shall be confirmed by the sender thereof promptly after transmission in writing by registered mail or personal delivery. Anything to the contrary contained herein notwithstanding, notices to any Party shall not be deemed effective with respect to such Party until such notice would, but for this sentence, be effective both as to such Party and as to all other Persons to whom copies are provided above to be given.

## ARTICLE IX
## MISCELLANEOUS

9.1.    It is the intention of the parties hereto that this Agreement and the performance hereunder and all suits and special proceeds hereunder be construed in accordance with the laws of the State of New York, regardless of whether one party is or may become a resident of another state. Any action, special proceeding or other proceedings that may be brought arising out of, or in connection with, or by reason of this Agreement the laws of the State of New York shall be applicable and shall govern to the exclusion of the laws of any other forum, without regard to the jurisdiction in which any action or special proceeding may be instituted.

9.2.    The parties that any controversy arising under or in relation to this Agreement will be brought exclusively in the State of New York, County of New York. The state and federal courts and authorities with jurisdiction in New York County will have exclusive jurisdiction over all controversies which shall arise under or in relation to this Agreement.

9.3.    The parties acknowledge that this Agreement shall constitute the entire agreement between the parties and no variance or modification hereof shall be valid and enforceable except by supplemental agreement, in writing, executed and approved by both parties hereto.

9.4.    All provisions contained herein are severable, and in the event any of them shall be held to be invalid by any competent court, this Agreement shall be interpreted as if such invalid provisions or covenants were not contained herein, in order to give the remaining provisions full and legally binding meaning.

9.5.    This Agreement may be assigned by the Manager to a related or affiliated company without consent of the Company. Company may not assign this Agreement without the Manager's prior written consent.

8



9.6.    Failure of any party hereto to assist upon strict compliance with any of the terms, covenants and conditions hereof shall not be deemed a waiver or relinquishment of such terms, covenants and conditions of any similar right or power hereunder at any subsequent time.

9.7.    This Agreement may be executed in counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same agreement. This Agreement shall become effective upon, but only upon, its execution by both parties.



IN WITNESS WHEREOF, the parties hereto execute this Agreement under seal by their duly authorized representatives as of the date first above written.

FORALL U.S.A., INC.,

By: Paolo Torello-Viera
Title: Chief Executive Officer


SARAH, LLC.,


By: _____
Hala subh
Its: Member as to a 50% interest


By: _____
Suhad albasha
Its: Member as to a 50% interest

10

H



**BLEAKLEY PLATT & SCHMIDT, LLP**

NEW YORK    CONNECTICUT

STEPHEN J. BROWN
914.287.6191
SBROWN@BPSLAW.COM

ONE NORTH LEXINGTON AVENUE
WHITE PLAINS, NEW YORK 10601
914.949.2700
FAX: 914.683.6956
BPSLAW.COM

November 3, 2017

## PREPARED IN ANTICIPATION OF LITIGATION

*VIA FEDERAL EXPRESS AND EMAIL*

David Hochman, Esq.
Roetzel & Andress, LPA
20 South Clark Street
Suite 300
Chicago, IL 60603

Re:     Forall USA, Inc., adv. Sarah LLC
         Pal Zileri Forum Shops at Caesars II Las Vegas, Nevada

Dear Attorney Hochman:

This office has been retained by Forall USA, Inc. ("Forall") as litigation counsel in connection with Forall's claims for damages against your client, Sarah LLC ("Sarah"), and individual guarantors, Suhad Albasha, Hala Subh, Bachar Hamad and Ammar Hamad ("Individual Guarantors'"), arising from the breaches by Sarah and the Individual Guarantors of the Retail License Agreement and Management Agreement. By separate letters, I have noticed the Individual Guarantors.

In reliance upon the parties' contract and the assurances given by Sarah and the Individual Guarantors, Forall funded the build-out of the Las Vegas store and expended significant monies based upon the expectation that Sarah would run and operate the Pal Zileri store, and purchase, market and sell product pursuant to the Retail License Agreement through March 2021 as it agreed to by contract. *See* Articles 2.7 and 5.1 of the Retail License Agreement.

In addition to the build-out costs, Sarah is responsible for minimum product purchases of $900,00 per year for the duration of the License Agreement. *See* Article 4 of the Retail License Agreement. This obligation alone totals no less than $4,500,000.

PLEASE TAKE NOTICE, as a result of Sarah and the Individual Guarantors' breach and failure to take back and operate the store in September 2016, Sarah and the Individual Guarantors' are responsible for all losses and expenses incurred by Forall, including attorneys' fees and interest and other costs associated with the enforcement of the rights and obligations

David Hochman, Esq.
November 3, 2017
Page 2

under the respective Agreements and losses and damages arising from Sarah's breach of the Agreements. *See* Article 13.2 of the Retail License Agreement.

Please be further advised that this office has been authorized and will commence legal proceedings to recover these losses on behalf of Forall. We will seek full legal remedy for all contract damages, consequential damages, attorney's fees and interest computed thereon.

Notwithstanding the foregoing, and in furtherance of trying to resolve this matter short of litigation and the expense and delay associated therewith, Forall will agree to resolve all matters in consideration of and in exchange for payment by Sarah and/or the Individual Guarantors' of **$3.0 Million** to Forall, paid in six (6) equal installments of $500,000, with the first payment due on or before December 31, 2017, and the last payment to be made on or before September 30, 2018.

THIS LETTER IS PROVIDED IN FURTHERANCE OF SETTLEMENT AND IS PREPARED IN ANTICIPATION OF LITIGATION. ALL RIGHTS ARE RESERVED AND NOTHING HEREIN SHALL BE DEEMED A WAIVER OR LIMITATION OF RIGHTS OR CLAIMS. THE FOREGOING OFFER SHALL BE WITHDRAWN AND DEEMED NULL AND VOID IF NOT ACCEPTED ON OR BEFORE NOVEMBER 15, 2017. ANY SETTLEMENT SHALL BE SUBJECT TO CUSTOMARY AGREEMENTS, TERMS AND RELEASES EXECUTED BY AND BETWEEN THE PARTIES APPROVED BY COUNSEL.

Sincerely,

STEPHEN J. BROWN

SJB:kf

cc:   Hala Subh
      Suhad Albasha
      Bachar Hamad
      Ammar Hamad