**BLEAKLEY PLATT & SCHMIDT, LLP**
**STEPHEN J. BROWN**
*Attorneys for Forall USA, Inc.*
**One North Lexington Avenue**
**White Plains, New York 10601**
**Tel.: (914) 949-2700**

## AMERICAN ARBITRATION ASSOCIATION
-----------------------------------------------------------------X
SARAH LLC, HALA SUBH, SUHAD ALBASHA,
BACHAR HAMAD AND AMAR HAMAD

                          Case No.: 01-18-0000-6180

                   Claimants,

       - against-

FORALL USA, INC.,

                  Respondent.
-----------------------------------------------------------------X

## ANSWERING STATEMENT AND COUNTERCLAIMS

     Respondent, Forall USA, Inc., by and through its attorneys, Bleakley Platt & Schmidt,

LLP, as and for its Answer and Counterclaims in response to the demand for arbitration and

statement of claims dated January 12, 2018 (herein "Statement of Claims"), by Sarah LLC, Hala

Subh, Suhad Albasha, Bachar Hamad and Amar Hamad (collectively "Claimants"), specifically

alleges and states as follows:

## PRELIMINARY STATEMENT

     1.     This matter arises from a business venture between Forall USA, Inc. (herein

"Forall") and Sarah, LLC (herein "Sarah"), for brand and product licensing and the opening and

operation of a men's high-end Italian clothing and apparel store at The Forum Shops at Caesars

Palace in Las Vegas, Nevada (herein "The Forum Shops").  Forall has an exclusive license in the

United States to manufacturing, market, sell and distribute the well-known Pal Zileri™ line of

formal and casual Italian men's clothing and apparel.  Pal Zileri is sold in stores such as

Nordstrom, Saks Fifth Avenue and other high-end retailers.

2.      In or around 2011, the claimants Hala Subh, Suhad Albasha, Bachar Hamad and Amar Hamad (herein "Individual Guarantors") approached Forall to open, operate and own a "Pal Zileri" store selling products and menswear under license from Forall.

3.      The Claimants presented as very well-off, business-like and motivated to expand and operate in the Italian menswear and apparel space.  They agreed to personally guarantee the obligations of Sarah in consideration of Forall granting them a license to the Pal Zileri brand and apparel and distribution and supply of products for sale.

4.      Indeed, the Claimants were interested in opening a Las Vegas store but they negotiated an exclusive option to open a Pal Zileri store in New York City and Chicago, with the idea of expanding shortly after opening the first store in Las Vegas.

5.      The parties entered into a License and Retail Operator Agreement in March 2011 (defined below as License Agreement) under which Sarah agreed to open and operated a retail menswear clothing store at The Forum Shops and Forall agreed, *inter alia*, to sell and provide licensed Pal Zileri product and apparel and to allow Sarah to use the Pal Zileri brand and trademark and to fund half of the build out costs of the store.  Simultaneously with the execution of the License Agreement, Sarah entered into a retail Lease Agreement with The Forum Shops LLC, as Landlord.

6.      Forall agreed to support and pay for half of the construction costs of the Las Vegas Store and to provide product to Sarah for sale as well as to pay for certain marketing and advertising costs. Forall's share of these costs eventually totaled approximately $474,349.85 and Sarah was reimbursed for all these monies.

7.      The term of the License Agreement was for 10 years.  There was no fee or royalty

paid by Sarah to Forall for the right to use and operate under the Pal Zileri brand and to sell the Pal Zileri product line.  However, Sarah agreed, and the Individual Guarantors guaranteed, to run and operate the store and to make minimum product purchases during the term from Forall.

8.     Forall funded half of the build out of the Las Vegas store and significant marketing and advertising costs pursuant to the parties' License Agreement in reliance upon the expectation that Sarah would operate the store and purchase and sell Pal Zileri product and apparel through at least March 2021.

9.     Sarah was responsible for minimum product purchases of $900,00 per year for the term of the License Agreement.

10.    However, in rather short order, despite Forall's efforts and full support of the operation, Sarah began to experience operational issues due to Sarah's (and the Individual Guarantors') inability to run and properly manage a retail store and effectively communicate with both employees, customers and Forall.  In January 2013, after only 16 months after opening, Sarah wrote to Forall and notified Forall that they did not want to operate the Store and wanted to turn the lease back to the Landlord.

11.    Thereafter, and for a period of over two years, Forall worked closely with Sarah and found a third party experienced retail operator to manage the store for a period of 16 months and then Forall itself stepped in for another 18 months to manage the store.

12.    As set forth more fully below, despite these efforts, Sarah and the Individual Guarantors continually refused to work in good faith with Forall and refused to recognize and otherwise abide by their contractual obligations.  The Claimants were only focused on limiting their liability under the Lease Agreement (that they had signed) and refused to acknowledge the obligations under the License Agreement to Forall.  Claimaants acted in bad faith and in only a

3

self-serving manner trying to minimize their exposure on the Lease and in complete disregard for the contractual obligations under the License Agreement and Management Agreement with Forall and for Forall's business and interests.

13.     Ultimately, in an incredible betrayal, Sarah and the Individual Guarantors surrendered the Lease to the Landlord while Forall was operating the store and during the term of Forall's Management Agreement in June 2016, thereby resulting in Forall's eviction from the Store on or around July 31, 2016.  Sarah has lied about the facts surrounding this in their Statement of Claim – claiming that Forall was evicted due to failure to pay rent in a timely manner – a complete fabrication.  It was Sarah that signed the papers surrendering the Lease and stipulating to the Nevada court that Forall had no right to be in the premises!

14.     Since that time, Forall has attempted to resolve these disputes only to be time and time again ignored by Sarah and the Individual Guarantors.  Indeed, the first response that Forall has had from these parties was receipt of the demand for arbitration in which, rather incredibly, Sarah has commenced arbitration claiming that they are the aggrieved parties here.  Nothing could be further from the truth.

15.     At all times Forall acted in good faith and in compliance with the terms of the several agreements in place between the parties and discussed more in detail below.

16.     It is Sarah and the Individual Guarantors that have breached the agreements with Forall and have shown a complete disregard for the law and now the truth.

17.     As a result of Sarah's breach of the parties' License Agreement and Management Agreement and voluntary surrender of the Lease (while Forall was operating the store) and ultimately Sarah's failure to take back and operate the Pal Zileri store in accordance with the License Agreement and parties' Management Agreement in September 2016, Forall has been

4

severely damaged, its reputation and brand has suffered, and it has incurred attorneys' fees and costs.

## FACTUAL BACKGROUND

### A. **The License and Retail Operator Agreement for the Las Vegas Store**

18.     As discussed briefly above, this proceeding and the underlying claims arise from a certain License and Retail Operator Agreement by and between Forall and Sarah, dated March 2011 (herein "License Agreement"), which set forth the parties' agreement and obligations relating to the opening and operation of men's high-end retail Italian clothing and apparel store in The Forum Shops at Caesars Palace in Las Vegas, Nevada.  A copy of the License Agreement is annexed hereto as Exhibit 1.[1]

19.     Forall is a New York Corporation and is a wholly-owned domestic subsidiary of Forall Confezioni S.p.A., an Italian designer and manufacturer of well-known high-end men's apparel under the brand Pal Zileri™.  Forall has an exclusive license in the United States to manufacturing, market, sell and otherwise distribute the Pal Zileri line of formal and casual men's clothing and menswear.  The Pal Zileri brand is sold in stores such as Nordstrom, Saks Fifth Avenue and other high-end retailers.

20.     In or around 2011, the Individual Guarantors, Hala Subh, Suhad Albasha, Bachar Hamad and Amar Hamad approached Forall and expressed interest in opening a "Pal Zileri" store selling products and menswear under license from Forall.

21.     Upon information and belief, Hala Subh, Suhab Albasha, Bachar Hamad and Amar Hamad own, control and otherwise manage Sarah, LLC.

---

[1]     A copy of the License Agreement (and several other exhibits also annexed hereto) are attached to the Claimants' Statement of Claims.  However, for completeness and ease of reference, we have attached and refer to all relevant documents to this document.  In addition, the Claimants failed to provide all relevant agreements and documents for consideration.  We have attempted to provide a more complete record.

22.     Following extensive discussion and negotiations, the parties executed the License Agreement in March 2011 under which Sarah agreed to open and operated a retail menswear clothing store at The Forum Shops and Forall agreed, *inter alia*, to sell and provide licensed Pal Zileri product and apparel and to allow Sarah to use the Pal Zileri brand and trademark and to fund half of the build out costs of the store.

23.     Simultaneously with the execution of the License Agreement, Sarah entered into a retail Lease Agreement with The Forum Shops LLC, as landlord.  A copy of the Lease Agreement is attached hereto as Exhibit 2 (the "Lease").

24.     Sarah also executed a Collateral Assignment of Lease in favor of Forall thereby granting a security interest in and agreed not to surrender, transfer or otherwise assign Sarah's interest in the Lease without Forall's consent.  A copy of Collateral Assignment of Lease attached hereto at Exhibit 3.

25.     As part of the License, Forall agreed to provide Sarah with an exclusive option to open Pal Zileri stores in New York City and/or City of Chicago.  License Agreement at § 14.

26.     In order to induce Forall into entering into the License Agreement and to otherwise guarantee performance by Sarah LLC, Hala Subh, Suhad Albasha, Bachar Hamad and Amar Hamad individually guaranteed the performance of all obligations arising under the License Agreement.  A copy of the Guaranty is annexed hereto at Exhibit 4.

27.     Las Vegas is (and was seen at the time) as an important market for the Pal Zileri brand, and, thus, it was important for Forall that The Forums Shop retail store be managed effectively and operate properly.

28.     In addition, Forall provided Sarah with the exclusive option to open stores in New York City and City of Chicago – arguably the two most important and profitable retail mens'

apparel markets in the United States. License Agreement at Article 14.

29.      Forall also agreed to (and did) fund fifty percent (50%) of the remodeling costs of the Pal Zileri store at The Forum Shops (and any other stores opened during the term of the License Agreement).  License Agreement at Article 5.  Forall's contribution to the remodeling costs were provided by way of discounted Pal Zileri product sold to Sarah.  These costs totaled approximately $474,349.85.  Contrary to the claims made in the demand for arbitration, Sarah was reimbursed and otherwise credited all of the construction costs.

30.      Forall in funded half of the build out of the Las Vegas store and other costs in reliance upon the expectation that Sarah would operate the store and purchase and sell Pal Zileri product and apparel through at least March 2021.  *See* Articles 2.7 and 5.1 of the License Agreement.

31.      Specifically, Forall provided advertisement material and photographs and illustrations for product at cost to Forall and Forall agreed to contribute up to $27,000 on a dollar for dollar match of Sarah's expenditures for advertising and promotion of the Store.  License Agreement § 8.

32.      Notably, Sarah did not pay any fee or royalty or other money to Forall to obtain the Pal Zileri license, opportunities and other rights set forth in the License Agreement.  License Agreement § 2.6.

33.      Sarah agreed, as consideration and in exchange for the right to the Pal Zileri name, apparel and store rights, to buy certain product minimums from Forall each season/year in exchange for the license of Pal Zileri brand and right to sell the Pal Zileri men's clothing and products and Forall's commitment to manufacture and deliver product and apparel to Sarah on a regular and seasonal basisAs part of the which would assist with the build out costs and supply

"Pal Zileri" products, menswear, apparel, suits, shirts and formal and causal wear to Sarah.  *See*

License Agreement § 4 – Ordering Apparel, Licensed Products and Discounts.

34.     The term of the License Agreement was for 10 years.  License Agreement § 2.7.

35.     The Forum Shops Pal Zileri store opened in or around September 2011.  Forall

provided full support, advertising and products for sale to Sarah for the grand opening and during

all times relevant and at issue in this proceeding.

36.     At all times Forall provided products for marketing and sale and full support to

Sarah in the operation of the store.

**B.   Forall Grants Sarah the Right to Sell Licensed Products on the Internet**

37.     In February 2012, at Sarah's request, Forall granted Sarah the right to market,

advertise and sell Pal Zileri apparel online within the United States on a non-exclusive basis.  *See*

a copy of the License Agreement Internet Site & Sales of Licensed Products dated February

2012 attached hereto as Exhibit 5.

38.     This is only further indicia of the efforts and lengths that Forall was willing to go

to make Sarah successful and profitable.

**C.   Sarah Requests that Forall find a new Operator or Take Over the Store After
       Only 16 Months of Operations**

39.     On January 28, 2013, only sixteen months after the store opened, Sarah sent a

letter to Forall stating that Sarah LLC has found operating the Pal Zileri store at The Forum

Shops "in a profitable manner to be a near impossibility."  See copy of January 28, 2013 Letter

from Sarah LLC to Forall USA Inc., attached hereto as Exhibit 6.

40.     The letter states that, contrary to the claims now set forth in the Claimants'

arbitration demand, that Sarah's "conclusion [that the store cannot be run in a profitable manner]

has come despite the best efforts of all parties involved, as well as the fine cooperation between

Sarah and Forall USA, Inc...as well as the home operation of Pal Zileri." *Id.*

41.     Of course, the foregoing is wholly contrary and puts the lie to the Claimants' Statement Claim which alleges that Forall did not support Sarah LLC and damaged Sarah LLC in various unsubstantiated ways.

42.     Indeed, in the January 28, 2013 letter, Bachar Hamad, M.D., on behalf of Sarah invited Forall to take over operations of the store or to discuss some other options "to either find a way to put the store on the road to profitability, find a new operator for the store or close the store – whatever Sarah, Forall and Pal Zileri deem prudent." *Id.*

43.     On February 21, 2013, Forall responded to Sarah stating that it was important that Sarah continue to operate the store but that Forall would work with Sarah to find a new operator of the store.  A copy of this letter from counsel dated February 21, 2013 is attached at Exhibit 7.

44.     Indeed, Forall advised that "Forall shall not assume any liability or obligation with respect to this search and all of Sarah's obligations under the Agreement are continuing and in full force."  However, Forall emphasized that it would work with Sarah and that "Forall and Pal Zileri have invested a significant amount of money into the Store and operation and their image and reputation is at stake.  Accordingly, it will be in all parties' best interest to come to a quick resolution of this matter."

45.     Thereafter, Forall did in fact undertake to find a new third party to take over the operation of the store.

46.     It was becomingly increasingly clear to Forall at that time that Sarah did not know how to effectively run the store and the Claimants had proven themselves to be very difficult to deal with and did not communicate well with Forall and did not make good business decisions.

47.     On February 25, 2013, Sarah, though counsel Lee Levin, Esq., responded to

Forall's letter of February 21, 2013, stating that the terms outlined by Forall necessary to find a potential new operator of the store were generally acceptable but that Sarah had some of its own terms that would need to be met in order to transition the store to a new operator. Specifically, Sarah stated that it would need to be compensated for all build out and advertising costs owed, all money spent on the 2013 merchandise, that the new "investor" would need to take an assignment of the Lease and that Sarah wanted to be paid a "transfer fee" of $150,000 for the operation. *See* letter dated February 25, 2013 from Lee Levin, Esq., enclosed as <u>Exhibit 8</u>.

48.     On March 5, 2013, Forall's counsel responded in detail to Sarah's February 25, 2013 letter. A copy of this letter dated March 5, 2013, is attached as <u>Exhibit 9</u>. The soundness and reasonableness of Forall's position as well as Forall's willingness to work with Sarah on a mutually agreeable resolution is evident in this letter of March 5, 2013. Also clear is the fact, and contrary to what is claimed now by Sarah in the Claimant's Statement of Claim, Forall paid for all construction and advertising costs that it was responsible for and was in constant communication and did in fact work with Sarah in all respects to resolve any questions and concerns.

### D. Sarah Notifies Forall that Sarah will Surrender the Lease to the Landlord Effective October 1, 2013 in Breach of the License Agreement and Collateral Assignment of Lease

49.     Upon information and belief, Sarah approached the Landlord and began to try negotiate a surrender of the Lease in or around June 2013. This was despite Forall's good faith efforts and Sarah's clear contractual obligations and responsibilities.

50.     Specifically, on June 5, 2013, Dr. Hamad wrote to Forall by email stating that he would be notifying The Forum Shops at Caesars Palace that Sarah LLC would "transfer the store to the mall effective "October 1, 2013]."

51.     Forall objected to this unilateral and anticipatory breach by Sarah.  See letter from James J. Veneruso, Esq., dated June 19, 2013 to Lee Levin, Esq., attached as <u>Exhibit 10</u>.

52.     The parties continued to work to try to find an experienced operator of the store and ultimately Forall identified Italnord Forum LV, LLC, an retail operator known to Forall, as a possible party to manage the store for Sarah LLC.

E.  **Sarah and Italnord enter into a Management Agreement for the Store**

53.     As indicated in the Statement of Claim, Forall made the introduction of Italnord to Sarah LLC and discussions ensued for Italnord to take over management of the store pursuant to a Management Agreement and Asset Purchase Agreement, both dated September 10, 2013. However, Claimants fail to provide the full and true nature of this arrangement between Sarah and Italnord (and Forall).   A copy of the Management Agreement dated September 10, 2013, between Sarah LLC and Italnord Forum LV, LLC is attached as <u>Exhibit 11</u>.  A copy of the Asset Purchase Agreement ("APA") dated September 10, 2013, is attached as <u>Exhibit 12</u>.

54.     Claimants fail to provide (or even mention) the Stipulation and Consent Agreement by and between Sarah and Forall dated September 13, 2013, relating to the Management Agreement by Italnord.

55.     Italnord and Sarah negotiated the terms for management of the store for a term of September 10, 2013 to January 31, 2015, after which point Italnord would either take over the store and Lease or terminate the parties' Management Agreement and turn the store back to Sarah. *See* Italnord Management Agreement § 1.1, 2.1, etc.

56.     Under the APA, Italnord purchased and paid for the assets necessary to run and operate the store, however, as set forth in the terms of the agreement itself, the parties clearly understood and agreed that Italnord was not purchasing the Lease and was not assuming the

License Agreement.  Pursuant to Section 1.7 of the APA: "Notwithstanding anything in this Agreement to the contrary, [Italnord] is not assuming the Lease or the License Agreement in full; it is only assuming [Sarah's] performance and payment obligations during the Term (as defined in Section 4.4 of this Agreement) under the Lease, License Agreement, and other operational contracts listed on Schedule 1.1(c)(iv)."

57.     Section 4.4 of the APA set forth the Term of the management of the store and the mechanism and procedure by which Italnord would elect to take over the business or turn the operation back to Sarah at the end of the Term, or January 31, 2015.

58.     Simultaneously and as a condition to the Italnord Management Agreement between, Sarah and Forall executed a Stipulation and Consent Agreement dated September 10, 2013, consenting to the management of the store by Italnord.  A copy of the Stipulation and Consent Agreement dated September 10, 2013 (herein "Consent Agreement") is attached as Exhibit 13.

59.     The Consent Agreement is clear -- Forall agreed to the management of the store by Italnord on the express condition that Sarah would continue to be responsible for all terms and obligations under the License Agreement upon termination of the Italnord Management Agreement.  *See* Sections 2 and 3 of the Consent Agreement:

> During the term of the Management Agreement only, Forall shall look to the manager and hold the Manger responsible for the performance of all obligations under the License Agreement.  To the extent the Management Agreement is terminated, at such time, [Sarah] shall again be responsible for the performance of all obligations under the License Agreement.

Consent Agreement Section 3.

60.     The Consent Agreement further stated:

> Except as specifically set forth herein, nothing shall act as to waive, limit or otherwise alter any obligation or liability that the Company and/or its

> principals, owners, members, and/or guarantors are subject to or arising from the License and Retail Operator Agreement, the Lease Agreement and/or any Guaranty, undertaking or promise thereunder.

Consent Agreement Section 7.

61.     Prior to the end of the term, Italnord notified Sarah that it was electing to terminate the Management Agreement and turned the store back to Sarah to operate.   See Termination Notice dated September 29, 2014 attached hereto as <u>Exhibit 14</u>.

62.     Sarah did in fact take back the store in or around January 2015 and operated the store for several months – Claimants fail to mention this fact in the demand for arbitration in which they claim, falsely, that the Italnord APA operated as a novation and waiver of any further rights and obligations under the License Agreement and/or related to the store.  The truth was that Sarah and the Individual Guarantors knew full well that they were responsible to continue to operate the store both under the License Agreement but also the Lease with the Landlord.

F.  **Forall Assumes Management of the Store Pursuant to a Management Agreement dated February 9, 2015 with Sarah LLC**

63.     Following negotiations and a genuine interest in helping, in March 2015, Forall assumed management of the Pal Zileri store at The Forum Shops in an effort grow business and leverage the Pal Zileri store presence and in recognition of the opportunity that existed in Las Vegas and with The Forum Shops Lease.  Forall and Sarah entered into a Management Agreement dated February 9, 2015, for a set term of eighteen (18) months.  A copy of the Forall Management Agreement dated February 9, 2015, is attached as <u>Exhibit 15</u>.

64.     Like the Italnord agreement, the Forall Management Agreement placed all responsibility for the operations of the store and Lease on the manager (in this case Forall) for the term but did not relieve or otherwise release Sarah and its guarantors from the obligations of the License Agreement after the Term. *See* Sections 2.1 – 2.4, 5.10 and 5.15 of the Forall

Management Agreement.

65.     Thereafter, Forall operated the Pal Zileri store until February 2016, at which time Forall requested an extension of the notice date set forth in Management Agreement by which to advise Sarah whether Forall intended to assume the operation and ownership of the store and Lease or to terminate the Management Agreement and turn the store back over to Sarah.  *See* email from Stephen J. Brown, Esq., dated February 23, 2016 to Sarah's counsel, David Hochman, Esq., attached hereto as Exhibit 16.

66.     Inexplicably, Sarah did not respond to Forall's initial request for an extension of time so Forall sent a letter dated February 25, 2016, asking again for an extension of time on the notice date set forth in paragraph 2.4 of the Management Agreement.  *See* letter from Paolo Torello-Viera dated February 25, 2016, attached hereto as Exhibit 17.

67.     Again, Sarah failed to provide any response to Forall's request, although Sarah's attorney confirmed receipt of the letter.

68.     Having had no response from Sarah to Forall's reasonable request, Forall advised formally by letter dated March 9, 2016, that the Management Agreement would terminate September 1, 2016, and that Sarah was responsible under the License Agreement to assume operations of the store and the attendant obligations thereof.  *See* Forall letter dated March 9, 2016, attached hereto as Exhibit 18.

69.     Sarah did not respond to this letter either.

70.     It was becoming increasingly clear that Forall did not have a partner working in good faith in Sarah and the Individual Guarantors.

71.     On June 1, 2016, counsel to Forall wrote to Sarah's counsel stating that there had been no response from Sarah to Forall's March 9, 2016 letter and that it was imperative that

Sarah confirm that it would be prepared to take over the Store and Lease effective September 1,

2016. *See* letter from Stephen J. Brown dated June 1, 2016, attached hereto as Exhibit 19.

72.     No response was provided by Sarah or its counsel.

**G.    Sarah Unilaterally and Without Notice to Forall Surrendered the Lease to the Landlord on June 14, 2016 and Stipulated to an Eviction Proceeding Throwing Forall out of the Pal Zileri Store, Causing an Emergency Exit and Shuttering of the Store and Loss of Business and Damages to Forall**

73.     As Forall would come to later learn, Sarah and the Individual Guarantors agreed

on June 14, 2016, to surrender the Lease and stipulated to an eviction warrant to evict Forall

from the premises – despite the fact that Forall was rightfully in possession of the premises and

operating the Pal Zileri store pursuant to the parties' Management Agreement up and through

September 1, 2016!

74.     Indeed, in hindsight, it is believed that Sarah was trying to locate and did in fact

locate a replacement tenant and may have even gotten key money to vacate (or provide the

premises) to the Landlord early.  Hence this is why Sarah was ignoring Forall's requests for an

extension of time on Management Agreement and other requests.

75.     The Claimants allegations in their demand for arbitration and statement of claims

that Forall did not pay the rent on the Lease and was therefore evicted by the Landlord (and

thereby damaging Sarah) are patently false and untrue and fraudulent upon the AAA.

76.     As set forth in the annexed "Agreement Cancelling Lease" between Forum Shops,

LLC and Sarah, LLC d/b/a "Pal Zileri", Suhad Albasha executed the agreement on June 14,

2016, thereby cancelling and surrendering the Lease and premises effective July 31, 2016.

77.     Indeed, Forall later learned that a replacement tenant had been located to take

possession of the premises.

78.     Upon information and belief, Sarah and/or the Individual Garantors received

money and/or other consideration to surrender the Lease early.

79.     Moreover, the Landlord commenced an eviction proceeding against Forall and without notice to Forall, Sarah stipulated to the entry of Court ordered permanent writ of restitution of the Leased premises. *See* letter dated August 1, 2016 from Kevin R. Stolworthy, Esq. to Forall attached hereto as Exhibit 20.

80.     As a result of these absurd actions and Sarah's and the Individual Guarantors' egregious and bad faith breach of both the License and Management Agreements, Forall had absolutely no choice under threat of legal and court order and had to close the store, lay off employees and vacate the premises at massive business disruption and cost.

81.     Forall was severely damaged and had to close the Pal Zileri store almost literally overnight – causing a massive business disruption, employee layoffs, attorneys' fees and costs and harm to reputation and the Pal Zileri brand.

82.     Sarah did not assume operation of the Pal Zileri store and never responded to any of Forall's multiple attempts to settle these differences.

83.     Rather, Sarah and the Guarantors commenced this arbitration.

### AS FOR FORALL'S ANSWER TO CLAIMAINTS' CLAIMS

84.     Claim A, Declaratory Judgment and Finding of Release and Waiver of Guaranty – Italnord Transfer: Forall denies this claim in its entirety.

85.     Claim B, Declaratory Judgment and Finding of Release and Waiver of License Agreement – Italnord Transfer:  Forall denies this claim in its entirety.

86.     Claim C, Declaratory Judgment and Finding of Novation – Italnord Transfer: Forall denies this claim in its entirety.

87.     Claim D, Declaratory Judgment and Finding of Release and Waiver of Guaranty –

Forall Transfer: Forall denies this claim in its entirety.

88.　　Claim E, Declaratory Judgment and Finding of Release and Waiver of License Agreement – Forall Transfer: Forall denies this claim in its entirety.

89.　　Claim F, Declaratory Judgment and Finding of Novation – Forall Transfer: Forall denies this claim in its entirety.

90.　　Claim G, Breach of Contract:  Forall denies this claim in its entirety.

91.　　Claim H, Breach of Covenant of Good Faith and Fair Dealing:  Forall denies this claim in its entirety.

92.　　Claim I, Breach of Indemnity: Forall denies this claim in its entirety.

## AS FOR FORALL'S AFFIRMATIVE DEFENESES

93.　　Claimants have failed to state a claim upon which relief can be granted.

94.　　Claimants have not been damaged as a result of Forall's acts and conduct.

95.　　Forall did not breach any agreement with Sarah.

96.　　Claimants have been unjustly enriched at Forall's expense.

97.　　Claimants have unclean hands.

98.　　Claimants are equitably estopped from enforcing any of the contracts between the parties.

## AS FOR FORALL'S COUNTERCLAIMS

## COUNT I

## BREACH OF THE LICENSE AGREEMENT BY SARAH LLC

99.　　Forall hereby incorporates by reference all of the preceding paragraphs 1 through 98 above as if more fully set forth herein, and states the following claim for relief.

100.　　Sarah breached the License Agreement and failed to operate the Pal Zileri store

for the term set forth in the parties' Agreement.

101.    Sarah refused and otherwise failed to take back the store and operate the store pursuant to the parties' agreements.

102.    Sarah refused and otherwise failed to order and pay for the minimum purchase orders set forth in the License Agreement.

103.    Sarah failed to operate the store for the Term of the Agreement and surrendered the Lease and vacated the store in breach of the License Agreement.

104.    Sarah has refused to and otherwise failed to indemnify Forall from all losses and damages as set forth in the parties' License Agreement.

105.    As a result of the foregoing breach of contract, Forall has been severely damaged and is entitled to recover actual damages, compensatory and special damages, attorneys' fees, interest and the cost of these proceedings from the Claimants.

## COUNT II

### BREACH OF THE MANAGEMENT AGREEMENT BY SARAH LLC

106.    Forall hereby incorporates by reference paragraphs 1 through 105 above as if more fully set forth herein, and states the following claim for relief.

107.    Sarah breached the Management Agreement and failed to allow Forall to conduct business and operate the Pal Zileri store for the term set forth in the parties' Management Agreement.

108.    Sarah terminated and surrendered the Lease and had Forall evicted in gross breach of the parties' Management Agreement, which ran until September 1, 2016.

109.    Sarah refused and otherwise failed to take back the store and operate the store pursuant to the parties' agreement on or before September 1, 2016.

110.    Sarah has refused to and otherwise failed to indemnify Forall from all losses and damages as set forth in the parties' Management Agreement.

111.    As a result of the foregoing breach of contract, Forall has been severely damaged and is entitled to recover actual damages, compensatory and special damages, attorneys' fees, interest and the cost of these proceedings from the Claimants.

## COUNT III

### BREACH OF THE COLLATERAL ASSIGNMENT LEASE BY SARAH LLC

112.    Forall hereby incorporates by reference paragraphs 1 through 111 above as if more fully set forth herein, and states the following claim for relief.

113.    Sarah entered into and assigned its interest in the Lease to Forall as part of and in consideration of the parties' License Agreement in 2011.

114.    Sarah, and its members, executed the Collateral Lease Assignment on March 19, 2011.

115.    The Collateral Lease Assignment restricted Sarah's ability to transfer and/or surrender the Lease and required that Sarah provide Forall, at a minimum, with notice and the option to take over the premises prior to surrendering the lease on June 14, 2016.

116.    Sarah breached the Collateral Assignment of Lease and failed to allow Forall to conduct business and operate the Pal Zileri store for the term set forth in the parties' Management Agreement.

117.    Sarah terminated and surrendered the Lease and had Forall evicted in gross breach of the parties' License and Management agreements.

118.    Sarah refused and otherwise failed to take back the store and operate the store pursuant to the parties' License and Management agreements.

119.    Sarah has refused to and otherwise failed to indemnify Forall from all losses and damages as set forth in the parties' License and Management Agreement.

120.    As a result of the foregoing breach of contract, Forall has been severely damaged and is entitled to recover actual damages, compensatory and special damages, attorneys' fees, interest and the cost of these proceedings from the Claimants.

## COUNT IV

## JUDGMENT ON THE GUARANTY AGAINST ALL INDIVIDUAL GUARANTORS

121.    Forall hereby incorporate by reference paragraphs 1 through 120 above as if more fully set forth herein, and state the following claim for relief.

122.    The Individual Guarantors, Hala Subh, Suhad Albasha, Bachar Hamad and Amar Hamad, executed an absolute and unconditional guaranty for the debts and obligations of Sarah LLC under the License Agreement.

123.    The Individual Guarantors expressly waived demand or presentment and were expressly made and assumed responsibility for any and all obligations of Sarah LLC.

124.    Sarah LLC has defaulted on its obligations and otherwise has breached the License Agreement and Management Agreement and substantially damaged Forall.

125.    Sarah, through the conduct and knowledge of the Individual Guarantors, terminated and surrendered the Lease and had Forall evicted in gross breach of the parties' various agreements.

126.    As a result of the foregoing, Forall has been severely damaged and is entitled to recover actual damages, compensatory and special damages, attorneys' fees, interest and the cost of these proceedings from the Individual Guarantors under the Guaranty.

## COUNT V

**INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE AS TO ALL CLAIMANTS**

127.    Forall hereby incorporate by reference paragraphs 1 through 126 above as if more fully set forth herein, and state the following claim for relief.

128.    Claimants knew, or in the exercise of ordinary care should have known, that Forall had an expectation of growing its business and brand in the Las Vegas Pal Zileri store.

129.    As a result of Claimants' refusal to extend the date by which Forall had to elect whether to take over the store and the Claimants' surrender of the Lease and stipulation to evict Forall during the term of the Management Agreement, the Claimants materially damaged Forall's business and ability to conduct business in the Las Vegas store and sent a negative message to the industry at large.

130.    The aforementioned conduct was willful and intentional and done with the intent to injure or was otherwise reckless towards Forall and its business interests.

131.    As a direct and proximate result of Claimants' interference with prospective economic advantage, Forall has suffered and will continue to suffer damages in the amount to be proven at arbitration.

## <u>COUNT VI</u>

**BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING**

132.    Plaintiffs hereby incorporates by reference paragraphs 1 through 132 above as if more fully set forth herein, and states the following claim for relief as against each of the individual Claimants, jointly and severally.

133.    Implicit in all of the agreements between Forall and Sarah is a covenant of good faith and fair dealing between the parties and that neither will do anything to interfere with the

other's enjoyment of its contractual rights and benefits, and that each contracting party will do everything that the contract presupposes it will do to accomplish the purpose of the contract.

134.    Sarah breached its obligation of good faith and fair dealing as set forth above in that: (i) Sarah refused to assume operation of the store at the end of the Forall Management Agreement; (ii) Sarah surrendered the Lease and had Forall evicted from the store without notice or compensation or other legitimate basis other than to serve its own self-interests and that of the Individual Guarantors; (iii) Sarah did what was most expedient and what it viewed to be in its best interests rather than comply with the agreements that it had made with Forall; (iv) Sarah and the Individual Guarantors' actions and conduct were in bad faith.

135.    As a direct and proximate result of Claimants' conduct, as alleged herein, Forall has suffered and continues to suffer substantial losses, for which it is entitled to recover compensatory damages in an amount to be determined at hearing.

**COUNT VII**

**UNJUST ENRICHMENT UNDER NEW YORK LAW**

136.    Plaintiffs hereby incorporate by reference paragraphs 1 through 136 above as if more fully set forth herein, and state the following claim for relief as against each of the individual Claimants, jointly and severally.

137.    As a result of Claimants' wrongful surrender of the Lease and termination of the Management Agreement and Lease Agreement, Claimants forced Forall to incur costs and expenses and damaged the reputation and business of Pal Zileri and have unjustly enriched themselves, to the detriment of Forall, in violation of the common law of New York State.

138.    Upon information and belief, the Claimants received money and/or other consideration to surrender the Lease early and were unjustly enriched at Forall's direct expense.

Claimants should be required to disgorge any such proceeds to Forall.

139.    As a direct and proximate result of Forall's conduct, Claimants' received substantial benefits to which it had no entitlement, at Forall's expense, including but not limited to increased profits.

140.    Allowing Claimants' to keep and retain these substantial benefits would be unjust, unfair and inequitable, under the circumstances.

141.    As a direct and proximate result of Claimants' conduct, as alleged herein, Forall has suffered and continues to suffer substantial losses, for which it is entitled to recover compensatory damages in an amount to be determined at hearing.

What amounts plaintiffs are entitled to receive in compensation and benefits.

## RELIEF REQUESTED

WHEREFORE, Forall prays for judgment against the Claimants, jointly and severally, as follows:

a.    Actual compensatory damages to Forall to the full extent permitted by law;

b.    A judgment in favor of Forall for all contractual and liquidated damages allowed by law;

c.    Award of prejudgment interest to Forall;

d.    Award of punitive damages in an amount to be determined at hearing;

e.    Attorneys' fees and costs as provided by law;

f.    Awarding Forall the costs of this arbitration proceeding; and

j.    Such other further relief may deem just and equitable.

Dated: White Plains, New York
       March 16, 2018

                                          BLEAKLEY PLATT & SCHMIDT, LLP

                                          By: _____
                                          STEPHEN J. BROWN
                                          *Attorneys for Plaintiffs*
                                          ONE NORTH LEXINGTON AVENUE
                                          WHITE PLAINS, NY 10601
                                          Tel. No.: (914) 949-2700

TO:      Barbara C. Cook
          Manager of ADR Services
          Northeast Case Management Center
          1301 Atwood Avenue, Suite 211N
          Johnston, RI 02919
          barbaracook@adr.org

          Anthony J. Nasharr
          Polsinelli PC
          150 N. Riverside Plaza, Suite 3000
          Chicago, IL 60606
          Anasharr@polsinelli.com

# EXHIBIT 1

# License and Retail Operator Agreement

## Between

## FORALL U.S.A, INC.
## AND
## SARAH, LLC

Prepared by: James J. Veneruso, Esq.
Dated: March_____, 2011

TABLE OF CONTENTS

ARTICLE 1        Definitions

ARTICLE 2        Grant and Acceptance of the Right, License and Privilege
                 and Term

ARTICLE 3        Marks

ARTICLE 4        Ordering apparel, licensed Products and Discounts

ARTICLE 5        Remodeling Costs of New Store

ARTICLE 6        Marketing and Sales Methods

ARTICLE 7        Personnel Standards and Training

ARTICLE 8        Advertising and Promotion

ARTICLE 9        Insurance and Records

ARTICLE 10       Additional Duties and Covenants of Operator

ARTICLE 11       Default and Termination

ARTICLE 12       Transferability of Interests

ARTICLE 13       Independent Contractor

ARTICLE 14       Option Regarding the Cities of New York and Chicago

ARTICLE 15       Right of First Refusal Areas other than Cities of New York and
                 Chicago

ARTICLE 16       Forall's Right to Operate Stores

ARTICLE 17       General Provisions

ARTICLE 18       Caveat

**LICENSE AND RETAIL OPERATOR AGREEMENT**
**BETWEEN**
**FORALL U.S.A., INC.**
**AND**
**SARAH, LLC**

This Franchise Agreement (the "Agreement") is made as of the ___ day of March 2011, by and between Forall U.S.A., Inc., a New York corporation ("Forall"), with its principal office located  Seven Sutton Place, Brewster, New York 10509, and Sarah, LLC, a Limited Liability Company formed in the State of Illinois, (herein "Operator") with a principal office located at 1717 Midwest Club Parkway, Oakbrook, IL. 60523.

## W I T N E S S E T H:

1.  Forall has developed a distinctive system (the "System") for the establishment and operation of a retail operation for the sale and presentation of "Pal Zileri" brand clothing and other licensed products (as defined herein, the "Licensed Products") consistent with the uniform worldwide image of its tradename by using distinctive facilities, décor, operating procedures, merchandising strategies and advertising programs;

2.  Pursuant to a license from Forall Confezioni S.P.A. ("Parent"), Forall has the sole right to use and to grant others the right to use the trademarks PAL ZILERI (represented by the PAL ZILERI, PAL ZILERI CONCEPT, PAL ZILERI SARTORIALE, PAL ZILERI CERIMONIA collections) and LAB.Pal Zileri (collectively, the "Marks") in connection with retail operations in the United States and to develop, use and control the Marks for the benefit and use of itself and its licensees and to represent the System's high standards of quality and service;

3.  Operator acknowledges the distinctiveness and value of the System, and Licensed Products and the Marks and desires to obtain the right, license and privilege and Forall to employ the System to establish and operate a retail operation at <u>The Forum Shops at Caesars Palace,                , 3500 Las Vegas Blvd. South, Las Vegas, NV 89109</u> (the "Store"), to use the Marks at the Store, and to purchase the Licensed Products from the authorized licensees of Parent specified herein, all under the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Forall Operator hereby agree as follows:

## ARTICLE 1.  DEFINITIONS

1.1     The term "Apparel" shall mean clothing and accessories produced by Parent and affixed with a label bearing one or more of the Marks.

1.2     The term "Licensed Products" shall mean Apparel, and any other clothing and accessories and any other products produced by or for an authorized licensee of Parent as designated by Forall to the Operator and affixed with one or more of the Marks.

1.3     The term "Member"" refers individually to Hala Subh and Suhad Albasha who each own a fifty (50%) interest in Operator.

1.4     "Territory" shall mean within the City of Las Vegas, Nevada,or any other geographic area which pursuant to Article 14 herein. Multi-brand dept. store and specialty store are excluded.

1.5     Guarantors refers collectively to Hala Subh, Suhad Albasha, Dr. Bashar Damad and Ammar Hammad.

## ARTICLE 2.  GRANT AND ACCEPTANCE OF THE RIGHT, LICENSE
##            AND PRIVILEGE AND TERM

2.1     Forall hereby grants to Operator, during the term of this Agreement, the exclusive right, license and privilege to employ the System, to establish and obtain Apparel and other Licensed Products for display and sale at the Store within the Territory, all in accordance with this Agreement.

2.2     The right, license and privilege granted in Section 2.1 excludes any right, license or privilege to sell Licensed Products for resale, to sell in the Store any clothing, accessories or other products other than the Licensed Products, without the prior written approval of Parent or to use the Marks in association with any logos, trade names, trademarks or service marks other than the Marks, to use the Marks in association with any other than Licensed Products or any services other than sales services of the Licensed Products in the Store.

2.3     Operator accepts the right, license and privilege set forth in Section 2.1 and agrees to adhere to the exclusions set forth in Section 2.2.  Operator undertakes the obligation to operate the Store in conformity with the System and in accordance with this Agreement for the duration of the term of this Agreement.

2.4     The rights granted by Forall to Operator pursuant to this Agreement are not transferable by Operator, in whole or in part, to any site other than the Store or to any person, firm or entity other than Operator.  Operator is not entitled to grant any sublicenses, assignments or partial assignments pursuant to this Agreement.

2.5.    As further consideration and security for the rights granted hereunder, Operator agrees as follows:

A. For the First season A/W 2011-2012 Operator shall pay to Forall, at execution of this Agreement, $398,238.00, by bank check or wire transfer, representing the total discounted cost of Licensed Products ordered for the Store.

B. For the Second Season, Spring/Summer 2012 and in no event later than August 30, 2011 Operator shall pay to Forall a security deposit in the amount of $200,000.00. The security deposit shall be held in escrow in an interest bearing account for the term of this Agreement. In the event Operator defaults in the payment of any order for the Store, Forall in its sole and absolute discretion shall have the right to use the security deposit to pay the amounts past due.

C. For orders placed from August 2011 and thereafter, Operator shall either (i). pay for the order in advance ; or (ii). Open a 90 day Letter of Credit.

D. If Operator chooses to provide a letter of credit in accordance with Section C above, Forall does not have to accept any orders if at any time inventory purchases for the Store exceeds, or in the reasonable estimation of Forall will exceed, the letter of credit amount and Forall shall promptly notify Operator should this occur. Forall shall not be obligated to accept additional orders or ship orders already received unless and until Operator increases the amount of the letter of credit to an amount sufficient to collateralize inventory purchases. Forall shall have no liability whatsoever to Operator or any third party due to or arising out of Foralls refusal to accept additional orders or ship orders already received in the event that the letter of credit does not comply with the terms herein.

2.6 The parties acknowledge that Operator has not paid any fee to Forall directly or indirectly in order to obtain the license or other rights granted herein. Operator is obligated to pay for the licensed Products it purchases from Forall.

2.7 The term of this Agreement is ten (10) years from the date of this Agreement, unless sooner terminated in accordance with this Agreement.

## ARTICLE 3. MARKS

3.1 Operator shall affix the Marks inside and outside the Store in accordance with the specifications approved by Forall.

3.2 Operator expressly acknowledges and agrees that the Marks and the goodwill attached thereto are valuable property owned solely by Forall its licensor and all past, present and future goodwill associated with the Marks, including any directly or exclusively to the benefit of Forall and its licensor. Operator expressly covenants the Operator shall not at any time directly or indirectly contest or aid in contesting the validity of the Marks or Forall's and its licensor's ownership of the Marks.

3.3 Operator shall not use or allow others to use any of the Marks as part of the corporate name or other business name of Operator or any entity owned or controlled by it. Operator understands and agrees that its License to use the Marks is non-exclusive and Forall has the right to use the Marks and to grant other licensees the right to use the Marks on any terms and conditions other than grants expressly excluded by this Agreement.

3.4 In the event any person, or entity uses without authority or otherwise infringes the Marks or any apparent challenger to Operators use of any Mark, Forall shall control all litigation, and shall determine, in its sole discretion, whether or not any other action should be taken. Operator agrees to notify promptly Forall of any such use or infringement of which it becomes aware or of any litigation involving the Marks instituted by any person, firm, corporation or governmental agency against Operator or of which Operator has knowledge. If Forall, in its sole discretion, undertakes the defense or prosecution of any litigation or administrative proceeding involving or affecting the Marks, Operator agrees to do such acts and things as may, in the opinion of counsel for Forall, be necessary to carry out such defense or prosecution, whether in the name of Forall, its licensor or Operator, as Forall or its licensor shall elect.

3.5 Forall agrees to indemnify and defend Sarah for all damages for which Sarah is held liable or any claim or proceeding referred to in Section 3.4 hereof provided Sarah's use of the Marks was authorized pursuant to and in compliance with this Agreement and for all costs reasonably incurred by Sarah in the defense of any such claim brought against Sarah or any such proceeding in which Sarah is named as a party, provided that Operator has timely notified Forall of such claim or proceeding, have given Forall sole control of the defense (including selection of attorneys to represent Sarah) and settlement of any such proceeding, and have otherwise complied with this Agreement.

3.6 In order to maintain uniformity, to preserve the integrity of the Marks and to enhance the reputation and goodwill associated with the Marks, Operator agrees:

3.6.1 To use the Marks only at the Store or in advertising and promotional material employed in connection with the sale of Licensed Products and operation of the Store; and

3.6.2 To operate the store in accordance with the System and as may be otherwise mutually agreed in writing between Forall and Operator. Forall reserves the right to promulgate such additional reasonable standards and obligations concerning the use of the Marks or the products and services offered thereunder as Forall may, deem necessary to preserve and protect the use, goodwill and integrity of the Marks.

3.7 Forall its agents shall at all reasonable times have the right to enter and inspect the Store and observe the manner in which Operator is selling Apparel and rendering services.

## ARTICLE 4.  ORDERING APPAREL, LICENSED PRODUCTS AND DISCOUNTS

4.1     Subject to the terms of this Agreement, Operator shall purchase all Apparel from Forall pursuant to such terms and conditions as Forall may establish.

4.2     Operator shall place a minimum order of Four Hundred Thousand ($400,000.00) Dollars for Spring/Summer and Five Hundred Thousand ($500,000.00) Dollars for Fall/Winter for a total of Nine Hundred Thousand ($900,000.00) Dollars per calendar year.

4.3     Orders must be placed in Italy at Pal Zileris' Quinto Vicentino's show room.

4.4     Operator hereby undertakes to maintain at all times an adequate stock of Apparel within the limits of sound business management.  Within these limits, Operator shall have in stock all the categories of Apparel offered by Forall, including current collection of Apparel

4.5     Foralls pricing for Products purchased by Operator shall be based on a Pricing Schedule which is uniform worldwide.

4.6     Forall hereby grants: a twenty (20%) percent discount for the first year (first and second season) and a ten (10%) percent discount for the second year (third and fourth season).  This discount applies to any new store open during the term of this agreement.

## ARTICLE 5.  REMODELING COSTS OF NEW STORE

5.1     In addition to the discounts specified in Article 4. Section 6 of this Agreement, Forall agrees to provide fifty (50%) percent of the remodeling costs for Operator's store opened during the term of this Agreement subject to the following terms and conditions:

    a.     The location of the store is to be mutually agreed upon by Forall and Operator.

    b.     The budget for the renovations shall be mutually agreed upon by Forall and the Operator.

    c.     Forall's contribution for remodeling costs shall be accomplished by providing a twenty (20%) percent discount on all orders until such discounts equal fifty (50%) percent of the costs of remodeling.

    d.     Operator shall be solely responsible for paying all of the costs of remodeling.  By way of example, if:

        i.     Total Renovation Cost of $800,000'

        ii.     Operator's total orders for the first two (2) years equals $2,000,000.

        iii.     20% of $2,000,000 = $400,000.

e. The twenty (20%) percent discount shall end upon reaching the fifty (50%) percent "renovation cost" obligation.
f. Design of internal/external lay-out shall be obtained by the Parent, at its expense.
g. All contracts for the renovations shall require the prior written approval of Forall.
h. Upon request any and all records relating to the renovation shall be provided to Forall.

## ARTICLE 6.  MARKETING AND SALES METHODS

6.1   From time to time Forall will consult with Operator and provide suggestions regarding various marketing methods.

6.2   Operator shall not permit at, in or on the Store any advertising or merchandising of products other than Licensed Products, or services other than sales services of Licensed Products without the prior approval of an authorized officer of Forall.

6.3   Operator shall meet Forall's requirements regarding merchandising and image. Window displays shall conform to Forall's requirements.  It is Forall's intention that the Store be maintained to the highest standards.

6.4   Sales may take place seasonally a/w, s/s twice a year. Sale Dates to be approved by Forall.

6.5   Store mark ups shall be between 2.3 to 3.0.  Any deviation requires Forall's prior written consent.

6.6   Operator shall not employ any manager not approved in advance by Forall.

6.7   Operator may sell unsold merchandise at the end of each season through an outlet store within the territory.

## ARTICLE 7.  PERSONNEL STANDARDS AND TRAINING

7.1   Operator shall be responsible for ensuring that sufficient trained staff are available at all times to provide service to commensurate with a discerning clientele.  During business hours, the shirts, trousers, jackets, suits, ties and other visible apparel of the staff shall consist exclusively of Forall Apparel.  The staff's clothing, appearance and advice shall always accord with the Forall image. Forall at its sole cost and expense will provide the following apparel to Operator which apparel shall be worn by Operator's employees during business hours: one (1) suit, one(1)  shirt, one (1) tie (once a season) while  one (1) pair of shoes (once a year).   Forall shall provide the foregoing for up to nine (9) employees per year. Operator shall be responsible for apparel and shoe costs incurred for more than nine (9) employees in any given year.

7.2     Operator and Principal shall devote full time and effort to the supervision, management and operation of the Store; provided, however, that if Operator or Principal is involved with any other Forall retail operation pursuant to a separate Franchise Agreement, such party shall devote its time between this Store and other retail operations in such a manner to ensure that all such retail operations, including the Store, are operated in compliance with their respective Agreements, including this Agreement, and in a profitable manner.   Operator shall hire competent persons as employees and shall cause all of its employees to complete such training programs as Forall may from time to time reasonably require in order that Operator's employees may be fully trained and instructed on a continuing basis in the various aspects of the System.  The manager of the Store must be approved by Forall prior to being hired, which shall not be unreasonable withheld.

## ARTICLE 8.  ADVERTISING AND PROMOTION

8.1     Forall shall furnish Operator with approved illustrations, photographs, layout and copy for use in such advertising.   Operator shall obtain Forall's specific prior written approval before displaying, placing or otherwise using any advertisement or material bearing the Marks or advertising or promoting the Licensed Products or the Store;

   8.1.1   Advertising material used in the Store's premises and windows shall be current approved material.   All Licensed Product advertisements must comply with the approved Forall worldwide advertising concept.   In particular, the latest approved layout must be employed; any modification of the approved layout must be approved in writing by Forall; and

   8.1.2   Operator is not permitted to advertise both Apparel and other Licensed Products in the same advertisement without Forall's prior written approval. Illustrations and photographs furnished by Forall may be employed in advertisements only in conjunction with the Marks.   In no event shall Operator use the illustrations, photographs, designs or any other materials provided by Forall in connection with the promotion or advertisement of any goods or services other than a Licensed Product or the Store.

8.3 In no event may Operator display, publish or distribute advertising or promotional materials that are not approved by Forall.

8.4  Advertising: During the first (1st ) year of this Agreement Operator agrees to spend Twenty- Seven Thousand ($27,000.00) Dollars (3% of $900,000.00) for advertising and promotion.  Forall, will also match up to Twenty-Seven Thousand ($27,000.00) for advertising and promotion for the Store.   Thereafter, Operator agrees to spend three (3%) percent of Gross Purchases per season for advertising and promotion and Forall shall match such amount.  If for any reason the total amount of purchases in any year falls below $900,000.00 per year, in addition to all other rights under this agreement, Forall shall have the absolute right to either not contribute to advertising and promotion costs or to partially contribute to such costs.

## ARTICLE 9.  INSURANCE AND RECORDS

9.1     During the term hereof, Operator shall obtain and maintain insurance coverage with insurance carriers acceptable to Forall.  The coverage shall commence when the site for the Store is secured by Operator, shall comply with the requirements of Operator's lease, if any, for the Store and shall include coverage for public liability, including products liability, in the amount of at least Five Million and 00/100 ($5,000,000.00) Dollars and of at least One Million and 00/100 ($1,000,000) Dollars for the contents of the Store.  Operator also shall carry fire and extended coverage insurance with endorsements of vandalism and malicious mischief, covering the building, structures, improvements and the contents thereof in and at the Store, on a full replacement cost basis, insuring against all risks of direct physical loss except for such unusual perils as nuclear attack, earth movement and war, and business interruption insurance for actual losses sustained covering the rental of the facility, previous profit margins, maintenance of competent personnel and other fixed expenses.  Operator also shall carry such workers' compensation insurance and such other insurance as may be required by applicable law.  In connection with any construction, refurbishment or remodeling of the Store, Operator shall maintain builders' insurance and performance and completion bonds in forms and amounts, and written by a carrier or carriers, acceptable to Forall.

9.2     Forall shall be named as additional insured on all of the insurance policies described in Section 9.1 above to the extent of each of their interests and shall be provided with certificates of insurance evidencing such coverage.  All public liability and property damage policies shall contain a provision that each of Forall , although named as an insured, shall nevertheless be entitled to recover under such policies on any loss occasioned to it, its affiliates, agents and employees by reason of the negligence of Operator, its principals, contractors, agents and employees.  All policies shall provide Forall   with at least thirty (30) days' notice of cancellation or termination of coverage.  Forall reserves the right to specify reasonable changes in the types and amounts of insurance coverage required by Section 9.1 above and this Section 9.2.  Should Operator fail or refuse to procure the required insurance coverage form an insurance carrier acceptable to Forall or the maintain it throughout the term of this Agreement, including any renewal term, Forall may, at its sole discretion, obtain such coverage for Operator, in which event Operator agrees to pay the required premiums or to reimburse Forall therefor immediately.  Failure to maintain the insurance coverage required herein or to promptly reimburse Forall for any premiums paid by Forall on Operator's behalf shall constitute a breach of this Agreement.

9.5     To enable Operator and Forall to best ascertain Operator's costs and to maintain an economical method of operation, Operator agrees to keep and preserve, for at least six (6) years from the date of their preparation, full, complete and accurate

books and accounts in accordance with generally accepted accounting principles and in the form and manner as may be prescribed by Forall.

9.6    Operator shall submit an unaudited income statement to Forall within forty-five (45) days following each calendar quarter during the term, which shall set forth quarterly cash flow, total gross receipts and itemized expenses. Additionally, Operator shall, at its expense, submit to Forall within ninety (90) days of the end of each calendar year during the term of this Agreement, a full set of Financial statements for such calendar year including a balance sheet as of the last date of such year, an income statement and a statement of case flow which have been audited by a certified public accountant acceptable to Forall certified as true by Operator.

9.7    Operator shall submit to Forall monthly sales reports and such other periodic reports, copies of purchase orders, forms, information and records as may be requested from time to time by Forall.

9.8    Operator shall keep true, complete and correct records of each transaction of any activity affecting sales, revenues or purchase, including advertising. Forall's representatives shall have the right to inspect and copy at all reasonable times and with reasonable notice, Operator's books, records, inventory and cash control devices or systems. Further, within sixty (60) days of Forall's written request, Operator shall, at Operator's expense, supply Forall with a full, certified audit of Operator's affairs made by an independent certified public accountant acceptable to Forall in accordance with generally accepted accounting principles. Failure to follow any accounting procedure required herein shall constitute a breach of this Agreement.

9.9    Operator acknowledges that nothing contained herein constitutes an agreement of Forall, Parent, any other purveyor of licensed Products or any other party to extend credit to or otherwise finance Operator. Further, Operator acknowledges that its failure to pay all amounts when due shall constitute grounds for termination of this Agreement, as provided in Section 12.2 hereof.

9.10   Operator shall permit Forall, at Forall's expense, to install and operate on-line communications equipment in the Store which is compatible with Operator's point-of-sale equipment in order to permit Forall to monitor and track sales and purchases of Apparel on a daily basis.

## ARTICLE 10. ADDITIONAL DUTIES AND COVENANTS OF OPERATOR

10.1   Operator shall not at any time, without Forall's prior written consent, copy, duplicate, record or otherwise reproduce Information which Forall has designated as Confidential Information, in whole or in part, nor otherwise make the same available to any unauthorized person. The parties agree that Forall's pricing methods, mark down and margin policies all constitute Confidential Information.

10.2   Operator acknowledges and agrees that Operator acquires no interest in Confidential Information other than the right to utilize it in the development and operation of the Store during the term, and the use or duplication of Confidential Information by any unauthorized person or firm or in any other business would

constitute an unfair method of completion and a violation of this Agreement. Operator acknowledges and agrees that Confidential Information is a trade secret of Forall that Operator, including Principal and all of Operator's employees, directors, officers, agents and shareholders:

10.2.1 Shall not use Confidential Information in any other business or capacity;

10.2.2 Shall at all times maintain the absolute confidentiality of Confidential Information;

10.2.3 Shall adopt and implement all reasonable procedures prescribed from time to time by Forall to prevent unauthorized use or disclosure of Confidential Information, including restrictions on disclosure thereof to employees of the business and the requirement of written nondisclosure and non-competition agreements with Operator's officers, directors, shareholders, agents and employees who may have access to Confidential Information.

10.3 Operator acknowledges that the Marks are associated with high quality, prestige products and that marketing any of the Licensed Products in the Store at prices substantially below prices Operator normally charges for the licensed Products could substantially diminish the value and prestige of the Marks. Operator therefore agrees not to hold a clearance sale, going-out-of-business sale, store-wide reduction sale, liquidation sale or other sale outside the ordinary course of business without obtaining the prior written approval of Forall.

## ARTICLE 11  DEFAULT AND TERMINATION

11.1 Forall may, in its sole discretion, elect to either (I) terminate this Agreement or (ii) manage the operation of this Store for the account of Forall pursuant to the provisions of this Agreement, effective immediately upon delivery of notice of termination to Operator, in either case (a) if Forall notifies Operator of an event of default and Operator fails to cure any such default susceptible to being cured within thirty (30) days after written notice of default is delivered to Operator or (b) if Forall notifies Operator of an event of default and such default is not susceptible to being cured. An event of default shall be deemed to occur if Operator or an officer, director, shareholder or employee of Operator or Principal:

11.1.1 Fails to develop and equip the Store as provided herein;

11.1.2 Has made any material misrepresentation or omission in applying for the business governed by this Agreement or in any budget and business plan previously provided to Forall by Operator;

11.1.3 Is convicted of or pleads no contest to a felony or other crime or offense that is likely to adversely affect the reputation of Forall, the Apparel, the System, the Marks or the Store;

11.1.4  Makes any unauthorized use, copy or disclosure of the Confidential Information;

11.1.5 Abandons or fails to operate, or refuses actively to operate, the Store for 15 business days in any twelve-month period, unless the Store has been closed for a purpose approved by Forall, or fails to relocate the Store to a premise approved by Forall within thirty (30) days following expiration or termination of the lease for the premises of the Store;

11.1.6 Becomes insolvent, is or will be unable to pay its obligations as they mature by reason of its inability to pay its debts as they mature or makes an assignment for the benefit of creditors or an admission of its inability to pay its obligations as they become due;

11.1.7 Fails to retain Principal as chief executive officer of Operator or Principal does not hold a majority interest in Operator;

11.1.8 Fails on three or more separate occasions within any twelve month period to submit when due reports or other information or supporting records;

11.1.9 Fails or refuses to make payments of any amounts due Forall or its licensees or affiliates for purchases from Forall's or its affiliates or any other amounts due to Forall or its affiliates, and Operator does not correct such failure or refusal within five (5) days after written notice of such failure is delivered to Operator;

11.1.10 Fails or refuses to comply with any provision of this Agreement, or a Specification. ; or

11.2   Operator agrees to pay to Forall or its licensee or affiliate within ten (10) days after the effective date of termination or expiration of this Agreement for any reason, or such later date that the amounts due are determined, such amounts owed for purchases of Licensed Products from Forall's licensee or affiliate, interest due on the foregoing and all other amounts owed to Forall  its licensees and affiliates which are then unpaid.

11.3   Operator agrees that after the termination or expiration of this Agreement for any reason, Operator and its officers, directors, shareholders, and Principal shall:

11.3.1  Not directly or indirectly at any time or in any manner advertise, promote or represent in similar fashion Operator or any business or it as a current or former Forall retail operation, business or franchise, or as a franchisee, licensee or dealer of or as otherwise associated with Forall, or use Marks, any colorable imitation thereof or other indicia of a Forall retail operation, in any manner or for any purpose (except as is necessary to comply with law or to identify simply or concisely on occupational history), or utilize for any purpose any logo, trade name, trademark, service mark or other commercial symbol that is confusingly similar to a Mark or suggests or

indicates a connection or association with Parent, Forall, its distributees or licensees;

11.3.2 Cease to use and promptly return to Forall all catalogs, advertising materials, forms, invoices and other materials containing any Marks or otherwise identifying or relating to Forall retail operation (including all Confidential Information, but excluding signs and sign faces which Operator shall retain, but not use, or destroy) and allow Forall, without liability, to remove all such items from the Store; and

11.3.3 Promptly take such action as may be required to cancel all fictitious or assumed name or equivalent registrations relating to its use of any Marks.

11.3.4 Continue to comply with the provisions of Article 10 of this Agreement regarding the non-disclosure of Confidential Information.

11.4    This Agreement and the obligations of the parties hereunder shall survive termination or expiration of the Agreement except to the extent expressly otherwise provided herein.

11.5    In the event of the death or incapacity of a Guarantor or any Member owning fifty (50%) percent or more of the capital stock of Operator, the heirs, beneficiaries, devisees or legal representatives of said Guarantor or Member shall, within one hundred twenty (120) days of such event:

11.5.1 Apply to Forall for the right to Operator to continue to operate the Store for the duration of the term of this Agreement and any renewals hereof, which right shall be granted in Forall's sole discretion; or

11.5.2 Sell, assign, transfer, or convey Operator's interest in compliance with the provisions of Article 11 hereto; provided, however, in the event a proper and timely application for the right to continue to operate has been made and rejected, the one hundred twenty (120) day period to sell, assign, transfer or convey shall be computed from the date of said rejection.

11.6    In the event of the death or incapacity of a Guarantor or any Member owning fifty (50%) percent or more of the capital stock of Operator where the provisions of Article 11.5 hereto have been fulfilled within the time provided, all rights licensed to Operator under this Agreement shall, at the option of Forall, terminate forthwith and automatically revert to Forall  Forall shall make payment to Operator or such Members of the fair market value of Operator's remaining rights under this Agreement upon the determination, by mutual agreement, as to the fair market value of such interest.  If the parties cannot agree on the fair market value within forty-five (45) days after such election, an independent appraiser shall be designated by Forall  the appraiser's determination shall be conclusive and binding on both parties.  The appraisal shall exclude any value for goodwill.

11.7    In order to prevent any interruption of the business which would cause harm and impair the value thereof, Operator authorizes Forall, in the event Principal is

absent, incapacitated or departs from the business of the Operator by reason of illness, death or otherwise and Operator is not, therefore, in the sole reasonable judgment of Forall, able to operate the business hereunder, to operate said business for so long as Forall reasonably deems necessary and practical, and without waiver of any other rights or remedies Forall may have under this Agreement or otherwise. All monies from the operation of the business during such period of operation by Forall shall be kept in a separate account and the expenses of the business, including reasonable compensation and expenses for Forall's representative, shall be charged to said account. If, as herein provided, Forall temporarily operates for Operator the business licensed herein, Operator agrees to indemnify and hold harmless Forall any representatives or Forall who may act hereunder, from any and all claims arising from the acts and omissions of Forall its representatives, excepting the willfully unlawful or grossly negligent acts or omissions of Forall or such representative. Forall is not required or obliged pursuant to this Section 11.7 to operate the business in the event of the absence, disability, death or departure of Principal, and shall do so only in Forall's sole discretion.

11.8    If this Agreement is terminated, Forall has the right, but not the obligation, to buy from Operator and Operator shall have the obligation to sell all or part of the merchandise in stock at the time of termination at eighty (80%) percent of the wholesale price paid for current season merchandise, seventy (70%) percent for merchandise from the season before and forty (40%) percent for merchandise from two (2) seasons before or older. Foralls cost for such merchandise shall be offset by any funds owed by Operator to Forall.

11.9    Upon the occurrence of an event of default as described in Sections 11.1.2, 11.1.4, 11.1.5, 11.1.6, 11.1.7 or 11.1.10 of this Agreement, Forall may elect to manage the operation of the Store for the account of Forall.

      11.9.1 If Forall so elects, the Agreement shall be deemed to be terminated and Forall shall immediately commence management of the operation of the Store for the account of Forall. Following the date of such election, Forall shall be obligated to acquire the merchandise in stock at the time of the election at the prices set forth in Section 11.8 of this Agreement.

      11.9.2 All revenues generated by Store shall be for the benefit of Forall from the date of such election. Forall shall be responsible for the payment of all operating expenses incurred from the date of such election, but Operator shall remain liable for, and shall indemnify and hold harmless Forall from any claims related to or arising from, any expenses or obligations incurred prior to the date of such election or following the date upon which Forall ceases to manage the operation of the Store for the account of Forall.

11.9.3 Operator agrees to cooperate fully with Forall to facilitate the transfer of management of the Store in the event of such election including, without limitation, transfer of utilities, notification to employees and assignment of all materials contracts and leases. Operator agrees to require its landlord to include in its lease for the Store a provision pursuant to which the landlord agrees to permit Operator, in the event of such an election, to grant Forall a license to lease the Store at the rental rate set forth in the lease for the period of time that Forall is managing the operation of the Store for the account of Forall.

11.9.4 If Forall elects to operate the Store in accordance with this Article 11, the lease for the Store shall be immediately assigned to Forall without any further action required by either party. Operator agrees, that in the event required, it will fully cooperate, and within two (2) business days execute the Assignment of Lease.
The parties acknowledge Landlord has granted consent to such assignment pursuant to Section 13.1 of Operator's lease with The Forum Shops, LLC.

## ARTICLE 12  TRANSFERABILITY OF INTERESTS

12.1   This Agreement and all rights hereunder may be assigned and transferred by Forall , if so, shall be binding upon and inure to the benefit of Forall's successors and assigns.

12.2   Operator's interest in this Agreement or in the business conducted hereunder shall not be pledged, transferred or assigned to or assumed by any other person, firm or entity (the "assignee" or "transferee"), in whole or in part, by sale, lease, management agreement, gift or otherwise, including involuntarily or by operation of law, or at the election of a receiver or trustee in bankruptcy, without the prior written consent of Forall.

12.3  Any change in the Control of Sarah shall be deemed a transfer for the purposes Of this Agreement.  Any purported assignment or transfer of members not having prior written Consent of Forall shall be null and void and shall constitute a material breach of this Agreement for which Forall may immediately terminate this Agreement without notice.  For the purposes of this Agreement the term change in the Control of Operator shall mean any event or occurance resulting in less than 100% of the membership interest of Operator owners by someone or some entity other than Hala Subh, Suhad Albasha, Dr. Bachar Hamad and Ammar Hammad.

## ARTICLE 13.  INDEPENDENT CONTRACTOR

13.1   Operator shall neither have nor exercise any authority , express, implied or apparent, to act on behalf of or as an agent of Forall or any of its affiliates or subsidiaries for any purpose, and shall take no action which might tend to create an apparent employer-employee or agency relationship between Forall Operator.  No fiduciary relationship exists between Forall  Operator.  Operator is,

and shall remain, an independent contractor responsible for all obligations and liabilities of, and for all loss or damage to, the Store and its business and for all claims and demands based on damages or destruction of property or based on an injury, illness or death of any person or persons, directly or indirectly arising from or in connection with the operation of the Store or to manage the business of the Store or to hire, fire, or discipline persons employed by the Operator or at the Store.  Operator acknowledges that Operator is solely responsible for control, management and business of the Store, including hiring and discharging employees and setting and paying wages and benefits of employees, and that Forall shall have no responsibility, liability or power in respect to Operator's pricing, hiring (except as otherwise provided herein), setting and paying of wages or related matters.

13.2    Under no circumstances shall Forall be liable for any act, omission, debt or any other obligation of Operator.  Operator shall indemnify and hold Forall its licensor harmless against and from all loss and damage, including the legal fees and expenses of defending against such claims, experienced by Forall or by Forall's licensor as a result of any act, omission or obligation arising directly from, or as a result of or in connection with, Operator's operation of the Store or Operator's failure to comply with this Agreement.

## ARTICLE 14.  OPTION REGARDING CITIES OF NEW YORK AND CHICAGO

14.1    Subject to terms herein and provided Operator is not in default with the terms of this Agreement, Operator shall have the exclusive option to acquire a license to operate a store in the areas noted herein, upon the same terms and conditions contained in this Agreement, except as modified by this Article.

14.2    For a two year period commencing on the earlier of date the Las Vegas store opens for business or September 1, 2011, Operator shall have the right to have the City of New York and/or City of Chicago ("New Store") included within the "Territory" as defined in section 1.4 of this Agreement to open one store in each city.  All of the terms of this Agreement shall apply to such "New Store" except as modified by this Article.

14.3    The term of this Agreement as it relates to such New Stores shall coincide with the lease term of such store but in no event shall such term be more than ten (10) years.
        For example: Operator exercised option to have New York included in the Territory on June 10, 2012.  The New York store lease commences October 1, 2012, the term of this agreement as it relates to such store would expire September 20, 2022.

14.4    The maximum amount which Forall will reimburse Operator (through discount formula contained in Article 5 of this Agreement) store buildout for a New Store shall be fifty (50%) percent of the cost.

14.5    Until Foral receives written notice of Operators exercise of option rights, Forall shall have the right to enter into a License & Retail Operator Agreement or Franchise Agreement with any other person or entity provided Forall gives fifteen (15) days prior

written notice of its intention to enter into such agreement.  Operator shall then have a fifteen (15) day period in which to elect to operate a store in New York City or Chicago upon the terms and conditions stated in Foralls notice.  If Operator fails to provide such written notice to Forall within such fifteen (15) day period, Forall shall have the absolute right to enter into a License & Operators Agreement or a Franchise Agreement with such third party.  From the date the Las Vegas Store opens for business or September 1, 2011 whichever is earlier, Operator has the exclusive right to open a store in New York or Chicago.

## ARTICLE 15.       RIGHT OF 1ST REFUSAL IN AREAS OTHER THAN  THE CITIES OF LAS VEGAS, NEW YORK OR CHICAGO

Subject to the terms of this provision Forall shall have the right to enter into a License/Operator Agreement, or a Franchise Agreement with any other person or entitiy but shall first give written notice to operator.  Operator shall then have a fifteen (15) day period from receipt of such notice in which to notify Forall that it elects to Operate a store in such city upon the terms and conditions stated in Foralls notice.  If Operator fails to provide such written notice to Forall within such fifteen (15) day period, Forall shall have the absolute right to enter into a License & Retail Operators Agreement or a Franchise Agreement with such third party.  This right of first refusal shall expire two (2) years from the date the Las Vegas Store opens for business.

## ARTICLE 16.  FORALL'S RIGHT TO OPERATE STORES

Nothing contained herein shall be construed to limit Foralls absolute right to establish and directly operate stores worldwide, except the territories in which Operator has a Store in operation.

## ARTICLE 17.  GENERAL PROVISIONS

17.1  Applicable Law.  This Agreement was accepted in The State of New York and shall be governed by the laws thereof which laws shall prevail, except to the extent preempted by the United States Trademark Act (Lanham Act, 15 U.S.C. Section 1051 et seq.) and other federal law.

17.2  Arbitration.  Except as otherwise specifically provided below, and excluding controversies and payments relating to the use, ownership, or infringement of the Marks, all actions, disputes, claims and controversies heretofore or hereafter arising out of or directly or indirectly relating to: (a) this Agreement and/or any renewals, extensions, changes, amendments, addenda, additions or modifications hereto, or the breach, invalidity or termination hereof;(b) any subsequent agreements entered into between the parties hereto; (c) any pervious agreement entered into between the parties hereto; (d) any relationship or business dealings between the parties hereto; and/or (e) the transaction contemplated by this Agreement or any previous or subsequent agreement between the parties hereto, shall be settled by binding arbitration, to be

conducted in Westchester County, New York, in accordance with the Commercial Arbitration Rules of the American Arbitration Association.   Nothing in this Agreement shall be constructed to prevent either party's use of any prejudgment or provisional action or remedy to enforce any party's rights under this or any other agreement, or under applicable law.  This institution and maintenance of an action for judicial relief of any party, including the plaintiff, to compel arbitration of any disputes subject to arbitration as provided herein.  If, however, either party brings any other action for judicial relief with respect to any disputes that the parties have agreed to arbitrate under the terms of this Agreement, the party who bought such action shall be liable for and will immediately pay to the other party all of the other party's costs and expenses (including attorney's fees) incurred by the other party to stay such action and remove or defer such disputes to arbitration.

Any award, judgment or order rendered by the arbitrator(s) pursuant to the terms of this Agreement may be entered and enforced by either party in any state or federal court having competent jurisdiction.   Any award, judgment or order rendered by the arbitrator(s) pursuant to such arbitration will be included in a written decision signed by the arbitrator(s) joining therein, which will specify the reasons why the award, judgment or order was based.

If either party brings legal action to vacate or modify the arbitrator's (s') award and such party does not prevail, such party will pay all costs and expenses, including attorney's fees, incurred by the other party in defending such action. Such costs and expenses will also be assessed against the petitioning party who does not prevail in any subsequent appellate action.

17.3   <u>Jurisdiction and Venue</u>.  Expect as provided in Section 14.2 regarding arbitration proceedings, if a claim is asserted in legal proceeding by Operator or Forall in connection with this Agreement, Operator and Forall irrevocably agree to submit to the exclusive jurisdiction of the courts of the State of New York and the U.S. District Court for the Southern District of New York, and irrevocably agree that venue for any such action proceeding shall be exclusively in New York County, New York.  Both parties waive any objection to the jurisdiction of these courts or to venue in New York City, New York. **FORALL OPERATOR ACKNOWLEDGE THAT THE RIGHT OF TRIAL BY JURY IS CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED.  EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THEIR MUTUAL BENEFIT, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION REGARDING THE PERFORMANCE OR ENFORCEMENT OF, OR IN ANY WAY RELATED TO, THIS AGREEMENT.**

17.4   <u>Equitable Relief</u>.   Operator acknowledges that a violation of any covenant in Article 5, 11, 12 and 13 will cause irreparable damage to Forall, the exact amount of which may no be subject to reasonable or accurate ascertainment, and therefore, notwithstanding any arbitration commenced by either party, Operator does hereby consent that, in the event such violation, Forall shall as a matter of right be entitled to injunctive relief to restrain or require specific performance of

Operator (including all its shareholders), or anyone acting for or on its behalf, to prevent or cease violation of such covenants, or any of them. Such remedies, however, shall be cumulative and in addition to any other remedies to which Forall may be entitled. In the event Forall prevails in any suit to enforce any provision hereof, Forall shall be entitled to receive from Operator, in addition to any relief or remedy granted, the costs of bringing such suit, including reasonable attorney fees. The covenants set forth in this Section 15.4 shall survive the termination, transfer, nonrenewal and expiration of this Agreement.

17.5   <u>Non-Waiver</u>.  No failure of Forall to exercise any power reserved to it hereunder, or to insist upon strict compliance by Operator with any obligation or condition hereunder, and no custom or practice of the parties at variance with the terms hereof, shall constitute a waiver of Forall's right to demand exact compliance the terms hereof. Waiver by Forall of any particular default by Operator shall not be binding unless in writing and executed by Forall shall not affect or impair Forall's rights in respect to any subsequent default of the same or a different nature; nor shall any delay, waiver, forbearance, or omission of Forall to exercise any power or rights arising out of any breach or default by Operator's rights nor shall such a waiver by Forall of any right hereunder or of the right to declare any subsequent breach or default. Subsequent acceptance of Forall of any payment due to it hereunder shall not be deemed to be a wavier by Forall of any proceeding breach by Operator of any terms, covenants or conditions of this Agreement.

17.6   <u>Notices</u>.  Any and all notices required or permitted under this Agreement shall be in writing and shall be sent by hand or by courier or certified or registered mail or by facsimile transmission or overnight courier to the respective parties at the following addresses unless and until a different address has been designated by written notice to the other party. Notice shall be effective upon receipt, if sent by hand, courier or mail or upon receipt of a confirmation if sent by facsimile transmission. Either party may change the name and address for notices by a written notification served on the other party in accordance with this Section 14.6.

|                      |                                          |
|----------------------|------------------------------------------|
| Notices to Forall:   | Forall U.S.A, Inc.                       |
|                      | Seven Sutton Place                       |
|                      | Brewster, NY 10509                       |
|                      |                                          |
| Copy to:             | James J. Veneruso, Esq.                  |
|                      | Veneruso, Curto Schwartz & Curto  LLP    |
|                      | 35 East Grassy Sprain Road, Suite 400    |
|                      | Yonkers, New York 10710                  |
|                      |                                          |
| Notices to Operator: | Sarah, LLC                               |
|                      | 1717 Midwest Club Parkway                |
|                      | Oakbrook, IL 60523                       |

Copy to:        Mr . Lee Levin, Esq.
7250 North Cicero Avenue, Suite 200
Lincolnwood, Illinois 60712-1693

17.7    <u>Entire Agreement</u>.  This Agreement shall constitute the entire full and complete agreement between the parties concerning the subject matter hereof.   No other representation has been relied upon by Operator or its directors, officers or shareholders, or induced Operator to execute this Agreement and there are no representations, inducements, promises, or agreements, oral or otherwise, between the parties not embodied herein , which are of any force or effect with reference to this Agreement or otherwise.  No amendment, change or variance from this Agreement shall be binding unless executed in writing.

17.8    <u>Severability</u>.  Each section, subsection, term and provision of this Agreement shall be considered severable, and if for any reason, any section, subsection, term or provision herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation, such shall not impair the operation of or affect the remaining portions, sections, subsections, terms and provisions of the Agreement, and the latter will continue to be given full force and effect and bind the parties hereto; and said invalid sections, subsections, terms or provisions shall be deemed not part of this Agreement.

17.9    <u>Parties</u>.   Anything to the contrary herein notwithstanding, nothing in this Agreement is intended, nor shall be deemed to confer upon any person or legal entity other than Forall or Operator as a third party beneficiary hereto, and such of their respective successors and assigns as may be contemplated by this Agreement, any right or remedies under or by reason of this Agreement.

17.10   <u>Captions</u>. All captions herein are intended solely for the convenience of the parties, and none shall be deemed to affect the meaning or construction of any provision hereof.

17.11   <u>Counterparts</u>.  This Agreement may be executed in multiple copies, and each copy executed shall be deemed an original.

## ARTICLE 18 CAVEAT

18.1    Operator acknowledges that it has entered into this Agreement after making an independent investigation of Forall's operations and not in reliance upon or as a result of a representation as to gross revenues, volume, potential earnings or profits which Operator in particular might be expected to realize, nor has anyone made any other representation which is not expressly set forth herein, on which Operator or its shareholders, officers or directors relied to induce Operator to accept and execute this Agreement. Forall does not make any representation, warranty or guaranty, express or implied, as to the potential success of the business venture contemplated hereby.

18.2   In order to induce Forall U.S.A. Inc. to enter into this Agreement <u>Hala Subh</u> and <u>Suhad Albasha</u>, each owning a 50% interest in <u>Operator, and their husbands Bachar Hamad and Ammar Hamad have executed,</u> a Guaranty of even date herewith attached hereto at Exhibit A and the effectiveness of this Agreement is conditioned upon the execution of said Guaranty.

18.3   The effectiveness of this agreement is predicated upon Operator (a). executing and delivering to Forall a collateral assignment of the lease for the store, attached hereto at Exhibit A, (b).  copy of the filing receipt and Operating Agreement of Sarah, LLC; (d).  copy of the fully executed Store lease.  In the event the foregoing documents are not provided by April 1, 2011 Forall shall have the absolute right to cancel this Agreement by giving written notice to Operator.

THE BALANCE OF THIS PAGE INTENTIONALLY LEFT BLANK

**IN WITNESS WHEREOF**, the parties hereto execute this Agreement under seal by their duly authorized representatives as of the date first above written.

Attest:                                      **Forall U.S.A., Inc.**

_Bihana_
Witness                                      By:_____

                                             Its:_____


Attest:                                      **Sarah, LLC., Operator**

_A. UBD_
Witness                                      By: _____
                                                    Hala subh

                                             Its: Member as to a 50% interest

                                             By: _S. ALBASHA_____
                                                    Suhad albasha

                                             Its: Member as to a 50% interest


STATE OF  ILLINOIS          )
                            ) ss.:
COUNTY OF  DuPage           )


    On the 19 day of MARCH_____ in the year 2011 before me, the undersigned personally appeared **Hala subh** personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_Sarah E Botka_
(signature and office of individual taking acknowledgment)

"OFFICIAL SEAL"
Sarah E. Botka
Notary Public, State of Illinois
Will County
My Commission Expires 06-08-2014

STATE OF ILLINOIS     )
                           ) ss.:
COUNTY OF DuPage   )

On the 19 day of MARCH in the year 2011 before me, the undersigned personally appeared **Suhad albasha** personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_Sarah E. Botka_____
(signature and office of individual taking acknowledgment)

"OFFICIAL SEAL"
Sarah E. Botka
Notary Public, State of Illinois
Will County
My Commission Expires 06-08-2014

# EXHIBIT A

## Collateral Assignment of Lease

## COLLATERAL ASSIGNMENT OF LEASE

**THIS COLLATERAL ASSIGNMENT OF LEASE** ("Assignment"), made as of the __ day of March, 2011 by and among Sarah, LLC, a Limited Liability Company formed in the State of Illinois, having an address at c/o Palma Settimi Inc., Seven Sutton Place, Brewster, New York ("Assignor or Tenant" ), and Forall U.S.A. a corporation organized and existing under the laws the State of New York with an address at Seven Sutton Place, Brewster, New York 10509, ("Assignee");

## W I T N E S S E T H:

**WHEREAS,** Assignor is the tenant under a Lease Agreement (together with all amendments and modifications thereto, the "Lease") dated as of _____, 2010 for the Store located at The Forum Shops at Caesars Palace, Space G19, 3500 Las Vegas Blvd. South, Las Vegas, NV 89109; and

**WHEREAS,** as a condition to Landlord letting the Premises to Tenant, Landlord required that the Assignee guarantee the obligations of Tenant pursuant to the terms of the Lease;

**WHEREAS,** Assignee is willing to provide said guarantee to Landlord in consideration of Tenant executing this Collateral Assignment of Lease giving Assignor the option to take over the Premises from Tenant should the Landlord call on Assignee to perform pursuant to any provision of its guarantee.

**NOW THEREFORE,** in consideration of the foregoing and the mutual covenants hereinafter contained, the parties hereto agree as follows:

1. **Grant of Security Interest and Assignment.** Assignor hereby grants a security interest in, assigns, transfers, conveys and sets over to Assignee, all of Assignor's estate, title and interest in and to the Lease (the entirety of such estate, title and interest, and all rights, powers, privileges, options and other benefits of Assignor pursuant thereto, including the proceeds thereof, are hereinafter referred to collectively as the "Assignor's Interests"). The assignment of, and grant of a security interest in, Assignor's Interests shall be absolute and unconditional, and shall be effective upon the execution of this Assignment.

2. **Collateral Security.** The grant of the security interest, assignment, transfer and conveyance effected by Section 1 hereof is made by Assignor for the purpose of securing the performance of Assignor's obligations pursuant to the terms of the lease.

3.     **Representations, Warranties and Covenants of Assignor.**

Assignor represents and warrants to, and covenants with, Assignee as follows:

(a)  Assignor is the tenant under the Lease and no other party has any right, title or interest as a tenant, undertenant or assignee under the Lease.

(b)  Assignor has full right, power and authority to assign and transfer to Assignee the Assignor's Interests, free and clear of all liens, claims or encumbrances of any kind whatever, and this Assignment is effective to do so. The execution and delivery of this Assignment and the performance and observance of the obligations of Assignor hereunder will not violate the provisions of any agreement between Assignor and the Landlord under the Lease, or any other party or any other agreement of any kind to which Assignor is a party or by the terms of which Assignor is bound.

(c)  There will be no defaults under the Lease.

(d)  So long as this Assignment remains in effect, Assignor will not, without Assignee's prior written consent, sell, assign, convey, pledge, encumber or otherwise transfer to any other person, firm or entity any interest in the Lease.

4.     **Default and Remedy.** If Assignor breaches any of the representations, warranties or covenants herein contained, or if a default under the Lease or an Event of Default shall occur and Landlord calls upon Assignee to honor its guarantee, or if Assignor shall make an assignment for the benefit of creditors, be adjudged bankrupt or have filed in its behalf or against it any type of bankruptcy or insolvency proceeding, or if a trustee or receiver shall be appointed for Assignor or any of its property (the foregoing hereinafter referred to as an "Event of Default"), then, and in any such event, Assignee shall have the absolute right, without notice or demand, to succeed to the rights of Assignor as tenant under the Lease in accordance with the assignment evidenced hereby.

5. **Non-inclusive Remedy.** Should a default under the Lease or an Event of Default occur, and Assignee is called upon by Landlord to honor its guarantee, in addition to succeeding to the rights of Assignee as tenant under the Lease, Assignee may also at its election proceed directly and personally against Assignor to collect any and all damages incurred by reason of such default or Event of Default, including, but not limited to, any

sums paid to Landlord rightfully owed by Assignor, attorneys fees and any other expenses or damages incurred by Assignor in connection with honoring its guarantee.

6. **Waiver of Certain Laws**. Assignor agrees, to the full extent permitted by law, that upon the occurrence of any default or Event of Default, neither Assignor nor anyone claiming by or under Assignor shall or will set up, claim or seek to take advantage of laws now or hereafter in force in order to prevent or hinder the enforcement of this Assignment, and Assignor, for Assignor and all who may at any time claim through or under Assignor, hereby expressly waives to the full extent that Assignor may lawfully do so, the benefit of any such laws.

7. **Recording and Filing**. A counterpart of this Assignment and/or one or more UCC-1 financing statements may be recorded or filed, at the option of Assignee, in such offices as may be provided by law or as Assignee may deem appropriate. Assignor agrees to execute and deliver to Assignee any financing statements required under the Uniform Commercial Code as enacted in any state in which such recordation and filing would be appropriate. The costs of all such recordings and filings shall be borne by Assignor.

8. **Notices**. Each notice required or permitted hereunder shall be deemed to have been properly given or served by the deposit of same in the United States Mail, designated as registered or certified mail, return receipt requested, bearing adequate postage, and addressed as hereinafter provided:

| | |
|---|---|
| If to Assignor, to | Sarah, LLC<br>1717 Midwest Club Parkway<br>Oakbrook, IL 60523 |
| with a copy to | Mr. Adams<br>Bardier & Adams |
| If to Assignee, to | Forall, U.S.A.<br>Seven Sutton Place<br>Brewster, New York |
| with a copy to | James J. Veneruso, Esq.<br>Veneruso, Curto, Schwartz & Curto LLP<br>35 East Grassy Sprain Road, Suite 400<br>Yonkers, New York 10710 |

-3-

Each notice shall be effective upon being deposited as aforesaid, and rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given shall be deemed to be receipt of the notice sent.

9. **Assignment Irrevocable; Supplemental Instruments.** Assignor agrees that the assignment, transfer and conveyance made hereby is irrevocable, and that Assignor will not, while this Assignment is in effect, take any action that is inconsistent with this Assignment, or make any other assignment or conveyance of Assignor's Interests (other than to Assignee) without Assignee's prior written consent, and that any such assignment or conveyance without such consent shall be void and of no effect. Assignor will from time to time, upon request of Assignee, execute all instruments of further assurance and all supplemental instruments necessary to effect the transactions contemplated hereby as Assignee may specify.

10. **Amendment.** This Assignment may be amended or modified only in a writing specifically referring to this Assignment and executed by each of the parties hereto.

11. **Governing Law.** This Assignment shall be construed and enforced in accordance with the internal laws of the State of Nevada. The invalidity, illegality or unenforceability of any provision of this Note shall not affect or impair the validity, legality or enforceability of the remainder of this Note, and to this end, the provisions of this Note are declared to be severable.

12. **Counterparts.** This Assignment may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

13. **Jurisdiction and Venue.** Assignor hereby consents to the jurisdiction of the courts of the State of Nevada in the County wherein the Store is located and the United States District Court for the District wherein the Store is located, as well as to the jurisdiction of all courts from which an appeal shall be taken from such courts, for the purpose of any suit, action or other proceeding arising out of any of its obligations arising under this Assignment or with respect to the transactions contemplated hereby, and expressly waives any and all objections it may have as to venue in any of such courts.

14. **Waiver of Trial by Jury.** ASSIGNOR AND ASSIGNEE HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDINGS, CLAIMS OR COUNTER-CLAIMS, WHETHER IN CONTRACT OR TORT, AT LAW OR IN EQUITY, ARISING OUT OF OR IN ANY WAY RELATING TO THIS AGREEMENT.

-4-

15. **Miscellaneous**.  The section and paragraph headings contained in this Assignment are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Assignment.  When used herein, the singular shall include the plural, and vice versa, and the use of the masculine, feminine or neuter gender shall include all other genders, as the context may require.

IN WITNESS WHEREOF, the parties hereto have executed this Assignment or have caused this Assignment to be duly executed as of the date first above written.

Sarah, LLC

By:_____
Name: Hala subh
Title: Member

By:_____
Name:  Suhad albasha
Title:  Member

Forall U.S.A.

By:_____
Name:
Title:

LANDLORD:

By:_____

-5-

STATE OF ILLINOIS )
                    ) ss.:
COUNTY OF DuPage )

On the 19 day of March in the year 2011 before me, the undersigned personally appeared **Hala subh** personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
(signature and office of individual taking acknowledgment)

> "OFFICIAL SEAL"
> Sarah E. Botka
> Notary Public, State of Illinois
> Will County
> My Commission Expires 06-08-2014

STATE OF ILLINOIS )
                    ) ss.:
COUNTY OF DuPage )

On the 19 day of March in the year 2011 before me, the undersigned personally appeared **Suhad albasha** personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
(signature and office of individual taking acknowledgment)

> "OFFICIAL SEAL"
> Sarah E. Botka
> Notary Public, State of Illinois
> Will County
> My Commission Expires 06-08-2014

-6-

STATE OF                                    )
                                            ) ss.:
COUNTY OF                                   )


On the ___day of _____ in the year 2011 before me, the undersigned personally appeared _____ personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.


_____
(signature and office of individual taking acknowledgment)


STATE OF                                    )
                                            ) ss.:
COUNTY OF                                   )


On the ___day of _____ in the year 2011 before me, the undersigned personally appeared _____ personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.


_____
(signature and office of individual taking acknowledgment)


-7-

## Guaranty

The undersigned, in order to induce Forall U.S.A., Inc. ("Company") to enter into a License and Retail Operator Agreement ("Operator Agreement"), dated the____day of March 2011 with  Sarah, LLC ("Operator"), **Hala subh, Suhad albasha, Bacher Hamad and Ammar Hamad** (each individually as a  "Guarantor") unconditionally, jointly and severally, guarantees to Company, its successors or assigns, the prompt full payment and performance of all obligations of Operator which are or may become due and owing to Company under the Franchise Agreement and all obligations arising out of any other agreement (whether or not in effect on the date hereof) between Operator and Company, including but not limited to any other franchise agreement, security agreement, purchase agreement, sublease or promissory note, and all extensions or renewals thereof, and the payment of all attorney's fees, costs and other expenses incurred by Company to enforce this Guaranty (collectively, with the License and Retail Operator Agreement, the "Agreements") in the same manner as if Agreements were executed between Company and the undersigned directly, as Operator.

The undersigned expressly waive(s): (a) notice of the acceptance by Company of this Guaranty, (b) demands of payment, presentation and protest, (c) all rights to assert or plead any statute of limitations as to or relating to this Guaranty, (d) any right to require Company to proceed against any other Guarantor, if any. or any other person or entity liable to Company, (e) any right to require Company to proceed under any other remedy Company may have before proceeding against Guarantor, or any other Guarantor, and (f) any right of subrogation. This Guaranty shall not be affected by the modification, amendment, extension, release or renewal of any agreement between Company and Operator, the taking of a note or other obligation from Operator or others, the taking of security for payment, the granting of extension of time for payment, the filing by or against Operator of bankruptcy, insolvency, reorganization of other debtor's relief afforded by the Federal Bankruptcy Act or any other state or federal statute or by the decision of any court, or any other matter, whether similar or dissimilar to any of the foregoing; and this Guaranty shall cover the terms and obligations of any such modifications, notes, security agreements, extensions, or renewals. The obligations of the undersigned shall be unconditional notwithstanding any defect in the genuineness, validity, regularity, or enforceability of the Operator's obligations or liability to Company, or any other circumstances whether or not referred to herein which might otherwise constitute a legal or equitable discharge of a surety or guarantor.

This is an irrevocable, unconditional and absolute guaranty of payment and performance and the undersigned agree(s) that his, hers or their liability of this Guaranty shall be immediate and shall not be contingent upon the exercise or enforcement by Company of whatever remedies

it may have against the Operator or others, or the enforcement of any lien or realization upon any security Company may at any time possess.

The undersigned covenant(s) and agree(s) that any indebtedness by the Operator to the undersigned, for any reason, currently existing, or which might hereafter arise, shall at all times be inferior and subordinate to any indebtedness owed by the Operator to Company.

The undersigned further covenant(s) and agree(s) that as long as the Operator owes any monies to Company the Operator will not pay and the undersigned will not accept payment of any part of any indebtedness owed by the Operator to any one of the undersigned, either directly or indirectly, without the consent of Company.

This Guaranty shall remain in full force and effect until all obligations arising out of and pursuant to the Agreements including all renewals, modifications, amendments and extensions thereof, are fully paid and satisfied.

This Guaranty shall be governed by and interpreted in accordance with the laws of the State of New York without regards to its conflicts of laws principles. Any dispute arising out of or under this Guaranty not settled by arbitration shall be resolved in accordance with the dispute resolution process set forth in the Agreement

**SIGNATURE PAGE TO FOLLOW**

2

**IN WITNESS THEREOF**, the undersigned have constituted this Agreement on the date set forth below.

Dated: March___, 2011

**GUARANTOR(S)**

_____
**Hala subh**
Address: 1717 Midwest club, Oak Brook, IL 60523, Social Security # 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
Drivers License # S100-3206-9871 State of Issuance    IL

_____
**Suhad albasha**
Address: 1 Andrew ct. Burr Ridge, IL 60527, Social Security # 324 90.0181
Drivers License # A412-7807-1731 State of Issuance_____

_____
**Bachar Hamad**
Address: 1717 Midwest club Pk, IL 60523, Social Security # 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
Drivers License #_____ / State of Issuance    IL

_____
**Ammar Hamad**
Address: 1 Andrew ct. Burr Ridge IL 60527, Social Security # 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
Drivers License # H530.0006.1297 / State of Issuance    IL


STATE OF ILLINOIS      )
                                        ) ss.:
COUNTY OF DuPage      )


   On the 10 day of March in the year 2011 before me, the undersigned personally appeared **Hala subh**  personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
(signature and office of individual taking acknowledgment)

"OFFICIAL SEAL"
Sarah E. Botka
Notary Public, State of Illinois
Will County
My Commission Expires 06-08-2014

3

STATE OF ILLINOIS )
) ss.:
COUNTY OF DuPage )

On the 19 day of March in the year 2011 before me, the undersigned personally appeared **Suhad albasha** personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_Sarah E Botka_
(signature and office of individual taking acknowledgment)

"OFFICIAL SEAL"
Sarah E. Botka
Notary Public, State of Illinois
Will County
My Commission Expires 06-08-2014

STATE OF ILLINOIS )
) ss.:
COUNTY OF DuPage )

On the 19 day of March in the year 2011 before me, the undersigned personally appeared **Bachar Hamad** personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_Sarah E Botka_
(signature and office of individual taking acknowledgment)

"OFFICIAL SEAL"
Sarah E. Botka
Notary Public, State of Illinois
Will County
My Commission Expires 06-08-2014

STATE OF ILLINOIS )
) ss.:
COUNTY OF DuPage )

On the 19 day of March in the year 2011 before me, the undersigned personally appeared **Ammar Hamad** personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_Sarah E Botka_
(signature and office of individual taking acknowledgment)

"OFFICIAL SEAL"
Sarah E. Botka
Notary Public, State of Illinois
Will County
My Commission Expires 06-08-2014

4

# EXHIBIT 2

LEASE

BY AND BETWEEN

FORUM SHOPS, LLC,

a Delaware limited liability company

AND

SARAH, LLC

02/09/11

FORUM SHOPS AT CAESARS

LEASE

THIS LEASE made this _18TH_ day of _MAY_, 20 _11_, by and between FORUM SHOPS, LLC, a Delaware limited liability company, FEIN 36-4541963 ("Landlord"), and SARAH, LLC ("Tenant");

WHEREAS, Landlord occupies the land on which a shopping complex is located under a certain Ground Lease by and between Caesars Palace Realty Corp., a Nevada Corporation, as landlord ("Ground Lessor"), and Landlord, as tenant, made as of June 1, 1990 (the "Ground Lease"), as the same may be amended from time to time, and

WHEREAS, Tenant desires to sublease from Landlord and Landlord desires to sublease to Tenant certain retail space within the Center (as hereinafter defined) pursuant to the terms and provisions of this Lease.

WITNESSETH THAT, in consideration of the rents, covenants and agreements hereinafter set forth, such parties enter into the following agreement:

ARTICLE I

BASIC LEASE INFORMATION AND DEFINITIONS

Section 1.1.        Basic Lease Information.
    This Article I is an integral part of this Lease and all of the terms hereof are incorporated into this Lease in all respects. In addition to the other provisions which are elsewhere defined in this Lease, the following, whenever used in this Lease, shall have the meanings set forth in this Section:

    (a)        Center: Forum Shops at Caesars, situated in the City of Las Vegas, County of Clark, State of Nevada.

    (b)        Premises: Room K8.  Landlord shall have the right to change the room designation upon written notice to Tenant.

    (c)        Store Floor Area: 2,536 square feet.

    (d)        Lease Term: Commencing on the Commencement Date and continuing until the last day of ~~January next following the end of~~ the tenth (10th) Lease Year.

    (e)        Commencement Date:  The earlier of (i) the date the Tenant opens for business, or (ii) the Required Completion Date.

    (f)        Required Completion Date: The earlier of (i) the *90th* day after the earlier of (a) the date specified in such notice as the date when Tenant can commence Tenant's Work or (b) the date Landlord has notified Tenant that the Premises are ready for commencement of Tenant's Work or (ii) October 1, 2011. *Landlord shall deliver possession of the Premises to Tenant on July 1, 2011.*

    (g)        Minimum Annual Rent: A Minimum Annual Rent of $220.00 per square foot of Store Floor Area, or Five Hundred Fifty-Seven Thousand Nine Hundred Twenty and 00/100 Dollars ($557,920.00) per annum (based on the Store Floor Area), payable in equal monthly installments, in advance upon the first day of each and every month commencing upon the Commencement Date and continuing thereafter through and including the last day of the first (1st) Lease Year;

        A Minimum Annual Rent of $226.60 per square foot of Store Floor Area, or Five Hundred Seventy-Four Thousand Six Hundred Fifty-Seven and 60/100 Dollars ($574,657.60) per annum (based on the Store Floor Area), payable in equal monthly installments, in advance upon the first day of each and every month during the second (2nd) Lease Year of the Lease Term;

        A Minimum Annual Rent of $233.40 per square foot of Store Floor Area, or Five Hundred Ninety-One Thousand Nine Hundred Two and 40/100 Dollars ($591,902.40) per annum (based on the Store Floor Area), payable in equal monthly installments, in advance upon the first day of each and every month during the third (3rd) Lease Year of the Lease Term; ~~and~~

        A Minimum Annual Rent of $240.40 per square foot of Store Floor Area, or Six Hundred Nine Thousand Six Hundred Fifty-Four and 40/100 Dollars ($609,654.40) per annum (based on the Store Floor Area), payable in equal

-1-

IN WITNESS WHEREOF, Landlord and Tenant have signed and sealed this Lease as of the day and year first above written.

(LANDLORD)

FORUM SHOPS, LLC, a Delaware limited liability company
By:    FORUM DEVELOPERS LIMITED PARTNERSHIP, a Nevada limited partnership, its sole member
    By:    SIMON PROPERTY GROUP, L.P., a Delaware limited partnership, its general partner
        By:    SIMON PROPERTY GROUP, INC., a Delaware corporation, its general partner

By: _____
John Rulli, Executive Vice President and Chief Administrative Officer

(TENANT)

SARAH, LLC

By: _____×Hala subH_____
Its: _____Italy_____

Suhad Albasha
X. SALBASHA .

"OFFICIAL SEAL"
Sarah E. Botka
Notary Public, State of Illinois
Will County
My Commission Expires 06-08-2014

Sarah E Botka
3-21-11

-36-

## GUARANTY

FOR VALUE RECEIVED, and in consideration of the execution of a certain Lease of even date herewith and concurrently herewith covering certain premises in the Forum Shops at Caesars, the creation of the tenancy under said Lease and the extension of credit by FORUM SHOPS, LLC, a Delaware limited liability company (Landlord) to SARAH, LLC (Tenant), and for the purpose of inducing Landlord to enter into such Lease, BACHAR HAMAD (Guarantor), does hereby absolutely and unconditionally guarantee to Landlord, its successors and assigns, the full and prompt payment when due, of all rents, charges and additional sums coming due under said Lease, together with the performance of all covenants and agreements of the Tenant therein contained and together with the full and prompt payment of all damages that may arise or be incurred by Landlord in consequence of Tenant's failure to perform such covenants and agreements (all such obligations hereinafter collectively referred to as "Liabilities"), and Guarantor further agrees to pay all expenses, including attorneys' fees and legal expenses, paid or incurred by Landlord in endeavoring to collect or enforce the Liabilities or any part thereof and in enforcing this guaranty, such payment and performance to be made or performed by Guarantor forthwith upon a default by Tenant.

In the event of the death, incompetency, dissolution, bankruptcy or insolvency of Tenant, or the inability of Tenant to pay debts as they mature, or an assignment by Tenant for the benefit of creditors, or the institution of any bankruptcy or other proceedings by or against Tenant alleging that Tenant is insolvent or unable to pay debts as they mature, or Tenant's default under this Lease, and if such event shall occur at a time when any of the Liabilities may not then be due and payable, Guarantor agrees to pay to Landlord upon demand, the full amount which would be payable hereunder by Guarantor if all Liabilities were then due and payable.

This Guaranty shall be an absolute and unconditional guaranty and shall remain in full force and effect as to Guarantor during the *first three (3) Lease Years of the* demised term of said Lease, and any renewal or extension thereof, and thereafter so long as any Liabilities *accruing during such first three (3) Lease Years* remain due and payable even though the demised term or any renewal or extension thereof shall have expired. An Assignment of said Lease or any subletting thereunder shall not release or relieve Guarantor from its liability hereunder. *After the end of the third (3rd) Lease Year, the undersigned's liabilities shall be limited to an amount equal to one (1) year's Minimum Rent, Percentage Rent and additional rent based upon the Minimum Rent, Percentage Rent and additional rent in effect at the time Tenant defaults under the terms of this Lease.*

Landlord may, from time to time, without notice to Guarantor: ~~(a) retain or obtain a security interest in any property to secure any of the Liabilities or any obligation hereunder,~~ (a) retain or obtain the primary or secondary liability or any party or parties, in addition to Guarantor, with respect to any of the Liabilities, (b) extend or renew for any period (whether or not longer than the original period), alter or exchange said Lease or any of the Liabilities, (c) release, waive or compromise any liability of the Guarantor hereunder or any liability of any other party or parties primarily or secondarily liable on any of the Liabilities, (d) release or impair any security interest or lien, if any, in all or any property securing any of the Liabilities or any obligation hereunder and permit any substitution or exchange for any such property, and (e) resort to Guarantor for payment of any of the Liabilities, whether or not Landlord shall have resorted to any property securing any of the Liabilities or any obligation hereunder or shall have proceeded against the Guarantor or against Tenant or any other party primarily or secondarily liable on any of the Liabilities. No such action or failure to act by Landlord shall affect Guarantor's liability hereunder in any manner whatsoever. Any amount received by Landlord from whatsoever source and applied by it toward the payment of the Liabilities shall be applied in such order of application as Landlord may from time to time elect.

Guarantor hereby expressly waives: (a) notice of the acceptance of this Guaranty, (b) notice of the existence, creation, amount, modification, amendment, alteration or extension of the Lease or all or any of the Liabilities, whether or not such notice is required to be given to Tenant under the terms of the Lease, (c) presentment, demand, notice of dishonor, protest, and all other notices whatsoever, (d) any benefit of valuation, appraisement, homestead or other exemption law, now or hereafter in effect in any jurisdiction in which enforcement of this Guaranty is sought, and (e) all diligence in collection, perfection or protection of or realization upon the Liabilities or any thereof, any obligation hereunder, or any security for any of the foregoing.

No delay on the part of Landlord in the exercise of any right or remedy shall operate as a waiver thereof, and no final or partial exercise by Landlord of any right or remedy shall preclude other or further exercises thereof or the exercises of any other right or remedy.

The validity of this Guaranty and the obligations of Guarantor hereunder shall not be terminated, affected or impaired by reason of any action which Landlord may take or fail to take against Tenant or by reason of any waiver of, or failure to enforce, any of the rights or remedies reserved to Landlord in said Lease, or otherwise, or by reason of the bankruptcy or insolvency of Tenant and whether or not the term of said Lease shall terminate by reason of said bankruptcy or insolvency.

This Guaranty shall be binding upon Guarantor, and upon the heirs, legal representatives, successors and assigns of Guarantor and shall be governed by the laws of the State of *Nevada.* ~~Indiana.~~

-37-

If this Guaranty is executed by a corporation, association, partnership (general or limited), joint venture, syndicate, trust or any other type of organization other than individuals, the individual signatories hereto represent and warrant that they, and each of them, are duly authorized to execute this Guaranty for and on behalf of such organization and that such organization is the sole owner of all ownership interest in the Tenant.

-38-

02/09/11

IN WITNESS WHEREOF, Guarantor has executed this instrument, or caused this instrument to be executed by its officers, duly authorized in the premises, on this _8_ day of _March_, 20_11_.

GUARANTOR

Attest

_Karen A. Sellers_

_333 N. Madison_
Residence Address

_Joliet IL 60435_
City      State      Zip

LANDLORD

"OFFICIAL SEAL"
Karen A Sellers
Notary Public, State of Illinois
Commission Expires 2/28/2012

TENANT

By: _Bi Hamad_
Bachar Hamad

_1717 Midwest Club_
Residence Address

_Oak Brook, IL 60523_
City      State      Zip

FORUM SHOPS, LLC, a Delaware limited
liability company
By: FORUM DEVELOPERS LIMITED
  PARTNERSHIP, a Nevada limited
  partnership, its sole member
By: SIMON PROPERTY GROUP, L.P., a
  Delaware limited partnership, its
  general partner
  By: SIMON PROPERTY GROUP,
    INC., a Delaware corporation, its
    general partner

By: _____
  John Rulli, Executive Vice President and
    Chief Administrative Officer

SARAH, LLC

By: _Bi Hamad._
  _Hala Subh_
  _Hala_

  _Suhad Albasha_
  X  _S. Albasha._



**RELOCATION ZONE**

# FORUM SHOPS AT CAESARS

TSD# K08-1
Level: CASINO

## SIMON®
SIMON PROPERTY GROUP
225 W. WASHINGTON ST.
INDIANAPOLIS,   IN 46204

Structural Element, must be field verified by tenant.

The information in this document is confidential and a proprietary trade secret of the Landlord and may not be copied, distributed, published or disclosed without prior written permission.   Landlord retains the right to design, change, alter or modify (without prior written notice) the size and configuration of any or all of the Center or any of the buildings, premises, hallways, malls, corridors, kiosks, tenant spaces or common areas contained therein, including, but not limited to, the identity, size, configuration, location or arrangement of any of the foregoing.   This document does not constitute any contract or obligation by the Landlord.   Landlord makes no representations or warranties regarding the Center, any premises contained therein, or the accuracy of the information contained in this document.   It is the responsibility of Tenant or Tenant's contractor to field verify existing site conditions and dimensions.

| DBA Name: | Date: '08/09/2010 15:29 |
|---|---|
| Unit No.      K08 | Scale: 1" = 20' |
| Leasing Agent: | Corp. No.  1145 |

EXHIBIT "A"

02/09/11

### DESCRIPTION OF TENANT'S WORK

I.    TENANT'S WORK – Unless otherwise specifically identified as Landlord's Work, Tenant shall complete all work required to place the Premises in a finished condition ready to open for business at the Tenant's own expense.  Tenant's Work includes, but is not limited to, the following:

   A.    GENERAL PROVISIONS:   All work done by Tenant shall be governed in all respects by, and be subject to the following:

      1.    <u>Payment and Performance Bonds</u>.  Landlord shall have the right to require Tenant to furnish payment and performance bonds or other security in form satisfactory to Landlord for the prompt and faithful performance of Tenant's Work, assuring completion of Tenant's Work and conditioned that Landlord will be held harmless from payment of any claim either by way of damages or liens on account of bills for labor or material in connection with Tenant's Work.

      2.    <u>Tenant's Work Standards</u>.  All Tenant's Work shall conform to the more stringent of applicable statutes, ordinances, regulations, codes, all requirements of Landlord's insurance carrier, all rating bureaus, and the Tenant Information Package (Exhibit "B-1") which contains the basic architectural, electrical and mechanical information necessary for the preparation of Tenant's Plans, and which by this reference is incorporated into and made a part of this Lease.  Landlord reserves the right to require changes in Tenant's Work when necessary by reason of the aforementioned standards.  No approval by Landlord shall be deemed valid unless in writing and signed by Landlord.  Tenant shall obtain all permits arising out of Tenant's Work including, but not limited to, building permits and any sewer connection charges assessed by applicable governmental authorities.

      3.    <u>Insurance Requirements</u>.  Prior to commencement of Tenant's Work and until completion thereof, or commencement of the Lease Term, whichever is the last to occur, Tenant shall effect and maintain Builder's Risk Insurance covering Landlord, Landlord's general contractor, Tenant, Tenant's contractors and Tenant's subcontractors, as their interest may appear against loss or damage by fire, vandalism and malicious mischief and such other risks as are customarily covered by a standard "All Risk" policy of insurance protecting against all risk of physical loss or damage to all Tenant's Work in place and all materials stored at the site of Tenant's Work, and all materials, equipment, supplies and temporary structures of all kinds incidental to Tenant's Work, and equipment, all while forming a part of or contained in such improvements or temporary structures, or while on the Premises or within the Center, all to the actual replacement cost thereof at all times on a completed value basis.  In addition, Tenant agrees to indemnify and hold Landlord harmless against any and all claims for injury to persons or damage to property by reason of the use of the Premises for the performance of Tenant's Work, and claims, fines, and penalties arising out of any failure of Tenant or its agents, contractors and employees to comply with any law, ordinance, code requirement, regulations or other requirement applicable to Tenant's Work and Tenant agrees to require all contractors and subcontractors engaged in the performance of Tenant's Work to effect and maintain and deliver to Tenant and Landlord, certificates evidencing the existence of, and covering Landlord, Tenant and Tenant's contractors, prior to commencement of Tenant's Work and until completion thereof, the following insurance coverages:

         a.    Workmen's Compensation and Occupational Disease insurance in accordance with laws of the State in which the property is located and Employer's Liability Insurance with limits of not less than $1,000,000.00 per occurrence.

         b.    Commercial General Liability Insurance affording protection for bodily injury, death, personal injury and property damage, and including coverage for contractual liability, independent contractors, completed operations and products liability with limits of not less than $3,000,000.00 combined single limit per occurrence.

         c.    Comprehensive Automobile Liability Insurance, including coverage for "non-owned" automobiles, for property damage, bodily injury, including death resulting therefrom with limits of not less than $1,000,000.00 for any one occurrence combined single limit.

         d.    Owners and contractors protective liability coverage for an amount not less than $1,000,000.00.

EXHIBIT "B"<br/>Page -1-

4.     <u>Reasonable Easement.</u>  Landlord specifically reserves the right (and Tenant shall permit Landlord or its employees, agents or contractors reasonable access to the Premises for the purpose of exercising such rights), to install, maintain, repair and replace in the ceiling space and/or under the concrete slab in the Premises, all such electrical, plumbing, HVAC and other system components that may be required to service the Common Areas or other tenants in the Center. Adequate access panels or doors shall be incorporated into Tenant's Work for inspection, service and replacement of both Landlord and Tenant equipment.

5.     Tenant agrees that the contract of every contractor, subcontractor, mechanic, journeyman, laborer, material supplier or other person or entity performing labor upon, or furnishing materials or equipment to, the Premises in connection with Tenant's Work shall contain the following provision:

"Contractor acknowledges that this provision is required under Tenant's lease of the premises to be improved under this Contract (Lease Premises) from Forum Developers Limited Partnership (Lease). In consideration of Tenant's engagement of Contractor to perform the work hereunder, and as an inducement to Tenant to enter into this Contract with Contractor, Contractor acknowledges, covenants and agrees that any mechanic's lien which it may hereafter file, claim, hold or assert with respect to the work hereunder (i) shall attach only to Tenant's interest in the Lease Premises under the Lease and (ii) shall be subject, subordinate and inferior to the lien of any mortgage(s) now or hereafter held upon and against the Forum Developers Limited Partnership by any lender(s) now or hereafter providing funds for the financing for the Forum Developers Limited Partnership, notwithstanding that any such mortgage(s) may be recorded after the commencement of the work hereunder and that Contractor's mechanic's lien otherwise might be entitled to priority over any such mortgage(s). For such purposes, Contractor also shall execute, acknowledge and deliver a separate subordination agreement upon request by Tenant, Forum Developers Limited Partnership, or any such lender(s), prior to making any application or request for payment hereunder and as a condition precedent to Contractor's right to receive any payment hereunder. Contractor likewise shall cause the liens and lien rights of all subcontractors, sub-subcontractors, materialmen, suppliers, laborers and all other persons furnishing work, labor, materials, equipment and services on or in connection with the Lease Premises to be limited to the Tenant's interest in the Lease Premises under the Lease and to be subordinated to such mortgage(s), and Contractor shall obtain and deliver to Tenant a similar subordination agreement duly executed and acknowledged by each such subcontractor, sub-subcontractor, materialman, supplier, laborer and other person prior to making any application or request for payment hereunder and as a condition precedent to Contractor's right to receive any payment hereunder. Contractor shall indemnify, defend and hold harmless Tenant, Forum Developers Limited Partnership, Forum Developers' lessor, the Owner of Caesars Palace Hotel and such lender(s) from and against any and all loss, costs, damage, expense (including, without limitation, reasonable attorney fees), liability, suits, actions and judgments arising or resulting from Contractor's failure to cause all such mechanic's and materialmen's liens to be limited to Tenant's interest in the Lease Premises under the Lease and to be subordinated to said mortgage(s) as herein provided, in addition to all other indemnities contained herein with respect to such liens."

Tenant shall indemnify, defend and hold harmless Landlord, Ground Lessor, the Owner of the Hotel Parcel and such lender(s) from and against any and all loss, costs, damage, expense (including, without limitation, reasonable attorney fees), liability, suits, action and judgments arising or resulting from Tenant's failure to cause all such mechanic's and materialmen's liens to be limited to Tenant's interest in the Premises under this Lease and to be subordinated to said mortgage(s) as herein provided, in addition to all other indemnities contained herein with respect to such liens.

6.     If Landlord or Ground Lessor in the sole and absolute discretion of either of them determines that the Center, the Hotel or the Adjacent Land or the businesses conducted thereon would otherwise be adversely affected, any or all work shall be done by recognized union labor.

B.     TENANT'S PLANS.  Tenant shall, at Tenant's expense, prepare and submit to Landlord for Landlord's approval, all drawings required (including signage) for the completion of the Premises as provided for herein ("Tenant's Plans"). Tenant's Plans shall indicate all proposed demolition, modification or reuse of existing improvements or equipment (if applicable), delineate all proposed new improvements or equipment including minimum of one (1) toilet room, be to scale, be prepared, stamped and signed by an architect or engineer licensed to do business in the state in which the Center is located and be in accordance with: the Federal Occupational Safety and Health Act (OSHA) and regulations promulgated thereunder; all laws, ordinance and regulations of governing authorities having jurisdiction over the premises and utility companies; the overall design and

EXHIBIT "B"<br>Page -2-

construction standards of the Center contained in Exhibit "B-1"; and the requirements of Landlord's fire and casualty insurer and/or the criteria of this Exhibit, whichever is more stringent.

Tenant shall not submit plans, shop drawings or specifications which have been prepared by contractors, subcontractors or suppliers (unless otherwise specifically required in Exhibit "B-1") as such plans, shop drawings or specifications shall not be given consideration by Landlord and shall not serve to satisfy the obligations of Tenant provided for herein.

1.    Landlord's Approval of Tenant's Plans.
   a.    Approval of plans and specifications by Landlord shall not constitute the assumption of any responsibility by Landlord for their accuracy or sufficiency or conformity with applicable laws (including but not limited to the Americans with Disabilities Act of 1990 and the Williams-Steiger Occupational Safety and Health Act), and Tenant shall be solely responsible for such plans and specifications. Tenant shall indemnify and hold Landlord harmless from and against any and all errors and omissions contained in Tenant's Plans, and any losses, costs, damages or claims of whatever nature (including, but not limited to attorneys' fees and costs of any kind), arising out of or in connection with such compliance. Landlord shall not be liable for any loss to Tenant's property or the property of any other person during construction.

   b.    Should any conflict arise between any of Tenant's Plans and the Lease such that, in Landlord's sole opinion, the integrity or code compliance of any existing Landlord or adjacent tenant improvements and construction is jeopardized, the applicable portion(s) of the Lease shall be determinative. Any modification of such existing improvements or construction must receive the prior written approval of Landlord and all work shall be specifically stated in writing. Landlord's approval of Tenant's Plans will in no way alter, amend or waive the requirements or criteria of this Exhibit.

2.    Existing Conditions.
   a.    Prior to the preparation of Tenant's Plans, Tenant shall visit the Premises to verify existing conditions and construction to ensure that none of Tenant's Work shall be in conflict with any existing Landlord or adjacent tenant improvements and construction. In addition, if the Premises' concrete slab is not on grade (compacted soil), Tenant shall remove all previous floor penetrations not intended to be re-used, and patch and repair the floor to original condition; and re-seal all floor penetrations to be re-used utilizing Landlord's waterproofing specifications.

   b.    In the event Tenant's store design requires revisions to Landlord's building, mechanical, electrical or HVAC system(s), Tenant shall request, in writing, approval for such revision(s) and, if approved by Landlord, Landlord shall perform the necessary work to accommodate Tenant's request. Tenant shall reimburse Landlord for the cost of such work as provided herein.

3.    Utility Services. All utility services are subject to the limitation and capacities of existing Center facilities and equipment and the availability of service from the local serving utilities. Tenant shall, at Tenant's expense and subject to Landlord's prior written approval, provide and install any equipment necessary to adapt such existing services to Tenant's requirements.

4.    Roof. Tenant shall provide any required supports, blocking, temporary flashing, counterflashing or other work necessary to complete installation of Tenant's equipment on Landlord's roof. Cant strips and weatherproofing shall be done only by contractor designated by Landlord. Tenant will be required to supplement existing construction to achieve assembly ratings, thermal values or additional criteria as required by Tenant's Work.

5.    Fire Protection. Modifications to Tenant's automatic fire sprinkler system shall be performed by a contractor designated by Landlord. The work shall conform to Landlord's requirements and may include, but not be limited to, the cost of preparing engineered sprinkler shop drawings and the submission of such drawings to Landlord's fire insurance underwriter for approval, the relocating, re-sizing, and adding sprinkler piping or heads, draining the system and fire watch during system down-time.

6.    HVAC Criteria.
   a.    Restaurants, food service, pet shops, beauty salons, barber shops and any other occupancies which, in the sole opinion of the Landlord, produce odors or produce a high level of humidity,

02/09/11

shall provide an exhaust system which will prevent such odors or moisture from entering the enclosed mall, other tenant spaces or any other portion of the Center. If, in the sole opinion of the Landlord, any of Tenant's roof mounted equipment accumulates grease, Tenant shall, at Tenant's expense, furnish and install grease collection and elimination facilities in accordance with Landlord's requirements (which may include the use of a Grease Guard collection pan).

b.   In the event that Tenant elects to reuse all or a portion of any existing HVAC system(s), Tenant shall indicate same on Tenant's drawings for Landlord's review. In the event Landlord permits Tenant to reuse said systems, Tenant shall employ a qualified contractor to verify, by written confirmation to Landlord, that such HVAC system(s) is fully operable and in conformance with Landlord's design criteria as provided in Landlord's drawings (said written confirmation shall include, but not be limited to, an air balance report completed by an AABC certified air balance contractor and shall indicate, at a minimum, any discrepancies between design quantities and tested quantities). If any portion of Tenant's HVAC system(s) is not fully operable or does not conform to Landlord's design criteria, Tenant shall, at Tenant's expense, have its contractor repair or replace same to comply therewith and thereafter provide Landlord with written confirmation thereof.

7.   <u>Construction Deposit</u>.  Prior to commencement of construction in the Premises, Tenant's contractor shall deliver a damage deposit in the form of a cashier's check in the amount of $5,000.00 made payable to Landlord. Landlord shall have the right to use all or any part of said damage deposit as reimbursement for any debris clean-up or damage caused by Tenant's Contractor(s) to any Common Areas.

8.   <u>Materials and Services</u>:  Prior to commencement of construction in the Premises, Tenant's contractor shall deliver a cashier's check, made payable to Landlord, as payment for materials issued to or services provided for Tenant's contractor by Landlord or for work performed by Landlord for Tenant's contractor at the request of Tenant's contractor. Such items are itemized in the Tenant Information Package and may include (but not be limited to): entrance floor tile; service door, frame and hardware; smoke detectors; temporary utilities; temporary sprinkler system (standard grid); sheetrock; temporary toilets; dumpster and trash removal; final connection and testing to Landlord's fire system; and governmental fees.

9.   <u>Construction Rules</u>.  Tenant will abide by and cause its contractors, subcontractors, agents and employees to abide by rules and regulations published by Landlord from time to time, including, but not limited to, those pertaining to parking, toilet facilities, safety conduct, delivery of materials and supplies, employee egress to the Center, trash storage or collection or removal, and cooperation with Landlord's architect, general contractor and subcontractors or other agents.

10.   <u>Storefront Barricade</u>.  If, in the sole opinion of the Landlord, a temporary storefront barricade is required for the Premises, Landlord shall install same at Tenant's expense.

11.   <u>Signage</u>.  Tenant shall provide and install a storefront identification sign for the Premises which may include, at Landlord's discretion, multiple signs (depending upon Tenant's storefront configuration) and Tenant's established national logo or insignia, if any. Storefront identification signs shall be limited to Tenant's Trade Name as approved in this Lease or as otherwise approved in writing by Landlord. The storefront sign shall be illuminated (unless otherwise specifically approved, in writing, by Landlord). Landlord's approval of Tenant's storefront signage shall be based on the size and style of the sign and lettering, the location of the sign within the storefront, and the cohesive integration of the sign into the overall storefront design. Prohibited storefront signage includes, but is not limited to, signage which advertises or describes products, services, vendors, or departments or is informational or directional in nature, regardless if such signage is attached as a tagline to, or is included as part of, Tenant's Trade Name.

12.   <u>Waterproofing</u>.  If the Premises' concrete slab is not on grade (compacted soil), Tenant shall install a waterproofing barrier membrane, in accordance with Landlord's specifications, in all areas that may be exposed to fluids or liquids including, but not limited to, restrooms, food preparation and service areas; shampoo and wash areas, laundry and dry cleaning areas, and photo processing areas.

C.   CLOSE-OUT REQUIREMENTS.  Tenant's Work shall be deemed completed at such time as Tenant, at its sole expense and without cost to Landlord, shall provide:

1.    <u>Proof of Payment</u>.   Furnish evidence satisfactory to Landlord that all of Tenant's Work has been completed and paid for in full (and that such work has been accepted by Landlord), including the costs for Tenant's Work that may have been done by Landlord and the costs for any other work done by Landlord which Landlord may be entitled to payment in accordance with the provisions of this Exhibit "B", the Tenant Information Package, or elsewhere in the Lease, that any and all liens therefor that have been or might be filed have been discharged of record or waived, and that no security interests relating thereto are outstanding.

2.    <u>Tenant's Affidavit</u>.   Furnish an affidavit from Tenant listing all contractors and any material suppliers in the employ of said Tenant who have provided goods or services for the completion of Tenant's Work in the Premises.

3.    <u>Tenant Contractor's Affidavit</u>.   Furnish an affidavit from Tenant's general contractor listing all parties who have furnished materials or labor or services to that contractor for completion of Tenant's Work in the Premises.

4.    <u>Certificate of Occupancy</u>.   Furnish all certificates and other approvals with respect to Tenant's Work that may be required from any governmental authority and any board of fire underwriter's or similar body for the use and occupancy of the Premises.

5.    <u>Record Drawings</u>.   Furnish Landlord with one set of reproducible record drawings of the Premises showing any changes made during construction.

6.    <u>Estoppel Certificate</u>.   Furnish a Tenant-executed estoppel certificate as may be required Landlord or Landlord's mortgagee.

EXHIBIT "B"
Page -5-



EXHIBIT "B-3"

EXHIBIT "B-3"



EXHIBIT "C"

FORUM AT CAESARS

FACILITY NAMES

EXHIBIT "D"

***DINING / LOUNGE***
Palace Court
Primavera
Bacchanal
Spanish Steps Steak & Seafood House
Ah'So Restaurant
Empress Court
Cafe' Roma
The Palatium
Post-Time Snack Bar
Cleopatra's Barge
Olympic Lounge
Galleria Bar
Discus Bar
Palace Court Lounge
Ah'So Lounge
Empress Court Lounge
Neptune Bar
Palatium Bar
Primavera Lounge
Spanish Steps Lounge
Forum Lounge

The Olympiad Race and Sports Book
Caesars Palace Poker Room
Omnimax Theatre
Caesars Adventure Arcade
Olympic Casino
Palace Court Casino
Forum Casino
Caesars Palace Sports Pavilion
Caesars Palace Sports Shop
Brahma Shrine
Garden of the Gods
Cleopatra's Beauty Salon & Spa
Circus Maximum Showroom
Caesars Exclusively Shops
Champagne Brunch
Appian Way
The World of Caesar
Olympiad Plaza (the area under the exterior of the Omnimax)
The Olympiad Club Parking
Il Palazzo
Olympic Tower
Centurion Tower
Romas Tower
Via Suites
Villa Suites
Olympic Tower Suites
Caesars Boulevard
Diana's Dome
The Piazza

EXHIBIT "D"
Page -1-

02/09/11

Colosseum Complex
Emperors Complex
   (convention rooms, if needed)
Caligula
Vitellius
Vespesian
Julius
Augustus
Tiberius
Claudius
Nero
Galba
Titus
Forum I
Forum II
Magestium
Regalium
Senate I
Senate II
Senate III
Romulus
Remus
Colosseum I
Colosseum II
Colosseum III
Colosseum IV
Colosseum V
Colosseum VI
Colosseum VII

**_Restaurants_**
Le Posh
The Broiler Room
Empress Court
Primavera
Cafe Roma
Evergreen Buffet
Post Time Snack Bar

**_Bars / Lounges_**
Fireside Lounge
Spooner Bar
Post Time Bar

**_Entertainment_**
Cascade Showroom
Caesars Cabaret
Caesars Outdoor Arena

**_Other_**
Sweet Suite (Dessert Shop)
Caesars Spa
Caesars Tahoe Convention Center
Caesars Galleria (shops)
Promenade
Race and Sports Book
Arcade (video games for "kids")
Caesars Exclusively
Caesars Yogurt Palace

EXHIBIT "D"
Page -2-

02/09/11



EXHIBIT "E"

EXHIBIT "E"

# EXHIBIT 3

## COLLATERAL ASSIGNMENT OF LEASE

**THIS COLLATERAL ASSIGNMENT OF LEASE** ("Assignment"), made as of the ___ day of March, 2011 by and among Sarah, LLC, a Limited Liability Company formed in the State of Illinois, having an address at c/o Palma Settimi Inc., Seven Sutton Place, Brewster, New York ("Assignor or Tenant" ), and Forall U.S.A. a corporation organized and existing under the laws the State of New York with an address at Seven Sutton Place, Brewster, New York 10509, ("Assignee");

## W I T N E S S E T H:

**WHEREAS,** Assignor is the tenant under a Lease Agreement (together with all amendments and modifications thereto, the "Lease") dated as of _____, 2010 for the Store located at The Forum Shops at Caesars Palace, Space G19, 3500 Las Vegas Blvd. South, Las Vegas, NV 89109; and

**WHEREAS,** as a condition to Landlord letting the Premises to Tenant, Landlord required that the Assignee guarantee the obligations of Tenant pursuant to the terms of the Lease;

**WHEREAS,** Assignee is willing to provide said guarantee to Landlord in consideration of Tenant executing this Collateral Assignment of Lease giving Assignor the option to take over the Premises from Tenant should the Landlord call on Assignee to perform pursuant to any provision of its guarantee.

**NOW THEREFORE,** in consideration of the foregoing and the mutual covenants hereinafter contained, the parties hereto agree as follows:

1. **Grant of Security Interest and Assignment.** Assignor hereby grants a security interest in, assigns, transfers, conveys and sets over to Assignee, all of Assignor's estate, title and interest in and to the Lease (the entirety of such estate, title and interest, and all rights, powers, privileges, options and other benefits of Assignor pursuant thereto, including the proceeds thereof, are hereinafter referred to collectively as the "Assignor's Interests"). The assignment of, and grant of a security interest in, Assignor's Interests shall be absolute and unconditional, and shall be effective upon the execution of this Assignment.

2. **Collateral Security.** The grant of the security interest, assignment, transfer and conveyance effected by Section 1 hereof is made by Assignor for the purpose of securing the performance of Assignor's obligations pursuant to the terms of the lease.

3.     **Representations, Warranties and Covenants of Assignor.**

Assignor represents and warrants to, and covenants with, Assignee as follows:

(a)  Assignor is the tenant under the Lease and no other party has any right, title or interest as a tenant, undertenant or assignee under the Lease.

(b)  Assignor has full right, power and authority to assign and transfer to Assignee the Assignor's Interests, free and clear of all liens, claims or encumbrances of any kind whatever, and this Assignment is effective to do so. The execution and delivery of this Assignment and the performance and observance of the obligations of Assignor hereunder will not violate the provisions of any agreement between Assignor and the Landlord under the Lease, or any other party or any other agreement of any kind to which Assignor is a party or by the terms of which Assignor is bound.

(c)  There will be no defaults under the Lease.

(d)  So long as this Assignment remains in effect, Assignor will not, without Assignee's prior written consent, sell, assign, convey, pledge, encumber or otherwise transfer to any other person, firm or entity any interest in the Lease.

4.     **Default and Remedy.** If Assignor breaches any of the representations, warranties or covenants herein contained, or if a default under the Lease or an Event of Default shall occur and Landlord calls upon Assignee to honor its guarantee, or if Assignor shall make an assignment for the benefit of creditors, be adjudged bankrupt or have filed in its behalf or against it any type of bankruptcy or insolvency proceeding, or if a trustee or receiver shall be appointed for Assignor or any of its property (the foregoing hereinafter referred to as an "Event of Default"), then, and in any such event, Assignee shall have the absolute right, without notice or demand, to succeed to the rights of Assignor as tenant under the Lease in accordance with the assignment evidenced hereby.

5. **Non-inclusive Remedy.** Should a default under the Lease or an Event of Default occur, and Assignee is called upon by Landlord to honor its guarantee, in addition to succeeding to the rights of Assignee as tenant under the Lease, Assignee may also at its election proceed directly and personally against Assignor to collect any and all damages incurred by reason of such default or Event of Default, including, but not limited to, any

sums paid to Landlord rightfully owed by Assignor, attorneys fees and any other expenses or damages incurred by Assignor in connection with honoring its guarantee.

6. **Waiver of Certain Laws.** Assignor agrees, to the full extent permitted by law, that upon the occurrence of any default or Event of Default, neither Assignor nor anyone claiming by or under Assignor shall or will set up, claim or seek to take advantage of laws now or hereafter in force in order to prevent or hinder the enforcement of this Assignment, and Assignor, for Assignor and all who may at any time claim through or under Assignor, hereby expressly waives to the full extent that Assignor may lawfully do so, the benefit of any such laws.

7. **Recording and Filing.** A counterpart of this Assignment and/or one or more UCC-1 financing statements may be recorded or filed, at the option of Assignee, in such offices as may be provided by law or as Assignee may deem appropriate. Assignor agrees to execute and deliver to Assignee any financing statements required under the Uniform Commercial Code as enacted in any state in which such recordation and filing would be appropriate. The costs of all such recordings and filings shall be borne by Assignor.

8. **Notices.** Each notice required or permitted hereunder shall be deemed to have been properly given or served by the deposit of same in the United States Mail, designated as registered or certified mail, return receipt requested, bearing adequate postage, and addressed as hereinafter provided:

| | |
|---|---|
| If to Assignor, to | Sarah, LLC<br>1717 Midwest Club Parkway<br>Oakbrook, IL 60523 |
| with a copy to | Mr. Adams<br>Bardier & Adams |
| If to Assignee, to | Forall, U.S.A.<br>Seven Sutton Place<br>Brewster, New York |
| with a copy to | James J. Veneruso, Esq.<br>Veneruso, Curto, Schwartz & Curto LLP<br>35 East Grassy Sprain Road, Suite 400<br>Yonkers, New York 10710 |

Each notice shall be effective upon being deposited as aforesaid, and rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given shall be deemed to be receipt of the notice sent.

9. **Assignment Irrevocable; Supplemental Instruments**. Assignor agrees that the assignment, transfer and conveyance made hereby is irrevocable, and that Assignor will not, while this Assignment is in effect, take any action that is inconsistent with this Assignment, or make any other assignment or conveyance of Assignor's Interests (other than to Assignee) without Assignee's prior written consent, and that any such assignment or conveyance without such consent shall be void and of no effect. Assignor will from time to time, upon request of Assignee, execute all instruments of further assurance and all supplemental instruments necessary to effect the transactions contemplated hereby as Assignee may specify.

10. **Amendment**.  This Assignment may be amended or modified only in a writing specifically referring to this Assignment and executed by each of the parties hereto.

11. **Governing Law**.  This Assignment shall be construed and enforced in accordance with the internal laws of the State of Nevada.  The invalidity, illegality or unenforceability of any provision of this Note shall not affect or impair the validity, legality or enforceability of the remainder of this Note, and to this end, the provisions of this Note are declared to be severable.

12. **Counterparts**. This Assignment may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

13. **Jurisdiction and Venue**. Assignor hereby consents to the jurisdiction of the courts of the State of Nevada in the County wherein the Store is located and the United States District Court for the District wherein the Store is located, as well as to the jurisdiction of all courts from which an appeal shall be taken from such courts, for the purpose of any suit, action or other proceeding arising out of any of its obligations arising under this Assignment or with respect to the transactions contemplated hereby, and expressly waives any and all objections it may have as to venue in any of such courts.

14. **Waiver of Trial by Jury**. ASSIGNOR AND ASSIGNEE HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDINGS, CLAIMS OR COUNTER-CLAIMS, WHETHER IN CONTRACT OR TORT, AT LAW OR IN EQUITY, ARISING OUT OF OR IN ANY WAY RELATING TO THIS AGREEMENT.

-4-

15. **Miscellaneous**.  The section and paragraph headings contained in this Assignment are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Assignment.  When used herein, the singular shall include the plural, and vice versa, and the use of the masculine, feminine or neuter gender shall include all other genders, as the context may require.

IN WITNESS WHEREOF, the parties hereto have executed this Assignment or have caused this Assignment to be duly executed as of the date first above written.

Sarah, LLC

By: _____
Name: Hala subh
Title: Member

By: _____
Name:  Suhad albasha
Title:  Member

Forall U.S.A.

By:_____
Name:
Title:

LANDLORD:

By:_____

-5-

STATE OF ILLINOIS )
                      ) ss.:
COUNTY OF DuPage )

On the 19 day of March in the year 2011 before me, the undersigned personally appeared **Hala subh** personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_Sarah E Botka_
(signature and office of individual taking acknowledgment)

"OFFICIAL SEAL"
Sarah E. Botka
Notary Public, State of Illinois
Will County
My Commission Expires 06-08-2014

STATE OF ILLINOIS )
                      ) ss.:
COUNTY OF DuPage )

On the 19 day of March in the year 2011 before me, the undersigned personally appeared **Suhad albasha** personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_Sarah E Botka_
(signature and office of individual taking acknowledgment)

"OFFICIAL SEAL"
Sarah E. Botka
Notary Public, State of Illinois
Will County
My Commission Expires 06-08-2014

-6-

STATE OF                                    )
                                            ) ss.:
COUNTY OF                                   )


     On the ___day of _____ in the year 2011 before me, the undersigned personally appeared _____ personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.


_____
(signature and office of individual taking acknowledgment)


STATE OF                                    )
                                            ) ss.:
COUNTY OF                                   )


     On the ___day of _____ in the year 2011 before me, the undersigned personally appeared _____ personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.


_____
(signature and office of individual taking acknowledgment)

# EXHIBIT 4

### Guaranty

The undersigned, in order to induce Forall U.S.A., Inc. ("Company") to enter into a License and Retail Operator Agreement ("Operator Agreement"), dated the____day of March 2011with  Sarah, LLC ("Operator"), **Hala subh, Suhad albasha, Bacher Hamad and Ammar Hamad** (each individually as a  "Guarantor") unconditionally, jointly and severally, guarantees to Company, its successors or assigns, the prompt full payment and performance of all obligations of Operator which are or may become due and owing to Company under the Franchise Agreement and all obligations arising out of any other agreement (whether or not in effect on the date hereof) between Operator and Company, including but not limited to any other franchise agreement, security agreement, purchase agreement, sublease or promissory note, and all extensions or renewals thereof, and the payment of all attorney's fees, costs and other expenses incurred by Company to enforce this Guaranty (collectively, with the License and Retail Operator Agreement, the "Agreements") in the same manner as if Agreements were executed between Company and the undersigned directly, as Operator.

The undersigned expressly waive(s): (a) notice of the acceptance by Company of this Guaranty, (b) demands of payment, presentation and protest, (c) all rights to assert or plead any statute of limitations as to or relating to this Guaranty, (d) any right to require Company to proceed against any other Guarantor, if any. or any other person or entity liable to Company, (e) any right to require Company to proceed under any other remedy Company may have before proceeding against Guarantor, or any other Guarantor, and (f) any right of subrogation. This Guaranty shall not be affected by the modification, amendment, extension, release or renewal of any agreement between Company and Operator, the taking of a note or other obligation from Operator or others, the taking of security for payment, the granting of extension of time for payment, the filing by or against Operator of bankruptcy, insolvency, reorganization of other debtor's relief afforded by the Federal Bankruptcy Act or any other state or federal statute or by the decision of any court, or any other matter, whether similar or dissimilar to any of the foregoing; and this Guaranty shall cover the terms and obligations of any such modifications, notes, security agreements, extensions, or renewals. The obligations of the undersigned shall be unconditional notwithstanding any defect in the genuineness, validity, regularity, or enforceability of the Operator's obligations or liability to Company, or any other circumstances whether or not referred to herein which might otherwise constitute a legal or equitable discharge of a surety or guarantor.

This is an irrevocable, unconditional and absolute guaranty of payment and performance and the undersigned agree(s) that his, hers or their liability of this Guaranty shall be immediate and shall not be contingent upon the exercise or enforcement by Company of whatever remedies

it may have against the Operator or others, or the enforcement of any lien or realization upon any security Company may at any time possess.

The undersigned covenant(s) and agree(s) that any indebtedness by the Operator to the undersigned, for any reason, currently existing, or which might hereafter arise, shall at all times be inferior and subordinate to any indebtedness owed by the Operator to Company.

The undersigned further covenant(s) and agree(s) that as long as the Operator owes any monies to Company the Operator will not pay and the undersigned will not accept payment of any part of any indebtedness owed by the Operator to any one of the undersigned, either directly or indirectly, without the consent of Company.

This Guaranty shall remain in full force and effect until all obligations arising out of and pursuant to the Agreements including all renewals, modifications, amendments and extensions thereof, are fully paid and satisfied.

This Guaranty shall be governed by and interpreted in accordance with the laws of the State of New York without regards to its conflicts of laws principles. Any dispute arising out of or under this Guaranty not settled by arbitration shall be resolved in accordance with the dispute resolution process set forth in the Agreement

**SIGNATURE PAGE TO FOLLOW**

2

**IN WITNESS THEREOF**, the undersigned have constituted this Agreement on the date set forth below.

Dated: March____, 2011

**GUARANTOR(S)**

_____

**Hala subh**
Address: 1717 Midwest Club, Oak Brook IL 60523 , Social Security # 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
Drivers License # 5103-3206-401 / State of Issuance     IL

_SALFASHA_
**Suhad albasha**
Address: 1 Andrew Ct, Burr Ridge IL 60527 , Social Security # 324 90.0181
Drivers License # AL42-7807-1731 / State of Issuance _____

_Bithand_
**Bachar Hamad**
Address: 1717 Midwest Club PK IL 60523 , Social Security # 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
Drivers License # _____ / State of Issuance     IL

_A. Hand_
**Ammar Hamad**
Address: 1 Andrew Ct. Burr Ridge IL 60527 , Social Security # 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
Drivers License # H 530 0006 1297 / State of Issuance     IL

STATE OF ILLINOIS          )
                                       ) ss.:
COUNTY OF DuPage          )

On the 1⁹ᵗʰ day of March in the year 2011 before me, the undersigned personally appeared **Hala subh**  personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_Sarah E Botka_
(signature and office of individual taking acknowledgment)

"OFFICIAL SEAL"
Sarah E. Botka
Notary Public, State of Illinois
Will County
My Commission Expires 06-08-2014

3

STATE OF ILLINOIS )
) ss.:
COUNTY OF DuPage )

On the 19 day of March in the year 2011 before me, the undersigned personally appeared **Suhad albasha** personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

*Sarah E Botka*
(signature and office of individual taking acknowledgment)

"OFFICIAL SEAL"
Sarah E. Botka
Notary Public, State of Illinois
Will County
My Commission Expires 06-08-2014

STATE OF ILLINOIS )
) ss.:
COUNTY OF DuPage )

On the 19 day of March in the year 2011 before me, the undersigned personally appeared **Bachar Hamad** personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

*Sarah E Botka*
(signature and office of individual taking acknowledgment)

"OFFICIAL SEAL"
Sarah E. Botka
Notary Public, State of Illinois
Will County
My Commission Expires 06-08-2014

STATE OF ILLINOIS )
) ss.:
COUNTY OF DuPage )

On the 19 day of March in the year 2011 before me, the undersigned personally appeared **Ammar Hamad** personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

*Sarah E Botka*
(signature and office of individual taking acknowledgment)

"OFFICIAL SEAL"
Sarah E. Botka
Notary Public, State of Illinois
Will County
My Commission Expires 06-08-2014

4

# EXHIBIT 5

## LICENSE AGREEMENT
## INTERNET SITE & SALES OF LICENSED PRODUCTS

This License Agreement (the "Agreement") is made as of ____ day of February, 2012, by and between **Forall USA., Inc.**, a New York Corporation ("Forall") with its principal place of business located at Seven Sutton Place, Brewster, New York (herein "Licensor") and **Sarah, LLC** a limited liability company formed in the State of Illinois (herein "Licensee") with a principal office located at 1717 Midwest Club Parkway, Oakbrook, IL 60523.

### WITNESSETH:

WHEREAS Licensor & Licensee entered into a License and Retail Operators Agreement dated March 19, 2011 (herein the "Retail Agreement");

**WHEREAS** the Agreement granted certain rights and imposed certain obligations upon Licensee pertaining to the "Pal Zileri" Licensed Products, as defined in the Retail Agreement, and specifically regarding, among other things, (a) the licensing of the System for the establishment and operation of a retail operation for the sale and presentation of "Pal Zileri" brand clothing and licensed products; and (b) to use of certain trademarks and Marks;

**WHEREAS** as Licensee has requested and Licensor has agreed to establish a website in order to sell Licensed Products on the internet; and

WHEREAS, Licensor is willing to grant Licensee's request subject to the terms and obligations contained in this Agreement.

NOW therefore in consideration of one dollar and other good and valuable consideration the parties agree as follows:

I.      Right to Sell Apparel in USA Market.

During the term of this Agreement Licensee shall have the right to sell Licensed Products (as that term is defined in the Retail Agreement) on the internet but only as to the US market only on a non-exclusive basis.  The right and license hereby granted excludes any right to sell Licensed Products for resale.  In addition, Licensee shall not display or sell any clothing accessories or other products other than the Licensed Products.

II.     Grant of License to Use Trademarks / Term.

A.      During the term of this Agreement Licensee may license to use the trademarks and marks identified in the Retail Agreement as "Marks" on Licensee's website upon the same rights and restrictions imposed by the Retail Agreement.  Licensee agrees not to display any additional trademarks or marks or its website.  Licensee will promptly notify Licensor of any new web address for Licensee's website.  Licensee acknowledges that the trademarks or marks cannot be further exploited without Licensor's prior written approval.  Notwithstanding the foregoing, Licensee must obtain Lisensor's approval of the website and its contents prior to its launch date.

B.      Licensee understands that Licensor intends to launch a website owned and controlled by Licensor promoting Pal Zileri Licensed Products ("Licensors Website").  Licensors Website will contain a link to Licensee's website and conversely Licensee's website will contain a link to Licensors Website.  The content of Licensee's website will be subject to the exclusive control of Licensor, including but not limited to

Licensed Products exhibited, product placement, text and all images.  This arrangement will remain in effect so long as the Retail Agreement is in effect.  Upon termination Licensee will remove its website from the Internet.

    III.    Indemnification.    Licensee agrees to defend, indemnify and hold harmless Licensor, its directors, officers and its agents from any and all claims arising from its obligations under this Agreement.

    IV.    Modification.

    This Agreement may be amended only in writing and only with the signature of a duly authorized representative of each party.

    V.    Notices.

    Any and all notices shall be in writing and shall be sent in accordance with the procedures set forth in section 17.6 of the Retail Agreement.

    VI.    Entire Agreement.

    This Agreement shall constitute the entire full and complete agreement between the parties concerning the subject matter hereof.  No other representation has been relied upon by Licensee or its officers or members or induced Licensee to execute this Agreement and there are no representations, inducements, promises, or agreements, oral or otherwise, between the parties not embodied herein which are of any force or effect with reference to this Agreement.

THE BALANCE OF THIS PAGE INTENTIONALLY LEFT BLANK

**IN WITNESS WHEREOF**, the parties hereto execute this Agreement under seal by their duly authorized representatives as of the date first above written.

Attest:

_____
Witness

**Forall U.S.A., Inc., Licensor**

By: _____

Its: _____

Attest:

_____
Witness

**Sarah, LLC., Licensee**

By: _____
        Hala subh

Its: Member as to a 50% interest

By: _____
        Suhad albasha

Its: Member as to a 50% interest

STATE OF   IL       )
                ) ss.:
COUNTY OF  DuPage   )

    On the 2 day of _____April_____ in the year 2012 before me, the undersigned personally appeared **Hala subh** personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
(signature and office of individual taking acknowledgment)

OFFICIAL SEAL
ANIL SAYANI
Notary Public - State of Illinois
My Commission Expires Feb 8, 2015

STATE OF    *IL*         )
                         ) ss.:
COUNTY OF *DuPage*    )

        On the *2* day of *April* in the year 2012 before me, the undersigned personally appeared **Suhad albasha** personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

OFFICIAL SEAL
ANIL SAYANI
Notary Public - State of Illinois
My Commission Expires Feb 8, 2015

(signature and office of individual taking acknowledgment)

STATE OF                  )
                         ) ss.:
COUNTY OF            )

        On the    day of           in the year 2012 before me, the undersigned personally appeared          personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

(signature and office of individual taking acknowledgment)

# EXHIBIT 6

**Sarah, LLC**
**1717 Midwest Club Parkway**
**Oak Brook, IL 60523**

January 28, 2013

Forall USA, Inc.
Seven Sutton Place
Brewster, NY 10509

Dear Sirs,

As you aware, Sarah, LLC is a party to certain License Retail and Operator Agreement executed in February, 2011 (the "Agreement"). As you are further aware, the Agreement provided Sarah, LLC ("Sarah") the exclusive license to market suits and related products bearing the "Pal Zileri" brand and Sarah has done so at the Forum Shops at Caesars Palace in Las Vegas since that time.

Unfortunately, as with the predecessor Pal Zileri store in Las Vegas, Sarah has found that operating the store in a profitable manner to be a near impossibility. This conclusion has come despite the best efforts of all parties involved, as well as the fine cooperation between Sarah and Forall USA, Inc. ("Forall"), as well as the home operation of Pal Zileri.

While Sarah intends to continue to operate the store in accordance with the terms set forth in the Agreement, it has come to the conclusion that such operations cannot be maintained long term. As a result, this letter is written to invite you to assist us in determining a prudent next step with respect to the Las Vegas store.

While Sarah is not in breach of the Agreement and does not intend to breach the Agreement in the foreseeable future, we note that one of the remedies set forth in the Agreement may be for Forall (or Pal Zileri) to take over the operations of the store and Sarah would be willing to discuss this as well as any other options the parties deem reasonable in order to either find a way to put the store on the road to profitability, find a new operator for the store or close the store -- whatever Sarah, Forall and Pal Zileri deem prudent.

Forall USA, Inc.
January 28, 2013
Page 2

     I look forward to hearing from you soon to discuss the options that would make the most sense for all of us.

                         Sincerely,

                         SARAH, LLC

                         Bachar Hamad, M.D.
                         Authorized Representative

LL/cm
W:\CASES\016374\00003\00008975.DOC

cc: James J. Veneruso, Esq.
    Lee Levin
    G. Casarotto (gcasarrotto@Pal Zileri.com)
    L. Spano (lspano@Pal Zileri.com )

# EXHIBIT 7

# VENERUSO, CURTO, SCHWARTZ & CURTO, LLP
## ATTORNEYS & COUNSELORS AT LAW

James J. Veneruso (Also Fl)
Joseph R. Curto
Stephen J. Schwartz
Michael J. Curto

Steven A. Accinelli (Also Ct)
Stephen J. Brown (Also Ct)
Renata Goldshteyn (Also NJ)

Of Counsel
Vincent Castellano
James M. Coogan
John Q. Kelly
William E. Sulzer (Also NJ)
Tracey Spencer Walsh

The Hudson Valley Bank Building
35 East Grassy Sprain Road
Suite 400
Yonkers, New York 10710
(914) 779-1100
(914) 779-0369 fax
www.vcsclaw.com

Writer's Direct Phone:

Writer's Direct E-Mail:

Writer's Direct Fax:

February 21, 2013

*Via Federal Express Overnight and Facsimile*

Sarah, LLC
Attn: Bachar Hamad, M.D.
1717 Midwest Club Parkway
Oakbrook, Illinois 60523

Re:  *License and Retail Operator Agreement – Forall U.S.A., Inc., and Sarah, LLC*

Dear Dr. Bachar Hamad:

This firm represents Forall U.S.A., Inc. (herein "Forall"). I write in response to your letter dated January 28, 2013, wherein you have advised that Sarah, LLC, has found it difficult to operate the "Pal Zileri" store at the Forum Shops at Caesars Palace in Las Vegas (herein "Store") in a profitable manner. You have expressed a desire on the part of Sarah, LLC to discuss the available "options" under the parties' License and Retail Operator Agreement dated March 2011 ("Agreement") as it pertains to the Store.

As a preliminary matter, Forall is concerned as to Sarah's operation of the Store and its obligations under the Agreement. We must impress upon Sarah that this issue must be resolved as quickly as possible to the satisfaction of Forall in order to prevent any loss of business or reputation to the Pal Zileri brand.

Please be advised that at this time, and without waiving any of its rights under the Agreement, Forall does not wish to nor does it intend to take over the operation of the Store.

In order to save its investment and to preserve the company image, Forall will try, without any commitment and full reservation of rights under the Agreement, to find a new operator of the Store who may be able to take over the operation from Sarah, LLC. Forall deems the following items of critical importance to finding a new potential business partner to operate the Store and assume the License and Retail Operator Agreement:

1. Sarah must be current and not in default on the Lease;
2. Sarah will turn over the Store and assign the Agreement and Lease without payment or compensation of any kind;
3. The business must be debt free and all creditors must be paid in full;

VENERUSO, CURTO, SCHWARTZ & CURTO, LLP
ATTORNEYS & COUNSELORS AT LAW

Sarah, LLC
February 21, 2013
Page 2 of 2

    4.  In the event a new operator is identified and the operation is transferred to the new operator, the only amount paid to Sarah shall be for any transferred Store merchandise, which shall be transferred in accordance with Section 11.8 of the Agreement.

Forall shall not assume any liability or obligation with respect to this search and all of Sarah's obligations under the Agreement are continuing and in full force.

We must emphasize that Forall and Pal Zileri have invested a significant amount of money into the Store and operation and their image and reputation is at stake. Accordingly, it will be in all parties' best interest to come to a quick resolution of this matter.

Thank you for your time and kind attention. All rights are reserved. Nothing herein is intended nor shall it act as a modification or waiver of any contractual right or remedy under the law.

Very truly yours,

James J. Veneruso

Encl.

cc:    Lee Levin, Esq. (via facsimile)

# EXHIBIT 8

LAW OFFICES

# KAMENSKY RUBINSTEIN HOCHMAN & DELOTT, LLP

AN LLP INCLUDING PROFESSIONAL CORPORATIONS

SUITE 200

7250 NORTH CICERO AVENUE

LINCOLNWOOD, ILLINOIS 60712-1693

(847) 982-1776

FACSIMILE: (847) 982-1676
WWW.KR-LAW.COM

LEE J. LEVIN
(847) 568-5612
E-MAIL: llevin@kr-law.com

SUITE 1350
ONE NORTH LASALLE STREET
CHICAGO, ILLINOIS 60602
TELEPHONE (312) 368-1776
TELEPHONE (312) 807-3980

February 25, 2013

Mr. James J. Veneruso
The Hudson Valley Bank Building, Suite 400
35 East Grassy Sprain Road
Yonkers, NY 10710

Re:  Forall U.S.A., Inc./Sarah, LLC.

Dear Mr. Veneruso:

Dr. Hamad has asked me to respond to your letter to him dated February 21, 2013. Sarah, LLC ("Sarah") appreciates Forall U.S.A., Inc.'s ("Forall") efforts in response to Dr. Hamad's letter dated January 28, 2013 in its offer to seek to find a new operator of the Las Vegas store at Caesars Palace (the "Store"). Your outline of the terms of Forall's offer to undertake those efforts was generally acceptable to Sarah, but there are a number of other items it believes are needed to be further set forth to memorialize the parties' understanding with respect to their relationship going forward and the efforts of Forall to find a replacement operator.

They are:

1.  Forall still needs to make the final payment for the construction build out which was due for the 2013 season.

2.  Forall needs to pay Sarah the amount due for advertising and employee clothing for 2013.

3.  The new investor must understand that they must take an assignment of Sarah's lease at Caesars as part of the transaction.

4.  The agreement with the new investor should indicate that their new investment entity needs to pay one hundred percent (100%) of the money spent by Sarah on the merchandise for Spring 2013 as part of the investment to be made by that person or entity. To do so, will alleviate that burden on Forall. The balance of the money spent on merchandise currently in the store would then follow the provisions set forth in the original agreement between Forall and Sarah.

KAMENSKY RUBINSTEIN
HOCHMAN & DELOTT, LLP

Mr. James J. Veneruso
February 25, 2013
Page 2

5. The new investor also needs to pay for the computer system and sewing machine Sarah acquired and installed at a total cost of Twenty Two Thousand Dollars ($22,000).

6. To the extent possible, given the fact that the new investor will be receiving a turnkey operation with a build out and a substantial investment by Sarah, that a One Hundred Fifty Thousand Dollar ($150,000) transfer fee be negotiated as well.

Again, Sarah appreciates the cooperation shown by Forall with respect to this matter and looks forward to a successful transition to a new investor. To the extent that any new investors are identified by Forall, please have Forall work directly with Dr. Hamad to finalize whatever transition items need to be discussed among the parties.

Sincerely,

KAMENSKY RUBINSTEIN
HOCHMAN & DELOTT, LLP

Lee Levin

LL/cm
W:\CASES\016374\00003\00011128.DOC

Cc: Bachar Hamad, M.D.

# EXHIBIT 9

# VENERUSO, CURTO, SCHWARTZ & CURTO, LLP

## ATTORNEYS & COUNSELORS AT LAW

James J. Veneruso (Also Fl)
Joseph R. Curto
Stephen J. Schwartz
Michael J. Curto
————
Steven A. Accinelli (Also Ct)
Stephen J. Brown (Also Ct)
Renata Goldshteyn (Also NJ)
————
Of Counsel
Vincent Castellano
James M. Coogan
John Q. Kelly
William E. Sulzer (Also NJ)

The Hudson Valley Bank Building
35 East Grassy Sprain Road
Suite 400
Yonkers, New York 10710

(914) 779-1100
(914) 779-0369 fax
www.vcsclaw.com

Writer's Direct Phone:
Extension 329
Writer's Direct E-Mail:
sbrown@vcsclaw.com
Writer's Direct Fax:
914-793-0639

March 5, 2013

*Via Federal Express Overnight and Facsimile*

Lee Levin, Esq.
Kamensky Rubinstein Hochman & Delott, LLP
7250 North Cicero Avenue
Lincolnwood, Illinois 60712-1693

Re:  *License and Retail Operator Agreement – Forall U.S.A., Inc., and Sarah, LLC*

Dear Mr. Levin:

As you are aware, this firm represents Forall U.S.A., Inc. ("Forall"). We are in receipt of your letter dated February 25, 2013. We have consulted with our client and respond to the several items highlighted by Sarah, LLC ("Sarah"), in your letter as follows:

1. Construction Costs.

Forall will, pursuant to the parties' Agreement, continue to pay the Forall contribution for the Store construction costs through a 20% discount for all goods sold to Sarah. Sarah will need to take in the product for Spring 2013 and pay for it in advance in order to provide sufficient credit to pay for all outstanding construction costs. According to Forall's calculations, once Forall delivers the Spring / Summer 2013 product, enough credit should be available to pay approximately 100% of Forall's responsibility for the build out costs. Of course, to the extent that Sarah is able to finalize a transfer the Store to a new operator on or before April 30, 2013, the Spring goods will be the responsibility of the new operator.

2. Advertising and Employee Clothing for 2013.

Advertising costs shall be paid seasonably and by way of discount for paid goods pursuant to the parties' Agreement. Please provide a detailed list of all advertisement and employee clothing expenses outstanding.

**VENERUSO, CURTO, SCHWARTZ & CURTO, LLP**
ATTORNEYS & COUNSELORS AT LAW

Lee Levin, Esq.
Re: Sarah, LLC
March 5, 2013
Page 2 of 2

3.   Assignment of Lease.

To the extent a new investor is identified and the investor agrees to assume the operation of the Store, we expect that as part of that transaction, the Lease shall be assigned to the new investor, subject to landlord approval and/or consent per the terms of the Lease.

4.   Terms of Agreement with New Investor.

Although Forall is willing to work with Sarah to identify a new third party to take over the Store, it must be stressed that Forall does not have a new operator or investor identified and Forall does not assume responsibility with respect to same.   Any terms for a transition of the Store to a new party will have to be negotiated and finalized with the third party by and among Sarah, the third party and Forall (per the terms of the Agreement).   Of course, Forall will support efforts in order to ensure a smooth transition of the Store and that the Store is sufficiently stocked with product at all times.   Forall currently has $400,000 on order to be delivered by April 30, 2013.   Sarah is expected to pay for all goods shipped to the Store until such further time that a new arrangement is made.

5.   Computer System and Sewing Machine.

Forall believes that it is reasonable for Sarah to be reimbursed by the third party for the new computer system and sewing machine as part of a transfer of the Store.   However, this is a matter that will need to be negotiated between Sarah and the potential new operator of the Store and Forall cannot guarantee that the new operator will agree to purchase the equipment and at what price.   Please note that the button-hole machine is property of Forall and should not be included in any transfer / reimbursement calculation .Please have Sarah provide the invoices for these capital purchases to Forall.

6.   Transfer Fee.

Any terms of the transfer, including a transfer fee, if applicable, will have to be negotiated and agreed to by the new third party.   Forall believes that Sarah's insistence on a transfer fee may complicate any potential transfer and assignment of the Store and feels that the best way to find a new operator is for Sarah to give the Store back with zero "Key Money".   We suggest that you give this some thought.

Thank you for your time and kind attention.   All rights are reserved.   Nothing herein is intended nor shall it act as a modification or waiver of Forall's contractual rights or remedies under the law.

Very truly yours,

James J. Veneruso

cc:      Luca Spano

# EXHIBIT 10

# VENERUSO, CURTO, SCHWARTZ & CURTO, LLP

## ATTORNEYS & COUNSELORS AT LAW

James J. Veneruso (Also Fl)
Joseph R. Curto
Stephen J. Schwartz
Michael J. Curto

Steven A. Accinelli (Also Ct)
Stephen J. Brown (Also Ct)
Renata Goldshteyn (Also NJ)

Of Counsel
Vincent Castellano
James M. Coogan
John Q. Kelly
William E. Sulzer (Also NJ)
Tracey Spencer Walsh

The Hudson Valley Bank Building
35 East Grassy Sprain Road
Suite 400
Yonkers, New York 10710

(914) 779-1100
(914) 779-0369 fax
www.vcsclaw.com

Writer's Direct Phone:

Writer's Direct E-Mail:

Writer's Direct Fax:

June 19, 2013

*Via Federal Express Overnight and Facsimile*

Lee Levin, Esq.
Kamensky Rubinstein Hochman & Delott, LLP
7250 North Cicero Avenue
Lincolnwood, Illinois 60712-1693

      Re:     *License and Retail Operator Agreement – Forall U.S.A., Inc., and Sarah, LLC*

Dear Mr. Levin:

As you are aware, this firm represents Forall U.S.A., Inc. ("Forall") as counsel. We have been informed that your client, Dr. Hamad, by email dated June 5, 2013, advised Forall that he would be notifying The Forum Shops at Caesars Palace ("Landlord") that Sarah, LLC ("Sarah"), would "transfer the store to the mall effective [October 1, 2013]".

Please be advised that Forall does not consent to the proposed transfer of the store by Sarah to the Landlord or any other party at this time and that all rights are reserved under the parties' License and Retail Operator Agreement ("Agreement") and the Lease Agreement between Sarah and the Landlord, which provides Forall with the right of assignment of the Lease.

Please be further advised that your client's communication amounts to an anticipatory breach of, *inter alia*, Article 11.1.5 of the parties' Agreement and as such your client is hereby provided notice to cure any and all breaches of the Agreement and provide written confirmation of same forthwith.

All rights are reserved. Nothing herein is intended nor shall it act as a modification or waiver of Forall's contractual rights or remedies under the law. Please do not hesitate to contact me to discuss further.

Very truly yours,

James J. Veneruso

cc:     Luca Spano
        Landlord

# Send Result Report

MFP

**FS-1128MFP**



Firmware Version  2JN_2F00.022.009 2010.11.17

06/20/2013 12:55
[2H9_1000.005.001] [2H9_1100.001.003] [2H9_7000.001.011]

Job No.: 006132          Total Time: 0°00'47"          Page: 002

# Complete

Document:          doc20130620125406

55 EAST GRASSY SPRAIN ROAD, YONKERS, NEW YORK, 10701

(914) 779-1100 ‖ FAX: (914) 779-0569

| No. | Date and Time | Destination | Times | Type | Result | Resolution/ECM |
|-----|---------------|-------------|-------|------|--------|----------------|
| 001 | 06/20/13 12:54 | 18479821676 | 0°00'47" | FAX | OK | 200x100 Normal/On |

[ QRH1127395 ]

# EXHIBIT 11

W:\CASES\016374\00003\00027093.DOC
9/10/13

## MANAGEMENT AGREEMENT

**THIS MANAGEMENT AGREEMENT** ("Agreement") is made this 10th day of September 2013, by and between **ITALNORD FORUM LV, LLC,** a Florida limited liability company (the "Manager") and **SARAH, LLC,** a Nevada limited liability company (the "Company") to be effective as of September 10, 2013 (the "Effective Date").

## WITNESSETH:

**WHEREAS,** Company is in the business (the "Business") of selling men's attire and accessories primarily bearing the name "Pal Zileri" pursuant to a License Agreement ("License Agreement") with Forall, U.S.A., Inc. ("Forall"), from its current location at the Forum Shops at Caesar's, Las Vegas, Nevada (the "Location"); and

**WHEREAS,** Company desires to retain the services of a manager to manage all aspects of the Business; and

**WHEREAS,** Manager is willing to assume such duties on the terms and conditions contained in this Agreement.

**NOW, THEREFORE,** for good and valuable consideration, including the mutual promises contained herein, the parties agree as follows:

## ARTICLE I
## EMPLOYMENT

**Section 1.1.**  Company appoints Manager, and Manager accepts the appointment, on the terms and conditions hereinafter provided as the exclusive managing agent for Company.

**Section 1.2.**  Manager will be in compliance at all times with Company's obligations under its lease of the Location ("the Lease") and these acts and their respective regulations. Notwithstanding anything in this Agreement to the contrary, Manager is not, by this Agreement or otherwise, assuming the Lease.

**Section 1.3.**  Manager will make all decision affecting the Business, and will confer fully and freely with Company as such times as it deems necessary and relating to the Business.

## ARTICLE II
## TERM

**Section 2.1.**  This Agreement shall be effective from the Effective Date, and shall continue until January 31, 2015 (the "Expiration Date").  The period between the Effective Date and the Expiration Date (as same may be extended, as set forth below) is referred to herein as the "Term."  If Manager assumes the Lease within the Term, this Agreement shall terminate.  If Manager does not assume the Lease prior to the expiration of the Term, Manager may, but shall



not have the obligation to, extend the Term for an additional twelve (12)-month period by delivering written notice of same to Company prior to the expiration of the Term.

**ARTICLE III**
**COMPENSATION**

**Section 3.1**. In consideration for the services to be provided pursuant to this Agreement during each calendar year, Company shall pay Manager a fee ("Administrative Fee") equal to the profit of the Business, commencing from the Effective Date through the end of the Term. For purposes of this Agreement, the term "profit" means total revenue generated from the operation of the Business, less all expenses of the Business (including, without limitation, rent and other payments under the Lease, payments to suppliers and vendors, licensing fees, franchise fees (if any), insurance premiums, taxes, and depreciation and all other expenses of Company which are not specifically excluded under this Article III. Expenses of the Business do not include any of the following (all of which shall be the sole obligation of the Company, and none of which shall be deducted from total revenue): taxes and assessments attributable to the Excluded Assets (as defined in the Asset Purchase Agreement, defined in Section 4.3 below), expenses incurred by Company without the knowledge or consent of the Manager, and salaries and fringe benefits for principals, executives, and employees of the Company (except relating to employees who are hired by Manager), all of which shall be the sole obligation of the Company. Revenue and expenses of the Business shall be prorated on a per diem, accrual (rather than cash) basis, with Manager being responsible for same accruing during the Term, and the Company being responsible for same accruing prior to and after the Term. During the Term, Manager shall prepare, and the Company shall promptly file, all sales and excise tax returns and filings, and employment tax returns and filings, related to the Business; payments with respect to these returns shall be expenses of the Business (except as provided above in this Section 3.1 with respect to employees of the Company not hired by Manager).

**Section 3.2**. The Administrative Fee shall be paid by Company to Manager at Manager's discretion provided, however, that the Administrative Fee shall be paid by Company to Manager no less often than annually and no more often than monthly. In no event shall any administrative fee, distribution, or other compensation be owed or paid to the Company with respect to the Business during the Term.

**ARTICLE IV**
**MANAGER'S DUTIES**

**Section 4.1**. Manager shall provide or cause to be provided all services necessary to operate the day to day management of Company which include those services which, in Manager's sole discretion, may be reasonably necessary for the successful operation of the Business, and shall include, but shall not be limited to, the services set forth on Schedule 4.1 attached to this Agreement and made a part of this Agreement by this reference.

**Section 4.2**. Manager may retain or hire on behalf of Company any employees, independent contractors or agents Manager deems necessary to accomplish the purposes set forth in Section 4.1 above. All such persons or entities so retained or hired shall be considered

2



retained or hired by Company, but the salaries, fees, commissions, costs and expenses incurred in retaining and compensating such employees, independent contractors and agents shall be borne entirely by Manager.

**Section 4.3**.  The parties acknowledge and understand that Manager has purchased all of the furniture, fixtures and equipment of Company, effective as of the Effective Date, pursuant to that certain Asset Purchase Agreement of even date herewith (the "Asset Purchase Agreement"). As a result, Manager shall provide during the Term all of the furniture, fixtures and equipment so acquired by Manger for the benefit of Company's operations of the Business at the Location at no charge to Company during the Term.   In addition, Manager shall be responsible for purchasing, at Manager's cost, all inventory necessary for the successful operation of the Business.  Manager shall also be responsible for paying any and all other overhead incurred by Company in the normal course of its operations, such as but not limited to accounting, legal fees (to the extent necessary as determined by Manager on behalf of Company) and business license fees; it being the goal of Manager and Company that neither Company nor Company's principals shall have to come out of pocket for the payment of any Company-related expenses; it being understood that Manager shall, as additional consideration for entering into this Agreement, be entitled to all receipts and revenue generated from the Business in exchange for Manager's agreement to pay expenses as set forth in this Agreement.   Manager understands and acknowledges that the receipts from the Business may be lower than Manager's expense obligations hereunder and Manager agrees that Manager shall be solely responsible for covering any shortfall so resulting.

**Section 4.4**.  The rights, duties and obligations of each of Company and Manager under this Agreement shall not be modified or amended without the express written consent of the party to be charged.

**ARTICLE V**
**RESPONSIBILITIES AND COOPERATION**

**Section 5.1**.  Everything done by Manager under the provisions of Article IV hereof shall be done as an agent of Company.  Every liability or obligation of the Business for the account of Company accruing after the Effective Date shall be borne by Manager, excluding, however,  any of same related to Company's acts or omissions.  Manager agrees to pay promptly all obligations properly incurred by Manager on behalf of Company.

**Section 5.2**.  Manager's responsibilities pursuant to this Agreement may be performed by Manager or any employee, subagent or other representative of Manager.

**Section 5.3**.  Company shall cause its principals to cooperate with Manager in the execution of any documentation reasonably necessary to continue Company's existence, including, but not limited to, submission of annual reports, the execution of consents and any other documentation reasonably determined by Manager to be necessary to be signed by Company; provided, however, that in seeking such consent Manager shall continue to assume ultimate responsibility for any liabilities created therein and Company's principals shall not be required to personally guarantee any liabilities not currently guaranteed by them.



3

**Section 5.4**.  As a material inducement for Manager to enter into this Agreement, the Company shall not, during the Term, as same may be extended:  (a) enter into any agreement to sell all or any portion of the Business, or to assign or otherwise transfer any interest in the Lease, or to sublet all or any portion of the Premises, or (b) collaterally assign or pledge any interest in the Business or the Lease (the "Prohibited Transactions").   Notwithstanding the foregoing, Company shall be permitted to undertake any one or more of the Prohibited Transactions prior to the end of the Term if both: (i) Manager expressly informs Company, in a manner in compliance with the provisions of Section 4.4 of the Asset Purchase Agreement, of its unwillingness to take over the Business effective at the Term; and (ii) the effective date of the closing of the Prohibited Transactions is after the expiration of the Term (as same may be extended).

## ARTICLE VI
## COMPANY'S RESPONSIBILITIES

**Section 6.1**.  Company shall provide Manager with all necessary information concerning its operation and will be responsible to Manager for any additional information reasonably necessary to enable Manager to carry out his responsibilities under this Agreement.

**Section 6.2**.  To ensure the reasonable and proper functioning of Company the parties agree that Company shall not contract, borrow funds, deposit or withdraw funds and incur debts without prior notice and prior approval by Manager.

## ARTICLE VII
## INDEMNIFICATION

**Section 7.1**.  Manager shall be liable to Company for all losses and damages with respect to the Business incurred by Company accruing during the Term, which are not related to Company's acts or omissions occurring prior to the Effective Date.  Manager shall indemnify, defend and hold Company harmless from the following accruing and arising after the Effective Date (which are not related to Company's acts or omissions occurring prior to the Effective Date), to the extent not related to Company's negligence or willful malfeasance: (a) any liability, damage, cost, and expense, including reasonable attorneys' fees sustained or incurred from injury to any person or property in, about and in connection with the Business accruing during the Term from any cause whatsoever, unless such injury shall be caused by Company's failure to comply with its obligations hereunder; (b) any liability, damage, penalty, cost and expense, statutory or otherwise for all acts properly performed by Company pursuant to the instructions of Manager.   Notwithstanding anything in this Agreement to the contrary, unless caused by Manager's acts or omissions Manager will not be liable for the Location's noncompliance with applicable laws, statutes, ordinances, rules, codes, regulations, orders, and interpretations of all federal, state, and other governmental or quasi-governmental authorities having jurisdiction over the Location, including, without limitation, any zoning laws and the Americans with Disabilities Act of 1990, as the same may be amended; the costs to cure any of same shall be solely those of the Company, and shall not be expenses of the Business deducted from total revenue.



4

## ARTICLE VIII
## NOTICES

**Section 8.1**.  Any written notice to either party to this Agreement required or permitted by this Agreement shall be given by facsimile, nationally recognized overnight courier, or certified mail with return receipt requested, postage prepaid, to such party. Any and all notices referred to in this Agreement or which any party desires to give to another, shall be addressed as follows:

To Company:

      _____
      _____
      _____
      Attn: Bachar Hamad, M.D.

with a copy to:

      Kamensky Rubinstein Hochman
       & Delott, LLP
      7250 North Cicero Avenue, Suite 200
      Lincolnwood, Illinois 60712
      Attn:  Lee Levin

To Purchaser:

      Italnord Forum LV, LLC
      c/o Gutierrez Yelin & Boulris, PLLC
      100 Almeria Avenue
      Suite 340
      Coral Gables, FL 33134
      Attn:  Alfonso Entebi

with a copy to:

      Gutierrez Yelin & Boulris, PLLC
      100 Almeria Avenue
      Suite 340
      Coral Gables, FL 33134
      Attn: Jorge R. Gutierrez

**Section 8.2**.  A party may change its address for notice by delivery of at least ten (10) days' prior written notice to the other party of its new address for notice.

**Section 8.3**.  Any notice given by mail shall be deemed delivered upon receipt or upon delivery being deemed refused or undeliverable as determined by the postal authorities.

## ARTICLE IX
## BINDING EFFECT



**Section 9.1**. This Agreement has been executed under the laws of the State of Nevada and shall be binding upon the respective heirs, successors, assigns and legal representatives of the parties.

**Section 9.2**. It is the intention of the parties hereto that this Agreement and the performance hereunder and all suits and special proceeds hereunder be construed in accordance with the laws of the State of Nevada, regardless of whether one party may become a resident of another state. Any action, special proceeding or other proceedings that may be brought arising out of, or in connection with, or by reason of this Agreement the laws of the State of Nevada shall be applicable and shall govern to the exclusion of the laws of any other forum, without regard to the jurisdiction in which any action or special proceeding may be instituted.

## ARTICLE X
## ENTIRE AGREEMENT

**Section 10.1**. The parties acknowledge that this Agreement shall constitute the entire agreement between the parties and no variance or modification hereof shall be valid and enforceable except by supplemental agreement, in writing, executed and approved by both parties hereto.

**Section 10.2**. The parties stipulate that neither of them has made any representations with respect to the subject matter of this Agreement, including the execution and delivery hereof, except such representations as are specifically set forth herein and each of the parties hereto acknowledges that each has relied on his or her own judgment in entering into this Agreement.

## ARTICLE XI
## MISCELLANEOUS PROVISIONS

**Section 11.1**. All agreements and covenants contained herein are severable, and in the event any of them shall be held to be invalid by any competent court, this Agreement shall be interpreted as if such invalid provisions or covenants were not contained herein, in order to give the remaining provisions full and legally binding meaning.

**Section 11.2**. This Agreement may not be assigned by either Company or Manager without the other party's prior written consent.

**Section 11.3**. Failure of any party hereto to assist upon strict compliance with any of the terms, covenants and conditions hereof shall not be deemed a waiver or relinquishment of such terms, covenants and conditions of any similar right or power hereunder at any subsequent time.

**Section 11.4**. The provisions of this Management Agreement, are subject to and to be interpreted consistently with the provisions of Section 4.4 of the Asset Purchase Agreement.



**IN WITNESS WHEREOF**, the parties have executed this Agreement on the date first above written.

**COMPANY:**

**SARAH, LLC**

By:_____
          President

**ATTEST:**

_____

**MANAGER:**

**ITALNORD FORUM LV, LLC**

By:_____
          Alfonso Entebi, as Manager

**FOR VALUE RECEIVED**, for the period beginning on the Effective Date and ending January 31, 2015, the undersigned agrees to look solely to Manager for the performance of the Company's obligations under the License Agreement during the Term.   The undersigned represents and warrants to Company and Manager that it will personally benefit by its Agreement to be so bound and recognizes that the parties would not enter into this Agreement to the benefit of the undersigned without the undersigned's agreements to the terms set forth in this paragraph.

**FORALL, U.S.A, INC.**

_____

_____

7

## SCHEDULE 4.1 TO MANAGEMENT AGREEMENT

1.   Hire and fire all personnel.
2.   Review personnel performances.
3.   Schedule personnel.
4.   Coordinate all activities of personnel.
5.   Purchase inventory and stock the shelves of the location.
6.   Schedule vacation time.
7.   Review all business done by Company as to procedures, consultations, business aspects and collections.
8.   Supervise all staff.
9.   Set prices for inventory.
10.  Set all wages, services and bonuses.
11.  Maintain and purchase all equipment and supplies.
12.  Strategic planning for Company.
13.  Arrange for timely filing of tax reports for Company and be a liaison with the accountant and attorneys.
14.  Assign work to personnel and coordinate the efficient performance of that work.
15.  Write all checks and manage bank accounts.
16.  Maintain adequate cash flow for Company.
17.  Undertake all marketing and advertising.
18.  Coordinate purchases of insurance and workmen's compensation coverage for Company.
19.  Monitor the paperwork of the organization, ensuring proper cash flow and adequate capital.
20.  Maintain overhead for Company to be within reasonable limits and prevent undue expenses to Company from timely researching of inventory purchased and services used by Company.
21.  Reviewing and approving all contracts that Company may contract with.
22.  Ensure an adequate supply of materials and equipment for Company for smooth functioning.
23.  Any other functions that may pertain to the above from a coordinating, managing and supervisory level, it being understood that Manager shall have complete authority to operate the Business.



8

# EXHIBIT 12

W:\CASES\016374\00003\00027388.DOC
9/10/13a

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** ("Agreement") is made this 10th day of September 2013, by and among **SARAH, LLC**, a Nevada limited liability company ("Seller") and **ITALNORD FORUM LV, LLC**, a Florida limited liability company ("Purchaser").

## R E C I T A L S

A.  Seller owns and operates a retail store primarily selling goods with the Pal Zileri brand name (the "Business") located at The Forum Shops at Caesar's Palace, 3500 Las Vegas Blvd. South, Suite K-8, Las Vegas, Nevada (the "Premises").

B.  Seller desires to sell to Purchaser, and Purchaser desires to purchase from Seller, substantially all of the assets of the Business, on the terms and conditions set forth below.

C.  Accordingly, for the mutual promises and covenants contained in this Agreement, and other good and valuable consideration, the parties hereto agree as follows:

## ARTICLE I
## PURCHASE AND SALE OF ASSETS

**1.1    Purchase and Sale of Business Assets.**  Subject to the terms and conditions set forth in this Agreement, on the Closing Date (which is defined in Section 2.1 of this Agreement) Seller shall sell to Purchaser, and Purchaser shall purchase, certain of Seller's assets comprising or relating to the Business (collectively, the "Business Assets") to Purchaser, but excluding the Excluded Assets (as defined in Section 1.2).   Business Assets of Seller include, without limitation, the following:

(a)  All furniture, fixtures, equipment and other tangible personal property used in conducting the Business on the Closing Date, including, but not limited to, those items listed on Schedule 1.1(a), which is attached hereto and made a part hereof by this reference;

(b)  All intangible property now or hereafter owned or used by Seller in connection with the Business or otherwise comprising a portion of the assets, properties and/or business of the Business, including, but not limited to:

(i)  The proprietary information and other intellectual property of the Business;

(ii)     A license to use, during the Term (as defined in Section 4.4 of this Agreement), all contracts of Seller utilized in the operation of the Business which are exclusive to Seller, which are assignable by Seller and accepted by Purchaser, including, but not limited to, the Seller's License and Retail Operations Agreement with Forall U.S.A., Inc. ("Forall") which provides Seller with the right to sell goods with the Pal Zileri name and utilize that name in its operations and advertising (the "License Agreement") and those contracts that are listed on Schedule 1.1(c)(iv), but not including; Seller's lease of the Premises (the "Lease"); and

(iii)     All of employee records, business billing and insurance information; and

(c)     All goodwill of the Business which is being sold to Purchaser under the terms set forth in this Agreement.

**1.2  Excluded Assets.** Notwithstanding the provisions of Section 1.1 of this Agreement, the following (the "Excluded Assets") shall be excluded from the Business Assets sold by Seller to Purchaser hereunder:

(a)     All of Seller's accounts receivables accruing prior to the Closing Date plus any receivable created by Seller's sale of any Excluded Assets, and cash, checkbooks, canceled checks, correspondence and business records with respect to the Business in existence prior to the Closing Date;

(b)     All of Seller's employees' personal effects, including but not limited to, personal photographs, pictures, books, diplomas, certificates, memorabilia, artifacts, mementos and similar personal items;

(c)     All books of account and tax records of Seller other than records of the nature described in Section 1.1(c) (v);

(d)     All of Seller's rights under this Agreement;

(e)     Those items of furniture, fixtures and equipment set forth in Schedule 1.2(e);

(f)     All inventory owned by Seller; and

(g)     The Lease; however, the parties recognize that Purchaser shall be provided the right and obligation to manage the Premises under the Management Agreement (as defined in Section 4.4).

**1.3  Purchase Price.**

(a)     The purchase price for the Business Assets shall be One Hundred Forty Thousand Dollars ($140,000), hereinafter referred to as the "Purchase Price."



2

(b)     The parties agree to file all appropriate Internal Revenue Service forms, including Form 8594, with their respective Federal income tax returns for their respective tax years in which the Closing Date occurs based upon the foregoing allocations.

**1.4     Lease Deposit and Forall Payment.** In addition to the Purchase Price, Purchaser shall:

(a)     Provide Seller with a refundable deposit equal to Sixty Five Thousand Dollars ($65,000), representing one month's rent of the Premises under the Lease (the "Lease Deposit"). Seller shall return the Lease Deposit to Purchaser within five (5) business days of Seller's receipt of proof that all rent and other charges under the Lease, if any, due to the landlord of the Premises for the period October 1, 2013 through the expiration of the Term (as same may be extended); and

(b)     Pay to Seller Thirty-Eight Thousand Dollars ($38,000) which is due from Forall to Seller (the "Forall Payment"). Purchaser shall seek reimbursement of the Forall Payment from Forall.

**1.5     Payment of Purchase Price, Lease Deposit, and Forall Payment.** Payment of the Purchase Price, Lease Deposit, and Forall Payment shall be paid by Purchaser to Seller as follows:

(a)     Ninety-Three Thousand Dollars ($93,000) shall be paid to Seller within five (5) business days after the Closing Date by cash, certified check, wire transfer or other immediately available funds (the "First Payment"); followed by

(b)     Three (3) payments to Seller of Fifty Thousand Dollars ($50,000) each, shall be due October 1, 2013, November 1, 2013 and December 2, 2013, each made by cash, certified check, wire transfer or other immediately available funds.

The parties acknowledge and agree that Sixty Five Thousand Dollars ($65,000) of the First Payment shall constitute the Lease Deposit, required by and governed pursuant to the terms of Section 1.4 shall be secured by Purchaser's pledge of the Business Assets in the manner set forth in the form of Security Agreement attached as Exhibit A.

On the Payment Date, Purchaser shall also pay to Seller 20/30ths of the September 2013 rent for the Premises under the Lease.

**1.6     Offsets, Credits and Prorations.** All taxes, rents, utilities, insurance premiums and other costs and expenses of owning or operating the Business Assets or conducting the Business shall be prorated, with Seller responsible for the cost of all such items which relate to the period before the Closing Date and Purchaser bearing the cost of all such items which relate to the period on and after the Closing Date. All credits other than reimbursement described in subsection 1.1(d) shall remain the property of the Seller.



3

**1.7** **No Assumption of Obligations.** Except for obligations under the Lease arising during the Term (with the exception of any of such obligations retained by Seller hereunder or for which Seller has agreed to indemnify Purchaser), the License Agreement and the obligations set forth in the Management Agreement and any other obligations specifically described in this Agreement, Purchaser shall not assume or agree to pay, perform or discharge any debt, obligation, liability or contract of Seller, and Purchaser's obligations assumed under the Lease are for post-Closing obligations only. Notwithstanding anything in this Agreement to the contrary, Purchaser is not assuming the Lease or the License Agreement in full; it is only assuming Seller's performance and payment obligations during the Term (as defined in Section 4.4 of this Agreement) under the Lease, License Agreement, and other operational contracts listed on Schedule 1.1(c)(iv).



## ARTICLE II
## CLOSING

**2.1** **Time and Place.** The Closing shall take place on or before midnight on September 10, 2013, or such other date and time as the parties shall mutually agree (the "Closing Date"). The Closing shall take place on the Closing Date at such place as may be agreed upon by the parties in writing.

**2.2** **Seller's Deliveries at Closing.**

(a)     At the Closing, Seller shall deliver (or cause to be delivered) to Purchaser the following duly executed instruments and other documents in form and substance reasonably satisfactory to Purchaser and Purchaser's counsel:

(i)     A Bill of Sale and a General Assignment in the forms set forth on Exhibits "B" and "C", attached hereto and made a part hereof by this reference, duly executed by Seller;

(ii)     Such other instruments of assignment, transfer, conveyance, endorsement, direction or authorization as will be sufficient or requisite to vest in Purchaser full, complete, legal and equitable title in and to all of the Business Assets;

(iii)     A closing statement duly executed by Seller ("Closing Statement");

(iv)     A signed Management Agreement;

(v)     Exclusive possession of the Premises, and all keys, access codes, and parking cards (if any) used in connection with the Premises;

(vi)     Operational manuals and maintenance instructions for all equipment (including, without limitation, air conditioning, fire prevention, security alarm, and "cash register" equipment) used in the operation of the Business and/or the Premises, to the extent in Seller's possession or control; and



4

> (vi)   Such other instruments or documents as may reasonably be required by Purchaser and/or Purchaser's counsel, including such consents from third parties as may be necessary to transfer the Purchase Assets at Closing, plus consents of Seller's shareholders and directors, approving the transactions described herein.

**2.3**   **Purchaser's Deliveries at Closing.** At the Closing, Purchaser shall deliver (or cause to be delivered) to Seller, as applicable, the following instruments and other documents in form and substance reasonably satisfactory to Seller's counsel:

(a)   The Security Agreement executed by Purchaser;

(b)   The General Assignment executed by Purchaser;

(c)   Resolutions of the [directors and shareholders of] Purchaser approving this Agreement and the transactions described herein;

(d)   The Closing Statement duly executed by Purchaser;

(e)   A signed Management Agreement; and

(f)   Such other instruments or documents as may reasonably be required by Seller and/or Seller's counsel.

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES**

**3.1**   **Representations and Warranties of Seller.** Seller represents and warrants to Purchaser, that the following are true and correct as of the date hereof and shall be true and correct as of the Closing Date, and Seller hereby acknowledges that Purchaser is relying on such representations and warranties in connection with the transactions contemplated under this Agreement:

(a)   The execution, delivery and performance of this Agreement, including any Exhibit hereto, by Seller does not and will not immediately, or with the passage of time, the giving of notice or otherwise:

> (i)   result in any material breach of or conflict with any of the terms, conditions or provisions of any agreement, indenture, mortgage, lease or other instrument to which Seller is a party or by which Seller is bound or give rise to any right of termination by any party; or

> (ii)   materially conflict with any judgment, order, injunction, decree or award of any court, administrative agency or governmental body by which Seller, or any of the Business Assets is bound or subject.

5

(b)      Seller is (and upon the execution and delivery by Seller to Purchaser of the documents set forth in Section 2.2, Purchaser will be) vested with good and marketable title to the Business Assets, none of which is or shall be subject to any lien, charge, claim or encumbrance.

(c)      Neither Seller nor any of the Business Assets is subject to:

(1)      any pending, or to Seller's knowledge, any threatened, claim, action, suit, proceeding, inquiry or investigation at law or in equity or before any court, arbitrator, public board or body; or

(2)      any order of any court, arbitrator or governmental authority which would be materially violated by its transfer to Purchaser.

(d)      This Agreement has been duly executed and delivered by Seller, and upon execution and delivery, the other agreements and transactions contemplated under this Agreement to which Seller is a party will be the legal, valid and binding obligations of Seller enforceable in accordance with their terms, subject to the effect of: (X) any applicable bankruptcy, insolvency, reorganization, fraudulent conveyance or other law relating to or affecting creditors' right generally; and (Y) the availability of certain remedies which may be subject to equitable principals and to the discretion of the court before which any proceeding therefore may be brought.

(e)      All Business Assets are being sold, "as is, where is" and all warranties, including fitness and merchantability, are hereby excluded.

(f)      Seller is not in material default under any contract, lease, agreement or other instrument with regard to the Business.

(g)      Seller has not retained a broker who is or would be entitled to a commission related to the sale of the Business Assets.

(h)      Neither Seller, nor the Premises, nor or any bonding company or surety, is subject to any claim, or potential claim, for compensation or amounts owed relative to materials, services, or labor in connection with the improvement of the Premises. Seller shall indemnify, defend, and save Purchaser harmless from any and all costs, liabilities, damages, lawsuits, and obligations related to any and all such claims or threatened claims.

(i)      There is no representation or warranty by Seller in this Agreement or in any certificate, schedule, statement, document or instrument furnished or to be furnished to Purchaser pursuant to the Agreement or in connection with the negotiation, execution or performance of this Agreement, that contains or will contain any untrue statement of material fact or that omits to state any material fact required to be stated herein or therein necessary to make any such representation or warranty not misleading.

6



3.2     **Representations and Warranties of Purchaser.** Purchaser represents and warrants to Seller that the following are true and correct as of the date hereof and shall continue to be true and correct as of the Closing Date, and Purchaser hereby acknowledges that Seller is relying on such representations and warranties in connection with the transactions contemplated under this Agreement:

(a)     Purchaser is a Florida limited liability company, and is in good standing, qualified to do business in Nevada.

(b)     The execution, delivery and performance of this Agreement, including any Exhibit hereto, by Purchaser does not and will not immediately, or with the passage of time, the giving of notice or otherwise:

(i)     result in any breach of or conflict with any of the terms, conditions or provisions of any agreement, indenture, mortgage, lease or other instrument to which Purchaser is a party or by which Purchaser is bound or give rise to any right of termination by any party; or

(ii)    violate or conflict with any judgment, order, injunction, decree or award of any court, administrative agency or governmental body by which Purchaser or any of its assets is bound or subject.

(c)     Purchaser is not subject to:

(i)     any pending or to Purchaser's knowledge, any threatened, claim, action, suit, proceeding, inquiry or investigation at law or in equity or before any court, arbitrator, public board or body; or

(ii)    any order of any court, arbitrator or governmental authority which would be materially violated by the transfer of the Business Assets to Purchaser.

(d)     This Agreement has been duly executed and delivered by Purchaser, and upon execution and delivery, the other agreements and transactions contemplated under this Agreement to which Purchaser is party will be the legal, valid and binding obligations of Purchaser enforceable in accordance with their respective terms, subject to the effect of: (A) any applicable bankruptcy, insolvency, reorganization, fraudulent conveyance or other law relating to or affecting creditors' rights generally; and (B) the availability of certain remedies which may be subject to equitable principle and to the discretion of the court before which any proceeding therefore may be brought.



7

(e)     The execution, delivery and performance of this Agreement have been duly authorized by Purchaser. Purchaser has the complete and unrestricted power and authority, and Purchaser has taken all corporate action necessary, to enter into, execute and deliver this Agreement, to perform all of its obligations hereunder and to consummate all transactions contemplated under this Agreement.

(f)     Purchaser has not retained a broker who is or would be entitled to a commission related to the sale of the Business Assets.

(g)     Purchaser has not as of the Closing Date borrowed money or received any other financial accommodation from any institutional lender seeking a security interest in the Purchaser's assets that will be the subject of the Security Agreement.

## ARTICLE IV
## COVENANTS OF SELLER AND PURCHASER

**4.1     Seller's Pre-Closing Covenants.**  From the date hereof through the Closing Date, Seller covenants as follows:

(a)     Seller shall not intentionally take any action or omit to take any action that would render any representation and warranty or obligation of Seller set forth in this Agreement or any Exhibit or Schedule hereto materially inaccurate as of the Closing Date.

(b)     Seller shall operate the Business in its customary and ordinary course and in all material respects in accordance with applicable provisions of federal, state and local laws.  To the extent Seller desires to hire or fire any personnel, it may do so only after consulting with Purchaser.  In addition, in the event Seller enters into any discussions with the landlord regarding the lease for the Premises, Purchaser shall be given the opportunity to participate in all such discussions.

(c)     Seller shall use reasonable good faith efforts and cooperate with Purchaser with respect to the transfer of the Business Assets to Purchaser and the consummation of the transactions contemplated under this Agreement.

**4.2     Pre-Closing Covenants of Purchaser.**  From the date hereof through the Closing Date, Purchaser covenants as follows:

(a)     Purchaser shall refrain from intentionally taking any action or omitting to take any action that would render any representation and warranty of Purchaser set forth in this Agreement or any exhibit or schedule hereto inaccurate as of the Closing Date.

(b)     Purchaser shall use reasonable good faith efforts and cooperate with Seller with respect to the transfer of the Business Assets to Purchaser and the consummation of the transactions contemplated under this Agreement.

8



**4.3     Retention of Records.**  Purchaser will take possession of all purchased records and shall retain such records in accordance with the provisions of this Section 4.3.  Upon written notice from Seller, Purchaser shall allow Seller reasonable access and an opportunity to review such records to institute or defend litigation or to respond to governmental inquiries and shall retain such records for the same length of time it retains the records created in its operation of the Business following the Closing Date.  By way of example and not by limitation, if Purchaser's customary practice is to retain a record created after the Closing Date for ten (10) years, and it had received, as part of the sale of Business Assets, as set of records created two (2) years prior to the Closing Date, then Purchaser shall retain that acquired set of records for eight (8) years following the Closing Date.

**4.4     Premises, Lease and Operation of the Business.**  For the period beginning September 10, 2013, and ending January 31, 2015 (the "Term"), Purchaser and Seller shall enter into a Management Agreement in the form set forth in the attached Exhibit 4.4, which is incorporated into this Agreement by this reference (the "Management Agreement"), which shall permit Purchaser to operate the Business through Seller at the Premises and shall provide that Purchaser shall, in its own name, be responsible for incurring and paying each and every debt and/or obligation created during the Term, in connection with the operation of the Business, including, without limitation, employee salaries and benefits, inventory, advertising, all operating expenses.  The Management Agreement shall provide for extension of the "term" of the Management Agreement; if such term is extended, same shall automatically extend the Term of this Agreement on a per diem basis, to be coterminous with the term of the Management Agreement.  In addition to the foregoing, the parties acknowledge that Seller shall maintain the Lease, but Purchaser shall pay, on Seller's behalf, the payment of rent for the Premises and utilities during the Term and all expenses incurred in the maintenance of Sarah, LLC during the Term as a limited liability company in good standing.  The payment of rent includes all other charges associated with the Lease of the Premises, and all rent increases during the Term.  In order to effectuate Purchaser's obligation to pay the rent on behalf of Seller, Purchaser shall either deliver payment of the rent to Seller by the first of the month or provide proof to Seller that the rent due has been paid by the first of the month.  While the Management Agreement is in effect, Purchaser shall maintain in its name and on behalf of Seller usual and customary amounts and types of insurance on the Premises and Business and the Purchaser shall have the absolute right to operate the Business in such manner as Purchaser deems proper and to the extent requested by Purchaser, the members and mangers of Seller shall execute any and all documentation necessary to allow Purchaser to operate the Business in this manner and make all necessary filings.  During the week of December 15, 2014, Purchaser shall inform Seller of its desire to take over the Business from Seller or to cease managing the Business, in either event, with such decision to be effective January 31, 2015.  In the event that Purchaser elects to cease managing the Business, then no later than January 31, 2015, Purchaser shall provide to Seller all company records relating to Seller that have been created and/or maintained from and after September 10, 2013 and to provide Seller with such necessary ingress and egress to the Premises from and after the date of such election to allow Seller to attempt to make a proper disposition of the Premises as Seller deems fit.

In the event that Purchaser elects to continue to operate the Business from and after January 31, 2015, then at such time Purchaser shall seek and obtain either: (i) an assignment of the lease governing the Premises then in effect from the landlord of the Premises, which such



assignment shall then set forth the landlord's representation that all amounts due under the Premises Lease, along with a statement by the landlord that Seller shall have no further liability under the Lease from and after the effective date of the assignment; or (ii) obtaining a new lease for the Premises upon such terms and conditions as the landlord of the Premises and Purchaser may agree. Seller agrees to provide all reasonable assistance to help Purchaser effectuate the desired result under (i) or (ii) of the foregoing sentence, but the parties agree that such assistance shall not include a guarantee by Seller or its principals of Purchaser's assigned lease or new lease. In either event, indemnifications provided by Purchaser regarding the operation of the Business and the maintenance of Seller as an entity in good standing shall continue in effect Seller's members and managers shall be permitted to dissolve Seller at any time of their choosing after January 31, 2015 (the cost of same after the Term shall be solely that of Seller).

## ARTICLE V
## CONDITIONS PRECEDENT

**5.1    Conditions Precedent to Purchaser's Obligations.** The obligations of Purchaser under this Agreement are subject to the conditions precedent (any of which may be waived by Purchaser in whole or in part) that, on the Closing Date:

(a)    All material terms and conditions of this Agreement to be complied with or performed by Seller on or before the Closing Date shall have been fully complied with and performed in all material respects.

(b)    All representations, warranties and covenants of Seller contained in this Agreement, shall be true and correct as of the date of this Agreement and shall be true and correct in all material respects as of the Closing Date with the same effect as though made at such time.

(c)    Purchaser has requested and has been provided with the information of Seller relating to Seller's conduct of the Business requested by Purchaser.

(d)    The Purchaser shall have received an executed Management Agreement.

(e)    Seller shall have provided Purchaser with proof that the September 1, 2013 rent payment for the Premises has been paid.

**5.2    Conditions Precedent to Seller's Obligations.** The obligations of Seller under this Agreement are subject to the conditions precedent (any of which may be waived by Seller in whole or in part) that, on the Closing Date:

(a)    All material terms and conditions of this Agreement to be complied with and to be performed by Purchaser on or before the Closing Date shall have been fully complied with and performed in all material respects.

(b)    All representations, warranties and covenants of Purchaser contained in this Agreement or in any schedule, exhibit, certificate or document delivered in

10



connection with this transaction shall be true and correct in all material respects on and as of the Closing Date with the same effect as though made at such time.

(c)     Purchaser has delivered a copy of its Articles of Organization to Seller.

(d)     Forall, U.S.A. has waived its rights to acquire Seller's inventory pursuant to that certain License Agreement dated _____, 2010 and releases Seller's members from any liability of Seller for obligations accruing before or after September 10, 2013.

(e)     Seller shave have received a signed Management Agreement from Purchaser.

### ARTICLE VI
### REMEDIES

**6.1     Survival.** All representations and warranties, as well as all other covenants, of each party set forth in this Agreement shall continue to the end of the applicable statutes of limitations periods.

**6.2     Indemnification by Seller.** Seller agrees to and does hereby indemnify, defend, save and hold Purchaser and its agents, employees, officers, directors, shareholders, successors and assigns harmless from and against each and every claim, demand, loss, liability, damage or expense (including, without limitation, any settlement payment, reasonable attorneys' fees and other expenses incurred in litigation or settlement of any claims) based upon, arising out of or in connection with:

(a)     the conduct of the Business prior to the Closing Date, including, without limitation, any third party claims, suits, investigations or charges asserted as a result of the conduct of the Business prior to the Closing Date;

(b)     debts or other obligations of Seller that are not assumed by Purchaser pursuant to this Agreement; and

(c)     any breach of representation, warranty, covenant or agreement of Seller contained in this Agreement.

**6.3     Indemnification by Purchaser.** Purchaser agrees to and does hereby indemnify, defend, save and hold Seller and its agents, employees, shareholders, officers, directors, successors and assigns harmless from and against each and every claim, demand, loss, liability, damage or expense (including, without limitation, any settlement payment, reasonable attorneys' fees and other expenses incurred in litigation or settlement of any claims) based upon, arising out of or in connection with arising and accruing after the Closing Date (and not pertaining to the period prior to the Closing Date):

(a)     the conduct of the Business after the Closing Date, including, without limitation, any third party claims, suits, investigations or charges asserted as a result of the conduct of the Business after the Closing Date through Seller (but not arising out



11

of: [i] Seller's members' negligence or willful misconduct, or [ii] the operation of the Company) and further including Purchaser's payment of all Lease obligations arising after Closing;

(b)     the liabilities assumed pursuant to this Agreement and all other debts or other obligations of Purchaser; and

(c)     any breach of representation, warranty, covenant or agreement of Purchaser contained in this Agreement.

**6.4     Notice of Claim.**  In the event that any claim is asserted against any party entitled to indemnification pursuant to this Article VI (an "Indemnified Party"), the Indemnified Party shall promptly after learning of such claim notify the other party (the "Indemnifying Party") thereof in writing.  Notwithstanding the foregoing, the failure of the Indemnified Party to give prompt notice of such claim shall not relieve the obligation of the Indemnifying Party to indemnify with respect to such claim, provided, however, that the Indemnifying Party shall not be responsible for amounts which could have been avoided upon prompt notice.

**6.5     No Negation of Insurance Coverage.**  In no event shall a party's obligations with respect to indemnification pursuant to this Article apply to the extent (if any) that such application would nullify any insurance coverage of such party or as to that portion of any claim or loss in which the insurer is obligated to defend or satisfy.

**6.6     Set Off.**  In addition to any rights of set off or other rights that the Purchaser may have at common law or otherwise, the Purchaser shall have the right to withhold and deduct any sum that may be owed to Purchaser under this Agreement or any other agreement between Purchaser and Seller from any amount otherwise payable to Seller under this Agreement.  The withholding and deduction of any such sum shall operate for all purposes as a complete discharge (to the extent of such sum so set off) of the obligation to pay the amount from which such sum was withheld and deducted.

**ARTICLE VII**
**SELLER'S EMPLOYEES**

Effective as of Closing on the Closing Date, Seller shall terminate the employment of all employees who are employed by Seller with respect to the conduct of the Business and the Seller shall be responsible for the payment of all accrued salaries, benefits, taxes and other obligations and liabilities associated with the employment of those employees through the time of Closing on the Closing Date.  Purchaser shall have the option, but shall not be obligated, to employ any of the employees of Seller after the time of Closing on the Closing Date on such terms as Purchaser elects to extend to the employees it seeks to hire.  Upon the execution of this Agreement, Purchaser shall be permitted to interview such of Seller's employees as Purchaser deems necessary to assess Purchaser's hiring needs, provided, that Seller may be present at such interview and such interview shall take place at such time and in such manner as is non-disruptive to the Business.  Seller will cooperate with Purchaser in notifying those employees of Seller that Purchaser desires to retain.

12



### ARTICLE VIII
### MISCELLANEOUS PROVISIONS

**8.1    Expenses.** Except as otherwise provided for herein, whether or not the transactions contemplated by this Agreement are consummated, each of the parties hereto shall pay the fees and expenses incurred by such party with respect to his, her or its counsel, accountants, other experts and all other expenses incurred by such party incidental to the negotiation, preparation and execution of this Agreement.

**8.2    Binding Effect.** This Agreement shall be binding upon and inure to the benefit of all of the parties hereto, their heirs, executors, administrators, successors and assigns.

**8.3    Amendments.** This Agreement may be amended in whole or in part at any time only by a written instrument setting forth such changes and signed by each of the parties hereto.

**8.4    Entire Agreement.** This Agreement and the Exhibits attached hereto set forth the entire understanding among the parties relating to the transactions described herein, there being no terms, conditions, warranties or representations other than those contained herein.

**8.5    Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

**8.6    Choice of Law.** This Agreement shall be subject to and governed by the laws of the State of Nevada without regard to its laws of conflicts and venue shall be in Clark County, Nevada.

**8.7    Headings.** The headings contained herein are for reference only, are not a part of this Agreement and shall have no substantive meaning.

**8.8    Notices.** Any and all notices given in connection with this Agreement shall be deemed adequately given only if in writing and personally delivered, sent by nationally recognized overnight courier or sent registered or certified mail, postage prepaid, to the party or parties for whom such notices are intended. A written notice shall be deemed to have been given to the recipient party on the earlier of:

(a)    the date it shall be delivered to the intended recipient or to the address required by this Agreement;

(b)    the date delivery shall have been refused at the address required by this Agreement; or

(c)    with respect to notices sent by mail but not delivered, the date as of which the postal service shall have indicated such notice to be undeliverable at the address required by this Agreement.

13



Any and all notices referred to in this Agreement or which any party desires to give to another, shall be addressed as follows:

To Seller:

_____

_____

_____
Attn: Bachar Hamad, M.D.

with a copy to:

Kamensky Rubinstein Hochman
  & Delott, LLP
7250 North Cicero Avenue, Suite 200
Lincolnwood, Illinois 60712
Attn:  Lee Levin

To Purchaser:

Italnord Forum LV, LLC
c/o Jorge R. Gutierrez
100 Almeria Avenue
Suite 340
Coral Gables, FL 33134

with a copy to:

Gutierrez Yelin & Boulris, PLLC
100 Almeria Avenue
Suite 340
Coral Gables, FL 33134
Attn: Jorge R. Gutierrez

A party may change its address for notice by delivery of written notice to the other parties of its new address for notice.

**8.9    Pronouns.**  Unless the context indicates otherwise, any pronouns used in this Agreement shall include the corresponding masculine, feminine, neuter, singular or plural pronouns, as the case may be.

**8.10    Further Deliveries and Assurances.**  Each party shall, at its sole expense, perform such actions (including, without limitation, executing and delivering appropriate documents) as reasonably requested by any party hereto, or the permitted successors or assigns of such party, in order to implement this Agreement and the transactions contemplated under this Agreement.



14

**8.11   Confidentiality.** Except as otherwise required by law, each party agrees to keep this Agreement and its contents confidential and not to disclose the same to any third party except for receiving party's attorneys, accountants, financial advisers and lenders and except to applicable governmental agencies in connection with any required notification or application for approval or exemption therefrom without the written consent of the other parties. With respect to information provided by or obtained from a party in connection with and relative to this transaction, the receiving party agrees not to use such information, directly or indirectly, for any purpose other than to evaluate this transaction, and to keep all such information confidential which is not in the public domain, exercising the same care in handling such information as they would exercise with similar information of their own and, if required, to return any such written information to the disclosing party promptly upon its demand. In addition, the receiving party agrees (a) to inform all of his representatives, attorneys, accountants, financial advisors and lenders who receive any of such information of the confidential nature of such information and to direct all such persons to treat such information confidentially and not to use it other than for the purpose of analyzing and evaluating the Agreement, and (b) to make all reasonable, necessary and appropriate efforts to safeguard such information from disclosure to anyone other than as permitted hereby.

**8.12   Survival.** The provisions of this Agreement which are intended to survive the Closing Date shall survive for the periods specified therein.

**8.13   Seller's Attorneys.** The parties acknowledge and understand that Seller's attorneys, Kamensky Rubinstein Hochman & Delott, Ltd., prepared this document and the Exhibits on behalf of Seller and do not represent Purchaser. Purchaser acknowledge and understand that they have had the opportunity to have this Agreement and all documents related thereto reviewed by legal counsel of their own choosing if they so desired prior to execution.

**IN WITNESS WHEREOF,** the parties hereto have signed this Agreement this 10th day of September 2013.

**SELLER:**                                              **PURCHASER:**

**SARAH, LLC**                                          **ITALNORD FORUM LV, LLC**

~~S. Hamo~~                                              By: _____
                                                             Alfonso Entebi

Its: ____President____                                  As its: Manager

Signed or attested before me

on __9/11/2013__ by __Bacher Hamo__

Notary Signature _____

OFFICIAL SEAL
MATTHEW TROUTMAN
Notary Public - State of Illinois
My Commission Expires Oct 25, 2016

15

**8.11   Confidentiality.**  Except as otherwise required by law, each party agrees to keep this Agreement and its contents confidential and not to disclose the same to any third party except for receiving party's attorneys, accountants, financial advisers and lenders and except to applicable governmental agencies in connection with any required notification or application for approval or exemption therefrom without the written consent of the other parties.  With respect to information provided by or obtained from a party in connection with and relative to this transaction, the receiving party agrees not to use such information, directly or indirectly, for any purpose other than to evaluate this transaction, and to keep all such information confidential which is not in the public domain, exercising the same care in handling such information as they would exercise with similar information of their own and, if required, to return any such written information to the disclosing party promptly upon its demand.  In addition, the receiving party agrees (a) to inform all of his representatives, attorneys, accountants, financial advisors and lenders who receive any of such information of the confidential nature of such information and to direct all such persons to treat such information confidentially and not to use it other than for the purpose of analyzing and evaluating the Agreement, and (b) to make all reasonable, necessary and appropriate efforts to safeguard such information from disclosure to anyone other than as permitted hereby.

**8.12   Survival.**  The provisions of this Agreement which are intended to survive the Closing Date shall survive for the periods specified therein.

**8.13   Seller's Attorneys.**   The parties acknowledge and understand that Seller's attorneys, Kamensky Rubinstein Hochman & Delott, Ltd., prepared this document and the Exhibits on behalf of Seller and do not represent Purchaser.   Purchaser acknowledge and understand that they have had the opportunity to have this Agreement and all documents related thereto reviewed by legal counsel of their own choosing if they so desired prior to execution.

**IN WITNESS WHEREOF,** the parties hereto have signed this Agreement this 10th day of September 2013.

SELLER:                                              PURCHASER:

**SARAH, LLC**                                     **ITALNORD FORUM LV, LLC**

By: _____
    Alfonso Entebi

_____

Its: _____     As its:  Manager

15

## LIST OF EXHIBITS AND SCHEDULES

### EXHIBITS

**Exhibit A**          **Security Agreement**

**Exhibit B**          **Bill of Sale**

**Exhibit C**          **Assignment and Assumption Agreement**

**Exhibit D**          **Management Agreement**

### SCHEDULES

**Schedule 1.1(a)**          **List of Tangible Assets**

**Schedule 1.1(c)(iv)**   **List of Contracts to be Assumed**

**Schedule 1.2(e)**          **Excluded Furniture, Fixtures & Equipment**

## EXHIBIT A

## SECURITY AGREEMENT

**THIS SECURITY AGREEMENT** ("Agreement") is made effective the tenth (10th) day of September 2013, by and between **ITALNORD FORUM LV, LLC**, a Florida limited liability company ("Debtor"), and **SARAH, LLC** ("Secured Party"), to induce Secured Party to accept future payment of the "Purchase Price" and the "Lease Deposit" set forth in that certain Asset Purchase Agreement executed by Debtor and Secured and dated on or about even date herewith (the "APA") and to recite the agreement between the parties as follows:

1.  To secure payment to Secured Party of the Purchase Price and the Lease Deposit pursuant to the APA, the Debtor hereby grants a security interest (subject to any interests of any institutional lender provided financing secured by any of the following) in, and mortgages to the Secured Party all of Debtor's assets, now existing or hereinafter created, and all proceeds therefrom which include, but are not limited to all of Purchaser's equipment, inventory (subject to any rights of Forall U.S.A., Inc. and/or Pal Zileri), accounts, documents, general intangibles, instruments, chattel paper, consumer goods, deposit accounts, software, and tangible chattel paper as such classes of collateral are identified and deferred under the Uniform Commercial Code. (collectively, the "Collateral").

2.  The Debtor hereby represents, warrants and covenants to the Secured Party that:

    (a)  The Collateral shall not be subject to any additional liens, claims, or encumbrances, other than those created by this Agreement and those which were in existence as of the date of this Agreement (the "Liens") and except for the Liens, there are no restrictions upon the transfer of the Collateral. Except for the Liens, the Debtor has good and marketable title and the full right and power to transfer the Collateral free and clear of any and all liens, claims or encumbrances;

    (b)  Secured Party shall have the right, during the Debtor's normal business hours, to inspect and examine the Collateral and any books and records related thereto or the financial statements noted hereafter which are in the Debtor's possession or under its control and Debtor shall provide, upon reasonable request by Secured Party, any and all financial statements, including balance sheets, profit and loss statements, and change of condition statements of Debtor from time to time;

    (c)  Debtor will not, without the prior written consent of Secured Party, other than in the ordinary course of business, sell, lease, assign, pledge, or otherwise dispose of, move, relocate or transfer any of the Collateral;

    (d)  To the best of Debtor's knowledge and belief, Debtor is not in violation of any applicable statute, rule, regulation or ordinance of any federal, state or local



governmental entity ("Law"), which would materially and adversely affect the Collateral.

(e)    The entry into this Agreement, Debtor's delivery of the APA to Secured Party and the pledge of the Collateral to Secured Party shall not result in a default in any agreement, instrument or note between Debtor and any third party whose obligation(s) are secured by one or more of the Liens, and will not cause acceleration of any of the indebtedness due under any such agreement, instrument or note.

3.    Secured Party shall be entitled to file on behalf of Debtor a UCC-1 Financing Statement, plus all other amendments, termination statements and other filings permitted by law related to the pledge of the Collateral described herein to Secured Party and may use a super generic description of the Collateral when following the UCC-1.

4.    Upon payment in full by Debtor of the Purchase Price and the Lease Deposit under the APA, Secured Party shall terminate the lien that it has placed on the Collateral hereunder and surrender and transfer to Debtor all rights received as a result of its lien as granted hereunder. Notwithstanding anything herein to the contrary, this Agreement shall expire and become null and void unless Secured Party, within the "Term" as defined in the APA, notifies Debtor in writing of a default by Debtor with respect to the Obligations (defined below).

5.    Upon the occurrence of any default by Debtor under the APA (as defined therein), this Agreement, or under any other documents evidencing or relating to the obligations described in the APA (the "Obligations"), Secured Party shall have the right to accelerate any or all Obligations and shall have all of the rights and remedies provided to a secured creditor under the Uniform Commercial Code including, but not by way of limitation, the right of Secured Party to sell, assign, or otherwise dispose of the Collateral, or any part thereof, by public or private proceedings or sale, or contact Debtor's account debtors and direct payment of the amount due to Debtor directly by Secured Party. The net proceeds realized upon any sale or other disposition of the Collateral, after deducting expenses of the sale or other handling or disposition and reasonable attorney's fees, costs, and expenses incurred by Secured Party, shall be applied to the payment of the Obligations. Secured Party shall account to Debtor for any surplus realized on such disposition. Debtor shall remain liable for any deficiency remaining on the Obligations after application of the Collateral sale proceeds as described above, which Debtor agrees to pay forthwith upon demand. Debtor agrees to give Secured Party written notice of the occurrence of any of the following events within five (5) calendar days of the occurrence of any such event: any change in the ownership of Debtor, transaction outside the usual course of Debtor's business, default in any material obligation owed by Debtor to any third party under any contract, loan, order or judgment, the borrowing by Debtor of any funds, any notice to Debtor from any court or federal, state or local governmental body regarding any violation of Law, any lawsuit against Debtor or notice of nonrenewal or cancellation of Debtor's lease of its premises or of any insurance policy covering the Collateral.

6.  Secured Party shall not be deemed to have waived any rights under this Agreement, under the Obligations or under any related documents, unless such waiver is in writing and signed by the Secured Party. No delay or omission on the part of the Secured Party in exercising any right shall operate as a waiver of such right or any other right. No prior waiver, nor any course of dealing between Secured Party and Debtor, shall constitute a waiver of Secured Party's rights or the Debtor's obligations as to any future transactions. Whenever consent by Secured Party is required in this Agreement, the granting of such consent by Secured Party in any instance shall not constitute a continuing consent to subsequent instances where such consent is required.

7.  All notices required to be given by any party to any other party or parties under this Agreement shall be in writing and shall be effective when actually delivered or three (3) business days after deposited in the United States Mail, First Class, postage prepaid, return receipt requested, addressed to the other party or parties at the addresses as each party may designate to the other parties in writing.

8.  Debtor agrees that this Agreement shall be construed and governed in accordance with the laws of the State of Nevada and shall be binding upon Debtor and its successors and permitted assigns. If this Agreement contains any blanks when executed by Debtor, the Secured Party is hereby authorized, without notice to Debtor, to complete any such blanks according to the terms upon which the Collateral is pledged. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or be invalid under such law, such provision shall be considered severable and be ineffective to the extent of such prohibition or invalidity, without invalidating the remaining provisions of this Security Agreement.

9.  Debtor agrees that unless it obtains the prior written consent of the Secured Party, it will keep the Collateral free from any adverse lien, security interest or encumbrance, other than the Liens, and in good order and repair, and shall not waste or destroy the Collateral or any part thereof, and shall not use the Collateral in violation of any statute, ordinance or policy of insurance thereon.

10. Debtor will pay promptly when due all taxes and assessments upon the Collateral or for its use or operation or upon any Notes evidencing the Obligations. Debtor shall at all times maintain commercially reasonable general liability insurance covering its business and the Collateral with an insurance company having limits not less than the amount of unpaid Obligations. Promptly upon request, Debtor shall provide Secured Party with certificates of insurance evidencing the existence of all such coverages.

11. At Secured Party's option, the Secured Party may discharge taxes, liens or security interests or other encumbrances at any time levied or placed on the Collateral, may place and pay for insurance on the Collateral upon the failure by the Debtor, after being requested to do so with such expense incurred to be added to the principal of the APA.

19



12. The rights and remedies of Secured Party under this Agreement shall be cumulative with any rights and remedies available to Secured Party under the APA. The selection of any remedy by Secured Party shall not limit Secured Party's right to pursue any other remedy which may be available to Secured Party.

13. If any portion or portions of this Agreement shall be, for any reason, invalid or unenforceable, the remaining portion or portions shall nevertheless be valid, enforceable, and carried into effect, unless to do so would clearly violate the present legal and valid intentions of the parties hereto.

**IN WITNESS WHEREOF,** the parties hereto have each executed this Agreement on the day and year first above written.

**DEBTOR:**

**WITNESS:**                    **ITALNORD FORUM LV, LLC**

By: _____
     Alfonso Entebi, as its Manager

**SECURED PARTY:**

**SARAH, LLC**

**ATTEST:**

By: _____
Its: _____
             president

_____                Secretary

Signed or attested before me

on 9/1/13  by Baruch Murad

Notary Signature _____

OFFICIAL SEAL
MATTHEW TROUTMAN
Notary Public - State of Illinois
My Commission Expires Oct 25, 2016

20

12. The rights and remedies of Secured Party under this Agreement shall be cumulative with any rights and remedies available to Secured Party under the APA. The selection of any remedy by Secured Party shall not limit Secured Party's right to pursue any other remedy which may be available to Secured Party.

13. If any portion or portions of this Agreement shall be, for any reason, invalid or unenforceable, the remaining portion or portions shall nevertheless be valid, enforceable, and carried into effect, unless to do so would clearly violate the present legal and valid intentions of the parties hereto.

**IN WITNESS WHEREOF,** the parties hereto have each executed this Agreement on the day and year first above written.

**DEBTOR:**

**WITNESS:**

**ITALNORD FORUM LV, LLC**

By: _____
Alfonso Entebi, as its Manager

**SECURED PARTY:**

**SARAH, LLC**

**ATTEST:**

_____
Secretary

By: _____
Its: _____

20

## EXHIBIT B

### BILL OF SALE

Seller, **SARAH, LLC**, an Illinois professional corporation having its principal place of business at The Forum Shops at Caesar's Palace, 3500 Las Vegas Blvd. South, Suite K-8, Las Vegas, Nevada (the "Business"), in consideration of Ten and no/100 Dollars ($10.00), receipt whereof is hereby acknowledged, does hereby sell, assign, transfer and set over to **ITALNORD FORUM LV, LLC**, a Florida limited liability company ("Purchaser") the following described personal property, to-wit:

> The tangible Business Assets identified in that certain Asset Purchase Agreement dated September 10, 2013, entered into by and among Seller and Purchaser.

Seller hereby represents and warrants to Purchaser, that Seller is the absolute owner of said property, that said property is free and clear of all liens, charges and encumbrances, and that Seller has full rights, power and authority to sell said personal property and to make this Bill of Sale.

**IN WITNESS WHEREOF**, Seller has caused this Bill of Sale to be signed this 10th day of September 2013.

**SARAH, LLC**

Signed or attested before me
on _7/11/2013_ by _Barbar Houst_

Notary Signature _____

Its: _president_

> OFFICIAL SEAL
> MATTHEW TROUTMAN
> Notary Public - State of Illinois
> My Commission Expires Oct 25, 2015

STATE OF ~~NEVADA~~ IL       )
                            ) ss
COUNTY OF ~~CLARK~~ Cook    )

    I, the undersigned, a Notary Public in and for the County and State aforesaid, **DO HEREBY CERTIFY** that _Bucker Hamad_, personally known to me to be the _President_ of SARAH, LLC, whose names were subscribed to the foregoing instrument, appeared before me this day in person and signed and delivered the said instrument as their free and voluntary act, and as the free and voluntary act and deed, for the uses and purposes therein set forth.

    **GIVEN UNDER MY HAND AND NOTARIAL SEAL** this 10th day of September 2013.

OFFICIAL SEAL
MATTHEW TROUTMAN
Notary Public - State of Illinois
My Commission Expires Oct 25, 2016

**Notary Public**

**My Commission Expires:**

OCT 25 2016

## EXHIBIT C

### ASSIGNMENT AND ASSUMPTION AGREEMENT

**THIS ASSIGNMENT AND ASSUMPTION AGREEMENT** (the "Agreement") is made, executed and delivered this 10th day of September 2013, by and between **SARAH, LLC** ("Seller") and **ITALNORD FORUM LV, LLC**, a Florida limited liability company ("Purchaser"), to be effective September 10, 2013.

### R E C I T A L S

**WHEREAS**, pursuant to an Asset Purchase Agreement by and among the Seller, Sarah, LLC and the Purchaser dated September 10, 2013 ("Purchase Agreement"), Seller agreed to sell the Business Assets (as defined in the Purchase Agreement) to Purchaser pursuant to an Agreement and Assumption Agreement in a form acceptable to the parties (except as otherwise defined herein capitalized terms shall have the same meaning as in the Purchase Agreement); and

**WHEREAS**, this Agreement is intended to serve as such agreement.

**NOW, THEREFORE**, in consideration of the premises and mutual covenants contained herein, the parties hereto agree as follows:

1. **Preambles.** The preambles to this Agreement are incorporated herein and made a part hereof by this reference.

2. **Agreement.** Seller hereby assigns, transfers, grants, bargains, sells, conveys, sets over and delivers to Purchaser all of the intangible Business Assets.

3. **Acceptance by Purchaser.** Purchaser hereby accepts the transfer and assignment of the Business Assets and Liabilities.

4. **Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

23



5.    <u>Cooperation</u>.    Seller and Purchaser agree to execute such other documents and take such other actions as may be reasonably necessary or desirable to confirm or effectuate the assignments and assumptions contemplated hereby.

**IN WITNESS WHEREOF**, this Agreement has been duly executed to be effective as of the date first above written.

SARAH, LLC

Its: _____

24

## SCHEDULE 1.1 (a)

### LIST OF TANGIBLE ASSETS

## SCHEDULE 1.1(c)(iv)

### LIST OF CONTRACTS TO BE ASSUMED

**License Agreement**

**SCHEDULE 1.2(e)**

**EXCLUDED FURNITURE, FIXTURES AND EQUIPMENT**

**EXHIBIT 13**

## AGREEMENT

**THIS STIPULATION AND CONSENT AGREEMENT** ("Agreement") is made this __ day of September, 2013, (the "Effective Date") by and between **SARAH, LLC**, a Nevada limited liability company (herein "Company") and **FORALL USA, INC.**, a New York corporation (herein "Forall").

### WITNESSETH:

**WHEREAS**, Company is in the business of selling men's attire and accessories primarily bearing the name "Pal Zileri" pursuant to a License and Retail Operator Agreement dated March 2011 (herein "License Agreement") with Forall, at the Forum Shops at Caesar's, Las Vegas, Nevada (the "Business"); and

**WHEREAS**, Company desires to retain the services of a manager to manage all aspects of the Business; and

**WHEREAS**, ITALNORD FORUM LV, LLC, a Florida limited liability company (herein "Manager") is willing to assume such duties on the terms and conditions contained in the Management Agreement dated September __, 2013, between Company and Manager; and

**WHEREAS**, the parties acknowledge and agree that the obligations set forth in the License Agreement are continuing;

**WHEREAS**, Forall is willing to consent and agree to the management of the Business by the Manager based upon and in consideration of the promises and assurances of the Company as set forth in this Agreement;

**NOW, THEREFORE**, for good and valuable consideration, including the mutual promises contained herein, the parties agree as follows:

1. Forall hereby consents to the operation of the Business by Manager.

2. The Company shall continue to be responsible for and will remain in compliance at all times with Company's obligations under the lease agreement with the Forum Shops LLC at Caesar's, Las Vegas ("the Lease Agreement").

3. During the term of the Management Agreement only, Forall shall look to the Manager and hold the Manager responsible for the performance of all obligations under the License Agreement. To the extent that the Management Agreement is terminated, at such time, the Company shall again be responsible for the performance of all obligations under the License Agreement.

4. The Company shall not transfer the Lease Agreement without Forall's prior written consent and agreement.

5. The Company acknowledges and agrees to assign and/or transfer the Lease Agreement for no additional consideration at the end of the term of the Management Agreement, or as otherwise agreed to between the parties, to the Manager or Forall, as may be determined at that time.

6. The Company hereby represents and covenants to Forall that the Company is not in default of any material provision of the License and Lease Agreements.

7. Except as specifically set forth herein, nothing shall act as to waive, limit or otherwise alter any obligation or liability that the Company and/or its principals, owners, members, and/or guarantors are subject to or arising from the License and Retail Operator Agreement, the Lease Agreement, and/or any Guaranty, undertaking or promise thereunder.

8. All provisions contained herein are severable, and in the event any of them shall be held to be invalid by any competent court, this Agreement shall be interpreted as if such invalid provisions or covenants were not contained herein, in order to give the remaining provisions full and legally binding meaning.

9. This Agreement may not be assigned by the Company without Forall's prior written consent.

10. The Company shall not terminate or otherwise amend or modify the Management Agreement with Manager without Forall's prior written consent and agreement.

11. No failure of Forall to exercise any power reserved to it under the License Agreement or this Agreement, or to insist upon strict compliance by Company or Manager with any obligation or condition, and no custom or practice of the parties at variance with the terms hereof, shall constitute a waiver of Forall's right to demand exact compliance the terms of the License Agreement or this Agreement. Waiver by Forall of any particular default by Company or Manager shall not be binding unless in writing and executed by Forall.

12. The provisions of this Agreement are subject to and shall be interpreted in accordance with the provisions of the License Agreement. The License Agreement shall govern all aspects of this Agreement. Any provisions contained in this Agreement that are deemed inconsistent and/or vague shall be controlled by and construed in accordance with the License Agreement. This Agreement and its provisions shall have no effect on any default, claim or loss arising prior to the Effective Date.

13. This Agreement may be amended only by an instrument in writing executed by both parties hereto.

14. This Agreement may be executed in counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same agreement. This Agreement shall become effective upon, but only upon, its execution by both parties.

2

IN WITNESS WHEREOF, the parties hereto execute this Agreement under seal by their duly authorized representatives as of the date first above written.

Attest:

_Arnold Buckley_
Witness

FORALL U.S.A., INC.,

By: _____
Its: _____

> NANCY J. BUCKLEY
> NOTARY PUBLIC, STATE OF NEW YORK
> Registration No. 01BU6200120
> Qualified in Dutchess County
> Commission Expires May 18, 2018

Attest:

_____
Witness

SARAH, LLC.,

By: _Hala_
Hala subh
Its: Member as to a 50% interest

> OFFICIAL SEAL
> SARAH E BOTKA
> Notary Public - State of Illinois
> My Commission Expires Oct 25, 2016

By: _SALBASHA_
Suhad albasha
Its: Member as to a 50% interest

> OFFICIAL SEAL
> SARAH E BOTKA
> Notary Public - State of Illinois
> My Commission Expires Oct 25, 2016

STATE OF            )
                    ) ss.:
COUNTY OF           )


On the 2/6 day of September in the year 2013 before me, the undersigned personally appeared Hala subh personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.


*Sarah E Botka — Banker*
(signature and office of individual taking acknowledgment)


STATE OF            )
                    ) ss.:
COUNTY OF           )


On the 2/0 day of September in the year 2013 before me, the undersigned personally appeared Suhad albasha personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.


*Sarah E Botka — Banker*
(signature and office of individual taking acknowledgment)


4

# EXHIBIT 14

# ITALNORD FORUM LV, LLC

4000 W. ISLAND BOULEVARD, #1104
AVENTURA, FLORIDA 33160
alfonso@entebi.com.mx

September 29, 2014

BY UPS

Sarah, LLC
1717 Midwest Club
Oakbrook, Illinois 60529
Attention: Bashar Hamad, MD

> Re: Asset Purchase Agreement dated September 10, 2013, by and between Italnord Forum LV, LLC, a Florida limited liability company ("Italnord"), as "Purchaser," and Sarah, LLC, a Nevada limited liability company ("Sarah"), as "Seller" (the "APA"), and Management Agreement dated September 10, 2013, by and between Italnord, as "Manager," and Sarah, as "Company" (the "Management Agreement"), pertaining to the Pal Zileri location at the Forum Shops at Caesar's, Las Vegas, Nevada

Dear Dr. Hamad:

Pursuant to Section 4.4 of the APA, this letter is formal notice that Italnord elects to cease managing the "Business" (as defined in the APA). Additionally, and with reference to Section 2.1 of the Management Agreement, Italnord will not be assuming the "Lease" (as defined in the Management Agreement) and will not be extending the Management Agreement "Term" (as defined in the Management Agreement).

In light of the this letter, the APA "Term" (as defined in the APA) and the Management Agreement Term will expire on January 31, 2015, in accordance with the provisions of the APA and the Management Agreement, respectively.   Nevertheless, I would be willing to discuss with you an earlier termination of the APA and the Management Agreement; please contact me if you would be amenable to such discussions.

Sincerely,

ITALNORD FORUM LV, LLC

By:
Alfonso Entebi, as Manager

cc:    Bashar Hamad, MD (by e-mail to bhamad@sbcglobal.net)
Lee Levin, Esq. (by e-mail to llevin@kr-law.com; and by UPS to Lee Levin, Esq., Kamensky Rubinstein Hochman & Delott, LLP, 7250 North Cicero Avenue, Suite 200, Lincolnwood, Illinois 60712)
Mark J. Boulris, Esq. (by e-mail to Mark.Boulris@gbbpl.com)

# EXHIBIT 15

## MANAGEMENT AGREEMENT

**THIS MANAGEMENT AGREEMENT** ("Agreement") is made this 9 day of February, 2015, by and between **FORALL USA, INC.**, a New York corporation (herein "Forall" or the "Manager") and **SARAH, LLC**, a Nevada limited liability company (the "Company") to be effective as of March 15, 2015 (the "Effective Date").

Forall and Sarah are sometimes collectively referred to herein as "parties".

### WITNESSETH:

**WHEREAS,** Company is in the business (the "Business") of selling men's attire and accessories primarily bearing the name "Pal Zileri" pursuant to a License Agreement ("License Agreement") with Forall, U.S.A., Inc. ("Forall"), at its current location at the Forum Shops at Caesar's, Las Vegas, Nevada (the "Premises"); and

**WHEREAS,** the Company operates the Business and Location subject to a certain of Premises dated May 18, 2011, between Sarah LLC and Forum Shops, LLC ("Landlord");

**WHEREAS,** Company desires to retain the services of a manager to manage all aspects of the Business for the term and conditions set forth herein; and

**WHEREAS,** Manager, by and through its assigns, affiliate and or subsidiary, is willing to assume such duties on the terms and conditions contained in this Agreement.

**NOW, THEREFORE,** for good and valuable consideration, including the mutual promises contained herein, the parties agree as follows:

### ARTICLE I
### MANAGEMENT

1.1.    Company appoints Manager, and Manager accepts the appointment, on the terms and conditions hereinafter provided as the exclusive managing agent for Company and the Business. Forall or its affiliate and/or subsidiary shall be the Manager and operator of the Pal Zileri store located at the Forum Shops at Caesars II, Las Vegas. Forall shall assume exclusive management and control of the Business and Premises, effective no later than March 15, 2015, for the term set forth in this Agreement. Forall will assume responsibility the operations of the Business and Lease.

### ARTICLE II
### TERM

2.1.    Forall shall assume exclusive management of and control of the Business, effective no later than March 15, 2015 ("Start Date"), for a term of eighteen (18) months ("Initial Term"). Forall shall, at its sole discretion, advise Sarah on or before March 1, 2016, whether it

intends to take over the Lease and Business and/or otherwise terminate the Management Agreement at the end of the Initial Term.

2.2.    Notwithstanding the foregoing provision 2.1, Forall, at its option and written notice to Company (said notice may be by email notwithstanding anything to the contrary in this agreement), may elect and take over management of the Business and possession of the Premises as early as February 22, 2015 ("Early Start Date"), upon which, as an incentive, Sarah will pay the rent on the Premises and all other expenses associated with the Premises, up and through March 7, 2015. If Forall elects to take over management of the Business after February 22, but before March 1, 2015, Sarah will pay the rent on the Premises up and through March 7, 2015, less the number of days after February 22, 2015 that Forall assumed management. To illustrate, if Forall takes over the Business on February 26, Sarah shall pay the rent on the Premises through March 3, 2015 (March 7th less 4 days). If Forall elects to take over management of the Business after March 1 but before March 15, Company shall pay half or 50% of the days prioar to March 15th on a pro rata basis of the March rent for the number of days prior to March 15th that Forall is operating the Business; however, at no such time will Forall be responsible for any rent or other obligation prior to the date it actually commences management of the Business. To illustrate the foregoing, if Forall takes over management of the Business on March 8, Company is responsible for rent for March 1 through March 7, plus half of the days between March 8 and March 15, or 3.5 days of rent.

2.3.    Forall shall have the right at the expiration of the Initial Term to take over the Lease for the remainder of the duration of the Lease or to terminate this Agreement. Forall shall so advise the Company on or before March 1, 2016, of its intentions with respect to whether to take over the Lease and/or terminate this Agreement at the end of the Initial Term. Notwithstanding anything to the contrary in this Agreement, should Forall so choose to take over the Lease, the parties agree and acknowledge that this Management Agreement shall terminate upon the expiration of the Initial Term and Forall shall assume the operation and ownership of the Business at that point in time without further consideration due and owing to Company.

2.4.    Sarah hereby assigns and provides Forall with the option to assume and take over the Lease upon the expiration of the Initial Term at Forall's election. Forall shall provide notice to Sarah on or before March 1, 2016, of its intent to take over the Lease. Sarah shall obtain and otherwise assist with obtaining the Landlord's approval, if necessary, for any transfer or assignment of the Lease.

## ARTICLE III
## OPERATION OF THE BUSINESS AND PREMISES

3.1.    The Manager shall operate the Business and be responsible for and otherwise entitled to all revenue, profits, losses and other opportunities arising from the Business during the Term.   Forall shall assume responsibility for the operation and management of the Business, the payment of the lease during the Term, taxes, and all operational expenses associated with the Business directly to the Landlord with the Landlord's approval, as required.   Forall shall not owe or otherwise pay any monies to Sarah under the Management Agreement or in connection with the Business.   Forall shall retain all profits and losses associated with the operation of the Business.

3.2.    Forall, at its option, may establish a stand-alone entity for the management of the Business and assign this Agreement and the rights and obligations hereunder to the affiliate or subsidiary company.

3.3.    Any unusual charges arising under the Lease not arising as a result of or in connection with the Manager's use of the Premises shall continue to be the responsibility of Sarah.

3.4.    The Company shall maintain commercial and premises insurance on the Premises and shall add Forall as an additional insured under said policies and shall provide Forall with a certificate of insurance upon fifteen (15) days request.   The insurance premiums shall be paid by Forall in accordance with Section 4.3.   Forall reserves the right to pay all insurance premiums directly and to obtain its own commercially reasonable insurance as it deems fit and that complies with the obligations under the Lease.

3.5.    Forall reserves the right to make all rent payments under the Lease directly to the Landlord.   The Company will timely provide all notices and rent payments under the Lease to Forall, and at no time later than two (2) business days after receipt.

3.6.    Sarah shall obtain any and all necessary consent(s) from the Landlord for this Management Agreement.   Sarah shall indemnify and hold Forall harmless from any loss or liability incurred by Forall that arises from the October 23, 2014 Letter Agreement between Sarah and the Landlord.

## ARTICLE IV
## MANAGER'S REPRESENTATIONS AND OBLIGATIONS

3

4.1.    Manager shall provide or cause to be provided all services necessary to operate the day to day management of the Business which shall include those services which, in Manager's sole discretion, may be reasonably necessary for the successful operation of the Business.

4.2.    Manager may retain or hire any employees, independent contractors or agents Manager deems necessary to accomplish the purposes set forth in Section 4.1 above.  All such persons or entities so retained or hired shall be and corresponding salaries, fees, commissions, costs and expenses incurred in retaining and compensating such employees, independent contractors and agents shall be borne entirely by Manager.

4.3.    Manager shall also be responsible for paying any and all other overhead incurred by the Business in the normal course of its operations, such as but not limited to accounting, legal fees (to the extent necessary as determined by Manager) and business license fees; it being the goal of Manager and Company that neither Company nor Company's principals shall have to come out of pocket for the payment of any Business-related expenses; it being understood that Manager shall, as additional consideration for entering into this Agreement, be entitled to all receipts generated from the Business in exchange for Manager's agreement to pay all expenses. Manager understands and acknowledges that the receipts from the Business may be lower than Manager's expense obligations hereunder and Manager agrees that Manager shall be solely responsible for covering any shortfall so resulting.

4.4.    Manager's responsibilities pursuant to this Agreement may be performed by Manager or any employee, subagent or other representative, affiliate or subsidiary of Manager.

## ARTICLE V
## COMPANY'S REPRESENTATIONS AND OBLIGATIONS

5.1.    Company shall provide Manager with all necessary information concerning its operation and will be responsible to Manager for any additional information reasonably necessary to enable Manager to carry out the responsibilities under this Agreement.

5.2.    Company shall assign, provide and otherwise ensure that all assets, furniture, fixtures, equipment, machinery, product, inventory, books, records and other items necessary and/or otherwise located at and used in connection with operations of the Business at the Premises ("Business Assets") at no charge to Forall.  To the extent that any of the Business Assets are not owned by the Company, Company shall pay for, secure and otherwise purchase the furniture, fixtures, and equipment at no expense to Forall.  For the avoidance of doubt, the Business Assets include but are not limited to computers, point of sale equipment, showroom and office furniture, lighting, shelving, displays, signage, and other store equipment.

5.3.    Company shall cause its principals to cooperate with Manager in the execution of any documentation reasonably necessary to continue Company's existence, including, but not limited to, submission of annual reports, the execution of consents and any other documentation reasonably determined by Manager to be necessary to be signed by Company; provided, however, that in seeking such consent Manager shall continue to assume ultimate responsibility

4

for any liabilities created therein and Company's principals shall not be required to personally guarantee any liabilities not currently guaranteed by them.

5.4.     The Company shall, at its sole expense, fix all the fixtures, doors, furniture, lights, equipment, etc. that are not in perfect working condition.

5.5.     The Company shall, at its sole expense, provide Forall use of and access to a portion of the store prior to the Effective Date, for purposes of Forall's entertaining and marketing to Forall and fashion clients during Magic fashion event in Las Vegas during the week of February 16 through February 20, 2015.

5.6.     The Company shall, free of charge, provide Forall use of and access to the stock room at least two weeks prior to the Start Date.

5.7.     The Company agrees to allow Forall to close the store for two (2) days prior to the Start Date in order to make renovations, stock inventory and other such work in preparation of opening the store under Forall management.

5.8.     The Company shall, free of charge, allow Forall to store merchandise in the stock room at least two weeks prior to the Start Date

5.9.     At the expiration of the Initial Term, at Forall's sole option, Sarah shall assign all of its right and interest in the Lease to Forall at no additional cost to Forall.  Sarah shall obtain and otherwise assist with obtaining the Landlord's approval, if necessary, for any transfer or assignment of the Lease.

5.10.    The Management Agreement shall not alter or amend the parties' rights and obligations under the License and Retail Operating Agreement between Sarah and Forall dated March 2011 and Sarah's obligations under the Lease, except that Forall shall assume all lease payments during the Term.

5.11.    The Company shall cooperate fully with Forall's due diligence review of this proposed transaction.  Sarah shall provide Forall with access to all Business records, financial statements, employee records, etc., and shall allow Forall and its representatives to access and monitor the Business and the store Premises during this due diligence period.  Sarah shall continue to operate the Business in the normal course and manner until Forall assumes the operations under the Management Agreement and Sarah shall assist Forall in the transition of the Business.

5.12.    The Company shall not transfer or surrender the Lease without Forall's prior written consent and agreement.  If Forall has exercised the option set forth in Section 2.3, this obligation shall survive the termination of this Agreement.

5.13.    The Company shall obtain the written consent of the Landlord to this Management Agreement to the extent that said consent is required at any point in time.  Forall shall, at its option, have the right to terminate this Agreement to the extent that the Company

5

fails to obtain the consent of the Landlord on any required matter under the Lease. Notwithstanding the foregoing, Forall shall not affirmatively approach the Landlord to discuss the Management Agreement; however nothing herein shall prevent Forall and/or its representatives from otherwise contacting or discussing the Business and/or Lease with the Landlord as may be required in the course of business.

5.14.   The Company hereby represents and covenants to Forall that the Company is not in default of any material provision of the License and Lease Agreements.

5.15.   Except as specifically set forth herein, nothing shall act as to waive, limit or otherwise alter any obligation or liability that the Company and/or its principals, owners, members, and/or guarantors are subject to or arising from the License and Retail Operator Agreement, the Lease Agreement, and/or any Guaranty, undertaking or promise thereunder.

## ARTICLE VI
## TERMINATION

6.1.   This Agreement may be terminated as follows:

     i.      by mutual written consent of Company and Manager;

     ii.     by Manager, if at any time, the Company is in default of the Lease or materially defaults under the License Agreement, provided, that the default is not caused by Manager acting on behalf of Company unless Manager was acting at Company's direction;

     iii.    by Manager, if there has been a material breach by Company of any of its representations, warranties, covenants or agreements contained in this Agreement and such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured within ten (10) Business Days after written notice thereof shall have been provided to Company by Manager.

     iv.    by Company, if there has been a material breach by Manager of any of its representations, warranties, covenants or agreements contained in this Agreement and such breach shall not have been cured within ten (10) Business Days after written notice thereof shall have been provided to Manager by Company.

6.2.   In the event of any termination pursuant to this Article VI, written notice thereof setting forth the reasons therefor shall promptly be given by the terminating Party to the other Party and the transactions contemplated by this Agreement shall be terminated, without farther action by any Party.

## ARTICLE VII
## INDEMNIFICATION

7.1.   Sarah shall indemnify and hold harmless Forall for any losses, claims, and/or liability, including a reasonable attorneys' fees, that arises as a result of or in connection with the operation and/or management of the Business and/or Premises, including but not limited to all

6

liability arising from the store, Lease, employee matters, taxes for the time period prior to the Start Date of the Management Agreement.

7.2.   Forall shall indemnify and hold Sarah harmless for any losses, claims and/or liability caused by or arising in connection with Forall's operation of the Business during the term of Management Agreement, except to the extent that any losses, claims and/or liability is caused by Sarah's own conduct.   Notwithstanding anything to the contrary in this Agreement, neither Forall nor any of its assigns, affiliates, or subsidiaries shall have any responsibility for nor make any representations or provide any indemnification concerning any liabilities and/or obligations related to or arising from the any predecessor company or person operating the Business or Lease prior to the effective date of this Agreement, including any acts or conduct by Sarah LLC, or any of its owners, shareholders, officers, employees, agents or representatives.

## ARTICLE VIII
### NOTICES

8.1.   Any notice, request, instruction, correspondence or other document to be given hereunder by any Party to another (herein collectively called "notice") shall be in writing and delivered personally or mailed by registered or certified mail, postage prepaid and return receipt requested, or by facsimile, as follows:

| If to Manager: | Name: | Forall USA, LLC |
| | Address: | Fuller Building |
| | | 595 Madison Avenue – Suite 605 |
| | | New York, New York   10022 |
| | Attn: | Paolo Torello-Viera |
| | | CEO - President Americas, |
| | Facsimile: | (212) 751- |
| with a copy to: | Name: | Stephen J. Brown, Esq. |
| | | Veneruso, Curto, Schwartz & Curto, LLP |
| | Address: | 35 East Grassy Sprain Road, Suite 400 |
| | | Yonkers, New York 10710 |
| | Facsimile: | (914) 779-0369 |
| If to Company: | Name: | Bachar Hamad, MD |
| | | Sarah, LLC |
| | Address: | 1717 Midwest Club Parkway |
| | | Oakbrook, IL 60523 |
| | Facsimile: | |
| with a copy to: | Name: | David Hochman, Esq. |
| | | Kamensky Rubenstein Hochman & Delott, LLP |

7

| Address: | 7250 N. Cicero Avenue |
| | Lincolnwood, IL 60712 |
| Facsimile: | (847) 982-1776 |

Each of the above addresses for notice purposes may be changed by providing appropriate notice hereunder. Notice given by personal delivery or registered mail shall be effective upon actual receipt. Notice given by facsimile shall be effective upon actual receipt if received during the recipient's normal business hours, or at the beginning of the recipient's next normal Business Day after receipt if not received during the recipient's normal business hours. All notices by facsimile shall be confirmed by the sender thereof promptly after transmission in writing by registered mail or personal delivery. Anything to the contrary contained herein notwithstanding, notices to any Party shall not be deemed effective with respect to such Party until such notice would, but for this sentence, be effective both as to such Party and as to all other Persons to whom copies are provided above to be given.

## ARTICLE IX
## MISCELLANEOUS

9.1.    It is the intention of the parties hereto that this Agreement and the performance hereunder and all suits and special proceeds hereunder be construed in accordance with the laws of the State of New York, regardless of whether one party is or may become a resident of another state. Any action, special proceeding or other proceedings that may be brought arising out of, or in connection with, or by reason of this Agreement the laws of the State of New York shall be applicable and shall govern to the exclusion of the laws of any other forum, without regard to the jurisdiction in which any action or special proceeding may be instituted.

9.2.    The parties that any controversy arising under or in relation to this Agreement will be brought exclusively in the State of New York, County of New York. The state and federal courts and authorities with jurisdiction in New York County will have exclusive jurisdiction over all controversies which shall arise under or in relation to this Agreement.

9.3.    The parties acknowledge that this Agreement shall constitute the entire agreement between the parties and no variance or modification hereof shall be valid and enforceable except by supplemental agreement, in writing, executed and approved by both parties hereto.

9.4.    All provisions contained herein are severable, and in the event any of them shall be held to be invalid by any competent court, this Agreement shall be interpreted as if such invalid provisions or covenants were not contained herein, in order to give the remaining provisions full and legally binding meaning.

9.5.    This Agreement may be assigned by the Manager to a related or affiliated company without consent of the Company. Company may not assign this Agreement without the Manager's prior written consent.

8

9.6.    Failure of any party hereto to assist upon strict compliance with any of the terms, covenants and conditions hereof shall not be deemed a waiver or relinquishment of such terms, covenants and conditions of any similar right or power hereunder at any subsequent time.

9.7.    This Agreement may be executed in counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same agreement. This Agreement shall become effective upon, but only upon, its execution by both parties.

IN WITNESS WHEREOF, the parties hereto execute this Agreement under seal by their duly authorized representatives as of the date first above written.

**FORALL U.S.A., INC.,**

By: Paolo Torello-Viera
Title: Chief Executive Officer

**SARAH, LLC.,**

By: _____
       Hala subh
Its: Member as to a 50% interest

By: _____
       Suhad albasha
Its: Member as to a 50% interest

10

STATE OF NEW YORK      )
                                          ) ss.:
COUNTY OF NEW YORK  )

On the _20_ day of February in the year 2015 before me, the undersigned personally appeared Paolo Torello-Viera, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____          **MARSHA S. COYE**
                                                              Notary Public, State of New York
(signature and office of individual taking acknowledgment)   No. 01CO6259974
                                                              Qualified in Kings County
                                                              Commission Expires April 16, 20_16_

STATE OF      _IL_        )
                                   ) ss.:
COUNTY OF  _DuPage_  )

On the _9_ day of February in the year 2013 before me, the undersigned personally appeared Hala subh personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
(signature and office of individual taking acknowledgment)

STATE OF      _IL_        )
                                   ) ss.:
COUNTY OF  _DuPage_  )

On the ___ day of February in the year 2015 before me, the undersigned personally appeared Suhad albasha  personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
(signature and office of individual taking acknowledgment)

11

OFFICIAL SEAL
**MATTHEW TROUTMAN**
NOTARY PUBLIC, STATE OF ILLINOIS
My Commission Expires July 02, 2018

OFFICIAL SEAL
**MATTHEW TROUTMAN**
NOTARY PUBLIC, STATE OF ILLINOIS
My Commission Expires July 02, 2018

# EXHIBIT 16

**Stephen Brown**

| | |
|---|---|
| **From:** | Stephen Brown |
| **Sent:** | Tuesday, February 23, 2016 10:51 PM |
| **To:** | Hochman, David |
| **Subject:** | RE: New Contact Information |

Dear David,

As discussed, Forall is seeking a sixty day extension on the March 1, 2016, date set forth in the parties' Management Agreement, by which Forall is to provide Sarah with notice as to whether Forall intends to assume the business and lease or terminate the Management Agreement following the Initial Term.

We will need this extension agreed to and in writing by the close of business this week.  If we do not have your client's agreement to the sixty day extension of the notification date in Management Agreement, Forall will reevaluate its approach as to the Las Vegas store and the Management Agreement.

Let's discuss the foregoing at your earliest convenience.  Thank you.


Stephen J. Brown
Bleakley Platt & Schmidt, LLP
One North Lexington Avenue
White Plains, New York 10601

Telephone: (914) 949-2700
Direct Dial: (914) 287-6191
Facsimile: (914) 683-6956
Email: sbrown@bpslaw.com
Website: http://www.bpslaw.com
Bio / vcard



This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution or copying of this e-mail, and any attachments thereto, is strictly prohibited. If you have received this e-mail in error, please notify me by replying to this message and permanently delete the original and any copy of this e-mail and any printout thereof.

For additional information about Bleakley Platt & Schmidt, LLP, including a list of attorneys, please see our website at http://www.bpslaw.com

**From:** Hochman, David [mailto:DHochman@ralaw.com]
**Sent:** Friday, February 19, 2016 11:20 AM
**To:** Stephen Brown <SBrown@bpslaw.com>
**Subject:** Re: New Contact Information

# EXHIBIT 17

# PAL ZILERI

February 25, 2016

*Via Email and Registered Mail*

Sarah, LLC
c/o Bachar Hamad, M.D.
729 Heath Court
Westmont, IL 60559
bhamad@sbcglobal.net

Re:   Management Agreement between Forall Nevada, LLC, and Sarah LLC
      Premises: Pal Zileri (Room K8) Forum Shops at Caesars II, Las Vegas, Nevada

Dear Dr. Hamad:

By this letter, please be advised that Forall USA, Inc. ("Forall"), requests a sixty (60) day extension of the March 1, 2016 notice date set forth in paragraph 2.4 of the Management Agreement between Forall USA, Inc., and Sarah, LLC ("Sarah") dated February 9, 2015 ("Management Agreement"), to and including June 1, 2016. All terms not expressly defined herein shall have the meaning set forth in the Management Agreement.

Specifically, Forall seeks Sarah's consent and agreement to allow Forall until and including June 1, 2016, by which to notify Sarah as to whether Forall intends to take over the Lease and Business and/or otherwise terminate the Management Agreement.

By your countersignature below, Sarah expressly agrees and consents to the modification of the notice date set forth in paragraph 2.4 of the Management Agreement from March 1, 2016 to June 1, 2016. No other terms of the Management Agreement shall be deemed to be amended and/or modified except as expressly set forth herein. Moreover, the end date of the Initial Term Management Agreement, which is September 1, 2016, shall remain unchanged by this modification and agreement.

Alternatively, to the extent that Sarah does not agree and consent to the foregoing amendment and modification of the Management Agreement, please be advised that this letter shall serve as notice by Forall that it does not intend to take over the Lease or the Business and that the Management Agreement shall expire at the end of the Initial Term, September 1, 2016, and that Forall shall turn the Pal Zileri Premises and Business back to Sarah pursuant to the parties' License Agreement. I further remind you that all rights and obligations under the License Agreement remain in effect.

FORALL USA
7, Sutton Place
Brewster, NY, 10509

PAL ZILERI SHOWROOM
681 Fifth Avenue – 8th Floor
New York, NY 10022
212.751.8585

# PAL ZILERI

Nothing herein shall modify or amend the rights and obligations under the parties' Management Agreement not expressly stated herein.

This letter is being sent via email pursuant to authorization of your counsel and registered mail.

FORALL USA, INC.,
FORALL NEVADA, LLC,

By: _____
Name: Pablo Torello-Viera
Date: February 25 2016

Agreed, Acknowledged and Consented to:

SARAH, LLC

By: _____
Name: Bachar Hamad, President
Date:   February __, 2016

Cc:     David Hochman
        Roetzel & Andress, LPA
        20 S. Clark, Suite 300
        Chicago, Illinois 60305
        DHochman@ralaw.com

        Stephen J. Brown
        Bleakley Platt & Schmidt, LLP
        One North Lexington Avenue
        White Plains, New York 10601
        sbrown@bpslaw.com

FORALL USA
7, Sutton Place
Brewster, NY, 10509

PAL ZILERI SHOWROOM
681 Fifth Avenue – 8th Floor
New York, NY 10022
212.751.8585

www.palzileri.com

# EXHIBIT 18

# PAL ZILERI

March 9, 2016

*Via Email and Registered Mail*

Sarah, LLC
c/o Bachar Hamad, M.D.
729 Heath Court
Westmont, IL 60559
bhamad@sbcglobal.net

Re:   Management Agreement between Forall Nevada, LLC, and Sarah LLC
      Premises: Pal Zileri (Room K8) Forum Shops at Caesars II, Las Vegas, Nevada

Dear Dr. Hamad:

By letter dated February 25, 2016, Forall has notified Sarah, LLC ("Sarah") that Forall will not be extending the term of the parties' Management Agreement dated February 9, 2015 ("Management Agreement").

Consequently, effective September 1, 2016, Sarah shall again assume possession of the Pal Zileri store, the lease for the premises and all obligations under the parties' License and Retail Operator Agreement dated March 2011 ("License Agreement").

I remind you that under the License Agreement, Sarah is responsible to pay in advance for stock inventory in the store and is required to provide adequate inventory at the store at all times. Article 2 of the License Agreement. Article 4 sets forth that Sarah shall place a minimum order of Four Hundred Thousand ($400,000.00) Dollars for Spring/Summer and Five Hundred Thousand ($500,000.00) Dollars
for Fall/Winter for a total of Nine Hundred Thousand ($900,000.00) Dollars per calendar year.

Please contact me to discuss store inventory, fall and winter purchasing, employee matters, and transitioning the operations. We wish to make this as smooth for Sarah as possible. All rights are reserved. This letter is being sent via email pursuant to authorization of your counsel and registered mail.

FORALL USA, INC.,
FORALL NEVADA, LLC,

By: _____

Name: Paolo Torello-Viera
Date: March 09, 2016

FORALL USA
7, Sutton Place
Brewster, NY, 10509

PAL ZILERI SHOWROOM
681 Fifth Avenue – 8th Floor
New York, NY 10022
212.751.8585

www.palzileri.com

# PAL ZILERI

Cc:   David Hochman
        Roetzel & Andress, LPA
        20 S. Clark, Suite 300
        Chicago, Illinois 60305
        DHochman@ralaw.com

        Stephen J. Brown
        Bleakley Platt & Schmidt, LLP
        One North Lexington Avenue
        White Plains, New York 10601
        sbrown@bpslaw.com

FORALL USA
7, Sutton Place
Brewster, NY, 10509

PAL ZILERI SHOWROOM
681 Fifth Avenue – 8th Floor
New York, NY 10022
212.751.8585

www.palzileri.com

# EXHIBIT 19



# BLEAKLEY PLATT

NEW YORK    CONNECTICUT

BLEAKLEY PLATT & SCHMIDT, LLP

ONE NORTH LEXINGTON AVENUE
WHITE PLAINS, NEW YORK 10601
914.949.2700
FAX: 914.683.6956
BPSLAW.COM

June 1, 2016

*Via Email and First Class Mail*

David Hochman
Roetzel & Andress, LPA
20 S. Clark, Suite 300
Chicago, Illinois 60305

Re:    Management Agreement between Forall Nevada, LLC, and Sarah LLC
       Premises: Pal Zileri (Room K8) Forum Shops at Caesars II, Las Vegas, Nevada

Dear Mr. Hochman:

This letter is a follow up to my clients' letter dated March 9, 2016, a copy of which is attached. We have had no response from either office or from client. It is imperative that we confirm that your client is prepared to take over the Store and Lease effective September 2016 and meet its obligations under the License and Retail Agreement.

I remind you that under the License Agreement, Sarah LLC is responsible to pay in advance for stock inventory in the Store and is required to provide adequate inventory at the Store at all times as more particularly set forth in the letter of March 9, 2016.

Please notify me of your clients' intentions and confirm that Sarah LLC will meet its contractual obligations.

All rights are reserved.

Very truly yours,

Stephen J. Brown

Cc:    Paolo Torello-Viera
       Pal Zileri
       681 Fifth Avenue, 8th Floor
       New York, NY 10022
       PTorelloViera@palzileri.com

# EXHIBIT 20



Kevin R. Stolworthy

Direct T 702.415.2952   F 314.552.4862
kstolworthy@armstrongteasdale.com

MISSOURI  KANSAS  ILLINOIS  NEVADA  SHANGHAI

August 1, 2016

Forall Nevada, LLC                        Forall USA, INC.
c/o National Registered Agents, Inc. of NV    7 Sutton Place
701 Carson St. Ste. 200                    Brewster, NY 10509
Carson City, NV 89701

Re:    UNLAWFUL DETAINER IN VIOLATION OF NRS 40.240

<u>NOTICE TO SURRENDER</u>

To The Authorized Representative of Forall Nevada, LLC and/or Forall USA, Inc.:

Please be advised that this law firm represents Forum Shops, LLC ("Forum Shops").  This letter is written to advise you that you are guilty of a forcible detainer under NRS 40.240, and that you have a duty to surrender possession of the Leased Premises as described below.  Please read the contents of this letter carefully to fully understand your rights and obligations.   In the event you have counsel, please forward this to your counsel.

A.    **Lease Agreement With Sarah, LLC**

On or about May 18, 2011, Forum Shops and Sarah, LLC ("Tenant") entered into a Lease Agreement ("Lease Agreement") for premises located in The Forum Shops at Caesars, Las Vegas, Nevada, specifically Room K8, containing approximately 2,536 square feet of store floor area (the "Leased Premises").   Tenant was to operate out of the Leased Premises under the trade name "Pal Zileri" for the purpose of offering for retail sale menswear and accessories.

The term of the Lease Agreement was for ten (10) years, commencing on October 1, 2011, and continuing until the last day of the tenth lease year (the "Lease Term").   In or about early 2016, Tenant informed Forum Shops of its desire to close the Leased Premises for business and surrender the Leased Premises to Forum Shops.

On or about July 1, 2016, Forum Shops and Tenant executed an Agreement Canceling Lease ("ACL"). Pursuant to the ACL, the Lease Agreement is cancelled and terminated and neither party shall thereafter be bound by any of the terms and provisions therein as of the close of business on July 31, 2016 ("Cancellation Date").  A true and correct copy of the ACL is attached hereto as **Exhibit "1."**

Forum Shops located a replacement tenant that is ready to take possession of the Leased Premises on August 1, 2016.  If you fail to surrender the Leased Premises, Forum Shops will incur damages for each day

August 1, 2016
Page 2

that Forum Shops is unable to deliver the Leased Premises to the replacement tenant.  You will be responsible for those damages, consequential damages, costs and attorneys' fees arising from your failure to surrender the Leased Premises.

### B.  Complaint Against Sarah, LLC

On July 25, 2016, Forum Shops filed a Complaint asserting *inter alia* a claim for unlawful detainer in the case styled *Forum Shops, LLC v. Sarah, LLC*, Case No. A:16-740556-B, in the Eighth Judicial District Court, Clark County, Nevada.  As part of the relief requested, Forum Shops requested entry of a permanent writ of restitution of the Leased Premises.  Subsequently, Tenant did in fact stipulate to a permanent writ of restitution, and has acknowledged that it has no possessory right to the Leased Premises on or after 5:01 p.m. on July 31, 2016.  A true and correct copy of the Stipulation and Order is attached hereto as **Exhibit "2."**  Tenant further acknowledged that it neither assigned nor subleased its tenancy to any other person or entity.  Accordingly, Tenant has agreed that its tenancy for the Leased Premises has terminated effective 5:01 p.m. on July 31, 2016.

### C.  Violation Of NRS 40.240

Notwithstanding the fact that Tenant has conceded that it has no right to possession of the Leased Premises effective 5:01 p.m. on July 31, 2016, you are in possession of the Leased Premises without any legal authority to do so.  For this reason, you are hereby notified in accordance with NRS 40.240(2)(a) that you are in direct violation of the forcible detainer laws set forth under NRS 40.240.  Because you are guilty of a forcible detainer, **you must surrender the Leased Premises immediately, but within no later than 4 judicial days of receipt of this letter as set forth in NRS 40.240(2)(b).**  Furthermore, your actions of retaining possession of the Leased Premises beyond 5:01 p.m. on July 31, 2016 subjects you to damages, including direct and consequential damages as a result of business interruption.  Notably, you will also be liable for treble damages for the three times the amount at which actual damages are assessed as specified under NRS 40.240(3).

Additionally, you are hereby notified of the following:

1. Pursuant to NRS 40.414(3)(a), you are hereby notified that the Eighth Judicial District Court of Nevada and/or Las Vegas Justice Court has jurisdiction over this matter.

2. Pursuant to NRS 40.414(3)(b)(1), you are hereby notified of the right to contest the matter by filing, before the court's close of business on the fourth judicial day following service of the notice of surrender, an affidavit with the court stating the reasons why you are not guilty of a forcible detainer.

3. Pursuant to NRS 40.414(3)(b)(1), you are hereby notified that if the court determines that you are guilty of a forcible detainer, the court may issue a summary order for removal of you providing for the nonadmittance of you, directing the sheriff or constable of Clark County to remove you within 24 hours after the sheriff's or constable's receipt of the order from the court.

4. Pursuant to NRS 40.414(3)(b)93), you are hereby notified that, except as otherwise provided in this subparagraph, Forum Shops shall provide safe storage of any personal property of yours which remains on the Leased Premises. Forum Shops may dispose of any personal property of yours

August 1, 2016
Page 3

remaining on the Leased Premises after 14 calendar days from the execution of an order for removal of you or your compliance with this Notice to Surrender, whichever comes first.  You must pay Forum Shops the reasonable and actual costs of inventorying, moving and storing the personal property before the personal property will be released to you.

Accordingly, you are hereby notified of the duty to surrender the Leased Premises as detailed above. Should you fail to do so, Forum Shops intends to assert any and all legal remedies at its disposal, including seeking an eviction as set forth under NRS 40.414(5) and any monetary damages owed to it as a result of your unlawful actions.  **Lastly, please note that Forum Shops will not accept any tender of rent from you for the month of August, so please do not tender any such payment.**   To the extent you ignore this directive and tender payment to Forum Shops, such payment will be delivered to a lock box.   In the event the payment is deposited for whatever reason, Forum Shops will take steps to immediately refund such money.   Any temporary receipt of rent shall not constitute a waiver of any of Forum Shops' rights.  Please do not hesitate to contact me if you have any questions.

Sincerely,

Kevin R. Stolworthy

KRS:

Enclosures

# Exhibit 1

# Exhibit 1

AGREEMENT CANCELING LEASE

THIS AGREEMENT CANCELING LEASE ("Agreement") is made on this __1ST__ day of
__July__, 2016, by and between FORUM SHOPS, LLC, a Delaware limited liability
company, having a business address of 225 West Washington Street, Indianapolis, Indiana 46204-3438 (the
"Landlord"), and SARAH, LLC, d/b/a "PAL ZILERI", having a business address of c/o Bachar Hamad MD, 729 Heath
Court, Westmont, Illinois 60559 (the "Tenant"):

W I T N E S S E T H:

WHEREAS, by a Lease dated May 18, 2011 (the "Lease"), Landlord leased to Tenant certain premises being
identified in the Lease as Room K8 (the "Premises"), located in the Forum Shops at Caesars II, Las Vegas, Nevada, and

WHEREAS, Landlord and Tenant have mutually determined that it will be in their best interest to cancel and
terminate the Lease, subject to the terms and provisions as hereinafter stated:

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable
consideration, the receipt and sufficiency of which is hereby acknowledged by each of the parties hereto, it is hereby
mutually agreed as follows:

1. Effective as of the close of business on July 31, 2016 (the "Effective Date"), the Lease by and between
   Landlord and Tenant as more particularly described above, shall be cancelled and terminated and
   neither party shall thereafter be bound by any of the terms and provisions thereof, except as set forth
   below.

2. After the Effective Date, Tenant shall have no further claim to the Premises, including any and all
   installations made therein by Tenant (except that Tenant shall have the right, prior to the Effective
   Date, to remove its merchandise, personal property, and trade fixtures, and any other removable items
   which are the property of the Tenant so long as Tenant repairs any damage occasioned by such
   removal), and does hereby release and convey to the Landlord, its successors and assigns, free and
   clear of all liens and encumbrances, all interest it acquired in the Premises, and by any construction or
   installation it has performed or caused to be performed therein.

3. Tenant shall remain liable for the performance of all its obligations and for the payment of rent and
   other charges, including any and all final termination billings, which it is to pay to Landlord pursuant
   to the provisions of the Lease, which shall have accrued as of the Effective Date, and for the
   performance of all other terms, covenants and provisions of the Lease through and including the
   Effective Date.

4. Tenant hereby releases and forever discharges Landlord, its officers, directors, shareholders, partners,
   agents, employees, successors and assigns from all claims, contracts, liabilities, obligations,
   misrepresentation, damages for money due, or cause of action of any kind or nature, whether known or
   unknown, fixed or contingent, liquidated or unliquidated, including, but not limited to, all claims
   arising out of or related to the performance or nonperformance by Landlord of its obligations and
   liabilities under the Lease which Tenant now has, ever had or may ever have in the future against
   Landlord by reason of any matter whatsoever occurring on or at any time prior to the Effective Date.

REMAINDER OF PAGE LEFT INTENTIONALLY BLANK

IN WITNESS WHEREOF, Landlord and Tenant have executed this Agreement as of the day and year first above written.

FORUM SHOPS, LLC, a Delaware limited liability company
By: FORUM DEVELOPERS LIMITED PARTNERSHIP, a
Nevada limited partnership, its sole member
By: SIMON PROPERTY GROUP, L.P., a Delaware limited
partnership, its general partner
By: SIMON PROPERTY GROUP, INC., a Delaware
corporation, its general partner



By: _____
David J. Contis, Sr. Exec. Vice President and
President Simon Malls

SARAH, LLC

By: _____
Name:
Title:

Attest: _____
Name:
Title:

## AFFIRMATION OF GUARANTY

Guarantor hereby acknowledges it has reviewed the terms and provisions of the Agreement Cancelling Lease acknowledges and agrees to the terms of the same AND affirms its obligations under the Guaranty and agrees and affirms that its guarantee of the Lease continues to be in full force and effect and is hereby ratified and confirmed in all respects and shall apply to the Lease, as such is amended, restated, supplemented or otherwise modified from time to time in accordance with their terms, including (but not limited to) all other terms and conditions of the aforesaid Agreement Cancelling Lease.

Guarantor
By: _____
Printed: _____
Date: _____

2

REMAINDER OF PAGE LEFT INTENTIONALLY BLANK

IN WITNESS WHEREOF, Landlord and Tenant have executed this Agreement as of the day and year first above written.

~~FORUM SHOPS, LLC, a Delaware~~
limited liability company
By:    FORUM DEVELOPERS
    LIMITED PARTNERSHIP, a
    Nevada limited partnership, its
    sole member

By:    SIMON PROPERTY GROUP, L.P., a Delaware
    limited partnership, its general partner

By:    SIMON PROPERTY
    GROUP, INC., a Delaware
    corporation, its general
    partner

By:

    John    Rulli,    Senior
Executive Vice President
    and  Chief  Administrative
Officer

OFFICIAL SEAL
GINA A SWANSON
Notary Public - State of Illinois
My Commission Expires Oct 26, 2017

Suhad Albasha Signed
before me on this 14th day
of June, 2016
Gina Swans

SARAH, LLC

By: S. ALBASHA

Name: Suhad Albasha

Title:


Attest:


Name:
Title:


## AFFIRMATION OF GUARANTY

Guarantor hereby acknowledges it has reviewed the terms and provisions of the Agreement Cancelling Lease, acknowledges and agrees to the terms of the same AND affirms its obligations under the Guaranty and agrees and affirms that its guarantee of the Lease continues to be in full force and effect and is hereby ratified and confirmed in all respects and shall apply to the Lease, as such is amended, restated, supplemented or otherwise modified from time to time in accordance with their terms, including (but not limited to) all other terms and conditions of the aforesaid Agreement Cancelling Lease.

Guarantor
By: _Hala_
Printed: _HaLa SubH_

Date: _6/14/2016_

1

_Hala Subh signed before me this 14th day of June 2016_

_Gina Swanson_

OFFICIAL SEAL
GINA A SWANSON
Notary Public - State of Illinois
My Commission Expires Oct 26, 2017

# Exhibit 2

# Exhibit 2

1  SAO
   KEVIN R. STOLWORTHY, ESQ.
   Nevada Bar No. 2798
2  CONOR P. FLYNN, ESQ.
   Nevada Bar No. 11569
3  MICHELLE D. ALARIE, ESQ.
   Nevada Bar No. 11894
4  ARMSTRONG TEASDALE LLP
   3770 Howard Hughes Parkway, Suite 200
5  Las Vegas, Nevada 89169
   Telephone: 702.678.5070
6  Facsimile: 702.878.9995
   kstolworthy@armstrongteasdale.com
7  cflynn@armstrongteasdale.com
   malarie@armstrongteasdale.com
8
   *Attorneys for Plaintiff Forum Shops, LLC*
9

10                         **DISTRICT COURT**

11                      **CLARK COUNTY, NEVADA**

12

13

14  FORUM SHOPS, LLC, a Delaware limited          Case No.: A-16-740556-B
    liability company,
15                                                Dept. No.: 13
               Plaintiff,
16
    vs.
17                                                **STIPULATION AND ORDER FOR**
    SARAH, LLC, a Nevada limited liability         **ENTRY OF PERMANENT WRIT OF**
18  company; DOES I through X, inclusive; and ROE  **RESTITUTION; AND PERMANENT**
    CORPORATIONS I through X, inclusive,           **WRIT OF RESTITUTION**
19
               Defendants.
20

21        Plaintiff FORUM SHOPS, LLC ("Forum Shops"), by and through its attorneys of record,

22  Armstrong Teasdale LLP, and Defendant SARAH, LLC dba Pal Zileri ("Tenant") hereby stipulate

23  and agree to entry of a permanent writ of restitution concerning the leased premises more particularly

24  identified as Room K8 of The Forum Shops at Caesars Palace, 3500 S. Las Vegas Blvd, Las Vegas,

25  Nevada ("Premises") as Tenant acknowledges that it has no right to possession of the Premises after

26  July 31, 2016, at 5:00 p.m.

27        A tenant of real property "for a term less than life is guilty of an unlawful detainer when the

28  tenant continues in possession, in person or by subtenant, of the property . . . or any part thereof,

after the expiration of the term for which it is let to the tenant." NRS 40.250. "In all cases where real property is leased for a specified term or period . . . the tenancy terminates without notice at the expiration of the specified term or period." *Id.*   Upon the landlord's filing of a complaint for unlawful detainer to determine the right to possession between the landlord and the tenant, the court may enter a permanent writ of restitution to return possession of the real property to the landlord from whom it is unlawfully being withheld. NRS 40.300; *see also Chapman v. Deutsche Bank Nat'l Trust Co.*, 129 Nev. Adv. Op. 34, 302 P.3d 1103, 1107 (2013).

The Parties submit that good cause exists for entry of a permanent writ of restitution,

1)      On May 18, 2011, Forum Shops and Tenant entered into a Lease Agreement granting Tenant exclusive occupancy and use of the Premises to offer for retail sale menswear and accessories ("Lease Agreement").

2)      The Lease Agreement was not assigned, nor has Tenant sublet the Premises, to any other person or entity.  And any assignment, subletting, or concession by Tenant of the Premises would be void pursuant to Section 13.1 of the Lease Agreement because Tenant did not comply with the conditions to effectuate and assignment, sublease, or concession including reporting requirements and payment of an assignment fee.

3)      In or about early 2016, Tenant informed Forum Shops of its desire to close the Premises for business and surrender the Premises to Forum Shops.

4)      On July 1, 2016, Forum Shops and Tenant executed an Agreement Canceling Lease ("ACL"), wherein the Parties, upon receipt and acknowledgment of good and valuable consideration, agreed that "[e]ffective as of the close of business on July 31, 2016 (the "Effective Date"), the [Lease Agreement] . . . shall be cancelled and terminated and neither party shall thereafter be bound by any of the terms and provisions therein, except as set forth below."

5)      The additional terms of the ACL included the following:

> After the Effective Date, Tenant shall have no further claim to the Premises, including any and all installations made therein by Tenant (except that Tenant shall have the right, prior to the Effective Date, to remove its merchandise, personal property, and trade fixtures, and any other removable items which are the property of the Tenant so long as Tenant repairs any damage occasioned by such removal), and does hereby release and convey to the

2

[Forum Shops], its successors and assigns, free and clear of all liens and encumbrances, all interest it acquired in the Premises, and by any construction or installation it has performed or caused to be performed therein.

Tenant shall remain liable for the performance of all its obligations and for the payment of rent and other charges, including any and all final termination billings, which it is to pay to [Forum Shops] pursuant to the provisions of the [Lease Agreement], which shall have accrued as of the Effective Date, and for the performance of all other terms, covenants and provisions of the [Lease Agreement] through and including the Effective Date.

Tenant hereby releases and forever discharges [Forum Shops], its officers, directors, shareholders, partners, agents, employees, successors and assigns from all claims, contracts, liabilities, obligations, misrepresentation, damages for money due, or cause of action of any kind or nature, whether known or unknown, fixed or contingent, liquidated or unliquidated, including, but not limited to, all claims arising out of or related to the performance or nonperformance by [Forum Shops] of its obligations and liabilities under the [Lease Agreement] which Tenant now has, ever had or may ever have in the future against [Forum Shops] by reason of any matter whatsoever occurring on or at any time prior to the Effective Date

6)    On the Effective Date, the Lease Agreement is terminated.  Accordingly, Tenant has no right to possession of the Premises and Forum Shops is entitled to possession of the Premises.

7)    Forall, USA, Inc. and/or Forall Nevada, LLC ("Forall") is currently is operating at the Premises without Forum Shops' consent.

8)    After the Effective Date, neither Tenant nor Forall shall have any continuing right to possess the premises.  Anyone continuing to possess the premises after the Effective Date shall be in unlawful detainer of the premises pursuant to NRS 40.250.

9)    On July 25, 2016, Forum Shops filed a Complaint asserting *inter alia* a claim for unlawful detainer based upon its good faith belief that Tenant or Forall will continue in possession of the Premises after the Effective Date.  As part of the relief requested, Forum Shops seeks entry of a permanent writ of restitution of the Premises.

10)    Tenant acknowledges receipt of a copy of the Complaint and Summons, and has in fact accepted service of the Complaint and Summons.

11)    Pursuant to NRS 40.250, where a tenancy terminates at the expiration of a specific period of time, service upon the tenant of a notice to vacate or surrender at the expiration of that period of time is not required.  Notwithstanding, Tenant agrees to waive any and all right to receive

3

any and all notices that may be required under NRS 40.280 or any other applicable law.

12)   Forum Shops agrees that it will comply with the provision set forth in NRS 118C.230 with regard to any personal property remaining on the Premises after the Effective Date.

13)   Tenant further agrees that it shall be required to pay all reasonably incurred attorneys' fees and court costs incurred by Forum Shops in connection with initiating the instant case, pursuing a writ of restitution, and enforcing a writ of restitution.   The Parties agree to work in good-faith to reach a resolution on the amount of attorney's fees and costs to be paid to Forum Shops without court intervention once the writ of restitution has been entered.   The Parties agree, however, that this Court shall have jurisdiction to determine the amount of attorney's fees and costs to be paid to Forum Shops in the event the Parties cannot reach such a resolution, even despite the fact that other claims may remain pending in the instant case.   Nothing in this Stipulation shall prohibit Forum Shops from seeking any other attorney's fees and costs it may be otherwise entitled to as a matter of law

Accordingly, Forum Shops and Tenant agree that entry of a permanent writ of restitution over the Premises is necessary under the present facts and circumstances, that no bond shall be necessary, and therefore respectfully request that this Court enter a permanent writ of restitution to restore possession of the Premises to Forum Shops by 5:01 p.m. on July 31, 2016.

Dated this 28th day of July, 2016.

ARMSTRONG TEASDALE, LLP

By: _____
    KEVIN R. STOLWORTHY, ESQ.
    Nevada Bar No. 2798
    CONOR P. FLYNN, ESQ.
    Nevada Bar No. 11569
    MICHELLE D. ALARIE, ESQ.
    Nevada Bar No. 11894
    3770 Howard Hughes Parkway, Suite 200
    Las Vegas, Nevada 89169
    Telephone:  702.678.5070
    Facsimile:  702.878.9995
    kstolworthy@armstrongteasdale.com
    cflynn@armstrongteasdale.com
    malarie@armstrongteasdale.com
    *Attorneys for Plaintiff Forum Shops, LLC*

Dated this ___ day of July, 2016.

KOLESAR & LEATHAM, CHTD.

By: _____
    MATTHEW T. DUSHOFF, ESQ.
    Nevada Bar No. 4975
    400 S. Rampart Blvd., Ste. 400
    Las Vegas, NV 89145
    Telephone: 702.889.7761
    Facsimile: 702.362.9472
    mdushoff@klvnevada.com

    *Attorney for Defendant Sarah, LLC dba Pal Zileri*

4

1   any and all notices that may be required under NRS 40.280 or any other applicable law.

2         12)    Forum Shops agrees that it will comply with the provision set forth in NRS 118C.230

3   with regard to any personal property remaining on the Premises after the Effective Date.

4         13)    Tenant further agrees that it shall be required to pay all reasonably incurred attorneys'

5   fees and court costs incurred by Forum Shops in connection with initiating the instant case, pursuing

6   a writ of restitution, and enforcing a writ of restitution.   The Parties agree to work in good-faith to

7   reach a resolution on the amount of attorney's fees and costs to be paid to Forum Shops without

8   court intervention once the writ of restitution has been entered.   The Parties agree, however, that this

9   Court shall have jurisdiction to determine the amount of attorney's fees and costs to be paid to

10  Forum Shops in the event the Parties cannot reach such a resolution, even despite the fact that other

11  claims may remain pending in the instant case.   Nothing in this Stipulation shall prohibit Forum

12  Shops from seeking any other attorney's fees and costs it may be otherwise entitled to as a matter of

13  law

14        Accordingly, Forum Shops and Tenant agree that entry of a permanent writ of restitution

15  over the Premises is necessary under the present facts and circumstances, that no bond shall be

16  necessary, and therefore respectfully request that this Court enter a permanent writ of restitution to

17  restore possession of the Premises to Forum Shops by 5:01 p.m. on July 31, 2016.

18  Dated this 28th day of July, 2016.      Dated this 29 day of July, 2016.

19
20  ARMSTRONG TEASDALE, LLP      KOLESAR & LEATHAM, CHTD.

20  By:_____      By:_____

21      KEVIN R. STOLWORTHY, ESQ.
22      Nevada Bar No. 2798      MATTHEW I. DUSHOFF, ESQ.
         CONOR P. FLYNN, ESQ.      Nevada Bar No. 4975
23      Nevada Bar No. 11569      400 S. Rampart Blvd., Ste. 400
         MICHELLE D. ALARIE, ESQ.      Las Vegas, NV 89145
24      Nevada Bar No. 11894      Telephone: 702.889.7761
         3770 Howard Hughes Parkway, Suite 200    Facsimile: 702.362.9472
25      Las Vegas, Nevada 89169      mdushoff@klvnevada.com
26      Telephone:  702.678.5070
         Facsimile:  702.878.9995      *Attorney for Defendant Sarah, LLC dba*
27      kstolworthy@armstrongteasdale.com    *Pal Zileri*
         cflynn@armstrongteasdale.com
28      malarie@armstrongteasdale.com
         *Attorneys for Plaintiff Forum Shops, LLC*

4

1

<u>**ORDER**</u>

2      This Court, having reviewed the stipulation of the Parties and finding good cause,

3      **IT IS HEREBY ORDERED** that a Permanent Writ of Restitution shall be entered, for the

4 reasons set forth in the Stipulation, whereby the Sheriff or Constable shall cause the Defendant

5 Sarah, LLC dba Pal Zileri and any other person occupying the Premises to be removed from the

6 Premises by 5:01 p.m. on July 31, 2016, and allowing Plaintiff Forum Shops, LLC to have peaceable

7 restitution of the premises.

8      **IT IS FURTHER ORDERED** that no bond shall be required in this matter.

9      **IT IS FURTHER ORDERED** that Tenant's stipulation to entry of a permanent writ of

10 restitution, for the reasons set forth in the Stipulation, of the Premises constitutes sufficient notice of

11 the unlawful detainer proceeding under NRS 40.280, and therefore, any notice requirements are

12 hereby waived.

13      **IT IS FURTHER ORDERED** that Tenant shall be required to pay all reasonably incurred

14 attorneys' fees and court costs incurred by Forum Shops in connection with initiating the instant

15 case, pursuing a writ of restitution, and enforcing a writ of restitution.   The Court shall retain

16 jurisdiction to determine the amount of attorney's fees and costs to be paid to Forum Shops in the

17 event the Parties cannot reach an out-court resolution, even despite the fact that other claims may

18 remain pending in the instant case.   Nothing in this Stipulation shall prohibit Forum Shops from

19 seeking any other attorney's fees and costs it may be otherwise entitled to as a matter of law.

20      **IT IS FURTHER ORDERED** that nothing in this Order shall preclude Forum Shops from

21 pursuing and recovering on its other pending claims.

22 / / /

23 / / /

24 / / /

25 / / /

26 / / /

27 / / /

28 / / /

1    WHEREFORE, this Court hereby enters:

2    **PERMANENT WRIT OF RESTITUTION**

3    THE STATE OF NEVADA TO THE SHERIFF OR CONSTABLE OF THE COUNTY OF

4    CLARK, GREETINGS:

5    WHEREAS, upon stipulation by Plaintiff Forum Shop, LLC and Defendant Sarah, LLC dba

6    Pal Zileri, for good cause shown, this Court enters a Permanent Writ of Restitution on the premises

7    identified as Room K8 within The Forum Shops at Caesars Palace, 3500 S. Las Vegas Blvd, Las

8    Vegas, Nevada.

9    YOU ARE THEREFORE COMMANDED, that taking with you the force of the County, if

10   necessary, you cause the Defendant Sarah, LLC dba Pal Zileri and any other person occupying the

11   premises to be removed from the above-mentioned premises by 5:01 p.m. on the 31st day of July,

12   2016, and allow Plaintiff Forum Shops, LLC to have peaceable restitution of the premises.  You are

13   also commanded to make the return of this writ within thirty (30) days of this date.

14   Dated this 29th day of July, 2016.

15

16

17                                        DISTRICT COURT JUDGE

18   Respectfully submitted by:

19   ARMSTRONG TEASDALE, LLP

20

21

22   By: _____
       KEVIN R. STOLWORTHY, ESQ.
23     Nevada Bar No. 2798
       CONOR P. FLYNN, ESQ.
24     Nevada Bar No. 11569
       MICHELLE D. ALARIE, ESQ.
25     Nevada Bar No. 11894
       3770 Howard Hughes Parkway, Suite 200
26     Las Vegas, Nevada 89169

27     *Attorneys for Plaintiff Forum Shops, LLC*

28

                                        6