Page 1

AMERICAN ARBITRATION ASSOCIATION
--------------------------------------X
In the Matter of the Arbitration of

SARAH LLC, HALA SUBH, SUHAD ALBASHA,
BACHAR HAMAD AND AMAR HAMAD,
                              CLAIMANT,

          -and-            Case No.:
                           01-18-0000-6180

FORALL USA, INC.,

                           RESPONDENT.
--------------------------------------X

                DATE: October 26, 2020

                TIME: 9:39 A.M.



          ARBITRATION in the above

entitled matter, held Via Zoom,

transcribed by Magdalena M. Artiles, a

Notary Public of the State of New York,

held before Eugene I. Farber,

Arbitrator.




                Magna Legal Services
                  (866) 624-6221
                  www.MagnaLS.com



Page 2

```
 1
 2   A P P E A R A N C E S :
 3
     EUGENE I. FARBER
 4      ARBITRATOR
        200 E. Post Road
 5    White Plains, New York 10601
        Efarber@farberadr.com
 6
 7
     POLSINELLI
 8      Attorneys for the Claimants
        150 N Riverside Plz Suite 3000
 9    Chicago, Illinois 60606
        BY: RODNEY L. LEWIS, ESQ.
10        -and-
        SOHIL M. SHAH, ESQ.
11
12
     BLEAKLEY PLATT & SCHMIDT, LLP
13      Attorneys for the Respondents
        One North Lexington Ave
14    White Plains, New York 10601
        BY: STEPHEN J. BROWN, ESQ.
15    SBrown@bpslaw.com
          -and-
16    VINCENT CROWE, ESQ.
17
     ALSO PRESENT:
18
     Amar Hamad
19
     Palma Settimi
20
     Sana'a Hussein
21
22
23
24
              *   *   *
25      I N D E X
```

Page 3

```
 1
 2   WITNESS    EXAMINATION BY    PAGE
 3   MR. SPANO   MR. LEWIS      123, 232
 4   MR. SPANO   MR. BROWN      159
 5   DR. A. HAMAD MR. LEWIS     237
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              PROCEEDINGS
 2         THE ARBITRATOR:  Morning,
 3   everyone.
 4         Mr. Lewis or Mr. Shah, can
 5   you please identify who is on
 6   this Zoom call for claimant.
 7         MR. LEWIS:  Yes.  Thank you.
 8   Rodney Lewis on behalf of
 9   claimants.  We have Mr. Sohil
10   Shah appearing alongside me.
11   Also, on behalf of claimants, I
12   am seeing that we have Sana'a
13   Hussein, who is Dr. Hamad's
14   personal attorney, and we have
15   Dr. Amar Hamad as well.
16         THE ARBITRATOR:  Hang on a
17   minute.  Could you spell your
18   last name.  I see on the screen
19   "S-A-N-A."
20         MS. HUSSEIN:  It's -- first
21   name is S-A-N-A, apostrophe, A.
22   Last name is:  H-U-S-S-E-I-N.
23         THE ARBITRATOR:  Thank you.
24   Good morning.
25         And who else is the on the
```

Page 5

```
 1   line, Mr. Lewis?
 2         MR. LEWIS:  We have Dr. Amar
 3   Hamad.
 4         THE ARBITRATOR:  Dr. Hamad,
 5   I'd like to see you, please.  I
 6   only see the words "Amar Hamad".
 7         MR. HAMAD:  Good morning.
 8   How are you?
 9         THE ARBITRATOR:  I'm good,
10   but I still don't see you.  Dr.
11   Hamad, I think that at the bottom
12   of your screen, you'll see a
13   little video, and I suspect it
14   has a line in it.  What you have
15   to do is:  You have to hit that
16   with your cursor and then the
17   video will appear.  Okay.  That
18   worked.  Good morning, Dr. Hamad.
19         And is there anyone else on
20   for you, Mr. Lewis?
21         MR. LEWIS:  Not that I see,
22   Mr. Farber.
23         THE ARBITRATOR:  Okay.  Very
24   good.
```





Page 6

```
1              PROCEEDINGS
2         And Mr. Brown or Mr. Crowe,
3    whoever is going to handle it,
4    could you identify who is on for
5    respondents?
6         MR. BROWN:  Sure.  Just if I
7    might, though, I would like the
8    contact information for Ms.
9    Hussein when we have a moment.
10   She does not have an appearance
11   in this matter, so I just want to
12   have the ability to contact her
13   if need be.
14        Stephen Brown for --
15        THE ARBITRATOR:  Ms.
16   Hussein, why don't you give us a
17   phone number right now?
18        MS. HUSSEIN:  (708)361-3030.
19        THE ARBITRATOR:  And let us
20   have an address, please.
21        MS. HUSSEIN:  14490 John
22   Humphrey Drive, and that's in
23   Orland Park, Illinois 60462.
24        THE ARBITRATOR:  Thank you
25   very much.
```

Page 7

```
1              PROCEEDINGS
2    Mr. Brown, go ahead.
3         MR. BROWN:  Thank you.  Good
4    morning, everyone.  Stephen Brown
5    with Bleaky Platt & Schmidt,
6    White Planes, New York, for
7    respondent, Forall USA Inc.
8         MR. CROWE:  And I'm Vincent
9    Crowe, also for the respondent,
10   Bleaky Platt & Schmidt.
11        MR. BROWN:  And Mr. Farber,
12   in the room with us to is Paolo
13   Torello-Viera.  He's not on
14   screen.  He's looking at it on a
15   projected screen, but he's
16   participating and listening to
17   the proceeding today.
18        THE ARBITRATOR:  Can you
19   spell his name for me, please?
20        MR. BROWN:  Paolo,
21   P-A-O-L-O.
22        THE ARBITRATOR:  I couldn't
23   hear you, Mr. Brown.  Say it
24   again.
25        MR. BROWN:  One second, Your
```

Page 8

```
1              PROCEEDINGS
2    Honor.  I need to look at it.
3         THE ARBITRATOR:  And this is
4    the last time I'll say it, but
5    it's not necessary to call me
6    "Your Honor".  You can just call
7    me Mr. Farber.
8         MR. BROWN:  I apologize.
9    Paolo, P-A-O-L-O; Torello-Viera,
10   T-O-R-E-L-L-O, hyphen, V-I-E-R-A.
11        THE ARBITRATOR:  Okay.  And
12   is there anyone else on?
13        MS. SETTIMI:  I'm Palma
14   Settimi.
15        THE ARBITRATOR:  Can you
16   spell your last name?
17        MS. SETTIMI:  S-E-T-T-I-M-I.
18        THE ARBITRATOR:  And you
19   are?
20        MS. SETTIMI:  I'm the
21   assistant treasurer and secretary
22   of Forall USA.
23        THE ARBITRATOR:  Okay.
24   Thank you.  Welcome.  Hang on.
25   Mr. Lewis disappeared.  I don't
```

Page 9

```
1              PROCEEDINGS
2    see Mr. Lewis.  Okay.
3         And I have on this what's
4    called "Call in user."
5    Mr. Brown, am I correct that that
6    is simply another line for you?
7         MR. BROWN:  Yes.  We are
8    dialing in and listening to the
9    audio with a telephone.
10        THE ARBITRATOR:  Okay.  Very
11   good.  All right.  I think we
12   lost Mr. Lewis again.  I only see
13   an empty chair.  Okay.
14        Look, everyone, good
15   morning.  I'm Gene Farber, and
16   this is our first evidentiary
17   hearing in connection with this
18   matter.  And on consent, we are
19   conducting this hearing by Zoom,
20   and you've both given me rather
21   detailed submissions.  You've
22   given me briefs and exhibits.  I
23   have carefully reviewed the same.
24   We're going to start with opening
25   argument, and the opening
```

3 (Pages 6 to 9)





Page 10

```
 1            PROCEEDINGS
 2    argument you can discuss what
 3    you'd like in response to the
 4    briefs submitted by the other
 5    side.  I may interrupt with
 6    questions.
 7         Claimant will go first.
 8    Presumably, that will be Mr.
 9    Lewis or Mr. Shah.  When they are
10    finished, we will hear from
11    respondent's counsel, either
12    Mr. Brown or Mr. Crowe.  Then
13    we'll get to work with our first
14    witness, and we'll just continue
15    with our work.
16         So I did get delivered to me
17    this morning -- looks like about
18    10 binders of material.  I have
19    not been through them yet.  They
20    were just delivered within the
21    last hour.  So I have not had an
22    opportunity to look at them, but
23    there were rather detailed
24    exhibits, particularly, the
25    agreements, the documents that
```

Page 11

```
 1            PROCEEDINGS
 2    were signed, which were attached
 3    to the two briefs, so I'm
 4    familiar with them.  All right.
 5         Without anything further, if
 6    there are any administrative
 7    matters, we'll deal with them
 8    after we're finished with the
 9    opening statements.
10         Mr. Lewis, why don't you
11    proceed?
12         Guys, I also want to
13    apologize.  The way my office is
14    set up, my monitor is to the
15    right of my -- of my desk.  So
16    for me to write, I'm going to be
17    sitting like this, and you may
18    therefore only see a side view,
19    and I'll turn from time to time
20    for the frontal view, but as I'm
21    writing, it's going to be like
22    this, so you may not see the
23    direct full face front of me.
24    It's just the way my office is
25    set up.  So I just want you to be
```

Page 12

```
 1            PROCEEDINGS
 2    aware of that.  Okay.
 3         Mr. Lewis, why don't you go
 4    ahead, sir.
 5         MR. LEWIS:  Thank you, Mr.
 6    Farber.  And Mr. Farber, you're
 7    quite aware of what this case is
 8    about.
 9         This is about two ambitious
10    --
11         THE ARBITRATOR:  Speak
12    louder, if you can.
13         Hang on.  I'm not going have
14    a situation where I cannot see
15    people.  It's difficult enough to
16    do this by Zoom.  I've got to
17    have visual of Dr. Hamad.  Either
18    he's in or he's out.  Okay.  As a
19    witness, I want you to be in.
20    All right.  Go ahead.  Go ahead.
21         MR. LEWIS:  Thank you.
22    Again, you're quite aware of what
23    this case is about, Mr. Farber.
24    It is about two ambitious
25    physicians in further pursuit of
```

Page 13

```
 1            PROCEEDINGS
 2    the America dream, who developed
 3    an infinity for Pal Zileri
 4    menswear, and happened to meet
 5    some people in the fashion
 6    industry, and connected to Forall
 7    USA and began discussing opening
 8    a Pal Zileri store in Las Vegas.
 9         The store opened in 2011 and
10    for merit reasons, many of which
11    will be discuss here in the
12    arbitration, the store failed.
13    Now, the store closed in less
14    than five years, despite having
15    three different operators.
16    First, Sarah.  Second, Italnord,
17    which is owned by a gentleman
18    named Alfonso Entebi of Mexico
19    who owned several successful
20    high-end mens' fashion wear
21    stores, including a Pal Zileri
22    store, and had operated
23    successfully in these other
24    locations in Latin America.  Mr.
25    Entebi also failed in this
```



Page 14

```
1              PROCEEDINGS
2    particular location.  Third, was
3    Forall itself.
4          As Mr. Farber is aware,
5    Forall, in early 2015, decided to
6    try its hand in operating the
7    store.  Obviously, they're
8    experienced with their brand and
9    their operation, and they were
10   still unable to get the store to
11   succeed in that particular
12   location.
13         Now, the evidence will show
14   that it did not matter who was
15   operating the store; the store
16   was not going to succeed in the
17   Forum shops of Las Vegas at that
18   time.  The evidence will show
19   that it was not the doctor's
20   inexperience, as Forall suggests,
21   that caused the store's ultimate
22   failure.  The evidence will show
23   it was a combination of the size
24   of the space, a lack of
25   marketing, advertising, and brand
```

Page 15

```
1              PROCEEDINGS
2    awareness of the United States.
3          The evidence will show that
4    after the Simon Group, who is the
5    manager of the Forum shop now,
6    took over the management from
7    Caesars Palace, less quality
8    stores changed, and the quality
9    of the clientele diminished.
10         We also know and it's well
11   documented that there was an
12   explosion of hotels in Las Vegas
13   during this period of time, and
14   the high end mens' clothing
15   fashion wear market was
16   centering.  And we're going to
17   have testimony from Forall USA's
18   former direct of sales, who will
19   testify that it was these factors
20   and the not the doctor's
21   operation of the store that
22   contributed to the store's
23   failure, and that no matter who
24   was operating the store in 2011,
25   the same was going to happen.
```

Page 16

```
1              PROCEEDINGS
2          THE ARBITRATOR: Mr. Lewis,
3    let me ask you this:  In terms of
4    what I have to decide in this
5    case, except to the extent that
6    your clients blame Forall for not
7    living up to the license
8    agreement, why is it important to
9    me to know why the store failed?
10         MR. LEWIS:  It's really the
11   question, Mr. Farber.  The
12   evidence will show that in 2015,
13   Simon, the manager of the
14   property who received monthly
15   sales reports, and this is a key
16   point, they are tracking the
17   sales of the store going forward
18   from 2011 until it closed the
19   store in August of 2016.
20         Simon is becoming
21   increasingly frustrated and
22   concerned about the store's
23   performance, and when Forall took
24   over the store, the understanding
25   was this was the last chance.
```

Page 17

```
1              PROCEEDINGS
2    This was the last try.  And in --
3    what's going to be important is
4    that Forall -- there's evidence
5    that Forall agreed to provide the
6    doctors with a six-month notice
7    if they weren't going to continue
8    on operating the store and take
9    over the lease so that Simon
10   could find another tenant and the
11   doctors could turn in the store
12   to Simon and everyone walk away;
13   that was the arrangement when
14   Forall took over, the evidence
15   will show.
16         THE ARBITRATOR:  So let's go
17   back to my question, though.  You
18   started your argument by telling
19   me the reasons why the store
20   failed, and what I asked was:
21   Except to the extent that your
22   clients blame Forall for
23   contributing to the failure of
24   the store, why is it important or
25   necessary for me to hear about
```





Page 18

```
1              PROCEEDINGS
2    all these other items, like
3    change of clientele, purchase of
4    more hotels, and Las Vegas, and
5    all these other things.  Why is
6    that relevant to what I have to
7    decide?
8              MR. LEWIS:  It's really to
9    rebut what you're going to hear
10   -- what we anticipate you're
11   going to hear from respondents.
12   Respondents going to say that it
13   was the doctor's inexperience and
14   choices that they made that
15   contributed to the demise of the
16   store.  They dug their own hole,
17   so to speak.  So this is a rebut
18   to that.  And if again, if Mr.
19   Farber does not believe that
20   that's, then that's going to hold
21   true for the respondent, and I
22   can move forward in the opening.
23             THE ARBITRATOR:  Okay.  I
24   hear your -- your point.  I
25   understand it.  We're going --
```

Page 19

```
1              PROCEEDINGS
2    we'll revisit this when we
3    actually hear the testimony,
4    because I can understand Forall
5    trying to put in information to
6    say your claims that Forall
7    contributed to demise are wrong,
8    it was the doctors themselves,
9    but in terms of, you know, my
10   making a judgement about the
11   ability of the doctors to run
12   this high-end store, I'm not sure
13   that I have to get into that.
14             So why don't you proceed,
15   Mr. Lewis.  I thank you for your
16   responses.  Go ahead.
17             MR. LEWIS:  Thank you.  So
18   what we also anticipate, Mr.
19   Farber, is hearing -- it's going
20   to take just a while to adjust in
21   not saying on "your honor,"
22   Mr. Farber, but what --
23             THE ARBITRATOR:  Go ahead.
24   Mr. Lewis, you might be a little
25   bit far from the mic, because at
```

Page 20

```
1              PROCEEDINGS
2    various points you fade.  So try
3    to get a little closer to the
4    audio part of it.  All right?
5              MR. LEWIS:  Okay.  One of
6    the technical issues I was having
7    was the sound went out and I had
8    to start using the microphone out
9    of the web cam.
10             THE ARBITRATOR:  Go ahead,
11   sir.
12             MR. LEWIS:  So we also
13   anticipate that Mr. Farber is
14   going to hear from respondent, at
15   points, some language in the
16   underlying contracts between the
17   parties, and I won't share those
18   with Mr. Farber right now.  I'm
19   sure you're intimately aware of
20   the license agreement, of the
21   management agreement between
22   Sarah and Italnord, the asset
23   purchase agreement between Sarah
24   and Italnord, and the management
25   agreement between Sarah and
```

Page 21

```
1              PROCEEDINGS
2    Forall, and what respondents will
3    point to is language within the
4    license agreement requiring Sarah
5    to purchase $900,000 worth of
6    merchandise per year through year
7    2021.
8              They're also going to point
9    to language without those
10   ancillary agreement or subsequent
11   agreements referring back to the
12   license agreement and saying that
13   Sarah's obligations thereunder
14   continue after the term of the
15   new operators's expire.  So why
16   I'm mentioning that Mr. Farber
17   is:  We don't contest that the
18   language is what the language is.
19   It says what it says in the
20   contract, but that is not the end
21   of the story.  We know that it's
22   well settled under New York law
23   that doctrines such as,
24   impracticality, impossibility,
25   frustration of purpose, course of
```




Page 22

```
1              PROCEEDINGS
2  performance, and mitigation all
3  come in and they determine or can
4  determine whether a party has
5  continuing obligations under a
6  contract.
7        So it is clear that the
8  parties made a different
9  arrangement and the evidence will
10 show the parties made a different
11 arrangement about the minimum
12 purchase agreement.  It is
13 undisputed that Forall chose not
14 to enforce the minimum purchase
15 agreement at any point in time
16 between 2011 and 2016.
17        THE ARBITRATOR:  So let me
18 ask you about those, if I could,
19 one at a time.
20        First of all, you say "the
21 parties made a different
22 arrangement regarding the minimum
23 purchase requirement," in your
24 brief you didn't speak about this
25 at all, so tell me when and who
```

Page 23

```
1              PROCEEDINGS
2  made this different arrangement?
3        MR. LEWIS:  Absolutely, Mr.
4  Farber.  You're going to hear
5  from him next.  He's going to be
6  our first witness.  The
7  gentleman's name is Luca Spano.
8  He's the former Director of Sales
9  for the Forall USA.  And Mr.
10 Spano's testimony is going to be
11 that because of the difficulty
12 that all the parties experienced,
13 witnessed, in 2011 and 2012, how
14 dramatically underperforming the
15 store was, that Forall decided
16 that the purchase requirement was
17 going to be based on the sales
18 from the prior season.
19        So if the store sold more,
20 the expectation would be that the
21 doctors would purchase more
22 merchandise.  If the store sold
23 less, the expectation is going to
24 be that the doctors would not be
25 required to purchase as much
```

Page 24

```
1              PROCEEDINGS
2  merchandise.
3        THE ARBITRATOR:  And are
4  there any writing supporting
5  that?
6        MR. LEWIS:  The writings
7  that support that are the lack of
8  writings of any enforcing of the
9  $900,000 minimum --
10       THE ARBITRATOR:  I didn't
11 ask about lack of writings.  Are
12 there any writings that support
13 that?
14       MR. LEWIS:  There are no
15 writings that support that.  What
16 I would say that -- Mr. Luca
17 Spano was the gentleman who met
18 with the doctors in Italy to do
19 the purchasing.  He was the
20 Director of Sales in charge the
21 Hamad store on behalf of Forall.
22 He monitored sales consistently
23 and he handled the purchasing.
24       So quite frankly, it was his
25 decision of how much merchandise
```

Page 25

```
1              PROCEEDINGS
2  would be purchased, how much
3  merchandise would be responsible
4  -- they would be responsible for
5  while he was in charge.
6        THE ARBITRATOR:  And what am
7  I supposed make therefor the
8  waiver clauses the merger clauses
9  that are in these agreements?
10       MR. LEWIS:  That's a good
11 question Mr. Farber.  So we're
12 going to present caselaw, and
13 this will be in our post arb
14 briefing, and let me show you one
15 now, please.
16       THE ARBITRATOR:  Okay.  Do
17 we have share screen available
18 for everybody?  Maggie, do you
19 know?
20       THE COURT REPORTER:  Yes.
21       MR. LEWIS:  Are you all able
22 to see this slide?
23       THE ARBITRATOR:  Yes.
24       MR. LEWIS:  So we've got
25 several cases and won't spend all
```





Page 26

PROCEEDINGS

1
2  the time now, we'll have an
3  opportunity in post-arb briefing
4  to share, but this is one I
5  wanted to show to Mr. Farber.
6      "Once a contract is formed,
7  the parties may, of course,
8  change their agreement by another
9  -- excuse me -- by another
10  agreement, course of performance,
11  or by conduct amounting to a
12  waiver or estoppel." So in this
13  particular case, so just a
14  parenthetical for this case.
15  "Product sellers were equitably
16  estopped from invoking benefit of
17  the no-oral-waiver provision in a
18  contract with minimum monthly and
19  annually purchase requirement,
20  when the purchasers persistently
21  and repeatedly failed to meet
22  minimum purchase requirements,
23  and the sellers continue to
24  accept such conduct without any
25  reservation or protest until just

Page 27

PROCEEDINGS

1
2  weeks before the expiration of
3  the agreements." Here we have no
4  enforcement of this term for not
5  only during the course of the
6  time this store was open, but
7  Forall waited an additional
8  15 months after the store closed
9  before attempting to enforce the
10  contract, and this minimum
11  purchase requirement. So I
12  thought that was relevant to
13  share, and again, there will be
14  additional caselaw in our post
15  arb briefing.
16      THE ARBITRATOR: All right.
17  Okay. Go ahead.
18      MR. LEWIS: Thank you.
19      THE ARBITRATOR: You can
20  proceed, Mr. Lewis.
21      MR. LEWIS: Okay. Thank
22  you. So again, I think it's
23  important to note here, and I'll
24  risk repeating to just point it
25  out again, the store closes in

Page 28

PROCEEDINGS

1
2  August of 2016, the arrangement
3  we submit to Mr. Farber is that
4  once Forall informs Sarah that it
5  will not continue on and extend
6  its operation of the store, Sarah
7  and Simon will have six months to
8  find a new tenant, and for Sarah
9  to surrender the store back to
10  Simon.
11      THE ARBITRATOR: Now,
12  Forall, in its brief, takes the
13  position that it was operating
14  the store pursuant to the
15  management agreement that it
16  signed after a -- I don't know if
17  I'm saying it right, Italnord?
18      MR. LEWIS: Yes.
19      THE ARBITRATOR: After they
20  left. And they say that it was a
21  complete surprise to them that an
22  arrangement was entered into with
23  Simon to terminate the lease.
24  And you're telling me now to the
25  contrary, am I right? That

Page 29

PROCEEDINGS

1
2  you're saying that it was not a
3  surprise to them, because they
4  told your client that they were
5  only going to be operating the
6  store for another six months
7  under that management agreement;
8  is that what you're saying?
9      MR. LEWIS: It's close to
10  what I'm saying Mr. Farber. It
11  goes farther than that. Before
12  the parties entered into the
13  management agreement, the
14  discussions leading up to the
15  management agreement, we have
16  absolutely have writings. We
17  have e-mails between the CEO of
18  Forall and the doctors, where
19  they are discussing the terms in
20  the management agreement and how
21  Forall will come in and operate
22  the store. And the provision
23  that the doctors insisted on was
24  a six-month notice provision,
25  very specifically written out in





Page 30

1          PROCEEDINGS
2  the e-mail, to give Sarah and
3  Simon time to find a new tenant
4  and surrender the lease to Simon.
5          THE ARBITRATOR: And was
6  such a notice actually sent by
7  Forall?
8          MR. LEWIS: It was. That's
9  correct. And that provision made
10 its way into the management
11 agreement. I will try my hand at
12 sharing the screen again. This
13 is also -- these are documents
14 you're going to see.
15         THE ARBITRATOR: I don't
16 think we're communicating. I'm
17 familiar with that. In fact, I
18 think the record is going to show
19 that Forall, I think, by a letter
20 from Mr. Brown, actually, asked
21 to extend that six-month period
22 didn't they.
23         MR. LEWIS: They asked for
24 an additional 60 days to consider
25 whether they were going to

Page 31

1          PROCEEDINGS
2  continue on operating the store.
3          THE ARBITRATOR: And was
4  there a response to that request?
5          MR. LEWIS: I did not see a
6  written response, and the doctors
7  are going to testify that they
8  are not aware -- they do not
9  recall whether there was verbal
10 response. They certainly didn't
11 respond in writing. That's true.
12 This was no written response.
13         THE ARBITRATOR: Okay. Just
14 so that I understand your
15 client's view of the facts here,
16 you're saying that there was a
17 six-month deal, then there was a
18 request by Forall for another
19 60 days to consider whether they
20 were going to extend the six
21 months, that there is no writing
22 responding to that request, and
23 your clients are not sure if
24 there was an oral response to
25 that request, but they went ahead

Page 32

1          PROCEEDINGS
2  and negotiated with Simon to
3  terminate the lease anyway; is
4  that it?
5          MR. LEWIS: That is not it,
6  Mr. Farber.
7          THE ARBITRATOR: Then
8  explain to me from your
9  perspective what happened.
10         MR. LEWIS: Absolutely. And
11 I want to be clear as possible
12 here on the time line.
13         THE ARBITRATOR: Okay.
14         MR. LEWIS: Perhaps that
15 will be helpful for me to share
16 that.
17         THE ARBITRATOR: I actually
18 made my own time line in
19 preparation, so I'm going to be
20 tracking it as you do yours. All
21 right?
22         MR. LEWIS: I believe we've
23 got three then.
24         MR. BROWN: Can I be heard
25 on one point here?

Page 33

1          PROCEEDINGS
2          THE ARBITRATOR: No. Mr.
3  Brown, let's do this: We're
4  going to give Mr. Lewis the full
5  opportunity, and then you'll have
6  your full opportunity. I prefer
7  not to have interruptions. Let's
8  just do it with him. All right?
9          MR. BROWN: Understood. But
10 it pertains to the demonstrative
11 that he's about to pull up.
12         THE ARBITRATOR: If you have
13 an objection to it, that I will
14 hear, if there's an objection, so
15 let him pull it up first, right.
16         MR. BROWN: Right. So
17 Rodney, my objection is: If
18 you're -- I will relinquish my
19 objections to yours if you
20 relinquish yours on my time line.
21 I think it does really do us
22 much benefit to have standing
23 objections to these time lines,
24 which we've both pulled together.
25         MR. LEWIS: Mr. Farber,

9  (Pages 30 to 33)





Page 34

PROCEEDINGS
1
2 that's a very reasonable request.
3 My only concern is that Mr. Brown
4 shared his concern that I had
5 some argumentative information in
6 the time line yesterday --
7        THE ARBITRATOR:  Guys.
8 Guys.  I'm an arbitrator, not a
9 jury.  You don't have to worry
10 about it.  I understand there's
11 hidden argument in just about
12 everything that was given to me.
13 It's cool.  You don't have to
14 worry about it, Mr. Lewis.  Go
15 ahead.
16        MR. LEWIS:  Are you able to
17 see the time line, Mr. Farber?
18        THE ARBITRATOR:  I've got
19 it.  Right.
20        MR. LEWIS:  So I'll go to
21 the pertinent point here which is
22 -- there are a few points that
23 I'll make since we're in this
24 time from when Forall and Sarah
25 are negotiating, Forall is coming

Page 35

PROCEEDINGS
1
2 in to operate the agreement.
3        One of the things that I'm
4 sure Mr. Farber knows is that
5 Sarah had entered into a letter
6 agreement with Simon after
7 Italnord was unable to
8 successfully operate the store.
9 And the letter agreement allowed
10 Simon to go and find a new tenant
11 for the store at that time back
12 in 2014, October of 2014.  Okay.
13        When Forall expressed
14 interest in coming in and
15 operating the store, Sarah had to
16 go back to Simon and ask to
17 rescind the letter agreement.
18 There was some back and forth,
19 there was some ruffled feathers,
20 and Simon ultimately agreed to
21 rescind the letter agreement,
22 provided that this would be the
23 last try that the store would
24 have to turn around within
25 12 months, and there's writing to

Page 36

PROCEEDINGS
1
2 that you'll see when --
3        THE ARBITRATOR:  Right.  But
4 when Sarah and Simon originally
5 entered into their letter
6 agreement, did Forall agree to
7 that?
8        MR. LEWIS:  My understanding
9 is yes.  They did agree to it.
10 This was something that was
11 necessary after Italnord was just
12 going to wash their hands of the
13 store and walk away.
14        THE ARBITRATOR:  Is there a
15 writing that signifies that
16 agreement?
17        MR. LEWIS:  I believe there
18 is, and I make sure I present
19 that as evidence when Dr. Hamad
20 testifies.
21        I want to bring to Mr.
22 Farber's attention about the
23 frame when before Sarah entered
24 into the agreement with Simon to
25 surrender the lease, and the

Page 37

PROCEEDINGS
1
2 important parts that come into
3 play are:  One, Forall took over
4 the store in March of 2015.  And
5 again, the management agreement
6 required six months, and the
7 e-mails will support that that
8 was just for an opportunity for
9 Sarah and Simon to find another
10 tenant and come into the store.
11        In February of 2016 --
12 sorry.  Okay.  So the timing here
13 is very important, Mr. Farber.
14 In February of 2016, Simon
15 informed Sarah that it will not
16 allow Forall to take over and
17 extend the lease.  Simon made
18 that decision.  And you'll hear
19 testimony that Simon was
20 increasingly frustrated with this
21 back and forth, three different
22 operators, and again they're
23 monitoring the sales monthly.
24 And you see the sales are
25 consistently going down,



Page 38

```
 1              PROCEEDINGS
 2  sometimes below the rent amount.
 3  Rent is being paid late, and we
 4  have evidence to that effect,
 5  that it's not months late, but it
 6  is late, consistently late.  And
 7  this is a high-end manager who is
 8  not used to dealing with checks
 9  coming in the middle of the
10  month, and rent being paid at the
11  end of the month.  So Simon is
12  frustrated and informed Sarah
13  that they will not move forward
14  with Forall regardless in
15  February of 2015.  They feel the
16  time has come.
17         Then Forall officially
18  informs Sarah it will not
19  continue operating the store past
20  September 1, 2016, on March 9,
21  2016.  This is the six-month
22  notice.  March 9, 2016.  And you
23  will see here that Simon informs
24  Sarah about a new tenant, and the
25  store must be returned before
```

Page 39

```
 1              PROCEEDINGS
 2  August 1, 2016, on July 6, 2016.
 3         Now, full disclosure, right
 4  here, in June of 2016, and I'm
 5  sure that Mr. Brown is going to
 6  elaborate on this, in June is
 7  when Sarah entered into the
 8  agreement with Simon to surrender
 9  the lease, June of 2016, that was
10  months after Forall had informed
11  Sarah that it wouldn't move
12  forward in operating the store.
13  So it was not before then, it was
14  after Forall had already decided
15  it was going to walk away.
16         The only thing that changed
17  from the agreement that was
18  reached between Sarah and Forall
19  is that the store was surrendered
20  one month early.  It was
21  surrendered on July 31st or
22  August 1st was when the lease was
23  to terminate as opposed to
24  September 1, 2016.
25         THE ARBITRATOR:  Mr. Lewis,
```

Page 40

```
 1              PROCEEDINGS
 2  is it not so that the documents
 3  that were signed on behalf of
 4  Forall, to the extent that there
 5  were any documents signed by
 6  Forall, all indicated that Forall
 7  was reserving all of its rights
 8  as against Sarah, and
 9  particularly is against the
10  guarantors?
11         MR. LEWIS:  Consistently
12  that language is present.  It
13  absolutely is.  You will hear no
14  contest to that.
15         THE ARBITRATOR:  So what am
16  I supposed to make of that
17  language in the face of your
18  argument that this conduct meant
19  that the efficacy of the minimum
20  purchase requirement was waved?
21         MR. LEWIS:  Well, again the
22  minimum purchase requirement,
23  you'll hear from Mr. Spano, was
24  something that was amended based
25  on the conditions and the store's
```

Page 41

```
 1              PROCEEDINGS
 2  performance.  The license
 3  agreement was signed well before
 4  anyone knew what they were going
 5  to face that that Las Vegas
 6  market.  So the subsequent
 7  agreements having language saying
 8  that the obligations under the
 9  license agreement move forward, I
10  contend the minimum purchase
11  agreement in the license
12  agreement is something that was
13  waved and altered through the
14  course of performance.
15         And again, there will be no
16  writing shown to Mr. Farber where
17  Forall attempts to enforce that
18  agreement with that provision of
19  the agreement until November 3rd,
20  2017.
21         At some point in time,
22  waiver course performance, these
23  doctrines have to come into play
24  at some point in time.  I know
25  not to pose a question to a judge
```

11  (Pages 38 to 41)



Page 42

```
 1              PROCEEDINGS
 2  or an arbitrator, but this is one
 3  instance that I will ask and it's
 4  hypothetical actually, though,
 5  it's rhetorical.  If the contract
 6  extended 20 more years, would
 7  Forall be able to enforce the
 8  minimum purchase requirement
 9  extending 20 more years?  At some
10  point in time, and I will contend
11  that, certainly, this period of
12  time qualifies.  The course of
13  performance will establish that
14  they waved the minimum purchase
15  required back in 2011, 2012,
16  2013, but certainly had done so
17  by a failure to enforce it by
18  November 3rd of 2017 when someone
19  had the idea, we have an
20  opportunity for revenue stream by
21  sending a demand letter for the
22  doctors, I know this was years
23  ago, but we've got the agreement,
24  and we may be able to get
25  something from them.  And a
```

Page 43

```
 1              PROCEEDINGS
 2  demand letter went out 15 months
 3  later to the doctor demanding 4.5
 4  million.
 5       THE ARBITRATOR:  Okay.  Why
 6  don't you proceed, go ahead.
 7  Actually, guys, let me pause just
 8  a moment because you do raise a
 9  good point.  Mr. Lewis, on your
10  side of the table just in case
11  because I actually did a Zoom
12  hearing about two months ago, I
13  did it from home and we had a
14  thunder storm and I lost total
15  power.  So do you want to give me
16  your cell number just in case?
17  Mr. Lewis, what's your cell?
18       MR. LEWIS: (312)342-9704.
19       THE ARBITRATOR:  And Mr.
20  Shah, let me have yours as well.
21       MR. SHAH: (312)720-1562.
22       THE ARBITRATOR:  Okay.  And
23  Mr. Brown, let me have yours.
24       MR. BROWN:  (914)522-7301.
25       THE ARBITRATOR:  And Mr.
```

Page 44

```
 1              PROCEEDINGS
 2  Crowe, are you going to be with
 3  us the whole time?  Do you want
 4  me to take yours or not?
 5       MR. CROWE:  You can have
 6  mine as well, Mr. Farber.  It's
 7  (914)217-6915.
 8       THE ARBITRATOR:  Okay.
 9  Okay.  Let's proceed.  Go ahead.
10  Well, actually, Court Reporter,
11  Maggie, let's have yours as well.
12       Court go ahead, Mr. Lewis.
13       MR. LEWIS:  Thank you, Mr.
14  Farber.  I think it will be
15  important to share an e-mail that
16  I've been referring to, so please
17  indulge me while I bring that up
18  on the screen.
19       THE ARBITRATOR:  Is this a
20  document that is in the joint
21  books?
22       MR. LEWIS:  It is.  Joint
23  Exhibit 51.
24       MR. BROWN:  Hold on.  We're
25  going to be scrambling with your
```

Page 45

```
 1              PROCEEDINGS
 2  documents somewhat.
 3       MR. LEWIS:  I'm in the same
 4  boat.
 5       MR. BROWN:  And I just want
 6  to express my frustration in
 7  that.
 8       THE ARBITRATOR:  Guys.
 9  Guys.  Not necessary.  I've heard
10  all of this already.  I don't
11  want to waste more time with it.
12  We'll be courteous to each one
13  and give you the time necessary
14  to get your documents.  All
15  right?  Right now I think let's
16  put it on the screen for purposes
17  of the argument.  Let's put it up
18  on the screen.
19       Mr. Lewis, go ahead.
20       MR. LEWIS:  Mr. Farber,
21  you've heard me in my opening
22  talking about that there was an
23  absolute understanding on both
24  sides that when Forall came over
25  to take over the store in 2015,
```




Page 46

```
1              PROCEEDINGS
2    that this would be a last go
3    around, and everyone was on the
4    same understanding that that's
5    what this was, and so I want to
6    share with you the e-mail treated
7    between the doctors and the CEO
8    of Pal Zileri.  And we're having
9    these conversation back in
10   October of 2014.  Let me bring
11   the screen to the pertinent part
12   of the e-mail.  So this portion
13   the e-mail is from Dr. Amar Hamad
14   to Paolo Torello-Viera, the CEO
15   of Forall at the time.  And this
16   is the part that's important:
17   "This e-mail is to confirm that
18   we are very interested for Pal
19   Zileri to take over the
20   management of the Vegas store for
21   a period of one and a half years.
22   At the end of the first year in
23   this agreement, you will let us
24   know if you would like to take
25   over the entire lease, which will
```

Page 47

```
1              PROCEEDINGS
2    be a six-year agreement.  If not,
3    then Sarah LLC will have a
4    six-month period to turn the
5    store over to Simon.  All
6    financial aspects of this deal
7    will be dealt with both of our
8    lawyers.  Please confirm your
9    response in the next couple of
10   days.  Thank you so much and have
11   a nice evening."  You couldn't be
12   more clear as to what the
13   six-month period was for.
14        It wasn't for Sarah to come
15   back in and resume operations; it
16   was for Sarah -- for Sarah to
17   Sarah to turn back the store over
18   to Simon, and Simon find a new
19   tenant and move on, couldn't be
20   more clear.
21        So in Mr.Torello-Viera's
22   response, "Thank you for the
23   time," etcetera, "As agreed, we
24   have given mandate for our
25   counsel to deal with yours on the
```

Page 48

```
1              PROCEEDINGS
2    management agreement.  All the
3    best."  Okay.  So any testimony
4    that Forall was unaware of what
5    was to take place after the
6    six-month notice was provided
7    would be -- would lack
8    credibility, because they
9    absolutely are aware that this is
10   why the doctors are insisting on
11   the six-month notice period.  It
12   is to turn the store back into
13   Simon and that's what they did.
14   And again, only after Forall had
15   informed Sarah that it will not
16   continue on for the rest of the
17   term.
18        THE ARBITRATOR:  All right.
19        MR. LEWIS:  I don't want to
20   belabor points, so I just want to
21   look through my notes to see if
22   I've covered everything that I've
23   intended to.
24        THE ARBITRATOR:  Mr. Lewis,
25   I think what you're telling me
```

Page 49

```
1              PROCEEDINGS
2    based upon the one case you
3    showed me is not so much an issue
4    of waiver or course of conduct,
5    but the -- you want me to rely on
6    the New York doctrine of what's
7    called the "equitable estoppel";
8    is that really what your pitch is
9    to me?
10        MR. LEWIS:  Well, Your
11   Honor, I have said, estoppel and
12   addition to the doctrines
13   impossibility, frustration of
14   performance.  The course of
15   performance I think really speaks
16   to -- in addition to equitable to
17   estoppel; I'm quite familiar with
18   that doctrine.  Again -- excuse
19   me, but I thought I had mentioned
20   that in my opening as well, but
21   these are all that I think are
22   relevant here, and that alter the
23   obligation that Sarah would have
24   going forward.
25        THE ARBITRATOR:  All right.
```

13  (Pages 46 to 49)



Page 50

```
 1              PROCEEDINGS
 2    I understand your position.  Take
 3    a moment and tell me if there's
 4    anything else you want to tell me
 5    in the opening.
 6         MR. LEWIS:  Let me speak
 7    about what you're going to hear
 8    from the experts, and I wouldn't
 9    steal their thunder.  I think
10    it's important to point out at
11    the beginning that you're going
12    to hear from Forall's expert that
13    of the damages calculation that
14    projects out through 2021.
15    What's going to be -- why they
16    think that's flawed -- there are
17    numerous reasons why we think
18    that's flawed, and our rebuttal
19    expert will do a better job
20    explaining it than I will, but
21    for the sake of pointing this out
22    in the opening, I think it's
23    important to note that the
24    expert's report does not take
25    into account mitigation at all,
```

Page 51

```
 1              PROCEEDINGS
 2    and mitigation is another
 3    doctrine that I hope Mr. Farber
 4    keeps in mind throughout these
 5    proceedings.
 6         Forall's failure to mitigate
 7    while it was operating the store,
 8    and I'm sure Mr. Farber has it in
 9    his time line; I certainly have
10    it in mine.  In the summer of
11    2015, Simon approached Forall
12    directly and suggested to Forall
13    that they move the store location
14    to a smaller location with a
15    dramatically reduced rent.  This
16    would have given an opportunity
17    for -- instead of paying the flat
18    rent, which was averaging
19    approximately $70,000 per month,
20    rent would have been based on a
21    percentage of sales, and again,
22    in a smaller location.  And
23    Forall did not take advantage of
24    that opportunity, and we submit
25    that was a failure to mitigate.
```

Page 52

```
 1              PROCEEDINGS
 2         After the store closed, you
 3    will see no evidence of Forall
 4    attempting to bring in a
 5    different operator to open a
 6    different store, perhaps in a
 7    different U.S. market.  Instead,
 8    again, 15 months passed and
 9    Forall simply sends a demand
10    letter to the doctors asking for
11    4.5 million dollars, so you'll
12    see no effort to mitigate, as
13    required by law, after the store
14    closed.
15         There is no reflexion or
16    accounting for mitigation in Mr.
17    Flaherty's expert report, and
18    you'll hear from our expert why
19    we think that's flawed.  And
20    again, we have damages being
21    calculated through 2021.  And in
22    Mr. Flaherty's defense, he could
23    not project or foresee how the
24    world would have changed since he
25    submitted his report.  But now
```

Page 53

```
 1              PROCEEDINGS
 2    that we know, we have to account
 3    for the fact that in 2000 [sic],
 4    the economy was decimated.  The
 5    Las Vegas economy was absolutely
 6    decimated.  It is not recovered.
 7    The information that we pulled,
 8    the research that we've done
 9    shows that it's only recovered to
10    the extent of approximately 10
11    percent of what it was in the
12    years passed.  So we would not
13    think it would be equitable in
14    any way to extend the full
15    damages award, including 2020 and
16    2021, without taking COVID into
17    account.
18         By no means do we believe
19    that Forall is entitled to any
20    damages whatsoever, but if Mr.
21    Farber disagrees, there are a lot
22    of factors, including the lack of
23    mitigation that we submit should
24    reduce any award substantially.
25         THE ARBITRATOR:  All right.
```



Page 54

```
 1              PROCEEDINGS
 2    Mr. Lewis, thank you very much.
 3    I appreciate your opening.
 4    Thanks for the information you
 5    gave me.
 6         Mr. Brown, are you going to
 7    handle this one?
 8         MR. BROWN:  I am, sir.
 9    Thank you.
10         THE ARBITRATOR:  Why don't
11    you proceed?
12         MR. BROWN:  Very well.  Bear
13    with me one moment.  Despite what
14    you've just heard, and with all
15    due respect to my esteemed
16    colleague who I have enjoyed
17    working with on this case.  It's
18    a very straightforward contract
19    action.  99 percent of what needs
20    to be determined on the law is in
21    the papers, in the documents
22    themselves.
23         This is not about the Las
24    Vegas economy.  This is not
25    about, perhaps, even the doctor's
```

Page 55

```
 1              PROCEEDINGS
 2    inexperience in retail and
 3    inability to run a profitable
 4    retail store.
 5         This is about an investment
 6    group that approached Forall, the
 7    claimant's investment group that
 8    approached Forall and wanted to
 9    be in this marketplace selling
10    luxury Italians fine made in
11    Italy menswear.  Claimants have
12    tried to make this about
13    impossibility, frustration of
14    purpose, in a way and you're
15    hearing it with this -- this
16    reference to COVID and 2020 sort
17    of like a clause force majeure.
18    They fail woefully short of
19    meeting any of those legal
20    standards, as Mr. Farber will
21    well know.
22         The discussion that -- I
23    mean -- in some ways they've
24    turned it on their head.  They,
25    themselves, without notice to
```

Page 56

```
 1              PROCEEDINGS
 2    Forall canceled the lease,
 3    surrendered a lease, and
 4    stipulated to a forced eviction
 5    of, essentially, their contract
 6    business partner.
 7         The damage to the brand was
 8    terrible.  The personal affect
 9    that it had on the employees at
10    the store, and the -- Forall's
11    management team was true and
12    dramatic.  It was just the wrong
13    thing to do.  And that is -- as
14    you'll see when we step through
15    the history of this case -- time
16    and time again what the claimants
17    did.  They did the wrong things
18    each and every time.
19         There is a mention of a
20    failure to mitigate damages.
21    That is, on its face, false.  At
22    every turn Forall attempted as a
23    good business partner, good
24    contracting, good faith effort to
25    mitigate damages at each and
```

Page 57

```
 1              PROCEEDINGS
 2    every step.  They went so far as
 3    to identify -- or first was they
 4    -- they provided the claimants --
 5    the claimants with the
 6    opportunity and right and license
 7    to sell product on the internet
 8    in -- in 2012, February 2012.
 9    They allowed that even though the
10    claimants had themselves already
11    launched their e-commerce and
12    website ahead of Forall's
13    authorization, approval.  They
14    put an agreement in place
15    allowing them to sell to the U.S.
16    on the internet the Pal Zileri
17    brand on a nonexclusive basis.  I
18    mean, that in and of itself in
19    the retail world is a golden
20    ticket.
21         They were -- the claimants
22    weren't able -- as many things,
23    they were not able to turn that
24    into the -- the revenue that they
25    should have, that was based on
```



Page 58

| | PROCEEDINGS |
|---|---|
| 1 | PROCEEDINGS |
| 2 | their own failings. |
| 3 | THE ARBITRATOR:  Wait a |
| 4 | minute.  I see that Dr. Hamad is |
| 5 | not with us.  We'll give him the |
| 6 | courtesy if he wants to take a |
| 7 | minute. |
| 8 | Mr. Brown, let me ask you |
| 9 | this" in Mr. Lewis's brief, he |
| 10 | and Mr. Shah argue that under the |
| 11 | internet agreement that your |
| 12 | client had a duty to establish a |
| 13 | website and that you didn't, and |
| 14 | that the failure to do so he said |
| 15 | contributed to the ability to |
| 16 | sell the product. |
| 17 | MR. BROWN:  Right. |
| 18 | THE ARBITRATOR:  How do you |
| 19 | respond? |
| 20 | MR. BROWN:  Well, I almost |
| 21 | fell out of my chair when I read |
| 22 | that.  Let's put a little spin on |
| 23 | that, that is patently false, |
| 24 | Your Honor.  The documents show |
| 25 | in the underlining discovery will |

Page 59

| | PROCEEDINGS |
|---|---|
| 1 | PROCEEDINGS |
| 2 | show that.  The documents show, |
| 3 | in fact, that our client was |
| 4 | being badgered by the claimant to |
| 5 | allow them to start selling on |
| 6 | their e-commerce platform.  The |
| 7 | claimant had engaged a website, |
| 8 | an e-commerce vendor to establish |
| 9 | and create this website.  They |
| 10 | launched it in advance of the |
| 11 | internet agreement, which was |
| 12 | ultimately executed in April, and |
| 13 | the claimants went live with |
| 14 | their website in February.  I |
| 15 | have all the documents.  It's all |
| 16 | in the e-mails.  It might take |
| 17 | some time to step through. |
| 18 | But they're trying to hinge |
| 19 | in a somewhat poorly whereas |
| 20 | provision clause in that internet |
| 21 | agreement and try -- and it says |
| 22 | -- it's not right in front of me, |
| 23 | but I can certainly pull it up, |
| 24 | that the claimants, Sarah, has |
| 25 | requested and Forall has agreed |

Page 60

| | PROCEEDINGS |
|---|---|
| 1 | PROCEEDINGS |
| 2 | to establish a website.  Okay. |
| 3 | That's how the language kind of |
| 4 | reads in that whereas provision, |
| 5 | but the agreement itself, and the |
| 6 | testimony you'll hear from Palma |
| 7 | Settimi, from Luca Spano himself, |
| 8 | and the documents show that the |
| 9 | claimants, the doctors, were |
| 10 | already pushing ahead with the |
| 11 | e-commerce platform.  The company |
| 12 | was allowing them to do it.  And |
| 13 | the company didn't have its own |
| 14 | e-commerce platform, and they |
| 15 | were going to be launching that. |
| 16 | And it discusses that once their |
| 17 | website, the corporate website |
| 18 | was up, these would be merged, |
| 19 | and there would be links back and |
| 20 | forth, but we weren't stopping |
| 21 | them from going ahead; they were |
| 22 | going head.  So that's a false |
| 23 | allegation.  Unfortunately, many |
| 24 | of them. |
| 25 | And they don't highlight |

Page 61

| | PROCEEDINGS |
|---|---|
| 1 | PROCEEDINGS |
| 2 | them now, but they're in the |
| 3 | papers and I'm going to be |
| 4 | stepping through them.  In fact, |
| 5 | I anticipated going through it in |
| 6 | this opening statement.  One of |
| 7 | the other -- if you read the |
| 8 | statement of claim, remember who |
| 9 | brought this action, it's |
| 10 | actually the claimants.  They |
| 11 | filed a statement of claim saying |
| 12 | that Forall was evicted from by |
| 13 | Simon from the Forum shop Cesar |
| 14 | Palace, because Forall failed to |
| 15 | pay the rent.  That's a claim in |
| 16 | their action.  Okay. |
| 17 | They didn't bring to |
| 18 | anyone's attention -- they must |
| 19 | have assumed that I didn't have |
| 20 | the document.  They didn't bring |
| 21 | to the attention that they |
| 22 | themselves had canceled the lease |
| 23 | and surrendered it and stipulated |
| 24 | to a forced eviction during our |
| 25 | management of the store on the |



Page 62

```
 1              PROCEEDINGS
 2   contract.  So they're not talking
 3   about in that in their brief now,
 4   but that's been disproved.  That
 5   was a false allegation.  It's a
 6   false claim in the arbitration.
 7        Another false claim that
 8   they have alleged, okay, they've
 9   alleged in their pre-arbitration
10   brief that Forall guaranteed the
11   lease with Simon.  That's
12   fiction.  It's patently false and
13   demonstratively so.  There's a
14   collateral -- in fact, it's
15   exactly the opposite.  There's
16   collateral of assignment that was
17   given at the onset of party's
18   relationship for the lease from
19   Sarah claimants to Forall.  It's
20   a security document for Forall
21   that secured if Sarah decided to
22   or whatever Sarah fell flat on
23   its face, what have you, the
24   intent there was that Forall will
25   not lose its investment in the
```

Page 63

```
 1              PROCEEDINGS
 2   store, which was significant.
 3        We split cost to build out
 4   the store.  The build out was
 5   approximately a million dollars.
 6   We put advertising into this
 7   market.  We did everything to
 8   support these people.  And what
 9   did they do?  Well, first off,
10   they falsely alleged that we
11   guaranteed the lease.  The lease
12   was negotiated exclusively by and
13   between Sarah and the Forum
14   shops.  Okay.  Those terms --
15   those financial terms that the
16   doctors claimed that they were
17   impossible to operate properly,
18   they were struck by them.  Those
19   were their terms.  Forall didn't
20   make them do anything there.  And
21   then they have the audacity of
22   claiming we have guaranteed the
23   lease and that somehow the
24   responsibility falls back on us.
25   That's just a false statement.
```

Page 64

```
 1              PROCEEDINGS
 2        THE ARBITRATOR:  What page
 3   do they say that Forall
 4   guaranteed the lease?
 5        MR. BROWN:  I have it right
 6   here.  Page 6 of their brief,
 7   claimants pre-arbitration brief,
 8   other agreements B, the first
 9   paragraph in that section says,
10   "In connection with the license
11   agreement and lease, on or about
12   March 2011 Sarah and Forall
13   entered into certainly collateral
14   assignment of lease.  Pursuant to
15   which Forall guaranteed Sarah's
16   obligations pursuant to the
17   lease."  Patently false.
18        I mean, we all know, I
19   think, on this call what a
20   collateral assignment of lease is
21   and what it does, and the terms
22   of that agreement did not in any
23   way obligate Forall for the
24   payment of the lease between
25   Sarah and Simon and Forum shops.
```

Page 65

```
 1              PROCEEDINGS
 2        And then the falsehoods
 3   continue.  In the very next
 4   documents they discuss this
 5   internet agreement, where they
 6   claim Forall agreed to establish
 7   a website; also demonstratively
 8   false.  As I mentioned before,
 9   Sarah had already entered into
10   and was working a e-commerce
11   vendor to launch a website at
12   that prior to the time the
13   internet agreement was ultimately
14   executed.  And Luca Spano, who
15   was a former employee, and
16   frankly has its own axe to
17   grind --
18        THE ARBITRATOR:  Let me just
19   note that someone named Monica
20   Spano is showing.  I assume
21   that's Mr. Spano.
22        Mr. Spano, you're with us on
23   the line?
24        MR. SPANO:  Yes, I am.
25   That's my wife.
```



Page 66

```
1              PROCEEDINGS
2         THE ARBITRATOR:  Welcome
3    just hang loose.  I understand
4    you're going to be our first
5    witness.
6         And Mr. Brown, why don't you
7    proceed.
8         MR. LEWIS:  Mr. Farber, may
9    I ask that since Mr. Spano is the
10   first witness, that he not join
11   right now.
12        THE ARBITRATOR:  He's your
13   witness, of course.  If that's
14   what you want.
15        So Mr. Spano, we'd like you
16   to do the following:  Does -- Mr.
17   Spano who did you communicate
18   with in order to be a witness
19   here today?  Who did you work
20   that out with?
21        MR. SPANO:  Mr. Brown.
22        MR. BROWN:  That's not true.
23        MR. SPANO:  I didn't
24   understand the question.  I'm
25   sorry.
```

Page 67

```
1              PROCEEDINGS
2         THE ARBITRATOR:  Who spoke
3    to you about being a witness this
4    morning?
5         MR. SPANO:  The attorney of
6    Bachar.
7         THE ARBITRATOR:  And who is
8    that, Mr. Lewis?
9         MR. SPANO:  Yes.
10        THE ARBITRATOR:  Does Mr.
11   Lewis have your cell phone
12   number?
13        MR. SPANO:  Yes.
14        THE ARBITRATOR:  So here's
15   what we'd like you to do:  So
16   we'd like you to drop off.  Mr.
17   Lewis is asking that you drop off
18   this discussion now and that you
19   stay where you are.  Mr. Lewis is
20   going to call or Mr. Shah who
21   works with Mr. Lewis will call
22   you on your cell phone and then
23   you'll join us.
24        Is that okay, Mr. Lewis.
25        MR. LEWIS:  Thank you,
```

Page 68

```
1              PROCEEDINGS
2    Mr. Farber.
3         THE ARBITRATOR:  So why
4    don't you do that.  All right.
5    We'll see you in a little while.
6         MR. SPANO:  Thank you.
7         THE ARBITRATOR:  Thank you,
8    sir.
9         Go ahead, Mr. Brown.
10        MR. BROWN:  And I was just
11   -- I hadn't seen him come on the
12   screen, but I was just indicating
13   that Mr. Spano left the company,
14   resigned in a bit of a huff in
15   2014.  Okay.  He has his own axe
16   to grind here.  But the documents
17   -- what he did, what he worked
18   on, clearly show, in the course
19   of these party's feelings, that
20   Mr. Spano and Forall were
21   supporting the doctors,
22   supporting the store, did
23   everything to the T under the
24   party's agreements, and he's not
25   going to be able to walk away
```

Page 69

```
1              PROCEEDINGS
2    from what he put in e-mails years
3    ago and what the agreements
4    actually say.
5         So again, back to the
6    website.  That's a false
7    allegation as well.
8         The third thing that was
9    also false in the brief on Page 8
10   where they claim that Sarah was
11   not provided with a full credit
12   for the construction costs.
13   Okay?  At the time that Sarah
14   handed off management of the
15   store to Italnord, that was done
16   in the context of a consent by
17   Forall, but we were not parties
18   to those agreements.  But what is
19   misleading about this credit, I
20   notion, okay, is that there was
21   about $38,000 that was due to be
22   credited, again, for the
23   construction cost, but it -- the
24   arrangement was that it was to be
25   credited based upon 20 percent
```




Page 70

```
 1              PROCEEDINGS
 2  discounts from purchases by Sarah
 3  to the store.
 4      Sarah had not purchased
 5  sufficient product up until the
 6  point in time, because they were
 7  only running the store for two
 8  years.  So they weren't due this
 9  $38,000 stub, I'll call, it
10  because they hadn't ordered
11  sufficient product yet.
12      Remember, the agreement was
13  for a ten-year deal.  They were
14  going to run a store for 10
15  years, so this was a longstanding
16  relationship and the credit to
17  the construction cost was going
18  to be based 20 percent discounts
19  against product.
20      So had they ordered more --
21  purchased more product, they
22  would have gotten this credit.
23  But to show the good faith that
24  Forall was operating in all
25  contexts, and essentially the bad
```

Page 71

```
 1              PROCEEDINGS
 2  faith that the doctors were
 3  proceeding with, the doctors
 4  required Italnord at the time
 5  that it came on to manage to pay
 6  them that $38,000.
 7      And the evidence will show
 8  that Italnord did pay them that
 9  $38,000, and we, Forall,
10  recognizing this, credited
11  Italnord the $38,000.  So it's --
12  it's ingenuous to claim that
13  money wasn't paid to them when in
14  fact it wasn't yet due, and even
15  though it wasn't yet due, we
16  credited to the managing agent
17  that came in that was helping
18  out, essentially, Sarah.  Also,
19  at that time with Italnord.
20      The claimants received
21  $140,000 from Italnord as
22  so-called key money.  Key money
23  is a big term in that industry
24  out in Vegas, but Italnord paid
25  Sarah to take over the operation
```

Page 72

```
 1              PROCEEDINGS
 2  of the store.  Okay.  So they got
 3  money back for having a
 4  professional manager step in for
 5  them.  It's really kind of
 6  ironic.
 7      Now, another big thing that
 8  I want to discuss, and Mr. Lewis,
 9  in his opening, really muddied
10  the waters, I would say, on it,
11  and I do not suggest
12  intentionally.  But this idea
13  that we did not notify them of
14  our intentions at the -- towards
15  the end of the management
16  agreement by Forall, this is in
17  2016, okay.
18      THE ARBITRATOR:  Before you
19  get to that whole episode, Mr.
20  Lewis, you heard, in his argument
21  said -- because you mentioned the
22  failure to mitigate -- said that
23  the landlord had -- Simon had
24  approached and talked about or
25  offered a smaller store where the
```

Page 73

```
 1              PROCEEDINGS
 2  rent would be based upon some
 3  percent of income rather the very
 4  expensive lease that you had, and
 5  he claimed that you're -- your
 6  client wrongfully refused that,
 7  and implied that that was
 8  unreasonable, or he didn't quite
 9  say that, but that's the
10  implication of it.  How do you
11  respond to his point in that
12  regard?
13      MR. BROWN:  That's in
14  accurate.  All options were on
15  the table for Forall.  We were
16  genuinely trying to find a
17  solution that worked for the
18  brand, worked for the company,
19  and also coincided and mutually
20  aligned the interest of the
21  claimants.
22      There were many discussions,
23  actually, had at that time, all
24  of which were attempts to
25  mitigate, find solutions, find
```

19  (Pages 70 to 73)



MAGNA ▶
LEGAL SERVICES

Page 74

```
 1              PROCEEDINGS
 2   answers.
 3         We were operating this
 4   store.  Okay.  They're going to
 5   try to say that we didn't do it
 6   profitably.  That doesn't have
 7   any bearing on legal and factual
 8   issues.
 9         THE ARBITRATOR:  Let me just
10   focus on the question I asked.
11   What about this incident with the
12   offer to move to a smaller
13   location?
14         MR. BROWN:  The proposed
15   space from Simon, and the -- we
16   have witness that will make more
17   readily to this then I can.
18   However, the proposed space was
19   in an off corner four-foot
20   traffic in the Forum shop; we
21   were not interested in that
22   space.
23         This location or this store,
24   Mr. Farber, was ideal.  It was
25   beautiful.  It's an incredible
```

Page 75

```
 1              PROCEEDINGS
 2   mall.  The doctors just may have
 3   struck a lease that was too rich
 4   for them, but that wasn't -- that
 5   was what they saddled themselves
 6   with.  That wasn't what that was
 7   the issue for Forall and its
 8   branding and its marketing.
 9         So that store that Simon
10   had tried to -- let's put it this
11   away:  There was proposal made
12   that we could take a smaller
13   store.  That was not -- we
14   evaluated.  It my clients went
15   out and looked at it, but it was
16   deemed not the business decision
17   that they wanted to make.
18         Because if you put yourself
19   -- and it was also off the track
20   of the luxury clothing items.  It
21   was in a different mix in the
22   mall.  As you might know, in
23   malls they do different stores
24   kind of grouped together based
25   upon what the foot traffic might
```

Page 76

```
 1              PROCEEDINGS
 2   be and the clientele might be
 3   looking at those various
 4   competitors.
 5         THE ARBITRATOR:  I have your
 6   answer and I understand.  As long
 7   as we're talking about
 8   mitigation, though, tell me,
 9   Mr. Brown, and we'll get into
10   this, I think, with the experts a
11   bit, but what is your perspective
12   on or what is the testimony going
13   to show me on what happened to
14   the brand and the sales of the
15   brand in the United States after
16   the store was closed?
17         MR. BROWN:  It was a
18   monumental hit to this brand that
19   they still have not recovered
20   from.  Okay.  This is a
21   longstanding Italian's clothing
22   line that dates back to the 80s,
23   actually, early -- late 70s.
24   They -- this type of closure hit
25   the marketplace.  This is a small
```

Page 77

```
 1              PROCEEDINGS
 2   industry.  Everyone knows
 3   everyone.  This -- going back to
 4   Italy --
 5         THE ARBITRATOR:  Did the
 6   Beverly Hills store actually open
 7   or not?
 8         MR. BROWN:  No.  So -- and I
 9   have that on my opening remarks.
10   They were -- no.  The Beverly
11   Hills store did not open.  The
12   doctors, despite trying
13   impossibility of turning the
14   profit in Las Vegas.
15         So they opened in September
16   of '11, 2011.  By December 2011,
17   the doctors were going to Simon
18   and seeking concessions on the
19   rent.  And they were claiming to
20   our client despite our genuine
21   and best efforts and working well
22   together, they were asking for
23   concessions for products three
24   months after opening.
25         That being said, in
```





| Page 78 |
|---|

```
1              PROCEEDINGS
2   September 2012, a full year
3   later, they're in advance lease
4   negotiations in Beverly Hills.
5   Without -- without bringing this
6   for the approval, and to my
7   knowledge -- you know, again, Mr.
8   Spano will testifying to this
9   perhaps, but they never brought
10  it up to corporate Forall that
11  they were looking at a space in
12  Beverly Hills.  And they still
13  loved the brand.
14          They just didn't like Las
15  Vegas anymore.  Well, that is not
16  really how an appropriate
17  contractual relationship works.
18  They had guaranteed performance
19  personally.  We were invested.
20  We had done build out in Las
21  Vegas.  But the Beverly Hills,
22  you know, negotiations by the
23  claimants goes to show that they
24  were still sold on this brand.
25  They were trying to just take it
```

| Page 79 |
|---|

```
1              PROCEEDINGS
2   elsewhere.  But it really puts a
3   lot of -- it shows the
4   disingenuous nature of the claims
5   now that they, themselves, could
6   never make this work, because of
7   brand recognition or whatever
8   else, the economy, that type of
9   stuff.  All right.
10          So one other thing that is a
11  big key is this notion of waiver.
12  Okay.
13          THE ARBITRATOR:  Hang on
14  before you get to that.  You were
15  about to tell me your client's
16  view in connection with the
17  notion of the closing of the
18  store, and I cut you off and
19  diverted you.  I don't want to
20  divert you too much that you
21  forget about it.
22          MR. BROWN:  Thank you.  And
23  yeah.  This does go to mitigation
24  of damages.  There was no
25  obligation for Forall to cut a
```

| Page 80 |
|---|

```
1              PROCEEDINGS
2   new lease with Simon, a cheaper
3   lease based on store sales.
4          Again, we were evaluating
5   whether or not to proceed and
6   take over the store.  Okay.  And
7   the doctors would not communicate
8   with us.  They would not.  We had
9   three successive correspondence
10  stating we want an extension of
11  time.  We're still evaluating.
12  Please advise and get back to us
13  about you intention to take over
14  the store in September.  We need
15  further and additional time.  No
16  responses.
17          How could we -- we weren't
18  on the lease.  How could we just
19  willy-nilly decide that we're
20  proceeding with either downsizing
21  the store or continuing the
22  current operation at that time.
23  There was no obligation for us to
24  mitigate those damages, because
25  those weren't actual damages yet.
```

| Page 81 |
|---|

```
1              PROCEEDINGS
2   We were -- the store was still in
3   operation.
4          You -- you have to mitigate
5   damages once there's a breech.
6   Okay.  And at that time there was
7   no standing breech.  The breech
8   came later with no notice to us,
9   and that's why Mr. Spano's
10  testimony, frankly, is of limited
11  value at this point because he's
12  two years gone.  The breached
13  occurred in 2015.
14          And I'm moving around a
15  little bit here and I apologize.
16  But on that point, and I'm going
17  to pull up on my screen right
18  now.  Mr. Lewis spend a good deal
19  amount of time in his opening
20  saying that there was no
21  insistence upon a $900,000
22  purchase until a year or 14,
23  15 months after the closure of
24  the store.  Okay.  That's just
25  false.  And it -- it's
```

21  (Pages 78 to 81)





Page 82

```
1              PROCEEDINGS
2    demonstratively false.
3          And I'm going to bring up --
4    bear with me one second.  I'm
5    going to share my screen for a
6    moment.  This is an exhibit that
7    is on the joint exhibit list.  It
8    is -- bear with me.  It's
9    Exhibit 256.
10         THE ARBITRATOR:  Is this in
11   the joint exhibit book?
12         MR. BROWN:  It is, Your
13   Honor.  I'm sorry, 156.  And it's
14   Bates label Forall 280 to 281,
15   and with your permission I'm
16   going to share the screen.
17         This is a letter dated
18   March 9, 2016, to Sarah LLC care
19   of Bachar Hamad.  Okay.  This
20   followed two successive pieces of
21   correspondence.  One from myself
22   to counsel and another to Paolo
23   Torello-Viera, CEO of Forall to
24   the doctors.  And in this letter,
25   basically we had no response to
```

Page 83

```
1              PROCEEDINGS
2    either of those prior
3    correspondences.  "By letter
4    dated February 25th," etcetera.
5    "Consequently, effective
6    September 1, 2016, Sarah shall
7    again be -- assume possession of
8    Pal Zileri store."
9          We go on to say that, and
10   remind them, that they have
11   minimum purchase requirements.
12   Okay.  So Mr. Lewis was heard
13   earlier saying that this was
14   never told to them until
15   15 months after the closure of
16   the store, that this was an
17   opportunity that Forall saw to
18   try to collect money, four and a
19   half million dollars.  Wrong.
20   Okay.
21         We wanted a working partner
22   in Las Vegas.  This brand was --
23   this was a flag ship store in a
24   key and critical market that we
25   wanted to succeed.  And it's --
```

Page 84

```
1              PROCEEDINGS
2    so here we have another
3    demonstratively false statement
4    by claimants.  Now, the reason we
5    were telling them this is because
6    they had to take back the store.
7    They had to get the fall and
8    winter collection on site and in
9    inventory.
10         These things take time.  We
11   have to manufacture.  We have to
12   ship.  We have to get it to them.
13   This was all done with the best
14   intentions.  Not -- it's not a
15   got-you-moment.  Okay.  So that
16   -- this is a key piece of
17   evidence, but it's all in the
18   documents as we go through it.
19         By the way, and then we
20   never heard from them again until
21   July.  And they -- and Mr. Lewis
22   references that -- well, there
23   was a new tenant, and they got
24   the new tenant.  Simon notified
25   the new tenant in July 6th.
```

Page 85

```
1              PROCEEDINGS
2    Well, the doctors surrendered a
3    lease on June 14, almost a month
4    prior.  Of course Simon got a new
5    tenant.  He surrendered the lease
6    the impossibilities are thrown
7    out of the window, because you
8    can't create the impossibility
9    and claim you can't run a store
10   because you turned the store back
11   over.
12         The hit to the brand will be
13   testified to by Ms. Settimi.
14   She's a longstanding treasurer
15   and secretary of the company, as
16   well Mr. Paolo Torello-Viera.  It
17   was incredible and it was not
18   something that our clients could
19   just go down to the street and
20   open a new Pal Zileri.
21         The brand had been -- had
22   sustained massive damage and
23   reputation.  This -- we're
24   talking about luxury items.  When
25   a luxury store goes out in the
```



Page 86

```
 1            PROCEEDINGS
 2   dead of night because there's an
 3   eviction, it -- it hurts what
 4   we're trying to do with our
 5   clientele.  And there's
 6   longstanding very loyal
 7   customers.  These people by
 8   thousands of dollars worth of
 9   goods every time they come in.
10   They come specifically to the
11   store.  That -- we'll get into
12   this in this documents.
13        But the claimants produced a
14   tremendous amount of this type of
15   literature in the discovery.  And
16   these people come expecting a
17   certain thing, and they buy.
18   They buy throughout the year.
19   When a store goes out, they move
20   on.
21        One other thing that will
22   come out in testimony is that the
23   claimants themselves were
24   absentee owners.  They were
25   investors.  The doctors, they
```

Page 87

```
 1            PROCEEDINGS
 2   worked and lived in Chicago.
 3   They had practices up there.
 4   They weren't on site.  They
 5   weren't selling.  They weren't in
 6   the store very often.  They hired
 7   at various points different
 8   retail representatives who had
 9   experience in the industry.
10        THE ARBITRATOR:  Mr. Brown,
11   almost the same question I asked
12   Mr. Lewis:  Why is it important
13   for me to know this?  I mean, if
14   Dr. Hamad, presumably, I don't
15   know what kind of doctor, I'm
16   guessing he's a physician, and
17   he's busy in Chicago area.
18   What's wrong with him hiring
19   someone, and if it works, it
20   works.  If it doesn't, it
21   doesn't.  Why do I have to know
22   that and get involved with who
23   they hired, and how they
24   interviewed, and how often they
25   were there?  Why is that relevant
```

Page 88

```
 1            PROCEEDINGS
 2   to what I have to decide?
 3        MR. BROWN:  Right.  And I
 4   agree 100 percent.  It is only
 5   relevant to counter what I see as
 6   the main thrust of claimant's
 7   case here.  And it's that we
 8   couldn't make it work.  It was
 9   impossible.  This was doomed to
10   fail from the beginning.
11        They had experience
12   retailers come in and tell them
13   what they needed to do, and time
14   and time again they didn't do it.
15   And they didn't implement the
16   purchases that their people were
17   telling they should.  That Mr.
18   Spano and other people within
19   Forall were saying this is what
20   you should have in the store.
21   They just didn't do it, and
22   there's just e-mails to that
23   effect.  So it's only relevant as
24   a counter to claimants argument.
25        THE ARBITRATOR:  Counsel,
```

Page 89

```
 1            PROCEEDINGS
 2   you both have told me for
 3   different reasons why I should be
 4   hearing testimony about who did
 5   what that lead to the failure of
 6   the store, so if you both want
 7   it, I'll hear it, but just
 8   understand I question if we're
 9   going to spend -- you know, you
10   guys -- the clients here are
11   spending money on a lot of
12   lawyers, they're spending money
13   on me, and part of my job is to
14   only focus on the issue that is
15   really related to what I decide.
16        So I'm going to let you do
17   it because you both want to do
18   it, but just understand that I
19   question the utility of a lot of
20   testimony about why the stores
21   failed.  I know they failed.  Go
22   ahead.
23        MR. BROWN:  I will be
24   objecting to testimony that's not
25   relevant, and I do view this is
```



Page 90

```
 1              PROCEEDINGS
 2   not relevant.  It only counters
 3   to the extent it's being brought
 4   in.  I will also bring those
 5   portions in.
 6          Another claim that was
 7   false, the and this is -- it goes
 8   to the veracity and credibility
 9   of the witnesses, Your Honor.
10   They claim -- they filed and the
11   Amended Statement of Claim, which
12   was ultimately rejected by Mr.
13   Farber, the arbitrator.  However,
14   in that document, they alleged
15   that they had no knowledge of a
16   prior Las Vegas operation or
17   store.
18          And it's -- it's patently
19   untrue.  And we demonstrate as
20   such, because the original
21   investment group that approached
22   Forall, Bachar Hamad and he had
23   some other partners.  One of
24   those partners, and it's listed
25   in the business proposal plans,
```

Page 91

```
 1              PROCEEDINGS
 2   was an employee at the Pal Zileri
 3   store, and it states that the
 4   business proposal.
 5          So it's just -- they knew
 6   what they were getting into.
 7   They had done their due
 8   diligence.  They loved the brand.
 9   They wanted the ganache of Pal
10   Zileri.
11          Pal Zileri is very big in
12   the middle east, it's very big in
13   Asia, very big in Europe, and it
14   had great potential here in the
15   United States.  I mean, it's
16   still operating in the states.
17   Still sells out of the show room
18   down New York City in 5th Avenue.
19   It's in Saks Fifth Avenue, it's
20   in, you know Nordstrom, all of
21   these high-end stores.  They
22   wanted their part and they got it
23   and then they just didn't live up
24   to their deal.
25          So as I mentioned, they
```

Page 92

```
 1              PROCEEDINGS
 2   claim that they failed to pay
 3   construction costs, we can
 4   demonstrate that's not true.
 5   They claim that we failed to do
 6   sufficient advertising, that's
 7   untrue as well; we have the
 8   documents to demonstrate it.  We
 9   lived up to our agreement to
10   every cent and actually over
11   spent under the agreement for
12   matching advertising costs.
13          They claim that we failed to
14   advise as to our intentions at
15   the end of the management
16   agreement; that's demonstratively
17   false.  They claim that we got
18   evicted because we failed to pay
19   the rent; that's demonstratively
20   false.
21          One point on this waiver or
22   estoppel issue, Your Honor, this
23   Kamco Supply case, 2017, Second
24   Department, that Mr. Lewis is
25   relying upon is completely
```

Page 93

```
 1              PROCEEDINGS
 2   distinguishable.  Okay.  In that
 3   case, which the -- the purchasing
 4   party had -- had not even bought,
 5   like, two percent of what they
 6   had committed to, and the parties
 7   went on for several years, and in
 8   -- the courts go on to say that
 9   no default was ever noticed, no
10   reservation of rights was ever
11   provided.  Okay?
12          And the court even spent
13   time saying that even if they had
14   breached, there was no -- it was
15   not going to serve as a -- an
16   inability respectively to insist
17   on the agreement.  Okay.  And
18   that's what we -- so we have at
19   every turn reserved full rights
20   in this case, and it's in every
21   letter, every agreement.  We put
22   them on notice.
23          And they only ran the store
24   for two years.  The first year
25   they met their minimum.  The
```





Page 94

```
 1              PROCEEDINGS
 2   second year, they're trying to go
 3   to Beverly Hills, and they stop
 4   buying and we consented to a
 5   professional management company
 6   coming in because we're good
 7   partners.
 8         So there's no established
 9   course of conduct of letting them
10   go year after year where they
11   didn't meet the minimum.  They
12   ran the store for two years.  The
13   first year they met the minimum.
14   The second year, they were doing
15   what they were doing.  We had
16   full reservation of rights on a
17   consent for Italnord to step in.
18         They came back after
19   Italnord to run the store for
20   three months, at which point we
21   took over, because we're good
22   business partners and we wanted
23   that store to work.
24         The last thing I'm going to
25   say is:  This notion that we knew
```

Page 95

```
 1              PROCEEDINGS
 2   that they were going to surrender
 3   the lease and they had approached
 4   Simon in October of 2014 and
 5   there's e-mail to the effect, Mr.
 6   Lewis was touching on that.
 7   Okay.  As soon as we learned in
 8   October or November of '14 that
 9   Simon had entered into a -- it
10   was a letter agreement with Simon
11   and Sarah saying that Simon could
12   go out and find a new replacement
13   tenant.  As soon as Forall
14   learned about that -- it wasn't
15   disclosed to us; we learned about
16   it, and we went through the roof,
17   and there's documents to that
18   effect.
19         We said, "This is
20   anticipatory breach.  You can't
21   just surrender this lease.  We
22   have an interest in the store.
23   You have to keep running it,"
24   etcetera, etcetera.  We got a
25   withdrawal letter executed
```

Page 96

```
 1              PROCEEDINGS
 2   between Simon and Sarah saying
 3   that that letter agreement was
 4   null and void, because we did not
 5   want them to surrender the lease.
 6         So they never -- everything
 7   was underhanded here, never above
 8   board, not good partners to work
 9   with, and that's all in the
10   documents.  So that argument
11   needs to be rejected, that we
12   somehow knew that their intention
13   was to terminate the lease.  When
14   they went to do it, we objected,
15   and we got them to withdraw it,
16   and they did withdraw it.
17   There's a letter agreement to
18   that effect.
19         You know, last but not
20   least, Mr. Lewis brought up that
21   e-mail from Amar or is it Bachar
22   Hamad to Paolo Torello-Viera.
23   Paolo says, "As agreed, we're
24   going to get this to the lawyers
25   to iron out the management
```

Page 97

```
 1              PROCEEDINGS
 2   agreement."  In the management
 3   agreement, the controlling
 4   document, there's no mention that
 5   Simon could -- Sarah could turn
 6   the store back.
 7         In fact, that was absolutely
 8   not the case and all rights were
 9   reserve, license agreement
10   remained in effect, we were going
11   to run the store and take on the
12   responsibility of the store for
13   the term of the management
14   agreement, and we abided by that.
15   And we were evicted even before
16   the end of the term of the
17   management agreement to great
18   impact upon the company, the
19   brand, costs, the employees, the
20   people that were trying to make
21   this work.  So that's what this
22   case is about.
23         THE ARBITRATOR:  Okay.  Mr.
24   Brown, do you need a moment or
25   are you finished?
```

25  (Pages 94 to 97)



| Page 98 |
|---|

PROCEEDINGS

1
2     MR. BROWN:  One moment.
3  About the damages portion of
4  things, Your Honor, we're going
5  to have very, very good testimony
6  from our side on that.  The -- I
7  just would point out that they
8  filed a supplemental claiming
9  that you know, the damages should
10  include the COVID impact upon the
11  Las Vegas market.
12     That's a -- an event that
13  occurred four years post breach.
14  They don't get to have the
15  benefits of the vagaries of the
16  market on some later date.  Not
17  to mention it has no impact on a
18  minimum purchase agreement.
19  Whether or not the store or would
20  have been closed for a couple of
21  weeks, which was a duration of
22  this impact out in Vegas.
23     They had minimum purchase
24  requirements for spring, summer,
25  inventory, which had to be

| Page 99 |
|---|

PROCEEDINGS

1
2  purchased by January.  So
3  January 2020, they would have
4  needed to make the purchases for
5  that line, and spring, fall,
6  winter those purchases had to be
7  in store by August, September the
8  latest.  So it's really not
9  something that a lot of time
10  should be spent upon.
11     And they tried to wiggle
12  their claim down by saying
13  there's all this variable cost
14  and what have you, and there's
15  just no basis for that
16  particularly in the context of
17  this party's relationships.
18     THE ARBITRATOR:  Okay.
19     MR. BROWN:  One second.
20  Just to confer with counsel.
21     THE ARBITRATOR:  All right.
22     MR. BROWN:  Just going back
23  to the documents themselves, Your
24  Honor.  The -- all waivers, any
25  modifications had to be in

| Page 100 |
|---|

PROCEEDINGS

1
2  writing.  Okay.  There's full
3  integration clauses in every
4  material agreement here.  Parole
5  evidence should not be
6  considered, does not have to be
7  considered.
8     It's clear what the parties
9  intended.  Forall lived up to its
10  bargain at every turn and was a
11  good partner, and they did not
12  have that in return.  So their
13  investment, the claimant's
14  investment perhaps did not go as
15  they would like, but they chose
16  to surrender the lease and the
17  personal guarantees on that lease
18  in -- in favor of their
19  obligations that they owed to
20  Forall, their working partner.
21     And that's too bad.  Because
22  had there been more of a
23  meaningful conversation, had
24  there been more -- you know,
25  someone flew to New York and had

| Page 101 |
|---|

PROCEEDINGS

1
2  a sit down, perhaps, something to
3  that effect, things could have
4  been worked out and they were
5  not.
6     And they chose to cover
7  themselves on the personal
8  guaranty of the lease, because
9  they viewed that, perhaps, as
10  their biggest liability.  And
11  they chose to let Forall just
12  dangle in the wind on their
13  store, and never mind the impact
14  of the brand and the employees
15  and the people trying to make
16  this work all those many years.
17     THE ARBITRATOR:  Okay.  Is
18  that it, Mr. Brown?
19     MR. BROWN:  Yes, sir.
20     THE ARBITRATOR:  Thank you
21  very much.  Guys, what we're
22  going to do is we're going to go
23  from 9:30 to 5:30 every day.
24  We'll take one morning break of
25  about 15 minutes, one afternoon



Page 102

```
 1              PROCEEDINGS
 2   break of about 15 minutes.  We'll
 3   generally take lunch between 1:00
 4   and 2:00.  So I'm just telling
 5   you this so you understand our
 6   scheduling.
 7          And I think it might be an
 8   appropriate point now to take our
 9   15-minute break.  Mr. Lewis can
10   then call the first witness, and
11   we'll proceed accordingly.
12          So why don't we take a break
13   now.  I've got -- and let's be
14   sharp about it.  I've got 11:05,
15   so at 11:20 I'd like everybody to
16   be back at the meeting.  All
17   right.
18          Thank you very much
19   everyone.  We'll see you in
20   15 minutes.  All right?
21          (Whereupon, a recess was
22   taken at this time.)
23          THE ARBITRATOR:  Mr. Brown,
24   let me turn to you.  I note that
25   I have the books that was given
```

Page 103

```
 1              PROCEEDINGS
 2   to me.  I have joint exhibits.  I
 3   also have something denominated
 4   as Claimant's C Book.  Am I
 5   correct, Mr. Brown, that you
 6   object to my receipt in evidence
 7   of all the documents that are in
 8   Claimant C Book?
 9          MR. BROWN:  Yes.  I think
10   with the exception of just one
11   document that we kind of
12   resolved, and I -- I don't quite
13   recall if that came out of that
14   book or not before Rodney got it
15   to you, but yes.  Many of the --
16   yes.  That's right.
17          THE ARBITRATOR:  Okay.  So
18   let me just ask you this:  Many
19   of these documents, and I'm just
20   -- I have not read the documents,
21   because I won't if I'm going to
22   sustain the objection, but I'm
23   looking at the index right now.
24   Many of these documents seem to
25   be financial documents, P and L
```

Page 104

```
 1              PROCEEDINGS
 2   statement balance sheet, product
 3   purchase schedules, and so on.
 4   What's the basis of your
 5   objection to those?
 6          MR. BROWN:  Well, I have a
 7   relevancy objection to them, A.
 8   B, I have an authentication
 9   objection to them, and --
10          THE ARBITRATOR:  To P and L
11   statements, you have a -- hold
12   on.
13          Maggie, are we on the
14   record?
15          THE COURT REPORTER:  Yes.
16          THE ARBITRATOR:  What's the
17   authentication objection?
18          MR. BROWN:  I would
19   anticipate a witness would have
20   to say that these are accurate,
21   and these are -- how they were
22   compiled, who produced them, who
23   made them.  Some of these were
24   produced in discovery, and I
25   don't know where they came from.
```

Page 105

```
 1              PROCEEDINGS
 2   Others were given to me post
 3   discovery, and that was another
 4   basis for some of the objections
 5   in the later documents.
 6          But the ones with -- I have
 7   my list here.
 8          THE ARBITRATOR:  I want to
 9   know what exactly -- in terms of
10   relevance, that's not going to
11   serve as a basis for an
12   objection, because I'll take that
13   and, you know, you can always
14   move to exclude it at a later
15   point if it really has nothing to
16   do with anything in connection
17   with this case, but -- and then
18   I've got some documents called
19   "Litigation Services Handbook,"
20   "The Role of Financial Expert,"
21   "Expert Witness," what are the
22   objections there?
23          MR. BROWN:  Can I go in
24   turn, because I'm looking at the
25   list myself?  The Exhibit 14 was
```





Page 106

```
 1            PROCEEDINGS
 2  -- was purported -- was produced
 3  by claimants in this case, and it
 4  was purportedly a balance sheet
 5  of a Forall USA or Forall Nevada
 6  operation as of '08, '09 and
 7  2010.  I just -- I don't know
 8  where that came from, so I was
 9  looking for authentication on
10  that from a witness.  They had an
11  allegation earlier on in their
12  amendment statement that there
13  was disclosure of a store made,
14  and then all of a sudden they're
15  producing financials of that
16  store, etcetera, etcetera.  So I
17  had an objection standing on
18  authentication.
19        The next 40 through 46 are
20  financial statements, looks like,
21  or an invoice summary.  Those
22  were produced in the discovery.
23  I don't believe they're relevant,
24  but I'll withdraw my objection at
25  this time.
```

Page 107

```
 1            PROCEEDINGS
 2        THE ARBITRATOR:  All right.
 3  Then 40 through 46 are going to
 4  also be admitted into evidence on
 5  consent.
 6        Go ahead.  Now, what about
 7  64 through --
 8        MR. BROWN:  64 there was no
 9  description that I could
10  identify, but I think Rodney and
11  I resolved this.  This was an
12  exhibit that was actually in my
13  exhibits.  I think it was 164.
14        Rodney, do you know offhand?
15        THE ARBITRATOR:  Doesn't
16  matter.  It's going to be in
17  evidence.  Keep going.
18        MR. BROWN:  So 65 and 66, I
19  don't believe they were able to
20  locate -- there's no identified
21  -- I wasn't able to view these
22  documents.  They didn't produce
23  them to me.  So this IR is not a
24  number that's --
25        THE ARBITRATOR:  I don't
```

Page 108

```
 1            PROCEEDINGS
 2  understand "unable to locate".
 3        MR. BROWN:  Neither do I,
 4  but that's what I was told.
 5        THE ARBITRATOR:  They're in
 6  this book, so someone located
 7  them.
 8        MR. BROWN:  Rodney, can you
 9  talk to that?
10        MR. LEWIS:  I'd be happy to.
11  Yes.  Mr. Farber, the exhibit
12  that have the IRs are documents
13  that were part of our production.
14  What I had committed to Mr. Brown
15  was I was going to see if I could
16  find a corresponding claimants
17  Bates number that was associated
18  with those documents.  We weren't
19  able to find those.  So with Mr.
20  Brown's -- I take him at his
21  words that he did not receive
22  those documents, even though it
23  was queued up to go in our
24  production, but I don't think
25  that's where the story ends.
```

Page 109

```
 1            PROCEEDINGS
 2        I mean, we provided those
 3  documents to Mr. Brown, and I
 4  would say either again or with
 5  the understanding we thought we
 6  had included it in our original
 7  production, but we provided to
 8  him 10 days ago for him to
 9  review, and to see if he had any
10  objection other than just getting
11  the Document 10 days ago, and I
12  don't know if there's another
13  objection to the documents, but
14  I'll let Mr. Brown speak to that.
15        THE ARBITRATOR:  Well, if
16  they were produced, why don't
17  they have a Bates number?
18        MR. LEWIS:  That's what I
19  was saying, Mr. Farber.  We could
20  not find a corresponding Bates
21  number of the document, but the
22  IR shows that it was in our queue
23  to be produced, that's -- that's
24  what would show in our label of
25  the production number, our
```



Page 110

```
1            PROCEEDINGS
2   internal number as we ran the
3   production.
4            THE ARBITRATOR: Mr. Brown,
5   is there anything substantively
6   in these document which makes it
7   significant enough to exclude?
8            MR. BROWN:  Respectively,
9   Your Honor, and you may not love
10  this answer, but there were so
11  many documents flying back and
12  forth in the last 10 days, that
13  if I hadn't gotten it before, and
14  there was no claimants Bates
15  label to it, I was keeping an
16  objection on it for coming in now
17  because it was -- you know.
18           THE ARBITRATOR:  What about
19  67 and so on?  These are also
20  IRs.  Is it the same point?
21           MR. BROWN:  67, well, the
22  once with the IRs, yes.  That is
23  the same point.  67 has a Bates
24  labeled to 71.  Again, I had an
25  authentication objection to
```

Page 111

```
1            PROCEEDINGS
2   those.  I just don't know, you
3   know, what system they were run
4   from, if they were credible.
5            THE ARBITRATOR:  So they
6   have a Bates so they were
7   produced, is that right?
8            MR. BROWN:  So I'll withdraw
9   my objections to those at this
10  point.
11           THE ARBITRATOR:  So then 67
12  through 71 are in.  All right.
13  Now what about 70 -- I'm sorry.
14  67 through 72 are in.
15           MR. BROWN:  Not 72.
16           THE ARBITRATOR:  Okay.  What
17  about 72.
18           MR. BROWN:  It was an IR
19  document.  No Bates label.  I
20  don't believe I was provided with
21  it during discovery.
22           THE ARBITRATOR:  What about
23  74, 75?
24           MR. BROWN:  After
25  discussions with counsel, I
```

Page 112

```
1            PROCEEDINGS
2   didn't know what these were, but
3   73 to 86 are documents apparently
4   that their expert either referred
5   to or relied on.  Only the first
6   three are actual referenced in
7   his report.  The others are not.
8   Although, he might have -- these
9   financials specifically are not
10  referenced in his report, so that
11  was my objection at this point.
12  If he was going to have relied on
13  them, he should have included
14  them in his report.
15           THE ARBITRATOR:  All right.
16  So you want me to keep them out
17  for that reason?
18           MR. LEWIS:  Mr. Farber, can
19  I speak to that?
20           THE ARBITRATOR:  No.
21  Because the objection is
22  overruled.  I'll take them.  So
23  the documents are going to be
24  received 73 through 86 are going
25  to be in.  What about 89 through
```

Page 113

```
1            PROCEEDINGS
2   95?
3            MR. BROWN:  This was a post
4   discovery production.  I haven't
5   gotten them.  When I got the exit
6   list, I haven't seen these.  I
7   think that Rodney indicated they
8   may have been received from
9   Simon.
10           Simon did, you know, refused
11  to comply with my subpoena.  I
12  don't believe they should be
13  brought in at this time.
14           THE ARBITRATOR:  Mr. Lewis,
15  let me hear you on these, 89
16  through 95.
17           MR. LEWIS:  Well, one of the
18  documents, and I apologize I
19  forgot which one, one of these
20  are tax returns, so those did not
21  come from Simon.  So those should
22  be a separate discussion.  So the
23  tax returns were not produced by
24  Simon.
25           The other exhibits in that
```

29 (Pages 110 to 113)





Page 114

```
 1            PROCEEDINGS
 2   range were, and I would say two
 3   things.  The -- the lease
 4   required.
 5          THE ARBITRATOR:  Hold on.
 6   Mr. Brown, do you object to the
 7   2012 tax return?
 8          MR. BROWN:  Just on a
 9   relevancy basis, Your Honor.
10          THE ARBITRATOR:  That will
11   be in.
12          Mr. Lewis, go ahead.  What
13   about the others?
14          MR. LEWIS:  Sure.  All the
15   operators had to, monthly, send
16   their sales to Simon so Simon
17   could track those sales.  So this
18   is a Simon's compilation of the
19   sales for the store for those
20   years in question.
21          THE ARBITRATOR:  Did Simon
22   supply you with documents in
23   response to the subpoena that
24   Mr. Brown served?
25          MR. LEWIS:  No.  He supplied
```

Page 115

```
 1            PROCEEDINGS
 2   them to us informally, and they
 3   did not respond to the subpoena
 4   to either party.
 5          THE ARBITRATOR:  When were
 6   these documents sent to
 7   Mr. Brown?
 8          MR. LEWIS:  10 days ago.
 9          THE ARBITRATOR:  Mr. Brown,
10   what's your objection?
11          MR. BROWN:  I have an
12   authentication objection, Your
13   Honor.  I subpoenaed this party.
14   I got a one sentence letter back
15   with no contact information
16   saying that for legitimate
17   reasons they're not complying
18   with the subpoena.  They've
19   produced these -- I think you
20   have a real authentication issue
21   here.
22          MR. LEWIS:  If I may say
23   this one last thing, these are
24   documents that we asked from
25   Forall.  Forall had to compile
```

Page 116

```
 1            PROCEEDINGS
 2   these documents to provide them
 3   to Simon, in a different format
 4   perhaps, but they have to send
 5   the monthly sales, and those were
 6   not produced, and we had a
 7   document request, Request Number
 8   8, that asked for these
 9   documents, and they weren't
10   produced.
11          MR. BROWN:  We've searched
12   our records, we didn't come
13   across these.  I note there was
14   no -- Sarah was running the store
15   in '11 and '12, those reports
16   were not produced, why not?
17          THE ARBITRATOR:  Gentleman
18   I've heard enough.  So as it
19   stands right now, all the
20   documents that are in claimants
21   book are going to be received in
22   evidence, except not at this
23   point, 65, 66, 72, 89, 91, 92,
24   93, 94, 95.
25          Mr. Lewis, if you want to
```

Page 117

```
 1            PROCEEDINGS
 2   get these documents in later on,
 3   you'll have to lay the foundation
 4   for them.
 5          MR. LEWIS:  Mr. Farber, one
 6   is not a document produced by
 7   Simon.  91 is a publicly
 8   available article.
 9          THE ARBITRATOR:  As I said,
10   you'll have to lay the foundation
11   for it later on, because I'm told
12   they were only produced 10 days
13   ago, and I don't understand why
14   they weren't produced during
15   discovery, so that's my ruling
16   right now.  You can -- you can
17   try to lay the foundation later
18   on.
19          Now, let's open up
20   respondent's book, the R
21   documents.  Mr. Lewis, what's
22   your problem with -- this one I
23   don't have a -- yes, I do.  Okay.
24          Let's hear what your problem
25   is with these documents starting
```




Page 118

```
 1            PROCEEDINGS
 2   with 117.
 3        MR. LEWIS:  Let me pull up
 4   an e-mail that I sent to
 5   Mr. Brown.  Quite frankly, I
 6   thought we had resolved a lot of
 7   this.
 8        THE ARBITRATOR:  I'm sorry.
 9   I'm having trouble hearing you,
10   Mr. Lewis.
11        MR. LEWIS:  Frankly, I
12   thought we had resolved a lot of
13   this as Mr. Farber instructed us
14   to try to do so after our last
15   call, so I thought we had covered
16   some of this ground and resolved
17   these issues on many of them.
18        MR. BROWN:  And Rodney,
19   that's true, I think, but, you
20   know, step through would be due
21   to the late nature of what we
22   were complying and had to get
23   over to the arbitrator, I was not
24   able to, you know, incorporate --
25        THE ARBITRATOR:  And here's
```

Page 119

```
 1            PROCEEDINGS
 2   what we're going to do:  Since
 3   we're starting with claimant,
 4   we'll stop here.  Right after
 5   lunch, I will come back and ask
 6   which of the respondent's
 7   exhibits you still maintain an
 8   objection to, Mr. Lewis.
 9        And guys, the reason I do
10   this right now at the beginning
11   is because I'm not going to spend
12   hours going through documents.
13   In arbitration, we don't do that.
14   We do it much quicker, and I've
15   now disposed of all claimant's
16   documents, all of respondent's
17   documents, the joint exhibit
18   books are received in evidence on
19   consent, and after lunch we'll go
20   through respondent's book, since
21   -- and you guys -- Mr. Lewis,
22   you'll tell me what you still
23   maintain on objection to, and if
24   I can rule, I'll rule, and that's
25   it.
```

Page 120

```
 1            PROCEEDINGS
 2        Okay.  Mr. Spano, is he your
 3   first witness, Mr. Lewis?
 4        MR. LEWIS:  He is.
 5        THE ARBITRATOR:  Mr. Spano,
 6   good morning.  Are you alone in a
 7   room, Mr. Spano?
 8        MR. SPANO:  I am.
 9        THE ARBITRATOR:  Mr. Spano,
10   I'd appreciate your standing for
11   a moment and adjust your monitor
12   so that I can still see you.  I
13   want to see your face.
14        So, Mr. Spano, would you
15   please raise your right hand?  Do
16   you solemnly swear the testimony
17   you're about to give in this
18   arbitration proceeding will be
19   the truth, the whole truth, and
20   nothing but the truth?
21        MR. SPANO:  Yes, I do.
22        THE ARBITRATOR:  Could you
23   be seated, sir.  Spell your full
24   name for me, and also let me have
25   an address, which can be home or
```

Page 121

```
 1            PROCEEDINGS
 2   work, your choice.
 3        MR. SPANO:  Luca, L-U-C-A;
 4   Spano, S-P-A-N-O.  My home
 5   address at the moment is 1100
 6   Gulf Shore Boulevard North,
 7   Apartment 107, Naples, Florida
 8   32102.
 9        THE ARBITRATOR:  Mr. Lewis,
10   are you handling this one?
11        MR. LEWIS:  Yes.
12        THE ARBITRATOR:  Mr. Lewis
13   is going to be asking you some
14   questions.  What I want you to do
15   is:  After each question, I want
16   -- don't interrupt him while he's
17   asking a question.  After each
18   question, I want you to pause.
19        Mr. Brown, are you handling
20   this witness?
21        MR. BROWN:  Yes.
22        THE ARBITRATOR:  If
23   Mr. Brown says the word
24   "objection," do not answer the
25   question until I tell you whether
```




Page 122

```
 1              PROCEEDINGS
 2   or not you should do so.  If
 3   Mr. Brown does not say the word
 4   "objection," then I don't want
 5   long stories.  I just want the
 6   answer to the question.  So
 7   whatever Mr. Lewis has asked you,
 8   you respond to.  All right?
 9        MR. SPANO:  Yes, sir.
10        THE ARBITRATOR:  And that's
11   the way we are going to proceed.
12   I will have different
13   instructions for you when
14   Mr. Brown asks you question.
15        Mr. Lewis, why don't you
16   proceed?
17        MR. LEWIS:  Thank you, Mr.
18   Farber.
19
20
21
22              * * *
23
24
25
```

Page 123

```
 1   DIRECT EXAMINATION OF MR. SPANO
 2
 3   L U C A   S P A N O, the witness herein,
 4   having been first duly sworn by the
 5   arbitrator, was examined and testified
 6   as follows:
 7   DIRECT-EXAMINATION
 8   BY MR. LEWIS:
 9        Q. I believe it's still morning on
10   east coast.  Good morning, Mr. Spano.
11   How are you?
12        A. Good morning.  Good.  Thank you.
13        Q. Appreciate you taking time out
14   of your day to testify today.
15        Mr. Spano, can you please
16   explain to Mr. Farber what your role
17   with Forall was while you were employed
18   there?
19        A. I was the Director of Sales for
20   Forall USA.
21        Q. And what were your
22   responsibilities as director of sales
23   for Forall USA?
24        A. Well, I was following up the
25   sales reports and pulling up all the
```

Page 124

```
 1        DIRECT EXAMINATION OF MR. SPANO
 2   customers that placed orders with us
 3   and I did sales for Forall USA.
 4        Q. And how did you come to become
 5   acquainted with the doctors Hamad?  How
 6   did you meet the doctors Hamad?
 7        A. Well, we had another store prior
 8   to the one that Dr. Hamad opened, and
 9   one of his friends was a customer of
10   ours, and basically he contacted me
11   saying that there was somebody
12   interested in opening a Pal Zireli
13   store in Las Vegas.
14        Q. And did they ultimately
15   introduce you to the doctors?
16        A. Correct.  Let me rephrase that.
17   I met Dr. Bachar; that was my initial
18   contact.
19        Q. And do you recall approximately
20   when this was?
21        A. I'm sorry.
22        Q. Do you recall approximately when
23   that was?
24        A. I believe it was 2012, 2013,
25   probably.  2012 maybe.  About 2012, I
```

Page 125

```
 1        DIRECT EXAMINATION OF MR. SPANO
 2   believe.  Yes.
 3        Q. Well, do you recall the store
 4   opened in 2011?
 5        MR. BROWN:  Objection.
 6        THE ARBITRATOR:  What's the
 7   objection, Counsel.
 8        MR. BROWN:  Leading.
 9        THE ARBITRATOR:  In an
10   arbitration leading is fine, but
11   if it's really heavy leading,
12   guys, it's not going to be worth
13   much to me.  So I'll take it.
14        You can answer.  Did the
15   store open in '11?  That's the
16   question.
17        THE WITNESS:  I believe so.
18        Q. So you met the doctor some time
19   before then?
20        A. Correct.
21        Q. Did you participated in the plan
22   for the Las Vegas store to open in
23   2011?
24        A. Absolutely, yes.
25        Q. What was your role, as you
```



Page 126

DIRECT EXAMINATION OF MR. SPANO

1
2    recall, in preparing for the store to
3    open in 2011?
4        A. Well, I was basically a middle
5    man like I am with -- with the -- every
6    other customer.  Meaning that the
7    initial deal was proposed to me and
8    then, of course, I forwarded it to the
9    CEO of our company in Italy.
10       And depending on what they were
11   saying, I was basically giving the
12   information to the doctors, the doctor.
13       Q. You mentioned the CEO in Italy;
14   who was the CEO at that time in 2011?
15       A. Marco Baritza.
16       Q. And in 2011, did you have a U.S.
17   store?  Did Pal Zireli have a U.S.
18   store?
19       A. 2011, we had -- we had -- yeah.
20   We had a temporary store, if I recall,
21   correct at the Palatso (phonetic) prior
22   to the opening at Cesar's Palace with
23   Dr. Bachar.
24       Q. That store closed prior to the
25   Las Vegas store opening in the Forum

Page 127

DIRECT EXAMINATION OF MR. SPANO

1
2    malls, right?
3        A. I believe so.
4        Q. Did you have another store in
5    the United States besides the Las Vegas
6    store?
7        A. Prior to that, we had a store
8    that we given basically the right to
9    use the name.  It was one of our
10   customers at the multi-brand stores
11   that was interested in opening a store,
12   and he did at the Venetian, and he
13   basically we gave him the right to use
14   our name to sell our product and it was
15   a mono brand store, Pal Zileri store.
16       Q. But again, that store was closed
17   by the time the doctors opened their
18   store in Cesar's Palace, correct?
19       A. Correct.
20       Q. So I guess what I was trying to
21   ask you -- was there another store in
22   the United States at the time the
23   doctors opened in 2011?
24       A. No.  Not that I'm aware.
25       Q. Did you work closely with the

Page 128

DIRECT EXAMINATION OF MR. SPANO

1
2    doctors in -- when they opened the
3    store, what kind of services did you
4    provide for the doctors as they opened
5    the stores?
6        MR. BROWN:  Objection to the
7    form.
8        THE ARBITRATOR:  What's the
9    objection?
10       MR. BROWN:  The form multi
11   -- I'm not sure.  There are two
12   different questions there.
13       THE ARBITRATOR:  Mr. Brown,
14   as indicated before, we're in
15   arbitration.  I'm not a jury.  So
16   I can handle it.  All right?
17   Even three in one.  So it's okay.
18   Let's go ahead.  Overruled.
19       Mr. Lewis, go ahead.
20       Q. The better question is whether
21   the witness can handle it, so let me
22   ask it again.
23       Did you work closely with the
24   doctors as they developed their plan to
25   open a store?

Page 129

DIRECT EXAMINATION OF MR. SPANO

1
2        A. I worked closely with the Dr.
3    Bachar, yes.
4        Q. And what types of services did
5    you provide for him?
6        A. Well, basically, I helped him
7    out with the buying, I helped him out
8    with the training of the staff, and I
9    followed the stores from -- from the
10   beginning.
11       I was in Vegas once a month to
12   make sure that the store looked the
13   right way because we also had rules and
14   regulations.  The store had to look
15   certain ways.  So we had to make sure
16   that it was that way.  And I helped him
17   with the buying, yes.
18       Q. When you say you helped him with
19   the buying, can you be more specific?
20       A. Well, you know, twice a year,
21   you know, we all went to Italy, the
22   manager of the store, which was
23   responsible for the buying, Dr. Bachar,
24   and myself, and with them we did the
25   selection of the buying.





Page 130

DIRECT EXAMINATION OF MR. SPANO
1    I've been doing this for almost
2   30 years, so I have big knowledge about
3   the U.S. market and they asked me --
4   Dr. Bachar asked me to help them out
5   and so I did.
6        Q. Are you familiar with the
7   license agreement between Forall and
8   Sarah?
9        A. Well, a little bit.  I am, yes.
10   Now, I cannot go back so many years, of
11   course, as I was a middle man, so I
12   went through it, and I was the one that
13   helped put it together.
14        Q. I'm going to show you a document
15   if my computer will cooperate.  Bear
16   with me just a moment.
17        A. No problem.
18        Q. Mr. Spano, are you able to see a
19   document on my screen that reads
20   "License and Retail Operator
21   Agreement"?
22        A. Yes.
23        Q. Are you familiar with this
24   document?

Page 131

DIRECT EXAMINATION OF MR. SPANO
1        A. I'm just seeing the first page.
2        Q. Okay.  Do you recall if you've
3   seen this document before?
4        A. You can continue to scroll if
5   you want.
6        Q. But let me save you some time.
7   I'm going to take you to a particular
8   provision in that document, that is
9   Section 4.2.  Mr. Spano, can you see
10   where my cursor is?
11        A. Yes.
12        Q. Someone is unmuted.
13        May I ask you to take a look at
14   this provision and let me know when you
15   finish reading it?
16        A. 4.2?
17        Q. Yes, please.
18        A. Yes.
19        Q. Okay.  Do you understand that
20   pursuant to this contract, Sarah was
21   required to purchase $900,000 worth of
22   merchandise per year from Forall; do
23   you understand that?
24        A. Yes, I do.

Page 132

DIRECT EXAMINATION OF MR. SPANO
1        Q. Were you aware of that back when
2   you were working with the doctors and
3   they opened the store?
4        A. Yes, I was.
5        Q. Did Sarah purchase $900,000
6   worth of inventory from Forall each
7   time the store was open?
8        MR. BROWN:  Objection.
9        THE ARBITRATOR:  What's the
10   objection?
11        MR. BROWN:  Foundation.  He
12   was not around for the duration
13   of the party's relationship.
14        THE ARBITRATOR:  Overruled.
15   You can answer to the extent you
16   know.  Did -- the question is:
17   Did Sarah purchase $900,000 a
18   year of inventory from Forall?
19        THE WITNESS:  When I was
20   there, no.
21        Q. And you -- how do you know that?
22        A. Well, because again, every
23   season we went down to Italy together
24   and we did budgets, and we went

Page 133

DIRECT EXAMINATION OF MR. SPANO
1   according to what the store sold, and
2   what the amount would have been to
3   place for the following season.
4        Q. Let me ask you about that.  You
5   said that when you would go down and do
6   the purchasing that that would be based
7   on how the store had performed the
8   prior season; is that correct?  Did I
9   hear you correctly?
10        A. That's correct.
11        Q. Now, that's inconsistent with
12   what's in the contract, right?
13        MR. BROWN:  Objection.
14   Calls for a legal conclusion.
15        THE ARBITRATOR:  Well, guys
16   it really doesn't matter.  I
17   mean, I read 4.2 and he just said
18   they didn't do it, so of course
19   it's inconsistent.  Next
20   question.  Go ahead.
21        MR. BROWN:  Can I just --
22   administratively, I need to ask a
23   question.
24        Rodney, this version of the

34 (Pages 130 to 133)




Page 134

DIRECT EXAMINATION OF MR. SPANO

1  agreement is not the same as mine
2  agreement is not the same as mine
3  that I'm looking at.  What --
4  because this is on Page 5.  My
5  4.2 is on Page 6, and this is the
6  first time I see the discrepancy
7  in the license agreement.  What
8  -- are you marking this as
9  exhibit?  What was in your
10  exhibits?  What number?
11  MR. LEWIS:  This is 319 in
12  the joint exhibits.
13  MR. BROWN:  Bear with me.
14  MR. LEWIS:  You can see our
15  Bates number at the bottom, so
16  you certainly had this version.
17  Mr. Farber, another
18  administrative question is
19  whether you want us to move the
20  documents into evidence now or --
21  THE ARBITRATOR:  No.
22  Absolutely not.  I said before
23  when we were doing documents, all
24  the documents are in evidence
25  except those that I have kept out

Page 135

DIRECT EXAMINATION OF MR. SPANO

1  DIRECT EXAMINATION OF MR. SPANO
2  of the claimants and all the ones
3  that respondent gave me as joint
4  in exhibits are also in evidence.
5  In fact, at any point either
6  counsel can simply say, "Mr.
7  Farber I refer you to this
8  exhibit," and read it to me, or
9  just ask me to read it.  You
10  don't have to waste time with the
11  witness going through it.
12  MR. LEWIS:  Fair enough.
13  Respondents R Book in until
14  we have our discussion after
15  lunch?
16  THE ARBITRATOR:  Okay.
17  MR. BROWN:  I just -- you
18  know, look, I don't know what the
19  issue is in terms of the
20  formatting, and maybe it just got
21  pushed on to another page in a
22  different but this document is
23  not a counter signed document.
24  The counter signed document you
25  have attached at 321.

Page 136

DIRECT EXAMINATION OF MR. SPANO

1  DIRECT EXAMINATION OF MR. SPANO
2  THE ARBITRATOR:  Let me ask
3  you this:  Mr. Brown, is 4.2
4  different in the versions?
5  MR. BROWN:  That's what I'm
6  trying to check, Mr. Farber, and
7  it does not appear to be.  It
8  appears to be the same 4.2.
9  THE ARBITRATOR:  Okay.  Then
10  let's deal with -- you can sort
11  out the issue of the different
12  versions later, but for purposes
13  of this examination let's
14  proceed.
15  Go ahead, Counselor.  Mr.
16  Lewis, go ahead.
17  Q. Mr. Spano you had said that at
18  the time you were working with the
19  doctors at the opening of the store,
20  you were aware that --
21  THE ARBITRATOR:  Hang on.
22  Are you finished with reference
23  to the document, Mr. Lewis?
24  MR. LEWIS:  No.  I was just
25  going to reiterate because I'm

Page 137

DIRECT EXAMINATION OF MR. SPANO

1  DIRECT EXAMINATION OF MR. SPANO
2  not sure Mr. Spano was still
3  there given the fact that we got
4  side tracked on the
5  administrative question.
6  THE ARBITRATOR:  Go ahead.
7  Q. You understood that this
8  provision was in the contract, the
9  $900,000 minimal purchase agreement,
10  when you were working with the Hamads
11  at the beginning of the store opening?
12  A. I'm sorry.  I did not hear you
13  correctly.
14  THE ARBITRATOR:  He wants to
15  know if you were aware of 4.2
16  when the store opened?
17  THE WITNESS:  Yes.  Of
18  course I was.  Did you hear my
19  answer?
20  THE ARBITRATOR:  Yes, we
21  heard it.
22  Q. So, as far as you're aware, did
23  Forall at any time enforce Section 4.2,
24  the $900,000 minimum purchase
25  agreement, while you were still working




| | |
|---|---|
| Page 138 | Page 139 |

**Page 138**

```
 1        DIRECT EXAMINATION OF MR. SPANO
 2   with Forall?
 3        A. No, we did not.
 4        Q. Can you explain to us why?  What
 5   was the arrangement you had reached
 6   about the minimum purchase agreement?
 7        A. Well, like a -- in any other
 8   type of business that we do, I mean,
 9   now we're in the states, we go
10   according to the sales of the store.
11   The CEO at the time, Marco Baritza, did
12   not want to push too much on the
13   doctors, because he was understanding
14   that the sales were not what we
15   initially expected.
16        Q. And so did that -- did that in
17   fact lead to the policy that you all
18   had decided to operate under going
19   forward?  Did the sales affect that
20   decision?
21        A. No.
22        MR. BROWN:  Objection.
23   Leading the witness.
24        THE ARBITRATOR:  Well, I
25   heard the answer.  It's no.  Go
```

**Page 139**

```
 1        DIRECT EXAMINATION OF MR. SPANO
 2   ahead.  It did not lead to a
 3   policy.  Go ahead.
 4        THE WITNESS:  No, it did
 5   not.
 6        Q. Do you understand the question?
 7        A. I do.
 8        Q. I'm sorry.  Why did you all
 9   decide to not enforce the $900,000
10   purchase agreement?
11        A. Because the idea was for all of
12   us to be successful, the doctors, the
13   store, I mean, the -- the company.  You
14   know, and for us to force something
15   like that, would have been -- would
16   have not been good.
17        Q. So you didn't think it would be
18   proper to enforce the $900,000 purchase
19   agreement under those circumstances?
20        A. It was not my decision.  The
21   decision was taken by the CEO, because
22   he was present at all the meetings
23   prior where we discussed the budget.
24   And the doctor asked that we could not
25   place such an order, we had the numbers
```

| | |
|---|---|
| Page 140 | Page 141 |

**Page 140**

```
 1        DIRECT EXAMINATION OF MR. SPANO
 2   from the prior season, and we went
 3   according to that.
 4        Q. So let me understand, the
 5   doctors asked directly to the CEO to
 6   not be forced to purchase the $900,000
 7   minimum because of the low sales?
 8        A. The sales were not low.  The
 9   sales did not achieve the goal of our
10   budgets.  We had budgets we had to
11   arrive to, and we didn't.  So it was
12   lenient of letting us not buy as much
13   as he was supposed to, but the amount
14   was -- was -- what was written in the
15   agreement.  So --
16        Q. But, again, the CEO at the
17   highest level made the decision not to
18   enforce the minimum purchase agreement
19   while you were involved with the store?
20        A. Correct.
21        Q. I don't want to spend a lot of
22   time on this.  We've touched upon it
23   briefly, and I know Mr. Farber is not
24   looking for a lot of testimony on this,
25   but please share with us what you
```

**Page 141**

```
 1        DIRECT EXAMINATION OF MR. SPANO
 2   believe when you were on the ground,
 3   what were the factors and the
 4   challenges that the store was facing in
 5   Las Vegas when the doctors were
 6   operating it?
 7        A. Well, that shopping center in
 8   the Forum shops at the time was one of
 9   the best shopping malls to be in, as
10   per square footage, it was probably
11   number one in the U.S.  So we thought
12   that we had a good chance, you know, to
13   have a -- a good store that would
14   produce good amount of money and would
15   give us a nice image.
16        However, things in Las Vegas
17   back then changed quite a bit.  You
18   know, the mall started to go down a
19   little bit.  The amount of retails in
20   the Las Vegas area went up
21   significantly, and the type of
22   customers that started coming in into
23   the Forum shops started to becoming
24   lower level, so that had a big impact
25   on the sales few seasons after we
```





1    DIRECT EXAMINATION OF MR. SPANO
2    opened the store.
3    Q. So the respondents -- part of
4    their arguments are that the doctor's
5    inexperience caused the store to fail;
6    would you agree with that or disagree
7    with that?
8    A. Well, definitely the doctor -- I
9    say "the doctor," because I -- you
10   know, the second -- second doctor came
11   in afterwards, definitely did not have
12   any experience in retail or wholesale.
13   Q. Right.  But would you say that
14   that was the contributing factor to the
15   store -- let me ask you this:  What was
16   your role and was it meant to make up
17   for some of that inexperience?
18   A. Well, my role, first of all,
19   was, again, to be a middle man.  On the
20   other end, I did more than I was
21   supposed to, because it was not my
22   responsibility to run the store, but
23   when Dr. Bachar asked me to help him
24   out, I did.
25       Again, I was in Vegas once a

1    DIRECT EXAMINATION OF MR. SPANO
2    month, sometimes twice a month.  I ran
3    all the trainings for the employees,
4    which was not my job, but it was in my
5    interest to make sure the store was
6    successful.
7        Again, I take my job really
8    seriously, and when I do something, I
9    try to do it 100 percent, so.
10   Q. You were listing some of the
11   challenges that the store faced,
12   including the -- did they have a change
13   in management of the Forum malls after
14   the store opened?
15   A. I believe that the store was
16   taken over by Simon maybe a year
17   before, I'm not sure exactly, but it
18   was definitely -- Simon took over the
19   shopping center, and that's when the
20   changes start to happen.
21   Q. Did it have a positive or
22   negative effect when Simon took over?
23   A. This is my personal opinion,
24   probably negative.
25   Q. I don't want you to draw a

1    DIRECT EXAMINATION OF MR. SPANO
2    conclusion, but your testimony is that
3    there were a number of factors that
4    were challenging the store's sales; is
5    that safe to say, is that a fair
6    summary of your testimony?
7    A. Well, our business has been
8    having many challenges for the past
9    15 years, but definitely, yes.  There
10   were many, many, many, factors.
11   Q. Bear with me just a moment, Mr.
12   Spano.
13   A. Yes.
14   Q. Was there a time when Sarah
15   asked for Forall's assistance due to
16   the store's performance?
17   A. Sarah, yes.  There were many
18   times they asked for -- yes.
19   Q. Were they transparent about the
20   challenges that they were facing with
21   sales in Las Vegas?
22   A. Well, yes, we all had the
23   numbers, so Italy was well aware of the
24   challenges that the store was having.
25   Q. And as you recall, did Forall

1    DIRECT EXAMINATION OF MR. SPANO
2    make efforts to try to help while
3    you -- you were involved?
4    A. Absolutely.
5    Q. And that included some
6    discounts?
7    A. Discounts, I don't recall what
8    discounts we give them, but we
9    definitely gave some discounts in some
10   particular occasions.
11   Q. Do you remember it came a time
12   when Forall decided to help find a new
13   operator?
14   A. Forall did not look -- they
15   started looking when the doctor asked.
16   Q. That's part of the assistance
17   that the doctors asked for?
18   A. I'm sorry.
19   Q. That's part of the assistance
20   the doctors asked for?
21   A. Right, yes.
22   Q. Forall would help find a new
23   operator?
24   A. Correct.
25   Q. And do you do so?




Page 146

DIRECT EXAMINATION OF MR. SPANO
1
2      A. Well, it wasn't me personally,
3  but my colleague in Italy, they were
4  dealing with somebody that was
5  interested and he found somebody, yes.
6      Q. And was that Alfonso Entebi?
7      A. Yes.
8      Q. And the name of his company was
9  Italnord?
10      A. Italnord out of Mexico, yes.
11      Q. Are you familiar with other
12  stores that Mr. Entebi owns?
13      A. Mr. Mr. Entebi -- when the deal
14  was introduced to me that he might be
15  interested in taking over the Sarah
16  store Las Vegas, I knew that he had
17  other businesses in Mexico, including a
18  Pal Zileri, but other than that, no. I
19  was not aware of 100 percent what was
20  --
21      Q. Sure. Are you familiar with or
22  were you aware of the performance of
23  Mr. Entebi's other stores?
24      A. Well, what I heard from my
25  colleagues was he was successful

Page 147

DIRECT EXAMINATION OF MR. SPANO
1
2  businessman. He was doing business
3  with Pal Zireli for many years, so he
4  was successful, but he also did private
5  label besides Pal Zireli.
6      Q. Your understanding was he was
7  successful in operating Pal Zileri
8  stores?
9      A. Also, yes.
10      Q. Do you recall when Mr. Entebi
11  took over the store, the Las Vegas
12  store?
13      A. 2012, 2013 maybe. If I recall
14  correctly.
15      Q. Late 2013, but I know it was a
16  long time ago.
17      A. Yes. Okay.
18      Q. And do you recall whether Sarah
19  was required to stay on the lease while
20  Mr. Entebi was running the store?
21      A. If I recall correctly, yes. I
22  think they were required to stay on the
23  lease.
24      Q. And I don't want you to
25  speculate, if you don't recall, that's

Page 148

DIRECT EXAMINATION OF MR. SPANO
1
2  fine.
3      A. I'm sure. Yes.
4      MR. BROWN: I didn't
5  understand his answer there. Can
6  that be read back?
7      THE ARBITRATOR: Yes. Of
8  course. Maggie.
9      (Whereupon, a portion of the
10  record was read back.)
11      MR. BROWN: Thank you.
12      Q. Mr. Spano, do you recall whether
13  Simon required Sarah to stay on the
14  lease while Mr. Entebi was running the
15  store?
16      A. No. I think Mr. Entebi didn't
17  want to take over the lease.
18      MR. LEWIS: Sorry, Mr.
19  Farber. It's a new world we're
20  living in.
21      Q. Mr. Spano, can you see this
22  document that's on the screen?
23      A. Yes.
24      Q. You see that this is an e-mail
25  August 22, 2013; do you see that?

Page 149

DIRECT EXAMINATION OF MR. SPANO
1
2      A. Yes.
3      Q. Do you recall this document?
4      A. I wrote it, but I don't recall
5  it. But let me read it.
6      Q. Please do. And let me know when
7  you're finished.
8      A. Can you move it to my left
9  because I can only see it partial.
10      THE ARBITRATOR: Counsel, am
11  I correct that is Exhibit 53?
12      MR. LEWIS: Correct.
13      Q. Mr. Spano, are you saying you
14  can't see the full screen?
15      A. Correct. Because I see your
16  faces on the right side. Let me see if
17  I can move it. Yes, I can. Perfect.
18  I got it.
19      Q. It's just the first paragraph
20  I'm going to ask you about.
21      Does this refresh your
22  recollection as to why Mr. Entebi was
23  unable to come onto the lease himself?
24      A. Yes.
25      Q. And this is because that his





Page 150

DIRECT EXAMINATION OF MR. SPANO

1
2  credit wasn't sufficient for Simon to
3  accept him on a lease, right?
4      A. Yes.  Did you hear me?
5      Q. Yes.  And I'm going to ask you
6  the last question about the document.
7      In the first sentence you can
8  see it was Alfonso Entebi asking to
9  have the lease transferred to him,
10  correct?
11      MR. BROWN:  Objection.
12      THE ARBITRATOR:  What's the
13  objection.
14      MR. BROWN:  That's leading.
15  That's not -- I think it's just a
16  leading question.  This isn't
17  from Mr. Entebi.
18      THE ARBITRATOR:  It doesn't
19  matter.  This is a letter from
20  the witness, and he says -- it's
21  kind of like quadruple hearsay.
22  "I spoke to Dr. Hamad and he's
23  telling me that now, you, "you,"
24  being Mr. Alfonso, are asking to
25  have in writing that the mall

Page 151

DIRECT EXAMINATION OF MR. SPANO

1
2  will transfer the lease to you?"
3      Mr. Lewis, you're asking the
4  witness --
5      I mean, you wrote this Mr.
6  Spano?
7      THE WITNESS:  Yes, I did.
8      THE ARBITRATOR:  I read it.
9  Why don't we move on?  Next
10  question.  Sustained.  It's kind
11  of like quadruple hearsay, so
12  it's not worth too much.
13      Q. Did Forall approve of Italnord
14  taking over the store?
15      A. Yes, they did.
16      Q. Did there come a time when
17  Italnord no longer wanted to operate
18  the store?
19      A. Yes.
20      Q. And do you recall whether that
21  was because of the sales performance or
22  lack there of?
23      A. The reason was because it did
24  not achieve the goal that it wanted to
25  achieve.

Page 152

DIRECT EXAMINATION OF MR. SPANO

1
2      THE ARBITRATOR:  Mr. Spano,
3  when the deal was made, as far as
4  you know, with Mr. Entebi, Mr.
5  Entebi, I take it, was aware of
6  the minimal sales requirement
7  that was in the license
8  agreement; is that right?
9      THE WITNESS:  I believe
10  there was a different agreement
11  that he had to go by, not the
12  original agreement, if I recall
13  correctly.
14      THE ARBITRATOR:  A separate
15  agreement, and as far as you
16  know, that separate agreement
17  changed the requirements of the
18  $900,000; is that what you're
19  saying?
20      THE WITNESS:  Yes, I believe
21  so.
22      THE ARBITRATOR:  And that
23  was a written agreement you're
24  talking about with Mr. Entebi?
25      THE WITNESS:  Yes.  Between

Page 153

DIRECT EXAMINATION OF MR. SPANO

1
2  Forall and Mr. Entebi.
3      THE ARBITRATOR:  Go ahead,
4  Counselor.
5      Q. Mr. Spano, what conclusions that
6  you draw from the fact that Italnord,
7  an experienced and successful operator
8  of Pal Zileri stores, could not
9  successfully operate the Pal Zileri
10  store in the Forum malls?
11      A. That's a tough question because,
12  you know, it was not fully committed to
13  this market.  For him it was a test for
14  him to see if a store would perform the
15  way he wanted to.  Definitely it did
16  not do well, and that was the reason he
17  wanted to get out of the deal, and he
18  did.
19      Q. In your opinion, Mr. Spano, what
20  should have happened after Italnord
21  refused to continue operating the
22  store?
23      MR. BROWN:  Objection.
24  Calls for speculation.
25      THE ARBITRATOR:  "What

39 (Pages 150 to 153)





Page 154

DIRECT EXAMINATION OF MR. SPANO
1
2  should have happened," I think I
3  think I have to sustain that one
4  because I'm not sure what you
5  mean.  A lot more people would
6  come to Las Vegas, a lot more
7  people would go shopping, it
8  could be a lot of things.  You
9  know, I'm just kind of --
10       MR. LEWIS:  Let me ask more
11  specifically, Mr. Farber.
12       THE ARBITRATOR:  Why don't
13  you rephrase, Mr. Lewis.  Go
14  ahead sustained.
15       Q. After Italnord refused to
16  continue managing the store, Mr.
17  Spano, what do you think the parties
18  should have done?  What decisions
19  should they have made about the store?
20       MR. BROWN:  Objection again.
21       THE ARBITRATOR:  Sustained.
22  I just don't know what you're
23  getting at, Mr. Lewis.
24       MR. LEWIS:  If you all would
25  let Mr. Spano answer --

Page 155

DIRECT EXAMINATION OF MR. SPANO
1
2       THE ARBITRATOR:  You've got
3  to rephrase.  Go ahead.
4       Q. Did Forall change CEOs at some
5  point while the Vegas store was open
6  while you were with Forall?
7       A. Yes.
8       Q. And who came on as CEO?
9       A. You're talking about the company
10  CEO, Forall Star or Forall USA?
11       Q. Forall USA?
12       A. Forall USA came out with Paolo
13  Torello-Viera.
14       Q. Did you have any opinion about
15  that hire -- withdrawn.
16       Did anything change in how
17  Forall dealt with Sarah after Mr.
18  Torello became CEO?
19       A. Well, I left a few months after
20  the new CEO came to the United States.
21  Whatever happened afterwards, I cannot
22  tell you because I was not part of
23  Forall no longer.
24       Q. Are you aware that Forall USA
25  took over and began operating the store

Page 156

DIRECT EXAMINATION OF MR. SPANO
1
2  in 2015?
3       A. I heard, yes.
4       Q. This happened after you had left
5  Forall?
6       A. Yes.
7       Q. Were you surprised to learn that
8  Sarah and Forall were engaged in
9  litigation?
10       A. Yes and no.  Yes and no.
11       Q. Can you explain that?
12       A. Well, I was surprised because,
13  again, if it was my decision, which
14  wasn't, you know, I knew the situation
15  with the store, and if they would have
16  found somebody that took over the --
17  the lease, my opinions I would have
18  given to the CEO would have been to let
19  her do it, but when these new people,
20  again, it changed.  So I knew that they
21  were not going to let it go.  That's
22  basically it.
23       Q. Just to make sure we're
24  understanding your testimony.  You're
25  saying that if the former regime was in

Page 157

DIRECT EXAMINATION OF MR. SPANO
1
2  place, Marco as CEO, you would have
3  suggested that the parties find a
4  lease, someone to take over the lease
5  and go their separate ways; is that
6  your testimony?
7       A. Correct.
8       MR. BROWN:  Note my
9  objection the relevancy of this
10  is nil.  This is --
11       THE ARBITRATOR:  I heard the
12  answer already.  That's correct.
13  So Mr. Spano, you've got to pause
14  at the end of each question.
15       Mr. Lewis, next question.
16       MR. LEWIS:  No further
17  questions, Mr. Farber.
18       THE ARBITRATOR.  Mr. Spano,
19  we're going to do what's called
20  "cross examination."  Mr. Spano,
21  look, Mr. Brown is in charge.  He
22  is the boss of the cross.  All
23  right?  So I don't want you
24  fighting with him. I just want
25  you to listen to his question.




Page 158

1    DIRECT EXAMINATION OF MR. SPANO
2        THE WITNESS:  Absolutely.
3        THE ARBITRATOR:  And respond
4    as directly and as succinctly as
5    you can.  If you can answer,
6    "yes," "no," "I don't remember,"
7    "I don't know," that's fine.  All
8    right.  Same rules in reverse.
9    If Mr. Lewis says the word
10   "objection" don't answer until I
11   tell you whether or not you
12   should do so.
13       THE WITNESS:  Okay.
14       THE ARBITRATOR:  All right.
15   Mr. Brown, go ahead.
16       MR. BROWN:  Thank you, Mr.
17   Farber.
18
19
20                * * *
21
22
23
24
25

Page 159

1    CROSS EXAMINATION OF MR. SPANO
2    CROSS-EXAMINATION
3    BY MR. BROWN:
4        Q. Hello, Luca.
5        A. Hello, Mr. Brown.  How are you?
6        Q. Good.  We talked in the past,
7    have we not?
8        A. Of course.
9        Q. When did you leave Forall USA?
10       A. I left in 2015.
11       Q. Was it -- is it more accurate to
12   state that your resignation came in
13   December of '14?
14       A. Let's see.  December probably
15   and then I left afterwards -- I stayed
16   a little longer to help them out with
17   the transition, because we were in the
18   full selling season, so I didn't want
19   to leave them in the middle of selling
20   season.
21       Q. So when was your last date of
22   employment with Forall?
23       A. It was in June, I believe.  If I
24   remember correctly, because my son was
25   born in July, so about a month before

Page 160

1    CROSS EXAMINATION OF MR. SPANO
2    my son was born, so in June.
3        Q. So you stayed on six months
4    after your resignation letter?
5        A. I believe so.  I don't remember
6    if it was six months or three months,
7    but I stayed longer than I was supposed
8    to.
9        Q. And how -- how long had you
10   worked for Forall?
11       A. I -- I worked like -- I been
12   representing Pal Zileri for 20 --
13   21 years.  I worked 10 years with
14   Forall USA as Director of Sales.  Prior
15   to that, I worked for the agency that
16   represented Pal Zileri.  Italcoast
17   (phonetic), if I remember correctly,
18   and then I went -- the old agent
19   retired and the company offered me the
20   position to run the U.S. market.
21       Q. Okay.  And did there come a time
22   where you were approached by the
23   claimants, the doctors, with a business
24   proposal to open a store in Las Vegas?
25       A. Yes.

Page 161

1    CROSS EXAMINATION OF MR. SPANO
2        Q. Do you recall that?
3        A. Absolutely.
4        Q. And do you recall at that time
5    who approached you with that plan?
6        A. As I stated before, it was a
7    friend of the doctors that was a
8    customer of ours in the prior store we
9    had, and eventually Dr. Bachar
10   contacted me and asked me to meet with
11   him.
12       Q. And where did that meeting
13   occur?
14       A. It was in Las Vegas.  If I
15   remember correctly, Las Vegas.
16       Q. And what was their pitch or
17   proposal to Forall at that time?
18       A. Well, they wanted to -- you
19   know, they wanted to open -- let me
20   also say something that is gentleman
21   that was a friend of their's --
22       THE ARBITRATOR:  Hang on.
23   Let's stick with the question.
24   Just tell me what they said.
25       A. They -- they told me that




Page 162

CROSS EXAMINATION OF MR. SPANO

1    CROSS EXAMINATION OF MR. SPANO
2    they're interested in opening a Pal
3    Zileri store in Las Vegas.
4    Q. And who was there at that
5    meeting?
6    A. Dr. Bachar and another
7    gentleman, which I don't recall his
8    name, which is the person that told Dr.
9    Bachar a possibility of being a Pal
10   Zileri store in Las Vegas.
11   Q. Okay. I'm going to show you
12   what's been marked as Forall Bates
13   labeled Forall 834 to 848, and this was
14   produced only yesterday, so I'm not
15   sure if it's actually made its way into
16   Mr. Farber's binder or not due to --
17   this was the only document of its kind,
18   though. It was produced to me late
19   yesterday afternoon by Ms. Settimi.
20   She located in her prep for this.
21       MR. LEWIS:  Mr. Farber, I
22   object to this based on the
23   representation that this was
24   something that was produced
25   yesterday.

Page 163

1    CROSS EXAMINATION OF MR. SPANO
2        MR. BROWN:  Exactly. It was
3    produced, but I'm going to
4    establish a foundation, and it's
5    an e-mail on this witness that
6    I'd like to cross him on.
7        THE ARBITRATOR:  Mr. Lewis,
8    do you have an objection or not?
9        MR. LEWIS:  Is this being
10   used for rebuttal?
11       THE ARBITRATOR:  He said he
12   wants to use it for cross.
13       MR. LEWIS:  I'm going to
14   say, just for the record, Mr.
15   Farber, that there are several
16   exhibits that Mr. Brown produced
17   yesterday or over the weekend
18   that I hope we're going to have
19   an opportunity to talk about
20   after lunch before it is shown to
21   witnesses.
22       THE ARBITRATOR:  Just tell
23   me "yes" or "no", do you object
24   to this one?
25       MR. LEWIS:  I don't know

Page 164

1    CROSS EXAMINATION OF MR. SPANO
2    yet.
3        MR. BROWN:  I'm going to put
4    it up. This was the business
5    plan e-mail, Rodney, that I sent
6    over.
7        THE ARBITRATOR:  Is this
8    correct that that was produced
9    yesterday, Mr. Brown?
10       MR. BROWN:  Yes, it is, Mr.
11   Farber. It was located by Ms.
12   Settimi and it's an e-mail from
13   Luca to Ms. Settimi dated Monday,
14   May 20, 2010.
15       MR. LEWIS:  This is highly
16   objectionable.
17       THE ARBITRATOR:  Hang on.
18   Why was it not produced
19   previously?
20       MR. BROWN:  It wasn't
21   necessarily responsive to any of
22   the requests by claimants, and
23   more so the fact that Mr. Spano
24   was produced by a witness for
25   them was not anticipated to be

Page 165

1    CROSS EXAMINATION OF MR. SPANO
2    perfectly honest with you. Ms.
3    Settimi went back in her e-mails
4    and located it. This was not
5    previously located, but this is
6    the business plan by the
7    claimants sent to Forall back in
8    2010. It's highly relevant.
9        THE ARBITRATOR:  I heard
10   enough argument.
11       MR. BROWN:  It should have
12   been produced by them, Your
13   Honor, if anything.
14       THE ARBITRATOR:  Well, I
15   don't know guys. Right now, I am
16   told this was only produced
17   yesterday, and I've not been
18   given a reason as to why it
19   wasn't produced previously.
20       At this point, the objection
21   is sustained. And I am not going
22   to take the document because it
23   wasn't produced during the course
24   of discovery. If you want to go
25   back at some point and show me





Page 166

```
 1        CROSS EXAMINATION OF MR. SPANO
 2   that it was not the subject of a
 3   request, Mr. Brown, you can do
 4   so.
 5        But at this stage, it was
 6   not on a witness list, which was
 7   due a long time ago.  It was not
 8   produced previously.  Life is a
 9   two-way street.  Objection is
10   sustained.  Next question, and
11   you can take it off the screen.
12        MR. BROWN:  Let me stop my
13   share.
14   Q.  Mr. Spano, do you recall one of
15   the initial investors with Mr. Bachar
16   was a gentleman that actually worked at
17   the Pal Zileri in Las Vegas prior to
18   that date?
19   A.  No, I don't recall that.
20   Q.  Who were -- who were the -- do
21   you recall Mr. Bachar referring to
22   himself as investor, an investor group
23   at that time?
24   A.  An investor, yes.
25   Q.  And who was part of his
```

Page 167

```
 1        CROSS EXAMINATION OF MR. SPANO
 2   investment group or investor group?
 3   A.  Hamad, I believe.
 4   Q.  Anybody else?
 5   A.  Not that I recall.
 6   Q.  What about the friend that
 7   referred you, was he part of that
 8   investor group?
 9   A.  No.  I don't think so.
10   Q.  Do you recall if the doctors put
11   together a business proposal plan that
12   they submitted to Forall?
13   A.  Yes, they did.
14   Q.  And was that submitted to you?
15   A.  Yes, sir.
16   Q.  And what was in that proposal
17   plan that you saw?
18        THE ARBITRATOR:  Counsel,
19   there's been no objection, but
20   why are we getting to this.
21        MR. LEWIS:  I was about to
22   object to the relevancy of this.
23        THE ARBITRATOR:  Now we have
24   an objection.
25        Why do I need to go through
```

Page 168

```
 1        CROSS EXAMINATION OF MR. SPANO
 2   all this, Mr. Brown?
 3        MR. BROWN:  Because I think
 4   this witness is -- has talked
 5   about the beginning of the origin
 6   of the party's relationship, and
 7   I just wanted to establish the
 8   nature that they were coming in
 9   as investors in this store.  And
10   they had a sophisticated group.
11   They put together a plan where
12   they had done market analysis on
13   Pal Zileri and that market, and I
14   thought that was relevant for
15   purposes of background.
16        THE ARBITRATOR:  I think we
17   can move on, frankly, Mr. Brown.
18   I just don't see how this is
19   going to be determinative of what
20   I have to decide.  They -- you
21   know.
22        The doctors could have
23   gotten whatever advice they want.
24   They could have been
25   sophisticated or less
```

Page 169

```
 1        CROSS EXAMINATION OF MR. SPANO
 2   sophisticated or not
 3   sophisticated.  The fact of the
 4   matter is they signed certain
 5   documents.  They may have been
 6   waived.  That would be, you know,
 7   relevant, but the original
 8   business plan, I don't see how it
 9   has much to do with what I have
10   to decide, so let's move on.
11        MR. BROWN:  I'll move on.
12   Q.  Luca, did you -- was Forall
13   party to the lease agreement between
14   Sarah and the Forall shops?
15   A.  I don't believe so.
16   Q.  It was not a signatory to that,
17   was it?
18   A.  Correct.
19   Q.  And were you part of the
20   negotiations on the collateral
21   assignment of lease between Sarah and
22   Forall wherein -- go ahead.
23   A.  No, I was not.
24   Q.  Who handled that for Forall?
25   A.  Forall, Palma Settimi, and with
```




Page 170

CROSS EXAMINATION OF MR. SPANO
1
2     my counterpart in Italy.
3         Q. And who was the counterpart in
4     Italy.
5         A. Giuliano Casarotto, which is the
6     expert manager and Marco Bartiza, which
7     was the CEO.
8         Q. So other persons within Forall
9     handled those negotiations at the
10    outset of the license agreement with
11    Sarah and -- isn't that correct?
12        A. That's correct.
13        Q. And to your knowledge, did both
14    parties have counsel involved during
15    those negotiations?
16        A. Yes, they did.
17        Q. And did you have any part in
18    drafting of the license agreement
19    between Sarah and Forall?
20        A. No, I did not.
21        Q. Did you sign any agreements
22    binding Forall as it related to the
23    license agreement or management
24    agreements there -- with Sarah?
25        A. No, I did not have the authority

Page 171

CROSS EXAMINATION OF MR. SPANO
1
2     of any signature.
3         Q. Were you an officer of Forall
4     USA?
5         A. No, I was not.
6         Q. To your knowledge, who did sign
7     those agreements on behalf of Forall?
8         A. I'm sorry.  I didn't hear you.
9         Q. To your knowledge, who did sign
10    the license agreements with -- on
11    behalf of Forall?
12        A. I believe Palma.  She was in --
13    it was her job to do so.  Palma Settimi
14    did.
15        Q. Okay.  Did there come a time
16    where the claimants requested the
17    ability to sell Pal Zileri product on
18    the internet?
19        A. Yes.
20        Q. What do you recall of that?
21        A. They asked to -- to bill -- they
22    asked authorization to sell online.
23        Q. The "authorization," is that
24    what you said?
25        A. Yes.

Page 172

CROSS EXAMINATION OF MR. SPANO
1
2         Q. And is that because the ability
3     to sell Pal Zileri license product
4     online was not a right that they were
5     provided with in the license agreement?
6         A. That's correct.
7         Q. And did the claimants request
8     the ability to do that to help them in
9     sales in the United States?
10        MR. LEWIS:  Objection.
11        THE ARBITRATOR:  What's the
12    objection?
13        MR. LEWIS:  This is an
14    objection to lines of questioning
15    that are beyond the scope of Mr.
16    Spano's direct.
17        THE ARBITRATOR:  In
18    arbitration, that's certainly not
19    going to be the basis for an
20    objection.  Overruled.
21        You can answer.
22    A. Repeat the question again.
23        THE ARBITRATOR:  Mr. Brown,
24    I want you to restate it, it will
25    be faster.

Page 173

CROSS EXAMINATION OF MR. SPANO
1
2         Q. Did they ask for the ability to
3     sell Pal Zileri brands online to help
4     them with sales in the United States?
5         A. Yes.
6         Q. And wasn't this a valuable asset
7     that they were requesting of that
8     Forall ultimately provided them with?
9         A. I believe so.
10        Q. And did Forall require the
11    claimants to provide them anything in
12    exchange for that ability to sell
13    online?
14        A. I don't remember, but -- I don't
15    remember.
16        Q. Okay.  Did you operate a show
17    room in Manhattan for Forall at this
18    time?
19        A. Yes, I did.
20        Q. And that's where customers would
21    come and make purchases for the various
22    seasons, the lines?
23        A. Correct.
24        Q. To your understanding of the
25    website agreement that was reached





Page 174

```
 1          CROSS EXAMINATION OF MR. SPANO
 2   between Forall and Simon -- Forall and
 3   Sarah.  I keep doing that.  I
 4   apologize.  Was -- whose obligation was
 5   it to create Sarah's website?
 6       A. Sarah.
 7       Q. Are you aware that Sarah has
 8   alleged in this arbitration that they
 9   -- that Forall was supposed to set up
10   an e-commerce store for them and Forall
11   failed to do that and as a result Sarah
12   was damaged?
13       A. I was not aware of that.
14       Q. Is that an accurate allegation
15   to your knowledge?
16       A. I don't think so.
17       Q. What was your understanding of
18   the website and the parties respective
19   obligations?
20       A. That Sarah would build and
21   operate the website at their own
22   discretion under, of course, our
23   guidance as regards to image.  No other
24   responsibility was on our end.
25       Q. And in fact, do you recall that
```

Page 175

```
 1          CROSS EXAMINATION OF MR. SPANO
 2   Sarah engaged an e-vendor to establish
 3   set up and launch a website for them?
 4       A. I think so, yes.  I think so,
 5   yes.
 6       Q. Does the company Vegas Graphics
 7   ring any bells with you?
 8       A. I don't -- I don't remember.
 9       Q. I'm going to pull up an exhibit,
10   but you're going to have to bear with
11   me.  I apologize.  It will only take a
12   second.  I think I have it, but I would
13   need cross reference to the exhibit
14   list.  Okay.
15          MR. BROWN:  I'm going to
16   pull what's been the joint
17   Exhibit 238 if anyone wants to
18   look at it in hard copy.  This is
19   hard, actually.  There's a lot of
20   different toggles to go through.
21   And I'm going to share this
22   screen.
23       Q. Can everyone see that?
24       A. Yes.
25       Q. And this is an e-mail chain and
```

Page 176

```
 1          CROSS EXAMINATION OF MR. SPANO
 2   I scrolled to the bottom of it.  And
 3   Mr. Spano, you can see your name there?
 4       A. Yes.
 5       Q. Is that your e-mail address?
 6       A. That's correct.  It was.
 7       Q. And I'm going to go to the very
 8   bottom e-mail and let you read that and
 9   scroll up as you need me to.  Okay?
10   Who was Giuliano Casarotto?
11       A. He was expert manager for Forall
12   stock.  He was my direct supervisor.
13       Q. Let me know when you're done
14   reading the e-mail.
15       A. I'm done.
16       Q. And in reply to that e-mail
17   there was an e-mail dated December 14,
18   2011, which you're copied on that I'll
19   ask you to read back from Mr.
20   Casarotto?
21       A. Okay.
22       Q. Do you recall this e-mail or
23   this time period of events?
24       A. Yes.  Now I do.
25       Q. And what were the claimants
```

Page 177

```
 1          CROSS EXAMINATION OF MR. SPANO
 2   requesting and what at that time?
 3       A. They were requesting -- I think
 4   they were requesting -- I don't
 5   remember.  I remember the e-mail and
 6   where Mr. Casarotto states whatever you
 7   read in the e-mail here, but I don't
 8   remember exactly what they were -- they
 9   were asking.
10       Q. Okay.  But is it -- do you
11   recall Sarah asking for the ability to
12   sell products online?  I think you
13   previously testified "yes".
14       A. Yes.
15       Q. And Forall got back to them and
16   said, "Yes.  You can tell it online
17   even though the license agreement
18   pertains only to sales in the store";
19   is that right?
20          MR. LEWIS:  Objection.
21       Q. And there was some conditions on
22   that though; do you recall what the
23   conditions were?
24       A. No.
25       Q. Do you recall that it was a
```



Page 178

CROSS EXAMINATION OF MR. SPANO
1
2     non-exclusive license for the USA?
3         A. Yes.
4         Q. And that's a pretty valuable
5     thing, right, to provide a business
6     partner or company with the ability to
7     sell online products to the United
8     States of America market; isn't that
9     true?
10        A. I believe so.
11        Q. And you've been in the retail
12    industry luxury brands for 30 something
13    years, right?
14        A. That's correct.
15        Q. And the United States is the
16    biggest retail market in the world?
17        A. Yes.  Supposed to be, yes.
18        Q. Now, do you recall sending the
19    e-mail that I just scrolled up to here
20    or do you recall the e-mail?
21        A. I do recall, yes, sending
22    several e-mails.
23        Q. And do you recall, in fact, that
24    there came a time where the -- Sarah
25    launched a website prior to finalizing

Page 179

CROSS EXAMINATION OF MR. SPANO
1
2     the website agreement?
3         A. That I do not recall.  I don't
4     remember, to tell you the truth.
5         Q. Okay.  But was it your
6     understanding that Sarah was going --
7     Sarah was going to launch their own
8     E-commerce website?
9         A. Yes.
10        Q. And Forall did not commit to do
11    it for them?
12        A. That's correct.
13        Q. And that was never -- that was
14    never the agreement, right?
15        A. That's correct.
16           MR. BROWN:  You know what,
17    I'm still sharing.  That was a
18    mistake there, but I don't know
19    if I gave anything away.
20           This is another e-mail.  I
21    believe it's Exhibit 597 in the
22    joint list.  It's claimants 10815
23    through 10818.  Okay.  And I'm
24    going to scroll through it.
25    Okay.

Page 180

CROSS EXAMINATION OF MR. SPANO
1
2         Q. Do you see here that this begins
3     a chain from Steve at Vegas Graphics to
4     Ghanem; do you see that?
5         A. Yes.
6         Q. Who is Ghanem?
7         A. Ghanem worked for the doctors
8     for a period of time; he was doing
9     their marketing and their website.
10        Q. Okay.  And you're looped in on
11    this e-mail a little higher up?
12        A. Yes.
13        Q. Who is Ms. Metageti (phonetic)?
14        A. Our PR person involved in public
15    relation for a group of Forall in
16    Italy.
17        Q. So she worked for Forall,
18    correct?
19        A. That's correct.
20        Q. And here's an e-mail February
21    2012 saying, "Elena, Luca, I have sent
22    you the first draft/layout of the
23    website homepage last week and I have
24    not received any feedback from you," he
25    talks about a tight schedule and design

Page 181

CROSS EXAMINATION OF MR. SPANO
1
2     process; do you see that?
3         A. Yes, I do.
4         Q. And does this refresh your
5     recollection as to who was -- that
6     Sarah was developing there website at
7     this time?
8         A. Yes.
9         Q. And do you recall Ms. Metageti
10    providing some feedback on that
11    website?
12        A. I believe, why he.
13        Q. Now I'm going to scroll up
14    higher, and this is an e-mail from
15    Ghanem saying, "We had to launch the
16    website earlier due to our agreement
17    with American Express," and it gives
18    the website link here and the date of
19    this is February 13, 2012; do you
20    recall this happening?
21        A. Yes.
22        Q. And was there issue that you had
23    with it at that time?
24        A. I believe the company did, not
25    me.



Page 182

```
 1        CROSS EXAMINATION OF MR. SPANO
 2      Q. Okay.  What was Forall's issue?
 3   What was the concern?
 4      A. Well, because it was launched
 5   prior to the approval.
 6      Q. So they launched the website,
 7   but was there a written agreement
 8   governing the terms what the license on
 9   the Pal Zileri product was yet?
10      A. Not yet.
11      Q. So did you, after this point in
12   time, have to follow up with the
13   doctors and insist upon a written
14   agreement being put in place?
15      A. I believe so.
16      Q. In fact you had to badger them
17   for that, didn't you?
18        MR. LEWIS:  Objection.
19        THE ARBITRATOR:  Did I hear
20   an objection to at that?
21        MR. LEWIS:  (Inaudible.)
22        THE ARBITRATOR:  Mr. Lewis,
23   you don't sound right on the
24   audio.  You sound like you have a
25   hoarse throat.  Try to repeat.
```

Page 183

```
 1        CROSS EXAMINATION OF MR. SPANO
 2        MR. LEWIS:  Is that better?
 3        THE ARBITRATOR:  No.
 4        MR. LEWIS:  Can you hear me?
 5   Can you understand what I'm
 6   saying?
 7        THE ARBITRATOR:  Only
 8   vaguely.
 9        MR. BROWN:  Rodney, you may
10   want to do what we did.  We
11   called in with the phone, so the
12   audio is through the phone.
13        MR. LEWIS:  (Inaudible.)
14        MR. SHAH:  Mr. Farber, just
15   to clarify, Mr. Lewis just
16   indicated he might leave the zoom
17   and dial back in.  Just to let you
18   know, I think there is a problem
19   sometimes with -- the audio gets
20   messed up and he'll have to dial
21   in via phone.
22        THE ARBITRATOR:  Mr. Shah
23   are you together in the same
24   place with Mr. Lewis?
25        MR. SHAH:  No.
```

Page 184

```
 1        CROSS EXAMINATION OF MR. SPANO
 2        THE ARBITRATOR:  Okay.  Mr.
 3   Lewis, if you can hear me, what
 4   you last said was very difficult
 5   to understand.  Why don't you try
 6   to dial back in?  Why don't you
 7   shake your head.  Do you
 8   understand what I just said?
 9        MR. BROWN:  It's close to
10   lunch.  It may be more efficient
11   to break.
12        THE ARBITRATOR:  Mr. Lewis,
13   are you there?
14        MR. LEWIS:  Can you hear me
15   now?
16        THE ARBITRATOR:  Much
17   better.  Go ahead.  So let's go
18   back so that we have it all.
19        Mr. Brown, rephrase your
20   last question, and if there's an
21   objection we'll deal with it.
22        MR. BROWN:  Okay.
23      Q. I was saying, in fact, Mr.
24   Spano, didn't you have to follow up
25   multiple times in order to have the
```

Page 185

```
 1        CROSS EXAMINATION OF MR. SPANO
 2   doctors actually sign the license
 3   agreement pertaining to their ability
 4   to sell internet Pal Zileri product?
 5        MR. LEWIS:  Objection to the
 6   form.  I'm objecting to what's
 7   really become Mr. Brown
 8   testifying and saying "isn't that
 9   correct," at the end of his
10   testimony.  I know some leading
11   I've done the same, but I believe
12   we've gone past that.  And
13   separately, Mr. Farber, I believe
14   this is becoming cumulative at
15   this point.
16        THE ARBITRATOR:  I'm not
17   sure, Mr. Brown, I just don't
18   understand why we're doing this.
19   I mean, Exhibit D to claimants
20   brief, which I read last week, is
21   the internet agreement.  I see
22   that it's signed by everyone, so
23   why do I need to know if the
24   doctors had to be pestered to do
25   this, if they didn't have to be.
```




Page 186

CROSS EXAMINATION OF MR. SPANO
1  CROSS EXAMINATION OF MR. SPANO
2  I don't know why we're going
3  through all this.
4      The internet agreement says
5  what it says. Mr. Lewis alleges
6  that under the internet agreement
7  your client was supposed to do
8  something, and that's what -- you
9  know, I don't see any relevance
10 to what we're doing other than
11 that. So what's the point?
12     MR. BROWN: Thank you. The
13 point is the claimants have
14 launched their website, which --
15 is the e-mail that I'm going
16 through disclosed that, prior to
17 that internet agreement even
18 being signed. That agreement was
19 signed by the claimants on
20 April 2, 2012, with a notary
21 stamp.
22     There's e-mails that I'm
23 putting before this witness from
24 February saying, "We had to
25 launch it early; Amex required

Page 187

1  CROSS EXAMINATION OF MR. SPANO
2  it." And then there's a series
3  of subsequent e-mails that I have
4  not gotten to yet, but Mr. Spano
5  had to follow up multiple times
6  with the claimant saying, "Hey,
7  we need this agreement in place.
8  You got ahead of us on this,"
9  etcetera, etcetera, but it puts a
10 lie to their statement that we
11 were obligated to launch a
12 website.
13     That's complete falsehood
14 and distortion of what was
15 understood of the parties at that
16 time that Sarah wanted to launch
17 their website, they did launch
18 their website, and then the
19 agreement, you know, is
20 cart-before-the-horse type of
21 thing, but it's demonstrating
22 that that was not the party's
23 intent nor what they have done at
24 the time.
25     THE ARBITRATOR: Mr. Lewis,

Page 188

1  CROSS EXAMINATION OF MR. SPANO
2  let me ask you a question: Is
3  there specific language in the
4  internet that sets forth an
5  agreement by Forall to help
6  launch a website or to lunch a
7  website in the United States as
8  you alleged in your brief?
9      MR. LEWIS: It's
10 interpretation. It's our
11 interpretation, and I don't have
12 that in front of me, Mr. Farber,
13 so I don't want to speak out of
14 turn. But I'm happy to take a
15 look at that and answer your
16 question.
17     THE ARBITRATOR: Well, I
18 assumed it was a -- an
19 interpretation because I didn't
20 see the language in there, so I
21 didn't understand it.
22     But Mr. Brown, I think you
23 did explain your position well,
24 and I understand now, and I think
25 I have to overrule the objection,

Page 189

1  CROSS EXAMINATION OF MR. SPANO
2  and give you leave to go into
3  that area. So you can go ahead
4  with your questions.
5      MR. BROWN: Thank you, Your
6  Honor, Mr. Farber.
7      I'm going to share another
8  exhibit then. This is really a
9  continuation of the e-mail chain
10 we were just looking at, and this
11 is Bates labeled it was produced
12 by claimants --
13     THE ARBITRATOR: Are all
14 these documents in evidence
15 already?
16     MR. BROWN: Yes.
17     THE ARBITRATOR: Let me just
18 take a shot at this.
19     Mr. Spano --
20     Could you take this off and
21 let me see Mr. Spano. All right?
22     MR. BROWN: Sure. Sorry.
23 I'm layers within the share. I
24 can't Zoom through my work --
25 there we go.

48  (Pages 186 to 189)




Page 190

1    CROSS EXAMINATION OF MR. SPANO
2        THE WITNESS:  Mr. Spano,
3    are you with me?
4        THE WITNESS:  Yes.
5        THE ARBITRATOR:  Mr. Spano,
6    did you have any understanding
7    that Forall had agreed to create
8    a website for -- for Sarah?
9        THE WITNESS:  No.  We did
10   not agree to create a website.
11       THE ARBITRATOR:  Did anyone
12   ever tell you that it was the
13   duty of Forall to create a
14   website for Sarah?
15       THE WITNESS:  No.
16       THE ARBITRATOR:  Did there
17   come a time when Sarah was
18   promoting product on its own
19   website and there was not yet
20   permission from Forall to do
21   that?
22       THE WITNESS:  I'm sorry.
23       THE ARBITRATOR:  Did it
24   happen that Sarah had -- did
25   Sarah have its own website?

Page 191

1    CROSS EXAMINATION OF MR. SPANO
2        THE WITNESS:  No, I don't
3    believe so.  The Sarah website,
4    no, did not exist.
5        THE ARBITRATOR:  Okay.
6    Okay.  So when was the first time
7    that there was a website that
8    promoted the Pal Zileri products?
9        THE WITNESS:  Well, when the
10   doctors asked to build Pal Zileri
11   website for the USA.
12       THE ARBITRATOR:  And when
13   was that?  Do you remember?
14       THE WITNESS:  I don't
15   remember, but I think it was
16   probably two years after we
17   opened the store.  If I recall
18   correctly, it wasn't -- it wasn't
19   right away.
20       THE ARBITRATOR:  Okay.  And
21   what was the reaction of Forall
22   when the doctors asked them that?
23       THE WITNESS:  Forall agreed
24   to let them operate the website
25   in the U.S., of course, going by

Page 192

1    CROSS EXAMINATION OF MR. SPANO
2    our standards.  But, the
3    agreement was for them to build
4    their website and operate their
5    website.
6        THE ARBITRATOR:  Did Forall
7    take any financial responsibility
8    in connection of the expense of
9    building the website?
10       THE WITNESS:  No.
11       THE ARBITRATOR:  Mr. Brown,
12   do you have any more questions in
13   this area?
14       MR. BROWN:  Not in this
15   area.
16       THE ARBITRATOR:  Okay.
17   Next.
18       MR. BROWN:  Thank you.  Bear
19   with me as I --
20       MR. LEWIS:  Can I make a
21   suggestion?
22       THE ARBITRATOR:  Yes.
23       MR. LEWIS:  Depending on how
24   much more Mr. Brown has on his
25   cross, should we talk about when

Page 193

1    CROSS EXAMINATION OF MR. SPANO
2    we would break for lunch or do
3    you think Mr. Spano would be
4    completed before we break?
5        MR. BROWN:  No.  I don't see
6    that being the case.
7        THE ARBITRATOR:  All right.
8    Guys, well, it's up to you.  You
9    want to keep going or are you
10   ready for a break, Mr. Brown, if
11   you're headed to a new area.
12       MR. BROWN:  Sure.  I am
13   going to a new area.
14       THE ARBITRATOR:  How much
15   more do you think you have on the
16   witness, Mr. Brown, and I'm not
17   going to stick it to you if you
18   go over, because it's hard to
19   always estimate.
20       MR. BROWN:  I think I
21   probably have 45 minutes with
22   him.
23       THE ARBITRATOR:  Okay.  All
24   right, everyone.  2:00, let's
25   resume, but sharp at 2:00 let's



Page 194

```
 1         CROSS EXAMINATION OF MR. SPANO
 2   resume and then we'll finish up
 3   with the witness, and we'll go to
 4   our next witness thereafter.
 5   Thank you.
 6         (Whereupon, a lunch break
 7   was taken.)
 8         THE ARBITRATOR:  Mr. Brown,
 9   why don't you proceed?
10   Q. Thank you.  Thank you Luca.
11   Based on your recollection, how many
12   seasons did -- selling seasons did
13   Sarah operate the store during your
14   tenure?
15   A. Selling season, let's see.
16   While I was involved?
17   Q. Yes.
18   A. I believe eight.
19   Q. And aren't there two seasons per
20   year?
21   A. Correct.
22   Q. And do you recall that Sarah
23   opened up the Pal Zileri store in
24   September of 2011?
25   A. Yes, now I do.
```

Page 195

```
 1         CROSS EXAMINATION OF MR. SPANO
 2   Q. And do you recall that Italnord
 3   took over operations and management of
 4   the store in September of 2013?
 5   A. Yes.
 6   Q. Isn't that accurate?
 7   A. That's correct.
 8   Q. So they operate -- Sarah ran the
 9   store for -- for two years from
10   September of '11 to September of '13
11   for those buying seasons, correct?
12   A. Yes.
13   Q. That would be four total buying
14   seasons?
15   A. Yes.  Actually, I misunderstood
16   the question about the Pal Zileri store
17   because I kept going also with Mr.
18   Entebi and helped him out as well.
19   Q. So Sarah was still on the lease
20   and the license agreement was still in
21   effect, correct, during that time?
22   A. Correct.
23         MR. LEWIS:  Objection.
24   Calls for a legal conclusion.
25   Q. But they weren't actually
```

Page 196

```
 1         CROSS EXAMINATION OF MR. SPANO
 2   managing -- they weren't making the
 3   purchases for the time that Italnord
 4   was operating the store, right?
 5   A. Correct.
 6   Q. And you did some buys for them,
 7   right, or you helped them with that, I
 8   should say?
 9   A. Right, I helped them with it.
10   Q. And how many -- how many of the
11   seasons did you assist them with?
12   A. Since the beginning until --
13   until I left, basically.
14   Q. So all four seasons you assisted
15   Sarah with the purchases?
16   A. Yes.
17   Q. And is it your testimony that
18   for those two years that you operated
19   the store, they did not purchase
20   $900,000 worth of product from Forall?
21         MR. LEWIS:  Objection.
22   A. Yearly?
23   Q. Yes.
24   A. Correct, they did not purchase
25   $900,000 yearly.
```

Page 197

```
 1         CROSS EXAMINATION OF MR. SPANO
 2   Q. And what are you basing that
 3   understanding on?
 4   A. From the record that we placed.
 5   Q. Did you, in advance to your
 6   testimony, refer to any paperwork or
 7   any documents to refresh your
 8   recollection on those purchases?
 9   A. No.
10   Q. So are you just going off your
11   recollection?
12   A. Right.
13   Q. And is it possible that
14   recollection is flawed?
15   A. Let me think for one moment.  If
16   that happened probably it's the first
17   two seasons within the first year, but
18   I -- I don't recall spending
19   $900,000 in one year.
20   Q. You do or do not?
21   A. I do not.
22   Q. And I'm going to share the
23   screen and put an exhibit that's
24   already been introduced.  This is the
25   licensing agreement you were asked
```





Page 198

CROSS EXAMINATION OF MR. SPANO

1    questions about by Mr. Lewis.  Do you
2    see Section 4.2?
3        A. Yes.
4        Q. So there was an obligation under
5    the license agreement for Sarah to
6    purchase $900,000 per calender year,
7    right?
8        A. Correct.
9        Q. So if they operated the store
10    for two years, the minimum requirement
11    was that they purchase $1.8 million of
12    product; isn't that correct?
13        A. That's correct.
14        Q. Okay.  I'm going to show you
15    another exhibit that is Joint Exhibit
16    130, okay?  And it's Bates labeled
17    Forall 149.  This is an e-mail -- it's
18    a forwarded e-mail, but the e-mail
19    originated from you in February of
20    2014.  Just take a minute and read
21    this, please.
22        MR. SHAH:  Sorry.
23    Mr. Brown, could you repeat the
24    Bates label?

Page 199

CROSS EXAMINATION OF MR. SPANO

1        MR. BROWN:  Exhibit 130,
2    it's Bates labeled Forall 149.
3        Q. Do you recall this e-mail Luca?
4        A. Vaguely I do, yes.
5        Q. And we'll get to the first part
6    where you're talking about the credits,
7    but why were you sending this e-mail to
8    -- strike that.
9        Who is Michelle Gioffre, Gina
10    Sedlarcik, Christian Zanin, and Palma
11    Settimi?
12        A. She's -- what's her title --
13    she --
14        Q. They all worked with Palma in
15    her office?
16        A. That is correct.  I cannot think
17    of the word, but she's the one that
18    sends taxes.
19        Q. They do accounting and back
20    office work for Forall, correct?
21        A. Correct, yes.
22        Q. And do you recall that at the --
23    when you sent this, this was while
24    Italnord was managing the store?

Page 200

CROSS EXAMINATION OF MR. SPANO

1        A. I don't recall it.
2        Q. Well, Italnord took over in
3    September of '13, correct?
4        A. Yes.  If you -- yes.
5        Q. And this e-mail is February of
6    '14, right, and you say that you're
7    doing final numbers for Sarah LLC,
8    right?
9        A. Yes.
10        Q. And you say here in the third
11    paragraph, "I'm also enclosing a
12    spreadsheet.  The total amount divided
13    by construction amount and credits
14    given for it," right?
15        A. Yes.
16        Q. Do you recall where you were
17    pulling these figures from?
18        A. No, I don't recall where I was
19    pulling it from.  No, I don't.
20        Q. Did you have access to
21    accounting software or was there some
22    other repository you were able to pull
23    figures with Sarah out from?
24        A. Well, this -- I had -- I believe

Page 201

CROSS EXAMINATION OF MR. SPANO

1    I had copies of invoices and things
2    that were sent to me; that's how I came
3    up with the number.
4        Q. And you were tracking
5    construction cost and credits why?
6        A. Because Forall USA -- I had to
7    give them credits for what was owed to
8    them.
9        Q. And that was under the license
10    agreement that Forall commit to
11    reimburse construction cost 50/50 with
12    Sarah, right?
13        A. That is correct.
14        Q. And did Forall, in fact,
15    reimburse those construction cost 50/50
16    to Sarah?
17        A. Yes, they did.
18        Q. And there was also an obligation
19    for Forall to send certain amounts on
20    advertising under the license
21    agreement with Sarah, correct?
22        A. That's correct.
23        Q. And did Forall live up to those
24    commitments under the license





Page 202

```
 1          CROSS EXAMINATION OF MR. SPANO
 2   agreement?
 3       A. Yes, they did.
 4       Q. Are you aware of the fact in
 5   this case that Sarah has alleged that
 6   Forall did not reimburse them the full
 7   amount of construction cost?
 8       A. No, I'm not aware of that.
 9       Q. Do you believe that to be an
10   accurate allegation by Sarah?
11       A. As far as -- yes.
12       Q. That's an accurate accusation
13   that they were not reimbursed the
14   appropriate amount of construction
15   cost?
16       A. Yes.  Because I worked closely
17   with BSI, Palma Settimi's office and
18   Italy, and if that would have happened,
19   I would be aware of it, yes.
20       Q. I guess I'm not clear -- if I'm
21   not hearing you right, I'm not sure,
22   but let me rephrase the question then.
23          Do you believe that -- you've
24   already answered this.
25          Do you believe that the
```

Page 203

```
 1          CROSS EXAMINATION OF MR. SPANO
 2   allegation by Sarah that they were not
 3   reimbursed full construction cost, is
 4   that an accurate allegation?
 5       A. No, it's not.  They were
 6   reimbursed for and they were given
 7   credits for what they were owed.
 8       Q. And the allegation that they --
 9   that Forall did not spend or reimburse
10   appropriate advertising costs, is that
11   an accurate allegation?
12       A. Until I was there, every credit
13   was given.
14       Q. Okay.  So enclosed with your
15   e-mail was a spreadsheet, right, you've
16   reference it here?
17       A. Yes.
18       Q. I'm going to go to that next
19   page, which is the spreadsheet.  Okay.
20   Do you see this?  Do you recognize
21   this?
22       A. Of course.
23       Q. Did you create this document?
24       A. Yes, I did.
25       Q. And where did you get these
```

Page 204

```
 1          CROSS EXAMINATION OF MR. SPANO
 2   numbers that are on here?  There's
 3   construction cost and credits and
 4   invoices received; do you see that?
 5       A. Yes.  These are all invoices
 6   from the contractor and these were
 7   provided to me by Sarah and the
 8   construction company.
 9       Q. Okay.  And based on this
10   spreadsheet and the information that
11   you had, what was the total
12   construction cost for the build out?
13       A. 948,698.17.
14       Q. And the obligation to reimburse
15   Sarah by Forall was 50 percent of those
16   costs, correct?
17       A. Correct.
18       Q. And you have a line that says
19   "Contributions, 50 percent," do you see
20   this line?
21       A. Yes.
22       Q. Is that 474,349 is that half of
23   948,698?
24       A. I believe so.
25       Q. Yes, it is.  I can tell you
```

Page 205

```
 1          CROSS EXAMINATION OF MR. SPANO
 2   that.  I just did the math, and you did
 3   it on the spreadsheet, right?
 4       A. Yes.
 5       Q. It seemed like you have a
 6   credited line totaling 512; do you see
 7   that?
 8       A. Yes.
 9       Q. So based on this, did Forall
10   credit 512,639 to Sarah?
11       A. Yes.
12       Q. Why did it credit it -- why did
13   it credit more than 50 percent of the
14   construction cost?
15       A. It must have been some credits
16   maybe on uniform or something that we
17   give extra for the employees or maybe
18   for an advertisement.
19       Q. But the obligation was specific
20   to construction build out cost, right,
21   the reimbursement under the license
22   agreement?
23       A. That's correct.
24       Q. And you see this you have an
25   amount left, "38,289" right?
```



| | |
|---|---|
| Page 206 | Page 207 |

**Page 206**

1  CROSS EXAMINATION OF MR. SPANO
2      A. Yes.
3      Q. Isn't that amount the difference
4  between 512, the credits given, and the
5  contribution allotment of 4744 that's
6  38,000, correct?
7      A. Correct.
8      Q. So this $38,000 figure, wasn't
9  that an overage of credit that was
10  applied to Sarah's invoices rather than
11  an underpayment?
12      A. Yes.
13      MR. LEWIS:  Objection.
14      A. Yes.
15      MR. LEWIS:  I objected to
16  that, Mr. Farber.
17      THE ARBITRATOR:  I can't
18  hear.  Say it again.
19      MR. LEWIS:  I'm objecting to
20  Mr. Brown's testimony they're
21  drawing a conclusion as to what
22  this represents.  It also calls
23  for speculation.
24      THE ARBITRATOR:  Overruled.
25  You can answer.  Was this an

**Page 207**

1  CROSS EXAMINATION OF MR. SPANO
2  overage?
3      THE WITNESS:  Yes.
4      Q. Do you have any understanding as
5  to why Sarah's seeking in this lawsuit
6  $38,000 in additional from Forall?
7      A. I don't know.
8      Q. Doesn't this spreadsheet
9  indicate that actually Sarah owes
10  Forall $38,000 for an overpayment or
11  over-application of credit?
12      A. Correct.
13      Q. Do you have any other
14  explanation for that?
15      A. No.
16      THE ARBITRATOR:  I'm not
17  sure I understand the question.
18  Explanation for?
19      MR. BROWN:  Does he have any
20  other explanation as to why Sarah
21  would be seeking $38,000 for
22  construction cost from Forall in
23  this lawsuit?
24      A. No, I don't.
25      Q. Okay.  Now, I go to the blue

| | |
|---|---|
| Page 208 | Page 209 |

**Page 208**

1  CROSS EXAMINATION OF MR. SPANO
2  portion, "Invoices received to date,"
3  okay, There's a $1,059,0000 entry here
4  with 2010 to 2011 years; do you see
5  that?
6      A. Yes.
7      Q. What does that represent?
8      A. This represents the regular
9  seasons and probably some made to
10  measure and some of the assortments.
11      Q. But the million dollar figure is
12  an invoice total of purchases by Sarah
13  from Forall, correct?
14      A. That's correct.
15      Q. Now, we've established that the
16  store was opened in September 2011,
17  correct?
18      A. Yes.
19      Q. So you have a 2010 to 2011
20  grouping here, but do you have, as you
21  sit there today, an understanding as to
22  why you ground it that way?
23      A. Because, you know, we work six
24  months in advance, in order to deliver
25  the goods during that period, so these

**Page 209**

1  CROSS EXAMINATION OF MR. SPANO
2  are the invoices they made in 2010 and
3  2011.
4      Q. Okay.  But they weren't
5  operating the store in 2010 at any
6  point, right?
7      A. No.  They placed an order in
8  2010.
9      Q. What was -- we've established
10  the date of the license agreement was
11  March 11th, right?
12      A. Yes.
13      Q. So as you sit here today, do you
14  know if they placed an order in 2010?
15      MR. LEWIS:  Objection.
16  Asked and answered.  He just
17  testified that they did.
18      THE ARBITRATOR:  We'll --
19  well, he did say that, Counselor,
20  I've got it.  He said that they
21  placed an order in '10.
22      MR. BROWN:  I would like to
23  check his memory on that, because
24  I would like to know what he's
25  basing that recollection on.





Page 210

CROSS EXAMINATION OF MR. SPANO
1  CROSS EXAMINATION OF MR. SPANO
2      THE ARBITRATOR:  All right.
3  You can probe it.  Go ahead.
4  Overruled.  You can go ahead, Mr.
5  Brown.
6      MR. BROWN:  Thank you.
7      Q. As you sit here today, do you
8  know specifically if they placed an
9  order in 2010?
10     A. Well, the store opened in 2011,
11 correct?
12     Q. That's what document indicates.
13     A. What I probably mean by this is,
14 again, we placed the order in 2010, and
15 then during the period 2010, 2011, they
16 received this amount of merchandise.
17     That doesn't mean necessarily
18 that, you know, they received the
19 merchandise in 2010.  They may have
20 received it in 2011, but the order was
21 placed, maybe, in 2010.
22     Q. Okay.  So these invoices, this
23 breakdown, you haven't broken it down
24 by selling season, though, have you?
25     A. This is -- a PSI will be able to

Page 211

1  CROSS EXAMINATION OF MR. SPANO
2  give you this breakdown.
3      Q. Okay.
4      A. These are what I get from them,
5  and then I match them to the ones that
6  are sent from Italnord.
7      Q. And PSI being Palma Settimi?
8      A. That's correct.
9      Q. So and then there's an entry of
10 2012 of 598,044; do you see that?
11     A. Yes.
12     Q. And then there's an entry for
13 2013, 544,939, right?
14     A. Correct.
15     Q. And again, these selling seasons
16 are not indicated on this -- this
17 summary sheet, but the invoices would
18 bear that out; is that your testimony?
19     A. That's correct.
20     Q. And the total of -- so this
21 number 2.2 -- $2,202,469; do you see
22 that total amount?
23     A. Yes.
24     Q. Is that the total of those
25 invoices in those periods of times?

Page 212

1  CROSS EXAMINATION OF MR. SPANO
2      A. Yes, they are.
3      Q. But does that mean that Sarah
4  purchased 2.2 million dollars worth of
5  product during that period?
6      A. That means they were invoiced
7  2,202,469.59.
8      Q. Okay.  And we've established
9  already that they operate the store for
10 a total of four seasons, correct?
11     A. Correct.
12     Q. And at $900,000 a year for two
13 years, the minimum purchase requirement
14 was 1.8 million dollars, right, under
15 the license agreement?
16     A. Right.
17     Q. So is that right?
18     A. Yes.
19     Q. So does your spreadsheet here
20 not indicate that they had actually
21 exceeded 1.8 million dollars for this
22 two-year time period in purchases?
23     MR. LEWIS:  Objection.
24     THE ARBITRATOR:  What's the
25 objection?

Page 213

1  CROSS EXAMINATION OF MR. SPANO
2      MR. LEWIS:
3  Mischaracterizing the testimony,
4  Mr. Farber.  It's not for the
5  two-year period.  This is
6  starting with the season in 2010,
7  and we know that Mr. Entebi did
8  not take over until the end of
9  2013.  It is not just based on
10 the calender years, the two
11 calendar years.
12     THE ARBITRATOR:  Well, I'm
13 going to overrule the objection,
14 principally, because of the
15 objection.  I think that
16 Mr. Brown is trying to clarify
17 exactly the point of the
18 objection, so we're going to let
19 him clarify whether this is
20 really for four seasons or five.
21     So why don't you go ahead
22 and -- and continue.  You can
23 continue Mr. Brown.
24     MR. BROWN:  Can you read the
25 question back?




Page 214

CROSS EXAMINATION OF MR. SPANO

1    CROSS EXAMINATION OF MR. SPANO
2        (Whereupon, a portion of the
3    record was read back.)
4        THE ARBITRATOR: Can you
5    answer that, Mr. Spano?
6    A. This spreadsheet, as the judge
7    was referring to, this is supposed
8    to -- I think it has five selling
9    seasons here, not four. Because you
10   have -- 2010, 2011 is one, and then you
11   have two in '12 and two in '13.
12       THE ARBITRATOR: Well, if
13   the store opened in March '11,
14   would they have carried the
15   winter of '10 to '11 or would
16   they have started with summer
17   '11.
18       THE WITNESS: They would
19   start with spring, summer 2011.
20       THE ARBITRATOR: So you're
21   going to have --
22       MR. BROWN: Mr. Farber, if I
23   may, though, the store didn't
24   open until September 2011. They
25   didn't have possession of the

Page 215

CROSS EXAMINATION OF MR. SPANO

1    CROSS EXAMINATION OF MR. SPANO
2    lease for the build out until
3    July of '11, and they had a build
4    out completed and open in
5    September of '11.
6        THE ARBITRATOR: Fair
7    enough. So do you remember, Mr.
8    Spano, what the first collection
9    was that was available for sale
10   when the shop actually opened to
11   customers?
12       THE WITNESS: Well, it must
13   have been autumn, winter 2011.
14       THE ARBITRATOR: I didn't
15   hear the last thing you said.
16       THE WITNESS: It must have
17   been autumn, winter 2011.
18       THE ARBITRATOR: Okay. So
19   it would have been '11 to '12,
20   and then '12, and then '12 and
21   '13, and then '13. So then
22   wouldn't that really be four
23   seasons?
24       THE WITNESS: You will have
25   autumn, winter '11, spring,

Page 216

CROSS EXAMINATION OF MR. SPANO

1    CROSS EXAMINATION OF MR. SPANO
2    summer '12, autumn, winter '12,
3    spring, summer '13, and autumn,
4    winter '13.
5        THE ARBITRATOR: Okay.
6    We've got it. So you'd have
7    four.
8        MR. LEWIS: That's five.
9        THE ARBITRATOR: I'm sorry.
10   You're right. So you've got
11   five.
12       MR. BROWN: So let me ask a
13   follow up question then.
14   Q. When Alfonso took over the store
15   in September of '11 --
16   A. Yes.
17   Q. -- didn't they make the --
18       MR. LEWIS: Objection.
19       THE ARBITRATOR: I don't
20   think Alfonso took over in
21   September '11.
22       MR. BROWN: I'm sorry.
23   2013.
24   Q. When Alfonso took over in
25   September 2013, didn't Alfonso purchase

Page 217

CROSS EXAMINATION OF MR. SPANO

1    CROSS EXAMINATION OF MR. SPANO
2    the autumn, winter '13 products for the
3    store?
4    A. No. I don't -- I don't remember
5    how the transition went. I don't
6    exactly remember the transition went
7    [sic]. An order for autumn, winter '13
8    was placed six months prior, so there
9    was already an order that was placed,
10   and this was placed by Sarah. Then I
11   don't remember if later on something
12   between the two of them was agreed upon
13   in order to take in this order.
14   Q. So you don't know?
15   A. I don't.
16   Q. Okay. So if there was -- let's
17   assume arguendo that there was five
18   selling seasons, right, what would the
19   total amount that would have to been
20   purchased by Sarah would have been
21   [sic]?
22   A. Let me calculate it for you.
23   Hold on one second. So I'm going by
24   the agreement, of course.
25   Q. Which I'll pull up right now.




Page 218

CROSS EXAMINATION OF MR. SPANO
1
2     A. 2,250,000 for the five seasons.
3     Q. I'm sorry.
4     A. 2,250,000 for the five seasons.
5     Q. I come up with 2.3, right?
6         MR. BROWN:  What did he say?
7     2,250,000, alright.
8     Q. So -- let's -- let's assume
9     there were five seasons.  If there was
10    four they were over, and if it was five
11    they were --
12    A. Under.
13    Q. They bought -- so they were --
14    what --  under your map they were
15    $23,000 off of that figure; is that
16    right?
17    A. That's correct.
18    Q. $23,000.  Okay.  So -- so you
19    indicated that -- did the CEO of Forall
20    ever indicate in writing that Sarah did
21    not have to make the minimum purchases
22    under the license agreement, to your
23    knowledge?
24    A. I don't recall that, no.
25    Q. Did Forall expect that for the

Page 219

CROSS EXAMINATION OF MR. SPANO
1
2     10-year term of this license agreement
3     that Sarah would make those minimum
4     purchases going forward for the next
5     years?
6         MR. LEWIS:  Objection.
7     Mr. Spano can't speculate about
8     the organization's state of mind.
9         THE ARBITRATOR:  He's not
10    speculating.  Someone may have
11    told him or he may have read it.
12    So we'll see what he says, and if
13    it needs to be explored further
14    we can do so.
15        So you can answer that.
16    Overruled.
17    A. That was the goal of the
18    company.
19        THE ARBITRATOR:  Did anyone
20    say that to you or did you read
21    that?
22        THE WITNESS:  During our
23    meetings that we had also with
24    the doctors, we discussed this --
25    this was our ultimate goal to

Page 220

CROSS EXAMINATION OF MR. SPANO
1
2     have the store doing these kind
3     of numbers.
4         THE ARBITRATOR:  Okay.  Go
5     ahead, Counselor.
6     Q. Wasn't the $900,000 minimum
7     purchase requirement incorporated in
8     the license agreement so that Forall
9     could make money and recoup its
10    investment with the store?
11    A. Of course.  The CFO of the
12    company, of course, had the budget in
13    mind in order to recoup the cost and
14    make the company profitable.
15    Q. Now, you testified before just
16    at one point that you believe there may
17    have been a different agreement with
18    Forall and Alfonso and Italnord which
19    Italnord was managing the store; were
20    you privy to that agreement?
21    A. I read the agreement, yes.  But
22    I was not part of -- of the initial
23    discussion.
24    Q. Did you -- did you see a written
25    agreement to that effect that stated

Page 221

CROSS EXAMINATION OF MR. SPANO
1
2     that?
3     A. Yes, I did.
4     Q. Where did you see that?
5     A. I saw it during a meeting in
6     Italy.
7     Q. And was that specific to Las
8     Vegas?
9     A. Correct.
10    Q. Who showed that to you?
11    A. Well, in a meeting that we had
12    also with Alfonso Entebi, CEO, and my
13    colleagues in Italy, this was discussed
14    and we went over it.
15    Q. Am I still sharing my screen?
16    A. I see it.
17    Q. This is the consent agreement
18    between Forall and -- Sarah and Forall.
19    This was on all of the pleadings, and
20    let's see -- let's get this exhibit
21    number for you, though.
22        I'm going to exhibit on my joint
23    list, and I'm going to share my screen
24    again, and we're going to go to the
25    document.  This is the stipulation and





Page 222

CROSS EXAMINATION OF MR. SPANO

1    CROSS EXAMINATION OF MR. SPANO
2    consent agreement between Sarah and
3    Forall.  Luca, have you ever seen this
4    before?
5        A. I believe so.
6        Q. And the signature at the end
7    here is signed by Forall USA; do you
8    recognize that signature?
9        A. Yes.
10       Q. Who is that?
11       A. Palma Settimi, I believe.
12           THE ARBITRATOR:  I couldn't
13    hear.  Say it again.
14       A. Palma Settimi, I believe.
15           THE ARBITRATOR:  All right.
16       Q. So what was your understanding
17    at the time that Sarah contracted with
18    Italnord to manage the store in
19    September of '13?
20       A. My understanding was that when
21    Mr. Entebi decided to try to get into
22    the Pal Zileri store in Las Vegas,
23    there was going to be a management
24    agreement, being that he did not want
25    to have a full responsibility for the

Page 223

CROSS EXAMINATION OF MR. SPANO

1    CROSS EXAMINATION OF MR. SPANO
2    store, so Italy and the doctor, and
3    Italnord, they came to an agreement.
4    They put this in place.
5        Q. Okay.  And what -- do you know
6    if Forall was party to any agreement
7    related to that other than the
8    stipulation and consent, which is shown
9    here?
10       A. No.
11       Q. Okay.  And in this agreement,
12    isn't it the case that Forall consented
13    to the management of the store by
14    Italnord, but it, itself, was not a
15    party to that agreement; isn't that
16    right?
17       A. That is correct.
18       Q. And under this agreement that
19    you've seen before, it says here that
20    "One, Forall hereby consents the
21    operation of the business by manager";
22    do you see that?
23       A. Yes.
24       Q. And then "Two, the company,
25    which is Sarah, shall continue to be

Page 224

CROSS EXAMINATION OF MR. SPANO

1    CROSS EXAMINATION OF MR. SPANO
2    responsible for and will remain in
3    compliance at all times with company's
4    obligations under lease agreement with
5    the Forum shops LLC at Caesars Las
6    Vegas," right?
7        A. Right.
8        Q. And do you remember that being
9    that that's exactly what you were --
10    Forall was trying to accomplish at that
11    time?
12       A. That is correct, I do remember.
13       Q. Right.  And then "Three, during
14    the term of the management agreement
15    only, Forall shall look to the manager,
16    and hold the manager responsible -- the
17    manager being Italnord -- responsible
18    for the performance of obligations
19    under the license agreement.  To the
20    extent that the management agreement is
21    terminated, at such time the company
22    shall again be responsible for the
23    performance of all obligations under
24    the license agreement"; do you see
25    that?

Page 225

CROSS EXAMINATION OF MR. SPANO

1    CROSS EXAMINATION OF MR. SPANO
2        A. Yes.
3        Q. And does that comport with your
4    recollection as to what Forall intended
5    at that time?
6        A. Yes, sir.
7        Q. And then it says, "Four, the
8    company shall not transfer the lease
9    agreement without Forall's prior
10    written consent"; right?
11       A. I see it.
12       Q. So section seven says, "Except
13    for specifically set forth herein,
14    nothing shall act as to waive, limit,
15    or otherwise alter any obligation or
16    liability of the company, and or its
17    principals, owners, members, or
18    guarantors, subject to or arising from
19    the license and retail operating
20    agreement, the lease agreement and or
21    any guaranty undertaking or promise
22    thereunder," right?
23       A. Yes.
24       Q. And wasn't it explained at that
25    time to the claimants that this was a




Page 226

CROSS EXAMINATION OF MR. SPANO
1
2   temporary management agreement that if
3   terminated they need to take the store
4   back and the obligations stand under
5   the license agreement?
6       A. Well, my understanding is that,
7   being this is a legal paper, the doctor
8   had legal advice on this, and there
9   should have been an understanding of
10  what this meant.
11      Q. When the doctors took the store
12  back after Italnord's management term,
13  were you still with the company?
14      A. When -- I'm sorry. When --
15      Q. Do you recall them taking it
16  back while you were there at -- with
17  Forall?
18      A. Yes, I was still there.
19      Q. What time period was that?
20      A. I think it was 2014 maybe, end
21  of 2013. 2014, yeah. 2014. If my
22  memory is --
23      Q. Okay. But you do recall them
24  coming back after this management
25  agreement and running the store for a

Page 227

CROSS EXAMINATION OF MR. SPANO
1
2   period of time?
3       A. I'm not sure. Yes.
4       Q. There was an allegation
5   pertaining to the advertising costs and
6   the failure to reimburse them, okay.
7           What was -- do you recall what
8   the obligations under the license
9   agreement were with respect to the
10  advertising obligations?
11      A. I believe there was a percentage
12  of the amount purchased, if I remember
13  correctly, and not to go over a certain
14  amount, if I remember correctly. That
15  was the -- the deal.
16      Q. Okay. So I'm going share -- I'm
17  going to go back to the license
18  agreement, okay. And I think 319 --
19          MR. LEWIS: Before you bring
20  this up, Mr. Brown.
21          Mr. Farber, I'm objecting to
22  this, because Mr. Spano was asked
23  this earlier in his testimony,
24  "Did Forall live up to its
25  obligations to reimburse for the

Page 228

CROSS EXAMINATION OF MR. SPANO
1
2   advertising," and Mr. Spano
3   answered in the affirmative,
4   "Yes, while I was there we lived
5   up to all of our obligations,"
6   that was his testimony. So I'm
7   not sure if --
8           THE ARBITRATOR: All right.
9   That's true, but why don't we
10  wait for a specific question? It
11  might be a different question. I
12  don't know yet. And then if it
13  is the same thing, the objection
14  will be sustained, but if it's
15  different, then we'll hear what
16  it is. But right now he's just
17  referring him back here.
18          Why don't you ask your
19  question, Mr. Brown.
20          MR. BROWN: Okay.
21      Q. Can you see my screen here,
22  Luca? Okay. So is this the provision
23  in the license agreement that -- I'm
24  sorry -- that governed the advertising
25  expenditures by the parties?

Page 229

CROSS EXAMINATION OF MR. SPANO
1
2       A. Yes.
3       Q. Okay. Do you see Section 8.4,
4   "Advertising," and I'll zoom in and
5   scroll down.
6       A. Yes.
7       Q. Didn't this provision obligate
8   the claimant, Sarah, to make certain
9   expenditures on advertising each year?
10      A. Yes.
11      Q. And if he this made those
12  expenditures, Forall was going to match
13  -- Forall shall match such amount,
14  right?
15      A. Yes.
16      Q. Do you know -- you've answered
17  that we've spent all these
18  advertisement -- we reimbursed all the
19  advertisement that was required, but do
20  you know if Sarah, themselves, spent
21  sufficient monies on advertising per
22  this agreement during this agreement
23  during their operation of the store?
24      A. Yes, I believe they did.
25      Q. Okay. But to your knowledge,





Page 230

```
 1        CROSS EXAMINATION OF MR. SPANO
 2   there was never a time that Forall did
 3   not make the appropriate expenditures
 4   under this provision?
 5        A. As I stated before, Forall gave
 6   and paid credit for whatever was owed.
 7        Q. Okay.  Very good.
 8            MR. BROWN:  I may be at the
 9   end, but can I just have a moment
10   to confer with my co-counsel?
11            THE ARBITRATOR:  Yes.
12            MR. BROWN:  Thank you.
13            THE ARBITRATOR:  Why don't
14   we take just five.  No more than
15   five, all right?
16            MR. BROWN:  Thank you.
17            (Whereupon, a recess was
18   taken at this time.)
19            THE ARBITRATOR:  Mr. Brown,
20   anything further?
21            MR. BROWN:  No.  Thank you.
22            THE ARBITRATOR:  Mr. Lewis,
23   do you have anything further?
24   You're on mute, Mr. Lewis.
25            MR. LEWIS:  Very brief
```

Page 231

```
 1        CROSS EXAMINATION OF MR. SPANO
 2   redirect for Mr. Spano.
 3            THE ARBITRATOR:  Gentleman,
 4   ladies, two conventions that I'd
 5   like to observe on re-direct and
 6   re-cross, all right?  Number one,
 7   it's not necessary to repeat.  A
 8   lot of times, Counsel thinks that
 9   the arbitrator kind of forgot
10   stuff and then they repeat what
11   was said in the direct or on the
12   cross. It's not necessary.  Only
13   new material.
14            Number two, no re-re.
15   Unless there's some extraordinary
16   reason.  Each one gets one shot
17   and that's it.  All right?
18            Mr. Lewis, go ahead.
19            MR. LEWIS:  Well, at the
20   risk of violating Mr. Farber's
21   instruction there, I want to just
22   clarify.
23            THE ARBITRATOR:  Clarify is
24   okay.
25                   * * *
```

Page 232

```
 1        RE-DIRECT EXAMINATION OF MR. SPANO
 2   RE-DIRECT EXAMINATION BY
 3   MR. LEWIS:
 4        Q. Mr. Spano, you said that the
 5   spreadsheet -- and this was joint
 6   Exhibit 130 that was shared.
 7        The spreadsheet, it represented
 8   invoices, correct?
 9        A. Right.
10        Q. It was not a reflection of
11   payments, of who actually paid for
12   merchandise, right?
13        A. Correct.
14        Q. And you testified that you
15   didn't recall where those numbers came
16   from; I want to make sure that we
17   understand that?
18        A. No, I didn't say that.
19        Q. Okay.  Can you please clarify
20   that for us?
21        A. All the information I got from
22   Palma Settimi's office.  They are the
23   ones that received the invoices, and
24   then I received copies of the invoices
25   from Italy as well.  But my liaison is
```

Page 233

```
 1        RE-DIRECT EXAMINATION OF MR. SPANO
 2   Palma Settimi's office, which she did
 3   all the accounting for -- for Forall.
 4        Q. So, Mr. Spano, do you remember
 5   Forall sending a check for $38,000 to
 6   Italnord; do you recall that?
 7        A. Me sending a check?
 8        Q. Not you personally.  Forall
 9   sending a check for $38,000 to
10   Italnord?
11        A. No, I don't recall that.
12        Q. Nothing further, Mr. Spano.
13            THE ARBITRATOR:  Anything
14   else, Mr. Brown?
15            MR. BROWN:  No.
16            THE ARBITRATOR:  Mr. Spano,
17   I just have one or two questions
18   for you.  Mr. Spano, was there
19   ever a discussion that you
20   recollect whereby Forall agreed
21   for the rest of this contract,
22   the rest of the 10 years, we're
23   not going try to have sales of
24   $900,000 a year?
25            THE WITNESS:  No, I don't
```




Page 234

1    RE-DIRECT EXAMINATION OF MR. SPANO
2    recall that.
3         THE ARBITRATOR:  Was -- did
4    the $900,000 a year remain at
5    least as the minimum the goal?
6         THE WITNESS:  We had to go
7    according to the contract, and
8    that's what the contract that was
9    agreed upon during the
10   transition.
11        THE ARBITRATOR:  Well, when
12   you say now, "We had to go
13   according to the contract," in
14   other words, you're telling me
15   the contract always remained in
16   effect, right?
17        THE WITNESS:  That's
18   correct.
19        THE ARBITRATOR:  Okay.  All
20   right.  Mr. Spano, thank you very
21   much for your testimony.  You're
22   excused.
23        THE WITNESS:  Thank you so
24   much.
25              * * *

Page 235

1              PROCEEDINGS
2         THE ARBITRATOR:  Thank you.
3    Okay.  Who is our next witness,
4    Mr. Lewis?  It's going to be
5    Dr. Hamad Bachar -- excuse me,
6    Amar Hamad.  Okay.
7         Dr. Hamad, are you alone in
8    a room right now, sir?
9         THE WITNESS:  Yes.
10        THE ARBITRATOR:  Okay.
11   Could you please stand for a
12   moment?  Let me still see you on
13   the screen.  Could you raise your
14   right hand?  Do you solemnly
15   swear the testimony you're about
16   to give in this arbitration
17   proceeding will be the truth, the
18   whole truth, and nothing but the
19   truth?
20        THE WITNESS:  Yes.
21        THE ARBITRATOR:  Could you
22   be seated, sir, spell your full
23   name for me and let me have an
24   address, which could either be
25   work or an office, as you choose?

Page 236

1              PROCEEDINGS
2         THE WITNESS:  First name
3    Amar, A-M-A-R.  Last name Hamad,
4    H-A-M-A-D.  And address 1 Andrew
5    Court, it's Burr Ridge, Illinois
6    60527.
7         THE ARBITRATOR:  Okay.  It's
8    Dr. Hamad, is that right?
9         THE WITNESS:  Yes, sir.
10   Thank you.
11        THE ARBITRATOR:  So, Dr.
12   Hamad, Mr. Lewis, your lawyer is
13   going to be asking you some
14   questions.  And I know you were
15   here when I gave the protocol to
16   the other witness, so I'd like
17   you to observe the same protocol.
18   At the end of each question,
19   pause.
20        Mr. Brown, you're handling
21   this one?
22        MR. BROWN:  Yes, Your Honor.
23        THE ARBITRATOR:  So if Mr.
24   Brown says the word "objection,"
25   do not answer the question until

Page 237

1    DIRECT-EXAMINATION OF DR. A. HAMAD
2    I tell you whether you should do
3    so, all right, otherwise just
4    listen to Mr. Lewis' question and
5    try to respond as directly and as
6    succinctly as you can.  All
7    right?
8         THE WITNESS:  Okay.
9         THE ARBITRATOR:  Counsel,
10   you can proceed.
11   D R.  A M A R  H A M A D, the witness
12   herein, having been first duly sworn by
13   a Notary Public of the State of New
14   York, was examined and testified as
15   follows:
16   DIRECT-EXAMINATION
17   BY MR. LEWIS
18        Q.  For me, Dr. Hamad, your
19   microphone is a little -- a little
20   high.
21        MR. LEWIS:  I don't know if
22   that's coming through for
23   everyone else.
24        MR. BROWN:  It is.  Little
25   blaring and hard to make out.



Page 238

1    DIRECT-EXAMINATION OF DR. A. HAMAD
2        A. Do you hear me now?
3        Q. It's almost a little too loud,
4    if there's a little way to adjust it
5    down just a bit.
6        A. One second.  Let me see how I do
7    it.
8        Q. That's better there.
9        A. Okay.  Do you hear me now?
10       THE ARBITRATOR:  I hear you
11   loud and clear.
12       THE WITNESS:  Okay.  Thank
13   you.
14       Q. Thank you.  Dr. Hamad, I'm going
15   to ask you to just share with
16   Arbitrator Farber how it came about
17   that you and your brother became
18   involved with Forall?
19       A. It was, I think, early 2008,
20   early 2010, early 2011, a friend of
21   ours was --
22       THE ARBITRATOR:  Hang on a
23   minute.  There's some siren out
24   of my window, so let me just wait
25   for that to pass.

Page 239

1    DIRECT-EXAMINATION OF DR. A. HAMAD
2        Are you guys hearing
3    background noise from me?
4        MR. BROWN:  There's some
5    disturbance and Dr. Hamad is not
6    too clear, so I hope to make it
7    all out, but --
8        THE ARBITRATOR:  All right.
9    If it gets really loud rather
10   than interrupt a witness, I might
11   mute myself so that everyone can
12   hear.  Just wait one second more.
13       THE WITNESS:  Let me mute
14   myself and see if it goes away.
15   It's not me.
16       THE ARBITRATOR:  Okay.  I
17   think it left.  Okay.  Go ahead.
18       Mr. Lewis, why don't you
19   repeat your question because I
20   had interrupted it I want you to
21   repeat your question and then
22   we'll have the answer.  All
23   right?
24       MR. LEWIS:  Yes.  Thank you.
25       Q. Dr. Hamad, please explain to

Page 240

1    DIRECT-EXAMINATION OF DR. A. HAMAD
2    Arbitrator Farber how you and your
3    brother came to become involved with
4    Forall.
5        A. It was through a friend of ours
6    who knew Pal Zileri and introduced us
7    to Spano -- actually, my brother was
8    first and then me second.
9        Q. And did there come a time that
10   you spoke with Forall about your plans
11   for the store?
12       A. Yes.  After initial discussion
13   with Luca Spano, you know, we -- we had
14   further discussion in this matter.
15       Q. And do you --
16       THE ARBITRATOR:  Around what
17   year was that, Dr. Hamad?
18       THE WITNESS:  I think it was
19   early -- late 2010, early 2011.
20       THE ARBITRATOR:  Okay.
21       Q. And do you recall entering into
22   a license agreement?
23       A. Yes, I did.
24       Q. You've been present for the
25   testimony so far today; is that

Page 241

1    DIRECT-EXAMINATION OF DR. A. HAMAD
2    correct?
3        A. Yes, I did.
4        Q. Did you hear Mr. Spano's
5    testimony about the license agreement,
6    and the specifically Section 4.2 with
7    the minimal purchase requirement?
8        A. Yes, I did.
9        Q. Were you all aware --you and
10   your brother aware of the minimum
11   purchase requirement when Sarah entered
12   into the license agreement?
13       A. Yes, we did.
14       Q. Is it your recollection that --
15   I'll ask you:  Did Sarah purchase
16   $900,000 worth of merchandise each year
17   that it operated the store?
18       A. No.
19       Q. Do you recall having a
20   discussion with the CEO of Forall at
21   the time about the minimum purchase
22   requirement?
23       A. Yes.  When we went to Italy.
24       Q. And is your recollection
25   consistent with Mr. Spano that the CEO,





Page 242

DIRECT-EXAMINATION OF DR. A. HAMAD

1        DIRECT-EXAMINATION OF DR. A. HAMAD
2  let's just say, deviated from the
3  minimum purchase requirement when you
4  all had that discussion?
5     A. He absolutely confirmed that,
6  and he said it depends on the sales
7  will make purchases [sic].
8       THE ARBITRATOR:  Say it
9  again.  It depends on what?
10      THE WITNESS:  It depends on
11  the prior season's sale, we make
12  purchases or not [sic].
13      THE ARBITRATOR:  Exactly who
14  was the CEO who said this?
15      THE WITNESS:  Marco, I
16  think, was present.  I can't
17  remember the last name, but
18  Marco.  There was a CEO, there
19  was the CFO, and there was a
20  marketing person.  They were all
21  present.
22      THE ARBITRATOR:  Were there
23  minutes taken of this meeting?
24      THE WITNESS:  I don't know,
25  sir.  I don't recall, but that

Page 243

DIRECT-EXAMINATION OF DR. A. HAMAD

1        DIRECT-EXAMINATION OF DR. A. HAMAD
2  conversation absolutely
3  100 percent happened.
4      THE ARBITRATOR:  All right.
5     Go ahead, sir.
6     Q. Okay.  So I want to take it
7  back, but since we mentioned the
8  license agreement, I want to ask that
9  your recollection was consistent with
10  Mr. Spano's about how that meeting went
11  in Italy.
12     But let's go back to the
13  beginning when you opened the store; do
14  you recall when the store opened?
15     A. September 2011.
16     Q. Do you recall how much you and
17  your brother invested into the store
18  while you all operated the store?
19     A. The total between -- the total
20  between build out and merchandise close
21  to 2.2 million dollars.
22     Q. And this is of your -- you and
23  your brother's own personal funds that
24  you invested?
25      MR. BROWN:  Objection.

Page 244

DIRECT-EXAMINATION OF DR. A. HAMAD

1        DIRECT-EXAMINATION OF DR. A. HAMAD
2      THE ARBITRATOR:  Hang on.
3  Is there an objection?
4      MR. BROWN:  Yes.  I'm
5  wondering on the relevance of
6  this based on what's been
7  discussed to date, but I'll
8  withdraw it.
9      THE ARBITRATOR:  Okay.  You
10  can answer.
11     A. It was our savings plus loans on
12  our homes.
13      MR. BROWN:  Can you read the
14  answer back?
15     (Whereupon, the record was
16  read by the reporter.)
17      MR. BROWN:  Thank you.
18      THE ARBITRATOR:  Dr. Hamad,
19  are you a physician.
20      MR. BROWN:  Yes.  I am an
21  oncologist.
22      THE ARBITRATOR:  Okay.
23     Q. Dr. Hamad, did you share with
24  the CEO at the time, Marco, how much
25  you all had invested and where those

Page 245

DIRECT-EXAMINATION OF DR. A. HAMAD

1        DIRECT-EXAMINATION OF DR. A. HAMAD
2  funds had come from when you were in
3  Italy?
4     A. They were aware of it, yes.
5     Q. And was that part of the
6  discussion as to why you weren't in a
7  position to make the $900,000 purchase,
8  was that part of that discussion?
9     A. Um, to my recollection, yes.
10     Q. So in 2011 when the store
11  opened, how was business initially?
12      THE ARBITRATOR:  Before you
13  go away from the last topic, Dr.
14  Hamad, was this only a -- was
15  this at one meeting?  What is
16  Marco's last name, do you know?
17      THE WITNESS:  I can't recall
18  honestly, Honor.  But he is the
19  CEO.  He was also the CFO of the
20  company, and was the chief
21  marketing who was the daughter of
22  the CEO [sic].
23      THE ARBITRATOR:  Okay.  So
24  was this only at one meeting or
25  more than one meeting that --





Page 246

DIRECT-EXAMINATION OF DR. A. HAMAD
1
2     THE WITNESS:  This is --
3     THE ARBITRATOR:  Let me just
4  finish.  That Marco said that
5  we're going to base the amount
6  that you're required to buy on
7  last year's sales instead of the
8  $900,000, was it one time or more
9  than one time?
10     THE WITNESS:  This is
11  through some instruction with
12  Spano let to go to the meeting in
13  November of 2012 [sic].  And
14  during the conversation -- this
15  is, like, a year and two months
16  after the fact when the store was
17  not performing.
18     We did the buying, the first
19  season and the second season
20  complete, but we were not able to
21  do a lot of sales, so we had to
22  explain to him the dire need of
23  the store that needs some help
24  and -- you know, so we had that
25  discussion with him.

Page 247

DIRECT-EXAMINATION OF DR. A. HAMAD
1
2     THE ARBITRATOR:  So let me
3  go back.  My question was:  Was
4  it only at one meeting?
5     THE WITNESS:  Yes.
6     THE ARBITRATOR:  Which
7  you're going to tell me was in
8  November of '12, right?
9     THE WITNESS:  Yes.
10     THE ARBITRATOR:  And this
11  meeting took place in Italy, you
12  said?
13     THE WITNESS:  Yes.  In the
14  corporate in Venice, Italy in
15  their headquarters.
16     THE ARBITRATOR:  Okay.  And
17  you don't know -- I'm repeating,
18  but you don't know if minutes or
19  notes were taken of that meeting;
20  is that correct?
21     THE WITNESS:  I honestly
22  don't remember.
23     THE ARBITRATOR:  And exactly
24  -- well, did anyone say anything
25  about the contract documents,

Page 248

DIRECT-EXAMINATION OF DR. A. HAMAD
1
2  "we're going to draw a new
3  contract," anything to that
4  effect?  "We have to amend the
5  contract," did anyone talk about
6  that at that meeting?
7     THE WITNESS:  We didn't talk
8  about the contract, but we were
9  trying to find solutions to
10  improve the performance of the
11  store.
12     THE ARBITRATOR:  And was it
13  your understanding that this --
14  well, let me ask you this:  How
15  did it come about that you --
16  that a measurement of one year's
17  performance was supposed to be
18  based on the prior year?  Who
19  suggested that as the new
20  formula?
21     THE WITNESS:  That's what --
22     MR. LEWIS:  Or did Marco
23  suggest it?
24     THE WITNESS:  That was the
25  rules, if I'm not mistaken, and

Page 249

DIRECT-EXAMINATION OF DR. A. HAMAD
1
2  that Mr. Spano said it, that they
3  used to look at past year's
4  performance and then make
5  decisions.
6     THE ARBITRATOR:  So do that
7  again.  What exactly --
8     THE WITNESS:  So that was
9  their rules.  That was -- this is
10  what they used to do.  They get
11  used to it in a sense they would
12  look at past year's performance,
13  not only for Las Vegas stores,
14  but for most of the stores
15  throughout Europe and Asia and
16  the Middle East.  They would look
17  at past performance stores, and
18  then make a decision as far as,
19  you know, how much to buy and
20  sell.
21     THE ARBITRATOR:  All right.
22  So I'm not quite understanding
23  then how it would help you,
24  because if the first year you had
25  over a million dollars worth of




Page 250

DIRECT-EXAMINATION OF DR. A. HAMAD

1  DIRECT-EXAMINATION OF DR. A. HAMAD
2  sales.
3         THE WITNESS:  No, we didn't.
4  We did not.  It was terrible.  It
5  wasn't -- it wasn't the sales.
6         THE ARBITRATOR:  Why don't
7  you hold right here.  I'm going
8  to let Mr. Lewis continue,
9  because I clarified what I want
10  to know.  So we're going to let
11  Mr. Lewis do it his way.
12        Mr. Lewis, why don't you go
13  ahead.
14        MR. LEWIS:  Mr. Farber, let
15  me clear this up for you.
16  Marco's last name is Baritza,
17  B-A-R-T-I-Z-A.  That is the CEO
18  at the time.
19        And I think Mr. -- Dr. Hamad
20  was having trouble hearing you.
21  I think you guys were probably
22  speaking at the same time.
23        Luca Spano's testimony was
24  --
25        MR. BROWN:  I'm going to

Page 251

1  DIRECT-EXAMINATION OF DR. A. HAMAD
2  object on this.  Ask a question.
3  Don't clarify your client's
4  testimony.
5         THE ARBITRATOR:  Not
6  necessary.  I have a pretty good
7  handle on what occurred.
8         Mr. Lewis, what's your next
9  question go ahead.
10  Q. Well, I'll allow you to finish
11  your thought on that, Dr. Hamad.  You
12  were saying that when were you in
13  Italy, it was explained to you that the
14  company's policy, generally, was to
15  base future purchases on prior seasons'
16  sales; is that correct?
17  A. Yes.
18  Q. So the store starting to perform
19  poorly in the first season of 2012; is
20  that right?
21  A. Yes.
22  Q. That's what prompted you to
23  reach out to Forall and ask for the
24  meeting to -- to ask for further
25  assistance?

Page 252

1  DIRECT-EXAMINATION OF DR. A. HAMAD
2  A. Yes.
3  Q. And so that the sparked the
4  conversation with Marco Baritza about
5  the minimum purchase agreement and
6  whether you all were going to be held
7  to that; is that correct?
8  A. Yes.
9  Q. When you opened the store in
10  2011 -- strike that.
11        When did the store start to
12  struggle?  When do you recall starting
13  to realize that the store was in
14  trouble?
15  A. The first day we starred.
16  Q. Can you elaborate on that?
17  A. We were led to believe that the
18  projected sales for the store on a
19  yearly basis should be no less than
20  five million dollars.
21  Q. Projected sales?
22  A. For the stores on a yearly basis
23  is supposed to be more than five
24  million dollars, according to Pal
25  Zileri's estimations.  And day one we

Page 253

1  DIRECT-EXAMINATION OF DR. A. HAMAD
2  sold -- I still remember that day, and
3  day one we only sold $800.  So we were
4  way short on what we were supposed to
5  be, and from that day on it was a
6  struggle.
7  Q. Who told you that the projected
8  revenue was supposed to be five million
9  a year?
10  A. Pal Zileri leaders.  Luca, one
11  of them.
12  Q. And did you base your decision
13  to open the store and operate it where
14  it was, in part, on your understanding
15  of the sales projection?
16  A. Absolutely.
17  Q. So you entered into the license
18  agreement, you also signed a guaranty
19  collateral assignment agreement; did
20  you not?
21  A. Absolutely.  Because we believed
22  in every word they told us.
23  Q. Okay.  I won't spend the time
24  putting the license agreement back on
25  the screen.  You understand what it




Page 254

1          DIRECT-EXAMINATION OF DR. A. HAMAD
2    says and we've covered that.  Give me
3    just a moment.  Okay.
4          There's been testimony that
5    Forall was obligated to provide certain
6    discounting to Sarah to cover half of
7    the construction cost; do you recall
8    that?
9          A. Yes, I did.
10         Q. And you heard Mr. Spano's
11   testimony about his understanding, that
12   at least while he was in place, that
13   Forall did indeed provide those
14   discounts, you heard that?
15         A. That's what he said.
16         Q. Do you remember it differently?
17         A. In a couple of areas, yes.
18         Q. Explain for Mr. Farber how you
19   differ with Mr. Spano's testimony?
20         A. The first one -- the $38,000
21   left over, there was definitely an
22   e-mail saying that this matter should
23   be solved between Sarah LLC and
24   Italnord, and Italnord was supposed to
25   pay us the $38,000, because they took

Page 255

1          DIRECT-EXAMINATION OF DR. A. HAMAD
2    over the store, but they never did.
3          Q. Let me see if I understand.
4    You're saying that Forall instructed
5    you to pursue Italnord and work with
6    Italnord to get the $38,000 payment?
7          A. Yes.
8          Q. And that $38,000 payment was
9    supposed to be what, what did that
10   represent?
11         A. Left over of the construction.
12         Q. The final payment on the
13   construction costs?
14         A. Yes.
15         Q. And did Italnord make that
16   payment?
17         A. Not to my knowledge, no.
18         Q. Did you consent to that
19   obligation being, let's say,
20   transferred to Italnord?
21         A. No, I didn't.
22         Q. You still expected Forall to
23   reimburse you that $38,000; is that
24   right?
25         A. Yes.

Page 256

1          DIRECT-EXAMINATION OF DR. A. HAMAD
2          Q. But otherwise, you do agree that
3    Forall did provide those discounts to
4    otherwise make up for the construction
5    costs, right?
6          A. Absolutely.  Absolutely.
7          Q. And on the advertisements, your
8    -- you -- you now agree that Forall did
9    reimburse for its portion of the
10   advertising or do you disagree with
11   that?
12         A. Um, the portion of $27,000 we
13   agreed, yes, they did.  However, we did
14   way above more than the 27,000 in the
15   year -- in the couple of years when we
16   took over the store.  We spent tons of
17   money marketing the store, marketing
18   Pal Zileri, worked very hard on
19   promoting the product and the store.
20         And if you look at the tax of
21   2000 -- if I'm not mistaken '12 or --
22   '11 or '12 from our tax return, it was
23   total at $136,000 in marketing.
24         Q. And that's one year's worth of
25   marketing effort?

Page 257

1          DIRECT-EXAMINATION OF DR. A. HAMAD
2          A. I think if, I'm not mistaken,
3    yes.
4          Q. And we'll pull that document up.
5    And so do you feel as if the $27,000
6    that Forall had committed to match was
7    sufficient?  Was that a sufficient
8    amount to help launch a store in Las
9    Vegas?
10         MR. LEWIS:  Objection.
11         THE ARBITRATOR:  What's your
12   objection?
13         MR. BROWN:  His feeling
14   about the sufficiency of the
15   document he signed, is that the
16   question?
17         THE ARBITRATOR:  I think it
18   is.
19         Mr. Lewis, what's the
20   relevance of that?  He signed a
21   document that says something.
22   Why do I have to know if he
23   thought it was sufficient or not?
24         MR. LEWIS:  Well, I would
25   say that the doctor's




Page 258

DIRECT-EXAMINATION OF DR. A. HAMAD
1
2    understanding that -- it's an
3    equitable question.  It's the
4    equities that I'm inquiring
5    about, whether he had the proper
6    support to make the question
7    equitable.
8          THE ARBITRATOR:  Let me
9    understand.  The agreement says
10   there's a cap of $27,000, I
11   think, right?
12         MR. LEWIS:  So it would be
13   helpful to get perspective for
14   Mr. Farber as to what 27,000 in
15   advertising in Las Vegas gets and
16   does not get.
17         THE ARBITRATOR:  Doctor, you
18   agreed to the contribution by
19   Forall of 27,000; isn't that
20   right.
21         THE WITNESS:  I did.  But
22   honestly, Mr. Farber, it was
23   peanuts.  It was nothing to
24   market the store and the product.
25   Again, that's my feelings.

Page 259

DIRECT-EXAMINATION OF DR. A. HAMAD
1
2          THE ARBITRATOR:  That may
3    have been, but in light of the
4    fact that you say you did, I have
5    to sustain the objection.  Next
6    question.
7    Q. Was Forall obligated to only
8    support advertising in the amount of
9    $27,000, could they have done more?
10   A. Absolutely.
11   Q. Did you approach Forall with
12   other initiatives to promote the store
13   and the brand?
14   A. Absolutely.
15   Q. Did you approach the store with
16   an opportunity to participate in a
17   Forbes event?
18   A. Yes.
19   Q. Can you explain what that event
20   was?
21   A. It was an event -- actually,
22   there were two really big events.  One
23   in Vegas that's called Net Jet Events,
24   and the other one in New York for the
25   Fortune 500 companies.

Page 260

DIRECT-EXAMINATION OF DR. A. HAMAD
1
2          We were working hard to promote
3    the product and introduce it to the
4    high end customers.  So we felt that
5    those two events will be a great
6    return, not only for the store, but for
7    Pal Zileri in general.
8    Q. And so what happened?  Were you
9    ultimately supported on those efforts?
10   A. We spent more than the support
11   they provided, but we were supported.
12   But it wasn't enough support.
13   Q. Did you ask for additional
14   support?
15   A. Yes, we did.
16   Q. To whom did you direct that
17   request for support?
18   A. To Mariola, the daughter of the
19   owner of the company.  She's in charge
20   of marketing.
21         THE ARBITRATOR:  Do you
22   remember her name?
23         THE WITNESS:  I don't
24   remember.  The first name
25   Mariola.  It's a name and I'll

Page 261

DIRECT-EXAMINATION OF DR. A. HAMAD
1
2    get it for you.
3          THE ARBITRATOR:  It's all
4    right.  Mariola, you said?
5          THE WITNESS:  Yes.
6          MR. LEWIS:  Mr. Farber, I'm
7    going to show a document that's
8    an e-mail between Dr. Hamad and
9    Mariola and so we'll have her
10   name.
11         THE ARBITRATOR:  All right.
12   Q. Dr. Hamad, are you able to see
13   my screen?
14   A. Yes, I can.
15   Q. Dr. Hamad, take a minute and
16   just read through this e-mail, please.
17   A. I remember it extremely well.
18   Q. Okay.  And can you explain to
19   us, generally, about what this
20   conversation is about and who you're
21   having it with?
22         THE ARBITRATOR:  This is --
23   is this J3 or 30?
24         MR. LEWIS:  30.
25         THE WITNESS:  Can I talk?





Page 262

```
1          DIRECT-EXAMINATION OF DR. A. HAMAD
2          THE ARBITRATOR:  Yes.  Go
3    ahead, Dr. Hamad.
4          A. This is Mariola Manuela.  As I
5    said, she's in charge of the marketing.
6    We were having a discussions to build a
7    marketing program for the Pal Zileri in
8    the United States.
9          And we asked for support on
10   those two events, but also to really
11   broaden the marketing so the store can
12   be successful and Pal Zileri can be
13   great.
14         However, as you can see in the
15   answer here, and I get to know then
16   their thoughts is that they're really
17   -- and you can read it on here, you can
18   read it clearly, that they do not want
19   to invest money in the losing market.
20         As opposed to what Mr. Brown
21   said, that this was a phenomenal market
22   in the United States.  You know, they
23   already determined that the United
24   States market is a losing market for
25   them.  At that moment, I knew that Pal
```

Page 263

```
1          DIRECT-EXAMINATION OF DR. A. HAMAD
2    Zileri has no intention whatsoever to
3    support us and take us to the next
4    level.
5          You can read it clearly here in
6    the e-mail.  This is just unbelievable.
7          Q. Dr. Hamad, may I interrupt you
8    for a moment, please?
9          A. Go ahead.
10         Q. Let's concentrate on the e-mail.
11   Can you see my cursor?
12         A. Yes.
13         Q. Read for the record, please,
14   just that portion right there?
15         A. "Every year we decide to focus
16   our market strategy in particular
17   countries or project where to
18   concentrate our investment.
19   Considering the present economic
20   situation, we decided last year to
21   focus our budget on the countries where
22   our presence is already consolidated in
23   order to guaranty a return of
24   investment and give stability to that
25   specific market.  I'm really sorry not
```

Page 264

```
1          DIRECT-EXAMINATION OF DR. A. HAMAD
2    to be able to welcome your proposal.  I
3    suggest we start working next year on a
4    budget in order to receive the requests
5    in advance."
6          So meaning -- to me it meant
7    that they knew the United States of
8    America has a losing market and they
9    decided not to invest.
10         Q. Do you feel like you were kind
11   of left out to dry without this kind of
12   support?
13         A. Absolutely.
14         THE WITNESS:  Can I make two
15   comments, Honor?
16         THE ARBITRATOR:  No, no, no.
17   Just answer Mr. Lewis' questions.
18         Q. So were there other initiatives
19   similar to the Forbes event that you
20   presented to Forall?
21         A. We had LA event where we had a
22   show for a high end and also actors --
23   actors, I'm sorry.  Movie stars.
24         Q. Did you ask for support from
25   Forall for that event?
```

Page 265

```
1          DIRECT-EXAMINATION OF DR. A. HAMAD
2          A. Yes, we asked.
3          Q. And what was the result of that?
4          A. Supported us a little bit not as
5    much as we wanted.
6          Q. Did you ask for additional
7    support for that event?
8          A. We did.  But again, I don't
9    recall how much, to be honest with you
10   Mr. Rodney, but I know that we were not
11   100 percent supported.
12         Q. Let's talk about inventory.  Do
13   you recall having issues with the
14   inventory that you received from Forall
15   while you were operating the store?
16         A. Yes, I do.
17         Q. Can you explain to Mr. Farber
18   the type of -- of issues that you
19   experienced?
20         A. All the time delayed deliveries.
21   You know, the season -- let me give you
22   an example, Mr. Farber.  The season for
23   fall winter starts in August, sometimes
24   we received the first shipment either
25   August or early September, and it goes
```




Page 266

1          DIRECT-EXAMINATION OF DR. A. HAMAD
2   all the way into October.
3          And typically, a season, start
4   discount in November, so you could
5   imagine receiving some shipment in
6   October to put it on discount sales in
7   November.  We complained multiple times
8   about those issues, but they said this
9   is what it is, and, you know, it
10  depends on when and how they produced
11  the product and how it's shipped to the
12  United States.
13         And we brought up this subject
14  in Italy we went to meet with the CEO
15  and leaders.  That cost us a lot of
16  money in sales.
17         THE ARBITRATOR:  Dr. Hamad,
18    were any of these complaints in
19    writings?
20         THE WITNESS:  Yes.  We sent
21    couple of e-mails and also as a
22    conversation face-to-face with
23    the leader there.
24         THE ARBITRATOR:  Okay.
25    Q. And I'm going to show you some

Page 267

1          DIRECT-EXAMINATION OF DR. A. HAMAD
2   documents, Dr. Hamad, if we can take a
3   look at those.
4          MR. LEWIS:  And I'll do a
5    better job of calling out the
6    exhibit numbers, Mr. Farber.  I'm
7    going to pull up joint Exhibit
8    Number 15.
9    Q. Dr. Hamad, can you see my
10  screen?
11   A. Yes.
12   Q. Okay.  Do you see this e-mail
13  dated 1/24/2012?
14   A. Yes.
15   Q. It's an e-mail string between
16  Ghanem, you're on here, Luca Spano,
17  etcetera; do you see that?
18   A. Yes.
19   Q. Are you familiar with this
20  e-mail string?
21   A. Yes.  A little bit.  Yes.
22   Q. You say "a little bit," you're
23  vaguely familiar but you're not
24  intimately familiar with this?
25   A. I'm -- I'm vaguely familiar.  I

Page 268

1          DIRECT-EXAMINATION OF DR. A. HAMAD
2   have to read it to be honest with you,
3   but I'm vaguely familiar with you.
4    Q. Take a moment.  I'll scroll
5   slowly up.
6    A. Okay.  Go ahead.  Okay.
7    Q. Can you describe for Mr. Farber
8   based on your understanding what's
9   happening here?
10   A. There was discrepancy between
11  what's ordered and what's provided in
12  the store.  We had difficult
13  identifying certain items, to be honest
14  with you.  And you know, we felt that
15  those items either missed -- they were
16  missed and not delivered or at some
17  time they were delivered really late,
18  so this was the conversation at that
19  time and probably Ghanem would give a
20  much better answer when you ask him.
21   Q. I'm going to show joint
22  Exhibit 29.  Dr. Hamad, can you see my
23  screen?
24   A. Now, yes.
25   Q. Okay.  I want to just draw your

Page 269

1          DIRECT-EXAMINATION OF DR. A. HAMAD
2   attention to -- did you send this
3   e-mail?  Do you recall sending this
4   e-mail back in November of 2011?
5    A. Yes.  Absolutely.
6    Q. Can you explain what's being
7   discussed in this e-mail?
8    A. This e-mail I sent to Luca to
9   explain to him that the store is really
10  not doing well, and sales are bad.  So,
11  you know, also, we were different.  We
12  opened the store.  We were led to the
13  believe that there are a lot of
14  customers for Pal Zileri.
15         And when they had their old
16  store, which is -- I honestly didn't
17  know where it was, but again they had
18  their old store, they had customers
19  they provided names of those customers
20  and phone numbers.
21         So we asked our workers to call
22  those customers.  And when they came to
23  the store, to our surprise, they were
24  asking for high discount, which is
25  unbelievable.  And it came to our

68 (Pages 266 to 269)





DIRECT-EXAMINATION OF DR. A. HAMAD
1    attention that the old store was
2    actually -- that the discount --
3    sometimes they were asking for 70,
4    80 percent.
5         And it came to our attention
6    that the store they had was almost like
7    an outlet store or wholesale store. It
8    wasn't really representing Pal Zileri's
9    image. It was just doing pathetic in
10   the sense they were just sending
11   merchandise at a high discount price.
12        So when we opened our store, it
13   was a boutique, nice store, those
14   customers -- I would say 80,
15   90 percent, they refused to buy, and
16   they wanted a high discount, and that
17   also lead to really a bad start of the
18   store.
19        Q. Mr. Hamad, you're saying in this
20   e-mail that you open -- you open late
21   in the season, right, at least a month
22   and a half; do you see that?
23        A. Yes.
24        Q. Can you tell me why the store

DIRECT-EXAMINATION OF DR. A. HAMAD
1    opened later in the season?
2         A. We -- we had to obey by order,
3    rules, and regulations for Pal Zileri
4    for the store. There was no question
5    about how to do the interior design,
6    how to put the products, what kind of
7    cabinets you want, what kind of lights
8    you need to be, everything has to be
9    done in Italy.
10        They did the interior design in
11   Italy. They did the cabinets in Italy.
12   The lights from Italy, everything, the
13   carpets from Italy. So there were
14   delays in manufacturing those carpers
15   -- I mean those cabinets and certain
16   materials.
17        We were supposed to be open in
18   July first, and I think we didn't open
19   until September or early October. I
20   can't remember, but something like
21   this. We lost at because of their
22   retirement.
23        So you have to imagine, Honor,
24   that I opened in October, I put the

DIRECT-EXAMINATION OF DR. A. HAMAD
1    full merchandise, 500,000 of
2    merchandise in October. In December, I
3    received the order to put the
4    merchandise on sale, so we can get rid
5    of the product because they are going
6    to bring the next season in December,
7    January.
8         In three months, October,
9    November, December, we were able to
10   sell $310,000. Now, you have to -- we
11   have to remember that they led us to
12   believe that sales -- the projected
13   sales a year is five million dollars.
14   So in three months, $300,000, let's do
15   the math. That was a disaster.
16        Q. Dr. Hamad, you said that you
17   were -- let's go back to the original
18   part of the question, which was what
19   caused the store to open later than you
20   had originally intended? And you said
21   that there was some delays; can you be
22   specific about the delays?
23        MR. BROWN: I'm objecting to
24   this entire line of questioning,

DIRECT-EXAMINATION OF DR. A. HAMAD
1    Arbitrator Farber. This dates
2    back to September 2011.
3         THE ARBITRATOR: Hang on.
4         Mr. Lewis, what's the
5    relevance of this in terms of
6    what I have to decide?
7         MR. LEWIS: Well, I would
8    say, Mr. Farber, you did say you
9    would allow us some leeway in
10   terms of some testimony of the
11   causes of the store's demise and
12   the poor performance while the
13   store was being operated. And
14   certainly, I don't want to
15   belabor the point, and go beyond
16   what's necessary but I'm just
17   letting some of that --
18        MR. BROWN: I have answers
19   and, frankly, better arguments on
20   the other side, but it's -- it's
21   -- what's -- it's a mine hole. I
22   don't want to go down them. This
23   is 2011. They don't have timely
24   claims for actions or any actions



Page 274

DIRECT-EXAMINATION OF DR. A. HAMAD

1  DIRECT-EXAMINATION OF DR. A. HAMAD
2  as of 2011.  This is so long ago.
3      THE ARBITRATOR:  Mr. Lewis,
4  I think in light of my prior
5  ruling, I've heard enough on
6  these points.  I do understanding
7  the witness's frustration.  I'm
8  sure you've explained to the
9  witness my ruling regarding
10  statute of limitations, which is
11  based upon the applicable law, so
12  let's move onto the next
13  question.  The objection will be
14  sustained.
15      Are you starting a new area
16  now, Mr. Lewis?
17      MR. LEWIS:  I think so.
18      THE ARBITRATOR:  How much
19  more do you think you have with
20  the witness?
21      MR. LEWIS:  Probably
22  30 minutes.
23      THE ARBITRATOR:  Okay.  So,
24  guys, why don't we take our
25  afternoon break at this point,

Page 275

1  DIRECT-EXAMINATION OF DR. A. HAMAD
2  because we've been going over a
3  hour and a half?  So I've got
4  3:35, let's return at 10 to 4:00,
5  and then really hopefully finish
6  off this witness and see if we
7  can start another witness.
8      Who is going to be your next
9  witness, Mr. Lewis?
10      MR. LEWIS:  It depends right
11  now it's scheduled to be Ghanem.
12      THE ARBITRATOR:  Say it
13  again.  I didn't hear you.
14      MR. LEWIS:  It's scheduled
15  to be Ghanem.
16      THE ARBITRATOR:  Okay.  All
17  right, guys.  15 minutes.  Let's
18  come back at 3:50.  Thank you,
19  everyone.
20      (Whereupon, a recess was
21  taken at this time.)
22      THE ARBITRATOR:  All right.
23  Mr. Lewis, why don't you proceed.
24  You're on mute, Mr. Lewis.
25  Q. This came up in 2013, do you

Page 276

1  DIRECT-EXAMINATION OF DR. A. HAMAD
2  recall having a conversation with
3  Forall about finding a new operator?
4  Dr. Hamad, can you hear me?
5      A. I'm sorry.  Yes, I hear you.  Do
6  you hear me?
7      Q. Yes.
8      A. All right.  Thank you.  Repeat
9  that question.
10      Q. In 2013, do you recall having a
11  conversation with Forall about finding
12  a new operator?
13      A. Yes, we did.
14      Q. Do you recall when that was?
15      A. It was February, March of 2013.
16      Q. And did Forall agree to help
17  find a new operator?
18      A. Yes, they did.
19      Q. And was that operator Alfonso
20  Entebi?
21      A. Yes, he is.
22      Q. And what was your understanding
23  about Mr. Entebi and the stores he
24  owned?
25      A. He is an experienced operator.

Page 277

1  DIRECT-EXAMINATION OF DR. A. HAMAD
2  He had stores in Mexico and some in
3  South America.  One of them is Pal
4  Zileri and he was successful in, you
5  know, setting up, buying the products,
6  and operating the market.
7      Q. Okay.  And so did you personally
8  meet with Mr. Entebi during the
9  negotiations about Italnord coming on
10  board?
11      A. Yes, I did.
12      Q. And do you recall having
13  conversations about what the
14  arrangement would be, what the
15  expectations were?
16      A. He is to come and completely
17  take over the store.
18      Q. Did you end up selling, "you," I
19  mean Sarah, end up selling any of your
20  merchandise to Mr. Entebi?
21      A. No.
22      Q. You said you did not sell the
23  merchandise to Mr. Entebi?
24      A. You mean when he took over?
25      Q. When he took over.




Page 278

```
1          DIRECT-EXAMINATION OF DR. A. HAMAD
2          A. No.
3          Q. Okay.
4          A. We didn't.
5          Q. There was -- let me ask.  My
6    understanding was there was an asset
7    purchase agreement?
8          A. You mean assets not merchandise.
9    I'm sorry.  He took over -- he bought
10   all the assets of the store, yes.
11         THE ARBITRATOR:  You're
12   saying that did not included the
13   inventory, the merchandise.
14         THE WITNESS:  He did not --
15   he -- he had -- he bought his
16   season five for us was his
17   season, Honor.  So when they
18   showed that tables, the last one
19   was Mr. Entebi's buy.  It wasn't
20   our buy.
21         Q. Let's make sure Mr. Farber is
22   clear on what you're testifying to, Dr.
23   Hamad.  You're saying that the
24   spreadsheet in Exhibit 130 that
25   Mr. Brown showed to Mr. Luca Spano,
```

Page 279

```
1          DIRECT-EXAMINATION OF DR. A. HAMAD
2    there was a purchase for 500 and some
3    odd dollars for 2013; explain your
4    testimony about who paid for that
5    merchandise?
6          A. That was the season we were
7    supposed to take over and sell, but
8    since he came over to run the store, so
9    it went under Alfonso.  He did not buy.
10   So we only bought four seasons.  We
11   only did four seasons; we didn't do
12   five seasons.
13         Q. However, just to be sure you're
14   saying that you all, "you all," being
15   Sarah, did not purchase 2.2 million
16   dollars worth of merchandise while you
17   were operating the store?
18         A. Absolutely not.
19         Q. We'll come back to that.  For
20   now let's cut straight on your dealings
21   with Mr. Entebi.  You had an asset
22   purchase agreement that you entered
23   into with Italnord, that did not
24   included the merchandise that you had
25   in the store; are we correct about
```

Page 280

```
1          DIRECT-EXAMINATION OF DR. A. HAMAD
2    that?
3          A. Yes.
4          Q. What was included?
5          A. Everything inside the store,
6    computers, manikins, you know, tables,
7    rugs, everything, books, marketing
8    materials, all the way into the asset
9    purchasing agreement -- all the way
10   into the license purchasing agreement.
11   That was included in that document
12   [sic].
13         Q. We'll take a look at that.  So
14   what did you do?  What did Sarah do
15   with the merchandise if it wasn't
16   included in the asset purchase
17   agreement?
18         A. Honestly, it was -- it was sold
19   as a wholesale in the store.  That day
20   he came in, our merchandise was packed
21   in the back of the store, and it was
22   sold at the whole sale, 15 cents and a
23   dollar.  That was big blow for us
24   [sic].
25         Q. What did you sell the
```

Page 281

```
1          DIRECT-EXAMINATION OF DR. A. HAMAD
2    merchandise for, let's just say,
3    whatever you could get?  Why did you
4    make the decision to do that?
5          A. Otherwise, you know, we would
6    have thrown it away.  We did not want
7    to damage the name of Pal Zileri by
8    just throwing it away, so we had to
9    sell it.  And actually, Paolo -- not
10   Paolo -- Luca help us find the company
11   who bought the merchandise.
12         Q. Is it fair to say that you all
13   sold the merchandise as you did --
14   liquidated the merchandise to try to
15   mitigate your losses?
16         A. Absolutely.
17         Q. And so Luca was aware of the
18   gentleman who helped you do the
19   liquidation?
20         A. Yes, he did.
21         Q. All right.
22         MR. LEWIS:  I'm going to
23   share my screen and bring up
24   joint Exhibit Number 6.
25         THE ARBITRATOR:  Let me just
```

71  (Pages 278 to 281)



Page 282

DIRECT-EXAMINATION OF DR. A. HAMAD
1
2    go back.  Dr. Hamad, did you say
3    that it was from the back of the
4    store sold for 50 cents on the
5    dollar or 15 cents on the dollar?
6        THE WITNESS:  One, five.
7    And actually, honestly, when they
8    took over they packed our stuff
9    in a miserable way, but I don't
10   want to go into that now.
11       THE ARBITRATOR:  Go ahead,
12   Mr. Lewis.  Go ahead.
13   Q. Dr. Hamad, can you see my
14   screen?
15   A. Now I do.
16   Q. Do you recognize this document
17   that I have up?
18   A. Yes, I do.
19   Q. You see this is the asset
20   purchase agreement dated the 10th of
21   September 2013?
22   A. Yes, I do.
23   Q. And you entered this -- Sarah
24   entered into this agreement with
25   Italnord?

Page 283

DIRECT-EXAMINATION OF DR. A. HAMAD
1
2    A. Yes.
3    Q. Okay.  You were trying to recall
4    what was included in the -- in the
5    actual statement of the assets, and do
6    you see --
7    A. Yes.
8    Q. -- fixtures, etcetera, do you
9    see that?
10   A. Yes.
11   Q. Do you see "intangible
12   property," do you see that?
13   A. Yes.
14       THE ARBITRATOR:  Mr. Lewis,
15   I reviewed this yesterday.  I
16   think the one you really want to
17   refer me to is 1.2, the extended
18   areas, particularly F.
19       MR. LEWIS:  Well, let's go
20   there.  I'll take your advice and
21   see if that is indeed what I'm
22   looking for.  You said "S" or
23   "F"?
24       THE ARBITRATOR:  1.2 F is
25   the one I think we're talking

Page 284

DIRECT-EXAMINATION OF DR. A. HAMAD
1
2    about.
3        MR. LEWIS:  You're right
4    this does exclude the inventory.
5    There's another piece that I
6    think will be interesting to you,
7    Mr. Farber.
8        THE ARBITRATOR:  All right.
9        MR. LEWIS:  I appreciate
10   that though.
11   Q. It's the Subsection 2 here, and
12   I'm going to read this for you Dr.
13   Hamad, the pertinent portion of this,
14   essentially this is what is being
15   included in the sale and it's a license
16   to use during the term "All contracts
17   with seller utilizing the operation of
18   the business, which are exclusive to
19   sellers, which are assignable by seller
20   and accepted by purchaser.  Including
21   but not limited to the seller's license
22   and retail operation agreement with
23   Forall USA"; do you see that?
24   A. Yes, I did, and that's what I
25   said.

Page 285

DIRECT-EXAMINATION OF DR. A. HAMAD
1
2    Q. So what was your understanding
3    of the effects of this provision?
4    A. That Alfonso or Italnord took
5    over the store completely and we stayed
6    only for the lease.
7    Q. Okay.  And what is your
8    recollection as to why Sarah was
9    required to stay on the lease?
10   A. Two reasons:  One, he didn't
11   have enough credit in the United
12   States.  Alfonso, Italnord, he
13   requested to take over the lease as you
14   showed previous e-mail to Luca, but he
15   didn't have enough credit to go in
16   front of Simon and request the lease to
17   be transferred.
18   Q. Now, Simon actually weighed in
19   on whether they would allow Alfonso to
20   take over the lease, correct?  Let me
21   ask that differently.
22   Simon actually gave a decision
23   as to whether or not they would allow
24   Alfonso to take over the lease,
25   correct?




Page 286

DIRECT-EXAMINATION OF DR. A. HAMAD
1
2    A. They requested us to stay on the
3    lease.
4    Q. So your understanding was that
5    through Alfonso coming on board,
6    Italnord coming on board to operate the
7    agreement, that Sarah was no longer
8    going to be obligating under its
9    obligation -- excuse me -- under its
10   obligations of the license agreement;
11   that was your understanding?
12       MR. BROWN: I'm going to
13   object. I mean, that's really
14   leading a direct witness.
15       MR. LEWIS: Overruled. You
16   can tell me what your
17   understanding was. You can
18   answer the question.
19       A. My understanding -- I'm not
20   liable whatsoever for the license
21   purchasing agreement. Italnord formed
22   the company and had different license
23   purchasing agreement with Forall. Our
24   license purchasing agreement was never
25   enforced, was never enforced by

Page 287

DIRECT-EXAMINATION OF DR. A. HAMAD
1
2    anybody.
3        My understanding that he took --
4    he bought the license purchasing
5    agreement. He formed his own new
6    license purchasing agreement, and I am
7    only staying because of the lease -- he
8    doesn't have enough credit to go in
9    front of Simon.
10       THE ARBITRATOR: So can you
11   just show me or Mr. Lewis, you
12   can show me which paragraph says
13   that in this agreement.
14       MR. LEWIS: Mr. Farber,
15   you're saying which paragraph
16   supports Dr. Hamad's
17   understanding?
18       THE ARBITRATOR: Okay. I'll
19   take it that way.
20       MR. LEWIS: Okay. I believe
21   it's the one we just read.
22       MR. BROWN: Which is what
23   number?
24       MR. LEWIS: I can re-share
25   it if that was helpful.

Page 288

DIRECT-EXAMINATION OF DR. A. HAMAD
1
2        THE ARBITRATOR: 1.1 B
3    little 2 he's referring me to,
4    right?
5        MR. LEWIS: Correct. Are we
6    there? Okay.
7        THE ARBITRATOR: Just one
8    second. Just one moment. So Mr.
9    Lewis, I'll take it from you
10   since it's a legal document, just
11   tell me which language in little
12   two says that Sarah no longer has
13   any liability?
14       MR. LEWIS: I'm not saying
15   that that exact language is
16   present, Mr. Farber. What I'm
17   saying is the combination of
18   Sarah of selling all of its
19   assets to Italnord and Mr. -- Dr.
20   Hamad's understanding of this
21   provision in the asset purchase
22   agreement gave him the
23   understanding at the time.
24       And I have follow-up
25   questions for with -- with Dr.

Page 289

DIRECT-EXAMINATION OF DR. A. HAMAD
1
2    Hamad now, but at the time he
3    thought that Sarah was moving on.
4    That Sarah was off the hook.
5        THE ARBITRATOR: Dr. Hamad,
6    in 2013, this asset purchase
7    agreement between Sarah and
8    Italnord did -- you had a lawyer
9    representing Sarah, did you not?
10       THE WITNESS: Yes, I did.
11       THE ARBITRATOR: Who was the
12   lawyer?
13       THE WITNESS: It was -- it
14   was a different lawyer. Lee
15   Levin.
16       THE ARBITRATOR: Okay.
17       THE WITNESS: L-E-V-I-N.
18       THE ARBITRATOR: Okay. And
19   Mr. Levin reviewed this asset
20   purchase agreement, right?
21       THE WITNESS: Absolutely.
22       THE ARBITRATOR: Okay.
23       THE WITNESS: And Italnord's
24   lawyer reviewed it also.
25       THE ARBITRATOR: Okay. All

73 (Pages 286 to 289)





Page 290

```
1        DIRECT-EXAMINATION OF DR. A. HAMAD
2    right.  Go ahead, Mr. Lewis.
3        Q. So Dr. Hamad you understand that
4    there are contradictory provisions in
5    here as well, right, and you understand
6    there's contradictory language in the
7    management agreement that you entered
8    into with Italnord?
9        A. Yes, I did.
10       Q. So you understand there's
11   language, which I'm sure Mr. Brown is
12   going to be anxious to show you that
13   says something to the opposite of what
14   your understanding was that Sarah was
15   going to no longer be obligated under
16   the license agreement; you understand
17   that, right?
18       A. Yes, I do.
19       Q. It came a time --
20       THE ARBITRATOR:  Are you
21   leaving the license agreement
22   now, Mr. Lewis?
23       MR. LEWIS:  I am.
24       THE ARBITRATOR:  Not the
25   license agreement, but really the
```

Page 291

```
1        DIRECT-EXAMINATION OF DR. A. HAMAD
2    agreement between Sarah and
3    Italnord.  Okay.  Then let me
4    just ask this:  So I just -- I'm
5    not understanding this point.
6    When you entered in negotiations
7    with Entebi, did you discuss with
8    him this minimum purchase
9    requirement of $900,000 and your
10   meeting in Italy in September of
11   2012?
12       THE WITNESS:  We provided
13   him with the lease agreement and
14   with the license purchasing
15   agreement.  He took a look at
16   both of them.
17       THE ARBITRATOR:  But I
18   didn't ask that.  What I asked
19   was:  Did you discuss with him
20   the meeting that you had in 2012
21   regarding the minimum purchase
22   requirement?
23       THE WITNESS:  I think we
24   did, but I don't recall, to be
25   honest with you.  I think we did.
```

Page 292

```
1        DIRECT-EXAMINATION OF DR. A. HAMAD
2        THE ARBITRATOR:  So why --
3        THE WITNESS:  He's -- he --
4    I'm sorry.  He was aware of it.
5        THE ARBITRATOR:  Okay.  So
6    was there anything put into the
7    agreement with Italnord that
8    dealt with the minimum purchase
9    requirement or the change that
10   you said you thought took place
11   in September '12 as a result of
12   that meeting in Italy?
13       THE WITNESS:  My
14   understanding that -- Luca
15   testified to that -- that our
16   license purchasing agreement is
17   -- is over, and he is forming his
18   new license purchasing agreement.
19       So the $900,000 was -- it
20   didn't mean anything at that
21   moment for him because he was
22   forming his own new licensing
23   purchasing agreement with Forall.
24       THE ARBITRATOR:  Okay.  Go
25   ahead, Mr. Lewis.
```

Page 293

```
1        DIRECT-EXAMINATION OF DR. A. HAMAD
2        Q. Dr. Hamad, it came a time when
3    Italnord decided it did not want to
4    move forward operating the store any
5    longer, right?
6        A. Yes.
7        Q. And what are the reasons that
8    were given to you that they were making
9    that decision?
10       A. Very poor performance of the
11   store.
12       Q. And can you quantify that?  Are
13   you familiar with what their sales
14   were?
15       A. From my understanding in talking
16   to him, a certain month it was still
17   less than 100,000 in certain months,
18   more than 100,000.
19       Q. Do you recall what the rent was
20   in that location in the Forum malls in
21   2013?
22       A. Close to $70,000.
23       Q. Do you recall what your overhead
24   was in terms of salaries when you were
25   operating the store in 2012?
```



Page 294

1      DIRECT-EXAMINATION OF DR. A. HAMAD
2          A. Close to $40,000. 35, 40 -- 30
3      to 40 a month.
4          Q. Do you recall what your overhead
5      was in terms of utilities and other
6      expenses while you were operating the
7      store in 2012?
8          A. I don't recall, but probably
9      everything 10 to $15,000 or more.
10         Q. We'll, take a look at the
11     document. I just want to understand
12     the recollection that you had.
13         So when Mr. Entebi said he
14     wasn't going to continue on with the
15     store, what position did that put Sarah
16     in?
17         A. An awkward potion, because we
18     are liable for the lease in front of
19     the mall.
20         Q. And so what were you forced to
21     do?
22         A. He sent couple of e-mails after
23     discussing with Pal Zileri that he
24     wants Simon to take over the store or
25     find a new tenant [sic].

Page 295

1      DIRECT-EXAMINATION OF DR. A. HAMAD
2          Q. Did you help facilitate that?
3          A. I initially, you know, talked to
4      them, but later on, yes, we did open
5      his request.
6          Q. And what did you do to help
7      facilitate his request?
8          A. We talked to Simon to see if
9      they have a new tenant.
10         Q. Did you end up entering into an
11     agreement with Simon about finding a
12     new tenant?
13         A. Yes, I did.
14         Q. And was that the letter
15     agreement you entered into in October
16     of 2014?
17         A. Yes, I did. I mean, if you show
18     it to me, I know what it is.
19         Q. Dr. Hamad, can you see my
20     screen, the document on my screen?
21         A. Yes.
22         Q. Is this the letter agreement
23     that we were referring to between Simon
24     and Sarah?
25         A. I think so, yes.

Page 296

1      DIRECT-EXAMINATION OF DR. A. HAMAD
2          Q. It's dated October 23, 2014.
3          A. Yes.
4          THE ARBITRATOR: What
5      exhibit number is this,
6      Counselor?
7          MR. LEWIS: This is -- I
8      believe this is 325, and I'll ask
9      Mr. Shah if he can confirm that
10     for me.
11         MR. SHAH: That's correct.
12         MR. BROWN: The Bates label
13     on that, if you have it?
14         MR. LEWIS: Sohil, if you
15     don't mind.
16         MR. SHAH: It's Claimant
17     2168.
18         MR. BROWN: Thank you.
19         Q. Okay. Dr. Hamad, have you had
20     the opportunity to read at least the
21     portion of the document that's on the
22     screen?
23         A. Quickly, yes.
24         Q. I'm going to ask you to look at
25     the second and third paragraph, "Tenant

Page 297

1      DIRECT-EXAMINATION OF DR. A. HAMAD
2      currently occupies the premises under
3      lease dated May 18, 2011. It is
4      landlord's understanding that tenant
5      now desires to close the premises for
6      business and surrender tenant's lease
7      hold to landlord therefore, tenant
8      wishes to authorize landlord to begin a
9      search for a suitable replacement
10     tenant for the premises"; do you see
11     that?
12         A. Yes, I do.
13         Q. And in the next paragraph we see
14     that the language is: "Please be
15     advised that landlord is willing to
16     commence using its reasonable efforts
17     to find a replacement tenant to the
18     premises on terms and conditions
19     acceptable solely to landlord"; do you
20     see that?
21         A. Yes, I do.
22         Q. So within this agreement, you
23     were asking Simon to try to help find a
24     new tenant given Alfonso's eminent
25     departure from the store; is that



Page 298

1        DIRECT-EXAMINATION OF DR. A. HAMAD
2    right?
3        A. Absolutely.
4        Q. Did you end up having a
5    conversation with Forall about this
6    agreement?  I'll leave it there.  Did
7    you have a conversation with Forall
8    about this agreement?
9        A. Yes, I did.
10       Q. And do you recall what Forall
11   asked you to do?
12       A. I -- the conversation I had with
13   Paolo and Paolo and Luca did not object
14   to finding a new tenant.  And as a
15   matter of fact, Paolo sent me an e-mail
16   stating that he's willing to assist
17   finding a new tenant, and he had some
18   conditions for that tenant to take over
19   the store.
20       Q. So Forall agreed to join in in
21   trying to find a new tenant for the
22   store?
23       A. Absolutely.
24       Q. I don't know if you were present
25   during Mr. Brown's opening statements.

Page 299

1        DIRECT-EXAMINATION OF DR. A. HAMAD
2    You were on the Zoom call then.
3        A. Yes, I was.
4        Q. And do you remember Mr. Brown
5    saying that his understanding was
6    Forall, I believe, hit the roof, when
7    they found out that Simon was looking
8    to find a new tenant based on this
9    agreement; do you recall that?
10       A. Absolutely.
11       Q. Is that your recollection?  Do
12   you remember it that way?
13       A. No.  Absolutely not.  Though
14   they sent a letter later on, but
15   absolutely not.  They sent an e-mail.
16       Q. So between the execution of this
17   agreement in October of 2014, until
18   Alfonso left the store, did Forall
19   change its mind about finding a new
20   tenant?
21       A. They reproached me and said,
22   "Good news.  Forall, is willing to take
23   the store."
24       Q. Now, was that something that you
25   had suggested or did Forall come up

Page 300

1        DIRECT-EXAMINATION OF DR. A. HAMAD
2    with that idea and share it with you?
3        A. Forall came up with the idea,
4    and we were good citizens.  We tried to
5    assist them in doing that.
6        Q. So when Forall came up with the
7    ideas that they would take over the
8    store instead of working with Simon and
9    finding a new tenant, did that require
10   you all to approach Simon about the
11   letter agreement?
12       A. Yes.  I did and I remember that
13   time extremely well.
14       Q. All right.  Well, tell Mr.
15   Farber about that time.  What was that
16   process like to deal with the letter
17   agreement?
18       A. So we had to -- I had my lawyer
19   talk with them almost constantly on a
20   daily base to really retrieve the
21   letter and bring the lease back in full
22   -- full speed whatever it is, you know,
23   in all conditions.
24       Q. When you say "retrieve," you
25   mean rescind?

Page 301

1        DIRECT-EXAMINATION OF DR. A. HAMAD
2        A. Rescind, yes.
3        Q. And so were you ultimately
4    successful in getting that letter
5    agreement rescinded?
6        A. Yes, I did.
7        Q. Were there -- was there any
8    damage done to the Simon relationship
9    as far as you recall?
10       A. There were -- there were some
11   damage, but the main one was they were
12   very nervous about the performance of
13   that store and that the store will be
14   closed at any given moment.
15       Q. Now, how would Simon know about
16   the performance of the store?
17       A. They have the daily sales, the
18   monthly sales, and everything.  They
19   know about it.
20       Q. All right.  Is it your testimony
21   that the operators of the store were
22   required to report their sales to
23   Simon?
24       A. Yes.
25       Q. Did you, Sarah, have to do that



Page 302

```
1        DIRECT-EXAMINATION OF DR. A. HAMAD
2   when you were operating the store?
3        A. Absolutely.
4        Q. Did you review the sales figures
5   when those were presented to Simon?
6        A. Yes.
7        Q. And so you know that that was a
8   consistent process of reporting sales
9   to Simon?
10       A. They looked at our sales during
11  operation, they look at Italnord's
12  sales during his operation, and they
13  looked at Forall's sales during their
14  operations.
15       They have the numbers and they
16  know what's going on in the store in
17  terms of stay.
18       Q. So Italnord had to report its
19  sales to Simon just as you had to?
20       A. Absolutely.
21       Q. So we're going to come back to
22  the sales.  I want you to continue
23  speaking about Simons attitude toward
24  Forall coming on board.
25       A. They really were not big fans of
```

Page 303

```
1        DIRECT-EXAMINATION OF DR. A. HAMAD
2   Forall coming back and operating in the
3   store, to be honest with you, because
4   of the poor -- because of the poor
5   performance of the product in the mall.
6        You know, Pal Zileri product is
7   good, but it wasn't sellable in the
8   mall.  It was not.  You know, talking
9   about being in -- in the mall, imagine
10  yourself, you're next to H&M, you know,
11  you talk about Pal Zileri with the high
12  quality next to H&M, next to other
13  stores selling jeans, and low quality
14  materials.
15       Q. Well, since you mentioned that,
16  Dr. Hamad, and I don't want us to lose
17  our place here, but since you're saying
18  that, are you saying that at that time
19  in 2013, the location that the Pal
20  Zileri store was in was not around high
21  -- high end retailers?
22       A. Absolutely not.  And as a matter
23  of fact, Pal Zileri customers would
24  come to the store because they see the
25  name, walk in customers in the mall, or
```

Page 304

```
1        DIRECT-EXAMINATION OF DR. A. HAMAD
2   customers just looking to buy $10
3   shorts and so forth.
4        Q. So you heard testimony or you
5   heard our opening statements about
6   Simon approaching Forall to move the
7   store to a smaller location with a
8   reduction in rent; do you recall that?
9        A. Absolutely.  And we were part of
10  that conversation.
11       Q. Okay.  So what do you recall
12  about that as being part of that
13  conversation?
14       A. Simon looked at the sales of the
15  store, and they realized that the store
16  was selling at approximately $63,000
17  average a month.
18       And Honor, I want you to
19  understand, when we were running the
20  store, our average sale was close to
21  $155,000 a month.  So there is no way
22  Pal Zileri will say we didn't perform.
23  We outperformed Forall, itself, by
24  ourselves.
25       However, you know, Alfonso
```

Page 305

```
1        DIRECT-EXAMINATION OF DR. A. HAMAD
2   dropped the sales down to 110, $113,000
3   a month, and then Forall sales were
4   close to $63,000 or $65,000 a month.
5   That made Simon panic.  They knew the
6   store is going to close.  There was no
7   way for the store to survive.
8        So they sent an e-mail in June
9   or July saying, "If you guys need
10  assistance, we'll be more than happy to
11  assist you by finding a new location
12  and then the decreasing the rent and so
13  forth."
14       Q. And are you -- do you know
15  whether or not -- well, we're here
16  today, but do you recall whether Forall
17  took advantage of that opportunity?
18       A. We put that two together.  We
19  give the permission -- Forall asked our
20  lawyer to give the permission to talk
21  to them, and we did not hesitate a
22  minute.  We wanted to find a solution
23  for everybody to be successful.  So we
24  went ahead and give them permission to
25  talk to Simon.
```





Page 306

1    DIRECT-EXAMINATION OF DR. A. HAMAD
2        Q. Dr. Hamad, I'm trying to ask a
3    different question.  Do you know
4    whether or not Forall accepted or
5    rejected Simon's offer to move to
6    another location?
7        A. As far as I know, they did not
8    act on it.  So they did not -- I have
9    to assume they rejected it.
10       Q. And you heard in Mr. Brown's
11   opening statement that you felt that --
12   Forall felt that the location that was
13   being offered wasn't as desirable to
14   the location where they were; do you
15   agree with that?
16       A. I totally disagree.
17       Q. Okay.  Let's go back to -- let's
18   go back to -- after you had spoken with
19   Simon and they rescinded the letter
20   agreement, did you enter into
21   negotiations with Forall on a document
22   that would govern Forall operating the
23   store?
24       A. Yes, we did.
25       Q. And was that a management

Page 307

1    DIRECT-EXAMINATION OF DR. A. HAMAD
2    agreement?  Did you all negotiate a
3    management agreement?
4        A. Yes, I did.
5        Q. In advance of that, do you
6    recall e-mails being sent about certain
7    provisions that you all wanted to see
8    in the management agreement?
9        A. Yes, I did.
10       Q. Okay.
11       MR. LEWIS:  I'm going to
12   show what's been marked as -- I'm
13   going to show joint Exhibit 251.
14       Q. This particular document I'm
15   going to show you, Dr. Hamad, speaks to
16   what you just testified about the --
17   can you see this document, Dr. Hamad?
18       A. Yes, I do.
19       Q. Starting at the bottom here, you
20   see that this is an e-mail dated
21   January 9, 2015; do you see that?
22       A. Yes, I do.
23       Q. Okay.  And who is David Hochman?
24       A. He is our lawyer.
25       Q. And who was Mr. Steen?

Page 308

1    DIRECT-EXAMINATION OF DR. A. HAMAD
2        A. He is the -- responsible for the
3    Caesar's Mall from Simon.
4        Q. And so and his name is John?
5        THE ARBITRATOR:  I thought
6    you said your lawyer was Levy,
7    Lev or something like that.
8        THE WITNESS:  That's his
9    partner.
10       Q. So I'm going to read this really
11   quickly.  "John, thank you for speaking
12   with Dr. Hamad and me.  I want to
13   confirm what Sarah LLC is requesting.
14   In lieu of your proposal, you're asking
15   that Simon suspend its efforts to
16   obtain a replacement tenant until
17   January 31st, 2016.  There will not be
18   a sales target, which will need to be
19   met during this proceed.  Sarah will
20   assess the sales performance of the
21   store, and if the sales do not improve
22   during the 12-month period, Sarah will
23   then notify Simon to resume its search
24   for a replacement tenant"; do you see
25   that?

Page 309

1    DIRECT-EXAMINATION OF DR. A. HAMAD
2        A. Yes, I do.
3        Q. Is this consistent with the
4    discussions you all were having with
5    Simon at the time?
6        A. Absolutely.
7        Q. So I want to really focus in
8    hear on "Sarah will assess the sales
9    performance of the store.  If sales do
10   not improve during the 12-month period,
11   Sarah will then notify Simon to resume
12   its search for a replacement tenant";
13   did you understand this to be Simon
14   giving the store, like, another chance?
15       A. We had to beg them to give the
16   store another chance, to be honest with
17   you.  I had so many conversations with
18   John Steen to really let Forall take
19   over the store again.  They knew the
20   store wasn't going to perform.
21       Q. Dr. Hamad, did you understand
22   this to be Simon giving the store a
23   final chance?
24       A. Absolutely.
25       THE ARBITRATOR:  What was



Page 310

DIRECT-EXAMINATION OF DR. A. HAMAD

1
2    meant by the word "there will not
3    be a sales target"?
4        THE WITNESS:  Honor, they
5    requested almost 200 to 250
6    percent increase in sales.  They
7    realized if they don't do, that the
8    store is not going to be
9    performing and it has to close.
10       So you could imagine
11   $63,000, You need more than 200,
12   225,000 for the store to survive.
13   They were selling at 63,000.
14   That was just unbelievable.  So
15   the requested target we refused
16   because we didn't know if we were
17   going to achieve that target.
18       Q. But they were going to impose
19   that target on whomever operated the
20   store?
21       A. Absolutely.
22       Q. And so there's clearly some
23   parameters around Simon giving the
24   store this one more chance, right?
25       A. Absolutely.

Page 311

DIRECT-EXAMINATION OF DR. A. HAMAD

1
2        Q. And then it's coming up, it
3    looks likes Mr. Steen agrees that Simon
4    will not lease the space in 2015,
5    right?
6        A. Absolute.
7        Q. And that's pursuant to your
8    request so that Forall could operate
9    the store, right?
10       A. Yes.  We pled a good citizen
11   with Forall so they can have another
12   chance to operate the store and
13   supposedly make it successful.
14       Q. Okay.  Now, this is important,
15   and the top of this e-mail Mr. Brown is
16   copied, Forall's counsel today, right?
17       A. Yes.
18       Q. And here it says, your attorney
19   to Mr. Brown, that "The goal was to
20   coordinate with the letter of intent.
21   Our thought is that if Forall decides
22   that it wants to continue the
23   management arrangement beyond 18
24   months, and advises Sarah of this by
25   December of 2015, Sarah would then

Page 312

DIRECT-EXAMINATION OF DR. A. HAMAD

1
2    revoke this letter agreement with
3    Simon.  If things do not improve to a
4    level that Forall wants to continue the
5    management arrangement, Simon would
6    then recommit to looking for a
7    replacement tenant, which generally
8    takes six months or more"; do you see
9    that?
10       A. Absolutely.  And that was the
11   request from Simon.  They needed six
12   months to find a new tenant.
13       Q. So the six-month period -- the
14   six-month notice period made its way
15   into the management agreement; isn't
16   that correct?
17       A. Yes.
18       Q. And you recall during my opening
19   statement we went through e-mails where
20   you are writing in the e-mail to Forall
21   where you needed the six-month notice
22   period so that Simon could find
23   replacement tenant; do you recall that?
24       A. Absolutely.
25       Q. Is there any doubt in your mind

Page 313

DIRECT-EXAMINATION OF DR. A. HAMAD

1
2    that Forall was aware that this was a
3    one last chance to operate the store,
4    and that they were supposed to give you
5    six months notice if they weren't going
6    to continue on so that the store could
7    be turned back over to Simon?
8        MR. BROWN:  Objection.
9    Legal summary in closing, but
10   that's not a question for this --
11       THE ARBITRATOR:  Overruled.
12   I'll take it as his lay
13   understanding, not as a legal
14   conclusion.
15       You can answer the question,
16   sir.
17       A. I had no doubt in my mind that
18   Paolo Torello, the CEO of North America
19   knew that this is the last chance of
20   the store to be operated.  Otherwise,
21   if they fail, the store has to be
22   closed.  I had no doubt whatsoever,
23   Honor.
24       Q. But specifically about the
25   six-month notice --




Page 314

1    DIRECT-EXAMINATION OF DR. A. HAMAD
2        A. Yes.
3        Q. What --
4        A. So I asked them specifically in
5    the e-mail that he needs to give us six
6    months, so we have enough time for
7    Simon to find a new tenant.  So he
8    should tell us six months before the
9    end of the 18 months if he's going to
10   continue to operate or not.
11           MR. LEWIS:  I'm going to
12       show Joint Exhibit 8.
13       Q. Dr. Hamad, can you see my
14   screen?
15       A. Yes, I do.
16       Q. Is this the management agreement
17   between Forall and Sarah dated --
18       A. Yes.
19       Q. I'm going to draw your attention
20   to Section 2.1.  Okay.  And for the
21   sake of time I'll go ahead and read it
22   quickly, "Forall shall assume exclusive
23   management of and control of the
24   business effective no later than
25   March 15th, 2015, start date, for a

Page 315

1    DIRECT-EXAMINATION OF DR. A. HAMAD
2    term of 18 months.  Forall shall, at
3    its own discretion, on or before
4    March 1, 2016, whether it intends to
5    take over the lease and business,
6    and/or otherwise terminate the
7    management agreement at the end of the
8    initial term"; do you see that?
9        A. Yes.
10       Q. Is this the six-month notice
11   period making its way into the
12   management agreement?
13       A. Absolutely.
14       Q. So, Dr. Hamad, when Forall did,
15   in fact, take over after this was
16   executed and Forall took over, you've
17   testified to it a bit, but what was
18   your understanding of how -- did the
19   performance improve as Simon was
20   requiring?
21       A. I -- I think they did the worse
22   of all three operators.
23       Q. And was Forall required to
24   provide its sales figures to Simon on a
25   regular basis as well?

Page 316

1    DIRECT-EXAMINATION OF DR. A. HAMAD
2        A. Absolutely.
3        Q. Now, you testified also that you
4    had agreed for Simon and Forall to be
5    able to speak directly about
6    renegotiating the lease; is that
7    correct?
8        A. Absolutely.
9        Q. Okay.  And so once you had given
10   that consent to Forall to renegotiate
11   the lease with Simon, do you know if
12   those discussions took place?
13       A. They did.  I'm sorry.  Say that
14   again what time, 2016?
15       Q. Yes.
16       A. They did not.  Okay.
17       Q. Well, you testified that
18   discussions did take place; when are
19   you aware that discussion did take
20   place?
21       A. I'm -- ask that question again.
22   I apologize to you.
23       Q. You gave permission for Forall
24   to speak directly with Simon about
25   renegotiating the lease, correct?

Page 317

1    DIRECT-EXAMINATION OF DR. A. HAMAD
2        A. Yes, I did.
3        Q. And I'm asking you if you knew
4    if those discussions took place.
5        A. I think -- again, I'm not sure,
6    but I think they did.
7        Q. Okay.  Do you know what Simon
8    decided?
9        A. Simon decided that they do not
10   want Forall in the mall anymore.  They
11   wanted Pal Zileri out.
12       Q. And they communicated that to
13   you, Simon did?
14       A. Yes, they did.
15       Q. Do you recall -- and I apologize
16   to jump around just a little bit.  Do
17   you recall whether Forall was ever late
18   paying the rent?
19       A. Yes, they did.
20           MR. LEWIS:  I'm going to
21       show joint Exhibit 50.
22           THE ARBITRATOR:  50?
23           MR. LEWIS:  Yes.
24       Q. Dr. Hamad, can you see my
25   screen?



Page 318

```
1        DIRECT-EXAMINATION OF DR. A. HAMAD
2        A. Yes, I do.
3        Q. Is this a Simon account?
4        A. Yes, it is.  Actually, this is a
5   6/1/2016.
6        Q. And who was operating the store
7   at this point?
8        A. I think it's Simon.  I mean
9   Forall.
10       Q. And does this show an amount
11  past due?
12       A. That's what it shows, yes.
13       Q. And total outstanding amount of
14  139,252.52, and you testified earlier
15  that rent was approximately 70 thousand
16  a month, that's correct?
17       A. Exactly.  That's what I said.
18       MR. BROWN:  Could you scroll
19  up to see the top of this,
20  please.  So the statement date
21  6/16, got it.  Thanks.
22       Q. And so -- is it safe to
23  ascertain from the outstanding balance
24  being $139,000 that they were one month
25  behind?
```

Page 319

```
1        DIRECT-EXAMINATION OF DR. A. HAMAD
2        A. That's what the document shows.
3        Q. Do you recall having
4   conversations with Simon about Simon's
5   frustration with rent being paid late?
6        A. Simon sent two or three e-mails
7   to us saying that rents are late, you
8   know, and they're frustrated with that.
9        Q. So we've got mounting
10  frustration from Simon; that's safe to
11  say?
12       A. Absolutely.  On top of poor
13  performance of sales.
14       Q. All right.
15       MR. LEWIS:  I'm going to
16  show joint Exhibit 55.
17       Q. Dr. Hamad, can you see my
18  screen?
19       A. Yes, I do.
20       Q. You see this is an e-mail dated
21  February 13, 2016?
22       A. Yes, I do.
23       Q. Who is T Eads?
24       A. It was Todd Eads.  He was in
25  charge of the Cecar Palace Mall from
```

Page 320

```
1        DIRECT-EXAMINATION OF DR. A. HAMAD
2   Simon.
3        Q. I'm going to read this for the
4   record, "Hi, Dr. Hamad.  We do not plan
5   to transfer the plan to Pal Zileri
6   corporate.  It does not appear the
7   lease allows the assignment to
8   cooperate [sic]" --
9        THE ARBITRATOR:  Not "to
10  cooperate," to corporate.
11       Q. I apologize.  "Please sign the
12  paperwork and return it and we will
13  earnestly begin finding a replacement";
14  do you see that?
15       A. Yes, I did.
16       Q. So Simon is making a decision in
17  February 2016, that it will not allow
18  the Pal Zileri brand to go forward,
19  correct?
20       A. Absolutely.
21       Q. So there's been discussion about
22  Sarah, let's say, acting in concert
23  with Simon to relinquish the lease.  We
24  just seen February 2016 Simon is making
25  the decision that it won't allow Simon
```

Page 321

```
1        DIRECT-EXAMINATION OF DR. A. HAMAD
2   -- excuse me -- it won't allow Forall
3   to go forward on the lease.
4        Let's talk about what happened
5   in March of 2016.  You recall that that
6   was the month Forall was supposed to
7   provide the six-month notice to Sarah
8   whether it intended to go forward
9   operating the store?
10       A. Yes.
11       Q. Now, there is evidence that
12  Forall asked for an extension; do you
13  recall that?
14       A. Yes, I do.
15       Q. Do you know if you granted
16  Forall an extension to continue
17  thinking about whether or not it wanted
18  to operate the store after --
19       A. I do not recall.
20       Q. But you do recall them asking
21  for an extension, correct?
22       A. Yes.
23       THE ARBITRATOR:  When they
24  asked for the extension, did you
25  respond?
```



Page 322

```
 1          DIRECT-EXAMINATION OF DR. A. HAMAD
 2          THE WITNESS:  I don't recall
 3    responding Honor, but --
 4          Q. Let me --
 5          A. Go ahead.
 6          Q. Let's be clear, though, Simon
 7    had already told your company that they
 8    weren't going to go forward with Simon
 9    [sic] on the lease, they were done with
10    the brand you had already been told
11    that, correct?
12          A. Absolutely.
13          Q. So did you hear from Forall in
14    March of 2016 --
15          A. Can I make one more comment?
16          THE ARBITRATOR:  No.  Just
17    answer your lawyer's questions.
18          THE WITNESS:  Okay.
19          Q. Did you hear from Forall in
20    March of 2016?  Did Forall give you a
21    decision whether or not it intended to
22    go forward after the initial term in
23    March 2016?
24          A. Yes, they did.
25          Q. And what was their decision?
```

Page 323

```
 1          DIRECT-EXAMINATION OF DR. A. HAMAD
 2          A. They did not want to take over
 3    the lease and operate the store.
 4          Q. And so what did you do after
 5    learning that Forall would not continue
 6    operating the store after the initial
 7    term expired?
 8          A. We talked to Simon about finding
 9    a new tenant.
10          Q. And there's -- Mr. Brown spoke
11    in his opening statement about Sarah
12    entering into an agreement with Simon
13    in June of 2016 to relinquish the
14    lease; is that true?
15          A. Yes.
16          Q. And do you recall when you
17    informed Forall that Simon had found a
18    new tenant?
19          A. The first part of July.  We give
20    them a month notice [sic].
21          Q. And do you recall when Simon
22    informed you that they had found a new
23    tenant?
24          A. I think that June.  I don't
25    remember the date or maybe early July.
```

Page 324

```
 1          DIRECT-EXAMINATION OF DR. A. HAMAD
 2    I don't remember the date.
 3          MR. LEWIS:  Okay.  Mr.
 4    Farber, if I may -- may I ask for
 5    a very short five-minute break?
 6          THE ARBITRATOR:  Yes, of
 7    course.  Are you coming near a
 8    wrap, Mr. Lewis?
 9          MR. LEWIS:  I may be.
10          THE ARBITRATOR:  Sure.
11    Let's take five everyone.  All
12    right.
13          (Whereupon, a recess was
14    taken at this time.)
15          THE ARBITRATOR:  Okay.
16    Anything further, Mr. Lewis?
17          MR. LEWIS:  I'm going try to
18    be as brief as possible.
19          THE ARBITRATOR:  Go ahead.
20          MR. LEWIS:  I'm going to
21    show joint Exhibit 25.
22          Q. Can you see my screen?
23          A. Yes, I do.
24          Q. You see this is March 9, 2016?
25          A. Yes, I do.
```

Page 325

```
 1          DIRECT-EXAMINATION OF DR. A. HAMAD
 2          Q. For our purposes, we'll just
 3    look at the first paragraph first, "By
 4    letter dated February 25, 2016, Forall
 5    has notified Sarah that Forall will not
 6    be extending the terms of the party's
 7    management agreement dated February 9,
 8    2015," do you see that?
 9          A. Yes.
10          Q. Now, you do see there's language
11    here reminding you about the license
12    agreement, etcetera, the $900,000
13    calendar year, you see that this is
14    included in this letter, right?
15          A. Yes.
16          Q. But as you testified earlier,
17    Simon had already made a decision that
18    the Pal Zileri brand was not going to
19    go forward in that space?
20          A. Absolutely.
21          Q. So could you have come back in
22    and operated the store at this point?
23          A. You know, I'm going to give you
24    an example --
25          Q. Dr. Hamad --
```



Page 326

1    DIRECT-EXAMINATION OF DR. A. HAMAD
2    A. No.  Absolutely not.  The
3  biggest insanity is to keep doing the
4  things same things over and over and
5  expecting a different result.
6  Absolutely not.
7    Q. Dr. Hamad, I'm asking you just
8  very specifically about after Simon's
9  decision to -- that the brand was not
10 going forward, could you have possibly
11 come back in and run the store after
12 March 6, 2016?
13   A. No.
14    MR. LEWIS:  I'm going to
15  show Joint Exhibit 49.  This is
16  just to clean up some earlier
17  testimony.
18   Q. You said that there was an
19 e-mail about Simon being upset about
20 rent being paid late, right?
21   A. Yes.
22   Q. Okay.  And this is an e-mail
23 from you to Paolo, CEO of Forall USA,
24 in June 2016.  You say, "This is the
25 statement for the month of July.  Simon

Page 327

1    DIRECT-EXAMINATION OF DR. A. HAMAD
2  is getting upset about the delay of
3  payment, so please make sure that is
4  paid promptly by the First of July"; do
5  you see that?
6    A. Yes.
7    Q. Is this what you were talking
8  about Simon's frustration about rent
9  being paid late?
10   A. Yes.
11    MR. BROWN:  That was
12  Exhibit 49?
13    MR. LEWIS:  49.  And I'm
14  going to show 48.
15    MR. BROWN:  Can you put that
16  back up for a second?  The date
17  of that was what?
18    MR. LEWIS:  Exhibit 49.
19    MR. BROWN:  I'll go back to
20  it.
21   Q. Can you see this document?
22   A. Yes, I do.
23   Q. In July 6, 2016, this is a
24 letter to Forall's counsel, Mr. Brown,
25 from your attorney David Hochman; do

Page 328

1    DIRECT-EXAMINATION OF DR. A. HAMAD
2  you see that?
3    A. Yes.
4    Q. And it reads, "On behalf of our
5  client, Sarah LLC, I'm writing to
6  advise you that the property found a
7  new tenant for Sarah's space at the
8  Forum shops.  Existing lease will be
9  canceled effective at the closing of
10 business on July 31, 2016.  New
11 tenant's lease will begin August 1,
12 2016.  Informing Forall to arrange to
13 vacate business by July 31, 2016, at
14 that time the store will be closed
15 permanently"; do you see that?
16   A. Yes.
17   Q. Now, did Forall vacate the
18 premises by July 31, 2016?
19   A. No.
20   Q. And what did Simon do as a
21 result?
22   A. They filed a lawsuit to evict
23 them from the store.
24   Q. Who did they name of the
25 lawsuit?

Page 329

1    DIRECT-EXAMINATION OF DR. A. HAMAD
2    A. I'm sorry?
3    Q. Who did they name in the
4  lawsuit?
5    A. Sarah LLC.
6    Q. Why was Sarah the named
7  defendant?
8    A. Because we were on the lease.
9    Q. Did Sarah have to pay anything
10 as a result of that lawsuit?
11   A. Paid lawyer fees close to
12 $40,000.
13   Q. Is that part of the damages that
14 you're seeking in this arbitration?
15   A. Yes, I do.
16   Q. So when the store finally closed
17 in August of 2016, you heard from Sarah
18 prior to that, from Forall prior to
19 that, but when the store finally closed
20 in August of 2016, did you hear from
21 Forall after that?  Let me be very
22 specific, did you hear from --
23    THE ARBITRATOR:  Mr. Lewis,
24  I'm getting some feedback.  I
25  don't know if others can hear it




Page 330

DIRECT-EXAMINATION OF DR. A. HAMAD
1   DIRECT-EXAMINATION OF DR. A. HAMAD
2   as well.  It's like a -- let's
3   start again.
4        MR. LEWIS:  Sure.
5        THE ARBITRATOR:  Same thing
6   so it must be on your end.  It's
7   on your end because I'm hearing
8   it again now.  Now you're on
9   mute.
10        MR. LEWIS:  Did it go away
11   when I muted?  So it's probably
12   -- I can resolve that by coming
13   out of the meeting and coming
14   back in.  I'll try to do that as
15   quickly as possible.
16        THE ARBITRATOR:  All right.
17   Go ahead.
18        (Whereupon, a recess was
19   taken at this time.)
20        MR. LEWIS:  Is that better?
21        THE ARBITRATOR:  No.
22        MR. BROWN:  Can you use the
23   phone option?  Do you want me to
24   ask him your questions?
25        MR. LEWIS:  I appreciate

Page 331

1   DIRECT-EXAMINATION OF DR. A. HAMAD
2   that.
3        THE ARBITRATOR:  Mr. Brown,
4   that was a good one.
5        MR. LEWIS:  Is that any
6   better?
7        THE ARBITRATOR:  Yes.
8   Q. So, Dr. Hamad, I was asking you
9   if after the store closed in October of
10   2016, you heard from Forall?
11   A. No.
12   Q. What did you think had happened?
13   A. I think they locked away.
14   Q. Is that what you all had done?
15   You thought everyone had gone their
16   separate ways?
17   A. The store performed poorly,
18   closed, and everybody walked away.
19   Q. And wasn't that consistent with
20   what the agreement was on the six-month
21   notice that the store would be turned
22   back in to Simon?
23   A. Absolutely.
24   Q. Now, it came a time that you did
25   hear from Forall, again, at some point,

Page 332

1   DIRECT-EXAMINATION OF DR. A. HAMAD
2   right?
3   A. Yes.
4   Q. And when was that?
5   A. In November 2017.
6   Q. And was that when you received
7   the demand letter?
8   A. Yes.
9        MR. LEWIS:  Showing Joint
10   Exhibit 62.
11   Q. Dr. Hamad, can you see my
12   screen?
13   A. Yes, I do.
14   Q. Now, you see this is a letter to
15   David Hochman from Stephen Brown; do
16   you see that?
17   A. Yes, I did.
18   Q. Do you see the big bold letters
19   right here, "Prepared in anticipation
20   of litigation"?
21   A. Yes, I do.
22   Q. And so this was the first time
23   you heard from Forall since August of
24   2016, this demand letter, right?
25   A. Yes, I did.

Page 333

1   DIRECT-EXAMINATION OF DR. A. HAMAD
2   Q. And Forall is seeking
3   4.5 million dollars from you and your
4   brother, right?
5   A. Yes, I do.  I don't know why,
6   but I do.
7   Q. How are you doing, Dr. Hamad?
8   Still okay?
9   A. Yes, it's okay.  I'm fine.
10   Q. Okay.  You've spoken about some
11   of your financials, and I just want to
12   show it so you can speak to the
13   document.  Okay?
14        MR. LEWIS:  I'm going to
15   show joint Exhibit 41, and I'm
16   almost done.
17   Q. Dr. Hamad, can you see my
18   screen?
19   A. Yes.
20   Q. Explain for Mr. Farber what this
21   is and what it's showing us?
22        THE ARBITRATOR:  Is this one
23   in evidence?
24        MR. LEWIS:  It is.
25   A. So that show the total assets




Page 334

1          DIRECT-EXAMINATION OF DR. A. HAMAD
2     liability for Sarah LLC after -- which
3     is 5/3/2013 this is almost less than
4     two years into the operations.
5          Q. Okay.  And -- all right.  So
6     will you tell Mr. Farber what the
7     significance of this is?  What's the
8     takeaway that you have from this?
9          A. It shows the liability of 1.191
10    million dollars [sic] and on that store
11    in operations, which means at that
12    point -- this is not taking into
13    consideration that build out of the
14    store.  This is how much we lost money.
15    How much liability we have.
16         Q. "Total net income, total equity
17    figure," what is that?
18         A. Which one?  I'm sorry.  I have
19    to take a look.  It's total liquidity
20    in the minus, 952,000.  Returned
21    earnings in the minus.  You know,
22    everything is in the minus.  I mean, as
23    far as I could look here.
24         THE ARBITRATOR:  Well, the
25    biggest number by far is what

Page 335

1     DIRECT-EXAMINATION OF DR. A. HAMAD
2     says "Due to Members;" what is
3     that?
4          THE WITNESS:  Those are the
5     loans we provided to Sarah LLC,
6     Honor.  That's my loan to the
7     store.  I put my saving and I
8     took a loan on my house, because
9     I believed in what they told us.
10         THE ARBITRATOR:  And Dr.
11    Hamad, this balance sheet, who
12    prepared it?
13         THE WITNESS:  My tax people.
14    This is provided to the IRS, I
15    think.  This is our tax paper.
16         THE ARBITRATOR:  All right.
17         MR. LEWIS:  If you're done,
18    Mr. Farber, I'm going to stop the
19    share.
20         THE ARBITRATOR:  Do you have
21    anything else, Mr. Lewis?
22         MR. LEWIS:  I've got sales
23    figures, but I can do that with
24    Dr. Hamad's brother.
25         THE ARBITRATOR:  It's up to

Page 336

1               PROCEEDINGS
2     you.
3          MR. LEWIS:  I think it's
4     probably a good place to stop.
5          THE ARBITRATOR:  All right.
6     Then what I'd like to do before
7     we talk about the cross -- which
8     we might pick up in the morning
9     -- is let's take a look for a
10    minute at Respondent's exhibit
11    book.  And can you tell me, Mr.
12    Lewis, which, if any, of these
13    documents you still object to.
14         MR. LEWIS:  I'm in a bit of
15    a disadvantage that I don't have
16    respondents hard copies, so we've
17    got a spreadsheet we've put
18    together and I'm going to pull up
19    and work from, and I'd like Mr.
20    Shah to join me in this, because
21    he's been working closely on the
22    documents.
23         THE ARBITRATOR:  That's
24    fine.  Mr. Shah, if you're the
25    one who wants to tell me about

Page 337

1               PROCEEDINGS
2     this, that's fine.
3          MR. LEWIS:  Again, to Mr.
4     Brown's credit, he and I spent
5     some time on these documents when
6     we were preparing for testimony,
7     and I really thought we were
8     further along in terms of have
9     having an agreement on all of
10    them, but we've got Exhibit 125,
11    126, 127, 128, 129, 144, and 145
12    that contain accounting, so it's
13    not as much an objection as --
14         THE ARBITRATOR:  Hang on.
15    The ones you just read off, do
16    you still object to those or not?
17         MR. LEWIS:  Again, Mr.
18    Farber, it's not an objection as
19    much as we need someone to
20    translate it, the Italian portion
21    of the documents.
22         THE ARBITRATOR:  Oh, it's in
23    Italian.  I didn't know that.
24         Mr. Brown, it's tough to get
25    someone on the last minute to




Page 338

```
 1              PROCEEDINGS
 2  agree or disagree if he doesn't
 3  have them translated, so.
 4       MR. BROWN:  Well, Your
 5  Honor, they were provided over a
 6  year ago, and I don't -- I'm
 7  looking at 125.  I don't see any
 8  Italian.  Earlier on there is
 9  some Italian from Luca.
10       THE ARBITRATOR:  Hold on,
11  Mr. Brown.
12       Mr. Lewis, I'm being told
13  these were provided a year ago.
14       MR. LEWIS:  We've had them
15  for a while; that is correct.
16       THE ARBITRATOR:  Then why
17  should I give any credence to an
18  objection that you haven't had
19  time to get them translate.
20       MR. LEWIS:  Well, I can
21  appreciate that, and perhaps we
22  can work to do that before
23  Mr. Brown needs to use them when
24  he's presenting his case.  I was
25  really more saying it in case the
```

Page 339

```
 1              PROCEEDINGS
 2  witness who's being shown that
 3  can translate it for us and tell
 4  us what that means in English,
 5  but either way is fine.
 6       THE ARBITRATOR:  Let me go
 7  back.  Exhibits 117, 119, and
 8  120, do you have any objection?
 9       MR. LEWIS:  117, no.  119,
10  no. 120, no.
11       THE ARBITRATOR:  Okay.  So
12  those are going to be in evidence
13  on consent.
14       Now, 125, 126, 7, 8, 9, 144
15  and 145, do you have any other
16  objections other than there are
17  portions in Italian?
18       THE ARBITRATOR:  That's the
19  only objection.  Objection is
20  overruled.  The documents are
21  received.
22       MR. LEWIS:  Mr. Farber, may
23  I share with you the exhibit
24  numbers where we're withdrawing
25  our objection.
```

Page 340

```
 1              PROCEEDINGS
 2       THE ARBITRATOR:  Well, let
 3  me go in order as long as I'm
 4  doing it this way.
 5       157, 158 did you have
 6  objections?
 7       MR. SHAH:  We do have
 8  objections.
 9       THE ARBITRATOR:  What is the
10  objection on there?
11       MR. SHAH:  Authentication.
12  157 is a list and it's not clear
13  who prepared that list.
14       THE ARBITRATOR:  Okay.  Then
15  we're not going to admit those
16  right now.  What about 158?
17       MR. SHAH:  It's a receipt
18  and same, we don't know who
19  prepared the receipt.
20       THE ARBITRATOR:  What about
21  174, 6, 7, 8 and 9.
22       MR. BROWN:  How do you --
23  it's a receipt -- it's a
24  document.  I mean, I don't
25  understand that objection to 158,
```

Page 341

```
 1              PROCEEDINGS
 2  but honestly, if I need that
 3  document to demonstrate we turned
 4  in the keys on August 9th, I'll
 5  put follow on and get it on.
 6  That's not a big deal.  Whatever.
 7  It's not a legitimate objection.
 8       THE ARBITRATOR:  All right.
 9  174, 6, 7, 8, and 9, any
10  objection?
11       MR. SHAH:  174 there is no
12  description on Respondent's
13  spreadsheet.  I believe the entry
14  for that was blank.
15       THE ARBITRATOR:  All right.
16  Then what about the others?
17       MR. LEWIS:  Mr. Brown, you I
18  talked about these.  What "CMs"
19  mean, I'm not sure that either
20  call or --
21       MR. BROWN:  These were
22  information and reports run from
23  Ms. Settimi's office for Forall
24  out of her accounting software.
25  They're certainly relevant.  We
```




Page 342

PROCEEDINGS
1
2  can put them on now or I can put
3  her on, but we haven't been doing
4  that with each of these
5  documents.
6      These are accounting entries
7  regarding advertising costs,
8  discounts, credits given, this is
9  all the back up for the
10  financials of what was credited
11  and ordered by.
12      THE ARBITRATOR:  Mr. Lewis,
13  Mr. Shah, do you have objections
14  to these or not?
15      MR. LEWIS:  If -- if he has
16  a witness that -- obviously, we
17  haven't been put through our
18  basis on doing foundation, but I
19  believe that we have sales
20  figures that we received from
21  Simon that Mr. Farber said we
22  would have to lay a foundation
23  for.
24      If Mr. Brown can lay a
25  foundation for one, I have no

Page 343

PROCEEDINGS
1
2  objection to the rest.
3      MR. BROWN:  That's
4  different.  The Simon objection
5  you just provided them post
6  sharing an exhibit list, not
7  discovery time period.  I
8  provided these over a year ago.
9  They were responsive and they're
10  absolutely germane, and it's not
11  an analogy to form to the Simon
12  docs which were received only 10
13  days.
14      THE ARBITRATOR:  Any further
15  response on that point Mr. Lewis
16  or Mr. Shah?
17      MR. LEWIS:  No objection,
18  Your Honor.
19      THE ARBITRATOR:  All right.
20  Then all those are in.  What
21  about 184?
22      MR. LEWIS:  I would say
23  this, and again back to the
24  meeting I had with Mr. Brown, my
25  understanding is how we agreed to

Page 344

PROCEEDINGS
1
2  resolve these objections were
3  laying some kind of foundation
4  for the financial documents, and
5  we -- that would resolve our
6  objections.  That's what I
7  thought we left it.
8      THE ARBITRATOR:  Isn't one
9  before an e-mail with some
10  attached financial information?
11      MR. BROWN:  Yes, it is.
12  From Luca Spano, December 11,
13  2011.
14      THE ARBITRATOR:  So what's
15  the problem with 184?
16      MR. LEWIS:  Again, it's not
17  a problem per se with that
18  document as it is with the
19  standard alone financials that
20  were being offered on both sides,
21  that both sides objected to.
22      You allowed ours in earlier,
23  Mr. Farber, and so in spirit of
24  that same, if these are
25  standalone documents that they

Page 345

PROCEEDINGS
1
2  produced timely --
3      THE ARBITRATOR:  184 is in.
4  What about 196, 7, and 8?
5      MR. SHAH:  We've withdrawn
6  our objections to those three.
7      THE ARBITRATOR:  What about
8  202, 203, and 204.
9      MR. SHAH:  Objection to 202.
10  It's a standalone excel document.
11  There's no parent e-mail.  It's
12  not clear who prepared the
13  document and what the context of
14  the document is.
15      MR. BROWN:  This was
16  provided to me from Palma
17  Settimi's files, Your Honor, so
18  these were paper files that were
19  copied, but it's relevant.  The
20  title of it is "Sarah
21  Invoices/Statement," about it's
22  the purchase orders and then the
23  construction discount that we
24  applied to that.  This whole
25  subset is that.

87  (Pages 342 to 345)




Page 346

```
 1              PROCEEDINGS
 2          THE ARBITRATOR:  I'm going
 3  to take these documents, but you
 4  certainly can ask about them, and
 5  they'd be subject to a motion to
 6  strike if I'm not convinced that
 7  they're authentic.  So those
 8  three are going to be in as well.
 9          All right, 208 and 209?
10          MR. SHAH:  Your Honor, 208
11  we're objecting to it.  It's a
12  handwritten note with two numbers
13  on it for authentication.  And
14  then 209 is a typed note with
15  just one phrase on it.  There's
16  no context.  We have no idea who
17  prepared these.
18          THE ARBITRATOR:  Right.  I
19  think Mr. Brown on these two
20  you've got to lay a foundation.
21          MR. BROWN:  All right.
22  Fine.
23          THE ARBITRATOR:  All right
24  so those two are not in.  221?
25          MR. SHAH:  We withdraw our
```

Page 347

```
 1              PROCEEDINGS
 2  objection to that.
 3          THE ARBITRATOR:  225, 26,
 4  and 28.
 5          MR. LEWIS:  I know 225 we
 6  resolved our objection on.
 7          THE ARBITRATOR:  226?
 8          MR. BROWN:  226.
 9          MR. LEWIS:  Well, 226 we
10  just received this weekend, so
11  our objection stands on that.
12          THE ARBITRATOR:  What is it?
13          MR. LEWIS:  The description
14  we have is it's an expense sheet
15  run accounting software, Las
16  Vegas rent expenses.
17          THE ARBITRATOR:  Mr. Brown,
18  any comment?
19          MR. BROWN:  Yeah.  831 is a
20  report Ms. Settimi ran from her
21  accounting software relative to
22  this.  I apologize, we were
23  crunched with time so this isn't
24  exactly how I would have -- I
25  didn't expect to find this
```

Page 348

```
 1              PROCEEDINGS
 2  exhibit here.
 3          Why don't we just -- there's
 4  actually two different exhibits,
 5  and they're broken out later in
 6  these spreadsheets, so I think
 7  226 should really just be
 8  stricken as a non-exhibit and 228
 9  seems to be totally blank.
10          THE ARBITRATOR:  All right.
11  So 226 and 228, no.  287, 88 --
12  I'm sorry I skipped 286.  86, 87,
13  88, 89 and 90.
14          MR. SHAH:  We withdrew our
15  objections to those.
16          THE ARBITRATOR:  317 and 18.
17          MR. SHAH:  These are
18  settlement communications between
19  Forall and Sarah and their
20  counsel.  We'd argue that they're
21  inadmissible pursuant to Rule
22  4547.
23          THE ARBITRATOR:  Mr. Brown.
24          MR. BROWN:  They claim that
25  they had never heard from us
```

Page 349

```
 1              PROCEEDINGS
 2  again until a year later, and
 3  that's certainly relevant to that
 4  argument, to the extent that is
 5  even an argument.
 6          THE ARBITRATOR:  The
 7  objection is going to be
 8  sustained.  I'm not taking
 9  settlement documents.  If you
10  want to establish communication,
11  you can ask a witness about that,
12  and if the witness needs his or
13  her recollection refreshed by
14  reference to this you can do it,
15  but I'm not going to -- I think
16  Mr. Lewis is correct -- Mr. Shah
17  is correct.  I'm not going to
18  take settlement documents.
19          MR. BROWN:  But you know, I
20  don't know if -- can we just
21  double-check this notion that
22  this was a settlement discussion?
23  Give me one second.  I haven't
24  heard that --
25          THE ARBITRATOR:  The subject
```




Page 350

1              PROCEEDINGS
2    description says "Rejection of
3    Sarah settlement proposal."
4         MR. BROWN:  That's the
5    second document.  The first
6    document doesn't say that.  I'm
7    just -- bear with me.  My e-mail
8    does say for settlement purposes
9    only, so all right.
10        THE ARBITRATOR:  534?
11        MR. SHAH:  We've withdrawn
12   our objection to that.
13        THE ARBITRATOR:  529.
14        MR. SHAH:  Your Honor, we're
15   going to object because that's a
16   settlement communication as well.
17        MR. BROWN:  I just want some
18   basis to introduce the fact that
19   discussions were had, and I'll be
20   willing to redact any actual
21   settlement numbers that are
22   discussed, but I'm not -- I
23   can't, as I sit here right now,
24   say that the discussion itself
25   wasn't germane to this issue.

Page 351

1              PROCEEDINGS
2         THE ARBITRATOR:  Why as
3    arbitrator is it important for me
4    to know whether or not there were
5    settlement discussions?
6         MR. BROWN:  Because this was
7    -- this was right at the heels of
8    our eviction, so, you know, we
9    may have said -- I don't know.
10   I'll look at it again.  I think
11   if it's important, I may -- let
12   me reserve the right to bring it
13   back up, if you don't mind.
14        THE ARBITRATOR:  You can try
15   it again, but right now I think
16   that Mr. Lewis and Mr. Shah have
17   the better of the argument, so
18   I'm going to agree with their
19   position, and I'm going to
20   sustain that objection.
21        Last 198 and 599?
22        MR. BROWN:  These are
23   documents that I produced very
24   late in the game.  They were
25   produced by Ms. Settimi upon prep

Page 352

1              PROCEEDINGS
2    of this -- of her testimony here.
3    They were, to the extent not
4    previously produced,
5    inadvertently not previously
6    produced, but they're important
7    to the case.
8         The first 831 is the credit
9    month memo that Forall credited
10   to the Italnord, so this was not
11   actually something that was
12   requested in the document
13   production, but it demonstrate
14   that this movement of the $38,000
15   which is at issue here.
16        THE ARBITRATOR:  Mr. Lewis,
17   Mr. Shah, what's the basis of
18   your objection?
19        MR. LEWIS:  Well, the fact
20   that we received it two days ago
21   while we were preparing for this
22   arbitration is the primary
23   objection.
24        THE ARBITRATOR:  Mr. Brown
25   is telling me that this was not

Page 353

1              PROCEEDINGS
2    the subject a document request;
3    do you agree?
4         MR. LEWIS:  We certainly
5    disagree.  This is our damages.
6    38,000 is one of the -- a portion
7    of the damages that we're
8    claiming, and this is proof that
9    Forall credited this to Italnord
10   when we're saying that should
11   have been credited to us.
12        MR. BROWN:  So then let it
13   in, and we can talk about it.
14   What's the objection?
15        THE ARBITRATOR:  Okay.  No.
16   I think that since it was
17   produced two days ago, and it was
18   the subject of a document
19   request --
20        MR. BROWN:  What document
21   request?  I have it right here.
22   I can look at it.  Which number?
23        MR. LEWIS:  I don't have it
24   right here.
25        MR. BROWN:  I think we need



Page 354

```
 1          PROCEEDINGS
 2   to know that before we state that
 3   affirmatively.
 4          THE ARBITRATOR:  Gentleman,
 5   at this point I think Mr. Lewis
 6   has the better of the argument.
 7   I will not take it.
 8          But Mr. Lewis, I do want
 9   you, between to night and
10   tomorrow morning, or Mr. Shah, to
11   send an e-mail to Mr. Brown
12   indicating which document
13   request.
14          And Mr. Brown, you can
15   re-raise this issue depending
16   upon the nature of the response,
17   all right?
18          MR. BROWN:  All right.
19   Thank you.
20          MR. SHAH:  What exhibit
21   number, again?
22          THE ARBITRATOR:  I'm talking
23   about 598 and 599.
24          MR. SHAH:  Thank you.
25          THE ARBITRATOR:  So just to
```

Page 355

```
 1          PROCEEDINGS
 2   summarize, except for 157, 158,
 3   208, 209, 226, 228, 317, 318,
 4   592, and tentatively 598 and 599,
 5   all the other documents are
 6   admitted.  Okay.
 7          Ladies and gentlemen, in my
 8   view you've worked very hard
 9   today.
10          Maggie, how many pages did
11   we do today?
12          Well, that's certainly a
13   good day of testimony and
14   argument, and I appreciate your
15   hard work.  We're going to pick
16   up the cross tomorrow at 9:30.
17          Two other points as
18   indicated, I have to give a
19   lecture on arbitration between
20   9:00 and 9:30, so I may be a
21   minute or two late.
22          And number two, Dr.
23   Hamad, tomorrow, when you're
24   preparing the cross examination,
25   I'd like you to have a pad with
```

Page 356

```
 1          PROCEEDINGS
 2   you for your testimony, all
 3   right, a pencil and pad.
 4          MR. LEWIS:  Okay.  Thank
 5   you.
 6          THE ARBITRATOR:  All right,
 7   everyone.  Does anyone else have
 8   anything else that you feel needs
 9   to be raise before we adjourn,
10   Mr. Lewis, Mr. Shah?
11          MR. LEWIS:  Nothing on my
12   end.
13          THE ARBITRATOR:  Mr. Brown,
14   Mr. Crowe?
15          MR. BROWN:  Yes.  Can we
16   just get some insight as to our
17   adversary's witness plan for
18   testimony after we get through
19   with this gentleman?
20          THE ARBITRATOR:  Fair
21   request.
22          Mr. Lewis, who do you have
23   on tomorrow?
24          MR. LEWIS:  Tonight I'm
25   going to decide whether or not
```

Page 357

```
 1          PROCEEDINGS
 2   I'm going to need to present both
 3   Ghanem and Dr. Bachar Hamad.  It
 4   may just be one.  So I would like
 5   to be able to get through all of
 6   our witnesses tomorrow.
 7          THE ARBITRATOR:  Okay.  When
 8   you've made that decision, I'd
 9   like it, even if it's very late,
10   for you to send an e-mail to Mr.
11   Brown and Mr. Crowe with a copy
12   to me of what your decision is.
13          And then, Mr. Brown, Mr.
14   Crowe, if he's finished tomorrow
15   -- well, let me ask you, Mr.
16   Brown, do you have any
17   anticipation right now of how
18   long your cross is going to be?
19          MR. BROWN:  It's going to be
20   a couple of hours.  No question.
21          THE ARBITRATOR:  Okay.  Then
22   I think we have time to deal with
23   all of that.  All right.  And
24   what I would like you to do is --
25   do you know who your first
```





Page 358

```
 1              PROCEEDINGS
 2    witness is going to be,
 3    Mr. Brown?
 4         MR. BROWN:  Not as I sit in
 5    the chair right now, no.
 6         THE ARBITRATOR:  Okay.  Same
 7    decision, you may not know
 8    tonight, because you may only
 9    want to decide after you've heard
10    their testimony, but when you do
11    know, I'm going to want you to
12    e-mail Mr. Lewis and Mr. Shah and
13    tell them who you decided it
14    should be, all right?
15         MR. BROWN:  No problem.
16         MR. SHAH:  Mr. Farber, just
17    one thing for the e-mail we're
18    going to send about the
19    witnesses, Mr. Brown, could you
20    send us Mr. Crowe's e-mail
21    address?
22         MR. CROWE:  I'll give you it
23    right now.
24         It's vcrowe@BTSlaw.com.
25         THE ARBITRATOR:  All right
```

Page 359

```
 1              PROCEEDINGS
 2    everyone.  Thank you very much.
 3         (Time noted:  5:29 p.m.)
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 360

```
 1
 2         C E R T I F I C A T E
 3      I, MAGDALENA M. ARTILES, a shorthand
 4    reporter and Notary Public within and
 5    for the State of New York, do hereby
 6    certify:
 7      That the Witness(es) whose testimony
 8    is hereinbefore set forth was duly sworn
 9    by me, and the foregoing transcript is a
10    true record of the testimony given by
11    such Witness(es).
12      I further certify that I am not
13    related to any of the parties to this
14    action by blood or marriage, and that I
15    am in no way interested in the outcome
16    of this matter.
17
18
19
20
21
22
23
24         Magdalena M. Artiles, a Court
             Reporter and Notary Public
25         Date: November 5th, 2020
```





**A**

**A-M-A-R** 236:3
**A.M** 1:11
**abided** 97:14
**ability** 6:12 19:11
  58:15 171:17
  172:2,8 173:2
  173:12 177:11
  178:6 185:3
**able** 25:21 34:16
  42:7,24 57:22
  57:23 68:25
  107:19,21
  108:19 118:24
  130:19 200:23
  210:25 246:20
  261:12 264:2
  272:10 316:5
  357:5
**absentee** 86:24
**absolute** 45:23
  311:6
**absolutely** 23:3
  29:16 32:10
  40:13 48:9 53:5
  97:7 125:24
  134:22 145:4
  158:2 161:3
  242:5 243:2
  253:16,21
  256:6,6 259:10
  259:14 264:13
  269:5 279:18
  281:16 289:21
  298:3,23
  299:10,13,15
  302:3,20
  303:22 304:9
  309:6,24
  310:21,25
  312:10,24
  315:13 316:2,8
  319:12 320:20
  322:12 325:20
  326:2,6 331:23

343:10
**accept** 26:24
  150:3
**acceptable**
  297:19
**accepted** 284:20
  306:4
**access** 200:21
**accomplish**
  224:10
**account** 50:25
  53:2,17 318:3
**accounting** 52:16
  199:20 200:22
  233:3 337:12
  341:24 342:6
  347:15,21
**accurate** 73:14
  104:20 159:11
  174:14 195:6
  202:10,12
  203:4,11
**accusation**
  202:12
**achieve** 140:9
  151:24,25
  310:17
**acquainted** 124:5
**act** 225:14 306:8
**acting** 320:22
**action** 54:19 61:9
  61:16 360:14
**actions** 273:25,25
**actors** 264:22,23
**actual** 80:25
  112:6 283:5
  350:20
**addition** 49:12
  49:16
**additional** 27:7
  27:14 30:24
  80:15 207:6
  260:13 265:6
**address** 6:20
  120:25 121:5
  176:5 235:24

236:4 358:21
**adjourn** 356:9
**adjust** 19:20
  120:11 238:4
**administrative**
  11:6 134:18
  137:5
**administratively**
  133:23
**admit** 340:15
**admitted** 107:4
  355:6
**advance** 59:10
  78:3 197:5
  208:24 264:5
  307:5
**advantage** 51:23
  305:17
**adversary's**
  356:17
**advertisement**
  205:18 229:18
  229:19
**advertisements**
  256:7
**advertising** 14:25
  63:6 92:6,12
  201:21 203:10
  227:5,10 228:2
  228:24 229:4,9
  229:21 256:10
  258:15 259:8
  342:7
**advice** 168:23
  226:8 283:20
**advise** 80:12
  92:14 328:6
**advised** 297:15
**advises** 311:24
**affect** 56:8
  138:19
**affirmative**
  228:3
**affirmatively**
  354:3
**afternoon** 101:25

162:19 274:25
**agency** 160:15
  160:18
**agent** 71:16
**ago** 42:23 43:12
  69:3 109:8,11
  115:8 117:13
  147:16 166:7
  274:2 338:6,13
  343:8 352:20
  353:17
**agree** 36:6,9 88:4
  142:6 190:10
  256:2,8 276:16
  306:15 338:2
  351:18 353:3
**agreed** 17:5
  35:20 47:23
  59:25 65:6
  96:23 190:7
  191:23 217:12
  233:20 234:9
  256:13 258:18
  298:20 316:4
  343:25
**agreement** 16:8
  20:20,21,23,25
  21:4,10,12
  22:12,15 26:8
  26:10 28:15
  29:7,13,15,20
  30:11 35:2,6,9
  35:17,21 36:6
  36:16,24 37:5
  39:8,17 41:3,9
  41:11,12,18,19
  42:23 46:23
  47:2 48:2 57:14
  58:11 59:11,21
  60:5 64:11,22
  65:5,13 70:12
  72:16 92:9,11
  92:16 93:17,21
  95:10 96:3,17
  97:2,3,9,14,17
  98:18 100:4

130:8,22 134:2
  134:7 137:9,25
  138:6 139:10
  139:19 140:15
  140:18 152:8
  152:10,12,15
  152:16,23
  169:13 170:10
  170:18,23
  172:5 173:25
  177:17 179:2
  179:14 181:16
  182:7,14 185:3
  185:21 186:4,6
  186:17,18
  187:7,19 188:5
  192:3 195:20
  197:25 198:6
  201:11,22
  202:2 205:22
  209:10 212:15
  217:24 218:22
  219:2 220:8,17
  220:20,21,25
  221:17 222:2
  222:24 223:3,6
  223:11,15,18
  224:4,14,19,20
  224:24 225:9
  225:20,20
  226:2,5,25
  227:9,18
  228:23 229:22
  229:22 240:22
  241:5,12 243:8
  252:5 253:18
  253:19,24
  258:9 278:7
  279:22 280:9
  280:10,17
  282:20,24
  284:22 286:7
  286:10,21,23
  286:24 287:5,6
  287:13 288:22
  289:7,20 290:7



290:16,21,25
291:2,13,15
292:7,16,18,23
295:11,15,22
297:22 298:6,8
299:9,17
300:11,17
301:5 306:20
307:2,3,8 312:2
312:15 314:16
315:7,12
323:12 325:7
325:12 331:20
337:9
**agreements**
10:25 21:11
25:9 27:3 41:7
64:8 68:24 69:3
69:18 170:21
170:24 171:7
171:10
**agrees** 311:3
**ahead** 7:2 12:4
12:20,20 19:16
19:23 20:10
27:17 31:25
34:15 43:6 44:9
44:12 45:19
57:12 60:10,21
68:9 89:22
107:6 114:12
128:18,19
133:21 136:15
136:16 137:6
139:2,3 153:3
154:14 155:3
158:15 169:22
184:17 187:8
189:3 210:3,4
213:21 220:5
231:18 239:17
243:5 250:13
251:9 262:3
263:9 268:6
282:11,12
290:2 292:25

305:24 314:21
322:5 324:19
330:17
**ALBASHA** 1:4
**Alfonso** 13:18
146:6 150:8,24
216:14,20,24
216:25 220:18
221:12 276:19
279:9 285:4,12
285:19,24
286:5 299:18
304:25
**Alfonso's** 297:24
**aligned** 73:20
**allegation** 60:23
62:5 69:7
106:11 174:14
202:10 203:2,4
203:8,11 227:4
**alleged** 62:8,9
63:10 90:14
174:8 188:8
202:5
**alleges** 186:5
**allotment** 206:5
**allow** 37:16 59:5
251:10 273:10
285:19,23
320:17,25
321:2
**allowed** 35:9
57:9 344:22
**allowing** 57:15
60:12
**allows** 320:7
**alongside** 4:10
**alright** 218:7
**alter** 49:22
225:15
**altered** 41:13
**Amar** 1:4 2:18
4:15 5:3,7
46:13 96:21
235:6 236:3
**ambitious** 12:9

12:24
**amend** 248:4
**amended** 40:24
90:11
**amendment**
106:12
**America** 13:2,24
178:8 264:8
277:3 313:18
**American** 1:2
181:17
**Amex** 186:25
**amount** 38:2
81:19 86:14
133:3 140:13
141:14,19
200:13,14
202:7,14
205:25 206:3
210:16 211:22
217:19 227:12
227:14 229:13
246:5 257:8
259:8 318:10
318:13
**amounting** 26:11
**amounts** 201:20
**analogy** 343:11
**analysis** 168:12
**ancillary** 21:10
**and-** 1:6 2:10,15
**and/or** 315:6
**Andrew** 236:4
**annually** 26:19
**answer** 76:6
110:10 121:24
122:6 125:14
132:16 137:19
138:25 148:5
154:25 157:12
158:5,10
172:21 188:15
206:25 214:5
219:15 236:25
239:22 244:10
244:14 262:15

264:17 268:20
286:18 313:15
322:17
**answered** 202:24
209:16 228:3
229:16
**answers** 74:2
273:19
**anticipate** 18:10
19:18 20:13
104:19
**anticipated** 61:5
164:25
**anticipation**
332:19 357:17
**anticipatory**
95:20
**anxious** 290:12
**anybody** 167:4
287:2
**anymore** 78:15
317:10
**anyone's** 61:18
**anyway** 32:3
**Apartment** 121:7
**apologize** 8:8
11:13 81:15
113:18 174:4
175:11 316:22
317:15 320:11
347:22
**apostrophe** 4:21
**apparently** 112:3
**appear** 5:18
136:7 320:6
**appearance** 6:10
**appearing** 4:10
**appears** 136:8
**applicable**
274:11
**applied** 206:10
345:24
**appreciate** 54:3
120:10 123:13
284:9 330:25
338:21 355:14

**approach** 259:11
259:15 300:10
**approached**
51:11 55:6,8
72:24 90:21
95:3 160:22
161:5
**approaching**
304:6
**appropriate**
78:16 102:8
202:14 203:10
230:3
**approval** 57:13
78:6 182:5
**approve** 151:13
**approximately**
51:19 53:10
63:5 124:19,22
304:16 318:15
**April** 59:12
186:20
**arb** 25:13 27:15
**arbitration** 1:2,3
1:14 13:12 62:6
119:13 120:18
125:10 128:15
172:18 174:8
235:16 329:14
352:22 355:19
**arbitrator** 1:19
2:4 4:2,16,23
5:5,10,24 6:15
6:19,24 7:18,22
8:3,11,15,18,23
9:10 12:11 16:2
17:16 18:23
19:23 20:10
22:17 24:3,10
25:6,16,23
27:16,19 28:11
28:19 30:5,15
31:3,13 32:7,13
32:17 33:2,12
34:7,8,18 36:3
36:14 39:25



40:15 42:2 43:5
43:19,22,25
44:8,19 45:8
48:18,24 49:25
53:25 54:10
58:3,18 64:2
65:18 66:2,12
67:2,7,10,14
68:3,7 72:18
74:9 76:5 77:5
79:13 82:10
87:10 88:25
90:13 97:23
99:18,21
101:17,20
102:23 103:17
104:10,16
105:8 107:2,15
107:25 108:5
109:15 110:4
110:18 111:5
111:11,16,22
112:15,20
113:14 114:5
114:10,21
115:5,9 116:17
117:9 118:8,23
118:25 120:5,9
120:22 121:9
121:12,22
122:10 123:5
125:6,9 128:8
128:13 132:10
132:15 133:16
134:21 135:16
136:2,9,21
137:6,14,20
138:24 148:7
149:10 150:12
150:18 151:8
152:2,14,22
153:3,25
154:12,21
155:2 157:11
157:18 158:3
158:14 161:22

163:7,11,22
164:7,17 165:9
165:14 167:18
167:23 168:16
172:11,17,23
182:19,22
183:3,7,22
184:2,12,16
185:16 187:25
188:17 189:13
189:17 190:2,5
190:11,16,23
191:5,12,20
192:6,11,16,22
193:7,14,23
194:8 206:17
206:24 207:16
209:18 210:2
212:24 213:12
214:4,12,20
215:6,14,18
216:5,9,19
219:9,19 220:4
222:12,15
228:8 230:11
230:13,19,22
231:3,9,23
233:13,16
234:3,11,19
235:2,10,21
236:7,11,23
237:9 238:10
238:16,22
239:8,16 240:2
240:16,20
242:8,13,22
243:4 244:2,9
244:18,22
245:12,23
246:3 247:2,6
247:10,16,23
248:12 249:6
249:21 250:6
251:25 257:11
257:17 258:8
258:17 259:2

260:21 261:3
261:11,22
262:2 264:16
266:17,24
273:2,4 274:3
274:18,23
275:12,16,22
278:11 281:25
282:11 283:14
283:24 284:8
287:10,18
288:2,7 289:5
289:11,16,18
289:22,25
290:20,24
291:17 292:2,5
292:24 296:4
308:5 309:25
313:11 317:22
320:9 321:23
322:16 324:6
324:10,15,19
329:23 330:5
330:16,21
331:3,7 333:22
334:24 335:10
335:16,20,25
336:5,23
337:14,22
338:10,16
339:6,11,18
340:2,9,14,20
341:8,15
342:12 343:14
343:19 344:8
344:14 345:3,7
346:2,18,23
347:3,7,12,17
348:10,16,23
349:6,25
350:10,13
351:2,3,14
352:16,24
353:15 354:4
354:22,25
356:6,13,20

357:7,21 358:6
358:25
**area** 87:17
141:20 189:3
192:13,15
193:11,13
274:15
**areas** 254:17
283:18
**argue** 58:10
348:20
**arguendo** 217:17
**argument** 9:25
10:2 17:18
34:11 40:18
45:17 72:20
88:24 96:10
165:10 349:4,5
351:17 354:6
355:14
**argumentative**
34:5
**arguments** 142:4
273:20
**arising** 225:18
**arrange** 328:12
**arrangement**
17:13 22:9,11
22:22 23:2 28:2
28:22 69:24
138:5 277:14
311:23 312:5
**arrive** 140:11
**article** 117:8
**Artiles** 1:16
360:3,24
**ascertain** 318:23
**Asia** 91:13
249:15
**asked** 17:20
30:20,23 74:10
87:11 115:24
116:8 122:7
130:4,5 139:24
140:5 142:23
144:15,18

145:15,17,20
161:10 171:21
171:22 191:10
191:22 197:25
209:16 227:22
262:9 265:2
269:21 291:18
298:11 305:19
314:4 321:12
321:24
**asking** 52:10
67:17 77:22
121:13,17
150:8,24 151:3
177:9,11
236:13 269:24
270:4 297:23
308:14 317:3
321:20 326:7
331:8
**asks** 122:14
**aspects** 47:6
**assess** 308:20
309:8
**asset** 20:22 173:6
278:6 279:21
280:8,16
282:19 288:21
289:6,19
**assets** 278:8,10
283:5 288:19
333:25
**assignable**
284:19
**assignment** 62:16
64:14,20
169:21 253:19
320:7
**assist** 196:11
298:16 300:5
305:11
**assistance** 144:15
145:16,19
251:25 305:10
**assistant** 8:21
**assisted** 196:14



associated
   108:17
ASSOCIATION
   1:2
assortments
   208:10
assume 65:20
   83:7 217:17
   218:8 306:9
   314:22
assumed 61:19
   188:18
attached 11:2
   135:25 344:10
attempted 56:22
attempting 27:9
   52:4
attempts 41:17
   73:24
attention 36:22
   61:18,21 269:2
   270:2,6 314:19
attitude 302:23
attorney 4:14
   67:5 311:18
   327:25
Attorneys 2:8,13
audacity 63:21
audio 9:9 20:4
   182:24 183:12
   183:19
August 16:19
   28:2 39:2,22
   99:7 148:25
   265:23,25
   328:11 329:17
   329:20 332:23
   341:4
authentic 346:7
authentication
   104:8,17 106:9
   106:18 110:25
   115:12,20
   340:11 346:13
authority 170:25
authorization

57:13 171:22
   171:23
authorize 297:8
autumn 215:13
   215:17,25
   216:2,3 217:2,7
available 25:17
   117:8 215:9
Ave 2:13
Avenue 91:18,19
average 304:17
   304:20
averaging 51:18
award 53:15,24
aware 12:2,7,22
   14:4 20:19 31:8
   48:9 127:24
   132:2 136:20
   137:15,22
   144:23 146:19
   146:22 152:5
   155:24 174:7
   174:13 202:4,8
   202:19 241:9
   241:10 245:4
   281:17 292:4
   313:2 316:19
awareness 15:2
awkward 294:17
axe 65:16 68:15

## B

B 64:8 104:8
   288:2
B-A-R-T-I-Z-A
   250:17
Bachar 1:4 67:6
   82:19 90:22
   96:21 124:17
   126:23 129:3
   129:23 130:5
   142:23 161:9
   162:6,9 166:15
   166:21 235:5
   357:3
back 17:17 21:11

28:9 35:11,16
   35:18 37:21
   42:15 46:9
   47:15,17 48:12
   60:19 63:24
   69:5 72:3 76:22
   77:3 80:12 84:6
   85:10 94:18
   97:6 99:22
   102:16 110:11
   115:14 119:5
   130:11 132:2
   141:17 148:6
   148:10 165:3,7
   165:25 176:19
   177:15 183:17
   184:6,18
   199:20 213:25
   214:3 226:4,12
   226:16,24
   227:17 228:17
   243:7,12
   244:14 247:3
   253:24 269:4
   272:18 273:3
   275:18 279:19
   280:21 282:2,3
   300:21 302:21
   303:2 306:17
   306:18 313:7
   325:21 326:11
   327:16,19
   330:14 331:22
   339:7 342:9
   343:23 351:13
background
   168:15 239:3
bad 70:25 100:21
   269:10 270:18
badger 182:16
badgered 59:4
balance 104:2
   106:4 318:23
   335:11
bargain 100:10
Baritza 126:15

138:11 250:16
   252:4
Bartiza 170:6
base 246:5
   251:15 253:12
   300:20
based 23:17
   40:24 49:2
   51:20 57:25
   69:25 70:18
   73:2 75:24 80:3
   133:7 162:22
   194:11 204:9
   205:9 213:9
   244:6 248:18
   268:8 274:11
   299:8
basically 82:25
   124:10 126:4
   126:11 127:8
   127:13 129:6
   156:22 196:13
basing 197:2
   209:25
basis 57:17 99:15
   104:4 105:4,11
   114:9 172:19
   252:19,22
   315:25 342:18
   350:18 352:17
Bates 82:14
   108:17 109:17
   109:20 110:14
   110:23 111:6
   111:19 134:15
   162:12 189:11
   198:17,25
   199:3 296:12
bear 54:12 82:4,8
   130:16 134:13
   144:11 175:10
   192:18 211:18
   350:7
bearing 74:7
beautiful 74:25
becoming 16:20

141:23 185:14
beg 309:15
began 13:7
   155:25
beginning 50:11
   88:10 119:10
   129:10 137:11
   168:5 196:12
   243:13
begins 180:2
behalf 4:8,11
   24:21 40:3
   171:7,11 328:4
belabor 48:20
   273:16
believe 18:19
   32:22 36:17
   53:18 106:23
   107:19 111:20
   113:12 123:9
   124:24 125:2
   125:17 127:3
   141:2 143:15
   152:9,20
   159:23 160:5
   167:3 169:15
   171:12 173:9
   178:10 179:21
   181:12,24
   182:15 185:11
   185:13 191:3
   194:18 200:25
   202:9,23,25
   204:24 220:16
   222:5,11,14
   227:11 229:24
   252:17 269:13
   272:13 287:20
   296:8 299:6
   341:13 342:19
believed 253:21
   335:9
bells 175:7
benefit 26:16
   33:22
benefits 98:15



**best** 48:3 77:21 84:13 141:9
**better** 50:19 128:20 183:2 184:17 238:8 267:5 268:20 273:20 330:20 331:6 351:17 354:6
**Beverly** 77:6,10 78:4,12,21 94:3
**beyond** 172:15 273:16 311:23
**big** 71:23 72:7 79:11 91:11,12 91:13 130:3 141:24 259:22 280:23 302:25 332:18 341:6
**biggest** 101:10 178:16 326:3 334:25
**bill** 171:21
**binder** 162:16
**binders** 10:18
**binding** 170:22
**bit** 19:25 68:14 76:11 81:15 130:10 141:17 141:19 238:5 265:4 267:21 267:22 315:17 317:16 336:14
**blame** 16:6 17:22
**blank** 341:14 348:9
**blaring** 237:25
**BLEAKLEY** 2:12
**Bleaky** 7:5,10
**blood** 360:14
**blow** 280:23
**blue** 207:25
**board** 96:8 277:10 286:5,6 302:24

**boat** 45:4
**bold** 332:18
**book** 82:11 103:4 103:8,14 108:6 116:21 117:20 119:20 135:13 336:11
**books** 44:21 102:25 119:18 280:7
**born** 159:25 160:2
**boss** 157:22
**bottom** 5:12 134:15 176:2,8 307:19
**bought** 93:4 218:13 278:9 278:15 279:10 281:11 287:4
**Boulevard** 121:6
**boutique** 270:14
**brand** 14:8,25 56:7 57:17 73:18 76:14,15 76:18 78:13,24 79:7 83:22 85:12,21 91:8 97:19 101:14 127:15 259:13 320:18 322:10 325:18 326:9
**branding** 75:8
**brands** 173:3 178:12
**breach** 95:20 98:13
**breached** 81:12 93:14
**break** 101:24 102:2,9,12 184:11 193:2,4 193:10 194:6 274:25 324:5
**breakdown** 210:23 211:2

**breech** 81:5,7,7
**brief** 22:24 28:12 58:9 62:3,10 64:6,7 69:9 185:20 188:8 230:25 324:18
**briefing** 25:14 26:3 27:15
**briefly** 140:23
**briefs** 9:22 10:4 11:3
**bring** 36:21 44:17 46:10 52:4 61:17,20 82:3 90:4 227:19 272:7 281:23 300:21 351:12
**bringing** 78:5
**broaden** 262:11
**broken** 210:23 348:5
**brother** 238:17 240:3,7 241:10 243:17 333:4 335:24
**brother's** 243:23
**brought** 61:9 78:9 90:3 96:20 113:13 266:13
**Brown** 2:14 3:4 6:2,6,14 7:2,3,4 7:11,20,23,25 8:8 9:5,7 10:12 30:20 32:24 33:3,9,16 34:3 39:5 43:23,24 44:24 45:5 54:6 54:8,12 58:8,17 58:20 64:5 66:6 66:21,22 68:9 68:10 73:13 74:14 76:9,17 77:8 79:22 82:12 87:10 88:3 89:23

97:24 98:2
99:19,22
101:18,19
102:23 103:5,9
104:6,18
105:23 107:8
107:18 108:3,8
108:14 109:3
109:14 110:4,8
110:21 111:8
111:15,18,24
113:3 114:6,8
114:24 115:7,9
115:11 116:11
118:5,18
121:19,21,23
122:3,14 125:5
125:8 128:6,10
128:13 132:9
132:12 133:14
133:22 134:13
135:17 136:3,5
138:22 148:4
148:11 150:11
150:14 153:23
154:20 157:8
157:21 158:15
158:16 159:3,5
163:2,16 164:3
164:9,10,20
165:11 166:3
166:12 168:2,3
168:17 169:11
172:23 175:15
179:16 183:9
184:9,19,22
185:7,17
186:12 188:22
189:5,16,22
192:11,14,18
192:24 193:5
193:10,12,16
193:20 194:8
198:24 199:2
207:19 209:22
210:5,6 213:16

213:23,24
214:22 216:12
216:22 218:6
227:20 228:19
228:20 230:8
230:12,16,19
230:21 233:14
233:15 236:20
236:22,24
237:24 239:4
243:25 244:4
244:13,17,20
250:25 257:13
262:20 272:24
273:19 278:25
286:12 287:22
290:11 296:12
296:18 299:4
311:15,19
313:8 318:18
323:10 327:11
327:15,19,24
330:22 331:3
332:15 337:24
338:4,11,23
340:22 341:17
341:21 342:24
343:3,24
344:11 345:15
346:19,21
347:8,17,19
348:23,24
349:19 350:4
350:17 351:6
351:22 352:24
353:12,20,25
354:11,14,18
356:13,15
357:11,13,16
357:19 358:3,4
358:15,19
**Brown's** 108:20
206:20 298:25
306:10 337:4
**BSI** 202:17
**budget** 139:23



220:12 263:21
264:4
**budgets** 132:25
140:10,10
**build** 63:3,4
78:20 174:20
191:10 192:3
204:12 205:20
215:2,3 243:20
262:6 334:13
**building** 192:9
**Burr** 236:5
**business** 56:6,23
75:16 90:25
91:4 94:22
138:8 144:7
147:2 160:23
164:4 165:6
167:11 169:8
178:5 223:21
245:11 284:18
297:6 314:24
315:5 328:10
328:13
**businesses**
146:17
**businessman**
147:2
**busy** 87:17
**buy** 86:17,18
140:12 246:6
249:19 270:16
278:19,20
279:9 304:2
**buying** 94:4
129:7,17,19,23
129:25 195:11
195:13 246:18
277:5
**buys** 196:6

— C —

**C** 2:2 103:4,8
123:3 360:2,2
**cabinets** 271:8,12
271:16

**Caesar's** 308:3
**Caesars** 15:7
224:5
**calculate** 217:22
**calculated** 52:21
**calculation** 50:13
**calendar** 213:11
325:13
**calender** 198:7
213:10
**call** 4:6 8:5,6 9:4
64:19 67:20,21
70:9 102:10
118:15 269:21
299:2 341:20
**called** 9:4 49:7
105:18 157:19
183:11 259:23
**calling** 267:5
**calls** 133:15
153:24 195:24
206:22
**cam** 20:9
**canceled** 56:2
61:22 328:9
**cap** 258:10
**care** 82:18
**carefully** 9:23
**carpers** 271:15
**carpets** 271:14
**carried** 214:14
**cart-before-the...**
187:20
**Casarotto** 170:5
176:10,20
177:6
**case** 1:6 12:7,23
16:5 26:13,14
43:10,16 49:2
54:17 56:15
88:7 92:23 93:3
93:20 97:8,22
105:17 106:3
193:6 202:5
223:12 338:24
338:25 352:7

**caselaw** 25:12
27:14
**cases** 25:25
**caused** 14:21
142:5 272:20
**causes** 273:12
**Cecar** 319:25
**cell** 43:16,17
67:11,22
**cent** 92:10
**center** 141:7
143:19
**centering** 15:16
**cents** 280:22
282:4,5
**CEO** 29:17 46:7
46:14 82:23
126:9,13,14
138:11 139:21
140:5,16 155:8
155:10,18,20
156:18 157:2
170:7 218:19
221:12 241:20
241:25 242:14
242:18 244:24
245:19,22
250:17 266:14
313:18 326:23
**CEOs** 155:4
**certain** 86:17
129:15 169:4
201:20 227:13
229:8 254:5
268:13 271:16
293:16,17
307:6
**certainly** 31:10
42:11,16 51:9
59:23 64:13
134:16 172:18
273:15 341:25
346:4 349:3
353:4 355:12
**certify** 360:6,12
**Cesar** 61:13

**Cesar's** 126:22
127:18
**CFO** 220:11
242:19 245:19
**chain** 175:25
180:3 189:9
**chair** 9:13 58:21
358:5
**challenges** 141:4
143:11 144:8
144:20,24
**challenging**
144:4
**chance** 16:25
141:12 309:14
309:16,23
310:24 311:12
313:3,19
**change** 18:3 26:8
143:12 155:4
155:16 292:9
299:19
**changed** 15:8
39:16 52:24
141:17 152:17
156:20
**changes** 143:20
**charge** 24:20
25:5 157:21
260:19 262:5
319:25
**cheaper** 80:2
**check** 136:6
209:23 233:5,7
233:9
**checks** 38:8
**Chicago** 2:9 87:2
87:17
**chief** 245:20
**choice** 121:2
**choices** 18:14
**choose** 235:25
**chose** 22:13
100:15 101:6
101:11
**Christian** 199:11

**circumstances**
139:19
**citizen** 311:10
**citizens** 300:4
**City** 91:18
**claim** 61:8,11,15
62:6,7 65:6
69:10 71:12
85:9 90:6,10,11
92:2,5,13,17
99:12 348:24
**claimant** 1:5 4:6
10:7 59:4,7
103:8 119:3
187:6 229:8
296:16
**claimant's** 55:7
88:6 100:13
103:4 119:15
**claimants** 2:8 4:9
4:11 55:11
56:16 57:4,5,10
57:21 59:13,24
60:9 61:10
62:19 64:7
71:20 73:21
78:23 84:4
86:13,23 88:24
106:3 108:16
110:14 116:20
135:2 160:23
164:22 165:7
171:16 172:7
173:11 176:25
179:22 185:19
186:13,19
189:12 225:25
**claimed** 63:16
73:5
**claiming** 63:22
77:19 98:8
353:8
**claims** 19:6 79:4
273:25
**clarified** 250:9
**clarify** 183:15



213:16,19
231:22,23
232:19 251:3
**clause** 55:17
59:20
**clauses** 25:8,8
100:3
**clean** 326:16
**clear** 22:7 32:11
47:12,20 100:8
202:20 238:11
239:6 250:15
278:22 322:6
340:12 345:12
**clearly** 68:18
262:18 263:5
310:22
**client** 29:4 58:12
59:3 73:6 77:20
186:7 328:5
**client's** 31:15
79:15 251:3
**clientele** 15:9
18:3 76:2 86:5
**clients** 16:6 17:22
31:23 75:14
85:18 89:10
**close** 29:9 184:9
243:20 293:22
294:2 297:5
304:20 305:4,6
310:9 329:11
**closed** 13:13
16:18 27:8 52:2
52:14 76:16
98:20 126:24
127:16 301:14
313:22 328:14
329:16,19
331:9,18
**closely** 127:25
128:23 129:2
202:16 336:21
**closer** 20:3
**closes** 27:25
**closing** 79:17

313:9 328:9
**closure** 76:24
81:23 83:15
**clothing** 15:14
75:20 76:21
**CMs** 341:18
**co-counsel**
230:10
**coast** 123:10
**coincided** 73:19
**collateral** 62:14
62:16 64:13,20
169:20 253:19
**colleague** 54:16
146:3
**colleagues**
146:25 221:13
**collect** 83:18
**collection** 84:8
215:8
**combination**
14:23 288:17
**come** 22:3 29:21
37:2,10 38:16
41:23 47:14
68:11 86:9,10
86:16,22 88:12
113:21 116:12
119:5 124:4
149:23 151:16
154:6 160:21
171:15 173:21
190:17 218:5
240:9 245:2
248:15 275:18
277:16 279:19
299:25 302:21
303:24 325:21
326:11
**coming** 34:25
35:14 38:9 94:6
110:16 141:22
168:8 226:24
237:22 277:9
286:5,6 302:24
303:2 311:2

324:7 330:12
330:13
**commence**
297:16
**comment** 322:15
347:18
**comments**
264:15
**commit** 179:10
201:11
**commitments**
201:25
**committed** 93:6
108:14 153:12
257:6
**communicate**
66:17 80:7
**communicated**
317:12
**communicating**
30:16
**communication**
349:10 350:16
**communications**
348:18
**companies**
259:25
**company** 60:11
60:13 68:13
73:18 85:15
94:5 97:18
126:9 139:13
146:8 155:9
160:19 175:6
178:6 181:24
204:8 219:18
220:12,14
223:24 224:21
225:8,16
226:13 245:20
260:19 281:10
286:22 322:7
**company's** 224:3
251:14
**competitors** 76:4
**compilation**

114:18
**compile** 115:25
**compiled** 104:22
**complained**
266:7
**complaints**
266:18
**complete** 28:21
187:13 246:20
**completed** 193:4
215:4
**completely** 92:25
277:16 285:5
**compliance**
224:3
**comply** 113:11
**complying**
115:17 118:22
**comport** 225:3
**computer** 130:16
**computers** 280:6
**concentrate**
263:10,18
**concern** 34:3,4
182:3
**concerned** 16:22
**concert** 320:22
**concessions**
77:18,23
**conclusion**
133:15 144:2
195:24 206:21
313:14
**conclusions**
153:5
**conditions** 40:25
177:21,23
297:18 298:18
300:23
**conduct** 26:11,24
40:18 49:4 94:9
**conducting** 9:19
**confer** 99:20
230:10
**confirm** 46:17
47:8 296:9

308:13
**confirmed** 242:5
**connected** 13:6
**connection** 9:17
64:10 79:16
105:16 192:8
**consent** 9:18
69:16 94:17
107:5 119:19
221:17 222:2
223:8 225:10
255:18 316:10
339:13
**consented** 94:4
223:12
**consents** 223:20
**Consequently**
83:5
**consider** 30:24
31:19
**consideration**
334:13
**considered** 100:6
100:7
**Considering**
263:19
**consistent** 241:25
243:9 302:8
309:3 331:19
**consistently**
24:22 37:25
38:6 40:11
**consolidated**
263:22
**constantly**
300:19
**construction**
69:12,23 70:17
92:3 200:14
201:6,12,16
202:7,14 203:3
204:3,8,12
205:14,20
207:22 254:7
255:11,13
256:4 345:23



**contact** 6:8,12
115:15 124:18
**contacted** 124:10
161:10
**contain** 337:12
**contend** 41:10
42:10
**contest** 21:17
40:14
**context** 69:16
99:16 345:13
346:16
**contexts** 70:25
**continuation**
189:9
**continue** 10:14
17:7 21:14
26:23 28:5 31:2
38:19 48:16
65:3 131:5
153:21 154:16
213:22,23
223:25 250:8
294:14 302:22
311:22 312:4
313:6 314:10
321:16 323:5
**continuing** 22:5
80:21
**contract** 21:20
22:6 26:6,18
27:10 42:5
54:18 56:5 62:2
131:21 133:13
137:8 233:21
234:7,8,13,15
247:25 248:3,5
248:8
**contracted**
222:17
**contracting**
56:24
**contractor** 204:6
**contracts** 20:16
284:16
**contractual**

78:17
**contradictory**
290:4,6
**contrary** 28:25
**contributed**
15:22 18:15
19:7 58:15
**contributing**
17:23 142:14
**contribution**
206:5 258:18
**Contributions**
204:19
**control** 314:23
**controlling** 97:3
**conventions**
231:4
**conversation**
46:9 100:23
243:2 246:14
252:4 261:20
266:22 268:18
276:2,11 298:5
298:7,12
304:10,13
**conversations**
277:13 309:17
319:4
**convinced** 346:6
**cool** 34:13
**cooperate** 130:16
320:8,10
**coordinate**
311:20
**copied** 176:18
311:16 345:19
**copies** 201:2
232:24 336:16
**copy** 175:18
357:11
**corner** 74:19
**corporate** 60:17
78:10 247:14
320:6,10
**correct** 9:5 30:9
103:5 124:16

125:20 126:21
127:18,19
133:9,11
140:20 145:24
149:11,12,15
150:10 157:7
157:12 164:8
169:18 170:11
170:12 172:6
173:23 176:6
178:14 179:12
179:15 180:18
180:19 185:9
194:21 195:7
195:11,21,22
196:5,24 198:9
198:13,14
199:17,21,22
200:4 201:14
201:22,23
204:16,17
205:23 206:6,7
207:12 208:13
208:14,17
210:11 211:8
211:14,19
212:10,11
218:17 221:9
223:17 224:12
232:8,13
234:18 241:2
247:20 251:16
252:7 279:25
285:20,25
288:5 296:11
312:16 316:7
316:25 318:16
320:19 321:21
322:11 338:15
349:16,17
**correctly** 133:10
137:13 147:14
147:21 152:13
159:24 160:17
161:15 191:18
227:13,14

**correspondence**
80:9 82:21
**correspondences**
83:3
**corresponding**
108:16 109:20
**cost** 63:3 69:23
70:17 99:13
201:6,12,16
202:7,15 203:3
204:3,12
205:14,20
207:22 220:13
254:7 266:15
**costs** 69:12 92:3
92:12 97:19
203:10 204:16
227:5 255:13
256:5 342:7
**counsel** 10:11
47:25 82:22
88:25 99:20
111:25 125:7
135:6 149:10
167:18 170:14
231:8 237:9
311:16 327:24
348:20
**Counselor**
136:15 153:4
209:19 220:5
296:6
**counter** 88:5,24
135:23,24
**counterpart**
170:2,3
**counters** 90:2
**countries** 263:17
263:21
**couple** 47:9
98:20 254:17
256:15 266:21
294:22 357:20
**course** 21:25
26:7,10 27:5
41:14,22 42:12

49:4,14 66:13
68:18 85:4 94:9
126:8 130:12
133:19 137:18
148:8 159:8
165:23 174:22
191:25 203:22
217:24 220:11
220:12 324:7
**court** 25:20
44:10,12 93:12
104:15 236:5
360:24
**courteous** 45:12
**courtesy** 58:6
**courts** 93:8
**cover** 101:6
254:6
**covered** 48:22
118:15 254:2
**COVID** 53:16
55:16 98:10
**create** 59:9 85:8
174:5 190:7,10
190:13 203:23
**credence** 338:17
**credibility** 48:8
90:8
**credible** 111:4
**credit** 69:11,19
70:16,22 150:2
203:12 205:10
205:12,13
206:9 207:11
230:6 285:11
285:15 287:8
337:4 352:8
**credited** 69:22,25
71:10,16 205:6
342:10 352:9
353:9,11
**credits** 199:7
200:14 201:6,8
203:7 204:3
205:15 206:4
342:8



critical 83:24
cross 157:20,22
  159:1 160:1
  161:1 162:1
  163:1,6,12
  164:1 165:1
  166:1 167:1
  168:1 169:1
  170:1 171:1
  172:1 173:1
  174:1 175:1,13
  176:1 177:1
  178:1 179:1
  180:1 181:1
  182:1 183:1
  184:1 185:1
  186:1 187:1
  188:1 189:1
  190:1 191:1
  192:1,25 193:1
  194:1 195:1
  196:1 197:1
  198:1 199:1
  200:1 201:1
  202:1 203:1
  204:1 205:1
  206:1 207:1
  208:1 209:1
  210:1 211:1
  212:1 213:1
  214:1 215:1
  216:1 217:1
  218:1 219:1
  220:1 221:1
  222:1 223:1
  224:1 225:1
  226:1 227:1
  228:1 229:1
  230:1 231:1,12
  336:7 355:16
  355:24 357:18
CROSS-EXA...
  159:2
Crowe 2:16 6:2
  7:8,9 10:12
  44:2,5 356:14

357:11,14
  358:22
Crowe's 358:20
crunched 347:23
cumulative
  185:14
current 80:22
currently 297:2
cursor 5:17
  131:11 263:11
customer 124:9
  126:6 161:8
customers 86:7
  124:2 127:10
  141:22 173:20
  215:11 260:4
  269:14,18,19
  269:22 270:15
  303:23,25
  304:2
cut 79:18,25
  279:20

————————
**D**
D 2:25 185:19
  237:11,11
daily 300:20
  301:17
damage 56:7
  85:22 281:7
  301:8,11
damaged 174:12
damages 50:13
  52:20 53:15,20
  56:20,25 79:24
  80:24,25 81:5
  98:3,9 329:13
  353:5,7
dangle 101:12
date 1:10 98:16
  159:21 166:18
  181:18 208:2
  209:10 244:7
  314:25 318:20
  323:25 324:2
  327:16 360:25

dated 82:17 83:4
  164:13 176:17
  267:13 282:20
  296:2 297:3
  307:20 314:17
  319:20 325:4,7
dates 76:22 273:2
daughter 245:21
  260:18
David 307:23
  327:25 332:15
day 101:23
  123:14 252:15
  252:25 253:2,3
  253:5 280:19
  355:13
days 30:24 31:19
  47:10 109:8,11
  110:12 115:8
  117:12 343:13
  352:20 353:17
dead 86:2
deal 11:7 31:17
  47:6,25 70:13
  81:18 91:24
  126:7 136:10
  146:13 152:3
  153:17 184:21
  227:15 300:16
  341:6 357:22
dealing 38:8
  146:4
dealings 279:20
dealt 47:7 155:17
  292:8
December 77:16
  159:13,14
  176:17 272:3,7
  272:10 311:25
  344:12
decide 16:4 18:7
  80:19 88:2
  89:15 139:9
  168:20 169:10
  263:15 273:7
  356:25 358:9

decided 14:5
  23:15 39:14
  62:21 138:18
  145:12 222:21
  263:20 264:9
  293:3 317:8,9
  358:13
decides 311:21
decimated 53:4,6
decision 24:25
  37:18 75:16
  138:20 139:20
  139:21 140:17
  156:13 249:18
  253:12 281:4
  285:22 293:9
  320:16,25
  322:21,25
  325:17 326:9
  357:8,12 358:7
decisions 154:18
  249:5
decreasing
  305:12
deemed 75:16
default 93:9
defendant 329:7
defense 52:22
definitely 142:8
  142:11 143:18
  144:9 145:9
  153:15 254:21
delay 327:2
delayed 265:20
delays 271:15
  272:22,23
deliver 208:24
delivered 10:16
  10:20 268:16
  268:17
deliveries 265:20
demand 42:21
  43:2 52:9 332:7
  332:24
demanding 43:3
demise 18:15

19:7 273:12
demonstrate
  90:19 92:4,8
  341:3 352:13
demonstrating
  187:21
demonstrative
  33:10
demonstratively
  62:13 65:7 82:2
  84:3 92:16,19
denominated
  103:3
Department
  92:24
departure 297:25
depending
  126:10 192:23
  354:15
depends 242:6,9
  242:10 266:10
  275:10
describe 268:7
description 107:9
  341:12 347:13
  350:2
design 180:25
  271:6,11
desirable 306:13
desires 297:5
desk 11:15
despite 13:14
  54:13 77:12,20
detailed 9:21
  10:23
determinative
  168:19
determine 22:3,4
determined
  54:20 262:23
developed 13:2
  128:24
developing 181:6
deviated 242:2
dial 183:17,20
  184:6



dialing 9:8
differ 254:19
difference 206:3
different 13:15
  22:8,10,21 23:2
  37:21 52:5,6,7
  75:21,23 87:7
  89:3 116:3
  122:12 128:12
  135:22 136:4
  136:11 152:10
  175:20 220:17
  228:11,15
  269:11 286:22
  289:14 306:3
  326:5 343:4
  348:4
differently
  254:16 285:21
difficult 12:15
  184:4 268:12
difficulty 23:11
diligence 91:8
diminished 15:9
dire 246:22
direct 11:23
  15:18 123:1
  124:1 125:1
  126:1 127:1
  128:1 129:1
  130:1 131:1
  132:1 133:1
  134:1 135:1
  136:1 137:1
  138:1 139:1
  140:1 141:1
  142:1 143:1
  144:1 145:1
  146:1 147:1
  148:1 149:1
  150:1 151:1
  152:1 153:1
  154:1 155:1
  156:1 157:1
  158:1 172:16
  176:12 231:11

260:16 286:14
DIRECT-EXA...
  123:7 237:1,16
  238:1 239:1
  240:1 241:1
  242:1 243:1
  244:1 245:1
  246:1 247:1
  248:1 249:1
  250:1 251:1
  252:1 253:1
  254:1 255:1
  256:1 257:1
  258:1 259:1
  260:1 261:1
  262:1 263:1
  264:1 265:1
  266:1 267:1
  268:1 269:1
  270:1 271:1
  272:1 273:1
  274:1 275:1
  276:1 277:1
  278:1 279:1
  280:1 281:1
  282:1 283:1
  284:1 285:1
  286:1 287:1
  288:1 289:1
  290:1 291:1
  292:1 293:1
  294:1 295:1
  296:1 297:1
  298:1 299:1
  300:1 301:1
  302:1 303:1
  304:1 305:1
  306:1 307:1
  308:1 309:1
  310:1 311:1
  312:1 313:1
  314:1 315:1
  316:1 317:1
  318:1 319:1
  320:1 321:1
  322:1 323:1

324:1 325:1
326:1 327:1
328:1 329:1
330:1 331:1
332:1 333:1
334:1 335:1
directly 51:12
  140:5 158:4
  237:5 316:5,24
director 23:8
  24:20 123:19
  123:22 160:14
disadvantage
  336:15
disagree 142:6
  256:10 306:16
  338:2 353:5
disagrees 53:21
disappeared 8:25
disaster 272:16
disclosed 95:15
  186:16
disclosure 39:3
  106:13
discount 266:4,6
  269:24 270:3
  270:12,17
  345:23
discounting
  254:6
discounts 70:2,18
  145:6,7,8,9
  254:14 256:3
  342:8
discovery 58:25
  86:15 104:24
  105:3 106:22
  111:21 113:4
  117:15 165:24
  343:7
discrepancy
  134:6 268:10
discretion 174:22
  315:3
discuss 10:2
  13:11 65:4 72:8

291:7,19
discussed 139:23
  219:24 221:13
  244:7 269:7
  350:22
discusses 60:16
discussing 13:7
  29:19 294:23
discussion 55:22
  67:18 113:22
  135:14 220:23
  233:19 240:12
  240:14 241:20
  242:4 245:6,8
  246:25 316:19
  320:21 349:22
  350:24
discussions 29:14
  73:22 111:25
  262:6 309:4
  316:12,18
  317:4 350:19
  351:5
disingenuous
  79:4
disposed 119:15
disproved 62:4
distinguishable
  93:2
distortion 187:14
disturbance
  239:5
divert 79:20
diverted 79:19
divided 200:13
docs 343:12
doctor 43:3
  87:15 125:18
  126:12 139:24
  142:8,9,10
  145:15 223:2
  226:7 258:17
doctor's 14:19
  15:20 18:13
  54:25 142:4
  257:25

doctors 17:6,11
  19:8,11 23:21
  23:24 24:18
  29:18,23 31:6
  42:22 46:7
  48:10 52:10
  60:9 63:16
  68:21 71:2,3
  75:2 77:12,17
  80:7 82:24 85:2
  86:25 124:5,6
  124:15 126:12
  127:17,23
  128:2,4,24
  132:3 136:19
  138:13 139:12
  140:5 141:5
  145:17,20
  160:23 161:7
  167:10 168:22
  180:7 182:13
  185:2,24
  191:10,22
  219:24 226:11
doctrine 49:6,18
  51:3
doctrines 21:23
  41:23 49:12
document 44:20
  61:20 62:20
  90:14 97:4
  103:11 109:11
  109:21 110:6
  111:19 116:7
  117:6 130:15
  130:20,25
  131:4,9 135:22
  135:23,24
  136:23 148:22
  149:3 150:6
  162:17 165:22
  203:23 210:12
  221:25 257:4
  257:15,21
  261:7 280:11
  282:16 288:10



294:11 295:20
296:21 306:21
307:14,17
319:2 327:21
333:13 340:24
341:3 344:18
345:10,13,14
350:5,6 352:12
353:2,18,20
354:12
**documented**
15:11
**documents** 10:25
30:13 40:2,5
45:2,14 54:21
58:24 59:2,15
60:8 65:4 68:16
84:18 86:12
92:8 95:17
96:10 99:23
103:7,19,20,24
103:25 105:5
105:18 107:22
108:12,18,22
109:3,13
110:11 112:3
112:23 113:18
114:22 115:6
115:24 116:2,9
116:20 117:2
117:21,25
119:12,16,17
134:20,23,24
169:5 189:14
197:7 247:25
267:2 336:13
336:22 337:5
337:21 339:20
342:5 344:4,25
346:3 349:9,18
351:23 355:5
**doing** 94:14,15
130:2 134:23
147:2 174:3
180:8 185:18
186:10 200:8

220:2 269:10
270:10 300:5
326:3 333:7
340:4 342:3,18
**dollar** 208:11
280:23 282:5,5
**dollars** 52:11
63:5 83:19 86:8
212:4,14,21
243:21 249:25
252:20,24
272:14 279:3
279:16 333:3
334:10
**doomed** 88:9
**double-check**
349:21
**doubt** 312:25
313:17,22
**downsizing** 80:20
**Dr** 3:5 4:13,15
5:3,5,11,19
12:17 36:19
46:13 58:4
87:14 124:8,17
126:23 129:2
129:23 130:5
142:23 150:22
161:9 162:6,8
235:5,7 236:8
236:11 237:1
237:18 238:1
238:14 239:1,5
239:25 240:1
240:17 241:1
242:1 243:1
244:1,18,23
245:1,13 246:1
247:1 248:1
249:1 250:1,19
251:1,11 252:1
253:1 254:1
255:1 256:1
257:1 258:1
259:1 260:1
261:1,8,12,15

262:1,3 263:1,7
264:1 265:1
266:1,17 267:1
267:2,9 268:1
268:22 269:1
270:1 271:1
272:1,17 273:1
274:1 275:1
276:1,4 277:1
278:1,22 279:1
280:1 281:1
282:1,2,13
283:1 284:1,12
285:1 286:1
287:1,16 288:1
288:19,25
289:1,5 290:1,3
291:1 292:1
293:1,2 294:1
295:1,19 296:1
296:19 297:1
298:1 299:1
300:1 301:1
302:1 303:1,16
304:1 305:1
306:1,2 307:1
307:15,17
308:1,12 309:1
309:21 310:1
311:1 312:1
313:1 314:1,13
315:1,14 316:1
317:1,24 318:1
319:1,17 320:1
320:4 321:1
322:1 323:1
324:1 325:1,25
326:1,7 327:1
328:1 329:1
330:1 331:1,8
332:1,11 333:1
333:7,17 334:1
335:1,10,24
355:22 357:3
**draft/layout**
180:22

**drafting** 170:18
**dramatic** 56:12
**dramatically**
23:14 51:15
**draw** 143:25
153:6 248:2
268:25 314:19
**drawing** 206:21
**dream** 13:2
**Drive** 6:22
**drop** 67:16,17
**dropped** 305:2
**dry** 264:11
**due** 54:15 69:21
70:8 71:14,15
91:7 118:20
144:15 162:16
166:7 181:16
318:11 335:2
**dug** 18:16
**duly** 123:4
237:12 360:8
**duration** 98:21
132:13
**duty** 58:12
190:13

———————
**E**
**E** 2:2,2,4,25
360:2,2
**e-commerce**
57:11 59:6,8
60:11,14 65:10
174:10 179:8
**e-mail** 30:2 44:15
46:6,12,13,17
95:5 96:21
118:4 148:24
163:5 164:5,12
175:25 176:5,8
176:14,16,17
176:22 177:5,7
178:19,20
179:20 180:11
180:20 181:14
186:15 189:9

198:18,19,19
199:4,8 200:6
203:15 254:22
261:8,16 263:6
263:10 267:12
267:15,20
269:3,4,7,8
270:21 285:14
298:15 299:15
305:8 307:20
311:15 312:20
314:5 319:20
326:19,22
344:9 345:11
350:7 354:11
357:10 358:12
358:17,20
**e-mails** 29:17
37:7 59:16 69:2
88:22 165:3
178:22 186:22
187:3 266:21
294:22 307:6
312:19 319:6
**e-vendor** 175:2
**Eads** 319:23,24
**earlier** 83:13
106:11 181:16
227:23 318:14
325:16 326:16
338:8 344:22
**early** 14:5 39:20
76:23 186:25
238:19,20,20
240:19,19
265:25 271:20
323:25
**earnestly** 320:13
**earnings** 334:21
**east** 91:12 123:10
249:16
**economic** 263:19
**economy** 53:4,5
54:24 79:8
**Efarber@farb...**
2:5



effect 38:4 88:23
95:5,18 96:18
97:10 101:3
143:22 195:21
220:25 234:16
248:4
effective 83:5
314:24 328:9
effects 285:3
efficacy 40:19
efficient 184:10
effort 52:12
56:24 256:25
efforts 77:21
145:2 260:9
297:16 308:15
eight 194:18
either 10:11
12:17 80:20
83:2 109:4
112:4 115:4
135:5 235:24
265:24 268:15
339:5 341:19
elaborate 39:6
252:16
Elena 180:21
eminent 297:24
employed 123:17
employee 65:15
91:2
employees 56:9
97:19 101:14
143:3 205:17
employment
159:22
empty 9:13
enclosed 203:14
enclosing 200:12
ends 108:25
enforce 22:14
27:9 41:17 42:7
42:17 137:23
139:9,18
140:18
enforced 286:25

286:25
enforcement
27:4
enforcing 24:8
engaged 59:7
156:8 175:2
English 339:4
enjoyed 54:16
Entebi 13:18,25
146:6,12,13
147:10,20
148:14,16
149:22 150:8
150:17 152:4,5
152:24 153:2
195:18 213:7
221:12 222:21
276:20,23
277:8,20,23
279:21 291:7
294:13
Entebi's 146:23
278:19
enter 306:20
entered 28:22
29:12 35:5 36:5
36:23 39:7
64:13 65:9 95:9
241:11 253:17
279:22 282:23
282:24 290:7
291:6 295:15
entering 240:21
295:10 323:12
entire 46:25
272:25
entitled 1:15
53:19
entries 342:6
entry 208:3
211:9,12
341:13
episode 72:19
equitable 49:7,16
53:13 258:3,7
equitably 26:15

equities 258:4
equity 334:16
ESQ 2:9,10,14,16
essentially 56:5
70:25 71:18
284:14
establish 42:13
58:12 59:8 60:2
65:6 163:4
168:7 175:2
349:10
established 94:8
208:15 209:9
212:8
esteemed 54:15
estimate 193:19
estimations
252:25
estopped 26:16
estoppel 26:12
49:7,11,17
92:22
etcetera 47:23
83:4 95:24,24
106:16,16
187:9,9 267:17
283:8 325:12
Eugene 1:18 2:3
Europe 91:13
249:15
evaluated 75:14
evaluating 80:4
80:11
evening 47:11
event 98:12
259:17,19,21
264:19,21,25
265:7
events 176:23
259:22,23
260:5 262:10
eventually 161:9
everybody 25:18
102:15 305:23
331:18
evict 328:22

evicted 61:12
92:18 97:15
eviction 56:4
61:24 86:3
351:8
evidence 14:13
14:18,22 15:3
16:12 17:4,14
22:9 36:19 38:4
52:3 71:7 84:17
100:5 103:6
107:4,17
116:22 119:18
134:20,24
135:4 189:14
321:11 333:23
339:12
evidentiary 9:16
exact 288:15
exactly 62:15
105:9 143:17
163:2 177:8
213:17 217:6
224:9 242:13
247:23 249:7
318:17 347:24
examination 3:2
123:1 124:1
125:1 126:1
127:1 128:1
129:1 130:1
131:1 132:1
133:1 134:1
135:1 136:1,13
137:1 138:1
139:1 140:1
141:1 142:1
143:1 144:1
145:1 146:1
147:1 148:1
149:1 150:1
151:1 152:1
153:1 154:1
155:1 156:1
157:1,20 158:1
159:1 160:1

161:1 162:1
163:1 164:1
165:1 166:1
167:1 168:1
169:1 170:1
171:1 172:1
173:1 174:1
175:1 176:1
177:1 178:1
179:1 180:1
181:1 182:1
183:1 184:1
185:1 186:1
187:1 188:1
189:1 190:1
191:1 192:1
193:1 194:1
195:1 196:1
197:1 198:1
199:1 200:1
201:1 202:1
203:1 204:1
205:1 206:1
207:1 208:1
209:1 210:1
211:1 212:1
213:1 214:1
215:1 216:1
217:1 218:1
219:1 220:1
221:1 222:1
223:1 224:1
225:1 226:1
227:1 228:1
229:1 230:1
231:1 232:1,2
233:1 234:1
355:24
examined 123:5
237:14
example 265:22
325:24
exceeded 212:21
excel 345:10
exception 103:10
exchange 173:12



**exclude** 105:14
110:7 284:4
**exclusive** 284:18
314:22
**exclusively** 63:12
**excuse** 26:9
49:18 235:5
286:9 321:2
**excused** 234:22
**executed** 59:12
65:14 95:25
315:16
**execution** 299:16
**exhibit** 44:23
82:6,7,9,11
105:25 107:12
108:11 119:17
134:9 135:8
149:11 175:9
175:13,17
179:21 185:19
189:8 197:23
198:16,16
199:2 221:20
221:22 232:6
267:6,7 268:22
278:24 281:24
296:5 307:13
314:12 317:21
319:16 324:21
326:15 327:12
327:18 332:10
333:15 336:10
337:10 339:23
343:6 348:2
354:20
**exhibits** 9:22
10:24 103:2
107:13 113:25
119:7 134:10
134:12 135:4
163:16 339:7
348:4
**exist** 191:4
**Existing** 328:8
**exit** 113:5

**expect** 218:25
347:25
**expectation**
23:20,23
**expectations**
277:15
**expected** 138:15
255:22
**expecting** 86:16
326:5
**expenditures**
228:25 229:9
229:12 230:3
**expense** 192:8
347:14
**expenses** 294:6
347:16
**expensive** 73:4
**experience** 87:9
88:11 142:12
**experienced** 14:8
23:12 153:7
265:19 276:25
**expert** 50:12,19
52:17,18
105:20,21
112:4 170:6
176:11
**expert's** 50:24
**experts** 50:8
76:10
**expiration** 27:2
**expire** 21:15
**expired** 323:7
**explain** 32:8
123:16 138:4
156:11 188:23
239:25 246:22
254:18 259:19
261:18 265:17
269:6,9 279:3
333:20
**explained** 225:24
251:13 274:8
**explaining** 50:20
**explanation**

207:14,18,20
**explored** 219:13
**explosion** 15:12
**express** 45:6
181:17
**expressed** 35:13
**extend** 28:5
30:21 31:20
37:17 53:14
**extended** 42:6
283:17
**extending** 42:9
325:6
**extension** 80:10
321:12,16,21
321:24
**extent** 16:5 17:21
40:4 53:10 90:3
132:16 224:20
349:4 352:3
**extra** 205:17
**extraordinary**
231:15
**extremely** 261:17
300:13

————————
**F**

**F** 283:18,23,24
360:2
**face** 11:23 40:17
41:5 56:21
62:23 120:13
**face-to-face**
266:22
**faced** 143:11
**faces** 149:16
**facilitate** 295:2,7
**facing** 141:4
144:20
**fact** 30:17 53:3
59:3 61:4 62:14
71:14 97:7
135:5 137:3
138:17 153:6
164:23 169:3
174:25 178:23

182:16 184:23
201:15 202:4
246:16 259:4
298:15 303:23
315:15 350:18
352:19
**factor** 142:14
**factors** 15:19
53:22 141:3
144:3,10
**facts** 31:15
**factual** 74:7
**fade** 20:2
**fail** 55:18 88:10
142:5 313:21
**failed** 13:12,25
16:9 17:20
26:21 61:14
89:21,21 92:2,5
92:13,18
174:11
**failings** 58:2
**failure** 14:22
15:23 17:23
42:17 51:6,25
56:20 58:14
72:22 89:5
227:6
**fair** 135:12 144:5
215:6 281:12
356:20
**faith** 56:24 70:23
71:2
**fall** 84:7 99:5
265:23
**falls** 63:24
**false** 56:21 58:23
60:22 62:5,6,7
62:12 63:25
64:17 65:8 69:6
69:9 81:25 82:2
84:3 90:7 92:17
92:20
**falsehood** 187:13
**falsehoods** 65:2
**falsely** 63:10

**familiar** 11:4
30:17 49:17
130:7,24
146:11,21
267:19,23,24
267:25 268:3
293:13
**fans** 302:25
**far** 19:25 57:2
137:22 152:3
152:15 202:11
240:25 249:18
301:9 306:7
334:23,25
**Farber** 1:18 2:3
5:23 7:11 8:7
9:15 12:6,6,23
14:4 16:11
18:19 19:19,22
20:13,18 21:16
23:4 25:11 26:5
28:3 29:10 32:6
33:25 34:17
35:4 37:13
41:16 44:6,14
45:20 51:3,8
53:21 55:20
66:8 68:2 74:24
90:13 108:11
109:19 112:18
117:5 118:13
122:18 123:16
134:17 135:7
136:6 140:23
148:19 154:11
157:17 158:17
162:21 163:15
164:11 183:14
185:13 188:12
189:6 206:16
213:4 214:22
227:21 238:16
240:2 250:14
254:18 258:14
258:22 261:6
265:17,22



267:6 268:7
273:2,9 278:21
284:7 287:14
288:16 300:15
324:4 333:20
334:6 335:18
337:18 339:22
342:21 344:23
358:16
**Farber's** 36:22
162:16 231:20
**farther** 29:11
**fashion** 13:5,20
15:15
**faster** 172:25
**favor** 100:18
**feathers** 35:19
**February** 37:11
37:14 38:15
57:8 59:14 83:4
180:20 181:19
186:24 198:20
200:6 276:15
319:21 320:17
320:24 325:4,7
**feedback** 180:24
181:10 329:24
**feel** 38:15 257:5
264:10 356:8
**feeling** 257:13
**feelings** 68:19
258:25
**fees** 329:11
**fell** 58:21 62:22
**felt** 260:4 268:14
306:11,12
**fiction** 62:12
**Fifth** 91:19
**fighting** 157:24
**figure** 206:8
208:11 218:15
334:17
**figures** 200:18,24
302:4 315:24
335:23 342:20
**filed** 61:11 90:10

98:8 328:22
**files** 345:17,18
**final** 200:8
255:12 309:23
**finalizing** 178:25
**finally** 329:16,19
**financial** 47:6
63:15 103:25
105:20 106:20
192:7 344:4,10
**financials** 106:15
112:9 333:11
342:10 344:19
**find** 17:10 28:8
30:3 35:10 37:9
47:18 73:16,25
73:25 95:12
108:16,19
109:20 145:12
145:22 157:3
248:9 276:17
281:10 294:25
297:17,23
298:21 299:8
305:22 312:12
312:22 314:7
347:25
**finding** 276:3,11
295:11 298:14
298:17 299:19
300:9 305:11
320:13 323:8
**fine** 55:10 125:10
148:2 158:7
333:9 336:24
337:2 339:5
346:22
**finish** 131:16
194:2 246:4
251:10 275:5
**finished** 10:10
11:8 97:25
136:22 149:7
357:14
**first** 4:20 9:16
10:7,13 13:16

22:20 23:6
33:15 46:22
57:3 63:9 64:8
66:4,10 93:24
94:13 102:10
112:5 120:3
123:4 131:2
134:6 142:18
149:19 150:7
180:22 191:6
197:16,17
199:6 215:8
236:2 237:12
240:8 246:18
249:24 251:19
252:15 254:20
260:24 265:24
271:19 323:19
325:3,3 327:4
332:22 350:5
352:8 357:25
**five** 13:14 213:20
214:8 216:8,11
217:17 218:2,4
218:9,10
230:14,15
252:20,23
253:8 272:14
278:16 279:12
282:6 324:11
**five-minute**
324:5
**fixtures** 283:8
**flag** 83:23
**Flaherty's** 52:17
52:22
**flat** 51:17 62:22
**flawed** 50:16,18
52:19 197:14
**flew** 100:25
**Florida** 121:7
**flying** 110:11
**focus** 74:10 89:14
263:15,21
309:7
**follow** 182:12

184:24 187:5
216:13 341:5
**follow-up** 288:24
**followed** 82:20
129:9
**following** 66:16
123:24 133:4
**follows** 123:6
237:15
**foot** 75:25
**footage** 141:10
**Forall** 1:7 7:7
8:22 13:6 14:3
14:5,20 15:17
16:6,23 17:4,5
17:14,22 19:4,6
21:2 22:13 23:9
23:15 24:21
27:7 28:4,12
29:18,21 30:7
30:19 31:18
34:24,25 35:13
36:6 37:3,16
38:14,17 39:10
39:14,18 40:4,6
40:6 41:17 42:7
45:24 46:15
48:4,14 51:11
51:12,23 52:3,9
53:19 55:6,8
56:2,22 59:25
61:12,14 62:10
62:19,20,24
63:19 64:3,12
64:15,23 65:6
68:20 69:17
70:24 71:9
72:16 73:15
75:7 78:10
79:25 82:14,23
83:17 88:19
90:22 95:13
100:9,20
101:11 106:5,5
115:25,25
123:17,20,23

124:3 130:8
131:23 132:7
132:19 137:23
138:2 144:25
145:12,14,22
151:13 153:2
155:4,6,10,10
155:11,12,17
155:23,24
156:5,8 159:9
159:22 160:10
160:14 161:17
162:12,13
165:7 167:12
169:12,14,22
169:24,25
170:8,19,22
171:3,7,11
173:8,10,17
174:2,2,9,10
176:11 177:15
179:10 180:15
180:17 188:5
190:7,13,20
191:21,23
192:6 196:20
198:18 199:3
199:21 201:7
201:11,15,20
201:24 202:6
203:9 204:15
205:9 207:6,10
207:22 208:13
218:19,25
220:8,18
221:18,18
222:3,7 223:6
223:12,20
224:10,15
225:4 226:17
227:24 229:12
229:13 230:2,5
233:3,5,8,20
238:18 240:4
240:10 241:20
251:23 254:5



254:13 255:4
255:22 256:3,8
257:6 258:19
259:7,11
264:20,25
265:14 276:3
276:11,16
284:23 286:23
292:23 298:5,7
298:10,20
299:6,18,22,25
300:3,6 302:24
303:2 304:6,23
305:3,16,19
306:4,12,21,22
309:18 311:8
311:11,21
312:4,20 313:2
314:17,22
315:2,14,16,23
316:4,10,23
317:10,17
318:9 321:2,6
321:12,16
322:13,19,20
323:5,17 325:4
325:5 326:23
328:12,17
329:18,21
331:10,25
332:23 333:2
341:23 348:19
352:9 353:9
**Forall's** 50:12
51:6 56:10
57:12 144:15
182:2 225:9
302:13 311:16
327:24
**Forbes** 259:17
264:19
**force** 55:17
139:14
**forced** 56:4 61:24
140:6 294:20
**foregoing** 360:9

**foresee** 52:23
**forget** 79:21
**forgot** 113:19
231:9
**form** 128:7,10
185:6 343:11
**format** 116:3
**formatting**
135:20
**formed** 26:6
286:21 287:5
**former** 15:18
23:8 65:15
156:25
**forming** 292:17
292:22
**formula** 248:20
**forth** 35:18 37:21
60:20 110:12
188:4 225:13
304:3 305:13
360:8
**Fortune** 259:25
**Forum** 14:17
15:5 61:13
63:13 64:25
74:20 126:25
141:8,23
143:13 153:10
224:5 293:20
328:8
**forward** 16:17
18:22 38:13
39:12 41:9
49:24 138:19
219:4 293:4
320:18 321:3,8
322:8,22
325:19 326:10
**forwarded** 126:8
198:19
**found** 146:5
156:16 299:7
323:17,22
328:6
**foundation** 117:3

117:10,17
132:12 163:4
342:18,22,25
344:3 346:20
**four** 83:18 98:13
195:13 196:14
212:10 213:20
214:9 215:22
216:7 218:10
225:7 279:10
279:11
**four-foot** 74:19
**frame** 36:23
**frankly** 24:24
65:16 81:10
118:5,11
168:17 273:20
**friend** 161:7,21
167:6 238:20
240:5
**friends** 124:9
**front** 11:23 59:22
188:12 285:16
287:9 294:18
**frontal** 11:20
**frustrated** 16:21
37:20 38:12
319:8
**frustration** 21:25
45:6 49:13
55:13 274:7
319:5,10 327:8
**full** 11:23 33:4,6
39:3 53:14
69:11 78:2
93:19 94:16
100:2 120:23
149:14 159:18
202:6 203:3
222:25 235:22
272:2 300:21
300:22
**fully** 153:12
**funds** 243:23
245:2
**further** 11:5

12:25 80:15
157:16 219:13
230:20,23
233:12 240:14
251:24 324:16
337:8 343:14
360:12
**future** 251:15

---
**G**
---
**game** 351:24
**ganache** 91:9
**Gene** 9:15
**general** 260:7
**generally** 102:3
251:14 261:19
312:7
**gentleman** 13:17
24:17 116:17
161:20 162:7
166:16 231:3
281:18 354:4
356:19
**gentleman's** 23:7
**gentlemen** 355:7
**genuine** 77:20
**genuinely** 73:16
**germane** 343:10
350:25
**getting** 91:6
109:10 154:23
167:20 301:4
327:2 329:24
**Ghanem** 180:4,6
180:7 181:15
267:16 268:19
275:11,15
357:3
**Gina** 199:10
**Gioffre** 199:10
**Giuliano** 170:5
176:10
**give** 6:16 30:2
33:4 43:15
45:13 58:5
120:17 141:15

145:8 189:2
201:8 205:17
211:2 235:16
254:2 263:24
265:21 268:19
305:19,20,24
309:15 313:4
314:5 322:20
323:19 325:23
338:17 349:23
355:18 358:22
**given** 9:20,22
34:12 47:24
51:16 62:17
102:25 105:2
127:8 137:3
156:18 165:18
200:15 203:6
203:13 206:4
293:8 297:24
301:14 316:9
342:8 360:10
**gives** 181:17
**giving** 126:11
309:14,22
310:23
**go** 7:2 10:7 12:3
12:20,20 17:16
19:16,23 20:10
27:17 34:14,20
35:10,16 43:6
44:9,12,15 45:19
46:2 68:9 79:23
83:9 84:18
85:19 89:21
93:8 94:2,10
95:12 100:14
101:22 105:23
107:6 108:23
114:12 119:19
128:18,19
130:11 133:6
133:21 136:15
136:16 137:6
138:9,25 139:3
141:18 152:11



153:3 154:7,13
155:3 156:21
157:5 158:15
165:24 167:25
169:22 175:20
176:7 184:17
184:17 189:2,3
189:25 193:18
194:3 203:18
207:25 210:3,4
213:21 220:4
221:24 227:13
227:17 231:18
234:6,12
239:17 243:5
243:12 245:13
246:12 247:3
250:12 251:9
262:2 263:9
268:6 272:18
273:16,23
282:2,10,11,12
283:19 285:15
287:8 290:2
292:24 306:17
306:18 314:21
320:18 321:3,8
322:5,8,22
324:19 325:19
327:19 330:10
330:17 339:6
340:3
**goal** 140:9
151:24 219:17
219:25 234:5
311:19
**goes** 29:11 78:23
85:25 86:19
90:7 239:14
265:25
**going** 6:3 9:24
11:16,21 12:13
14:16 15:16,25
16:17 17:3,7
18:9,11,12,20
18:25 19:19

20:14 21:8 23:4
23:5,10,17,23
25:12 29:5
30:14,18,25
31:7,20 32:19
33:4 36:12
37:25 39:5,15
41:4 44:2,25
49:24 50:7,11
50:15 54:6
60:15,21,22
61:3,5 66:4
67:20 68:25
70:14,17 74:4
76:12 77:3,17
81:16 82:3,5,16
89:9,16 93:15
94:24 95:2
96:24 97:10
98:4 99:22
101:22,22
103:21 105:10
107:3,16,17
108:15 112:12
112:23,24
116:21 119:2
119:11,12
121:13 122:11
125:12 130:15
131:8 135:11
136:25 138:18
149:20 150:5
156:21 157:19
162:11 163:3
163:13,18
164:3 165:21
168:19 172:19
175:9,10,15,21
176:7 179:6,7
179:24 181:13
186:2,15 189:7
191:25 193:9
193:13,17
195:17 197:10
197:22 198:15
203:18 213:13

213:18 214:21
217:23 219:4
221:22,23,24
222:23 227:16
227:17 229:12
233:23 235:4
236:13 238:14
246:5 247:7
248:2 250:7,10
250:25 252:6
261:7 266:25
267:7 268:21
272:6 275:2,8
281:22 284:12
286:8,12
290:12,15
294:14 296:24
302:16,21
305:6 307:11
307:13,15
308:10 309:20
310:8,17,18
313:5 314:9,11
314:19 317:20
319:15 320:3
322:8 324:17
324:20 325:18
325:23 326:10
326:14 327:14
333:14 335:18
336:18 339:12
340:15 346:2,8
349:7,15,17
350:15 351:18
351:19 355:15
356:25 357:2
357:18,19
358:2,11,18
**golden** 57:19
**good** 4:24 5:8,10
5:19,25 7:3
9:11,14 25:10
43:9 56:23,23
56:24 70:23
81:18 94:6,21
96:8 98:5

100:11 120:6
123:10,12,12
139:16 141:12
141:13,14
159:6 230:7
251:6 299:22
300:4 303:7
311:10 331:4
336:4 355:13
**goods** 86:9
208:25
**got-you-moment**
84:15
**gotten** 70:22
110:13 113:5
168:23 187:4
**govern** 306:22
**governed** 228:24
**governing** 182:8
**granted** 321:15
**Graphics** 175:6
180:3
**great** 91:14 97:17
260:5 262:13
**grind** 65:17
68:16
**ground** 118:16
141:2 208:22
**group** 15:4 55:6
55:7 90:21
166:22 167:2,2
167:8 168:10
180:15
**grouped** 75:24
**grouping** 208:20
**guaranteed**
62:10 63:11,22
64:4,15 78:18
**guarantees**
100:17
**guarantors** 40:10
225:18
**guaranty** 101:8
225:21 253:18
263:23
**guess** 127:20

202:20
**guessing** 87:16
**guidance** 174:23
**Gulf** 121:6
**guys** 11:12 34:7,8
43:7 45:8,9
89:10 101:21
119:9,21
125:12 133:16
165:15 193:8
239:2 250:21
274:24 275:17
305:9

---

**H**

**H** 237:11
**H-A-M-A-D**
236:4
**H-U-S-S-E-I-N**
4:22
**H&M** 303:10,12
**HALA** 1:4
**half** 46:21 83:19
204:22 254:6
270:23 275:3
**Hamad** 1:4,4
2:18 3:5 4:15
5:4,5,7,8,12,19
12:17 24:21
36:19 46:13
58:4 82:19
87:14 90:22
96:22 124:5,6,8
150:22 167:3
235:5,6,7 236:3
236:8,12 237:1
237:18 238:1
238:14 239:1,5
239:25 240:1
240:17 241:1
242:1 243:1
244:1,18,23
245:1,14 246:1
247:1 248:1
249:1 250:1,19
251:1,11 252:1



253:1 254:1
255:1 256:1
257:1 258:1
259:1 260:1
261:1,8,12,15
262:1,3 263:1,7
264:1 265:1
266:1,17 267:1
267:2,9 268:1
268:22 269:1
270:1,20 271:1
272:1,17 273:1
274:1 275:1
276:1,4 277:1
278:1,23 279:1
280:1 281:1
282:1,2,13
283:1 284:1,13
285:1 286:1
287:1 288:1
289:1,2,5 290:1
290:3 291:1
292:1 293:1,2
294:1 295:1,19
296:1,19 297:1
298:1 299:1
300:1 301:1
302:1 303:1,16
304:1 305:1
306:1,2 307:1
307:15,17
308:1,12 309:1
309:21 310:1
311:1 312:1
313:1 314:1,13
315:1,14 316:1
317:1,24 318:1
319:1,17 320:1
320:4 321:1
322:1 323:1
324:1 325:1,25
326:1,7 327:1
328:1 329:1
330:1 331:1,8
332:1,11 333:1
333:7,17 334:1

335:1,11
355:23 357:3
**Hamad's** 4:13
287:16 288:20
335:24
**Hamads** 137:10
**hand** 14:6 30:11
120:15 235:14
**Handbook**
105:19
**handed** 69:14
**handle** 6:3 54:7
128:16,21
251:7
**handled** 24:23
169:24 170:9
**handling** 121:10
121:19 236:20
**hands** 36:12
**handwritten**
346:12
**hang** 4:16 8:24
12:13 66:3
79:13 136:21
161:22 164:17
238:22 244:2
273:4 337:14
**happen** 15:25
143:20 190:24
**happened** 13:4
32:9 76:13
153:20 154:2
155:21 156:4
197:16 202:18
243:3 260:8
321:4 331:12
**happening**
181:20 268:9
**happy** 108:10
188:14 305:10
**hard** 175:18,19
193:18 237:25
256:18 260:2
336:16 355:8
355:15
**he'll** 183:20

**head** 55:24 60:22
184:7
**headed** 193:11
**headquarters**
247:15
**hear** 7:23 10:10
17:25 18:9,11
18:24 19:3
20:14 23:4
33:14 37:18
40:13,23 50:7
50:12 52:18
60:6 89:7
113:15 117:24
133:10 137:12
137:18 150:4
171:8 182:19
183:4 184:3,14
206:18 215:15
222:13 228:15
238:2,9,10
239:12 241:4
275:13 276:4,5
276:6 309:8
322:13,19
329:20,22,25
331:25
**heard** 32:24 45:9
45:21 54:14
72:20 83:12
84:20 116:18
137:21 138:25
146:24 156:3
157:11 165:9
254:10,14
274:5 304:4,5
306:10 329:17
331:10 332:23
348:25 349:24
358:9
**hearing** 9:17,19
19:19 43:12
55:15 89:4
118:9 202:21
239:2 250:20
330:7

**hearsay** 150:21
151:11
**heavy** 125:11
**heels** 351:7
**held** 1:15,18
252:6
**Hello** 159:4,5
**help** 130:5
142:23 145:2
145:12,22
159:16 172:8
173:3 188:5
246:23 249:23
257:8 276:16
281:10 295:2,6
297:23
**helped** 129:6,7
129:16,18
130:14 195:18
196:7,9 281:18
**helpful** 32:15
258:13 287:25
**helping** 71:17
**hereinbefore**
360:8
**hesitate** 305:21
**Hey** 187:6
**Hi** 320:4
**hidden** 34:11
**high** 15:14
237:20 260:4
264:22 269:24
270:12,17
303:11,20,21
**high-end** 13:20
19:12 38:7
91:21
**higher** 180:11
181:14
**highest** 140:17
**highlight** 60:25
**highly** 164:15
165:8
**Hills** 77:6,11
78:4,12,21 94:3
**hinge** 59:18

**hire** 155:15
**hired** 87:6,23
**hiring** 87:18
**history** 56:15
**hit** 5:16 76:18,24
85:12 299:6
**hoarse** 182:25
**Hochman** 307:23
327:25 332:15
**hold** 18:20 44:24
104:11 114:5
217:23 224:16
250:7 297:7
338:10
**hole** 18:16
273:22
**home** 43:13
120:25 121:4
**homepage**
180:23
**homes** 244:12
**honest** 165:2
265:9 268:2,13
291:25 303:3
309:16
**honestly** 245:18
247:21 258:22
269:16 280:18
282:7 341:2
**honor** 8:2,6
19:21 49:11
58:24 82:13
90:9 92:22 98:4
99:24 110:9
114:9 115:13
165:13 189:6
236:22 245:18
264:15 271:24
278:17 304:18
310:4 313:23
322:3 335:6
338:5 343:18
345:17 346:10
350:14
**hook** 289:4
**hope** 51:3 163:18



239:6
**hopefully** 275:5
**hotels** 15:12 18:4
**hour** 10:21 275:3
**hours** 119:12
357:20
**house** 335:8
**huff** 68:14
**Humphrey** 6:22
**hurts** 86:3
**Hussein** 2:20
4:13,20 6:9,16
6:18,21
**hyphen** 8:10
**hypothetical** 42:4

**I**

**idea** 42:19 72:12
139:11 300:2,3
346:16
**ideal** 74:24
**ideas** 300:7
**identified** 107:20
**identify** 4:5 6:4
57:3 107:10
**identifying**
268:13
**Illinois** 2:9 6:23
236:5
**image** 141:15
174:23 270:10
**imagine** 266:5
271:24 303:9
310:10
**impact** 97:18
98:10,17,22
101:13 141:24
**implement** 88:15
**implication**
73:10
**implied** 73:7
**important** 16:8
17:3,24 27:23
37:2,13 44:15
46:16 50:10,23
87:12 311:14

351:3,11 352:6
**impose** 310:18
**impossibilities**
85:6
**impossibility**
21:24 49:13
55:13 77:13
85:8
**impossible** 63:17
88:9
**impracticality**
21:24
**improve** 248:10
308:21 309:10
312:3 315:19
**inability** 55:3
93:16
**inadmissible**
348:21
**inadvertently**
352:5
**Inaudible** 182:21
183:13
**incident** 74:11
**include** 98:10
**included** 109:6
112:13 145:5
278:12 279:24
280:4,11,16
283:4 284:15
325:14
**including** 13:21
53:15,22
143:12 146:17
284:20
**income** 73:3
334:16
**inconsistent**
133:12,20
**incorporate**
118:24
**incorporated**
220:7
**increase** 310:6
**increasingly**
16:21 37:20

**incredible** 74:25
85:17
**index** 103:23
**indicate** 207:9
212:20 218:20
**indicated** 40:6
113:7 128:14
183:16 211:16
218:19 355:18
**indicates** 210:12
**indicating** 68:12
354:12
**indulge** 44:17
**industry** 13:6
71:23 77:2 87:9
178:12
**inexperience**
14:20 18:13
55:2 142:5,17
**infinity** 13:3
**informally** 115:2
**information** 6:8
19:5 34:5 53:7
54:4 115:15
126:12 204:10
232:21 341:22
344:10
**informed** 37:15
38:12 39:10
48:15 323:17
323:22
**Informing**
328:12
**informs** 28:4
38:18,23
**ingenuous** 71:12
**initial** 124:17
126:7 166:15
220:22 240:12
315:8 322:22
323:6
**initially** 138:15
245:11 295:3
**initiatives** 259:12
264:18
**inquiring** 258:4

**insanity** 326:3
**inside** 280:5
**insight** 356:16
**insist** 93:16
182:13
**insisted** 29:23
**insistence** 81:21
**insisting** 48:10
**instance** 42:3
**instructed**
118:13 255:4
**instruction**
231:21 246:11
**instructions**
122:13
**intangible** 283:11
**integration** 100:3
**intended** 48:23
100:9 225:4
272:21 321:8
322:21
**intends** 315:4
**intent** 62:24
187:23 311:20
**intention** 80:13
96:12 263:2
**intentionally**
72:12
**intentions** 72:14
84:14 92:14
**interest** 35:14
73:20 95:22
143:5
**interested** 46:18
74:21 124:12
127:11 146:5
146:15 162:2
360:15
**interesting** 284:6
**interior** 271:6,11
**internal** 110:2
**internet** 57:7,16
58:11 59:11,20
65:5,13 171:18
185:4,21 186:4
186:6,17 188:4

**interpretation**
188:10,11,19
**interrupt** 10:5
121:16 239:10
263:7
**interrupted**
239:20
**interruptions**
33:7
**interviewed**
87:24
**intimately** 20:19
267:24
**introduce** 124:15
260:3 350:18
**introduced**
146:14 197:24
240:6
**inventory** 84:9
98:25 132:7,19
265:12,14
278:13 284:4
**invest** 262:19
264:9
**invested** 78:19
243:17,24
244:25
**investment** 55:5
55:7 62:25
90:21 100:13
100:14 167:2
220:10 263:18
263:24
**investor** 166:22
166:22,24
167:2,8
**investors** 86:25
166:15 168:9
**invoice** 106:21
208:12
**invoiced** 212:6
**invoices** 201:2
204:4,5 206:10
208:2 209:2
210:22 211:17
211:25 232:8



232:23,24
**Invoices/State...**
345:21
**invoking** 26:16
**involved** 87:22
140:19 145:3
170:14 180:14
194:16 238:18
240:3
**IR** 107:23 109:22
111:18
**iron** 96:25
**ironic** 72:6
**IRs** 108:12
110:20,22
335:14
**issue** 49:3 75:7
89:14 92:22
115:20 135:19
136:11 181:22
182:2 350:25
352:15 354:15
**issues** 20:6 74:8
118:17 265:13
265:18 266:8
**Italcoast** 160:16
**Italian** 337:20,23
338:8,9 339:17
**Italian's** 76:21
**Italians** 55:10
**Italnord** 13:16
20:22,24 28:17
35:7 36:11
69:15 71:4,8,11
71:19,21,24
94:17,19 146:9
146:10 151:13
151:17 153:6
153:20 154:15
195:2 196:3
199:25 200:3
211:6 220:18
220:19 222:18
223:3,14
224:17 233:6
233:10 254:24

254:24 255:5,6
255:15,20
277:9 279:23
282:25 285:4
285:12 286:6
286:21 288:19
289:8 290:8
291:3 292:7
293:3 302:18
352:10 353:9
**Italnord's** 226:12
289:23 302:11
**Italy** 24:18 55:11
77:4 126:9,13
129:21 132:24
144:23 146:3
170:2,4 180:16
202:18 221:6
221:13 223:2
232:25 241:23
243:11 245:3
247:11,14
251:13 266:14
271:10,12,12
271:13,14
291:10 292:12
**items** 18:2 75:20
85:24 268:13
268:15

---
**J**

**J** 2:14
**J3** 261:23
**January** 99:2,3
272:8 307:21
308:17
**jeans** 303:13
**Jet** 259:23
**job** 50:19 89:13
143:4,7 171:13
267:5
**John** 6:21 308:4
308:11 309:18
**join** 66:10 67:23
298:20 336:20
**joint** 44:20,22

82:7,11 103:2
119:17 134:12
135:3 175:16
179:22 198:16
221:22 232:5
267:7 268:21
281:24 307:13
314:12 317:21
319:16 324:21
326:15 332:9
333:15
**judge** 41:25
214:6
**judgement** 19:10
**July** 39:2,21
84:21,25
159:25 215:3
271:19 305:9
323:19,25
326:25 327:4
327:23 328:10
328:13,18
**jump** 317:16
**June** 39:4,6,9
85:3 159:23
160:2 305:8
323:13,24
326:24
**jury** 34:9 128:15

---
**K**

**Kamco** 92:23
**keep** 95:23
107:17 112:16
174:3 193:9
326:3
**keeping** 110:15
**keeps** 51:4
**kept** 134:25
195:17
**key** 16:15 71:22
71:22 79:11
83:24 84:16
**keys** 341:4
**kind** 60:3 72:5
75:24 87:15

103:11 128:3
150:21 151:10
154:9 162:17
220:2 231:9
264:10,11
271:7,8 344:3
**knew** 41:4 91:5
94:25 96:12
146:16 156:14
156:20 240:6
262:25 264:7
305:5 309:19
313:19 317:3
**know** 15:10 16:9
19:9 21:21
25:19 28:16
41:24 42:22
46:24 53:2
55:21 64:18
75:22 78:7,22
87:13,15,21
89:9,21 91:20
96:19 98:9
100:24 104:25
105:9,13 106:7
107:14 109:12
110:17 111:2,3
112:2 113:10
118:20,24
129:20,21
131:15 132:17
132:22 135:18
135:18 137:15
139:14 140:23
141:12,18
142:10 147:15
149:6 152:4,16
153:12 154:9
154:22 156:14
158:7 161:19
163:25 165:15
168:21 169:6
176:13 179:16
179:18 183:18
185:10,23
186:2,9 187:19

207:7 208:23
209:14,24
210:8,18 213:7
217:14 223:5
228:12 229:16
229:20 236:14
237:21 240:13
242:24 245:16
246:24 247:17
247:18 249:19
250:10 257:22
262:15,22
265:10,21
266:9 268:14
269:11,17
277:5 280:6
281:5 295:3,18
298:24 300:22
301:15,19
302:7,16 303:6
303:8,10
304:25 305:14
306:3,7 310:16
316:11 317:7
319:8 321:15
325:23 329:25
333:5 334:21
337:23 340:18
347:5 349:19
349:20 351:4,8
351:9 354:2
357:25 358:7
358:11
**knowledge** 78:7
90:15 130:3
170:13 171:6,9
174:15 218:23
229:25 255:17
**knows** 35:4 77:2

---
**L**

**L** 2:9 103:25
104:10 123:3
**L-E-V-I-N**
289:17
**L-U-C-A** 121:3



**LA** 264:21
**label** 82:14
  109:24 110:15
  111:19 147:5
  198:25 296:12
**labeled** 110:24
  162:13 189:11
  198:17 199:3
**lack** 14:24 24:7
  24:11 48:7
  53:22 151:22
**ladies** 231:4
  355:7
**landlord** 72:23
  297:7,8,15,19
**landlord's** 297:4
**language** 20:15
  21:3,9,18,18
  40:12,17 41:7
  60:3 188:3,20
  288:11,15
  290:6,11
  297:14 325:10
**Las** 13:8 14:17
  15:12 18:4 41:5
  53:5 54:23
  77:14 78:14,20
  83:22 90:16
  98:11 124:13
  125:22 126:25
  127:5 141:5,16
  141:20 144:21
  146:16 147:11
  154:6 160:24
  161:14,15
  162:3,10
  166:17 221:7
  222:22 224:5
  249:13 257:8
  258:15 347:15
**late** 38:3,5,6,6
  76:23 118:21
  147:15 162:18
  240:19 268:17
  270:21 317:17
  319:5,7 326:20

327:9 351:24
  355:21 357:9
**latest** 99:8
**Latin** 13:24
**launch** 65:11
  175:3 179:7
  181:15 186:25
  187:11,16,17
  188:6 257:8
**launched** 57:11
  59:10 178:25
  182:4,6 186:14
**launching** 60:15
**law** 21:22 52:13
  54:20 274:11
**lawsuit** 207:5,23
  328:22,25
  329:4,10
**lawyer** 236:12
  289:8,12,14,24
  300:18 305:20
  307:24 308:6
  329:11
**lawyer's** 322:17
**lawyers** 47:8
  89:12 96:24
**lay** 117:3,10,17
  313:12 342:22
  342:24 346:20
**layers** 189:23
**laying** 344:3
**lead** 89:5 138:17
  139:2 270:18
**leader** 266:23
**leaders** 253:10
  266:15
**leading** 29:14
  125:8,10,11
  138:23 150:14
  150:16 185:10
  286:14
**learn** 156:7
**learned** 95:7,14
  95:15
**learning** 323:5
**lease** 17:9 28:23

30:4 32:3 36:25
  37:17 39:9,22
  46:25 56:2,3
  61:22 62:11,18
  63:11,11,23
  64:4,11,14,17
  64:20,24 73:4
  75:3 78:3 80:2
  80:3,18 85:3,5
  95:3,21 96:5,13
  100:16,17
  101:8 114:3
  147:19,23
  148:14,17
  149:23 150:3,9
  151:2 156:17
  157:4,4 169:13
  169:21 195:19
  215:2 224:4
  225:8,20 285:6
  285:9,13,16,20
  285:24 286:3
  287:7 291:13
  294:18 297:3,6
  300:21 311:4
  315:5 316:6,11
  316:25 320:7
  320:23 321:3
  322:9 323:3,14
  328:8,11 329:8
**leave** 159:9,19
  183:16 189:2
  298:6
**leaving** 290:21
**lecture** 355:19
**led** 252:17
  269:12 272:12
**Lee** 289:14
**leeway** 273:10
**left** 28:20 68:13
  149:8 155:19
  156:4 159:10
  159:15 196:13
  205:25 239:17
  254:21 255:11
  264:11 299:18

344:7
**legal** 1:24 55:19
  74:7 133:15
  195:24 226:7,8
  288:10 313:9
  313:13
**legitimate** 115:16
  341:7
**lenient** 140:12
**let's** 17:16 33:3,7
  44:9,11 45:15
  45:17 58:22
  75:10 102:13
  117:19,24
  128:18 136:10
  136:13 159:14
  161:23 169:10
  184:17 193:24
  193:25 194:15
  217:16 218:8,8
  221:20,20
  242:2 243:12
  255:19 263:10
  265:12 272:15
  272:18 274:12
  275:4,17
  278:21 279:20
  281:2 283:19
  306:17,17
  320:22 321:4
  322:6 324:11
  330:2 336:9
**letter** 30:19 35:5
  35:9,17,21 36:5
  42:21 43:2
  52:10 82:17,24
  83:3 93:21
  95:10,25 96:3
  96:17 115:14
  150:19 160:4
  295:14,22
  299:14 300:11
  300:16,21
  301:4 306:19
  311:20 312:2
  325:4,14

327:24 332:7
  332:14,24
**letters** 332:18
**letting** 94:9
  140:12 273:18
**Lev** 308:7
**level** 140:17
  141:24 263:4
  312:4
**Levin** 289:15,19
**Levy** 308:6
**Lewis** 2:9 3:3,5
  4:4,7,8 5:2,3,21
  5:22 8:25 9:2
  9:12 10:9 11:10
  12:3,5,21 16:2
  16:10 18:8
  19:15,17,24
  20:5,12 23:3
  24:6,14 25:10
  25:21,24 27:18
  27:20,21 28:18
  29:9 30:8,23
  31:5 32:5,10,14
  32:22 33:4,25
  34:14,16,20
  36:8,17 39:25
  40:11,21 43:9
  43:17,18 44:12
  44:13,22 45:3
  45:19,20 48:19
  48:24 49:10
  50:6 54:2 66:8
  67:8,11,17,19
  67:21,24,25
  72:8,20 81:18
  83:12 84:21
  87:12 92:24
  95:6 96:20
  102:9 108:10
  109:18 112:18
  113:14,17
  114:12,14,25
  115:8,22
  116:25 117:5
  117:21 118:3



118:10,11
119:8,21 120:3
120:4 121:9,11
121:12 122:7
122:15,17
123:8 128:19
134:11,14
135:12 136:16
136:23,24
148:18 149:12
151:3 154:10
154:13,23,24
157:15,16
158:9 162:21
163:7,9,13,25
164:15 167:21
172:10,13
177:20 182:18
182:21,22
183:2,4,13,15
183:24 184:3
184:12,14
185:5 186:5
187:25 188:9
192:20,23
195:23 196:21
198:2 206:13
206:15,19
209:15 212:23
213:2 216:8,18
219:6 227:19
230:22,24,25
231:18,19
232:3 235:4
236:12 237:17
237:21 239:18
239:24 248:22
250:8,11,12,14
251:8 257:10
257:19,24
258:12 261:6
261:24 267:4
273:5,8 274:3
274:16,17,21
275:9,10,14,23
275:24 281:22

282:12 283:14
283:19 284:3,9
286:15 287:11
287:14,20,24
288:5,9,14
290:2,22,23
292:25 296:7
296:14 307:11
314:11 317:20
317:23 319:15
324:3,8,9,16,17
324:20 326:14
327:13,18
329:23 330:4
330:10,20,25
331:5 332:9
333:14,24
335:17,21,22
336:3,12,14
337:3,17
338:12,14,20
339:9,22
341:17 342:12
342:15 343:15
343:17,22
344:16 347:5,9
347:13 349:16
351:16 352:16
352:19 353:4
353:23 354:5,8
356:4,10,11,22
356:24 358:12
**Lewis'** 237:4
264:17
**Lewis's** 58:9
**Lexington** 2:13
**liability** 101:10
225:16 288:13
334:2,9,15
**liable** 286:20
294:18
**liaison** 232:25
**license** 16:7
20:20 21:4,12
41:2,9,11 57:6
64:10 97:9

130:8,21 134:7
152:7 170:10
170:18,23
171:10 172:3,5
177:17 178:2
182:8 185:2
195:20 198:6
201:10,25
205:21 209:10
212:15 218:22
219:2 220:8
224:19,24
225:19 226:5
227:8,17
228:23 240:22
241:5,12 243:8
253:17,24
280:10 284:15
284:21 286:10
286:20,22,24
287:4,6 290:16
290:21,25
291:14 292:16
292:18 325:11
**licensing** 197:25
201:21 292:22
**lie** 187:10
**lieu** 308:14
**Life** 166:8
**light** 259:3 274:4
**lights** 271:8,13
**likes** 311:3
**limit** 225:14
**limitations**
274:10
**limited** 81:10
284:21
**line** 5:2,15 9:6
32:12,18 33:20
34:6,17 51:9
65:23 76:22
99:5 204:18,20
205:6 272:25
**lines** 33:23
172:14 173:22
**link** 181:18

**links** 60:19
**liquidated**
281:14
**liquidation**
281:19
**liquidity** 334:19
**list** 82:7 105:7,25
113:6 166:6
175:14 179:22
221:23 340:12
340:13 343:6
**listed** 90:24
**listen** 157:25
237:4
**listening** 7:16 9:8
**listing** 143:10
**literature** 86:15
**litigation** 105:19
156:9 332:20
**little** 5:14 19:24
20:3 58:22 68:5
81:15 130:10
141:19 159:16
180:11 237:19
237:19,24
238:3,4 265:4
267:21,22
288:3,11
317:16
**live** 59:13 91:23
201:24 227:24
**lived** 87:2 92:9
100:9 228:4
**living** 16:7
148:20
**LLC** 1:4 47:3
82:18 200:8
224:5 254:23
308:13 328:5
329:5 334:2
335:5
**LLP** 2:12
**loan** 335:6,8
**loans** 244:11
335:5
**locate** 107:20

108:2
**located** 108:6
162:20 164:11
165:4,5
**location** 14:2,12
51:13,14,22
74:13,23
293:20 303:19
304:7 305:11
306:6,12,14
**locations** 13:24
**locked** 331:13
**long** 76:6 122:5
147:16 160:9
166:7 274:2
340:3 357:18
**longer** 151:17
155:23 159:16
160:7 286:7
288:12 290:15
293:5
**longstanding**
70:15 76:21
85:14 86:6
**look** 8:2 9:14
10:22 48:21
129:14 131:14
135:18 145:14
157:21 175:18
188:15 224:15
249:3,12,16
256:20 267:3
280:13 291:15
294:10 296:24
302:11 325:3
334:19,23
336:9 351:10
353:22
**looked** 75:15
129:12 302:10
302:13 304:14
**looking** 7:14 76:3
78:11 103:23
105:24 106:9
134:3 140:24
145:15 189:10



283:22 299:7
304:2 312:6
338:7
**looks** 10:17
106:20 311:3
**looped** 180:10
**loose** 66:3
**lose** 62:25 303:16
**losing** 262:19,24
264:8
**losses** 281:15
**lost** 9:12 43:14
271:22 334:14
**lot** 53:21 79:3
89:11,19 99:9
118:6,12
140:21,24
154:5,6,8
175:19 231:8
246:21 266:15
269:13
**loud** 238:3,11
239:9
**louder** 12:12
**love** 110:9
**loved** 78:13 91:8
**low** 140:7,8
303:13
**lower** 141:24
**loyal** 86:6
**Luca** 23:7 24:16
60:7 65:14
121:3 159:4
164:13 169:12
180:21 194:10
199:4 222:3
228:22 240:13
250:23 253:10
267:16 269:8
278:25 281:10
281:17 285:14
292:14 298:13
338:9 344:12
**lunch** 102:3
119:5,19
135:15 163:20

184:10 188:6
193:2 194:6
**luxury** 55:10
75:20 85:24,25
178:12

———————

**M**
**M** 1:16 2:10
237:11,11
360:3,24
**Magdalena** 1:16
360:3,24
**Maggie** 25:18
44:11 104:13
148:8 355:10
**Magna** 1:24
**main** 88:6 301:11
**maintain** 119:7
119:23
**majeure** 55:17
**making** 19:10
196:2 293:8
315:11 320:16
320:24
**mall** 75:2,22
141:18 150:25
294:19 303:5,8
303:9,25 308:3
317:10 319:25
**malls** 75:23
127:2 141:9
143:13 153:10
293:20
**man** 126:5
130:12 142:19
**manage** 71:5
222:18
**management**
15:6 20:21,24
28:15 29:7,13
29:15,20 30:10
37:5 46:20 48:2
56:11 61:25
69:14 72:15
92:15 94:5
96:25 97:2,13

97:17 143:13
170:23 195:3
222:23 223:13
224:14,20
226:2,12,24
290:7 306:25
307:3,8 311:23
312:5,15
314:16,23
315:7,12 325:7
**manager** 15:5
16:13 38:7 72:4
129:22 170:6
176:11 223:21
224:15,16,17
**managing** 71:16
154:16 196:2
199:25 220:19
**mandate** 47:24
**Manhattan**
173:17
**manikins** 280:6
**Manuela** 262:4
**manufacture**
84:11
**manufacturing**
271:15
**map** 218:14
**March** 37:4
38:20,22 64:12
82:18 209:11
214:13 276:15
314:25 315:4
321:5 322:14
322:20,23
324:24 326:12
**Marco** 126:15
138:11 157:2
170:6 242:15
242:18 244:24
246:4 248:22
252:4
**Marco's** 245:16
250:16
**Mariola** 260:18
260:25 261:4,9

262:4
**marked** 162:12
307:12
**market** 15:15
41:6 52:7 63:7
83:24 98:11,16
130:4 153:13
160:20 168:12
168:13 178:8
178:16 258:24
262:19,21,24
262:24 263:16
263:25 264:8
277:6
**marketing** 14:25
75:8 180:9
242:20 245:21
256:17,17,23
256:25 260:20
262:5,7,11
280:7
**marketplace**
55:9 76:25
**marking** 134:8
**marriage** 360:14
**massive** 85:22
**match** 211:5
229:12,13
257:6
**matching** 92:12
**material** 10:18
100:4 231:13
**materials** 271:17
280:8 303:14
**math** 205:2
272:16
**matter** 1:3,15
6:11 9:18 14:14
15:23 107:16
133:17 150:19
169:4 240:14
254:22 298:15
303:22 360:16
**matters** 11:7
**mean** 55:23
57:18 64:18

262:4
**marked** 162:12
307:12
**market** 15:15
41:6 52:7 63:7
83:24 98:11,16
130:4 153:13
160:20 168:12
168:13 178:8
178:16 258:24
262:19,21,24
262:24 263:16
263:25 264:8
277:6
87:13 91:15
109:2 133:18
138:8 139:13
151:5 154:5
185:19 210:13
210:17 212:3
271:16 277:19
277:24 278:8
286:13 292:20
295:17 300:25
318:8 334:22
340:24 341:19
**meaning** 126:6
264:6
**meaningful**
100:23
**means** 53:18
212:6 334:11
339:4
**meant** 40:18
142:16 226:10
264:6 310:2
**measure** 208:10
**measurement**
248:16
**meet** 13:4 26:21
94:11 124:6
161:10 266:14
277:8
**meeting** 55:19
102:16 161:12
162:5 221:5,11
242:23 243:10
245:15,24,25
246:12 247:4
247:11,19
248:6 251:24
291:10,20
292:12 330:13
343:24
**meetings** 139:22
219:23
**members** 225:17
335:2
**memo** 352:9
**memory** 209:23



226:22
**mens'** 13:20
15:14
**menswear** 13:4
55:11
**mention** 56:19
97:4 98:17
**mentioned** 49:19
65:8 72:21
91:25 126:13
243:7 303:15
**mentioning**
21:16
**merchandise**
21:6 23:22 24:2
24:25 25:3
131:23 210:16
210:19 232:12
241:16 243:20
270:12 272:2,3
272:5 277:20
277:23 278:8
278:13 279:5
279:16,24
280:15,20
281:2,11,13,14
**merged** 60:18
**merger** 25:8
**merit** 13:10
**messed** 183:20
**met** 24:17 93:25
94:13 124:17
125:18 308:19
**Metageti** 180:13
181:9
**Mexico** 13:18
146:10,17
277:2
**mic** 19:25
**Michelle** 199:10
**microphone** 20:8
237:19
**middle** 38:9
91:12 126:4
130:12 142:19
159:19 249:16

**million** 43:4
52:11 63:5
83:19 198:12
208:11 212:4
212:14,21
243:21 249:25
252:20,24
253:8 272:14
279:15 333:3
334:10
**mind** 51:4 101:13
219:8 220:13
296:15 299:19
312:25 313:17
351:13
**mine** 44:6 51:10
134:2 273:22
**minimal** 137:9
152:6 241:7
**minimum** 22:11
22:14,22 24:9
26:18,22 27:10
40:19,22 41:10
42:8,14 83:11
93:25 94:11,13
98:18,23
137:24 138:6
140:7,18
198:11 212:13
218:21 219:3
220:6 234:5
241:10,21
242:3 252:5
291:8,21 292:8
**minus** 334:20,21
334:22
**minute** 4:17 58:4
58:7 198:21
238:23 261:15
305:22 336:10
337:25 355:21
**minutes** 101:25
102:2,20
193:21 242:23
247:18 274:22
275:17

**Mischaracteriz...**
213:3
**miserable** 282:9
**misleading** 69:19
**missed** 268:15,16
**mistake** 179:18
**mistaken** 248:25
256:21 257:2
**misunderstood**
195:15
**mitigate** 51:6,25
52:12 56:20,25
72:22 73:25
80:24 81:4
281:15
**mitigation** 22:2
50:25 51:2
52:16 53:23
76:8 79:23
**mix** 75:21
**modifications**
99:25
**moment** 6:9 43:8
50:3 54:13 82:6
97:24 98:2
120:11 121:5
130:17 144:11
197:15 230:9
235:12 254:3
262:25 263:8
268:4 288:8
292:21 301:14
**Monday** 164:13
**money** 71:13,22
71:22 72:3
83:18 89:11,12
141:14 220:9
256:17 262:19
266:16 334:14
**Monica** 65:19
**monies** 229:21
**monitor** 11:14
120:11
**monitored** 24:22
**monitoring** 37:23
**mono** 127:15

**month** 38:10,11
39:20 51:19
85:3 129:11
143:2,2 159:25
270:22 293:16
294:3 304:17
304:21 305:3,4
318:16,24
321:6 323:20
326:25 352:9
**monthly** 16:14
26:18 37:23
114:15 116:5
301:18
**months** 27:8 28:7
29:6 31:21
35:25 37:6 38:5
39:10 43:2,12
52:8 77:24
81:23 83:15
94:20 155:19
160:3,6,6
208:24 217:8
246:15 272:9
272:15 293:17
311:24 312:8
312:12 313:5
314:6,8,9 315:2
**monumental**
76:18
**morning** 4:2,24
5:8,19 7:4 9:15
10:17 67:4
101:24 120:6
123:9,10,12
336:8 354:10
**motion** 346:5
**mounting** 319:9
**move** 18:22
38:13 39:11
41:9 47:19
51:13 74:12
86:19 105:14
134:19 149:8
149:17 151:9
168:17 169:10

169:11 274:12
293:4 304:6
306:5
**movement**
352:14
**Movie** 264:23
**moving** 81:14
289:3
**Mr.Torello-Vi...**
47:21
**muddied** 72:9
**multi** 128:10
**multi-brand**
127:10
**multiple** 184:25
187:5 266:7
**mute** 230:24
239:11,13
275:24 330:9
**muted** 330:11
**mutually** 73:19

———— **N** ————
**N** 2:2,8,25 123:3
**name** 4:18,21,22
7:19 8:16 23:7
120:24 127:9
127:14 146:8
162:8 176:3
235:23 236:2,3
242:17 245:16
250:16 260:22
260:24,25
261:10 281:7
303:25 308:4
328:24 329:3
**named** 13:18
65:19 329:6
**names** 269:19
**Naples** 121:7
**nature** 79:4
118:21 168:8
354:16
**near** 324:7
**necessarily**
164:21 210:17



**necessary** 8:5
17:25 36:11
45:9,13 231:7
231:12 251:6
273:17
**need** 6:13 8:2
80:14 97:24
133:23 167:25
175:13 176:9
185:23 187:7
226:3 246:22
271:9 305:9
308:18 310:11
337:19 341:2
353:25 357:2
**needed** 88:13
99:4 312:11,21
**needs** 54:19
96:11 219:13
246:23 314:5
338:23 349:12
356:8
**negative** 143:22
143:24
**negotiate** 307:2
**negotiated** 32:2
63:12
**negotiating** 34:25
**negotiations** 78:4
78:22 169:20
170:9,15 277:9
291:6 306:21
**Neither** 108:3
**nervous** 301:12
**net** 259:23
334:16
**Nevada** 106:5
**never** 78:9 79:6
83:14 84:20
96:6,7 101:13
179:13,14
230:2 255:2
286:24,25
348:25
**new** 1:17 2:5,14
7:6 21:15,22

28:8 30:3 35:10
38:24 47:18
49:6 80:2 84:23
84:24,25 85:4
85:20 91:18
95:12 100:25
145:12,22
148:19 155:20
156:19 193:11
193:13 231:13
237:13 248:2
248:19 259:24
274:15 276:3
276:12,17
287:5 292:18
292:22 294:25
295:9,12
297:24 298:14
298:17,21
299:8,19 300:9
305:11 312:12
314:7 323:9,18
323:22 328:7
328:10 360:5
**news** 299:22
**nice** 47:11 141:15
270:14
**night** 86:2 354:9
**nil** 157:10
**no-oral-waiver**
26:17
**noise** 239:3
**non-exclusive**
178:2
**non-exhibit**
348:8
**nonexclusive**
57:17
**Nordstrom** 91:20
**North** 2:13 121:6
313:18
**notary** 1:17
186:20 237:13
360:4,24
**note** 27:23 50:23
65:19 102:24

116:13 157:8
346:12,14
**noted** 359:3
**notes** 48:21
247:19
**notice** 17:6 29:24
30:6 38:22 48:6
48:11 55:25
81:8 93:22
312:14,21
313:5,25
315:10 321:7
323:20 331:21
**noticed** 93:9
**notified** 84:24
325:5
**notify** 72:13
308:23 309:11
**notion** 69:20
79:11,17 94:25
349:21
**November** 41:19
42:18 95:8
246:13 247:8
266:4,7 269:4
272:10 332:5
360:25
**null** 96:4
**number** 6:17
43:16 67:12
107:24 108:17
109:17,21,25
110:2 116:7
134:10,15
141:11 144:3
201:4 211:21
221:21 231:6
231:14 267:8
281:24 287:23
296:5 334:25
353:22 354:21
355:22
**numbers** 139:25
144:23 200:8
204:2 220:3
232:15 267:6

269:20 302:15
339:24 346:12
350:21
**numerous** 50:17

---

**O**

**O** 123:3
**obey** 271:3
**object** 103:6
114:6 162:22
163:23 167:22
251:2 286:13
298:13 336:13
337:16 350:15
**objected** 96:14
206:15 344:21
**objecting** 89:24
185:6 206:19
227:21 272:24
346:11
**objection** 33:13
33:14,17
103:22 104:5,7
104:9,17
105:12 106:17
106:24 109:10
109:13 110:16
110:25 112:11
112:21 115:10
115:12 119:8
119:23 121:24
122:4 125:5,7
128:6,9 132:9
132:11 133:14
138:22 150:11
150:13 153:23
154:20 157:9
158:10 163:8
165:20 166:9
167:19,24
172:10,12,14
172:20 177:20
182:18,20
184:21 185:5
188:25 195:23
196:21 206:13

209:15 212:23
212:25 213:13
213:15,18
216:18 219:6
228:13 236:24
243:25 244:3
257:10,12
259:5 274:13
313:8 337:13
337:18 338:18
339:8,19,19,25
340:10,25
341:7,10 343:2
343:4,17 345:9
347:2,6,11
349:7 350:12
351:20 352:18
352:23 353:14
**objectionable**
164:16
**objections** 33:19
33:23 105:4,22
111:9 339:16
340:6,8 342:13
344:2,6 345:6
348:15
**obligate** 64:23
229:7
**obligated** 187:11
254:5 259:7
290:15
**obligating** 286:8
**obligation** 49:23
79:25 80:23
174:4 198:5
201:19 204:14
205:19 225:15
255:19 286:9
**obligations** 21:13
22:5 41:8 64:16
100:19 174:19
224:4,18,23
226:4 227:8,10
227:25 228:5
286:10
**observe** 231:5



236:17
**obtain** 308:16
**obviously** 14:7
342:16
**occasions** 145:10
**occupies** 297:2
**occur** 161:13
**occurred** 81:13
98:13 251:7
**October** 1:10
35:12 46:10
95:4,8 266:2,6
271:20,25
272:3,9 295:15
296:2 299:17
331:9
**odd** 279:3
**offer** 74:12 306:5
**offered** 72:25
160:19 306:13
344:20
**offhand** 107:14
**office** 11:13,24
199:16,21
202:17 232:22
233:2 235:25
341:23
**officer** 171:3
**officially** 38:17
**Oh** 337:22
**okay** 5:18,24
8:11,23 9:2,10
9:13 12:2,18
18:23 20:5
25:16 27:17,21
31:13 32:13
35:12 37:12
43:5,22 44:8,9
48:3 60:2 61:16
62:8 63:14
67:24 68:15
69:13,20 72:2
72:17 74:4
76:20 79:12
80:6 81:6,24
82:19 83:12,20

84:15 93:2,11
93:17 95:7
97:23 99:18
100:2 101:17
103:17 111:16
117:23 120:2
128:17 131:3
131:20 135:16
136:9 147:17
158:13 160:21
162:11 171:15
173:16 175:14
176:9,21
177:10 179:5
179:23,25
180:10 182:2
184:2,22 191:5
191:6,20
192:16 193:23
198:15,17
203:14,19
204:9 207:25
208:3 209:4
210:22 211:3
212:8 215:18
216:5 217:16
218:18 220:4
223:5,11
226:23 227:6
227:16,18
228:20,22
229:3,25 230:7
231:24 232:19
234:19 235:3,6
235:10 236:7
237:8 238:9,12
239:16,17
240:20 243:6
244:9,22
245:23 247:16
253:23 254:3
261:18 266:24
267:12 268:6,6
268:25 274:23
275:16 277:7
278:3 283:3

285:7 287:18
287:20 288:6
289:16,18,22
289:25 291:3
292:5,24
296:19 304:11
306:17 307:10
307:23 311:14
314:20 316:9
316:16 317:7
322:18 324:3
324:15 326:22
333:8,9,10,13
334:5 339:11
340:14 353:15
355:6 356:4
357:7,21 358:6
**old** 160:18
269:15,18
270:2
**once** 26:6 28:4
60:16 81:5
110:22 129:11
142:25 316:9
**oncologist** 244:21
**ones** 105:6 135:2
211:5 232:23
337:15
**online** 171:22
172:4 173:3,13
177:12,16
178:7
**onset** 62:17
**open** 27:6 52:5
77:6,11 85:20
117:19 125:15
125:22 126:3
128:25 132:8
155:5 160:24
161:19 214:24
215:4 253:13
270:21,21
271:18,19
272:20 295:4
**opened** 13:9
77:15 124:8

125:4 127:17
127:23 128:2,4
132:4 137:16
142:2 143:14
191:17 194:23
208:16 210:10
214:13 215:10
243:13,14
245:11 252:9
269:12 270:13
271:2,25
**opening** 9:24,25
11:9 13:7 18:22
45:21 49:20
50:5,22 54:3
61:6 72:9 77:9
77:24 81:19
124:12 126:22
126:25 127:11
136:19 137:11
162:2 298:25
304:5 306:11
312:18 323:11
**operate** 29:21
35:2,8 63:17
138:18 151:17
153:9 173:16
174:21 191:24
192:4 194:13
195:8 212:9
253:13 286:6
311:8,12 313:3
314:10 321:18
323:3
**operated** 13:22
196:18 198:10
241:17 243:18
273:14 310:19
313:20 325:22
**operating** 14:6
14:15 15:24
17:8 28:13 29:5
31:2 35:15
38:19 39:12
51:7 70:24 74:3
91:16 141:6

147:7 153:21
155:25 196:4
209:5 225:19
265:15 277:6
279:17 293:4
293:25 294:6
302:2 303:2
306:22 318:6
321:9 323:6
**operation** 14:9
15:21 28:6
71:25 80:22
81:3 90:16
106:6 223:21
229:23 284:17
284:22 302:11
302:12
**operations** 47:15
195:3 302:14
334:4,11
**operator** 52:5
130:21 145:13
145:23 153:7
276:3,12,17,19
276:25
**operators** 13:15
37:22 114:15
301:21 315:22
**operators's** 21:15
**opinion** 143:23
153:19 155:14
**opinions** 156:17
**opportunity**
10:22 26:3 33:5
33:6 37:8 42:20
51:16,24 57:6
83:17 163:19
259:16 296:20
305:17
**opposed** 39:23
262:20
**opposite** 62:15
290:13
**option** 330:23
**options** 73:14
**oral** 31:24



order 66:18
  139:25 184:25
  208:24 209:7
  209:14,21
  210:9,14,20
  217:7,9,13,13
  220:13 263:23
  264:4 271:3
  272:4 340:3
ordered 70:10,20
  268:11 342:11
orders 124:2
  345:22
organization's
  219:8
origin 168:5
original 90:20
  109:6 152:12
  169:7 272:18
originally 36:4
  272:21
originated
  198:20
Orland 6:23
outcome 360:15
outlet 270:8
outperformed
  304:23
outset 170:10
outstanding
  318:13,23
over-application
  207:11
overage 206:9
  207:2
overhead 293:23
  294:4
overpayment
  207:10
overrule 188:25
  213:13
overruled 112:22
  128:18 132:15
  172:20 206:24
  210:4 219:16
  286:15 313:11

339:20
owed 100:19
  201:8 203:7
  230:6
owes 207:9
owned 13:17,19
  276:24
owner 260:19
owners 86:24
  225:17
owns 146:12

P
P 2:2,2 103:25
  104:10 123:3
P-A-O-L-O 7:21
  8:9
p.m 359:3
packed 280:20
  282:8
pad 355:25 356:3
page 3:2 64:2,6
  69:9 131:2
  134:4,5 135:21
  203:19
pages 355:10
paid 38:3,10
  71:13,24 230:6
  232:11 279:4
  319:5 326:20
  327:4,9 329:11
Pal 13:3,8,21
  46:8,18 57:16
  83:8 85:20 91:2
  91:9,11 124:12
  126:17 127:15
  146:18 147:3,5
  147:7 153:8,9
  160:12,16
  162:2,9 166:17
  168:13 171:17
  172:3 173:3
  182:9 185:4
  191:8,10
  194:23 195:16
  222:22 240:6

252:24 253:10
  256:18 260:7
  262:7,12,25
  269:14 270:9
  271:4 277:3
  281:7 294:23
  303:6,11,19,23
  304:22 317:11
  320:5,18
  325:18
Palace 15:7
  61:14 126:22
  127:18 319:25
Palatso 126:21
Palma 2:19 8:13
  60:6 169:25
  171:12,13
  199:11,15
  202:17 211:7
  222:11,14
  232:22 233:2
  345:16
panic 305:5
Paolo 7:12,20 8:9
  46:14 82:22
  85:16 96:22,23
  155:12 281:9
  281:10 298:13
  298:13,15
  313:18 326:23
paper 226:7
  335:15 345:18
papers 54:21
  61:3
paperwork 197:6
  320:12
paragraph 64:9
  149:19 200:12
  287:12,15
  296:25 297:13
  325:3
parameters
  310:23
parent 345:11
parenthetical
  26:14

Park 6:23
Parole 100:4
part 20:4 46:11
  46:16 89:13
  91:22 108:13
  142:3 145:16
  145:19 155:22
  166:25 167:7
  169:19 170:17
  199:6 220:22
  245:5,8 253:14
  272:19 304:9
  304:12 323:19
  329:13
partial 149:9
participate
  259:16
participated
  125:21
participating
  7:16
particular 14:2
  14:11 26:13
  131:8 145:10
  263:16 307:14
particularly
  10:24 40:9
  99:16 283:18
parties 20:17
  22:8,10,21
  23:12 26:7
  29:12 69:17
  93:6 100:8
  154:17 157:3
  170:14 174:18
  187:15 228:25
  360:13
partner 56:6,23
  83:21 100:11
  100:20 178:6
  308:9
partners 90:23
  90:24 94:7,22
  96:8
parts 37:2
party 22:4 93:4

115:4,13
  169:13 223:6
  223:15
party's 62:17
  68:19,24 99:17
  132:14 168:6
  187:22 325:6
pass 238:25
passed 52:8
  53:12
patently 58:23
  62:12 64:17
  90:18
pathetic 270:10
pause 43:7
  121:18 157:13
  236:19
pay 61:15 71:5,8
  92:2,18 254:25
  329:9
paying 51:17
  317:18
payment 64:24
  255:6,8,12,16
  327:3
payments 232:11
peanuts 258:23
pencil 356:3
people 12:15
  13:5 63:8 86:7
  86:16 88:16,18
  97:20 101:15
  154:5,7 156:19
  335:13
percent 53:11
  54:19 69:25
  70:18 73:3 88:4
  93:5 143:9
  146:19 204:15
  204:19 205:13
  243:3 265:11
  270:5,16 310:6
percentage 51:21
  227:11
Perfect 149:17
perfectly 165:2



**perform** 153:14
251:18 304:22
309:20
**performance**
16:23 22:2
26:10 41:2,14
41:22 42:13
49:14,15 78:18
144:16 146:22
151:21 224:18
224:23 248:10
248:17 249:4
249:12,17
273:13 293:10
301:12,16
303:5 308:20
309:9 315:19
319:13
**performed** 133:8
331:17
**performing**
246:17 310:9
**period** 15:13
30:21 42:11
46:21 47:4,13
48:11 176:23
180:8 208:25
210:15 212:5
212:22 213:5
226:19 227:2
308:22 309:10
312:13,14,22
315:11 343:7
**periods** 211:25
**permanently**
328:15
**permission** 82:15
190:20 305:19
305:20,24
316:23
**persistently**
26:20
**person** 162:8
180:14 242:20
**personal** 4:14
56:8 100:17

101:7 143:23
243:23
**personally** 78:19
146:2 233:8
277:7
**persons** 170:8
**perspective** 32:9
76:11 258:13
**pertaining** 185:3
227:5
**pertains** 33:10
177:18
**pertinent** 34:21
46:11 284:13
**pestered** 185:24
**phenomenal**
262:21
**phone** 6:17 67:11
67:22 183:11
183:12,21
269:20 330:23
**phonetic** 126:21
160:17 180:13
**phrase** 346:15
**physician** 87:16
244:19
**physicians** 12:25
**pick** 336:8
355:15
**piece** 84:16 284:5
**pieces** 82:20
**pitch** 49:8 161:16
**place** 48:5 57:14
133:4 139:25
157:2 182:14
183:24 187:7
223:4 247:11
254:12 292:10
303:17 316:12
316:18,20
317:4 336:4
**placed** 124:2
197:4 209:7,14
209:21 210:8
210:14,21
217:8,9,10

**Plains** 2:5,14
**plan** 125:21
128:24 161:5
164:5 165:6
167:11,17
168:11 169:8
320:4,5 356:17
**Planes** 7:6
**plans** 90:25
240:10
**platform** 59:6
60:11,14
**Platt** 2:12 7:5,10
**play** 37:3 41:23
**pleadings** 221:19
**please** 4:5 5:6
6:20 7:19 25:15
44:16 47:8
80:12 120:15
123:15 131:18
140:25 149:6
198:22 232:19
235:11 239:25
261:16 263:8
263:13 297:14
318:20 320:11
327:3
**pled** 311:10
**plus** 244:11
**Plz** 2:8
**point** 16:16 18:24
21:3,8 22:15
27:24 32:25
34:21 41:21,24
42:10 43:9
50:10 70:6
73:11 81:11,16
92:21 94:20
98:7 102:8
105:15 110:20
110:23 111:10
112:11 116:23
135:5 155:5
165:20,25
182:11 185:15
186:11,13

209:6 213:17
220:16 273:16
274:25 291:5
318:7 325:22
331:25 334:12
343:15 354:5
**pointing** 50:21
**points** 20:2,15
34:22 48:20
87:7 274:6
355:17
**policy** 138:17
139:3 251:14
**POLSINELLI**
2:7
**poor** 273:13
293:10 303:4,4
319:12
**poorly** 59:19
251:19 331:17
**portion** 46:12
98:3 148:9
208:2 214:2
256:9,12
263:14 284:13
296:21 337:20
353:6
**portions** 90:5
339:17
**pose** 41:25
**position** 28:13
50:2 160:20
188:23 245:7
294:15 351:19
**positive** 143:21
**possession** 83:7
214:25
**possibility** 162:9
**possible** 32:11
197:13 324:18
330:15
**possibly** 326:10
**post** 2:4 25:13
27:14 98:13
105:2 113:3
343:5

**post-arb** 26:3
**potential** 91:14
**potion** 294:17
**power** 43:15
**PR** 180:14
**practices** 87:3
**pre-arbitration**
62:9 64:7
**prefer** 33:6
**premises** 297:2,5
297:10,18
328:18
**prep** 162:20
351:25
**preparation**
32:19
**prepared** 332:19
335:12 340:13
340:19 345:12
346:17
**preparing** 126:2
337:6 352:21
355:24
**presence** 263:22
**present** 2:17
25:12 36:18
40:12 139:22
240:24 242:16
242:21 263:19
288:16 298:24
357:2
**presented** 264:20
302:5
**presenting**
338:24
**presumably** 10:8
87:14
**pretty** 178:4
251:6
**previous** 285:14
**previously**
164:19 165:5
165:19 166:8
177:13 352:4,5
**price** 270:12
**primary** 352:22



**principally**
213:14
**principals** 225:17
**prior** 23:18 65:12
83:2 85:4 90:16
124:7 126:21
126:24 127:7
133:9 139:23
140:2 160:14
161:8 166:17
178:25 182:5
186:16 217:8
225:9 242:11
248:18 251:15
274:4 329:18
329:18
**private** 147:4
**privy** 220:20
**probably** 124:25
141:10 143:24
159:14 191:16
193:21 197:16
208:9 210:13
250:21 268:19
274:21 294:8
330:11 336:4
**probe** 210:3
**problem** 117:22
117:24 130:18
183:18 344:15
344:17 358:15
**proceed** 11:11
19:14 27:20
43:6 44:9 54:11
66:7 80:5
102:11 122:11
122:16 136:14
194:9 237:10
275:23 308:19
**proceeding** 7:17
71:3 80:20
120:18 235:17
**proceedings** 4:1
5:1 6:1 7:1 8:1
9:1 10:1 11:1
12:1 13:1 14:1

15:1 16:1 17:1
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1,5 52:1
53:1 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1 81:1 82:1
83:1 84:1 85:1
86:1 87:1 88:1
89:1 90:1 91:1
92:1 93:1 94:1
95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1
103:1 104:1
105:1 106:1
107:1 108:1
109:1 110:1
111:1 112:1
113:1 114:1
115:1 116:1
117:1 118:1
119:1 120:1
121:1 122:1
235:1 236:1
336:1 337:1
338:1 339:1
340:1 341:1
342:1 343:1
344:1 345:1

346:1 347:1
348:1 349:1
350:1 351:1
352:1 353:1
354:1 355:1
356:1 357:1
358:1 359:1
**process** 181:2
300:16 302:8
**produce** 107:22
141:14
**produced** 86:13
104:22,24
106:2,22
109:16,23
111:7 113:23
115:19 116:6
116:10,16
117:6,12,14
162:14,18,24
163:3,16 164:8
164:18,24
165:12,16,19
165:23 166:8
189:11 266:10
345:2 351:23
351:25 352:4,6
353:17
**producing**
106:15
**product** 26:15
57:7 58:16 70:5
70:11,19,21
104:2 127:14
171:17 172:3
182:9 185:4
190:18 196:20
198:13 212:5
256:19 258:24
260:3 266:11
272:6 303:5,6
**production**
108:13,24
109:7,25 110:3
113:4 352:13
**products** 77:23

177:12 178:7
191:8 217:2
271:7 277:5
**professional** 72:4
94:5
**profit** 77:14
**profitable** 55:3
220:14
**profitably** 74:6
**program** 262:7
**project** 52:23
263:17
**projected** 7:15
252:18,21
253:7 272:13
**projection**
253:15
**projects** 50:14
**promise** 225:21
**promote** 259:12
260:2
**promoted** 191:8
**promoting**
190:18 256:19
**prompted** 251:22
**promptly** 327:4
**proof** 353:8
**proper** 139:18
258:5
**properly** 63:17
**property** 16:14
283:12 328:6
**proposal** 75:11
90:25 91:4
160:24 161:17
167:11,16
264:2 308:14
350:3
**proposed** 74:14
74:18 126:7
**protest** 26:25
**protocol** 236:15
236:17
**provide** 17:5
116:2 128:4
129:5 173:11

178:5 254:5,13
256:3 315:24
321:7
**provided** 35:22
48:6 57:4 69:11
93:11 109:2,7
111:20 172:5
173:8 204:7
260:11 268:11
269:19 291:12
335:5,14 338:5
338:13 343:5,8
345:16
**providing** 181:10
**provision** 26:17
29:22,24 30:9
41:18 59:20
60:4 131:9,15
137:8 228:22
229:7 230:4
285:3 288:21
**provisions** 290:4
307:7
**PSI** 210:25 211:7
**public** 1:17
180:14 237:13
360:4,24
**publicly** 117:7
**pull** 33:11,15
59:23 81:17
118:3 175:9,16
200:23 217:25
257:4 267:7
336:18
**pulled** 33:24 53:7
**pulling** 123:25
200:18,20
**purchase** 18:3
20:23 21:5
22:12,14,23
23:16,21,25
26:19,22 27:11
40:20,22 41:10
42:8,14 81:22
83:11 98:18,23
104:3 131:22



132:6,18 137:9
137:24 138:6
139:10,18
140:6,18
196:19,24
198:7,12
212:13 216:25
220:7 241:7,11
241:15,21
242:3 245:7
252:5 278:7
279:2,15,22
280:16 282:20
288:21 289:6
289:20 291:8
291:21 292:8
345:22
**purchased** 25:2
70:4,21 99:2
212:4 217:20
227:12
**purchaser**
284:20
**purchasers** 26:20
**purchases** 70:2
88:16 99:4,6
173:21 196:3
196:15 197:8
208:12 212:22
218:21 219:4
242:7,12
251:15
**purchasing** 24:19
24:23 93:3
133:7 280:9,10
286:21,23,24
287:4,6 291:14
292:16,18,23
**purported** 106:2
**purportedly**
106:4
**purpose** 21:25
55:14
**purposes** 45:16
136:12 168:15
325:2 350:8

**pursuant** 28:14
64:14,16
131:21 311:7
348:21
**pursue** 255:5
**pursuit** 12:25
**push** 138:12
**pushed** 135:21
**pushing** 60:10
**put** 19:5 45:16,17
57:14 58:22
63:6 69:2 75:10
75:18 93:21
130:14 164:3
167:10 168:11
182:14 197:23
223:4 266:6
271:7,25 272:4
292:6 294:15
305:18 327:15
335:7 336:17
341:5 342:2,2
342:17
**puts** 79:2 187:9
**putting** 186:23
253:24

_____
**Q**

**quadruple**
150:21 151:11
**qualifies** 42:12
**quality** 15:7,8
303:12,13
**quantify** 293:12
**question** 16:11
17:17 25:11
41:25 66:24
74:10 87:11
89:8,19 114:20
121:15,17,18
121:25 122:6
122:14 125:16
128:20 132:17
133:21,24
134:18 137:5
139:6 150:6,16

151:10 153:11
157:14,15,25
161:23 166:10
172:22 184:20
188:2,16
195:16 202:22
207:17 213:25
216:13 228:10
228:11,19
236:18,25
237:4 239:19
239:21 247:3
251:2,9 257:16
258:3,6 259:6
271:5 272:19
274:13 276:9
286:18 306:3
313:10,15
316:21 357:20
**questioning**
172:14 272:25
**questions** 10:6
121:14 128:12
157:17 189:4
192:12 198:2
233:17 236:14
264:17 288:25
322:17 330:24
**queue** 109:22
**queued** 108:23
**quicker** 119:14
**quickly** 296:23
308:11 314:22
330:15
**quite** 12:7,22
24:24 49:17
73:8 103:12
118:5 141:17
249:22

_____
**R**

**R** 2:2 117:20
135:13 237:11
237:11 360:2
**raise** 43:8 120:15
235:13 356:9

**ran** 93:23 94:12
110:2 143:2
195:8 347:20
**range** 114:2
**re-cross** 231:6
**re-direct** 231:5
232:1,2 233:1
234:1
**re-raise** 354:15
**re-re** 231:14
**re-share** 287:24
**reach** 251:23
**reached** 39:18
138:5 173:25
**reaction** 191:21
**read** 58:21 61:7
103:20 133:18
135:8,9 148:6
148:10 149:5
151:8 176:8,19
177:7 185:20
198:21 213:24
214:3 219:11
219:20 220:21
244:13,16
261:16 262:17
262:18 263:5
263:13 268:2
284:12 287:21
296:20 308:10
314:21 320:3
337:15
**readily** 74:17
**reading** 131:16
176:14
**reads** 60:4
130:20 328:4
**ready** 193:10
**real** 115:20
**realize** 252:13
**realized** 304:15
310:7
**really** 16:10 18:8
33:21 49:8,15
72:5,9 78:16
79:2 89:15 99:8

105:15 125:11
133:17 143:7
185:7 189:8
213:20 215:22
239:9 259:22
262:10,16
263:25 268:17
269:9 270:9,18
275:5 283:16
286:13 290:25
300:20 302:25
308:10 309:7
309:18 337:7
338:25 348:7
**reason** 84:4
112:17 119:9
151:23 153:16
165:18 231:16
**reasonable** 34:2
297:16
**reasons** 13:10
17:19 50:17
89:3 115:17
285:10 293:7
**rebut** 18:9,17
**rebuttal** 50:18
163:10
**recall** 31:9
103:13 124:19
124:22 125:3
126:2,20 131:3
144:25 145:7
147:10,13,18
147:21,25
148:12 149:3,4
151:20 152:12
161:2,4 162:7
166:14,19,21
167:5,10
171:20 174:25
176:22 177:11
177:22,25
178:18,20,21
178:23 179:3
181:9,20
191:17 194:22



195:2 197:18
199:4,23 200:2
200:17,19
218:24 226:15
226:23 227:7
232:15 233:6
233:11 234:2
240:21 241:19
242:25 243:14
243:16 245:17
252:12 254:7
265:9,13 269:3
276:2,10,14
277:12 283:3
291:24 293:19
293:23 294:4,8
298:10 299:9
301:9 304:8,11
305:16 307:6
312:18,23
317:15,17
319:3 321:5,13
321:19,20
322:2 323:16
323:21
**receipt** 103:6
340:17,19,23
**receive** 108:21
264:4
**received** 16:14
71:20 112:24
113:8 116:21
119:18 180:24
204:4 208:2
210:16,18,20
232:23,24
265:14,24
272:4 332:6
339:21 342:20
343:12 347:10
352:20
**receiving** 266:5
**recess** 102:21
230:17 275:20
324:13 330:18
**recognition** 79:7

**recognize** 203:20
222:8 282:16
**recognizing**
71:10
**recollect** 233:20
**recollection**
149:22 181:5
194:11 197:8
197:11,14
209:25 225:4
241:14,24
243:9 245:9
285:8 294:12
299:11 349:13
**recommit** 312:6
**record** 30:18
104:14 148:10
163:14 197:4
214:3 244:15
263:13 320:4
360:10
**records** 116:12
**recoup** 220:9,13
**recovered** 53:6,9
76:19
**redact** 350:20
**redirect** 231:2
**reduce** 53:24
**reduced** 51:15
**reduction** 304:8
**refer** 135:7 197:6
283:17
**reference** 55:16
136:22 175:13
203:16 349:14
**referenced** 112:6
112:10
**references** 84:22
**referred** 112:4
167:7
**referring** 21:11
44:16 166:21
214:7 228:17
288:3 295:23
**reflection** 232:10
**reflexion** 52:15

**refresh** 149:21
181:4 197:7
**refreshed** 349:13
**refused** 73:6
113:10 153:21
154:15 270:16
310:15
**regard** 73:12
**regarding** 22:22
274:9 291:21
342:7
**regardless** 38:14
**regards** 174:23
**regime** 156:25
**regular** 208:8
315:25
**regulations**
129:14 271:4
**reimburse**
201:12,16
202:6 203:9
204:14 227:6
227:25 255:23
256:9
**reimbursed**
202:13 203:3,6
229:18
**reimbursement**
205:21
**reiterate** 136:25
**rejected** 90:12
96:11 306:5,9
**Rejection** 350:2
**related** 89:15
170:22 223:7
360:13
**relation** 180:15
**relationship**
62:18 70:16
78:17 132:14
168:6 301:8
**relationships**
99:17
**relative** 347:21
**relevance** 105:10
186:9 244:5

257:20 273:6
**relevancy** 104:7
114:9 157:9
167:22
**relevant** 18:6
27:12 49:22
87:25 88:5,23
89:25 90:2
106:23 165:8
168:14 169:7
341:25 345:19
349:3
**relied** 112:5,12
**relinquish** 33:18
33:20 320:23
323:13
**rely** 49:5
**relying** 92:25
**remain** 224:2
234:4
**remained** 97:10
234:15
**remarks** 77:9
**remember** 61:8
70:12 145:11
158:6 159:24
160:5,17
161:15 173:14
173:15 175:8
177:5,5,8 179:4
191:13,15
215:7 217:4,6
217:11 224:8
224:12 227:12
227:14 233:4
242:17 247:22
253:2 254:16
260:22,24
261:17 271:21
272:12 299:4
299:12 300:12
323:25 324:2
**remind** 83:10
**reminding**
325:11
**renegotiate**

316:10
**renegotiating**
316:6,25
**rent** 38:2,3,10
51:15,18,20
61:15 73:2
77:19 92:19
293:19 304:8
305:12 317:18
318:15 319:5
326:20 327:8
347:16
**rents** 319:7
**repeat** 172:22
182:25 198:24
231:7,10
239:19,21
276:8
**repeatedly** 26:21
**repeating** 27:24
247:17
**rephrase** 124:16
154:13 155:3
184:19 202:22
**replacement**
95:12 297:9,17
308:16,24
309:12 312:7
312:23 320:13
**reply** 176:16
**report** 50:24
52:17,25 112:7
112:10,14
301:22 302:18
347:20
**reporter** 25:20
44:10 104:15
244:16 360:4
360:24
**reporting** 302:8
**reports** 16:15
116:15 123:25
341:22
**repository**
200:23
**represent** 208:7



255:10
**representation**
162:23
**representatives**
87:8
**represented**
160:16 232:7
**representing**
160:12 270:9
289:9
**represents**
206:22 208:8
**reproached**
299:21
**reputation** 85:23
**request** 31:4,18
31:22,25 34:2
116:7,7 166:3
172:7 260:17
285:16 295:5,7
311:8 312:11
353:2,19,21
354:13 356:21
**requested** 59:25
171:16 285:13
286:2 310:5,15
352:12
**requesting** 173:7
177:2,3,4
308:13
**requests** 164:22
264:4
**require** 173:10
300:9
**required** 23:25
37:6 42:15
52:13 71:4
114:4 131:22
147:19,22
148:13 186:25
229:19 246:6
285:9 301:22
315:23
**requirement**
22:23 23:16
26:19 27:11

40:20,22 42:8
152:6 198:11
212:13 220:7
241:7,11,22
242:3 291:9,22
292:9
**requirements**
26:22 83:11
98:24 152:17
**requiring** 21:4
315:20
**rescind** 35:17,21
300:25 301:2
**rescinded** 301:5
306:19
**research** 53:8
**reservation**
26:25 93:10
94:16
**reserve** 97:9
351:12
**reserved** 93:19
**reserving** 40:7
**resignation**
159:12 160:4
**resigned** 68:14
**resolve** 330:12
344:2,5
**resolved** 103:12
107:11 118:6
118:12,16
347:6
**respect** 54:15
227:9
**respective** 174:18
**respectively**
93:16 110:8
**respond** 31:11
58:19 73:11
115:3 122:8
158:3 237:5
321:25
**respondent** 1:8
7:7,9 18:21
20:14 135:3
**respondent's**

10:11 117:20
119:6,16,20
336:10 341:12
**respondents** 2:13
6:5 18:11,12
21:2 135:13
142:3 336:16
**responding** 31:22
322:3
**response** 10:3
31:4,6,10,12,24
47:9,22 82:25
114:23 343:15
354:16
**responses** 19:16
80:16
**responsibilities**
123:22
**responsibility**
63:24 97:12
142:22 174:24
192:7 222:25
**responsible** 25:3
25:4 129:23
224:2,16,17,22
308:2
**responsive**
164:21 343:9
**rest** 48:16 233:21
233:22 343:2
**restate** 172:24
**result** 174:11
265:3 292:11
326:5 328:21
329:10
**resume** 47:15
193:25 194:2
308:23 309:11
**retail** 55:2,4
57:19 87:8
130:21 142:12
178:11,16
225:19 284:22
**retailers** 88:12
303:21
**retails** 141:19

**retired** 160:19
**retirement**
271:23
**retrieve** 300:20
300:24
**return** 100:12
114:7 256:22
260:6 263:23
275:4 320:12
**returned** 38:25
334:20
**returns** 113:20
113:23
**revenue** 42:20
57:24 253:8
**reverse** 158:8
**review** 109:9
302:4
**reviewed** 9:23
283:15 289:19
289:24
**revisit** 19:2
**revoke** 312:2
**rhetorical** 42:5
**rich** 75:3
**rid** 272:5
**Ridge** 236:5
**right** 6:17 9:11
11:4,15 12:20
20:4,18 27:16
28:17,25 32:21
33:8,15,16
34:19 36:3 39:3
45:15,15 48:18
49:25 53:25
57:6 58:17
59:22 64:5
66:11 68:4 79:9
81:17 88:3
99:21 102:17
102:20 103:16
103:23 107:2
111:7,12
112:15 116:19
117:16 119:4
119:10 120:15

122:8 127:2,8
127:13 128:16
129:13 133:13
142:13 145:21
149:16 150:3
152:8 157:23
158:8,14
165:15 172:4
177:19 178:5
178:13 179:14
182:23 189:21
191:19 193:7
193:24 196:4,7
196:9 197:12
198:8 200:7,9
200:15 201:13
202:21 203:15
205:3,20,25
209:6,11 210:2
211:13 212:14
212:16,17
216:10 217:18
217:25 218:5
218:16 222:15
223:16 224:6,7
224:13 225:10
225:22 228:8
228:16 229:14
230:15 231:6
231:17 232:9
232:12 234:16
234:20 235:8
235:14 236:8
237:3,7 239:8
239:23 243:4
247:8 249:21
250:7 251:20
255:24 256:5
258:11,20
261:4,11
263:14 270:22
275:10,17,22
276:8 281:21
284:3,8 288:4
289:20 290:2,5
290:17 293:5



298:2 300:14
301:20 310:24
311:5,9,16
319:14 324:12
325:14 326:20
330:16 332:2
332:19,24
333:4 334:5
335:16 336:5
340:16 341:8
341:15 343:19
346:9,18,21,23
348:10 350:9
350:23 351:7
351:12,15
353:21,24
354:17,18
356:3,6 357:17
357:23 358:5
358:14,23,25
**rights** 40:7 93:10
93:19 94:16
97:8
**ring** 175:7
**risk** 27:24 231:20
**Riverside** 2:8
**Road** 2:4
**Rodney** 2:9 4:8
33:17 103:14
107:10,14
108:8 113:7
118:18 133:25
164:5 183:9
265:10
**role** 105:20
123:16 125:25
142:16,18
**roof** 95:16 299:6
**room** 7:12 91:17
120:7 173:17
235:8
**ruffled** 35:19
**rugs** 280:7
**rule** 119:24,24
348:21
**rules** 129:13

158:8 248:25
249:9 271:4
**ruling** 117:15
274:5,9
**run** 19:11 55:3
70:14 85:9
94:19 97:11
111:3 142:22
160:20 279:8
326:11 341:22
347:15
**running** 70:7
95:23 116:14
147:20 148:14
226:25 304:19

—————————
**S**

**S** 2:2 123:3
283:22
**S-A-N-A** 4:19,21
**S-E-T-T-I-M-I**
8:17
**S-P-A-N-O** 121:4
**saddled** 75:5
**safe** 144:5 318:22
319:10
**sake** 50:21
314:21
**Saks** 91:19
**salaries** 293:24
**sale** 215:9 242:11
272:5 280:22
284:15 304:20
**sales** 15:18 16:15
16:17 23:8,17
24:20,22 37:23
37:24 51:21
76:14 80:3
114:16,17,19
116:5 123:19
123:22,25
124:3 138:10
138:14,19
140:7,8,9
141:25 144:4
144:21 151:21

152:6 160:14
172:9 173:4
177:18 233:23
242:6 246:7,21
250:2,5 251:16
252:18,21
253:15 266:6
266:16 269:10
272:13,14
293:13 301:17
301:18,22
302:4,8,10,12
302:13,19,22
304:14 305:2,3
308:18,20,21
309:8,9 310:3,6
315:24 319:13
335:22 342:19
**Sana'a** 2:20 4:12
**Sarah** 1:4 13:16
20:22,23,25
21:4 28:4,6,8
30:2 34:24 35:5
35:15 36:4,23
37:9,15 38:12
38:18,24 39:7
39:11,18 40:8
47:3,14,16,17
48:15 49:23
59:24 62:19,21
62:22 63:13
64:12,25 65:9
69:10,13 70:2,4
71:18,25 82:18
83:6 95:11 96:2
97:5 116:14
130:9 131:21
132:6,18
144:14,17
146:15 147:18
148:13 155:17
156:8 169:14
169:21 170:11
170:19,24
174:3,6,7,11,20
175:2 177:11

178:24 179:6,7
181:6 187:16
190:8,14,17,24
190:25 191:3
194:13,22
195:8,19
196:15 198:6
200:8,24
201:13,17,22
202:5,10 203:2
204:7,15
205:10 207:9
207:20 208:12
212:3 217:10
217:20 218:20
219:3 221:18
222:2,17
223:25 229:8
229:20 241:11
241:15 254:6
254:23 277:19
279:15 280:14
282:23 285:8
286:7 288:12
288:18 289:3,4
289:7,9 290:14
291:2 294:15
295:24 301:25
308:13,19,22
309:8,11
311:24,25
314:17 320:22
321:7 323:11
325:5 328:5
329:5,6,9,17
334:2 335:5
345:20 348:19
350:3
**Sarah's** 21:13
64:15 174:5
206:10 207:5
328:7
**save** 131:7
**saving** 335:7
**savings** 244:11
**saw** 83:17 167:17

221:5
**saying** 19:21
21:12 28:17
29:2,8,10 31:16
41:7 61:11
81:20 83:13
88:19 93:13
95:11 96:2
99:12 109:19
115:16 124:11
126:11 149:13
152:19 156:25
180:21 181:15
183:6 184:23
185:8 186:24
187:6 251:12
254:22 255:4
270:20 278:12
278:23 279:14
287:15 288:14
288:17 299:5
303:17,18
305:9 319:7
338:25 353:10
**says** 21:19,19
59:21 64:9
96:23 121:23
150:20 158:9
186:4,5 204:18
219:12 223:19
225:7,12
236:24 254:2
257:21 258:9
287:12 288:12
290:13 311:18
335:2 350:2
**SBrown@bpsl...**
2:15
**schedule** 180:25
**scheduled** 275:11
275:14
**schedules** 104:3
**scheduling** 102:6
**Schmidt** 2:12 7:5
7:10
**scope** 172:15



**scrambling** 44:25
**screen** 4:18 5:13
  7:14,15 25:17
  30:12 44:18
  45:16,18 46:11
  68:12 81:17
  82:5,16 130:20
  148:22 149:14
  166:11 175:22
  197:23 221:15
  221:23 228:21
  235:13 253:25
  261:13 267:10
  268:23 281:23
  282:14 295:20
  295:20 296:22
  314:14 317:25
  319:18 324:22
  332:12 333:18
**scroll** 131:5
  176:9 179:24
  181:13 229:5
  268:4 318:18
**scrolled** 176:2
  178:19
**se** 344:17
**search** 297:9
  308:23 309:12
**searched** 116:11
**season** 23:18
  132:24 133:4,9
  140:2 159:18
  159:20 194:15
  210:24 213:6
  246:19,19
  251:19 265:21
  265:22 266:3
  270:22 271:2
  272:7 278:16
  278:17 279:6
**season's** 242:11
**seasons** 141:25
  173:22 194:12
  194:12,19
  195:11,14
  196:11,14

197:17 208:9
  211:15 212:10
  213:20 214:9
  215:23 217:18
  218:2,4,9
  279:10,11,12
**seasons'** 251:15
**seated** 120:23
  235:22
**second** 7:25
  13:16 82:4
  92:23 94:2,14
  99:19 142:10
  142:10 175:12
  217:23 238:6
  239:12 240:8
  246:19 288:8
  296:25 327:16
  349:23 350:5
**secretary** 8:21
  85:15
**section** 64:9
  131:10 137:23
  198:3 225:12
  229:3 241:6
  314:20
**secured** 62:21
**security** 62:20
**Sedlarcik** 199:11
**see** 4:18 5:6,7,11
  5:13,22 9:2,12
  11:18,22 12:14
  25:22 30:14
  31:5 34:17 36:2
  37:24 38:23
  48:21 52:3,12
  56:14 58:4 68:5
  88:5 102:19
  108:15 109:9
  120:12,13
  130:19 131:10
  134:6,14
  148:21,24,25
  149:9,14,15,16
  150:8 153:14
  159:14 168:18

169:8 175:23
  176:3 180:2,4
  181:2 185:21
  186:9 188:20
  189:21 193:5
  194:15 198:3
  203:20 204:4
  204:19 205:6
  205:24 208:4
  211:10,21
  219:12 220:24
  221:4,16,20
  223:22 224:24
  225:11 228:21
  229:3 235:12
  238:6 239:14
  255:3 261:12
  262:14 263:11
  267:9,12,17
  268:22 270:23
  275:6 282:13
  282:19 283:6,9
  283:11,12,21
  284:23 295:8
  295:19 297:10
  297:13,20
  303:24 307:7
  307:17,20,21
  308:24 312:8
  314:13 315:8
  317:24 318:19
  319:17,20
  320:14 324:22
  324:24 325:8
  325:10,13
  327:5,21 328:2
  328:15 332:11
  332:14,16,18
  333:17 338:7
**seeing** 4:12 131:2
**seeking** 77:18
  207:5,21
  329:14 333:2
**seen** 68:11 113:6
  131:4 222:3
  223:19 320:24

**selection** 129:25
**sell** 57:7,15 58:16
  127:14 171:17
  171:22 172:3
  173:3,12
  177:12 178:7
  185:4 249:20
  272:11 277:22
  279:7 280:25
  281:9
**sellable** 303:7
**seller** 284:17,19
**seller's** 284:21
**sellers** 26:15,23
  284:19
**selling** 55:9 59:5
  87:5 159:18,19
  194:12,15
  210:24 211:15
  214:8 217:18
  277:18,19
  288:18 303:13
  304:16 310:13
**sells** 91:17
**send** 114:15
  116:4 201:20
  269:2 354:11
  357:10 358:18
  358:20
**sending** 42:21
  178:18,21
  199:8 233:5,7,9
  269:3 270:11
**sends** 52:9
  199:19
**sense** 249:11
  270:11
**sent** 30:6 115:6
  118:4 164:5
  165:7 180:21
  199:24 201:3
  211:6 266:20
  269:8 294:22
  298:15 299:14
  299:15 305:8
  307:6 319:6

**sentence** 115:14
  150:7
**separate** 113:22
  152:14,16
  157:5 331:16
**separately**
  185:13
**September** 38:20
  39:24 77:15
  78:2 80:14 83:6
  99:7 194:24
  195:4,10,10
  200:4 208:16
  214:24 215:5
  216:15,21,25
  222:19 243:15
  265:25 271:20
  273:3 282:21
  291:10 292:11
**series** 187:2
**seriously** 143:8
**serve** 93:15
  105:11
**served** 114:24
**services** 1:24
  105:19 128:3
  129:4
**set** 11:14,25
  174:9 175:3
  225:13 360:8
**sets** 188:4
**Settimi** 2:19 8:13
  8:14,17,20 60:7
  85:13 162:19
  164:12,13
  165:3 169:25
  171:13 199:12
  211:7 222:11
  222:14 347:20
  351:25
**Settimi's** 202:17
  232:22 233:2
  341:23 345:17
**setting** 277:5
**settled** 21:22
**settlement**



348:18 349:9
349:18,22
350:3,8,16,21
351:5
**seven** 225:12
**Shah** 2:10 4:4,10
10:9 43:20,21
58:10 67:20
183:14,22,25
198:23 296:9
296:11,16
336:20,24
340:7,11,17
341:11 342:13
343:16 345:5,9
346:10,25
348:14,17
349:16 350:11
350:14 351:16
352:17 354:10
354:20,24
356:10 358:12
358:16
**shake** 184:7
**share** 20:17
25:17 26:4
27:13 32:15
44:15 46:6 82:5
82:16 140:25
166:13 175:21
189:7,23
197:22 221:23
227:16 238:15
244:23 281:23
300:2 335:19
339:23
**shared** 34:4
232:6
**sharing** 30:12
179:17 221:15
343:6
**sharp** 102:14
193:25
**sheet** 104:2 106:4
211:17 335:11
347:14

**ship** 83:23 84:12
**shipment** 265:24
266:5
**shipped** 266:11
**shop** 15:5 61:13
74:20 215:10
**shopping** 141:7,9
143:19 154:7
**shops** 14:17
63:14 64:25
141:8,23
169:14 224:5
328:8
**Shore** 121:6
**short** 55:18 253:4
324:5
**shorthand** 360:3
**shorts** 304:3
**shot** 189:18
231:16
**show** 14:13,18,22
15:3 16:12
17:15 22:10
25:14 26:5
30:18 58:24
59:2,2 60:8
68:18 70:23
71:7 76:13
78:23 91:17
109:24 130:15
162:11 165:25
173:16 198:15
261:7 264:22
266:25 268:21
287:11,12
290:12 295:17
307:12,13,15
314:12 317:21
318:10 319:16
324:21 326:15
327:14 333:12
333:15,25
**showed** 49:3
221:10 278:18
278:25 285:14
**showing** 65:20

332:9 333:21
**shown** 41:16
163:20 223:8
339:2
**shows** 53:9 79:3
109:22 318:12
319:2 334:9
**sic** 53:3 217:7,21
242:7,12
245:22 246:13
280:12,24
294:25 320:8
322:9 323:20
334:10
**side** 10:5 11:18
163:20 98:6
137:4 149:16
273:21
**sides** 45:24
344:20,21
**sign** 170:21 171:6
171:9 185:2
320:11
**signatory** 169:16
**signature** 171:2
222:6,8
**signed** 11:2 28:16
40:3,5 41:3
135:23,24
169:4 185:22
186:18,19
222:7 253:18
257:15,20
**significance**
334:7
**significant** 63:2
110:7
**significantly**
141:21
**signifies** 36:15
**similar** 264:19
**Simon** 15:4 16:13
16:20 17:9,12
28:7,10,23 30:3
30:4 32:2 35:6
35:10,16,20

36:4,24 37:9,14
37:17,19 38:11
38:23 39:8 47:5
47:16,18,18
48:13 51:11
61:13 62:11
64:25 72:23
74:15 75:9
77:17 80:2
84:24 85:4 95:4
95:9,10,11 96:2
97:5 113:9,10
113:21,24
114:16,16,21
116:3 117:7
143:16,18,22
148:13 150:2
174:2 285:16
285:18,22
287:9 294:24
295:8,11,23
297:23 299:7
300:8,10 301:8
301:15,23
302:5,9,19
304:6,14 305:5
305:25 306:19
308:3,15,23
309:5,11,13,22
310:23 311:3
312:3,5,11,22
313:7 314:7
315:19,24
316:4,11,24
317:7,9,13
318:3,8 319:4,6
319:10 320:2
320:16,23,24
320:25 322:6,8
323:8,12,17,21
325:17 326:19
326:25 328:20
331:22 342:21
343:4,11
**Simon's** 114:18
306:5 319:4

326:8 327:8
**Simons** 302:23
**simply** 9:6 52:9
135:6
**sir** 12:4 20:11
54:8 68:8
101:19 120:23
122:9 167:15
225:6 235:8,22
236:9 242:25
243:5 313:16
**siren** 238:23
**sit** 101:2 208:21
209:13 210:7
350:23 358:4
**site** 84:8 87:4
**sitting** 11:17
**situation** 12:14
156:14 263:20
**six** 28:7 29:6
31:20 37:6
160:3,6 208:23
217:8 312:8,11
313:5 314:5,8
**six-month** 17:6
29:24 30:21
31:17 38:21
47:4,13 48:6,11
312:13,14,21
313:25 315:10
321:7 331:20
**six-year** 47:2
**size** 14:23
**skipped** 348:12
**slide** 25:22
**slowly** 268:5
**small** 76:25
**smaller** 51:14,22
72:25 74:12
75:12 304:7
**so-called** 71:22
**software** 200:22
341:24 347:15
347:21
**Sohil** 2:10 4:9
296:14



**sold** 23:19,22
78:24 133:2
253:2,3 280:18
280:22 281:13
282:4
**solely** 297:19
**solemnly** 120:16
235:14
**solution** 73:17
305:22
**solutions** 73:25
248:9
**solved** 254:23
**somebody** 124:11
146:4,5 156:16
**somewhat** 45:2
59:19
**son** 159:24 160:2
**soon** 95:7,13
**sophisticated**
168:10,25
169:2,3
**sorry** 37:12
66:25 82:13
111:13 118:8
124:21 137:12
139:8 145:18
148:18 171:8
189:22 190:22
198:23 216:9
216:22 218:3
226:14 228:24
263:25 264:23
276:5 278:9
292:4 316:13
329:2 334:18
348:12
**sort** 55:16 136:10
**sound** 20:7
182:23,24
**South** 277:3
**space** 14:24
74:15,18,22
78:11 311:4
325:19 328:7
**Spano** 3:3,4 23:7

24:17 40:23
60:7 65:14,20
65:21,22,24
66:9,15,17,21
66:23 67:5,9,13
68:6,13,20 78:8
88:18 120:2,5,7
120:8,9,14,21
121:3,4 122:9
123:1,10,15
124:1 125:1
126:1 127:1
128:1 129:1
130:1,19 131:1
131:10 132:1
133:1 134:1
135:1 136:1,17
137:1,2 138:1
139:1 140:1
141:1 142:1
143:1 144:1,12
145:1 146:1
147:1 148:1,12
148:21 149:1
149:13 150:1
151:1,6 152:1,2
153:1,5,19
154:1,17,25
155:1 156:1
157:1,13,18,20
158:1 159:1
160:1 161:1
162:1 163:1
164:1,23 165:1
166:1,14 167:1
168:1 169:1
170:1 171:1
172:1 173:1
174:1 175:1
176:1,3 177:1
178:1 179:1
180:1 181:1
182:1 183:1
184:1,24 185:1
186:1 187:1,4
188:1 189:1,19

189:21 190:1,2
190:5 191:1
192:1 193:1,3
194:1 195:1
196:1 197:1
198:1 199:1
200:1 201:1
202:1 203:1
204:1 205:1
206:1 207:1
208:1 209:1
210:1 211:1
212:1 213:1
214:1,5 215:1,8
216:1 217:1
218:1 219:1,7
220:1 221:1
222:1 223:1
224:1 225:1
226:1 227:1,22
228:1,2 229:1
230:1 231:1,2
232:1,4 233:1,4
233:12,16,18
234:1,20 240:7
240:13 241:25
246:12 249:2
267:16 278:25
344:12
**Spano's** 23:10
81:9 172:16
241:4 243:10
250:23 254:10
254:19
**sparked** 252:3
**speak** 12:11
18:17 22:24
50:6 109:14
112:19 188:13
316:5,24
333:12
**speaking** 250:22
302:23 308:11
**speaks** 49:15
307:15
**specific** 129:19

188:3 205:19
221:7 228:10
263:25 272:23
329:22
**specifically** 29:25
86:10 112:9
154:11 210:8
225:13 241:6
313:24 314:4
326:8
**speculate** 147:25
219:7
**speculating**
219:10
**speculation**
153:24 206:23
**speed** 300:22
**spell** 4:17 7:19
8:16 120:23
235:22
**spend** 25:25
81:18 89:9
119:11 140:21
203:9 253:23
**spending** 89:11
89:12 197:18
**spent** 92:11
93:12 99:10
229:17,20
256:16 260:10
337:4
**spin** 58:22
**spirit** 344:23
**split** 63:3
**spoke** 67:2
150:22 240:10
323:10
**spoken** 306:18
333:10
**spreadsheet**
200:13 203:15
203:19 204:10
205:3 207:8
212:19 214:6
232:5,7 278:24
336:17 341:13

**spreadsheets**
348:6
**spring** 98:24 99:5
214:19 215:25
216:3
**square** 141:10
**stability** 263:24
**staff** 129:8
**stage** 166:5
**stamp** 186:21
**stand** 226:4
235:11
**standalone**
344:25 345:10
**standard** 344:19
**standards** 55:20
192:2
**standing** 33:22
81:7 106:17
120:10
**stands** 116:19
347:11
**Star** 155:10
**starred** 252:15
**stars** 264:23
**start** 9:24 20:8
59:5 143:20
214:19 252:11
264:3 266:3
270:18 275:7
314:25 330:3
**started** 17:18
141:18,22,23
145:15 214:16
**starting** 117:25
119:3 213:6
251:18 252:12
274:15 307:19
**starts** 265:23
**state** 1:17 159:12
219:8 237:13
354:2 360:5
**stated** 161:6
220:25 230:5
**statement** 61:6,8
61:11 63:25



MAGNA
LEGAL SERVICES

84:3 90:11
104:2 106:12
187:10 283:5
306:11 312:19
318:20 323:11
326:25
**statements** 11:9
104:11 106:20
298:25 304:5
**states** 15:2 76:15
91:3,15,16
127:5,22 138:9
155:20 172:9
173:4 177:6
178:8,15 188:7
262:8,22,24
264:7 266:12
285:12
**stating** 80:10
298:16
**statute** 274:10
**stay** 67:19 147:19
147:22 148:13
285:9 286:2
302:17
**stayed** 159:15
160:3,7 285:5
**staying** 287:7
**steal** 50:9
**Steen** 307:25
309:18 311:3
**step** 56:14 57:2
59:17 72:4
94:17 118:20
**Stephen** 2:14
6:14 7:4 332:15
**stepping** 61:4
**Steve** 180:3
**stick** 161:23
193:17
**stipulated** 56:4
61:23
**stipulation**
221:25 223:8
**stock** 176:12
**stop** 94:3 119:4

166:12 335:18
336:4
**stopping** 60:20
**store** 13:8,9,12
13:13,22 14:7
14:10,15,15
15:21,24 16:9
16:17,19,24
17:8,11,19,24
18:16 19:12
23:15,19,22
24:21 27:6,8,25
28:6,9,14 29:6
29:22 31:2 35:8
35:11,15,23
36:13 37:4,10
38:19,25 39:12
39:19 45:25
46:20 47:5,17
48:12 51:7,13
52:2,6,13 55:4
56:10 61:25
63:2,4 68:22
69:15 70:3,7,14
72:2,25 74:4,23
75:9,13 76:16
77:6,11 79:18
80:3,6,14,21
81:2,24 83:8,16
83:23 84:6 85:9
85:10,25 86:11
86:19 87:6
88:20 89:6
90:17 91:3
93:23 94:12,19
94:23 95:22
97:6,11,12
98:19 99:7
101:13 106:13
106:16 114:19
116:14 124:7
124:13 125:3
125:15,22
126:2,17,18,20
126:24,25
127:4,6,7,11,15

127:15,16,18
127:21 128:3
128:25 129:12
129:14,22
132:4,8 133:2,8
136:19 137:11
137:16 138:10
139:13 140:19
141:4,13 142:2
142:5,15,22
143:5,11,14,15
144:24 146:16
147:11,12,20
148:15 151:14
151:18 153:10
153:14,22
154:16,19
155:5,25
156:15 160:24
161:8 162:3,10
168:9 174:10
177:18 191:17
194:13,23
195:4,9,16
196:4,19
198:10 199:25
208:16 209:5
210:10 212:9
214:13,23
216:14 217:3
220:2,10,19
222:18,22
223:2,13 226:3
226:11,25
229:23 240:11
241:17 243:13
243:14,17,18
245:10 246:16
246:23 248:11
251:18 252:9
252:11,13,18
253:13 255:2
256:16,17,19
257:8 258:24
259:12,15
260:6 262:11

265:15 268:12
269:9,12,16,18
269:23 270:2,7
270:8,8,13,14
270:19,25
271:5 272:20
273:14 277:17
278:10 279:8
279:17,25
280:5,19,21
282:4 285:5
293:4,11,25
294:7,15,24
297:25 298:19
298:22 299:18
299:23 300:8
301:13,13,16
301:21 302:2
302:16 303:3
303:20,24
304:7,15,15,20
305:6,7 306:23
308:21 309:9
309:14,16,19
309:20,22
310:8,12,20,24
311:9,12 313:3
313:6,20,21
318:6 321:9,18
323:3,6 325:22
326:11 328:14
328:23 329:16
329:19 331:9
331:17,21
334:10,14
335:7
**store's** 14:21
15:22 16:22
40:25 144:4,16
273:12
**stores** 13:21 15:8
75:23 89:20
91:21 127:10
128:5 129:9
146:12,23
147:8 153:8

249:13,14,17
252:22 276:23
277:2 303:13
**stories** 122:5
**storm** 43:14
**story** 21:21
108:25
**straight** 279:20
**straightforward**
54:18
**strategy** 263:16
**stream** 42:20
**street** 85:19
166:9
**stricken** 348:8
**strike** 199:9
252:10 346:6
**string** 267:15,20
**struck** 63:18 75:3
**struggle** 252:12
253:6
**stub** 70:9
**stuff** 79:9 231:10
282:8
**SUBH** 1:4
**subject** 166:2
225:18 266:13
346:5 349:25
353:2,18
**submissions** 9:21
**submit** 28:3
51:24 53:23
**submitted** 10:4
52:25 167:12
167:14
**subpoena** 113:11
114:23 115:3
115:18
**subpoenaed**
115:13
**Subsection**
284:11
**subsequent** 21:10
41:6 187:3
**subset** 345:25
**substantially**



53:24
**substantively**
110:5
**succeed** 14:11,16
83:25
**successful** 13:19
139:12 143:6
146:25 147:4,7
153:7 262:12
277:4 301:4
305:23 311:13
**successfully**
13:23 35:8
153:9
**successive** 80:9
82:20
**succinctly** 158:4
237:6
**sudden** 106:14
**sufficiency**
257:14
**sufficient** 70:5,11
92:6 150:2
229:21 257:7,7
257:23
**suggest** 72:11
248:23 264:3
**suggested** 51:12
157:3 248:19
299:25
**suggestion**
192:21
**suggests** 14:20
**SUHAD** 1:4
**suitable** 297:9
**Suite** 2:8
**summarize** 355:2
**summary** 106:21
144:6 211:17
313:9
**summer** 51:10
98:24 214:16
214:19 216:2,3
**supervisor**
176:12
**supplemental**

98:8
**supplied** 114:25
**supply** 92:23
114:22
**support** 24:7,12
24:15 37:7 63:8
258:6 259:8
260:10,12,14
260:17 262:9
263:3 264:12
264:24 265:7
**supported** 260:9
260:11 265:4
265:11
**supporting** 24:4
68:21,22
**supports** 287:16
**supposed** 25:7
40:16 140:13
142:21 160:7
174:9 178:17
186:7 214:7
248:17 252:23
253:4,8 254:24
255:9 271:18
279:7 313:4
321:6
**supposedly**
311:13
**sure** 6:6 19:12
20:19 31:23
35:4 36:18 39:5
51:8 114:14
128:11 129:12
129:15 137:2
143:5,17
146:21 148:3
154:4 156:23
162:15 185:17
189:22 193:12
202:21 207:17
227:3 228:7
232:16 274:8
278:21 279:13
290:11 317:5
324:10 327:3

330:4 341:19
**surprise** 28:21
29:3 269:23
**surprised** 156:7
156:12
**surrender** 28:9
30:4 36:25 39:8
95:2,21 96:5
100:16 297:6
**surrendered**
39:19,21 56:3
61:23 85:2,5
**survive** 305:7
310:12
**suspect** 5:14
**suspend** 308:15
**sustain** 103:22
154:3 259:5
351:20
**sustained** 85:22
151:10 154:14
154:21 165:21
166:10 228:14
274:14 349:8
**swear** 120:16
235:15
**sworn** 123:4
237:12 360:8
**system** 111:3

---
**T**

**T** 68:23 319:23
360:2,2
**T-O-R-E-L-L-O**
8:10
**table** 43:10 73:15
**tables** 278:18
280:6
**take** 17:8 19:20
37:16 44:4
45:25 46:19,24
48:5 50:2,24
51:23 58:6
59:16 71:25
75:12 78:25
80:6,13 84:6,10

97:11 101:24
102:3,8,12
105:12 108:20
112:22 125:13
131:8,14 143:7
148:17 152:5
157:4 165:22
166:11 175:11
188:14 189:18
189:20 192:7
198:21 213:8
217:13 226:3
230:14 243:6
261:15 263:3
267:2 268:4
274:24 277:17
279:7 280:13
283:20 285:13
285:20,24
287:19 288:9
294:10,24
298:18 299:22
300:7 309:18
313:12 315:5
315:15 316:18
316:19 323:2
324:11 334:19
336:9 346:3
349:18 354:7
**takeaway** 334:8
**taken** 102:22
139:21 143:16
194:7 230:18
242:23 247:19
275:21 324:14
330:19
**takes** 28:12 312:8
**talk** 74:16 108:9
163:19 192:25
248:5,7 261:25
265:12 300:19
303:11 305:20
305:25 321:4
336:7 353:13
**talked** 72:24
159:6 168:4

295:3,8 323:8
341:18
**talking** 45:22
62:2 76:7 85:24
152:24 155:9
199:7 283:25
293:15 303:8
327:7 354:22
**talks** 180:25
**target** 308:18
310:3,15,17,19
**tax** 113:20,23
114:7 256:20
256:22 335:13
335:15
**taxes** 199:19
**team** 56:11
**technical** 20:6
**telephone** 9:9
**tell** 22:25 50:3,4
76:8 79:15
88:12 119:22
121:25 155:22
158:11 161:24
163:22 177:16
179:4 190:12
204:25 237:2
247:7 270:25
286:16 288:11
300:14 314:8
334:6 336:11
336:25 339:3
358:13
**telling** 17:18
28:24 48:25
84:5 88:17
102:4 150:23
234:14 352:25
**temporary**
126:20 226:2
**ten-year** 70:13
**tenant** 17:10 28:8
30:3 35:10
37:10 38:24
47:19 84:23,24
84:25 85:5



295:9,12
296:25 297:4,7
297:10,17,24
298:14,17,18
298:21 299:8
299:20 300:9
308:16,24
309:12 312:7
312:12,23
314:7 323:9,18
323:23 328:7
**tenant's** 297:6
328:11
**tentatively** 355:4
**tenure** 194:14
**term** 21:14 27:4
48:17 71:23
97:13,16 219:2
224:14 226:12
284:16 315:2,8
322:22 323:7
**terminate** 28:23
32:3 39:23
96:13 315:6
**terminated**
224:21 226:3
**terms** 16:3 19:9
29:19 63:14,15
63:19 64:21
105:9 135:19
182:8 273:6,11
293:24 294:5
297:18 302:17
325:6 337:8
**terrible** 56:8
250:4
**test** 153:13
**testified** 85:13
123:5 177:13
209:17 220:15
232:14 237:14
292:15 307:16
315:17 316:3
316:17 318:14
325:16
**testifies** 36:20

**testify** 15:19 31:7
123:14
**testifying** 78:8
185:8 278:22
**testimony** 15:17
19:3 23:10
37:19 48:3 60:6
76:12 81:10
86:22 89:4,20
89:24 98:5
120:16 140:24
144:2,6 156:24
157:6 185:10
196:17 197:6
206:20 211:18
213:3 227:23
228:6 234:21
235:15 240:25
241:5 250:23
251:4 254:4,11
254:19 273:11
279:4 301:20
304:4 326:17
337:6 352:2
355:13 356:2
356:18 358:10
360:7,10
**thank** 4:7,23 6:24
7:3 8:24 12:5
12:21 19:15,17
27:18,21 44:13
47:10,22 54:2,9
67:25 68:6,7
79:22 101:20
102:18 122:17
123:12 148:11
158:16 186:12
189:5 192:18
194:5,10,10
210:6 230:12
230:16,21
234:20,23
235:2 236:10
238:12,14
239:24 244:17
275:18 276:8

296:18 308:11
354:19,24
356:4 359:2
**Thanks** 54:4
318:21
**their's** 161:21
**therefor** 25:7
**thereunder** 21:13
225:22
**they'd** 346:5
**thing** 39:16 56:13
69:8 72:7 79:10
86:17,21 94:24
115:23 178:5
187:21 215:15
228:13 330:5
358:17
**things** 18:5 35:3
56:17 57:22
84:10 98:4
101:3 114:3
141:16 154:8
201:2 312:3
326:4,4
**think** 5:12 9:11
27:22 30:16,18
30:19 33:21
44:14 45:15
48:25 49:15,21
50:9,16,17,22
52:19 53:13
64:19 76:10
102:7 103:9
107:10,13
108:24 113:7
115:19 118:19
139:17 147:22
148:16 150:15
154:2,3,17
167:9 168:3,16
174:16 175:4,4
175:12 177:3
177:12 183:18
188:22,24
191:15 193:3
193:15,20

197:15 199:17
213:15 214:8
216:20 226:20
227:18 238:19
239:17 240:18
242:16 250:19
250:21 257:2
257:17 258:11
271:19 274:4
274:17,19
283:16,25
284:6 291:23
291:25 295:25
315:21 317:5,6
318:8 323:24
331:12,13
335:15 336:3
346:19 348:6
349:15 351:10
351:15 353:16
353:25 354:5
357:22
**thinking** 321:17
**thinks** 231:8
**third** 14:2 69:8
200:11 296:25
**thought** 27:12
49:19 109:5
118:6,12,15
141:11 168:14
251:11 257:23
289:3 292:10
308:5 311:21
331:15 337:7
344:7
**thoughts** 262:16
**thousand** 318:15
**thousands** 86:8
**three** 13:15 32:23
37:21 77:23
80:9 94:20
112:6 128:17
160:6 224:13
272:9,15
315:22 319:6
345:6 346:8

**throat** 182:25
**throwing** 281:8
**thrown** 85:6
281:6
**thrust** 88:6
**thunder** 43:14
50:9
**ticket** 57:20
**tight** 180:25
**time** 1:11 8:4
11:19,19 14:18
15:13 22:15,19
26:2 27:6 30:3
32:12,18 33:20
33:23 34:6,17
34:24 35:11
38:16 41:21,24
42:10,12 44:3
45:11,13 46:15
47:23 51:9
56:15,16,18
59:17 65:12,12
69:13 70:6 71:4
71:19 73:23
80:11,15,22
81:6,19 84:10
86:9 88:13,14
93:13 99:9
102:22 106:25
113:13 123:13
125:18 126:14
127:17,22
131:7 132:8
134:6 135:10
136:18 137:23
138:11 140:22
141:8 144:14
145:11 147:16
151:16 160:21
161:4,17 166:7
166:23 171:15
173:18 176:23
177:2 178:24
180:8 181:7,23
182:12 187:16
187:24 190:17



191:6 195:21
196:3 212:22
222:17 224:11
224:21 225:5
225:25 226:19
227:2 230:2,18
240:9 241:21
244:24 246:8,9
250:18,22
253:23 265:20
268:17,19
275:21 288:23
289:2 290:19
293:2 300:13
300:15 303:18
309:5 314:6,21
316:14 324:14
328:14 330:19
331:24 332:22
337:5 338:19
343:7 347:23
357:22 359:3
**timely** 273:24
345:2
**times** 144:18
184:25 187:5
211:25 224:3
231:8 266:7
**timing** 37:12
**title** 199:13
345:20
**today** 7:17 66:19
123:14 208:21
209:13 210:7
240:25 305:16
311:16 355:9
355:11
**Todd** 319:24
**toggles** 175:20
**told** 29:4 83:14
89:2 108:4
117:11 161:25
162:8 165:16
219:11 253:7
253:22 322:7
322:10 335:9

338:12
**tomorrow** 354:10
355:16,23
356:23 357:6
357:14
**tonight** 356:24
358:8
**tons** 256:16
**top** 311:15
318:19 319:12
**topic** 245:13
**Torello** 155:18
313:18
**Torello-Viera**
7:13 8:9 46:14
82:23 85:16
96:22 155:13
**total** 43:14
195:13 200:13
204:11 208:12
211:20,22,24
212:10 217:19
243:19,19
256:23 318:13
333:25 334:16
334:16,19
**totaling** 205:6
**totally** 306:16
348:9
**touched** 140:22
**touching** 95:6
**tough** 153:11
337:24
**track** 75:19
114:17
**tracked** 137:4
**tracking** 16:16
32:20 201:5
**traffic** 74:20
75:25
**training** 129:8
**trainings** 143:3
**transcribed** 1:16
**transcript** 360:9
**transfer** 151:2
225:8 320:5

**transferred**
150:9 255:20
285:17
**transition** 159:17
217:5,6 234:10
**translate** 337:20
338:19 339:3
**translated** 338:3
**transparent**
144:19
**treasurer** 8:21
85:14
**treated** 46:6
**tremendous**
86:14
**tried** 55:12 75:10
99:11 300:4
**trouble** 118:9
250:20 252:14
**true** 18:21 31:11
56:11 66:22
92:4 118:19
178:9 228:9
323:14 360:10
**truth** 120:19,19
120:20 179:4
235:17,18,19
**try** 14:6 17:2
20:2 30:11
35:23 59:21
74:5 83:18
117:17 118:14
143:9 145:2
182:25 184:5
222:21 233:23
237:5 281:14
297:23 324:17
330:14 351:14
**trying** 19:5 59:18
73:16 77:12
78:25 86:4 94:2
97:20 101:15
127:20 136:6
213:16 224:10
248:9 283:3
298:21 306:2

**turn** 11:19 17:11
35:24 47:4,17
48:12 56:22
57:23 93:19
97:5 100:10
102:24 105:24
188:14
**turned** 55:24
85:10 313:7
331:21 341:3
**turning** 77:13
**twice** 129:20
143:2
**two** 11:3 12:9,24
43:12 70:7
81:12 82:20
93:5,24 94:12
114:2 128:11
191:16 194:19
195:9 196:18
197:17 198:11
212:12 213:10
214:11,11
217:12 223:24
231:4,14
233:17 246:15
259:22 260:5
262:10 264:14
285:10 288:12
305:18 319:6
334:4 346:12
346:19,24
348:4 352:20
353:17 355:17
355:21,22
**two-way** 166:9
**two-year** 212:22
213:5
**type** 76:24 79:8
86:14 138:8
141:21 187:20
265:18
**typed** 346:14
**types** 129:4
**typically** 266:3

| U |
| --- |
**U** 123:3
**U.S** 52:7 57:15
126:16,17
130:4 141:11
160:20 191:25
**ultimate** 14:21
219:25
**ultimately** 35:20
59:12 65:13
90:12 124:14
173:8 260:9
301:3
**Um** 245:9 256:12
**unable** 14:10
35:7 108:2
149:23
**unaware** 48:4
**unbelievable**
263:6 269:25
310:14
**underhanded**
96:7
**underlining**
58:25
**underlying** 20:16
**underpayment**
206:11
**underperformi...**
23:14
**understand**
18:25 19:4
31:14 34:10
50:2 66:3,24
76:6 89:8,18
102:5 108:2
117:13 131:20
131:24 139:6
140:4 148:5
183:5 184:5,8
185:18 188:21
188:24 207:17
232:17 253:25
255:3 258:9
290:3,5,10,16



294:11 304:19
309:13,21
340:25
**understanding**
16:24 36:8
45:23 46:4
109:5 138:13
147:6 156:24
173:24 174:17
179:6 190:6
197:3 207:4
208:21 222:16
222:20 226:6,9
248:13 249:22
253:14 254:11
258:2 268:8
274:6 276:22
278:6 285:2
286:4,11,17,19
287:3,17
288:20,23
290:14 291:5
292:14 293:15
297:4 299:5
313:13 315:18
343:25
**understood** 33:9
137:7 187:15
**undertaking**
225:21
**undisputed** 22:13
**Unfortunately**
60:23
**uniform** 205:16
**United** 15:2
76:15 91:15
127:5,22
155:20 172:9
173:4 178:7,15
188:7 262:8,22
262:23 264:7
266:12 285:11
**unmuted** 131:13
**unreasonable**
73:8
**untrue** 90:19

92:7
**upset** 326:19
327:2
**USA** 1:7 7:7 8:22
13:7 23:9 106:5
123:20,23
124:3 155:10
155:11,12,24
159:9 160:14
171:4 178:2
191:11 201:7
222:7 284:23
326:23
**USA's** 15:17
**use** 127:9,13
163:12 284:16
330:22 338:23
**user** 9:4
**utilities** 294:5
**utility** 89:19
**utilizing** 284:17

————————
**V**
**V-I-E-R-A** 8:10
**vacate** 328:13,17
**vagaries** 98:15
**vaguely** 183:8
199:5 267:23
267:25 268:3
**valuable** 173:6
178:4
**value** 81:11
**variable** 99:13
**various** 20:2 76:3
87:7 173:21
**vcrowe@BTSl...**
358:24
**Vegas** 13:8 14:17
15:12 18:4 41:5
46:20 53:5
54:24 71:24
77:14 78:15,21
83:22 90:16
98:11,22
124:13 125:22
126:25 127:5

129:11 141:5
141:16,20
142:25 144:21
146:16 147:11
154:6 155:5
160:24 161:14
161:15 162:3
162:10 166:17
175:6 180:3
221:8 222:22
224:6 249:13
257:9 258:15
259:23 347:16
**vendor** 59:8
65:11
**Venetian** 127:12
**Venice** 247:14
**veracity** 90:8
**verbal** 31:9
**version** 133:25
134:16
**versions** 136:4,12
**video** 5:14,18
**view** 11:18,20
31:15 79:16
89:25 107:21
355:8
**viewed** 101:9
**Vincent** 2:16 7:8
**violating** 231:20
**visual** 12:17
**void** 96:4

————————
**W**
**wait** 58:3 228:10
238:24 239:12
**waited** 27:7
**waive** 225:14
**waived** 169:6
**waiver** 25:8
26:12 41:22
49:4 79:11
92:21
**waivers** 99:24
**walk** 17:12 36:13
39:15 68:25

303:25
**walked** 331:18
**want** 6:11 11:12
11:25 12:19
32:11 36:21
43:15 44:3 45:5
45:11 46:5
48:19,20 49:5
50:4 66:14 72:8
79:19 80:10
89:6,17 96:5
105:8 112:16
116:25 120:13
121:14,15,18
122:4,5 131:6
134:19 138:12
140:21 143:25
147:24 148:17
157:23,24
159:18 165:24
168:23 172:24
183:10 188:13
193:9 222:24
231:21 232:16
239:20 243:6,8
250:9 262:18
268:25 271:8
273:15,23
281:6 282:10
283:16 293:3
294:11 302:22
303:16 304:18
308:12 309:7
317:10 323:2
330:23 333:11
349:10 350:17
354:8 358:9,11
**wanted** 26:5 55:8
75:17 83:21,25
91:9,22 94:22
151:17,24
153:15,17
161:18,19
168:7 187:16
265:5 270:17
305:22 307:7

317:11 321:17
**wants** 58:6
137:14 163:12
175:17 294:24
311:22 312:4
336:25
**wash** 36:12
**wasn't** 47:14
71:13,14,15
75:4,6 95:14
107:21 146:2
150:2 156:14
164:20 165:19
165:23 173:6
191:18,18
206:8 220:6
225:24 250:5,5
260:12 270:9
278:19 280:15
294:14 303:7
306:13 309:20
331:19 350:25
**waste** 45:11
135:10
**waters** 72:10
**waved** 40:20
41:13 42:14
**way** 11:13,24
30:10 53:14
55:14 64:23
84:19 122:11
129:13,16
153:15 162:15
208:22 238:4
250:11 253:4
256:14 266:2
280:8,9 282:9
287:19 299:12
304:21 305:7
312:14 315:11
339:5 340:4
360:15
**ways** 55:23
129:15 157:5
331:16
**we'll** 10:13,14



11:7 19:2 26:2
45:12 58:5 68:5
76:9 86:11
101:24 102:2
102:11,19
119:4,19
184:21 194:2,3
199:6 209:18
219:12 228:15
239:22 257:4
261:9 279:19
280:13 294:10
305:10 325:2
**we're** 9:24 11:8
15:16 18:25
25:11 30:16
33:3 34:23
44:24 46:8 76:7
80:11,19 85:23
86:4 89:8 94:6
94:21 96:23
98:4 101:21,22
119:2,3 128:14
138:9 148:19
156:23 157:19
163:18 185:18
186:2,10
213:18 221:24
233:22 246:5
248:2 250:10
283:25 302:21
305:15 339:24
340:15 346:11
350:14 353:7
353:10 355:15
358:17
**we've** 25:24
32:22 33:24
42:23 53:8
116:11 140:22
185:12 208:15
209:9 212:8
216:6 229:17
254:2 275:2
319:9 336:16
336:17 337:10

338:14 345:5
350:11
**wear** 13:20 15:15
**web** 20:9
**website** 57:12
58:13 59:7,9,14
60:2,17,17 65:7
65:11 69:6
173:25 174:5
174:18,21
175:3 178:25
179:2,8 180:9
180:23 181:6
181:11,16,18
182:6 186:14
187:12,17,18
188:6,7 190:8
190:10,14,19
190:25 191:3,7
191:11,24
192:4,5,9
**week** 180:23
185:20
**weekend** 163:17
347:10
**weeks** 27:2 98:21
**weighed** 285:18
**welcome** 8:24
66:2 264:2
**went** 20:7 31:25
43:2 57:2 59:13
75:14 93:7
95:16 96:14
129:21 130:13
132:24,25
140:2 141:20
160:18 165:3
217:5,6 221:14
241:23 243:10
266:14 279:9
305:24 312:19
**weren't** 17:7
57:22 60:20
70:8 80:17,25
87:4,5,5 108:18
116:9 117:14

195:25 196:2
209:4 245:6
313:5 322:8
**whatsoever**
53:20 263:2
286:20 313:22
**White** 2:5,14 7:6
**wholesale** 142:12
270:8 280:19
**wife** 65:25
**wiggle** 99:11
**willing** 297:15
298:16 299:22
350:20
**willy-nilly** 80:19
**wind** 101:12
**window** 85:7
238:24
**winter** 84:8 99:6
214:15 215:13
215:17,25
216:2,4 217:2,7
265:23
**wishes** 297:8
**withdraw** 96:15
96:16 106:24
111:8 244:8
346:25
**withdrawal**
95:25
**withdrawing**
339:24
**withdrawn**
155:15 345:5
350:11
**withdrew** 348:14
**witness** 3:2 10:14
12:19 23:6 66:5
66:10,13,18
67:3 74:16
102:10 104:19
105:21 106:10
120:3 121:20
123:3 125:17
128:21 132:20
135:11 137:17

138:23 139:4
150:20 151:4,7
152:9,20,25
158:2,13 163:5
164:24 166:6
168:4 186:23
190:4,9,15,22
191:2,9,14,23
192:10 193:16
194:3,4 207:3
214:18 215:12
215:16,24
219:22 233:25
234:6,17,23
235:3,9,20
236:2,9,16
237:8,11
238:12 239:10
239:13 240:18
242:10,15,24
245:17 246:2
246:10 247:5,9
247:13,21
248:7,21,24
249:8 250:3
258:21 260:23
261:5,25
264:14 266:20
274:9,20 275:6
275:7,9 278:14
282:6 286:14
289:10,13,17
289:21,23
291:12,23
292:3,13 308:8
310:4 322:2,18
335:4,13 339:2
342:16 349:11
349:12 356:17
358:2
**witness's** 274:7
**Witness(es)**
360:7,11
**witnessed** 23:13
**witnesses** 90:9
163:21 357:6

358:19
**woefully** 55:18
**wondering** 244:5
**word** 121:23
122:3 158:9
199:18 236:24
253:22 310:2
**words** 5:7 108:21
234:14
**work** 10:13,15
66:19 79:6 88:8
94:23 96:8
97:21 101:16
121:2 127:25
128:23 189:24
199:21 208:23
235:25 255:5
336:19 338:22
355:15
**worked** 5:19
68:17 73:17,18
87:2 101:4
129:2 160:10
160:11,13,15
166:16 180:7
180:17 199:15
202:16 256:18
355:8
**workers** 269:21
**working** 54:17
65:10 77:21
83:21 100:20
132:3 136:18
137:10,25
260:2 264:3
300:8 336:21
**works** 67:21
78:17 87:19,20
**world** 52:24
57:19 148:19
178:16
**worry** 34:9,14
**worse** 315:21
**worth** 21:5 86:8
125:12 131:22
132:7 151:12



196:20 212:4
241:16 249:25
256:24 279:16
**wouldn't** 39:11
50:8 215:22
**wrap** 324:8
**write** 11:16
**writing** 11:21
24:4 31:11,21
35:25 36:15
41:16 100:2
150:25 218:20
312:20 328:5
**writings** 24:6,8
24:11,12,15
29:16 266:19
**written** 29:25
31:6,12 140:14
152:23 182:7
182:13 220:24
225:10
**wrong** 19:7 56:12
56:17 83:19
87:18
**wrongfully** 73:6
**wrote** 149:4
151:5
**www.MagnaL....**
1:25

———————
**X**
**X** 1:2,9 2:25

———————
**Y**
**yeah** 79:23
126:19 226:21
347:19
**year** 21:6,6 46:22
78:2 81:22
86:18 93:24
94:2,10,10,13
94:14 129:20
131:23 132:19
143:16 194:20
197:17,19
198:7 212:12

229:9 233:24
234:4 240:17
241:16 246:15
248:18 249:24
253:9 256:15
263:15,20
264:3 272:14
325:13 338:6
338:13 343:8
349:2
**year's** 246:7
248:16 249:3
249:12 256:24
**yearly** 196:22,25
252:19,22
**years** 13:14 42:6
42:9,22 46:21
53:12 69:2 70:8
70:15 81:12
93:7,24 94:12
98:13 101:16
114:20 130:3
130:11 144:9
147:3 160:13
160:13 178:13
191:16 195:9
196:18 198:11
208:4 212:13
213:10,11
219:5 233:22
256:15 334:4
**yesterday** 34:6
162:14,19,25
163:17 164:9
165:17 283:15
**York** 1:17 2:5,14
7:6 21:22 49:6
91:18 100:25
237:14 259:24
360:5

———————
**Z**
**Zanin** 199:11
**Zileri** 13:3,8,21
46:8,19 57:16
83:8 85:20 91:2

91:10,11
127:15 146:18
147:7 153:8,9
160:12,16
162:3,10
166:17 168:13
171:17 172:3
173:3 182:9
185:4 191:8,10
194:23 195:16
222:22 240:6
253:10 256:18
260:7 262:7,12
263:2 269:14
271:4 277:4
281:7 294:23
303:6,11,20,23
304:22 317:11
320:5,18
325:18
**Zileri's** 252:25
270:9
**Zireli** 124:12
126:17 147:3,5
**zoom** 1:15 4:6
9:19 12:16
43:11 183:16
189:24 229:4
299:2

———————
**0**
**01-18-0000-6180**
1:6
**08** 106:6
**09** 106:6

———————
**1**
**1** 38:20 39:2,24
83:6 236:4
315:4 328:11
**1,059,0000** 208:3
**1.1** 288:2
**1.191** 334:9
**1.2** 283:17,24
**1.8** 198:12 212:14
212:21

**1/24/2012** 267:13
**1:00** 102:3
**10** 10:18 53:10
70:14 109:8,11
110:12 115:8
117:12 160:13
209:21 214:15
233:22 275:4
294:9 304:2
343:12
**10-year** 219:2
**100** 88:4 143:9
146:19 243:3
265:11
**100,000** 293:17
293:18
**10601** 2:5,14
**107** 121:7
**10815** 179:22
**10818** 179:23
**10th** 282:20
**11** 77:16 116:15
125:15 195:10
214:13,15,17
215:3,5,19,25
216:15,21
256:22 344:12
**11:05** 102:14
**11:20** 102:15
**110** 305:2
**1100** 121:5
**113,000** 305:2
**117** 118:2 339:7,9
**119** 339:7,9
**11th** 209:11
**12** 35:25 116:15
214:11 215:19
215:20,20
216:2,2 247:8
256:21,22
292:11
**12-month** 308:22
309:10
**120** 339:8,10
**123** 3:3
**125** 337:10 338:7

339:14
**126** 337:11
339:14
**127** 337:11
**128** 337:11
**129** 337:11
**13** 181:19 195:10
200:4 214:11
215:21,21
216:3,4 217:2,7
222:19 319:21
**130** 198:17 199:2
232:6 278:24
**136,000** 256:23
**139,000** 318:24
**139,252.52**
318:14
**14** 81:22 85:3
95:8 105:25
159:13 176:17
200:7
**140,000** 71:21
**144** 337:11
339:14
**14490** 6:21
**145** 337:11
339:15
**149** 198:18 199:3
**15** 27:8 43:2 52:8
81:23 83:15
101:25 102:2
102:20 144:9
267:8 275:17
280:22 282:5
**15-minute** 102:9
**15,000** 294:9
**150** 2:8
**155,000** 304:21
**156** 82:13
**157** 340:5,12
355:2
**158** 340:5,16,25
355:2
**159** 3:4
**15th** 314:25
**164** 107:13


MAGNA
LEGAL SERVICES

**174** 340:21 341:9
341:11
**18** 297:3 311:23
314:9 315:2
348:16
**184** 343:21
344:15 345:3
**196** 345:4
**198** 351:21
**1st** 39:22

---

**2**

**2** 186:20 284:11
288:3
**2,202,469** 211:21
**2,202,469.59**
212:7
**2,250,000** 218:2,4
218:7
**2.1** 314:20
**2.2** 211:21 212:4
243:21 279:15
**2.3** 218:5
**2:00** 102:4
193:24,25
**20** 42:6,9 69:25
70:18 160:12
164:14
**200** 2:4 310:5,11
**2000** 53:3 256:21
**2008** 238:19
**2010** 106:7
164:14 165:8
208:4,19 209:2
209:5,8,14
210:9,14,15,19
210:21 213:6
214:10 238:20
240:19
**2011** 13:9 15:24
16:18 22:16
23:13 42:15
64:12 77:16,16
125:4,23 126:3
126:14,16,19
127:23 176:18

**194**:24 208:4
208:16,19
209:3 210:10
210:15,20
214:10,19,24
215:13,17
238:20 240:19
243:15 245:10
252:10 269:4
273:3,24 274:2
297:3 344:13
**2012** 23:13 42:15
57:8,8 78:2
114:7 124:24
124:25,25
147:13 180:21
181:19 186:20
211:10 246:13
251:19 291:11
291:20 293:25
294:7
**2013** 42:16
124:24 147:13
147:15 148:25
195:4 211:13
213:9 216:23
216:25 226:21
275:25 276:10
276:15 279:3
282:21 289:6
293:21 303:19
**2014** 35:12,12
46:10 68:15
95:4 198:21
226:20,21,21
295:16 296:2
299:17
**2015** 14:5 16:12
37:4 38:15
45:25 51:11
81:13 156:2
159:10 307:21
311:4,25
314:25 325:8
**2016** 16:19 22:16
28:2 37:11,14

**38**:20,21,22
39:2,2,4,9,24
72:17 82:18
83:6 308:17
315:4 316:14
319:21 320:17
320:24 321:5
322:14,20,23
323:13 324:24
325:4 326:12
326:24 327:23
328:10,12,13
328:18 329:17
329:20 331:10
332:24
**2017** 41:20 42:18
92:23 332:5
**202** 345:8,9
**2020** 1:10 53:15
55:16 99:3
360:25
**2021** 21:7 50:14
52:21 53:16
**203** 345:8
**204** 345:8
**208** 346:9,10
355:3
**209** 346:9,14
355:3
**21** 160:13
**2168** 296:17
**22** 148:25
**221** 346:24
**225** 347:3,5
**225,000** 310:12
**226** 347:7,8,9
348:7,11 355:3
**228** 348:8,11
355:3
**23** 296:2
**23,000** 218:15,18
**232** 3:3
**237** 3:5
**238** 175:17
**25** 324:21 325:4
**250** 310:5

**251** 307:13
**256** 82:9
**25th** 83:4
**26** 1:10 347:3
**27,000** 256:12,14
257:5 258:10
258:14,19
259:9
**28** 347:4
**280** 82:14
**281** 82:14
**286** 348:12
**287** 348:11
**29** 268:22

---

**3**

**3:35** 275:4
**3:50** 275:18
**30** 130:3 178:12
261:23,24
274:22 294:2
**300,000** 272:15
**3000** 2:8
**31** 328:10,13,18
**310,000** 272:11
**312)342-9704**
43:18
**312)720-1562**
43:21
**317** 348:16 355:3
**318** 355:3
**319** 134:11
227:18
**31st** 39:21 308:17
**321** 135:25
**32102** 121:8
**325** 296:8
**35** 294:2
**38,000** 69:21 70:9
71:6,9,11 206:6
206:8 207:6,10
207:21 233:5,9
254:20,25
255:6,8,23
352:14 353:6
**38,289** 205:25

**3rd** 41:19 42:18

---

**4**

**4.2** 131:10,17
133:18 134:5
136:3,8 137:15
137:23 198:3
241:6
**4.5** 43:3 52:11
333:3
**4:00** 275:4
**40** 106:19 107:3
294:2,3
**40,000** 294:2
329:12
**41** 333:15
**45** 193:21
**4547** 348:22
**46** 106:19 107:3
**474,349** 204:22
**4744** 206:5
**48** 327:14
**49** 326:15 327:12
327:13,18

---

**5**

**5** 134:4
**5/3/2013** 334:3
**5:29** 359:3
**5:30** 101:23
**50** 204:15,19
205:13 282:4
317:21,22
**50/50** 201:12,16
**500** 259:25 279:2
**500,000** 272:2
**51** 44:23
**512** 205:6 206:4
**512,639** 205:10
**529** 350:13
**53** 149:11
**534** 350:10
**544,939** 211:13
**55** 319:16
**592** 355:4
**597** 179:21



**598** 354:23 355:4
**598,044** 211:10
**599** 351:21
  354:23 355:4
**5th** 91:18 360:25

---
**6**
**6** 39:2 64:6 134:5
  281:24 326:12
  327:23 340:21
  341:9
**6/1/2016** 318:5
**6/16** 318:21
**60** 30:24 31:19
**60462** 6:23
**60527** 236:6
**60606** 2:9
**62** 332:10
**624-6221** 1:24
**63,000** 304:16
  305:4 310:11
  310:13
**64** 107:7,8
**65** 107:18 116:23
**65,000** 305:4
**66** 107:18 116:23
**67** 110:19,21,23
  111:11,14
**6th** 84:25

---
**7**
**7** 339:14 340:21
  341:9 345:4
**70** 111:13 270:4
  318:15
**70,000** 51:19
  293:22
**708)361-3030**
  6:18
**70s** 76:23
**71** 110:24 111:12
**72** 111:14,15,17
  116:23
**73** 112:3,24
**74** 111:23
**75** 111:23

---
**8**
**8** 69:9 116:8
  314:12 339:14
  340:21 341:9
  345:4
**8.4** 229:3
**80** 270:5,15
**800** 253:3
**80s** 76:22
**831** 347:19 352:8
**834** 162:13
**848** 162:13
**86** 112:3,24
  348:12
**866** 1:24
**87** 348:12
**88** 348:11,13
**89** 112:25 113:15
  116:23 348:13

---
**9**
**9** 38:20,22 82:18
  307:21 324:24
  325:7 339:14
  340:21 341:9
**9:00** 355:20
**9:30** 101:23
  355:16,20
**9:39** 1:11
**90** 270:16 348:13
**900,000** 21:5 24:9
  81:21 131:22
  132:6,18 137:9
  137:24 139:9
  139:18 140:6
  152:18 196:20
  196:25 197:19
  198:7 212:12
  220:6 233:24
  234:4 241:16
  245:7 246:8
  291:9 292:19
  325:12
**91** 116:23 117:7
**914)217-6915**
  44:7

---
**914)522-7301**
  43:24
**92** 116:23
**93** 116:24
**94** 116:24
**948,698** 204:23
**948,698.17**
  204:13
**95** 113:2,16
  116:24
**952,000** 334:20
**99** 54:19
**9th** 341:4



Page 1

AMERICAN ARBITRATION ASSOCIATION
-------------------------------------X
In the Matter of the Arbitration of

SARAH LLC, HALA SUBH, SUHAD ALBASHA,
BACHAR HAMAD AND AMAR HAMAD,

                              CLAIMANT,

        -and-           Case No.:
                        01-18-0000-6180

FORALL USA, INC.,

                        RESPONDENT.
-------------------------------------X

              DATE: October 27, 2020

              TIME: 9:40 a.m.



        ARBITRATION in the above

entitled matter, held Via Zoom,

transcribed by Magdalena M. Artiles, a

Notary Public of the State of New York,

held before Eugene I. Farber,

Arbitrator.




              Magna Legal Services
                 (866) 624-6221
                 www.MagnaLS.com



Page 2

1
2  A P P E A R A N C E S :
3
4  EUGENE I. FARBER
       ARBITRATOR
5     200 E. Post Road
       White Plains, New York 10601
6     Efarber@farberadr.com
7
8  POLSINELLI
       Attorneys for the Claimants
9     150 N Riverside Plz Suite 3000
       Chicago, Illinois 60606
10    BY: RODNEY L. LEWIS, ESQ.
          -and-
11    SOHIL M. SHAH, ESQ.
12
13 BLEAKLEY PLATT & SCHMIDT, LLP
       Attorneys for the Respondents
14    One North Lexington Ave
       White Plains, New York 10601
15    BY: STEPHEN J. BROWN, ESQ.
       SBrown@bpslaw.com
16        -and-
       VINCENT CROWE, ESQ.
17
18 ALSO PRESENT:
19 Amar Hamad
20 Palma Settimi
21 Sana'a Hussein
22         *     *     *
23
24
25

Page 3

1
2              I N D E X
3  WITNESS      EXAMINATION BY    PAGE
4  DR. A. HAMAD  MR. BROWN        12, 145
5  DR. A. HAMAD  MR. LEWIS        119
6  DR. B. HAMAD  MR. LEWIS        158
7  DR. B. HAMAD  MR. BROWN        231
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1             PROCEEDINGS
2        THE ARBITRATOR: Dr. Hamad,
3  good morning.  You're on mute,
4  Dr. Hamad.
5        THE WITNESS:  Good morning,
6  sir.
7        THE ARBITRATOR:  Okay.  So
8  Dr. Hamad, you're now going to
9  have cross examination by
10 Mr. Brown, and here are some
11 rules that I want you to observe
12 in connection.  It's not that I
13 want, I insist that you observe
14 during the cross examination.
15       First of all, please
16 understand that your job is to
17 answer the questions as directly
18 and succinctly as you can.  I do
19 not, under any circumstance, want
20 you to be fighting with
21 Mr. Brown.  Mr. Brown is the boss
22 of the examination.  Now, when we
23 broke last night, I asked that
24 you please have a pad.
25       THE WITNESS:  I do.

Page 5

1             PROCEEDINGS
2        THE ARBITRATOR:  Good.  The
3  reason I asked you to have a pad
4  is as follows:  Mr. Brown is
5  going to be asking you questions,
6  and I don't want you to give any
7  explanation at all unless he asks
8  for it or I ask for it.
9        There are going to be times
10 during the course of the
11 examination that you will want to
12 explain.  You're going to want to
13 explain, you're going to want to
14 say, "No, just answering "yes" or
15 "no" is not good enough.  I want
16 to explain."  Do not explain.
17 What you do is you make a note on
18 your pad of the area that you
19 would like to explain.
20       When Mr. Brown is finished
21 with his cross examination, I
22 will give you an opportunity to
23 consult -- I don't see Mr. Shah.
24 There's Mr. Shah -- to consult
25 with Mr. Lewis and Mr. Shah, and



Page 6

```
1              PROCEEDINGS
2   they will decide on the second
3   set of questioning called
4   "redirect," if they want to ask
5   you questions so that you can
6   provide the explanations that you
7   wanted to give.
8         So listen to his question,
9   if you can answer his question
10  "yes," "no," "I don't know," "I
11  don't remember," that's fine.  If
12  you want to give an explanation,
13  only give the explanation if I
14  ask you or if he asks you.
15        If he does not ask you, and
16  he moves on to another question,
17  that's it.  You can make a note
18  and as I said then later on
19  you'll be able to provide the
20  explanation.  And I repeat, under
21  no circumstance am I going to
22  allow any fighting or arguing
23  between you and Mr. Brown.
24        If -- if there's going to be
25  a fight, he's going to win every
```

Page 7

```
1              PROCEEDINGS
2   time.  He's the boss of the
3   cross.  All right?  So with that
4   in mind, what I want you to do
5   now is listen carefully to his
6   questions and respond.
7         MR. LEWIS:  Before we begin,
8   Mr. Farber, if I may, there's a
9   couple of housekeeping points
10  that I've discussed with
11  Mr. Brown yesterday that I'd like
12  to share with you.
13        THE ARBITRATOR:  Go ahead.
14        MR. LEWIS:  First, after
15  meeting with my clients
16  yesterday, we have decided to
17  withdraw the allegations about
18  the internet and E-commerce.
19  They weren't included in any
20  damages calculation, but we do
21  have allegations to that effect
22  in our brief, and we are
23  withdrawing them officially at
24  this point.
25        THE ARBITRATOR:  All right.
```

Page 8

```
1              PROCEEDINGS
2   Anything else?
3         MR. LEWIS:  I want to ask if
4   Mr. Brown has any more clarity on
5   the order of his witness, which
6   delves into my third point which
7   is the allowance of exerts to
8   listen into the other expert's
9   testimony.
10        THE ARBITRATOR:  Okay.  On
11  the order of the witnesses, as
12  soon as we're finished with the
13  cross examination, I will -- I or
14  at some point as, I do every day,
15  I'll ask counsel for the
16  witnesses so that he can --
17  unless you know something right
18  now, Mr. Brown, if you have
19  better information about your
20  witnesses, but hang on.
21        Mr. Lewis, after Dr. Hamad
22  you have other witnesses, right,
23  you said so yesterday?
24        MR. LEWIS:  That's correct,
25  but I believe Dr. Bachar's
```

Page 9

```
1              PROCEEDINGS
2   testimony is going to be brief.
3         THE ARBITRATOR:  Okay.  And
4   are you calling anyone beyond Dr.
5   Bachar or you haven't made up
6   your mind yet?
7         MR. LEWIS:  He's for
8   rebuttal.
9         THE ARBITRATOR:  Okay.  Mr.
10  Brown, do you know who you're
11  going to start with?
12        MR. BROWN:  It's either
13  going to be Palma Settimi or
14  Paolo Torello-Viera, but I
15  haven't made that determination
16  yet.
17        THE ARBITRATOR:  As soon as
18  you do, let Mr. Lewis know.  On
19  the second point, Counsel, it's
20  really up to you unless you
21  disagree, I'll rule.
22        Mr. Lewis, do you prefer
23  that the experts sit in for the
24  other experts' testimony or not?
25        MR. LEWIS:  I do.
```



| | |
|---|---|
| Page 10 | Page 11 |

**Page 10**

1           PROCEEDINGS
2      THE ARBITRATOR:  Mr. Brown,
3  how about you?
4      MR. BROWN:  One moment, if
5  you would.
6      THE ARBITRATOR:  All right.
7      MR. BROWN:  Mr. Farber, I
8  think it -- due to -- they can't
9  go at the same time, so one will
10  have the advantage of the other,
11  I will prefer that they did not
12  listen in or on the others.
13      MR. LEWIS:  Well, just to
14  respond, Mr. Farber, our expert
15  is a rebuttal expert, so it makes
16  complete sense for him to listen
17  to the testimony that he's going
18  to be called to rebut.
19      THE ARBITRATOR:  No.  I
20  think Mr. Lewis has a better
21  point here.  I certainly had
22  many, many, hundreds of experts
23  testify before me.  I looked at
24  the credentials of both experts
25  here.  I think that they are both

**Page 11**

1           PROCEEDINGS
2  people with some integrity, and
3  I'm going to allow them to listen
4  to the others' testimony.
5      And, you know, you can have
6  your expert stay in while Mr.
7  Lewis' expert talks and vice
8  versa in light of the
9  disagreement.  I think Mr. Lewis
10  has the better of the argument
11  here.  So we're going to hand it
12  that way.
13      Mr. Brown, why don't you
14  proceed.
15      MR. BROWN:  Mr. Farber, can
16  you just remind the witness that
17  he is under oath?
18      THE ARBITRATOR:  I thought I
19  had, but Dr. Hamad, you remain
20  under oath, and please act
21  accordingly.
22      Go ahead, Mr. Brown.
23      MR. BROWN:  Thank you.
24
25             * * *

| | |
|---|---|
| Page 12 | Page 13 |

**Page 12**

1     CROSS-EXAMINATION OF DR. A. HAMAD
2  CROSS-EXAMINATION BY
3  MR. BROWN:
4      Q. Good morning, Dr. Hamad.  How
5  are you?
6      A. Good morning.  How you doing?
7      Q. Good.  Thank you for your time
8  today.  Are you an owner of Sarah --
9  Sarah LLC?
10      A. No.
11      Q. Who are the owners of that LLC?
12      A. Suhad Albasha and Hala Subh.
13      Q. And who are those persons?
14      A. Suhad Albasha is my wife; Hala
15  Subh is my brother's wife.
16      Q. And who is your brother?
17      A. Bachar Hamad.
18      Q. What is -- do you have a title
19  with Sarah LLC?
20      A. I don't believe so.
21      Q. What connection do you have with
22  Sarah LLC?
23      A. My wife is an owner.
24      Q. So your testimony in this
25  proceeding is under -- under what

**Page 13**

1     CROSS-EXAMINATION OF DR. A. HAMAD
2  guise?
3      A. Working on behalf of my wife.
4      Q. You're representing -- you're
5  testifying on behalf of your wife?
6      A. No.  I said I am -- my wife --
7      THE ARBITRATOR:  Hang on, he
8  didn't ask you -- you answered,
9  "No," that's a sufficient answer.
10  Next question.  Go ahead,
11  next question, Mr. Brown.
12      MR. BROWN:  Give me one
13  moment to confer with my
14  co-counsel, Mr. Farber.
15      THE ARBITRATOR:  All right.
16      Q. Doctor, do you have any interest
17  in this litigation or arbitration?
18      A. What do you mean?
19      Q. Do you have any investment in
20  Sarah LLC?
21      A. Yes, I do.
22      Q. And is that a personal
23  investment?
24      A. Yes.
25      Q. The loans that were set forth on



CROSS-EXAMINATION OF DR. A. HAMAD
1
2   your profit and loss statement that we
3   were viewing yesterday, in your
4   question from your counsel, were those
5   loans made by you?
6       A. And my brother.
7       Q. Were they loans made by your
8   wife in any respect?
9       A. No.
10      Q. So you have -- you are an
11  investor in Sarah LLC; is that right?
12      A. Yes.
13      Q. Were you a guarantor of any
14  obligations that Sarah LLC was party
15  to?
16      A. Yes.
17      Q. Which were those?  Which are
18  those, I should say?
19      A. Financial guaranty.
20      Q. Can you describe or tell me what
21  guaranty you signed on behalf of
22  Sarah's obligation?
23      A. There is a document, financial
24  guaranty, I don't have it in front of
25  me now.

CROSS-EXAMINATION OF DR. A. HAMAD
1
2       Q. Is that a guaranty guaranteeing
3   Sarah's performances with Forall?
4       A. Yes.
5       Q. And who else provided those
6   similar types of guarantees?
7       A. My brother, Bachar Hamad, and I
8   think his wife, and then and the
9   document, and my wife.
10      Q. Okay.  Prior to your -- your
11  venture in Las Vegas in the Pal Zileri
12  store, had you had any retail
13  experience?
14      A. No.
15      Q. Did you ever work in a clothing
16  store?
17      A. No.
18      Q. Did you own any other interests
19  in a luxury high-end retail store?
20      A. No.
21      Q. Do you currently own any
22  interest in any retailers?
23      A. No.
24      Q. Other than Sarah LLC and the Pal
25  Zileri store, have you ever been

CROSS-EXAMINATION OF DR. A. HAMAD
1
2   involved in any retail stores or
3   operation?
4       A. No.
5       Q. Prior to opening the Pal Zileri
6   store and entering into the lease with
7   the Forum shops, did you do any kind of
8   market analysis on Las Vegas and mens'
9   fashion wear?
10      A. Pal Zileri did it for us.
11      Q. Tell me about that.
12      A. Luca, explain to us what the
13  market -- and I think there was some --
14  some sort of document.  I can't
15  remember.  But he explained the market,
16  the sales expectation, how much to sell
17  and so forth.
18      Q. And did you see the business
19  proposal that I believe you testified
20  was submitted to -- I'm sorry -- that
21  Luca testified was submitted to Pal
22  Zileri and Forall before it was
23  submitted?
24          MR. LEWIS:  Objection.
25      A. I don't --

CROSS-EXAMINATION OF DR. A. HAMAD
1
2          THE ARBITRATOR:  What's the
3   objection?
4          MR. LEWIS:  Foundation.
5   Assuming that this proposal was
6   shown to Dr. Hamad when Luca
7   testified about it, Dr. Hamad has
8   not testified viewing the
9   proposal.
10         THE ARBITRATOR:  Overruled.
11  You can answer.
12      A. I didn't.
13      Q. Did your brother have it
14  prepared?
15      A. I don't remember.
16      Q. Were you part of the initial
17  investment group that your brother had
18  put together or did you come on later?
19      A. I came on later.
20      Q. When did you come on?
21      A. Just before the store started,
22  opened.
23      Q. And did his other investors drop
24  off?
25      A. I don't know.



1    CROSS-EXAMINATION OF DR. A. HAMAD
2        Q. Is it fair to say that Bachar
3    has more information as to the earlier
4    business proposal and earlier
5    discussions with Forall?
6        A. Absolutely.
7            MR. BROWN:  I'm going to
8        show what's been introduced
9        already as Exhibit 55 Claimant's
10       10608.  I'm going to share my
11       screen.  I'm going to clear a
12       couple of things up from
13       yesterday.
14       Q. Doctor, can you see my screen?
15       A. Yes.
16       Q. Okay.  I believe this document
17   was shown to you by your counsel
18   yesterday; do you recall that
19   testimony?
20       A. Yes.
21       Q. Okay.  And this document was
22   forwarded to you by your brother on
23   July 18, 2016; do you see that heading?
24       A. Yes.
25       Q. Prior to that time, had you ever

1    CROSS-EXAMINATION OF DR. A. HAMAD
2    seen this correspondence?
3        A. I don't recall.
4        Q. And you testified yesterday that
5    it would have been impossible for you
6    to take back the store after Forall's
7    management because Simon had given you
8    your last warning; isn't that right?
9        A. Yes.
10       Q. And you -- you base that -- I'm
11   sorry.  Hold on one second.  And you
12   base that on this e-mail; is that
13   evidence of that fact?
14       A. I believe so, because my brother
15   receive it and talk to him about it.
16       Q. Okay.  Now, down below there is
17   an e-mail from Bachar to Todd Eads at
18   Simon on February 17, 2018, and do you
19   see this e-mail here?
20       A. Yes, I do.
21       Q. It says, "Good morning, please
22   let me know if you are going to get the
23   store back to Simon and not allow Pal
24   Zileri to take over, so I can sign the
25   paper and send it back to you, thank

1    CROSS-EXAMINATION OF DR. A. HAMAD
2    you"; do you see that?
3        A. Yes, I do.
4        Q. What paperwork was Bachar
5    referencing?
6        A. I don't know.
7        Q. Do you recall that at this time
8    Forall was managing the store under the
9    management --
10       A. Yes, I do.
11       Q. And why was there an on-going
12   effort to get the store back to Simon
13   at this time by Sarah or your brother?
14           MR. LEWIS:  Objection.
15           THE ARBITRATOR:  What's the
16       objection?
17           MR. LEWIS:  Form.
18       Mischaracterizing testimony.
19       "On-going effort to get the store
20       back to Simon."
21           THE ARBITRATOR:  Mr. Lewis,
22       we're in arbitration.  We don't
23       get involved in form unless the
24       witness doesn't really understand
25       it.  Overruled.  You can answer.

1    CROSS-EXAMINATION OF DR. A. HAMAD
2        A. Due to the poor performance of
3    the store, and due to the fact that
4    Simon had since June or July -- I'm
5    sorry -- Forall had since June or July
6    of 2015 a discussion with Simon to see
7    if they need to renew the lease, take
8    over the lease, or find a new space.
9        Q. So why were you going around
10   Forall and Paolo at this time and
11   having discussions directly with Simon
12   about getting the store back to Simon?
13       A. My understanding that Forall
14   never communicated with Simon about
15   taking over the store.  They were given
16   an opportunity to do that and they
17   never did.
18       Q. How do you know that?
19       A. From Todd Eads.
20       Q. When did he tell you that?
21       A. He talked to my brother in
22   January 2016 and he said, "I have not
23   had a conversation with Forall
24   whatsoever since they came to visit me,
25   I think, in August 2015."



CROSS-EXAMINATION OF DR. A. HAMAD
1
2     Pal Zileri went there for two or
3  three days and then disappeared and
4  never replied to his request if he was
5  going to take over and change the lease
6  and so forth.
7     Q. So you have that understanding
8  based on a conversation your brother
9  told me about?
10     A. It is a conversation,
11  absolutely, yes.
12     Q. Did you have that -- any
13  conversation with Todd Eads at that
14  time?
15     A. Not personally, but my brother.
16     Q. So this paperwork -- wasn't this
17  a lease cancellation or a -- similar to
18  what you'd signed in October '14, that
19  it was a letter agreement with Simon to
20  turn back the store or for them to find
21  a replacement tenant?
22     A. Repeat your question.
23     Q. Wasn't this paperwork that
24  Bachar is referencing with Todd that
25  Todd had sent to him, wasn't that a --

CROSS-EXAMINATION OF DR. A. HAMAD
1
2  was it a letter agreement to allow
3  Simon to look for a replacement tenant?
4     A. Not necessarily.
5     Q. Did you or your brother produce
6  any documents regarding what this
7  paperwork was that had been provided by
8  Simon?
9     A. What paperwork?
10     Q. Do you know if you produced any
11  paperwork evidencing what Todd, Simon,
12  purportedly sent to Bachar in February
13  of '15?
14     A. I think he's talking about the
15  same paperwork he did in October 2014.
16         THE ARBITRATOR:  Let's just
17     -- he didn't ask you what you
18     think.  He just asked you a
19     question.  If you have knowledge
20     of something.
21     A. No.
22         THE ARBITRATOR:  Okay.
23     Q. Did you or your brother execute
24  a letter agreement authorizing Simon to
25  find a replacement tenant in or around

CROSS-EXAMINATION OF DR. A. HAMAD
1
2  2016?
3     A. Personally, I don't recall.
4     Q. Did you tell Forall that you
5  were going to be executing a letter
6  agreement authorizing Simon to find
7  another replacement tenant?
8     A. I don't recall.
9     Q. Did you have any conversation
10  with Pal Zileri or anyone at Forall at
11  this time about the management of the
12  store, the management agreement, or the
13  lease?
14     A. Yes.
15     Q. You did?
16     A. I didn't personally, but there
17  was a letter sent.
18         THE ARBITRATOR:  He didn't
19     ask you about that.  He just
20     asked you if you had any
21     conversation.  If he asks you
22     what the conversation is, then
23     you can answer him.
24     A. I believe there was a
25  conversation.

CROSS-EXAMINATION OF DR. A. HAMAD
1
2     Q. By you?
3     A. By -- I don't remember me or my
4  brother, but there was a conversation.
5     Q. But you don't know if you had
6  it?
7     A. I don't recall now, but there
8  was a conversation.
9     Q. Okay.  So I'm going to look at
10  this e-mail that you talked about
11  yesterday from Todd Eads back to
12  Bachar.
13     He says, "Hi, Dr. Hamad, we do
14  not plan to transfer the store to Pal
15  Zileri corporate.  It does not appear
16  the lease allows the assignment to
17  corporate.  Sign the paperwork and
18  return it and we will earnestly begin
19  finding a replacement"; do you see
20  that?
21     A. I see that.
22     Q. Do you remember whether Bachar
23  signed the paperwork at that time and
24  sent it to Todd?
25     A. I don't remember.  I don't know.



Page 26

1    CROSS-EXAMINATION OF DR. A. HAMAD
2    Q. Do you believe that it happened?
3    A. I don't believe at that time,
4    but I don't remember.
5    Q. Okay.  So you testified
6    yesterday that communication by Todd
7    was evidence that it was impossible for
8    you to take back the store in September
9    after the management agreement; do you
10   recall that testimony?
11   A. Absolutely.
12   Q. And let me ask you a question:
13   Who is on the lease with Forum shops?
14   A. Sarah LLC.
15   Q. Is Forall USA or Forall
16   corporate on that lease?
17   A. No.
18   Q. And Mr. Eads says, "The lease
19   does not allow for an assignment to
20   corporate"; do you see that?
21   A. Yes, I do.
22   Q. Do you have an understanding
23   what he is saying there?
24   A. He is saying he doesn't want Pal
25   Zileri to take over the lease.

Page 27

1    CROSS-EXAMINATION OF DR. A. HAMAD
2    (Connection disruption.)
3    Q. -- by Sarah to assign it, do you
4    have an understanding of that?
5    A. No, that's your understanding.
6    Our understanding is that they will not
7    give the lease to Simon.
8    Q. Okay.  But do you understand
9    that Todd is not saying Sarah can't
10   continue to operate the store under the
11   lease?
12   A. Say it again.
13   MR. BROWN:  Maggie, can you
14   repeat that question?
15   (Whereupon, a portion of the
16   record was read back.)
17   A. I don't understand the question.
18   Can you rephrase it?
19   Q. Did Todd Eads say in this e-mail
20   Sarah cannot take back the store after
21   the term of the management agreement?
22   A. He's saying he wants the store
23   back.
24   Q. That's what you think this
25   e-mail says?

Page 28

1    CROSS-EXAMINATION OF DR. A. HAMAD
2    A. Absolutely.  No doubt about it.
3    Q. Okay.  And does Mr. Eads say to
4    you -- to your brother, Simon is
5    terminating the lease in this e-mail?
6    A. He wants -- he wants him to sign
7    the agreement.  Again, repeat that
8    question.
9    MR. BROWN:  Maggie, can you
10   read it back?
11   (Whereupon, a portion of the
12   record was read back.)
13   A. That's what he's implying.
14   Q. But it doesn't say that, does
15   it?
16   A. That's what he's implying.
17   Q. "Yes" or "no", sir, does it say
18   that?
19   A. In my interpretation --
20   THE ARBITRATOR:  He asked
21   you if you have an understanding
22   if it says that.
23   THE WITNESS:  It says that.
24   THE ARBITRATOR:  Okay.  Okay
25   his answer is "yes".

Page 29

1    CROSS-EXAMINATION OF DR. A. HAMAD
2    MR. BROWN:  Okay.
3    Q. At any time, sir, did Simon
4    advise Sarah that it was terminating
5    the lease prior to July -- prior to you
6    -- your Sarah LLC executing the
7    cancelation of lease?
8    A. Repeat that question.
9    Q. At any time prior to Sarah LLC
10   or its representatives executing the
11   cancelation of lease in June of 2016,
12   did Simon ever communicate to you or
13   your brother or anyone else at Sarah --
14   A. Yes.  Through the e-mail.  It
15   appears they want to take the lease
16   back.
17   Q. Okay.  So through this e-mail,
18   this is the communication that you
19   believe says that?
20   A. Absolutely.
21   Q. Were there any other e-mails or
22   communications that say that?
23   A. He talked to my brother on the
24   phone.
25   Q. But anything else in writing?



1  CROSS-EXAMINATION OF DR. A. HAMAD
2     A. He talked to my brother on the
3  phone.  No.
4     Q. Okay.  I'm sorry.  Bear with me.
5  Dr. Hamad, why did your brother forward
6  this e-mail to you on July 18, 2018; do
7  you recall?
8     A. I don't recall.
9     Q. And July 18, 2016, was that
10 right around the time you had advised
11 Forall that you were -- that you had
12 canceled the lease?
13    A. July what?
14    Q. Let me rephrase that question.
15       Did you ever advise Forall that
16 you canceled the lease in June of 2016?
17    A. Yes.  I think there was a --
18 yes.
19    Q. You would -- okay.  When was
20 that?
21    A. I don't remember that date, but
22 was late June I think.
23    Q. And --
24    A. Early July.
25    Q. In that letter, did you -- did

1  CROSS-EXAMINATION OF DR. A. HAMAD
2  your lawyer state that Sarah had
3  canceled and voluntarily surrendered
4  the lease?
5     A. I don't recall the language of
6  the letter.
7     Q. But you never had any
8  conversation or wrote any
9  correspondence to that effect?
10    A. With who?
11    Q. With anyone.
12    A. I don't understand your
13 question.
14    Q. Did you -- did you --
15       THE ARBITRATOR:  Go ahead.
16    Q. Did you, yourself, have any
17 communications or correspondence
18 advising Forall that you had terminated
19 and voluntarily surrendered the lease
20 in June of 2016?
21    A. From the prior agreement, we
22 needed six months.
23       THE ARBITRATOR:  He didn't
24    ask you that.  He just asked you
25    if you had any correspondence.

1  CROSS-EXAMINATION OF DR. A. HAMAD
2     THE WITNESS:  Yes.
3     THE ARBITRATOR:  Okay.
4     Q. What were those correspondence?
5     A. The e-mail -- exchanged e-mail
6  between us and Paolo about the six
7  months notice and mail it to the -- to
8  the management agreement.
9     Q. And those e-mails you just
10 referred to, were those sent prior to
11 the execution of the management
12 agreement, which was executed in March
13 of 2015?
14    A. Close to the management
15 agreement, yes.
16    Q. But nothing after that point in
17 time?
18    A. I had a couple of phone
19 conversations with Paolo about this
20 issue, but that's around the execution
21 time for the management agreement.
22    Q. Okay.
23       MR. BROWN:  Okay.  I'm going
24    to put in front of the witness
25    what's been Joint Exhibit 236,

1  CROSS-EXAMINATION OF DR. A. HAMAD
2     Claimant's 000634.  Share my
3     screen.
4     Q. Dr. Hamad, I'd ask you to look
5  at this e-mail from Todd Eads to Bachar
6  Hamad.
7     A. That was July 2015, yes.
8     Q. Right.  And then up above, it
9  looks like it was forwarded from Bachar
10 to Lee Levin and yourself; do you see
11 that?
12    A. Yes.
13    Q. And Lee Levin is whom again?
14    A. He was our lawyer.
15    Q. Do you know what Todd Eads is
16 asking your brother here about?
17    A. He's asking for a set up of a
18 call.
19    Q. Who is MCM?
20    A. I have no clue.
21    Q. Do you know what Crystal's is?
22    A. I think that's Crystal mall.
23    Q. Is that a mall in Vegas?
24    A. Yes.
25    Q. And why did Bachar send this to



Page 34

CROSS-EXAMINATION OF DR. A. HAMAD
1       CROSS-EXAMINATION OF DR. A. HAMAD
2   you and Lee Levin in July of '15?
3       A. I don't know.
4       Q. Were you trying to get the lease
5   back to Simon at this point and get out
6   from underneath it and the obligation
7   and guaranty that was on the lease?
8       A. No.  We never send -- we never
9   did.  I don't remember.
10      Q. All right.  So you don't
11  remember if you were trying to, in July
12  of 2015, get out from underneath the
13  lease?
14      A. I don't think we did, but I can
15  -- I don't remember, but I don't think
16  we did.  And as far as -- can I make a
17  comment?
18          THE ARBITRATOR:  No.  Make a
19  note in your pad.
20          THE WITNESS:  Okay.
21      Q. How many times did Sarah request
22  rent reductions from Simon during its
23  tenure under the lease approximately?
24      A. Twice.
25      Q. When were those times?

Page 35

CROSS-EXAMINATION OF DR. A. HAMAD
1       CROSS-EXAMINATION OF DR. A. HAMAD
2       A. I don't remember the dates.
3       Q. Did you ever receive any rent
4   reductions?
5       A. No.
6       Q. Who negotiated the lease on
7   behalf of Simon principally?
8       A. My brother.
9       Q. Were you involved in that
10  process?
11      A. No.
12      Q. Do you recall seeing that chart
13  yesterday that Luca Spano was
14  testifying about that he created, and
15  it stated that Sarah had purchased over
16  2.2 million dollars of product during
17  its 2011 to 2013 operation of the
18  store; do you recall that?
19      A. Recall seeing it.
20      Q. And then you testified that
21  there was no way that Sarah purchased
22  that amount?
23      A. As far as I know.
24      Q. What were you basing that
25  testimony on?

Page 36

CROSS-EXAMINATION OF DR. A. HAMAD
1       CROSS-EXAMINATION OF DR. A. HAMAD
2       A. Based on our accounting, I
3   think, if I remember.
4       Q. But can you point to a specific
5   document or documents that, you know,
6   set forth the amount that Sarah did, in
7   fact, purchase from Forall?
8       A. I know the last season, 2013
9   order, was done by Alfonso Entebi, so
10  there was no way -- and I was -- that
11  was for the fall, winter season.
12         So typically, we do the order
13  for the spring -- I'm sorry -- for the
14  -- the fall, winter.
15      Q. I asked you if there was a
16  document you could point to.
17      A. Your document.  The table you
18  showed me.
19      Q. Okay.  Thank you.  You said you
20  sold inventory when Italnord took over
21  the store in the back of the store, is
22  that right, the inventory that you had?
23      A. Yes.  Absolutely.
24      Q. Had you carved out Sarah's
25  inventory of Pal Zileri products out of

Page 37

CROSS-EXAMINATION OF DR. A. HAMAD
1       CROSS-EXAMINATION OF DR. A. HAMAD
2   the asset purchase agreement with
3   Italnord?
4       A. I didn't hear you.  Say it
5   again.
6       Q. Did you carve the inventory out
7   of the asset purchase agreement?
8       A. What do you mean?
9       Q. Did you specifically exclude it
10  such that you could sell it?
11      A. It was a left-over inventory.
12  We took it out and sold it.  Yeah.  Our
13  inventory.
14      Q. Okay.
15          THE ARBITRATOR:  Sorry.  I
16  think yesterday we looked at that
17  agreement.  It was little F, as I
18  recall.
19          MR. BROWN:  Right.  Thank
20  you.  Sorry.  My computer is
21  frozen, it seems.  That's not
22  good.
23      Q. I believe yesterday you
24  testified that there was issues with
25  products being delivered by Forall, and



Page 38

1  CROSS-EXAMINATION OF DR. A. HAMAD
2  you were referring to an inventory
3  e-mail from Ghanem Musalimi, who worked
4  for Sarah to Luca Spano, right, do you
5  recall that testimony?
6      A. Yes, I do.
7      Q. And I'm specifically referring
8  to Exhibit 15. Mr. Lewis had shown you
9  Exhibit 15.
10     MR. BROWN: This is
11  measurably more difficult remote.
12  I apologize.
13     Okay.
14     Q. Doctor, do you recall looking at
15  this e-mail yesterday, updated
16  inventory from January '12?
17     A. Yeah.
18     Q. Okay. Do you know if this issue
19  was resolved by Luca?
20     A. I don't remember, but it was an
21  issue at that time.
22     Q. Okay. Okay. I'd like you to
23  look at this document, which is
24  Claimant's 3087. I'll give you an
25  exhibit number in a second.

Page 39

1  CROSS-EXAMINATION OF DR. A. HAMAD
2  Exhibit 354 in the Joint Exhibit list.
3      You see here where Luca says on
4  February 15, 2012, "Dear all, yesterday
5  I met with Ghanem at the Pal Zileri in
6  Vegas. He confirms with me that the
7  inventory taken for A/W2011 matches
8  invoices so forth. The spreadsheet
9  sent by Gina is accurate and should be
10  considered as final for the season"; do
11  you see that?
12     A. Yes.
13     Q. And Gina -- do you know who
14  Gina is?
15     A. No, I don't.
16     Q. Do you see her name down here,
17  Gina Sedlarcik at Palma Settimi Inc.
18  dot com?
19     A. Yes.
20     Q. Palma Settimi handled the back
21  office for Forall?
22     A. Okay.
23     Q. Do you know that or --
24     A. No, I don't. I'm taking your
25  word.

Page 40

1  CROSS-EXAMINATION OF DR. A. HAMAD
2      MR. BROWN: Mr. Farber, I
3  think I'm going to request a
4  ten-minute break. I do
5  apologize. I'm a little
6  plumished with some of these
7  exhibits, and I want to get a
8  little better order without
9  waiting anyone's time. Can I
10  request that?
11     THE ARBITRATOR: All right.
12  Why don't -- we'll give you that
13  courtesy. Guys, let's take a
14  ten-minute break, and maybe we'll
15  shorten up our mid morning break
16  later because we've only been at
17  it a little less than an hour.
18  So, guys, let's pause for 10
19  minutes.
20     MR. BROWN: Thank you so
21  much.
22     (Whereupon, a recess was
23  taken at this time.)
24     THE ARBITRATOR: Mr. Brown,
25  why don't you proceed.

Page 41

1  CROSS-EXAMINATION OF DR. A. HAMAD
2      Q. Dr. Hamad, did you ever work in
3  the Pal Zileri store at the Forum
4  shops?
5      A. Did I ever work?
6      Q. Yeah.
7      A. No, I didn't.
8      Q. Did you live in Chicago in all
9  times that you had the store or your
10  wife had the store down in Las Vegas?
11     A. Yes.
12     Q. How about Bachar, did he ever
13  work in the store?
14     A. I don't believe so.
15     Q. How about his wife?
16     A. I don't believe so.
17     Q. Did they reside up near Chicago
18  at all times that Sarah operated the
19  store?
20     A. Yes.
21     Q. All right. I'm going to show
22  you what's been marked Exhibit 321, the
23  license agreement. Have you seen this
24  document before?
25     A. Yes, I did.



Page 42

CROSS-EXAMINATION OF DR. A. HAMAD
1
2     Q. You're familiar with it?
3     A. Yes.
4     Q. Were you -- was Sarah
5  represented by counsel when it entered
6  into this agreement?
7     A. Yes.
8     Q. Who -- who was that?
9     A. Lee Levin.
10    Q. And he is based out of Chicago?
11    A. I believe so.
12    Q. Did you refer to this document
13 when you claimed that the construction
14 cost were not reimbursed to Sarah in a
15 proper manner?
16    A. I refer to that discount, yes.
17    Q. Okay.  Do you -- how did you
18 determine that you -- that Sarah was
19 still owed construction money by
20 Forall?
21    A. At the end there was $38,000
22 left supposed to be paid for the last
23 season, but the last season was taken
24 by Alfonso so it was deferred to him.
25    Q. And was that $38,000 number, was

Page 43

CROSS-EXAMINATION OF DR. A. HAMAD
1
2  that calculated by Luca Spano?
3     A. I don't remember who calculated
4  it.
5     Q. Did you calculate it?
6     A. I know there was $38,000 left.
7     Q. But did you calculate that
8  amount?  Did you track the construction
9  cost and the reimbursement that were
10 given against product by Forall?
11    A. I believe so.
12    Q. You did?
13    A. I didn't calculate it, but I
14 believe that was the number left from
15 the construction.
16    Q. Do you have any documents that
17 support this $38,000 credit that you
18 believe Sarah was owed when you turned
19 the store over to Italnord?
20    A. It was a discussion with Luca.
21       THE ARBITRATOR:  He didn't
22    ask you about discussions.  He
23    asked you if you had any
24    documents.
25    A. There was some exchange e-mails.

Page 44

CROSS-EXAMINATION OF DR. A. HAMAD
1
2     Q. By whom?
3     A. By Luca and Italnord, if -- I
4  believe, if I'm not mistaken.
5     Q. Can you tell me specifically
6  when that was?
7     A. At that time or before or during
8  the time we had discussions with
9  Italnord and Luca prior to taking over
10 the store.
11    Q. So isn't it true that Luca
12 calculated that $38,000 figure?
13    A. It was joint calculation between
14 him and my brother, if I'm not
15 mistaken.
16    Q. But not you?
17    A. I was a part of the discussion.
18    Q. Did you do the calculation?  Did
19 you --
20    A. No, I didn't.
21    Q. You were a guarantor to these
22 obligations in the license agreement by
23 Sarah; isn't that correct?
24    A. Yes.
25    Q. Do you see your wife's signature

Page 45

CROSS-EXAMINATION OF DR. A. HAMAD
1
2  on this page?
3     A. Yes.
4     Q. Which signature is it?
5     A. Suhad Albasha.
6     Q. Right here where I have my
7  cursor?
8     A. Yes.
9     Q. Do you recognize this document
10 that's entitled "Guaranty"?
11    A. Yes.
12    Q. And is this the guaranty you
13 executed guaranteeing the obligation of
14 Sarah to Forall?
15    A. Yes.
16    Q. And do you see your name and
17 signature on this page?
18    A. Why.
19    Q. And is that your Social Security
20 next to your name here?
21    A. Yes.
22    Q. And is your wife's signature on
23 this page?
24    A. Yes.
25    Q. And how about your brother's, do



1      CROSS-EXAMINATION OF DR. A. HAMAD
2   you recognize his signature here?
3      A. That's probably his signature,
4   yes.
5      Q. Now, you said you didn't
6   negotiate or sign the lease by Sarah to
7   Forum shops; is that correct?
8      A. Yes.
9      Q. Do you know if your wife signed
10  that document as a member of Sarah LLC?
11     A. I think she did.
12     Q. Okay. I'm putting another
13  exhibit. It's the management agreement
14  between Italnord and Sarah. Just bear
15  with me on an exhibit number. I
16  apologize. It's Exhibit Number 7. My
17  apologies.
18        Dr. Hamad, do you recognize this
19  document?
20     A. Yes.
21     Q. And yesterday your counsel was
22  stepping you through the asset purchase
23  agreement with Italnord; isn't that
24  correct; do you recall that testimony?
25     A. Yes.

1      CROSS-EXAMINATION OF DR. A. HAMAD
2      Q. Did this management agreement
3   accompany that management purchase agreement
4   at the time that Sarah engaged the
5   management services of Italnord?
6      A. Repeat the question.
7      Q. Did this -- was this management
8   agreement part of the transition of the
9   store from Sarah to Italnord during the
10  management term?
11     A. Yes.
12     Q. Okay. And do you see -- is it
13  your testimony that there was some sort
14  of novation or a relinquishment of
15  rights --
16        MR. LEWIS: Objection.
17     Q. -- as a result of management?
18        THE ARBITRATOR: Let him
19  finish the question, Mr. Lewis.
20  Why don't you start again from
21  the start.
22     Q. Okay. Sir, are you aware of the
23  fact that in this lawsuit that was
24  commenced by Sarah and yourself and the
25  other parties that you claim that there

1      CROSS-EXAMINATION OF DR. A. HAMAD
2   was a novation or a relinquishment of
3   certain rights when Pal Zileri -- I
4   mean when the Pal Zileri store was
5   managed by Italnord in September of
6   '13?
7      A. What do you mean?
8      Q. Let's go at this a different
9   way. I apologize.
10        So you see under Section 2.1 it
11  says, "This agreement shall be
12  effective from the effective date and
13  shall continue until January 31, 2015,
14  the expiration date"?
15     A. Yes.
16     Q. Did you understand when this
17  document was executed by the parties
18  that Italnord was coming in for a
19  period of time to manage the store, but
20  Sarah was continuing to be on the lease
21  and have responsibility under the
22  license agreement with Forall?
23     A. Sarah LLC will be responsibility
24  for the lease [sic]. Italnord will
25  come and manage and build credit, until

1      CROSS-EXAMINATION OF DR. A. HAMAD
2   they have enough credit, so they can
3   take over the lease.
4         THE ARBITRATOR: Right. But
5   the second part of his question
6   is: Did you understand that
7   Sarah still had responsibility
8   under the license agreement?
9         THE WITNESS: For the lease,
10  yes.
11     Q. And what about for the license
12  agreement with Forall?
13     A. My understanding is he created
14  his own license purchasing agreement
15  with Forall.
16        THE ARBITRATOR: Okay. But
17  he didn't ask you about what he
18  did. He asked you if your
19  understanding was that Sarah
20  still had        responsibility
21  --
22        THE WITNESS: No.
23  Absolutely not.
24     Q. And what was that based on?
25     A. Based on the asset purchase



Page 50

CROSS-EXAMINATION OF DR. A. HAMAD
1    CROSS-EXAMINATION OF DR. A. HAMAD
2  agreement, he bought the license
3  purchasing agreement, and based on the
4  fact that he created his own license
5  purchasing agreement to operate in the
6  store.
7     Q. Were you -- were you ever
8  provided with a copy of that purported
9  license agreement between Italnord and
10 Forall?
11    A. No.  But I was told he has one.
12    Q. But you never saw it?
13    A. No.
14    Q. And were there any -- was -- is
15 there anything in this agreement that
16 says that the license agreement is
17 terminated by Forall in this management
18 agreement or the asset purchase
19 agreement?
20    A. In the asset purchase agreement,
21 yes.  Not by Forall, but there was --
22 it was an asset purchase agreement.
23    Q. But Forall wasn't party to the
24 asset purchase agreement?
25    A. Forall facilitated both

Page 51

1    CROSS-EXAMINATION OF DR. A. HAMAD
2  agreements.
3     Q. But was it a party or signatory
4  to that agreement?
5     A. They facilitate both agreements.
6        THE ARBITRATOR:  He didn't
7  ask you that.  He asked you if
8  knew if Forall was a party to the
9  agreement.
10       THE WITNESS:  It was --
11 Honor, they facilitated.  They
12 were part of it.  They were aware
13 of it.
14    Q. Okay.  Let me show you this
15 document here at the top.  This
16 management agreement, who is this
17 agreement between?
18    A. Italnord and Sarah LLC.
19    Q. Okay.  All right.  And this is a
20 copy of the asset purchase agreement.
21 Okay.  And that is Exhibit 6, I
22 apologize.
23     Have you seen -- you were
24 testifying about this document
25 yesterday, right?

Page 52

1    CROSS-EXAMINATION OF DR. A. HAMAD
2     A. Yeah.
3     Q. And this agreement, who is it
4  between?
5     A. Italnord and Sarah LLC.
6     Q. And I want to take you to
7  Section 1.1 B, little two.  This right
8  here, okay?
9      Do you see this says, "A license
10 to use during the term, all contracts
11 of seller utilizing" --
12    A. What is this?
13    Q. I'm just reading section two
14 here.
15    A. Okay.
16    Q. "A license to use during the
17 term as defined in Section 4.4 of this
18 agreement, all contracts of seller
19 utilizing in the operation of the
20 business, which were exclusive to
21 seller, which are assignable by seller
22 and accepted by purchaser, included but
23 not limited to the seller's license and
24 retail operation agreement with Forall
25 Inc., Forall, which provides seller's

Page 53

1    CROSS-EXAMINATION OF DR. A. HAMAD
2  right to sell goods with the Pal Zileri
3  name and utilize that name in the
4  operations and advertising," and then
5  it defines parenthetically the license
6  agreement.  Okay.
7      So the arrangement between
8  Italnord and Sarah was to license the
9  license agreement for the store; isn't
10 that right?
11    A. License and license purchasing
12 agreement.
13    Q. Right.  And does it say -- what
14 was the term?  What was that referring
15 to?  What was your understanding that?
16    A. Our understanding that he took
17 over the license agreement for the
18 store and a license purchasing
19 agreement.
20    Q. But it was a license, it wasn't
21 a transfer, right?
22    A. He created his own license.  Our
23 license stopped.  There was no
24 enforcement.  It was transferred to
25 him.



CROSS-EXAMINATION OF DR. A. HAMAD
1
2    Q. Does that say this here in this
3  agreement anywhere?
4    A. It says, "License agreement,"
5  our interpretations for both of them --
6        THE ARBITRATOR:  Dr. Hamad,
7  hang on a minute.  Do you know if
8  there is any document that was
9  signed by Forall which said that
10 the license agreement between
11 Forall and Sarah stopped?
12       THE WITNESS:  Are you asking
13 me that question, Your Honor?
14       THE ARBITRATOR:  Do you know
15 if there is any document signed
16 by Forall which said that the
17 license agreement between Forall
18 and Sarah stopped?
19       THE WITNESS:  Are you asking
20 me that question?
21       THE ARBITRATOR:  I am, Dr.
22 Hamad.  You can call me Mr.
23 Farber.  The question simply is,
24 you just testified that the
25 agreement between Forall and

CROSS-EXAMINATION OF DR. A. HAMAD
1
2  Sarah stopped.  And my question
3  is:  Do you know of any writing
4  that says that the license
5  agreement between Sarah and
6  Forall stopped?
7        THE WITNESS:  Those two
8  agreements were approved by
9  Forall, and my lawyer told me --
10       THE ARBITRATOR:  Hang on a
11 minute.  Look, this is up to Mr.
12 Lewis now.  The law says that you
13 don't have to testify about
14 conversations with your lawyer,
15 but you are free to if Mr. Lewis
16 allows you to testify about
17 conversations with your lawyer.
18 Then Mr. Brown is going to be
19 free to ask questions about those
20 conversations.
21       So before you testify about
22 anything that your lawyer had
23 with you in the nature of
24 conversations --
25       Mr. Lewis, are you allowing

CROSS-EXAMINATION OF DR. A. HAMAD
1
2  him to continue to testify or
3  not?
4        MR. LEWIS:  Well, it's
5  certainly his privilege to waive,
6  but I want to advise him about
7  the consequences of that.
8        So if you get into
9  conversations you had with your
10 prior attorneys, then Mr. Brown
11 can probe those conversations and
12 the privilege would be waived.  I
13 want to just remind you, the
14 question is whether you're aware
15 of a writing where Forall
16 released Sarah from the license
17 agreement.
18       THE ARBITRATOR:  That is
19 correct.  So Mr. Lewis is quite
20 right, I asked about a writing
21 and you were beginning to respond
22 about conversations with your
23 lawyer.
24       And Dr. Hamad, I cut you off
25 because I wanted to be sure you

CROSS-EXAMINATION OF DR. A. HAMAD
1
2  were aware of your rights in that
3  regard.
4        THE WITNESS:  Okay.  Thank
5  you, sir.
6        THE ARBITRATOR:  Okay.  So
7  my question then is:  Do you know
8  of a writing that specifically
9  says that the agreement, the
10 license agreement, between Sarah
11 and Forall stopped?
12       THE WITNESS:  This is the
13 only document I have.
14       THE ARBITRATOR:  Okay.
15       THE WITNESS:  No.
16       THE ARBITRATOR:  Okay.
17 Thank you.  All right.  Go ahead,
18 Mr. Brown.
19    Q. Okay.  Thank you, sir.  Under
20 Section 1.2, I'm sorry, 1.3, "Purchase
21 price"; do you see this?
22    A. Yes.
23    Q. Did Sarah receive $140,000
24 payment from Italnord to -- for the
25 management term?



1    CROSS-EXAMINATION OF DR. A. HAMAD
2        A. Yes.
3        Q. And Section 1.4, the lease
4    deposit it says, "In addition to the
5    purchase price, purchaser shall provide
6    seller were a refundable deposit equal
7    to $65,000 representing one month's
8    rent of the premises of the lease"; do
9    you see that?
10       A. $65,000, yes, he did.
11       Q. And so during the term of the
12   management agreement by Italnord, did
13   Sarah or any of Sarah's owners or
14   people, the guarantors, have to pay
15   rent during that intervening period of
16   time?
17       A. No, I don't remember.
18       Q. Is it no or you don't remember?
19       A. At the end of the agreement, he
20   stayed an extra month, Italnord, he was
21   supposed to leave in January 31st.
22           THE ARBITRATOR: Hang on.
23   Let's go back to the question,
24   and we'll try to get an answer.
25   Can you restate the

1    CROSS-EXAMINATION OF DR. A. HAMAD
2    question?
3        Q. During the term that Italnord
4    managed the store, did Sarah or any of
5    its guarantors have to pay the rent?
6        A. No.
7        Q. And you see on 1.4 B, "Pay to
8    seller $38,000 which is due from Forall
9    to seller, the Forall payment.
10   Purchaser shall seek reimbursement of
11   the Forall payment from Forall"; do you
12   see that?
13       A. Yes.
14       Q. Did Italnord pay to Sarah or any
15   of its guarantors $38,000 at the
16   commencement of the management
17   agreement?
18       A. I don't recall.  I don't
19   remember.  I don't think he did.
20       Q. What are you basing that on?
21       A. Based on the only payment of
22   $140,000.
23       Q. How do you -- do you have
24   documents that you're referring to or
25   are aware of that reference that?

1    CROSS-EXAMINATION OF DR. A. HAMAD
2        A. Not in my hands, but I know the
3    $38,000 was not paid.
4        Q. But you don't know what -- did
5    you have a closing statement or binder
6    for this?
7        A. I don't have it now, but I know
8    he did not pay the $38,000.
9        Q. Would your attorney have let you
10   hand over the management of the store
11   without receipts of this payment?
12           MR. LEWIS:  Objection.
13           THE ARBITRATOR:  What's the
14   basis for the objection?
15           MR. LEWIS:  Privileged and
16   speculation.
17           THE ARBITRATOR:  Sustained
18   on the basis of privilege.
19           MR. BROWN:  Well, I'm
20   calling for a hypothetical, I
21   suppose.
22       Q. Would -- who received the checks
23   for -- from Italnord when this
24   management agreement was entered into?
25       A. I don't remember, honestly.

1    CROSS-EXAMINATION OF DR. A. HAMAD
2        Q. But you know there was -- that's
3    $140,000 was paid?
4        A. Absolutely.  I know he paid the
5    $140,000, but I don't remember at all
6    paying the $38,000.
7        Q. Okay.  Was there any follow up
8    to Italnord that he -- he was in
9    default of this agreement by not paying
10   that amount that you recall?
11       A. There were repeated efforts with
12   Forall and him to collect the money,
13   but I don't remember exactly when, I
14   mean, just right after.
15       Q. Can you refer me to any
16   documents evidencing that?
17       A. I think there were conversations
18   throughout.
19           THE ARBITRATOR:  So Dr.
20   Hamad, why did Forall tell you
21   that in these conversations that
22   they didn't want to pay you the
23   $38,000?
24           THE WITNESS:  Because it was
25   the last season of our management



Page 62

CROSS-EXAMINATION OF DR. A. HAMAD
1
2    agreement, Honor, and they said
3    it's not due.  That's why.
4         THE ARBITRATOR:  And why did
5    this agreement which Mr. Brown
6    has now put up on the screen say
7    that you were going to get paid
8    $38,000 in that little B over
9    there, 1.4 B, from Italnord?  Why
10   would Italnord pay that same
11   number to you?
12        THE WITNESS:  Because that
13   was the last amount of build out
14   of the construction.
15        THE ARBITRATOR:  So why is
16   the obligation to pay it shifted
17   from Forall to Italnord?
18        THE WITNESS:  And this is
19   why we were wondering.  We didn't
20   know.  And second, because he was
21   occupying the space in the last
22   season of our -- I mean after
23   our --
24        THE ARBITRATOR:  Hang on.
25   I'm not understanding this.  This

Page 63

CROSS-EXAMINATION OF DR. A. HAMAD
1
2    is a document that you and
3    Italnord signed.
4         THE WITNESS:  Right.
5         THE ARBITRATOR:  Are you
6    tell me that you went ahead and
7    you signed a document that says
8    you -- by "you," I mean Sarah
9    signed.  You signed a document
10   that said Italnord is going to
11   pay you $38,000 and you didn't
12   know the reason for that?
13        THE WITNESS:  No.  I knew
14   the reason is the build out
15   construction of the store left
16   over.
17        THE ARBITRATOR:  So it goes
18   back to my prior question.  If
19   you entered into an agreement
20   that Italnord had to pay the
21   $38,000, why is it that Forall is
22   still responsible for the
23   $38,000?  That's what I'm trying
24   to understand.
25        THE WITNESS:  He didn't pay

Page 64

CROSS-EXAMINATION OF DR. A. HAMAD
1
2    it, Honor, and it shifted to him,
3    so it was forced on us.  I'm
4    being honest with you.
5         THE ARBITRATOR:  You mean
6    Italnord -- I thought you said
7    you didn't remember if they paid
8    it or not.  Now you're saying --
9         THE WITNESS:  They did not
10   pay it.  I'm telling you they did
11   not pay it.  But the way it
12   happened is it shifted to him and
13   it was supposed to be given to
14   him later on; that's how it
15   worked.  They were supposed to
16   pay us some money and they were
17   supposed to give him a credit for
18   $38,000.
19        THE ARBITRATOR:  Who is
20   "they"?
21        THE WITNESS:  Forall.  So
22   later on they give him a credit
23   for $38,000, and the gentleman
24   never paid the $38,000 to us.
25        THE ARBITRATOR:  So you know

Page 65

CROSS-EXAMINATION OF DR. A. HAMAD
1
2    that Forall did give a credit for
3    $38,000, but they gave it to
4    Italnord, right?
5         THE WITNESS:  Yes.  My
6    understanding, that's what
7    happened.
8         THE ARBITRATOR:  So, Dr.
9    Hamad, I'm trying to understand
10   this.  Mr. Lewis and Mr. Shah, on
11   your behalf, have asserted a
12   claim here against Forall for
13   $38,000 on the build out, and I
14   think you just told me that they
15   gave a credit to Italnord for
16   that same amount, except that
17   Italnord never paid you.
18        THE WITNESS:  Right.
19        THE ARBITRATOR:  Okay.  All
20   right.  Go ahead, Counselor.
21   Q.  So it's your testimony, though,
22   that this agreement was put in place
23   and Italnord took over management of
24   the store, but they never paid you the
25   $38,000 despite what it's saying that



Page 66

CROSS-EXAMINATION OF DR. A. HAMAD

1     CROSS-EXAMINATION OF DR. A. HAMAD
2  it was an obligation to be done under
3  1.4 here?
4     A. The obligation was for Forall to
5  pay us.  But they shifted the game and
6  they made -- they made Italnord
7  responsible for it.
8     Q. That's not my question.  My
9  question is:  Your testimony today
10  under oath is that this $38,000 was not
11  received by Sarah or any of its
12  guarantors at the time of the
13  management agreement, even though it's
14  a condition under this agreement here?
15     A. Yes.
16     Q. Did you ever seek any -- to
17  enforce this provision with Italnord?
18     A. We talked to both of them,
19  Forall and Italnord.
20     Q. Did you ever peruse any legal
21  action against Italnord on the basis of
22  the nonpayment of $38,000?
23     A. No.
24     Q. Did you -- you were present for
25  Luca Spano's testimony yesterday,

Page 67

CROSS-EXAMINATION OF DR. A. HAMAD

1     CROSS-EXAMINATION OF DR. A. HAMAD
2  right, when he was going through his
3  spreadsheet where in he calculated the
4  $38,000 construction credit?
5     A. Yes.
6     Q. And you saw his multi colored
7  exhibit where he had done those
8  calculations, right?
9     A. I remember vaguely, yes.
10     Q. And do you recall him state that
11  he -- that the construction credits
12  given to Sarah were actually $512,000,
13  whereas the -- half of the construction
14  totaled $474,000?
15     A. I have to take a look at it
16  again, but -- again, I have to take a
17  look.
18     Q. Okay.  And isn't it true that
19  Forall actually credited Sarah more
20  money than 50 percent of the
21  construction build out cost?
22     A. No.
23     Q. You, yourself, ever compile
24  those calculations and run numbers
25  related to the construction costs and

Page 68

CROSS-EXAMINATION OF DR. A. HAMAD

1     CROSS-EXAMINATION OF DR. A. HAMAD
2  the credits that were due from Forall?
3     A. At that time, the only thing
4  left is the $38,000.  That's it.
5     Q. And isn't that -- didn't that
6  number come from Luca and not yourself
7  or anyone at Sarah?
8     A. If you go back to his sheet,
9  those were orders.  Again, I -- he made
10  his numbers.  I don't know.  I'm
11  telling you the only thing left is
12  $38,000.
13     Q. Okay.  But you didn't have your
14  own independent calculation for that --
15  that credit due, did you?
16     A. At that time we were calculating
17  everything with him and there was a
18  $38,000 left.
19     Q. Okay.  I'm going to Section 1.7.
20  It says, "No assumptions of
21  obligations," this is in the asset
22  purchase agreement, and highlighting
23  this last sentence that says,
24  "Notwithstanding anything in this
25  agreement to the contrary, purchaser is

Page 69

CROSS-EXAMINATION OF DR. A. HAMAD

1     CROSS-EXAMINATION OF DR. A. HAMAD
2  not assuming the lease or the license
3  agreement in full; it is only assuming
4  seller's performance and payment
5  obligations during the term, as defined
6  in Section 4.4 of this agreement under
7  the lease, license agreement, and other
8  operational contracts listed on
9  Schedule 1.1 little C, Roman numeral
10  four"; do you see that?
11     A. Yes.
12     Q. Isn't this provision stating
13  that Italnord is only responsible
14  during the term for both the lease and
15  the license agreement, but it's not
16  assuming it -- either of those
17  agreements from Sarah?
18     A. To my understanding, the lease
19  only is not assuming.
20     Q. Okay.  And are you basing that
21  on this language or some other
22  document?
23     A. On the previous language.  On
24  the previous item you showed me.
25     Q. Within the same asset purchase



CROSS-EXAMINATION OF DR. A. HAMAD

1
2 agreement?
3     A. I think so.
4     Q. What provision, specifically?
5     A. The one you showed me earlier,
6 that he's assuming the license and
7 everything.
8     Q. Okay. So that section 1.1 B,
9 little two, right, that's what you're
10 referring to here? A license to you --
11    A. I think so.
12        THE ARBITRATOR: Dr. Hamad,
13 let me just try to ask you this
14 again, because I'm -- I'm trying
15 to understand your testimony in
16 this regard.
17        Mr. Brown, could you just go
18 back to the $38,000 clause in
19 this agreement?
20        MR. BROWN: Right here.
21 Yup.
22        THE ARBITRATOR: Look, I'm
23 going to ask you in plain -- not
24 lawyer's language, but plain
25 language. I mean, you are coming

CROSS-EXAMINATION OF DR. A. HAMAD

1
2 to me through your lawyer,
3 lawyers, Mr. Lewis and Mr. Shah,
4 and you're asking me to direct
5 Forall to pay you the $38,000 for
6 the unpaid construction costs.
7        And yet, you just told me
8 that the $38,000 was credited by
9 Forall to Italnord and this 1.4 B
10 clearly says that Italnord is
11 supposed to pay you the $38,000
12 and they didn't.
13        So -- and you're also
14 telling me that you never got
15 paid the $38,000 at the closing.
16 I don't know why. And you're
17 also telling me that you never
18 went against Italnord to try to
19 get the $38,000.
20        Can you explain to me, from
21 your understanding, why I should
22 order Forall to pay the $38,000
23 again when you've just told me
24 they gave the credit for that
25 amount to Italnord?

CROSS-EXAMINATION OF DR. A. HAMAD

1
2        And I see here a document
3 that Sarah signed saying that the
4 money is supposed to come from
5 Italnord, and they just never
6 paid. So could you explain that,
7 because I'm trying to understand
8 it?
9        THE WITNESS: Okay. Can you
10 go back? When was this document
11 signed?
12        THE ARBITRATOR: Looks like
13 September 10, '13.
14        THE WITNESS: And then when
15 did Italnord move in?
16        THE ARBITRATOR: Well, you
17 would know better than me.
18        THE WITNESS: They moved in
19 around September 9th or 10th,
20 Honor.
21        THE ARBITRATOR: Okay.
22        THE WITNESS: So there was
23 no way, really, at that point to
24 try to collect the money right
25 away from him. So he was already

CROSS-EXAMINATION OF DR. A. HAMAD

1
2 in the store, if I'm not
3 mistaken.
4        So we were good citizens
5 trying to facilitate everything
6 in order for the store to keep
7 moving forward. It's not about
8 the money. $38,000 is $38,000,
9 but the principle that we were
10 really good citizens.
11        We did everything we can to
12 help the store move forward and
13 signed the agreement at the time
14 or just a day or two before or
15 after, I can't remember, but at
16 the time when he moved in he
17 promised to pay it. It was
18 shifted and never paid it.
19        THE ARBITRATOR: When you
20 say, "he promised to pay," you
21 mean Entebi, right?
22        THE WITNESS: Right. So we
23 were hooked in the middle of
24 this. They shifted this to this,
25 and they shifted this to that,



Page 74

CROSS-EXAMINATION OF DR. A. HAMAD
1
2 and we got caught in the middle
3 of this.  We were good citizens
4 trying to help the store move
5 forward.
6        THE ARBITRATOR:  Let me ask
7 this one final time and then I'll
8 leave it alone, but you're
9 telling me that Forall already
10 paid it because they gave a
11 credit to Mr. Entebi, so what
12 reason should I have to agree
13 with what Mr. Lewis is arguing
14 for on your behalf that I should
15 now order Forall to pay it again?
16        THE WITNESS:  It was almost,
17 like, forced on us to do this.
18 So we had no choice but to move
19 forward with the store, so I
20 apologize to you, Honor, however,
21 what was promised was not done.
22        THE ARBITRATOR:  All right.
23 Let me ask you something else,
24 what Mr. Brown is asking you
25 about right now.

Page 75

CROSS-EXAMINATION OF DR. A. HAMAD
1
2        Mr. Brown, could you flip
3 back to 1.7?
4        MR. BROWN:  Certainly.
5        THE ARBITRATOR:  So I'm
6 going to ask you the same kind of
7 question, and it relates to the
8 last questions that Mr. Brown
9 asked.
10        So I read a document and the
11 document is signed by you, and
12 signed by Entebi -- well, not
13 really by Entebi, by his company,
14 Italnord, and not really by you,
15 but by Sarah, but that's what I
16 mean, those two parties.
17        And it says, "Purchaser,
18 that's Italnord, is not assuming
19 the lease or the license
20 agreement in full.  It's only
21 assuming Sarah's performance and
22 obligations during the term,"
23 that's this time period which I
24 think was roughly scheduled at
25 like 18 months under the lease,

Page 76

CROSS-EXAMINATION OF DR. A. HAMAD
1
2 license agreement, and this deal.
3        So I see a document and it
4 reads that Entebi and Italnord
5 are not accepting whatever
6 obligations Sarah has to Forall,
7 except for the limiting time
8 period that it's going to be this
9 deal with -- and yet you're
10 telling me that that's not the
11 deal.  That the deal was -- let
12 me finish.
13        Your testimony as I heard
14 was that the deal is:  They took
15 -- Sarah no longer had any
16 obligations except under the
17 lease, you say they still did,
18 but under the license agreement,
19 you say they had nothing left.
20        So tell me why Sarah signed
21 something that says that the only
22 thing that they're giving away to
23 Italnord is just for this time
24 period under the license
25 agreement, but you're telling me

Page 77

CROSS-EXAMINATION OF DR. A. HAMAD
1
2 no, it's for the whole remainder
3 of the license agreement; what am
4 I supposed to understand from
5 this?
6        THE WITNESS:  Honor, what
7 happened is they -- they took
8 over the management agreement.
9 He didn't have enough credit to
10 build for the lease, so it was a
11 trial period for him to build up
12 his credit for the lease during
13 that time.
14        And our understanding and my
15 understanding that our license
16 purchasing agreement was not
17 enforceable, whatsoever, during
18 that period of time, and he had a
19 new license purchasing agreement
20 with Forall.  So that's what I'm
21 trying to explain.
22        THE ARBITRATOR:  Right.
23 That's the document we're looking
24 at now.
25        THE WITNESS:  Yeah.  So



CROSS-EXAMINATION OF DR. A. HAMAD

1  CROSS-EXAMINATION OF DR. A. HAMAD
2  that's what I'm trying to
3  explain.  So the license
4  purchasing agreement during
5  Entebi's operation was never
6  enforced on Sarah.
7      Sarah had -- did not buy --
8  did not put any liability,
9  whatsoever, during that period of
10  time for the license purchasing
11  agreement.
12      THE ARBITRATOR:  I think you
13  defined it well.  You called it a
14  "trial period," and I think
15  that's a good -- a good
16  definition.
17      THE WITNESS:  Right.
18      THE ARBITRATOR:  So I
19  understand Sarah didn't buy
20  anything during the trial period,
21  because it wasn't running the
22  store anymore, so it didn't buy
23  anything.
24      But what I'm being asked in
25  this case by Forall is to enforce

1  CROSS-EXAMINATION OF DR. A. HAMAD
2  a claim that Forall has for after
3  the trial period, and what I'm
4  trying to understand is your
5  position, what it's based on,
6  that under the license agreement
7  that you had no further -- Sarah
8  had no further obligation at all
9  to Forall.  And I'm trying to
10  understand the basis for it when
11  you signed 1.7.  That's what I'm
12  trying to understand.
13      THE WITNESS:  Honor, the
14  basis for it again, is -- it was
15  a trial -- it was supposed to
16  take over.  He didn't take over.
17  Forall took over.  And it was
18  still -- the license purchasing
19  agreement was not enforced.
20      So it was three years in a
21  row, and even during our time,
22  the two years, the license
23  purchasing agreement was never
24  fully enforced.  Sarah was not
25  requested, whatsoever, during --

1  CROSS-EXAMINATION OF DR. A. HAMAD
2  during Entebi's period or during
3  Forall's period to really perform
4  on the license purchasing
5  agreement.
6      And the unfortunate part is
7  the store did miserably and
8  didn't perform, so there was no
9  way to go back and perform on a
10  license purchasing agreement when
11  everybody failed.  So that's what
12  I'm trying to communicate to you,
13  is that it's an awkward position.
14      Everybody tried.  Everybody
15  did their best.  But
16  unfortunately, the product is not
17  sellable and the store did poorly
18  and there was no able to close it
19  [sic].
20      The --
21      THE ARBITRATOR:  All right.
22  Look, I thank you for your
23  explanation.  I appreciate it.
24      Mr. Brown, thank you for
25  letting me interrupt you with

1  CROSS-EXAMINATION OF DR. A. HAMAD
2  these questions.  I was just
3  trying to understand a little
4  better the document during the
5  course of your examination.  So
6  why don't you proceed, sir?
7      MR. BROWN:  Thank you, Your
8  Honor -- Mr. Farber.
9      Q. Dr. Hamad, before I do that,
10  just bear with me one more minute.
11  This is -- I'm going to the signature
12  page of the asset purchase agreement.
13      THE WITNESS:  Honor.
14      THE ARBITRATOR:  Yes.  What
15  is it, Dr. Hamad?
16      THE WITNESS:  Can I make one
17  more comment?
18      THE ARBITRATOR:  Sure.  Go
19  ahead.
20      THE WITNESS:  During that
21  time also, Simon, as I said, was
22  very nervous about the store and
23  the performance.  The sales were
24  dropping left and right.  The --
25  the sales were decreased from



1    CROSS-EXAMINATION OF DR. A. HAMAD
2    almost $160,000 to $63,000.
3         And Entebi and Italnord did
4    poorly in management and sales.
5    Forall didn't do much, so that's
6    why there no base, whatsoever, in
7    my opinion about enforcing the
8    license purchasing agreement,
9    because the store didn't do good
10   and Simon wanted the store back.
11        THE ARBITRATOR:  Okay.
12   We're going to let your lawyers
13   peruse the arguments in question
14   on that one, but I see what
15   you're saying and thank you.
16        Mr Brown, you can proceed.
17   Q. Dr. Hamad, do you recognize the
18   signature under Sarah here?
19   A. That's B Hamad.
20   Q. Is that your brother?
21   A. Yes.
22   Q. Is that his signature?
23   A. Yes.
24   Q. And it looks like he signed here
25   as president of Sarah LLC; is that

1    CROSS-EXAMINATION OF DR. A. HAMAD
2    right?
3    A. Yes.
4    Q. I'm going back to the
5    stipulation and consent agreement that
6    was executed in September of '13
7    between Sarah and Forall.
8         And do you recognize this,
9    Doctor?
10   A. Yes.
11        MR. SHAH:  Mr. Brown, do you
12   have an exhibit number?
13        MR. BROWN:  That's what I'm
14   working on.  It is Exhibit 9.
15   Q. Okay.  So isn't this the only
16   agreement that Forall entered into at
17   the time of the Italnord management?
18   A. What is this again?  What
19   document is this?
20   Q. This is the consent and
21   stipulation agreement by -- between
22   Forall and Sarah of September 13, 2013.
23   And my question is:  Isn't this the
24   only agreement that Forall entered into
25   at this time --

1    CROSS-EXAMINATION OF DR. A. HAMAD
2         MR. LEWIS:  Objection.
3    Q. -- relative of the management of
4    the store by Italnord?
5         THE ARBITRATOR:  Mr. Lewis,
6    what's the objection?
7         MR. LEWIS:  I'm not sure Dr.
8    Hamad would have visibility into
9    what agreements Forall entered
10   into.
11        THE ARBITRATOR:  Overruled.
12   Then he'll say he doesn't know.
13        If you know you can answer,
14   Dr. Hamad.
15        THE WITNESS:  No, I don't
16   know.
17        MR. BROWN:  Okay.
18   Q. Is this your wife's signature at
19   end of the document here?
20   A. Yes.
21   Q. Do you see Section 3, "During
22   the term of the management agreement,
23   only, Forall shall look to the manager
24   and hold the manager responsible for
25   the performance of all obligations

1    CROSS-EXAMINATION OF DR. A. HAMAD
2    under the license agreement.  To the
3    extent the management agreement is
4    terminated, at such time the company
5    shall again be responsible for the
6    performance of all obligations under
7    the license agreement"; do you see
8    that?
9    A. Yes.
10   Q. And isn't this clear language
11   stated that at the time in September
12   '13 Forall intended to hold Sarah
13   responsible for the license agreement
14   if the management term by Italnord was
15   terminated for any reason?
16        MR. LEWIS:  Objection.
17   Calling for a legal conclusion.
18        THE ARBITRATOR:  I'll take
19   it as just his understanding
20   without a legal conclusion.
21   Overruled.
22        THE WITNESS:  I'm reading
23   the document.
24        THE ARBITRATOR:  All right.
25   A. I am not a lawyer, so I cannot



CROSS-EXAMINATION OF DR. A. HAMAD
1
2 do interpretation of this [sic].
3     Q. Do you have an understanding as
4 a medical doctor or any -- or even
5 someone with a fair amount of
6 education, what this provision is
7 stating?
8     A. What do you mean?
9     Q. Do you know what this says?
10     MR. LEWIS:  Mr. Brown, can
11     you restate the question?  You're
12     asking Dr. Hamad to read it.  I'm
13     not sure what do you mean by what
14     this says.
15         THE ARBITRATOR:  Counselor,
16     also would you just remind me the
17     exhibit number here?
18         MR. BROWN:  Exhibit 9, Mr.
19     Farber.
20         THE ARBITRATOR:  I couldn't
21     hear you.  Say it again.
22         MR. BROWN:  Joint Exhibit 9.
23         THE ARBITRATOR:  Okay.
24         MR. BROWN:  And this was in
25     many of the pleadings.

CROSS-EXAMINATION OF DR. A. HAMAD
1
2         THE ARBITRATOR:  Right.  I
3     certainly read it before.  Why
4     don't you restate your question?
5     Q. Mr. Hamad, can you read for
6 everyone the sentence that I'm
7 highlighting right now?  Can you read
8 that for us out loud?
9     A. "To the extent that management
10 agreement is terminated, at such time
11 the company shall again be responsible
12 for the performance of all obligations
13 under the license agreement."
14     Q. Thank you.  Do you know what
15 that means?  Do you have an
16 understanding?
17     A. It means that whenever the
18 license agreement -- I don't know.  No.
19 I don't know.  I don't know exactly
20 what it means.
21     Q. Do you see this Section 6 it
22 says, "The company hereby representing
23 convenance of Forall that the company
24 is not in default of any material
25 provision of the license and lease

CROSS-EXAMINATION OF DR. A. HAMAD
1
2 agreement"; do you see that?
3     A. Yes.
4     Q. Do you understand that to be a
5 representation by Sarah that Forall
6 relied upon in the execution of this
7 consent and stipulation?
8     A. Say it again.
9     Q. Having stated this in this
10 agreement, do you believe that Forall
11 was justified in relying upon this
12 representation?
13     A. I believe so.
14     Q. And then Section 7 says, "As
15 specifically set forth herein, nothing
16 shall act as to waive, limit, or
17 otherwise alter any obligation or
18 liability that the company and/or its
19 principals, owners, members and/or
20 guarantors, are subject to arising from
21 the lease and retail operator
22 agreement, the lease agreement and/or
23 any guaranty undertaking or promise
24 thereunder"; do you see that?
25     A. Yes.

CROSS-EXAMINATION OF DR. A. HAMAD
1
2     Q. Is it still your testimony that
3 you thought Sarah or you believe Sarah
4 was no longer responsible under the
5 license agreement when Italnord took
6 over management of the store?
7     A. This language was a little bit
8 confusing.  But again, the document
9 says what it says.
10     Q. Then Section 11, "No failure of
11 Forall to exercise any power reserved
12 to it under the license agreement or
13 this agreement or to assist upon strict
14 compliance by company or manager with
15 any obligation or condition, and no
16 custom or practice of the parties at
17 variance with the terms hereof shall
18 constitute a waiver of Forall's right
19 to demand exact compliance to terms of
20 the license agreement or this
21 agreement.  Waiver by Forall of any
22 particular default by company or
23 manager shall not binding unless in
24 writing and executed by Forall"; do you
25 see that?



Page 90

CROSS-EXAMINATION OF DR. A. HAMAD

1    CROSS-EXAMINATION OF DR. A. HAMAD
2    A. Yes.  But -- but our
3    understanding that the license
4    purchasing agreement would not be
5    enforced fully when we went to Italy
6    and talked to the CEO.
7    Q. And what year was that when you
8    went to Italy and talked to the CEO?
9    A. 2012.
10    Q. And this agreement --- you
11    didn't -- there was nothing in writing
12    about that conversation or discussion
13    that you can point to, is there?
14    A. No.  It was practiced.
15    Q. I think you testified that --
16    strike that.
17    Do you believe it was Forall's
18    obligation to try to mitigate Sarah's
19    obligation under the lease agreement?
20    MR. LEWIS:  I'm going to
21    object and make sure Dr. Hamad
22    understands the question as it
23    calls for a legal conclusion.
24    THE ARBITRATOR:  Sustained.
25    Mr. Brown, when you use language

Page 91

CROSS-EXAMINATION OF DR. A. HAMAD

1    CROSS-EXAMINATION OF DR. A. HAMAD
2    like "duty to mitigate," that's
3    really a legalese kind of thing,
4    so I think Mr. Lewis has a point.
5    Why don't you rephrase?
6    MR. BROWN:  Fair enough.
7    Q. Dr. Hamad, you were testifying
8    yesterday that Forall, while it was
9    operating the store under the
10    management agreement, should have tried
11    to downsize or relocate the store.
12    THE ARBITRATOR:  Hang on.
13    Mr. Brown, as I said, we took 10
14    minutes earlier, but I could use
15    a break now.  Are you at a point
16    where we can do that?
17    MR. BROWN:  Yes.  I'm at a
18    perfect point for that.
19    THE ARBITRATOR:  Because
20    we're going to break for lunch a
21    little before 1:00, so it's an
22    appropriate time to do it.  Why
23    don't we take another 10 minutes.
24    Let's be sharp about it.
25    (Whereupon, a recess was

Page 92

CROSS-EXAMINATION OF DR. A. HAMAD

1    CROSS-EXAMINATION OF DR. A. HAMAD
2    taken at this time.)
3    THE ARBITRATOR:  Why don't
4    you proceed, Counsel.  Go ahead.
5    MR. BROWN:  Okay.  I'm going
6    to put up Exhibit 8.  Joint
7    Exhibit 8.
8    Q. It's the management agreement by
9    and between Forall and Sarah dated --
10    effective March 15, 2015; do you see
11    the document, sir, that's on the
12    screen?
13    A. Yes.
14    Q. All right.  I'm going to scroll
15    to the bottom, and is that your -- do
16    you see your wife's signature as a
17    50 percent member of Sarah LLC for this
18    agreement?
19    A. Yes.
20    Q. And have you seen this document
21    before?
22    A. Yes.
23    Q. And did there come a time in
24    March -- I lost my conductivities,
25    which I need.  Hold on.

Page 93

CROSS-EXAMINATION OF DR. A. HAMAD

1    CROSS-EXAMINATION OF DR. A. HAMAD
2    THE ARBITRATOR:  It says
3    reconnecting.
4    MR. BROWN:  Yeah.  This can
5    make a minute.
6    Q. While I'm rebooting, did there
7    come a time in March of 2015 Forall
8    agreed to step in and manage the store
9    for a term?
10    A. Yes.
11    Q. And do you recall how long that
12    term was for?
13    A. 18 months.
14    MR. BROWN:  Trying to get it
15    back on.  Bear with me.  Oh gosh,
16    I'm having some difficulty here.
17    I'm sorry.
18    THE ARBITRATOR:  Guys, I
19    hope no one objects, at 1:00
20    during the lunch time, I've got
21    an emergency application for an
22    temporary restraining order so
23    I'm going to be munching some
24    lunch now.  I'll try to be as
25    inconspicuous as possible.


MAGNA
LEGAL SERVICES

Page 94

1    CROSS-EXAMINATION OF DR. A. HAMAD
2        MR. BROWN:  That's fine.
3        Q. So it was an 18-month term,
4    correct, sir?
5        A. Yes.
6        Q. Do you see -- you testified as
7    this provision before, but "Forall
8    shall at its sole discretion advise
9    Sarah on or before March 2015 whether
10   it intends to take over the lease and
11   business and/or otherwise terminate the
12   management agreement at the end of the
13   initial term"; do you see that?
14       A. Yes.
15       Q. And did it, in fact, on or
16   before March 1, 2016, Forall indicate
17   its intentions to Sarah?
18       A. I don't think so.
19       Q. You don't believe that Forall
20   ever got in touch with Sarah at that
21   deadline to advise what it intended to
22   do?
23       A. They did.  I'm sorry.  They did.
24       Q. Okay.  And in fact, didn't
25   Forall request additional time to make

Page 95

1    CROSS-EXAMINATION OF DR. A. HAMAD
2    that determination?
3        A. I believe so.
4        Q. And you -- you testified that no
5    written response was provided at that
6    time in 2016, right?
7        A. Say it again.
8        Q. You testified previously that
9    you did not -- that Sarah and none of
10   its interested persons provided any
11   kind of written response to Forall in
12   response to Forall's request for
13   additional time to make the
14   determination on the management
15   agreement?
16       A. Not at that point.
17       Q. And so Section 2.3 says, "Forall
18   shall have the right at the expiration
19   of the initial term to take over the
20   lease for the remainder of the duration
21   of the lease or to terminate this
22   agreement.  Forall shall so advise the
23   company on or before March 1, 2016, of
24   its intentions with respect to whether
25   to take over the lease and/or terminate

Page 96

1    CROSS-EXAMINATION OF DR. A. HAMAD
2    this agreement at the end of the
3    initial term."
4        Isn't it true that prior to
5    March 1, 2016, Sarah and/or its
6    representatives were trying to turn
7    back the lease to Simon?
8        A. Simon tried.
9        Q. Simon tried to take the lease
10   back?
11       A. Simon communicated with us about
12   the status of the -- of the store.
13       Q. And did you advise Simon that
14   they would need to discuss with Forall
15   because Forall had an on-going
16   management agreement that the term ran
17   through September of 2016?
18       A. It was our understanding that
19   Forall was in constant discussion with
20   Simon since June or July 2014 all the
21   way into March 1, 2016.
22       Q. I'm sorry, what did Simon do?
23       A. I said it was our understanding
24   that Forall was in discussion with
25   Simon about lease or finding the new

Page 97

1    CROSS-EXAMINATION OF DR. A. HAMAD
2    space since June or July 2015, all the
3    way March 2016.
4        Q. I didn't get -- those dates seem
5    to overlap.  You believe Forall was
6    speaking to Simon --
7        A. I believe Simon and Forall were
8    in constant communications since
9    July 2014 all the way until March of
10   2016.
11       Q. And you're basing that on what?
12       A. Based on e-mail, based on Paolo
13   visit to sign in 2014, and based on the
14   letter requested from Forall in
15   February 2016 asking to speak to Simon.
16       Q. But did you advise or did anyone
17   advise at Sarah that in or around the
18   spring of 2016, Sarah was surrendering
19   the lease and had signed the
20   cancelation of the lease in June 14,
21   2016?
22       A. It was clearly communicated to
23   Forall that they have a one year trial
24   to turn the store around, and they had
25   multiple opportunities to speak to



1    CROSS-EXAMINATION OF DR. A. HAMAD
2  Simon about, you know, the lease and
3  changing the space.
4        So it was well understood
5  between both parties that this is a
6  one-year trial.
7    Q. Okay.  And what about that trial
8  period --
9    A. What about --
10       THE ARBITRATOR:  Let's wait
11   until he finishes the question.
12   Q. What about that trial period
13  modified or altered Sarah's on-going
14  obligations under the license to Forall
15  to make minimum purchases and run the
16  store for the period set forth in the
17  license agreement?
18   A. What do you mean by that
19  question?
20   Q. Sir, you just said there was a
21  trial period.  Forall was managing the
22  store for a trial proceed, but the
23  obligations that Sarah committed to on
24  the license agreement were surviving,
25  weren't they not?

1    CROSS-EXAMINATION OF DR. A. HAMAD
2    A. It was never enforced.
3    Q. Well, what -- did anything that
4  you can point to modify or alter the
5  on-going -- the obligations under the
6  license agreement by Sarah to run the
7  store up until September of 2021?
8    A. The language says that in the
9  contract, but it was never enforced.
10   Q. Okay.  But you -- but there's no
11  agreement that you can point to or no
12  writing that you can point to that
13  modified or otherwise terminated those
14  obligations that Sarah had, is there?
15   A. The six months notice to Sarah,
16  that was the modifications.  It was
17  well understood that the six months.
18       THE ARBITRATOR:  Dr. Hamad,
19   he just asked you if there was
20   anything in writing that modified
21   Sarah's obligations.  Your answer
22   is it's understood but he didn't,
23   and you said that before, and
24   I've got it.
25       But he's not asking you

1    CROSS-EXAMINATION OF DR. A. HAMAD
2    about that, so let's just stick
3    with the question.  All right?
4       THE WITNESS:  Thank you.
5       THE ARBITRATOR:  Go ahead,
6    Mr. Brown.
7       MR. BROWN:  Okay.
8    Q. So in this section, is there
9  anything in this management agreement
10  between Forall and Sarah that state
11  that after the term of the management
12  agreement Sarah's obligations will be
13  terminated under the license agreement?
14   A. The only thing is the six
15  months.  Otherwise, no.
16   Q. And the six months, where is
17  that?  Do you -- do you want to scroll
18  through this document?  I can give you
19  access to that.  Does that --
20   A. No.  That -- supposed to give us
21  a notice in March 1, six months before
22  the send of the agreement.
23   Q. Okay.  And that's in Section
24  2.1, correct?
25   A. I don't know what section it is,

1    CROSS-EXAMINATION OF DR. A. HAMAD
2  but it is there.
3    Q. Right here, right.  2.1, "Forall
4  shall assume exclusive management.
5  Forall at its sole discretion shall
6  advise on or before March 1, 2016,
7  whether it intends to take over"; is
8  that the six-month notice you're
9  talking about?
10   A. The exchanged e-mail before the
11  signed agreement and the six months,
12  yes.
13   Q. If the e-mail incorporated in
14  any way -- oh, gosh.  That e-mail that
15  you're referring to, was that
16  incorporated in the management
17  agreement at all?
18       MR. LEWIS:  Objection.
19       THE ARBITRATOR:  Hold on.
20   You're rebooting, apparently.
21   Q. Does it reference the e-mail in
22  any way in this agreement, sir?
23   A. No.  But -- no.
24   Q. And I'm going to go to 9.3,
25  which is on Page 8.  And I'll point you



Page 102

CROSS-EXAMINATION OF DR. A. HAMAD
1        CROSS-EXAMINATION OF DR. A. HAMAD
2  to this provision, 9.3, "The parties
3  acknowledge that this agreement should
4  constitute the entire agreement between
5  the parties and no variance or
6  modification hereof will be valid and
7  enforceable, except by supplemental
8  agreement in writing, executed and
9  approved by hereto"; do you see that?
10    A. Yes.
11    Q. Was there any subsequent
12  amendment or modification executed by
13  the parties that you're aware of?
14    A. No.
15    Q. And Sarah was represented by
16  counsel in connection with the
17  preparation and the execution of this
18  agreement, right?
19    A. Yes.
20    Q. In fact, David Hochman of
21  Kamensky Rubinstein Hochman & Delott
22  LLP, was that the law firm that
23  represented Sarah?
24    A. Yes.
25      MR. BROWN: Mr. Farber, I'm

Page 103

1        CROSS-EXAMINATION OF DR. A. HAMAD
2  just going to take a minute to
3  confer with my co-counsel to see
4  if I have anything further.
5      THE ARBITRATOR: Okay.
6      (Whereupon, a recess was
7  taken.)
8      THE ARBITRATOR: Are we
9  ready?
10      MR. BROWN: Okay. I'm going
11  to go put my screen on. And I'm
12  going to pull up Exhibit 130,
13  Joint Exhibit 130.
14    Q. And were you present for Luca
15  Spano's testimony yesterday, sir?
16    A. Yes.
17    Q. And in fact, you talked a little
18  bit about this Forbes event, correct,
19  that you -- that Sarah put on in --
20  when was that? 2012?
21    A. Yes.
22    Q. And I think Mr. Lewis was asking
23  you some questions. You were talking
24  about how Forall supported you, but
25  didn't support you sufficiently for

Page 104

1        CROSS-EXAMINATION OF DR. A. HAMAD
2  these types of things; do you recall
3  that testimony?
4    A. Yes.
5    Q. But isn't it the case that
6  Forall had given a $46,000 credit for
7  that Forbes event to Sarah?
8    A. The event cost was a lot more
9  than $46,000.
10    Q. Right. But did Sarah -- did
11  Forall support the event up to $46,255
12  credit?
13    A. Yes, they did. But again, it
14  cost a lot more than this. Yes, they
15  did.
16    Q. And then under the license
17  agreement, Forall's obligation only
18  which were a match up to $27,000 per
19  year, correct?
20    A. Yes.
21    Q. And this specific e-mail, Luca
22  is writing -- is talking about two
23  different credits and how they have to
24  be accounted for, but the other credit
25  below that is advertisements, Vegas

Page 105

1        CROSS-EXAMINATION OF DR. A. HAMAD
2  mag, Hassan, Amex --
3    A. I do.
4    Q. Does that ring any bell as to
5  what those advertisement moneys were
6  spent for?
7    A. I don't remember. But this was
8  over a period a year, year and a half,
9  if I'm not mistaken.
10    Q. I'm putting up Luca's
11  spreadsheet here with the construction
12  cost and various data that Mr. Spano
13  testified about yesterday; do you
14  recall seeing this?
15    A. Yes, I do.
16    Q. And I think you said you had an
17  issue with the 2013 selling seasons or
18  seasons here $544,939; is that your
19  testimony?
20    A. If I remember well, yes.
21    Q. What is your issue with that --
22  that allotment here in this 2013 year?
23    A. It wasn't -- I don't think it
24  was done by Sarah.
25    Q. And what do you base that on?

1    CROSS-EXAMINATION OF DR. A. HAMAD
2    A. Because this is in 2013, and it
3  has to be for the fall, winter of 2013.
4    Q. Tell me why that is.
5    A. Because you place orders in
6  February or March of 2013 for the fall,
7  winter of 2013.
8    Q. But -- so is it your testimony
9  there's only one selling season in the
10 year?
11   A. No.  It's two.  So for the
12 spring, summer -- for spring, summer
13 you do in the fall -- the previous
14 fall, and for the fall, winter you do
15 in the previous summer or previous
16 spring.
17   Q. So what about -- so are the
18 other -- are the other data points
19 accurate, to your knowledge, of 2010,
20 2011 entry and 2012 entry?
21   A. Possibly.  I have to verify.
22 That's his spreadsheet.  It's not mine.
23   Q. Why would he have credited those
24 purchases to Sarah if they weren't
25 placed by Sarah?

1    CROSS-EXAMINATION OF DR. A. HAMAD
2    A. Which one?
3    Q. These invoices received to date?
4    A. Again, you know, the 2013 I know
5  for a fact we did not do that.
6    Q. How do you know that for a fact?
7  Didn't you run the store until
8  September '13?
9    A. Yeah.  But again, that order has
10 to be for the fall, winter in 2013, and
11 we didn't do a buy then.  I know that
12 for a fact.
13   Q. How many buys -- how many
14 seasons did you buy for total between
15 2010 and 2013?
16   A. I don't recall.  But I know we
17 didn't buy that last season.
18   Q. So did you buy for three seasons
19 or four seasons or five seasons?
20   A. It has to be for four seasons.
21 But, again, that may be placed under
22 Sarah, but Sarah was not responsible
23 for it.  We did not perform for the
24 fall, winter of 2013.
25      THE ARBITRATOR:  Anything

1    CROSS-EXAMINATION OF DR. A. HAMAD
2  else, Counselor?
3      MR. BROWN:  Yes, I do, Your
4  Honor.  I'm going to go to
5  Exhibit 109.  Joint Exhibit 109.
6    Q. Dr. Hamad, can you see what's on
7  my screen?
8    A. Okay.  Yes.
9    Q. Do you recognize this document
10 at all?
11   A. Not really, but I can see it.
12   Q. Do you know who Jim Veneruso is?
13   A. Has to be a lawyer.
14   Q. And you know who Lee Levin is,
15 right?
16   A. Yes.
17   Q. And on March 5, 2013, Mr.
18 Veneruso writes, "Dear, Mr. Levin, as
19 you are aware, this firm represents
20 Forall USA Inc., Forall.  We are in
21 receipt of your letter dated
22 February 25, 2013."  Okay?
23   A. Yes.
24   Q. He writes, "Point one,
25 construction costs, Forall will,

1    CROSS-EXAMINATION OF DR. A. HAMAD
2  pursuant to the party's agreement,
3  continue to offer discounts to all
4  goods sold to Sarah"; do you see that?
5    A. Yes.
6    Q. He goes on to say, "Sarah will
7  need to take in the product for spring
8  2013 and pay for it in advance in order
9  to provide sufficient credit to pay for
10 all outstanding construction costs.
11 According to Forall's calculations,
12 once Forall delivers the spring/summer
13 2013 product, enough credit should be
14 available to pay approximately
15 100 percent of Forall's responsibility
16 for the build out cost"; do you see
17 that?
18   A. Yes.
19   Q. So this letter indicates, as of
20 March 5, 2013, Sarah had not yet taken
21 in the spring 2013 line of product; do
22 you agree?
23   A. That's what it says.
24   Q. Do you have anything that would
25 demonstrate that this was false at that



1      CROSS-EXAMINATION OF DR. A. HAMAD
2   time, that you had in fact already,
3   according to your testimony -- you
4   testified that you would have had to
5   place and receive those orders in 2012.
6      A. I think you're confused here.
7      Q. Tell me why I'm confused.
8      A. Because when you go in the
9   spring when you go in the fall,
10  winter of 2013.
11     Q. Okay. But allow me, it says
12  "According to Forall's calculation,
13  once Forall delivers the spring/summer
14  '13 product"; isn't that pretty clear
15  that that's not the fall, winter
16  product?
17     A. I don't know here what you
18  trying to say [sic].
19     Q. I'm trying to demonstrate that
20  your statement that you know you did
21  not receive product in 2013 is false.
22        MR. LEWIS: Objection. Hold
23     on.
24        THE ARBITRATOR: Let's hear
25     the objection.

1      CROSS-EXAMINATION OF DR. A. HAMAD
2        MR. LEWIS: The objection is
3   Dr. Hamad did not say he received
4   product. He said that was not
5   invoiced. That was not
6   representative of what they paid,
7   that last item for 500 something
8   thousand, not that the
9   merchandise wasn't delivered, and
10  I think that's the confusion that
11  you are having.
12        THE ARBITRATOR: Mr. Brown,
13  I take Mr. Lewis' point. I think
14  you should clarify with
15  questions, if you so chose.
16     Q. This letter to counsel, your
17  counsel, states that Sarah had not yet
18  accepted the product for the spring,
19  summer 2013; do you see that?
20     A. Yes.
21     Q. And it had not accepted it, and
22  it had not paid for it. Is it your
23  testimony it was already invoiced and
24  therefore it somehow was not your
25  product that was put in Mr. Spano's

1      CROSS-EXAMINATION OF DR. A. HAMAD
2   2013 line?
3      A. This product must have been
4   ordered in 2012. I think you're
5   confused here. Because -- because
6   we're talking about spring, summer
7   2013, and delivery for spring, summer
8   2013, and the product must have been
9   ordered in the fall -- in the fall of
10  2012. So do not confuse the issue,
11  please.
12     Q. Your testimony is that there was
13  no invoices that were properly credited
14  to Sarah in 2013?
15     A. There was invoices for the
16  orders, the fall, winter, for the
17  spring, summer 2013. But we didn't
18  make any purchases for the fall, winter
19  of 2013, which happen typically in
20  February, March of 2013. So this is
21  where you are confused.
22     Q. Okay. But according to your
23  testimony, there would be only one
24  selling season per year and that's not
25  right, is it?

1      CROSS-EXAMINATION OF DR. A. HAMAD
2      A. No. There's two selling
3   seasons, but it happens the six months
4   before for the spring, summer. It
5   happens in the year before. And the
6   fall, winter, it happened in the same
7   spring, summer, so that's where the
8   confusion is.
9         MR. LEWIS: Objection.
10  Objection.
11        THE ARBITRATOR: Hang on.
12  There's no pending question.
13     Q. Did Sarah take receipts of the
14  fall -- spring, summer 2013 product as
15  Mr. Veneruso is writing about to
16  Mr. Levin in March of '13?
17        MR. LEWIS: Objection.
18        THE ARBITRATOR: What's the
19  objection?
20        MR. LEWIS: Based on the
21  relevance of this. I have no
22  idea where Counsel is going with
23  this. I'm sure he does, but he's
24  got a witness that's going to
25  testify about who paid for what



| Page 114 | Page 115 |
|---|---|

**Page 114**

CROSS-EXAMINATION OF DR. A. HAMAD
1  CROSS-EXAMINATION OF DR. A. HAMAD
2  invoices. I'm sure that's what
3  Ms. Settimi --
4       THE ARBITRATOR: Mr. Lewis,
5  the last question simply asked
6  the witness if he knows if Sarah
7  took delivery of some -- and he
8  specified what the items were.
9  Either the witness knows or he
10  doesn't know. It has nothing to
11  do with invoicing. So he can
12  answer.
13       Dr. Hamad?
14       THE WITNESS: I don't
15  remember.
16       THE ARBITRATOR: Okay.
17  That's your answer. Go ahead.
18  Next question.
19       MR. BROWN: Okay. I don't
20  have any further questions.
21       THE ARBITRATOR: All right.
22  I just want to ask you one or two
23  questions. First of all, did you
24  write anything on your pad so you
25  want a few minutes to confer with

**Page 115**

1  CROSS-EXAMINATION OF DR. A. HAMAD
2  Mr. Lewis.
3       THE WITNESS: Yes, I did.
4       THE ARBITRATOR: Okay.
5  Well, I'll give you that
6  opportunity in a moment. I just
7  want to ask you something. Could
8  you take a look at the license
9  agreement itself and maybe you
10  could put up on the screen. I
11  think my memory was it was at the
12  beginning. Put up on the screen
13  article two of the license
14  agreement, and particularly I was
15  interested in 2.5.
16       Could you do that,
17  Mr. Brown?
18       MR. BROWN: Yes. I'm
19  working on it. 2.5 you want to
20  see?
21       THE ARBITRATOR: Yes.
22       MR. BROWN: Got it here.
23  2.5 starts at the very bottom of
24  Page 3. Is that the same
25  version?

**Page 116**

1  CROSS-EXAMINATION OF DR. A. HAMAD
2       THE ARBITRATOR: I think
3  it's, yes. But I'm interested in
4  little B and little C, which is
5  on Page 4. Sorry, big B and big
6  C at the top of Page 4. There we
7  do.
8       Dr. Hamad, take a look at
9  this, because when I was
10  preparing last week and I read
11  this, I just -- no one has
12  touched on this and I just don't
13  know.
14       If you look at B, it says,
15  "Operator" -- that's Sarah --
16  "shall pay to Forall a security
17  deposit in the amount of $200,000
18  to be held in escrow"; was there
19  a security deposit that was paid
20  and if so, whatever happened to
21  it?
22       THE WITNESS: There was no
23  security deposit. It was waived.
24       THE ARBITRATOR: It was
25  waived. Okay. Okay. Now, look

**Page 117**

1  CROSS-EXAMINATION OF DR. A. HAMAD
2  at A. A says, "For the first
3  season, operator shall pay Forall
4  in execution of this agreement --
5  and it's very close to the
6  $400,000 -- 398,238 by check or
7  wire transfer for the license
8  products ordered for the store,
9  the discounted cost"; was that
10  paid?
11       THE WITNESS: It was paid in
12  full, Your Honor, yes, four
13  months before we opened.
14  Actually, it was paid in March.
15  We opened in September and we
16  paid it in March.
17       THE ARBITRATOR: And is that
18  part of the chart that we were
19  just referring to?
20       THE WITNESS: Yes.
21       THE ARBITRATOR: All right.
22  That's all I wanted to know. I
23  just didn't -- particularly, the
24  security deposit I didn't know
25  about, so I wanted to know that,



1    CROSS-EXAMINATION OF DR. A. HAMAD
2    and that's all I have.  All
3    right.
4        Mr. Lewis, do you want 10
5    minutes to confer with your
6    client?
7        MR. LEWIS:  Yes.  Thank you,
8    Mr. Farber, unless -- I know you
9    have an obligation at 1:00.
10   Would you rather us reconvene
11   after lunch or you want us to get
12   started?
13       THE ARBITRATOR:  Well, I'm
14   hoping we can finish with the
15   witness before lunch.  Do you
16   know now if you have significant
17   redirect?
18       MR. LEWIS:  Longer than a
19   half hour.
20       THE ARBITRATOR:  I rather
21   not because, I told them I was
22   available --
23       Off the record, Maggie.
24       (Whereupon, a discussion was
25   held off the record.)

1    RE-DIRECT EXAMINATION OF DR. A. HAMAD
2    RE-DIRECT EXAMINATION BY
3    MR. LEWIS:
4        Q. Dr. Hamad, you understand that
5    the stipulation consent agreement says
6    what it says?
7        A. Yes.
8        Q. And understand that the
9    management agreements between Sarah and
10   Italnord and Sarah and Forall say what
11   that they say, right, you understand
12   the language that's in these documents,
13   right?
14       A. Yes.
15       Q. Same thing for the APA, right,
16   you understand the language that's
17   present in those documents, right?
18       A. Yes.
19       Q. And you understand that based
20   solely on that language that Sarah was
21   obligated to continue on under the
22   license agreement, you understand that
23   that language says that, right?
24       A. Yes.
25       Q. But that -- there's more to it

1    RE-DIRECT EXAMINATION OF DR. A. HAMAD
2    though, right?
3        A. Right.
4        Q. And Mr. Farber asked you and
5    Mr. Brown asked you whether there was
6    writings that supported your
7    understanding that Sarah was not
8    obligated to continue on under the
9    license agreement after the store
10   closed; do you remember being asked
11   that?
12       A. Yes.
13       Q. And there are, in fact, writings
14   that support that understanding, aren't
15   they?
16       A. Absolutely.
17       Q. And what are those writings?
18       A. Sets of e-mail exchanged between
19   lawyers, Mr. Brown, and Sarah LLC and
20   Forall.
21       Q. And what are those e-mails that
22   you're referring to state?
23       A. They state that the stores --
24   the store will be operating for one
25   year.  At the end of the year, it will

1    RE-DIRECT EXAMINATION OF DR. A. HAMAD
2    be Forall's decision to give us -- if
3    they want to operate the store or not,
4    give us a month notice, and if they
5    don't want to operate the store, the
6    six-month notice will give us an
7    opportunity to turn the store back to
8    Simon.
9        Q. I'm going to show you one of
10   those writings and I'm going to show
11   Joint Exhibit 51.
12       MR. BROWN:  Can I ask the
13   witness to get a better head
14   shot?  I can't see his mouth, and
15   I'd like to see his whole face.
16       THE ARBITRATOR:  Dr. Hamad,
17   if you can move back a little bit
18   on the screen.  That's better.
19   We can see you better now.  Okay.
20       THE WITNESS:  I have to
21   focus on the screen, that's why
22   I'm putting my face next to the
23   screen.
24       THE ARBITRATOR:  All right.
25   But we can see you better now, so



Page 122

RE-DIRECT EXAMINATION OF DR. A. HAMAD
1    RE-DIRECT EXAMINATION OF DR. A. HAMAD
2    we appreciate it.
3    THE WITNESS:  Thank you.
4    THE ARBITRATOR:  Okay.
5    Q. Dr. Hamad, can you see my
6    screen?
7    A. Yes.
8    Q. And do you see at the bottom
9    here we've got an e-mail string
10   starting November 4, 2014; do you see
11   that?
12   A. Yes.
13   Q. And then above that you see an
14   e-mail from you to Paolo Torello-Viera;
15   do you see that?
16   A. Yes.
17   Q. Do you see this piece here, and
18   I'm going to read it very quickly,
19   "This e-mail is to confirm that we are
20   very interested for Pal Zileri to take
21   over the, management of the Vegas store
22   for a period of one and a half years.
23   At the end of the first year of the
24   agreement, you will let us know if you
25   would like to take over the entire

Page 123

1    RE-DIRECT EXAMINATION OF DR. A. HAMAD
2    lease, which would be a six-year
3    agreement.  If not, then Sarah LLC will
4    have a six-month period to turn the
5    store over to Simon"; do you see that?
6    A. Yes.
7    Q. And this was an e-mail you sent
8    directly to the CEO of Forall?
9    A. Absolutely.
10   Q. And again, were you specific
11   about what the six-month notice
12   provision was for?
13   A. To give us an opportunity to
14   talk to Simon and find a new tenant.
15   Q. Did Mr. Paolo Torello-Viera push
16   back on that?  Did he say, "No, we
17   can't agree to that six-month notice
18   provision"?
19   A. No.  Absolutely not.
20   THE ARBITRATOR:  Well, is
21   there a written response from
22   him?  Dr. Hamad, do you know if
23   there was a written response to
24   him?
25   THE WITNESS:  There was and

Page 124

1    RE-DIRECT EXAMINATION OF DR. A. HAMAD
2    he said, "Agreed."
3    THE ARBITRATOR:  Can we see
4    that, please?
5    MR. BROWN:  Thank you.
6    MR. LEWIS:  So here's the
7    exchange, Mr. Farber.  We're
8    starting with, "Great talking to
9    you this morning," and I'll
10   scroll up.
11   THE ARBITRATOR:  Right.  So
12   where is the response where he
13   says, "Agreed"?
14   MR. LEWIS:  I'm scrolling
15   now.
16   THE ARBITRATOR:  I see.
17   Okay.  So where does he say he
18   agrees?
19   MR. LEWIS:  Are you asking
20   me or are you asking Mr. --
21   THE WITNESS:  "Dr. Hamad,
22   thank you for the time dictated
23   to our conversation this morning.
24   As agreed, we will give mandate
25   to our counsel to deal with yours

Page 125

1    RE-DIRECT EXAMINATION OF DR. A. HAMAD
2    on the management agreement.  All
3    best."
4    "As agreed," and I'm
5    100 percent sure, Honor, that
6    that was the agreement.
7    Q. There's other documents I'm
8    going to show you as well, Dr. Hamad.
9    THE ARBITRATOR:  Go ahead.
10   Q. I'm going to share Joint Exhibit
11   8 really briefly because I don't want
12   to belabor the point.  This is the
13   management agreement, Dr. Hamad,
14   between Forall and Sarah, March 15,
15   2015.
16   A. Yes.
17   Q. And this is the term Section
18   2.1, and Mr. Brown covered this, but,
19   again, this incorporates that, Sarah on
20   or before March 1, 2016 -- it will
21   inform Sarah on or before March of 2016
22   whether it intends to take over the
23   lease and business and/or otherwise
24   terminate the management at the end of
25   the initial term; do you see that?



Page 126

```
 1        RE-DIRECT EXAMINATION OF DR. A. HAMAD
 2        A. Yes.
 3        Q. Is this consistent with the
 4   e-mail exchange that you had with the
 5   CEO of Forall that the six-month notice
 6   would be provided, or six-month notice
 7   would be provided for Sarah to turn the
 8   store back over to Simon; is that
 9   consistent with that?
10        A. Absolutely.
11        Q. There's one more exhibit and I
12   apologize. Dr. Hamad, you also were
13   asked about the possibility of Sarah
14   going back into the store and taking
15   over the store after Forall operated;
16   do you recall being asked that?
17        A. Yes.
18        Q. Okay.  I'm going to share with
19   you Joint Exhibit 250.  Can you see my
20   screen, Dr. Hamad?
21        A. Yes, I do now.
22        Q. And this is an e-mail between
23   yourself, your attorney David Hochman,
24   and the attorney for Simon, John Steen;
25   do you see that?
```

Page 127

```
 1        RE-DIRECT EXAMINATION OF DR. A. HAMAD
 2        A. Yes.
 3        Q. And I'll read really quickly, "I
 4   want to confirm what Sarah LLC is
 5   requesting.  In lieu of your proposal,
 6   we are asking that Simon suspend its
 7   efforts to obtain a replacement until
 8   January 31, 2016.  There will not be a
 9   sales target that need to be met during
10   this period.  Sarah will assess the
11   sales performance of the store.  If its
12   sales have not improved during this
13   12-month period, Sarah will then notify
14   Simon to resume its search for a
15   replacement tenant"; did you see that?
16        A. Yes.
17        Q. Was this a condition of Simon
18   allowing Sarah to rescind the letter
19   agreement and allow Forall to operate
20   the store?
21        A. Absolutely.
22        Q. Do you see Mr. Steen agreeing to
23   the terms?
24        A. Yes.
25            THE ARBITRATOR:  All right,
```

Page 128

```
 1        RE-DIRECT EXAMINATION OF DR. A. HAMAD
 2   Counsel, I'm afraid we're going
 3   to have to stop here because it's
 4   five to 1:00, so we're going to
 5   take our lunch break now.  How
 6   much more do you think you have,
 7   Mr. Lewis?
 8        MR. LEWIS:  Maybe 10.
 9        THE ARBITRATOR:  We're going
10   on to lunch, and then we'll go
11   onto Dr. Bachar Hamad.
12        (Whereupon, a lunch break
13   was taken.)
14        THE ARBITRATOR:  Mr. Lewis,
15   do you have any questions?  Dr.
16   Hamad you're still under oath.
17        THE WITNESS:  Thank you.
18        MR. LEWIS:  Counsel, go
19   ahead.
20        MR. SHAH:  You're still
21   muted.
22        MR. LEWIS:  Thank you.
23        Q. Dr. Hamad, we were speaking
24   prior to lunch, and we were talking
25   about Exhibit 251 and the six months
```

Page 129

```
 1        RE-DIRECT EXAMINATION OF DR. A. HAMAD
 2   notice provision that had been
 3   discussed with Simon and with Forall,
 4   correct?
 5        A. Yes.
 6        Q. And we've gone through most of
 7   this document, but we didn't look at
 8   the top of the document; do you see the
 9   January 12, 2015, e-mail?
10        A. Yes.
11        Q. And this is from your attorney,
12   David Hochman, to Forall's attorney,
13   Stephen Brown?
14        A. Absolutely.
15        MR. BROWN:  We're not seeing
16   anything on the screen.
17        THE ARBITRATOR:  I've got
18   it.
19        MR. LEWIS:  It's shared.
20        MR. BROWN:  It looks like we
21   might have just lost our
22   connection to Zoom.  We're having
23   some internet issues today.  Can
24   you bear with me as I --
25        MR. LEWIS:  Sure.
```



Page 130

RE-DIRECT EXAMINATION OF DR. A. HAMAD
1
2    MR. BROWN:  I can pull up a
3  copy in the meantime.  What is
4  the exhibit?
5    MR. LEWIS:  251.  And we'll
6  be on it for 30 seconds.
7    MR. BROWN:  We're back on.
8  Thank you.  Sorry.
9    Q. Dr. Hamad, do you see this
10  January 12, 2015, e-mail?
11    A. Absolutely.
12    Q. And again this is from your
13  attorney, David Hochman, to Mr. Brown?
14    A. Yes.
15    Q. And your attorney explains to
16  Mr. Brown and shares with him streams
17  of e-mails with Simon's attorney,
18  right?
19    A. That's the property manager for
20  Simon, yes.
21    Q. "The goal was coordinate this
22  with the letter of content.  Our
23  thought is that if Forall decides that
24  it wants to continue the management
25  agreement beyond the 18 months and

Page 131

RE-DIRECT EXAMINATION OF DR. A. HAMAD
1
2  advises Sarah of this by December,
3  2015, Sarah would then revoke the
4  letter agreement with Simon.  If things
5  do not improve to a level that Forall
6  wants to continue with the management
7  agreement, Simon would then recommence
8  looking for a replacement tenant, which
9  generally takes six months or more"; do
10  you see that?
11    A. Absolutely.
12    Q. Is this consistent with your
13  testimony that all parties involved,
14  Sarah Simon, and Forall, understood
15  that the six-month notice requirement
16  was for Sarah to be able to turn the
17  store back over to Simon?
18    A. Absolutely.  And not only what
19  you mentioned, but also the law firm of
20  Forall, Mr. Brown.
21    Q. Mr. Brown is part of this
22  discussion?
23    A. Yes.
24    Q. Did the six-month notice
25  provision make it into the management

Page 132

RE-DIRECT EXAMINATION OF DR. A. HAMAD
1
2  agreement?
3    A. Yes.
4    Q. And then to take that further,
5  did Forall in fact give you six months
6  notice that it did not intend to
7  operate the store in March of 2016?
8    A. Absolutely.
9    Q. And they understood how
10  important that was because they even
11  ask for an extension of time to keep
12  considering it, did they not?
13    A. Yes.
14    MR. BROWN:  Objection.  A
15  lot of inputting of what we
16  understood or other parties
17  understood.
18    THE ARBITRATOR:  Is that an
19  objection or not?
20    MR. BROWN:  Yes.  I said
21  objection.  Did you not hear?
22    THE ARBITRATOR:  No, I
23  didn't hear it.  I'm sorry.  I
24  heard the answer already, so
25  let's go on.  I apologize.

Page 133

RE-DIRECT EXAMINATION OF DR. A. HAMAD
1
2    MR. BROWN:  For some reason,
3  I think that you've missed a
4  couple of objections today.  I
5  don't know if it's not picking my
6  first word up as I go.
7    THE ARBITRATOR:
8  Unfortunately, you may be having
9  -- for some reason your
10  connection today is not great.
11  All right.  Let's proceed.
12    Q. Okay.  Just to close this point
13  off, Dr. Hamad, you were asked if there
14  were writings that supported your
15  understanding that Sarah would not have
16  to continue its obligation under
17  the license agreement, does this
18  refresh your recollection as to the
19  types of writing you relied on to
20  support that understanding?
21    A. Absolutely.
22    Q. Is there anything else that
23  supports your understanding that Sarah
24  would not have to continue on its
25  obligations under the license



1  RE-DIRECT EXAMINATION OF DR. A. HAMAD
2  agreement?
3      A. These documents are more
4  important than anything else.
5      Q. Did you also have a conversation
6  with Forall's CEO?
7      A. Yes.
8      Q. And I know we talked about that
9  before, I don't want to belabor the
10  point, but just to make sure it's
11  clear. In addition to these writings
12  leading up to the management agreement,
13  you had a conversation with the CEO in
14  2013, November of 2013, correct?
15      A. It was 2013 and also '12.
16      Q. In that conversation Mr. Baritza
17  said directly to you that you would not
18  be required to fulfill the minimum
19  purchase requirement under the license
20  agreement; is that true?
21      A. Absolutely, yes.
22      Q. We talked a bit about whether it
23  would be possible for you to have come
24  back into the store after Simon had
25  given the Pal Zileri one more chance to

1  RE-DIRECT EXAMINATION OF DR. A. HAMAD
2  make it work for a 12-month period; do
3  you remember that?
4      A. Yes.
5      Q. Let's talk about the practical
6  aspects of what would have happened had
7  you been forced to come back and
8  operate the store in March of 2016; do
9  you understand what I'm saying?
10      A. Yes.
11      Q. What inventory would you have
12  had had you been forced to come back
13  and operate the store in March of 2016
14  -- I'm sorry -- in September of 2016?
15      A. It had to be all the inventories
16  in the store, all seasons.
17      THE ARBITRATOR: I thought
18  the question was what inventory
19  would you have had; wasn't that
20  the question?
21      MR. LEWIS: I think he was
22  answering it, Mr. Farber, that's
23  correct.
24      Q. What inventory would you have
25  had in September of 2016 had you been

1  RE-DIRECT EXAMINATION OF DR. A. HAMAD
2  forced to come back in and operate the
3  store?
4      MR. BROWN: Objection.
5      THE ARBITRATOR: What's the
6  objection?
7      MR. BROWN: Calls for
8  hypothetical. And you know, with
9  all due respect, this gentleman
10  wasn't even an officer of Sarah
11  LLC.
12      THE ARBITRATOR: Mr. Lewis,
13  where are we going with this? It
14  certainly is hypothetical.
15      MR. LEWIS: Mr. Farber, if
16  you just allow Dr. Hamad to
17  answer the question, it will be
18  clear.
19      MR. BROWN: Let's get a
20  proper witness. His only
21  position here is he's speaking --
22  he's not even speaking on behalf
23  of his wife, that's what he
24  testified to. He's a guarantor
25  to the license agreement.

1  RE-DIRECT EXAMINATION OF DR. A. HAMAD
2      MR. LEWIS: Is this an
3  objection, Mr. Brown?
4      THE ARBITRATOR: Hold on.
5  It is an objection. All right,
6  Counsel. I hear the objection.
7  All right. I'm going to overrule
8  the objection. I understand the
9  import of it, though, and I will
10  consider the import of the
11  objection in weighing what
12  weight, if any, I will give to
13  the response, but to the extent
14  he has knowledge, which he may
15  have gotten from his wife or from
16  someone in the store, he can
17  respond.
18      So the question was: What
19  inventory would have been
20  available to the store if Sarah
21  retook possession of the store?
22      THE WITNESS: It would have
23  been all the inventory, Honor,
24  all seasons' inventory.
25      Q. And why is that Dr. Hamad?



| Page 138 |
|---|

RE-DIRECT EXAMINATION OF DR. A. HAMAD
1
2    A. Because we didn't do a buy, so
3  and -- and actually, in a letter from
4  Paolo to us, he specified that you need
5  to take over all inventories in the
6  store, which is all the inventories.
7    Q. The point being, Dr. Hamad, that
8  it would have been too late to do a buy
9  for the spring --
10   A. Absolutely.
11   Q. Let me finish the question.  For
12 the fall, winter of 2016, that's the
13 point, correct?
14   A. Right.
15   Q. Mr. Brown asked you about
16 Exhibit 55, and I'm going to bring that
17 up just very briefly.
18     Dr. Hamad, do you see my screen?
19   A. Yes, I do.
20   Q. Okay.  Mr. Brown asked you about
21 this document, and he took you to this
22 sentence starting with, "It does not
23 appear the lease allows the assignment
24 to corporate"; do you see that?
25   A. Yes.

| Page 139 |
|---|

RE-DIRECT EXAMINATION OF DR. A. HAMAD
1
2    Q. But the sentence prior to that
3  really is what demonstrates Simon's
4  intention here?
5      THE ARBITRATOR:  Hang on.
6    Let me hear that question again?
7    Q. The sentence before that more
8  speaks to Simon's intentions; does it
9  not?
10   A. Yes.
11   Q. Can you read that for Arbitrator
12 Farber?
13   A. "We do not plan to transfer the
14 store to Pal Zileri corporate."
15   Q. Okay.  That's a definitive
16 statement, correct?
17   A. It's 100 percent definitive
18 statement.
19   Q. Okay.  And that's February of
20 2016; do you see that?
21   A. Yes.
22   Q. And is that before or after
23 Forall informed you they would not
24 extend the term of their operation of
25 the store?

| Page 140 |
|---|

RE-DIRECT EXAMINATION OF DR. A. HAMAD
1
2    A. This is before.
3    Q. So we've got Simon saying "No,"
4  they had no intention of going forward
5  with Pal Zileri in February, correct?
6    A. Absolutely.
7    Q. And we have Forall saying that
8  they do not intend to move forward
9  operating the store in March of 2016,
10 correct?
11   A. Yes.
12   Q. And then we have Sarah entering
13 into the agreement to return the lease
14 to Simon in June of 2016, correct, do I
15 have that timeline correct?
16   A. Yes.
17   Q. There was some discussion about
18 the $38,000, and I would say there was
19 some -- it wasn't very clear, the
20 discussion about the $38,000; do you
21 recall that?
22   A. Yes.
23   Q. Without belaboring this point
24 either, can you try to put a finer
25 point on why you feel Forall was still

| Page 141 |
|---|

RE-DIRECT EXAMINATION OF DR. A. HAMAD
1
2  responsible for the $38,000?
3    A. The reason why, again, is
4  Alfonso started operating the store on
5  September 9th or 10th or something like
6  this in that range.
7      And the license agreement was
8  not done and signed until, I think,
9  September '13.  So we were in an
10 awkward position where we were forced
11 to accept what's written because it was
12 already in the store and --
13   Q. So you were forced because you
14 had already moved out of the store and
15 Italnord was already in the store when
16 you signed that agreement; is that your
17 testimony?
18   A. I think so, yes.
19   Q. Let me ask you this:  Your
20 understanding was that Forall still
21 owned the responsibility to reimburse
22 the $38,000 on the construction costs?
23   A. Yes.
24   Q. So let's talk very quickly about
25 the store's performance.  There has



Page 142

1    RE-DIRECT EXAMINATION OF DR. A. HAMAD
2  been testimony and there's been
3  discussion about it in opening remarks,
4  but I want to ask you if you recall
5  what the store's performance was, let's
6  just say, in 2013, do you recall what
7  your sales were?
8    A. We were privileged to have
9  monthly report from Simon at the
10  Caesars Palace and the monthly sales
11  for the store.  So Sarah LLC had
12  average sales of 150,000, 155,000 a
13  month, and that was not enough to
14  sustain the store and make it move
15  forward.  We were in the negative.
16    And when Italnord took over, we
17  were still privileged to have those
18  informations.  And, you know, that
19  calculations and the average were
20  around $113,000 a month.  As a matter
21  of fact, I still remember vividly, the
22  last month Italnord was at the store he
23  sold for $30,000.  So the store's
24  performance was deteriorating as we
25  moved on.

Page 143

1    RE-DIRECT EXAMINATION OF DR. A. HAMAD
2    And then Forall took over.  We
3  thought they were going to do the great
4  job.  They're the mother company.  They
5  know the business.  This is their
6  product.  They're familiar with how to
7  sell it.  And unfortunately, even
8  though, you know, they did what they
9  did, the sales dropped even more and
10  drastically to, like, $63,000 a month,
11  not to cover the rent.
12    Simon was panicking and they did
13  not like what they saw, and this is was
14  one of the reasons also why they didn't
15  want Pal Zileri to be in the mall.
16  They were just afraid that one day they
17  going to close the shop and walk away.
18  And those reports are available; if you
19  want I can supply with those reports.
20    They're directly from Simon from
21  Caesars Palace.  There's
22  authentications on those reports.
23  There's no doubt about it.
24    Q. Okay.  I appreciate that, Dr.
25  Hamad.

Page 144

1    RE-DIRECT EXAMINATION OF DR. A. HAMAD
2    MR. LEWIS:  I don't have
3  anything further with this
4  witness.
5    THE ARBITRATOR:  Mr. Brown,
6  anything else?
7    MR. BROWN:  Yes, sir.
8
9        * * *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 145

1    RE-CROSS EXAMINATION OF DR. A. HAMAD
2  RE-CROSS EXAMINATION BY
3  MR. BROWN:
4    Q. You just said Simon was
5  panicking as a result of the sales
6  numbers; wasn't it in fact you and your
7  brother that were panicking?
8    MR. LEWIS:  Objection.  This
9  was more for clarification.  I
10  thought you instructed us that we
11  could not do any re.
12    THE ARBITRATOR:  Wait a
13  minute.  You called him as a
14  witness, and you just had
15  re-direct.  Each one gets one.
16  You had a re-direct, he gets a
17  re-cross.  Am I missing
18  something?
19    You can answer the question,
20  Dr. Hamad.
21    A. We were concerned about the
22  performance of the store.  We thought
23  Forall will do a great job; however,
24  they really do the poor job, Honor.
25  They were not up to the task and they

MAGNA
LEGAL SERVICES

1    RE-CROSS EXAMINATION OF DR. A. HAMAD
2  destroyed the store and the brand name.
3      Q. I'll say it again.  Wasn't it
4  you, in fact, that was panicking and
5  you chose to --
6      A. No.
7      Q. You chose to mitigate your
8  exposure by getting out from the
9  guaranty on lease with Simon; is that
10 correct?
11     A. Absolutely not.  We were very
12 concerned about the market, Pal Zileri,
13 the store.  As opposed to -- you know,
14 I mean, we were very concerned, but we
15 were not panicking.
16       We wished you well, by the way.
17 We were good citizens.  We did --
18       THE ARBITRATOR:  Dr. Hamad,
19    just -- just answer the question.
20    All right.
21    Go ahead, Mr. Brown.
22     Q. So you just testified that you
23 were going to be unable to take the
24 store back because you would have only
25 had old inventory as of September '16;

1    RE-CROSS EXAMINATION OF DR. A. HAMAD
2  isn't that right?
3       MR. LEWIS:  Objection.  Not
4    his testimony.
5      A. Yes, we did.  There was not
6  enough time to go and buy any new
7  merchandise.
8      Q. I'm sharing my screen here,
9  which is unfortunately continuing to
10 have issues.  I'm going to Exhibit 240.
11      THE ARBITRATOR:  Getting
12    connection lost again.
13       MR. BROWN:  I know.  So am
14    I.
15     Q. Here we are.  Going to the
16 second page of this document, which
17 this is a letter, sir, from me to your
18 counsel dated June 1, 2016.  Okay?
19     A. Yes.
20     Q. Have you ever seen this document
21 before?
22     A. Vaguely.
23       MR. LEWIS:  What exhibit is
24    this?
25       MR. BROWN:  Exhibit 240.

1    RE-CROSS EXAMINATION OF DR. A. HAMAD
2       THE ARBITRATOR:  The
3    question is:  Have you ever seen
4    this before?
5       THE WITNESS:  Yes.
6      Q. Okay.  And it says -- and did
7  you see it at that time, June 1, 2016,
8  or thereabouts?
9      A. Yes.
10     Q. And I said, "This letter is in
11 follow up to my client's letter dated
12 March 9, 2016, a copy of which is
13 attached.  We had no response from
14 either office or from client," pardon
15 the brevity of my writing there. "It is
16 imperative that we confirm that your
17 client is prepared to take over the
18 store and lease effective
19 September 2016, and meet its
20 obligations under the license and
21 retail agreement."
22       This is before you canceled the
23 lease, right?
24     A. Yes.
25     Q. "I remind you that under the

1    RE-CROSS EXAMINATION OF DR. A. HAMAD
2  license agreement, Sarah LLC is
3  responsible to pay in advance for stock
4  inventory in the store, and is required
5  to provide adequate inventory at the
6  store at all times as more particularly
7  set forth in the letter of March 9,
8  2016.  Please notify me of your
9  client's contention to confirm that
10 Sarah LLC will meet its contractual
11 obligations.  All rights are reserved."
12       Did you or anyone on your behalf
13 respond to this letter?
14     A. I'm not aware of it.
15     Q. And the second page of this
16 document was the previously provided
17 letter from Paolo Torello-Viera, CEO of
18 Pal Zireli, of March 9, right, to your
19 brother, Sarah LLC, care of your
20 brother?
21       And it states that we've already
22 notified you. "Consequently, effective
23 September 1, 2016, Sarah shall again
24 assume possession Pal Zileri store.
25 The lease for the premises and all



Page 150

RE-CROSS EXAMINATION OF DR. A. HAMAD
1 obligations under the party's license
2 and retail operator agreement dated
3 March 2011."
4
5     Sir, how can you say that you
6 thought that you didn't have to take
7 back the store?
8     A. Because of the e-mails we
9 exchanged with and you were aware of
10 it, and because of the six months made
11 it into the management agreement.  And
12 you guys were aware of it, that we are
13 going to turn the store if you don't
14 take care of it.
15     Q. But you don't have anything in
16 e-mails six months prior from your side
17 stating some, you know, wishes, but you
18 have nothing in the agreements that the
19 parties actually agreed to, do you?
20     A. In the agreement, we have the
21 six months notice.  It was clear-cut
22 notice that you need -- you need to
23 tell us six months in advance.  You
24 were on the e-mail, and you're aware of
25 it.

Page 151

RE-CROSS EXAMINATION OF DR. A. HAMAD
1
2     Q. Okay.  I'm -- so by you stating
3 just now that -- you testified you
4 would not have had the opportunity to
5 have inventory in the store; isn't that
6 false?
7     Didn't Mr. Torello-Viera give
8 you adequate notice that you had to get
9 product and start ordering it, and get
10 it in the store as early as March 2016,
11 and then you had no response to this?
12     A. Mr. Brown, you probably are not
13 aware of the way the business is done.
14     THE ARBITRATOR:  Hang on.
15 Dr.  Hamad, he's not asking you
16 how the business was done.  He's
17 simply asking did you have this
18 notice from Forall about getting
19 inventory; that's all he's
20 asking.
21     Either you had the notice or
22 you didn't have the notice.
23 That's what he's asking.
24     THE WITNESS:  Let him ask
25 that question again, Honor.

Page 152

RE-CROSS EXAMINATION OF DR. A. HAMAD
1
2     THE ARBITRATOR:  Why don't
3 you restate it, Mr. Brown.
4     Q. Didn't you, in fact, have this
5 notice as earlier as March 9, 2016,
6 from Forall that you needed to get
7 product ready for the fall?
8     A. The notice is here, but there is
9 no adequate time to go and do the buy.
10 The buy usually happens --
11     THE ARBITRATOR:  He's not
12 asking about the buy, Dr. Hamad.
13 The question simply was:  Did you
14 have the notice?  That's all.
15     THE WITNESS:  Okay.  I had
16 the notice.
17     THE ARBITRATOR:  Okay.
18 That's it.
19     Q. And is it your testimony that
20 Forall would not have been able to
21 provide you with the autumn and fall
22 product line with that amount of time?
23     A. It's not enough time to do it.
24     Q. Isn't it true that in the
25 selling season in Las Vegas that

Page 153

RE-CROSS EXAMINATION OF DR. A. HAMAD
1
2 product generally delivered late
3 September for October and November
4 rushes?
5     A. It's usually delivered in
6 August, start delivering in August,
7 late July, August into September.
8     Q. Isn't it true that there's very
9 little foot traffic in Las Vegas due to
10 the heat, and therefore, the fall and
11 winter lines are not usually delivered
12 into the start of September, late
13 September?
14     A. No.
15     Q. Okay.
16     MR. BROWN:  I don't have any
17 other questions.
18     THE ARBITRATOR:  Okay.  Dr.
19 Hamad, thank you very much for
20 your testimony.  We appreciate
21 it.  You're excused.  Mr. Lewis,
22 who is your next witness?
23     THE WITNESS:  Thank you,
24 sir.
25     MR. BROWN:  Thank you.



| Page 154 |
|---|

1    RE-CROSS EXAMINATION OF DR. A. HAMAD
2        MR. LEWIS:  Dr. Bachar
3    Hamad.
4        THE ARBITRATOR:  All right.
5    Let's get Dr. Mathew Bachar
6    [sic].
7        MR. LEWIS:  Dr. Bachar
8    Hamad.
9        THE ARBITRATOR:  Bachar
10   Hamad, okay.
11       MR. BROWN:  Mr. Farber, if
12   it's okay with you, I'm going to
13   try to reboot my computer to
14   perhaps see if that may help my
15   bandwidth issues.  I've been
16   having them throughout the day.
17       THE ARBITRATOR:  Go ahead.
18   We're waiting for Dr. Bachar
19   Hamad.
20       Dr. Bachar Hamad?
21       THE WITNESS:  Yes.
22       THE ARBITRATOR:  I'm Gene
23   Farber.  If we could see you, I'd
24   appreciate it.  Nice to meet you,
25   Doctor.

| Page 155 |
|---|

1    RE-CROSS EXAMINATION OF DR. A. HAMAD
2        THE WITNESS:  Nice meeting
3    you.
4        THE ARBITRATOR:  I know that
5    Mr. Lewis wanted to call the A
6    before the B, so that's why he
7    called your brother first, right?
8        We're waiting for counsel
9    for Forall to join us.  He had
10   some computer issues, and he's
11   rebooting right now, so give us a
12   moment.
13       MR. BROWN:  Arbitrator
14   Farber, you can proceed.  I can
15   see the screen on my co-counsel's
16   screen.
17       THE ARBITRATOR:  Right.  I
18   prefer to see if you're handling
19   the witness, because if you say
20   the word "objection" and I can't
21   see you that doesn't work.  I'd
22   rather be able to see you.
23       That's better.
24       MR. BROWN:  Good.  Thank
25   you.

| Page 156 |
|---|

1    RE-CROSS EXAMINATION OF DR. A. HAMAD
2        THE ARBITRATOR:  Dr. Bachar
3    Hamad, are you alone in the room?
4        THE WITNESS:  Yes.
5        THE ARBITRATOR:  Could you
6    stand please or stand in such a
7    way that I could still see you?
8    I need to see your face.  Okay.
9        Raise your right hand.  Do
10   you solemnly swear the testimony
11   you're about to give in this
12   arbitration proceeding will be
13   the truth, the whole truth, and
14   nothing but the truth?
15       THE WITNESS:  I do.
16       THE ARBITRATOR:  Could you
17   be seated please and spell your
18   full name for me and let me have
19   an address which could be either
20   home or work?
21       THE WITNESS:  B-A-C-H-A-R,
22   last name, H-A-M-A-D.  And the
23   address 1717 Midwest Club
24   Parkway, Oak Brook, Illinois
25   06523.

| Page 157 |
|---|

1    RE-CROSS EXAMINATION OF DR. A. HAMAD
2        THE ARBITRATOR:  Dr. B.
3    Hamad, your counsel, Mr. Rodney
4    Lewis, is going to ask you some
5    questions, and what I'd like you
6    to do is, let him finish the
7    question.  Don't jump in with an
8    answer.
9        And when he's finished with
10   each question, pause.  The
11   gentleman in the vest who you see
12   on the screen is Mr. Brown, and
13   if Mr. Brown says the word
14   "objection," do not answer the
15   question until I tell you whether
16   or not you should do so.
17       Otherwise, if he does not
18   say the word "objection," just
19   try to respond as directly as you
20   can to the question posed by Mr.
21   Lewis.  All right?
22       THE WITNESS:  All right.
23       THE ARBITRATOR:  Mr. Lewis,
24   why don't you proceed, please.
25            * * *



1    DIRECR-EXAMINATION OF DR. B. HAMAD
2  B A C H A R   H A M A D, the witness
3  herein, having been first duly sworn by
4  the arbitrator, was examined and
5  testified as follows:
6  DIRECT=EXAMINATION
7  BY MR. LEWIS:
8      Q. Good afternoon, Dr. Hamad.  How
9  are you?
10     A. Good morning.
11     Q. I covered a lot of the
12  background of how you all --
13        THE ARBITRATOR:  Speak a
14     little louder, Mr. Lewis, if you
15     can.
16        MR. LEWIS:  Are we having
17     the same issues with my sound
18     again?
19        THE ARBITRATOR:  Better now.
20     Go ahead.
21     Q. I was saying -- Dr. Hamad, we'll
22  jump right in instead of doing the
23  background with you, since we have
24  covered background.
25     I want to take you to 2013 --

1    DIRECR-EXAMINATION OF DR. B. HAMAD
2  excuse me -- 2014, when Alfonso Entebi
3  decided that he was going to the go --
4  let me take a half step back.
5      Do you recall a time when
6  Italnord began operating the store in
7  Las Vegas?
8      A. Do I remember the time, the
9  date?
10     Q. No.  Do you recall that that
11  happened?
12     A. I do.
13     Q. And do you recall the terms
14  surrounding -- the period of time
15  surrounding when Italnord would operate
16  the store?
17     A. Yes.
18     Q. And some point in time did
19  Alfonso Entebi inform Sarah that
20  Italnord would not continue operating
21  the store after the end of the first
22  term?
23     A. Yes.
24     Q. And there was some testimony and
25  there's been some argument that Sarah

1    DIRECR-EXAMINATION OF DR. B. HAMAD
2  came back into the store after Italnord
3  cease operating or notified Sarah that
4  it was going to ceased operating and
5  began operating the store again?
6      A. That's not true.  That's not
7  true.
8      Q. So I'm going to show you a
9  couple of documents just to help with
10  the timing here.  I'm going to show you
11  Group Exhibit 7 -- Joint Exhibit 7,
12  rather.
13        Dr. Hamad, can you see my
14  screen?
15     A. I can see it here, yeah.
16     Q. Okay.  All right.  Do you see
17  this is the management agreement
18  between Italnord and Sarah dated
19  September 20, 2013?
20     A. Yes.
21     Q. And you see the term of this
22  agreement was to continue until
23  January 31, 2015, correct?
24     A. Yes.
25     Q. That's your understanding that

1    DIRECR-EXAMINATION OF DR. B. HAMAD
2  Italnord was going to operate the store
3  at least until January 31, 2015?
4      A. Yes.
5      Q. Okay.  However, at some point,
6  Mr. Entebi informed you that it was not
7  going to continue operating the store
8  beyond January 31, 2015, right?
9      A. He did inform us, yeah.
10     Q. And you were aware that Forall
11  came in and began operating the store
12  somewhere around March 15, 2016,
13  correct?
14     A. Yes.
15     Q. I'm sorry.  March of 2015?
16     A. Yeah.
17     Q. So there was a little bit a
18  month and a half lag --
19        THE ARBITRATOR:  You meant
20     '15 not '16.  You said '16.
21        MR. LEWIS:  That's right,
22     '15.
23     Q. So between January 31, 2015, and
24  when Forall came in and began operating
25  in March of 2015, did Sarah operate the



Page 162

DIRECR-EXAMINATION OF DR. B. HAMAD

1
2 store?
3       A. No.
4       Q. Didn't Simon insist that
5 business continue and that the store
6 was operational at all times?
7       A. Yes.
8       Q. So who operated the store during
9 that period?
10      A. Actually, what happened is there
11 was a drop from the part of Paolo and
12 he allowed Entebi to stay in that store
13 for one and a half month.
14      Because we are on the lease, we
15 have to pay the lease, and he was
16 selling his merchandise for his own
17 benefit. So we had to pay the lease
18 for one and a half month allowing
19 Entebi to stay in the store, because
20 Paolo was saying, "Yes, tomorrow, after
21 tomorrow, the day after, we see what
22 happened," until end of March and they
23 made agreement.
24      Q. So if I understand, Italnord is
25 still in the store selling merchandise

Page 163

DIRECR-EXAMINATION OF DR. B. HAMAD

1
2 and keeping the revenue, but Sarah was
3 being forced to pay the rent?
4       A. Yes.
5       Q. And so that's what took place
6 for February of 2015?
7       A. Yeah. I'm sorry. From
8 January 31st until mid March, one and a
9 half month.
10      Q. So looking at that time from a
11 broader perspective. When Sarah sold
12 its assets to Italnord back when this
13 agreement was entered and the asset
14 purchase agreement was entered in
15 September of 2013, did Sarah ever come
16 back in to operate the store?
17      A. To be honest with you, we never
18 went back until now, no. We did not go
19 to Vegas, and up to now we did not go
20 to Vegas.
21      Q. I'm sorry. I didn't mean to
22 interrupt you. I don't mean you and
23 your brother specifically. I mean
24 Sarah LLC, from the time you sold the
25 assets to Italnord in September of

Page 164

DIRECR-EXAMINATION OF DR. B. HAMAD

1
2 2013, Sarah LLC never came back in to
3 operate the store, correct?
4       A. No, it did not. No.
5       Q. Is that consistent -- first of
6 all, is it your understanding that when
7 the store closed in August of 2016,
8 that Sarah LLC was no longer required
9 to fulfill its obligations under the
10 license agreement; is that your
11 understanding?
12      A. Yes.
13      Q. Is the fact that Sarah never
14 came back into the store to operate the
15 store after September 2013, does that
16 support your understanding that you
17 were not required to continue on under
18 the license agreement?
19      A. Yes.
20      MR. BROWN: Objection. I
21 mean, I just --
22      THE ARBITRATOR: Well, he
23 answered already, so let's go to
24 the next question.
25      Dr. Bachar Hamad, you have

Page 165

DIRECR-EXAMINATION OF DR. B. HAMAD

1
2 to wait to give Mr. Brown an
3 opportunity to say "objection."
4 So you have to pause at the end
5 of each question. All right.
6      Next question, Mr. Lewis.
7      Q. Dr. Hamad, do you recall going
8 to Italy in November of 2013?
9      A. Yes.
10      Q. What was the purpose of your
11 trip to Italy in November 2013?
12      A. We -- the store was not
13 performing very well, so we went to the
14 company and had a nice discussion with
15 owner and CFO and Luca and informed
16 that the store was not performing
17 [sic].
18      Q. And when you say "the owner,"
19 and then you said, "The CFO," or --
20      A. Yeah. I think all of them --
21 Mr. Marco, and Luca, and there was
22 another guy in charge of the operation
23 in the meeting.
24      Q. Okay. And what was the
25 discussion, to the extent you can



DIRECR-EXAMINATION OF DR. B. HAMAD

1       DIRECR-EXAMINATION OF DR. B. HAMAD
2 recall?
3    A. Discussion was about the status
4 of the store, that the sales were not
5 that great, and if we going to continue
6 to operate like this, it would be total
7 collapse soon -- sooner or later so we
8 asked for some help [sic].
9    Q. And did Forall offer any help at
10 that meeting?
11    A. Well, he said he will expect to
12 look -- to look to see if there is
13 anything he can do management,
14 advertisements. We asked for reduction
15 at that time of the -- of the price.
16     They said they are giving us
17 three percent, including the
18 construction, 20 percent. But we found
19 out later on that the three percent was
20 given to everybody buying from that
21 place, in any store around the world.
22     THE ARBITRATOR: You just
23 said -- Dr. Bachar Hamad, you
24 asked for reduction of price,
25 what does that mean?

DIRECR-EXAMINATION OF DR. B. HAMAD

1       DIRECR-EXAMINATION OF DR. B. HAMAD
2     THE WITNESS: Discount --
3 More discount.
4     THE ARBITRATOR: I see.
5 Okay.
6    Q. And did Forall eventually agree
7 to provide additional discounts?
8    A. No. At that meeting, no. But
9 later on I think they sent an e-mail
10 that they are considering more
11 discount. It never happened.
12    Q. Did you discuss the minimum
13 purchase requirement at the meeting in
14 November of 2013?
15    A. We discuss this issue and the
16 president at that time, he said it's
17 not enforceable.
18     THE ARBITRATOR: I'm sorry.
19 I can't hear the last answer.
20     THE WITNESS: I said we
21 discuss it with Luca and
22 Mr. Marco and they informed us
23 that that agreement is not
24 enforceable. So we buy whatever
25 we can sell.

DIRECR-EXAMINATION OF DR. B. HAMAD

1       DIRECR-EXAMINATION OF DR. B. HAMAD
2     THE ARBITRATOR: Who said
3 what?
4     THE WITNESS: Marco --
5 Mr. Marco, the owner, said we can
6 buy whatever we can, you know, we
7 can sell. The agreement is not
8 enforceable. You don't have to
9 buy like 500 or 450 a season.
10     THE ARBITRATOR: And who
11 said that, Luca or Marco?
12     THE WITNESS: Marco. He
13 said keep whatever left in the
14 old season, and buy whatever you
15 can support the new season.
16 That's -- the plan was to do it
17 this way [sic].
18     THE ARBITRATOR: Did anyone
19 take any notes at this meeting?
20     THE WITNESS: No.
21     THE ARBITRATOR: Okay. Go
22 ahead.
23    Q. So your brother was at the
24 meeting as well?
25    A. Yes.

DIRECR-EXAMINATION OF DR. B. HAMAD

1       DIRECR-EXAMINATION OF DR. B. HAMAD
2    Q. Did you all discuss afterwards
3 the changes or what the discussion --
4 did you all discuss afterward what you
5 all had discussed with the CEO and
6 Marco -- excuse me -- the CEO and Luca
7 during the meeting?
8    A. That meeting we told them what's
9 going on with the store that -- you
10 know, I think by that time we put
11 $2 million, lots of $2 million in the
12 store.
13     And he was shocked by this
14 number. And he said, "We'll do
15 whatever to help you," and it was a
16 nice conversation. But he is -- at
17 that time he said, "We cannot give you
18 more discount, and see what the
19 option." And we said "Well, he was
20 thinking about having somebody else
21 taking over the store who can manage
22 the store better," thinking that
23 there's problem with the management.
24 And he said, "Well we can investigate
25 other -- other -- other -- let's put it



Page 170

```
1        DIRECR-EXAMINATION OF DR. B. HAMAD
2   this way -- other operators of the
3   store."
4        And you know, I expressed
5   interest, if it doesn't work out to
6   look for other avenue.  You know,
7   because you cannot keep losing like
8   this all the time.
9        Q.  Okay.  And I guess I was asking
10  you if you and your brother after the
11  meeting had spoken about what
12  transpired at the meeting?
13       A.  From then, nothing.
14       Q.  I'm going to show you joint
15  Exhibit 55.
16       THE ARBITRATOR:  Could you
17    just hold one second?  I'm
18    looking in my notes for
19    something.
20       What was the date -- this
21    meeting took place in Venice
22    right?
23       THE WITNESS:  Yes.
24       THE ARBITRATOR:  And you're
25    sure it was in '13?
```

Page 171

```
1        DIRECR-EXAMINATION OF DR. B. HAMAD
2        THE WITNESS:  I think it was
3    in -- actually, '12, '12.
4    One year after.  It was around
5    Thanksgiving.
6        THE ARBITRATOR:  That's what
7    I want to clarify.  All right.
8    Now, at this meeting, was
9    anything said about some other
10   formula that you had to abide by
11   or were you just told you could
12   ignore the minimum purchase
13   requirements?
14       THE WITNESS:  We were told
15   that we going to help you by, you
16   know, whatever we can do to help
17   you.  You don't have to buy the
18   minimum purchase.  And exactly
19   that that was -- whatever left in
20   the store, keep it.  Then sell it
21   in the wholesale and buy new
22   stuff.  You don't have to go
23   there with the whole amount
24   [sic].  And Luca was in the
25   meeting.
```

Page 172

```
1        DIRECR-EXAMINATION OF DR. B. HAMAD
2        THE ARBITRATOR:  Right.  Did
3    anyone say anything about
4    readjusting the minimum purchase
5    requirement in some fashion?
6        THE WITNESS:  I don't recall
7    that, no.
8        THE ARBITRATOR:  Did anyone
9    say anything about a minimum
10   purchase requirement based on
11   prior years sales?
12       THE WITNESS:  They said if
13   it doesn't sell, you don't have
14   to buy it.  You can go lower.  It
15   doesn't have to be the exact
16   amount, because they were not
17   selling.  He said, "You don't
18   have to buy whatever we agreed
19   on.  You can buy whatever you
20   need."
21       THE ARBITRATOR:  And did
22   anyone say how long this
23   agreement would last that you
24   didn't have to buy any minimum
25   purchase requirement at all?
```

Page 173

```
1        DIRECR-EXAMINATION OF DR. B. HAMAD
2        THE WITNESS:  He said it
3    only vaguely for -- he did not
4    specify any time.  I'm not
5    remembering that was specified
6    time.
7        THE ARBITRATOR:  Do you know
8    of any writing that exists that
9    -- that exists for the this
10   statement that you say that was
11   made that you don't have to pay
12   attention to the minimum purchase
13   requirement?
14       THE WITNESS:  I'm not aware
15   of any I can think, no [sic].
16       THE ARBITRATOR:  All right.
17   Why don't you proceed, Mr. Lewis?
18       MR. LEWIS:  Thank you.
19       Q.  Just to finish off Arbitrator
20  Farber's point, Dr. Hamad, was there a
21  discussion about the new requirement to
22  purchase being connected to prior
23  seasons' sales.  I want to make sure
24  you have an opportunity to make that
25  clear for Arbitrator Farber?
```



DIRECR-EXAMINATION OF DR. B. HAMAD
1
2        MR. BROWN:  Objection.  That
3   was asked and answered.
4        THE ARBITRATOR:  I think he
5   made it pretty clear.  He said
6   there was no such thing, so if
7   you want to repeat it.  He can
8   repeat it.
9        MR. LEWIS:  That's what I
10  thought came through, but that's
11  not what he said originally.
12       THE ARBITRATOR:  Okay.  The
13  record will show what he said,
14  but you go ahead with your
15  questions.
16       Q. I believe Mr. Farber was asking
17  you, Dr. Hamad, and I wasn't sure you
18  understood.
19       MR. BROWN:  Objection.
20  Coaching a witness.
21       MR. LEWIS:  I'm sorry.
22       THE ARBITRATOR:  Let's pose
23  the question without what he
24  understood, and what he didn't
25  understand.  Just pose the

DIRECR-EXAMINATION OF DR. B. HAMAD
1
2   question.
3       Q. During the meeting with Marco
4   Baritza and Luca Spano, was there a
5   discussion about purchases being
6   connected to past seasons' sales
7   determining how --
8       A. That's exactly -- that's what
9   they said.  I just mentioned to you
10  that that season -- what did not sell,
11  he said you can go down on the amount
12  of purchase needed.
13       Q. That's what I thought you said.
14       THE ARBITRATOR:  Okay.  Go
15  ahead.
16       A. I have some connection problem
17  here.
18       THE ARBITRATOR:  No.  You're
19  fine.  We can hear you loud and
20  clear, Dr. Bachar Hamad.
21       So go ahead Mr. Lewis.
22       Q. So did sales improve in 2013?
23       A. No.
24       Q. Eventually, did you ask for
25  additional assistance from Forall?

DIRECR-EXAMINATION OF DR. B. HAMAD
1
2       A. Yes.
3       Q. Did you at some point ask Forall
4   to help find a new operator?
5       A. Yes.
6       Q. Did Forall, in fact, find a new
7   operator?
8       A. Yes.
9       Q. Was that Italnord?
10      A. Yes.
11      Q. Had you had any familiarity with
12  Italnord before Forall identified them
13  as a new operator?
14      A. No.
15      Q. What did you come to learn about
16  Italnord and other stores that it may
17  have owned?
18      A. I'm sorry.  Say that again.
19      Q. What did you come to learn about
20  Italnord and its owner, Alfonso Entebi,
21  and other stores that they owned?
22      A. This is from Forall.  They are
23  the one who brought him to operate the
24  store.  We didn't know anything about
25  him.  They said, "He have four, five

DIRECR-EXAMINATION OF DR. B. HAMAD
1
2   stores in Mexico, he's a good guy, and
3   have him take over."
4       Q. You said he had four, five
5   stores in Mexico?
6       A. Yes.
7       Q. Do you know if he had a Pal
8   Zileri store, at lease one?
9       A. Yes, he want to have Pal Zileri
10  store, yes.
11      Q. What was your understanding
12  about the performance of Mr. Entebi's
13  stores?
14      A. No idea.  Before the -- he came
15  to us, they did not tell us anything
16  about him, no.
17      Q. Did you come to learn that he
18  had successfully operated Pal Zileri
19  stores?
20      A. Yes.
21      Q. Was Mr. Entebi able to
22  successfully operate the Las Vegas
23  store?
24      A. The answer is no.
25      Q. Despite his years --



| | |
|---|---|
| Page 178 | Page 179 |

**Page 178**

DIRECR-EXAMINATION OF DR. B. HAMAD
1
2    A. Despite his experience.  Sorry
3  about this.  Go ahead.
4    Q. Despite his experience and
5  successful track record with Pal Zileri
6  stores, he wasn't successfully able to
7  operate the Pal Zileri store?
8    A. He was not able to perform no.
9    Q. Dr. Hamad, did Simon require
10  Sarah to provide regular sales reports?
11    A. Yes.
12    Q. How often did you have to
13  provide those to Simon?
14    A. Every month.
15    Q. From what you recall, was that a
16  provision of the lease that required
17  that?
18    A. Yes.
19    Q. And did you abide by that?
20    A. Yes.
21    Q. From what you recall, as far as
22  you were aware, did Italnord also have
23  to abide by that lease provision?
24    A. The answer is yes.
25    Q. So Italnord had to provide

**Page 179**

DIRECR-EXAMINATION OF DR. B. HAMAD
1
2  monthly sales figures to Simon as well?
3    A. He was providing under our name;
4  not under his name.  Even Pal Zileri
5  was supposed to provide monthly payment
6  under our name, under Sarah LLC,
7  because legally they cannot -- you
8  know, they cannot operate the store.
9  They are not on the lease.
10    Q. Dr. Hamad, two things.  Number
11  one, we can't see your face right now.
12    A. How about now?
13    Q. That's much better.  Thank you.
14    A. I'm not seeing anything, you
15  know, but it's okay.  Go ahead.
16    Q. Okay.  So my question is about
17  the sales reports first.
18    A. Yes.
19    Q. You said Italnord was under the
20  same obligation under the lease to
21  provide monthly sales reports to Simon?
22    A. Yes.
23    Q. And as far as you know, they
24  abided by that obligation?
25    A. To my knowledge, yes.

| | |
|---|---|
| Page 180 | Page 181 |

**Page 180**

DIRECR-EXAMINATION OF DR. B. HAMAD
1
2    Q. Was Forall under the same
3  obligation to provide monthly reports
4  to Simon when it operated the store?
5    A. Yes.
6    Q. As far as you know, did they
7  abide by that obligation?
8    A. Yes.  Simon has all the sales
9  each month from the beginning to the
10  end.
11       THE ARBITRATOR:  Dr. Bachar
12    Hamad let's wait for a question
13    and then you respond to the
14    question.  All right?
15       THE WITNESS:  Yes.
16    Q. So Simon was aware of the
17  store's performance or lack thereof,
18  right?
19    A. Yes.
20    Q. Did you have conversations with
21  Simon in 2013 about the sales -- the
22  store's performance?
23    A. Yes.
24    Q. Did you have conversations with
25  Simon in 2014 about the store's

**Page 181**

DIRECR-EXAMINATION OF DR. B. HAMAD
1
2  performance?
3    A. Yes.
4    Q. I'm going to show Exhibit 55.
5    A. I cannot see anything.  I have
6  to ask for some help here.  I can't
7  see.  I can't see anything.  Let me
8  just ask for some help.  Now it's
9  better.  Yeah.
10    Q. Before I get to that exhibit,
11  Dr. Hamad, did Simon share you with
12  concerns about the store's performance?
13    A. Multiple times, yes.
14    Q. Can you recall some of those
15  occasions?
16    A. Well, he called, you know,
17  complaining that the store is not
18  performing very well, and the sales are
19  going down, and he have to do something
20  about it, otherwise he will stop -- you
21  know, he might have to eject us from
22  the store [sic].
23    Q. They suggested you all may have
24  to leave the store?
25    A. Yes.



Page 182

DIRECR-EXAMINATION OF DR. B. HAMAD
1
2     Q. Do you recall when that was,
3  when that conversation took place?
4     A. He called multiple times in '14
5  -- I mean, mainly before the end.
6     Q. When you say -- I'm sorry to
7  interrupt you.  When you say "he," who
8  are you referring to?
9     A. Todd Eads.
10     Q. Who is Todd Eads?
11     A. He's in charge of the
12  properties.
13     Q. Of Simon?
14     A. Simon, yeah.
15        THE ARBITRATOR:  For Simon?
16        THE WITNESS:  Yes.
17     Q. You were saying that he called
18  multiple times?
19     A. He called multiple times, yeah.
20  He had concerns that somehow you guys
21  are not doing well, and he was afraid
22  one day we might have to pack and leave
23  the store and it will be legal issue
24  for the lease and etcetera, etcetera.
25     Q. Did Mr. Eads make any

Page 183

DIRECR-EXAMINATION OF DR. B. HAMAD
1
2  suggestions to you about what could be
3  done?
4     A. Well, somehow at the end he was
5  not convinced at all that the store
6  will be successful, and, you know,
7  honestly he lost hope in Pal Zileri
8  performing very well in that area.
9        And he said, you know, around --
10  before the end, he said he's not going
11  to renew the contract.  It's going to
12  be like this.  He might have to ask us
13  to leave.
14        MR. LEWIS:  I apologize.
15     There's another exhibit that I
16     want us to go to, but I don't
17     want to forget to show this to
18     you either.  So Joint Exhibit 21.
19     Q. Dr. Hamad, can you see my screen
20  now?
21     A. Yes, I do.
22     Q. Okay.  So this is an e-mail Luca
23  Spano sent to you, your brother, some
24  others are CC'd in January of 2013; do
25  you see that?

Page 184

DIRECR-EXAMINATION OF DR. B. HAMAD
1
2     A. Yes.
3     Q. This is after you had met with
4  Luca and the CEO in November of 2012,
5  right?
6     A. Yes.
7     Q. Earlier you testified at the
8  meeting, Forall hadn't agreed to
9  additional discounts, but later sent an
10  e-mail agreeing to additional
11  discounts; do you recall that?
12     A. That's true.
13     Q. Does this e-mail refresh your
14  recollection as to what additional
15  discounts Forall agreed to provide?
16     A. That's -- it never happened.  It
17  never happened.  They said they going
18  to do it, but it did not happen.  I
19  don't recall this happened [sic].
20     Q. That was my next question, Dr.
21  Hamad.  This e-mail was laying out
22  additional discounts that Forall was
23  promising, right?
24     A. Yes.
25     Q. And did you receive those

Page 185

DIRECR-EXAMINATION OF DR. B. HAMAD
1
2  additional discounts?
3     A. No.
4     Q. So when Mr. Entebi from Italnord
5  was operating the store, and more
6  specifically, when he informed that he
7  would no longer continue operating the
8  store after the expiration of the
9  initial term, did there come a time
10  that you had a conversation with Simon
11  about entering into a letter agreement?
12     A. Yes.
13     Q. And do you recall when that was?
14     A. I think it was around that time
15  around that time -- yeah.  After --
16  there was period of one and a half
17  month, around that time, that we had a
18  discussion with Simon.
19     Q. Do you recall entering into a
20  letter agreement with Simon in October
21  of 2013?
22     A. Yes.
23     Q. Do you recall what the nature of
24  that agreement was?
25     A. He want us to sign a paper to

MAGNA
LEGAL SERVICES

Page 186

DIRECR-EXAMINATION OF DR. B. HAMAD

1  find a tenant for the store.
2
3      Q. To allow Simon to find a new
4  tenant?
5      A. Yeah.  But it takes sometimes
6  one and a half years, six months, a
7  year, one and a half year.  It depended
8  on the customer, so --
9      Q. There's been discussion about
10  whether Mr. Entebi and Italnord would
11  have been allowed to take over the
12  lease?
13      A. That was in the beginning.
14      Q. I understand.  What was your
15  understanding as to whether or not
16  Italnord and Mr. Entebi would have been
17  able to take over the lease on their
18  own?
19      A. Well, when they would sign the
20  contract they -- the discussion was
21  Mr. Entebi had no credit in this
22  country, so give him a time to have a
23  credit, then he would apply to take
24  over the lease.
25      Q. So was that the reason that

Page 187

DIRECR-EXAMINATION OF DR. B. HAMAD

1
2  Sarah had to remain on the hook for the
3  lease?
4      A. Yes.
5      Q. Is it because Mr. Entebi wasn't
6  able to -- Simon wasn't going to
7  approve Mr. Entebi on the lease
8  initially; is that your understanding?
9      A. Yes.  That's the reason, yeah.
10      Q. This is Exhibit 52 -- excuse me
11  53, Joint Exhibit 53.  Can you see this
12  exhibit on my screen, Dr. Hamad?
13      A. Yes.
14      Q. And you see -- well, first of
15  all, this is August of 2013 correct?
16      A. Correct.
17      Q. And this is an e-mail from Luca
18  Spano to Alfonso Entebi copying your
19  brother?
20      A. Yes.
21      Q. All right.  And I'll just read
22  this really quickly.  "I just spoke
23  with Dr. Amar Hamad, and he is telling
24  me now that you, Mr. Entebi, are asking
25  to have in writing that the mall will

Page 188

DIRECR-EXAMINATION OF DR. B. HAMAD

1
2  transfer the lease to you.  Please be
3  informed that this will not be possible
4  for several reasons.  And the main one
5  is that your corporation is new in the
6  USA and they will not accept it.  The
7  second reason is that you want to
8  sublease and it will take approximately
9  three, four months," etcetera, but you
10  see in this first part the first reason
11  is that the corporation is new in the
12  USA, and they will not accept it; do
13  you see this?
14      A. Yes.
15      Q. Is that consistent with your
16  earlier testimony that Simon would not
17  accept Mr. Entebi and Italnord as
18  tenants on the lease?
19      A. Yes.
20      Q. And that required Sarah to stay
21  on the lease to facilitate Italnord
22  operating the store, right?
23      A. Yes.
24      MR. BROWN:  Objection.
25  Arbitrator Farber, we have a

Page 189

DIRECR-EXAMINATION OF DR. B. HAMAD

1
2  fully integrated agreement here.
3  This is just getting attempting
4  to parole evidence in.  I just
5  raise a blanket objection to it.
6  The agreements speak for
7  themselves.
8      THE ARBITRATOR:  I certainly
9  note your objection.  But it's
10  arbitration, and the parole
11  evidence rule is an evidence
12  rule.  Therefore, I'm going to
13  allow the testimony.  Overruled.
14  You can answer it.
15      A. The answer is yes.
16      Q. I was going to repeat or ask the
17  court reporter to read it back for us.
18      MR. BROWN:  Is it -- I don't
19  think there's a question pending,
20  but can I ask for a bathroom
21  break?  I actually myself just
22  personally need to --
23      THE ARBITRATOR:  Absolutely.
24  It's a little early for our
25  afternoon break.  Let's just take



1      DIRECR-EXAMINATION OF DR. B. HAMAD
2    five minutes, everyone.
3           (Whereupon, a recess was
4    taken.)
5           THE ARBITRATOR:  Okay.
6    Let's proceed.  Mr. Lewis, go
7    ahead.
8      Q. Dr. Hamad, we were discussing
9    the circumstances surrounding
10   Mr. Entebi informing Sarah that it
11   would -- Italnord would no longer
12   continue operating the store after the
13   expiration of the term; do you recall
14   that?
15     A. Yes.
16     Q. Were there discussions after
17   Italnord informed Sarah that it
18   wouldn't continue operating the store
19   about bringing in a new tenant to run
20   the store?
21     A. Yes.
22     Q. Do you know if Forall was a
23   party to those discussions about
24   bringing in a new tenant after Alfonso
25   to operate the store?

1      DIRECR-EXAMINATION OF DR. B. HAMAD
2      A. Yes, they were.
3      Q. All right.  I'm going to show
4    you joint Exhibit 54.  Dr. Hamad, can
5    you see my screen?
6      A. Yes, I can.
7      Q. And I think this is particularly
8    important, and this is an exhibit that
9    we haven't covered so far.  We've got
10   Wednesday, October 8, 2014, this is the
11   earliest e-mail in the string; do you
12   see that?
13     A. Yes.
14        MR. BROWN:  Objection to the
15   characterization of counsel's
16   testimony there.
17        THE ARBITRATOR:  Let's wait
18   till there's a question.  Let's
19   hear the question.
20        MR. BROWN:  Okay.
21     Q. This is an e-mail from
22   Mr. Entebi to your brother.  It
23   includes the CEO of Forall Paolo
24   Torello-Viera and some others and it
25   says -- it's about Las Vegas Prospect

1      DIRECR-EXAMINATION OF DR. B. HAMAD
2    tenant; do you see that?
3      A. Yes.
4      Q. Okay.  I'm going to read this
5    very quickly.  "Hi, Amar, as we talked
6    and explained, I asked you to please
7    confirm to me and Paolo Torello-Viera,
8    the CEO Americas at Pal Zileri, that we
9    are authorized and can go forward with
10   the prospect tenant for a possible
11   takeover of the store"; they refer to
12   it as a "takeover of the store," right?
13     A. Yes.
14     Q. This is in October of 2014?
15     A. Yes.
16     Q. And your brother responds to the
17   entire group on the e-mail.  "Okay.  Go
18   and proceed.  Thank you"; do you see
19   that?
20     A. Yes.
21     Q. And then Alfonso writes back,
22   "Hi, Amar, Paolo Torello-Viera, CEO
23   Forall USA, Pal Zileri, is advancing
24   with the prospect of a new tenant.
25   Please confirm that we can send a copy

1      DIRECR-EXAMINATION OF DR. B. HAMAD
2    of the executed lease agreement between
3    Sarah and the mall"; do you see that?
4      A. Yes.
5      Q. What was your understanding of
6    about what the CEO of Forall was doing
7    in this portion of time in October of
8    2014?
9      A. As I mentioned to you before, we
10   were on the hook for the lease, so it
11   was time to find somebody to take over
12   the store from Alfonso Entebi, and to
13   continue with the same thing, but our
14   problem that we are -- we were
15   responsible for the lease, so they had
16   to ask for the lease.
17     Q. So with them asking for a copy
18   of the lease now -- I mean, it reads to
19   me, and I don't want to testify here,
20   but you see that they're saying
21   "takeover of the store," and you're
22   giving them permission to find someone
23   to take over the store?
24     A. To take over the store from
25   Alfonso, yes.



1     DIRECR-EXAMINATION OF DR. B. HAMAD
2     Q. And so my original question to
3 you was if you knew if Forall was part
4 of the discussion about finding a new
5 tenant to take over the store in
6 October of 2014, and your answer is?
7     A. Yes. They were aware of it,
8 yes.
9     Q. They were asking for your
10 permission along with --
11     A. They were asking permission to
12 do it, yes.
13       MR. BROWN: Objection.
14       THE ARBITRATOR: Sustained.
15 Counselor, I can read it.
16 Clearly just asked for permission
17 to get a copy of the lease.
18       MR. LEWIS: Arbitrator
19 Farber, I beg to differ. It
20 says, "I ask you please confirm
21 that we are authorized and can go
22 forward with the prospect tenant
23 for a possible takeover of the
24 store."
25       THE ARBITRATOR: I

1     DIRECR-EXAMINATION OF DR. B. HAMAD
2 understand. Let's move on.
3       MR. LEWIS: Thank you.
4     Q. So did Forall bring in a new
5 tenant right away after October of 2014
6 when you exchanged these e-mails?
7     A. They were -- no. They brought
8 mid March. They came over themselves.
9     Q. But in October of 2014, what was
10 being discussed. It didn't happen
11 then, right?
12     A. It did not happen, no.
13     Q. So instead you had to enter into
14 a letter agreement with Simon?
15     A. Yes.
16     Q. And I'll show you a copy of that
17 agreement. Dr. Hamad, can you see my
18 screen now?
19     A. Yes, I see it.
20     Q. Is this your letter agreement
21 dated October 23, 2014, between Sarah
22 and Simon?
23     A. Yes.
24     Q. And what is your understanding
25 of what this agreement allowed Simon to

1     DIRECR-EXAMINATION OF DR. B. HAMAD
2 do?
3     A. Let me read it here. Their
4 desire to close for business and
5 surrender tenant lease hold to the
6 landlord, yeah.
7       THE ARBITRATOR: Have you
8 ever seen this before, Dr. Bachar
9 Hamad? THE WITNESS: I cannot
10 recall exactly 100 percent, but
11 most likely I saw it, yeah.
12     Q. Well, I would draw your
13 attention to the signature line there;
14 is that your signature?
15     A. Yes, that's my signature.
16     Q. Does that refresh you
17 recollection as to --
18     A. Yes.
19     Q. That is your signature on the
20 document, correct?
21     A. That's my signature.
22     Q. So in here -- and I want to
23 provide some context. Earlier in
24 October, the CEO of Forall asked Sarah
25 for permission to find a new tenant to

1     DIRECR-EXAMINATION OF DR. B. HAMAD
2 take over the store along with Alfonso,
3 correct?
4       MR. BROWN: Objection.
5       THE ARBITRATOR: What's the
6 objection?
7       MR. BROWN: He's delving
8 into, with all due respect,
9 fantasy. I don't understand the
10 question.
11       THE ARBITRATOR: Counsel,
12 why don't you restate it. You
13 said, "To take over the store
14 with Entebi."
15       MR. LEWIS: Okay.
16       THE ARBITRATOR: I'm not
17 sure you meant they were looking
18 for someone else to work together
19 with Entebi. Why don't you
20 rephrase?
21       MR. LEWIS: Thank you, Mr.
22 Farber.
23     Q. We just read an e-mail, Dr.
24 Hamad, where Alfonso, along with Paolo,
25 CEO with Forall, was requesting



Page 198

1      DIRECR-EXAMINATION OF DR. B. HAMAD
2  permission from Sarah to find a new
3  tenant to operate the store, take over
4  the store was --
5      A. Take over the store.
6      Q. And then that same month you're
7  entering into a letter agreement with
8  Simon. "Whereby tenant currently
9  occupies the premises under the lease.
10  It is the landlord's understanding that
11  tenant now desires to close premises
12  for business, and surrender tenant's
13  lease hold to landlord. Therefore,
14  tenant wishes to authorize landlord to
15  begin a search for a suitable
16  replacement tenant for the premises";
17  do you see that?
18      A. Yes.
19      Q. So we had Forall discussing
20  finding a new tenant, and here you are
21  asking Simon for the authorization to
22  have a new tenant, take over the lease;
23  do you see that?
24      A. Yes.
25      MR. BROWN: Objection.

Page 199

1      DIRECR-EXAMINATION OF DR. B. HAMAD
2  That's testimony from counsel.
3  It's not a question. It
4  misstates, actually, the facts.
5      THE ARBITRATOR: Guys, I've
6  read this letter agreement. I
7  have a handle on what it says,
8  and having the witness do this is
9  not really that helpful, except
10  to the extent that it gives his
11  own state of mind, for whatever
12  that's worth, if it's worth
13  anything evidentiary wise. So he
14  can answer the question, and we
15  can proceed.
16      MR. LEWIS: Let me restate
17  the question.
18      Q. Dr. Hamad, do you see these
19  connected, the e-mail being connected
20  with the letter agreement in the time
21  and what's being asked for?
22      A. Yes.
23      Q. Is it your understanding that
24  Forall was fully aware that in October
25  of 2014, what was being considered was

Page 200

1      DIRECR-EXAMINATION OF DR. B. HAMAD
2  a new tenant coming in and taking other
3  the store?
4      A. Yes.
5      THE ARBITRATOR: Did anyone
6  at Forall ever tell you that?
7      THE WITNESS: From Forall?
8      THE ARBITRATOR: Yes.
9      THE WITNESS: Paolo.
10      THE ARBITRATOR: Okay. All
11  right. You can pursue that if
12  you chose to or on cross.
13      Q. Since you said that and I think
14  that is an important point, Were there
15  conversation that you were a part of
16  surrounding these documents that you
17  just reviewed that you think it would
18  be important for Mr. Farber to know
19  about?
20      THE ARBITRATOR: No. No.
21  I'm going to sustain that one.
22  We're not going to ask the
23  witness to just tell me about
24  conversations he thinks I think
25  are important. Let's have a

Page 201

1      DIRECR-EXAMINATION OF DR. B. HAMAD
2  specific question. Because I've
3  only met him today. I don't know
4  if he can figure out what I think
5  is important. So let's restate
6  it, all right?
7      MR. LEWIS: Fair enough.
8      Q. Did you have conversations with
9  Simon surrounding these agreements,
10  Dr. Hamad?
11      A. Yes. With Simon, yes.
12      Q. Can you share with us the nature
13  of the conversation with Simon
14  surrounding these agreements and the
15  e-mails that we read?
16      A. Well, Simon was all the time
17  extremely unhappy about, again, the
18  performance of the store. So he was
19  giving us time, and more time, and more
20  time to turn the store around.
21      And he said clearly that if it's
22  not going to perform, he will not give
23  the store to Pal Zileri or to anybody
24  related to Forall.
25      Q. So Simon was resistant to giving



Page 202

DIRECR-EXAMINATION OF DR. B. HAMAD
1
2    the store over to a tenant that Forall
3    found?
4        A. Yes.
5        Q. Did you have conversations with
6    Paolo around these exhibits and the
7    e-mail and the letter agreement that
8    we're seeing here?
9        A. That was a big discussion, and
10   heated discussion.  If you want to hear
11   it, I can tell you.
12       Q. Share it with us, please.
13       A. At that time, I heard that Paolo
14   was asking for -- to find a tenant, but
15   he was asking for money for himself,
16   and two-month free rent.
17          So he asked for $150,000
18   brokerage fee, and two-month rent free
19   in the end of February to find a
20   tenant.
21       Q. Let me -- let's break that down.
22   You're saying that Paolo asked for a
23   brokerage fee --
24       A. $150,000 brokerage fee and
25   two-month rent free for January and

Page 203

1    DIRECR-EXAMINATION OF DR. B. HAMAD
2    February.
3        Q. And this would be to -- to --
4        A. To find a new tenant.
5        Q. In consideration for his help in
6    finding a new tenant?
7        A. Yes.
8        Q. And did you agree to those
9    terms?
10       A. Well, I tell you it was a heated
11   discussion on the phone, and he didn't
12   talk to me after that at all.
13          THE ARBITRATOR:  Didn't hear
14       the last thing:  He didn't
15       something to me at all.
16          THE WITNESS:  We had a
17       heated discussion, how he can do
18       stuff like this, and he hung up
19       on me and walk away [sic].
20          THE ARBITRATOR:  All right.
21       Q. So my question was:  Did you
22   take Paolo up on his offer under those
23   terms?
24       A. What do you mean "take him up"?
25   Offer him 150, no.

Page 204

1    DIRECR-EXAMINATION OF DR. B. HAMAD
2        Q. Just so the record is clear, so
3    you did not agree to those terms?
4        A. No.
5        Q. And instead you said you entered
6    into the letter agreement with Simon?
7        A. Yes.
8        Q. Now, did it come a time where
9    Sarah and Forall resumed discussions
10   about a different tenant coming in to
11   take over the store?
12       A. That was when the -- I think
13   Amar had a discussion with him for
14   Forall to take over in March '15 and I
15   mentioned to you in the beginning of
16   this discussion, there was a drag on
17   for one and a half.
18          They force us to pay the rent
19   for Alfonso to stay in the store until
20   they get ready, quote-unquote get
21   ready, and that was one -- 45 days
22   after the expiration date of Alfonso.
23       Q. So were you part of the
24   discussions with Forall about Forall
25   coming in and running the store?

Page 205

1    DIRECR-EXAMINATION OF DR. B. HAMAD
2        A. No.
3        Q. Your brother handled that?
4        A. Yes, my brother.
5        Q. Do you recall having to ask
6    Simon to rescind this letter agreement;
7    do you recall?
8        A. Yes, I do.
9        Q. Was that -- how did that go?
10       A. Well, they said they want to try
11   one more time, the company will like to
12   take over and try one more time, and I
13   have to go -- Simon was, you know,
14   extremely unhappy about the
15   performance.
16          He was calling all the time.
17   "What's going on with you guys?  You
18   are not sell.  I'm afraid they going to
19   shut down.  They going to close and
20   walkway [sic]."
21          He was directing the discussion
22   to me.  So I had a discussion with him.
23   I asked -- you know, just give us one
24   more chance, and hopefully we will turn
25   it around, and he did.



1      DIRECR-EXAMINATION OF DR. B. HAMAD
2      Q. You mentioned an agreement to
3  rescind this letter agreement that we
4  just looked at?
5      A. Yes.
6      Q. And I'll show that exhibit.
7        MR. LEWIS:  Mr. Farber, when
8  -- I actually need a break.  I
9  was wondering if right now was a
10  good time for our afternoon break
11  or if you'd like for us to keep
12  going?
13        THE ARBITRATOR:  All right,
14  guys.  Just before our afternoon
15  break, can one of you tell me
16  what's the number for Flaherty's
17  expert report, the exhibit
18  number?  Actually, give me the
19  numbers for both experts.
20        MR. SHAH:  The Flaherty
21  report is 38, and the Salsbery
22  report is 39.
23        THE ARBITRATOR:  Okay, guys.
24  I've got 3:30.  3:45, let's come
25  back.  All right.

1      DIRECR-EXAMINATION OF DR. B. HAMAD
2        (Whereupon, a recess was
3  taken.)
4        THE ARBITRATOR:  Why don't
5  you proceed, Mr. Lewis?
6      Q. Dr. Hamad, before we break --
7  before we took a break, we just
8  reviewed the letter agreement between
9  Sarah and Simon, and we talked about
10  your efforts to get the letter
11  agreement rescinded; do you recall
12  that?
13      Dr. Hamad, can you hear me?
14  You're on mute.
15      A. Yes.
16      Q. So, Dr. Hamad, do you recall
17  having a conversation with Simon about
18  late rent payments when Forall was
19  operating the store?
20      A. With Forall and Alfonso.
21      Q. Entebi?
22      A. Yes.  They were concerned
23  because the payment was coming so late,
24  sometimes 26th, 27th of the month.
25  Although, they had to pay by, I think,

1      DIRECR-EXAMINATION OF DR. B. HAMAD
2  the 2nd or the 3rd.
3      Q. And you recall having
4  conversations with Simon about this
5  issue?
6      A. Yes.
7      Q. Dr. Hamad, can you see my
8  screen?
9      A. Yes, I do.
10      Q. And is this an e-mail from your
11  brother to Paolo Torello-Viera and
12  copying you and others?
13      A. Yes.
14      Q. And this is in June of 2016 when
15  Forall was operating the store; is that
16  correct?
17      A. That's correct.
18      Q. And you see here you write --
19  your brother writes that Simon is
20  getting upset about the delay in
21  payment, to please make sure it is paid
22  promptly by first of July, they're
23  referring to the rent, as far as you
24  know?
25      A. Yes.

1      DIRECR-EXAMINATION OF DR. B. HAMAD
2      Q. And so is it your understanding
3  that Forall had been slow in paying the
4  rent when he was operating the store at
5  times?
6      A. Yes.
7      Q. And you had conversations with
8  Simon where they expressed a
9  frustration over that?
10      A. Yes, we did.  Multiple times.
11      Q. I'm going to show Exhibit 52.
12  Dr. Hamad, can you see my screen now?
13      A. Yes, I do.
14      Q. Okay.  All right.  So this is an
15  e-mail that you forwarded to your
16  brother in July of 2015, prior to that,
17  this is an e-mail from Todd Eads to you
18  also July 15, 2015; do you see that?
19      A. Yes, I do.
20      Q. Take a moment to just read this
21  paragraph of Mr. Eads' e-mail, and
22  we'll talk about it.
23      A. Yes.  I remember that.
24      Q. Okay.  All right.  So can you
25  read this part that's at the bottom?

Page 210

```
1        DIRECR-EXAMINATION OF DR. B. HAMAD
2        A. "Hi, Dr. Hamad, any update on
3    setting up a call?  Sorry to be a
4    nuisance, but I'm starting to run out
5    of time.  MCM, who is the tenant
6    interested in your space, may now also
7    have an opportunity at Crystals.  Thank
8    you for your help."
9        Q. And this is an e-mail that your
10   brother was shown, a portion of this
11   e-mail, you write back to Mr. Eads
12   here, and for the sake of time, I'll
13   read it.  "Pal Zileri will contact you
14   today," so Mr. Eads, Simon, is not just
15   talking to Sarah about this proposal,
16   they're talking directly to Forall
17   about this proposal, correct?
18       A. That's correct.
19       Q. In fact, Mr. Eads writes to you,
20   "Dr. Hamad, I spoke to Stephen Brown,
21   Pal Zileri's counsel today, Pal
22   Zileri's general counsel, we talked
23   about the proposal, and I am scheduled
24   to have a call with Paolo on Friday.
25   I'm going to forward the proposal I
```

Page 211

```
1        DIRECR-EXAMINATION OF DR. B. HAMAD
2    sent you to Stephen.  I am hopeful that
3    we can make progress on today.  Thank
4    you for your support.  Please continue
5    to help if you can."  What is the
6    proposal as you understand it?
7        A. He was proposing to move him to
8    a different store in the mall because
9    all of us were complaining about the
10   high rent, and he asked him to move to
11   an area where they pay less rent.
12       Q. And --
13       A. No answer.
14       Q. So this is the same e-mail, same
15   e-mail, 7/15/2015.  This is another
16   portion of it, and here we've got
17   Mr. Eads sending you an e-mail.
18       And again, for the sake of time
19   I'll read the pertinent parts.  "As I
20   mentioned last week, we have a
21   prospective tenant for the Pal Zileri
22   space, and we'd very much like to move
23   forward with the termination of the
24   lease.  I understand that you've
25   committed to Zileri to continue to
```

Page 212

```
1        DIRECR-EXAMINATION OF DR. B. HAMAD
2    operate the store.  I have a
3    proposition that may allow you to
4    continue operating the store per your
5    agreement with Pal Zileri, but at a
6    much lower occupancy cost.  Also it
7    would eliminate the personal guarantee
8    for one year of rent, and ancillaries
9    on the existing Pal Zileri lease"; do
10   you see that?
11       A. Yes.
12       Q. "Pal Zileri will relocate to the
13   unit I attached.  The unit was just
14   vacated by Stuart Weitzman, which
15   relocated to a larger space.  The term
16   will be 18 months.  The rent will be
17   20 percent of sales during the term."
18       At that time period of time, was
19   the store having to pay a flat rent or
20   was it a percent of sales?
21       A. Flat rate.
22       Q. And approximately how much was
23   that?
24       A. 74,000 a month.
25       Q. Would going to 20 percent of
```

Page 213

```
1        DIRECR-EXAMINATION OF DR. B. HAMAD
2    sales be more or less than that amount?
3        A. Big time less.
4        Q. What was that?
5        A. Big time less.  Because we would
6    be charged rent based on how much they
7    sell.  If they sell 50,000 it will be
8    $10,000 instead of 74,000.
9        Q. Okay.  And so that was an e-mail
10   to you, and that's late June 2015.  And
11   then we have an e-mail from you to Mr.
12   Eads asking questions about the
13   proposal, right, whether you would be
14   compensated to help build out the
15   space, if it was possible to reduce the
16   percentage of rent, etcetera; do you
17   see that?
18       A. Yes.
19       Q. And then moving up, we get to
20   the portion of the e-mail -- there is a
21   request for a phone call; do you recall
22   whether you had a phone call with Mr.
23   Eads on July 8, 2015?
24       A. I did.
25       Q. And what was the nature of that
```

MAGNA
LEGAL SERVICES

54 (Pages 210 to 213)

Page 214

1      DIRECR-EXAMINATION OF DR. B. HAMAD
2  call?
3      A. That no one was answering.  That
4  he was frustrated because neither
5  Forall or anyone from this company
6  answered him about this proposal.
7      Q. So, again, the point I want to
8  take away from that is:  This
9  conversation -- this proposal is not
10  only being presented to Forall --
11  excuse me -- to Sarah, it's being
12  presented directly to Forall at the CEO
13  level?
14      A. Absolutely true.
15      Q. And so again, this is where we
16  get into the discussion where we
17  started discussing the offer with the
18  attorney.  We'll get back to you ASAP.
19  And here it's like -- "Sorry to be a
20  pest, but please let me know when we
21  can discuss your potential location,
22  discuss with your attorney, happy to
23  work with your attorney, if you want to
24  go that route."
25      So Mr. Eads is talking to you,

Page 215

1      DIRECR-EXAMINATION OF DR. B. HAMAD
2  and following up with you, and then per
3  this part of the e-mail, he talks about
4  having a similar conversation with
5  Stephen Brown, correct?
6      A. Correct.
7      Q. Okay.  Any doubt in your mind
8  that Forall was aware that Simon was
9  attempting to find a new tenant to take
10  over the space in July of 2015?
11      A. No doubt.
12      Q. Did they express to you any
13  objection to Simon finding a tenant to
14  take over the store in July of 2015?
15      A. No, they did not.
16      MR. BROWN:  I had an
17  objection to that question.
18      THE ARBITRATOR:  I've heard
19  the answer, but what was the
20  objection?
21      MR. BROWN:  Not worth
22  repeating.
23      THE ARBITRATOR:  Okay.
24  Let's move on.
25      Q. So Dr. Hamad, we spent a

Page 216

1      DIRECR-EXAMINATION OF DR. B. HAMAD
2  considerable time talking about a
3  six-month notice requirement that went
4  into the management agreement between
5  Forall and Sarah; are you familiar with
6  that requirement?
7      A. Yes, I am.
8      Q. And what is your understanding
9  of what that six-month notice period
10  was, for what was supposed to be
11  accomplished during that period?
12      THE ARBITRATOR:  Let me just
13  say the following, although there
14  has not been an objection.  In
15  arbitration we try to avoid
16  duplicative testimony.  We had
17  the same thing from the other Dr.
18  Hamad, and, you know, I just
19  don't know if this is going to
20  add anything.  It's kind of like
21  the last bit of testimony.  It
22  was the same thing from the other
23  Dr. Hamad, so I would urge you to
24  focus on new areas that we
25  haven't already covered.

Page 217

1      DIRECR-EXAMINATION OF DR. B. HAMAD
2      I mean, maybe there's some
3  area where the understandings of
4  the two brothers are different,
5  but otherwise, it's likely the
6  same for whatever legal import
7  that has a whole other question,
8  but I'm suggesting that we ought
9  to move it along.
10      MR. BROWN:  And I did have
11  an objection to the last
12  question, but thank you, Mr.
13  Farber.
14      THE ARBITRATOR:  All right.
15      Q. Mr. Brown showed your brother an
16  exhibit, and not to retread that
17  testimony, but there's an exhibit where
18  in February of 2016 where Simon asked
19  you to complete some paperwork so that
20  they could continue on trying to find a
21  replacement tenant, and my question to
22  you is:  Did you sign any paperwork to
23  release the lease with Simon in
24  February of 2016?
25      A. No, I did not.



Page 218

DIRECR-EXAMINATION OF DR. B. HAMAD
1
2    Q. When did you, Sarah, sign
3 paperwork to release the lease to
4 Simon?
5    A. I think around June.
6    Q. June of 2016?
7    A. Yes.
8    Q. Was that before or after Forall
9 had informed you that they would not
10 extend the terms of their operation of
11 the store?
12    A. After they informed me that
13 there is no way they're going to extend
14 it to Pal Zileri, they said, "No.
15 Enough is enough," and that's it.
16    Q. Who said that, Simon?
17    A. Simon.
18    Q. Now, my question was:  Was that
19 before or after Forall had informed
20 Sarah that it will not continue
21 operating the store after September of
22 2016?
23    A. You mean before March or after
24 March?
25    Q. That's correct.

Page 219

DIRECR-EXAMINATION OF DR. B. HAMAD
1
2    A. He was in constant contact with
3 me all the time, and he -- I think when
4 I told him that they probably are not
5 going to renew, he said, "Either way,
6 I'm not going to give them the space
7 anymore, even if they agreed."
8    Q. My fault.  Because it was a poor
9 question.  Let me ask it differently.
10     You said you didn't sign any
11 paperwork to relinquish the lease to
12 Simon until June of 2016?
13    A. Yes.
14    Q. Forall informed you that they
15 wouldn't continue on managing the store
16 after September of 2016, they informed
17 you that in March of 2016, correct?
18    A. Yes.
19    Q. Okay.  And Simon had informed
20 you that they would not continue on
21 with the Pal Zileri brand in that store
22 in February of 2016, correct?
23    A. Correct.
24       MR. BROWN:  Objection.
25 Objection to that question.  That

Page 220

DIRECR-EXAMINATION OF DR. B. HAMAD
1
2 document --
3       THE ARBITRATOR:  I couldn't
4 hear you, Mr. Brown.  What's the
5 basis?
6       MR. BROWN:  It's a
7 mischaracterization of the
8 written document that we've all
9 seen at this point, so I find it
10 objectionable.
11       THE ARBITRATOR:  Well, I'll
12 take his answer, but I do know
13 what the document says.  Go
14 ahead.  What is your answer?  You
15 want to repeat it?
16    Q. He did answer.
17    A. I'm sorry.
18       THE ARBITRATOR:  Go ahead,
19 Mr. Lewis.
20    Q. I'll repeat it so the record is
21 clear.  So you signed the paperwork to
22 relinquish the lease -- excuse me -- to
23 relinquish the lease to Simon after
24 Simon had informed you that it would
25 not extend or go forward on the lease

Page 221

DIRECR-EXAMINATION OF DR. B. HAMAD
1
2 with Forall with the Pal Zileri brand,
3 correct?
4    A. Correct.
5    Q. So Dr. Hamad, do you remember
6 when the store closed?
7    A. I think around August -- August
8 8, 9.
9    Q. Is that 2016?
10    A. 2016.
11    Q. Did you hear from Forall in
12 September of 2016?
13    A. No.
14    Q. Did you hear from Forall in
15 October of 2016?
16    A. No.
17    Q. When's the next time you heard
18 from Forall after the store closed
19 August 9, 2016?
20    A. We didn't hear anything after
21 that, no.
22    Q. At some point in time you heard
23 from Forall, correct?
24    A. 2017.
25    Q. And is that when you received



Page 222

DIRECR-EXAMINATION OF DR. B. HAMAD
1
2 the demand letter?
3     A. Yes.
4     Q. And that was in November of
5 2017, correct?
6     A. Correct.
7        MR. LEWIS:  Mr. Farber, I
8 need to check my notes, please, I
9 may not have anything further.
10        THE ARBITRATOR:  Okay.
11        (Whereupon, a recess was
12 taken at this time.)
13     Q. Dr. Hamad, you understand that
14 there are several contracts in place,
15 several contracts at issue in this
16 arbitration, right?
17     A. Yes.
18     Q. You understand there's a license
19 agreement, two management agreements,
20 an asset purchase agreement, and
21 several others, correct?
22     A. Yes.
23     Q. And you understand what the
24 language says in these contracts as it
25 relates to Sarah's continuing

Page 223

DIRECR-EXAMINATION OF DR. B. HAMAD
1
2 obligation under the license agreement,
3 correct?
4     A. Correct.
5     Q. The language says what it says,
6 right?
7     A. Correct.
8     Q. Okay.  I want you to just state
9 for Mr. Farber, though, why it is that
10 you specifically take the position that
11 Sarah was released from its obligation
12 under the license agreement after the
13 store closed?
14        MR. BROWN:  Objection.
15 Calls for a legal conclusion or
16 opinion.
17        THE ARBITRATOR:  Overruled.
18 I'm not taking it as a legal
19 conclusion.  I'm taking it as his
20 understanding.
21        You can answer the question.
22     A. All right.  There is multiple
23 problems with this contract.  When
24 Alfonso tried to take over the store,
25 and we -- in the first draft, there was

Page 224

DIRECR-EXAMINATION OF DR. B. HAMAD
1
2 no -- nothing mentioned about
3 continuing with the license agreement.
4        Then all of a sudden somebody
5 came, Luca Spano, and I think the rest
6 of the legal team, questioning what
7 happened if Simon would go and take a
8 look at the lease.  We are not allowed
9 to operate the store.  It's not for
10 sublease.  Then that was inserted in
11 that -- in that -- in the second draft.
12        And when we asked about it, they
13 said, "Well it's not enforceable
14 anyway.  Why you have to worry?"
15 Therefore, we never pay attention --
16 actually, we were not concerned, I
17 would say, about this license agreement
18 to be enforceable, because all the time
19 we heard from them -- we heard it's not
20 enforceable.
21        But the biggest fear was:  If
22 Simon would come and take a look at the
23 contract, he will say, "Okay, well, you
24 are not the guy who I give the lease
25 to.  Why you are standing in my store?

Page 225

DIRECR-EXAMINATION OF DR. B. HAMAD
1
2 I'm going to kick you out right away."
3 So that's number one.
4        Number two, never -- I was under
5 pressure from -- from Simon to perform,
6 and the license agreement, you know,
7 per se, was -- was never, you know,
8 enforced even at the level of the first
9 CEO.  With his -- you know, I have to
10 say he was nice guy and very
11 cooperated.
12        But some out down the road it
13 came at the end, never came out in the
14 last three or four years when they
15 operated the store.  It came only out
16 at the end, and we were under a lot of
17 pressure from Todd Eads to let go of
18 the store because definitely he was not
19 going to continue with Pal Zileri
20 [sic].
21        So that's why my understanding,
22 you know, regarding this license
23 agreement that it was inserted, and the
24 second draft, never in the first draft,
25 and the reason for them was, "Well

MAGNA ▶
LEGAL SERVICES

Page 226

1    DIRECR-EXAMINATION OF DR. B. HAMAD
2    Simon can kick us out of the store at
3    any time if he found out we were going
4    to try to take over or actually had
5    taken over." That's my understanding
6    of the license agreement.
7         Second issue, Alfonso paid
8    everything for us in the store,
9    including the mannequin.  He even paid
10   for registry, you know, computer, all
11   the computers, you know, mannequin --
12   he paid part of what we paid for.  So
13   it was completely for Alfonso to
14   operate the store.  We never interfere
15   with the management or the sale or the
16   buy of the merchandise during the three
17   years when they're operating [sic].
18        And there was a lot of problem
19   with management also.  I don't know if
20   I have the time to discuss it here.
21   But the main issue was for the license
22   agreement, you know, this was inserted,
23   was not our understanding that it had
24   to -- you know it's enforceable.
25        And Luca Spano, why you didn't

Page 227

1    DIRECR-EXAMINATION OF DR. B. HAMAD
2    ask him yesterday what was the meaning
3    of the license agreement?  All the time
4    for the two tenants of Pal Zileri and
5    for Alfonso, the biggest fear for them
6    was if Simon find out that they are
7    operating, they kick him out in the
8    same day.
9         Q.  Okay.  I appreciate that.  And I
10   know you waited a long time for your
11   day in court, so I'm glad you had an
12   opportunity to share that.
13        I would ask you if it factors
14   into your understanding the discussions
15   about the six months notice period and
16   turning the store back into Simon if
17   the store didn't perform?
18        A. Can I answer?  I don't know.
19   Any objection or --
20        THE ARBITRATOR:  I didn't
21   hear the word "objection," so you
22   can respond.
23        A. The six-month -- Forall know --
24   they knew about this six-month from the
25   beginning.  That it takes time to find

Page 228

1    DIRECR-EXAMINATION OF DR. B. HAMAD
2    a new tenant.  It doesn't happen in one
3    day.
4         And the purpose of the six
5    months, is not going to take the store,
6    it's just to find a new tenant.
7    Sometimes it takes more than six
8    months, a year.  We are on the hook for
9    the lease.
10        So we have to pay every month
11   until they find a new tenant, and that
12   was the purpose of the six-month, for
13   them to allow us to turn the store to
14   the mall to find a new tenant and they
15   knew about it.  All of them knew about
16   this issue.
17        Q. Thank you, Dr. Hamad.
18        MR. LEWIS:  That's all I
19   have for now, and we'll see if we
20   need to do a redirect.
21        THE ARBITRATOR:  Thank you
22   very much, Mr. Lewis.  Thank you,
23   Dr. Bachar Hamad.
24        Mr. Brown, are you handling
25   this one?

Page 229

1    DIRECR-EXAMINATION OF DR. B. HAMAD
2        MR. BROWN:  I'm handling it.
3    Thank you, Mr. Farber.
4        THE ARBITRATOR:  Dr. Bachar
5    Hamad, on cross examination of a
6    party, please be advised that
7    Mr. Brown is the boss of the
8    examination.  So I don't want you
9    to argue with him.  Your job is
10   simply to listen to his question,
11   and unless Mr. Lewis says the
12   word "objection," you just answer
13   it as directly and as succinctly
14   as you can.  That means if the
15   answer to the question is "yes,"
16   "no," "I don't remember," that's
17   fine.
18        Now, there are going to be
19   times where you want to explain,
20   because you think that the
21   question he's asking you is not
22   going to give me the full picture
23   and you'd like to explain.  Do
24   not explain unless he asks you or
25   I ask you.



Page 230

DIRECR-EXAMINATION OF DR. B. HAMAD
1
2       What you can do is:  On your
3   pad, make a note of what the area
4   is that you'd like to explain.
5       And when Mr. Brown's finished
6   questioning you, I'll give you an
7   opportunity to chat with
8   Mr. Lewis and Mr. Shah, and they
9   can decide, if they want to, on
10  what's called "re-direct" ask you
11  questions to bring out your
12  explanations.
13      So remember, no fighting
14  with Mr. Brown.  He is the boss
15  of the examination.  Just listen
16  to his question and answer.
17  Usually the objective of most
18  witnesses in cross examination is
19  to finish it.  So what you want
20  to do is you just want to listen
21  and respond to his questions.
22      Mr. Brown, why don't you
23  proceed, please?
24      MR. BROWN:  Thank you.
25          * * *

Page 231

DIRECR-EXAMINATION OF DR. B. HAMAD
1
2   CROSS-EXAMINATION BY
3   MR. BROWN:
4       Q. Good afternoon, doctor.
5       A. Good afternoon.
6       Q. You just indicated that it takes
7   time to find a replacement tenant,
8   right?
9       A. Right.
10      Q. And Simon found a replacement
11  tenant for your store in the Forum
12  shops as of -- as late of June 2016,
13  right?
14      A. Yes.
15      Q. When did they start looking for
16  that replacement tenant?
17      A. I don't know when they started
18  -- go ahead.
19      Q. After you what?
20      A. I think after we signed the --
21  the agreement.
22      Q. Which agreement?
23      A. With the -- with Pal Zileri that
24  they not going to take the store [sic].
25      Q. Isn't it true that you, as early

Page 232

DIRECR-EXAMINATION OF DR. B. HAMAD
1
2   as February of 2016, signed a letter
3   agreement to find a replacement tenant
4   with Simon?
5       A. That's not true.
6       Q. And isn't it true that Simon
7   then started putting things in work --
8   in the works such that they got MCM to
9   commit to a new lease starting in
10  August 2016?
11      A. That's not true.
12      Q. Are you aware, are you not, sir,
13  that there's an e-mail between you,
14  Todd Eads at Simon, in February 2016
15  where you're telling him that you're
16  going to sign the paperwork?
17      A. But I did not sign it.  He was
18  discussing it with me the option at
19  that time.  He was pushing for -- I'm
20  sorry.  Say it again.
21      THE ARBITRATOR:  I think
22  you've answered "no".
23      A. No.  The answer is:  No.
24      Q. Did you produce that paperwork
25  in connection with this lawsuit that

Page 233

DIRECR-EXAMINATION OF DR. B. HAMAD
1
2   Mr. Eads had sent to you in or around
3   February 2016?
4       A. Did I produce that paper as a
5   lawsuit?
6       Q. Yes.
7       A. That was the lawyer work [sic].
8   I don't know what happened in that.
9       Q. Have you seen that -- any of
10  that paper that Mr. Eads was asking for
11  -- had given to you in February 2016,
12  in any of your preparation for this
13  trial?
14      A. The e-mail he sent me.  The
15  e-mail Eads sent me; is that what
16  you're talking about?
17      Q. Yes, I am.
18      A. I know this e-mail for long
19  time.
20      Q. Okay.  So in February 2016, you
21  were talking to Mr. Eads about
22  surrendering the lease, though, right?
23      A. We were talking about the store
24  altogether.  He was pushing the --  go
25  ahead.



DIRECR-EXAMINATION OF DR. B. HAMAD

1    DIRECR-EXAMINATION OF DR. B. HAMAD
2        Q. So you've indicated that you
3    were under pressure from Simon on the
4    store, right?
5        A. For long time.  Not only in
6    February.  For long time.  For the last
7    five years.
8        Q. Did Forall make you execute the
9    lease?
10       A. With whom?
11       Q. With Simon.
12       A. Did Forall make me execute the
13   lease?  The lease was between me and
14   Simon.
15       Q. Right.  Forall was not party to
16   that agreement, right?
17       A. I don't know what you mean by
18   this.
19           THE ARBITRATOR:  Did they
20       sign the lease, that's what he
21       means, as far as you know?
22           THE WITNESS:  No.
23       Q. And did you negotiate the terms
24   of the lease with Simon?
25       A. Yes, I do.

1    DIRECR-EXAMINATION OF DR. B. HAMAD
2        Q. And it was a ten-year lease, was
3    it not?
4        A. Yes.
5        Q. And then once you secured that
6    lease, you brought it to Forall and
7    said, "I can open the store now,"
8    right?
9        A. Yes.
10       Q. And didn't you and your investor
11   group approach Forall to open a Pal
12   Zileri in Las Vegas?
13       A. They approached us.  There was a
14   mutual interest through a friend, yes.
15       Q. And you had an investor group,
16   did you not, when you first approached
17   Pal Zileri?
18       A. We did not have.  It was only
19   us.
20       Q. Who is "only us"?
21       A. Me and my brother in the
22   company.
23       Q. Okay.  Bear with me one second.
24   Who is Dr. Youssef Kauuas?
25       A. I have no idea.

1    DIRECR-EXAMINATION OF DR. B. HAMAD
2        Q. You never heard that name
3    before?
4        A. No.
5        Q. Was he not listed as a coowner
6    in your proposed business plan to Pal
7    Zileri?
8        A. Absolutely not.
9        Q. Who is Mr. Simon Jaohari,
10   J-A-O-U-H-A-R-I?
11       A. Absolutely no idea.
12       Q. Who is Mr. Jmal Sarioul?
13       A. That's friend of mine.
14       Q. How would you pronounce this
15   name, sir?
16       A. Sarioul.
17       Q. And did Mr. Sarioul have retail
18   experience?
19       A. No.
20       Q. He didn't have 25 years of
21   retail experience?
22       A. Not to my knowledge.
23       Q. Did he not own and operate
24   various businesses in Las Vegas area
25   for 10 years?

1    DIRECR-EXAMINATION OF DR. B. HAMAD
2        A. You mean high-end?
3        Q. Yeah.  What did he do?  How did
4    you know him?
5        A. He's friend of mine [sic].
6        Q. Yeah.  What kind of friend?
7            MR. LEWIS:  Objection.
8            THE ARBITRATOR:  Hang on.
9        One at a time, guys.  His
10       question is:  What kind of
11       friend.  There was an objection
12       to it.
13           Mr. Lewis, what's the
14       objection?
15           MR. LEWIS:  Relevance in its
16       entirety.  I don't see how this
17       bears upon what happened in 2016,
18       whether Sarah would be on the
19       hook for a license agreement
20       going forward from 2016.
21           THE ARBITRATOR:  It is
22       highly tangential, Mr. Brown, to
23       what I have to decide, but it's
24       cross, and I'm going to give you
25       leeway if you want to pursue it.

MAGNA
LEGAL SERVICES

Page 238

1  DIRECR-EXAMINATION OF DR. B. HAMAD
2  Overruled.
3       MR. BROWN:  I would just
4  like an answer to it.
5  Q. Who is he?
6  A. A friend of mine.
7  Q. And who introduced you to Pal
8  Zileri?
9  A. He is the one who introduced to
10  Pal Zileri, yes.
11  Q. And was he part of your initial
12  investment group when you --
13  A. No.
14  Q. How many times did you approach
15  Sarah -- I mean, did you approach
16  Simon, the Forum shops, for a reduction
17  of rent in the time period from when
18  you opened in September 2011 to when
19  you turned over management of the store
20  to Italnord in September 2016?
21  A. I think we were talking
22  constantly.  We asked him twice to
23  reduce the price.
24  Q. Were you considered a pest by
25  Simon, to your knowledge?

Page 239

1  DIRECR-EXAMINATION OF DR. B. HAMAD
2  A. Me, pest by Simon [sic]?
3  Q. Yeah.
4  A. No.
5  Q. Isn't it true that you
6  approached Simon on multiple occasions
7  looking to turn back the lease and
8  therefore that is why they ultimately
9  were giving you pressure at the time?
10  A. The other way around.
11  Q. Was it -- wasn't the rent always
12  paid for the premises during the
13  duration of September or maybe even
14  July 2011 through August of 2016?
15  A. Not all the time.  When Forall
16  and --
17       THE ARBITRATOR:  You
18  answered "not all the time."  I
19  got the answer.  Go ahead.
20  Q. Okay.  Do you have documents
21  evidencing the fact that the rent was
22  -- went unpaid during that period of
23  time?
24  A. We do have evidence that they
25  were delayed.  They were paid on the

Page 240

1  DIRECR-EXAMINATION OF DR. B. HAMAD
2  27th of the month instead of the 1st of
3  the month.
4       THE ARBITRATOR:  He just
5  asked you if you have documents
6  that the rent was paid late.
7       THE WITNESS:  Yes.
8  Q. And the only documents that have
9  been introduced into evidence by your
10  counsel evidencing that fact was dated
11  in June of 2016, after the time that
12  you had agreed and signed the surrender
13  of lease; do you have anything prior to
14  that?
15  A. Yes, we do.
16  Q. What's that?
17  A. It's a -- it's a -- it's an
18  e-mail from -- I think asking Luca to
19  investigate why there was -- Alfonso
20  did not pay, and there was a -- when we
21  got the e-mail at the end saying it was
22  paid on November -- let me tell you the
23  exact date.  Here we go.  April 1,
24  2015, they paid two months at one time.
25  4/01/15.  I have the paper here in my

Page 241

1  DIRECR-EXAMINATION OF DR. B. HAMAD
2  hand.
3  Q. What paper?
4  A. I have -- you can read it.  Same
5  two-month not paid, and then they had
6  to pay in one shot one time, and there
7  is another e-mail.
8  Q. What's the date of that?
9  A. The date is April 1, 2015.
10  Q. Are you aware --
11  A. You can see 134,000 for two
12  months.
13       MR. BROWN:  Rodney, was this
14  document produced in discovery?
15       MR. LEWIS:  Not only
16  produced.  We used it yesterday.
17       MR. BROWN:  I mean, he's
18  waving papers in front of me.  Is
19  there a bates label?
20       MR. LEWIS:  Let me get the
21  exhibit number.  This is an
22  exhibit we showed yesterday.
23       THE WITNESS:  And there is
24  another one --
25       THE ARBITRATOR:  No.  No.



Page 242

DIRECR-EXAMINATION OF DR. B. HAMAD
1
2    No.  Hang on until he asks
3    another question.
4    Q. Are you aware, sir --
5         THE ARBITRATOR:  Hang on,
6    Dr. Hamad.  We need to see your
7    face.
8    Q. You alleged in your statements
9    of claims, sir, that the lease was
10   terminated by Sarah because Forall did
11   not pay the rent; are you aware of that
12   allegation?
13   A. Did I say that was not paid, the
14   rent?
15   Q. Yes.
16   A. When did I say this?
17   Q. In the opening statement of this
18   litigation, in the statement of claim
19   submitted by Sarah, that's the
20   allegation; are you aware of that?
21   A. What was I -- everything was
22   handled by the lawyer at that time, and
23   most likely has some copy of e-mails.
24   I don't know.  I mean --
25        THE ARBITRATOR:  I'm sorry.

Page 243

DIRECR-EXAMINATION OF DR. B. HAMAD
1
2    But I can't see your mouth, so go
3    ahead.
4    A. It was handled by the lawyer.  I
5    do not recall exactly what happened.
6         THE ARBITRATOR:  The
7    question is:  Are you aware of
8    that?
9         THE WITNESS:  I'm not -- I
10   don't know.  No.  Not to my
11   knowledge.
12        THE ARBITRATOR:  Okay.  The
13   answer is, no, he's not.
14   Q. Did you review the statement of
15   claim that was filed by your lawyers in
16   this case before it was submitted to
17   the Triple A, American Arbitration
18   Association?
19   A. Yes.
20   Q. And in that -- so would it
21   surprise you to learn that one of the
22   key allegations in that statement of
23   claim was that Sarah -- that Simon
24   terminated the lease because Forall did
25   not pay the rent?

Page 244

DIRECR-EXAMINATION OF DR. B. HAMAD
1
2    A. He was upset about it all the
3    time.
4    Q. That's not my question.
5    A. The answer is yes.  I was -- you
6    know, there was some -- some delays in
7    the payment that upset Simon all the
8    time.  That's what I'm saying.
9    Q. Did Simon terminate the lease
10   for the Pal Zileri store because Forall
11   did not pay the rent; is that the
12   reason?
13   A. And poor performance.  Both.
14   Q. So is it your testimony that
15   Simon terminated the lease?
16   A. Did Simon terminate the lease?
17        THE ARBITRATOR:  That's the
18   question.  Is that what you're
19   telling us?
20        THE WITNESS:  Simon
21   terminated the lease, yes.  Of
22   course he terminated the lease.
23        THE ARBITRATOR:  Okay.
24   Q. Sarah didn't surrender the lease
25   by a cancellation of lease that it

Page 245

DIRECR-EXAMINATION OF DR. B. HAMAD
1
2    executed, did it?
3    A. Simon terminated the lease.
4    Q. Okay.  I'm going to go to
5    Exhibit 429.  I'm going to share my
6    screen.
7         Can you see what's on my screen?
8    I'm sorry.  This is not the right
9    exhibit.  Bear with me.  This is the
10   right one.  This is Exhibit 429.  Okay?
11   A. Yes.
12   Q. And I'm going to scroll through
13   it.  If you need me to stop, let me
14   know, but I want to go right to the
15   signatore on this, and is that your
16   name and signature sir?
17   A. Yes.  That's my name and
18   signature.
19   Q. And do you recall sending this
20   letter to Simon Property Group Forum
21   Shops in or around September 21, 2012?
22   A. I think so.
23   Q. Do you recall it?
24   A. We sent a letter.  I think might
25   be the first letter we sent to him,

Page 246

DIRECR-EXAMINATION OF DR. B. HAMAD

1
2  yes.
3      Q. And at this time, how long had
4  the store been open?
5      A. For about a year.
6      Q. Okay.  And is this one of the
7  requests that you made for reduction in
8  rent?
9      A. Yes.
10     Q. And here you say, "A substantial
11 reduction in rent," did you ever
12 indicate how much rent to be taken off
13 the lease?
14     A. No.
15     Q. And do you see here that it
16 says, "Currently the rent makes up
17 43 percent of our expenses to date, and
18 has been as high as 70 percent in
19 certain months"; do you see that?
20     A. Yes.
21     Q. And you negotiated this lease,
22 right?
23     A. Yes.
24     Q. You say, "We have had slash our
25 marketing and advertising budget below

Page 247

DIRECR-EXAMINATION OF DR. B. HAMAD

1
2  we feel is appropriate for a store
3  brand of our level"; do you see that?
4      A. Yes.
5      Q. And was that true?
6      A. That's true.
7      Q. And do you think that was a
8  recipe for success in a high-end luxury
9  market?
10     A. Well, the recipe for success is
11 to sell the clothes.  We're not
12 selling, so therefore we have to
13 modify, according to Luca's advice, to
14 modify things.
15     Q. Okay.  Now, you say here,
16 "Therefore, we have approached Forall
17 and the Caesars' management on multiple
18 occasions explaining the problem
19 seeking their help.  However, the
20 remedies they offered had minimal
21 effect on the overall store's
22 performance;" do you receive that?
23     A. Yes.
24     Q. "Despite all promises, we were
25 not allowed to participate in any

Page 248

DIRECR-EXAMINATION OF DR. B. HAMAD

1
2  shopping spree or any other promotional
3  programs that could have helped our
4  business."
5      A. Yes.
6      Q. So you were badgering, were you
7  not, Simon one year into your lease?
8      A. Well, I don't know if you took a
9  look at the performance of the first
10 year --
11     THE ARBITRATOR:  The
12 question is simply were you
13 badgering.  He didn't ask for any
14 speech.  You can make a note if
15 you want to explain, Dr. Hamad.
16 The question is:  Were you
17 badgering?  That's all.
18     THE WITNESS:  No.
19     Q. And you say, "We realize the
20 economy and consumer spending is
21 largely to blame for the current
22 situation," right?
23     A. Right.
24     Q. How is this, sir, different from
25 any investment that people make into

Page 249

DIRECR-EXAMINATION OF DR. B. HAMAD

1
2  assets or the market or the stock
3  market at large?
4      A. What do you mean by this?  The
5  whole economy was down at this time.
6      Q. And your investment in the Pal
7  Zileri store in Las Vegas was subject
8  to market fluctuations as you indicate
9  in your letter here, true?
10     A. It's part of the reason.  Not
11 all the reasons.
12     Q. And then you go onto the second
13 page, "We need -- discuss a reduction
14 of at least 30 percent of the current
15 rate, which we feel is an appropriate
16 level."  What was -- how did you come
17 to that number?
18     A. The rent was very high.  And we,
19 with discussion with Luca, he asked us
20 to see if we could get 30 percent to
21 decrease the overhead.
22     Q. Did Luca -- strike that.
23     You then had multiple follow ups
24 with Simon in the fall of 2012, right?
25     A. Yes.



Page 250

DIRECR-EXAMINATION OF DR. B. HAMAD
1
2    Q. And did they ever agree to
3  reduce the rent?
4    A. No.
5    Q. Sir, in or around September and
6  October and November of 2012, weren't
7  you in advance negotiations on a Pal
8  Zileri store in Beverly Hills?
9    A. Yes. My brother was handling
10  this. I did not handle it. Yes.
11    Q. Were you part of that group,
12  that investment, that was looking at
13  that opportunity?
14    A. My brother was handling it. I
15  did not have, you know, the whole
16  picture about what was going on.
17    Q. And but you were aware of it,
18  were you not?
19    A. Yes, I was aware.
20    Q. And in fact, you were looking at
21  an opportunity at the Four Seasons in
22  Beverly Hills, right, for a Pal Zileri?
23    A. Just for a sign and small store
24  at that time.
25    Q. Just a sign and a small store?

Page 251

DIRECR-EXAMINATION OF DR. B. HAMAD
1
2    A. And small store, yeah.
3    Q. Okay.
4    A. For marketing purposes.
5    Q. Okay. And who was Ghanem
6  Musalimi?
7    A. He was the manager in charge of
8  everything.
9    Q. Of your Pal Zileri operation,
10  right?
11    A. Yes.
12    Q. Okay. I'm going to pull up --
13  it's on my screen now, but it's an
14  electronic document that I want to
15  introduce produced by claimant, and
16  it's in the exhibit list. I just have
17  to find it. So this is Claimant's
18  6584?
19      MR. BROWN: It's
20  Exhibit 484, Mr. Farber. I just
21  want to make sure that the excel
22  spreadsheet that was enclosed
23  because Mr. Musalimi is providing
24  a proposal for the new hotel at
25  hotel Four Seasons. The hard

Page 252

DIRECR-EXAMINATION OF DR. B. HAMAD
1
2  copy exhibit may not have this.
3  I have to run that to ground.
4      But this is the -- and
5  perhaps Sohil and Rodney can
6  assist me, but this was an excel
7  spreadsheet that was produced by
8  claimants in connection with that
9  proposal. I believe this is the
10  proposal that was being
11  referenced. It's on my screen.
12  And so hopefully we can just look
13  at it electronically and then we
14  can run this to ground.
15    Q. But Dr. Hamad, have you seen
16  this before, this document?
17    A. No.
18    Q. Do you dispute in any way that
19  this was a document created by or on
20  behalf of Sarah LLC in connection with
21  its proposed venture to Beverly Hills
22  to open a Pal Zileri store?
23    A. Could be.
24    Q. Okay.
25      MR. SHAH: I'm sorry to

Page 253

DIRECR-EXAMINATION OF DR. B. HAMAD
1
2  interrupt, Mr. Brown. What
3  exhibit number is the excel?
4      MR. BROWN: I'm having a
5  problem locating it on the fly.
6  But I don't know that's
7  particularly relevant. It was
8  produced by my claimants.
9      THE ARBITRATOR: It's got to
10  be admitted as an exhibit.
11      MR. BROWN: I'm -- either
12  it's in or I'll have to move to
13  get it admitted. We have to take
14  a break because it's not at my
15  fingertips because I had it up on
16  my screen.
17      THE ARBITRATOR: All right.
18  I think you can cover the whole
19  Beverly Hills incident, really,
20  without the exhibit. The
21  document just shows what appears
22  to be part of a very pretty
23  store. So why don't you move on?
24    Q. Dr. Hamad, isn't it the case
25  that you and your brother wanted to get



DIRECR-EXAMINATION OF DR. B. HAMAD
1
2  out of Las Vegas and open in Beverly
3  Hills because you thought that to be
4  more advantageous for you at that time?
5      A. No.
6      Q. So -- and you testified that you
7  went to Italy and spoke with the Forall
8  folks and sought various concessions.
9  Did -- were they aware that you were
10 full steam ahead on a Beverly Hills
11 store?
12     A. They were aware of everything.
13     Q. And why did you not proceed with
14 the Beverly Hills store at that time?
15     A. Well, the idea of the Beverly
16 Hills was to attract more customers.
17 Not to open the big store, because
18 nobody can afford to open a big store
19 in Beverly Hills.
20        But again, this matter was
21 handled by my brother and by Luca.  I
22 think by Luca and my brother, yeah.
23 They handled it.
24     Q. Do you have -- did you have any
25 documents that show that Luca was

1  DIRECR-EXAMINATION OF DR. B. HAMAD
2  handling that?
3      A. Luca was handling every aspect
4  of the business because he is the
5  expert.  You can ask him; you can ask
6  Luca.
7      Q. All right.  You testified about
8  a letter agreement that you signed in
9  October '14 between Sarah and Simon
10 where in it stated that Sarah was
11 interested in finding a replacement
12 tenant and terminating the business and
13 turning over the store to Simon; do you
14 recall that?
15     A. Yes.
16     Q. And that agreement was
17 specifically between Sarah and Simon,
18 was it not?
19     A. Forall was involved.
20     Q. But the agreement, who was that
21 agreement between?
22     A. Between Simon and us.
23     Q. Okay.  Did you try to withdraw
24 that letter agreement?
25     A. Yes.

1  DIRECR-EXAMINATION OF DR. B. HAMAD
2      Q. Right after --
3      A. Sorry.  Actually, we try to
4  withdrew it because of the discussion
5  was to give opportunity to Entebi to
6  take over the store [sic].
7      Q. Well, wasn't there some
8  discussion about a termination fee that
9  caused you to try to withdraw that
10 agreement right away with Simon?
11     A. No.
12     Q. You don't recall that?
13     A. No.  There was no fee.
14     Q. Do you recall your brother
15 writing to Simon saying that -- that
16 letter agreement was signed in mistake?
17     A. I don't recall that letter, no.
18     Q. All right.
19        MR. BROWN: I'm going to
20 move to have Claimant's -- it's
21 bates labeled 9967 and 9968.  I'm
22 sorry.  I have it in the exhibit
23 list.  It's Exhibit 544.  Okay.
24 And I'm going to pull that up on
25 screen.

1  DIRECR-EXAMINATION OF DR. B. HAMAD
2      Q. Sir, you could look on what I
3  have on this agreement, this view.
4        THE ARBITRATOR: We don't
5  have it yet, Mr. Brown, or at
6  least I don't.
7        MR. BROWN: Sorry.  Here we
8  go.
9      Q. And this is dated -- an e-mail
10 from Amar to L. Arnold at Simon dot
11 com.  And it says, "Here is the
12 document for Mr. Bachar Hamad.  Please
13 review and let us know if there is
14 anything else needed.  Thank you."
15     A. Okay.
16     Q. And then Amar writes back later
17 that morning, "I have a question on
18 behalf of B Hamad.  What is the
19 termination fee, because that might
20 affect finishing the deal and is there
21 a way to call you"; does this refresh
22 your recollection about a termination
23 fee discussion?
24     A. This termination fee with whom?
25     Q. I'm not sure.  I'm asking you if



| Page 258 | Page 259 |
|---|---|

**Page 258**

1  DIRECR-EXAMINATION OF DR. B. HAMAD
2  this refreshes your recollection at
3  all.
4      A. No, it does not.
5      Q. And then at 9:25 -- I'm trying
6  to get this best view -- your brother
7  writes to L. Arnold, "Please be
8  informed that the document is signed by
9  mistake. It will be executed when we
10  know what is the termination fee and
11  when our lawyer gives the final okay.
12  Thank you for your cooperation"; do you
13  see that?
14      A. Yes, I see that.
15      Q. Do you know what this is about?
16      A. No.
17      Q. Later on Mr. Amar says,
18  "Discussed with lawyer this morning.
19  We will proceed with agreement once we
20  know what is the termination fee or --
21  are -- are -- this is a typo -- or,
22  O-R, A-R-E, until there -- until then
23  this agreement cannot be executed and,
24  please, again, if you can e-mail me
25  your phone number, etcetera"; do you

**Page 259**

1  DIRECR-EXAMINATION OF DR. B. HAMAD
2  see that?
3      A. I see that.
4      Q. You don't have any recollection
5  of this?
6      A. Absolutely not.
7      Q. Do you know why Amar at the top
8  writes to you, "Dying"?
9      A. What?
10      Q. Do you see right here?
11          THE ARBITRATOR: The word
12  "dying," he's asking about at the
13  top.
14          THE WITNESS: Yes. No, I
15  don't know.
16      Q. Okay. Do you recall getting
17  this e-mail he sent this to you on
18  11/5/16?
19          MR. LEWIS: Objection.
20      A. I do not.
21          THE ARBITRATOR: What's -- I
22  don't know that there's a
23  question, so.
24          MR. LEWIS: There was. Do
25  you recall seeing this e-mail,

| Page 260 | Page 261 |
|---|---|

**Page 260**

1  DIRECR-EXAMINATION OF DR. B. HAMAD
2  again, was the question, if I
3  remember correctly.
4          THE ARBITRATOR: Did you --
5          THE WITNESS: I don't
6  remember.
7          THE ARBITRATOR: Why don't
8  you restate the question because
9  I see the 16th. Why don't you
10  restate it, Mr. Brown?
11          MR. BROWN: Okay.
12      Q. You -- Amar sends this to you on
13  January 16, 2015 and it says, "Dying";
14  do you know why he was sending it to
15  you that way and with that message?
16      A. I don't know.
17          MR. LEWIS: Objection.
18          THE ARBITRATOR: You have to
19  -- Dr. Bachar Hamad, look, you
20  have a very good lawyer, and
21  you're defeating his ability to
22  help you if you jump in with the
23  answer, because he can't say
24  "objection." I will have already
25  heard the answer.

**Page 261**

1  DIRECR-EXAMINATION OF DR. B. HAMAD
2  So let him do his work, and
3  you've got to pause at the end of
4  a question. All right?
5          THE WITNESS: All right.
6          ARBITRATOR FARBER: Go
7  ahead, sir.
8          MR. LEWIS: Mr. Farber, this
9  will not be an issue, I believe
10  Mr. Brown is going to move on,
11  but Dr. Amar Hamad was cross
12  examined for at least three hours
13  today, and that would have been
14  the person to show this exhibit
15  to.
16          Dr. Bachar Hamad has
17  testified several times that he's
18  not familiar with this document.
19          THE ARBITRATOR: Well, let's
20  see what the question is. Go
21  ahead.
22          MR. BROWN: I'm pulling up
23  another exhibit. It's -- just
24  bear with me.
25          THE ARBITRATOR: Mr. Lewis,



Page 262

DIRECR-EXAMINATION OF DR. B. HAMAD
1
2  you forced him to another
3  exhibit.  You were very
4  persuasive.  Okay.  Let's move
5  on, guys.
6       MR. BROWN:  It's Exhibit 549
7  in the joint book.
8       Q. And this is a letter to your
9  attorney, David Hochman, right, was
10 that Sarah's counsel?
11      A. Yes.
12      Q. And in it Simon writes to Mr.
13 Hochman, right, "I'm writing in
14 response to your recent e-mail
15 correspondence to Mark Doll regarding
16 your client's desire to terminate the
17 letter agreement by and between
18 landlord and tenant dated October 23,
19 2014"; do you see that?
20      A. Yes.
21      Q. Why were you trying to withdraw
22 or terminate that letter agreement from
23 January of 2015?
24      A. Why I was trying to cancel the
25 letter, you mean?

Page 263

DIRECR-EXAMINATION OF DR. B. HAMAD
1
2       Q. Yes.
3       A. This is because at that time
4  Forall start to show some interest in
5  taking over the store, and we want to
6  give them the opportunity to perform
7  one more time.  We talk about this
8  before, I think.
9       Q. So was it out of the kindness of
10 your heart that you wanted to give
11 Forall this opportunity?
12      A. Yes.  You can say --
13      MR. LEWIS:  Objection.
14      THE ARBITRATOR:  Hang on.
15 Did I hear an objection, Mr.
16 Lewis?
17      MR. LEWIS:  It's not worth
18 repeating.
19      THE ARBITRATOR:  Go ahead.
20 Then the question stands.
21      MR. BROWN:  Did you hear the
22 answer, sir?
23      THE ARBITRATOR:  I did not.
24 The question was:  Was this out
25 of the kindness of your heart?

Page 264

DIRECR-EXAMINATION OF DR. B. HAMAD
1
2  And there's no objection, so
3  what's the answer?
4       A. You mean because we are good
5  people that we get this letter?
6       Q. No.
7       A. Is that what you -- is that what
8  you trying to say.
9       THE ARBITRATOR:  Counsel,
10 let's return this to the
11 professional level we were
12 working on and let's rephrase
13 another question.  All right.
14      Q. Isn't it true, sir, that you
15 asked this for this letter agreement to
16 be withdrawn because you had breached
17 the license agreement with Forall in so
18 signing it, and you needed to withdraw
19 it because you were advised by Forall
20 that that was a breach, and you could
21 not continue with surrendering the
22 lease without their -- at least, their
23 approval?
24      A. That's not true.
25      Q. Okay.  Do you see here where it

Page 265

DIRECR-EXAMINATION OF DR. B. HAMAD
1
2  says, "As you know, it was tenant that
3  approached landlord and explained its
4  desire to permanently close for
5  business, surrender the premises to
6  landlord, and terminate the lease"; do
7  you see that?
8       A. Yes, I see.
9       Q. And isn't that statement true?
10      A. Yes, it is.
11      Q. And -- and that had occurred
12 back in October 2014 without notice to
13 Forall, correct?
14      A. With notice to Forall.
15      Q. You noticed --
16      A. Yes.
17      Q. -- Forall --
18      A. They know --
19      THE ARBITRATOR:  Hold on.
20 We will not continue this way.
21      Dr. Bachar, this is the
22 third time I said you must let
23 the questioner complete his
24 question, and then you have to
25 give your own lawyer, Mr. Lewis,

MAGNA
LEGAL SERVICES

1    DIRECR-EXAMINATION OF DR. B. HAMAD
2    an opportunity to say the word
3    "objection." So we're -- that's
4    the only way we're going to
5    operate.
6         Now, restate your question
7    please, Mr. Brown.
8    Q. Is it your testimony, sir, that
9    you notified Forall in October 2014
10   prior to executing the letter agreement
11   with Simon to find a replacement tenant
12   that you were proceeding with that
13   letter agreement?
14   A. Can you say it again, please?
15        MR. BROWN: Maggie, can you
16   read it back, please?
17        (Whereupon, a recess was
18   taken at this time.)
19        THE ARBITRATOR: Mr. Brown,
20   I would appreciate it if you
21   restated the question. It's a
22   little muddled at the end, so why
23   don't you restate it. All right?
24   Q. Prior to executing and
25   delivering the October 2014 letter

1    DIRECR-EXAMINATION OF DR. B. HAMAD
2    agreement with Simon, did you advise
3    Forall that you were entering into that
4    letter agreement and seeking to
5    surrender the lease?
6    A. Yes.
7    Q. How did you do that, in writing?
8    A. Alfonso was aware. Luca was
9    aware of it.
10        THE ARBITRATOR: The
11   question was very specific. The
12   question was: How did you do
13   that? Not whether they were
14   aware of it.
15   A. They are the one who asked me to
16   do this, because they want to continue
17   --
18        THE ARBITRATOR: Dr. Hamad
19   --
20   A. There's no --
21        THE ARBITRATOR: All you
22   have to do is answer the
23   question. The question is: How
24   did you notify them? That's the
25   question.

1    DIRECR-EXAMINATION OF DR. B. HAMAD
2         THE WITNESS: You want me to
3    answer?
4         THE ARBITRATOR: Please do.
5         THE WITNESS: Yes. We
6    talked to them and they know
7    about everything at that time.
8         THE ARBITRATOR: You did it
9    orally then, right?
10        THE WITNESS: Orally.
11        THE ARBITRATOR: Okay. Mr.
12   Brown, go ahead.
13   Q. And did you provide them with a
14   copy of the letter agreement at that
15   time, October 2014, and said, "Here's a
16   copy. I just sent it to Simon. You
17   should be aware of it?"
18   A. I cannot recall.
19   Q. You did not, did you?
20   A. I did not recall.
21   Q. And isn't it true that as soon
22   as Forall learned of the letter
23   agreement having been executed months
24   later, it demanded it be withdrawn as
25   it was a breach of the license

1    DIRECR-EXAMINATION OF DR. B. HAMAD
2    agreement?
3    A. That's not true.
4    Q. Okay. But your actions were
5    that you did try to and ultimately were
6    successful in withdrawing the letter
7    agreement, were you not?
8    A. Yes.
9    Q. And are you aware that Sarah had
10   provided a collateral assignment of the
11   lease at issue to Forall at the
12   execution of the license agreement in
13   the beginning of the party's
14   relationship?
15   A. You want me to answer?
16        THE ARBITRATOR: Sure.
17   A. The answer is: Sarah has no
18   obligation towards Forall, whatsoever,
19   after we entered the first agreement.
20        THE ARBITRATOR: He didn't
21   ask you that. He asked you at
22   the time of the license
23   agreement, were you aware of the
24   fact that a collateral assignment
25   of lease was provided, that was



Page 270

DIRECR-EXAMINATION OF DR. B. HAMAD
1   the question.
2   THE WITNESS: Yes.
3   Q. Do you have an understanding
4   that the collateral assignment of lease
5   would prevent a party from surrendering
6   a lease without approval and notice to
7   the other secured party?
8   A. No, not necessarily.
9   Q. Okay.  Under what circumstances
10  would that not be the case?
11  A. The lease was for me, not for
12  Forall.  The lease was given to Sarah
13  LLC not to Forall, and we are the only
14  one that can execute the question.
15  THE ARBITRATOR:  That's not
16  the question.  The question was:
17  Are you aware of a situation
18  where a lease could be assigned
19  even though you had -- to another
20  party, even though you had
21  already provided this collateral
22  assignment of lease to Forall?
23  That was the question.
24  Am I right, Mr. Brown?

Page 271

DIRECR-EXAMINATION OF DR. B. HAMAD
1   MR. BROWN:  Yes, you are,
2   sir.
3   THE WITNESS:  Yes.
4   THE ARBITRATOR:  Dr. Hamad,
5   we have to see your face.  Go
6   ahead.
7   A. Yes, I was aware.
8   Q. Okay.  So after Simon initially
9   objected to the withdrawal of the
10  letter agreement, right, they
11  ultimately conceded on that point and
12  did terminate the letter agreement from
13  October 2014, correct?
14  A. Correct.
15  Q. And despite the testimony from
16  you and your brother about how Simon
17  was -- had -- had had enough and was
18  trying to force you out and was
19  otherwise pressuring you to surrender
20  the lease, they went ahead and withdrew
21  that letter agreement, did they not?
22  A. They did.
23  MR. BROWN:  I'm sorry?
24  THE ARBITRATOR:  Go ahead.

Page 272

DIRECR-EXAMINATION OF DR. B. HAMAD
1   Q. Okay.  Okay.  Exhibit 176.  I'm
2   going to pull up on the -- Claimant's
3   11416.  Let me make sure it's the same
4   thing.  Sorry.
5   THE ARBITRATOR:  Dr. Hamad,
6   I had asked at the beginning of
7   the examination if you were alone
8   in the room --
9   THE WITNESS:  I had asked my
10  nephew for help on the computer.
11  THE ARBITRATOR:  I
12  understand.  That's fine.
13  THE WITNESS:  No.  I had to
14  ask him --
15  THE ARBITRATOR:  That's
16  fine.  You identified who it was,
17  so that's okay.
18  Go ahead.  Mr. Brown go
19  ahead.
20  Q. Yes.  Okay.  So this is
21  Exhibit 176.  I'm going to put it up
22  the screen.  Doctor, this is the letter
23  dated January 28, 2015, and you're one
24  signatory to that, correct, is that

Page 273

DIRECR-EXAMINATION OF DR. B. HAMAD
1   your signature on the bottom right?
2   A. Yes.
3   Q. And this is an agreement by
4   which it states "Effective immediately,
5   the landlord and tenant mutually agree
6   to withdraw, rescind, and otherwise
7   terminate the letter agreement of
8   October 23, 2014," correct?
9   A. Correct.
10  Q. And it says, "Landlord and
11  tenant acknowledge and agree that the
12  lease agreement dated May 18, 2011 and
13  any amendments thereto, if any, the
14  lease, defined, shall remain in full
15  force and effect, and tenant shall
16  remain open for business and continue
17  to operate and pay rent and any and all
18  applicable charges due on the lease";
19  do you see that?
20  A. Yes.
21  Q. And what is -- why did you
22  execute and make sure that this
23  agreement was put in place with the
24  Forum shops?



Page 274

1   DIRECR-EXAMINATION OF DR. B. HAMAD
2       A. Because at that time they found
3   a tenant to take over the store, and
4   this is why Luca -- I think that was
5   Luca when he came in with Alfonso to
6   give him the store.
7       Q. Wasn't the reason you entered
8   into this agreement was because you had
9   on-going obligations under the license
10  agreement to run the store?
11      A. No.  I'm sorry.
12          THE ARBITRATOR:  Could you
13      just scroll up to the date of
14      this document?
15          MR. BROWN:  It's January 28,
16      2015.
17          THE ARBITRATOR:  Okay.  Now
18      I think you just testified, Dr.
19      Bachar Hamad, that you thought
20      that you entered into this in
21      order to facilitate Entebi taking
22      over the store; is that what I
23      heard?
24          THE WITNESS:  Forall.
25      Forall.  Sorry.  Forall.

Page 275

1   DIRECR-EXAMINATION OF DR. B. HAMAD
2          THE ARBITRATOR:  Okay.
3      That's what I thought.  Okay.  So
4      you did this to facilitate Forall
5      taking over the management of the
6      store, right?
7          THE WITNESS:  Yes.
8          THE ARBITRATOR:  All right.
9      Let's proceed.
10      Q. But you've acknowledged here
11  "Tenant shall remain open for business
12  and continue operating, pay rent, and
13  any and all applicable charges," right?
14      A. Yes.
15      Q. You were making this commitment,
16  once again, to Forum shops, but you
17  testified, did you not, when you first
18  started testimony today, that if you
19  we're ever back at the store, Sarah was
20  never running the store after September
21  '13; is that true?
22      A. Absolutely.  That's true.
23  Except the lease.  We are on the lease
24  only.  That's for the lease.
25      Q. You were just operating the

Page 276

1   DIRECR-EXAMINATION OF DR. B. HAMAD
2   lease at that point in time?
3       A. Yes.
4          MR. SHAH:  Mr. Brown, could
5      you clarify that exhibit number?
6      I think you said 174.
7          MR. BROWN:  176.
8          MR. SHAH:  Sorry.  I've got
9      that as something else, too.
10          MR. BROWN:  I'm sorry.  276.
11      Did I say "176"?  It's 276.
12      Thank you, Sohil.
13          THE ARBITRATOR:  Are we
14      ready Mr. Brown?
15          MR. BROWN:  Yes.  I'm just
16      looking at any time here and my
17      sincere hope to finish with the
18      witness today, but it may push
19      through 5:30.
20          THE ARBITRATOR:
21      Unfortunately, I'm charring a
22      meeting at 5:30 on another
23      matter, so I can't -- I can't go
24      beyond 5:25.
25          MR. BROWN:  I'll see how

Page 277

1   DIRECR-EXAMINATION OF DR. B. HAMAD
2      good I can do.  And Arbitrator
3      Farber, you know, I do think I
4      need to step through with this
5      witness with these various --
6      some of the various agreements
7      and provisions.  I think it's
8      important given his position in
9      the company.
10          THE ARBITRATOR:  I don't
11      need any convincing.  You have a
12      right to examine him.  So you're
13      going to have that right, and
14      he'll have to appear tomorrow.
15          MR. LEWIS:  Mr. Farber, if I
16      may be heard very briefly on
17      that.  You admonished me about
18      duplicative testimony, and just
19      having a witness read, or having
20      it read to him the language that
21      we've heard ad nauseam, I'm not
22      sure about the utility of that,
23      especially given the time
24      constraints we're under.
25          THE ARBITRATOR:  Well, I



1    DIRECR-EXAMINATION OF DR. B. HAMAD
2    don't know what the questions
3    are.
4         And Mr. Brown, I'm confident
5    you're mindful of the same
6    admonition I gave to Mr. Lewis.
7    There's no point in duplicating
8    something if it's been asked of
9    another witness.  But until I
10   hear the question, I don't know
11   if it's duplicative or not.  So
12   why don't you proceed right now,
13   and we're simply going to do the
14   best we can.  I know both of you
15   have worked very hard today.  Go
16   ahead.
17        MR. BROWN:  Thank you, sir.
18   All right.
19   Q. I'm going to go to the asset
20   purchase agreement between Sarah and
21   Italnord.  Exhibit 6.
22        Dr. Bachar, are you familiar
23   with this document?
24   A. Yes.
25   Q. Is that your signature as

1    DIRECR-EXAMINATION OF DR. B. HAMAD
2    president?
3    A. Yes.
4    Q. Did you sign that?
5    A. Yes.
6    Q. And under Section 1.4, which is
7    on Page 3, it discusses lease deposit
8    and Forall payment.  Section B says,
9    "Pay to, seller, $38,000, which is due
10   from Forall to seller, the Forall
11   payment.  Purchaser shall seek
12   reimbursement of the Forall payment
13   from Forall"; do you see that?
14   A. Yes, I do.
15   Q. Did Sarah or anyone on behalf of
16   Sarah receive this $38,000 payment from
17   Italnord?
18   A. Not to my knowledge, no.
19   Q. Have you checked your records
20   and looked for copies of checks or
21   deposits --
22   A. Yes.
23   Q. -- indicating the $38,000 was
24   made?
25   A. Was not made.

1    DIRECR-EXAMINATION OF DR. B. HAMAD
2    Q. And is it your testimony that
3    Italnord, despite not making this store
4    -- this payment, took over management
5    of the store?
6    A. What was your question at the
7    end?
8         THE ARBITRATOR:  Is it your
9    testimony that without -- even
10   though they didn't make the
11   payment, that Entebi and Italnord
12   still took over the store?
13        THE WITNESS:  Yes.
14   Q. Did you ever seek enforcement of
15   this provision by legal means or
16   otherwise against Italnord?
17   A. I think my brother was handling
18   this issue.  I cannot recall.
19        THE ARBITRATOR:  Counsel,
20   let me say that this really does
21   sound like almost an exact
22   duplication.  I heard from the
23   other Dr. Hamad that there was no
24   legal action, so I don't know why
25   we're doing it again with this

1    DIRECR-EXAMINATION OF DR. B. HAMAD
2    witness.
3         MR. BROWN:  I'm just -- to
4    the extent that Mr. Amar had no
5    position within the company, I've
6    dotted those Is and crossing
7    those Ts.  It is unfortunate that
8    he was their first witness, but I
9    think it is incumbent upon me to
10   touch upon this.  He is the
11   signatore to this agreement.
12        THE ARBITRATOR:  I didn't
13   stop you from that one.  Go
14   ahead.
15   Q. Dr. Hamad, do you see this
16   language here that's in Section 1.7
17   that says, "Notwithstanding anything in
18   this agreement to the contrary,
19   purchaser is not assuming the lease or
20   the license agreement in full.  It is
21   only assuming seller's performance and
22   payment of obligations during the term
23   as defined in Section 4.4 of this
24   agreement under the lease, license
25   agreement, and other operation



Page 282

DIRECR-EXAMINATION OF DR. B. HAMAD

1
2  contracts listed on Schedule 1.1,
3  little C, Roman numeral four"; do you
4  see that?
5      A. Yes.
6      Q. Do you have an understanding of
7  this provision?
8      A. Yes, I do.  It means that was
9  inserted in the second draft again,
10  that was not in the first draft, just
11  for Simon in case he check on the
12  lease.
13      Q. Why is it referenced the license
14  agreement?
15      A. Because -- what do you mean by
16  "license agreement," exactly, because
17  if Simon find out that they are
18  operating the store, not us, he would
19  kick them in the same day [sic].
20      Q. Simon, why would they care about
21  the license agreement; were they a
22  party to that?
23      A. Well, Simon has authorized us to
24  operate the store.  He doesn't care
25  about anything except us operating the

Page 283

DIRECR-EXAMINATION OF DR. B. HAMAD

1
2  store.
3      The biggest fear for Forall and
4  Alfonso and Forall, again, if Simon
5  find out they are directing the store
6  or operating store they will -- they
7  will tell them to -- ask them to leave.
8      Q. So this -- you said something
9  about a draft, but isn't this the final
10  agreement that you signed?
11      A. Yes, we did.  We were asking
12  about this -- this a lot of times.  He
13  said, "Don't worry.  It's not
14  enforceable."
15      Q. Do you have -- believe contracts
16  that you signed are not enforceable?
17      A. I believe people for their word.
18      Q. Did you think the lease was not
19  enforceable?
20      A. Again, the lease is the only
21  thing we were on the hook for.  Simon
22  -- Alfonso and Forall cannot have the
23  lease under their name.  They were
24  forcing us to keep the lease under our
25  name so they can operate the store.

Page 284

DIRECR-EXAMINATION OF DR. B. HAMAD

1
2      Q. You see this Section 3.2,
3  "Representation," I'm sorry.  Section
4  3.1, "Representations and warrantees of
5  seller," the Section A, "The execution,
6  delivery, and performance of this
7  agreement including any exhibit hereto
8  by seller does not and will not
9  immediately or with the passage of
10  time, the giving of notice or
11  otherwise, one, result in any material
12  breach of or conflict with any terms,
13  conditions, provisions, of any
14  agreement, and venture, mortgage,
15  lease, or other instruments, to which
16  seller is a party or by which seller is
17  bound or gives rise to any right of
18  termination by any party"; do you see
19  that?
20      A. Yes, I do.
21      Q. Wasn't this a representation by
22  Sarah to Italnord in the making of this
23  agreement that Sarah was not going to
24  be breaching any agreements that it was
25  party to by executing this doc?

Page 285

DIRECR-EXAMINATION OF DR. B. HAMAD

1
2      A. Sir, I never breach any
3  agreement with Alfonso Entebi.
4      Q. I'm sorry.  I didn't understand
5  the answer.
6      A. I said -- you asked me if I
7  breached an agreement with Entebi.  I
8  was not.
9      Q. My question is:  This is a
10  representation you've made to the
11  purchaser in this agreement?  You're
12  saying, "Look, by signing this
13  document, I'm not breaching any other
14  agreements that I'm party to."  "You,"
15  being Sarah.  Do you have an
16  understanding about that?
17      A. Yes, I do.
18      Q. Okay.  And didn't you have an
19  obligation under the license agreement
20  to remain responsible for operating the
21  store, keeping the lease in good order,
22  making minimum purchases under the
23  lease license agreement?
24      A. Well, we had obligation to keep
25  the store, the lease for the store.  We

MAGNA ►
LEGAL SERVICES

1        DIRECR-EXAMINATION OF DR. B. HAMAD
2    did not have any obligation when we
3    enter this, you know, contract with
4    Alfonso and Forall.  We did not have
5    any obligation to operate the store or
6    anything.
7        Q. Okay.  So for the term of the
8    agreement with Alfonso, he was going to
9    manage the store, correct?
10       A. He took over the store.
11       Q. And he was going to manage it
12   for you, for Sarah, during that time,
13   right?
14       A. That's not true.  He took
15   100 percent responsibility for the
16   store for himself.  Not for us.  I'm
17   sorry.
18       Q. Do you dispute the fact that
19   there was a term for Alfonso's
20   management of the store, that it was
21   for a set period of time, your brother
22   referred to it as a "trial"?
23       A. As what?
24       Q. As a "trial."
25       A. Actually, it was a -- a way for

1        DIRECR-EXAMINATION OF DR. B. HAMAD
2    him to build the credit so he can go
3    and ask for the lease to be transferred
4    in his name.
5        Q. Your attorney asked you if you
6    knew what was in the management
7    agreement and asset purchase agreement
8    and the documents that you've signed,
9    right?
10       A. Yes, I do.
11       Q. And you know that there is a
12   term for a period of time that Italnord
13   was going to manage your store; isn't
14   that right?
15          MR. LEWIS:  Objection.
16          THE ARBITRATOR:  What's the
17   objection?  I'm sorry, Mr. Lewis,
18   it's acting up again.  Guys,
19   we're really having a lot of
20   technical glitches today.  I
21   don't know why.  Mr. Lewis, try
22   it again.
23          MR. LEWIS:  Any better?
24          THE ARBITRATOR:  Same thing.
25          MR. LEWIS:  If you can hear

1        DIRECR-EXAMINATION OF DR. B. HAMAD
2    me at all, I was saying this
3    is --
4          THE ARBITRATOR:  No good,
5    Mr. Lewis.
6          MR. LEWIS:  I'm going to
7    jump off and come back right in.
8          (Whereupon, a recess was
9    taken.)
10          THE ARBITRATOR:  Now, Mr.
11   Lewis what were you going to say?
12          MR. LEWIS:  Just to explain
13   my objection.  This is
14   cumulative, duplicative, it's
15   asked and answered.  I think
16   Mr. Brown doesn't like the fact
17   that Dr. Hamad will not give in
18   that it was a management, as
19   opposed to him taking over the
20   store, no matter how many times
21   he asked that.  I don't know if
22   that's going to change.  But it's
23   duplicative at this point in
24   time.
25          THE ARBITRATOR:  Well, in

1        DIRECR-EXAMINATION OF DR. B. HAMAD
2    light of the fact that he's in
3    one on behalf of Sarah who
4    actually signed the agreement
5    with Italnord, I think it's fair
6    game for Mr. Brown.
7          So, Mr. Brown, you can
8    continue.  Overruled.
9          (Whereupon, a portion of the
10   record was read back.)
11       A. The term was again and again for
12   Alfonso to build the credit so he can
13   apply and take the lease under his name
14   from Simon.
15          THE ARBITRATOR:  The
16   question was:  Did you know there
17   was a term, yes or no?
18          THE WITNESS:  Yes, I do.
19          THE ARBITRATOR:  Okay.
20   That's the answer.  Next
21   question.
22       Q. Did this notion of Italnord
23   building his credit, is that anywhere
24   in any of the documents that were
25   signed between Sarah and Italnord?



Page 290

1          DIRECR-EXAMINATION OF DR. B. HAMAD
2          A. It's in the language between
3    Luca --
4          THE ARBITRATOR: He didn't
5    ask you about language between
6    Luca.
7          THE WITNESS: No.
8          THE ARBITRATOR: That is the
9    answer. Next question.
10         Q. Is that language anywhere in the
11   consent and stipulation that Forall
12   signed authorizing the management
13   agreement with Sarah?
14         THE ARBITRATOR: With
15   Italnord and Sarah, right?
16         MR. BROWN: Yes.
17   A. No.
18         THE ARBITRATOR: Counselor,
19   how much more do you have of the
20   witness?
21         MR. BROWN: Likely a half an
22   hour, Mr. Farber.
23         THE ARBITRATOR: Look guys,
24   I told you I've got another
25   meeting I'm charring at 5:30, so

Page 291

1          DIRECR-EXAMINATION OF DR. B. HAMAD
2    I do want to have just a moment
3    to take a break.
4          So are we at a good
5    convenient point, Mr. Brown?
6          MR. BROWN: We are.
7          THE ARBITRATOR: Tomorrow
8    morning 9:00 everyone.
9          Mr. Lewis, do you have
10   another witness after this
11   witness?
12         MR. BROWN: Only our
13   rebuttal expert.
14         THE ARBITRATOR: Okay. So
15   that would come in rebuttal.
16         Mr. Brown, who is going to
17   be your first witness as soon as
18   we're done with Dr. Bachar Hamad?
19         MR. BROWN: Paolo
20   Torello-Viera, and followed by
21   Palma Settimi.
22         THE ARBITRATOR: All right.
23   Tomorrow 9:30 everyone. We'll
24   see you then.
25         (Time noted: 5:20 p.m.)

Page 292

1
2          C E R T I F I C A T E
3      I, MAGDALENA M. ARTILES, a shorthand
4    reporter and Notary Public within and
5    for the State of New York, do hereby
6    certify:
7      That the Witness(es) whose testimony
8    is hereinbefore set forth was duly sworn
9    by me, and the foregoing transcript is a
10   true record of the testimony given by
11   such Witness(es).
12     I further certify that I am not
13   related to any of the parties to this
14   action by blood or marriage, and that I
15   am in no way interested in the outcome
16   of this matter.
17
18
19
20
21
22
23
24   Magdalena M. Artiles, a Court
     Reporter and Notary Public
25   Date: November 12th, 2020



74 (Pages 290 to 292)

**A**

**abide** 171:10
178:19,23
180:7
**abided** 179:24
**ability** 260:21
**able** 6:19 80:18
131:16 152:20
155:22 177:21
178:6,8 186:17
187:6
**absolutely** 18:6
22:11 26:11
28:2 29:20
36:23 49:23
61:4 120:16
123:9,19
126:10 127:21
129:14 130:11
131:11,18
132:8 133:21
134:21 138:10
140:6 146:11
189:23 214:14
236:8,11 259:6
275:22
**accept** 141:11
188:6,12,17
**accepted** 52:22
111:18,21
**accepting** 76:5
**access** 100:19
**accompany** 47:3
**accomplished**
216:11
**accounted**
104:24
**accounting** 36:2
**accurate** 39:9
106:19
**acknowledge**
102:3 273:12
**acknowledged**
275:10
**act** 11:20 88:16

**acting** 287:18
**action** 66:21
280:24 292:14
**actions** 269:4
**ad** 277:21
**add** 216:20
**addition** 58:4
134:11
**additional** 94:25
95:13 167:7
175:25 184:9
184:10,14,22
185:2
**address** 156:19
156:23
**adequate** 149:5
151:8 152:9
**admitted** 253:10
253:13
**admonished**
277:17
**admonition**
278:6
**advance** 109:8
149:3 150:23
250:7
**advancing**
192:23
**advantage** 10:10
**advantageous**
254:4
**advertisement**
105:5
**advertisements**
104:25 166:14
**advertising** 53:4
246:25
**advice** 247:13
**advise** 29:4 30:15
56:6 94:8,21
95:22 96:13
97:16,17 101:6
267:2
**advised** 30:10
229:6 264:19
**advises** 131:2

**advising** 31:18
**affect** 257:20
**afford** 254:18
**afraid** 128:2
143:16 182:21
205:18
**afternoon** 158:8
189:25 206:10
206:14 231:4,5
**afterward** 169:4
**agree** 74:12
109:22 123:17
167:6 203:8
204:3 250:2
273:6,12
**agreed** 93:8
124:2,13,24
125:4 150:19
172:18 184:8
184:15 219:7
240:12
**agreeing** 127:22
184:10
**agreement** 22:19
23:2,24 24:6,12
26:9 27:21 28:7
31:21 32:8,12
32:15,21 37:2,7
37:17 41:23
42:6 44:22
46:13,23 47:2,3
47:8 48:11,22
49:8,12,14 50:2
50:3,5,9,15,16
50:18,19,20,22
50:24 51:4,9,16
51:17,20 52:3
52:18,24 53:6,9
53:12,17,19
54:3,4,10,17,25
55:5 56:17 57:9
57:10 58:12,19
59:17 60:24
61:9 62:2,5
63:19 65:22
66:13,14 68:22

68:25 69:3,6,7
69:15 70:2,19
73:13 75:20
76:2,18,25 77:3
77:8,16,19 78:4
78:11 79:6,19
79:23 80:5,10
81:12 82:8 83:5
83:16,21,24
84:22 85:2,3,7
85:13 87:10,13
87:18 88:2,10
88:22,22 89:5
89:12,13,20,21
90:4,10,19
91:10 92:8,18
94:12 95:15,22
96:2,16 98:17
98:24 99:6,11
100:9,12,13,22
101:11,17,22
102:3,4,8,18
104:17 109:2
115:9,14 117:4
119:5,22 120:9
122:24 123:3
125:2,6,13
127:19 130:25
131:4,7 132:2
133:17 134:2
134:12,20
136:25 140:13
141:7,16
148:21 149:2
150:3,11,20
160:17,22
162:23 163:13
163:14 164:10
164:18 167:23
168:7 172:23
185:11,20,24
189:2 193:2
195:14,17,20
195:25 198:7
199:6,20 202:7
204:6 205:6

206:2,3 207:8
207:11 212:5
216:4 222:19
222:20 223:2
223:12 224:3
224:17 225:6
225:23 226:6
226:22 227:3
231:21,22
232:3 234:16
237:19 255:8
255:16,20,21
255:24 256:10
256:16 257:3
258:19,23
262:17,22
264:15,17
266:10,13
267:2,4 268:14
268:23 269:2,7
269:12,19,23
271:11,13,22
273:4,8,13,24
274:8,10
278:20 281:11
281:18,20,24
281:25 282:14
282:16,21
283:10 284:7
284:14,23
285:3,7,11,19
285:23 286:8
287:7,7 289:4
290:13

**agreements** 51:2
51:5 55:8 69:17
84:9 119:9
150:18 189:6
201:9,14
222:19 277:6
284:24 285:14
**agrees** 124:18
**ahead** 7:13 11:22
13:10 31:15
57:17 63:6
65:20 81:19



92:4 100:5
114:17 125:9
128:19 146:21
154:17 158:20
168:22 174:14
175:15,21
178:3 179:15
190:7 220:14
220:18 231:18
233:25 239:19
243:3 254:10
261:7,21
263:19 268:12
271:7,21,25
272:19,20
278:16 281:14
**Albasha** 1:4
12:12,14 45:5
**Alfonso** 36:9
42:24 141:4
159:2,19
176:20 187:18
190:24 192:21
193:12,25
197:2,24
204:19,22
207:20 223:24
226:7,13 227:5
240:19 267:8
274:5 283:4,22
285:3 286:4,8
289:12
**Alfonso's** 286:19
**allegation** 242:12
242:20
**allegations** 7:17
7:21 243:22
**alleged** 242:8
**allotment** 105:22
**allow** 6:22 11:3
19:23 23:2
26:19 110:11
127:19 136:16
186:3 189:13
212:3 228:13
**allowance** 8:7

**allowed** 162:12
186:11 195:25
224:8 247:25
**allowing** 55:25
127:18 162:18
**allows** 25:16
55:16 138:23
**alter** 88:17 99:4
**altered** 98:13
**altogether**
233:24
**Amar** 1:4 2:19
187:23 192:5
192:22 204:13
257:10,16
258:17 259:7
260:12 261:11
281:4
**amendment**
102:12
**amendments**
273:14
**American** 1:2
243:17
**Americas** 192:8
**Amex** 105:2
**amount** 35:22
36:6 43:8 61:10
62:13 65:16
71:25 86:5
116:17 152:22
171:23 172:16
175:11 213:2
**analysis** 16:8
**ancillaries** 212:8
**and/or** 88:18,19
88:22 94:11
95:25 96:5
125:23
**answer** 4:17 6:9
13:9 17:11
20:25 24:23
28:25 58:24
84:13 99:21
114:12,17
132:24 136:17

145:19 146:19
157:8,14
167:19 177:24
178:24 189:14
189:15 194:6
199:14 211:13
215:19 220:12
220:14,16
223:21 227:18
229:12,15
230:16 232:23
238:4 239:19
243:13 244:5
260:23,25
263:22 264:3
267:22 268:3
269:15,17
285:5 289:20
290:9
**answered** 13:8
164:23 174:3
214:6 232:22
239:18 288:15
**answering** 5:14
135:22 214:3
**anybody** 201:23
**anymore** 78:22
219:7
**anyone's** 40:9
**anyway** 224:14
**APA** 119:15
**apologies** 46:17
**apologize** 38:12
40:5 46:16 48:9
51:22 74:20
126:12 132:25
183:14
**apparently**
101:20
**appear** 25:15
138:23 277:14
**appears** 29:15
253:21
**applicable**
273:19 275:13
**application** 93:21

**apply** 186:23
289:13
**appreciate** 80:23
122:2 143:24
153:20 154:24
227:9 266:20
**approach** 235:11
238:14,15
**approached**
235:13,16
239:6 247:16
265:3
**appropriate**
91:22 247:2
249:15
**approval** 264:23
270:7
**approve** 187:7
**approved** 55:8
102:9
**approximately**
34:23 109:14
188:8 212:22
**April** 240:23
241:9
**arbitration** 1:2,3
1:14 13:17
20:22 156:12
189:10 216:15
222:16 243:17
**arbitrator** 1:19
2:4 4:2,7 5:2
7:13,25 8:10
9:3,9,17 10:2,6
10:19 11:18
13:7,15 17:2,10
20:15,21 23:16
23:22 24:18
28:20,24 31:15
31:23 32:3
34:18 37:15
40:11,24 43:21
47:18 49:4,16
51:6 54:6,14,21
55:10 56:18
57:6,14,16

58:22 60:13,17
61:19 62:4,15
62:24 63:5,17
64:5,19,25 65:8
65:19 70:12,22
72:12,16,21
73:19 74:6,22
75:5 77:22
78:12,18 80:21
81:14,18 82:11
84:5,11 85:18
85:24 86:15,20
86:23 87:2
90:24 91:12,19
92:3 93:2,18
98:10 99:18
100:5 101:19
103:5,8 107:25
110:24 111:12
113:11,18
114:4,16,21
115:4,21 116:2
116:24 117:17
117:21 118:13
118:20 121:16
121:24 122:4
123:20 124:3
124:11,16
125:9 127:25
128:9,14
129:17 132:18
132:22 133:7
135:17 136:5
136:12 137:4
139:5,11 144:5
145:12 146:18
147:11 148:2
151:14 152:2
152:11,17
153:18 154:4,9
154:17,22
155:4,13,17
156:2,5,16
157:2,23 158:4
158:13,19
161:19 164:22



166:22 167:4
167:18 168:2
168:10,18,21
170:16,24
171:6 172:2,8
172:21 173:7
173:16,19,25
174:4,12,22
175:14,18
180:11 182:15
188:25 189:8
189:23 190:5
191:17 194:14
194:18,25
196:7 197:5,11
197:16 199:5
200:5,8,10,20
203:13,20
206:13,23
207:4 215:18
215:23 216:12
217:14 220:3
220:11,18
222:10 223:17
227:20 228:21
229:4 232:21
234:19 237:8
237:21 239:17
240:4 241:25
242:5,25 243:6
243:12 244:17
244:23 248:11
253:9,17 257:4
259:11,21
260:4,7,18
261:6,19,25
263:14,19,23
264:9 265:19
266:19 267:10
267:18,21
268:4,8,11
269:16,20
270:16 271:5
271:25 272:6
272:12,16
274:12,17

275:2,8 276:13
276:20 277:2
277:10,25
280:8,19
281:12 287:16
287:24 288:4
288:10,25
289:15,19
290:4,8,14,18
290:23 291:7
291:14,22
**area** 5:18 183:8
211:11 217:3
230:3 236:24
**areas** 216:24
**argue** 229:9
**arguing** 6:22
74:13
**argument** 11:10
159:25
**arguments** 82:13
**arising** 88:20
**Arnold** 257:10
258:7
**arrangement**
53:7
**article** 115:13
**Artiles** 1:16
292:3,24
**ASAP** 214:18
**asked** 4:23 5:3
23:18 24:20
28:20 31:24
36:15 43:23
49:18 51:7
56:20 75:9
78:24 99:19
114:5 120:4,5
120:10 126:13
126:16 133:13
138:15,20
166:8,14,24
174:3 192:6
194:16 196:24
199:21 202:17
202:22 205:23

211:10 217:18
224:12 238:22
240:5 249:19
264:15 267:15
269:21 272:7
272:10 278:8
285:6 287:5
288:15,21
**asking** 5:5 33:16
33:17 54:12,19
71:4 74:24
86:12 97:15
99:25 103:22
124:19,20
127:6 151:15
151:17,20,23
152:12 170:9
174:16 187:24
193:17 194:9
194:11 198:21
202:14,15
213:12 229:21
233:10 240:18
257:25 259:12
283:11
**asks** 5:7 6:14
24:21 229:24
242:2
**aspect** 255:3
**aspects** 135:6
**asserted** 65:11
**assess** 127:10
**asset** 37:2,7
46:22 47:3
49:25 50:18,20
50:22,24 51:20
68:21 69:25
81:12 163:13
222:20 278:19
287:7
**assets** 163:12,25
249:2
**assign** 27:3
**assignable** 52:21
**assigned** 270:19
**assignment** 25:16

26:19 138:23
269:10,24
270:5,23
**assist** 89:13
252:6
**assistance** 175:25
**Association** 1:2
243:18
**assume** 101:4
149:24
**assuming** 17:5
69:2,3,16,19
70:6 75:18,21
281:19,21
**assumptions**
68:20
**attached** 148:13
212:13
**attempting** 189:3
215:9
**attention** 173:12
196:13 224:15
**attorney** 60:9
126:23,24
129:11,12
130:13,15,17
214:18,22,23
262:9 287:5
**attorneys** 2:8,13
56:10
**attract** 254:16
**August** 21:25
153:6,6,7 164:7
187:15 221:7,7
221:19 232:10
239:14
**authentications**
143:22
**authorization**
198:21
**authorize** 198:14
**authorized** 192:9
194:21 282:23
**authorizing**
23:24 24:6
290:12

**autumn** 152:21
**available** 109:14
118:22 137:20
143:18
**Ave** 2:14
**avenue** 170:6
**average** 142:12
142:19
**avoid** 216:15
**aware** 47:22
51:12 56:14
57:2 59:25
102:13 108:19
149:14 150:9
150:12,24
151:13 161:10
173:14 178:22
180:16 194:7
199:24 215:8
232:12 241:10
242:4,11,20
243:7 250:17
250:19 254:9
254:12 267:8,9
267:14 268:17
269:9,23
270:18 271:8
**awkward** 80:13
141:10
**A-R-E** 258:22
**a.m** 1:11
**A/W2011** 39:7

---

**B**

**B** 3:6,7 52:7 59:7
62:8,9 70:8
71:9 82:19
116:4,5,14
155:6 157:2
158:1,2 159:1
160:1 161:1
162:1 163:1
164:1 165:1
166:1 167:1
168:1 169:1
170:1 171:1



| | | | | |
|---|---|---|---|---|
| 172:1 173:1 | 264:1 265:1 | 131:17 134:24 | 161:24 | 130:25 161:8 |
| 174:1 175:1 | 266:1 267:1 | 135:7,12 136:2 | **beginning** 56:21 | 276:24 |
| 176:1 177:1 | 268:1 269:1 | 146:24 150:7 | 115:12 180:9 | **big** 116:5,5 202:9 |
| 178:1 179:1 | 270:1 271:1 | 159:4 160:2 | 186:13 204:15 | 213:3,5 254:17 |
| 180:1 181:1 | 272:1 273:1 | 163:12,16,18 | 227:25 269:13 | 254:18 |
| 182:1 183:1 | 274:1 275:1 | 164:2,14 | 272:7 | **biggest** 224:21 |
| 184:1 185:1 | 276:1 277:1 | 189:17 192:21 | **behalf** 13:3,5 | 227:5 283:3 |
| 186:1 187:1 | 278:1 279:1,8 | 206:25 210:11 | 14:21 35:7 | **binder** 60:5 |
| 188:1 189:1 | 280:1 281:1 | 214:18 227:16 | 65:11 74:14 | **binding** 89:23 |
| 190:1 191:1 | 282:1 283:1 | 239:7 257:16 | 136:22 149:12 | **bit** 89:7 103:18 |
| 192:1 193:1 | 284:1 285:1 | 265:12 266:16 | 252:20 257:18 | 121:17 134:22 |
| 194:1 195:1 | 286:1 287:1 | 275:19 288:7 | 279:15 289:3 | 161:17 216:21 |
| 196:1 197:1 | 288:1 289:1 | 289:10 | **belabor** 125:12 | **blame** 248:21 |
| 198:1 199:1 | 290:1 291:1 | **background** | 134:9 | **blanket** 189:5 |
| 200:1 201:1 | **Bachar** 1:4 9:5 | 158:12,23,24 | **belaboring** | **BLEAKLEY** |
| 202:1 203:1 | 12:17 15:7 18:2 | **badgering** 248:6 | 140:23 | 2:13 |
| 204:1 205:1 | 19:17 20:4 | 248:13,17 | **believe** 8:25 | **blood** 292:14 |
| 206:1 207:1 | 22:24 23:12 | **bandwidth** | 12:20 16:19 | **book** 262:7 |
| 208:1 209:1 | 25:12,22 33:5,9 | 154:15 | 18:16 19:14 | **boss** 4:21 7:2 |
| 210:1 211:1 | 33:25 41:12 | **Baritza** 134:16 | 24:24 26:2,3 | 229:7 230:14 |
| 212:1 213:1 | 128:11 154:2,5 | 175:4 | 29:19 37:23 | **bottom** 92:15 |
| 214:1 215:1 | 154:7,9,18,20 | **base** 19:10,12 | 41:14,16 42:11 | 115:23 122:8 |
| 216:1 217:1 | 156:2 164:25 | 82:6 105:25 | 43:11,14,18 | 209:25 273:2 |
| 218:1 219:1 | 166:23 175:20 | **based** 22:8 36:2 | 44:4 88:10,13 | **bought** 50:2 |
| 220:1 221:1 | 180:11 196:8 | 42:10 49:24,25 | 89:3 90:17 | **bound** 284:17 |
| 222:1 223:1 | 228:23 229:4 | 50:3 59:21 79:5 | 94:19 95:3 97:5 | **brand** 146:2 |
| 224:1 225:1 | 257:12 260:19 | 97:12,12,13 | 97:7 174:16 | 219:21 221:2 |
| 226:1 227:1 | 261:16 265:21 | 113:20 119:19 | 252:9 261:9 | 247:3 |
| 228:1 229:1 | 274:19 278:22 | 172:10 213:6 | 283:15,17 | **breach** 264:20 |
| 230:1 231:1 | 291:18 | **basing** 35:24 | **bell** 105:4 | 268:25 284:12 |
| 232:1 233:1 | **Bachar's** 8:25 | 59:20 69:20 | **benefit** 162:17 | 285:2 |
| 234:1 235:1 | **back** 19:6,23,25 | 97:11 | **best** 80:15 125:3 | **breached** 264:16 |
| 236:1 237:1 | 20:12,20 21:12 | **basis** 60:14,18 | 258:6 278:14 | 285:7 |
| 238:1 239:1 | 22:20 25:11 | 66:21 79:10,14 | **better** 8:19 10:20 | **breaching** 284:24 |
| 240:1 241:1 | 26:8 27:16,20 | 220:5 | 11:10 40:8 | 285:13 |
| 242:1 243:1 | 27:23 28:10,12 | **bates** 241:19 | 72:17 81:4 | **break** 40:4,14,15 |
| 244:1 245:1 | 29:16 34:5 | 256:21 | 121:13,18,19 | 91:15,20 128:5 |
| 246:1 247:1 | 36:21 39:20 | **bathroom** 189:20 | 121:25 155:23 | 128:12 189:21 |
| 248:1 249:1 | 58:23 63:18 | **bear** 30:4 46:14 | 158:19 169:22 | 189:25 202:21 |
| 250:1 251:1 | 68:8 70:18 | 81:10 93:15 | 179:13 181:9 | 206:8,10,15 |
| 252:1 253:1 | 72:10 75:3 80:9 | 129:24 235:23 | 287:23 | 207:6,7 253:14 |
| 254:1 255:1 | 82:10 83:4 | 245:9 261:24 | **Beverly** 250:8,22 | 291:3 |
| 256:1 257:1,18 | 93:15 96:7,10 | **bears** 237:17 | 252:21 253:19 | **brevity** 148:15 |
| 258:1 259:1 | 121:7,17 | **beg** 194:19 | 254:2,10,14,15 | **brief** 7:22 9:2 |
| 260:1 261:1 | 123:16 126:8 | **began** 159:6 | 254:19 | **briefly** 125:11 |
| 262:1 263:1 | 126:14 130:7 | 160:5 161:11 | **beyond** 9:4 | 138:17 277:16 |



**bring** 138:16
195:4 230:11
**bringing** 190:19
190:24
**broader** 163:11
**broke** 4:23
**brokerage**
202:18,23,24
**Brook** 156:24
**brother** 12:16
14:6 15:7 17:13
17:17 18:22
19:14 20:13
21:21 22:8,15
23:5,23 25:4
28:4 29:13,23
30:2,5 33:16
35:8 44:14
82:20 145:7
149:19,20
155:7 163:23
168:23 170:10
183:23 187:19
191:22 192:16
205:3,4 208:11
208:19 209:16
210:10 217:15
235:21 250:9
250:14 253:25
254:21,22
256:14 258:6
271:17 280:17
286:21
**brothers** 217:4
**brother's** 12:15
45:25
**brought** 176:23
195:7 235:6
**Brown** 2:15 3:4,7
4:10,21,21 5:4
5:20 6:23 7:11
8:4,18 9:10,12
10:2,4,7 11:13
11:15,22,23
12:3 13:11,12
18:7 27:13 28:9

29:2 32:23
37:19 38:10
40:2,20,24
55:18 56:10
57:18 60:19
62:5 70:17,20
74:24 75:2,4,8
80:24 81:7
82:16 83:11,13
84:17 86:10,18
86:22,24 90:25
91:6,13,17 92:5
93:4,14 94:2
100:6,7 102:25
103:10 108:3
111:12 114:19
115:17,18,22
120:5,19
121:12 124:5
125:18 129:13
129:15,20
130:2,7,13,16
131:20,21
132:14,20
133:2 136:4,7
136:19 137:3
138:15,20
144:5,7 145:3
146:21 147:13
147:25 151:12
152:3 153:16
153:25 154:11
155:13,24
157:12,13
164:20 165:2
174:2,19
188:24 189:18
191:14,20
194:13 197:4,7
198:25 210:20
215:5,16,21
217:10,15
219:24 220:4,6
223:14 228:24
229:2,7 230:5
230:14,22,24

231:3 237:22
238:3 241:13
241:17 251:19
253:2,4,11
256:19 257:5,7
260:10,11
261:10,22
262:6 263:21
266:7,15,19
268:12 270:25
271:2,24
272:19 274:15
276:4,7,10,14
276:15,25
278:4,17 281:3
288:16 289:6,7
290:16,21
291:5,6,12,16
291:19
**budget** 246:25
**build** 48:25 62:13
63:14 65:13
67:21 77:10,11
109:16 213:14
287:2 289:12
**building** 289:23
**business** 16:18
18:4 52:20
94:11 125:23
143:5 151:13
151:16 162:5
196:4 198:12
236:6 248:4
255:4,12 265:5
273:17 275:11
**businesses**
236:24
**buy** 78:7,19,22
107:11,14,17
107:18 138:2,8
147:6 152:9,10
152:12 167:24
168:6,9,14
171:17,21
172:14,18,19
172:24 226:16

**buying** 166:20
**buys** 107:13
**B-A-C-H-A-R**
156:21

---

### C

**C** 2:2 69:9 116:4
116:6 158:2
282:3 292:2,2
**Caesars** 142:10
143:21 247:17
**calculate** 43:5,7
43:13
**calculated** 43:2,3
44:12 67:3
**calculating** 68:16
**calculation** 7:20
44:13,18 68:14
110:12
**calculations** 67:8
67:24 109:11
142:19
**call** 33:18 54:22
155:5 210:3,24
213:21,22
214:2 257:21
**called** 6:3 10:18
78:13 145:13
155:7 181:16
182:4,17,19
230:10
**calling** 9:4 60:20
85:17 205:16
**calls** 90:23 136:7
223:15
**cancel** 262:24
**cancelation** 29:7
29:11 97:20
**canceled** 30:12
30:16 31:3
148:22
**cancellation**
22:17 244:25
**care** 149:19
150:14 282:20
282:24

**carefully** 7:5
**carve** 37:6
**carved** 36:24
**case** 1:6 78:25
104:5 243:16
253:24 270:11
282:11
**caught** 74:2
**caused** 256:9
**CC'd** 183:24
**cease** 160:3
**ceased** 160:4
**CEO** 90:6,8
123:8 126:5
134:6,13
149:17 169:5,6
184:4 191:23
192:8,22 193:6
196:24 197:25
214:12 225:9
**certain** 48:3
246:19
**certainly** 10:21
56:5 75:4 87:3
136:14 189:8
**certify** 292:6,12
**CFO** 165:15,19
**chance** 134:25
205:24
**change** 22:5
288:22
**changes** 169:3
**changing** 98:3
**characterization**
191:15
**charge** 165:22
182:11 251:7
**charged** 213:6
**charges** 273:19
275:13
**charring** 276:21
290:25
**chart** 35:12
117:18
**chat** 230:7
**check** 117:6



222:8 282:11
**checked** 279:19
**checks** 60:22
  279:20
**Chicago** 2:9 41:8
  41:17 42:10
**choice** 74:18
**chose** 111:15
  146:5,7 200:12
**circumstance**
  4:19 6:21
**circumstances**
  190:9 270:10
**citizens** 73:4,10
  74:3 146:17
**claim** 47:25
  65:12 79:2
  242:18 243:15
  243:23
**claimant** 1:5
  251:15
**claimants** 2:8
  252:8 253:8
**Claimant's** 18:9
  33:2 38:24
  251:17 256:20
  272:3
**claimed** 42:13
**claims** 242:9
**clarification**
  145:9
**clarify** 111:14
  171:7 276:5
**clarity** 8:4
**clause** 70:18
**clear** 18:11 85:10
  110:14 134:11
  136:18 140:19
  173:25 174:5
  175:20 204:2
  220:21
**clearly** 71:10
  97:22 194:16
  201:21
**clear-cut** 150:21
**client** 118:6

148:14,17
**clients** 7:15
**client's** 148:11
  149:9 262:16
**close** 32:14 80:18
  117:5 133:12
  143:17 196:4
  198:11 205:19
  265:4
**closed** 120:10
  164:7 221:6,18
  223:13
**closing** 60:5
  71:15
**clothes** 247:11
**clothing** 15:15
**Club** 156:23
**clue** 33:20
**Coaching** 174:20
**collapse** 166:7
**collateral** 269:10
  269:24 270:5
  270:22
**collect** 61:12
  72:24
**colored** 67:6
**com** 39:18
  257:11
**come** 17:18,20
  48:25 68:6 72:4
  92:23 93:7
  134:23 135:7
  135:12 136:2
  163:15 176:15
  176:19 177:17
  185:9 204:8
  206:24 224:22
  249:16 288:7
  291:15
**coming** 48:18
  70:25 200:2
  204:10,25
  207:23
**commenced**
  47:24
**commencement**

59:16
**comment** 34:17
  81:17
**commit** 232:9
**commitment**
  275:15
**committed** 98:23
  211:25
**communicate**
  29:12 80:12
**communicated**
  21:14 96:11
  97:22
**communication**
  26:6 29:18
**communications**
  29:22 31:17
  97:8
**company** 75:13
  85:4 87:11,22
  87:23 88:18
  89:14,22 95:23
  143:4 165:14
  205:11 214:5
  235:22 277:9
  281:5
**compensated**
  213:14
**compile** 67:23
**complaining**
  181:17 211:9
**complete** 10:16
  217:19 265:23
**completely**
  226:13
**compliance**
  89:14,19
**computer** 37:20
  154:13 155:10
  226:10 272:11
**computers**
  226:11
**conceded** 271:12
**concerned**
  145:21 146:12
  146:14 207:22

224:16
**concerns** 181:12
  182:20
**concessions**
  254:8
**conclusion** 85:17
  85:20 90:23
  223:15,19
**condition** 66:14
  89:15 127:17
**conditions**
  284:13
**conductivities**
  92:24
**confer** 13:13
  103:3 114:25
  118:5
**confident** 278:4
**confirm** 122:19
  127:4 148:16
  149:9 192:7,25
  194:20
**confirms** 39:6
**conflict** 284:12
**confuse** 112:10
**confused** 110:6,7
  112:5,21
**confusing** 89:8
**confusion** 111:10
  113:8
**connected** 173:22
  175:6 199:19
  199:19
**connection** 4:12
  12:21 27:2
  102:16 129:22
  133:10 147:12
  175:16 232:25
  252:8,20
**consent** 83:5,20
  88:7 119:5
  290:11
**consequences**
  56:7
**Consequently**
  149:22

**consider** 137:10
**considerable**
  216:2
**consideration**
  203:5
**considered** 39:10
  199:25 238:24
**considering**
  132:12 167:10
**consistent** 126:3
  126:9 131:12
  164:5 188:15
**constant** 96:19
  97:8 219:2
**constantly**
  238:22
**constitute** 89:18
  102:4
**constraints**
  277:24
**construction**
  42:13,19 43:8
  43:15 62:14
  63:15 67:4,11
  67:13,21,25
  71:6 105:11
  108:25 109:10
  141:22 166:18
**consult** 5:23,24
**consumer** 248:20
**contact** 210:13
  219:2
**content** 130:22
**contention** 149:9
**context** 196:23
**continue** 27:10
  48:13 56:2
  109:3 119:21
  120:8 130:24
  131:6 133:16
  133:24 159:20
  160:22 161:7
  162:5 164:17
  166:5 185:7
  190:12,18
  193:13 211:4



211:25 212:4
217:20 218:20
219:15,20
225:19 264:21
265:20 267:16
273:17 275:12
289:8
**continuing** 48:20
147:9 222:25
224:3
**contract** 99:9
183:11 186:20
223:23 224:23
286:3
**contracts** 52:10
52:18 69:8
222:14,15,24
282:2 283:15
**contractual**
149:10
**contrary** 68:25
281:18
**convenance**
87:23
**convenient** 291:5
**conversation**
21:23 22:8,10
22:13 24:9,21
24:22,25 25:4,8
31:8 90:12
124:23 134:5
134:13,16
169:16 182:3
185:10 200:15
201:13 207:17
214:9 215:4
**conversations**
32:19 55:14,17
55:20,24 56:9
56:11,22 61:17
61:21 180:20
180:24 200:24
201:8 202:5
208:4 209:7
**convinced** 183:5
**convincing**

277:11
**cooperated**
225:11
**cooperation**
258:12
**coordinate**
130:21
**coowner** 236:5
**copies** 279:20
**copy** 50:8 51:20
130:3 148:12
192:25 193:17
194:17 195:16
242:23 252:2
268:14,16
**copying** 187:18
208:12
**corporate** 25:15
25:17 26:16,20
138:24 139:14
**corporation**
188:5,11
**correct** 8:24
44:23 46:7,24
56:19 94:4
100:24 103:18
104:19 129:4
134:14 135:23
138:13 139:16
140:5,10,14,15
146:10 160:23
161:13 164:3
187:15,16
196:20 197:3
208:16,17
210:17,18
215:5,6 218:25
219:17,22,23
221:3,4,23
222:5,6,21
223:3,4,7
265:13 271:14
271:15 272:25
273:9,10 286:9
**correctly** 260:3
**correspondence**

19:2 31:9,17,25
32:4 262:15
**cost** 42:14 43:9
67:21 104:8,14
105:12 109:16
117:9 212:6
**costs** 67:25 71:6
108:25 109:10
141:22
**counsel** 8:15 9:19
14:4 18:17 42:5
46:21 92:4
102:16 111:16
111:17 113:22
124:25 128:2
128:18 137:6
147:18 155:8
157:3 197:11
199:2 210:21
210:22 240:10
262:10 264:9
280:19
**Counselor** 65:20
86:15 108:2
194:15 290:18
**counsel's** 191:15
**country** 186:22
**couple** 7:9 18:12
32:18 133:4
160:9
**course** 5:10 81:5
244:22
**court** 189:17
227:11 292:24
**courtesy** 40:13
**cover** 143:11
253:18
**covered** 125:18
158:11,24
191:9 216:25
**co-counsel** 13:14
103:3
**co-counsel's**
155:15
**created** 35:14
49:13 50:4

53:22 252:19
**credentials** 10:24
**credit** 43:17
48:25 49:2
64:17,22 65:2
65:15 67:4
68:15 71:24
74:11 77:9,12
104:6,12,24
109:9,13
186:21,23
287:2 289:12
289:23
**credited** 67:19
71:8 106:23
112:13
**credits** 67:11
68:2 104:23
**cross** 4:9,14 5:21
7:3 8:13 200:12
229:5 230:18
237:24 261:11
**crossing** 281:6
**CROSS-EXA...**
12:1,2 13:1
14:1 15:1 16:1
17:1 18:1 19:1
20:1 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1
32:1 33:1 34:1
35:1 36:1 37:1
38:1 39:1 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1

77:1 78:1 79:1
80:1 81:1 82:1
83:1 84:1 85:1
86:1 87:1 88:1
89:1 90:1 91:1
92:1 93:1 94:1
95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1
103:1 104:1
105:1 106:1
107:1 108:1
109:1 110:1
111:1 112:1
113:1 114:1
115:1 116:1
117:1 118:1
231:2
**CROWE** 2:16
**Crystal** 33:22
**Crystals** 210:7
**Crystal's** 33:21
**cumulative**
288:14
**current** 248:21
249:14
**currently** 15:21
198:8 246:16
**cursor** 45:7
**custom** 89:16
**customer** 186:8
**customers**
254:16
**cut** 56:24

**D**

**D** 3:2 158:2
**damages** 7:20
**data** 105:12
106:18
**date** 1:10 30:21
48:12,14 107:3
159:9 170:20
204:22 240:23
241:8,9 246:17
274:13 292:25



**dated** 92:9
108:21 147:18
148:11 150:3
160:18 195:21
240:10 257:9
262:18 272:24
273:13
**dates** 35:2 97:4
**David** 102:20
126:23 129:12
130:13 262:9
**day** 8:14 73:14
143:16 154:16
162:21 182:22
227:8,11 228:3
282:19
**days** 22:3 204:21
**deadline** 94:21
**deal** 76:2,9,11,11
76:14 124:25
257:20
**Dear** 39:4 108:18
**December** 131:2
**decide** 6:2 230:9
237:23
**decided** 7:16
159:3
**decides** 130:23
**decision** 121:2
**decrease** 249:21
**decreased** 81:25
**default** 61:9
87:24 89:22
**defeating** 260:21
**deferred** 42:24
**defined** 52:17
69:5 78:13
273:15 281:23
**defines** 53:5
**definitely** 225:18
**definition** 78:16
**definitive** 139:15
139:17
**delay** 208:20
**delayed** 239:25
**delays** 244:6

**delivered** 37:25
111:9 153:2,5
153:11
**delivering** 153:6
266:25
**delivers** 109:12
110:13
**delivery** 112:7
114:7 284:6
**Delott** 102:21
**delves** 8:6
**delving** 197:7
**demand** 89:19
222:2
**demanded**
268:24
**demonstrate**
109:25 110:19
**demonstrates**
139:3
**depended** 186:7
**deposit** 58:4,6
116:17,19,23
117:24 279:7
**deposits** 279:21
**describe** 14:20
**desire** 196:4
262:16 265:4
**desires** 198:11
**despite** 65:25
177:25 178:2,4
247:24 271:16
280:3
**destroyed** 146:2
**deteriorating**
142:24
**determination**
9:15 95:2,14
**determine** 42:18
**determining**
175:7
**dictated** 124:22
**differ** 194:19
**different** 48:8
104:23 204:10
211:8 217:4

248:24
**differently** 219:9
**difficult** 38:11
**difficulty** 93:16
**DIRECR-EXA...**
158:1 159:1
160:1 161:1
162:1 163:1
164:1 165:1
166:1 167:1
168:1 169:1
170:1 171:1
172:1 173:1
174:1 175:1
176:1 177:1
178:1 179:1
180:1 181:1
182:1 183:1
184:1 185:1
186:1 187:1
188:1 189:1
190:1 191:1
192:1 193:1
194:1 195:1
196:1 197:1
198:1 199:1
200:1 201:1
202:1 203:1
204:1 205:1
206:1 207:1
208:1 209:1
210:1 211:1
212:1 213:1
214:1 215:1
216:1 217:1
218:1 219:1
220:1 221:1
222:1 223:1
224:1 225:1
226:1 227:1
228:1 229:1
230:1 231:1
232:1 233:1
234:1 235:1
236:1 237:1
238:1 239:1

240:1 241:1
242:1 243:1
244:1 245:1
246:1 247:1
248:1 249:1
250:1 251:1
252:1 253:1
254:1 255:1
256:1 257:1
258:1 259:1
260:1 261:1
262:1 263:1
264:1 265:1
266:1 267:1
268:1 269:1
270:1 271:1
272:1 273:1
274:1 275:1
276:1 277:1
278:1 279:1
280:1 281:1
282:1 283:1
284:1 285:1
286:1 287:1
288:1 289:1
290:1 291:1
**direct** 71:4
**directing** 205:21
283:5
**directly** 4:17
21:11 123:8
134:17 143:20
157:19 210:16
214:12 229:13
**DIRECT=EX...**
158:6
**disagree** 9:21
**disagreement**
11:9
**disappeared** 22:3
**discount** 42:16
167:2,3,11
169:18
**discounted** 117:9
**discounts** 109:3
167:7 184:9,11

184:15,22
185:2
**discovery** 241:14
**discretion** 94:8
101:5
**discuss** 96:14
167:12,15,21
169:2,4 214:21
214:22 226:20
249:13
**discussed** 7:10
129:3 169:5
195:10 258:18
**discusses** 279:7
**discussing** 190:8
198:19 214:17
232:18
**discussion** 21:6
43:20 44:17
90:12 96:19,24
118:24 131:22
140:17,20
142:3 165:14
165:25 166:3
169:3 173:21
175:5 185:18
186:9,20 194:4
202:9,10
203:11,17
204:13,16
205:21,22
214:16 249:19
256:4,8 257:23
**discussions** 18:5
21:11 43:22
44:8 190:16,23
204:9,24
227:14
**dispute** 252:18
286:18
**disruption** 27:2
**doc** 284:25
**doctor** 13:16
18:14 38:14
83:9 86:4
154:25 231:4



272:23
**document** 14:23
15:9 16:14
18:16,21 36:5
36:16,17 38:23
41:24 42:12
45:9 46:10,19
48:17 51:15,24
54:8,15 57:13
63:2,7,9 69:22
72:2,10 75:10
75:11 76:3
77:23 81:4
83:19 84:19
85:23 89:8
92:11,20
100:18 108:9
129:7,8 138:21
147:16,20
149:16 196:20
220:2,8,13
241:14 251:14
252:16,19
253:21 257:12
258:8 261:18
274:14 278:23
285:13
**documents** 23:6
36:5 43:16,24
59:24 61:16
119:12,17
125:7 134:3
160:9 200:16
239:20 240:5,8
254:25 287:8
289:24
**doing** 12:6
158:22 182:21
193:6 280:25
**Doll** 262:15
**dollars** 35:16
**dot** 39:18 257:10
**dotted** 281:6
**doubt** 28:2
143:23 215:7
215:11

**downsize** 91:11
**Dr** 3:4,5,6,7 4:2,4
4:8 8:21,25 9:4
11:19 12:1,4
13:1 14:1 15:1
16:1 17:1,6,7
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1,13
26:1 27:1 28:1
29:1 30:1,5
31:1 32:1 33:1
33:4 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
41:2 42:1 43:1
44:1 45:1 46:1
46:18 47:1 48:1
49:1 50:1 51:1
52:1 53:1 54:1
54:6,21 55:1
56:1,24 57:1
58:1 59:1 60:1
61:1,19 62:1
63:1 64:1 65:1
65:8 66:1 67:1
68:1 69:1 70:1
70:12 71:1 72:1
73:1 74:1 75:1
76:1 77:1 78:1
79:1 80:1 81:1
81:9,15 82:1,17
83:1 84:1,7,14
85:1 86:1,12
87:1 88:1 89:1
90:1,21 91:1,7
92:1 93:1 94:1
95:1 96:1 97:1
98:1 99:1,18
100:1 101:1
102:1 103:1
104:1 105:1
106:1 107:1
108:1,6 109:1
110:1 111:1,3
112:1 113:1

114:1,13 115:1
116:1,8 117:1
118:1 119:1,4
120:1 121:1,16
122:1,5 123:1
123:22 124:1
124:21 125:1,8
125:13 126:1
126:12,20
127:1 128:1,11
128:15,23
129:1 130:1,9
131:1 132:1
133:1,13 134:1
135:1 136:1,16
137:1,25 138:1
138:7,18 139:1
140:1 141:1
142:1 143:1,24
144:1 145:1,20
146:1,18 147:1
148:1 149:1
150:1 151:1,15
152:1,12 153:1
153:18 154:1,2
154:5,7,18,20
155:1 156:1,2
157:1,2 158:1,8
158:21 159:1
160:1,13 161:1
162:1 163:1
164:1,25 165:1
165:7 166:1,23
167:1 168:1
169:1 170:1
171:1 172:1
173:1,20 174:1
174:17 175:1
175:20 176:1
177:1 178:1,9
179:1,10 180:1
180:11 181:1
181:11 182:1
183:1,19 184:1
184:20 185:1
186:1 187:1,12

187:23 188:1
189:1 190:1,8
191:1,4 192:1
193:1 194:1
195:1,17 196:1
196:8 197:1,23
198:1 199:1,18
200:1 201:1,10
202:1 203:1
204:1 205:1
206:1 207:1,6
207:13,16
208:1,7 209:1
209:12 210:1,2
210:20 211:1
212:1 213:1
214:1 215:1,25
216:1,17,23
217:1 218:1
219:1 220:1
221:1,5 222:1
222:13 223:1
224:1 225:1
226:1 227:1
228:1,17,23
229:1,4 230:1
231:1 232:1
233:1 234:1
235:1,24 236:1
237:1 238:1
239:1 240:1
241:1 242:1,6
243:1 244:1
245:1 246:1
247:1 248:1,15
249:1 250:1
251:1 252:1,15
253:1,24 254:1
255:1 256:1
257:1 258:1
259:1 260:1,19
261:1,11,16
262:1 263:1
264:1 265:1,21
266:1 267:1,18
268:1 269:1

270:1 271:1,5
272:1,6 273:1
274:1,18 275:1
276:1 277:1
278:1,22 279:1
280:1,23 281:1
281:15 282:1
283:1 284:1
285:1 286:1
287:1 288:1,17
289:1 290:1
291:1,18
**draft** 223:25
224:11 225:24
225:24 282:9
282:10 283:9
**drag** 204:16
**drastically**
143:10
**draw** 196:12
**drop** 17:23
162:11
**dropped** 143:9
**dropping** 81:24
**due** 10:8 21:2,3
59:8 62:3 68:2
68:15 136:9
153:9 197:8
273:19 279:9
**duly** 158:3 292:8
**duplicating**
278:7
**duplication**
280:22
**duplicative**
216:16 277:18
278:11 288:14
288:23
**duration** 95:20
239:13
**duty** 91:2
**dying** 259:8,12
260:13

————— E —————
**E** 2:2,2,5 3:2



292:2,2
**Eads** 19:17 21:19
  22:13 25:11
  26:18 27:19
  28:3 33:5,15
  182:9,10,25
  209:17,21
  210:11,14,19
  211:17 213:12
  213:23 214:25
  225:17 232:14
  233:2,10,15,21
**earlier** 18:3,4
  70:5 91:14
  152:5 184:7
  188:16 196:23
**earliest** 191:11
**early** 30:24
  151:10 189:24
  231:25
**earnestly** 25:18
**economy** 248:20
  249:5
**education** 86:6
**Efarber@farb...**
  2:6
**effect** 7:21 31:9
  247:21 273:16
**effective** 48:12
  48:12 92:10
  148:18 149:22
  273:5
**effort** 20:12,19
**efforts** 61:11
  127:7 207:10
**either** 9:12 69:16
  114:9 140:24
  148:14 151:21
  156:19 183:18
  219:5 253:11
**eject** 181:21
**electronic** 251:14
**electronically**
  252:13
**eliminate** 212:7
**emergency** 93:21

**enclosed** 251:22
**enforce** 66:17
  78:25
**enforceable**
  77:17 102:7
  167:17,24
  168:8 224:13
  224:18,20
  226:24 283:14
  283:16,19
**enforced** 78:6
  79:19,24 90:5
  99:2,9 225:8
**enforcement**
  53:24 280:14
**enforcing** 82:7
**engaged** 47:4
**Entebi** 36:9
  73:21 74:11
  75:12,13 76:4
  82:3 159:2,19
  161:6 162:12
  162:19 176:20
  177:21 185:4
  186:10,16,21
  187:5,7,18,24
  188:17 190:10
  191:22 193:12
  197:14,19
  207:21 256:5
  274:21 280:11
  285:3,7
**Entebi's** 78:5
  80:2 177:12
**enter** 195:13
  286:3
**entered** 42:5
  60:24 63:19
  83:16,24 84:9
  163:13,14
  204:5 269:19
  274:7,20
**entering** 16:6
  140:12 185:11
  185:19 198:7
  267:3

**entire** 102:4
  122:25 192:17
**entirety** 237:16
**entitled** 1:15
  45:10
**entry** 106:20,20
**equal** 58:6
**escrow** 116:18
**especially** 277:23
**ESQ** 2:10,11,15
  2:16
**etcetera** 182:24
  182:24 188:9
  213:16 258:25
**Eugene** 1:18 2:4
**event** 103:18
  104:7,8,11
**eventually** 167:6
  175:24
**everybody** 80:11
  80:14,14
  166:20
**evidence** 19:13
  26:7 189:4,11
  189:11 239:24
  240:9
**evidencing** 23:11
  61:16 239:21
  240:10
**evidentiary**
  199:13
**exact** 89:19
  172:15 240:23
  280:21
**exactly** 61:13
  87:19 171:18
  175:8 196:10
  243:5 282:16
**examination** 3:3
  4:9,14,22 5:11
  5:21 8:13 81:5
  119:1,2 120:1
  121:1 122:1
  123:1 124:1
  125:1 126:1
  127:1 128:1

129:1 130:1
131:1 132:1
133:1 134:1
135:1 136:1
137:1 138:1
139:1 140:1
141:1 142:1
143:1 144:1
145:1,2 146:1
147:1 148:1
149:1 150:1
151:1 152:1
153:1 154:1
155:1 156:1
157:1 229:5,8
230:15,18
272:8
**examine** 277:12
**examined** 158:4
  261:12
**excel** 251:21
  252:6 253:3
**exchange** 43:25
  124:7 126:4
**exchanged** 32:5
  101:10 120:18
  150:9 195:6
**exclude** 37:9
**exclusive** 52:20
  101:4
**excuse** 159:2
  169:6 187:10
  214:11 220:22
**excused** 153:21
**execute** 23:23
  234:8,12
  270:15 273:23
**executed** 32:12
  45:13 48:17
  83:6 89:24
  102:8,12 193:2
  245:2 258:9,23
  268:23
**executing** 24:5
  29:6,10 266:10
  266:24 284:25

**execution** 32:11
  32:20 88:6
  102:17 117:4
  269:12 284:5
**exercise** 89:11
**exerts** 8:7
**exhibit** 18:9
  32:25 38:8,9,25
  39:2,2 41:22
  46:13,15,16
  51:21 67:7
  83:12,14 86:17
  86:18,22 92:6,7
  103:12,13
  108:5,5 121:11
  125:10 126:11
  126:19 128:25
  130:4 138:16
  147:10,23,25
  160:11,11
  170:15 181:4
  181:10 183:15
  183:18 187:10
  187:11,12
  191:4,8 206:6
  206:17 209:11
  217:16,17
  241:21,22
  245:5,9,10
  251:16,20
  252:2 253:3,10
  253:20 256:22
  256:23 261:14
  261:23 262:3,6
  272:2,22 276:5
  278:21 284:7
**exhibits** 40:7
  202:6
**existing** 212:9
**exists** 173:8,9
**expect** 166:11
**expectation**
  16:16
**expenses** 246:17
**experience** 15:13
  178:2,4 236:18



236:21
**expert** 10:14,15
  11:6,7 206:17
  255:5 291:13
**experts** 9:23,24
  10:22,24
  206:19
**expert's** 8:8
**expiration** 48:14
  95:18 185:8
  190:13 204:22
**explain** 5:12,13
  5:16,16,19
  16:12 71:20
  72:6 77:21 78:3
  229:19,23,24
  230:4 248:15
  288:12
**explained** 16:15
  192:6 265:3
**explaining**
  247:18
**explains** 130:15
**explanation** 5:7
  6:12,13,20
  80:23
**explanations** 6:6
  230:12
**exposure** 146:8
**express** 215:12
**expressed** 170:4
  209:8
**extend** 139:24
  218:10,13
  220:25
**extension** 132:11
**extent** 85:3 87:9
  137:13 165:25
  199:10 281:4
**extra** 58:20
**extremely** 201:17
  205:14
**E-commerce**
  7:18
**e-mail** 19:12,17
  19:19 25:10

27:19,25 28:5
29:14,17 30:6
32:5,5 33:5
38:3,15 97:12
101:10,13,14
101:21 104:21
120:18 122:9
122:14,19
123:7 126:4,22
129:9 130:10
150:24 167:9
183:22 184:10
184:13,21
187:17 191:11
191:21 192:17
197:23 199:19
202:7 208:10
209:15,17,21
210:9,11
211:14,15,17
213:9,11,20
215:3 232:13
233:14,15,18
240:18,21
241:7 257:9
258:24 259:17
259:25 262:14
**e-mails** 29:21
32:9 43:25
120:21 130:17
150:8,16 195:6
201:15 242:23

—————————————
**F**
**F** 37:17 292:2
**face** 121:15,22
  156:8 179:11
  242:7 271:6
**facilitate** 51:5
  73:5 188:21
  274:21 275:4
**facilitated** 50:25
  51:11
**fact** 19:13 21:3
  36:7 47:23 50:4
  94:15,24

102:20 103:17
107:5,6,12
110:2 120:13
132:5 142:21
145:6 146:4
152:4 164:13
176:6 210:19
239:21 240:10
250:20 269:24
286:18 288:16
289:2
**factors** 227:13
**facts** 199:4
**failed** 80:11
**failure** 89:10
**fair** 18:2 86:5
  91:6 201:7
  289:5
**fall** 36:11,14
  106:3,6,13,14
  106:14 107:10
  107:24 110:9
  110:15 112:9,9
  112:16,18
  113:6,14
  138:12 152:7
  152:21 153:10
  249:24
**false** 109:25
  110:21 151:6
**familiar** 42:2
  143:6 216:5
  261:18 278:22
**familiarity**
  176:11
**fantasy** 197:9
**far** 34:16 35:23
  178:21 179:23
  180:6 191:9
  208:23 234:21
**Farber** 1:18 2:4
  7:8 10:7,14
  11:15 13:14
  40:2 54:23 81:8
  86:19 102:25
  118:8 120:4

124:7 135:22
136:15 139:12
154:11,23
155:14 173:25
174:16 188:25
194:19 197:22
200:18 206:7
217:13 222:7
223:9 229:3
251:20 261:6,8
277:3,15
290:22
**Farber's** 173:20
**fashion** 16:9
  172:5
**fault** 219:8
**fear** 224:21 227:5
  283:3
**February** 19:18
  23:12 39:4
  97:15 106:6
  108:22 112:20
  139:19 140:5
  163:6 202:19
  203:2 217:18
  217:24 219:22
  232:2,14 233:3
  233:11,20
  234:6
**fee** 202:18,23,24
  256:8,13
  257:19,23,24
  258:10,20
**feel** 140:25 247:2
  249:15
**fight** 6:25
**fighting** 4:20
  6:22 230:13
**figure** 44:12
  201:4
**figures** 179:2
**filed** 243:15
**final** 39:10 74:7
  258:11 283:9
**financial** 14:19
  14:23

**find** 21:8 22:20
  23:25 24:6
  123:14 176:4,6
  186:2,3 193:11
  193:22 196:25
  198:2 202:14
  202:19 203:4
  215:9 217:20
  220:9 227:6,25
  228:6,11,14
  231:7 232:3
  251:17 266:11
  282:17 283:5
**finding** 25:19
  96:25 194:4
  198:20 203:6
  215:13 255:11
**fine** 6:11 94:2
  175:19 229:17
  272:13,17
**finer** 140:24
**fingertips** 253:15
**finish** 47:19
  76:12 118:14
  138:11 157:6
  173:19 230:19
  276:17
**finished** 5:20
  8:12 157:9
  230:5
**finishes** 98:11
**finishing** 257:20
**firm** 102:22
  108:19 131:19
**first** 4:15 7:14
  114:23 117:2
  122:23 133:6
  155:7 158:3
  159:21 164:5
  179:17 187:14
  188:10,10
  208:22 223:25
  225:8,24
  235:16 245:25
  248:9 269:19
  275:17 281:8



282:10 291:17
**five** 107:19 128:4
  176:25 177:4
  190:2 234:7
**Flaherty** 206:20
**Flaherty's**
  206:16
**flat** 212:19,21
**flip** 75:2
**fluctuations**
  249:8
**fly** 253:5
**focus** 121:21
  216:24
**folks** 254:8
**follow** 61:7
  148:11 249:23
**followed** 291:20
**following** 215:2
  216:13
**follows** 5:4 158:5
**foot** 153:9
**Forall** 1:7 15:3
  16:22 18:5 20:8
  21:5,10,13,23
  24:4,10 26:15
  26:15 30:11,15
  31:18 36:7
  37:25 39:21
  42:20 43:10
  45:14 48:22
  49:12,15 50:10
  50:17,21,23,25
  51:8 52:24,25
  54:9,11,16,17
  54:25 55:6,9
  56:15 57:11
  59:8,9,11,11
  61:12,20 62:17
  63:21 64:21
  65:2,12 66:4,19
  67:19 68:2 71:5
  71:9,22 74:9,15
  76:6 77:20
  78:25 79:2,9,17
  82:5 83:7,16,22

83:24 84:9,23
85:12 87:23
88:5,10 89:11
89:21,24 91:8
92:9 93:7 94:7
94:16,19,25
95:11,17,22
96:14,15,19,24
97:5,7,14,23
98:14,21
100:10 101:3,5
103:24 104:6
104:11 108:20
108:20,25
109:12 110:13
116:16 117:3
119:10 120:20
123:8 125:14
126:5,15
127:19 129:3
130:23 131:5
131:14,20
132:5 139:23
140:7,25
141:20 143:2
145:23 151:18
152:6,20 155:9
161:10,24
166:9 167:6
175:25 176:3,6
176:12,22
180:2 184:8,15
184:22 190:22
191:23 192:23
193:6 194:3
195:4 196:24
197:25 198:19
199:24 200:6,7
201:24 202:2
204:9,14,24,24
207:18,20
208:15 209:3
210:16 214:5
214:10,12
215:8 216:5
218:8,19

219:14 221:2
221:11,14,18
221:23 227:23
234:8,12,15
235:6,11
239:15 242:10
243:24 244:10
247:16 254:7
255:19 263:4
263:11 264:17
264:19 265:13
265:14,17
266:9 267:3
268:22 269:11
269:18 270:13
270:14,23
274:24,25,25
275:4 279:8,10
279:10,12,13
283:3,4,22
286:4 290:11
**Forall's** 19:6
  80:3 89:18
  90:17 95:12
  104:17 109:11
  109:15 110:12
  121:2 129:12
  134:6
**Forbes** 103:18
  104:7
**force** 204:18
  271:19 273:16
**forced** 64:3 74:17
  135:7,12 136:2
  141:10,13
  163:3 262:2
**forcing** 283:24
**foregoing** 292:9
**forget** 183:17
**form** 20:17,23
**formula** 171:10
**forth** 13:25 16:17
  22:6 36:6 39:8
  88:15 98:16
  149:7 292:8
**Forum** 16:7

26:13 41:3 46:7
231:11 238:16
245:20 273:25
275:16
**forward** 30:5
  73:7,12 74:5,19
  140:4,8 142:15
  192:9 194:22
  210:25 211:23
  220:25 237:20
**forwarded** 18:22
  33:9 209:15
**found** 166:18
  202:3 226:3
  231:10 274:2
**Foundation** 17:4
**four** 69:10
  107:19,20
  117:12 176:25
  177:4 188:9
  225:14 250:21
  251:25 282:3
**free** 55:15,19
  202:16,18,25
**Friday** 210:24
**friend** 235:14
  236:13 237:5,6
  237:11 238:6
**front** 14:24 32:24
  241:18
**frozen** 37:21
**frustrated** 214:4
**frustration** 209:9
**fulfill** 134:18
  164:9
**full** 69:3 75:20
  117:12 156:18
  229:22 254:10
  273:15 281:20
**fully** 79:24 90:5
  189:2 199:24
**further** 79:7,8
  103:4 114:20
  132:4 144:3
  222:9 292:12

---
**G**
---
**game** 66:5 289:6
**Gene** 154:22
**general** 210:22
**generally** 131:9
  153:2
**gentleman** 64:23
  136:9 157:11
**getting** 21:12
  146:8 147:11
  151:18 189:3
  208:20 259:16
**Ghanem** 38:3
  39:5 251:5
**Gina** 39:9,13,14
  39:17
**give** 5:6,22 6:7,12
  6:13 13:12 27:7
  38:24 40:12
  64:17,22 65:2
  100:18,20
  115:5 121:2,4,6
  123:13 124:24
  132:5 137:12
  151:7 155:11
  156:11 165:2
  169:17 186:22
  201:22 205:23
  206:18 219:6
  224:24 229:22
  230:6 237:24
  256:5 263:6,10
  265:25 274:6
  288:17
**given** 19:7 21:15
  43:10 64:13
  67:12 104:6
  134:25 166:20
  233:11 270:13
  277:8,23
  292:10
**gives** 199:10
  258:11 284:17
**giving** 76:22
  166:16 193:22



201:19,25
239:9 284:10
**glad** 227:11
**glitches** 287:20
**go** 7:13 10:9
11:22 13:10
31:15 48:8
57:17 58:23
65:20 68:8
70:17 72:10
80:9 81:18 92:4
100:5 101:24
103:11 108:4
110:8 114:17
125:19 128:10
128:18 132:25
133:6 146:21
147:6 152:9
154:17 158:20
159:3 163:18
163:19 164:23
168:21 171:22
172:14 174:14
175:11,14,21
178:3 179:15
183:16 190:6
192:9,17
194:21 205:9
205:13 214:24
220:13,18,25
224:7 225:17
231:18 233:24
239:19 240:23
243:2 245:4,14
249:12 257:8
261:6,20
263:19 268:12
271:6,25
272:19,19
276:23 278:15
278:19 281:13
287:2
**goal** 130:21
**goes** 63:17 109:6
**going** 4:8 5:5,9
5:12,13 6:21,24

6:25 9:2,11,13
10:17 11:3,11
18:7,10,11
19:22 21:9 22:5
24:5 25:9 32:23
40:3 41:21
55:18 62:7
63:10 67:2
68:19 70:23
75:6 76:8 81:11
82:12 83:4
90:20 91:20
92:5,14 93:23
101:24 103:2
103:10,12
108:4 113:22
113:24 121:9
121:10 122:18
125:8,10
126:14,18
128:2,4,9
136:13 137:7
138:16 140:4
143:3,17
146:23 147:10
147:15 150:13
154:12 157:4
159:3 160:4,8
160:10 161:2,7
165:7 166:5
169:9 170:14
171:15 181:4
181:19 183:10
183:11 184:17
187:6 189:12
189:16 191:3
192:4 200:21
200:22 201:22
205:17,18,19
206:12 209:11
210:25 212:25
216:19 218:13
219:5,6 225:2
225:19 226:3
228:5 229:18
229:22 231:24

232:16 237:20
237:24 245:4,5
245:12 250:16
251:12 256:19
256:24 261:10
266:4 272:3,22
277:13 278:13
278:19 284:23
286:8,11
287:13 288:6
288:11,22
291:16
**good** 4:3,5 5:2,15
12:4,6,7 19:21
37:22 73:4,10
74:3 78:15,15
82:9 146:17
155:24 158:8
158:10 177:2
206:10 231:4,5
260:20 264:4
277:2 285:21
288:4 291:4
**goods** 53:2 109:4
**gosh** 93:15
101:14
**gotten** 137:15
**great** 124:8
133:10 143:3
145:23 166:5
**ground** 252:3,14
**group** 17:17
160:11 192:17
235:11,15
238:12 245:20
250:11
**guarantee** 212:7
**guaranteeing**
15:2 45:13
**guarantees** 15:6
**guarantor** 14:13
44:21 136:24
**guarantors** 58:14
59:5,15 66:12
88:20
**guaranty** 14:19

14:21,24 15:2
34:7 45:10,12
88:23 146:9
**guess** 170:9
**guise** 13:2
**guy** 165:22 177:2
224:24 225:10
**guys** 40:13,18
93:18 150:12
182:20 199:5
205:17 206:14
206:23 237:9
262:5 287:18
290:23

― **H** ―
**H** 158:2,2
**Hala** 1:4 12:12
12:14
**half** 67:13 105:8
118:19 122:22
159:4 161:18
162:13,18
163:9 185:16
186:6,7 204:17
290:21
**Hamad** 1:4,4
2:19 3:4,5,6,7
4:2,4,8 8:21
11:19 12:1,4,17
13:1 14:1 15:1
15:7 16:1 17:1
17:6,7 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1,13 26:1
27:1 28:1 29:1
30:1,5 31:1
32:1 33:1,4,6
34:1 35:1 36:1
37:1 38:1 39:1
40:1 41:1,2
42:1 43:1 44:1
45:1 46:1,18
47:1 48:1 49:1
50:1 51:1 52:1

53:1 54:1,6,22
55:1 56:1,24
57:1 58:1 59:1
60:1 61:1,20
62:1 63:1 64:1
65:1,9 66:1
67:1 68:1 69:1
70:1,12 71:1
72:1 73:1 74:1
75:1 76:1 77:1
78:1 79:1 80:1
81:1,9,15 82:1
82:17,19 83:1
84:1,8,14 85:1
86:1,12 87:1,5
88:1 89:1 90:1
90:21 91:1,7
92:1 93:1 94:1
95:1 96:1 97:1
98:1 99:1,18
100:1 101:1
102:1 103:1
104:1 105:1
106:1 107:1
108:1,6 109:1
110:1 111:1,3
112:1 113:1
114:1,13 115:1
116:1,8 117:1
118:1 119:1,4
120:1 121:1,16
122:1,5 123:1
123:22 124:1
124:21 125:1,8
125:13 126:1
126:12,20
127:1 128:1,11
128:16,23
129:1 130:1,9
131:1 132:1
133:1,13 134:1
135:1 136:1,16
137:1,25 138:1
138:7,18 139:1
140:1 141:1
142:1 143:1,25



144:1 145:1,20
146:1,18 147:1
148:1 149:1
150:1 151:1,15
152:1,12 153:1
153:19 154:1,3
154:8,10,19,20
155:1 156:1,3
157:1,3 158:1,8
158:21 159:1
160:1,13 161:1
162:1 163:1
164:1,25 165:1
165:7 166:1,23
167:1 168:1
169:1 170:1
171:1 172:1
173:1,20 174:1
174:17 175:1
175:20 176:1
177:1 178:1,9
179:1,10 180:1
180:12 181:1
181:11 182:1
183:1,19 184:1
184:21 185:1
186:1 187:1,12
187:23 188:1
189:1 190:1,8
191:1,4 192:1
193:1 194:1
195:1,17 196:1
196:9 197:1,24
198:1 199:1,18
200:1 201:1,10
202:1 203:1
204:1 205:1
206:1 207:1,6
207:13,16
208:1,7 209:1
209:12 210:1,2
210:20 211:1
212:1 213:1
214:1 215:1,25
216:1,18,23
217:1 218:1

219:1 220:1
221:1,5 222:1
222:13 223:1
224:1 225:1
226:1 227:1
228:1,17,23
229:1,5 230:1
231:1 232:1
233:1 234:1
235:1 236:1
237:1 238:1
239:1 240:1
241:1 242:1,6
243:1 244:1
245:1 246:1
247:1 248:1,5
249:1 250:1
251:1 252:1,15
253:1,24 254:1
255:1 256:1
257:1,12,18
258:1 259:1
260:1,19 261:1
261:11,16
262:1 263:1
264:1 265:1
266:1 267:1,18
268:1 269:1
270:1 271:1,5
272:1,6 273:1
274:1,19 275:1
276:1 277:1
278:1 279:1
280:1,23 281:1
281:15 282:1
283:1 284:1
285:1 286:1
287:1 288:1,17
289:1 290:1
291:1,18
**hand** 11:11 60:10
156:9 241:2
**handle** 199:7
250:10
**handled** 39:20
205:3 242:22

243:4 254:21
254:23
**handling** 155:18
228:24 229:2
250:9,14 255:2
255:3 280:17
**hands** 60:2
**hang** 8:20 13:7
54:7 55:10
58:22 62:24
91:12 113:11
139:5 151:14
237:8 242:2,5
263:14
**happen** 112:19
184:18 195:10
195:12 228:2
**happened** 26:2
64:12 65:7 77:7
113:6 116:20
135:6 159:11
162:10,22
167:11 184:16
184:17,19
224:7 233:8
237:17 243:5
**happens** 113:3,5
152:10
**happy** 214:22
**hard** 251:25
278:15
**Hassan** 105:2
**head** 121:13
**heading** 18:23
**hear** 37:4 86:21
110:24 132:21
132:23 137:6
139:6 167:19
175:19 191:19
202:10 203:13
207:13 220:4
221:11,14,20
227:21 263:15
263:21 278:10
287:25
**heard** 76:13

132:24 202:13
215:18 221:17
221:22 224:19
224:19 236:2
260:25 274:23
277:16,21
280:22
**heart** 263:10,25
**heat** 153:10
**heated** 202:10
203:10,17
**held** 1:15,18
116:18 118:25
**help** 73:12 74:4
154:14 160:9
166:8,9 169:15
171:15,16
176:4 181:6,8
203:5 210:8
211:5 213:14
247:19 260:22
272:11
**helped** 248:3
**helpful** 199:9
**hereinbefore**
292:8
**hereof** 89:17
102:6
**hereto** 102:9
284:7
**he'll** 84:12
277:14
**Hi** 25:13 192:5
192:22 210:2
**high** 211:10
246:18 249:18
**highlighting**
68:22 87:7
**highly** 237:22
**high-end** 15:19
237:2 247:8
**Hills** 250:8,22
252:21 253:19
254:3,10,14,16
254:19
**Hochman** 102:20

102:21 126:23
129:12 130:13
262:9,13
**hold** 19:11 84:24
85:12 92:25
101:19 110:22
137:4 170:17
196:5 198:13
265:19
**home** 156:20
**honest** 64:4
163:17
**honestly** 60:25
183:7
**Honor** 51:11
54:13 62:2 64:2
72:20 74:20
77:6 79:13 81:8
81:13 108:4
117:12 125:5
137:23 145:24
151:25
**hook** 187:2
193:10 228:8
237:19 283:21
**hooked** 73:23
**hope** 93:19 183:7
276:17
**hopeful** 211:2
**hopefully** 205:24
252:12
**hoping** 118:14
**hotel** 251:24,25
**hour** 40:17
118:19 290:22
**hours** 261:12
**housekeeping** 7:9
**hundreds** 10:22
**hung** 203:18
**Hussein** 2:21
**hypothetical**
60:20 136:8,14
**H-A-M-A-D**
156:22

_____

**I**

_____



idea 113:22
177:14 235:25
236:11 254:15
identified 176:12
272:17
ignore 171:12
Illinois 2:9
156:24
immediately
273:5 284:9
imperative
148:16
implying 28:13
28:16
import 137:9,10
217:6
important
132:10 134:4
191:8 200:14
200:18,25
201:5 277:8
impossible 19:5
26:7
improve 131:5
175:22
improved 127:12
incident 253:19
included 7:19
52:22
includes 191:23
including 166:17
226:9 284:7
inconspicuous
93:25
incorporated
101:13,16
incorporates
125:19
incumbent 281:9
independent
68:14
indicate 94:16
246:12 249:8
indicated 231:6
234:2
indicates 109:19

indicating 279:23
inform 125:21
159:19 161:9
information 8:19
18:3
informations
142:18
informed 139:23
161:6 165:15
167:22 185:6
188:3 190:17
218:9,12,19
219:14,16,19
220:24 258:8
informing 190:10
initial 17:16
94:13 95:19
96:3 125:25
185:9 238:11
initially 187:8
271:9
inputting 132:15
inserted 224:10
225:23 226:22
282:9
insist 4:13 162:4
instructed
145:10
instruments
284:15
integrated 189:2
integrity 11:2
intend 132:6
140:8
intended 85:12
94:21
intends 94:10
101:7 125:22
intention 139:4
140:4
intentions 94:17
95:24 139:8
interest 13:16
15:22 170:5
235:14 263:4
interested 95:10

115:15 116:3
122:20 210:6
255:11 292:15
interests 15:18
interfere 226:14
internet 7:18
129:23
interpretation
28:19 86:2
interpretations
54:5
interrupt 80:25
163:22 182:7
253:2
intervening
58:15
introduce 251:15
introduced 18:8
238:7,9 240:9
inventories
135:15 138:5,6
inventory 36:20
36:22,25 37:6
37:11,13 38:2
38:16 39:7
135:11,18,24
137:19,23,24
146:25 149:4,5
151:5,19
investigate
169:24 240:19
investment 13:19
13:23 17:17
238:12 248:25
249:6 250:12
investor 14:11
235:10,15
investors 17:23
invoiced 111:5
111:23
invoices 39:8
107:3 112:13
112:15 114:2
invoicing 114:11
involved 16:2
20:23 35:9

131:13 255:19
issue 32:20 38:18
38:21 105:17
105:21 112:10
167:15 182:23
208:5 222:15
226:7,21
228:16 261:9
269:11 280:18
issues 37:24
129:23 147:10
154:15 155:10
158:17
Italnord 36:20
37:3 43:19 44:3
44:9 46:14,23
47:5,9 48:5,18
48:24 50:9
51:18 52:5 53:8
57:24 58:12,20
59:3,14 60:23
61:8 62:9,10,17
63:3,10,20 64:6
65:4,15,17,23
66:6,17,19,21
69:13 71:9,10
71:18,25 72:5
72:15 75:14,18
76:4,23 82:3
83:17 84:4
85:14 89:5
119:10 141:15
142:16,22
159:6,15,20
160:2,18 161:2
162:24 163:12
163:25 176:9
176:12,16,20
178:22,25
179:19 185:4
186:10,16
188:17,21
190:11,17
238:20 278:21
279:17 280:3
280:11,16

284:22 287:12
289:5,22,25
290:15
Italy 90:5,8 165:8
165:11 254:7
item 69:24 111:7
items 114:8

———— J ————

J 2:15
January 21:22
38:16 48:13
58:21 127:8
129:9 130:10
160:23 161:3,8
161:23 163:8
183:24 202:25
260:13 262:23
272:24 274:15
Jaohari 236:9
Jim 108:12
Jmal 236:12
job 4:16 143:4
145:23,24
229:9
John 126:24
join 155:9
joint 32:25 39:2
44:13 86:22
92:6 103:13
108:5 121:11
125:10 126:19
160:11 170:14
183:18 187:11
191:4 262:7
July 18:23 21:4,5
29:5 30:6,9,13
30:24 33:7 34:2
34:11 96:20
97:2,9 153:7
208:22 209:16
209:18 213:23
215:10,14
239:14
jump 157:7
158:22 260:22



288:7
**June** 21:4,5
29:11 30:16,22
31:20 96:20
97:2,20 140:14
147:18 148:7
208:14 213:10
218:5,6 219:12
231:12 240:11
**justified** 88:11
**J-A-O-U-H-A-...**
236:10

**K**

**Kamensky**
102:21
**Kauuas** 235:24
**keep** 73:6 132:11
168:13 170:7
171:20 206:11
283:24 285:24
**keeping** 163:2
285:21
**key** 243:22
**kick** 225:2 226:2
227:7 282:19
**kind** 16:7 75:6
91:3 95:11
216:20 237:6
237:10
**kindness** 263:9
263:25
**knew** 51:8 63:13
194:3 227:24
228:15,15
287:6
**know** 6:10 8:17
9:10,18 11:5
17:25 19:22
20:6 21:18
23:10 25:5,25
33:15,21 34:3
35:23 36:5,8
38:18 39:13,23
43:6 46:9 54:7
54:14 55:3 57:7

60:2,4,7 61:2,4
62:20 63:12
64:25 68:10
71:16 72:17
84:12,13,16
86:9 87:14,18
87:19,19 98:2
100:25 107:4,4
107:6,11,16
108:12,14
110:17,20
114:10 116:13
117:22,24,25
118:8,16
122:24 123:22
133:5 134:8
136:8 142:18
143:5,8 146:13
147:13 150:17
155:4 168:6
169:10 170:4,6
171:16 173:7
176:24 177:7
179:8,15,23
180:6 181:16
181:21 183:6,9
190:22 200:18
201:3 205:13
205:23 208:24
214:20 216:18
216:19 220:12
225:6,7,9,22
226:10,11,19
226:22,24
227:10,18,23
231:17 233:8
233:18 234:17
234:21 237:4
242:24 243:10
244:6 245:14
248:8 250:15
253:6 257:13
258:10,15,20
259:7,15,22
260:14,16
265:2,18 268:6

277:3 278:2,10
278:14 280:24
286:3 287:11
287:21 288:21
289:16
**knowledge** 23:19
106:19 137:14
179:25 236:22
238:25 243:11
279:18
**knows** 114:6,9

**L**

**L** 2:10 257:10
258:7
**label** 241:19
**labeled** 256:21
**lack** 180:17
**lag** 161:18
**landlord** 196:6
198:13,14
262:18 265:3,6
273:6,11
**landlord's**
198:10
**language** 31:5
69:21,23 70:24
70:25 85:10
89:7 90:25 99:8
119:12,16,20
119:23 222:24
223:5 277:20
281:16 290:2,5
290:10
**large** 249:3
**largely** 248:21
**larger** 212:15
**Las** 15:11 16:8
41:10 152:25
159:7 177:22
191:25 235:12
236:24 249:7
254:2
**late** 30:22 138:8
153:2,7,12
207:18,23

213:10 231:12
240:6
**law** 55:12 102:22
131:19
**lawsuit** 47:23
232:25 233:5
**lawyer** 31:2
33:14 55:9,14
55:17,22 56:23
71:2 85:25
108:13 233:7
242:22 243:4
258:11,18
260:20 265:25
**lawyers** 71:3
82:12 120:19
243:15
**lawyer's** 70:24
**laying** 184:21
**leading** 134:12
**learn** 176:15,19
177:17 243:21
**learned** 268:22
**lease** 16:6 21:7,8
22:5,17 24:13
25:16 26:13,16
26:18,25 27:7
27:11 28:5 29:5
29:7,11,15
30:12,16 31:4
31:19 34:4,7,13
34:23 35:6 46:6
48:20,24 49:3,9
58:3,8 69:2,7
69:14,18 75:19
75:25 76:17
77:10,12 87:25
88:21,22 90:19
94:10 95:20,21
95:25 96:7,9,25
97:19,20 98:2
123:2 125:23
138:23 140:13
146:9 148:18
148:23 149:25
162:14,15,17

177:8 178:16
178:23 179:9
179:20 182:24
186:12,17,24
187:3,7 188:2
188:18,21
193:2,10,15,16
193:18 194:17
196:5 198:9,13
198:22 211:24
212:9 217:23
218:3 219:11
220:22,23,25
224:8,24 228:9
232:9 233:22
234:9,13,13,20
234:24 235:2,6
239:7 240:13
242:9 243:24
244:9,15,16,21
244:22,24,25
245:3 246:13
246:21 248:7
264:22 265:6
267:5 269:11
269:25 270:5,7
270:12,13,19
270:23 271:21
273:13,15,19
275:23,23,24
276:2 279:7
281:19,24
282:12 283:18
283:20,23,24
284:15 285:21
285:23,25
287:3 289:13
**leave** 58:21 74:8
181:24 182:22
183:13 283:7
**Lee** 33:10,13
34:2 42:9
108:14
**leeway** 237:25
**left** 42:22 43:6,14
63:15 68:4,11



68:18 76:19
81:24 168:13
171:19
**left-over** 37:11
**legal** 1:24 66:20
85:17,20 90:23
182:23 217:6
223:15,18
224:6 280:15
280:24
**legalese** 91:3
**legally** 179:7
**letter** 22:19 23:2
23:24 24:5,17
30:25 31:6
97:14 108:21
109:19 111:16
127:18 130:22
131:4 138:3
147:17 148:10
148:11 149:7
149:13,17
185:11,20
195:14,20
198:7 199:6,20
202:7 204:6
205:6 206:3
207:8,10 222:2
232:2 245:20
245:24,25
249:9 255:8,24
256:16,17
262:8,17,22,25
264:5,15
266:10,13,25
267:4 268:14
268:22 269:6
271:11,13,22
272:23 273:8
**letting** 80:25
**let's** 23:16 40:13
40:18 48:8
58:23 91:24
98:10 100:2
110:24 132:25
133:11 135:5

136:19 141:24
142:5 154:5
164:23 169:25
174:22 180:12
189:25 190:6
191:17,18
195:2 200:25
201:5 202:21
206:24 215:24
261:19 262:4
264:10,12
275:9
**level** 131:5
214:13 225:8
247:3 249:16
264:11
**Levin** 33:10,13
34:2 42:9
108:14,18
113:16
**Lewis** 2:10 3:5,6
5:25 7:7,14 8:3
8:21,24 9:7,18
9:22,25 10:13
10:20 11:7,9
16:24 17:4
20:14,17,21
38:8 47:16,19
55:12,15,25
56:4,19 60:12
60:15 65:10
71:3 74:13 84:2
84:5,7 85:16
86:10 90:20
91:4 101:18
103:22 110:22
111:2,13 113:9
113:17,20
114:4 115:2
118:4,7,18
119:3 124:6,14
124:19 128:7,8
128:14,18,22
129:19,25
130:5 135:21
136:12,15

137:2 144:2
145:8 147:3,23
153:21 154:2,7
155:5 157:4,21
157:23 158:7
158:14,16
161:21 165:6
173:17,18
174:9,21
175:21 183:14
190:6 194:18
195:3 197:15
197:21 199:16
201:7 206:7
207:5 220:19
222:7 228:18
228:22 229:11
230:8 237:7,13
237:15 241:15
241:20 259:19
259:24 260:17
261:8,25
263:13,16,17
265:25 277:15
278:6 287:15
287:17,21,23
287:25 288:5,6
288:11,12
291:9
**Lexington** 2:14
**liability** 78:8
88:18
**license** 41:23
44:22 48:22
49:8,11,14 50:2
50:4,9,16 52:9
52:16,23 53:5,8
53:9,11,11,17
53:18,20,22,23
54:4,10,17 55:4
56:16 57:10
69:2,7,15 70:6
70:10 75:19
76:2,18,24 77:3
77:15,19 78:3
78:10 79:6,18

79:22 80:4,10
82:8 85:2,7,13
87:13,18,25
89:5,12,20 90:3
98:14,17,24
99:6 100:13
104:16 115:8
115:13 117:7
119:22 120:9
133:17,25
134:19 136:25
141:7 148:20
149:2 150:2
164:10,18
222:18 223:2
223:12 224:3
224:17 225:6
225:22 226:6
226:21 227:3
237:19 264:17
268:25 269:12
269:22 274:9
281:20,24
282:13,16,21
285:19,23
**lieu** 127:5
**light** 11:8 289:2
**limit** 88:16
**limited** 52:23
**limiting** 76:7
**line** 109:21 112:2
152:22 196:13
**lines** 153:11
**list** 39:2 251:16
256:23
**listed** 69:8 236:5
282:2
**listen** 6:8 7:5 8:8
10:12,16 11:3
229:10 230:15
230:20
**litigation** 13:17
242:18
**little** 37:17 40:5,8
40:17 52:7 62:8
69:9 70:9 81:3

89:7 91:21
103:17 116:4,4
121:17 153:9
158:14 161:17
189:24 266:22
282:3
**live** 41:8
**LLC** 1:4 12:9,11
12:19,22 13:20
14:11,14 15:24
26:14 29:6,9
46:10 48:23
51:18 52:5
82:25 92:17
120:19 123:3
127:4 136:11
142:11 149:2
149:10,19
163:24 164:2,8
179:6 252:20
270:14
**LLP** 2:13 102:22
**loans** 13:25 14:5
14:7
**locating** 253:5
**location** 214:21
**long** 93:11
172:22 227:10
233:18 234:5,6
246:3
**longer** 76:15 89:4
118:18 164:8
185:7 190:11
**look** 23:3 25:9
33:4 38:23
55:11 67:15,17
70:22 80:22
84:23 115:8
116:8,14,25
129:7 166:12
166:12 170:6
224:8,22 248:9
252:12 257:2
260:19 285:12
290:23
**looked** 10:23



37:16 206:4
279:20
**looking** 38:14
77:23 131:8
163:10 170:18
197:17 231:15
239:7 250:12
250:20 276:16
**looks** 33:9 72:12
82:24 129:20
**Los** 153:9
**losing** 170:7
**loss** 14:2
**lost** 92:24 129:21
147:12 183:7
**lot** 104:8,14
132:15 158:11
225:16 226:18
283:12 287:19
**lots** 169:11
**loud** 87:8 175:19
**louder** 158:14
**lower** 172:14
212:6
**Luca** 16:12,21
17:6 35:13 38:4
38:19 39:3 43:2
43:20 44:3,9,11
66:25 68:6
103:14 104:21
165:15,21
167:21 168:11
169:6 171:24
175:4 183:22
184:4 187:17
224:5 226:25
240:18 249:19
249:22 254:21
254:22,25
255:3,6 267:8
274:4,5 290:3,6
**Luca's** 105:10
247:13
**lunch** 91:20
93:20,24
118:11,15

128:5,10,12,24
**luxury** 15:19
247:8

—————
**M**

**M** 1:16 2:11
158:2 292:3,24
**mag** 105:2
**Magdalena** 1:16
292:3,24
**Maggie** 27:13
28:9 118:23
266:15
**Magna** 1:24
**mail** 32:7
**main** 188:4
226:21
**making** 275:15
280:3 284:22
285:22
**mall** 33:22,23
143:15 187:25
193:3 211:8
228:14
**manage** 48:19,25
93:8 169:21
286:9,11
287:13
**managed** 48:5
59:4
**management**
19:7 20:9 24:11
24:12 26:9
27:21 32:8,11
32:14,21 46:13
47:2,5,7,10,17
50:17 51:16
57:25 58:12
59:16 60:10,24
61:25 65:23
66:13 77:8 82:4
83:17 84:3,22
85:3,14 87:9
89:6 91:10 92:8
94:12 95:14
96:16 100:9,11

101:4,16 119:9
122:21 125:2
125:13,24
130:24 131:6
131:25 134:12
150:11 160:17
166:13 169:23
216:4 222:19
226:15,19
238:19 247:17
275:5 280:4
286:20 287:6
288:18 290:12
**manager** 84:23
84:24 89:14,23
130:19 251:7
**managing** 20:8
98:21 219:15
**mandate** 124:24
**mannequin**
226:9,11
**manner** 42:15
**March** 32:12
92:10,24 93:7
94:9,16 95:23
96:5,21 97:3,9
100:21 101:6
106:6 108:17
109:20 112:20
113:16 117:14
117:16 125:14
125:20,21
132:7 135:8,13
140:9 148:12
149:7,18 150:4
151:10 152:5
161:12,15,25
162:22 163:8
195:8 204:14
218:23,24
219:17
**Marco** 165:21
167:22 168:4,5
168:11,12
169:6 175:3
**Mark** 262:15

**marked** 41:22
**market** 16:8,13
16:15 146:12
247:9 249:2,3,8
**marketing**
246:25 251:4
**marriage** 292:14
**match** 104:18
**matches** 39:7
**material** 87:24
284:11
**Mathew** 154:5
**matter** 1:3,15
142:20 254:20
276:23 288:20
292:16
**MCM** 33:19
210:5 232:8
**mean** 13:18 37:8
48:4,7 61:14
62:22 63:8 64:5
70:25 73:21
75:16 86:8,13
98:18 146:14
163:21,22,23
164:21 166:25
182:5 193:18
203:24 217:2
218:23 234:17
237:2 238:15
241:17 242:24
249:4 262:25
264:4 282:15
**meaning** 227:2
**means** 87:15,17
87:20 229:14
234:21 280:15
282:8
**meant** 161:19
197:17
**measurably**
38:11
**medical** 86:4
**meet** 148:19
149:10 154:24
**meeting** 7:15

155:2 165:23
166:10 167:8
167:13 168:19
168:24 169:7,8
170:11,12,21
171:8,25 175:3
184:8 276:22
290:25
**member** 46:10
92:17
**members** 88:19
**memory** 115:11
**mens** 16:8
**mentioned**
131:19 175:9
193:9 204:15
206:2 211:20
224:2
**merchandise**
111:9 147:7
162:16,25
226:16
**message** 260:15
**met** 39:5 127:9
184:3 201:3
**Mexico** 177:2,5
**mid** 40:15 163:8
195:8
**middle** 73:23
74:2
**Midwest** 156:23
**million** 35:16
169:11,11
**mind** 7:4 9:6
199:11 215:7
**mindful** 278:5
**mine** 106:22
236:13 237:5
238:6
**minimal** 247:20
**minimum** 98:15
134:18 167:12
171:12,18
172:4,9,24
173:12 285:22
**minute** 54:7



55:11 81:10
93:5 103:2
145:13
**minutes** 40:19
91:14,23
114:25 118:5
190:2
**mischaracteriz...**
220:7
**Mischaracteriz...**
20:18
**miserably** 80:7
**missed** 133:3
**missing** 145:17
**misstates** 199:4
**mistake** 256:16
258:9
**mistaken** 44:4,15
73:3 105:9
**mitigate** 90:18
91:2 146:7
**modification**
102:6,12
**modifications**
99:16
**modified** 98:13
99:13,20
**modify** 99:4
247:13,14
**moment** 10:4
13:13 115:6
155:12 209:20
291:2
**money** 42:19
61:12 64:16
67:20 72:4,24
73:8 202:15
**moneys** 105:5
**month** 58:20
121:4 142:13
142:20,22
143:10 161:18
162:13,18
163:9 178:14
180:9 185:17
198:6 207:24

212:24 228:10
240:2,3
**monthly** 142:9
142:10 179:2,5
179:21 180:3
**months** 31:22
32:7 75:25
93:13 99:15,17
100:15,16,21
101:11 113:3
117:13 128:25
130:25 131:9
132:5 150:10
150:16,21,23
186:6 188:9
212:16 227:15
228:5,8 240:24
241:12 246:19
268:23
**month's** 58:7
**morning** 4:3,5
12:4,6 19:21
40:15 124:9,23
158:10 257:17
258:18 291:8
**mortgage** 284:14
**mother** 143:4
**mouth** 121:14
243:2
**move** 72:15
73:12 74:4,18
121:17 140:8
142:14 195:2
211:7,10,22
215:24 217:9
253:12,23
256:20 261:10
262:4
**moved** 72:18
73:16 141:14
142:25
**moves** 6:16
**moving** 73:7
213:19
**muddled** 266:22
**multi** 67:6

**multiple** 97:25
181:13 182:4
182:18,19
209:10 223:22
239:6 247:17
249:23
**munching** 93:23
**Musalimi** 38:3
251:6,23
**mute** 4:3 207:14
**muted** 128:21
**mutual** 235:14
**mutually** 273:6

———————
**N**
**N** 2:2,9 3:2
**name** 39:16
45:16,20 53:3,3
146:2 156:18
156:22 179:3,4
179:6 236:2,15
245:16,17
283:23,25
287:4 289:13
**nature** 55:23
185:23 201:12
213:25
**nauseam** 277:21
**near** 41:17
**necessarily** 23:4
270:9
**need** 21:7 92:25
96:14 109:7
127:9 138:4
150:22,22
156:8 172:20
189:22 206:8
222:8 228:20
242:6 245:13
249:13 277:4
277:11
**needed** 31:22
152:6 175:12
257:14 264:18
**negative** 142:15
**negotiate** 46:6

234:23
**negotiated** 35:6
246:21
**negotiations**
250:7
**neither** 214:4
**nephew** 272:11
**nervous** 81:22
**never** 21:14,17
22:4 31:7 34:8
34:8 50:12
64:24 65:17,24
71:14,17 72:5
73:18 78:5
79:23 99:2,9
163:17 164:2
164:13 167:11
184:16,17
224:15 225:4,7
225:13,24
226:14 236:2
275:20 285:2
**new** 1:17 2:5,14
21:8 77:19
96:25 123:14
147:6 168:15
171:21 173:21
176:4,6,13
186:3 188:5,11
190:19,24
192:24 194:4
195:4 196:25
198:2,20,22
200:2 203:4,6
215:9 216:24
228:2,6,11,14
232:9 251:24
292:5
**nice** 154:24 155:2
165:14 169:16
225:10
**night** 4:23
**nonpayment**
66:22
**North** 2:14
**Notary** 1:17

292:4,24
**note** 5:17 6:17
34:19 189:9
230:3 248:14
**noted** 291:25
**notes** 168:19
170:18 222:8
**notice** 32:7 99:15
100:21 101:8
121:4,6 123:11
123:17 126:5,6
129:2 131:15
131:24 132:6
150:21,22
151:8,18,21,22
152:5,8,14,16
216:3,9 227:15
265:12,14
270:7 284:10
**noticed** 265:15
**notified** 149:22
160:3 266:9
**notify** 127:13
149:8 267:24
**notion** 289:22
**Notwithstanding**
68:24 281:17
**novation** 47:14
48:2
**November**
122:10 134:14
153:3 165:8,11
167:14 184:4
222:4 240:22
250:6 292:25
**nuisance** 210:4
**number** 38:25
42:25 43:14
46:15,16 62:11
68:6 83:12
86:17 169:14
179:10 206:16
206:18 225:3,4
241:21 249:17
253:3 258:25
276:5



numbers 67:24
    68:10 145:6
    206:19
numeral 69:9
    282:3

O

Oak 156:24
oath 11:17,20
    66:10 128:16
object 90:21
objected 271:10
objection 16:24
    17:3 20:14,16
    47:16 60:12,14
    84:2,6 85:16
    101:18 110:22
    110:25 111:2
    113:9,10,17,19
    132:14,19,21
    136:4,6 137:3,5
    137:6,8,11
    145:8 147:3
    155:20 157:14
    157:18 164:20
    165:3 174:2,19
    188:24 189:5,9
    191:14 194:13
    197:4,6 198:25
    215:13,17,20
    216:14 217:11
    219:24,25
    223:14 227:19
    227:21 229:12
    237:7,11,14
    259:19 260:17
    260:24 263:13
    263:15 264:2
    266:3 287:15
    287:17 288:13
objectionable
    220:10
objections 133:4
objective 230:17
objects 93:19
obligated 119:21

120:8
obligation 14:22
    34:6 45:13
    62:16 66:2,4
    79:8 88:17
    89:15 90:18,19
    104:17 118:9
    133:16 179:20
    179:24 180:3,7
    223:2,11
    269:18 285:19
    285:24 286:2,5
obligations 14:14
    44:22 68:21
    69:5 75:22 76:6
    76:16 84:25
    85:6 87:12
    98:14,23 99:5
    99:14,21
    100:12 133:25
    148:20 149:11
    150:2 164:9
    274:9 281:22
observe 4:11,13
obtain 127:7
occasions 181:15
    239:6 247:18
occupancy 212:6
occupies 198:9
occupying 62:21
occurred 265:11
October 1:10
    22:18 23:15
    153:3 185:20
    191:10 192:14
    193:7 194:6
    195:5,9,21
    196:24 199:24
    221:15 250:6
    255:9 262:18
    265:12 266:9
    266:25 268:15
    271:14 273:9
offer 109:3 166:9
    203:22,25
    214:17

offered 247:20
office 39:21
    148:14
officer 136:10
officially 7:23
oh 93:15 101:14
okay 4:7 8:10 9:3
    9:9 15:10 18:16
    18:21 19:16
    23:22 25:9 26:5
    27:8 28:3,24,24
    29:2,17 30:4,19
    32:3,22,23
    34:20 36:19
    37:14 38:13,18
    38:22,22 39:22
    42:17 46:12
    47:12,22 49:16
    51:14,19,21
    52:8,15 53:6
    57:4,6,14,16,19
    61:7 65:19
    67:18 68:13,19
    69:20 70:8 72:9
    72:21 82:11
    83:15 84:17
    86:23 92:5
    94:24 98:7
    99:10 100:7,23
    103:5,10 108:8
    108:22 110:11
    112:22 114:16
    114:19 115:4
    116:25,25
    121:19 122:4
    124:17 126:18
    133:12 138:20
    139:15,19
    143:24 147:18
    148:6 151:2
    152:15,17
    153:15,18
    154:10,12
    156:8 160:16
    161:5 165:24
    167:5 168:21

170:9 174:12
    175:14 179:15
    179:16 183:22
    190:5 191:20
    192:4,17
    197:15 200:10
    206:23 209:14
    209:24 213:9
    215:7,23
    219:19 222:10
    223:8 224:23
    227:9 233:20
    235:23 239:20
    243:12 244:23
    245:4,10 246:6
    247:15 251:3,5
    251:12 252:24
    255:23 256:23
    257:15 258:11
    259:16 260:11
    262:4 264:25
    268:11 269:4
    270:10 271:9
    272:2,2,18,21
    274:17 275:2,3
    285:18 286:7
    289:19 291:14
old 146:25
    168:14
once 109:12
    110:13 235:5
    258:19 275:16
one-year 98:6
on-going 20:11
    20:19 96:15
    98:13 99:5
    274:9
open 235:7,11
    246:4 252:22
    254:2,17,18
    273:17 275:11
opened 17:22
    117:13,15
    238:18
opening 16:5
    142:3 242:17

operate 27:10
    50:5 121:3,5
    127:19 132:7
    135:8,13 136:2
    159:15 161:2
    161:25 163:16
    164:3,14 166:6
    176:23 177:22
    178:7 179:8
    190:25 198:3
    212:2 224:9
    226:14 236:23
    266:5 273:18
    282:24 283:25
    286:5
operated 41:18
    126:15 162:8
    177:18 180:4
    225:15
operating 91:9
    120:24 140:9
    141:4 159:6,20
    160:3,4,5 161:7
    161:11,24
    185:5,7 188:22
    190:12,18
    207:19 208:15
    209:4 212:4
    218:21 226:17
    227:7 275:12
    275:25 282:18
    282:25 283:6
    285:20
operation 16:3
    35:17 52:19,24
    78:5 139:24
    165:22 218:10
    251:9 281:25
operational 69:8
    162:6
operations 53:4
operator 88:21
    116:15 117:3
    150:3 176:4,7
    176:13
operators 170:2



**opinion** 82:7
223:16
**opportunities**
97:25
**opportunity** 5:22
21:16 115:6
121:7 123:13
151:4 165:3
173:24 210:7
227:12 230:7
250:13,21
256:5 263:6,11
266:2
**opposed** 146:13
288:19
**option** 169:19
232:18
**orally** 268:9,10
**order** 8:5,11 36:9
36:12 40:8
71:22 73:6
74:15 93:22
107:9 109:8
110:9 274:21
285:21
**ordered** 112:4,9
117:8
**ordering** 151:9
**orders** 68:9
106:5 110:5
112:16
**original** 194:2
**originally** 174:11
**ought** 217:8
**outcome** 292:15
**outstanding**
109:10
**overall** 247:21
**overhead** 249:21
**overlap** 97:5
**overrule** 137:7
**Overruled** 17:10
20:25 84:11
85:21 189:13
223:17 238:2
289:8

**owed** 42:19 43:18
**owned** 141:21
176:17,21
**owner** 12:8,23
165:15,18
168:5 176:20
**owners** 12:11
58:13 88:19
**O-R** 258:22

——————
P
——————
**P** 2:2,2
**pack** 182:22
**pad** 4:24 5:3,18
34:19 114:24
230:3
**page** 3:3 45:2,17
45:23 81:12
101:25 115:24
116:5,6 147:16
149:15 249:13
279:7
**paid** 42:22 60:3
61:3,4 62:7
64:7,24 65:17
65:24 71:15
72:6 73:18
74:10 111:6,22
113:25 116:19
117:10,11,14
117:16 208:21
226:7,9,12,12
239:12,25
240:6,22,24
241:5 242:13
**Pal** 15:11,24 16:5
16:10,21 19:23
22:2 24:10
25:14 26:24
36:25 39:5 41:3
48:3,4 53:2
122:20 134:25
139:14 140:5
143:15 146:12
149:18,24
177:7,9,18

178:5,7 179:4
183:7 192:8,23
201:23 210:13
210:21,21
211:21 212:5,9
212:12 218:14
219:21 221:2
225:19 227:4
231:23 235:11
235:17 236:6
238:7,10
244:10 249:6
250:7,22 251:9
252:22
**Palace** 142:10
143:21
**Palma** 2:20 9:13
39:17,20
291:21
**panicking** 143:12
145:5,7 146:4
146:15
**Paolo** 9:14 21:10
32:6,19 97:12
122:14 123:15
138:4 149:17
162:11,20
191:23 192:7
192:22 197:24
200:9 202:6,13
202:22 203:22
208:11 210:24
291:19
**paper** 19:25
185:25 233:4
233:10 240:25
241:3
**papers** 241:18
**paperwork** 20:4
22:16,23 23:7,9
23:11,15 25:17
25:23 217:19
217:22 218:3
219:11 220:21
232:16,24
**paragraph**

209:21
**pardon** 148:14
**parenthetically**
53:5
**Parkway** 156:24
**parole** 189:4,10
**part** 17:16 44:17
47:8 49:5 51:12
80:6 117:18
131:21 162:11
188:10 194:3
200:15 204:23
209:25 215:3
226:12 238:11
249:10 250:11
253:22
**participate**
247:25
**particular** 89:22
**particularly**
115:14 117:23
149:6 191:7
253:7
**parties** 47:25
48:17 75:16
89:16 98:5
102:2,5,13
131:13 132:16
150:19 292:13
**parts** 211:19
**party** 14:14
50:23 51:3,8
190:23 229:6
234:15 270:6,8
270:21 282:22
284:16,18,25
285:14
**party's** 109:2
150:2 269:13
**passage** 284:9
**pause** 40:18
157:10 165:4
261:3
**pay** 58:14 59:5,7
59:14 60:8
61:22 62:10,16

63:11,20,25
64:10,11,16
66:5 71:5,11,22
73:17,20 74:15
109:8,9,14
116:16 117:3
149:3 162:15
162:17 163:3
173:11 204:18
207:25 211:11
212:19 224:15
228:10 240:20
241:6 242:11
243:25 244:11
273:18 275:12
279:9
**paying** 61:6,9
209:3
**payment** 57:24
59:9,11,21
60:11 69:4
179:5 207:23
208:21 244:7
279:8,11,12,16
280:4,11
281:22
**payments** 207:18
**pending** 113:12
189:19
**people** 11:2
58:14 248:25
264:5 283:17
**percent** 67:20
92:17 109:15
125:5 139:17
166:17,18,19
196:10 212:17
212:20,25
246:17,18
249:14,20
286:15
**percentage**
213:16
**perfect** 91:18
**perform** 80:3,8,9
107:23 178:8



201:22 225:5 227:17 263:6
**performance** 21:2 69:4 75:21 81:23 84:25 85:6 87:12 127:11 141:25 142:5,24 145:22 177:12 180:17,22 181:2,12 201:18 205:15 244:13 247:22 248:9 281:21 284:6
**performances** 15:3
**performing** 165:13,16 181:18 183:8
**period** 48:19 58:15 75:23 76:8,24 77:11 77:18 78:9,14 78:20 79:3 80:2 80:3 98:8,12,16 98:21 105:8 122:22 123:4 127:10,13 135:2 159:14 162:9 185:16 212:18 216:9 216:11 227:15 238:17 239:22 286:21 287:12
**permanently** 265:4
**permission** 193:22 194:10 194:11,16 196:25 198:2
**person** 261:14
**personal** 13:22 212:7
**personally** 22:15 24:3,16 189:22

**persons** 12:13 95:10
**perspective** 163:11
**persuasive** 262:4
**pertinent** 211:19
**peruse** 66:20 82:13
**pest** 214:20 238:24 239:2
**phone** 29:24 30:3 32:18 203:11 213:21,22 258:25
**picking** 133:5
**picture** 229:22 250:16
**piece** 122:17
**place** 65:22 106:5 110:5 163:5 166:21 170:21 182:3 222:14 273:24
**placed** 106:25 107:21
**plain** 70:23,24
**Plains** 2:5,14
**plan** 25:14 139:13 168:16 236:6
**PLATT** 2:13
**pleadings** 86:25
**please** 4:15,24 11:20 19:21 112:11 124:4 149:8 156:6,17 157:24 188:2 192:6,25 194:20 202:12 208:21 211:4 214:20 222:8 229:6 230:23 257:12 258:7 258:24 266:7 266:14,16 268:4

**plumished** 40:6
**Plz** 2:9
**point** 7:24 8:6,14 9:19 10:21 32:16 34:5 36:4 36:16 72:23 90:13 91:4,15 91:18 95:16 99:4,11,12 101:25 108:24 111:13 125:12 133:12 134:10 138:7,13 140:23,25 159:18 161:5 173:20 176:3 200:14 214:7 220:9 221:22 271:12 276:2 278:7 288:23 291:5
**points** 7:9 106:18
**POLSINELLI** 2:8
**poor** 21:2 145:24 219:8 244:13
**poorly** 80:17 82:4
**portion** 27:15 28:11 193:7 210:10 211:16 213:20 289:9
**pose** 174:22,25
**posed** 157:20
**position** 79:5 80:13 136:21 141:10 223:10 277:8 281:5
**possession** 137:21 149:24
**possibility** 126:13
**possible** 93:25 134:23 188:3 192:10 194:23 213:15

**Possibly** 106:21
**Post** 2:5
**potential** 214:21
**power** 89:11
**practical** 135:5
**practice** 89:16
**practiced** 90:14
**prefer** 9:22 10:11 155:18
**premises** 58:8 149:25 198:9 198:11,16 239:12 265:5
**preparation** 102:17 233:12
**prepared** 17:14 148:17
**preparing** 116:10
**present** 2:18 66:24 103:14 119:17
**presented** 214:10 214:12
**president** 82:25 167:16 279:2
**pressure** 225:5 225:17 234:3 239:9
**pressuring** 271:20
**pretty** 110:14 174:5 253:22
**prevent** 270:6
**previous** 69:23 69:24 106:13 106:15,15
**previously** 95:8 149:16
**price** 57:21 58:5 166:15,24 238:23
**principally** 35:7
**principals** 88:19
**principle** 73:9
**prior** 15:10 16:5 18:25 29:5,5,9

31:21 32:10 44:9 56:10 63:18 96:4 128:24 139:2 150:16 172:11 173:22 209:16 240:13 266:10 266:24
**privilege** 56:5,12 60:18
**privileged** 60:15 142:8,17
**probably** 46:3 151:12 219:4
**probe** 56:11
**problem** 169:23 175:16 193:14 226:18 247:18 253:5
**problems** 223:23
**proceed** 11:14 40:25 81:6 82:16 92:4 98:22 133:11 155:14 157:24 173:17 190:6 192:18 199:15 207:5 230:23 254:13 258:19 275:9 278:12
**proceeding** 12:25 156:12 266:12
**PROCEEDIN...** 4:1 5:1 6:1 7:1 8:1 9:1 10:1 11:1
**process** 35:10
**produce** 23:5 232:24 233:4
**produced** 23:10 241:14,16 251:15 252:7 253:8
**product** 35:16 43:10 80:16 109:7,13,21



110:14,16,21
111:4,18,25
112:3,8 113:14
143:6 151:9
152:7,22 153:2
**products** 36:25
37:25 117:8
**professional**
264:11
**profit** 14:2
**programs** 248:3
**progress** 211:3
**promise** 88:23
**promised** 73:17
73:20 74:21
**promises** 247:24
**promising**
184:23
**promotional**
248:2
**promptly** 208:22
**pronounce**
236:14
**proper** 42:15
136:20
**properly** 112:13
**properties**
182:12
**property** 130:19
245:20
**proposal** 16:19
17:5,9 18:4
127:5 210:15
210:17,23,25
211:6 213:13
214:6,9 251:24
252:9,10
**proposed** 236:6
252:21
**proposing** 211:7
**proposition**
212:3
**prospect** 191:25
192:10,24
194:22
**prospective**

211:21
**provide** 6:6,19
58:5 109:9
149:5 152:21
167:7 178:10
178:13,25
179:5,21 180:3
184:15 196:23
268:13
**provided** 15:5
23:7 50:8 95:5
95:10 126:6,7
149:16 269:10
269:25 270:22
**provides** 52:25
**providing** 179:3
251:23
**provision** 66:17
69:12 70:4 86:6
87:25 94:7
102:2 123:12
123:18 129:2
131:25 178:16
178:23 280:15
282:7
**provisions** 277:7
284:13
**Public** 1:17 292:4
292:24
**pull** 103:12 130:2
251:12 256:24
272:3
**pulling** 261:22
**purchase** 36:7
37:2,7 46:22
47:3 49:25
50:18,20,22,24
51:20 57:20
58:5 68:22
69:25 81:12
134:19 163:14
167:13 171:12
171:18 172:4
172:10,25
173:12,22
175:12 222:20

278:20 287:7
**purchased** 35:15
35:21
**purchaser** 52:22
58:5 59:10
68:25 75:17
279:11 281:19
285:11
**purchases** 98:15
106:24 112:18
175:5 285:22
**purchasing** 49:14
50:3,5 53:11,18
77:16,19 78:4
78:10 79:18,23
80:4,10 82:8
90:4
**purported** 50:8
**purportedly**
23:12
**purpose** 165:10
228:4,12
**purposes** 251:4
**pursuant** 109:2
**pursue** 200:11
237:25
**push** 123:15
276:18
**pushing** 232:19
233:24
**put** 17:18 32:24
62:6 65:22 78:8
92:6 103:11,19
111:25 115:10
115:12 140:24
169:10,25
272:22 273:24
**putting** 46:12
105:10 121:22
232:7
**p.m** 291:25

---

**Q**

**question** 6:8,9,16
13:10,11 14:4
22:22 23:19

26:12 27:14,17
28:8 29:8 30:14
31:13 47:6,19
49:5 54:13,20
54:23 55:2
56:14 57:7
58:23 59:2
63:18 66:8,9
75:7 82:13
83:23 86:11
87:4 90:22
98:11,19 100:3
113:12 114:5
114:18 135:18
135:20 136:17
137:18 138:11
139:6 145:19
146:19 148:3
151:25 152:13
157:7,10,15,20
164:24 165:5,6
174:23 175:2
179:16 180:12
180:14 184:20
189:19 191:18
191:19 194:2
197:10 199:3
199:14,17
201:2 203:21
215:17 217:7
217:12,21
218:18 219:9
219:25 223:21
229:10,15,21
230:16 237:10
242:3 243:7
244:4,18
248:12,16
257:17 259:23
260:2,8 261:4
261:20 263:20
263:24 264:13
265:24 266:6
266:21 267:11
267:12,23,23
267:25 270:2

270:15,17,17
270:24 278:10
280:6 285:9
289:16,21
290:9
**questioner**
265:23
**questioning** 6:3
224:6 230:6
**questions** 4:17
5:5 6:5 7:6
55:19 75:8 81:2
103:23 111:15
114:20,23
128:15 153:17
157:5 174:15
213:12 230:11
230:21 278:2
**quickly** 122:18
127:3 141:24
187:22 192:5
**quite** 56:19
**quote-unquote**
204:20

---

**R**

**R** 2:2 158:2 292:2
**raise** 156:9 189:5
**ran** 96:16
**range** 141:6
**rate** 212:21
249:15
**read** 27:16 28:10
28:12 75:10
86:12 87:3,5,7
116:10 122:18
127:3 139:11
187:21 189:17
192:4 194:15
196:3 197:23
199:6 201:15
209:20,25
210:13 211:19
241:4 266:16
277:19,20
289:10



**reading** 52:13
85:22
**readjusting**
172:4
**reads** 76:4
193:18
**ready** 103:9
152:7 204:20
204:21 276:14
**realize** 248:19
**really** 9:20 20:24
72:23 73:10
75:13,14 80:3
91:3 108:11
125:11 127:3
139:3 145:24
187:22 199:9
253:19 280:20
287:19
**reason** 5:3 63:12
63:14 74:12
85:15 133:2,9
141:3 186:25
187:9 188:7,10
225:25 244:12
249:10 274:7
**reasons** 143:14
188:4 249:11
**reboot** 154:13
**rebooting** 93:6
101:20 155:11
**rebut** 10:18
**rebuttal** 9:8
10:15 291:13
291:15
**recall** 18:18 19:3
20:7 24:3,8
25:7 26:10 30:7
30:8 31:5 35:12
35:18,19 37:18
38:5,14 46:24
59:18 61:10
67:10 93:11
104:2 105:14
107:16 126:16
140:21 142:4,6

159:5,10,13
165:7 166:2
172:6 178:15
178:21 181:14
182:2 184:11
184:19 185:13
185:19,23
190:13 196:10
205:5,7 207:11
207:16 208:3
213:21 243:5
245:19,23
255:14 256:12
256:14,17
259:16,25
268:18,20
280:18
**receipt** 108:21
**receipts** 60:11
113:13
**receive** 19:15
35:3 57:23
110:5,21
184:25 247:22
279:16
**received** 60:22
66:11 107:3
111:3 221:25
**recess** 40:22
91:25 103:6
190:3 207:2
222:11 266:17
288:8
**recipe** 247:8,10
**recognize** 45:9
46:2,18 82:17
83:8 108:9
**recollection**
133:18 184:14
196:17 257:22
258:2 259:4
**recommence**
131:7
**reconnecting**
93:3
**reconvene**

118:10
**record** 27:16
28:12 118:23
118:25 174:13
178:5 204:2
220:20 289:10
292:10
**records** 279:19
**redirect** 6:4
118:17 228:20
**reduce** 213:15
238:23 250:3
**reduction** 166:14
166:24 238:16
246:7,11
249:13
**reductions** 34:22
35:4
**refer** 42:12,16
61:15 192:11
**reference** 59:25
101:21
**referenced**
252:11 282:13
**referencing** 20:5
22:24
**referred** 32:10
286:22
**referring** 38:2,7
53:14 59:24
70:10 101:15
117:19 120:22
182:8 208:23
**refresh** 133:18
184:13 196:16
257:21
**refreshes** 258:2
**refundable** 58:6
**regard** 57:3
70:16
**regarding** 23:6
225:22 262:15
**registry** 226:10
**regular** 178:10
**reimburse**
141:21

**reimbursed**
42:14
**reimbursement**
43:9 59:10
279:12
**related** 67:25
201:24 292:13
**relates** 75:7
222:25
**relationship**
269:14
**relative** 84:3
**release** 217:23
218:3
**released** 56:16
223:11
**relevance** 113:21
237:15
**relevant** 253:7
**relied** 88:6
133:19
**relinquish**
219:11 220:22
220:23
**relinquishment**
47:14 48:2
**relocate** 91:11
212:12
**relocated** 212:15
**relying** 88:11
**remain** 11:19
187:2 273:15
273:17 275:11
285:20
**remainder** 77:2
95:20
**remarks** 142:3
**remedies** 247:20
**remember** 6:11
16:15 17:15
25:3,22,25 26:4
30:21 34:9,11
34:15 35:2 36:3
38:20 43:3
58:17,18 59:19
60:25 61:5,13

64:7 67:9 73:15
105:7,20
114:15 120:10
135:3 142:21
159:8 209:23
221:5 229:16
230:13 260:3,6
**remembering**
173:5
**remind** 11:16
56:13 86:16
148:25
**remote** 38:11
**renew** 21:7
183:11 219:5
**rent** 34:22 35:3
58:8,15 59:5
143:11 163:3
202:16,18,25
204:18 207:18
208:23 209:4
211:10,11
212:8,16,19
213:6,16
238:17 239:11
239:21 240:6
242:11,14
243:25 244:11
246:8,11,12,16
249:18 250:3
273:18 275:12
**repeat** 6:20 22:22
27:14 28:7 29:8
47:6 174:7,8
189:16 220:15
220:20
**repeated** 61:11
**repeating** 215:22
263:18
**rephrase** 27:18
30:14 91:5
197:20 264:12
**replacement**
22:21 23:3,25
24:7 25:19
127:7,15 131:8



198:16 217:21
231:7,10,16
232:3 255:11
266:11
**replied** 22:4
**report** 142:9
206:17,21,22
**reporter** 189:17
292:4,24
**reports** 143:18
143:19,22
178:10 179:17
179:21 180:3
**representation**
88:5,12 284:3
284:21 285:10
**Representations**
284:4
**representative**
111:6
**representatives**
29:10 96:6
**represented** 42:5
102:15,23
**representing**
13:4 58:7 87:22
**represents**
108:19
**request** 22:4
34:21 40:3,10
94:25 95:12
213:21
**requested** 79:25
97:14
**requesting** 127:5
197:25
**requests** 246:7
**require** 178:9
**required** 134:18
149:4 164:8,17
178:16 188:20
**requirement**
131:15 134:19
167:13 172:5
172:10,25
173:13,21

216:3,6
**requirements**
171:13
**rescind** 127:18
205:6 206:3
273:7
**rescinded** 207:11
**reserved** 89:11
149:11
**reside** 41:17
**resistant** 201:25
**resolved** 38:19
**respect** 14:8
95:24 136:9
197:8
**respond** 7:6
10:14 56:21
137:17 149:13
157:19 180:13
227:22 230:21
**RESPONDENT**
1:8
**Respondents**
2:13
**responds** 192:16
**response** 95:5,11
95:12 123:21
123:23 124:12
137:13 148:13
151:11 262:14
**responsibility**
48:21,23 49:7
49:20 109:15
141:21 286:15
**responsible**
63:22 66:7
69:13 84:24
85:5,13 87:11
89:4 107:22
141:2 149:3
193:15 285:20
**rest** 224:5
**restate** 58:25
86:11 87:4
152:3 197:12
199:16 201:5

260:8,10 266:6
266:23
**restated** 266:21
**restraining** 93:22
**result** 47:17
145:5 284:11
**resume** 127:14
**resumed** 204:9
**retail** 15:12,19
16:2 52:24
88:21 148:21
150:3 236:17
236:21
**retailers** 15:22
**retook** 137:21
**retread** 217:16
**return** 25:18
140:13 264:10
**revenue** 163:2
**review** 243:14
257:13
**reviewed** 200:17
207:8
**revoke** 131:3
**re-cross** 145:1,2
145:17 146:1
147:1 148:1
149:1 150:1
151:1 152:1
153:1 154:1
155:1 156:1
157:1
**re-direct** 119:1,2
120:1 121:1
122:1 123:1
124:1 125:1
126:1 127:1
128:1 129:1
130:1 131:1
132:1 133:1
134:1 135:1
136:1 137:1
138:1 139:1
140:1 141:1
142:1 143:1
144:1 145:15

145:16 230:10
**right** 7:3,25 8:17
8:22 10:6 13:15
14:11 19:8
30:10 33:8
34:10 36:22
37:19 38:4
40:11 41:21
45:6 49:4 51:19
51:25 52:7 53:2
53:10,13,21
56:20 57:17
61:14 63:4 65:4
65:18,20 67:2,8
70:9,20 72:24
73:21,22 74:22
74:25 77:22
78:17 80:21
81:24 83:2
85:24 87:2,7
89:18 92:14
95:6,18 100:3
101:3,3 102:18
104:10 108:15
112:25 114:21
117:21 118:3
119:11,13,15
119:17,23
120:2,3 121:24
124:11 127:25
130:18 133:11
137:5,7 138:14
146:20 147:2
148:23 149:18
154:4 155:7,11
155:17 156:9
157:21,22
158:22 160:16
161:8,21 165:5
170:22 171:7
172:2 173:16
179:11 180:14
180:18 184:5
184:23 187:21
188:22 191:3
192:12 195:5

195:11 200:11
201:6 203:20
206:9,13,25
209:14,24
213:13 217:14
222:16 223:6
223:22 225:2
231:8,9,13
233:22 234:4
234:15,16
235:8 245:8,10
245:14 246:22
248:22,23
249:24 250:22
251:10 253:17
255:7 256:2,10
256:18 259:10
261:4,5 262:9
262:13 264:13
266:23 268:9
270:25 271:11
273:2 275:6,8
275:13 277:12
277:13 278:12
278:18 284:17
286:13 287:9
287:14 288:7
290:15 291:22
**rights** 47:15 48:3
57:2 149:11
**ring** 105:4
**rise** 284:17
**Riverside** 2:9
**road** 2:5 225:12
**Rodney** 2:10
157:3 241:13
252:5
**Roman** 69:9
282:3
**room** 156:3
272:9
**roughly** 75:24
**route** 214:24
**row** 79:21
**Rubinstein**
102:21



rule 9:21 189:11
  189:12
rules 4:11
run 67:24 98:15
  99:6 107:7
  190:19 210:4
  252:3,14
  274:10
running 78:21
  204:25 275:20
rushes 153:4

_____
            S
S 2:2
sake 210:12
  211:18
sale 226:15
sales 16:16 81:23
  81:25 82:4
  127:9,11,12
  142:7,10,12
  143:9 145:5
  166:4 172:11
  173:23 175:6
  175:22 178:10
  179:2,17,21
  180:8,21
  181:18 212:17
  212:20 213:2
Salsbery 206:21
Sana'a 2:21
Sarah 1:4 12:8,9
  12:19,22 13:20
  14:11,14 15:24
  20:13 26:14
  27:3,9,20 29:4
  29:6,9,13 31:2
  34:21 35:15,21
  36:6 38:4 41:18
  42:4,14,18
  43:18 44:23
  45:14 46:6,10
  46:14 47:4,9,24
  48:20,23 49:7
  49:19 51:18
  52:5 53:8 54:11

54:18 55:2,5
56:16 57:10,23
58:13 59:4,14
63:8 66:11
67:12,19 68:7
69:17 72:3
75:15 76:6,15
76:20 78:6,7,19
79:7,24 82:18
82:25 83:7,22
85:12 88:5 89:3
89:3 92:9,17
94:9,17,20 95:9
96:5 97:17,18
98:23 99:6,14
99:15 100:10
102:15,23
103:19 104:7
104:10 105:24
106:24,25
107:22,22
109:4,6,20
111:17 112:14
113:13 114:6
116:15 119:9
119:10,20
120:7,19 123:3
125:14,19,21
126:7,13 127:4
127:10,13,18
131:2,3,14,16
133:15,23
136:10 137:20
140:12 142:11
149:2,10,19,23
159:19,25
160:3,18
161:25 163:2
163:11,15,24
164:2,8,13
178:10 179:6
187:2 188:20
190:10,17
193:3 195:21
196:24 198:2
204:9 207:9

210:15 214:11
216:5 218:2,20
223:11 237:18
238:15 242:10
242:19 243:23
244:24 252:20
255:9,10,17
269:9,17
270:13 275:19
278:20 279:15
279:16 284:22
284:23 285:15
286:12 289:3
289:25 290:13
290:15
Sarah's 14:22
  15:3 36:24
  58:13 75:21
  90:18 98:13
  99:21 100:12
  222:25 262:10
Sarioul 236:12
  236:16,17
saw 50:12 67:6
  143:13 196:11
saying 26:23,24
  27:9,22 64:8
  65:25 72:3
  82:15 135:9
  140:3,7 158:21
  162:20 182:17
  193:20 202:22
  240:21 244:8
  256:15 285:12
  288:2
says 19:21 25:13
  26:18 27:25
  28:22,23 29:19
  39:3 48:11
  50:16 52:9 54:4
  55:4,12 57:9
  58:4 63:7 68:20
  68:23 71:10
  75:17 76:21
  86:9,14 87:22
  88:14 89:9,9

93:2 95:17 99:8
109:23 110:11
116:14 117:2
119:5,6,23
124:13 148:6
157:13 191:25
194:20 199:7
220:13 222:24
223:5,5 229:11
246:16 257:11
258:17 260:13
265:2 273:11
279:8 281:17
SBrown@bpsl...
  2:15
Schedule 69:9
  282:2
scheduled 75:24
  210:23
SCHMIDT 2:13
screen 18:11,14
  33:3 62:6 92:12
  103:11 108:7
  115:10,12
  121:18,21,23
  122:6 126:20
  129:16 138:18
  147:8 155:15
  155:16 157:12
  160:14 183:19
  187:12 191:5
  195:18 208:8
  209:12 245:6,7
  251:13 252:11
  253:16 256:25
  272:23
scroll 92:14
  100:17 124:10
  245:12 274:13
scrolling 124:14
se 225:7
search 127:14
  198:15
season 36:8,11
  39:10 42:23,23
  61:25 62:22

106:9 107:17
112:24 117:3
152:25 168:9
168:14,15
175:10
seasons 105:17
  105:18 107:14
  107:18,19,19
  107:20 113:3
  135:16 137:24
  173:23 175:6
  250:21 251:25
seated 156:17
second 6:2 9:19
  19:11 38:25
  49:5 62:20
  147:16 149:15
  170:17 188:7
  224:11 225:24
  226:7 235:23
  249:12 282:9
seconds 130:6
section 48:10
  52:7,13,17
  57:20 58:3
  68:19 69:6 70:8
  84:21 87:21
  88:14 89:10
  95:17 100:8,23
  100:25 125:17
  279:6,8 281:16
  281:23 284:2,3
  284:5
secured 235:5
  270:8
security 45:19
  116:16,19,23
  117:24
Sedlarcik 39:17
see 5:23 16:18
  18:14,23 19:19
  20:2 21:6 25:19
  25:21 26:20
  33:10 39:3,11
  39:16 44:25
  45:16 47:12



48:10 52:9
57:21 58:9 59:7
59:12 69:10
72:2 76:3 82:14
84:21 85:7
87:21 88:2,24
89:25 92:10,16
94:6,13 102:9
103:3 108:6,11
109:4,16
111:19 115:20
121:14,15,19
121:25 122:5,8
122:10,13,15
122:17 123:5
124:3,16
125:25 126:19
126:25 127:15
127:22 129:8
130:9 131:10
138:18,24
139:20 148:7
154:14,23
155:15,18,21
155:22 156:7,8
157:11 160:13
160:15,16,21
162:21 166:12
167:4 169:18
179:11 181:5,7
181:7 183:19
183:25 187:11
187:14 188:10
188:13 191:5
191:12 192:2
192:18 193:3
193:20 195:17
195:19 198:17
198:23 199:18
208:7,18
209:12,18
212:10 213:17
228:19 237:16
241:11 242:6
243:2 245:7
246:15,19

247:3 249:20
258:13,14
259:2,3,10
260:9 261:20
262:19 264:25
265:7,8 271:6
273:20 276:25
279:13 281:15
282:4 284:2,18
291:24
**seeing** 35:12,19
105:14 129:15
179:14 202:8
259:25
**seek** 59:10 66:16
279:11 280:14
**seeking** 247:19
267:4
**seen** 19:2 41:23
51:23 92:20
147:20 148:3
196:8 220:9
233:9 252:15
**sell** 16:16 37:10
53:2 143:7
167:25 168:7
171:20 172:13
175:10 205:18
213:7,7 247:11
**sellable** 80:17
**seller** 52:11,18,21
52:21 58:6 59:8
59:9 279:9,10
284:5,8,16,16
**seller's** 52:23,25
69:4 281:21
**selling** 105:17
106:9 112:24
113:2 152:25
162:16,25
172:17 247:12
**send** 19:25 33:25
34:8 100:22
192:25
**sending** 211:17
245:19 260:14

**sends** 260:12
**sense** 10:16
**sent** 22:25 23:12
24:17 25:24
32:10 39:9
123:7 167:9
183:23 184:9
211:2 233:2,14
233:15 245:24
245:25 259:17
268:16
**sentence** 68:23
87:6 138:22
139:2,7
**September** 26:8
48:5 72:13,19
83:6,22 85:11
96:17 99:7
107:8 117:15
135:14,25
141:5,9 146:25
148:19 149:23
153:3,7,12,13
160:19 163:15
163:25 164:15
218:21 219:16
221:12 238:18
238:20 239:13
245:21 250:5
275:20
**services** 1:24
47:5
**set** 6:3 13:25
33:17 36:6
88:15 98:16
149:7 286:21
292:8
**Sets** 120:18
**Settimi** 2:20 9:13
39:17,20 114:3
291:21
**setting** 210:3
**Shah** 2:11 5:23
5:24,25 65:10
71:3 83:11
128:20 206:20

230:8 252:25
276:4,8
**share** 7:12 18:10
33:2 125:10
126:18 181:11
201:12 202:12
227:12 245:5
**shared** 129:19
**shares** 130:16
**sharing** 147:8
**sharp** 91:24
**sheet** 68:8
**shifted** 62:16
64:2,12 66:5
73:18,24,25
**shocked** 169:13
**shop** 143:17
**shopping** 248:2
**shops** 16:7 26:13
41:4 46:7
231:12 238:16
245:21 273:25
275:16
**shorten** 40:15
**shorthand** 292:3
**shot** 121:14
241:6
**show** 18:8 41:21
51:14 121:9,10
125:8 160:8,10
170:14 174:13
181:4 183:17
191:3 195:16
206:6 209:11
254:25 261:14
263:4
**showed** 36:18
69:24 70:5
217:15 241:22
**shown** 17:6 18:17
38:8 210:10
**shows** 253:21
**shut** 205:19
**sic** 48:24 80:19
86:2 110:18
154:6 165:17

166:8 168:17
171:24 173:15
181:22 184:19
203:19 205:20
225:20 226:17
231:24 233:7
237:5 239:2
256:6 282:19
**side** 150:16
**sign** 19:24 25:17
28:6 46:6 97:13
185:25 186:19
217:22 218:2
219:10 232:16
232:17 234:20
250:23,25
279:4
**signatore** 245:15
281:11
**signatory** 51:3
272:25
**signature** 44:25
45:4,17,22 46:2
46:3 81:11
82:18,22 84:18
92:16 196:13
196:14,15,19
196:21 245:16
245:18 273:2
278:25
**signed** 14:21
22:18 25:23
46:9 54:9,15
63:3,7,9,9 72:3
72:11 73:13
75:11,12 76:20
79:11 82:24
97:19 101:11
141:8,16
220:21 231:20
232:2 240:12
255:8 256:16
258:8 283:10
283:16 287:8
289:4,25
290:12



significant
  118:16
signing 264:18
  285:12
similar 15:6
  22:17 215:4
Simon 19:7,18,23
  20:12,20 21:4,6
  21:11,12,14
  22:19 23:3,8,11
  23:24 24:6 27:7
  28:4 29:3,12
  34:5,22 35:7
  81:21 82:10
  96:7,8,9,11,13
  96:20,22,25
  97:6,7,15 98:2
  121:8 123:5,14
  126:8,24 127:6
  127:14,17
  129:3 130:20
  131:4,7,14,17
  134:24 140:3
  140:14 142:9
  143:12,20
  145:4 146:9
  162:4 178:9,13
  179:2,21 180:4
  180:8,16,21,25
  181:11 182:13
  182:14,15
  185:10,18,20
  186:3 187:6
  188:16 195:14
  195:22,25
  198:8,21 201:9
  201:11,13,16
  201:25 204:6
  205:6,13 207:9
  207:17 208:4
  208:19 209:8
  210:14 215:8
  215:13 217:18
  217:23 218:4
  218:16,17
  219:12,19

220:23,24
  224:7,22 225:5
  226:2 227:6,16
  231:10 232:4,6
  232:14 234:3
  234:11,14,24
  236:9 238:16
  238:25 239:2,6
  243:23 244:7,9
  244:15,16,20
  245:3,20 248:7
  249:24 255:9
  255:13,17,22
  256:10,15
  257:10 262:12
  266:11 267:2
  268:16 271:9
  271:17 282:11
  282:17,20,23
  283:4,21
  289:14
Simon's 130:17
  139:3,8
simply 54:23
  114:5 151:17
  152:13 229:10
  248:12 278:13
sincere 276:17
sir 4:6 28:17 29:3
  47:22 57:5,19
  81:6 92:11 94:4
  98:20 101:22
  103:15 144:7
  147:17 150:5
  153:24 232:12
  236:15 242:4,9
  245:16 248:24
  250:5 257:2
  261:7 263:22
  264:14 266:8
  271:3 278:17
  285:2
sit 9:23
situation 248:22
  270:18
six 31:22 32:6

99:15,17
  100:14,16,21
  101:11 113:3
  128:25 131:9
  132:5 150:10
  150:16,21,23
  186:6 227:15
  228:4,7
six-month 101:8
  121:6 123:4,11
  123:17 126:5,6
  131:15,24
  216:3,9 227:23
  227:24 228:12
six-year 123:2
slash 246:24
slow 209:3
small 250:23,25
  251:2
Social 45:19
Sohil 2:11 252:5
  276:12
sold 36:20 37:12
  109:4 142:23
  163:11,24
sole 94:8 101:5
solely 119:20
solemnly 156:10
somebody 169:20
  193:11 224:4
soon 8:12 9:17
  166:7 268:21
  291:17
sooner 166:7
sorry 16:20
  19:11 21:5 30:4
  36:13 37:15,20
  57:20 93:17
  94:23 96:22
  116:5 130:8
  132:23 135:14
  161:15 163:7
  163:21 167:18
  174:21 176:18
  178:2 182:6
  210:3 214:19

220:17 232:20
  242:25 245:8
  252:25 256:3
  256:22 257:7
  271:24 272:5
  274:11,25
  276:8,10 284:3
  285:4 286:17
  287:17
sort 16:14 47:13
sought 254:8
sound 158:17
  280:21
space 21:8 62:21
  97:2 98:3 210:6
  211:22 212:15
  213:15 215:10
  219:6
Spano 35:13 38:4
  43:2 105:12
  175:4 183:23
  187:18 224:5
  226:25
Spano's 66:25
  103:15 111:25
speak 97:15,25
  158:13 189:6
speaking 97:6
  128:23 136:21
  136:22
speaks 139:8
specific 36:4
  104:21 123:10
  201:2 267:11
specifically 37:9
  38:7 44:5 57:8
  70:4 88:15
  163:23 185:6
  223:10 255:17
specified 114:8
  138:4 173:5
specify 173:4
speculation
  60:16
speech 248:14
spell 156:17

spending 248:20
spent 105:6
  215:25
spoke 187:22
  210:20 254:7
spoken 170:11
spreadsheet 39:8
  67:3 105:11
  106:22 251:22
  252:7
spree 248:2
spring 36:13
  97:18 106:12
  106:12,16
  109:7,21 110:9
  111:18 112:6,7
  112:17 113:4,7
  113:14 138:9
spring/summer
  109:12 110:13
stand 156:6,6
standing 224:25
stands 263:20
start 9:11 47:20
  47:21 151:9
  153:6,12
  231:15 263:4
started 17:21
  118:12 141:4
  214:17 231:17
  232:7 275:18
starting 122:10
  124:8 138:22
  210:4 232:9
starts 115:23
state 1:17 31:2
  67:10 100:10
  120:22,23
  199:11 223:8
  292:5
stated 35:15
  85:11 88:9
  255:10
statement 14:2
  60:5 110:20
  139:16,18



173:10 242:17
242:18 243:14
243:22 265:9
**statements** 242:8
**states** 111:17
149:21 273:5
**stating** 69:12
86:7 150:17
151:2
**status** 96:12
166:3
**stay** 11:6 162:12
162:19 188:20
204:19
**stayed** 58:20
**steam** 254:10
**Steen** 126:24
127:22
**step** 93:8 159:4
277:4
**Stephen** 2:15
129:13 210:20
211:2 215:5
**stepping** 46:22
**stick** 100:2
**stipulation** 83:5
83:21 88:7
119:5 290:11
**stock** 149:3 249:2
**stop** 128:3
181:20 245:13
281:13
**stopped** 53:23
54:11,18 55:2,6
57:11
**store** 15:12,16,19
15:25 16:6
17:21 19:6,23
20:8,12,19 21:3
21:12,15 22:20
24:12 25:14
26:8 27:10,20
27:22 35:18
36:21,21 41:3,9
41:10,13,19
43:19 44:10

47:9 48:4,19
50:6 53:9,18
59:4 60:10
63:15 65:24
73:2,6,12 74:4
74:19 78:22
80:7,17 81:22
82:9,10 84:4
89:6 91:9,11
93:8 96:12
97:24 98:16,22
99:7 107:7
117:8 120:9,24
121:3,5,7
122:21 123:5
126:8,14,15
127:11,20
131:17 132:7
134:24 135:8
135:13,16
136:3 137:16
137:20,21
138:6 139:14
139:25 140:9
141:4,12,14,15
142:11,14,22
145:22 146:2
146:13,24
148:18 149:4,6
149:24 150:7
150:13 151:5
151:10 159:6
159:16,21
160:2,5 161:2,7
161:11 162:2,5
162:8,12,19,25
163:16 164:3,7
164:14,15
165:12,16
166:4,21 169:9
169:12,21,22
170:3 171:20
176:24 177:8
177:10,23
178:7 179:8
180:4 181:17

181:22,24
182:23 183:5
185:5,8 186:2
188:22 190:12
190:18,20,25
192:11,12
193:12,21,23
193:24 194:5
194:24 197:2
197:13 198:3,4
198:5 200:3
201:18,20,23
202:2 204:11
204:19,25
207:19 208:15
209:4 211:8
212:2,4,19
215:14 218:11
218:21 219:15
219:21 221:6
221:18 223:13
223:24 224:9
224:25 225:15
225:18 226:2,8
226:14 227:16
227:17 228:5
228:13 231:11
231:24 233:23
234:4 235:7
238:19 244:10
246:4 247:2
249:7 250:8,23
250:25 251:2
252:22 253:23
254:11,14,17
254:18 255:13
256:6 263:5
274:3,6,10,22
275:6,19,20
280:3,5,12
282:18,24
283:2,5,6,25
285:21,25,25
286:5,9,10,16
286:20 287:13
288:20

**stores** 16:2
120:23 176:16
176:21 177:2,5
177:13,19
178:6
**store's** 141:25
142:5,23
180:17,22,25
181:12 247:21
**streams** 130:16
**strict** 89:13
**strike** 90:16
249:22
**string** 122:9
191:11
**Stuart** 212:14
**stuff** 171:22
203:18
**Subh** 1:4 12:12
12:15
**subject** 88:20
249:7
**sublease** 188:8
224:10
**submitted** 16:20
16:21,23
242:19 243:16
**subsequent**
102:11
**substantial**
246:10
**success** 247:8,10
**successful** 178:5
183:6 269:6
**successfully**
177:18,22
178:6
**succinctly** 4:18
229:13
**sudden** 224:4
**sufficient** 13:9
109:9
**sufficiently**
103:25
**suggested** 181:23
**suggesting** 217:8

**suggestions**
183:2
**Suhad** 1:4 12:12
12:14 45:5
**suitable** 198:15
**Suite** 2:9
**summer** 106:12
106:12,15
111:19 112:6,7
112:17 113:4,7
113:14
**supplemental**
102:7
**supply** 143:19
**support** 43:17
103:25 104:11
120:14 133:20
164:16 168:15
211:4
**supported**
103:24 120:6
133:14
**supports** 133:23
**suppose** 60:21
**supposed** 42:22
58:21 64:13,15
64:17 71:11
72:4 77:4 79:15
100:20 179:5
216:10
**sure** 56:25 81:18
84:7 86:13
90:21 113:23
114:2 125:5
129:25 134:10
170:25 173:23
174:17 197:17
208:21 251:21
257:25 269:16
272:4 273:23
277:22
**surprise** 243:21
**surrender** 196:5
198:12 240:12
244:24 265:5
267:5 271:20



surrendered 31:3
  31:19
surrendering
  97:18 233:22
  264:21 270:6
surrounding
  159:14,15
  190:9 200:16
  201:9,14
surviving 98:24
suspend 127:6
sustain 142:14
  200:21
Sustained 60:17
  90:24 194:14
swear 156:10
sworn 158:3
  292:8

——————
T
——————
T 292:2,2
table 36:17
take 19:6,24 21:7
  22:5 26:8,25
  27:20 29:15
  40:13 49:3 52:6
  67:15,16 79:16
  79:16 85:18
  91:23 94:10
  95:19,25 96:9
  101:7 103:2
  109:7 111:13
  113:13 115:8
  116:8 122:20
  122:25 125:22
  128:5 132:4
  138:5 146:23
  148:17 150:6
  150:14 158:25
  159:4 168:19
  177:3 186:11
  186:17,23
  188:8 189:25
  193:11,23,24
  194:5 197:2,13
  198:3,5,22

203:22,24
204:11,14
205:12 209:20
214:8 215:9,14
220:12 223:10
223:24 224:7
224:22 226:4
228:5 231:24
253:13 256:6
274:3 289:13
291:3
taken 39:7 40:23
  42:23 92:2
  103:7 109:20
  128:13 190:4
  207:3 222:12
  226:5 246:12
  266:18 288:9
takeover 192:11
  192:12 193:21
  194:23
takes 131:9 186:5
  227:25 228:7
  231:6
talk 19:15 123:14
  135:5 141:24
  203:12 209:22
  263:7
talked 21:21
  25:10 29:23
  30:2 66:18 90:6
  90:8 103:17
  134:8,22 192:5
  207:9 210:22
  268:6
talking 23:14
  101:9 103:23
  104:22 112:6
  124:8 128:24
  210:15,16
  214:25 216:2
  233:16,21,23
  238:21
talks 11:7 215:3
tangential 237:22
target 127:9

task 145:25
team 224:6
technical 287:20
tell 14:20 16:11
  21:20 24:4 44:5
  61:20 63:6
  76:20 106:4
  110:7 150:23
  157:15 177:15
  200:6,23
  202:11 203:10
  206:15 240:22
  283:7
telling 64:10
  68:11 71:14,17
  74:9 76:10,25
  187:23 232:15
  244:19
temporary 93:22
tenant 22:21 23:3
  23:25 24:7
  123:14 127:15
  131:8 186:2,4
  190:19,24
  192:2,10,24
  194:5,22 195:5
  196:5,25 198:3
  198:8,11,14,16
  198:20,22
  200:2 202:2,14
  202:20 203:4,6
  204:10 210:5
  211:21 215:9
  215:13 217:21
  228:2,6,11,14
  231:7,11,16
  232:3 255:12
  262:18 265:2
  266:11 273:6
  273:12,16
  274:3 275:11
tenants 188:18
  227:4
tenant's 198:12
tenure 34:23
ten-minute 40:4

40:14
ten-year 235:2
term 27:21 47:10
  52:10,17 53:14
  57:25 58:11
  59:3 69:5,14
  75:22 84:22
  85:14 93:9,12
  94:3,13 95:19
  96:3,16 100:11
  125:17,25
  139:24 159:22
  160:21 185:9
  190:13 212:15
  212:17 281:22
  286:7,19
  287:12 289:11
  289:17
terminate 94:11
  95:21,25
  125:24 244:9
  244:16 262:16
  262:22 265:6
  271:13 273:8
terminated 31:18
  50:17 85:4,15
  87:10 99:13
  100:13 242:10
  243:24 244:15
  244:21,22
  245:3
terminating 28:5
  29:4 255:12
termination
  211:23 256:8
  257:19,22,24
  258:10,20
  284:18
terms 89:17,19
  127:23 159:13
  203:9,23 204:3
  218:10 234:23
  284:12
testified 16:19,21
  17:7,8 19:4
  26:5 35:20

37:24 54:24
90:15 94:6 95:4
95:8 105:13
110:4 136:24
146:22 151:3
158:5 184:7
254:6 255:7
261:17 274:18
275:17
testify 10:23
  55:13,16,21
  56:2 113:25
  193:19
testifying 13:5
  35:14 51:24
  91:7
testimony 8:9 9:2
  9:24 10:17 11:4
  12:24 18:19
  20:18 26:10
  35:25 38:5
  46:24 47:13
  65:21 66:9,25
  70:15 76:13
  89:2 103:15
  104:3 105:19
  106:8 110:3
  111:23 112:12
  112:23 131:13
  141:17 142:2
  147:4 152:19
  153:20 156:10
  159:24 188:16
  189:13 191:16
  199:2 216:16
  216:21 217:17
  244:14 266:8
  271:16 275:18
  277:18 280:2,9
  292:7,10
thank 11:23 12:7
  19:25 36:19
  37:19 40:20
  57:4,17,19
  80:22,24 81:7
  82:15 87:14



100:4 118:7
122:3 124:5,22
128:17,22
130:8 153:19
153:23,25
155:24 173:18
179:13 192:18
195:3 197:21
210:7 211:3
217:12 228:17
228:21,22
229:3 230:24
257:14 258:12
276:12 278:17
**Thanksgiving**
171:5
**thereabouts**
148:8
**thereof** 180:17
**thereto** 273:14
**thereunder** 88:24
**thing** 68:3,11
76:22 91:3
100:14 119:15
174:6 193:13
203:14 216:17
216:22 272:5
283:21 287:24
**things** 18:12
104:2 131:4
179:10 232:7
247:14
**think** 10:8,20,25
11:9 15:8 16:13
21:25 23:14,18
27:24 30:17,22
33:22 34:14,15
36:3 37:16 40:3
46:11 59:19
61:17 65:14
70:3,11 75:24
78:12,14 90:15
91:4 94:18
103:22 105:16
105:23 110:6
111:10,13

112:4 115:11
116:2 128:6
133:3 135:21
141:8,18
165:20 167:9
169:10 171:2
173:15 174:4
185:14 189:19
191:7 200:13
200:17,24
201:4 204:12
207:25 218:5
219:3 221:7
224:5 229:20
231:20 232:21
238:21 240:18
245:22,24
247:7 253:18
254:22 263:8
274:4,18 276:6
277:3,7 280:17
281:9 283:18
288:15 289:5
**thinking** 169:20
169:22
**thinks** 200:24
**third** 8:6 265:22
**thought** 11:18
64:6 89:3
130:23 135:17
143:3 145:10
145:22 150:6
174:10 175:13
254:3 274:19
275:3
**thousand** 111:8
**three** 22:3 79:20
107:18 166:17
166:19 188:9
225:14 226:16
261:12
**till** 191:18
**time** 1:11 7:2
10:9 12:7 18:25
20:7,13 21:10
22:14 24:11

25:23 26:3 29:3
29:9 30:10
32:17,21 38:21
40:9,23 44:7,8
47:4 48:19
58:16 66:12
68:3,16 73:13
73:16 74:7
75:23 76:7,23
77:13,18 78:10
79:21 81:21
83:17,25 85:4
85:11 87:10
91:22 92:2,23
93:7,20 94:25
95:6,13 110:2
124:22 132:11
147:6 148:7
152:9,22,23
159:5,8,14,18
163:10,24
166:15 167:16
169:10,17
170:8 173:4,6
185:9,14,15,17
186:22 193:7
193:11 199:20
201:16,19,19
201:20 202:13
204:8 205:11
205:12,16
206:10 210:5
210:12 211:18
212:18,18
213:3,5 216:2
219:3 221:17
221:22 222:12
224:18 226:3
226:20 227:3
227:10,25
231:7 232:19
233:19 234:5,6
237:9 238:17
239:9,15,18,23
240:11,24
241:6 242:22

244:3,8 246:3
249:5 250:24
254:4,14 263:3
263:7 265:22
266:18 268:7
268:15 269:22
274:2 276:2,16
277:23 284:10
286:12,21
287:12 288:24
291:25
**timeline** 140:15
**times** 5:9 34:21
34:25 41:9,18
149:6 162:6
181:13 182:4
182:18,19
209:5,10
229:19 238:14
261:17 283:12
288:20
**timing** 160:10
**title** 12:18
**today** 12:8 66:9
129:23 133:4
133:10 201:3
210:14,21
211:3 261:13
275:18 276:18
278:15 287:20
**Todd** 19:17
21:19 22:13,24
22:25 23:11
25:11,24 26:6
27:9,19 33:5,15
182:9,10
209:17 225:17
232:14
**told** 22:9 50:11
55:9 65:14 71:7
71:23 118:21
169:8 171:11
171:14 219:4
290:24
**tomorrow** 162:20
162:21 277:14

291:7,23
**top** 51:15 116:6
129:8 259:7,13
**Torello-Viera**
9:14 122:14
123:15 149:17
151:7 191:24
192:7,22
208:11 291:20
**total** 107:14
166:6
**totaled** 67:14
**touch** 94:20
281:10
**touched** 116:12
**track** 43:8 178:5
**traffic** 153:9
**transcribed** 1:16
**transcript** 292:9
**transfer** 25:14
53:21 117:7
139:13 188:2
**transferred**
53:24 287:3
**transition** 47:8
**transpired**
170:12
**trial** 77:11 78:14
78:20 79:3,15
97:23 98:6,7,12
98:21,22
233:13 286:22
286:24
**tried** 80:14 91:10
96:8,9 223:24
**trip** 165:11
**Triple** 243:17
**true** 44:11 67:18
96:4 134:20
152:24 153:8
160:6,7 184:12
214:14 231:25
232:5,6,11
239:5 247:5,6
249:9 264:14
264:24 265:9



268:21 269:3
275:21,22
286:14 292:10
**truth** 156:13,13
156:14
**try** 58:24 70:13
71:18 72:24
90:18 93:24
140:24 154:13
157:19 205:10
205:12 216:15
226:4 255:23
256:3,9 269:5
287:21
**trying** 34:4,11
63:23 65:9
70:14 72:7 73:5
74:4 77:21 78:2
79:4,9,12 80:12
81:3 93:14 96:6
110:18,19
217:20 258:5
262:21,24
264:8 271:19
**Ts** 281:7
**turn** 22:20 96:6
97:24 121:7
123:4 126:7
131:16 150:13
201:20 205:24
228:13 239:7
**turned** 43:18
238:19
**turning** 227:16
255:13
**twice** 34:24
238:22
**two** 22:2 52:7,13
55:7 70:9 73:14
75:16 79:22
104:22 106:11
113:2 114:22
115:13 179:10
217:4 222:19
225:4 227:4
240:24 241:11

**two-month**
202:16,18,25
241:5
**types** 15:6 104:2
133:19
**typically** 36:12
112:19
**typo** 258:21

### U

**ultimately** 239:8
269:5 271:12
**unable** 146:23
**underneath** 34:6
34:12
**understand** 4:16
20:24 27:8,17
31:12 48:16
49:6 63:24 65:9
70:15 72:7 77:4
78:19 79:4,10
79:12 81:3 88:4
119:4,8,11,16
119:19,22
135:9 137:8
162:24 174:25
186:14 195:2
197:9 211:6,24
222:13,18,23
272:13 285:4
**understanding**
21:13 22:7
26:22 27:4,5,6
28:21 49:13,19
53:15,16 62:25
65:6 69:18
71:21 77:14,15
85:19 86:3
87:16 90:3
96:18,23 120:7
120:14 133:15
133:20,23
141:20 160:25
164:6,11,16
177:11 186:15
187:8 193:5

195:24 198:10
199:23 209:2
216:8 223:20
225:21 226:5
226:23 227:14
270:4 282:6
285:16
**understandings**
217:3
**understands**
90:22
**understood** 98:4
99:17,22
131:14 132:9
132:16,17
174:18,24
**undertaking**
88:23
**unfortunate** 80:6
281:7
**unfortunately**
80:16 133:8
143:7 147:9
276:21
**unhappy** 201:17
205:14
**unit** 212:13,13
**unpaid** 71:6
239:22
**update** 210:2
**updated** 38:15
**ups** 249:23
**upset** 208:20
244:2,7
**urge** 216:23
**USA** 1:7 26:15
108:20 188:6
188:12 192:23
**use** 52:10,16
90:25 91:14
**usually** 152:10
153:5,11
230:17
**utility** 277:22
**utilize** 53:3
**utilizing** 52:11,19

### V

**vacated** 212:14
**vaguely** 67:9
147:22 173:3
**valid** 102:6
**variance** 89:17
102:5
**various** 105:12
236:24 254:8
277:5,6
**Vegas** 15:11 16:8
33:23 39:6
41:10 104:25
122:21 152:25
153:9 159:7
163:19,20
177:22 191:25
235:12 236:24
249:7 254:2
**Veneruso** 108:12
108:18 113:15
**Venice** 170:21
**venture** 15:11
252:21 284:14
**verify** 106:21
**versa** 11:8
**version** 115:25
**vest** 157:11
**vice** 11:7
**view** 257:3 258:6
**viewing** 14:3
17:8
**VINCENT** 2:16
**visibility** 84:8
**visit** 21:24 97:13
**vividly** 142:21
**voluntarily** 31:3
31:19

### W

**wait** 98:10
145:12 165:2
180:12 191:17
**waited** 227:10
**waiting** 40:9
154:18 155:8

**waive** 56:5 88:16
**waived** 56:12
116:23,25
**waiver** 89:18,21
**walk** 143:17
203:19
**walkway** 205:20
**want** 4:11,13,19
5:6,11,12,13,15
6:4,12 7:4 8:3
26:24 29:15
40:7 52:6 56:6
56:13 61:22
100:17 114:22
114:25 115:7
115:19 118:4
118:11 121:3,5
125:11 127:4
134:9 142:4
143:15,19
158:25 171:7
173:23 174:7
177:9 183:16
183:17 185:25
188:7 193:19
196:22 202:10
205:10 214:7
214:23 220:15
223:8 229:8,19
230:9,19,20
237:25 245:14
248:15 251:14
251:21 263:5
267:16 268:2
269:15 291:2
**wanted** 6:7 56:25
82:10 117:22
117:25 155:5
253:25 263:10
**wants** 27:22 28:6
28:6 130:24
131:6
**warning** 19:8
**warrantees** 284:4
**wasn't** 22:16,23
22:25 50:23



53:20 78:21
105:23 111:9
135:19 136:10
140:19 145:6
146:3 174:17
178:6 187:5,6
239:11 256:7
274:7 284:21
**waving** 241:18
**way** 11:12 35:21
36:10 48:9
64:11 72:23
80:9 96:21 97:3
97:9 101:14,22
146:16 151:13
156:7 168:17
170:2 218:13
219:5 239:10
252:18 257:21
260:15 265:20
266:4 286:25
292:15
**wear** 16:9
**Wednesday**
191:10
**week** 116:10
211:20
**weighing** 137:11
**weight** 137:12
**Weitzman**
212:14
**went** 22:2 63:6
71:18 90:5,8
163:18 165:13
216:3 239:22
254:7 271:21
**weren't** 7:19
98:25 106:24
250:6
**we'll** 40:12,14
58:24 128:10
130:5 158:21
169:14 209:22
214:18 228:19
291:23
**we're** 8:12 11:11

20:22 77:23
82:12 91:20
112:6 124:7
128:2,4,9
129:15,22
130:7 154:18
155:8 200:22
202:8 247:11
266:3,4 275:19
277:24 278:13
280:25 287:19
291:18
**we've** 40:16
122:9 129:6
140:3 149:21
191:9 211:16
220:8 277:21
**whatsoever**
21:24 77:17
78:9 79:25 82:6
269:18
**When's** 221:17
**White** 2:5,14
**wholesale** 171:21
**wife** 12:14,15,23
13:3,5,6 14:8
15:8,9 41:10,15
46:9 136:23
137:15
**wife's** 44:25
45:22 84:18
92:16
**win** 6:25
**winter** 36:11,14
106:3,7,14
107:10,24
110:10,15
112:16,18
113:6 138:12
153:11
**wire** 117:7
**wise** 199:13
**wished** 146:16
**wishes** 150:17
198:14
**withdraw** 7:17

255:23 256:9
262:21 264:18
273:7
**withdrawal**
271:10
**withdrawing**
7:23 269:6
**withdrawn**
264:16 268:24
**withdrew** 256:4
271:21
**witness** 3:3 4:5
4:25 8:5 11:16
20:24 28:23
32:2,24 34:20
49:9,22 51:10
54:12,19 55:7
57:4,12,15
61:24 62:12,18
63:4,13,25 64:9
64:21 65:5,18
72:9,14,18,22
73:22 74:16
77:6,25 78:17
79:13 81:13,16
81:20 84:15
85:22 100:4
113:24 114:6,9
114:14 115:3
116:22 117:11
117:20 118:15
121:13,20
122:3 123:25
124:21 128:17
136:20 137:22
144:4 145:14
148:5 151:24
152:15 153:22
153:23 154:21
155:2,19 156:4
156:15,21
157:22 158:2
167:2,20 168:4
168:12,20
170:23 171:2
171:14 172:6

172:12 173:2
173:14 174:20
180:15 182:16
196:9 199:8
200:7,9,23
203:16 234:22
240:7 241:23
243:9 244:20
248:18 259:14
260:5 261:5
268:2,5,10
270:3 271:4
272:10,14
274:24 275:7
276:18 277:5
277:19 278:9
280:13 281:2,8
289:18 290:7
290:20 291:10
291:11,17
**witnesses** 8:11,16
8:20,22 230:18
**Witness(es)**
292:7,11
**wondering** 62:19
206:9
**word** 39:25 133:6
155:20 157:13
157:18 227:21
229:12 259:11
266:2 283:17
**work** 15:15 41:2
41:5,13 135:2
155:21 156:20
170:5 197:18
214:23 232:7
233:7 261:2
**worked** 38:3
64:15 278:15
**working** 13:3
83:14 115:19
264:12
**works** 232:8
**world** 166:21
**worry** 224:14
283:13

**worth** 199:12,12
215:21 263:17
**wouldn't** 190:18
219:15
**write** 114:24
208:18 210:11
**writes** 108:18,24
192:21 208:19
210:19 257:16
258:7 259:8
262:12
**writing** 29:25
55:3 56:15,20
57:8 89:24
90:11 99:12,20
102:8 104:22
113:15 133:19
148:15 173:8
187:25 256:15
262:13 267:7
**writings** 120:6,13
120:17 121:10
133:14 134:11
**written** 95:5,11
123:21,23
141:11 220:8
**wrote** 31:8
**www.MagnaL...**
1:25

---

**X**

**X** 1:2,9 3:2

---

**Y**

**yeah** 37:12 38:17
41:6 52:2 77:25
93:4 107:9
160:15 161:9
161:16 163:7
165:20 181:9
182:14,19
185:15 186:5
187:9 196:6,11
237:3,6 239:3
251:2 254:22
**year** 90:7 97:23



104:19 105:8,8
105:22 106:10
112:24 113:5
120:25,25
122:23 171:4
186:7,7 212:8
228:8 246:5
248:7,10
**years** 79:20,22
122:22 172:11
177:25 186:6
225:14 226:17
234:7 236:20
236:25
**yesterday** 7:11
7:16 8:23 14:3
18:13,18 19:4
25:11 26:6
35:13 37:16,23
38:15 39:4
46:21 51:25
66:25 91:8
103:15 105:13
227:2 241:16
241:22
**York** 1:17 2:5,14
292:5
**Youssef** 235:24
**Yup** 70:21

—————
**Z**
—————
**Zileri** 15:11,25
16:5,10,22
19:24 22:2
24:10 25:15
26:25 36:25
39:5 41:3 48:3
48:4 53:2
122:20 134:25
139:14 140:5
143:15 146:12
149:24 177:8,9
177:18 178:5,7
179:4 183:7
192:8,23
201:23 210:13

211:21,25
212:5,9,12
218:14 219:21
221:2 225:19
227:4 231:23
235:12,17
236:7 238:8,10
244:10 249:7
250:8,22 251:9
252:22
**Zileri's** 210:21
210:22
**Zireli** 149:18
**Zoom** 1:15
129:22

—————
**$**
—————
**$10,000** 213:8
**$113,000** 142:20
**$140,000** 57:23
59:22 61:3,5
**$150,000** 202:17
202:24
**$160,000** 82:2
**$2** 169:11,11
**$200,000** 116:17
**$27,000** 104:18
**$30,000** 142:23
**$38,000** 42:21,25
43:6,17 44:12
59:8,15 60:3,8
61:6,23 62:8
63:11,21,23
64:18,23,24
65:3,13,25
66:10,22 67:4
68:4,12,18
70:18 71:5,8,11
71:15,19,22
73:8,8 140:18
140:20 141:2
141:22 279:9
279:16,23
**$400,000** 117:6
**$46,000** 104:6,9
**$46,255** 104:11

**$474,000** 67:14
**$512,000** 67:12
**$544,939** 105:18
**$63,000** 82:2
143:10
**$65,000** 58:7,10

—————
**0**
—————
**000634** 33:2
**01-18-0000-6180**
1:6
**06523** 156:25

—————
**1**
—————
**1** 94:16 95:23
96:5,21 100:21
101:6 125:20
147:18 148:7
149:23 240:23
241:9
**1st** 240:2
**1.1** 52:7 69:9
70:8 282:2
**1.2** 57:20
**1.3** 57:20
**1.4** 58:3 59:7
62:9 66:3 71:9
279:6
**1.7** 68:19 75:3
79:11 281:16
**1:00** 91:21 93:19
118:9 128:4
**10** 40:18 72:13
91:13,23 118:4
128:8 236:25
**10th** 72:19 141:5
**100** 109:15 125:5
139:17 196:10
286:15
**10601** 2:5,14
**10608** 18:10
**109** 108:5,5
**11** 89:10
**11/5/16** 259:18
**11416** 272:4
**119** 3:5

**12** 3:4 38:16
129:9 130:10
134:15 171:3,3
**12th** 292:25
**12-month** 127:13
135:2
**13** 48:6 72:13
83:6,22 85:12
107:8 110:14
113:16 141:9
170:25 275:21
**130** 103:12,13
**134,000** 241:11
**14** 22:18 97:20
182:4 255:9
**145** 3:4
**15** 23:13 34:2
38:8,9 39:4
92:10 125:14
161:12,20,22
204:14 209:18
**150** 2:9 203:25
**150,000** 142:12
**155,000** 142:12
**158** 3:6
**16** 146:25 161:20
161:20 260:13
**16th** 260:9
**17** 19:18
**1717** 156:23
**174** 276:6
**176** 272:2,22
276:7,11
**18** 18:23 30:6,9
75:25 93:13
130:25 212:16
273:13
**18-month** 94:3

—————
**2**
—————
**2nd** 208:2
**2.1** 48:10 100:24
101:3 125:18
**2.2** 35:16
**2.3** 95:17
**2.5** 115:15,19,23

**20** 160:19 166:18
212:17,25
**200** 2:5
**2010** 106:19
107:15
**2011** 35:17
106:20 150:4
238:18 239:14
273:13
**2012** 39:4 90:9
103:20 106:20
110:5 112:4,10
184:4 245:21
249:24 250:6
**2013** 35:17 36:8
83:22 105:17
105:22 106:2,3
106:6,7 107:4
107:10,15,24
108:17,22
109:8,13,20,21
110:9,10,21
111:19 112:2,7
112:8,14,17,19
112:20 113:14
134:14,14,15
142:6 158:25
160:19 163:15
164:2,15 165:8
165:11 167:14
175:22 180:21
183:24 185:21
187:15
**2014** 23:15 96:20
97:9,13 122:10
159:2 180:25
191:10 192:14
193:8 194:6
195:5,9,21
199:25 262:19
265:12 266:9
266:25 268:15
271:14 273:9
**2015** 21:6,25
32:13 33:7
34:12 48:13



92:10 93:7 94:9
97:2 125:15
129:9 130:10
131:3 160:23
161:3,8,15,23
161:25 163:6
209:16,18
213:10,23
215:10,14
240:24 241:9
260:13 262:23
272:24 274:16
**2016** 18:23 21:22
24:2 29:11 30:9
30:16 31:20
94:16 95:6,23
96:5,17,21 97:3
97:10,15,18,21
101:6 125:20
125:21 127:8
132:7 135:8,13
135:14,25
138:12 139:20
140:9,14
147:18 148:7
148:12,19
149:8,23
151:10 152:5
161:12 164:7
208:14 217:18
217:24 218:6
218:22 219:12
219:16,17,22
221:9,10,12,15
221:19 231:12
232:2,10,14
233:3,11,20
237:17,20
238:20 239:14
240:11
**2017** 221:24
222:5
**2018** 19:18 30:6
**2020** 1:10 292:25
**2021** 99:7
**21** 183:18 245:21

**23** 195:21 262:18
273:9
**231** 3:7
**236** 32:25
**240** 147:10,25
**25** 108:22 236:20
**250** 126:19
**251** 128:25 130:5
**26th** 207:24
**27** 1:10
**27th** 207:24
240:2
**276** 276:10,11
**28** 272:24 274:15

---
**3**

**3** 84:21 115:24
279:7
**3rd** 208:2
**3.1** 284:4
**3.2** 284:2
**3:30** 206:24
**3:45** 206:24
**30** 130:6 249:14
249:20
**3000** 2:9
**3087** 38:24
**31** 48:13 127:8
160:23 161:3,8
161:23
**31st** 58:21 163:8
**321** 41:22
**354** 39:2
**38** 206:21
**39** 206:22
**398,238** 117:6

---
**4**

**4** 116:5,6 122:10
**4.4** 52:17 69:6
281:23
**4/01/15** 240:25
**429** 245:5,10
**43** 246:17
**45** 204:21
**450** 168:9

**484** 251:20

---
**5**

**5** 108:17 109:20
**5:20** 291:25
**5:25** 276:24
**5:30** 276:19,22
290:25
**50** 67:20 92:17
**50,000** 213:7
**500** 111:7 168:9
**51** 121:11
**52** 187:10 209:11
**53** 187:11,11
**54** 191:4
**544** 256:23
**549** 262:6
**55** 18:9 138:16
170:15 181:4

---
**6**

**6** 51:21 87:21
278:21
**60606** 2:9
**624-6221** 1:24
**6584** 251:18

---
**7**

**7** 46:16 88:14
160:11,11
**7/15/2015** 211:15
**70** 246:18
**74,000** 212:24
213:8

---
**8**

**8** 92:6,7 101:25
125:11 191:10
213:23 221:8
**866** 1:24

---
**9**

**9** 83:14 86:18,22
148:12 149:7
149:18 152:5
221:8,19

**9th** 72:19 141:5
**9.3** 101:24 102:2
**9:00** 291:8
**9:25** 258:5
**9:30** 291:23
**9:40** 1:11
**9967** 256:21
**9968** 256:21



Page 1

AMERICAN ARBITRATION ASSOCIATION
--------------------------------------X
In the Matter of the Arbitration of

SARAH LLC, HALA SUBH, SUHAD ALBASHA,
BACHAR HAMAD AND AMAR HAMAD,
                              CLAIMANT,

          -and-          Case No.:
                         01-18-0000-6180

FORALL USA, INC.,

                         RESPONDENT.
--------------------------------------X

             DATE: October 28, 2020

             TIME: 9:36 a.m.



        ARBITRATION in the above

entitled matter, held Via Zoom,

transcribed by Magdalena M. Artiles, a

Notary Public of the State of New York,

held before Eugene I. Farber,

Arbitrator.




          Magna Legal Services
            (866) 624-6221
            www.MagnaLS.com



Page 2

```
1
2   A P P E A R A N C E S:
3
4   EUGENE I. FARBER
        ARBITRATOR
5       200 E. Post Road
        White Plains, New York 10601
6       Efarber@farberadr.com
7
8   POLSINELLI
        Attorneys for the Claimants
9       150 N Riverside Plz Suite 3000
        Chicago, Illinois 60606
10      BY: RODNEY L. LEWIS, ESQ.
            -and-
11      SOHIL M. SHAH, ESQ.
12
13  BLEAKLEY PLATT & SCHMIDT, LLP
        Attorneys for the Respondents
14      One North Lexington Ave
        White Plains, New York 10601
15      BY: STEPHEN J. BROWN, ESQ.
        SBrown@bpslaw.com
16          -and-
        VINCENT CROWE, ESQ.
17
18  ALSO PRESENT:
19  Amar Hamad
20  Palma Settimi
21  Sana'a Hussein
22  Chad Salsbery
23        *     *     *
24
25
```

Page 3

```
1
2                  I N D E X
3   WITNESS     EXAMINATION BY   PAGE
4   DR. B. HAMAD  MR. BROWN        4
5   DR. B. HAMAD  MR. LEWIS        66
6   TORELLO-VIERA MR. BROWN      86, 310
7   TORELLO-VIERA MR. CROWE      175, 310
8   TORELLO-VIERA MR. LEWIS       106
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1       CROSS-EXAMINATION OF DR. B. HAMAD
2          THE ARBITRATOR:  Good
3   morning.  Nice to see everyone.
4          Dr. Hamad, be reminded that
5   you're still under oath.
6          Maggie, will you read the
7   last question and answer.
8          (Whereupon, a portion of the
9   record was read back.)
10         MR. BROWN:  Just, I would
11  note for the record that Paolo
12  Torello-Viera is with us again
13  today.
14         THE ARBITRATOR:  Good
15  morning.  Okay.
16  B A C H A R   H A M A D, resumed and
17  testified as follows:
18  CROSS-EXAMINATION
19  BY MR. BROWN:
20      Q. Good morning, Dr. Hamad.  How
21  are you this morning?
22      A. Good.  How are you?
23      Q. Just fine.  Thank you.  I want
24  to go back to a document that your
25  counsel had put up on the screen and
```

Page 5

```
1       CROSS-EXAMINATION OF DR. B. HAMAD
2   you testified about.  I'm going to do
3   that right now.
4          MR. BROWN:  It's 21,
5   everyone.
6       Q. Doctor, can you see my screen?
7       A. Yes.
8       Q. Okay and this was an e-mail from
9   Luca Spano sent on January 17, 2013; do
10  you see that?
11      A. Yes.
12      Q. Okay.  Now, you indicated that
13  Forall never gave you any discounts
14  pursuant to this e-mail; is that right?
15      A. Yeah.  I think so.  They did
16  not.
17      Q. But you also testified that you
18  not -- actually, Sarah did not buy
19  anything in 2013?
20      A. We bought for the first season
21  in 2013.
22      Q. And -- but is it your position
23  that the -- there was no purchases that
24  should have been credited in 2013?
25      A. We testified that the second
```



1  CROSS-EXAMINATION OF DR. B. HAMAD
2  purchase was not done, only the first
3  one. And that was the end of 2012 for
4  '13.
5  Q. Okay. But your point, and you
6  disputed Mr. Spano's allocation on his
7  spreadsheet that had purchases in 2013,
8  right?
9  A. The purchase for 2013, the first
10  season happened at the end of 2012.
11  The one you talking about was for the
12  fall 20 --
13  THE ARBITRATOR: Dr. Hamad,
14  let's go back now. Just answer
15  the question. We want to finish
16  your testimony as soon as
17  possible.
18  Go ahead.
19  Q. The question is: You disputed
20  in your prior testimony that there
21  should be no purchases made by Sarah in
22  2013, right?
23  A. No. I didn't say this.
24  Q. Okay. So now you're saying that
25  there were purchases made in 2013?

1  CROSS-EXAMINATION OF DR. B. HAMAD
2  A. I'm not saying -- I'm saying
3  what I said before.
4  THE ARBITRATOR: Hold on.
5  That's a "yes" or "no."
6  Counselor, as I understand
7  it, the witness's testimony is
8  that the actual placement of it
9  was the end of 2012 for '13, but
10  the second collection in '13 was
11  not purchased by Sarah. Is that
12  correct, Dr. Hamad?
13  THE WITNESS: That's
14  correct.
15  THE ARBITRATOR: Let's go to
16  the next question.
17  Q. So you -- according to your
18  testimony, after this e-mail by Mr.
19  Spano, there were no purchases made by
20  Sarah; isn't that right?
21  A. That's right.
22  Q. So why would you expect a credit
23  to have been given to you or discount
24  given to you -- I'm sorry -- discount
25  on purchases after this date if

1  CROSS-EXAMINATION OF DR. B. HAMAD
2  according to you there was no purchases
3  made?
4  A. Well, the conformation was
5  before the end of '12, before we bought
6  for the first season of '13. That came
7  later on.
8  Q. Oh. So your testimony is that
9  the discounts should have been applied
10  prior to this e-mail; is that right?
11  A. I'm -- yes or no? The answer is
12  yes.
13  Q. Okay. Do you see the language
14  of this e-mail, "Dr. Hamad, this is to
15  confirm and make official that as per
16  company approval, the following
17  discounts will be given to Sarah LLC
18  going forward"; do you see that?
19  A. I see.
20  Q. Do you understand that language,
21  sir?
22  A. I do.
23  Q. You -- do you have an
24  understanding of the language "Will be
25  given going forward." Does that -- so

1  CROSS-EXAMINATION OF DR. B. HAMAD
2  that, to you, tell you that it's
3  something in the past or in the future?
4  A. Should I say yes or no or should
5  I explain how I understand it?
6  THE ARBITRATOR: He asked if
7  it's past or future, and you can
8  say "past" or "future" or you
9  can't answer the question.
10  A. That's for '13, yes.
11  Q. For the future, right?
12  A. No. That's for '13. It says on
13  the first line "For '13."
14  Q. '13 wasn't my question. I said,
15  "past," "future," or you don't know.
16  That should be your answer per Mr.
17  Farber's instructions.
18  THE ARBITRATOR: Why don't
19  you --
20  A. Past.
21  THE ARBITRATOR: Okay. We
22  got the answer. Go ahead.
23  Q. Isn't it true that at this same
24  time Forall applied a $60,000 credit to
25  Sarah in its account?



1    CROSS-EXAMINATION OF DR. B. HAMAD
2    A. For what?
3    THE ARBITRATOR:  Do you know
4    if a $60,000 credit was applied
5    around this time?
6    THE WITNESS:  I don't know.
7    THE ARBITRATOR:  That's a
8    "no," you don't know?
9    THE WITNESS:  I don't know.
10   Q. Who would know that?
11   A. The accountant.
12   Q. And what's their name?
13   A. Kim Sampson.
14   Q. Kim Sampson?
15   A. Yes.
16   Q. Would Palma Settimi also have
17   that information?
18   A. I don't know.
19   Q. Do you see here where Mr. Spano
20   says, "SS2015 season."  Do you know
21   what "SS" means?  What does that refer
22   to?
23   A. No.
24   Q. "S slash S," do you know what
25   that -- what he's referring to there?

1    CROSS-EXAMINATION OF DR. B. HAMAD
2    A. No.
3    Q. Did you write back to Mr. Spano
4    and say, "I don't know what you're
5    talking about"?
6    A. No.
7    Q. Okay.  So I'll represent that "S
8    slash S," within your correspondence
9    between Forall and Sarah and many
10   points of time is referring to spring,
11   summer, okay?  Does that make sense to
12   you?
13   A. That would make sense, yes.
14   Q. Okay.  "From the spring, summer
15   2015 season and followings:  No more
16   discounts will be granted.  Thus, we
17   will return to the regular contractual
18   terms that should have started,
19   according to the signed contract, since
20   the S slash W 2013, '14 season"; do you
21   see that?
22   A. Yes.
23   Q. Do you know what "F slash W"
24   means?
25   A. Fall, winter.

1    CROSS-EXAMINATION OF DR. B. HAMAD
2    Q. So isn't Mr. Spano indicating to
3    you that they're going to work with you
4    by giving you additional discounts on
5    products, but that's going to come to a
6    close on a certain date, namely spring,
7    summer 2015?
8    A. Yes.
9    Q. Does anywhere in this e-mail,
10   does Mr. Spano say to you that the
11   $900,000 minimum purchase requirement
12   is waived or modified?
13   A. He repeated multiple times.
14   THE ARBITRATOR:  He didn't
15   ask you that.
16   A. No.
17   THE ARBITRATOR:  That's all.
18   You have the answer.  Go
19   ahead.
20   Q. And nowhere in writing at any
21   time did anybody from Forall tell you
22   that in that -- that the minimum
23   purchase requirement was waived or
24   otherwise modified, did they?
25   THE ARBITRATOR:  Counselor

1    CROSS-EXAMINATION OF DR. B. HAMAD
2    --
3    A. No.
4    THE ARBITRATOR:  Let me just
5    say, it's better to ask the
6    question in the affirmative
7    because, "Nobody at any time," he
8    says, "No," that actually means
9    yes.
10   MR. BROWN:  Thank you,
11   Mr. Farber.
12   THE ARBITRATOR:  You may
13   want to patch it up.  It's up to
14   you.
15   Q. Did anyone at Forall ever put in
16   writing to you that the minimum
17   purchase requirement under the license
18   agreement was waived or otherwise
19   modified?
20   A. No.
21   Q. And do you see here he says, "A
22   new shipment has been sent two days ago
23   containing spring S slash S 2013."
24   Spring, summer 2013; do you see that?
25   A. Yes.



| | Page 14 |
|---|---|

1     CROSS-EXAMINATION OF DR. B. HAMAD
2     Q. Do you recall the -- when Forall
3 would invoice Sarah for products when
4 that invoicing occurred?
5     A. No.
6     Q. Isn't it true that it occurred
7 upon shipping the invoicing would issue
8 from the accounting department [sic]?
9     A. I don't know.
10     Q. Okay.  Just to be clear, the sum
11 and substance of this e-mail is that
12 Forall was agreeing to additional
13 discounts to assist Sarah in its
14 profitability, but it was anticipated
15 by the very terms here that that would
16 slowly wind down and the parties would
17 get back to the agreement terms as it
18 relates to the discounts, right?
19     A. It could be.
20     Q. But in no time did they waive
21 the minimum purchase requirement,
22 right?
23          MR. LEWIS:  Objection.
24          THE ARBITRATOR:  What's the
25 objection?

| | Page 15 |
|---|---|

1     CROSS-EXAMINATION OF DR. B. HAMAD
2          MR. LEWIS:  That calls for a
3 legal conclusion.  That's what
4 were determining here in this
5 arbitration.
6          THE ARBITRATOR:  Okay.  I'll
7 take the witness's answer not as
8 a legal conclusion, but what his
9 lay understanding was.
10          You can answer the question.
11          THE WITNESS:  Yes or no or
12 explain?
13          THE ARBITRATOR:  The
14 question is:  Up to now, did
15 they, at any time, waive the
16 $900,000 minimum purchase
17 requirement?
18          THE WITNESS:  Yes.
19          THE ARBITRATOR:  Okay.
20          That's your answer.  Go
21 ahead, next question.
22     Q. And that waiver -- but that
23 waiver was never in writing, was it?
24          MR. LEWIS:  Objection.
25     A. Yes.

| | Page 16 |
|---|---|

1     CROSS-EXAMINATION OF DR. B. HAMAD
2          THE ARBITRATOR:  Hang on.
3 Dr. Hamad, once again --
4          THE WITNESS:  Okay.
5          THE ARBITRATOR:  If you're
6 going to jump in with an answer,
7 then you're not letting your own
8 lawyer help you.  So you have to
9 give him an opportunity to say
10 the word "objection".  Next
11 question.
12          MR. BROWN:  I did the
13 negative question there again and
14 it's confusing, so I just want to
15 restate that question.
16          THE ARBITRATOR:  All right.
17     Q. The waiver that you're referring
18 to, or you believe that occurred, that
19 was not in writing was --
20          MR. LEWIS:  Objection.
21          THE ARBITRATOR:  What's the
22 objection?
23          MR. LEWIS:  If you're asking
24 him from a legal standpoint, I
25 object to it.

| | Page 17 |
|---|---|

1     CROSS-EXAMINATION OF DR. B. HAMAD
2          THE ARBITRATOR:  Same
3 ruling.  Overruled.
4          You can answer.
5     A. No.
6     Q. Isn't it true that Forall wanted
7 efficient inventory to be in the store
8 so that --
9          THE ARBITRATOR:  Before you
10 get to that question, let me just
11 follow up on the last one,
12 Mr. Brown.
13          Look, Dr. Hamad, I've seen
14 all these contract documents and,
15 you know, it seems to me that you
16 and Forall had your lawyers and,
17 you know, and you were pretty
18 careful with a lot of the deals,
19 including the Italnord deal, and
20 later on when Forall, itself,
21 began the management arrangement.
22 You always did formal legal
23 agreements.
24          So my question to you is:
25 Why wasn't the waiver, as you



| | |
|---|---|
| Page 18 | Page 19 |

CROSS-EXAMINATION OF DR. B. HAMAD

1     CROSS-EXAMINATION OF DR. B. HAMAD
2 understood it, the waiver of the
3 $900,000 minimum purchase
4 requirement, why didn't you try
5 to have that put in writing as
6 well?
7     Did you hear my question,
8 Dr. Hamad?
9     THE WITNESS: Yes, I did.
10     THE ARBITRATOR: Okay. And
11 I can't see your face.
12     MR. BROWN: He's not reading
13 anything in that regard, is he?
14     THE ARBITRATOR: Did you
15 hear my question, Dr. Hamad?
16     THE WITNESS: Yes, I did.
17     THE ARBITRATOR: Okay.
18 What's your response.
19     THE WITNESS: You're asking
20 why did it not put the 900 in the
21 --
22     THE ARBITRATOR: The waiver,
23 you said you understood there was
24 a waiver of the 900, that it was
25 not in writing, and I'm asking

1     CROSS-EXAMINATION OF DR. B. HAMAD
2 you, given that I see other
3 writings for other things, why
4 wasn't this put in writing?
5     THE WITNESS: Because we're
6 -- from the beginning was -- the
7 deal was just to keep the lease
8 under our name [sic]. The whole
9 idea behind this was for the
10 lease to be legal and they can
11 operate under my lease.
12     The 900 issue never come to
13 the surface the whole five years.
14     THE ARBITRATOR: I just
15 don't understand the response.
16 The contract, as you saw, the
17 original license agreement
18 clearly has a statement about the
19 minimum purchase requirement of
20 $900,000 and, you know, it has --
21 has the length of the -- of the
22 term and all kinds of other
23 terms. And my question is --
24 maybe I'm just not grasping what
25 you're saying.

| | |
|---|---|
| Page 20 | Page 21 |

1     CROSS-EXAMINATION OF DR. B. HAMAD
2     If there was a change and
3 that was waived, that $900,000,
4 and you testified about the
5 meeting in -- I think it was
6 November of '13. The meeting in
7 Venice. You know, I heard about
8 it and you were there, your
9 bother was there.
10     My question simply is: Why
11 was that not put in some writing?
12 If not a formal contract, an
13 e-mail, something like that.
14     THE WITNESS: The answer is:
15 This purchasing agreement number
16 was never talked about. They
17 told me -- I asked Luca and I
18 asked all the company at that
19 time, why this is the license
20 agreement back then. He said,
21 "If Simon would take a look at
22 that contract, he will think that
23 this is Sarah operating the store
24 again under Sarah's name."
25 Because if they put their name or

1     CROSS-EXAMINATION OF DR. B. HAMAD
2 they change the contract, there
3 will be change and he might evict
4 him from the store. That's why.
5     We did not pay attention to
6 -- we did not bring it to the
7 surface because for them was not
8 an issue. They said, "Well this
9 is the way the original contract
10 [sic]. Leave it the way it is,
11 so Simon will not find out we are
12 trying to take over the store."
13 That's the answer.
14     THE ARBITRATOR: Okay. All
15 right. Thank you.
16     Go ahead, Mr. Brown.
17     MR. LEWIS: Mr. Farber, if I
18 may, before Mr. Brown continues,
19 I think Dr. Hamad thinks you're
20 asking about the period with
21 Italnord, not the period in
22 November 2012 when they came
23 back.
24     THE ARBITRATOR: You can
25 patch it up when you do your



Page 22

CROSS-EXAMINATION OF DR. B. HAMAD
1
2  examination if you think that,
3  you know, he was confused.
4       Go ahead, Mr. Brown.
5  Q. Doctor, isn't one of the
6  purposes that there was a minimum
7  purchase agreement agreed to in the
8  license agreement and required was so
9  that the store would have sufficient
10  inventory at all times to sell product
11  and make money?
12       A. No.
13  Q. And isn't it true that in the
14  high-end luxury line that it's
15  imperative to have sufficient product
16  and new looks in the store at all times
17  so that customers buy product?
18       A. Yes.
19  Q. And isn't it true that Pal
20  Zileri operated in the luxury fashion
21  space?
22       A. Yes.
23  Q. And the spring, summer, fall
24  winter lines, those would be constantly
25  updated every year, would they not?

Page 23

CROSS-EXAMINATION OF DR. B. HAMAD
1
2       A. Not necessarily.  But there
3  would be new lines issued every year,
4  correct.  Generally, yes.
5  Q. So there would be some staples
6  such as suits that may carry over from
7  season to season, but there were other
8  new line products that were generated
9  spring, summer, fall, winter, every
10  year?
11       A. Correct.
12  Q. So that by offering the discount
13  to assist with the store that Sarah was
14  operating, Forall was not agreeing to
15  have less inventory in the store,
16  correct?
17       A. That's not correct.
18  Q. What was incorrect about that?
19       A. Because it depends if they have
20  the inventory to ship or not.  Some --
21  you know, sometimes they do not have
22  the items and/or the items come late
23  instead of coming for the winter, will
24  come in the spring for the following
25  season, will be too late, and you

Page 24

CROSS-EXAMINATION OF DR. B. HAMAD
1
2  outdated.  The fashion is not there
3  anymore.  They different style [sic].
4  Q. It's your testimony that Forall
5  didn't get you product in time for the
6  selling seasons?
7       A. Yes.
8  Q. When was that?
9       A. First season and third season.
10  Q. So first season being the
11  September 2011 season?
12       A. Yes.
13  Q. When did you get that product,
14  that line?
15       A. I think end of September.  If
16  I'm not mistaken, end of September,
17  beginning of October.  It was continued
18  shipment.
19  Q. Isn't it true that in the
20  industry, the shipment occurs during a
21  period of time, generally speaking, a
22  couple of months so there's an influx
23  of products as the selling season keeps
24  up?
25       A. Yes.

Page 25

CROSS-EXAMINATION OF DR. B. HAMAD
1
2  Q. Is it your testimony that you
3  didn't have all of the -- all of the
4  product for the fall, winter at the
5  beginning of September?
6       A. Yes.
7  Q. And that --
8       A. We did not.  Yes.
9  Q. So you considered that a -- a
10  failing on the part of Forall.
11       A. Yes.
12       THE ARBITRATOR:  Wait until
13  he finishes the question.
14       A. Okay.
15  Q. You considered that a failing on
16  the part of Forall, not industry
17  practice?
18       A. Fail on Forall, yes.
19  Q. Bear with me.  I'm just going to
20  another document.
21       Dr. Bachar, at any time prior to
22  August 1st when Forall was served with
23  a notice of eviction by Simon's
24  counsel, August 1, 2016, did Sarah
25  advise Forall that it had surrendered



1     CROSS-EXAMINATION OF DR. B. HAMAD
2  the lease and was stipulated to an
3  eviction proceeding?
4     A. I don't recall.
5     Q. Can you point to any documents
6  in your possession or your counsel's
7  possession that provided any notice to
8  Forall that you had canceled the lease
9  and stipulated and consented to an
10 eviction proceeding?
11    MR. LEWIS:  Objection.
12    THE ARBITRATOR:  What's the
13 objection?
14    MR. LEWIS:  The
15 characterization of stipulating
16 to an eviction proceeding.
17    THE ARBITRATOR:  What's
18 wrong with that?  Someone can do
19 that.
20    MR. LEWIS:  It's not
21 accurate.  There's nothing in the
22 record that reflects that, unless
23 Mr. Brown has something or I can
24 deal with that on re-direct.
25    THE ARBITRATOR:  Overruled.

1     CROSS-EXAMINATION OF DR. B. HAMAD
2  If he knows of such a thing, he
3  can answer, or if he doesn't
4  know, he can say he doesn't know.
5     You can repeat the question,
6  Mr. Brown, or have it read back.
7     MR. BROWN:  I would love for
8  it to be read back.
9     Maggie, can you handle that?
10 Thank you.
11    (Whereupon, a portion of the
12 record was read back.)
13    A. I don't recall.
14    Q. But can you point to any
15 documents?  As you sit here today, do
16 you know if any exist?
17    A. I cannot remember.
18    Q. As you sit here today, you can't
19 point to any documents that provide
20 that kind of notice to Forall, can you?
21    A. It might be there, but I don't
22 know.  I don't recall.
23    Q. Why didn't you tell Forall
24 that -- "Oh, by the way, we've canceled
25 the lease and we've consented to an

1     CROSS-EXAMINATION OF DR. B. HAMAD
2  eviction.  You guys need to get out"?
3     A. I think the lawyer handled it,
4  and think he has some document.
5     Q. But you didn't pick up the phone
6  and call Paolo who had been running
7  this store now for you for well over a
8  year, in good faith, did you?
9     A. He was not running the store for
10 us.  He was running the store for
11 himself.  And we called him multiple
12 times.  He hang up [sic].  He was not
13 answering the phone the whole six
14 months before that.
15    Q. It's your testimony that he
16 would had hang up the phone on you --
17    A. Yes.
18    THE ARBITRATOR:  Let him
19 finish the question, all right?
20 The testimony is that whenever he
21 called, Paolo he hung up the
22 phone in the few months
23 beforehand; is that right?
24    THE WITNESS:  That's right.
25    Q. Did you ever call him to tell

1     CROSS-EXAMINATION OF DR. B. HAMAD
2  him, "We've surrendered the lease"?
3     A. Whenever we call him, he doesn't
4  answer.  He hang up again.  The same
5  answer.
6     Q. So your testimony is that you
7  did call him to advise him of that, but
8  he hung up on you?
9     A. Yes.  For the last six months,
10 whenever we call him, he doesn't
11 answer.
12    Q. Did you ever send him an e-mail
13 saying, "We've canceled the lease"?
14    A. That was handled by the lawyer.
15    Q. Do you know if the management
16 agreement had any specific provisions
17 that precluded Sarah from cancelling
18 the license during the --
19    A. That was handled by the lawyer.
20    THE ARBITRATOR:  He asked
21 you about your knowledge of
22 whether there was a provision in
23 this regard.
24    THE WITNESS:  I don't
25 remember.



| Page 30 | Page 31 |
|---|---|

Page 30

1    CROSS-EXAMINATION OF DR. B. HAMAD
2        Q. You don't know?
3        A. I don't remember.
4        Q. Okay.  But that's different than
5    "I don't remember."  So you don't know,
6    as you sit here today, if the
7    management agreement had a provision
8    that specifically precluded the
9    surrendering or cancellation of lease
10   during the term of the management
11   agreement?
12       A. I don't remember if I read it or
13   not.  I don't remember it.
14       Q. I'm going to show you the
15   statement of claim in this proceeding,
16   which was filed by Sarah.
17       And the exhibit should be right
18   up front and center, Exhibit 1, maybe.
19   Exhibit 101, Claimant's Demand for
20   Arbitration.  Okay, sir?  Can you see
21   my screen now?
22       A. Yes, I can.
23       Q. This allegation at paragraph six
24   says, "In or about 2013, Sarah LLC
25   became aware that prior to 2011, Forall

Page 31

1    CROSS-EXAMINATION OF DR. B. HAMAD
2    had previously franchised or licensed
3    the operation of Pal Zileri menswear
4    retail store in Las Vegas, Nevada, and
5    that such store had failed to operate
6    profitably and had been shut down and
7    closed by its operating
8    franchisee/licensee."  Do you see that?
9        A. Yes, I do.
10       Q. And then this allegation states,
11   "These facts have been withheld and
12   concealed by Forall in its negotiations
13   with Sarah LLC in 2011 to open the Pal
14   Zileri store at the Forum Shops."  Do
15   you see that?
16       A. Yes, I do.
17       Q. Is this paragraph true?
18       A. It is true.
19       Q. So your testimony today is that
20   you or Sarah only learned in 2013 that
21   there had been a prior Pal Zileri store
22   in Las Vegas prior to the Sarah store?
23       A. '13 or '12, I don't know, but
24   around that time, yes.
25       Q. Isn't it true that when you

Page 32

1    CROSS-EXAMINATION OF DR. B. HAMAD
2    approached Forall in 2010, one of your
3    business partners had worked at that
4    store for over 10 years and you were
5    intimately familiar with its
6    operations?
7        A. That's not true.
8        Q. Do you see Paragraph 13?  It
9    states, "On or about August of 2016,
10   and despite having assumed full
11   responsibility for the Pal Zileri
12   store, business, and the Forum lease,
13   Forall had defaulted in its monthly
14   payment to rent to the landlord"; do
15   you see that?
16       A. Yes.
17       Q. "In consequence of Forall's
18   default and failure to pay monthly
19   rents under the Forum lease, the
20   landlord commenced eviction action and
21   terminated the Forum lease for the Pal
22   Zileri store then operated by Forall."
23   Do you see that?
24       A. Yes.
25       Q. Is that paragraph true?

Page 33

1    CROSS-EXAMINATION OF DR. B. HAMAD
2        A. True.
3        Q. And you read this before it was
4    -- it was filed with the Triple A on
5    your behalf?
6        A. By the lawyer, yes.
7        Q. Do you know if Simon sent Forall
8    rent money back after it evicted them
9    in August or September 2016?
10       A. Say it again.  I'm sorry.
11       Q. Do you know whether Simon had to
12   return rent money to Forall after
13   Forall was evicted because they had
14   paid the August rent already?
15       A. I don't know that.
16       Q. Going back to the management
17   agreement, sir, and bear with me.  See
18   Section 5.10 of the management
19   agreement between Forall and Sarah.  It
20   says, "The management agreement shall
21   not alter or amend the party's rights
22   and obligations under the license and
23   retail operating agreement between
24   Sarah and Forall dated March 2011 and
25   Sarah's obligation under the lease.



| Page 34 | Page 35 |
|---|---|

**Page 34**

CROSS-EXAMINATION OF DR. B. HAMAD

1
2  Except that Forall shall assume all
3  lease payments during the term."  Do
4  you see that?
5      A. Yes.
6      Q. Didn't Forall make all rent
7  payments during its management term?
8      A. Late most of the time.
9      Q. That's not my question.  Did
10  they make them?  Were they paid?
11      A. Late, yes.
12      Q. Didn't the rent invoices
13  continue to come from Simon to Sarah
14  during the term that it was -- Forall
15  was operating the store?
16      A. Yes.
17      Q. And Sarah or someone for Sarah
18  would forward those invoices on to
19  Forall for payment, right?
20      A. Yes.
21      Q. And there were delays in when
22  Sarah would forward those to Forall,
23  were there not?
24      A. No.
25      Q. You see Section 5.12?

**Page 35**

CROSS-EXAMINATION OF DR. B. HAMAD

1
2      A. Yeah.
3      Q. "The company shall not transfer
4  or surrender the lease without Forall's
5  prior written consent and agreement."
6  Do you see that?
7      A. Yes.
8      Q. Didn't you, in fact, surrender
9  the lease during the term of the
10  management agreement without notice or
11  consent to or from Forall?
12      A. We surrendered the lease because
13  Simon didn't want Forall at all.
14          THE ARBITRATOR: He didn't
15      ask the reason.  He just asked
16      whether or not that happened.
17          THE WITNESS:  Let me read it
18      again.
19          THE ARBITRATOR:  The
20      sentence is:  "The company shall
21      not transfer or surrender the
22      lease without Forall's prior
23      written consent and agreement,"
24      and he's asking if Sarah did that
25      or not.

**Page 36**

CROSS-EXAMINATION OF DR. B. HAMAD

1
2          THE WITNESS:  We did.
3      Q. So how was it true in your
4  statement of claim that you've alleged
5  Simon evicted Forall because of
6  nonpayment of rent?
7      A. I don't know if you read the
8  e-mail about the six-month or you
9  forget completely about it, that was
10  the purpose for the six-month to
11  surrender the lease [sic].
12      Q. That answer wasn't at all
13  responsive to my question.
14      A. That answers the question.
15          MR. BROWN:  Maggie, can you
16      read that back, please.
17          (Whereupon, a portion of the
18      record was read back.)
19      A. We did surrender the lease
20  without their inform [sic].
21      Q. But you alleged in your
22  pleadings in this case that Simon
23  evicted Forall for nonpayment of rent;
24  is that true?
25      A. One of the reasons.

**Page 37**

CROSS-EXAMINATION OF DR. B. HAMAD

1
2      Q. What other reason you alleged in
3  your pleadings in this case --
4      A. Not performing very well.
5          THE ARBITRATOR:  Hang on.
6      Q. What other reasons -- you said
7  other reasons -- what other reasons did
8  you allege in your pleading that Simon
9  evicted Forall?
10      A. Very poor performance on their
11  part in the store.
12      Q. That's alleged in your pleading?
13      A. That's a reason.
14      Q. Did you think it relevant for
15  this case to provide the arbitrator
16  with a full set of facts to disclose
17  that you had surrendered and canceled
18  the lease and stipulated to an eviction
19  proceeding?
20      A. Can you repeat the question
21  again.
22          MR. BROWN:  Maggie, can you
23      read it back.
24          (Whereupon, a portion of the
25      record was read back.)



Page 38

CROSS-EXAMINATION OF DR. B. HAMAD
1    CROSS-EXAMINATION OF DR. B. HAMAD
2    A. From your part or my part?
3         THE ARBITRATOR: Well, from
4    anyones part.  Did you think it
5    was relevant to tell me that?
6         THE WITNESS: Yes.
7         THE ARBITRATOR: Okay.
8    Q. And you failed to do so, right?
9    A. I failed to do what?
10   Q. To make mention of that in your
11   pleadings and representations to the
12   Triple A?
13   A. I failed to do it.
14        THE ARBITRATOR: Next
15   question, Mr. Brown.
16        MR. BROWN: Arbitrator
17   Farber, I'd like to make another
18   run at the business proposal
19   plan, and I do that because it
20   goes to the credibility of this
21   witness.  And the documents
22   should have been produced, but
23   was not in discovery by the
24   claimants.  It was subject to a
25   specific request made by

Page 39

1    CROSS-EXAMINATION OF DR. B. HAMAD
2    respondent and bringing that up
3    on my screen now.
4         And that was Request Number
5    9, "All documents relating to the
6    claimant's due diligence and
7    review of the business
8    opportunity relating to the
9    opening and operating of the Pal
10   Zileri store in or around 2010,
11   2011," that's a very specific
12   request.
13        The business proposal plan
14   that was submitted should have
15   been provided.  I acknowledge the
16   fact that this plan resided with
17   Ms. Settimi; however, it was
18   sent to Mr. Spano who was no
19   longer with the company when this
20   action was commenced, and I did
21   not have the ability to review
22   his e-mails.
23        THE ARBITRATOR: So I'm not
24   sure what you're asking me.
25        MR. BROWN: I'm seeking to

Page 40

1    CROSS-EXAMINATION OF DR. B. HAMAD
2    admit as an exhibit the business
3    proposal plan which was produced
4    on the eve of this proceeding.
5    It was produced by Ms. Settimi to
6    me, I then forwarded it to Mr.
7    Lewis and attempted to have that
8    document admitted as --
9         THE ARBITRATOR: All right.
10   Let's hear if Mr. Lewis objects
11   or not.
12        MR. LEWIS: I certainly
13   object, Mr. Farber.  This is a
14   document, if I understand what it
15   is, that was sent to me, I
16   believe, it was Sunday before
17   trial.  It may have been Saturday
18   before the arbitration began.
19        We -- I don't know how this
20   document -- how they -- how
21   Mr. Brown can attest to the
22   authenticity of the document.
23   And if it was in       Ms.
24   Settimi's possession, it should
25   have been produced pursuant to

Page 41

1    CROSS-EXAMINATION OF DR. B. HAMAD
2    our discovery request, and that
3    wasn't produced by Forall either.
4         And again, just to share the
5    documents we -- I think I shared
6    with Mr. Farber, we came across a
7    few documents from Simon, we
8    received some documents from
9    Simon and we disclosed to Forall
10   ten days prior to the
11   arbitration, and those have not
12   been submitted into evidence yet.
13   This is a document we received
14   Saturday or Sunday right before
15   arbitration.
16        THE ARBITRATOR: Anything
17   further to argue to me, Mr.
18   Brown?
19        MR. BROWN: Yes.  His only
20   objection here is like a
21   timeliness argument.  There's no
22   prejudice here.  They were
23   directly asked for this document,
24   and documents like it in -- on
25   July 18, 2018.



Page 42

```
1        CROSS-EXAMINATION OF DR. B. HAMAD
2       Here's my document demand.
3   They didn't produce it, and it
4   goes directly to the credibility.
5   This witness is sitting here
6   saying he didn't know about the
7   prior operation and in his
8   business plan, which will layout
9   clearly his business plan, should
10  have been produced.  It puts a
11  lie to that testimony.
12       THE ARBITRATOR:  No.  I
13  think life is a two-way street,
14  and my ruling is that if the
15  document has not been produced in
16  a timely manner previously, I'm
17  not going to let it in.  And I
18  think Mr. Lewis is correct, and
19  I'm going to sustain his
20  objection.  I'm not going to take
21  the document.  Go ahead.  Next
22  point, Mr. Brown.
23       MR. BROWN:  You know what,
24  I'm going to ask for a minute to
25  collect my thoughts.
```

Page 43

```
1        CROSS-EXAMINATION OF DR. B. HAMAD
2       THE ARBITRATOR:  All right.
3       (Whereupon, a recess was
4   taken at this time.)
5       THE ARBITRATOR:  Mr. Brown,
6   we can't see you at this point.
7       MR. BROWN:  Yes.  I'm coming
8   back on.  Thank you very much for
9   that.
10       THE ARBITRATOR:  Do you have
11  any further questions?
12       MR. BROWN:  I do.  I'm going
13   to -- Forall bates number 126,
14  I will get you the corresponding
15  joint exhibit.  This was one of
16  the documents that was objected
17  to, but it came into evidence.
18  Exhibit 120, which might be in
19  respondent's book, Mr. Farber,
20  and it was on screen.  Can you
21  guys see that?  Am I sharing it?
22       THE ARBITRATOR:  Not yet.
23  Q. Dr. Hamad, please take a moment
24  and look at this letter, and do you see
25  the date of this letter?  Do you recall
```

Page 44

```
1        CROSS-EXAMINATION OF DR. B. HAMAD
2   sending this --
3       A. Yes.
4       Q. I didn't hear your answer.
5       A. I have to read it at first.
6       Q. Okay.  Sorry.
7       MR. LEWIS:  Can you repeat
8   which exhibit number this is?
9       THE ARBITRATOR:  He said
10  it's 120.
11       MR. BROWN:  120.  It's in
12  the respondent's set of R books.
13  It came in.
14       A. Okay.
15       Q. And this was only a couple of
16  days or two weeks after that e-mail Mr.
17  Spano had sent to you that we were just
18  looking at, right, same time frame?
19       A. For the -- which e-mail you
20  talking about [sic]?
21       Q. The one that we looked at on the
22  discounts.
23       A. Could be.
24       Q. Do you see here you state,
25  "Unfortunately, as with the predecessor
```

Page 45

```
1        CROSS-EXAMINATION OF DR. B. HAMAD
2   Pal Zileri store in Las Vegas, Sarah
3   has found that operating the store in
4   profitable manner would be a near
5   impossibility."
6       A. Yes, I see.
7       Q. Isn't it true that you knew
8   about that Pal Zileri store prior to
9   entering into the license agreement in
10  2011?
11       A. We were talking about our
12  operation.  We were not talking about
13  the old operation.
14       THE ARBITRATOR:  Let's focus
15  on the question.  The question
16  was:  Is it not true therefore
17  that you knew about the prior
18  store in Las Vegas?
19       THE WITNESS:  I don't think
20  around that time we knew about
21  it.  I'm not sure.
22       Q. I'm going to go to another
23  document.  Exhibit Number 110.  Let me
24  just pull it up on my screen.
25       Can you see my screen,     Dr.
```



1    CROSS-EXAMINATION OF DR. B. HAMAD
2  Hamad?
3    A. Yes.
4    Q. And have you seen this letter
5  before?
6    A. I don't recall.
7    Q. This letter is from Jim Veneruso
8  who represented Forall USA; do you
9  recall that?
10    A. I don't know.  I don't recall.
11    Q. And Lee Levin, he represented
12  Sarah; is that right?
13    A. Yes.
14    Q. And you see Mr. Veneruso writes
15  here, "We have been informed that your
16  client, Dr. Hamad, by e-mail dated
17  June 5, 2015, advised Forall that he
18  will be notifying the Forum Shops at
19  Caesars Palace (landlord) that Sarah
20  LLC (Sarah), would transfer the store
21  to the small effective October 1,
22  2015." Do you see that?
23    A. I see it, yes.
24    Q. And Mr. Veneruso writes to your
25  counsel, "Please be advised that Forall

1    CROSS-EXAMINATION OF DR. B. HAMAD
2  does not consent to the proposed
3  transfer of the store by Sarah to the
4  landlord and any other party at this
5  time, and that all rights are reserved
6  under the party's rights and retail
7  operation agreement, and that the lease
8  agreement between Sarah and landlord,
9  which provides Forall with the right of
10  assignment of the lease." Do you
11  that?
12    A. Yes.
13    Q. What did you do when Mr. Levin
14  got this letter?
15    A. I don't recall the whole
16  episode.
17    Q. You see Mr. Veneruso notifies
18  your client that this communication
19  amounts to an anticipatory breach of
20  the license agreement?
21    A. Yes.
22    Q. And he reserves all rights,
23  right?
24    A. Yes.
25    Q. Isn't it true that at every

1    CROSS-EXAMINATION OF DR. B. HAMAD
2  point in time your -- you were
3  advised -- you were represented by
4  counsel in each of these agreements and
5  discussions with Forall?
6    A. Yes.
7    Q. Did you contact Simon in June of
8  '13 and say that we were going -- we
9  were surrendering the lease?
10    A. June '13, I don't -- I don't
11  recall it.
12    Q. Isn't this the time, June '13,
13  when you were in discussions with
14  Italnord to take over the management of
15  the store?
16    A. June '13, I don't remember exact
17  date, but probably after June [sic].
18    Q. But you knew Forall was
19  insisting upon adherence to the license
20  agreement, right, based on the letter
21  and other communications and
22  correspondence?
23    A. No.
24    Q. You didn't know that.
25    Did you have a sense that the

1    CROSS-EXAMINATION OF DR. B. HAMAD
2  eviction of Forall from the Pal Zileri
3  store and the forced closure, and lay
4  off of employees, and fire sale of
5  product would cause damage to the Pal
6  Zileri brand and Forall as an entity?
7    A. They should know this
8  themselves.
9    Q. I'm sorry.
10    THE ARBITRATOR:  He didn't
11  ask you that.  He didn't ask you
12  what they should know themselves.
13  He asked:  Did you have sense
14  that this caused harm to Forall?
15    THE WITNESS:  If that cause
16  harm to -- they knew about this a
17  long time -- for a long time.
18  Yes.  They knew about it.
19    THE ARBITRATOR:  He didn't
20  ask you what they knew.  He asked
21  if you had a sense that the
22  closing of the store, or the
23  firing of the employees, the fire
24  sale, all the things he
25  enumerated, caused harm to



13  (Pages 46 to 49)

Page 50

1      CROSS-EXAMINATION OF DR. B. HAMAD
2      Forall?
3           THE WITNESS:  Yes.
4           THE ARBITRATOR:  Okay.  Go
5      ahead.
6           MR. BROWN:  I'm going to go
7      to another document.  I'm going
8      to put on the screen what's bates
9      labeled 226, which is Exhibit
10     Number 150, and I'm going to
11     share screen.
12     Q. Sir, I'm going to put on the
13     screen what's marked -- what's been
14     admitted as Joint Exhibit 150.
15          Have you seen this letter
16     before?
17     A. No.
18     Q. Okay.  Are you aware that on
19     July 25, 2016, Forum Shops filed a
20     complaint against Sarah LLC in Las
21     Vegas?
22     A. That was handled by the lawyer.
23     Yes, I think so.
24     Q. And have you seen this document
25     which was attached to the notice on

Page 51

1      CROSS-EXAMINATION OF DR. B. HAMAD
2      August 1st from the attorney to Forall.
3      It says, "Agreement cancelling lease,"
4      and it is signed by Sarah here.
5           THE ARBITRATOR:  Give us a
6      document number, if you can,
7      Mr. Brown.
8           MR. BROWN:  It's part of
9      that same exhibit, Mr. Farber.
10          THE ARBITRATOR:  150.  Okay.
11          MR. BROWN:  Yes.  It was
12     attached to that letter.  Okay.
13     Q. Do you recognize this signature
14     here, sir?
15     A. Yes.
16     Q. Who is that?
17     A. That's my wife.
18     Q. And the date, June 14, 2016?
19     A. Yes.
20     Q. And did you review with her at
21     that time this agreement of
22     cancellation of lease?
23     A. We reviewed with the lawyer,
24     yes.
25     Q. Okay.  And -- and when you

Page 52

1      CROSS-EXAMINATION OF DR. B. HAMAD
2      signed it, did you advise Forall that
3      you had canceled the lease that day?
4           I'm sorry.  When your wife
5      signed it, did you, at any point, call
6      up Paolo Torello-Viera or anyone at
7      Forall that you had signed a
8      cancellation of lease or your wife had?
9      A. That was handled by the lawyer.
10     Q. But you didn't advise Forall?
11     A. You asked me this question
12     before and I told you.
13          THE ARBITRATOR:  I know --
14     A. The answer is no.
15          THE ARBITRATOR:  Okay.
16     Q. And sir, also attached to that
17     same document, okay, is a consent
18     agreement, and can you please tell me,
19     as I'm scrolling through it, it says,
20     "Stipulation and order for entry of
21     permanent writ of restitution, and
22     permanent writ of restitution."
23          Who was Mathew Dushoff?
24     A. A lawyer.
25     Q. Out in Nevada?

Page 53

1      CROSS-EXAMINATION OF DR. B. HAMAD
2      A. I think so.
3      Q. And did he represent Sarah?
4      A. Yes, to my knowledge.
5      Q. And did you authorize him to
6      sign a writ of restitution and
7      eviction?
8      A. Again, that was handled by my
9      lawyer.  I think so.
10     Q. Okay.
11          MR. BROWN:  I'm going to
12     ask for five minutes to organize
13     my thoughts.  I may be done, but
14     I just want to confirm that.
15          THE ARBITRATOR:  All right.
16     Let's take a quick five.
17          (Whereupon, a recess was
18     taken at this time.)
19          MR. BROWN:  I'm putting up
20     on the screen --
21          THE ARBITRATOR:  Is Mr.
22     Lewis back on?
23          MR. BROWN:  Yes.  This is --
24     the reason I was delayed, I had a
25     little trouble locating it.  It's



1      CROSS-EXAMINATION OF DR. B. HAMAD
2   a set-alone exhibit.  But this is
3   a letter that's attached to
4   Respondent's Answering Statement,
5   which is in exhibits -- in the
6   exhibits as 102, but it's at the
7   very end of 102.  I think we
8   talked about this letter
9   previously in testimony, so it
10  may have its own stand-alone
11  exhibit number.
12      But nevertheless, it's in
13  Respondent's Answering Statement
14  as Exhibit 17 to the answering
15  statement and with counterclaims.
16      Q. And, Dr. Hamad, if you can look
17  at this letter, which is addressed to
18  you, dated February 25, 2016, from
19  Paolo Torello-Viera.
20      A. Yes.
21      Q. Do you recall receiving this
22  letter in February of 2015?
23      A. Possibly.
24      THE ARBITRATOR:  You
25  possibly recall?

1      CROSS-EXAMINATION OF DR. B. HAMAD
2      THE WITNESS:  I mean, I --
3   there was a letter, yes.
4      Q. You don't dispute that you
5   received this, correct, at that time?
6      A. I don't know what time I
7   received it, honestly.
8      Q. The -- in this letter Forall was
9   seeking a 68 Sanction on its notice
10  date under the management agreement,
11  right, do you recall that?
12      A. Yes.
13      Q. And you never wrote back to
14  Paolo in response to this letter, did
15  you?
16      A. I think our lawyer did.
17      Q. You think your lawyer responded
18  to this?
19      A. I think so, if my memory is
20  good.
21      Q. When did he do that?
22      A. I don't know.
23      Q. How did he respond?
24      A. I don't know.
25      Q. Can you -- can you refer me or

1      CROSS-EXAMINATION OF DR. B. HAMAD
2   point the arbitrator to any document by
3   which your lawyer responded to this
4   letter?
5      A. You're asking me or asking my
6   counselor?
7      Q. Can you refer us to any written
8   correspondence responding to this
9   February 25, 2016, letter?
10      A. I think it was handled by the
11  lawyer.  If there's anything, he must
12  have the document.
13      Q. But you don't know as you sit
14  here today if there was a response?
15      A. Again, it was handled by the
16  lawyer at that time.
17      THE ARBITRATOR:  The
18  question is:  Do you know?
19      THE WITNESS:  No.
20      THE ARBITRATOR:  Okay.
21      Q. So you see here it says, "No
22  other terms of the management agreement
23  shall be deemed to be amended or
24  modified, except expressly set forth
25  herein."  Do you see that language?

1      CROSS-EXAMINATION OF DR. B. HAMAD
2      A. Yes.
3      Q. And Paolo goes on to say, "To
4   the extent that Sarah does not agree
5   and consent to the foregoing amendment
6   and modification of the management
7   agreement, please be advised that this
8   letter shall serve as notice by Forall
9   that it does not intend to take over
10  the lease or the business, and that the
11  management agreement shall expire at
12  the end of the initial term
13  September 1, 2016, and that Forall
14  shall turn the Pal Zileri premises and
15  business back to Sarah pursuant to the
16  party's license agreement."  Do you see
17  that?
18      A. Yes, I do.
19      Q. And Paolo wrote, "I further
20  remind that all rights and obligations
21  under the license agreement remain in
22  effect."  Do you see that?
23      A. Yes.
24      Q. And he states, "Nothing herein
25  shall modify or amend the rights and



1     CROSS-EXAMINATION OF DR. B. HAMAD
2  obligations of the party's management
3  agreement not expressly stated herein";
4  correct?
5     A. Correct.
6     Q. And there's a counter signature
7  here.  You never signed this, did you?
8     A. As I mentioned to you,
9  there's -- David Hochman was handling
10 this.
11       THE ARBITRATOR:  The
12 question is --
13       THE WITNESS:  No.
14       THE ARBITRATOR:  You just
15 have the answer the question.
16    Q. Wasn't Paolo informing you that
17 he wanted more time to make the
18 decision, but if you were going to not
19 agree to that, then you needed to get
20 ready to take over the store in
21 September?
22    A. No.
23    Q. What's your understanding of
24 this letter?
25    A. My understanding that there is

1     CROSS-EXAMINATION OF DR. B. HAMAD
2  -- they refused to extend the lease and
3  they -- at that time, they wanted out
4  and they said, "No, we are not going
5  to, you know, continue to take the
6  management."  That's my understanding
7  from the -- what's going on around that
8  time.
9     Q. Is that what -- is that
10 understanding based upon this letter?
11    A. I don't see the letter.  I don't
12 remember seeing the letter, you know,
13 and details around -- I don't know.
14 Honestly, I don't know what happened
15 with this letter.  It was handled by
16 the lawyer at that time, I think.
17    Q. Well, my question was:  This
18 letter and your understanding of what
19 it said, and isn't this letter asking
20 for more time to make a determination
21 on the part of Forall --
22       THE ARBITRATOR:  Counselor,
23 can I make a suggestion,
24 although, there's not an
25 objection?  The witness testified

1     CROSS-EXAMINATION OF DR. B. HAMAD
2  he doesn't remember seeing the
3  letter, and now you're asking him
4  for what his understanding is of
5  the letter.  I read the letter
6  carefully.  I can get an
7  understanding of it as well as
8  the witness since he doesn't
9  recall seeing it.  So I just
10 wonder if there's utility in
11 asking further in this regard.
12       MR. BROWN:  Okay.  One final
13 question.
14    Q. Dr. Hamad, is that your e-mail
15 address or an e-mail address that you
16 used at that time, February 2016, that
17 I'm looking at here,
18 "BHamad@SCBglobal.net"?
19    A. No.
20    Q. What e-mail did you use at that
21 time?
22    A. I have to -- I use
23 BHamadmd@gmail.  I think I have -- I
24 mean, I remember not working [sic].
25    Q. Was that -- was that ever an

1     CROSS-EXAMINATION OF DR. B. HAMAD
2  e-mail address that you used?
3     A. I used in the past, yes.
4     Q. And you -- are you denying that
5  that was an e-mail that you used in
6  February 2015?
7     A. I don't know what I used at that
8  time.
9     Q. Okay.  And you don't know -- you
10 -- you've already stated you do not
11 dispute receiving this letter, though,
12 in February of '16; isn't that correct?
13    A. I told you I do not know.  I
14 cannot recall.
15       MR. LEWIS:  I am going to
16 lodge an objection.  This has
17 been covered.  That's asked and
18 answered.
19       THE ARBITRATOR:  But there's
20 no question pending.  He answered
21 the last question.
22       Counselor, I note that it
23 says "Via registered mail" as
24 well.  Registered mail is usually
25 accompanied by a receipt that's



| | |
|---|---|
| Page 62 | Page 63 |

**Page 62**

1   CROSS-EXAMINATION OF DR. B. HAMAD
2   returned.  Is such a receipt in
3   evidence to me now?
4       MR. BROWN:  No.  I don't
5   believe there is, Mr. Farber.  I
6   don't think there's any question
7   that this --
8       THE ARBITRATOR:  All right.
9   Go ahead.
10      MR. BROWN:  I don't think --
11  let's put it this way, any
12  credible dispute that this letter
13  was sent and received.
14      THE ARBITRATOR:  All right.
15      MR. BROWN:  I guess that's
16  for you to weigh.
17  Q.  Mr. Hamad -- Dr. Hamad, is your
18  testimony that you did not receive this
19  letter in February of 2016?
20      MR. LEWIS:  Objection.
21  Asked and answered.
22      THE ARBITRATOR:  Sustained.
23  Counselor, he's already said
24  three times that he does not
25  recollect.  He does not know if

**Page 63**

1   CROSS-EXAMINATION OF DR. B. HAMAD
2   he got it or not.
3       MR. BROWN:  Okay.  Fine.
4   I'm going to one more exhibit.
5       THE ARBITRATOR:  All right.
6       MR. BROWN:  And it is
7   Exhibit 307.  And I'm going to
8   pull it up on the screen.
9   Q.  Dr. Hamad, can you look at this
10  e-mail?
11  A.  Yes.
12  Q.  And can you tell me if you sent
13  this e-mail on July 14, 2016, to David
14  Hochman, Amar Hamad, and Lee Levin; do
15  you see that?
16  A.  Yes.
17  Q.  And can you read it for the
18  record, your address, your e-mail
19  address from that e-mail?
20  A.  BHamad@SBCglobal.net.
21  Q.  So isn't it true that in 2016
22  you had used it and did in fact use
23  BHamad@SBCglobal.net?
24  A.  Yes.
25      MR. BROWN:  I don't have any

| | |
|---|---|
| Page 64 | Page 65 |

**Page 64**

1   CROSS-EXAMINATION OF DR. B. HAMAD
2   further questions.
3       THE ARBITRATOR:  Mr. Lewis,
4   it may be that -- if you need to
5   consult with your client, it may
6   be a good time to take our
7   morning break to give you that
8   opportunity.  Do you want that or
9   do you want to start?  You're on
10  mute, Mr. Lewis.
11      MR. LEWIS:  I'd appreciate
12  that, Mr. Farber.
13      THE ARBITRATOR:  Okay.  Then
14  why don't we take our mid-morning
15  break right now.  And, Dr. Hamad,
16  do you have a lot of notes that
17  you made on the pad?  So is
18  15 minutes adequate or do you
19  need a little more than that?
20      THE WITNESS:  That's
21  adequate.
22      THE ARBITRATOR:  So I've got
23  exactly 11:00.  Let's resume at
24  11:15, and we'll go with the
25  re-direct at that point.

**Page 65**

1   CROSS-EXAMINATION OF DR. B. HAMAD
2       Thank you everyone.
3       (Whereupon, a recess was
4   taken at this time.)
5       MR. BROWN:  I just want to
6   handle one evidentiary matter, if
7   I may.
8       THE ARBITRATOR:  What is it?
9       MR. BROWN:  So there was
10  some question, and I know I'm off
11  screen, that the February 25th
12  letter, which I was referring to
13  the answering statement, the --
14      THE ARBITRATOR:  You said it
15  was Exhibit 102 at the end.
16      MR. BROWN:  The second to
17  last -- the February 25th letter
18  where we were talking about
19  registered mail, that type of
20  thing.
21      That letter is in evidence
22  as a standalone item at Exhibits
23  302, 304 and 305, and those are
24  claimant's bates labeled
25  documents produced by claimants,



RE-DIRECT EXAMINATION OF DR. B. HAMAD
1
2    so that letter from Paolo came
3    back from claimants and, very
4    obviously, received and in their
5    possession and produced in this
6    lawsuit.
7         THE ARBITRATOR:  I take your
8    point.  Anything else, Mr. Brown?
9         MR. BROWN:  No.
10        THE ARBITRATOR:  Mr. Lewis,
11   you may proceed.
12   RE-DIRECT EXAMINATION
13   BY MR. LEWIS:
14        Q. Dr. Hamad, do you remember being
15   asked about claimants -- your Statement
16   of Claims, a discussion about rent and
17   how that factored into the eviction or
18   termination of the lease; do you recall
19   testifying about that?
20        A. Yes.
21        Q. Isn't it true that -- that --
22   what is your understanding -- what is
23   your understanding as to whether rent
24   played a role in Simon refusing to
25   continue on the lease with Pal Zileri?

RE-DIRECT EXAMINATION OF DR. B. HAMAD
1
2         THE ARBITRATOR:  Counsel, I
3    said on re-direct only new
4    matters.  I can tell you his
5    understanding because he
6    testified it twice already, that
7    the rent was always rent and that
8    Simon was upset with it, so it
9    clearly figured in.
10        MR. LEWIS:  Mr. Farber, this
11   is a specific effort to clarify
12   the statements of claims, and
13   Mr. Brown brought up --
14        THE ARBITRATOR:  Then
15   rephrase your question in terms
16   of the statement of claim,
17   because you didn't do so.
18        Q. Dr. Hamad, in the Statement of
19   Claims in the Paragraph that Mr. Brown
20   showed you, you have alleged that rent
21   caused Simon to proceed with eviction
22   proceedings and canceled the lease; do
23   you recall that?
24        A. Yes.
25        Q. Was rent the only factor?

RE-DIRECT EXAMINATION OF DR. B. HAMAD
1
2         A. There is other factors.  There
3    were other factors.
4         Q. Such as?
5         A. The poor performance of the
6    store.  I think I mentioned, also, was
7    performing very poorly [sic].
8         Q. We're talking specifically about
9    what you have in your statements of
10   claims, and I want to be sure.
11   Mr. Brown asked you if you did indeed
12   allege in the Statement of Claims that
13   there was poor performance; do you
14   recall that?
15        A. Yes.  Yes.  There was a very
16   poor performance, and even yesterday I
17   testified that Simon was watching the
18   numbers and he was not happy.
19        THE ARBITRATOR:  No need to
20   repeat yesterday's testimony.
21        Q. Okay.  The question I have is:
22   But did you allege poor performance in
23   your Statement of Claims?
24        A. Yes.
25        Q. Okay.  I'm going to put that up

RE-DIRECT EXAMINATION OF DR. B. HAMAD
1
2    very quickly and allow you to point
3    that out for, Mr. Farber.
4         THE ARBITRATOR:  I think it
5    was Paragraph 13.
6         MR. LEWIS:  Yes.  And the
7    paragraph we're referencing, Mr.
8    Farber, is 12, and I've gotten
9    there now.
10        THE ARBITRATOR:  All right.
11        Q. Are you able to see my screen,
12   Dr. Hamad?
13        A. Yes.
14        Q. Will you read Paragraph 12 for
15   the record, please.
16        A. "Upon information and belief,
17   Forall's operation performance with the
18   Pal Zileri store from March 2015 to
19   August 2016 was poor, at best, and led
20   to economic loss that had likewise been
21   experienced by Sarah LLC during its
22   operations from September 2011 to
23   September 2013".
24        Q. Is it fair to say that your
25   allegation in Paragraph 13 is



RE-DIRECT EXAMINATION OF DR. B. HAMAD
1
2  incomplete as it only references
3  represent as factor?
4      A. It's another factor, yes.
5      Q. So I just want to clarify that
6  for the arbitrator.  Okay?
7      A. Okay.
8      Q. Dr. Hamad, you were asked about
9  the letter agreement and whether there
10  was a writing -- excuse me -- whether
11  you had previously informed Forall that
12  you would be looking to work with Simon
13  to find a new tenant; do you recall
14  being asked that?
15      A. Yes.
16      Q. To be clear, what is your
17  understanding as to whether or not you
18  had Forall's approval to work with
19  Simon and find a new tenant in October
20  of 2016?
21      A. Yes, I did.
22      Q. And what do you base that
23  understanding on?
24      A. It was a couple of
25  communications between Alfonso and

RE-DIRECT EXAMINATION OF DR. B. HAMAD
1
2  Luca, and he approved the part with
3  Simon.
4      Q. Approving you to work with Simon
5  to find a new tenant?
6      A. Yes.
7      Q. Are there any -- okay.
8  Dr. Hamad, do you see my screen?
9      A. Yes, I do.
10      Q. Is this one of the e-mails
11  you're referring to?
12      A. Yes.
13      Q. And this is an e-mail string
14  back in -- starting October 8, 2014; do
15  you see that?
16      A. Yes.
17      Q. And here Alfonso asks Paolo --
18  excuse me -- asks your brother, "As we
19  talked and explained, I ask you to
20  please confirm to me and Paolo Torello,
21  CEO of Americas Pal Zileri, that we are
22  authorizing and can go forward with the
23  prospective tenant for a possible
24  takeover of the store."  Do you see
25  that?

RE-DIRECT EXAMINATION OF DR. B. HAMAD
1
2      A. Yes.
3      Q. And you don't see any e-mail
4  from Mr. Torello in here to saying,
5  "No, I don't agree or I don't approve
6  of this," you don't see anything in
7  here like that?
8      A. No, I do not.
9      Q. And, in fact, you do see Alfonso
10  Entebi writing to the group, including
11  Paolo Torello-Viera saying, "According
12  to Paolo, he is advancing the prospect
13  of a new tenant.  Please confirm this
14  and we can send them a copy of the
15  executed lease agreement between Sarah
16  and the mall."  Do you see that?
17      A. Yes.
18      Q. Do you recall if you did send a
19  copy of the lease agreement to Alfonso
20  and to Paolo Torello-Viera at that
21  time?
22      A. I think it was done.
23      Q. Well, according to your e-mail
24  here on October 16, 2014, you write,
25  "Hi, yes.  You can send a copy of the

RE-DIRECT EXAMINATION OF DR. B. HAMAD
1
2  lease to, assuming, to the new tenant."
3  Do you see that?
4      A. Yes.
5      Q. And October 16, 2014, is before
6  you entered into the letter agreement
7  on October 23, 2014, correct?
8      MR. BROWN:  I just want to
9  note my objection to that last
10  question.  Mr. Lewis read into
11  the record something that's not
12  in the e-mail.  It says, "Copy of
13  the lease," it doesn't say, "To
14  the new tenant."
15      MR. LEWIS:  I did say
16  purportedly or assumingly to the
17  new tenant, but I appreciate your
18  point.
19      THE ARBITRATOR:  I note that
20  it just says, "Hi, yes, you can
21  send a copy of the lease."  All
22  right.  That's what it says.
23      Go ahead Mr. Lewis.
24      Q. It came a time, though, did it
25  not, Dr. Hamad, that you entered into



Page 74

1    RE-DIRECT EXAMINATION OF DR. B. HAMAD
2  an agreement to rescind the letter
3  agreement to Simon, right?
4      A. Right.
5      Q. Mr. Brown asked you about that?
6  Do you recall Mr. Brown asking you
7  about that?
8      A. I think so.
9      Q. And what was the reason that
10 Sarah sought to rescind the letter
11 agreement with Simon?
12     A. Because I called at that time
13 and said the company would take over
14 the store, for Forall to take over the
15 store.
16     Q. Forall was going to take over
17 the store?
18     A. Yes.
19     Q. Mr. Brown asked you about
20 whether you memorialized or Mr. Farber
21 asked you about whether you
22 memorialized in an e-mail or some kind
23 of writing what you had been told by
24 the CEO, Marco Baritza, in Italy, in
25 November of 2012; do you recall that?

Page 75

1  RE-DIRECT EXAMINATION OF DR. B. HAMAD
2      A. Yes.
3      Q. Did you believe it was necessary
4  to memorialize that or -- speak more to
5  that, please, what your impressions
6  were when you returned to Italy in
7  November of 2012?
8      A. That Mr. Marco was trying to
9  help, and he said, "You can buy
10 whatever, you know, you need it."
11 There was no enforcement of the license
12 agreement.
13     And I think if you go to season
14 number three, the purchase was way less
15 than was stated in the license
16 agreement; that was the approval of
17 Luca and     Mr. Marco.
18     Q. So you're saying they put that
19 into practice; is that your testimony?
20     A. Yes.
21     Q. When you purchased below the
22 required amount in season three, did
23 anyone ever say you still owe some
24 additional money, you still have to
25 make additional orders?

Page 76

1    RE-DIRECT EXAMINATION OF DR. B. HAMAD
2      A. No.  That an was agreement.  You
3  know, whatever -- you know, whatever
4  you need, that was the thought and the
5  agreement.
6      Q. Mr. Brown asked you whether you
7  had an appreciation for the fact that
8  an eviction or first part if you had an
9  appreciation that closing a store for a
10 high-end brand would have an impact on
11 the brand; do you remember Mr. Brown
12 asking you about that?
13     A. Yes.
14     Q. But isn't it true that Forall
15 agreed to allow Simon to -- and Sarah
16 to work to find a new tenant and turn
17 the store back into Simon before August
18 of 2016?
19     A. That's true.
20     Q. In fact, Forall had agreed for
21 Sarah to work with Simon to find a new
22 tenant and turn the store back into
23 Simon before you entered into the
24 management agreement; isn't that
25 correct?

Page 77

1  RE-DIRECT EXAMINATION OF DR. B. HAMAD
2      A. That's correct.
3      Q. So isn't this a better question,
4  whether Forall had an appreciation as
5  to whether closing the store would have
6  an impact on their brand?
7      MR. BROWN:  Objection.
8      THE ARBITRATOR:  Sustained.
9  Counselor, I don't think it's
10 appropriate to ask a witness what
11 a better question would be.
12 Let's move on.  He's a doctor,
13 and I don't think he's a lawyer.
14     By the way, what kind of
15 doctor are you?  I know your
16 brother said he's an oncologist.
17     THE WITNESS:
18 Gastroenterologist.
19     THE ARBITRATOR:  Okay.
20     Mr. Lewis, go ahead.
21     Q. So the agreement for Simon and
22 Sarah to work together to find a new
23 tenant in 2016, did that require a
24 lawsuit to be filled formally evicting
25 Forall from the store?



1    RE-DIRECT EXAMINATION OF DR. B. HAMAD
2        MR. BROWN:  Objection.
3        THE ARBITRATOR:  Wait.  Do
4    that one again.  Did the
5    agreement require a lawsuit; is
6    that the question?
7        MR. LEWIS:  I'll ask it
8    better, but you're getting to the
9    heart of it.
10   Q. The agreement that you entered
11   into in June of 2016 with Simon, to
12   turn the store back over to Simon for a
13   new tenant to operate it, did that
14   require Simon to evict Forall from the
15   store?
16   A. Well, Forall refused to leave
17   the store.  This is what the eviction
18   was filed.  It -- if they left the
19   store, there would be no eviction and
20   there would be no damage done to them.
21   Q. Mr. Brown showed you a letter
22   dated February 25, 2016, he spent
23   considerable time trying to offer
24   evidence that you received that letter;
25   do you recall that?

1    RE-DIRECT EXAMINATION OF DR. B. HAMAD
2    A. Yes.
3    Q. Does that letter that Mr. Brown
4    showed you bear your signature?
5    A. No.
6    Q. Dr. Hamad, what was Dr. Amar
7    Bachar's [sic] role with Sarah LLC?
8    A. He was an agent of the company.
9    Q. Was he authorized to act on the
10   company's behalf?
11   A. Yes.
12   Q. Did he in fact act on the
13   company's behalf?
14   A. Yes.
15   Q. Were there discussions about Dr.
16   Amar Hamad serving as an officer of
17   Sarah LLC?
18   A. There were talks about being
19   treasurer, but I don't recall if that
20   was formalized.
21   Q. You don't recall whether it
22   formalized?
23   A. Yeah.
24   Q. But you are sure that Dr. Amar
25   Hamad was an agent and acted on behalf

1    RE-DIRECT EXAMINATION OF DR. B. HAMAD
2    of the company, correct?
3    A. Yes.
4        MR. LEWIS:  I have nothing
5    further.
6        THE ARBITRATOR:  Mr. Brown,
7    anything else?
8        MR. BROWN:  It really goes
9    to this evidentiary matter, and I
10   have all -- all that I need to
11   demonstrate that Mr. Hamad
12   received that letter, so I
13   actually would like a stipulation
14   from counsel that they
15   acknowledge that the February 25,
16   2016, letter was sent and
17   received by his client, as well
18   as their Counselor.
19       If they do not stipulate,
20   then I will take the time and
21   bring the arbitrator through the
22   e-mails, documents, that I have
23   in possession that are in
24   evidence, and some of them aren't
25   even in evidence, and they were

1    RE-DIRECT EXAMINATION OF DR. B. HAMAD
2    produced by claimants and I will
3    introduce them into evidence.
4    That's my only condition here, so
5    -- but I rather move on.  I think
6    it's emphatically clear that they
7    sent this document back to us.
8    They had it.  So I just seek that
9    stipulation.
10       THE ARBITRATOR:  Well, it's
11   up to Mr. Lewis.
12       Mr. Lewis, do you want to so
13   stipulate.
14       MR. LEWIS:  Mr. Brown, if
15   you're looking for a stipulation
16   that we received a piece of paper
17   in February 25, 2016, and did not
18   sign it and we produced that
19   piece of paperback, we will
20   absolutely so stipulate.
21       MR. BROWN:  I'll stipulate
22   that -- no.  I won't stipulate.
23   He didn't -- the -- I don't see a
24   copy of him signing that letter
25   in evidence.  In fact, there was



Page 82

1              PROCEEDINGS
2    no response received by the
3    witness.
4         THE ARBITRATOR:  Can I make
5    a suggestion because I don't know
6    why where you went to law school
7    -- where I went to law school,
8    if your adversary gives you
9    something, don't argue further.
10   Just say, "thank you," and you're
11   done.  He said he'll so
12   stipulate, so you're done.
13        MR. BROWN:  Okay.  I'm done.
14        THE ARBITRATOR:  Anything
15   else you want to ask Dr. Hamad?
16        MR. BROWN:  No, sir.
17        THE ARBITRATOR:  Dr. Hamad,
18   we thank you very much for being
19   a witness in this proceeding.
20   You're excused.
21        Mr. Lewis, do you at this
22   point have any other witness,
23   except your rebuttal expert?
24        MR. LEWIS:  Not at this
25   time.

Page 83

1              PROCEEDINGS
2         THE ARBITRATOR:  Mr. Brown,
3    who is your first witness?
4         I'd like to call Mr. Paolo
5    Torello-Viera, but he's going to
6    zoom in now.  I have to get him
7    the details.  It will take us one
8    minute, if you don't mind.
9         THE ARBITRATOR:  Mr. Brown,
10   who is your first witness,
11   please.  Mr. Brown, can you hear
12   me?  Hello?
13        MR. BROWN:  One minute.  We
14   need one minute.
15        THE ARBITRATOR:  All right.
16   Who is your witness, please.
17        MR. BROWN:  Mr. Paolo
18   Torello-Viera.
19        THE ARBITRATOR:  Mr.
20   Torello-Viera, good morning.  Do
21   you hear me?
22        THE WITNESS:  Yes.  Loud and
23   clear.
24        THE ARBITRATOR:  Would you
25   stand, please, but keep your face

Page 84

1              PROCEEDINGS
2    so that I can see you.
3         Would you raise your right
4    hand, sir.  Do you solemnly swear
5    that the testimony you're about
6    to give in this arbitration
7    proceeding will be the truth, the
8    whole truth, and nothing but the
9    truth?
10        THE WITNESS:  I do.
11        THE ARBITRATOR:  You could
12   be seated, sir, and spell your
13   first name, and give us an
14   address, which could be either
15   home or work.
16        THE WITNESS:  Paolo
17   Torello-Viera, P-A-O-L-o,
18   T-O-R-E-L-L, hyphen, V-I-E-R-A.
19        328 Tappan Road, Norwood,
20   New Jersey 07648.
21        THE ARBITRATOR:
22   Mr. Torello-Viera, good morning.
23   I'm Gene Farber.  I'm the
24   arbitrator in the matter.  Your
25   lawyer --

Page 85

1              PROCEEDINGS
2         Mr. Brown, you're handling
3    it?
4         MR. BROWN:  So there -- at
5    the end of this direct, Your
6    Honor, my co-counsel, Mr. Crowe,
7    does have several questions
8    pertaining to the issue on
9    damages, so I would ask the
10   authorization to essentially --
11        THE ARBITRATOR:  That's
12   fine.  If you want to split it
13   up, that's fine.  Mr. Lewis would
14   have the same right if he made
15   the same request, so fine.
16        Mr. Brown is going to start
17   by asking you some questions,
18   sir, and what I appreciate your
19   doing is be sure to let him
20   finish each question and then
21   pause.  Do you see Mr. Lewis on
22   the screen?  He --
23        Mr. Lewis, you're handling
24   this one as well?
25        MR. LEWIS:  Yes, Mr. Farber.



Page 86

1        DIRECT-EXAMINATION  MR. TORELLO-VIERA
2        THE ARBITRATOR: Mr. Lewis,
3    if he says the word "objection,"
4    do not answer the question until
5    I tell you whether or not you
6    should do so.  If he does not say
7    the word "objection," then please
8    just try to respond to the
9    question as directly and as
10   succinctly as you can.  All
11   right.
12       Mr. Brown, why don't you
13   proceed.
14   P A O L O   T O R E L L O-V I E R A, the
15   witness herein, having been first duly
16   sworn by the arbitrator, was examined
17   and testified as Follows:
18   DIRECT-EXAMINATION
19   BY MR. BROWN
20       Q. Good morning, Paolo.  How are
21   you?
22       A. Good morning.
23       Q. Can you just briefly describe
24   your experience in the luxury retail
25   space?

Page 87

1        DIRECT-EXAMINATION  MR. TORELLO-VIERA
2        A. I've been in industry for over
3    25 years now, and I've managed
4    companies --
5        THE ARBITRATOR: Mr.
6    Torello-Viera, if you could speak
7    closer to the mic.
8        MR. BROWN:  I'm so sorry to
9    do this.  We're in a very big
10   conference room for COVID
11   reasons, but I think I need to
12   reorganize where my laptop is
13   versus the -- because we can only
14   dial through the one connection.
15   So I have to move --
16       THE WITNESS:  Can you hear
17   me now?
18       THE ARBITRATOR:  Why don't
19   you take a moment and re-arrange
20   yourselves.  Is Mr. Torello-Viera
21   in the same conference with you,
22   Mr. Brown?
23       MR. BROWN:  Yes, he is.
24       THE WITNESS:  Mr. Farber.
25       THE ARBITRATOR:  Why don't

Page 88

1        DIRECT-EXAMINATION  MR. TORELLO-VIERA
2    you take a moment and reorganize
3    yourself as you see fit.
4        THE WITNESS:  As I speak
5    now, can you hear me loud and
6    clear?
7        THE ARBITRATOR:  Yes.  Much
8    better.
9        THE WITNESS:  Thank you so
10   much.
11       THE ARBITRATOR:  Mr. Brown,
12   why don't you go ahead?  The
13   question was about the experience
14   in the industry and he was just
15   telling us about his 25 years of
16   experience.
17       So why don't you proceed,
18   Mr. Torello-Viera.  Go ahead.
19       A. I've been in this industry for
20   25 years and I've been managing
21   companies and subsidiaries of groups
22   like Ermenegildo Zegmna, Brioni, Pal
23   Zileri and Lanificio F.lii Cerruti.
24       Q. And sir, what is your -- what is
25   your native language?

Page 89

1        DIRECT-EXAMINATION  MR. TORELLO-VIERA
2        A. Italian.
3        Q. And is -- if at any point today
4    you don't understand the question, you
5    need me to rephrase it, or you may
6    think you know, or you're not certain
7    as to its translation, just let us know
8    and we can revisit that.  Okay?
9        A. Appreciate it.
10       MR. BROWN:  And Maggie, if
11   you need the spelling of any of
12   those, we can provide that.
13       Q. Paolo, are you currently
14   employed by Forall?
15       A. No, I'm not.
16       Q. Was there a time that you were?
17       A. Yes.  From July 2014 until
18   December 2016.
19       Q. And what was your title with
20   Forall?
21       A. CEO president of the Americas.
22       Q. And when you joined Forall, was
23   Luca Spano working with Forall?
24       A. Yes.
25       Q. And when did -- how soon after



23  (Pages 86 to 89)

DIRECT-EXAMINATION  MR. TORELLO-VIERA
1
2  your arrival did -- did Luca move on?
3       A. Couple of months later.
4       Q. And in July -- what was the
5  first time that you had any involvement
6  with Sarah LLC and/or doctor -- Dr.
7  Hamad Bachar or Amar?
8       A. Directly with the doctors, I
9  don't recall.  I know that the name of
10  Sarah and the doctor was often on the
11  table because of the Vegas situation
12  and Alfonso Entebi or Italnord been
13  managing the store.
14       Q. So when you took over, Italnord
15  was operating the Las Vegas store?
16       A. Yes, they were.
17       Q. And at that time, Forall
18  maintained a showroom in New York City;
19  is that correct?
20       A. Yes.  We had a showroom.
21  Initially, it was on 6th Avenue and
22  Madison, and then we move it to a
23  bigger space, to a more luxurious space
24  on 5th Avenue.
25       Q. And when was that move made?

DIRECT-EXAMINATION  MR. TORELLO-VIERA
1
2       A. That move -- it was done some
3  time in 2015.
4       Q. Was Las Vegas -- did -- the Pal
5  Zileri in Las Vegas, was that
6  considered the flagship store at that
7  time?
8       A. It was the only store that we
9  had at that time, so absolutely.  It
10  was the flagship store.
11       Q. And can you describe to me
12  during your -- your time period at
13  Forall, who its clientele was, how
14  sales were made to various entities,
15  and what was the business of Forall?
16       THE ARBITRATOR:  Hang on a
17  minute.  Counselor, when you
18  asked him that question, you want
19  to distinguish clientele from the
20  New York showroom, and clientele
21  in the Las Vegas store, because
22  you just said, "Clientele," and
23  my suspicion is those are two
24  very different kind of clientele.
25       MR. BROWN:  Good point,

DIRECT-EXAMINATION  MR. TORELLO-VIERA
1
2  Mr. Farber.  Thank you.
3       Q. So if you could just tell us
4  about the business, how it worked from
5  Forall's perspective?
6       A. So to answer, Mr. Farber, you
7  know, it is -- we had two type of
8  clientele, B to B, business to
9  business.  So we had clients who had
10  the store who are retailers, that Sarah
11  LLC, like the Nordstrom, the Neiman,
12  the Saks, Dubois, you name it.
13       And then we had the B to C
14  which, the business to consumer, which
15  is the sales we are making directly to
16  consumer when we managed the Las Vegas
17  store.
18       Q. Okay.  But --
19       A. Our client -- our B to B clients
20  were the top luxurious clients,
21  retailers in the country, and not only
22  also in Canada, just to name one, you
23  know, Harry Rosen.  And these guys --
24  these clients, they were running brands
25  like Ermenegildo Zegna, like Brioni,

DIRECT-EXAMINATION  MR. TORELLO-VIERA
1
2  like Corneliani, Canali, so all the top
3  brand on the men apparel luxury
4  industry.
5       Q. And those clients, would they
6  come to the showroom in New York City
7  and make purchases and buys --
8       A. These clients, yes.  They come
9  to the show.  We have a collection.
10  Our inventory has two collections a
11  year.  A fall, winter, and a spring,
12  summer.  We call it F/W and S/S.
13       Every collection is divided, is
14  split into, let me say, sub-collection.
15  There are the Father's Day collection
16  and the fall collection.  And the
17  spring, summer is divided into the
18  closed collection and the spring,
19  summer collection, but I don't want to
20  go too much in detail in that.
21       We prepare the collection.  We
22  present them at the showroom for
23  specific windows in order to guarantee
24  specific deliveries because usually the
25  turn-around time from when you get the



Page 94

DIRECT-EXAMINATION  MR. TORELLO-VIERA
1   DIRECT-EXAMINATION  MR. TORELLO-VIERA
2   orders, when you are start shipping the
3   merchandise into the store is four to
4   six months.
5       Q. Okay.  And you were present the
6   last two days, right, for the testimony
7   of claimants in this matter, correct?
8       A. Yes.
9       Q. The -- when -- was -- to your
10  knowledge, was Sarah a client of Forall
11  while it operated the store in Las
12  Vegas?
13      A. Sarah was -- operated the store
14  was at the same level of service that
15  we provided to the other client [sic].
16  Again, the Nordstrom, the Saks, with
17  additional support, because it was --
18  even it was managed by them -- had our
19  name on the door.
20      And for that reason, Mr. Spano
21  was at the store, as he mentioned,
22  almost every month, in order to make
23  sure that the store was run properly.
24      Q. And was -- who are the
25  competitors, or specific to when you

Page 95

DIRECT-EXAMINATION  MR. TORELLO-VIERA
1   DIRECT-EXAMINATION  MR. TORELLO-VIERA
2   were there, who are -- who were the
3   competitors or competitive brand to Pal
4   Zileri?
5       A. Ermenegildo Zegna, that I worked
6   for almost 10 years, Brioni that I
7   worked for more than two years,
8   Corneliani, Canali.  Those are the --
9   the main, main competitors, our target,
10  was Corneliani and Canali.
11      Q. So in that market space, it's
12  very much a competitive market for
13  high-end luxury menswear, correct?
14      A. Pal Zileri was at the opening of
15  the high-end luxury.  You know, the
16  pyramid, we were in -- towards, you
17  know, the top of the pyramid, but the
18  opening of the luxury.
19      Q. Okay.
20      A. We were far from, you know, past
21  production those kind of things.  We
22  were not a Zara or an H&M.
23      Q. You were above those?
24      A. Way above.  It's like, with all
25  due respect, buying a Ford or buying a

Page 96

DIRECT-EXAMINATION  MR. TORELLO-VIERA
1   DIRECT-EXAMINATION  MR. TORELLO-VIERA
2   Ferrari.
3       Q. Okay.  When you came and started
4   as CEO, did you -- did there come a
5   time where you became familiar with the
6   license agreement that was between
7   Forall and Sarah for the Pal Zileri Las
8   Vegas store?
9       A. Yes.  It was my duty to document
10  myself and say what was going in every
11  single aspect of the business, you
12  know, including the relationship
13  between Forall and Sarah.
14      Q. And the license agreement that's
15  been introduced into evidence in this
16  case, you were present for a lot of
17  that testimony; are you familiar with
18  that license agreement?
19      A. Yes.
20      Q. Have you seen it and read it
21  before?
22      A. Yes, I do.
23      Q. And during the time that you
24  were CEO at Forall, you were familiar
25  with that document, correct?

Page 97

DIRECT-EXAMINATION  MR. TORELLO-VIERA
1   DIRECT-EXAMINATION  MR. TORELLO-VIERA
2       A. Absolutely.
3       Q. And were you familiar with the
4   management agreement that was in place
5   between Sarah and Italnord?
6       A. Yes.  I -- I made myself
7   familiar with it, although, I didn't
8   sign it because it was prior to my
9   arrival to Pal Zileri, but yes.  I had
10  to because also Alfonso Entebi and the
11  owner of Italnord is Forall's business
12  partner in Mexico with a joint venture.
13      Q. So at that time you had occasion
14  to look at -- look at and refer to that
15  document and the rights and obligations
16  that were in place?
17      A. Yes.  And to that extent, I want
18  to clarify that -- first of all, I have
19  degree in business management.  I'm not
20  a lawyer.  So any kind of
21  communications and changes could have
22  been made to the agreement, to any kind
23  of agreement, would have been run by
24  our legal office.  That is your firm,
25  Mr. Veneruso before, and we also have a



1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2  legal counsel at Forall's head office.
3      But I would not have done
4  anything on my own before having this
5  approved or checked by the legal
6  department.  Because again, I'm not a
7  legal person.  I have a business
8  expertise, not legal.
9      Q. So -- and your practice during
10  that period of time as CEO of Forall
11  was to review these types of matters
12  and issues with counsel; isn't that
13  correct?
14      A. Absolutely.  Because my major
15  focus -- sorry guys -- was to run a
16  business and to grow a business and
17  make it profitable and eventually
18  support, you know, some recovery in
19  areas that were not performing as
20  expected, if they were not up to the
21  part the expectation of the brand.
22      We also have to constitute one
23  additional piece to the puzzle, that
24  is, in 2014 there was a change of
25  ownership, and this is why, you know, I

1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2  came on board.  I was appointed as CEO
3  of Forall USA.
4      The company Forall Italy, so the
5  parent company, was acquired by
6  30 percent.  It was Arafa Holding; that
7  is an Egyptian company, and 70 percent
8  is Mayhoola for investment.
9      So there was a change of
10  ownership between Mr. Baritza, which I
11  heard his name many times during this
12  day, and the Leon family to Mayhoola
13  and Arafa.
14      Just for your information,
15  because I think it's important to know,
16  Mayhoola for investment is the founder
17  from the royal family of Qatar.
18      THE ARBITRATOR:  Could you
19  spell "Mayhoola"?
20      THE WITNESS:  Yes, sir.
21  It's M-A-Y-H-O-O-L-A.
22      A. And Mayhoola, on top or in
23  addition to Pal Zileri, they owned
24  Valentino and they own Balmain.
25      Q. And during your tenure as CEO,

1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2  did you view the Pal Zileri store in
3  Las Vegas as an important venture to
4  succeed for purposes of the Pal Zileri
5  brand?
6      A. It was.  Because as you asked me
7  before, that was our flagship store for
8  the time being, because we inherited
9  that.  And we wanted to make sure that
10  the store would have reflected the
11  image or, you know, the new imagine
12  that Pal Zileri was purveying to the
13  market.
14      I mean, when you go into a
15  re-organization, like we were doing, it
16  takes time.  What sometimes is not
17  clear, you know, to the outside world,
18  and because, you know, we live and
19  breath this every day, is the fact that
20  every action that you take, it take --
21  it usually takes one year before you
22  see the result.
23      Think about, as I said before,
24  it takes six months for the product to
25  be ordered from when you order till you

1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2  produce it.  Before you have the lead
3  time in order to put in the collection,
4  then it goes to the store, it has to be
5  sold and it has to start being
6  appreciated by market [sic].  But it's
7  a lengthy and to a certain extent, you
8  know, tedious process.
9      Q. So is it fair to say like a
10  venture such as the Pal Zileri store in
11  Las Vegas would take a couple of years
12  to develop, grow, and ultimately become
13  profitable?
14      A. Yes.  And to stress that, you
15  know, when we came on board, and when I
16  say "we," you know, the new management
17  that was the -- headquarter CEO was
18  Paolo Viera, and know it's easy to mix
19  the names, Paolo Viera and Paolo
20  Torello-Viera.
21      But with Paolo Viera, one of the
22  first things we decided to do was to
23  develop a new store concept, that we
24  initially roll out in Milan, because
25  Milan is where they have the



1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2  headquarter, the showroom, it's
3  basically the flagship store,
4  world-wide flagship.
5        And we already knew -- were
6  thinking and considering of expanding
7  the concept including the Vegas store.
8        THE ARBITRATOR:
9  Mr. Torello-Viera, you testified
10       that one of the first things that
11       you did was to review the license
12       agreement.  And you said you
13       thought that was an important
14       part of your initial tasks.
15       And my question is:  Who
16       gave you the license agreement?
17       Where did you get that from?
18       THE WITNESS:  It was at our
19  office in New York.
20       THE ARBITRATOR:  In the
21  office of New York.  All right.
22  And when you saw the license
23  agreement, did you receive any
24  information from anyone that any
25  portion of that license agreement

1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2  had been changed or amended?
3        THE WITNESS:  Sir, what I
4  did -- and I'm sorry to go back
5  to  my --
6        MR. BROWN:  I want to be
7  careful here, Mr. Farber, it --
8  not that, you know, I don't want
9  to hear this answer, but the
10       instructions to this witness,
11       really, there are privileges that
12       may apply.
13       THE ARBITRATOR:  Fair
14  enough.  You don't have to tell
15  me anything about a conversation
16  with a lawyer, but he didn't tell
17  me he got it from the lawyer.  He
18  said it was in an office, so I
19  didn't perceive that there was
20  anything from a lawyer.
21       If there's a conversation
22  with a lawyer, you don't have to
23  tell me about that.  But did
24  anyone else from any of the
25  investors, the new investors, the

1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2       30 percent or the 70 percent,
3  anyone in ownership tell you that
4  there had been any changes to the
5  license agreement?
6        THE WITNESS:  No, I was not.
7  And --
8        THE ARBITRATOR:  Okay.
9  That's all right.  As long as you
10       said, "No," that's the answer I
11       need.
12       Go ahead, Mr. Brown.
13       Q. Italnord was managing the store
14  for Sarah?
15       A. Yes.
16       Q. And do you have an understanding
17  as to whether or not Italnord had
18  minimum purchase requirement with
19  Forall?
20       A. I don't have visibility to the
21  data anymore, but as far as I
22  recollect, and I may be wrong, they
23  were buying according to the minimums
24  that were in the Sarah agreement, the
25  famous $90,000.

1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2       But I would like Palma Settimi
3  to confirm that.  I may be wrong.  My
4  recollection is they were committed
5  also to the 900,000.
6       Q. Isn't it fair to say that your
7  understanding that Italnord was
8  operating the Las Vegas pursuant to the
9  license agreement?
10       A. Yes.
11       Q. What was your overall
12  impression -- did you ever go to the
13  Vegas?
14       A. I was there multiple times.
15       Q. And what was your overall
16  impression about that store's location
17  in the mall, that type of thing?
18       A. The location was -- I mean, this
19  store needed some make-up, because our
20  industry evolved so rapidly that every
21  three, four years have -- not to redo
22  the full blown store, but you need to
23  do touch-ups and adjustments and stuff.
24       Let's talk for a second about
25  the Forum at Caesars.  The Forum at

1      DIRECT-EXAMINATION  MR. TORELLO-VIERA
2   Caesars is a big rectangle, and luxury
3   is on one end where Pal Zileri was,
4   Canali, many brands of the LVLH Group,
5   and then where now our MCM is, and MCM
6   is another luxury brand.
7      Q. MCM is the tenant --
8      A. That took over the space.  But
9   as we said before, one of our main
10  competitors is Canali and Canali is
11  right in that area.
12     Any other area of the Forum Shop
13  can be open, but it's not the proper
14  area for a luxury brand.
15     Q. And based upon your experience
16  in this space, not just exclusive to
17  Forall, is it important for a luxury
18  brand to be properly situated within a
19  mall, like the Forum Shop, among its
20  other competitors?
21     A. It's key.  It's mandatory.  And
22  I think that this is proven by what
23  Simon did in the Woodbury Common
24  outlets.
25     Q. Woodbury Common is Upstate?

1      DIRECT-EXAMINATION  MR. TORELLO-VIERA
2      A. Upstate.  Because Woodbury
3   Common was open, at the beginning, all
4   scattered.  I mean, Zegna could have
5   been on one end, Canali on the other,
6   Gucci in the middle.
7      After 10 years, they reshuffled
8   the whole thing and they grouped by
9   product category, by collection.  So in
10  order that -- you want to by luxury,
11  you know that you go in a certain
12  place.  You want to buy mass
13  production, you go in another place.
14  You want to by jewelry, you go to
15  another destination.
16     But everything had to be at
17  hand.  Because also Simon, what they
18  care, yes, they look for the wealth of
19  every single brand, but they look at
20  the big picture [sic].  Because whether
21  they buy from Canali or they buy from
22  Pal Zileri, the important thing is
23  that, you know, taking this brand
24  [sic].  That's from Simon's
25  perspective.  My perspective is totally

1      DIRECT-EXAMINATION  MR. TORELLO-VIERA
2   different.
3      Q. Just for illustrative purposes,
4   and I shared this with Mr. Lewis.  I'd
5   like to pull up the map of the Forum
6   Shop that's online.  Mr. Farber, just
7   so the arbitrator has an understanding
8   of the space and where it was.
9      THE ARBITRATOR:  All right.
10  Any objection, Mr. Lewis?
11     MR. LEWIS:  I'd like to note
12  that this is a similar map to a
13  map that claimants included in
14  their exhibit list which
15  Mr. Brown objects, so those
16  positions are inconsistent.  I
17  just want to note that to
18  Mr. Farber.
19     THE ARBITRATOR:  Look, right
20  now that's a separate issue.  Do
21  you have any objection to
22  Mr. Brown showing me this or not?
23     MR. LEWIS:  If Mr.
24  Torello-Viera can provide some
25  foundation to the authenticity of

1      DIRECT-EXAMINATION  MR. TORELLO-VIERA
2   this particular map, I have no
3   objections.
4      THE ARBITRATOR:  Go ahead,
5   Mr. Brown.
6      Q. This is the map that's on the
7   Forum website, so it's available online
8   for everybody.
9      Paolo, do you recognize this
10  map?
11     A. I --
12     Q. Perhaps it might be better if I
13  gave you control of it.  It's an
14  interactive map.
15     MR. BROWN:  Can everyone see
16  the screen?
17     THE ARBITRATOR:  Yes.
18     MR. BROWN:  Bear with us.
19     A. So, as I said, this is a
20  rectangle.  If you can start pointing
21  the MCM location, please.
22     Q. Yes.
23     A. Maybe if you can enlarge it a
24  bit.  Okay.  This is MCM.  So that was
25  the former Pal Zileri space.



Page 110

1      DIRECT-EXAMINATION  MR. TORELLO-VIERA
2      Q. And its location with the mall
3  is more or less center of the mall?
4      A. Yes.  That is the luxury
5  location.
6      Q. And is that good for foot
7  traffic reasons, to be in the center?
8      A. Yes.  It's good for traffic.
9  The best part is right in the middle
10  where you see that H.
11      Q. And I'll hover over this?
12      A. That one.  That is the best
13  possible location.
14      Q. Fountain of thee God's?
15      A. Yes.
16      Q. So it's location is --
17      A. Is good.
18      Q. Is near what stores?
19      A. It's good because.  Yesterday, I
20  heard saying that we were across H&M
21  and it was wrong.  This is an incorrect
22  statement, because H&M is not right
23  across.  The adjacent is Boss.
24      Q. Is that a competitor?
25      A. Slightly lower.  Versace, I

Page 111

1      DIRECT-EXAMINATION  MR. TORELLO-VIERA
2  don't think there's anything you have
3  to say about Versace.
4      Q. Versace is the left here?
5      A. Yes.  Then to the right, you
6  have Salvatore Ferragamo.
7      Q. Over across?
8      A. Yes.  And then you have Gucci.
9  And you can go around here.  You see
10  that Canali here as well in the right.
11      Q. Where is that?
12      A. Lower to the right.  Rimowa is
13  part of the LDMH Group.  It's the
14  luggage company.  La Perla, that is
15  super luxury.
16      So the area is that there is no
17  other area where you can run a
18  successful business in Las Vegas.
19      Q. So even though you didn't select
20  this space because it predated you, it
21  was selected by the doctors?
22      A. I was happy about the space.
23      Q. And did it do what you wanted it
24  to do for the Pal Zileri name and
25  location and foot traffic within this

Page 112

1      DIRECT-EXAMINATION  MR. TORELLO-VIERA
2  mall?
3      A. In terms of location, yes.
4      Q. So there was some suggestion in
5  the prior testimony that you turned
6  down an opportunity from Simon or at
7  some point Simon approached you about
8  other space within the mall?
9      A. Right.
10      Q. Was that space that Simon was
11  discussing with you and Forall, was
12  that a similar type of space?
13      A. Absolutely wrong.  If you go to
14  the map, you go all the way to the
15  right.
16      Q. Okay.  So I'm going to Zoom out
17  and go down all the way over here?
18      A. Keep going all the way to the
19  right.  You see where is that white
20  rectangle.
21      Q. Yes.  On the spiral escalator?
22      A. Yes.  If you go on top -- yes.
23  We are there now.  B8T8, this is the
24  space that they offered to us.  And you
25  can go around and look, you know, at

Page 113

1      DIRECT-EXAMINATION  MR. TORELLO-VIERA
2  the adjacent tents, and you see that
3  the renters there are totally
4  different.  They are not on part with
5  Pal Zileri.
6      Q. So there's an art gallery?
7      A. Correct.
8      Q. It looks like Long Champ?
9      A. Yes.  And there is Chrome
10  Hearts.  That is jewelry.  So the only
11  one that can be in line with Pal Zileri
12  is Brooks Brothers.
13      Q. And where is that?
14      A. Right there.  And I think also
15  the proposal that Simon, Mr. Eads, put
16  together shows that it was tricky or it
17  was not good for us.  Why?  Because
18  they offered that space with a percent
19  on sales and not with a fixed rent.
20      I have worked with Simon and
21  other landlords over my 25 years, and
22  they offer these terms only when the
23  place doesn't work.  Otherwise, they
24  ask you for rent and minimum revenues
25  that you should hit.

DIRECT-EXAMINATION  MR. TORELLO-VIERA

1
2      I would like to say that I had
3  several meetings with Simon's people
4  because Mr. Eads was made available
5  once or twice, as far as I remember.
6      The first meeting when they --
7      Q. For time reference, for the
8  record and the arbitrator, this was
9  while -- while Forall was managing the
10 store pursuant to the management
11 agreement?
12     A. If my recollection was correct,
13 this is around July 2015.
14     Q. And at that time you were
15 evaluating all options?
16     A. We were -- again, we rolled out,
17 you know, the flagship in the land.  We
18 were looking at the overall map in the
19 states in order to see what would have
20 been our retail expansion plan.
21     But always keeping in mind that
22 at that time and until the time being,
23 until we made a decision, Vegas was our
24 flagship store.
25     Q. At any time during this time,

DIRECT-EXAMINATION  MR. TORELLO-VIERA

1
2  did you consider that the Sarah LLC was
3  not responsible for the license
4  agreement and the terms and conditions
5  and obligations that were on there?
6      A. As I said, I'm not a lawyer.  If
7  I would have done something to that
8  extent, I would have put that in
9  writing to Sarah.  We would have had
10 any conversation on that.  If there was
11 a condition --
12     Let me put it this way:  Any
13 change on the documentation that we
14 had, would have been done in writing
15 from me -- me, as a CEO of the company,
16 to Sarah with our counsel's help.
17     Q. So just back to the map for a
18 second.  This store B8T8, that was the
19 space that Simon was floating to you?
20     A. No.
21     Q. Did that have the same amount
22 of --
23     A. No.
24     Q. -- as the then current store?
25     A. It has less foot traffic because

DIRECT-EXAMINATION  MR. TORELLO-VIERA

1
2  the main entrance is in the middle
3  where I showed you before.
4      Q. So the main entrance was over
5  here by --
6      A. Keep going.  It's here.  Down at
7  the bottom there.
8      Q. Where it's red, is that the main
9  entrance?
10     A. Yes.  So look at the difference
11 in -- you know, walking distance
12 between where we were and where they
13 propose us to be.
14     Q. And was there a casino right off
15 of one of these entrances?
16     A. There are casinos everywhere.  I
17 don't know.  I'm not a gambler, so I
18 don't know.
19     So to that extent, I had several
20 conversations with Simon's people.  We
21 had our first meeting in our showroom
22 in New York, because I wanted to show
23 them, you know, the new Pal Zileri,
24 what we were working on in terms of
25 content and so on and so forth.

DIRECT-EXAMINATION  MR. TORELLO-VIERA

1
2      Then we met on site at the
3  Forum, then I had a meeting with
4  them at their office.  That, if I
5  remember correctly, 295 Park Avenue.
6  And that I notified them that we were
7  not interested in the space.
8      However, if they had other, let
9  me say, opportunities, other
10 opportunities that we could have been
11 in Vegas or any other location, we had
12 considered.
13     So let me put it also this way:
14 Our approach to the situation was to
15 work together with Simon, the doctor,
16 with everybody.  We always tried to
17 cooperate, because at the end of the
18 day, what we care, is the wellness of
19 the building and at that time the Pal
20 Zileri site.
21     We were really in the midst of a
22 huge transformation.  So we wanted to
23 make sure every step was taken the
24 right way, but also taking into
25 consideration all the players.  It's

MAGNA
LEGAL SERVICES

Page 118

```
1        DIRECT-EXAMINATION  MR. TORELLO-VIERA
2    not just one single entities' interest.
3        Unfortunately, then I discovered
4    Sarah doing all the time, it was just
5    looking, you know, what was their only
6    and sole benefit.  In our eyes -- in my
7    eyes, what was important was the
8    flagship, and to have the right
9    flagship in the right place.
10       Q. And every effort was made to
11   make that succeed, was it not, on
12   behalf of Forall?
13       A. Absolutely.
14       Q. The -- I'm going to go a little
15   bit in chronological order.  We've
16   heard testimony about an e-mail between
17   the doctors and Alfonso in the fall of
18   2014, did you not?
19       A. Yes.
20       Q. And --
21       A. Are you referring to the e-mail
22   that Mr. Lewis is referring?
23       Q. I'll put it up.  But are you --
24   you recall that in September 2014, that
25   Alfonso -- Italnord notified Sarah that
```

Page 119

```
1        DIRECT-EXAMINATION  MR. TORELLO-VIERA
2    it didn't -- it didn't want to take
3    over the store?
4        A. Yes.  My recollection is --
5        Q. And that was shortly after you
6    had started with Forall?
7        A. I just came on board.
8        Q. So you were getting -- you were
9    becoming emersed in the situation and
10   learning the players?
11       A. Yes.
12       Q. And I'm pulling this up on share
13   screen.  This is Exhibit 54.  That was
14   previously put up on testimony.
15       THE ARBITRATOR:  Before you
16   get there, and again, exclude any
17   communications you had with
18   counsel, but when you first came
19   on board, did ownership tell you
20   what the strategy objective was
21   of Forall regarding the Las Vegas
22   outlet, the store?  What was the
23   objective?  Was the objective to
24   continue Italnord there, to
25   close, to restore Sarah, to move?
```

Page 120

```
1        DIRECT-EXAMINATION  MR. TORELLO-VIERA
2    What -- what was the strategic
3    plan?
4        THE WITNESS:  When I came on
5    board, Mr. Farber, the Las Vegas
6    store was a piece of the puzzle,
7    like I said.  So we knew that
8    there was a Vegas store.  We knew
9    that there was an agreement,
10   license agreement, and a
11   management agreement with --
12   initially with Sarah, that was
13   taken over by Italnord in terms
14   of just managing the store.
15       And then Alfonso notified
16   Sarah that it was not continuing
17   the store at the end of the year.
18   But at the beginning, again, it
19   was one of the many situations
20   that we had to look into and take
21   care.  I mean, I -- I came in
22   July, so that was not an
23   immediate priority.  The
24   immediate priority in July was to
25   sell the collection, and to go to
```

Page 121

```
1        DIRECT-EXAMINATION  MR. TORELLO-VIERA
2    all the clients, informing them
3    that there was a new owner, there
4    was, what we call, the rebirth of
5    Pal Zileri, with a very detailed,
6    you know, commercial product and
7    marketing plan.
8        That also, you know, Sarah
9    to that extent would have
10   benefit, because the moment that
11   we were elevating our imagine,
12   our brand perception in the
13   market would have benefited the
14   store.
15       I hope this answered your
16   question, sir.
17       THE ARBITRATOR:  No.  What
18   I'm trying to understand is:  Did
19   -- when you were brought on
20   board, you obviously were told,
21   "We have a store, and it's the
22   only one in the United States,
23   except for the showroom.  We have
24   a store in Las Vegas," did
25   ownership give you any direction
```



Page 122

1      DIRECT-EXAMINATION  MR. TORELLO-VIERA
2  or did they say, "You've got to
3  go there, you've got to check it
4  out, you have to come back with
5  recommendation regarding the
6  strategic plan"?
7      I mean, you come in, you see
8  there's a store -- you read the
9  license agreement for a period of
10  time, but you find out that
11  there's someone else besides
12  Sarah who is running the store.
13  So I'm just trying to understand
14  from the start if you were given
15  any direction or no direction in
16  connection with the strategy from
17  Forall regarding the Las Vegas
18  store?
19      THE WITNESS:  I would say
20  the guideline that we were given
21  -- it was that we would have
22  looked at all our stores, and
23  first and foremost, you know,
24  what is the, you know, the look,
25  the image of the store, and what

Page 123

1      DIRECT-EXAMINATION  MR. TORELLO-VIERA
2  is going to be the new store
3  concept.  And overtime, every
4  store would have adjusted and
5  aligned to that store concept and
6  that imagine.
7      MR. BROWN:  Can I pick it up
8  from here, Mr. Farber?
9      THE ARBITRATOR:  Go ahead.
10  Q. You were the CEO of Forall,
11  right?
12  A. Yes.
13  Q. And they -- at that point in
14  time, you weren't replacing Luca Spano,
15  right, he wasn't the CEO, is that right
16  or not?
17  A. Correct.
18  Q. In fact, he wasn't an officer of
19  the company?
20  A. Correct.
21  Q. And it wasn't your job coming on
22  board to develop that strategic plan,
23  analyze Las Vegas, and see what could
24  be done?
25  A. Yes.  In sync with what was --

Page 124

1      DIRECT-EXAMINATION  MR. TORELLO-VIERA
2  would have been decided at a
3  headquarter level.  Because, again,
4  never forget that there is, if I may
5  say, a big difference in management
6  from, you know, a family business and a
7  corporate business as we do.
8  Q. Okay.  So you came on board and
9  that was -- that was your task to get a
10  handle on the situation, right?
11  A. Yes.
12  Q. This e-mail which is on the
13  screen, you've heard testimony about
14  this e-mail, correct?
15  A. Yes.
16  Q. And does the prior testimony
17  accurately reflect what was actually
18  being stated here and what was going on
19  at that time?
20      MR. LEWIS:  Mr. Brown, can
21  you repeat the exhibit number?
22      THE ARBITRATOR:  I couldn't
23  hear you, Mr. Lewis.
24      MR. LEWIS:  I was asking the
25  exhibit number.

Page 125

1      DIRECT-EXAMINATION  MR. TORELLO-VIERA
2      MR. BROWN:  50.
3      MR. LEWIS:  Say it again.
4      MR. BROWN:  54 and I'm going
5  to withdraw that question.  It
6  was not a very good question.
7  Q. Were you copied on an e-mail
8  below here from Alfonso to Dr. Amar
9  Hamad and Bachar Hamad, correct?
10  A. Yes.
11  Q. Did any of these correspondence
12  on here did you reply?
13  A. No.  Neither me neither Paolo
14  Viera, who was the corporate CEO.
15  Q. And there was discussion earlier
16  today from Dr. Bachar Hamad stating
17  that he was talking with Luca and Luca
18  agreed to this or something to that
19  effect; do you recall that?
20  A. I don't recall.  I don't see
21  Luca in the e-mail.
22  Q. That was my question.  Was Luca
23  copied in this e-mail?
24  A. As far as I see in the
25  documents, I don't see Luca in the



1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2  e-mail, and Luca was not an officer.
3  Luca was never an officer, but Luca was
4  very supportive of the business.
5      Q. And do you recall whether
6  Alfonso had already indicated
7  Italnord's decision as to whether to
8  proceed with managing the store beyond
9  the end of the year of 2014?
10     A. I don't remember.  But I
11 remember that Alfonso's obligation to
12 run the store was through the end of
13 the year, and in order to assist Sarah,
14 he carried over until -- for two and a
15 half months -- two and a half months
16 until March when we took over.
17     Q. Was --
18     A. Otherwise, Sarah would have had
19 to take the store on January 1st.
20     Q. And you knew that, right, at
21 that time that Sara's was obligated to
22 come back to and run the store at that
23 time?
24     A. I knew that Sarah was obligated
25 to run the store, and then I, you know,

1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2  started conversations with the doctors
3  that we may have taken over because
4  what was omitted, you know, in the
5  previous testimony is the amount of
6  calls that I got from those doctors
7  that they were very good and, you know,
8  playing tag and, you know, sorry, tag
9  teaming in making one phone call and
10 then it was the other that was very
11 confusing, especially for a guy like me
12 who is new to the business, and begging
13 to run the store.
14       But, again, I was very clear
15 from day one, we do -- as doctor said
16 yesterday, it's going to be a test.
17 It's going to be a trial to see how it
18 works.  Also, because before -- and
19 that probably was, you know, when it
20 was delayed through mid March because
21 an operation like this have to be
22 approved by the corporate board of
23 directors.
24     Q. I want to take a step back and
25 get back to this point.  But in the

1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2  industry, this minimum purchase
3  concept, is that done for several
4  reasons, but principally so that it
5  ensured there was sufficient inventory
6  in the store to sell?
7      A. The biggest issue that you have
8  in a store is when you lose a sale
9  because you don't have the item.
10       THE ARBITRATOR:  Is when you
11 what?
12       THE WITNESS:  Lose a sale
13 because you don't have that item
14 available.  I mean, there's going
15 to be a moment in time where you
16 break your stock because you
17 don't have your size run
18 complete, but that   is --
19 should be towards the end of the
20 season.
21       Also, consider that store
22 need to have new merchandise,
23 fresh merchandise all the time to
24 the extent that now the business
25 is evolving in having deliveries

1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2  every month.
3        Because you don't want a
4  client coming in and saying, "Oh,
5  I saw this already," and you need
6  to have enough amount of
7  merchandise that you can fulfill
8  the sales.  And to that extent,
9  also, you have the seasonal
10 merchandise.  And it is what we
11 call "the ladder of the stock,"
12 that is like 10, 15 percent of
13 the business.  That is, let me
14 say, the fitting of loose suits.
15 That is not seasonal.  You have
16 that all the time.
17       And on top of that for the
18 more prestigious client, you have
19 the made-to-measure.  That you
20 come in, they take your
21 measurement, they select the
22 fabric that they want.  We have
23 bunches, you know, with the
24 fabric they select, and it's made
25 custom made for the client.

Page 130

DIRECT-EXAMINATION  MR. TORELLO-VIERA
1
2      Q. And that was a service that was
3   offered at the store?
4      A. Absolutely.
5      Q. And you heard doctor's testimony
6   about late delivery and late product
7   and the lead times that you couldn't
8   get the inventory unless it was ordered
9   six months.
10      So tell me a little bit about
11   that because, especially in the Las
12   Vegas market, when do you want to get
13   the inventory into the store, and how
14   much, how much lead time do you need to
15   actually get it from the manufacturing
16   shop?
17      A. I want to divide my answer to
18   two parts.  The first part is Vegas,
19   delivery to Vegas.  Being on the
20   wholesale side of the business, I've
21   dealt with Sarah and other clients that
22   they have stores in Vegas.
23      In Vegas, you don't want
24   merchandise in July, winter
25   merchandise.  It ain't going to sell.

Page 131

DIRECT-EXAMINATION  MR. TORELLO-VIERA
1
2   It's hundred something degrees outside,
3   and the foot traffic is low.  You want
4   to start receiving merchandise in
5   September, but the goal is to have
6   enough goods to be, let me say, fully
7   loaded by beginning of November,
8   because then you get into Thanksgiving
9   and then all the holidays.
10      So the comment that one of the
11   doctors made about being late since we
12   delivered in October, if I'm not
13   mistaken, it is correct to the general
14   business.  It's not accurate when you
15   talk about Vegas.
16      Q. And what about spring season?
17   When did the store, you know, when
18   should they have the goods for anything
19   else?
20      A. Spring season, you know, it
21   start -- in a store like Vegas you have
22   spring a lot because of the weather,
23   but usually the spring season start
24   with shoes in mid/late, and the real
25   spring, summer merchandise is shipped

Page 132

DIRECT-EXAMINATION  MR. TORELLO-VIERA
1
2   January 1st to end of March, April, 8
3   or 15th, the latest.
4      Q. And so it's a rolling delivery?
5      A. Exactly.
6      Q. It's not just you get all the
7   inventory at once?
8      A. It's also from a production
9   standpoint.
10      Q. And that's just standard?
11      A. That is standard.  The other
12   thing is when we talk about production,
13   as you said, you know, it takes six
14   months, four to six months, you know,
15   depending if you talking about suit or
16   a shirt.
17      The rule of thumb is that it
18   takes 90 days to take the fabric and
19   about two months to work production, so
20   it's five months.  Consider that when
21   it was stated that Pal Zileri did not
22   have enough time to produce for the
23   store, that to me -- I disagree with
24   that for two reasons.  One, is because
25   we have six months, as I said, you

Page 133

DIRECT-EXAMINATION  MR. TORELLO-VIERA
1
2   know, in five months we could do it.
3      Second, the Pal Zileri Vegas
4   store was considered the flagship
5   store, and let's say part of the Pal
6   Zileri retail, so we could have been
7   able to supply merchandise having it
8   from the production all the other Pal
9   Zileri mono-brand store.
10      And also when you buy from those
11   stores, you buy, you know, extra
12   product.  You know, it's not that you
13   need 92 meters .5 or more of fabric and
14   you buy that, you have to buy distance.
15   So maybe you have to buy 120.  So you
16   always have a little overage and then
17   sometimes you have some shortage
18   because if you need just a little more
19   because you don't buy the whole piece
20   because not too much fabric left over,
21   but we were planning on possibility to
22   supply the store enough merchandise as
23   needed.
24      Q. And your answer there, you're
25   responding to prior testimony by the

MAGNA
LEGAL SERVICES

DIRECT-EXAMINATION  MR. TORELLO-VIERA

1  doctors where they claimed that it was
2  impossible to get that product, right?
3  A. Incorrect.
4  Q. You didn't agree with that?
5  A. No.  For the timing that I
6  explained.  And, again, if there's a
7  rush, also, you can cut that.
8  Q. And when you provided the notice
9  that we looked at earlier today from
10  January -- from February 25, 2015, for
11  the doctors requesting for more time,
12  was that enough -- was that sufficient
13  notice for the doctors to get inventory
14  on-hand to take back the store in
15  September?
16  A. Absolutely.  Because we gave
17  them, correct me if I'm wrong, six
18  months, and in six months it was plenty
19  of time to produce merchandise.
20  And, also, never forget that
21  headquarters is also keeping some
22  inventory for emergency or hopefully,
23  you know, an unexpected performance of
24  any store.

DIRECT-EXAMINATION  MR. TORELLO-VIERA

1  Q. Okay.  Thank you.
2  A. And on top of it, think about
3  the importance of a flagship store.  We
4  would have canceled pieces from other
5  clients penalizing them in order to do
6  a favor to a store that has our name
7  brand at the entrance.
8  Q. When -- did there come a time
9  shortly after this exchange of e-mails
10  which was dated February 16, 2014, that
11  you learned that the doctors had signed
12  a letter agreement with Simon to find a
13  replacement tenant?
14  A. No, I do not.
15  Q. You don't recall that?
16  A. No, I don't recall.
17  THE ARBITRATOR:  Are we
18  ready, Mr. Brown?
19  MR. BROWN:  Yes.  I'm just
20  pulling up an exhibit.
21  Q. There came a time that Forall
22  had discussions with Sarah about Forall
23  taking over the management of the store
24  pursuant to a management agreement,

DIRECT-EXAMINATION  MR. TORELLO-VIERA

1  right?
2  A. Yes.
3  Q. And do you recall if at prior to
4  that time Sarah had signed a document
5  with Simon saying Simon could go find a
6  replacement tenant and that was a
7  problem for Forall at that point?
8  MR. LEWIS:  Objection.
9  THE ARBITRATOR:  What's the
10  objection, Mr. Lewis?
11  MR. LEWIS:  Mr.
12  Torello-Viera has just recently
13  testified that he's not aware of
14  such an agreement, and Mr. Brown
15  is asking -- but, again, Mr.
16  Torello-Viera stated he wasn't
17  aware of such --
18  THE ARBITRATOR:  Why don't
19  you rephrase.  You can handle the
20  objection easily.
21  MR. BROWN:  I'm entitled to
22  refresh this witness's
23  recollection.  He was --
24  THE ARBITRATOR:  Mr. Brown,

DIRECT-EXAMINATION  MR. TORELLO-VIERA

1  I agree, except you haven't done
2  that with this question.  That's
3  why I said rephrase if you so
4  chose.  Up to you.
5  Q. Mr. Paolo, I'm showing you a
6  document that's been introduced into
7  evidence in this case.  It's a letter
8  agreement dated January 28, 2015,
9  between the Forum Shops and Sarah LLC
10  and I ask you to read this?
11  MR. SHAH:  Mr. Brown, could
12  you clarify the exhibit number?
13  MR. BROWN:  I don't know it
14  offhand.  I'd have to search for
15  it.  The withdrawal letter
16  between Simon and Sarah.  I'm
17  showing it to him to refresh his
18  recollection.
19  Q. Having looked at this document,
20  does this refresh your recollection
21  about a certain letter agreement
22  between Simon and Sarah that Sarah was
23  looking to turn back the store?
24  A. I'm not sure.



MAGNA
LEGAL SERVICES

1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2    Q. Did you -- did Forall ultimately
3  enter into a management agreement to
4  manage the store for a term for Sarah?
5    A. Yes.  For 18 months.
6    Q. And when was that, about?
7    A. That was -- we took over the
8  store March -- around March 15, 2015.
9    Q. Okay.  And that was pursuant to
10  a written management agreement; is that
11  right?
12    A. Yes.
13    Q. Did you seek to -- so during
14  that period of time that you operated
15  the store, were you analyzing -- strike
16  that.
17      Had you reviewed the management
18  agreement prior to executing it on
19  behalf of Forall?
20    A. Yes.
21    Q. And you signed it as CEO?
22    A. Yes, I did.
23    Q. And you understood it was for a
24  term only?
25    A. It was for up to 18 months, and

1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2  it was only related to the management
3  of the store.  It didn't change any
4  other existing agreement between Forall
5  and Sarah.
6    Q. And you understood that all
7  rights were reserved under the license
8  agreement?
9    A. Absolutely.  Absolutely because
10  it was spelled out, if my recollection
11  is correct, in this agreement, and any
12  official correspondence that we had
13  between the parties.
14    Q. And you had an understanding at
15  the time that if you did not elect to
16  continue to the management agreement,
17  that you would turn the store back over
18  to Sarah to run?
19    A. That was my understanding.  And
20  I think it's spelled out in the
21  management agreement.
22    Q. And did you have any -- did
23  Forall have an expectation that Simon
24  -- that Sarah would take back the store
25  in September of 2015 if Forall did not

1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2  elect to take over the store itself
3  under the management agreement?
4    A. To me it was their obligation.
5    Q. And did anyone at Forall ever
6  reduce or otherwise eliminate the
7  minimum purchase agreement with Sarah?
8    A. Not that I'm aware of.
9      THE ARBITRATOR:
10  Mr. Torello-Viera, you testified
11  earlier that, you know, you were
12  brought in after changing
13  ownership, and you described
14  something of the entities that
15  were the new ownership.  Do you
16  know if Sarah and its principals
17  were advised of the change of
18  ownership?
19      THE WITNESS:  I think so.
20      THE ARBITRATOR:  What's the
21  basis of that response?
22      THE WITNESS:  I think so
23  because based on the relationship
24  they had with Luca and Mr.
25  Baritza, they would have

1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2  informed.  Also, the news was
3  broadcasted, it was -- I would
4  assume, and I may be wrong, that
5  they were aware of the changes.
6      THE ARBITRATOR:  Okay.  Do
7  you have any specific knowledge
8  that they were told, other than
9  your assumptions, given the
10  relationship?
11      THE WITNESS:  No, I don't.
12      THE ARBITRATOR:  Did you,
13  yourself, ever discuss this with
14  the doctors or one of them?
15      THE WITNESS:  I was
16  introduced later on to the
17  doctors to talk about the
18  management of the store when
19  Italnord decided, you know, not
20  to continue.
21      THE ARBITRATOR:  Right.  I'm
22  not talking about that.  I just
23  want to know if when you were
24  introduced to them, did you ever
25  discuss that, you know, part of



DIRECT-EXAMINATION MR. TORELLO-VIERA

1    the reason you were brought on
2    board is that there was a change
3    of ownership who had retained you
4    as the CEO of Forall USA.
5            THE WITNESS: Yes. Because
6    I came on board as the CEO of the
7    Americas appointed by the new
8    owners.
9        Q. So you did tell them at that
10    time?
11        A. Yes. When I introduced myself.
12            THE ARBITRATOR: Okay. Did
13    you -- did you discuss with
14    them the way you testified today
15    who the new owner were and -- and
16    --
17            THE WITNESS: Absolutely.
18    Because --
19            THE ARBITRATOR: That's what
20    I wanted to know. Okay. I was
21    not aware of that. So you've
22    answered my question.
23            Go ahead, Mr. Brown.
24        Q. This minimum purchase concept in

DIRECT-EXAMINATION MR. TORELLO-VIERA

1    a licensing agreement, such as the one
2    specific to Sarah and Forall, that
3    minimum purchase would allow Forall to
4    recoup some of its investment into the
5    Pal Zileri store, right?
6        A. Absolutely.
7        Q. And it was a commitment that it
8    sought at the outset of the
9    negotiations so that it could have
10    some -- you know, it would be able to
11    have a longstanding relationship with
12    Sarah and it was to be profitable going
13    forward, right?
14            MR. LEWIS: Objection.
15            MR. BROWN: You didn't like
16    that question?
17            THE ARBITRATOR: We're
18    getting some feedback again. I
19    think it's from Mr. Lewis because
20    it sounds like his kind of
21    feedback.
22            MR. SHAH: Your audio is
23    messed up again.
24            MR. LEWIS: (Inaudible).

DIRECT-EXAMINATION MR. TORELLO-VIERA

1            THE ARBITRATOR: Whatever --
2    okay.
3            MR. SHAH: Mr. Farber, we've
4    had these issues with other
5    hearings before. It's our firm
6    laptop, so.
7            THE ARBITRATOR: You're
8    blaming your firm, Mr. Shah. I
9    don't know. Should I tell
10    Mr. Lewis about that?
11            MR. LEWIS: Is that better?
12            THE ARBITRATOR: I think
13    it's not actually.
14            MR. LEWIS: (Inaudible).
15            THE ARBITRATOR: Mr. Brown,
16    how much more do you have of the
17    witness? Can you hear me,
18    Mr. Brown? I guess not. Guys,
19    we did pretty well all morning
20    and now everything is kind of
21    getting messed up.
22            MR. BROWN: I'm sorry. We
23    get disconnected on the audio.
24            THE ARBITRATOR: Mr. Lewis,

DIRECT-EXAMINATION MR. TORELLO-VIERA

1    are you back. Can we hear you?
2            MR. BROWN: I'm going
3    withdraw that last question. Is
4    it too close to lunch to call it?
5            THE ARBITRATOR: Well, it's
6    about 10 to 1:00. How much more
7    do you have of the witness, do
8    you have, Mr. Brown, roughly? I
9    can't hear you now.
10            MR. BROWN: Can you hear me?
11            MR. LEWIS: Can you all hear
12    me? This is Rod?
13            THE ARBITRATOR: Yes. Now
14    it seems to be working well.
15    Mr. Brown, how much more do you
16    have of the witness?
17            MR. BROWN: We're going to
18    not finish with him before lunch
19    because Vinny has got some
20    questions as well.
21            THE ARBITRATOR: I
22    understand. So the two of you
23    together, give me a handle. I
24    just want to chart out the rest



DIRECT-EXAMINATION  MR. TORELLO-VIERA
1
2    of today, and I'm not going to
3    hold you to it.
4         MR. BROWN:  I think
5    45 minutes.
6         THE ARBITRATOR:  And, Mr.
7    Lewis, any notion as to how long
8    your cross is going to be?
9         MR. LEWIS:  Maybe a half
10   hour, an hour, 45 minutes.
11        THE ARBITRATOR:  Okay.  And
12   who is going to be our next
13   witness, Mr. Brown?
14        MR. BROWN:  Ms. Settimi.
15        THE ARBITRATOR:  All right.
16   Let's return at 2:00, everyone.
17        (Whereupon, a lunch break
18   was taken.)
19        THE ARBITRATOR:  Mr. Brown,
20   why don't you proceed?
21        MR. BROWN:  Paolo wanted to
22   say the Italian lunch would have
23   been three hours and a glass of
24   wine.
25        THE ARBITRATOR:  All right.

DIRECT-EXAMINATION  MR. TORELLO-VIERA
1
2         Well, we're working differently,
3    so it's okay.  Let's proceed.
4         MR. BROWN:  I'm going to go
5    right to Exhibit 114.
6    Q. Paolo, can you see this?
7    A. Yes.
8    Q. And I'm just going to scroll
9    through a few pages here.  It's a fax
10   copy of a document.  It has your
11   signature block on it.  Do you recall
12   this document?
13   A. If I'm not mistaken, this is the
14   document that we signed with the letter
15   of intent when we were in conversation
16   with Sarah to take over the management
17   of the store for 18 months when
18   Italnord decided not to go forward.
19   Q. Okay.  So at this time, setting
20   the stage, Italnord was still running
21   the store, but it indicated it would
22   not be going forward?
23   A. Yes.
24   Q. And you were talking with Sarah
25   and the doctors, Bachar Hamad,

DIRECT-EXAMINATION  MR. TORELLO-VIERA
1
2    principally about potentially coming in
3    to manage the store on their behalf?
4    A. Yes.  Just manage the store for
5    18 months.
6    Q. And is that more or less what
7    this letter of intent, which is -- it
8    said, "It's a nonbinding letter
9    intent," sets forth?
10   A. Yes.  It was the initial
11   document, the initial conversation.
12   But always, you know, stating that none
13   of the obligation in place could have
14   changed.
15   Q. And at this time you had spoken
16   with the doctors at some length?
17   A. Absolutely.
18   Q. And had heard Mr. Farber's
19   inquiry before.  You had advised them
20   as to new ownership and strategic
21   thinking of the company?
22   A. Yes.  In fact, we thought of
23   taking over, managing the store for a
24   limited period of time, as a trial, to
25   use words that have been used a lot,

DIRECT-EXAMINATION  MR. TORELLO-VIERA
1
2    and I ran it to headquarters in order
3    to get an approval.
4    Q. And at any point in time, did
5    you tell the doctors or anyone at Sarah
6    that, "Don't worry.  The license
7    agreement is going to go away.  It's
8    not something you're going to have to
9    live up to after this trial period"?
10   A. I think that all the documents
11   we have and that we signed spells out
12   clearly there were no changes.
13        THE ARBITRATOR:  Let's --
14   Mr. Torello-Viera, let's focus on
15   the question.  He didn't ask
16   about what the documents say.  He
17   asked if you had any discussion.
18        And let me ask you this,
19   scroll down the date of this,
20   please.
21        MR. BROWN:  I'll give you
22   the fax - how about the date it
23   was faxed back.  That should be
24   on the top here.  December 17,
25   2014.

Page 150

1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2        THE ARBITRATOR: So,
3    Mr. Torello-Viera, as of this
4    date, could you tell me -- did
5    you ever have any conversation
6    with either of doctors, Hamad,
7    regarding the minimum purchase
8    requirement that was in the
9    license agreement?
10       THE WITNESS: No. I had
11   conversation with the doctor
12   talking about exclusively the
13   management of the store, nothing
14   else.
15       THE ARBITRATOR: Okay. So
16   as of this day, say mid December
17   of '14, when this nonbinding
18   letter of intent was signed, you
19   never discussed with either of
20   them the minimum purchase
21   requirement that was in the
22   license agreement; is that
23   correct?
24       THE WITNESS: Yes. You're
25   correct, sir.

Page 151

1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2        THE ARBITRATOR: Okay. Go
3    ahead, Counselor.
4    Q. This nonbinding letter
5    ultimately formed -- a binding
6    management agreement was executed by
7    and between the parties, correct?
8        A. Correct.
9        Q. And that document has been
10   introduced in evidence and you've seen
11   it on the screen and otherwise?
12       A. Yes.
13       Q. And it had your signature to it?
14       A. Yes.
15       Q. And you signed it on behalf of
16   Forall?
17       A. As an officer of Forall USA.
18       Q. I'm just going to remind you for
19   purposes of the report's sanity and the
20   transcript, just wait for my answer
21   [sic] to end, Rodney might object, and
22   we're just not talking over each other.
23   That's all.
24       This letter states, "Management,
25   Forall USA and or its affiliate and/or

Page 152

1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2    subsidiary, sometimes referred to
3    herein as Forall, shall be the manager
4    of the Pal Zileri store located at the
5    Forum Shops Caesars to Las Vegas,
6    herein referred to as the business,"
7    right?
8        A. Yes.
9        Q. Was it clear at that time in
10   your discussions with doctors that they
11   knew it was for a term period of
12   management, and that they were still
13   responsible as owners of the store?
14       MR. LEWIS: Objection.
15       THE ARBITRATOR: I couldn't
16   hear you. Say it again.
17       MR. LEWIS: My objection,
18   Mr. Farber, is that Mr.
19   Torello-Viera cannot testify as
20   to what Sarah knew.
21       THE ARBITRATOR: To the
22   contrary. He can if someone from
23   Sarah told him, and if he had
24   conversations with them, so he
25   might know. He might not know.

Page 153

1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2        If he does know, then it's --
3    it's up to Mr. Brown as to
4    whether he wants to ask him the
5    source of the information. If
6    not, on cross you can ask the
7    source. If he doesn't know.
8    That's the end of it. Overruled.
9        You can answer.
10       MR. BROWN: Maggie, can you
11   read that one back?
12       (Whereupon, the record was
13   read by the reporter.)
14       THE ARBITRATOR: You can
15   answer it.
16       A. Yes. My conversation was only
17   related in temporary management of the
18   store, nothing else.
19       Q. This -- there's a section here
20   that says, "Landlord consent," in the
21   letter of intent, and the second
22   sentence says, "Sarah shall obtain and
23   ensure that the landlord will waive any
24   rights with respect to the October 23rd
25   of 2014 letter agreement between Sarah



1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2  and the landlord.  Sarah shall
3  indemnify and hold Forall harmless from
4  any loss or liability incurred by
5  Forall that arises from the October 23,
6  2014, letter agreement."  Do you see
7  that?
8      A. Yes.
9      Q. Having seen that, this language
10  in this letter of intent, does that
11  refresh your recollection as to what
12  was transpiring with that letter
13  agreement with Simon and Sarah?
14      A. It's getting a little more less
15  vague to the extent that while we were
16  in the middle of the conversation with
17  the doctor, in between the letter of
18  intent and the management agreement, we
19  found out, and I don't remember how,
20  that they already gave -- they
21  authorized -- Sarah authorized Simon to
22  look for a new tenant.
23      And as you remember, I mean, I
24  was pretty upset about that, and we
25  asked for his consent to be retrieved

1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2  in order that we can continue, and also
3  because it was 100 percent in breach of
4  the agreement that we had in place with
5  Sarah.
6      Q. And you, in your letter of
7  intent agreement, actually required
8  them to get that rescinded, correct?
9      A. Yes.
10      Q. And you told them that -- do you
11  recall telling them at the time that
12  they were in breach of the license
13  agreement if they turned back the
14  store?
15      A. Absolutely.  Because it required
16  our consent.
17      Q. Okay.  I don't have any further
18  questions about that.
19      MR. BROWN:  Just for the
20  purposes of being thorough, I'm
21  just going to show him a copy of
22  the management agreement, unless
23  arbitrator says that horse has
24  been beaten enough.
25      THE ARBITRATOR:  It's up to

1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2  you.  You're talking about the
3  Forall management agreement,
4  right?
5      MR. BROWN:  Yes, sir.
6      A. Which management agreement are
7  you talking about?
8      Q. We'll look at it on the screen.
9  This is a copy of the Forall, Sarah
10  management agreement, okay, and I want
11  you to -- this is exhibit --
12      MR. BROWN:  Jump in guys if
13  you have it before I do.  Looks
14  like Exhibit Number 7 -- no,
15  Number 8.
16      Q. Paolo, have you seen this
17  document before?  And I'll scroll
18  through.  It's a 10 pager.
19      A. Yes.
20      Q. Okay.  And did this document
21  contain the terms by which Forall
22  agreed to take over the management of
23  the Pal Zileri store in Las Vegas.
24      A. This should be the document that
25  ruled the management of the store by

1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2  Forall for 18 months.
3      Q. And is that your signature on
4  the last page?
5      A. Yes, it is.
6      Q. And there was some discussion by
7  the -- and testimony by the doctors
8  saying that they never came back to the
9  store after September '11, they didn't
10  have any responsibility -- sorry --
11  that they didn't -- after September
12  '13, when Italnord took over management
13  that they never came back and operated
14  the store; do you recall that
15  testimony?
16      A. Yes.
17      Q. Do you recall, and I'm looking
18  at Provision 2.2, do you recall
19  negotiating when Forall would actually
20  start the management of the store?
21      A. Yes.
22      Q. And didn't you go to great
23  lengths to accommodate the doctors in
24  that regard that you started management
25  of the store and transitioned for their



1        DIRECT-EXAMINATION  MR. TORELLO-VIERA
2  benefit?
3        A. Yes.  The extent that Italnord's
4  engagement or management of the store
5  was till the end of December.  Together
6  with Alfonso, that was very
7  cooperative, we facilitated the
8  transition, keeping him running the
9  store until mid March when we took over
10  because, otherwise, according to the
11  agreement in place, Sarah, on
12  January 1st, would have had to run the
13  store taking it over again, either for
14  the whole time or until Forall would
15  have stepped in and managed the store.
16        Q. And Simon -- and Sarah had
17  extensive liability as it related to
18  Simon and the lease to keep that store
19  open, right?
20        A. One of the points that is very
21  clear in the Simon lease in general is
22  --
23        THE ARBITRATOR:  Let's try
24     to stick with the question.  The
25     question was whether or not you

1        DIRECT-EXAMINATION  MR. TORELLO-VIERA
2     knew that Sarah had significant
3     liability to Simon under its
4     lease.
5        A. Yeah.  Because the lease states
6  that you have to run business according
7  to the mall hours of operation.
8        Q. Okay.
9        A. You have very limited time just
10  for inventory.
11        THE ARBITRATOR:  We've got
12     the answer.  Let's go to the next
13     question.
14        Q. During that period of time, did
15  you understand that Italnord was
16  managing the store, but, essentially,
17  as the agent for Sarah?
18        A. Yes.
19        Q. I'm going back to this exhibit,
20  which I think is best found at
21  Exhibit 302.  You know what, I'm --
22  well, let's go to 302.  Paolo, do you
23  recall this letter?
24        A. Yes, I do.
25        Q. And did you send it to Sarah

1        DIRECT-EXAMINATION  MR. TORELLO-VIERA
2  LLC?
3        A. Yes, I did.
4        Q. In care of Dr. Bachar?
5        A. Yes.
6        Q. And do you recall sending it by
7  e-mail?
8        A. We anticipated the letter via
9  e-mail as a courtesy and then as
10  registered mail.
11        Q. Sorry.  I'm pretty frozen here.
12  So I'm not able to scroll down.
13        At this time or at any time
14  after February 25, 2016, and July 1,
15  2016, did you have response back from
16  Sarah?
17        A. No.
18        Q. And is it fair to say as of
19  February 25, 2016, Forall wasn't --
20  hadn't made a final determination as to
21  whether to proceed with taking over the
22  store or turning management back over
23  to Sarah?
24        A. Correct.  This is the reason why
25  we asked for the 60 days extension.

1        DIRECT-EXAMINATION  MR. TORELLO-VIERA
2        THE ARBITRATOR:
3     Mr. Torello-Viera, who at that
4     time was actually, day-to-day, in
5     the store managing it?
6        THE WITNESS:  We had -- I
7     think, if I remember correctly,
8     it was a staff of eight people.
9     We had a store manager and
10     assistant store manager, sales
11     people and a tailor.
12        THE ARBITRATOR:  What was
13     the name of the store manager; do
14     you remember?
15        THE WITNESS:  Of the store
16     manager?
17        THE ARBITRATOR:  Who was
18     actually running the store at
19     that time.  Do you recall the
20     name?
21        THE WITNESS:  I know where
22     he went, but I don't remember the
23     name.
24        THE ARBITRATOR:  Did you
25     ever hear that anyone at the



1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2    store was unwilling to take phone
3    calls from either of the doctors
4    or owners of Sarah for any reason
5    at all?
6         THE WITNESS:  Technically,
7    my team was not at ease when the
8    doctors were calling, because the
9    tone of the conversation was
10   always pretty aggressive, to the
11   point that when they were calling
12   at the office where I was
13   located, the girls were telling
14   me to answer the phone because
15   they were the doctors.
16        THE ARBITRATOR:  So it could
17   well be that if one of the
18   doctors Hamad called the store
19   that there would have been a
20   reluctance to speak to them; is
21   that correct?
22        MR. BROWN:  I think that's
23   calling for --
24        MR. LEWIS:  I think that's a
25   question Mr. Farber has asked to

1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2    the witness, Mr. Brown.
3         THE ARBITRATOR:  I don't
4    mind hearing if there's an issue,
5    but I think the witness can
6    answer the question.
7         MR. BROWN:  I do have an
8    issue with that question, Mr.
9    Farber, because you're asking for
10   a hypothetical.
11        THE ARBITRATOR:  I'm not
12   asking for any hypothetical at
13   all.
14        I'm asking for your
15   knowledge, Mr. Torello-Viera.  Do
16   you know if it happened that
17   there was a state of events at
18   the store that when either
19   Dr. Hamad called, there was a
20   reluctance to take the call?
21        THE WITNESS:  I have to say
22   that any call at the store was
23   answered because that was the
24   rule that, you know, we needed to
25   pick up the phone ASAP, and not

1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2    have the customer wait.
3         I can also tell that I'm
4    instructed, you know, the
5    personnel at the store that any
6    call that was not just pertaining
7    to a sale, to have it delivered
8    -- forwarded to my office.  And
9    in case of, you know, business to
10   have it -- address it to me
11   directly.
12        THE ARBITRATOR:  Okay.  And
13   did you have any understanding
14   with either of the Dr. Hamads
15   that calls regarding negotiation
16   of the Forall Sarah management
17   agreement or regarding the lease
18   with Simon, anything like that,
19   would not go to the store, but
20   rather would go to you?
21        THE WITNESS:  It was clear
22   that I was the only person within
23   the organization that was an
24   executive, a manager together
25   with signatory power with Palma

1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2    Settimi.  Nobody else could make
3    any agreement whatsoever for the
4    company.  I was the only one.
5         THE ARBITRATOR:  Okay.  Go
6    ahead, Mr. Brown.
7         MR. BROWN:  Thank you,
8    Mr. Farber.  I have frozen.
9    Let's see.
10   Q. I'm going to share my screen,
11   and I want you to look at this e-mail.
12        MR. BROWN:  This is
13   Exhibit 300.  Okay.
14   Q. And, Paolo, was I representing
15   Forall at this time, February of 2015?
16   A. Yes.
17   Q. And was I taking my instructions
18   from you?
19   A. Yes.
20   Q. And do you recall having looked
21   at this -- do you recall who David
22   Hochman was?
23   A. David Hochman was your
24   counterpart at Sarah, if I'm not
25   mistaken.



1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2        Q. And so -- please read this
3    e-mail?
4        MR. LEWIS:  Can you enlarge
5        the text?
6        MR. BROWN:  Let me just pull
7        it down from the system.  I
8        apologize.  This should help.
9        A. Yes.  This is your letter asking
10   for the 60 days extension.
11       Q. And the date of this e-mail is
12   February 23rd.  Going back to that
13   prior agreement that was February 25th,
14   that letter that you sent?
15       A. Yes.
16       Q. And do you recall -- is this
17   consistent with your recollection that
18       we -- you made multiple attempts
19   with various parties that represented
20   Sarah at this time?
21       A. Yes.  And I recall his office
22   calling me before almost every day
23   asking to take over the store.
24       Q. Okay.  But how does that tie
25   into this?

1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2        A. Sorry.  I missed it.  Yes.
3    You're correct.
4        Q. Okay.
5        A. I went one year after.  I went
6    to 2016.
7        Q. Let's clarify what you're
8    talking about, and just stick with my
9    questions.
10       Let's clarify for the record,
11   the doctors -- did they ever respond to
12   your request for an extension of time
13   on the management agreement notice?
14       A. No.
15       Q. And do you know if counsel ever
16   responded in any substance?
17       A. Not to me.
18       Q. And then, was -- did you send a
19   follow-up communication after
20   February 29th to Sarah about their
21   termination of the management agreement
22   and the requirement to take over the
23   operation of the store?
24       A. I think so.
25       Q. And do you recall seeing that

1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2    exhibit in this testimony?
3        A. Yes, I think so.
4        Q. I'll pull it up.
5        A. Yeah.
6        Q. And was that the letter that you
7    advised him of the $900,000
8    requirement?
9        A. If you can pull that up, I think
10   so.  I would like to see it.
11       Q. All right.  And this is the
12   letter on Pal Zileri letterhead.  It
13   says -- this is Exhibit 184.  Okay.
14   Paolo, could you just take a moment and
15   read this letter to yourself?
16       A. Yes.
17       Q. And is this a letter you sent
18   back in March of 2016?
19       A. Correct.
20       Q. And in this letter you've
21   reminded the doctor of the minimum
22   purchase requirement, right?
23       A. Yes.
24       Q. And that the license agreement
25   was continuing?

1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2        A. Yes.
3        Q. And you also said that, "Please
4    contact me to discuss the store
5    inventory, fall, winter purchasing,
6    employee matters, and transitioning
7    operations"?
8        A. Yes.
9        Q. Do you recall stating that?
10       A. Say it again.
11       Q. Strike that.
12       You also say, "We wish to make
13   this as smooth as possible for Sarah"?
14       A. Yes.
15       Q. And that was true when you wrote
16   it, right?
17       A. Yes.
18       Q. And you have an all rights are
19   reserved in this letter?
20       A. Yes.
21       Q. Did you ever receive a response
22   from Sarah in connection wit this
23   letter?
24       A. No.
25       Q. Did anyone contact you about



1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2    transitioning the store from Sarah?
3        A. No.
4        Q. Did they contact you about
5    getting product in place for the
6    opening in September?
7        A. No.
8        Q. How about employee matters?
9        A. No.
10       Q. Was this enough time, March 9,
11   2016, would that have been enough time
12   for Sarah to have stocked up and gotten
13   appropriate product in the store for a
14   September transition?
15       A. Absolutely.
16       Q. And was Forall committed to do
17   that?
18       A. We would have done that with
19   pleasure because, again, never forget
20   that the store bears the Pal Zileri
21   brand name.
22       Q. I have another exhibit to get
23   to.
24       MR. BROWN:  I'm going to go
25   to Exhibit 242, everyone.  And

1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2    I'll share my screen.  Okay.
3        Q. This is a little hard to see.
4    Let me scroll.
5        Paolo take a moment to just look
6    at this letter.  You're CC'd on it.
7        A. Okay.
8        Q. And is this a letter you
9    received in or around June 1, 2016,
10   from my office.
11       A. Yes.
12       Q. And is this consistent with your
13   recollection that multiple attempts
14   were made to have Sarah respond and
15   otherwise assume its contractual
16   obligations under the license
17   agreement?
18       A. Yes.  Because we haven't
19   received an answer to the previous
20   letters that we sent.
21       Q. And so did there come a time in
22   or around August 1, 2016, that you --
23   that Forall was served an eviction
24   notice?
25       A. Yes.

1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2        Q. And it was an order from a
3    court?
4        A. Yes.
5        Q. And where were you when you
6    learned of that?
7        A. I was in Vegas, if I'm not
8    mistaken.
9        Q. Were you in Vegas or you had --
10   or you had traveled out there ahead?
11       A. I don't understand the
12   difference.
13       Q. Were you in Vegas at that point
14   in time?
15       A. If I remember correctly, yes.
16       MR. BROWN:  Mr. Farber, I'm
17   going to transition to Mr. Crowe.
18       THE ARBITRATOR:  Okay.
19   Thank you very much.
20       MR. LEWIS:  Mr. Farber,
21   housekeeping item, please.
22   Earlier, Mr. Brown said Mr. Crowe
23   was going to cover damages.  To
24   the extent  Mr. Crowe is going to
25   cover damages, I would like to

1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2    allow our damages expert to join
3    the Zoom call.
4        THE ARBITRATOR:  Mr. Crowe,
5    are you going to be handling
6    damages now?
7        MR. CROWE:  Yeah.  I'm going
8    to discuss what transpired in Las
9    Vegas, and how that impacted the
10   damage to my client.
11       THE ARBITRATOR:  Okay.  Well
12   I've already ruled on your
13   request, so you can go right
14   ahead and ask for your expert to
15   -- I think it's Mr. Salsbery; is
16   that right?
17       MR. LEWIS:  That's correct.
18       THE ARBITRATOR:  Yes.  To
19   join our meeting.  And, of
20   course, if Mr. Flaherty wants to
21   join, he's welcome to join as
22   well.
23       MR. BROWN:  I don't know
24   that's -- look, I know you made
25   your ruling, and I don't want to



Page 174

DIRECT-EXAMINATION  MR. TORELLO-VIERA

1
2    be yelling into the wind, but
3    we're still on direct with this
4    witness.  I don't think it's an
5    appropriate time to bring in the
6    damages expert.  What the topic
7    was when --
8         THE ARBITRATOR:  Mr. Brown,
9    you're right.  No point yelling
10   into the wind.
11        MR. BROWN:  Okay.  Thank
12   you.
13        Paolo is asking for a break.
14   I think he has to use the mens'
15   room.  Can we do that?
16        THE ARBITRATOR:  Sure.
17   Let's take five.  We'll take five
18   minutes.  All right.
19        (Whereupon, a recess was
20   taken at this time.)
21        THE ARBITRATOR:  Okay.
22   Mr. Crowe, why don't you proceed,
23   please.
24        MR. CROWE:  Thank you,
25   Mr. Farber.

Page 175

DIRECT-EXAMINATION  MR. TORELLO-VIERA

1
2
3    DIRECT-EXAMINATION
4    BY MR. CROWE:
5         Q.  Sir, did there come a time in
6    July of 2016 that you learned that you
7    had to close the store in Las Vegas?
8         A.  Yes.
9         Q.  How did that come to your
10   attention?
11        A.  We received a letter at the
12   beginning of July, if I'm not mistaken,
13   July 6th, that our lease -- Sarah's
14   lease was terminated by the end of the
15   month, and we had to vacate the store.
16        Q.  Who was the letter from?
17        A.  From the lawyer, if I'm not
18   mistaken.
19        Q.  Was that Simon's lawyer?
20        A.  Simon's lawyer.
21        Q.  And what did you do in response
22   to that notification?
23        A.  I called Stephen Brown
24   immediately.
25        Q.  And did you travel to Las Vegas?

Page 176

DIRECT-EXAMINATION  MR. TORELLO-VIERA

1
2         A.  I traveled to Las Vegas multiple
3    times, because, first of all, you know,
4    Mr. Brown --
5         THE ARBITRATOR:  Hang on.
6    The question simply was, "Did you
7    travel to Las Vegas?"  The answer
8    was, "Yes."  Next question.
9         Q.  Do you recall approximately when
10   you went out to Las Vegas in response
11   to this notice?
12        A.  If my recollection is correct I
13   went there twice, and the last time was
14   at the end of the month when we had no
15   option then vacating the store.
16        Q.  And did you bring out another
17   employee with you to help?
18        A.  One colleague one time and the
19   other colleague the other time.
20        Q.  And what was the purpose for
21   your visit?
22        A.  The purpose of the visit -- the
23   first one, you know, should have been
24   to run the business, but it was to take
25   care of the unexpected and unpleasant

Page 177

DIRECT-EXAMINATION  MR. TORELLO-VIERA

1
2    situation.
3         Q.  What did you do to -- what steps
4    did you take to close this business on
5    this short notice?
6         A.  Purely in regard to closing
7    business, was basically packing up all
8    the merchandise that we had there,
9    packing up all the store, arranging all
10   the operation transportation, you know,
11   to bring the merchandise back.
12   Unfortunately, laying off the whole
13   personnel.
14        Q.  How many people were working in
15   the store?
16        A.  If I'm not mistaken, it was
17   eight people.  But, you know, there was
18   the store manager, assistant store
19   manager, the sales team, and two
20   tailors.
21        Q.  And all these folks were given
22   short notice that they were out of
23   work?
24        A.  Unfortunately, these guys, they
25   were given, you know, two, three days



Page 178

1      DIRECT-EXAMINATION  MR. TORELLO-VIERA
2  notice.  They were so nice that they
3  helped in packing the store.  They
4  stayed with us, you know, until we lock
5  door, you know, for the final time, and
6  they help us packing inventory,
7  scanning, doing all the operation, to
8  make sure we were taking everything,
9  and everything was accounted properly.
10  Also, because we needed to make sure
11  our inventory was getting in the
12  warehouse correct.
13      Q.  Right.  And I'm going to get to
14  that.  Approximately when did you
15  succeed in closing the store down and
16  handing keys back to the landlord?
17      A.  It was the beginning of August.
18      Q.  And in connection with this
19  project, did the company incur certain
20  costs?
21      A.  Absolutely.
22      Q.  Let's start with the inventory.
23  Okay.  Was there inventory in this
24  store?
25      A.  There was a significant

Page 179

1      DIRECT-EXAMINATION  MR. TORELLO-VIERA
2  inventory in the store because, as I
3  said before, it was the store that was
4  fully filled with merchandise.
5      Q.  And how did you go about
6  determining what the inventory is when
7  you got out there?
8      A.  Everything is barcoded, and it's
9  logged into the retail POS system.
10  Everything is barcoded and scanned.
11      Q.  Did you do that or your
12  assistant?
13      A.  I think I did 80 percent of the
14  scanning because I wanted to make sure
15  that every piece that were taken out
16  and sent back to the warehouse was
17  accounted for.
18      Q.  Was that accomplished?
19      A.  It was.
20      Q.  So the merchandise was shipped
21  to a warehouse?
22      A.  It was shipped to our 3PL, our
23  external warehouse service provider.
24      Q.  Where is that?
25      A.  Secaucus.  It's called Model

Page 180

1      DIRECT-EXAMINATION  MR. TORELLO-VIERA
2  Express.
3      Q.  Now, as a result of this hasty
4  move from the -- with the inventory to
5  the warehouse, is there certain losses
6  to the inventory occur [sic]?
7      A.  Not during transportation.  If
8  there was, you know, a loss of
9  inventory, it was minimal.  Like I
10  said, it's part of the variable.  It's
11  part -- it's within the tolerance.
12      Q.  Let me put it this way, you had
13  to dispose of the inventory, correct?
14  There was loss of inventory value?
15      A.  If we're talking about inventory
16  value, yes.  Because when you sell, the
17  merchandising basically became, you
18  know, jobber material.  That is --
19      Q.  What is --
20          (Simultaneous speaking.)
21      A.  When the merchandise is --
22  becomes what we call "old," "obsolete,"
23  "out of season," you pull it out of the
24  store and either your outlet or you
25  sell it to jobbers that they buy

Page 181

1      DIRECT-EXAMINATION  MR. TORELLO-VIERA
2  usually you know 10, 15 cents on a
3  dollar, and then they resell it to the
4  Saks Off Fifth, the Century 21, you
5  know, to its --
6      Q.  Secondary market?
7      A.  Correct.
8      Q.  So in that process of disposing
9  that inventory, that had to be
10  accomplished in a rather hasty manner?
11      A.  It was -- let me say, it was a
12  very delicate situation because think
13  -- put yourself for one moment with the
14  company.  The company was trying to --
15          THE ARBITRATOR:  Hang on.
16  Mr. Torello-Viera, let's just
17  respond to Mr. Crowe's question.
18  He didn't ask you about the
19  position of the company.  He just
20  asked if that was a hasty
21  situation.
22          THE WITNESS:  Yes, it was.
23      Q.  And by hasty did -- was it the
24  result of this -- withdrawn.
25          In the ordinary course of



Page 182

DIRECT-EXAMINATION  MR. TORELLO-VIERA
1
2 orderly broad out of inventory, this
3 is not the same loss of value; am I
4 correct?
5     A. You're correct.
6     Q. Can you tell me, approximately,
7 was there a -- a percentage figure in
8 terms of the loss of dollar value as a
9 result of the conduct that the doctor
10 here arranging for this store to be
11 shut down on such short notice?
12     A. If my recollection is correct,
13 the value of the inventory, the cost
14 was a little less than a million.  If
15 you sell for 10 cents on retail dollar,
16 you can do the math.
17     Q. So it was substantial costs?
18     A. Yes.
19     Q. And if we were to say you lost
20 10 percent, that's very conservative;
21 am I correct?
22     A. Yes.  Can I add --
23     THE ARBITRATOR:  No.  Let's
24 try to stick to the questions.
25     Mr. Torello-Viera, so my

Page 183

DIRECT-EXAMINATION  MR. TORELLO-VIERA
1
2 question is:  Was there a, like,
3 a - sale at the store?
4     THE WITNESS:  We didn't have
5 time.
6     THE ARBITRATOR:  So the
7 answer is no.
8     THE WITNESS:  No.
9     THE ARBITRATOR:  And did you
10 attempt to sell to a jobber, or
11 to preserve the integrity of the
12 brand, did you decide not to do
13 that?
14     THE WITNESS:  We did both.
15 That was the point that I was
16 mentioning before, because we
17 sold the inventory, but at the
18 same time being very careful how
19 much and where we were selling
20 the good, not to flood the market
21 on a brand that was trying to,
22 basically, reshaping and gain
23 even a stronger, you know, brand
24 recognition.
25     THE ARBITRATOR:  So am I

Page 184

DIRECT-EXAMINATION  MR. TORELLO-VIERA
1
2     correct then that some was sold
3     to a jobber and then some was
4     sent to the warehouse, right?
5     THE WITNESS:  No.  It was --
6     everything was sent to the
7     warehouse and then from there we
8     start the sale to the jobber.
9     THE ARBITRATOR:  Okay.  Now
10     I understand.  Why don't you
11     proceed.
12     THE WITNESS:  Because our
13     jobbers, they are located in New
14     York, New Jersey area, and they
15     want to see the merchandise.
16     Q. This is somewhat an orderly
17 process in order to preserve some
18 value, correct?
19     A. Yes.
20     Q. Now, the question I have now,
21 sir, in addition to this damaged
22 inventory value, were there other
23 ancillary costs incurred by the company
24 as a result of the precipitous shut
25 down?

Page 185

DIRECT-EXAMINATION  MR. TORELLO-VIERA
1
2     A. Yes, they were.
3     Q. And did you -- could you just --
4 for purposes of our hearing, can you
5 just tell us, generally, what some of
6 those cost were?
7     A. The first one, sorry if I'm
8 smiling, because you guys -- because we
9 had legal fees.  Not only for involving
10 Stephen Brown and your law firm, but
11 also we had Stephen hire a colleague in
12 Las Vegas.
13     Q. So it was Nevada counsel?
14     A. Yes.
15     Q. Did he tell you the cost, the fee
16 was approximately $26,000?
17     A. Yes.
18     Q. Does that sound reasonable?
19     A. Yes.
20     Q. And does that sound correct?
21     A. Yes.  I would say it sounds
22 right.
23     Q. You also flew out there and
24 incurred transportation expenses?
25     A. Yes.

MAGNA
LEGAL SERVICES

Page 186

1      DIRECT-EXAMINATION  MR. TORELLO-VIERA
2      Q. If I were to tell you that
3    transportation costs were in the order
4    of $6,000; would that sound correct?
5      A. Yes.
6      Q. Did the company also have to pay
7    severance to these folks that were
8    working so hard for you?
9      A. Yes.  I mean, we had to lay off,
10   unfortunately, everybody and we offered
11   severance to all of them because they
12   were not responsible for this
13   unfortunate situation.
14     Q. And if the company's records
15   reflected severance pay of almost
16   $12,600, would that be correct in your
17   view?
18     A. Yes.
19     Q. And then going forward in 2017,
20   '18, '19, there has been additional
21   costs as a result of this controversy
22   resulting from the defendant's conduct?
23     A. I can talk to the end of 2016,
24   then I left the company.  So I have no
25   say in that.

Page 187

1      DIRECT-EXAMINATION  MR. TORELLO-VIERA
2      Q. Thank you.  Now, I want to talk
3    about the cost, what we would call the
4    product cost, and how we value that in
5    terms of analyzing the damages that
6    flow to the plaintiff in this
7    circumstance.
8        There is such a thing as margin
9    in this business; is that correct?
10     A. Yes.
11     Q. Now, you've been in this close
12   to 30 years.  So in the course of that
13   experience, you've learned what the
14   cost for the manufacturers, such as the
15   respondent; is that correct?
16     A. Yes.
17     Q. And in this circumstance, Forall
18   is -- is allowing this as wholesaler,
19   correct, as opposed to current retail
20   cost operations under the license
21   agreement?
22     A. Absolutely.
23     Q. Can you explain how the cost
24   structure in terms of the product --
25       THE ARBITRATOR:  Counselor,

Page 188

1      DIRECT-EXAMINATION  MR. TORELLO-VIERA
2    I'm sorry, but I'm confused.  The
3    testimony is that there was a
4    store in Las Vegas.  You're now
5    saying that Forall ran it at the
6    end.  Are you talking about
7    during the earlier period of
8    time?  Because, certainly, if
9    Forall was party to a management
10   agreement, then customers walked
11   in off the mall street, it was a
12   retail operation, so maybe you
13   would clarify that.
14       MR. CROWE:  I'm talking
15   about in the context of the
16   period of time when Sarah was to
17   run the business and had been
18   running the business, what the
19   cost structure is of the Forall
20   company and going forward for
21   when they were supposed to take
22   over this company in 2016.
23       THE ARBITRATOR:  All right.
24   So you're talking about prior to
25   the management -- to the Forall,

Page 189

1      DIRECT-EXAMINATION  MR. TORELLO-VIERA
2    Sarah management agreement,
3    right?
4        MR. CROWE:  Well, prior and
5    September -- prospectively
6    September of 2016 going forward
7    when Sarah stepped in.
8        THE ARBITRATOR:  Mr. Crowe,
9    why don't you rephrase the
10   question.
11     Q. In the context of going forward
12   from September 2016, when Sarah needs
13   to be operating its business, I want
14   you to tell me what is the margin or
15   cost that we incurred on a
16   representative basis for the sample
17   product made by Forall?
18       MR. LEWIS:  Objection.
19       THE ARBITRATOR:  What is the
20   objection?
21       MR. LEWIS:  To the extent
22   Mr. Torello-Viera is going to
23   testify what the cost structure
24   would be like after he left the
25   company in 2016, I do not think



Page 190

DIRECT-EXAMINATION MR. TORELLO-VIERA
1
2  that's an appropriate line of
3  testimony for this witness.
4       MR. CROWE: Well, he --
5       THE ARBITRATOR: Mr. Crowe,
6  not necessary. Overruled. He
7  may know. He -- just because he
8  left the company, doesn't mean he
9  didn't know. So once again, if
10 he so testifies, you can explore
11 as to the basis of his knowledge.
12 Overruled.
13 Q. What was the cost of Forall for
14 these products on a margin?
15 A. Just to clarify, we're talking
16 about the cost as wholesaler?
17 Q. Correct.
18 A. So usually the cost -- the
19 margin that you do as a wholesaler is
20 50 percent and up. Let me say, average
21 company is 50 percent. Top companies,
22 they can go up to 75 percent.
23 Q. When you say "50 percent
24 margin," does that mean the profit
25 factor, essentially, is 50 percent?

Page 191

DIRECT-EXAMINATION MR. TORELLO-VIERA
1
2  A. Yes. Let's assume that we sell
3  an item at $100, wholesale, the cost is
4  50.
5       THE ARBITRATOR:
6  Mr. Torello-Viera, does Forall
7  have its own manufacturing
8  facility?
9       THE WITNESS: Yes, it does.
10 For some product categories. Not
11 for everything.
12      THE ARBITRATOR: I see. Is
13 the manufacturing facility
14 located in Italy.
15      THE WITNESS: Yes.
16      THE ARBITRATOR: And for
17 other things it contracts with
18 others to do the manufacturing;
19 is that right?
20      THE WITNESS: Yes.
21      THE ARBITRATOR: Okay. I'll
22 let counsel continue. I just
23 needed to know that.
24 Q. So you heard the term "variable
25 cost"?

Page 192

DIRECT-EXAMINATION MR. TORELLO-VIERA
1
2  A. Yes.
3  Q. And does that go into play in a
4  circumstance when we're dealing with a
5  relationship between Forall and Sarah
6  operating the store respectively in
7  2016 going forward?
8  A. On the wholesale side of the
9  business, the variable cost that you
10 have is if you have an agent, then you
11 pay commission.
12 Q. And that would be it. The
13 variable cost general talking about
14 credit card and personnel expenses at
15 the store; is that correct?
16 A. That is on the retail side of
17 the business, so if the next step is
18 from wholesale to retail, but there you
19 have a 60 percent additional mark up.
20 Q. Right.
21 A. So what I'm saying is that the
22 50 that became 100, you know, Forall's
23 wholesale, it become 250 MSRP.
24 Q. Right.
25 A. Because there you have the cost

Page 193

DIRECT-EXAMINATION MR. TORELLO-VIERA
1
2  of the store, the personnel --
3  Q. I'm not asking about that. I'm
4  asking about solely in the relationship
5  between Forall, 2016, going forward,
6  assuming Sarah lived up to their --
7  Sarah lived up to their bargain and got
8  back into the business, the cost to
9  margin is approximately 50 percent?
10 A. Correct.
11 Q. Because the cost is the
12 manufacturing and any duty and freight
13 to get it to Las Vegas Nevada correct?
14 A. Yes.
15 Q. Now, when you went out there in
16 Nevada, and you had close the store
17 down, did this have some impact on the
18 brand name and representation in the
19 marketplace?
20 A. Absolutely.
21 Q. Can you describe what was the
22 result of this unfortunate exercise by
23 the doctors?
24 A. You know, as we said before, we
25 were looking into several



1      DIRECT-EXAMINATION  MR. TORELLO-VIERA
2   possibilities, opportunities.  So that
3   would have meant to the market we
4   stayed here and we moved out of the
5   store or we found a better location,
6   you know, different situation.
7        To close the store over night,
8   unfortunately, in the middle of market
9   -- so going back to New York where we
10   were seeings all the customers, the
11   Nordstrom, Neiman, the Saks that I
12   mentioned today, and the rumor spread
13   out immediately, and to justify why the
14   store was shut down, that put a big
15   dent on our representation.
16      Q. Now, there's been some
17   speculation by witness, if you recall,
18   that Forall was in the position to open
19   a new store in 18 months in the place
20   that required minimal sales.  What is
21   your response to that assertion?
22      A. Open the store, I would say --
23      THE ARBITRATOR: He's
24   talking about the possibility of
25   something in Beverly Hills maybe.

1      DIRECT-EXAMINATION  MR. TORELLO-VIERA
2      MR. CROWE: I'm talking
3   about in Las Vegas.
4      THE ARBITRATOR: Okay.
5      Q. Let me be clear in my question.
6   I'm talking about a claim, the theory,
7   that Forall should try and get a new
8   operator in the business and in one of
9   these malls in Las Vegas, not
10   withstanding the brand damage done to
11   the company, but it's -- in general?
12      A. Our industry is big, but it's
13   very small at the same time.  We were
14   evicted officially.  How can we find a
15   new landlord that is going to take us
16   in after being evicted by someone else?
17   That would have been very, very -- not
18   impossible, but extremely difficult.
19      THE ARBITRATOR: Did Forall
20   put out a press release upon the
21   closing of the store?
22      THE WITNESS: No.
23      MR. LEWIS: What was the
24   question?
25      THE ARBITRATOR: The

1      DIRECT-EXAMINATION  MR. TORELLO-VIERA
2   question was:  "Did Forall put
3   out a press release in connection
4   with the closing of the store."
5      THE WITNESS: Honestly,
6   Mr. Farber, due to the unpleasant
7   situation and the difficult
8   position that they put it in, we
9   kept it as low profile as
10   possible, and we were talking to
11   the client when they would come
12   into the store.  But we did not
13   do the press release or any --
14      THE ARBITRATOR: Are you
15   aware if there were any notices
16   on the web regarding the closure
17   of the store?
18      THE WITNESS: I'm not aware.
19      THE ARBITRATOR: Okay.  Go
20   ahead counsel.
21      Q. So I would follow up on that, do
22   you believe that this transaction, this
23   debacle, hurt the brand name going
24   forward and Pal Zileri?
25      A. Absolutely.

1      DIRECT-EXAMINATION  MR. TORELLO-VIERA
2      MR. LEWIS: Objection.
3      THE ARBITRATOR: What's the
4   objection?
5      MR. LEWIS: The
6   characterization that counsel is
7   using "debacle," things like
8   that.  If you can ask the
9   question without that --
10      THE ARBITRATOR: Let's
11   sustain that.  Let's use just,
12   "Did the closing of the store,"
13   we don't need "debacle".
14      Q. Was the closing of the store a
15   significant damage to the brand?
16      A. Yes it was.
17      Q. By the way, do you know if
18   Alfonso paid that $38,000 credit that
19   we had heard about they were required
20   to do so under the management
21   agreement?
22      A. I had conversation with Alfonso,
23   and he told me that the $38,000 were
24   paid, and, as far as I know, Forall
25   USA, and myself first, we would have

MAGNA
LEGAL SERVICES

Page 198

1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2  not paid Alfonso unless we were almost
3  sure that he had paid the $38,000.
4       Q. Okay.
5          MR. CROW:  Thank you.
6  That's all I have.
7          THE ARBITRATOR:  Okay.  Let
8  me just ask one follow-up
9  question from what Mr. Crowe just
10  asked.  Do you know of any
11  specific potential transactions
12  that Forall was involved with
13  which did not materialize either
14  in part or in whole because of
15  the closing of the store?
16          THE WITNESS:  The general
17  sense of the clientele --
18          THE ARBITRATOR:  I didn't
19  ask about general sense.  I asked
20  if you knew of any specific
21  transactions, so I used the word
22  "specific."  I'm not asking about
23  general.
24          THE WITNESS:  Not --
25          THE ARBITRATOR:  In other

Page 199

1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2  words, are you aware that someone
3  approached you to buy something
4  or to be a distributor or to do a
5  joint venture or to do some other
6  transaction, and this specific
7  transaction did not proceed in
8  whole or in part as a result of
9  the closing of the store?
10          THE WITNESS:  Not to that
11  extent.  But if I may, clients
12  retailers, you know, were more
13  skeptical in doing business with
14  us.
15          THE ARBITRATOR:  Do you know
16  of any retailer who declined to
17  do business with you in whole or
18  in part because of the closing of
19  the store?
20          THE WITNESS:  I can tell you
21  that those days we were in
22  conversation with some stores
23  that did not materialize.
24          THE ARBITRATOR:  And can you
25  name a store that you had such a

Page 200

1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2  conversation with where you know
3  that it did not materialize, to
4  use your words, in whole or in
5  part because of the closing of
6  the Las Vegas store?
7          THE WITNESS:  We were in
8  conversation with Neiman Marcus.
9  That never became a reality, and
10  also, you know, Saks Fifth Avenue
11  and Nordstrom, refused the order
12  or they did not meet what we
13  budgeted.
14          MR. CROWE:  One more
15  follow-up, if I may, Mr. Farber.
16          THE ARBITRATOR:  That's all
17  right, Mr. Crowe.  Go ahead.
18       Q. Did any clients inquire about
19  this at the showroom level about what
20  transpired?
21       A. Almost every client that came
22  into the showroom was asking about what
23  happened in Vegas.
24       Q. That was very unfortunate.
25       A. Yes.

Page 201

1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2          THE ARBITRATOR:  There are
3  -- I know Fashion World and there
4  are other publications both
5  online and actually hard copy; do
6  you know if there were any
7  articles about the closing of the
8  store?
9          THE WITNESS:  Mr. Farber, I
10  don't recall any articles.
11          MR. CROWE:  Mr. Farber, one
12  more follow up.
13          THE ARBITRATOR:  Okay.
14       Q. The conversations and all this
15  -- at the showroom level, did that
16  impact on the sales for the company?
17       A. Again, the rumor was out, so it
18  affected, you know, the credibility of
19  the company and how long they've been
20  in business.
21       Q. Okay.
22          MR. CROWE:  Thank you.
23          THE ARBITRATOR:  Okay.
24  Anything further, Mr. Crowe?
25          MR. CROWE:  No.



Page 202

1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2        THE ARBITRATOR:  Thank you
3    very much, Mr. Lewis.  Are you
4    prepared to proceed or do you
5    need a moment?  You're on mute.
6    Mr. Lewis, you're on mute.
7        MR. LEWIS:  Thank you.  Is
8    now a good time to take our
9    afternoon break?
10       THE ARBITRATOR:  If it helps
11   you in terms of your preparation
12   to blend it, we can do that.
13   Let's take our 15 minutes at this
14   point, and then we'll begin with
15   the cross examination.  All
16   right.
17       (Whereupon, a recess was
18   taken at this time.)
19       THE ARBITRATOR:  Okay.  Now,
20   Mr. Torello-Viera, let's go back.
21       THE WITNESS:  We're waiting
22   for Stephen Brown, Mr. Farber, if
23   you don't mind.
24       THE ARBITRATOR:  Sure.  Mr.
25   Torello-Viera, you know that at

Page 203

1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2    various points during the direct
3    I cautioned you just to respond
4    to the question.  Now, on cross
5    we're much stricter.  Do you have
6    a pad near you?
7        THE WITNESS:  I do.
8        THE ARBITRATOR:  Good.  So
9    perhaps it's been explained to
10   you the protocol that I and a lot
11   of other arbitrators use, and
12   it's really protocol to try to
13   minimize disputes and move the
14   cross along at a quicker pace.
15       So here's what I want you to
16   do:  Mr. Lewis is going to be
17   asking you some questions, and
18   all I want you to do is listen to
19   his question and respond as
20   directly and as succinctly as you
21   can.
22       That means that you can say,
23   "Yes, no, I don't remember, I
24   don't know."  That's fine.  There
25   are going to be times where

Page 204

1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2    you're going to want to explain.
3    You're going to think that Mr.
4    Lewis' question and the answer of
5    "no" or "yes" doesn't give me the
6    full explanation and you're going
7    to want to explain.
8        Do not explain unless Mr.
9    Lewis asks you or I ask you.
10   What you can do is make a note on
11   your pad, and when Mr. Lewis is
12   finished with his question, I'll
13   give you the opportunity to
14   consult, again, with Mr. Brown
15   and Mr. Crowe, and then they'll
16   decide if they want to ask you
17   questions to elicit your
18   explanation.
19       Also, Mr. Lewis is in charge
20   of the examination.  He's the
21   boss.  So do not fight with him,
22   and don't try to anticipate where
23   he is going or anything like
24   that.  If there's going to be
25   some sort of fight, he's going to

Page 205

1    DIRECT-EXAMINATION  MR. TORELLO-VIERA
2    win every time.  I'm telling you
3    that right now.  So he's in
4    charge of the examination.
5        Your job is simply to listen
6    to him, pause, if Mr. Brown or
7    Mr. Crowe --
8        Who is starting with this
9    one in terms of objecting?  Is it
10   you, Mr. Brown?
11       MR. BROWN:  Yes.  I'll stay
12   with it.  Thank you.
13       THE ARBITRATOR:  So if
14   Mr. Brown says the word
15   "objection," do not answer the
16   question until I tell you whether
17   or not you should do so.
18       And let -- you have to let
19   Mr. Lewis finish his question.
20   Don't jump in with an answer
21   until he is done, and I'm going
22   to be tough in terms of enforcing
23   this.  All right?
24       Mr. Lewis, why don't you
25   proceed.



Page 206

| | |
|---|---|
| 1 | CROSS-EXAMINATION  MR. TORELLO-VIERA |
| 2 | MR. LEWIS:  Thank you, |
| 3 | Mr. Farber. |
| 4 | CROSS-EXAMINATION BY |
| 5 | MR. LEWIS: |
| 6 | Q. Hello, Mr. Torello-Viera.  How |
| 7 | are you? |
| 8 | A. I'm good.  And you, sir? |
| 9 | Q. I'm doing well.  Thank you. |
| 10 | You started -- you were hired as |
| 11 | CEO at Forall USA in -- that was in |
| 12 | July of 2016; is that correct? |
| 13 | A. No. |
| 14 | Q. I'm sorry.  July of 2014, |
| 15 | correct? |
| 16 | A. Yes. |
| 17 | Q. That being the case, you do not |
| 18 | have firsthand knowledge about what the |
| 19 | doctors discussed with the former CEO |
| 20 | Marco Baritza in Italy in |
| 21 | November 2012, right? |
| 22 | A. Yes. |
| 23 | Q. That's correct, you don't have |
| 24 | firsthand knowledge about what was |
| 25 | discussed at that meeting, right? |

Page 207

| | |
|---|---|
| 1 | CROSS-EXAMINATION  MR. TORELLO-VIERA |
| 2 | A. Yes. |
| 3 | Q. So let me ask, were you present |
| 4 | for Mr. Luca Spano's testimony on |
| 5 | Monday in this arbitration? |
| 6 | A. Yes. |
| 7 | Q. And do you recall Mr. Spano |
| 8 | testifying that at the meeting in Italy |
| 9 | he and the CEO, Marco Baritza, decided |
| 10 | they were going to be, "lenient" is the |
| 11 | word  Mr. Spano used, on the minimum |
| 12 | purchase requirement with the doctors; |
| 13 | do you recall this testimony? |
| 14 | A. Yes. |
| 15 | Q. And Mr. Spano testified that its |
| 16 | perspective purchase requirement would |
| 17 | be based on past season's sales; do you |
| 18 | recall that? |
| 19 | MR. BROWN: Objection. |
| 20 | Mischaracterizes the testimony. |
| 21 | THE ARBITRATOR:  All right. |
| 22 | Why don't you rephrase and -- |
| 23 | because I don't think that's |
| 24 | exactly what he testified to. |
| 25 | And you can easily accommodate it |

Page 208

| | |
|---|---|
| 1 | CROSS-EXAMINATION  MR. TORELLO-VIERA |
| 2 | by simply leaving out reference |
| 3 | to the testimony. |
| 4 | And there's also no need to |
| 5 | ask the witness to tell me what |
| 6 | Mr. Spano testified to because |
| 7 | I've heard it. |
| 8 | Q. Do you understand that there's |
| 9 | been testimony and there have been |
| 10 | discussions about the perspective |
| 11 | purchases from the doctors being based |
| 12 | on prior season sales; do you |
| 13 | understand that? |
| 14 | A. Yes. |
| 15 | Q. Do you have any reason to doubt |
| 16 | that Mr. Spano and Mr. Baritza had the |
| 17 | conversations that Mr. Spano testified |
| 18 | to? |
| 19 | MR. BROWN: Objection. |
| 20 | You're asking this witness to |
| 21 | weigh the credibility of prior |
| 22 | testimony.  I don't think that's |
| 23 | proper. |
| 24 | THE ARBITRATOR:  No.  No. |
| 25 | He may have a reason to doubt |

Page 209

| | |
|---|---|
| 1 | CROSS-EXAMINATION  MR. TORELLO-VIERA |
| 2 | because one of those people may |
| 3 | have told him that's not true or |
| 4 | he may have read that that's not |
| 5 | true.  So if he has that |
| 6 | information, he can respond. |
| 7 | Mr. Torello-Viera. |
| 8 | Q. The answer is, no, you have no |
| 9 | reason to doubt that testimony? |
| 10 | A. Not what I said. |
| 11 | THE ARBITRATOR:  Let's |
| 12 | clarify that and see if we can |
| 13 | get it straight. |
| 14 | Mr. Torello-Viera, do you |
| 15 | have knowledge one way or another |
| 16 | whether the minimum purchase |
| 17 | requirement was replaced with a |
| 18 | -- some form of requirement that |
| 19 | related to prior years' sales; do |
| 20 | you have any knowledge of that? |
| 21 | THE WITNESS:  No, I don't. |
| 22 | THE ARBITRATOR:  Okay.  Go |
| 23 | ahead, Mr. Lewis. |
| 24 | MR. LEWIS:  Thank you. |
| 25 | Q. Can you please describe your |



CROSS-EXAMINATION  MR. TORELLO-VIERA

1  relationship with Italnord and Forall
2  when Italnord operate the store?
3       A. Italnord is business partner of
4  Forall.  They have an office in Mexico
5  and the distribution in Mexico and they
6  have some retail stores.
7       Q. Do you have independent
8  contracts with Italnord for their
9  stores in Mexico?
10      A. The relationship Italnord,
11  Forall is handled directly between
12  Italnord and Forall, Italy headquarter.
13      Q. Do you know whether headquarters
14  enters into contracts with Italnord for
15  the stores that Italnord operates?
16      A. I'm not sure.
17      Q. Do you know whether there was a
18  minimum purchase requirement that
19  Italnord agreed when it agreed to
20  operate the Las Vegas store?
21           MR. BROWN:  Objection.
22      Because he has testified to this,
23      but go ahead.
24           THE ARBITRATOR:  Well, is

CROSS-EXAMINATION  MR. TORELLO-VIERA

1  there an objection or not an
2  objection?
3           MR. BROWN:  It's an
4      objection.  He previously
5      testified he believed it was
6      pursuant to the license
7      agreement.
8           THE ARBITRATOR:  It's okay.
9      It's cross.  Overruled.  You can
10     answer.
11          Do you have the question in
12     your head, Mr. Torello-Viera.
13          THE WITNESS:  Yes, I do,
14     sir.
15      A. And like I said before,
16  according to my knowledge, Italnord
17  during the period that they managed the
18  Las Vegas store, they purchased
19  according to the minute requirements.
20      Q. I just want to note that in Mr.
21  Brown's objection lie the answer that
22  Mr. Torello-Viera just gave, but I'll
23  move on.
24          Do you know, Mr. Torello-Viera,

CROSS-EXAMINATION  MR. TORELLO-VIERA

1  if there was a contract signed between
2  Forall and Italnord when Italnord
3  operated the store, the Las Vegas
4  store?
5       A. There was a management agreement
6  signed between -- between Italnord and
7  Sarah.  That's for sure.
8       Q. And the question I'm asking, Mr.
9  Torello-Viera, is whether there was a
10  contract signed between Forall and
11  Italnord?
12      A. I don't remember.
13      Q. You don't remember?
14      A. Nope.
15      Q. You testified earlier that when
16  you came on board as CEO you educated
17  yourself as to what was going on in
18  this Las Vegas store, including the
19  reading of the operating agreement; do
20  you recall that?
21      A. Yes.
22      Q. You read the lease with Sarah,
23  correct [sic]?
24          MR. BROWN:  That was

CROSS-EXAMINATION  MR. TORELLO-VIERA

1  mumbled.
2           THE ARBITRATOR:  Why don't
3      you repeat it, Mr. Lewis?
4       Q. Did you read the lease with
5  Simon?
6       A. If I made the lease with Simon?
7           THE ARBITRATOR:  No.  The
8      question is:  Did you read the
9      lease between Sarah and Simon?
10          THE WITNESS:  Yes.
11      Q. You're doing these things to
12  educate yourself on what you called
13  your flagship store in the United
14  States, including reading the pertinent
15  agreements with Sarah and Forall, and
16  the lease with Simon and Sarah.  Are
17  you saying you didn't take the time to
18  determine whether there was a contract
19  between Forall and Italnord?
20          MR. BROWN:  Objection.
21          THE ARBITRATOR:  You're
22      saying he did not take the time,
23      okay.  Sustained, because I don't
24      think he said anything about the



Page 214

CROSS-EXAMINATION  MR. TORELLO-VIERA
1
2    time factor. So why don't you
3    rephrase that,     Mr. Lewis.
4        Q. Did you -- did you check to see
5    whether there was a contract between
6    Forall and Italnord when you came on
7    board as CEO?
8        A. I don't remember being a
9    contract there.
10       Q. That's not my question, sir.
11   Did you inquire whether there was a
12   contract between Forall and Italnord
13   when you came on board as CEO?
14       A. I don't remember.
15       Q. But you remember clearly reading
16   the other agreements that were in
17   place?
18       A. As far as my recollection goes,
19   there was no contract.
20       Q. Do you have anything to support
21   that understanding?
22       MR. BROWN:  I'm just
23   objecting. He gave his answer,
24   Mr. Farber.      If -- if
25   Rodney would like to put in a

Page 215

CROSS-EXAMINATION  MR. TORELLO-VIERA
1
2    document in front of him and ask
3    him if he looked at that
4    particular document, something to
5    that effect, that might be much
6    more helpful.
7        THE ARBITRATOR:  Mr. Brown,
8    it's arbitration.  And I suggest
9    that I've got some very good
10   counsel before me, so I don't
11   think we have to tell Mr. Lewis
12   how to conduct his examination.
13   He's capable of doing it.  We're
14   going to let him do it in his own
15   style.  The same way you and Mr.
16   Crowe do it in your style.
17       Mr. Lewis, why don't you
18   repeat your question and we'll
19   let him answer, assuming it's not
20   a totally completely different
21   question.
22       Q. Did you inquire whether there
23   was a contract in place between Forall
24   and Italnord when you came on board as
25   CEO?

Page 216

CROSS-EXAMINATION  MR. TORELLO-VIERA
1
2        A. To my knowledge, and to my
3    recollection, there was not a contract.
4        Q. Mr. Torello-Viera, I'm asking
5    you if you made inquiries.  Did you
6    speak with someone?  Did you ask if
7    there was?
8        A. I don't remember.
9        Q. Is your testimony that Italnord
10   was a business partner of Forall and
11   operated several stores?  Did I hear
12   that correctly?
13       A. Yes.
14       Q. And were you familiar with the
15   track record that Alfonso Entebi and
16   Italnord had selling Pal Zileri
17   merchandise?
18       A. In Mexico?
19       Q. Yes, in Mexico.  Yes.
20       A. Yes.
21       Q. Was he successful selling Pal
22   Zileri in Mexico?
23       A. Overall, yes.  Not all the
24   stores.
25       Q. Would you consider him to be an

Page 217

CROSS-EXAMINATION  MR. TORELLO-VIERA
1
2    experienced retailer of high-end mens'
3    fashion wear?
4        A. For Mexico, yes.
5        Q. Are you making a distinction
6    because they didn't perform well in Las
7    Vegas; is that what you're doing?
8        A. No.
9        Q. Do you know what -- do you know
10   whether Italnord successfully operated
11   the Las Vegas store?  What I mean by
12   that is:  Were they profitable?
13       A. I know there is a difference
14   managing a store in Mexico and managing
15   a store in U.S. or New York or
16   elsewhere.
17       THE ARBITRATOR:  Let's stick
18   with the question, Mr.
19   Torello-Viera.  We've got to
20   stick with the question.
21   Restate the question,     Mr.
22   Lewis.
23       Q. Do you know whether Italnord was
24   successful in operating a Las Vegas
25   store?  And by that I mean, do you know



Page 218

1  CROSS-EXAMINATION  MR. TORELLO-VIERA
2  whether they were profitable?
3    A. I don't have access to those
4  figures.
5        THE ARBITRATOR:  The answer
6  is "yes," "no," or "I don't
7  know".
8    A. I don't know.
9        THE ARBITRATOR:  Okay.
10   Q. Are you aware that Mr. Entebi
11  informed Sarah and Forall that they
12  would not be moving forward operating
13  the store after the initial term in the
14  management agreement; are you aware of
15  that?
16   A. Yes.
17   Q. You're aware that that was
18  because the store wasn't performing up
19  to its expectations; are you aware of
20  that?
21        MR. BROWN:  Objection.
22        THE ARBITRATOR:  What's the
23  objection?
24        MR. BROWN:  I mean, that was
25  the reason.  I don't know if

Page 219

1  CROSS-EXAMINATION  MR. TORELLO-VIERA
2  that's factual.
3        THE ARBITRATOR:  Well, he's
4  -- that's why he's asking -- it
5  might become factual if he says
6  yes.  So we'll overrule the
7  objection.
8        You can answer.
9        THE WITNESS:  Can you repeat
10  the question, please.
11        THE ARBITRATOR:  The
12  question is -- you can repeat it,
13  Mr. Lewis.
14        MR. LEWIS:  Maggie, can you
15  read that back for us, please.
16        THE ARBITRATOR:  Do you know
17  if the reason why they didn't
18  want to continue is because they
19  weren't doing well in the store?
20        MR. BROWN:  That's a
21  different question.
22        THE ARBITRATOR:  Maggie,
23  read it back.  I think it was
24  pretty much the same.
25        (Whereupon, the record was

Page 220

1  CROSS-EXAMINATION  MR. TORELLO-VIERA
2  read by the reporter.)
3        MR. LEWIS:  Mr. Farber, may
4  I say this before we go forward,
5  I've been very respectful of
6  Mr. Brown and his flow when
7  something has been -- let's just
8  say objectionable, to the point
9  where I felt like I needed to say
10  something I have, otherwise, I've
11  allowed him to get in a flow with
12  his witnesses.
13        Right now, we're just
14  getting started and we're
15  spending a lot of time dealing
16  with objections.
17        THE ARBITRATOR:  I think
18  both counsel have been respectful
19  of each other and me, and I
20  appreciate it, and I think we can
21  continue.  And I'm not going to
22  overall, like, limit anyone's
23  ability to object.
24        On the other hand, both
25  counsel know it's arbitration, so

Page 221

1  CROSS-EXAMINATION  MR. TORELLO-VIERA
2  we're not bound by the rules of
3  evidence, and I'm just looking to
4  get an essential testimony of
5  each witness.  So guys, let's
6  move on.  All right.  Okay.  So
7  the essence of the question was:
8  Do you know if they gave notice
9  that they didn't want to continue
10  because the store was not doing
11  well?
12        THE WITNESS:  Yes.  That's
13  what I heard.
14   Q. Okay.  So to have an experienced
15  operator, Alfonso Entebi, who could not
16  make it work in this Las Vegas store,
17  this is what you were told, correct?
18   A. Yes.
19   Q. Okay.  And after Alfonso Entebi
20  informed Sarah that he would not move
21  forward operating the store after the
22  initial term of the management
23  agreement, were there discussions about
24  finding a new tenant for the store?
25   A. Not with me.



## Page 222

```
1          CROSS-EXAMINATION  MR. TORELLO-VIERA
2      Q. Not with you.  Okay.  I'm going
3  to show you -- Mr. Torello-Viera, can
4  you see my screen?
5      A. Yes, sir.
6      Q. Do you see a series of e-mails,
7  first one dated October 8, 2014; do you
8  see that?
9      A. Yes, sir.
10     Q. And this is an e-mail from
11 Alfonso Entebi to Amar Hamad and others
12 including you, correct?
13     A. Yes, I am CC'd on the e-mail.
14        THE ARBITRATOR:  Guys, let's
15 just identify on the record that
16 this is Exhibit 54.  Go ahead.
17        MR. LEWIS:  Thank you,
18 Mr. Farber.
19     Q. I'm going to really quickly, for
20 you, Mr. Torello-Viera.  "As we talked
21 and explained, I asked you to please
22 confirm to me and Paolo Torello-Viera,
23 CEO Americas Pal Zileri, that we are
24 authorized and can go forward with
25 prospective tenant for a possible take
```

## Page 223

```
1          CROSS-EXAMINATION  MR. TORELLO-VIERA
2  over of the store."  Do you see that?
3      A. Yes.
4      Q. You're referenced in this e-mail
5  as seeking confirmation from Sarah that
6  you are authorized to go forward with a
7  respective tenant; do you see that?
8      A. Yes, sir.
9      Q. And Dr. Hamad responds back to
10 you, "Okay, go ahead and proceed"; do
11 you see that?
12     A. Yes.
13     Q. Okay.  And as we continue in
14 this e-mail thread, Alfonso writes
15 back, "Paolo Torello-Viera CEO Forall
16 USA, making sure you're getting the
17 full credentials in this e-mail, is
18 advancing with the prospect of a new
19 tenant.  Please confirm that we can
20 send them a copy of the executed lease
21 agreement between Sarah and the mall."
22 Do you see that?
23     A. Yes, sir.
24     Q. Who was the prospective tenant
25 that was waiting for the lease
```

## Page 224

```
1          CROSS-EXAMINATION  MR. TORELLO-VIERA
2  agreement?
3      A. I don't know.  To me -- again, I
4  was CC'd.
5         THE ARBITRATOR: No.  No.
6  No.  You answered the question.
7  The answer is you don't know.
8  That's all.  Next question.
9      Q. And Dr. Bachar Hamad sends back
10 an e-mail on October 2014 saying, "You
11 can send a copy of the lease."  Did you
12 all send a copy of the lease to the
13 prospective tenant?
14        MR. BROWN:  Objection.
15        THE ARBITRATOR:  What's the
16 objection?
17        MR. BROWN:  "You all."
18        MR. LEWIS:  Mr. Alfonso
19 Entebi is asking on behalf of
20 Paolo Torello-Viera, CEO, to send
21 a copy of the lease to the
22 prospective tenant.
23        THE ARBITRATOR:  Why don't
24 you rephrase the whole question.
25     Q. Mr. Torello-Viera, did you
```

## Page 225

```
1          CROSS-EXAMINATION  MR. TORELLO-VIERA
2  personally send a copy of the lease
3  back to the perspective tenant?
4      A. No.  I don't know who it was.
5      Q. You don't know who he was.  Do
6  you know if Alfonso Entebi sent a copy
7  of the lease back to the perspective
8  tenant?
9      A. I don't know.
10     Q. We started out of a big portion
11 of your testimony, this line of
12 questioning, you saying, "No one had a
13 conversation with me about finding a
14 perspective tenant after Alfonso Entebi
15 said he wasn't going to go on after the
16 initial term."  Do you recall saying
17 that?
18     A. Yes.
19     Q. Is that accurate?
20     A. That's what I said.
21     Q. That's not an answer to the
22 question, sir.  Was that accurate?
23     A. I think so.
24     Q. You think so.  Did you respond
25 back to this e-mail thread,        Mr.
```

Page 226

1    CROSS-EXAMINATION  MR. TORELLO-VIERA
2    Torello-Viera?
3        A. No.
4        Q. Your testimony today is that you
5    did not respond back -- you did not
6    participate in this e-mail thread;
7    that's your testimony?
8        A. I did not answer to these
9    e-mails.  As I am saying before, I was
10   CC'd.
11       MR. LEWIS:  Mr. Farber?
12       THE ARBITRATOR:  Yes.
13       MR. LEWIS:  We -- you just
14   heard this, there's a document
15   that I recently received which is
16   a part of this e-mail thread.  It
17   has not been produced in this
18   matter, but I want to use it for
19   impeachment purposes because.  It
20   goes to the credibility of the
21   witness.
22       THE ARBITRATOR:  That may
23   be, but why wasn't it produced?
24       MR. BROWN:  We received it
25   after the production -- we

Page 227

1    CROSS-EXAMINATION  MR. TORELLO-VIERA
2    recently received it.  It is part
3    of this thread we produced the
4    version -- an incorrect version
5    of this thread.  The thread has a
6    response from Mr. Paolo
7    Torello-Viera, and it should have
8    been produced by Sarah -- excuse
9    me -- by Forall as well.
10       THE ARBITRATOR:  You have
11   shown a copy of this document to
12   Mr. Brown.
13       MR. LEWIS:  I have not.  I
14   have not had an opportunity to.
15   It is just for impeachment
16   purposes only.  I can read it to
17   Mr. Torello-Viera or I can show
18   it to him.
19       THE ARBITRATOR:  My
20   suggestion that you very quickly
21   scan it, and send it to
22   Mr. Brown, and ask Mr. Brown if
23   he has any objection.
24       MR. BROWN:  I will have -- I
25   can put my objection right now.

Page 228

1    CROSS-EXAMINATION  MR. TORELLO-VIERA
2    I was not allowed to introduce
3    the business proposal plan which
4    had multiple impeachment
5    purposes.
6        That, in fact, was produced
7    prior to this hearing.  If
8    they're producing documents now
9    in e-mails, what things else
10   didn't they provide to us?
11       THE ARBITRATOR:  Mr. Brown
12   -- Mr. Brown, all I asked was if
13   you had an objection.  That's
14   all.  I think you ought to look
15   at it, but it's up to you.  If
16   you want to post your objection
17   on the basis of non-production, I
18   have not heard a good reason for
19   non-production.
20       And guys, look, I don't do
21   this to be harsh.  I'm actually
22   not good at being harsh.  I do
23   this because it's not fair, and
24   that's the reason it's not trial
25   by ambush.  So unless there's

Page 229

1    CROSS-EXAMINATION  MR. TORELLO-VIERA
2    really a good reason, I'm not
3    going to allow in documents that
4    were the subject of a request for
5    document production and were not
6    produced.
7        Now, I really haven't heard
8    a good reason, therefore, the
9    objection is going to be
10   sustained.
11       MR. LEWIS:  Mr. Farber, let
12   me just remind you that earlier
13   today Mr. Brown showed a document
14   that had not been produced to
15   refresh    Mr. Torello-Viera's
16   recollection.
17       THE ARBITRATOR:  If you want
18   to refresh your recollection,
19   someone's recollection, you can
20   use what used to be a telephone
21   book, and I haven't stopped you,
22   but right now you asked to
23   introduce something into
24   evidence.
25       MR. LEWIS:  No, I did not.



CROSS-EXAMINATION  MR. TORELLO-VIERA
1
2  THE ARBITRATOR: I'm sorry.
3  Then I misconstrued your request.
4  MR. LEWIS: I'm using it to
5  refresh his recollection only.
6  THE ARBITRATOR: Go ahead
7  with your question and we'll see
8  what the story is. I'm not sure
9  -- I'm seeing on the screen an
10  outline of questions, and I'm not
11  sure that you want to show that
12  to everybody.
13  MR. LEWIS: I apologize,
14  Mr. Farber. If you would just
15  give me two minutes, I'm sure I
16  can get this fixed. Okay.
17  MR. BROWN: It seems there
18  was an incomplete production done
19  here. That's the nature of this;
20  materially different than the
21  business proposal plan, which was
22  in possession of Palma Settimi
23  that had been forwarded by Luca
24  and was produced prior to
25  hearing. Now we're in this

CROSS-EXAMINATION  MR. TORELLO-VIERA
1
2  hearing --
3  MR. LEWIS: Mr. Brown --
4  THE ARBITRATOR: Let's let
5  him continue. If either counsel
6  has some sort of application,
7  I'll consider it, but right now
8  let's let Mr. Lewis finish his
9  cross.
10  Q. Mr. Torello-Viera, you first
11  testified that you weren't part of this
12  conversation about finding a new tenant
13  after Italnord decided it was not going
14  to move on; do you remember that?
15  A. Yes.
16  Q. And that was incorrect, right,
17  you were part of this conversation at
18  least by e-mail, right?
19  A. I was CC'd on the e-mail.
20  Q. Okay. And then you testified
21  that you did not respond in these
22  e-mails. You testified to that effect,
23  correct?
24  A. I don't remember responding to
25  the e-mail.

CROSS-EXAMINATION  MR. TORELLO-VIERA
1
2  Q. That wasn't your testimony. You
3  said that you did not respond, you did
4  not participate in the e-mails, you
5  were only CC'd, remember?
6  MR. BROWN: Mr. Farber, can
7  we at least have him put the
8  e-mail up that he's going to try
9  to refresh his recollection with.
10  I really find this objectionable
11  and distasteful.
12  THE ARBITRATOR: Mr. Brown,
13  calm down. This is cross
14  examination. And you know, many
15  years ago, I sat with an
16  arbitrator who said, you know,
17  don't think we arbitrator's don't
18  have some understanding of what's
19  going on.
20  All right, we've all
21  been there. We understand. Let
22  Mr. Lewis do his thing. He let
23  you do yours. All right? You
24  don't have to be concerned about
25  that. I really have a fairly

CROSS-EXAMINATION  MR. TORELLO-VIERA
1
2  good handle of what's going on,
3  and it's arbitration. Just
4  relax. All right?
5  It's the same thing for
6  Mr. Lewis, and he is
7  relaxed, so relax as well.
8  We'll get there.
9  Mr. Lewis, go ahead with
10  your questions.
11  Q. Mr. Torello-Viera, do you see
12  this e-mail of November 4, 2014? Do
13  you see this, it's on the screen, sir?
14  A. Yes, I see the e-mail.
15  Q. Please read that.
16  THE ARBITRATOR: Counsel,
17  why don't you give us an exhibit
18  number. That's always helpful
19  when I read the transcript. It
20  makes it a lot easier and I can
21  figure out where to go look in
22  the document.
23  MR. LEWIS: This is not an
24  exhibit that's been admitted.
25  We're not trying to admit it into



CROSS-EXAMINATION  MR. TORELLO-VIERA
1  evidence.  It's a document that
2  I'm only using to refresh his
3  recollection and impeach.
4      MR. BROWN:  Objection.
5      THE ARBITRATOR:  He can show
6  it to the witness.  I'm not
7  reading it, so go ahead.
8      Q. Mr. Torello-Viera, is this an
9  e-mail from you on November 4, 2014,
10  within this string; do you see that?
11     A. Yes, I see the e-mail.
12     Q. Okay.  And you write --
13     THE ARBITRATOR:  No.  No.
14  No.  That's effectively giving me
15  the e-mail.  I don't want to hear
16  it.  Not in evidence and with
17  good reason I've kept it out of
18  evidence.  I don't want to hear
19  it.  What's your next question?
20     Q. Would you now admit that you
21  participated in this conversation about
22  finding a new perspective tenant after
23  Italnord decided that he would not
24  continue on?

*(Note: lines renumbered; original numbering 1–25 shown in image)*

CROSS-EXAMINATION  MR. TORELLO-VIERA
1      MR. BROWN:  The question is:
2  Will he now admit that he had
3  some correspondence at this time?
4      MR. LEWIS:  Mr. Farber --
5      THE ARBITRATOR:  No.  He --
6  look, I think he's got the
7  question.
8      Do you understand the
9  question?
10     THE WITNESS:  Can you repeat
11  the question.
12     Q. Would you change your testimony
13  as to whether or not you participated
14  in the conversation about finding a new
15  tenant after Alfonso Entebi said that
16  he would not move on or continue on
17  after the end of the term in the
18  management agreement?  Would you change
19  your testimony now,         Mr.
20  Torello-Viera?
21     THE ARBITRATOR:  Give him a
22  chance to read -- Mr.
23  Torello-Viera, do you have a
24  better recollection now as to

CROSS-EXAMINATION  MR. TORELLO-VIERA
1  whether you participated in
2  trying to find another tenant or
3  do you stick to the same that you
4  don't remember participating in
5  trying to find another tenant?
6      THE WITNESS:  I see the
7  e-mail.  I don't have any
8  recollection,   Mr. Farber.
9      THE ARBITRATOR:  Next
10  question.
11     Q. Mr. Torello-Viera, did you
12  demand a brokerage fee to participate
13  in finding a new tenant after Italnord
14  left?
15     MR. BROWN:  You showed this
16  to him for recollection purposes.
17  He said he now doesn't --
18     MR. LEWIS:  I'm asking a
19  different question.
20     THE ARBITRATOR:  Mr. Brown.
21  Mr. Brown, is that an objection?
22     MR. BROWN:  That's an
23  objection.
24     THE ARBITRATOR:  Overruled.

CROSS-EXAMINATION  MR. TORELLO-VIERA
1      You can answer.
2      A. I see the e-mail, I don't have
3  recollection.
4      Q. I didn't even reference the
5  e-mail.  I asked you did you charge --
6  did you demand a brokerage fee to
7  participate in helping to find a new
8  tenant to operate the store in 2014;
9  that's my question.
10     A. Again, it's in the e-mail.  I
11  don't have a recollection.
12     THE ARBITRATOR:  Okay.  You
13  don't remember that.  Okay.  Go
14  ahead.
15     Q. Well, to help refresh your
16  recollection then, I'll refer you to
17  the e-mail, where you write -- and I
18  won't read it aloud to Mr. Farber.
19  I'll allow you to read it to yourself.
20     THE ARBITRATOR:  Read it to
21  yourself.  And does this refresh
22  your recollection as to whether
23  you asked for a brokerage fee?
24     THE WITNESS:  It's in the



Page 238

CROSS-EXAMINATION  MR. TORELLO-VIERA

1
2  e-mail.  I don't remember the
3  whole thing.
4      THE ARBITRATOR:  Okay.  It
5  does not refresh his
6  recollection.  Go ahead.
7      MR. LEWIS:  Mr. Farber, I
8  heard it differently.  He said,
9  "I don't remember the whole
10  thing."
11      THE ARBITRATOR:  Okay.  It
12  will be in the record.  Go ahead.
13  Q. Mr. Torello-Viera, isn't it true
14  after Italnord left or informed Sarah
15  and Forall that he would not continue
16  on after the initial term, you
17  testified about a letter agreement that
18  Sarah entered into with Simon, correct?
19  Do you remember testifying about the
20  letter agreement?
21  A. Can you give me a specific date?
22  Q. Absolutely.  October 23, 2014.
23  There was a letter agreement entered
24  into between Sarah and Simon on
25  October 23, 2014; do you recall

Page 239

CROSS-EXAMINATION  MR. TORELLO-VIERA

1
2  testifying about that?
3  A. Yes.
4  Q. You testified that you were
5  upset by that agreement because it was
6  an anticipatory breach of the license
7  agreement for the consignment
8  agreement, it was in the consent
9  agreement, correct?
10  A. Yes.
11  Q. Isn't it true,        Mr.
12  Torello-Viera, that you were upset
13  about the letter agreement, which would
14  have allowed Simon to find a new
15  tenant, because it would have
16  effectively cut you out of a brokerage
17  fee that you were demanding to help
18  find a new tenant, yourself?
19  A. No.
20  Q. Mr. Torello-Viera, you would --
21  you say that you don't recall the whole
22  thing, but you acknowledge that you
23  demanded a brokerage -- that language
24  indicates that you were demanding a
25  brokerage fee?

Page 240

CROSS-EXAMINATION  MR. TORELLO-VIERA

1
2      Let me ask you a different
3  question.
4      Were you here for Dr. Bachar
5  Hamad's testimony yesterday?
6  A. Yes, I was around.
7  Q. And do you recall Dr. Bachar
8  Hamad testifying that you demanded a
9  brokerage fee to help find a new tenant
10  to take over the store, but he didn't
11  agree to those demands; do you remember
12  that?
13  A. I remember him saying that, yes.
14  Q. And isn't that supported by what
15  you just read to yourself?
16      MR. BROWN:  Objection.
17      THE ARBITRATOR:  Sustained.
18  It's meaningless to me to know if
19  something is supported by
20  something not in evidence.  Next
21  question.
22  Q. Mr. Torello-Viera, you will
23  admit that you were part of discussions
24  in November 2014 to find a new tenant,
25  do you remember, you agree with that

Page 241

CROSS-EXAMINATION  MR. TORELLO-VIERA

1
2  now, correct?
3  A. I said that I saw the e-mail.
4      THE ARBITRATOR:  No.  Mr.
5  Torello-Viera, the question is,
6  simply, do you agree that you
7  were in discussions to find a new
8  tenant or not or you don't
9  remember?
10      THE WITNESS:  I don't
11  remember.
12      THE ARBITRATOR:  Okay.  Go
13  ahead.  Next question.
14  Q. Mr. Torello-Viera, can you see
15  my screen?
16  A. Yes.
17  Q. And you see that this is
18  Exhibit 51?
19      MR. BROWN:  Exhibit 51, is
20  that what you said, Rodney?
21      THE ARBITRATOR:  Yes.
22  Q. And so, Mr. Torello-Viera, this
23  string of e-mail start back on
24  October 8, 2014.  We covered some of
25  this.  This is in evidence, Mr. Farber,



Page 242

CROSS-EXAMINATION MR. TORELLO-VIERA
1
2  discussions about the prospective
3  tenant; do you see that?
4      A. Yes.  This is the same e-mail
5  you pulled up before.
6      Q. It's a different document with
7  different e-mails, but it does contain
8  some of the same, so you're right.
9          MR. LEWIS:  Bear with me as
10  we go up.  Okay.
11      Q. Here's what I want you to pay
12  attention to, this section right here.
13  November 4, 2014, you write in this
14  e-mail thread, "Dr. Hamad, it was nice
15  talking to you.  As requested, please
16  find attached copy of the lease
17  agreement between Sarah LLC and Forum
18  Shops that was sent to the prospective
19  tenant.  I am hopping to talk to the
20  prospective some time this week and
21  will keep you abreast."  Do you see
22  that?
23      A. Yes.
24          MR. BROWN:  Objection.  What
25  did you just read.

Page 243

CROSS-EXAMINATION MR. TORELLO-VIERA
1
2          THE ARBITRATOR:  I'm looking
3  for it as well.  Where is that?
4          MR. BROWN:  Rod, what did
5  you just read there, buddy?
6          MR. LEWIS:  I'm missing your
7  point.  If you all exchanged a
8  document that I have on the
9  screen, it should be very clear
10  what I'm reading.
11          THE ARBITRATOR:  Oh, I see.
12  It's in the middle of the page.
13  I missed it also, I was reading
14  the top one, and I didn't
15  understand it was the middle one
16  you were reading.
17          MR. LEWIS:  Are we all on
18  the same page now?
19          THE ARBITRATOR:  We are now,
20  I think.
21      Do you see it, Mr. Brown?
22          MR. BROWN:  My apologies.
23          MR. LEWIS:  Okay.
24      Q. So, Mr. Torello-Viera, you write
25  on November 4, 2014, to Dr. Hamad, "It

Page 244

CROSS-EXAMINATION MR. TORELLO-VIERA
1
2  was nice talking to you.  As requested,
3  please find attached a copy of the
4  lease agreement between Sarah LLC and
5  the Forum Shops that was sent to the
6  prospective tenant.  I am hopping to
7  talk to the prospective some time this
8  week and will keep you abreast,
9  sincerely, PTV," that's your correct?
10          MR. CROWE:  Which exhibit
11  are you referring to?
12          MR. BROWN:  Hold on.  This
13  was not the document, if I'm not
14  mistaken.
15          MR. LEWIS:  What's going on?
16          THE ARBITRATOR:  Guys, we're
17  rebooting, starting again.  State
18  your question, Mr. Lewis.  There
19  was some confusion.  Restate your
20  question.  If you want to read
21  something, go ahead.
22          MR. LEWIS:  I'm asking if
23  you are having technical issues,
24  because maybe that's it.  I have
25  Exhibit 51 on my screen that I'm

Page 245

CROSS-EXAMINATION MR. TORELLO-VIERA
1
2  sharing.  Is that what you're
3  seeing?
4          MR. BROWN:  Mr. Farber, give
5  me a second.
6          MR. LEWIS:  I'm going to
7  un-share and let's get this
8  squared away now.  Are you all
9  not seeing what I'm seeing on my
10  screen?
11          MR. BROWN:  We are seeing
12  it, and I just want to verify,
13  Mr. Lewis, that this is the exact
14  copy of Exhibit 51.
15          THE ARBITRATOR:  Mr. Crowe,
16  we're going to have to do
17  one-on-one not two-on-one,
18  because otherwise  Mr. Shah is
19  going to jump in and it will get
20  a bit chaotic.
21      So it looks like Mr. Brown
22  is doing a fine job, so let's let
23  him continue.  Otherwise, it gets
24  out of hand and it's not fair to
25  Mr. Lewis.  Mr. Brown, do you



1    CROSS-EXAMINATION  MR. TORELLO-VIERA
2    have a point you want to make or
3    can we continue with the
4    examination?
5        MR. LEWIS:  I have to tell
6    you, I'm confused why we're
7    pausing here.
8        THE ARBITRATOR:  I think
9    that they don't see the document
10   on their screen that you're
11   referring to.
12       MR. LEWIS:  Did you see it,
13   Mr. Farber?
14       THE ARBITRATOR:  I did see
15   it.  I no longer see it.
16       MR. LEWIS:  I took it down
17   so we could square this away.
18       THE ARBITRATOR:  So why
19   don't you put it back up, and
20   then you can restate the
21   question, and we can get to work
22   it away.
23       And guys, sometimes with
24   Zoom this will happen.  So we'll
25   take it slow and we'll get it

1    CROSS-EXAMINATION  MR. TORELLO-VIERA
2    done.
3        MR. LEWIS:  Okay.
4    Gentlemen, this is Exhibit 51.
5    If it will help you for me to
6    give you the bates number, I'm
7    happy to do so.
8        MR. BROWN:  Thank you,
9    Mr. Lewis.
10       MR. LEWIS:  Sure.  That is
11   Claimants 723, Exhibit 51, and
12   I'm about to share the screen
13   again.  Okay?
14       MR. BROWN:  Okay.
15       MR. LEWIS:  Okay.
16       MR. BROWN:  Thank you.
17       MR. LEWIS:  We're squared
18   away.
19   Q. So, again, Mr. Torello-Viera,
20   we've spent some time reading this
21   paragraph now, but you understand that
22   you are e-mailing Dr. Hamad and you are
23   saying that you have -- hold on.  Okay.
24       So here, Mr. Torello-Viera, you
25   are -- Mr. Torello-Viera, you're

1    CROSS-EXAMINATION  MR. TORELLO-VIERA
2    telling Dr. Hamad in this e-mail that
3    you were forwarding a copy of the lease
4    agreement between Sarah and Forum that
5    was sent to the prospective tenant; you
6    see that, right?
7    A. Yes.
8    Q. You testified earlier that you
9    didn't know who the prospective tenant
10   was; do you recall that?
11   A. Yes.  And I don't remember.
12   Q. That's different.  You said you
13   didn't know who the prospective
14   tenant -- Mr. Torello-Viera, you were
15   saying you weren't part of this
16   conversation.
17       THE ARBITRATOR:  Is that a
18   question, sir?
19   Q. The question is how can you
20   reconcile that with this e-mail?
21   A. I don't remember.
22   Q. Does this refresh your
23   recollection, Mr. Torello-Viera, that
24   not only did you agree to participate
25   in finding a new tenant to take over

1    CROSS-EXAMINATION  MR. TORELLO-VIERA
2    the store, you found someone; does that
3    refresh your recollection?
4    A. No.
5    Q. It doesn't.  It says right here
6    that you forwarded the lease agreement
7    between Sarah LLC and Forum Shop that
8    was sent to the prospective tenant, and
9    you were hopping to have the tenant
10   some time next week and will keep them
11   abreast; do you see that?
12   A. I see, but I don't remember.
13   Q. Well, that's different then
14   saying you didn't find a prospective
15   tenant because, clearly, you did.
16       We go on in the e-mail and you
17   have Dr. Hamad responding to you, Dr.
18   Amar Hamad responding to you, "Great
19   talking to you this morning."  Do you
20   remember having a conversation with Dr.
21   Amar Hamad on December 1, 2014; do you
22   recall that?
23       MR. BROWN:  I'm going to
24   object to that question because
25   there was a statement then a



CROSS-EXAMINATION  MR. TORELLO-VIERA
1
2    question, but --
3         THE ARBITRATOR: It's
4    overruled.  You can answer.
5         Do you remember a
6    conversation on the morning of
7    December 1, 2014, with Dr. Amar
8    Hamad?
9         THE WITNESS: On the e-mail
10   that I read, yes.
11   Q. Do you have an independent
12   recollection of that, Mr.
13   Torello-Viera?
14   A. Say it again, sorry.
15   Q. Do you have an independent
16   recollection of that, sir?
17   A. It tells me that we -- Pal
18   Zileri was taking over the management
19   --
20   Q. I'm asking you, sir, to talk
21   about --
22        THE ARBITRATOR: He thinks
23   you're asking to him to tell him
24   what the conversation was.
25        He just wants to know if you

CROSS-EXAMINATION  MR. TORELLO-VIERA
1
2    remember the conversation.  Do
3    you remember it?
4         THE WITNESS: No, I don't
5    remember a conversation.  But it
6    must have happened since we have
7    this e-mail.
8         THE ARBITRATOR: Okay.
9    Q. Okay.  So this is since between
10   November 4, 2014, when you had
11   identified a prospective tenant.  Now,
12   were at December 1, 2014, and Dr. Amar
13   Hamad is discussing Pal Zileri taking
14   over the store; do you see that?
15   A. Yes.
16   Q. What happened to the prospective
17   tenant between November 4, 2014, and
18   December 1, 2014?
19   A. It is clear to me that it didn't
20   materialize.
21   Q. And did that have anything to do
22   with Dr. Bachar Hamad's refusal to pay
23   the brokerage fee?
24   A. I don't remember.
25   Q. You don't remember.  You

CROSS-EXAMINATION  MR. TORELLO-VIERA
1
2    testified earlier that you were
3    committed to making sure everyone did
4    well, that Forall was committed to
5    making sure everyone did well,
6    collectively.
7         If that prospective tenant
8    didn't come to bear to operate the
9    store because you didn't get a
10   brokerage fee, would that be consistent
11   with that commitment to making sure
12   everyone did well?
13        MR. BROWN: Objection.
14   Q. Mr. Torello-Viera --
15        THE ARBITRATOR: Sustained,
16   Counsel.  I also lost the
17   question about the consistency
18   part.  Why don't you rephrase it?
19   Q. If you did not bring a
20   prospective tenant to operate the store
21   in November of 2014 because the doctors
22   refused to pay a brokerage fee, would
23   that be fair in your mind, sir?
24   A. No.
25        MR. BROWN: Objection.

CROSS-EXAMINATION  MR. TORELLO-VIERA
1
2         THE ARBITRATOR: He
3    answered.  All right.  Let me
4    just remind you, Mr.
5    Torello-Viera, you've got two
6    very good lawyers.
7         If you're going to jump in
8    with the answer, you've got to
9    give them the opportunity to say
10   "objection," because they're
11   trying to help you, and so I've
12   heard the answer.
13        MR. LEWIS:  I did not,
14   though, Mr. Farber.
15        THE ARBITRATOR: It was
16   "no".
17   Q. I want to take you back to this
18   e-mail on December 1, 2014.  Here, Dr.
19   Amar Hamad writes to you, "This e-mail
20   is to confirm we are very interested
21   for Pal Zileri to take over the
22   management of the Las Vegas store."
23   Let me pause there.  Was it Forall --
24   your idea for Pal Zileri to take over
25   the store or was it the doctor's idea?



Page 254

1    CROSS-EXAMINATION  MR. TORELLO-VIERA
2         MR. BROWN:  Do you recall?
3         MR. LEWIS:  We're getting
4    some coaching that I hear.
5         Mr. Torello-Viera, if he was
6    alone, he would have to figure
7    out how to answer, like our
8    witnesses had to figure out how
9    to answer.
10        MR. BROWN:  I object
11   strenuously to that
12   characterization.  You already
13   asked him about the e-mail.  He
14   said he didn't recall the
15   conversation, but it must --
16        MR. LEWIS:  If you allow him
17   to answer my question --
18        THE ARBITRATOR:  Gentlemen,
19   we'll need to take one at a time
20   or we will not take.  So we're
21   going      to -- we're going to,
22   again, reboot.  Guys, this
23   doesn't help me.
24        Ask your question, and if
25   you have an objection, Mr. Brown,

Page 255

1    CROSS-EXAMINATION  MR. TORELLO-VIERA
2    just say "objection," and then
3    I'll ask you what it is.  All
4    right?  Let's kind of go orderly
5    here, and I just want to hear
6    from the witness in response
7    unless you have an objection.
8         Restate your question,
9    Mr. Lewis.
10        Q. Mr. Torello-Viera, was it
11   Forall's idea or was it the doctor's
12   idea for Forall to come in and operate
13   the store?
14        A. It was a mutual agreement.
15        Q. Mutual agreement.  If the e-mail
16   says here, "It was good talking to you
17   this morning.  This e-mail is to
18   confirm that we are interested for Pal
19   Zileri to come over and take over the
20   management of the store."  Do you see
21   that?
22        A. Yes.
23        Q. Does that give you a better
24   indication as to who proposed the idea?
25        MR. BROWN:  Objection.

Page 256

1    CROSS-EXAMINATION  MR. TORELLO-VIERA
2         THE ARBITRATOR:  What is the
3    objection?
4         MR. BROWN:  This e-mail --
5    he's asking if that language from
6    Amar Hamad gives him a better
7    indication of whose idea it was.
8         MR. LEWIS:  It's a yes-or-no
9    question.
10        THE ARBITRATOR:  Mr. Lewis,
11   let him finish.
12        Go ahead, Mr. Brown.
13        MR. BROWN:  He indicated he
14   doesn't recall the conversation,
15   but it happened, obviously,
16   because there was an e-mail
17   around that time, so that's his
18   recollection about this.
19        THE ARBITRATOR:  I don't
20   understand.  What's your
21   objection, Mr. Brown?
22        MR. BROWN:  I'll withdraw it
23   if you don't understand it.
24        THE ARBITRATOR:  Okay.  You
25   can answer the question.  Guys,

Page 257

1    CROSS-EXAMINATION  MR. TORELLO-VIERA
2    this is not rocket science.  He's
3    using documents to try to ask
4    this witness if he remembers
5    whose idea it was for Pal Zileri
6    or Forall to take over the store
7    and that's it.
8         Does this jog your memory,
9    Mr. Torello-Viera, as to who
10   first had the idea for Forall to
11   take over the store?
12        THE WITNESS:  To a certain
13   extent, yes.
14        THE ARBITRATOR:  Okay.  Then
15   what's your memory?  What's your
16   better memory right now.
17        THE WITNESS:  That to a
18   certain extent, yes.  We proposed
19   that in order to assist the
20   doctors.  Otherwise, it will have
21   to take and run the store since
22   January 1st.
23        THE ARBITRATOR:  Okay.  So
24   when you say, "We proposed that,"
25   does that mean you proposed it?



Page 258

1    CROSS-EXAMINATION  MR. TORELLO-VIERA
2         THE WITNESS:  Yes.
3         THE ARBITRATOR:  Okay.
4    That's fine.  Okay.  You've got
5    your testimony.  Mr. Lewis, go
6    ahead.
7         MR. LEWIS:  Thank you.
8    Q. I want to clarify though -- I'll
9    come back to that.  So after
10   considering your idea of Forall coming
11   in and operating the store, Dr. Amar
12   Hamad writes back with some terms that
13   he'd like to see, "At the end of the
14   first year of the agreement, you will
15   let us know if you would like to take
16   over the entire lease, which would be a
17   six-year agreement.  If not, then Sarah
18   LLC will have a six-month period to
19   turn the store over to Simon"; do you
20   see that?
21       A. Yes.
22       Q. Okay.  So you understand then
23   that Sarah is asking for a six-month
24   notice period for the purpose of
25   turning the store back over to Simon.

Page 259

1    CROSS-EXAMINATION  MR. TORELLO-VIERA
2    You understand that, right?
3         A. Yes.  But this is not correct.
4         THE ARBITRATOR:  The
5    question is, "Did you understand
6    it?"  The answer is, "Yes."
7    That's good enough.  Let's --
8    next question.
9         Q. Next question is confirm that
10   this is on December 1, 2014, correct?
11       A. Yes.
12       Q. There's an e-mail that you write
13   on December 3rd, which is in response
14   to this e-mail from Dr. Amar Hamad to
15   you, asking for this six-month notice
16   appeared to be included in the proposal
17   that you had if Forall operated the
18   store, and you write, "Dr. Amar, thank
19   you for your time dedicated to our
20   conversation this morning.  As agreed,
21   you've given mandate to our counsel to
22   deal with yours on the management
23   agreement."  Do you see that?
24       A. Yes.
25       Q. Can you show me anywhere in here

Page 260

1    CROSS-EXAMINATION  MR. TORELLO-VIERA
2    where you write, "There's no way we can
3    turn the store back in.  It would
4    damage our brand.  There's no way we
5    can allow you to turn the store back
6    over to Simon.  It would have
7    detrimental affects on our brand."  Did
8    you write anything like that?
9         A. I deferred to our legal
10   counsel --
11        THE ARBITRATOR:  The
12   question is:  Did you write
13   anything like that?  Either you
14   did or you didn't.  And the
15   answer is pretty obvious because
16   I'm reading it.
17        MR. LEWIS:  I'd like an
18   answer for the record.
19        THE ARBITRATOR:  Did you
20   write anything like that or not?
21        THE WITNESS:  No.
22        THE ARBITRATOR:  Okay.  Next
23   question.
24       Q. Later in the e-mail Mr. -- Dr.
25   Hamad asks you if you had time for a

Page 261

1    CROSS-EXAMINATION  MR. TORELLO-VIERA
2    call; and do you recall having another
3    conversation with him on December 5,
4    2014?
5         A. If we made an appointment, I
6    guess we had the conversation.
7         Q. Do you have an independent
8    recollection of that conversation?
9         MR. BROWN:  He just said he
10   didn't, but you cut him off when
11   he said he doesn't recall.
12        THE ARBITRATOR:  I heard it.
13   Next question.
14        MR. LEWIS:  I want to make
15   sure this is working properly, so
16   please let me know if you see the
17   management agreement on the
18   screen.
19        MR. BROWN:  Yup.
20        THE ARBITRATOR:  We've got
21   it.
22        MR. LEWIS:  I want to make
23   sure before I spend any time on
24   the document.
25       Q. So, Mr. Torello-Viera, do you



Page 262

CROSS-EXAMINATION MR. TORELLO-VIERA
1 CROSS-EXAMINATION MR. TORELLO-VIERA
2 see that this is management agreement
3 between Forall USA and Sarah LLC dated
4 March 15, 2015?
5     A. Isn't it the 7th of February?
6     Q. I'm sorry.  It's dated the 9th
7 of February, should be effective as of
8 March 15, 2015.  So you recognize this
9 document?
10     A. Yes.
11     Q. And I will remind you what we
12 just spoke about and the conversation
13 you had December 2014 where Sarah were
14 asking for a six-month notice period
15 for the purpose of turning the store
16 back into Simon; do you recall us
17 talking about that before?
18     A. Yes, I saw the e-mail.
19     Q. Okay.  And so these -- please
20 take a look at 2.1 in the management
21 agreement; do see you this?
22     A. Yes.
23     Q. It says, "Forall shall assume
24 exclusive management of and control of
25 the business effective no letter than

Page 263

1 CROSS-EXAMINATION MR. TORELLO-VIERA
2 March 15, 2015, for a term of 18
3 months, initial term.  Forall shall at
4 its sole discretion advise Sarah on or
5 before March 1, 2016, whether it
6 intends to take over the lease and
7 business and/or otherwise terminate the
8 management agreement at the end of the
9 initial term."  Do you see that?
10     A. Yes.
11     Q. And the initial term was
12 18 months which would have ended in
13 September of 2016, correct?
14     A. Yes.
15     Q. Do you recognize that in here
16 "Forall has agreed to give six months
17 notice whether it intends to take over
18 the lease and business and/or otherwise
19 terminate management agreement at the
20 end of the initial term."  You see
21 that, right?
22     A. Yes.
23     Q. And you signed this on behalf of
24 Forall USA?
25     A. Yes.

Page 264

1 CROSS-EXAMINATION MR. TORELLO-VIERA
2     Q. And, again, do you recall that
3 the purpose of the six-month notice
4 period was for Sarah to be able to turn
5 the store back over to Simon; do you
6 remember?
7     A. No.
8     Q. That's inconsistent with --
9 that's okay.  We'll come back to that.
10     THE ARBITRATOR:  Counsel,
11 was that a question?
12     MR. LEWIS:  No.  I decided
13 I'll come back to it at another
14 document.
15     THE WITNESS:  I have this in
16 my notes for later.
17     Q. So, Mr. Torello-Viera, we've
18 seen the six-month notice period make
19 its way through e-mails into the
20 management agreement, correct?
21     A. No.
22     Q. It was picked up in the
23 management agreement, was it not?
24     A. No.  Again, I had it on my notes
25 later, since I cannot talk now.

Page 265

1 CROSS-EXAMINATION MR. TORELLO-VIERA
2     Q. I don't know what you mean by
3 that, sir.  I'm asking a yes-or-no
4 question.  Was the six-month notice
5 period reflected in the management
6 agreement?
7     THE WITNESS:  I'm asking,
8 Mr. Farber, if I can explain this
9 point.
10     THE ARBITRATOR:  That's a
11 different question.  Mr. Lewis,
12 you asked him if the six-month
13 notice that was referred to in
14 the communications was reflected
15 in the management agreement.
16 That's one question.  Now you
17 just asked a different question,
18 which is:  Is there a six-month
19 notice provision in the
20 management agreement?
21     MR. LEWIS:  I don't have any
22 problem getting a yes or no to
23 that question.
24     THE ARBITRATOR:  Pick one of
25 the questions and then we'll get

MAGNA
LEGAL SERVICES

CROSS-EXAMINATION  MR. TORELLO-VIERA
1
2    an answer.  Okay?
3        Q. Is there a six-month notice
4    provision in the management agreement,
5     Mr. Torello-Viera?
6        A. Yes.  But there's more to it.
7        THE ARBITRATOR:  Okay.
8        Q. And Mr. Torello-Viera, Forall
9    did, in fact, give the six-month notice
10    to Sarah when they decided not to
11    continue on after the initial term,
12    correct?
13        A. Correct.
14        Q. So we have the six-month notice
15    period requested in the e-mails,
16    correct?  That's a "yes" or "no," sir.
17        A. Can you repeat the question?
18        Q. Sure.  We have a six-month
19    notice period requested in the e-mails
20    that we reviewed, correct?
21        A. Yes.
22        Q. You have a six-month notice
23    period reflected here in the management
24    agreement, correct?
25        A. As noted yes.

CROSS-EXAMINATION  MR. TORELLO-VIERA
1
2        Q. And we had six-month notice
3    provided to Sarah when Forall made its
4    decision not to continue on after the
5    initial term, correct?
6        A. Yes.  With the letter that we
7    sent you.
8        Q. And that is absolutely right.
9    But you knew the importance of the
10    six-month notice period.  You adhered
11    to this provision in the contract and
12    its consent six-month notice, correct?
13        A. Yes.  With also the provisions
14    that we added to the letter.
15        THE ARBITRATOR:  All right.
16    I got the answer.  It's yes.
17        Q. Mr. Torello-Viera, you testified
18    earlier about the time period when
19    Simon suggested that Forall move the
20    store and that was in the summer of
21    2015, correct?
22        A. Yes.
23        Q. And you testified and your
24    counsel showed an interactive map of
25    the Forum malls; do you recall that?

CROSS-EXAMINATION  MR. TORELLO-VIERA
1
2        A. Yes.
3        Q. And do you recall whether that
4    was a current map or was that the map
5    back in 2015?
6        A. The map that we used today?
7        Q. That's correct.
8        A. Is from the website, so it's to
9    date map.
10        Q. So that doesn't reflect the
11    layout in the summer of 2015, right?
12        A. From my recollection, the vast
13    majority of the tenants that was there
14    at that time are still there now.
15        Q. Mr. Torello-Viera, that was a
16    yes-or-no question.  Whether that map
17    that we saw today reflects the layout
18    of 2015?
19        THE ARBITRATOR:  Counsel,
20    "reflected" is a hard word.  I
21    think the witness has answered
22    properly.  Let's move on.
23        Guys, look, I can, you
24    know, act as referee with this
25    jabbering back and forth.  I'm

CROSS-EXAMINATION  MR. TORELLO-VIERA
1
2    really trying to finish by
3    tomorrow.  We allocated four
4    days.  I don't want to add more
5    days and more expense.
6        Let's try to focus on the
7    real issues, because this kind of
8    stuff is not going to just help
9    me decide.  So let's go with it.
10    All right.
11        Mr. Lewis, next question.
12        Q. I was asking about the prospect
13    of moving the store as it was presented
14    to you by Simon, and you testified that
15    the location that was -- was suggested
16    for you to move wasn't desirable; do
17    you recall that?
18        A. Yes.
19        Q. And my -- am I correctly
20    summarizing your testimony about that?
21        A. Yes.
22        Q. And you said the location that
23    you were in was desirable.  It was
24    better because it was around a more
25    higher end brands, etcetera?



CROSS-EXAMINATION  MR. TORELLO-VIERA
1
2     A. Yes.
3     Q. And the point I'm trying to make
4  with these questions -- first, if that
5  location was so desirable and it was
6  right amongst the high-end brand,
7  Gucci, Versace, etcetera, why could the
8  store not perform in that location?
9     A. I need a yes-or-no question.
10     THE ARBITRATOR:  No.  The
11   question is why, so you can
12   explain why.
13     A. Because -- trying to recover the
14  damages that was previously done to the
15  brand by who managed the store before
16  us.
17     Q. Mr. Torello-Viera, you
18  understand that the store wasn't
19  profitable from the beginning, right?
20  I mean, you understand the sales
21  figures in 2012, don't you?
22     THE ARBITRATOR:  Counsel,
23   your question of why the store
24   couldn't perform, I don't think
25   you specified a time period, so I

CROSS-EXAMINATION  MR. TORELLO-VIERA
1
2  don't think the witness is really
3  questioning which time period
4  you're talking about or you
5  talking about the whole tenure of
6  the store.
7     MR. LEWIS:  Thank you,
8   Mr. Farber.
9     Q. I meant throughout the whole
10  tenure, but I can be more specific.
11  Why didn't the store, to the extent you
12  understand the answer, why didn't the
13  store perform in 2012 when it was in
14  this prime location?
15     MR. BROWN:  Well --
16     A. I can only guess.  I was not
17  there.
18     Q. And let's talk about when Forall
19  was operating the store in 2015 in a
20  portion of 2016, you were still in this
21  prime location around all of the high
22  end stores, correct?
23     A. Yes.
24     Q. Do you have an appreciation for
25  how much the store did in sales while

CROSS-EXAMINATION  MR. TORELLO-VIERA
1
2  Forall operated the store?
3     A. Yes.
4     Q. And how do you -- how are you
5  aware of the sales that the store did?
6  How did you come to understand that
7  information?
8     A. I don't understand the question.
9     Q. Sure.
10     A. If you can help me.
11     Q. Absolutely.  So you say that you
12  are aware of the sales Forall -- of
13  Forall in the Las Vegas store between
14  2015, 2016.  My question was just how
15  did you arrive at that knowledge?
16     A. I had access to the figures.
17     Q. Have you reviewed those figures
18  in preparation for the arbitration?
19     A. Yes.
20     Q. Okay.  Do you know whether your
21  counsel produced the sales that you
22  reviewed in preparation for this
23  arbitration?
24     A. Yes.
25     Q. They did?

CROSS-EXAMINATION  MR. TORELLO-VIERA
1
2     A. I'm sorry.
3     MR. BROWN:  Objection to the
4   limited -- the limited value of
5   asking this witness, who is no
6   longer with the company, that
7   question.
8     THE ARBITRATOR:  Either he
9   knows or he doesn't know.  Do you
10   know if the -- if Forall's lawyer
11   produced those financial
12   documents for the period prior to
13   the time you were employed?
14     THE WITNESS:  I don't know.
15     THE ARBITRATOR:  You don't
16   know.  Okay.  Next question.
17     Q. Do you know if -- but you did
18  review the documents?  You reviewed the
19  sales figures in preparation for your
20  arbitration, that was your testimony?
21     A. Yes.
22     Q. And so can you explain for
23  Arbitrator Farber what those sales were
24  in, let's just say, April of 2015?
25     A. I don't have them on top of my



CROSS-EXAMINATION  MR. TORELLO-VIERA
1   head, I mean.
2      Q. Is there a document that would
3   refresh your recollection?  Would that
4   help to see Simon's production,
5   including the sales figures for that
6   year?
7      A. There is a report that Simon is
8   producing.
9      Q. Okay.  So that's what you
10  reviewed, a report from Simon?
11     A. I reviewed the figures.  I can't
12  tell you whether it was that report or
13  something else.
14     Q. Okay.  I'll show you a Simon
15  report, and you can let me know if this
16  is what you reviewed; is that fair?
17        MR. BROWN:  Is it in
18     evidence?
19        MR. LEWIS:  It's not in
20     evidence.
21        THE ARBITRATOR:  Can I just
22     ask you, Mr. Lewis, what are we
23     accomplishing to get me to know
24     the figures of April of '15,

CROSS-EXAMINATION  MR. TORELLO-VIERA
1   let's say they were wonderful,
2   let's say they were terrible, how
3   does that bear on what I have to
4   decide in this matter?
5        MR. LEWIS:  Great question,
6     Mr. Farber.  Mr. Torello-Viera
7     also testified earlier, and I'm
8     going to ask him about this, that
9     Simon imposes minimum revenue
10    requirements on high-end stores,
11    and I'm going to ask him what
12    that revenue requirement was for
13    the Forall store, and if they met
14    it under Forall's operation, so
15    it's quite germane.
16       THE ARBITRATOR:  I'm not
17    quite sure that he so testified.
18    I don't recollect that, but if he
19    did, why not get to that?  So get
20    to it, and ask him that.
21       You know, asking him what he
22    reviewed in preparation since
23    April '15, and then fighting over
24    whether it's a document in

CROSS-EXAMINATION  MR. TORELLO-VIERA
1   evidence doesn't advance the
2   cause, so let's get right to it.
3   All right?
4        Do you know if Simon had
5   some minimum requirement in terms
6   of revenue for the high-end
7   stores, Mr. Torello-Viera?
8        THE WITNESS:  If I can put
9   it in contents of what I said
10  this morning, I said that the new
11  location that they offered to
12  us --
13       THE ARBITRATOR:  I'm aware
14  of what you said this morning,
15  which they do for their worst
16  location stores.  You said that.
17  I got it.
18       What he's asking you
19  general is:  Is there some sort
20  of requirement that Simon has, if
21  you know that?
22       THE WITNESS:  They had sales
23  minimums.
24       THE ARBITRATOR:  Next

CROSS-EXAMINATION  MR. TORELLO-VIERA
1   question, Mr. Lewis.
2      Q. What was the minimum sales
3   requirement for the Forall store?
4      A. I don't remember.
5      Q. You remember the sales figures?
6   You just testified that you had that
7   information, but you don't remember the
8   minimum revenue threshold that Simon
9   was requiring?
10     A. Yes.
11     Q. Who would have that information?
12     A. I don't know.
13     Q. Say that again, please.
14     A. I left the company four years
15  ago, so I'm not privy to this
16  information.  And as I left, I
17  surrendered all the confidential
18  information that I had as to my
19  contract.
20     Q. You surrendered the confidential
21  information to whom, sir?
22     A. To Forall.
23     Q. To whom at Forall?
24     A. Marco Sanavia, the corporate



1     CROSS-EXAMINATION  MR. TORELLO-VIERA
2  head of HR.
3      Q. Marco Sanavia, anyone else?
4      A. I don't remember.
5      Q. Do you remember having this
6  conversation with Palma Settimi?
7      A. I don't remember.
8      Q. Do you share the minimum revenue
9  requirement that Simon was requiring
10 from Forall with anyone else from
11 Forall including Palma Settimi?
12     THE ARBITRATOR:  Hang on.
13 This is a little different.
14     MR. BROWN:  Objection.
15     THE ARBITRATOR:
16 Mr. Torello-Viera, we have a
17 lease, we know what the lease
18 said.  Do you know if that lease
19 required some minimum revenue
20 requirement that Simon required
21 of Sarah.
22     THE WITNESS:  I don't
23 remember, sir.
24     THE ARBITRATOR:  Okay.
25 Counselor, the lease is in

1     CROSS-EXAMINATION  MR. TORELLO-VIERA
2  evidence.  Is there a clause in
3  the lease that has such
4  requirement?
5      MR. LEWIS:  Mr. Farber, I
6  appreciate your question, but
7  that's not where it was emanating
8  from, not the lease.  This is
9  something that Mr. Torello-Viera
10 testified that --
11     THE ARBITRATOR:  No.  He did
12 not so testify.  What he said
13 this morning was that for the
14 less desirable locations, that
15 they would have a lease that
16 would be based upon a percentage
17 of sales, but this one was not a
18 lease desirable location.  For
19 the Forall store, he testified
20 was a highly desirable location
21 in this mall.  That's my memory
22 of the testimony.
23     Therefore, I'm asking you,
24 because it's in evidence, if you
25 know that there is such a

1     CROSS-EXAMINATION  MR. TORELLO-VIERA
2  requirement in the lease.  If
3  there's none --
4      MR. LEWIS:  Mr. Farber --
5      THE ARBITRATOR:  If there's
6  none then I don't know what we're
7  doing.
8      MR. LEWIS:  Mr. Farber.
9      THE ARBITRATOR:  Go ahead.
10     MR. LEWIS:  With all due
11 respect.
12     THE ARBITRATOR:  Forget the
13 respect.  Let's get to the point.
14     MR. LEWIS:  I believe you're
15 missing the nature of my
16 question.
17     THE ARBITRATOR:  Okay.
18     MR. LEWIS:  It is not asking
19 Mr. Torello-Viera to confirm that
20 the Sarah lease was --
21     THE ARBITRATOR:  Hang on.
22 We lost Mr. Brown.
23     MR. BROWN:  I was just
24 grabbing a breath mint.
25     MR. LEWIS:  It's been a lot

1     CROSS-EXAMINATION  MR. TORELLO-VIERA
2  of back and forth, and it's been
3  disjointed, so I understand why
4  it may be unclear.  Mr.
5  Torello-Viera has testified, and
6  you can ask Maggie to read it
7  back, that there was a minimum
8  revenue requirement in this
9  instance that was imposed by
10 Simon.
11     THE ARBITRATOR:  I've not
12 heard that.  So when you say "in
13 this instance," which instance?
14 In the instance?  Are you talking
15 about the lease to Sarah?
16     MR. LEWIS:  This is new
17 information to me, Mr. Farber,
18 and it's new information to you.
19 Mr. Torello-Viera has just
20 testified that there was a
21 minimal revenue requirement Simon
22 was imposing on the Forall -- on
23 the Las Vegas store.  That's what
24 he testified to.
25     THE ARBITRATOR:  Mr. Lewis,



Page 282

CROSS-EXAMINATION  MR. TORELLO-VIERA
1    CROSS-EXAMINATION  MR. TORELLO-VIERA
2    I'm lost here.  Landlords can
3    impose requirements on tenants
4    either through a lease or some
5    building regulations.
6         I don't know what you're
7    talking about.  I haven't heard
8    this witness say there was some
9    other form of requirement.  Let's
10   ask him and clear it up.
11        Mr. Torello-Viera, do you
12   know if Simon had imposed some
13   sort of revenue requirement on
14   Forall at any point?
15        THE WITNESS:  No, I don't
16   remember.
17        THE ARBITRATOR:  Okay.  Next
18   question, Mr. Lewis.
19        MR. LEWIS:  We have an
20   e-mail, Mr. Torello-Viera, that
21   I'm going to pull up and share
22   for you, which has Simon -- let
23   me find the e-mail now.
24        MR. BROWN:  Is it in
25   evidence?

Page 283

CROSS-EXAMINATION  MR. TORELLO-VIERA
1    CROSS-EXAMINATION  MR. TORELLO-VIERA
2         THE ARBITRATOR:  Let him
3    find what he needs to find, and
4    then we'll see.
5         Q. In the mean time, while I find
6    that document, Mr. Torello-Viera, are
7    you aware of whether Forall paid rent
8    after the first of the month while
9    Forall was operating the store?
10        A. Yes.  But within a reasonable
11   time.
12        Q. I just asked are you aware if he
13   paid the rent after the first of the
14   month when it was due, sir.
15        THE ARBITRATOR:  The answer
16   was yes.  Go ahead.  Next
17   question.
18        Q. Do you have an appreciation
19   whether this happened more than once?
20        A. I don't remember.
21        Q. Did you review the payment
22   history of the rent along with the
23   sales figures that you reviewed?
24        A. No, I did not.
25        MR. LEWIS:  Mr. Farber, may

Page 284

1    CROSS-EXAMINATION  MR. TORELLO-VIERA
2    I ask for five minutes, please.
3         THE ARBITRATOR:  Of course.
4    Let's take five, everyone.
5         (Whereupon, a recess was
6    taken at this time.)
7         THE ARBITRATOR:  Mr. Lewis,
8    any more questions?
9         MR. LEWIS:  Just a few more.
10        Q. Mr. Torello-Viera, can you see
11   my screen?
12        A. Yes, I do.
13        MR. LEWIS:  This is
14   Exhibit 250, everyone, and I'll
15   start at the bottom and work my
16   way up.
17        Q. It's an e-mail, if you can see,
18   from David Hochman to Mr. John Steen, a
19   property manager at Simon, dated
20   January 9, 2015; do you see that?
21        A. Yes.
22        Q. A pertinent part of this e-mail
23   is, "In lieu of your proposal, we are
24   asking that Simon suspended its efforts
25   to obtain a replacement tenant until

Page 285

1    CROSS-EXAMINATION  MR. TORELLO-VIERA
2    January 31, 2016.  There will not be a
3    sales target which would need to be met
4    during this period.  Sarah will assess
5    the sales performance of the store.  If
6    sales have not improved during this
7    12-month period, Sarah would then
8    notify Simon to resume its search for a
9    replacement tenant."  Do you see that?
10        A. Yes.
11        Q. Does this refresh your
12   recollection at all as to whether Simon
13   had a minimum sales expectation to the
14   store?
15        A. No.
16        Q. A sales target, it does not
17   refresh your recollection?
18        A. No.
19        Q. And Simon writes, "We agree not
20   to lease the space in 2015."  Do you
21   see that?
22        A. Yes.
23        Q. And is it your understanding
24   that Simon was agreeing not to lease
25   the space so that Forall could come in



1    CROSS-EXAMINATION  MR. TORELLO-VIERA
2  and manage the store as of March 2015?
3           MR. BROWN:  Objection.
4           THE ARBITRATOR:  What's the
5  objection?
6           MR. LEWIS:  I'll rephrase.
7           THE ARBITRATOR:  All right.
8  It's withdrawn.  Rephrase.
9       Q. Your understanding that -- your
10  testimony earlier was that Sarah had
11  reached out to Simon, asked them to
12  rescind the letter agreement; do you
13  recall that testimony?
14          MR. BROWN:  I'm sorry,
15  Rodney.  I don't know if that's
16  exactly what he said.
17          THE ARBITRATOR:  It's more
18  or less correct.  I remember it.
19  Go ahead.  I can tell you what
20  the testimony was too because I
21  heard it.  So go ahead.  Next
22  question,      Mr. Lewis.
23          MR. LEWIS:  We didn't have
24  an answer to that one, Mr.
25  Farber.

1    CROSS-EXAMINATION  MR. TORELLO-VIERA
2       Q. Is this consistent with -- do
3  you recall your testimony --
4           MR. LEWIS:  That's okay.
5  Mr. Farber, you remember this
6  testimony.
7       Q. So Simon is not leasing the
8  space for 2015.  We talked earlier that
9  although Forall had a prospective
10  tenant, you didn't bring them in at the
11  end of 2014, right?
12          MR. BROWN:  Objection.
13          THE ARBITRATOR:  What's the
14  objection?
15          MR. BROWN:  He said he
16  didn't bring them in.  I don't
17  know what that means.
18          THE ARBITRATOR:  Sustained.
19  Next question.  "You didn't bring
20  them in," I'm not sure what that
21  means either, so rephrase, Mr.
22  Lewis.
23       Q. You had identified a prospective
24  tenant in late 2014, correct?
25       A. I don't remember.

1    CROSS-EXAMINATION  MR. TORELLO-VIERA
2       Q. In the e-mails you write that
3  you identified a prospective tenant in
4  2014, correct?
5       A. I don't remember.
6       Q. Do we need to put the e-mails
7  back up?
8           THE ARBITRATOR:  Counsel,
9  we've been through it.  I read
10  the e-mails.  Go ahead to
11  whatever you want to ask.  Go
12  ahead.
13          MR. LEWIS:  I just asked
14  what I wanted to ask, Mr. Farber.
15          THE ARBITRATOR:  I didn't
16  catch it, so restate it.  All
17  right?
18          MR. LEWIS:  Okay.
19       Q. Here we have Mr. John Steen
20  writing back, "We agree not to lease
21  the space in 2015."  Do you see that?
22          MR. BROWN:  At the bottom
23  there.
24       Q. Do you see that, sir?
25       A. Yes.

1    CROSS-EXAMINATION  MR. TORELLO-VIERA
2       Q. Okay.  And so the door is open
3  here for Forall to come back in and
4  operate the store in March of 2015,
5  correct?
6       A. And we did.
7       Q. That's a yes?
8       A. Yes, we did.
9       Q. Mr. Torello-Viera, is it your
10  understanding that Simon decided to
11  give the Pal Zileri brand store, one
12  more opportunity in 2015?
13       A. No.
14       Q. It's not your understanding?
15       A. No.
16          THE ARBITRATOR:  Just give
17  me one moment.  I see that my
18  assistant left the door open; I
19  just want to close it.
20          Go ahead, Mr. Lewis.
21       Q. We were talking about the space
22  that the store was in.  We talked about
23  that a bit and you acknowledged that.
24  Did the Forall store -- did the Pal
25  Zileri store sell over, let's say,



1    CROSS-EXAMINATION  MR. TORELLO-VIERA
2  $100,000 worth of merchandise in 2015?
3  Let me start over.
4      Do you recall what the sales
5  were on a monthly basis in 2015,
6  correct?
7     A. Roughly.
8     Q. Roughly.  Did the sale -- did
9  the store sell under $100,000 per month
10 in 2015, albeit, roughly?
11    A. I guess so.  I cannot confirm.
12    Q. Okay.  Did the -- the store did
13 not do, and we'll be very specific with
14 the numbers with Ms. Settimi, but -- so
15 I guess I'm asking, generally, did the
16 store perform as you expected in 2015
17 and 2016 while Forall was operating?
18    A. Yes.
19    Q. It did.  Well, why didn't Forall
20 just continue on operating the store?
21    A. Because we asked for a 60 day
22 extension, and since Sarah did not
23 reply, we had to take a position --
24    Q. But, Mr. Torello-Viera, what
25 would you need an extension for?  You

1    CROSS-EXAMINATION  MR. TORELLO-VIERA
2  already had 12 months of data.  You
3  said the store performed up to your
4  expectations.  Why would you need an
5  extension?
6     A. Because as I said this morning,
7  we were looking at the bigger picture,
8  not just Vegas.  We were looking at Pal
9  Zileri worldwide and then in the U.S.
10    Q. Well, before I ask the next
11 question in this line.  How was Pal
12 Zileri brand doing worldwide?
13    A. Can I add something to this?  I
14 think I said that --
15    Q. Mr. Torello-Viera, I don't have
16 a question pending right now.
17       THE ARBITRATOR:  No.  You
18    asked, you know, why they didn't
19    continue.  So if he wants to add
20    why they didn't continue, you can
21    do so.  Go ahead.
22       Mr. Torello-Viera, why
23    didn't Forall want to continue?
24       THE WITNESS:  Again, as I
25    said, you know, we were looking

1    CROSS-EXAMINATION  MR. TORELLO-VIERA
2     at all the different options, and
3     there was a communication open
4     with Simon when they offered that
5     space that we would then look at
6     any other possible locations that
7     they had that would be suitable
8     for us, and we haven't heard from
9     them.  So there was a lot of
10    moving parts in that moment.  And
11    that's why we asked for the
12    60 days, you know, extension and
13    Sarah did not reply, so refuse to
14    give us [sic].
15       THE ARBITRATOR:  I didn't
16    hear you what you said, Mr.
17    Lewis.  It's acting up again.  I
18    can't hear you.  Say it again.
19       MR. LEWIS:  Can you hear me?
20       THE ARBITRATOR:  You have to
21    do whatever it is again.
22       Mr. Brown, go ahead.
23       MR. LEWIS:  Can you hear me
24    now?
25       THE ARBITRATOR:  Yes.

1    CROSS-EXAMINATION  MR. TORELLO-VIERA
2     Q. I was asking, and forgive me if
3  I'm being repetitive, I can't recall
4  when the sound when out.  I was asking
5  you -- you had 12 months worth of data
6  and you had 25 years worth of
7  experience, why would you need an
8  extension to determine whether to
9  continue on operating the store?
10    A. I would repeat what I just said,
11 because we were looking into any
12 possible opportunity in accordance, you
13 know, with our global repositioning of
14 the brand and locally in the U.S.
15    Q. How was the brand performing
16 globally in 2016?
17    A. I left in 2016, so I do not know
18 numbers.  I cannot answer that
19 question.
20    Q. From your perspective, how was
21 the brand performing when you left?
22       MR. BROWN:  Can I --
23       THE WITNESS:  I can answer
24    this.
25       MR. BROWN:  Well, objection.



Page 294

CROSS-EXAMINATION  MR. TORELLO-VIERA
1    CROSS-EXAMINATION  MR. TORELLO-VIERA
2       Relevance, but --
3          THE ARBITRATOR:  We'll let
4    him answer.  How was the brand
5    performing around the time you
6    left, sir?
7          THE WITNESS:  The company,
8    was recovering, growing.
9          The ARBITRATOR:  Okay.
10      Q. It had taken a down turn for it
11   to be recovering; is that safe to say?
12      A. I think the answer is in the
13   fact that the company was sold in 2014.
14      Q. You're saying that the
15   company's -- I'll characterize it as --
16   poor performance led to the sale in
17   2014; is that you're answer?
18      A. I think I gave you already
19   information, you know, beyond my
20   knowledge, because we're talking about
21   situation that were prior to my arrival
22   [sic].  I came on board when the
23   company was sold.
24      Q. I understand.  You just included
25   that sale as part of your answer as to

Page 295

CROSS-EXAMINATION  MR. TORELLO-VIERA
1    CROSS-EXAMINATION  MR. TORELLO-VIERA
2    whether the company was recovering from
3    the down turn.
4          THE ARBITRATOR:  Mr. Lewis,
5       I don't understand how any of
6       this is relevant to what I have
7       to decide in this case.  Why
8       don't we move on.
9       Q. Mr. Torello-Viera, isn't it
10   possible that the new store, the
11   different store location, could have
12   been exactly what the brand needed?
13      A. No.  Otherwise, I would have
14   taken it.
15      Q. Well, it would have been -- rent
16   would have been a percentage of sales,
17   correct?
18      A. Yes.
19      Q. That would have dramatically
20   reduced your expenses, at least, it
21   would have done that, right?
22          MR. BROWN:  Mr. Farber,
23       objection.  The -- the rent is
24       not an element of damages in this
25       case for either side.

Page 296

CROSS-EXAMINATION  MR. TORELLO-VIERA
1    CROSS-EXAMINATION  MR. TORELLO-VIERA
2          THE ARBITRATOR:  Mr. Brown,
3       you don't have to argue further.
4       Sustained.  Next question.
5       Q. Mr. Torello-Viera, you testified
6    about damages part of cost, etcetera;
7    do you recall that?
8       A. Yes.
9       Q. Who were your competitors in the
10   United States?  I know you spoke to
11   that briefly, but can you expand on who
12   your competitors are?
13      A. Luxury high-end apparel and
14   clothing menswear.  If you want some
15   names --
16      Q. Will you, please.
17      A. Zegna, Canali, Corneliani,
18   Isaia.
19      Q. Can you think of any others?
20      A. Ralph Lauren Purple Label, to a
21   certain extent.  Samulesohn in Canada.
22   And I'm talking about just, you know,
23   the tailor clothing.  Paul Stewart,
24   Boglioli, I think that should give a
25   pretty good picture of what -- the

Page 297

CROSS-EXAMINATION  MR. TORELLO-VIERA
1    CROSS-EXAMINATION  MR. TORELLO-VIERA
2    arena that Pal Zileri is competing.
3       Q. Okay.  Would stores -- would
4    brands like Brooks Brothers be a
5    competitor or is -- what is your --
6    what do you think about that?
7       A. I don't know how privy you are
8    to Brooks Brothers, but they have three
9    collections; good, better, and best.
10         Pal Zileri would be competing
11   with the better and best.  They're
12   chunk of the business is the good one.
13      Q. Thank you for that.  And what is
14   your background in accounting,     Mr.
15   Torello-Viera?
16      A. I have a major in management.
17      Q. You have a bachelor's in -- you
18   have a bachelor's in management?
19      A. I'm not a CPA, that's for sure,
20   and I'm not a lawyer.
21      Q. Okay.  Do you have -- do you
22   have any post-graduate degrees?
23      A. No.  I'm not sure why you asking
24   me these questions.
25         MR. BROWN:  I'll handle



| Page 298 | Page 299 |
|---|---|

**Page 298**

CROSS-EXAMINATION  MR. TORELLO-VIERA

1   that.  You answer the questions.
2   Q. How much are commissions as
3   percent of sales in Pal Zileri stores?
4        MR. CROWE:  Objection.  Are
5   you talking about a particular
6   store?  I just want him to
7   understand the question?
8        MR. LEWIS:  I thought we
9   we're just going to have one of
10   Mr. --
11        THE ARBITRATOR:  I think
12   this deals now with damaged, so
13   we're going to hear from Mr.
14   Crowe.
15        Mr. Crowe, you said
16   objection, but I also couldn't
17   hear, like  Mr. Lewis, so say
18   again what's the objection?
19        MR. CROWE:  I think he asked
20   in the Pal Zileri store, so I'm
21   trying to understand if he's
22   talking about stores worldwide or
23   the U.S., or is there some focus
24   to the question, in other words,

**Page 299**

CROSS-EXAMINATION  MR. TORELLO-VIERA

1   context?
2        THE ARBITRATOR:  Overruled.
3   Depending upon his answer, if
4   it's still unclear, then you can
5   clarify it when you ask him
6   questions again.
7        You can answer the question.
8        Restate it, Mr. Lewis.
9   Q. How much were commissions as to
10   percentage of sale, and I'll say in the
11   Las Vegas store, to the extent you can
12   recall?
13        A. I don't remember it.  I should
14   have to go over, you know, every single
15   employment agreement that I did.  I
16   don't have it on top of my head.
17        And it varies from the store,
18   the level, and I would say, first and
19   foremost, you know, what the pay degree
20   of the -- of the salesperson that you
21   bring in.
22        THE ARBITRATOR:  In other
23   words, it varies depending upon
24   the salesperson?

| Page 300 | Page 301 |
|---|---|

**Page 300**

CROSS-EXAMINATION  MR. TORELLO-VIERA

1        THE WITNESS:  It depends on
2   the salesperson, you know, how
3   much you give as a fix, and how
4   much is the commission, and then
5   bonus kick in, and there's a lot
6   of variables.
7        Q. Could you give us a range as to
8   a lower commission and a higher
9   commission for a high degree
10   salesperson?
11        A. I can tell you what can be the
12   cost.  I can give you a ballpark of
13   what can be a cost of how much a
14   salesperson can make.
15        THE ARBITRATOR:  That's what
16   he's asking for.
17        A. A good salesperson can easily
18   make 150 to 200,000.
19        MR. CROWE:  Can I just note
20   an objection to relevance.
21   There's no indication that
22   commissions has anything to do
23   with this location, and the store
24   we're talking about in the

**Page 301**

CROSS-EXAMINATION  MR. TORELLO-VIERA

1   economic analysis.  Maybe there's
2   some ulterior motive.
3        THE ARBITRATOR:  No.
4   Overruled.  He testified
5   generally, and he can give us
6   information on this.  What's the
7   range?  And he asked you about
8   the Las Vegas store, if you know
9   what's the range.
10        THE WITNESS:  A good
11   salesperson can make 150 to
12   200,000.
13        THE ARBITRATOR:  He meant
14   the range of percentage for the
15   commission.
16        THE WITNESS:  It can go from
17   five percent and up.
18        THE ARBITRATOR:  Up to what?
19        THE WITNESS:  It can go to
20   10 percent, 12 percent and up.
21   It depended, also, the bonus that
22   you calculate.
23        THE ARBITRATOR:  Okay.  Next
24   question, Mr. Lewis.



CROSS-EXAMINATION  MR. TORELLO-VIERA
1      CROSS-EXAMINATION  MR. TORELLO-VIERA
2       Q. How are bonuses calculated?  Is
3   a percentage of the overall sales or
4   how are they calculated to the extent
5   you recall?
6          THE ARBITRATOR:  Where are
7       we going, Mr. Lewis?  Why is this
8       relevant to what I have to
9       decide?
10         MR. LEWIS:  It's relevant to
11      damages that Mr. Torello-Viera
12      testified to generally earlier.
13      I've just about four more if you
14      all will indulge me.
15         THE ARBITRATOR:  Relevant to
16      damages?
17         MR. LEWIS:  That's correct.
18      By the time I could have --
19      really, I've got just a few more.
20         THE ARBITRATOR:  Go ahead.
21      Q. How much in total annual cost
22   has Forall incurred for marketing and
23   advertising, as far as you can recall?
24      A. I have to look at the PNL.  I
25   don't remember off the top of my head,

1      CROSS-EXAMINATION  MR. TORELLO-VIERA
2   but Ms. Settimi has all the
3   information.
4       Q. Okay.  So I can direct those
5   questions to Ms. Settimi?
6       A. I can tell you that when we
7   started we had a global budget that was
8   important then.  That's what I can tell
9   you.
10      Q. Okay.  You testified earlier
11   that some of the items that you sell,
12   you manufacture -- Forall manufactures
13   itself and others are manufactured in
14   other facilities.  Can you speak to the
15   percentage of product sold by Sarah,
16   particularly, that was manufactured by
17   Forall versus manufactured by other --
18   by others?
19      A. The vast majority is made -- can
20   I say that internally, so by Forall.
21   The -- part of it is done is
22   100 percent internally.  Meaning, that
23   you receive the fabric and you do the
24   CMP, cut make and trim, or you buy the
25   fabric and you give out only the CMP.

1      CROSS-EXAMINATION  MR. TORELLO-VIERA
2   Like Forall is buying the fabric.  And
3   the one that you usually buy the finish
4   product are shoes, belts and leather
5   goods because it's a totally different
6   type of production set up.
7          THE ARBITRATOR:  All right.
8       Q. Do you know what Forall's
9   operating costs are as a percentage of
10   sales for its own manufacturing
11   facilities?
12         MR. CROWE:  Could you repeat
13      that question?
14      Q. Do you know what Forall's
15   operating costs are as a percentage of
16   sales for its own manufacturing
17   facilities?
18      A. I need you to be more specific,
19   because I need to make sure that I give
20   accurate answer that I can [sic].
21      Q. I'll move on.  I'll ask that of
22   Ms. Settimi tomorrow.  Do you know if
23   an inventory list that you described
24   earlier in your testimony was provided
25   for this arbitration?

1      CROSS-EXAMINATION  MR. TORELLO-VIERA
2          You were talking about when you
3   had to shut down the store, etcetera,
4   and there was an inventory list.  Do
5   you know if that was provided for this
6   arbitration?
7       A. As I said, sir, before I did
8   inventory, I was leading the inventory
9   account.  That, again, in 2016 I left,
10   and so I can't give you any additional
11   information after that.
12      Q. Do you know, specifically, how
13   much the inventory from the Las Vegas
14   cost Forall; do you know specifically?
15      A. The one that we took out from
16   when the store was shut down when we
17   were evicted?
18      Q. When the store closed, yes.
19      A. Yes.  As I said this morning, if
20   my recollection is correct, it was
21   under a million, but not -- I would say
22   between $750,000 and 1 million; in that
23   range.
24      Q. You testified that it would have
25   been difficult but not impossible to

| Page 306 |
|---|

```
1        CROSS-EXAMINATION  MR. TORELLO-VIERA
2   find another location to operate a
3   store.  Can you describe what effort
4   Forall took to find another location to
5   operate a store?
6        A.  Let's be specific.  We said that
7   it was difficult to find a store in
8   Vegas.  After that, I left the company
9        in -- at the end of the year,
10  so --
11           THE ARBITRATOR:
12  Mr. Torello-Viera, is the answer
13  you don't know?
14           THE WITNESS:  I don't know
15  exactly.
16           THE ARBITRATOR:  Then just
17  say that.  That's all.
18           THE WITNESS:  Sorry about
19  that.
20           THE ARBITRATOR:  It's okay.
21  All right.
22           MR. LEWIS:  I don't have
23  anything further, Mr. Farber.
24           THE ARBITRATOR:  Okay.
25  Thank you.  Did you make some
```

| Page 307 |
|---|

```
1        CROSS-EXAMINATION  MR. TORELLO-VIERA
2   notes,  Mr. Torello-Viera?
3   Look, we're just about at 5:30.
4   Let me ask the following, though:
5   What other witnesses do you have,
6   Mr. Brown?
7           MR. BROWN:  Palma Settimi
8   and we anticipate putting on our
9   damages expert to the extend --
10  we may call Michelle Giofree with
11  Palma's office depending on if
12  there's any holes in what Palma
13  can address or not.
14           THE ARBITRATOR:  How long do
15  you think you're going to be with
16   Ms. Settimi.
17           MR. BROWN:  Not very long.
18  An hour, less.
19           THE ARBITRATOR:  Okay.  And
20  then who's the possibly next
21  witness again?
22           MR. BROWN:  Michelle
23  Giofree.  She was on the initial
24  witness list, and she would
25  probably be, you know, 15
```

| Page 308 |
|---|

```
1        CROSS-EXAMINATION  MR. TORELLO-VIERA
2   minutes.
3           THE ARBITRATOR:  And then
4   you have Mr. Flaherty?
5           MR. BROWN:  Yes, sir.
6           THE ARBITRATOR:  Is there
7   anyone else?
8           MR. BROWN:  No.  Not
9   anticipated.
10           THE ARBITRATOR:  And you're
11  going to have Mr. Salsbery,
12  Mr. Lewis?
13           MR. LEWIS:  Yes.
14           THE ARBITRATOR:  Do you
15  anticipate anyone besides
16  Mr. Salsbery in rebuttal?
17           MR. LEWIS:  Not that I
18  anticipate.
19           THE ARBITRATOR:  Okay.
20  Look, guys, I can really be tough
21  on you in an effort to finish
22  tomorrow.  I really want to
23  finish tomorrow.  It's very
24  expensive to try to reassemble,
25  adjourn, and all that.
```

| Page 309 |
|---|

```
1        CROSS-EXAMINATION  MR. TORELLO-VIERA
2        So, you know -- well, you
3   tell me, Mr. Brown, you want to
4   continue and try to finish this
5   witness tonight because I can't
6   sit tonight?
7           MR. BROWN:  I think we need
8   to because he has a doctor's
9   appointment tomorrow morning,
10  which he just reminded me of, so
11  I do apologize.
12           THE ARBITRATOR:  Okay.  Then
13  we're going to do it.  We'll sit
14  late and we'll finish off this
15  witness.
16        So take -- it's 5:25.  I
17  want you to take no more than 10
18  minutes sharp to talk to him
19  about any areas that he wants to
20  cover, and then I want to come
21  back at 5:35, and we're going to
22  do our darnedest to finish this
23  witness tonight.
24        (Whereupon, a recess was
25  taken.)
```



Page 310

1    RE-DIRECT EXAMINATION TORELLO-VIERA
2         THE ARBITRATOR: Mr. Brown,
3    go ahead.  You're on mute,
4    Mr. Brown.
5         MR. BROWN:  I'm sorry.
6    RE-CROSS EXAMINATION
7    BY MR. BROWN:
8         Q. Paolo, a lot's been made about
9    e-mails dating back to the fall of 2014
10   today, and isn't it Forall's position
11   that the binding obligations of the
12   parties was memorialized in the
13   management agreement that was executed
14   in or around February --
15        THE ARBITRATOR:  Counselor,
16   this is re-direct.  I know that.
17   Let's move on.  Next question.
18        MR. CROWE:  I just have a
19   few issues, if I may, Mr. Farber.
20        THE ARBITRATOR:  Go ahead,
21   Mr. Crowe.
22   RE-CROSS EXAMINATION
23   BY MR. CROWE:
24        Q. So the competitors in this
25   high-end marketplace, you named a bunch

Page 311

1    RE-DIRECT EXAMINATION TORELLO-VIERA
2    of names, are these companies operating
3    in a different fashion as it relates to
4    the cost structure that we discussed
5    earlier in terms of the margin?
6         A. No.  Every brand that has a
7    retail end has two divisions, what we
8    call the wholesale division and the
9    retail division.
10        So to be clear, when we were
11   selling to Sarah and Sarah was running
12   the store, it was part of the wholesale
13   division.  When Forall was there -- was
14   managing the Pal Zileri store, that was
15   part of the retail division.
16        Q. Right.  So what I'm getting at
17   is, the competitor, if they were
18   operating retail store, they would have
19   a different cost structure; is that
20   correct?
21        A. They have a different cost, and
22   a different margin structure.
23        Q. That's my question.
24        A. To be specific --
25        THE ARBITRATOR:  No need,

Page 312

1    RE-DIRECT EXAMINATION TORELLO-VIERA
2    Mr. Torello-Viera.
3         Go ahead, Mr. Crowe.
4         Q. Which leads me to my next
5    question.  There were some inquiries
6    concerning commissions as a percentage
7    of sales just a few moments ago.  Do
8    you remember that?
9         A. Yes.
10        Q. In this particular instance
11   we're talking about with Sarah, and
12   assuming they have lived up to their
13   agreement going forward after 2016, was
14   there any commissions that were being
15   paid by Forall for salesmen that might
16   make the sale?
17        THE ARBITRATOR:  Counselor,
18   let me say this:  I do have some
19   experience in the fashion
20   industry.  I know the difference
21   between retail and wholesale.
22   What we're talking about on the
23   $900,000 minimum requirement has
24   to do with their production cost.
25   It has nothing to the do with the

Page 313

1    RE-DIRECT EXAMINATION TORELLO-VIERA
2    retail end.  I got it.  I think
3    we can move on.
4         Q. Then I'll go past the
5    commissions, and on that same general
6    theme, the marketing budget, there was
7    some discussion of that, do you know
8    that in the contexts of this particular
9    arrangement, was that marketing budget,
10   would that be considered fixed or a
11   variable cost of Forall?
12        A. Marketing budget is a fixed
13   cost, because you determine what is the
14   amount that you can spend per year.
15   It's a set amount.
16        Q. That's all.  So it's not
17   impacted by what happens in this
18   particular store in Las Vegas?
19        A. No.
20        Q. Okay.
21        MR. CROW:  Thank you.
22        THE ARBITRATOR:  Mr. Lewis,
23   anything further?
24        MR. LEWIS:  That's all.
25        THE ARBITRATOR:



Page 314

```
 1            PROCEEDINGS
 2    Mr. Torello-Viera, thank you very
 3    much for your testimony.  You're
 4    excused as a witness.
 5         Mr. Brown, it's up to you.
 6    I may have a problem sitting late
 7    tomorrow night, but I can still
 8    go further tonight.  Do you want
 9    to adjourn or do you want to do
10    more work?
11         I can probably work about
12    another 45 minutes, if you want
13    to.
14         MR. BROWN:  I think it will
15    be much more sufficient in terms
16    of speed of Ms. Settimi's
17    testimony if we broke now, I got
18    a little more organized, and we
19    start fresh in the morning.  I do
20    not anticipate a full morning on
21    my end, so I'm pretty confident
22    we can finish this tomorrow.
23         THE ARBITRATOR:  Okay.
24    Guys, we're going do our best.  I
25    really want to finish tomorrow.
```

Page 315

```
 1            PROCEEDINGS
 2    I don't want the additional cost
 3    of another day to be incurred.
 4    All right.  9:30 everyone,
 5    tomorrow morning.  We're
 6    adjourned.
 7    Good night, everyone.
 8      (Time noted:  5:40 p.m.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 316

```
 1
 2        C E R T I F I C A T E
 3     I, MAGDALENA M. ARTILES, a shorthand
 4    reporter and Notary Public within and
 5    for the State of New York, do hereby
 6    certify:
 7      That the Witness(es) whose testimony
 8    is hereinbefore set forth was duly sworn
 9    by me, and the foregoing transcript is a
10    true record of the testimony given by
11    such Witness(es).
12      I further certify that I am not
13    related to any of the parties to this
14    action by blood or marriage, and that I
15    am in no way interested in the outcome
16    of this matter.
17
18
19
20
21
22
23
24    Magdalena M. Artiles, a Court
      Reporter and Notary Public
25    Date:  November 8th, 2020
```

---

**A**

**ability** 39:21
220:23
**able** 69:11 133:7
143:11 160:12
264:4
**abreast** 242:21
244:8 249:11
**absolutely** 81:20
91:9 97:2 98:14
112:13 118:13
130:4 134:17
139:9,9 142:18
143:7 148:17
155:15 170:15
178:21 187:22
193:20 196:25
238:22 267:8
272:11
**access** 218:3
272:16
**accommodate**
157:23 207:25
**accompanied**
61:25
**accomplished**
179:18 181:10
**accomplishing**
274:24
**account** 9:25
305:9
**accountant** 10:11
**accounted** 178:9
179:17
**accounting** 14:8
297:14
**accurate** 26:21
131:14 225:19
225:22 304:20
**accurately**
124:17
**acknowledge**
39:15 80:15
239:22
**acknowledged**

289:23
**acquired** 99:5
**act** 79:9,12
268:24
**acted** 79:25
**acting** 292:17
**action** 32:20
39:20 100:20
316:14
**actual** 7:8
**add** 182:22 269:4
291:13,19
**added** 267:14
**addition** 99:23
184:21
**additional** 12:4
14:12 75:24,25
94:17 98:23
186:20 192:19
305:10 315:2
**address** 60:15,15
61:2 63:18,19
84:14 164:10
307:13
**addressed** 54:17
**adequate** 64:18
64:21
**adhered** 267:10
**adherence** 48:19
**adjacent** 110:23
113:2
**adjourn** 308:25
314:9
**adjourned** 315:6
**adjusted** 123:4
**adjustments**
105:23
**admit** 40:2
233:25 234:21
235:3 240:23
**admitted** 40:8
50:14 233:24
**advance** 276:2
**advancing** 72:12
223:18
**adversary** 82:8

**advertising**
302:23
**advise** 25:25 29:7
52:2,10 263:4
**advised** 46:17,25
48:3 57:7
140:17 148:19
168:7
**affiliate** 151:25
**affirmative** 13:6
**afternoon** 202:9
**agent** 79:8,25
159:17 192:10
**aggressive**
162:10
**ago** 13:22 232:15
277:16 312:7
**agree** 57:4 58:19
72:5 134:5
137:2 240:11
240:25 241:6
248:24 285:19
288:20
**agreed** 22:7
76:15,20
125:18 156:22
210:20,20
259:20 263:16
**agreeing** 14:12
23:14 285:24
**agreement** 13:18
14:17 19:17
20:15,20 22:7,8
29:16 30:7,11
33:17,19,20,23
35:5,10,23 45:9
47:7,8,20 48:20
51:3,21 52:18
55:10 56:22
57:7,11,16,21
58:3 70:9 72:15
72:19 73:6 74:2
74:3,11 75:12
75:16 76:2,5,24
77:21 78:5,10
96:6,14,18 97:4

97:22,23
102:12,16,23
102:25 104:5
104:24 105:9
114:11 115:4
120:9,10,11
122:9 135:13
135:25 136:15
137:9,22 138:3
138:10,18
139:4,8,11,16
139:21 140:3,7
143:2 149:7
150:9,22 151:6
153:25 154:6
154:13,18
155:4,7,13,22
156:3,6,10
158:11 164:17
165:3 166:13
167:13,21
168:24 171:17
187:21 188:10
189:2 197:21
211:8 212:6,20
218:14 221:23
223:21 224:2
235:19 238:17
238:20,23
239:5,7,8,9,13
242:17 244:4
248:4 249:6
255:14,15
258:14,17
259:23 261:17
262:2,21 263:8
263:19 264:20
264:23 265:6
265:15,20
266:4,24
286:12 299:16
310:13 312:13
**agreements**
17:23 48:4
213:16 214:16
**ahead** 6:18 9:22

12:19 15:21
21:16 22:4
42:21 50:5 62:9
73:23 77:20
88:12,18
104:12 109:4
123:9 142:24
151:3 165:6
172:10 173:14
196:20 200:17
209:23 210:24
222:16 223:10
230:6 233:9
234:8 237:15
238:6,12
241:13 244:21
256:12 258:6
280:9 283:16
286:19,21
288:10,12
289:20 291:21
292:22 302:20
310:3,20 312:3
**ain't** 130:25
**ALBASHA** 1:4
**albeit** 290:10
**Alfonso** 70:25
71:17 72:9,19
90:12 97:10
118:17,25
120:15 125:8
126:6 158:6
197:18,22
198:2 216:15
221:15,19
222:11 223:14
224:18 225:6
225:14 235:16
**Alfonso's** 126:11
**aligned** 123:5
**allegation** 30:23
31:10 69:25
**allege** 37:8 68:12
68:22
**alleged** 36:4,21
37:2,12 67:20



allocated 269:3
allocation 6:6
allow 69:2 76:15
143:4 173:2
229:3 237:20
254:16 260:5
allowed 220:11
228:2 239:14
allowing 187:18
aloud 237:19
alter 33:21
Amar 1:4 2:19
63:14 79:6,16
79:24 90:7
125:8 222:11
249:18,21
250:7 251:12
253:19 256:6
258:11 259:14
259:18
ambush 228:25
amend 33:21
57:25
amended 56:23
103:2
amendment 57:5
AMERICAN 1:2
Americas 71:21
89:21 142:8
222:23
amount 75:22
115:21 127:5
129:6 313:14
313:15
amounts 47:19
analysis 301:2
analyze 123:23
analyzing 138:15
187:5
ancillary 184:23
and/or 23:22
90:6 151:25
263:7,18
annual 302:21
answer 4:7 6:14
8:11 9:9,16,22

12:18 15:7,10
15:20 16:6 17:4
20:14 21:13
27:3 29:4,5,11
36:12 44:4
52:14 58:15
86:4 92:6 103:9
104:10 130:17
133:24 151:20
153:9,15
159:12 162:14
163:6 171:19
176:7 183:7
204:4 205:15
205:20 209:8
211:11,22
214:23 215:19
218:5 219:8
224:7 225:21
226:8 237:2
250:4 253:8,12
254:7,9,17
256:25 259:6
260:15,18
266:2 267:16
271:12 283:15
286:24 293:18
293:23 294:4
294:12,17,25
298:2 299:4,8
304:20 306:12
answered 61:18
61:20 62:21
121:15 142:23
163:23 224:6
253:3 268:21
answering 28:13
54:4,13,14
65:13
answers 36:14
anticipate 204:22
307:8 308:15
308:18 314:20
anticipated 14:14
160:8 308:9
anticipatory

47:19 239:6
anybody 12:21
anymore 24:3
104:21
anyones 38:4
anyone's 220:22
apologies 243:22
apologize 166:8
230:13 309:11
apparel 93:3
296:13
appeared 259:16
application 231:6
applied 8:9 9:24
10:4
apply 103:12
appointed 99:2
142:8
appointment
261:5 309:9
appreciate 64:11
73:17 85:18
89:9 220:20
279:6
appreciated
101:6
appreciation
76:7,9 77:4
271:24 283:18
approach 117:14
approached 32:2
112:7 199:3
appropriate
77:10 170:13
174:5 190:2
approval 8:16
70:18 75:16
149:3
approve 72:5
approved 71:2
98:5 127:22
Approving 71:4
approximately
176:9 178:14
182:6 185:16
193:9

April 132:2
273:24 274:25
275:24
Arafa 99:6,13
arbitration 1:2,3
1:14 15:5 30:20
40:18 41:11,15
84:6 207:5
215:8 220:25
233:3 272:18
272:23 273:20
304:25 305:6
arbitrator 1:19
2:4 4:2,14 6:13
7:4,15 9:6,18
9:21 10:3,7
12:14,17,25
13:4,12 14:24
15:6,13,19 16:2
16:5,16,21 17:2
17:9 18:10,14
18:17,22 19:14
21:14,24 25:12
26:12,17,25
28:18 29:20
35:14,19 37:5
37:15 38:3,7,14
38:16 39:23
40:9 41:16
42:12 43:2,5,10
43:22 44:9
45:14 49:10,19
50:4 51:5,10
52:13,15 53:15
53:21 54:24
56:2,17,20
58:11,14 59:22
61:19 62:8,14
62:22 63:5 64:3
64:13,22 65:8
65:14 66:7,10
67:2,14 68:19
69:4,10 70:6
73:19 77:8,19
78:3 80:6,21
81:10 82:4,14

82:17 83:2,9,15
83:19,24 84:11
84:21,24 85:11
86:2,16 87:5,18
87:25 88:7,11
91:16 99:18
102:8,20
103:13 104:8
108:7,9,19
109:4,17 114:8
119:15 121:17
123:9 124:22
128:10 135:18
136:10,19,25
140:9,20 141:6
141:12,21
142:13,20
143:18 144:2,8
144:13,16,25
145:6,14,22
146:6,11,15,19
146:25 149:13
150:2,15 151:2
152:15,21
153:14 155:23
155:25 158:23
159:11 161:2
161:12,17,24
162:16 163:3
163:11 164:12
165:5 172:18
173:4,11,18
174:8,16,21
176:5 181:15
182:23 183:6,9
183:25 184:9
187:25 188:23
189:8,19 190:5
191:5,12,16,21
194:23 195:4
195:19,25
196:14,19
197:3,10 198:7
198:18,25
199:15,24
200:16 201:2



201:13,23
202:2,10,19,24
203:8 205:13
207:21 208:24
209:11,22
210:25 211:9
213:3,8,22
215:7 217:17
218:5,9,22
219:3,11,16,22
220:17 222:14
224:5,15,23
226:12,22
227:10,19
228:11 229:17
230:2,6 231:4
232:12,16
233:16 234:6
234:14 235:6
235:22 236:10
236:21,25
237:13,21
238:4,11
240:17 241:4
241:12,21
243:2,11,19
244:16 245:15
246:8,14,18
248:17 250:3
250:22 251:8
252:15 253:2
253:15 254:18
256:2,10,19,24
257:14,23
258:3 259:4
260:11,19,22
261:12,20
264:10 265:10
265:24 266:7
267:15 268:19
270:10,22
273:8,15,23
274:22 275:17
276:14,25
278:12,15,24
279:11 280:5,9

280:12,17,21
281:11,25
282:17 283:2
283:15 284:3,7
286:4,7,17
287:13,18
288:8,15
289:16 291:17
292:15,20,25
294:3,9 295:4
296:2 298:12
299:3,23
300:16 301:4
301:14,19,24
302:6,15,20
304:7 306:11
306:16,20,24
307:14,19
308:3,6,10,14
308:19 309:12
310:2,15,20
311:25 312:17
313:22,25
314:23
**arbitrators**
203:11
**arbitrator's**
232:17
**area** 106:11,12
106:14 111:16
111:17 184:14
**areas** 98:19
309:19
**arena** 297:2
**argue** 41:17 82:9
296:3
**argument** 41:21
**arises** 154:5
**arrangement**
17:21 313:9
**arranging** 177:9
182:10
**arrival** 90:2 97:9
294:21
**arrive** 272:15
**art** 113:6

**articles** 201:7,10
**Artiles** 1:16
316:3,24
**ASAP** 163:25
**asked** 9:6 20:17
20:18 29:20
35:15 41:23
49:13,20 52:11
61:17 62:21
66:15 68:11
70:8,14 74:5,19
74:21 76:6
91:18 100:6
149:17 154:25
160:25 162:25
181:20 198:10
198:19 222:21
228:12 229:22
237:6,24
254:13 265:12
265:17 283:12
286:11 288:13
290:21 291:18
292:11 298:20
301:8
**asking** 16:23
18:19,25 21:20
35:24 39:24
56:5,5 59:19
60:3,11 74:6
76:12 85:17
124:24 136:16
163:9,12,14
166:9,23
174:13 193:3,4
198:22 200:22
203:17 208:20
212:9 216:4
219:4 224:19
236:19 244:22
250:20,23
256:5 258:23
259:15 262:14
265:3,7 269:12
273:5 275:22
276:19 279:23

280:18 284:24
290:15 293:2,4
297:23 300:17
**asks** 71:17,18
204:9 260:25
**aspect** 96:11
**assertion** 194:21
**assess** 285:4
**assignment** 47:10
**assist** 14:13
23:13 126:13
257:19
**assistant** 161:10
177:18 179:12
289:18
**ASSOCIATION**
1:2
**assume** 34:2
141:4 171:15
191:2 262:23
**assumed** 32:10
**assuming** 73:2
193:6 215:19
312:12
**assumingly** 73:16
**assumptions**
141:9
**attached** 50:25
51:12 52:16
54:3 242:16
244:3
**attempt** 183:10
**attempted** 40:7
**attempts** 166:18
171:13
**attention** 21:5
175:10 242:12
**attest** 40:21
**attorney** 51:2
**Attorneys** 2:8,13
**audio** 143:23
144:24
**August** 25:22,24
32:9 33:9,14
51:2 69:19
76:17 171:22

178:17
**authenticity**
40:22 108:25
**authorization**
85:10
**authorize** 53:5
**authorized** 79:9
154:21,21
222:24 223:6
**authorizing**
71:22
**available** 109:7
114:4 128:14
**Ave** 2:14
**Avenue** 90:21,24
117:5 200:10
**average** 190:20
**aware** 30:25
50:18 136:14
136:18 140:8
141:5 142:22
196:15,18
199:2 218:10
218:14,17,19
272:5,12
276:14 283:7
283:12
**a.m** 1:11

---
**B**
---
**B** 3:4,5 4:1,16 5:1
6:1 7:1 8:1 9:1
10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1 26:1 27:1
28:1 29:1 30:1
31:1 32:1 33:1
34:1 35:1 36:1
37:1 38:1 39:1
40:1 41:1 42:1
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1 51:1



52:1 53:1 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1
73:1 74:1 75:1
76:1 77:1 78:1
79:1 80:1 81:1
92:8,8,13,19,19
**Bachar** 1:4 25:21
90:7 125:9,16
147:25 160:4
224:9 240:4,7
251:22
**Bachar's** 79:7
**bachelor's**
297:17,18
**back** 4:9,24 6:14
11:3 14:17
20:20 21:23
27:6,8,12 33:8
33:16 36:16,18
37:23,25 43:8
53:22 55:13
57:15 66:3
71:14 76:17,22
78:12 81:7
103:4 115:17
122:4 126:22
127:24,25
134:15 137:24
139:17,24
145:2 149:23
153:11 155:13
157:8,13
159:19 160:15
160:22 166:12
168:18 177:11
178:16 179:16
193:8 194:9
202:20 219:15
219:23 223:9
223:15 224:9
225:3,7,25

226:5 241:23
246:19 253:17
258:9,12,25
260:3,5 262:16
264:5,9,13
268:5,25 281:2
281:7 288:7,20
289:3 309:21
310:9
**background**
297:14
**ballpark** 300:13
**Balmain** 99:24
**barcoded** 179:8
179:10
**bargain** 193:7
**Baritza** 74:24
99:10 140:25
206:20 207:9
208:16
**base** 70:22
**based** 48:20
59:10 106:15
140:23 207:17
208:11 279:16
**basically** 102:3
177:7 180:17
183:22
**basis** 140:21
189:16 190:11
228:17 290:5
**bates** 43:13 50:8
65:24 247:6
**bear** 25:19 33:17
79:4 109:18
242:9 252:8
275:4
**bears** 170:20
**beaten** 155:24
**becoming** 119:9
**began** 17:21
40:18
**begging** 127:12
**beginning** 19:6
24:17 25:5
107:3 120:18

131:7 175:12
178:17 270:19
**behalf** 33:5 79:10
79:13,25
118:12 138:19
148:3 151:15
224:19 263:23
**belief** 69:16
**believe** 16:18
40:16 62:5 75:3
196:22 280:14
**believed** 211:6
**belts** 304:4
**benefit** 118:6
121:10 158:2
**benefited** 121:13
**best** 69:19 110:9
110:12 159:20
297:9,11
314:24
**better** 13:5 77:3
77:11 78:8 88:8
109:12 144:12
194:5 235:25
255:23 256:6
257:16 269:24
297:9,11
**Beverly** 194:25
**beyond** 126:8
294:19
**BHamadmd@...**
60:23
**BHamad@SB...**
63:20,23
**BHamad@SC...**
60:18
**big** 87:9 106:2
107:20 124:5
194:14 195:12
225:10
**bigger** 90:23
291:7
**biggest** 128:7
**binding** 151:5
310:11
**bit** 109:24 118:15

130:10 245:20
289:23
**blaming** 144:9
**BLEAKLEY**
2:13
**blend** 202:12
**block** 147:11
**blood** 316:14
**blown** 105:22
**board** 99:2
101:15 119:7
119:19 120:5
121:20 123:22
124:8 127:22
142:3,7 212:17
214:7,13
215:24 294:22
**Boglioli** 296:24
**bonus** 300:6
301:22
**bonuses** 302:2
**book** 43:19
229:21
**books** 44:12
**boss** 110:23
204:21
**bother** 20:9
**bottom** 116:7
284:15 288:22
**bought** 5:20 8:5
**bound** 221:2
**brand** 49:6 76:10
76:11 77:6 93:3
95:3 98:21
100:5 106:6,14
106:18 107:19
107:23 121:12
135:8 170:21
183:12,21,23
193:18 195:10
196:23 197:15
260:4,7 270:6
270:15 289:11
291:12 293:14
293:15,21
294:4 295:12

311:6
**brands** 92:24
106:4 269:25
297:4
**breach** 47:19
155:3,12 239:6
**break** 64:7,15
128:16 146:17
174:13 202:9
**breath** 100:19
280:24
**briefly** 86:23
296:11
**bring** 21:6 80:21
174:5 176:16
177:11 252:19
287:10,16,19
299:22
**bringing** 39:2
**Brioni** 88:22
92:25 95:6
**broad** 182:2
**broadcasted**
141:3
**broke** 314:17
**brokerage**
236:13 237:7
237:24 239:16
239:23,25
240:9 251:23
252:10,22
**Brooks** 113:12
297:4,8
**brother** 71:18
77:16
**Brothers** 113:12
297:4,8
**brought** 67:13
121:19 140:12
142:2
**Brown** 2:15 3:4,6
4:10,19 5:4
13:10 16:12
17:12 18:12
21:16,18 22:4
26:23 27:6,7



36:15 37:22
38:15,16 39:25
40:21 41:18,19
42:22,23 43:5,7
43:12 44:11
50:6 51:7,8,11
53:11,19,23
60:12 62:4,10
62:15 63:3,6,25
65:5,9,16 66:8
66:9 67:13,19
68:11 73:8 74:5
74:6,19 76:6,11
77:7 78:2,21
79:3 80:6,8
81:14,21 82:13
82:16 83:2,9,11
83:13,17 85:2,4
85:16 86:12,19
87:8,22,23
88:11 89:10
91:25 103:6
104:12 108:15
108:22 109:5
109:15,18
123:7 124:20
125:2,4 135:19
135:20 136:15
136:22,25
137:12,14
142:24 143:16
144:16,19,23
145:3,9,11,16
145:18 146:4
146:13,14,19
146:21 147:4
149:21 153:3
153:10 155:19
156:5,12
162:22 163:2,7
165:6,7,12
166:6 170:24
172:16,22
173:23 174:8
174:11 175:23
176:4 185:10

202:22 204:14
205:6,10,11,14
207:19 208:19
210:22 211:4
212:25 213:21
214:22 215:7
218:21,24
219:20 220:6
224:14,17
226:24 227:12
227:22,22,24
228:11,12
229:13 230:17
231:3 232:6,12
234:5 235:2
236:16,21,22
236:23 240:16
241:19 242:24
243:4,21,22
244:12 245:4
245:11,21,25
247:8,14,16
249:23 252:13
252:25 254:2
254:10,25
255:25 256:4
256:12,13,21
256:22 261:9
261:19 271:15
273:3 274:18
278:14 280:22
280:23 282:24
286:3,14
287:12,15
288:22 293:22
293:25 295:22
296:2 297:25
307:6,7,17,22
308:5,8 309:3,7
310:2,4,5,7
314:5,14
**Brown's** 211:22
**buddy** 243:5
**budget** 303:7
313:6,9,12
**budgeted** 200:13

**building** 117:19
282:5
**bunch** 310:25
**bunches** 129:23
**business** 32:3,12
38:18 39:7,13
40:2 42:8,9
57:10,15 91:15
92:4,8,9,14
96:11 97:11,19
98:7,16,16
111:18 124:6,7
126:4 127:12
128:24 129:13
130:20 131:14
152:6 159:6
164:9 176:24
177:4,7 187:9
188:17,18
189:13 192:9
192:17 193:8
195:8 199:13
199:17 201:20
210:4 216:10
228:3 230:21
262:25 263:7
263:18 297:12
**buy** 5:18 22:17
75:9 107:12,21
107:21 133:10
133:11,14,14
133:15,19
180:25 199:3
303:24 304:3
**buying** 95:25,25
104:23 304:2
**buys** 93:7
**B8T8** 112:23
115:18

────── **C** ──────
**C** 2:2 4:16 92:13
316:2,2
**Caesars** 46:19
105:25 106:2
152:5

**calculate** 301:23
**calculated** 302:2
302:4
**call** 28:6,25 29:3
29:7,10 52:5
83:4 93:12
121:4 127:9
129:11 145:5
163:20,22
164:6 173:3
180:22 187:3
261:2 307:10
311:8
**called** 28:11,21
74:12 162:18
163:19 175:23
179:25 213:13
**calling** 162:8,11
162:23 166:22
**calls** 15:2 127:6
162:3 164:15
**calm** 232:13
**Canada** 92:22
296:21
**Canali** 93:2 95:8
95:10 106:4,10
106:10 107:5
107:21 111:10
296:17
**canceled** 26:8
27:24 29:13
37:17 52:3
67:22 135:5
**cancellation** 30:9
51:22 52:8
**cancelling** 29:17
51:3
**capable** 215:13
**card** 192:14
**care** 107:18
117:18 120:21
160:4 176:25
**careful** 17:18
103:7 183:18
**carefully** 60:6
**carried** 126:14

**carry** 23:6
**case** 1:6 36:22
37:3,15 96:16
137:8 164:9
206:17 295:7
295:25
**casino** 116:14
**casinos** 116:16
**catch** 288:16
**categories** 191:10
**category** 107:9
**cause** 49:5,15
276:3
**caused** 49:14,25
67:21
**cautioned** 203:3
**CC'd** 171:6
222:13 224:4
226:10 231:19
232:5
**center** 30:18
110:3,7
**cents** 181:2
182:15
**Century** 181:4
**CEO** 71:21 74:24
89:21 96:4,24
98:10 99:2,25
101:17 115:15
123:10,15
125:14 138:21
142:5,7 206:11
206:19 207:9
212:17 214:7
214:13 215:25
222:23 223:15
224:20
**Cerruti** 88:23
**certain** 12:6 89:6
101:7 107:11
137:22 178:19
180:5 257:12
257:18 296:21
**certainly** 40:12
188:8
**certify** 316:6,12



MAGNA ▶
LEGAL SERVICES

**Chad** 2:22
**Champ** 113:8
**chance** 235:23
**change** 20:2 21:2
  21:3 98:24 99:9
  115:13 139:3
  140:17 142:3
  235:13,19
**changed** 103:2
  148:14
**changes** 97:21
  104:4 141:5
  149:12
**changing** 140:12
**chaotic** 245:20
**characterization**
  26:15 197:6
  254:12
**characterize**
  294:15
**charge** 204:19
  205:4 237:6
**chart** 145:25
**check** 122:3
  214:4
**checked** 98:5
**Chicago** 2:9
**chose** 137:5
**Chrome** 113:9
**chronological**
  118:15
**chunk** 297:12
**circumstance**
  187:7,17 192:4
**City** 90:18 93:6
**claim** 30:15 36:4
  67:16 195:6
**CLAIMANT** 1:5
**claimants** 2:8
  38:24 65:25
  66:3,15 81:2
  94:7 108:13
  247:11
**claimant's** 30:19
  39:6 65:24
**claimed** 134:2

**claims** 66:16
  67:12,19 68:10
  68:12,23
**clarify** 67:11
  70:5 97:18
  137:13 167:7
  167:10 188:13
  190:15 209:12
  258:8 299:6
**clause** 279:2
**clear** 14:10 70:16
  81:6 83:23 88:6
  100:17 127:14
  152:9 158:21
  164:21 195:5
  243:9 251:19
  282:10 311:10
**clearly** 19:18
  42:9 67:9
  149:12 214:15
  249:15
**client** 46:16
  47:18 64:5
  80:17 92:19
  94:10,15 129:4
  129:18,25
  173:10 196:11
  200:21
**clientele** 91:13,19
  91:20,22,24
  92:8 198:17
**clients** 92:9,19,20
  92:24 93:5,8
  121:2 130:21
  135:6 199:11
**close** 12:6 119:25
  145:5 175:7
  177:4 187:11
  193:16 194:7
  289:19
**closed** 31:7 93:18
  305:18
**closer** 87:7
**closing** 49:22
  76:9 77:5 177:6

178:15 195:21
  196:4 197:12
  197:14 198:15
  199:9,18 200:5
  201:7
**closure** 49:3
  196:16
**clothing** 296:14
  296:23
**CMP** 303:24,25
**coaching** 254:4
**colleague** 176:18
  176:19 185:11
**collect** 42:25
**collection** 7:10
  93:9,13,15,16
  93:18,19,21
  101:3 107:9
  120:25
**collections** 93:10
  297:9
**collectively** 252:6
**come** 12:5 19:12
  23:22,24 34:13
  93:6,8 96:4
  122:4,7 126:22
  129:20 135:9
  171:21 175:5,9
  196:11 252:8
  255:12,19
  258:9 264:9,13
  272:6 285:25
  289:3 309:20
**coming** 23:23
  43:7 123:21
  129:4 148:2
  258:10
**commenced**
  32:20 39:20
**comment** 131:10
**commercial**
  121:6
**commission**
  192:11 300:5,9
  300:10 301:16
**commissions**

298:3 299:10
  300:23 312:6
  312:14 313:5
**commitment**
  143:8 252:11
**committed** 105:4
  170:16 252:3,4
  265:14
**Common** 106:23
  106:25 107:3
**communication**
  47:18 167:19
  292:3
**communications**
  48:21 70:25
  97:21 119:17
  265:14
**companies** 87:4
  88:21 190:21
  311:2
**company** 8:16
  20:18 35:3,20
  39:19 74:13
  79:8 80:2 99:4
  99:5,7 111:14
  115:15 123:19
  148:21 165:4
  178:19 181:14
  181:14,19
  184:23 186:6
  186:24 188:20
  188:22 189:25
  190:8,21
  195:11 201:16
  201:19 273:6
  277:15 294:7
  294:13,23
  295:2 306:8
**company's** 79:10
  79:13 186:14
  294:15
**competing** 297:2
  297:10
**competitive** 95:3
  95:12
**competitor**
  110:24 297:5

311:17
**competitors**
  94:25 95:3,9
  106:10,20
  296:9,12
  310:24
**complaint** 50:20
**complete** 128:18
**completely** 36:9
  215:20
**concealed** 31:12
**concept** 101:23
  102:7 123:3,5
  128:3 142:25
**concerned**
  232:24
**concerning** 312:6
**conclusion** 15:3,8
**condition** 81:4
  115:11
**conditions** 115:4
**conduct** 182:9
  186:22 215:12
**conference** 87:10
  87:21
**confident** 314:21
**confidential**
  277:18,21
**confirm** 8:15
  53:14 71:20
  72:13 105:3
  222:22 223:19
  253:20 255:18
  259:9 280:19
  290:11
**confirmation**
  223:5
**conformation** 8:4
**confused** 22:3
  188:2 246:6
**confusing** 16:14
  127:11
**confusion** 244:19
**connection** 87:14
  122:16 169:22
  178:18 196:3



consent 35:5,11
35:23 47:2
52:17 57:5
153:20 154:25
155:16 239:8
267:12
consented 26:9
27:25
consequence
32:17
conservative
182:20
consider 115:2
128:21 132:20
216:25 231:7
considerable
78:23
consideration
117:25
considered 25:9
25:15 91:6
117:12 133:4
313:10
considering
102:6 258:10
consignment
239:7
consistency
252:17
consistent 166:17
171:12 252:10
287:2
constantly 22:24
constitute 98:22
consult 64:5
204:14
consumer 92:14
92:16
contact 48:7
169:4,25 170:4
contain 156:21
242:7
containing 13:23
content 116:25
contents 276:10
context 188:15

189:11 299:2
contexts 313:8
continue 34:13
59:5 66:25
119:24 139:16
141:20 155:2
191:22 219:18
220:21 221:9
223:13 231:5
234:25 235:17
238:15 245:23
246:3 266:11
267:4 290:20
291:19,20,23
293:9 309:4
continued 24:17
continues 21:18
continuing
120:16 168:25
contract 11:19
17:14 19:16
20:12,22 21:2,9
212:2,11
213:19 214:5,9
214:12,19
215:23 216:3
267:11 277:20
contracts 191:17
210:9,15
contractual
11:17 171:15
contrary 152:22
control 109:13
262:24
controversy
186:21
conversation
103:15,21
115:10 147:15
148:11 150:5
150:11 153:16
154:16 162:9
197:22 199:22
200:2,8 225:13
231:12,17
234:22 235:15

248:16 249:20
250:6,24 251:2
251:5 254:15
256:14 259:20
261:3,6,8
262:12 278:6
conversations
116:20 127:2
152:24 201:14
208:17
cooperate 117:17
cooperative
158:7
copied 125:7,23
copy 72:14,19,25
73:12,21 81:24
147:10 155:21
156:9 201:5
223:20 224:11
224:12,21
225:2,6 227:11
242:16 244:3
245:14 248:3
Corneliani 93:2
95:8,10 296:17
corporate 124:7
125:14 127:22
277:25
correct 7:12,14
23:4,11,16,17
42:18 55:5 58:4
58:5 61:12 73:7
76:25 77:2 80:2
90:19 94:7
95:13 96:25
98:13 113:7
114:12 123:17
123:20 124:14
125:9 131:13
134:18 139:11
150:23,25
151:7,8 155:8
160:24 162:21
167:3 168:19
173:17 176:12
178:12 180:13

181:7 182:4,5
182:12,21
184:2,18
185:20 186:4
186:16 187:9
187:15,19
190:17 192:15
193:10,13
206:12,15,23
212:24 221:17
222:12 231:23
238:18 239:9
241:2 244:9
259:3,10
263:13 264:20
266:12,13,16
266:20,24
267:5,12,21
268:7 271:22
286:18 287:24
288:4 289:5
290:6 295:17
302:17 305:20
311:20
correctly 117:5
161:7 172:15
216:12 269:19
correspondence
11:8 48:22 56:8
125:11 139:12
235:4
corresponding
43:14
cost 182:13 185:6
185:15 187:3,4
187:14,20,23
188:19 189:15
189:23 190:13
190:16,18
191:3,25 192:9
192:13,25
193:8,11 296:6
300:13,14
302:21 305:14
311:4,19,21
312:24 313:11

313:13 315:2
costs 178:20
182:17 184:23
186:3,21 304:9
304:15
counsel 4:25
25:24 46:25
48:4 67:2 80:14
98:2,12 119:18
167:15 185:13
191:22 196:20
197:6 215:10
220:18,25
231:5 233:16
252:16 259:21
260:10 264:10
267:24 268:19
270:22 272:21
288:8
counselor 7:6
12:25 56:6
59:22 61:22
62:23 77:9
80:18 91:17
151:3 187:25
278:25 310:15
312:17
counsel's 26:6
115:16
counter 58:6
counterclaims
54:15
counterpart
165:24
country 92:21
couple 24:22
44:15 70:24
90:3 101:11
course 173:20
181:25 187:12
284:3
court 172:3
316:24
courtesy 160:9
cover 172:23,25
309:20



**covered** 61:17
241:24
**COVID** 87:10
**co-counsel** 85:6
**CPA** 297:19
**credentials**
223:17
**credibility** 38:20
42:4 201:18
208:21 226:20
**credible** 62:12
**credit** 7:22 9:24
10:4 192:14
197:18
**credited** 5:24
**cross** 146:8 153:6
202:15 203:4
203:14 211:10
231:9 232:13
**CROSS-EXA...**
4:1,18 5:1 6:1
7:1 8:1 9:1 10:1
11:1 12:1 13:1
14:1 15:1 16:1
17:1 18:1 19:1
20:1 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1
32:1 33:1 34:1
35:1 36:1 37:1
38:1 39:1 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1 63:1 64:1
65:1 206:1,4
207:1 208:1
209:1 210:1
211:1 212:1
213:1 214:1
215:1 216:1

217:1 218:1
219:1 220:1
221:1 222:1
223:1 224:1
225:1 226:1
227:1 228:1
229:1 230:1
231:1 232:1
233:1 234:1
235:1 236:1
237:1 238:1
239:1 240:1
241:1 242:1
243:1 244:1
245:1 246:1
247:1 248:1
249:1 250:1
251:1 252:1
253:1 254:1
255:1 256:1
257:1 258:1
259:1 260:1
261:1 262:1
263:1 264:1
265:1 266:1
267:1 268:1
269:1 270:1
271:1 272:1
273:1 274:1
275:1 276:1
277:1 278:1
279:1 280:1
281:1 282:1
283:1 284:1
285:1 286:1
287:1 288:1
289:1 290:1
291:1 292:1
293:1 294:1
295:1 296:1
297:1 298:1
299:1 300:1
301:1 302:1
303:1 304:1
305:1 306:1
307:1 308:1

309:1
**CROW** 198:5
313:21
**Crowe** 2:16 3:7
85:6 172:17,22
172:24 173:4,7
174:22,24
175:4 188:14
189:4,8 190:4,5
195:2 198:9
200:14,17
201:11,22,24
201:25 204:15
205:7 215:16
244:10 245:15
298:5,15,16,20
300:20 304:12
310:18,21,23
312:3
**Crowe's** 181:17
**current** 115:24
187:19 268:4
**currently** 89:13
**custom** 129:25
**customer** 164:2
**customers** 22:17
188:10 194:10
**cut** 134:8 239:16
261:10 303:24

_____
**D**
**D** 3:2 4:16
**damage** 49:5
78:20 173:10
195:10 197:15
260:4
**damaged** 184:21
298:13
**damages** 85:9
172:23,25
173:2,6 174:6
187:5 270:14
295:24 296:6
302:11,16
307:9
**darnedest** 309:22

**data** 104:21
291:2 293:5
**date** 1:10 7:25
12:6 43:25
48:17 51:18
55:10 149:19
149:22 150:4
166:11 238:21
268:9 316:25
**dated** 33:24
46:16 54:18
78:22 135:11
137:9 222:7
262:3,6 284:19
**dating** 310:9
**David** 58:9 63:13
165:21,23
284:18
**day** 52:3 93:15
99:12 100:19
117:18 127:15
150:16 166:22
290:21 315:3
**days** 13:22 41:10
44:16 94:6
132:18 160:25
166:10 177:25
199:21 269:4,5
292:12
**day-to-day** 161:4
**deal** 17:19 19:7
26:24 259:22
**dealing** 192:4
220:15
**deals** 17:18
298:13
**dealt** 130:21
**debacle** 196:23
197:7,13
**December** 89:18
149:24 150:16
158:5 249:21
250:7 251:12
251:18 253:18
259:10,13
261:3 262:13

**decide** 183:12
204:16 269:9
275:5 295:7
302:9
**decided** 101:22
124:2 141:19
147:18 207:9
231:13 234:24
264:12 266:10
289:10
**decision** 58:18
114:23 126:7
267:4
**declined** 199:16
**dedicated** 259:19
**deemed** 56:23
**default** 32:18
**defaulted** 32:13
**defendant's**
186:22
**deferred** 260:9
**degree** 97:19
299:20 300:10
**degrees** 131:2
297:22
**delayed** 53:24
127:20
**delays** 34:21
**delicate** 181:12
**delivered** 131:12
164:7
**deliveries** 93:24
128:25
**delivery** 130:6,19
132:4
**demand** 30:19
42:2 236:13
237:7
**demanded**
239:23 240:8
**demanding**
239:17,24
**demands** 240:11
**demonstrate**
80:11
**dent** 194:15



**denying** 61:4
**department** 14:8
98:6
**depended** 301:22
**depending**
132:15 299:4
299:24 307:11
**depends** 23:19
300:2
**describe** 86:23
91:11 193:21
209:25 306:3
**described** 140:13
304:23
**desirable** 269:16
269:23 270:5
279:14,18,20
**despite** 32:10
**destination**
107:15
**detail** 93:20
**detailed** 121:5
**details** 59:13
83:7
**determination**
59:20 160:20
**determine**
213:19 293:8
313:13
**determining** 15:4
179:6
**detrimental**
260:7
**develop** 101:12
101:23 123:22
**dial** 87:14
**difference** 116:10
124:5 172:12
217:13 312:20
**different** 24:3
30:4 91:24
108:2 113:4
194:6 215:20
219:21 230:20
236:20 240:2
242:6,7 248:12

249:13 265:11
265:17 278:13
292:2 295:11
304:5 311:3,19
311:21,22
**differently** 147:2
238:8
**difficult** 195:18
196:7 305:25
306:7
**diligence** 39:6
**direct** 85:5 174:3
203:2 303:4
**direction** 121:25
122:15,15
**directly** 41:23
42:4 86:9 90:8
92:15 164:11
203:20 210:12
**directors** 127:23
**DIRECT-EXA...**
86:1,18 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1
102:1 103:1
104:1 105:1
106:1 107:1
108:1 109:1
110:1 111:1
112:1 113:1
114:1 115:1
116:1 117:1
118:1 119:1
120:1 121:1
122:1 123:1
124:1 125:1
126:1 127:1
128:1 129:1
130:1 131:1
132:1 133:1
134:1 135:1
136:1 137:1
138:1 139:1

140:1 141:1
142:1 143:1
144:1 145:1
146:1 147:1
148:1 149:1
150:1 151:1
152:1 153:1
154:1 155:1
156:1 157:1
158:1 159:1
160:1 161:1
162:1 163:1
164:1 165:1
166:1 167:1
168:1 169:1
170:1 171:1
172:1 173:1
174:1 175:1,3
176:1 177:1
178:1 179:1
180:1 181:1
182:1 183:1
184:1 185:1
186:1 187:1
188:1 189:1
190:1 191:1
192:1 193:1
194:1 195:1
196:1 197:1
198:1 199:1
200:1 201:1
202:1 203:1
204:1 205:1
**disagree** 132:23
**disclose** 37:16
**disclosed** 41:9
**disconnected**
144:24
**discount** 7:23,24
23:12
**discounts** 5:13
8:9,17 11:16
12:4 14:13,18
44:22
**discovered** 118:3
**discovery** 38:23

41:2
**discretion** 263:4
**discuss** 141:13,25
142:14 169:4
173:8
**discussed** 150:19
206:19,25
311:4
**discussing**
112:11 251:13
**discussion** 66:16
125:15 149:17
157:6 313:7
**discussions** 48:5
48:13 79:15
135:23 152:10
208:10 221:23
240:23 241:7
242:2
**disjointed** 281:3
**dispose** 180:13
**disposing** 181:8
**dispute** 55:4
61:11 62:12
**disputed** 6:6,19
**disputes** 203:13
**distance** 116:11
133:14
**distasteful**
232:11
**distinction** 217:5
**distinguish** 91:19
**distribution**
210:6
**distributor** 199:4
**divide** 130:17
**divided** 93:13,17
**division** 311:8,9
311:13,15
**divisions** 311:7
**doctor** 5:6 22:5
77:12,15 90:6
90:10 117:15
127:15 150:11
154:17 168:21
182:9

**doctors** 90:8
111:21 118:17
127:2,6 131:11
134:2,12,14
135:12 141:14
141:17 147:25
148:16 149:5
150:6 152:10
157:7,23 162:3
162:8,15,18
167:11 193:23
206:19 207:12
208:11 252:21
257:20
**doctor's** 130:5
253:25 255:11
309:8
**document** 4:24
25:20 28:4 40:8
40:14,20,22
41:13,23 42:2
42:15,21 45:23
50:7,24 51:6
52:17 56:2,12
81:7 96:9,25
97:15 136:5
137:7,20
147:10,12,14
148:11 151:9
156:17,20,24
215:2,4 226:14
227:11 229:5
229:13 233:22
234:2 242:6
243:8 244:13
246:9 261:24
262:9 264:14
274:3 275:25
283:6
**documentation**
115:13
**documents** 17:14
26:5 27:15,19
38:21 39:5 41:5
41:7,8,24 43:16
65:25 80:22



125:25 149:10
149:16 228:8
229:3 257:3
273:12,18
**doing** 85:19
100:15 118:4
178:7 199:13
206:9 213:12
215:13 217:7
219:19 221:10
245:22 280:7
291:12
**dollar** 181:3
182:8,15
**door** 94:19 178:5
289:2,18
**doubt** 208:15,25
209:9
**Dr** 3:4,5 4:1,4,20
5:1 6:1,13 7:1
7:12 8:1,14 9:1
10:1 11:1 12:1
13:1 14:1 15:1
16:1,3 17:1,13
18:1,8,15 19:1
20:1 21:1,19
22:1 23:1 24:1
25:1,21 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1,23
44:1 45:1,25
46:1,16 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1,16 55:1
56:1 57:1 58:1
59:1 60:1,14
61:1 62:1,17
63:1,9 64:1,15
65:1 66:1,14
67:1,18 68:1
69:1,12 70:1,8

71:1,8 72:1
73:1,25 74:1
75:1 76:1 77:1
78:1 79:1,6,6
79:15,24 80:1
81:1 82:15,17
90:6 125:8,16
160:4 163:19
164:14 223:9
224:9 240:4,7
242:14 243:25
247:22 248:2
249:17,17,20
250:7 251:12
251:22 253:18
258:11 259:14
259:18 260:24
**dramatically**
295:19
**Dubois** 92:12
**due** 39:6 95:25
196:6 280:10
283:14
**duly** 86:15 316:8
**Dushoff** 52:23
**duty** 96:9 193:12

— E —
**E** 2:2,2,5 3:2
86:14,14 316:2
316:2
**Eads** 113:15
114:4
**earlier** 125:15
134:10 140:11
172:22 188:7
212:16 229:12
248:8 252:2
267:18 275:8
286:10 287:8
302:12 303:10
304:24 311:5
**ease** 162:7
**easier** 233:20
**easily** 136:21
207:25 300:18

**easy** 101:18
**economic** 69:20
301:2
**educate** 213:13
**educated** 212:17
**Efarber@farb...**
2:6
**effect** 57:22
125:19 215:5
231:22
**effective** 46:21
262:7,25
**effectively**
234:15 239:16
**efficient** 17:7
**effort** 67:11
118:10 306:3
308:21
**efforts** 284:24
**Egyptian** 99:7
**eight** 161:8
177:17
**either** 41:3 84:14
150:6,19
158:13 162:3
163:18 164:14
180:24 198:13
231:5 260:13
273:8 282:4
287:21 295:25
**elect** 139:15
140:2
**element** 295:24
**elevating** 121:11
**elicit** 204:17
**eliminate** 140:6
**emanating** 279:7
**emergency**
134:23
**emersed** 119:9
**emphatically**
81:6
**employed** 89:14
273:13
**employee** 169:6
170:8 176:17

**employees** 49:4
49:23
**employment**
299:16
**ended** 263:12
**enforcement**
75:11
**enforcing** 205:22
**engagement**
158:4
**enlarge** 109:23
166:4
**ensure** 153:23
**ensured** 128:5
**Entebi** 72:10
90:12 97:10
216:15 218:10
221:15,19
222:11 224:19
225:6,14
235:16
**enter** 138:3
**entered** 73:6,25
76:23 78:10
238:18,23
**entering** 45:9
**enters** 210:15
**entire** 258:16
**entities** 91:14
118:2 140:14
**entitled** 1:15
136:22
**entity** 49:6
**entrance** 116:2,4
116:9 135:8
**entrances** 116:15
**entry** 52:20
**enumerated**
49:25
**episode** 47:16
**Ermenegildo**
88:22 92:25
95:5
**escalator** 112:21
**especially** 127:11
130:11

**ESQ** 2:10,11,15
2:16
**essence** 221:7
**essential** 221:4
**essentially** 85:10
159:16 190:25
**etcetera** 269:25
270:7 296:6
305:3
**Eugene** 1:18 2:4
**evaluating**
114:15
**eve** 40:4
**events** 163:17
**eventually** 98:17
**everybody** 109:8
117:16 186:10
230:12
**evict** 21:3 78:14
**evicted** 33:8,13
36:5,23 37:9
195:14,16
305:17
**evicting** 77:24
**eviction** 25:23
26:3,10,16 28:2
32:20 37:18
49:2 53:7 66:17
67:21 76:8
78:17,19
171:23
**evidence** 41:12
43:17 62:3
65:21 78:24
80:24,25 81:3
81:25 96:15
137:8 151:10
221:3 229:24
234:2,17,19
240:20 241:25
274:19,21
276:2 279:2,24
282:25
**evidentiary** 65:6
80:9
**evolved** 105:20



evolving 128:25
exact 48:16
  245:13
exactly 64:23
  132:5 207:24
  286:16 295:12
  306:15
examination 3:3
  22:2 66:1,12
  67:1 68:1 69:1
  70:1 71:1 72:1
  73:1 74:1 75:1
  76:1 77:1 78:1
  79:1 80:1 81:1
  202:15 204:20
  205:4 215:12
  232:14 246:4
  310:1,6,22
  311:1 312:1
  313:1
examined 86:16
exchange 135:10
exchanged 243:7
exclude 119:16
exclusive 106:16
  262:24
exclusively
  150:12
excuse 70:10
  71:18 227:8
excused 82:20
  314:4
executed 72:15
  151:6 223:20
  310:13
executing 138:18
executive 164:24
exercise 193:22
exhibit 30:17,18
  30:19 40:2
  43:15,18 44:8
  45:23 50:9,14
  51:9 54:2,11,14
  63:4,7 65:15
  108:14 119:13
  124:21,25

135:21 137:13
  147:5 156:11
  156:14 159:19
  159:21 165:13
  168:2,13
  170:22,25
  222:16 233:17
  233:24 241:18
  241:19 244:10
  244:25 245:14
  247:4,11
  284:14
exhibits 54:5,6
  65:22
exist 27:16
existing 139:4
expand 296:11
expanding 102:6
expansion 114:20
expect 7:22
expectation
  98:21 139:23
  285:13
expectations
  218:19 291:4
expected 98:20
  290:16
expense 269:5
expenses 185:24
  192:14 295:20
expensive 308:24
experience 86:24
  88:13,16
  106:15 187:13
  293:7 312:19
experienced
  69:21 217:2
  221:14
expert 82:23
  173:2,14 174:6
  307:9
expertise 98:8
expire 57:11
explain 9:5 15:12
  187:23 204:2,7
  204:8 265:8

270:12 273:22
explained 71:19
  134:7 203:9
  222:21
explanation
  204:6,18
explore 190:10
Express 180:2
expressly 56:24
  58:3
extend 59:2
  307:9
extension 160:25
  166:10 167:12
  290:22,25
  291:5 292:12
  293:8
extensive 158:17
extent 57:4 97:17
  101:7 115:8
  116:19 121:9
  128:24 129:8
  154:15 158:3
  172:24 189:21
  199:11 257:13
  257:18 271:11
  296:21 299:12
  302:4
external 179:23
extra 133:11
extremely 195:18
eyes 118:6,7
e-mail 5:8,14
  7:18 8:10,14
  12:9 14:11
  20:13 29:12
  36:8 44:16,19
  46:16 60:14,15
  60:20 61:2,5
  63:10,13,18,19
  71:13 72:3,23
  73:12 74:22
  118:16,21
  124:12,14
  125:7,21,23
  126:2 160:7,9

165:11 166:3
  166:11 222:10
  222:13 223:4
  223:14,17
  224:10 225:25
  226:6,16
  231:18,19,25
  232:8 233:12
  233:14 234:10
  234:12,16
  236:8 237:3,6
  237:11,18
  238:2 241:3,23
  242:4,14 248:2
  248:20 249:16
  250:9 251:7
  253:18,19
  254:13 255:15
  255:17 256:4
  256:16 259:12
  259:14 260:24
  262:18 282:20
  282:23 284:17
  284:22
e-mailing 247:22
e-mails 39:22
  71:10 80:22
  135:10 222:6
  226:9 228:9
  231:22 232:4
  242:7 264:19
  266:15,19
  288:2,6,10
  310:9

⎯⎯⎯⎯⎯ F ⎯⎯⎯⎯⎯
F 11:23 316:2
fabric 129:22,24
  132:18 133:13
  133:20 303:23
  303:25 304:2
face 18:11 83:25
facilitated 158:7
facilities 303:14
  304:11,17
facility 191:8,13

fact 35:8 39:16
  63:22 72:9 76:7
  76:20 79:12
  81:25 100:19
  123:18 148:22
  228:6 266:9
  294:13
factor 67:25 70:3
  70:4 190:25
  214:2
factored 66:17
factors 68:2,3
facts 31:11 37:16
factual 219:2,5
Fail 25:18
failed 31:5 38:8,9
  38:13
failing 25:10,15
failure 32:18
fair 69:24 101:9
  103:13 105:6
  160:18 228:23
  245:24 252:23
  274:17
fairly 232:25
faith 28:8
fall 6:12 11:25
  22:23 23:9 25:4
  93:11,16
  118:17 169:5
  310:9
familiar 32:5
  96:5,17,24 97:3
  97:7 216:14
family 99:12,17
  124:6
famous 104:25
far 95:20 104:21
  114:5 125:24
  197:24 214:18
  302:23
Farber 1:18 2:4
  13:11 21:17
  38:17 40:13
  41:6 43:19 51:9
  62:5 64:12



67:10 69:3,8
74:20 84:23
85:25 87:24
92:2,6 103:7
108:6,18 120:5
123:8 144:4
152:18 162:25
163:9 165:8
172:16,20
174:25 196:6
200:15 201:9
201:11 202:22
206:3 214:24
220:3 222:18
226:11 229:11
230:14 232:6
235:5 236:9
237:19 238:7
241:25 245:4
246:13 253:14
265:8 271:8
273:23 275:7
279:5 280:4,8
281:17 283:25
286:25 287:5
288:14 295:22
306:23 310:19
**Farber's** 9:17
148:18
**fashion** 22:20
24:2 201:3
217:3 311:3
312:19
**Father's** 93:15
**favor** 135:7
**fax** 147:9 149:22
**faxed** 149:23
**February** 54:18
54:22 56:9
60:16 61:6,12
62:19 65:11,17
78:22 80:15
81:17 134:11
135:11 160:14
160:19 165:15
166:12,13

167:20 262:5,7
310:14
**fee** 185:15 236:13
237:7,24
239:17,25
240:9 251:23
252:10,22
**feedback** 143:19
143:22
**fees** 185:9
**felt** 220:9
**Ferragamo** 111:6
**Ferrari** 96:2
**Fifth** 181:4
200:10
**fight** 204:21,25
**fighting** 275:24
**figure** 182:7
233:21 254:6,8
**figured** 67:9
**figures** 218:4
270:21 272:16
272:17 273:19
274:6,12,25
277:6 283:23
**filed** 30:16 33:4
50:19 78:18
**filled** 77:24 179:4
**final** 60:12
160:20 178:5
**financial** 273:11
**find** 21:11 70:13
70:19 71:5
76:16,21 77:22
122:10 135:13
136:6 195:14
232:10 236:3,6
237:8 239:14
239:18 240:9
240:24 241:7
242:16 244:3
249:14 282:23
283:3,3,5 306:2
306:4,7
**finding** 221:24
225:13 231:12

234:23 235:15
236:14 248:25
**fine** 4:23 63:3
85:12,13,15
203:24 245:22
258:4
**finish** 6:15 28:19
85:20 145:19
205:19 231:8
256:11 269:2
304:3 308:21
308:23 309:4
309:14,22
314:22,25
**finished** 204:12
**finishes** 25:13
**fire** 49:4,23
**firing** 49:23
**firm** 97:24 144:6
144:9 185:10
**first** 5:20 6:2,9
8:6 9:13 24:9
24:10 44:5 76:8
83:3,10 84:13
86:15 90:5
97:18 101:22
102:10 114:6
116:21 119:18
122:23 130:18
176:3,23 185:7
197:25 222:7
231:10 257:10
258:14 270:4
283:8,13
299:19
**firsthand** 206:18
206:24
**fit** 88:3
**fitting** 129:14
**five** 19:13 53:12
53:16 132:20
133:2 174:17
174:17 284:2,4
301:18
**fix** 300:4
**fixed** 113:19

230:16 313:10
313:12
**flagship** 91:6,10
100:7 102:3,4
114:17,24
118:8,9 133:4
135:4 213:14
**Flaherty** 173:20
308:4
**flew** 185:23
**floating** 115:19
**flood** 183:20
**flow** 187:6 220:6
220:11
**focus** 45:14 98:15
149:14 269:6
298:24
**folks** 177:21
186:7
**follow** 17:11
196:21 201:12
**following** 8:16
23:24 307:4
**followings** 11:15
**follows** 4:17
86:17
**follow-up** 167:19
198:8 200:15
**foot** 110:6 111:25
115:25 131:3
**Forall** 1:7 5:13
9:24 11:9 12:21
13:15 14:2,12
17:6,16,20
23:14 24:4
25:10,16,18,22
25:25 26:8
27:20,23 30:25
31:12 32:2,13
32:22 33:7,12
33:13,19,24
34:2,6,14,19,22
35:11,13 36:5
36:23 37:9 41:3
41:9 43:13 46:8
46:17,25 47:9

48:5,18 49:2,6
49:14 50:2 51:2
52:2,7,10 55:8
57:8,13 59:21
70:11 74:14,16
76:14,20 77:4
77:25 78:14,16
89:14,20,22,23
90:17 91:13,15
94:10 96:7,13
96:24 98:10
99:3,4 104:19
106:17 112:11
114:9 118:12
119:6,21
122:17 123:10
135:22,23
136:8 138:2,19
139:4,23,25
140:5 142:5
143:3,4 151:16
151:17,25
152:3 154:3,5
156:3,9,21
157:2,19
158:14 160:19
164:16 165:15
170:16 171:23
187:17 188:5,9
188:19,25
189:17 190:13
191:6 192:5
193:5 194:18
195:7,19 196:2
197:24 198:12
206:11 210:2,5
210:12,13
212:3,11
213:16,20
214:6,12
215:23 216:10
218:11 223:15
227:9 238:15
252:4 253:23
255:12 257:6
257:10 258:10



259:17 262:3
262:23 263:3
263:16,24
266:8 267:3,19
271:18 272:2
272:12,13
275:14 277:4
277:23,24
278:10,11
279:19 281:22
282:14 283:7,9
285:25 287:9
289:3,24
290:17,19
291:23 302:22
303:12,17,20
304:2 305:14
306:4 311:13
312:15 313:11
**Forall's** 32:17
35:4,22 69:17
70:18 92:5
97:11 98:2
192:22 255:11
273:10 275:15
304:8,14
310:10
**forced** 49:3
**Ford** 95:25
**foregoing** 57:5
316:9
**foremost** 122:23
299:20
**forget** 36:9 124:4
134:21 170:19
280:12
**forgive** 293:2
**form** 209:18
282:9
**formal** 17:22
20:12
**formalized** 79:20
79:22
**formally** 77:24
**formed** 151:5
**former** 109:25

206:19
**forth** 56:24
116:25 148:9
268:25 281:2
316:8
**Forum** 31:14
32:12,19,21
46:18 50:19
105:25,25
106:12,19
108:5 109:7
117:3 137:10
152:5 242:17
244:5 248:4
249:7 267:25
**forward** 8:18,25
34:18,22 71:22
143:14 147:18
147:22 186:19
188:20 189:6
189:11 192:7
193:5 196:24
218:12 220:4
221:21 222:24
223:6 312:13
**forwarded** 40:6
164:8 230:23
249:6
**forwarding**
248:3
**found** 45:3
154:19 159:20
194:5 249:2
**foundation**
108:25
**founder** 99:16
**Fountain** 110:14
**four** 94:3 105:21
132:14 269:3
277:15 302:13
**frame** 44:18
**franchised** 31:2
**franchisee/lice...**
31:8
**freight** 193:12
**fresh** 128:23

314:19
**front** 30:18 215:2
**frozen** 160:11
165:8
**fulfill** 129:7
**full** 32:10 37:16
105:22 204:6
223:17 314:20
**fully** 131:6 179:4
**further** 41:17
43:11 57:19
60:11 64:2 80:5
82:9 155:17
201:24 296:3
306:23 313:23
314:8 316:12
**future** 9:3,7,8,11
9:15
**F.lii** 88:23
**F/W** 93:12

---
### G

**gain** 183:22
**gallery** 113:6
**gambler** 116:17
**Gastroenterolo...**
77:18
**Gene** 84:23
**general** 131:13
158:21 192:13
195:11 198:16
198:19,23
276:20 313:5
**generally** 23:4
24:21 185:5
290:15 301:6
302:12
**generated** 23:8
**Gentlemen** 247:4
254:18
**germane** 275:16
**getting** 78:8
119:8 143:19
144:22 154:14
170:5 178:11
220:14 223:16

254:3 265:22
311:16
**Giofree** 307:10
307:23
**girls** 162:13
**give** 16:9 51:5
64:7 84:6,13
121:25 145:24
149:21 204:5
204:13 230:15
233:17 235:22
238:21 245:4
247:6 253:9
255:23 263:16
266:9 289:11
289:16 292:14
296:24 300:4,8
300:13 301:6
303:25 304:19
305:10
**given** 7:23,24
8:17,25 19:2
122:14,20
141:9 177:21
177:25 259:21
316:10
**gives** 82:8 256:6
**giving** 12:4
234:15
**glass** 146:23
**global** 293:13
303:7
**globally** 293:16
**go** 4:24 6:14,18
7:15 9:22 12:18
15:20 21:16
22:4 42:21
45:22 50:4,6
62:9 64:24
71:22 73:23
75:13 77:20
88:12,18 93:20
100:14 103:4
104:12 105:12
107:11,13,14
109:4 111:9

112:13,14,17
112:22,25
118:14 120:25
122:3 123:9
136:6 142:24
147:4,18 149:7
151:2 157:22
159:12,22
164:19,20
165:5 170:24
173:13 179:5
190:22 192:3
196:19 200:17
202:20 209:22
210:24 220:4
222:16,24
223:6,10
225:15 230:6
233:9,21 234:8
237:14 238:6
238:12 241:12
242:10 244:21
249:16 255:4
256:12 258:5
269:9 280:9
283:16 286:19
286:21 288:10
288:11 289:20
291:21 292:22
299:15 301:17
301:20 302:20
310:3,20 312:3
313:4 314:8
**goal** 131:5
**God's** 110:14
**goes** 38:20 42:4
57:3 80:8 101:4
214:18 226:20
**going** 5:2 8:18,25
12:3,5 16:6
25:19 30:14
33:16 42:17,19
42:20,24 43:12
45:22 48:8 50:6
50:7,10,12
53:11 58:18



MAGNA
LEGAL SERVICES

59:4,7 61:15
63:4,7 68:25
74:16 83:5
85:16 96:10
112:16,18
116:6 118:14
123:2 124:18
125:4 127:16
127:17 128:14
130:25 143:13
145:3,18 146:2
146:8,12 147:4
147:8,22 149:7
149:8 151:18
155:21 159:19
165:10 166:12
170:24 172:17
172:23,24
173:5,7 178:13
186:19 188:20
189:6,11,22
192:7 193:5
194:9 195:15
196:23 203:16
203:25 204:2,3
204:6,23,24,25
205:21 207:10
212:18 215:14
220:21 222:2
222:19 225:15
229:3,9 231:13
232:8,19 233:2
244:15 245:6
245:16,19
249:23 253:7
254:21,21
269:8 275:9,12
282:21 298:10
298:14 302:7
307:15 308:11
309:13,21
312:13 314:24
**good** 4:2,14,20
4:22 28:8 55:20
64:6 83:20
84:22 86:20,22

91:25 110:6,8
110:17,19
113:17 125:6
127:7 183:20
202:8 203:8
206:8 215:9
228:18,22
229:2,8 233:2
234:18 253:6
255:16 259:7
296:25 297:9
297:12 300:18
301:11 315:7
**goods** 131:6,18
304:5
**gotten** 69:8
170:12
**grabbing** 280:24
**granted** 11:16
**grasping** 19:24
**great** 157:22
249:18 275:6
**group** 72:10
106:4 111:13
**grouped** 107:8
**groups** 88:21
**grow** 98:16
101:12
**growing** 294:8
**guarantee** 93:23
**Gucci** 107:6
111:8 270:7
**guess** 62:15
144:19 261:6
271:16 290:11
290:15
**guideline** 122:20
**guy** 127:11
**guys** 28:2 43:21
92:23 98:15
144:19 156:12
177:24 185:8
221:5 222:14
228:20 244:16
246:23 254:22
256:25 268:23

308:20 314:24

---

**H**

**H** 4:16,16 110:10
**HALA** 1:4
**half** 126:15,15
146:9
**Hamad** 1:4,4
2:19 3:4,5 4:1,4
4:20 5:1 6:1,13
7:1,12 8:1,14
9:1 10:1 11:1
12:1 13:1 14:1
15:1 16:1,3
17:1,13 18:1,8
18:15 19:1 20:1
21:1,19 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1
32:1 33:1 34:1
35:1 36:1 37:1
38:1 39:1 40:1
41:1 42:1 43:1
43:23 44:1 45:1
46:1,2,16 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1,16 55:1
56:1 57:1 58:1
59:1 60:1,14
61:1 62:1,17,17
63:1,9,14 64:1
64:15 65:1 66:1
66:14 67:1,18
68:1 69:1,12
70:1,8 71:1,8
72:1 73:1,25
74:1 75:1 76:1
77:1 78:1 79:1
79:6,16,25 80:1
80:11 81:1
82:15,17 90:7
125:9,9,16
147:25 150:6
162:18 163:19

222:11 223:9
224:9 240:8
242:14 243:25
247:22 248:2
249:17,18,21
250:8 251:13
253:19 256:6
258:12 259:14
260:25
**Hamads** 164:14
**Hamad's** 240:5
251:22
**hand** 84:4 107:17
220:24 245:24
**handing** 178:16
**handle** 27:9 65:6
124:10 136:20
145:24 233:2
297:25
**handled** 28:3
29:14,19 50:22
52:9 53:8 56:10
56:15 59:15
210:12
**handling** 58:9
85:2,23 173:5
**hang** 16:2 28:12
28:16 29:4 37:5
91:16 176:5
181:15 278:12
280:21
**happen** 246:24
**happened** 6:10
35:16 59:14
163:16 200:23
251:6,16
256:15 283:19
**happens** 313:17
**happy** 68:18
111:22 247:7
**hard** 171:3 186:8
201:5 268:20
**harm** 49:14,16
49:25
**harmless** 154:3
**Harry** 92:23

**harsh** 228:21,22
**hasty** 180:3
181:10,20,23
**head** 98:2 211:13
274:2 278:2
299:17 302:25
**headquarter**
101:17 102:2
124:3 210:13
**headquarters**
134:22 149:2
210:14
**hear** 18:7,15
40:10 44:4
83:11,21 87:16
88:5 103:9
124:23 144:18
145:2,10,11,12
152:16 161:25
216:11 234:16
234:19 254:4
255:5 292:16
292:18,19,23
298:14,18
**heard** 20:7 99:11
110:20 118:16
124:13 130:5
148:18 191:24
197:19 208:7
221:13 226:14
228:18 229:7
238:8 253:12
261:12 281:12
282:7 286:21
292:8
**hearing** 163:4
185:4 228:7
230:25 231:2
**hearings** 144:6
**heart** 78:9
**Hearts** 113:10
**held** 1:15,18
**Hello** 83:12
206:6
**help** 16:8 75:9
115:16 166:8



176:17 178:6
237:16 239:17
240:9 247:5
253:11 254:23
269:8 272:10
274:5
**helped** 178:3
**helpful** 215:6
233:18
**helping** 237:8
**helps** 202:10
**hereinbefore**
316:8
**he'll** 82:11
**Hi** 72:25 73:20
**high** 271:21
300:10
**higher** 269:25
300:9
**highly** 279:20
**high-end** 22:14
76:10 95:13,15
217:2 270:6
275:11 276:7
296:13 310:25
**Hills** 194:25
**hire** 185:11
**hired** 206:10
**history** 283:22
**hit** 113:25
**Hochman** 58:9
63:14 165:22
165:23 284:18
**hold** 7:4 146:3
154:3 244:12
247:23
**Holding** 99:6
**holes** 307:12
**holidays** 131:9
**home** 84:15
**honestly** 55:7
59:14 196:5
**Honor** 85:6
**hope** 121:15
**hopefully** 134:23
**hopping** 242:19

244:6 249:9
**horse** 155:23
**hour** 146:10,10
307:18
**hours** 146:23
159:7
**housekeeping**
172:21
**hover** 110:11
**HR** 278:2
**huge** 117:22
**hundred** 131:2
**hung** 28:21 29:8
**hurt** 196:23
**Hussein** 2:21
**hyphen** 84:18
**hypothetical**
163:10,12
**H&M** 95:22
110:20,22

─────── **I** ───────

**idea** 19:9 253:24
253:25 255:11
255:12,24
256:7 257:5,10
258:10
**identified** 251:11
287:23 288:3
**identify** 222:15
**Illinois** 2:9
**illustrative** 108:3
**image** 100:11
122:25
**imagine** 100:11
121:11 123:6
**immediate**
120:23,24
**immediately**
175:24 194:13
**impact** 76:10
77:6 193:17
201:16
**impacted** 173:9
313:17
**impeach** 234:4

**impeachment**
226:19 227:15
228:4
**imperative** 22:15
**importance**
135:4 267:9
**important** 99:15
100:3 102:13
106:17 107:22
118:7 303:8
**impose** 282:3
**imposed** 281:9
282:12
**imposes** 275:10
**imposing** 281:22
**impossibility**
45:5
**impossible** 134:3
195:18 305:25
**impression**
105:12,16
**impressions** 75:5
**improved** 285:6
**Inaudible** 143:25
144:15
**included** 108:13
259:16 294:24
**including** 17:19
72:10 96:12
102:7 212:19
213:15 222:12
274:6 278:11
**incomplete** 70:2
230:18
**inconsistent**
108:16 264:8
**incorrect** 23:18
110:21 134:4
227:4 231:16
**incur** 178:19
**incurred** 154:4
184:23 185:24
189:15 302:22
315:3
**indemnify** 154:3
**independent**

210:8 250:11
250:15 261:7
**indicated** 5:12
126:6 147:21
256:13
**indicates** 239:24
**indicating** 12:2
**indication** 255:24
256:7 300:22
**indulge** 302:14
**industry** 24:20
25:16 87:2
88:14,19 93:4
105:20 128:2
195:12 312:20
**influx** 24:22
**inform** 36:20
**information**
10:17 69:16
99:14 102:24
153:5 209:6
272:7 277:8,12
277:17,19,22
281:17,18
294:19 301:7
303:3 305:11
**informed** 46:15
70:11 141:2
218:11 221:20
238:14
**informing** 58:16
121:2
**inherited** 100:8
**initial** 57:12
102:14 148:10
148:11 218:13
221:22 225:16
238:16 263:3,9
263:11,20
266:11 267:5
307:23
**initially** 90:21
101:24 120:12
**inquire** 200:18
214:11 215:22
**inquiries** 216:5

312:5
**inquiry** 148:19
**insisting** 48:19
**instance** 281:9,13
281:13,14
312:10
**instructed** 164:4
**instructions** 9:17
103:10 165:17
**integrity** 183:11
**intend** 57:9
**intends** 263:6,17
**intent** 147:15
148:7,9 150:18
153:21 154:10
154:18 155:7
**interactive**
109:14 267:24
**interest** 118:2
**interested** 117:7
253:20 255:18
316:15
**internally** 303:20
303:22
**intimately** 32:5
**introduce** 81:3
228:2 229:23
**introduced** 96:15
137:7 141:16
141:24 142:12
151:10
**inventory** 17:7
22:10 23:15,20
93:10 128:5
130:8,13 132:7
134:14,23
159:10 169:5
178:6,11,22,23
179:2,6 180:4,6
180:9,13,14,15
181:9 182:2,13
183:17 184:22
304:23 305:4,8
305:8,13
**investment** 99:8
99:16 143:5



**investors** 103:25
103:25
**invoice** 14:3
**invoices** 34:12,18
**invoicing** 14:4,7
**involved** 198:12
**involvement** 90:5
**involving** 185:9
**Isaia** 296:18
**issue** 14:7 19:12
21:8 85:8
108:20 128:7
163:4,8
**issued** 23:3
**issues** 98:12
144:5 244:23
269:7 310:19
**Italian** 89:2
146:22
**Italnord** 17:19
21:21 48:14
90:12,14 97:5
97:11 104:13
104:17 105:7
118:25 119:24
120:13 141:19
147:18,20
157:12 159:15
210:2,3,4,9,11
210:13,15,16
210:20 211:17
212:3,3,7,12
213:20 214:6
214:12 215:24
216:9,16
217:10,23
231:13 234:24
236:14 238:14
**Italnord's** 126:7
158:3
**Italy** 74:24 75:6
99:4 191:14
206:20 207:8
210:13
**item** 65:22 128:9
128:13 172:21

191:3
**items** 23:22,22
303:11

---

**J**

**J** 2:15
**jabbering** 268:25
**January** 5:9
126:19 132:2
134:11 137:9
158:12 257:22
284:20 285:2
**Jersey** 84:20
184:14
**jewelry** 107:14
113:10
**Jim** 46:7
**job** 123:21 205:5
245:22
**jobber** 180:18
183:10 184:3,8
**jobbers** 180:25
184:13
**jog** 257:8
**John** 284:18
288:19
**join** 173:2,19,21
173:21
**joined** 89:22
**joint** 43:15 50:14
97:12 199:5
**July** 41:25 50:19
63:13 89:17
90:4 114:13
120:22,24
130:24 160:14
175:6,12,13
206:12,14
**jump** 16:6
156:12 205:20
245:19 253:7
**June** 46:17 48:7
48:10,12,16,17
51:18 78:11
171:9
**justify** 194:13

---

**K**

**keep** 19:7 83:25
112:18 116:6
158:18 242:21
244:8 249:10
**keeping** 114:21
134:22 158:8
**keeps** 24:23
**kept** 196:9
234:18
**key** 106:21
**keys** 178:16
**kick** 300:6
**Kim** 10:13,14
**kind** 27:20 74:22
77:14 91:24
95:21 97:20,22
143:21 144:21
255:4 269:7
**kinds** 19:22
**knew** 45:7,17,20
48:18 49:16,18
49:20 102:5
120:7,8 126:20
126:24 152:11
152:20 159:2
198:20 267:9
**know** 9:15 10:3,6
10:8,9,10,18,20
10:24 11:4,23
14:9 17:15,17
19:20 20:7 22:3
23:21 27:4,4,16
27:22 29:15
30:2,5 31:23
33:7,11,15 36:7
40:19 42:6,23
46:10 48:24
49:7,12 52:13
55:6,22,24
56:13,18 59:5
59:12,13,14
61:7,9,13 62:25
65:10 75:10
76:3,3 77:15

82:5 89:6,7
90:9 92:7,23
95:15,17,20
96:12 98:18,25
99:15 100:11
100:17,18
101:8,15,16,18
103:8 107:11
107:23 112:25
114:17 116:11
116:17,18,23
118:5 121:6,8
122:23,24
124:6 126:25
127:4,7,8,19
129:23 131:17
131:20 132:13
132:14 133:2
133:11,12
134:24 137:14
140:11,16
141:19,23,25
142:21 143:11
144:10 148:12
152:25,25
153:2,7 159:21
161:21 163:16
163:24 164:4,9
167:15 173:23
173:24 176:3
176:23 177:10
177:17,25
178:4,5 180:8
180:18 181:2,5
183:23 190:7,9
191:23 192:22
193:24 194:6
197:17,24
198:10 199:12
199:15 200:2
200:10 201:3,6
201:18 202:25
203:24 210:14
210:18 211:25
217:9,9,13,23
217:25 218:7,8

218:25 219:16
220:25 221:8
224:3,7 225:4,5
225:6,9 232:14
232:16 240:18
248:9,13
250:25 258:15
261:16 265:2
268:24 272:20
273:9,10,14,16
273:17 274:16
274:24 275:22
276:5,22
277:13 278:17
278:18 279:25
280:6 282:6,12
286:15 287:17
291:18,25
292:12 293:13
293:17 294:19
296:10,22
297:7 299:15
299:20 300:3
301:9 304:8,14
304:22 305:5
305:12,14
306:13,14
307:25 309:2
310:16 312:20
313:7
**knowledge** 29:21
53:4 94:10
141:7 163:15
190:11 206:18
206:24 209:15
209:20 211:17
216:2 272:15
294:20
**knows** 27:2 273:9

---

**L**

**L** 2:10 86:14,14
86:14
**La** 111:14
**Label** 296:20
**labeled** 50:9



65:24
**ladder** 129:11
**land** 114:17
**landlord** 32:14
32:20 46:19
47:4,8 153:20
153:23 154:2
178:16 195:15
**landlords** 113:21
282:2
**language** 8:13,20
8:24 56:25
88:25 154:9
239:23 256:5
**Lanificio** 88:23
**laptop** 87:12
144:7
**Las** 31:4,22 45:2
45:18 50:20
90:15 91:4,5,21
92:16 94:11
96:7 100:3
101:11 105:8
111:18 119:21
120:5 121:24
122:17 123:23
130:11 152:5
156:23 173:8
175:7,25 176:2
176:7,10
185:12 188:4
193:13 195:3,9
200:6 210:21
211:19 212:4
212:19 217:6
217:11,24
221:16 253:22
272:13 281:23
299:12 301:9
305:13 313:18
**late** 23:22,25
34:8,11 130:6,6
131:11 287:24
309:14 314:6
**latest** 132:3
**Lauren** 296:20

**law** 82:6,7 185:10
**lawsuit** 66:6
77:24 78:5
**lawyer** 16:8 28:3
29:14,19 33:6
50:22 51:23
52:9,24 53:9
55:16,17 56:3
56:11,16 59:16
77:13 84:25
97:20 103:16
103:17,20,22
115:6 175:17
175:19,20
273:10 297:20
**lawyers** 17:16
253:6
**lay** 15:9 49:3
186:9
**laying** 177:12
**layout** 42:8
268:11,17
**LDMH** 111:13
**lead** 101:2 130:7
130:14
**leading** 305:8
**leads** 312:4
**learned** 31:20
135:12 172:6
175:6 187:13
**learning** 119:10
**lease** 19:7,10,11
26:2,8 27:25
29:2,13 30:9
32:12,19,21
33:25 34:3 35:4
35:9,12,22
36:11,19 37:18
47:7,10 48:9
51:3,22 52:3,8
57:10 59:2
66:18,25 67:22
72:15,19 73:2
73:13,21
158:18,21
159:4,5 164:17

175:13,14
212:23 213:5,7
213:10,17
223:20,25
224:11,12,21
225:2,7 242:16
244:4 248:3
249:6 258:16
263:6,18
278:17,17,18
278:25 279:3,8
279:15,18
280:2,20
281:15 282:4
285:20,24
288:20
**leasing** 287:7
**leather** 304:4
**leave** 21:10 78:16
**leaving** 208:2
**led** 69:19 294:16
**Lee** 46:11 63:14
**left** 78:18 111:4
133:20 186:24
189:24 190:8
236:15 238:14
277:15,17
289:18 293:17
293:21 294:6
305:9 306:8
**legal** 1:24 15:3,8
16:24 17:22
19:10 97:24
98:2,5,7,8
185:9 260:9
**length** 19:21
148:16
**lengths** 157:23
**lengthy** 101:7
**lenient** 207:10
**Leon** 99:12
**letter** 43:24,25
46:4,7 47:14
48:20 50:15
51:12 54:3,8,17
54:22 55:3,8,14

56:4,9 57:8
58:24 59:10,11
59:12,15,18,19
60:3,5,5 61:11
62:12,19 65:12
65:17,21 66:2
70:9 73:6 74:2
74:10 78:21,24
79:3 80:12,16
81:24 135:13
137:8,16,22
147:14 148:7,8
150:18 151:4
151:24 153:21
153:25 154:6
154:10,12,17
155:6 159:23
160:8 166:9,14
168:6,12,15,17
168:20 169:19
169:23 171:6,8
175:11,16
238:17,20,23
239:13 262:25
267:6,14
286:12
**letterhead**
168:12
**letters** 171:20
**letting** 16:7
**let's** 6:14 7:15
40:10 45:14
53:16 62:11
64:23 77:12
105:24 133:5
146:16 147:3
149:13,14
158:23 159:12
159:22 165:9
167:7,10
174:17 178:22
181:16 182:23
191:2 197:10
197:11 202:13
202:20 209:11
217:17 220:7

221:5 222:14
231:4,8 245:7
245:22 255:4
259:7 268:22
269:6,9 271:18
273:24 275:2,3
276:3 280:13
282:9 284:4
289:25 306:6
310:17
**level** 94:14 124:3
200:19 201:15
299:19
**Levin** 46:11
47:13 63:14
**Lewis** 2:10 3:5,8
14:23 15:2,24
16:20,23 21:17
26:11,14,20
40:7,10,12
42:18 44:7
53:22 61:15
62:20 64:3,10
64:11 66:10,13
67:10 69:6
73:10,15,23
77:20 78:7 80:4
81:11,12,14
82:21,24 85:13
85:21,23,25
86:2 108:4,10
108:11,23
118:22 124:20
124:23,24
125:3 136:9,11
136:12 143:15
143:20,25
144:11,12,15
144:25 145:12
146:7,9 152:14
152:17 162:24
166:4 172:20
173:17 189:18
189:21 195:23
197:2,5 202:3,6
202:7 203:16



204:4,9,11,19
205:19,24
206:2,5 209:23
209:24 213:4
214:3 215:11
215:17 217:22
219:13,14
220:3 222:17
224:18 226:11
226:13 227:13
229:11,25
230:4,13 231:3
231:8 232:22
233:6,9,23
235:5 236:19
238:7 242:9
243:6,17,23
244:15,18,22
245:6,13,25
246:5,12,16
247:3,9,10,15
247:17 253:13
254:3,16 255:9
256:8,10 258:5
258:7 260:17
261:14,22
264:12 265:11
265:21 269:11
271:7 274:20
274:23 275:6
277:2 279:5
280:4,8,10,14
280:18,25
281:16,25
282:18,19
283:25 284:7,9
284:13 286:6
286:22,23
287:4,22
288:13,18
289:20 292:17
292:19,22,23
295:4 298:9,18
299:9 301:25
302:7,10,17
306:22 308:12

308:13,17
313:22,24
**Lexington** 2:14
**liability** 154:4
158:17 159:3
**license** 13:17
19:17 20:19
22:8 29:18
33:22 45:9
47:20 48:19
57:16,21 75:11
75:15 96:6,14
96:18 102:11
102:16,22,25
104:5 105:9
115:3 120:10
122:9 139:7
149:6 150:9,22
155:12 168:24
171:16 187:20
211:7 239:6
**licensed** 31:2
**licensing** 143:2
**lie** 42:11 211:22
**lieu** 284:23
**life** 42:13
**likewise** 69:20
**limit** 220:22
**limited** 148:24
159:9 273:4,4
**line** 9:13 22:14
23:8 24:14
113:11 190:2
225:11 291:11
**lines** 22:24 23:3
**list** 108:14
304:23 305:4
307:24
**listen** 203:18
205:5
**little** 53:25 64:19
118:14 130:10
133:16,18
154:14 171:3
182:14 278:13
314:18

**live** 100:18 149:9
**lived** 193:6,7
312:12
**LLC** 1:4 8:17
30:24 31:13
46:20 50:20
69:21 79:7,17
90:6 92:11
115:2 137:10
160:2 242:17
244:4 249:7
258:18 262:3
**LLP** 2:13
**loaded** 131:7
**locally** 293:14
**located** 152:4
162:13 184:13
191:14
**locating** 53:25
**location** 105:16
105:18 109:21
110:2,5,13,16
111:25 112:3
117:11 194:5
269:15,22
270:5,8 271:14
271:21 276:12
276:17 279:18
279:20 295:11
300:24 306:2,4
**locations** 279:14
292:6
**lock** 178:4
**lodge** 61:16
**logged** 179:9
**long** 49:17,17
104:9 113:8
146:7 201:19
307:14,17
**longer** 39:19
246:15 273:6
**longstanding**
143:12
**look** 17:13 20:21
43:24 54:16
63:9 97:14,14

107:18,19
108:19 112:25
116:10 120:20
122:24 154:22
156:8 165:11
171:5 173:24
228:14,20
233:21 235:7
262:20 268:23
292:5 302:24
307:3 308:20
**looked** 44:21
122:22 134:10
137:20 165:20
215:3
**looking** 44:18
60:17 70:12
81:15 114:18
118:5 137:24
157:17 193:25
221:3 243:2
291:7,8,25
293:11
**looks** 22:16 113:8
156:13 245:21
**loose** 129:14
**lose** 128:8,12
**loss** 69:20 154:4
180:8,14 182:3
182:8
**losses** 180:5
**lost** 182:19
252:16 280:22
282:2
**lot** 17:18 64:16
96:16 131:22
148:25 203:10
220:15 233:20
280:25 292:9
300:6
**lot's** 310:8
**loud** 83:22 88:5
**love** 27:7
**low** 131:3 196:9
**lower** 110:25
111:12 300:9

**Luca** 5:9 20:17
71:2 75:17
89:23 90:2
123:14 125:17
125:17,21,22
125:25 126:2,3
126:3 140:24
207:4 230:23
**luggage** 111:14
**lunch** 145:5,19
146:17,22
**luxurious** 90:23
92:20
**luxury** 22:14,20
86:24 93:3
95:13,15,18
106:2,6,14,17
107:10 110:4
111:15 296:13
**LVLH** 106:4

_____

**M**

**M** 1:16 2:11 4:16
316:3,24
**made-to-meas...**
129:19
**Madison** 90:22
**Magdalena** 1:16
316:3,24
**Maggie** 4:6 27:9
36:15 37:22
89:10 153:10
219:14,22
281:6
**Magna** 1:24
**mail** 61:23,24
65:19 160:10
**main** 95:9,9
106:9 116:2,4,8
**maintained**
90:18
**major** 98:14
297:16
**majority** 268:13
303:19
**make-up** 105:19



making 92:15
127:9 217:5
223:16 252:3,5
252:11
mall 72:16
105:17 106:19
110:2,3 112:2,8
159:7 188:11
223:21 279:21
malls 195:9
267:25
manage 138:4
148:3,4 286:2
managed 87:3
92:16 94:18
158:15 211:18
270:15
management
17:21 29:15
30:7,10 33:16
33:18,20 34:7
35:10 48:14
55:10 56:22
57:6,11 58:2
59:6 76:24 97:4
97:19 101:16
114:21 120:11
124:5 135:24
135:25 138:3
138:10,17
139:2,16,21
140:3 141:18
147:16 150:13
151:6,24
152:12 153:17
154:18 155:22
156:3,6,10,22
156:25 157:12
157:20,24
158:4 160:22
164:16 167:13
167:21 188:9
188:25 189:2
197:20 212:6
218:14 221:22
235:19 250:18

253:22 255:20
259:22 261:17
262:2,20,24
263:8,19
264:20,23
265:5,15,20
266:4,23
297:16,18
310:13
manager 152:3
161:9,10,13,16
164:24 177:18
177:19 284:19
managing 88:20
90:13 104:13
114:9 120:14
126:8 148:23
159:16 161:5
217:14,14
311:14
mandate 259:21
mandatory
106:21
manner 42:16
45:4 181:10
manufacture
303:12
manufactured
303:13,16,17
manufacturers
187:14
manufactures
303:12
manufacturing
130:15 191:7
191:13,18
193:12 304:10
304:16
map 108:5,12,13
109:2,6,10,14
112:14 114:18
115:17 267:24
268:4,4,6,9,16
March 33:24
69:18 126:16
127:20 132:2

138:8,8 158:9
168:18 170:10
262:4,8 263:2,5
286:2 289:4
Marco 74:24
75:8,17 206:20
207:9 277:25
278:3
Marcus 200:8
margin 187:8
189:14 190:14
190:19,24
193:9 311:5,22
mark 192:19
marked 50:13
market 95:11,12
100:13 101:6
121:13 130:12
181:6 183:20
194:3,8
marketing 121:7
302:22 313:6,9
313:12
marketplace
193:19 310:25
marriage 316:14
mass 107:12
material 180:18
materialize
198:13 199:23
200:3 251:20
materially
230:20
math 182:16
Mathew 52:23
matter 1:3,15
65:6 80:9 84:24
94:7 226:18
275:5 316:16
matters 67:4
98:11 169:6
170:8
Mayhoola 99:8
99:12,16,19,22
MCM 106:5,5,7
109:21,24

mean 55:2 60:24
100:14 105:18
107:4 120:21
122:7 128:14
154:23 186:9
190:8,24
217:11,25
218:24 257:25
265:2 270:20
274:2 283:5
Meaning 303:22
meaningless
240:18
means 10:21
11:24 13:8
203:22 287:17
287:21
meant 194:3
271:9 301:14
measurement
129:21
meet 200:12
meeting 20:5,6
114:6 116:21
117:3 173:19
206:25 207:8
meetings 114:3
memorialize 75:4
memorialized
74:20,22
310:12
memory 55:19
257:8,15,16
279:21
men 93:3
mens 174:14
217:2
menswear 31:3
95:13 296:14
mention 38:10
mentioned 58:8
68:6 94:21
194:12
mentioning
183:16
merchandise

94:3 128:22,23
129:7,10
130:24,25
131:4,25 133:7
133:22 134:20
177:8,11 179:4
179:20 180:21
184:15 216:17
290:2
merchandising
180:17
messed 143:24
144:22
met 117:2 275:14
285:3
meters 133:13
Mexico 97:12
210:5,6,10
216:18,19,22
217:4,14
mic 87:7
Michelle 307:10
307:22
mid 127:20
150:16 158:9
middle 107:6
110:9 116:2
154:16 194:8
243:12,15
midst 117:21
mid-morning
64:14
mid/late 131:24
Milan 101:24,25
million 182:14
305:21,22
mind 83:8 114:21
163:4 202:23
252:23
minimal 180:9
194:20 281:21
minimize 203:13
minimum 12:11
12:22 13:16
14:21 15:16
18:3 19:19 22:6



104:18 113:24
128:2 140:7
142:25 143:4
150:7,20
168:21 207:11
209:16 210:19
275:10 276:6
277:3,9 278:8
278:19 281:7
285:13 312:23
**minimums**
104:23 276:24
**mint** 280:24
**minute** 42:24
83:8,13,14
91:17 211:20
**minutes** 53:12
64:18 146:5,10
174:18 202:13
230:15 284:2
308:2 309:18
314:12
**Mischaracteriz...**
207:20
**misconstrued**
230:3
**missed** 167:2
243:13
**missing** 243:6
280:15
**mistaken** 24:16
131:13 147:13
165:25 172:8
175:12,18
177:16 244:14
**mix** 101:18
**Model** 179:25
**modification**
57:6
**modified** 12:12
12:24 13:19
56:24
**modify** 57:25
**moment** 43:23
87:19 88:2
121:10 128:15

168:14 171:5
181:13 202:5
289:17 292:10
**moments** 312:7
**Monday** 207:5
**money** 22:11
33:8,12 75:24
**mono-brand**
133:9
**month** 94:22
129:2 175:15
176:14 283:8
283:14 290:9
**monthly** 32:13
32:18 290:5
**months** 24:22
28:14,22 29:9
90:3 94:4
100:24 126:15
126:15 130:9
132:14,14,19
132:20,25
133:2 134:19
134:19 138:5
138:25 147:17
148:5 157:2
194:19 263:3
263:12,16
291:2 293:5
**morning** 4:3,15
4:20,21 64:7
83:20 84:22
86:20,22
144:20 249:19
250:6 255:17
259:20 276:11
276:15 279:13
291:6 305:19
309:9 314:19
314:20 315:5
**motive** 301:3
**move** 77:12 81:5
87:15 90:2,22
90:25 91:2
119:25 180:4
203:13 211:24

221:6,20
231:14 235:17
267:19 268:22
269:16 295:8
304:21 310:17
313:3
**moved** 194:4
**moving** 218:12
269:13 292:10
**MSRP** 192:23
**multiple** 12:13
28:11 105:14
166:18 171:13
176:2 228:4
**mumbled** 213:2
**mute** 64:10 202:5
202:6 310:3
**mutual** 255:14
255:15
**M-A-Y-H-O-O...**
99:21

---

**N**
**N** 2:2,9 3:2
**name** 10:12 19:8
20:24,25 84:13
90:9 92:12,22
94:19 99:11
111:24 135:7
161:13,20,23
170:21 193:18
196:23 199:25
**named** 310:25
**names** 101:19
296:15 311:2
**native** 88:25
**nature** 230:19
280:15
**near** 45:4 110:18
203:6
**necessarily** 23:2
**necessary** 75:3
190:6
**need** 28:2 64:4,19
68:19 75:10
76:4 80:10

83:14 87:11
89:5,11 104:11
105:22 128:22
129:5 130:14
133:13,18
197:13 202:5
208:4 254:19
270:9 285:3
288:6 290:25
291:4 293:7
304:18,19
309:7 311:25
**needed** 58:19
105:19 133:23
163:24 178:10
191:23 220:9
295:12
**needs** 189:12
283:3
**negative** 16:13
**negotiating**
157:19
**negotiation**
164:15
**negotiations**
31:12 143:10
**Neiman** 92:11
194:11 200:8
**neither** 125:13
125:13
**Nevada** 31:4
52:25 185:13
193:13,16
**never** 5:13 15:23
19:12 20:16
55:13 58:7
124:4 126:3
134:21 150:19
157:8,13
170:19 200:9
**nevertheless**
54:12
**new** 1:17 2:5,14
13:22 22:16
23:3,8 67:3
70:13,19 71:5

72:13 73:2,14
73:17 76:16,21
77:22 78:13
84:20 90:18
91:20 93:6
100:11 101:16
101:23 102:19
102:21 103:25
116:22,23
121:3 123:2
127:12 128:22
140:15 142:8
142:16 148:20
154:22 184:13
184:14 194:9
194:19 195:7
195:15 217:15
221:24 223:18
231:12 234:23
235:15 236:14
237:8 239:14
239:18 240:9
240:24 241:7
248:25 276:11
281:16,18
295:10 316:5
**news** 141:2
**nice** 4:3 178:2
242:14 244:2
**night** 194:7 314:7
315:7
**nonbinding**
148:8 150:17
151:4
**nonpayment**
36:6,23
**non-production**
228:17,19
**Nope** 212:15
**Nordstrom** 92:11
94:16 194:11
200:11
**North** 2:14
**Norwood** 84:19
**Notary** 1:17
316:4,24



**note** 4:11 61:22
73:9,19 108:11
108:17 204:10
211:21 300:20
**noted** 266:25
315:8
**notes** 64:16
264:16,24
307:2
**notice** 25:23 26:7
27:20 35:10
50:25 55:9 57:8
134:9,14
167:13 171:24
176:11 177:5
177:22 178:2
182:11 221:8
258:24 259:15
262:14 263:17
264:3,18 265:4
265:13,19
266:3,9,14,19
266:22 267:2
267:10,12
**notices** 196:15
**notification**
175:22
**notified** 117:6
118:25 120:15
**notifies** 47:17
**notify** 285:8
**notifying** 46:18
**notion** 146:7
**November** 20:6
21:22 74:25
75:7 131:7
206:21 233:12
234:10 240:24
242:13 243:25
251:10,17
252:21 316:25
**number** 20:15
39:4 43:13 44:8
45:23 50:10
51:6 54:11
75:14 124:21

124:25 137:13
156:14,15
233:18 247:6
**numbers** 68:18
290:14 293:18

---

**O**

**O** 86:14,14,14
**oath** 4:5
**object** 16:25
40:13 151:21
220:23 249:24
254:10
**objected** 43:16
**objecting** 205:9
214:23
**objection** 14:23
14:25 15:24
16:10,20,22
26:11,13 41:20
42:20 59:25
61:16 62:20
73:9 77:7 78:2
86:3,7 108:10
108:21 136:9
136:11,21
143:15 152:14
152:17 189:18
189:20 197:2,4
205:15 207:19
208:19 210:22
211:2,3,5,22
213:21 218:21
218:23 219:7
224:14,16
227:23,25
228:13,16
229:9 234:5
236:22,24
240:16 242:24
252:13,25
253:10 254:25
255:2,7,25
256:3,21 273:3
278:14 286:3,5
287:12,14

293:25 295:23
298:5,17,19
300:21
**objectionable**
220:8 232:10
**objections** 109:3
220:16
**objective** 119:20
119:23,23
**objects** 40:10
108:15
**obligated** 126:21
126:24
**obligation** 33:25
126:11 140:4
148:13
**obligations** 33:22
57:20 58:2
97:15 115:5
171:16 310:11
**obsolete** 180:22
**obtain** 153:22
284:25
**obvious** 260:15
**obviously** 66:4
121:20 256:15
**occasion** 97:13
**occur** 180:6
**occurred** 14:4,6
16:18
**occurs** 24:20
**October** 1:10
24:17 46:21
70:19 71:14
72:24 73:5,7
131:12 153:24
154:5 222:7
224:10 238:22
238:25 241:24
**offer** 78:23
113:22
**offered** 112:24
113:18 130:3
186:10 276:12
292:4
**offering** 23:12

**offhand** 137:15
**office** 97:24 98:2
102:19,21
103:18 117:4
162:12 164:8
166:21 171:10
210:5 307:11
**officer** 79:16
123:18 126:2,3
151:17
**official** 8:15
139:12
**officially** 195:14
**Oh** 8:8 27:24
129:4 243:11
**okay** 4:15 5:8,12
6:5,24 8:13
9:21 11:7,11,14
14:10 15:6,19
16:4 18:10,17
21:14 25:14
30:4,20 38:7
44:6,14 50:4,18
51:10,12,25
52:15,17 53:10
56:20 60:12
61:9 63:3 64:13
68:21,25 70:6,7
71:7 77:19
82:13 89:8
92:18 94:5
95:19 96:3
104:8 109:24
112:16 124:8
135:2 138:9
141:6 142:13
142:21 144:3
146:11 147:3
147:19 150:15
151:2 155:17
156:10,20
159:8 164:12
165:5,13
166:24 167:4
168:13 171:2,7
172:18 173:11

174:11,21
178:23 184:9
191:21 195:4
196:19 198:4,7
201:13,21,23
202:19 209:22
211:9 213:24
218:9 221:6,14
221:19 222:2
223:10,13
230:16 231:20
234:13 237:13
237:14 238:4
238:11 241:12
242:10 243:23
247:3,13,14,15
247:23 251:8,9
256:24 257:14
257:23 258:3,4
258:22 260:22
262:19 264:9
266:2,7 272:20
273:16 274:10
274:15 278:24
280:17 282:17
287:4 288:18
289:2 290:12
294:9 297:3,21
301:24 303:4
303:10 306:20
306:24 307:19
308:19 309:12
313:20 314:23
**old** 45:13 180:22
**omitted** 127:4
**once** 16:3 114:5
132:7 190:9
283:19
**oncologist** 77:16
**one-on-one**
245:17
**online** 108:6
109:7 201:5
**on-hand** 134:15
**open** 31:13
106:13 107:3



158:19 194:18
194:22 289:2
289:18 292:3
**opening** 39:9
95:14,18 170:6
**operate** 19:11
31:5 78:13
210:3,21 237:9
252:8,20
255:12 289:4
306:2,5
**operated** 22:20
32:22 94:11,13
138:14 157:13
212:4 216:11
217:10 259:17
272:2
**operates** 210:16
**operating** 20:23
23:14 31:7
33:23 34:15
39:9 45:3 90:15
105:8 189:13
192:6 212:20
217:24 218:12
221:21 258:11
271:19 283:9
290:17,20
293:9 304:9,15
311:2,18
**operation** 31:3
42:7 45:12,13
47:7 69:17
127:21 159:7
167:23 177:10
178:7 188:12
275:15
**operations** 32:6
69:22 169:7
187:20
**operator** 195:8
221:15
**opportunities**
117:9,10 194:2
**opportunity** 16:9
39:8 64:8 112:6

204:13 227:14
253:9 289:12
293:12
**opposed** 187:19
**option** 176:15
**options** 114:15
292:2
**order** 52:20
93:23 94:22
100:25 101:3
107:10 114:19
118:15 126:13
135:6 149:2
155:2 172:2
184:17 186:3
200:11 257:19
**ordered** 100:25
130:8
**orderly** 182:2
184:16 255:4
**orders** 75:25
94:2
**ordinary** 181:25
**organization**
164:23
**organize** 53:12
**organized** 314:18
**original** 19:17
21:9
**ought** 228:14
**outcome** 316:15
**outdated** 24:2
**outlet** 119:22
180:24
**outlets** 106:24
**outline** 230:10
**outset** 143:9
**outside** 100:17
131:2
**overage** 133:16
**overall** 105:11,15
114:18 216:23
220:22 302:3
**overrule** 219:6
**overruled** 17:3
26:25 153:8

190:6,12
211:10 236:25
250:4 299:3
301:5
**overtime** 123:3
**owe** 75:23
**owned** 99:23
**owner** 97:11
121:3 142:16
**owners** 142:9
152:13 162:4
**ownership** 98:25
99:10 104:3
119:19 121:25
140:13,15,18
142:4 148:20
**O-V** 86:14

_____

**P**

**P** 2:2,2 86:14
**pace** 203:14
**packing** 177:7,9
178:3,6
**pad** 64:17 203:6
204:11
**page** 3:3 157:4
243:12,18
**pager** 156:18
**pages** 147:9
**paid** 33:14 34:10
197:18,24
198:2,3 283:7
283:13 312:15
**Pal** 22:19 31:3,13
31:21 32:11,21
39:9 45:2,8
49:2,5 57:14
66:25 69:18
71:21 88:22
91:4 95:3,14
96:7 97:9 99:23
100:2,4,12
101:10 106:3
107:22 109:25
111:24 113:5
113:11 116:23

117:19 121:5
132:21 133:3,5
133:8 143:6
152:4 156:23
168:12 170:20
196:24 216:16
216:21 222:23
250:17 251:13
253:21,24
255:18 257:5
289:11,24
291:8,11 297:2
297:10 298:4
298:21 311:14
**Palace** 46:19
**Palma** 2:20 10:16
105:2 164:25
230:22 278:6
278:11 307:7
307:12
**Palma's** 307:11
**Paolo** 4:11 28:6
28:21 52:6
54:19 55:14
57:3,19 58:16
66:2 71:17,20
72:11,12,20
83:4,17 84:16
86:20 89:13
101:18,19,19
101:21 109:9
125:13 137:6
146:21 147:6
156:16 159:22
165:14 168:14
171:5 174:13
222:22 223:15
224:20 227:6
310:8
**paper** 81:16
**paperback** 81:19
**paragraph** 30:23
31:17 32:8,25
67:19 69:5,7,14
69:25 247:21
**parent** 99:5

**Park** 117:5
**part** 25:10,16
37:11 38:2,2,4
51:8 59:21 71:2
76:8 98:21
102:14 110:9
111:13 113:4
130:18 133:5
141:25 180:10
180:11 198:14
199:8,18 200:5
226:16 227:2
231:11,17
240:23 248:15
252:18 284:22
294:25 296:6
303:21 311:12
311:15
**participate** 226:6
232:4 236:13
237:8 248:24
**participated**
234:22 235:14
236:2
**participating**
236:5
**particular** 109:2
215:4 298:6
312:10 313:8
313:18
**particularly**
303:16
**parties** 14:16
139:13 151:7
166:19 310:12
316:13
**partner** 97:12
210:4 216:10
**partners** 32:3
**parts** 130:18
292:10
**party** 47:4 188:9
**party's** 33:21
47:6 57:16 58:2
**patch** 13:13
21:25



**Paul** 296:23
**pause** 85:21
  205:6 253:23
**pausing** 246:7
**pay** 21:5 32:18
  186:6,15
  192:11 242:11
  251:22 252:22
  299:20
**payment** 32:14
  34:19 283:21
**payments** 34:3,7
**penalizing** 135:6
**pending** 61:20
  291:16
**people** 114:3
  116:20 161:8
  161:11 177:14
  177:17 209:2
**perceive** 103:19
**percent** 99:6,7
  104:2,2 113:18
  129:12 155:3
  179:13 182:20
  190:20,21,22
  190:23,25
  192:19 193:9
  298:4 301:18
  301:21,21
  303:22
**percentage** 182:7
  279:16 295:16
  299:11 301:15
  302:3 303:15
  304:9,15 312:6
**perception**
  121:12
**perform** 217:6
  270:8,24
  271:13 290:16
**performance**
  37:10 68:5,13
  68:16,22 69:17
  134:24 285:5
  294:16
**performed** 291:3

**performing** 37:4
  68:7 98:19
  218:18 293:15
  293:21 294:5
**period** 21:20,21
  24:21 91:12
  98:10 122:9
  138:14 148:24
  149:9 152:11
  159:14 188:7
  188:16 211:18
  258:18,24
  262:14 264:4
  264:18 265:5
  266:15,19,23
  267:10,18
  270:25 271:3
  273:12 285:4,7
**Perla** 111:14
**permanent** 52:21
  52:22
**person** 98:7
  164:22
**personally** 225:2
**personnel** 164:5
  177:13 192:14
  193:2
**perspective** 92:5
  107:25,25
  207:16 208:10
  225:3,7,14
  234:23 293:20
**pertaining** 85:8
  164:6
**pertinent** 213:15
  284:22
**phone** 28:5,13,16
  28:22 127:9
  162:2,14
  163:25
**pick** 28:5 123:7
  163:25 265:24
**picked** 264:22
**picture** 107:20
  291:7 296:25
**piece** 81:16,19

  98:23 120:6
  133:19 179:15
**pieces** 135:5
**place** 97:4,16
  107:12,13
  113:23 118:9
  148:13 155:4
  158:11 170:5
  194:19 214:17
  215:23
**placement** 7:8
**Plains** 2:5,14
**plaintiff** 187:6
**plan** 38:19 39:13
  39:16 40:3 42:8
  42:9 114:20
  120:3 121:7
  122:6 123:22
  228:3 230:21
**planning** 133:21
**PLATT** 2:13
**play** 192:3
**played** 66:24
**players** 117:25
  119:10
**playing** 127:8
**pleading** 37:8,12
**pleadings** 36:22
  37:3 38:11
**please** 36:16
  43:23 46:25
  52:18 57:7
  69:15 71:20
  72:13 75:5
  83:11,16,25
  86:7 109:21
  149:20 166:2
  169:3 172:21
  174:23 209:25
  219:10,15
  222:21 223:19
  233:15 242:15
  244:3 261:16
  262:19 277:14
  284:2 296:16
**pleasure** 170:19

**plenty** 134:19
**Plz** 2:9
**PNL** 302:24
**point** 6:5 26:5
  27:14,19 42:22
  43:6 48:2 52:5
  56:2 64:25 66:8
  69:2 73:18
  82:22 89:3
  91:25 112:7
  123:13 127:25
  136:8 149:4
  162:11 172:13
  174:9 183:15
  202:14 220:8
  243:7 246:2
  265:9 270:3
  280:13 282:14
**pointing** 109:20
**points** 11:10
  158:20 203:2
**POLSINELLI**
  2:8
**poor** 37:10 68:5
  68:13,16,22
  69:19 294:16
**poorly** 68:7
**portion** 4:8 27:11
  36:17 37:24
  102:25 225:10
  271:20
**POS** 179:9
**position** 5:22
  181:19 194:18
  196:8 290:23
  310:10
**positions** 108:16
**possession** 26:6,7
  40:24 66:5
  80:23 230:22
**possibilities**
  194:2
**possibility**
  133:21 194:24
**possible** 6:17
  71:23 110:13

  169:13 196:10
  222:25 292:6
  293:12 295:10
**possibly** 54:23,25
  307:20
**post** 2:5 228:16
**post-graduate**
  297:22
**potential** 198:11
**potentially** 148:2
**power** 164:25
**practice** 25:17
  75:19 98:9
**precipitous**
  184:24
**precluded** 29:17
  30:8
**predated** 111:20
**predecessor**
  44:25
**prejudice** 41:22
**premises** 57:14
**preparation**
  202:11 272:18
  272:22 273:19
  275:23
**prepare** 93:21
**prepared** 202:4
**present** 2:18
  93:22 94:5
  96:16 207:3
**presented** 269:13
**preserve** 183:11
  184:17
**president** 89:21
**press** 195:20
  196:3,13
**prestigious**
  129:18
**pretty** 17:17
  144:20 154:24
  160:11 162:10
  219:24 260:15
  296:25 314:21
**previous** 127:5
  171:19



previously 31:2
42:16 54:9
70:11 119:14
211:5 270:14
prime 271:14,21
principally 128:4
148:2
principals 140:16
prior 6:20 8:10
25:21 30:25
31:21,22 35:5
35:22 41:10
42:7 45:8,17
97:8 112:5
124:16 133:25
136:4 138:18
166:13 188:24
189:4 208:12
208:21 209:19
228:7 230:24
273:12 294:21
priority 120:23
120:24
privileges 103:11
privy 277:16
297:7
probably 48:17
127:19 307:25
314:11
problem 136:8
265:22 314:6
proceed 66:11
67:21 86:13
88:17 126:8
146:20 147:3
160:21 174:22
184:11 199:7
202:4 205:25
223:10
proceeding 26:3
26:10,16 30:15
37:19 40:4
82:19 84:7
proceedings
67:22 82:1 83:1
84:1 85:1 314:1

315:1
process 101:8
181:8 184:17
produce 42:3
101:2 132:22
134:20
produced 38:22
40:3,5,25 41:3
42:10,15 65:25
66:5 81:2,18
226:17,23
227:3,8 228:6
229:6,14
230:24 272:21
273:11
producing 228:8
274:9
product 22:10,15
22:17 24:5,13
25:4 49:5
100:24 107:9
121:6 130:6
133:12 134:3
170:5,13 187:4
187:24 189:17
191:10 303:15
304:4
production 95:21
107:13 132:8
132:12,19
133:8 226:25
229:5 230:18
274:5 304:6
312:24
products 12:5
14:3 23:8 24:23
190:14
profile 196:9
profit 190:24
profitability
14:14
profitable 45:4
98:17 101:13
143:13 217:12
218:2 270:19
profitably 31:6

project 178:19
proper 106:13
208:23
properly 94:23
106:18 178:9
261:15 268:22
property 284:19
proposal 38:18
39:13 40:3
113:15 228:3
230:21 259:16
284:23
propose 116:13
proposed 47:2
255:24 257:18
257:24,25
prospect 72:12
223:18 269:12
prospective
71:23 222:25
223:24 224:13
224:22 242:2
242:18,20
244:6,7 248:5,9
248:13 249:8
249:14 251:11
251:16 252:7
252:20 287:9
287:23 288:3
prospectively
189:5
protocol 203:10
203:12
proven 106:22
provide 27:19
37:15 89:12
108:24 228:10
provided 26:7
39:15 94:15
134:9 267:3
304:24 305:5
provider 179:23
provides 47:9
provision 29:22
30:7 157:18
265:19 266:4

267:11
provisions 29:16
267:13
PTV 244:9
Public 1:17 316:4
316:24
publications
201:4
pull 45:24 63:8
108:5 166:6
168:4,9 180:23
282:21
pulled 242:5
pulling 119:12
135:21
purchase 6:2,9
12:11,23 13:17
14:21 15:16
18:3 19:19 22:7
75:14 104:18
128:2 140:7
142:25 143:4
150:7,20
168:22 207:12
207:16 209:16
210:19
purchased 7:11
75:21 211:19
purchases 5:23
6:7,21,25 7:19
7:25 8:2 93:7
208:11
purchasing 20:15
169:5
Purely 177:6
Purple 296:20
purportedly
73:16
purpose 36:10
176:20,22
258:24 262:15
264:3
purposes 22:6
100:4 108:3
151:19 155:20
185:4 226:19

227:16 228:5
236:17
pursuant 5:14
40:25 57:15
105:8 114:10
135:25 138:9
211:7
purveying
100:12
put 4:25 13:15
18:5,20 19:4
20:11,25 50:8
50:12 62:11
68:25 75:18
101:3 113:15
115:8,12
117:13 118:23
119:14 180:12
181:13 194:14
195:20 196:2,8
214:25 227:25
232:7 246:19
276:9 288:6
puts 42:10
putting 53:19
307:8
puzzle 98:23
120:6
pyramid 95:16
95:17
P-A-O-L-o 84:17
p.m 315:8

—————————

**Q**

Qatar 99:17
question 4:7 6:15
6:19 7:16 9:9
9:14 13:6 15:10
15:14,21 16:11
16:13,15 17:10
17:24 18:7,15
19:23 20:10
25:13 27:5
28:19 34:9
36:13,14 37:20
38:15 45:15,15



52:11 56:18
58:12,15 59:17
60:13 61:20,21
62:6 65:10
67:15 68:21
73:10 77:3,11
78:6 85:20 86:4
86:9 88:13 89:4
91:18 102:15
121:16 125:5,6
125:22 137:3
142:23 143:17
145:4 149:15
158:24,25
159:13 162:25
163:6,8 176:6,8
181:17 183:2
184:20 189:10
195:5,24 196:2
197:9 198:9
203:4,19 204:4
204:12 205:16
205:19 211:12
212:9 213:9
214:10 215:18
215:21 217:18
217:20,21
219:10,12,21
221:7 224:6,8
224:24 225:22
230:7 234:20
235:2,8,10,12
236:11,20
237:10 240:3
240:21 241:5
241:13 244:18
244:20 246:21
248:18,19
249:24 250:2
252:17 254:17
254:24 255:8
256:9,25 259:5
259:8,9 260:12
260:23 261:13
264:11 265:4
265:11,16,17

265:23 266:17
268:16 269:11
270:9,11,23
272:8,14 273:7
273:16 275:6
277:2 279:6
280:16 282:18
283:17 286:22
287:19 291:11
291:16 293:19
296:4 298:8,25
299:8 301:25
304:13 310:17
311:23 312:5
**questioning**
225:12 271:3
**questions** 43:11
64:2 85:7,17
145:21 155:18
167:9 182:24
203:17 204:17
230:10 233:10
265:25 270:4
284:8 297:24
298:2 299:7
303:5
**quick** 53:16
**quicker** 203:14
**quickly** 69:2
222:19 227:20
**quite** 275:16,18

**R**
**R** 2:2 4:16 44:12
86:14,14 316:2
**raise** 84:3
**Ralph** 296:20
**ran** 149:2 188:5
**range** 300:8
301:8,10,15
305:23
**rapidly** 105:20
**reached** 286:11
**read** 4:6,9 27:6,8
27:12 30:12
33:3 35:17 36:7

36:16,18 37:23
37:25 44:5 60:5
63:17 69:14
73:10 96:20
122:8 137:11
153:11,13
166:2 168:15
209:4 212:23
213:5,9 219:15
219:23 220:2
227:16 233:15
233:19 235:23
237:19,20,21
240:15 242:25
243:5 244:20
250:10 281:6
288:9
**reading** 18:12
212:20 213:15
214:15 234:8
243:10,13,16
247:20 260:16
**ready** 58:20
135:19
**real** 131:24 269:7
**reality** 200:9
**really** 80:8
103:11 117:21
203:12 222:19
229:2,7 232:10
232:25 269:2
271:2 302:19
308:20,22
314:25
**reason** 35:15
37:2,13 53:24
74:9 94:20
142:2 160:24
162:4 208:15
208:25 209:9
218:25 219:17
228:18,24
229:2,8 234:18
**reasonable**
185:18 283:10
**reasons** 36:25

37:6,7,7 87:11
110:7 128:4
132:24
**reassemble**
308:24
**rebirth** 121:4
**reboot** 254:22
**rebooting** 244:17
**rebuttal** 82:23
308:16
**recall** 14:2 26:4
27:13,22 43:25
46:6,9,10 47:15
48:11 54:21,25
55:11 60:9
61:14 66:18
67:23 68:14
70:13 72:18
74:6,25 78:25
79:19,21 90:9
118:24 125:19
125:20 126:5
135:16,17
136:4 147:11
155:11 157:14
157:17,18
159:23 160:6
161:19 165:20
165:21 166:16
166:21 167:25
169:9 176:9
194:17 201:10
207:7,13,18
212:21 225:16
238:25 239:21
240:7 248:10
249:22 254:2
254:14 256:14
261:2,11
262:16 264:2
267:25 268:3
269:17 286:13
287:3 290:4
293:3 296:7
299:13 302:5
302:23

**receipt** 61:25
62:2
**receive** 62:18
102:23 169:21
303:23
**received** 41:8,13
55:5,7 62:13
66:4 78:24
80:12,17 81:16
82:2 171:9,19
175:11 226:15
226:24 227:2
**receiving** 54:21
61:11 131:4
**recess** 43:3 53:17
65:3 174:19
202:17 284:5
309:24
**recognition**
183:24
**recognize** 51:13
109:9 262:8
263:15
**recollect** 62:25
104:22 275:19
**recollection**
105:4 114:12
119:4 136:24
137:19,21
139:10 154:11
166:17 171:13
176:12 182:12
214:18 216:3
229:16,18,19
230:5 232:9
234:4 235:25
236:9,17 237:4
237:12,17,23
238:6 248:23
249:3 250:12
250:16 256:18
261:8 268:12
274:4 285:12
285:17 305:20
**recommendation**
122:5



reconcile 248:20
record 4:9,11
  26:22 27:12
  36:18 37:25
  63:18 69:15
  73:11 114:8
  153:12 167:10
  216:15 219:25
  222:15 238:12
  260:18 316:10
records 186:14
recoup 143:5
recover 270:13
recovering 294:8
  294:11 295:2
recovery 98:18
rectangle 106:2
  109:20 112:20
red 116:8
redo 105:21
reduce 140:6
reduced 295:20
refer 10:21 55:25
  56:7 97:14
  237:17
referee 268:24
reference 114:7
  208:2 237:5
referenced 223:4
references 70:2
referencing 69:7
referred 152:2,6
  265:13
referring 10:25
  11:10 16:17
  65:12 71:11
  118:21,22
  244:11 246:11
reflect 124:17
  268:10
reflected 100:10
  186:15 265:5
  265:14 266:23
  268:20
reflects 26:22
  268:17

refresh 136:23
  137:18,21
  154:11 229:15
  229:18 230:5
  232:9 234:3
  237:16,22
  238:5 248:22
  249:3 274:4
  285:11,17
refusal 251:22
refuse 292:13
refused 59:2
  78:16 200:11
  252:22
refusing 66:24
regard 18:13
  29:23 60:11
  157:24 177:6
regarding 119:21
  122:5,17 150:7
  164:15,17
  196:16
registered 61:23
  61:24 65:19
  160:10
regular 11:17
regulations 282:5
related 139:2
  153:17 158:17
  209:19 316:13
relates 14:18
  311:3
relating 39:5,8
relationship
  96:12 140:23
  141:10 143:12
  192:5 193:4
  210:2,11
relax 233:4,7
relaxed 233:7
release 195:20
  196:3,13
relevance 294:2
  300:21
relevant 37:14
  38:5 295:6

302:8,10,15
reluctance
  162:20 163:20
remain 57:21
remember 27:17
  29:25 30:3,5,12
  30:13 48:16
  59:12 60:2,24
  66:14 76:11
  114:5 117:5
  126:10,11
  154:19,23
  161:7,14,22
  172:15 203:23
  212:13,14
  214:8,14,15
  216:8 231:14
  231:24 232:5
  236:5 237:14
  238:2,9,19
  240:11,13,25
  241:9,11
  248:11,21
  249:12,20
  250:5 251:2,3,5
  251:24,25
  264:6 277:5,6,8
  278:4,5,7,23
  282:16 283:20
  286:18 287:5
  287:25 288:5
  299:14 302:25
  312:8
remembers
  257:4
remind 57:20
  151:18 229:12
  253:4 262:11
reminded 4:4
  168:21 309:10
rent 32:14 33:8
  33:12,14 34:6
  34:12 36:6,23
  66:16,23 67:7,7
  67:20,25
  113:19,24

283:7,13,22
  295:15,23
renters 113:3
rents 32:19
reorganize 87:12
  88:2
repeat 27:5 37:20
  44:7 68:20
  124:21 213:4
  215:18 219:9
  219:12 235:11
  266:17 293:10
  304:12
repeated 12:13
repetitive 293:3
rephrase 67:15
  89:5 136:20
  137:4 189:9
  207:22 214:3
  224:24 252:18
  286:6,8 287:21
replaced 209:17
replacement
  135:14 136:7
  284:25 285:9
replacing 123:14
reply 125:12
  290:23 292:13
report 274:8,11
  274:13,16
reporter 153:13
  220:2 316:4,24
report's 151:19
repositioning
  293:13
represent 11:7
  53:3 70:3
representation
  193:18 194:15
representations
  38:11
representative
  189:16
represented 46:8
  46:11 48:3
  166:19

representing
  165:14
request 38:25
  39:4,12 41:2
  85:15 167:12
  173:13 229:4
  230:3
requested 242:15
  244:2 266:15
  266:19
requesting
  134:12
require 77:23
  78:5,14
required 22:8
  75:22 155:7,15
  194:20 197:19
  278:19,20
requirement
  12:11,23 13:17
  14:21 15:17
  18:4 19:19
  104:18 150:8
  150:21 167:22
  168:8,22
  207:12,16
  209:17,18
  210:19 275:13
  276:6,21 277:4
  278:9,20 279:4
  280:2 281:8,21
  282:9,13
  312:23
requirements
  211:20 275:11
  282:3
requiring 277:10
  278:9
rescind 74:2,10
  286:12
rescinded 155:8
resell 181:3
reserved 47:5
  139:7 169:19
reserves 47:22
reshaping 183:22



**reshuffled** 107:7
**resided** 39:16
**respect** 95:25
  153:24 280:11
  280:13
**respectful** 220:5
  220:18
**respective** 223:7
**respectively**
  192:6
**respond** 55:23
  86:8 167:11
  171:14 181:17
  203:3,19 209:6
  225:24 226:5
  231:21 232:3
**responded** 55:17
  56:3 167:16
**respondent** 1:8
  39:2 187:15
**Respondents**
  2:13
**respondent's**
  43:19 44:12
  54:4,13
**responding** 56:8
  133:25 231:24
  249:17,18
**responds** 223:9
**response** 18:18
  19:15 55:14
  56:14 82:2
  140:21 160:15
  169:21 175:21
  176:10 194:21
  227:6 255:6
  259:13
**responsibile**
  186:12
**responsibility**
  32:11 157:10
**responsible**
  115:3 152:13
**responsive** 36:13
**rest** 145:25
**restate** 16:15

217:21 244:19
246:20 255:8
288:16 299:9
**restitution** 52:21
  52:22 53:6
**restore** 119:25
**result** 100:22
  180:3 181:24
  182:9 184:24
  186:21 193:22
  199:8
**resulting** 186:22
**resume** 64:23
  285:8
**resumed** 4:16
**retail** 31:4 33:23
  47:6 86:24
  114:20 133:6
  179:9 182:15
  187:19 188:12
  192:16,18
  210:7 311:7,9
  311:15,18
  312:21 313:2
**retailer** 199:16
  217:2
**retailers** 92:10
  92:21 199:12
**retained** 142:4
**retrieved** 154:25
**return** 11:17
  33:12 146:16
**returned** 62:2
  75:6
**revenue** 275:10
  275:13 276:7
  277:9 278:8,19
  281:8,21
  282:13
**revenues** 113:24
**review** 39:7,21
  51:20 98:11
  102:11 273:18
  283:21
**reviewed** 51:23
  138:17 266:20

272:17,22
273:18 274:11
274:12,17
275:23 283:23
**revisit** 89:8
**re-arrange** 87:19
**RE-CROSS**
  310:6,22
**re-direct** 26:24
  64:25 66:1,12
  67:1,3 68:1
  69:1 70:1 71:1
  72:1 73:1 74:1
  75:1 76:1 77:1
  78:1 79:1 80:1
  81:1 310:1,16
  311:1 312:1
  313:1
**re-organization**
  100:15
**right** 5:3,14 6:8
  6:22 7:20,21
  8:10 9:11 14:18
  14:22 16:16
  21:15 28:19,23
  28:24 30:17
  34:19 38:8 40:9
  41:14 43:2
  44:18 46:12
  47:9,23 48:20
  53:15 55:11
  62:8,14 63:5
  64:15 69:10
  73:22 74:3,4
  83:15 84:3
  85:14 86:11
  94:6 102:21
  104:9 106:11
  108:9,19 110:9
  110:22 111:5
  111:10,12
  112:9,15,19
  113:14 116:14
  117:24 118:8,9
  123:11,15,15
  124:10 126:20

134:3 136:2
138:11 141:21
143:6,14
146:15,25
147:5 152:7
156:4 158:19
168:11,22
169:16 173:13
173:16 174:9
174:18 178:13
184:4 185:22
188:23 189:3
191:19 192:20
192:24 200:17
202:16 205:3
205:23 206:21
206:25 207:21
220:13 221:6
227:25 229:22
231:7,16,18
232:20,23
233:4 242:8,12
248:6 249:5
253:3 255:4
257:16 259:2
263:21 267:8
267:15 268:11
269:10 270:6
270:19 276:3,4
286:7 287:11
288:17 291:16
295:21 304:7
306:21 311:16
315:4
**rights** 33:21 47:5
  47:6,22 57:20
  57:25 97:15
  139:7 153:24
  169:18
**Rimowa** 111:12
**Riverside** 2:9
**Road** 2:5 84:19
**rocket** 257:2
**Rod** 145:13
  243:4
**Rodney** 2:10

151:21 214:25
241:20 286:15
**role** 66:24 79:7
**roll** 101:24
**rolled** 114:16
**rolling** 132:4
**room** 87:10
  174:15
**Rosen** 92:23
**roughly** 145:9
  290:7,8,10
**royal** 99:17
**rule** 132:17
  163:24
**ruled** 156:25
  173:12
**rules** 221:2
**ruling** 17:3 42:14
  173:25
**rumor** 194:12
  201:17
**run** 38:18 94:23
  97:23 98:15
  111:17 126:12
  126:22,25
  127:13 128:17
  139:18 158:12
  159:6 176:24
  188:17 257:21
**running** 28:6,9
  28:10 92:24
  122:12 147:20
  158:8 161:18
  188:18 311:11
**rush** 134:8

**S**

**S** 2:2 10:24,24
  11:7,8,20 13:23
  13:23
**safe** 294:11
**Saks** 92:12 94:16
  181:4 194:11
  200:10
**sale** 49:4,24
  128:8,12 164:7



183:3 184:8
290:8 294:16
294:25 299:11
312:16
**sales** 91:14 92:15
113:19 129:8
161:10 177:19
194:20 201:16
207:17 208:12
209:19 270:20
271:25 272:5
272:12,21
273:19,23
274:6 276:23
277:3,6 279:17
283:23 285:3,5
285:6,13,16
290:4 295:16
298:4 302:3
304:10,16
312:7
**salesmen** 312:15
**salesperson**
299:21,25
300:3,11,15,18
301:12
**Salsbery** 2:22
173:15 308:11
308:16
**Salvatore** 111:6
**sample** 189:16
**Sampson** 10:13
10:14
**Samulesohn**
296:21
**Sanavia** 277:25
278:3
**Sana'a** 2:21
**Sanction** 55:9
**sanity** 151:19
**Sarah** 1:4 5:18
6:21 7:11,20
8:17 9:25 11:9
14:3,13 20:23
23:13 25:24
29:17 30:16,24

31:13,20,22
33:19,24 34:13
34:17,17,22
35:24 45:2
46:12,19,20
47:3,8 50:20
51:4 53:3 57:4
57:15 69:21
72:15 74:10
76:15,21 77:22
79:7,17 90:6,10
92:10 94:10,13
96:7,13 97:5
104:14,24
115:2,9,16
118:4,25
119:25 120:12
120:16 121:8
122:12 126:13
126:18,24
130:21 135:23
136:5 137:10
137:17,23,23
138:4 139:5,18
139:24 140:7
140:16 143:3
143:13 147:16
147:24 149:5
152:20,23
153:22,25
154:2,13,21
155:5 156:9
158:11,16
159:2,17,25
160:16,23
162:4 164:16
165:24 166:20
167:20 169:13
169:22 170:2
170:12 171:14
188:16 189:2,7
189:12 192:5
193:6,7 212:8
212:23 213:10
213:16,17
218:11 221:20

223:5,21 227:8
238:14,18,24
242:17 244:4
248:4 249:7
258:17,23
262:3,13 263:4
264:4 266:10
267:3 278:21
280:20 281:15
285:4,7 286:10
290:22 292:13
303:15 311:11
311:11 312:11
**Sarah's** 20:24
33:25 175:13
**Sara's** 126:21
**sat** 232:15
**Saturday** 40:17
41:14
**saw** 19:16 102:22
129:5 241:3
262:18 268:17
**saying** 6:24 7:2,2
19:25 29:13
42:6 72:4,11
75:18 110:20
129:4 136:6
157:8 188:5
192:21 213:18
213:23 224:10
225:12,16
226:9 240:13
247:23 248:15
249:14 294:14
**says** 9:12 10:20
13:8,21 30:24
33:20 51:3
52:19 56:21
61:23 73:12,20
73:22 86:3
153:20,22
155:23 168:13
205:14 219:5
249:5 255:16
262:23
**SBrown@bpsl...**

2:15
**scan** 227:21
**scanned** 179:10
**scanning** 178:7
179:14
**scattered** 107:4
**SCHMIDT** 2:13
**school** 82:6,7
**science** 257:2
**screen** 4:25 5:6
30:21 39:3
43:20 45:24,25
50:8,11,13
53:20 63:8
65:11 69:11
71:8 85:22
109:16 119:13
124:13 151:11
156:8 165:10
171:2 222:4
230:9 233:13
241:15 243:9
244:25 245:10
246:10 247:12
261:18 284:11
**scroll** 147:8
149:19 156:17
160:12 171:4
**scrolling** 52:19
**search** 137:15
285:8
**season** 5:20 6:10
8:6 10:20 11:15
11:20 23:7,7,25
24:9,9,10,11,23
75:13,22
128:20 131:16
131:20,23
180:23 208:12
**seasonal** 129:9
129:15
**seasons** 24:6
**season's** 207:17
**seated** 84:12
**Secaucus** 179:25
**second** 5:25 7:10

65:16 105:24
115:18 133:3
153:21 245:5
**Secondary** 181:6
**section** 33:18
34:25 153:19
242:12
**see** 4:3 5:6,10
8:13,18,19
10:19 11:21
13:21,24 18:11
19:2 30:20 31:8
31:15 32:8,15
32:23 33:17
34:4,25 35:6
43:6,21,24
44:24 45:6,25
46:14,22,23
47:10,17 56:21
56:25 57:16,22
59:11 63:15
69:11 71:8,15
71:24 72:3,6,9
72:16 73:3
81:23 84:2
85:21 88:3
100:22 109:15
110:10 111:9
112:19 113:2
114:19 122:7
123:23 125:20
125:24,25
127:17 147:6
154:6 165:9
168:10 171:3
184:15 191:12
209:12 214:4
222:4,6,8 223:2
223:7,11,22
230:7 233:11
233:13,14
234:11,12
236:7 237:3
241:14,17
242:3,21
243:11,21



246:9,12,14,15 248:6 249:11 249:12 251:14 255:20 258:13 258:20 259:23 261:16 262:2 262:21 263:9 263:20 274:5 283:4 284:10 284:17,20 285:9,21 288:21,24 289:17
**seeing** 59:12 60:2 60:9 167:25 230:9 245:3,9,9 245:11
**seeings** 194:10
**seek** 81:8 138:13
**seeking** 39:25 55:9 223:5
**seen** 17:13 46:4 50:15,24 96:20 151:10 154:9 156:16 264:18
**select** 111:19 129:21,24
**selected** 111:21
**sell** 22:10 120:25 128:6 130:25 180:16,25 182:15 183:10 191:2 289:25 290:9 303:11
**selling** 24:6,23 183:19 216:16 216:21 311:11
**send** 29:12 72:14 72:18,25 73:21 159:25 167:18 223:20 224:11 224:12,20 225:2 227:21
**sending** 44:2 160:6
**sends** 224:9
**sense** 11:11,13 48:25 49:13,21 198:17,19
**sent** 5:9 13:22 33:7 39:18 40:15 44:17 62:13 63:12 80:16 81:7 166:14 168:17 171:20 179:16 184:4,6 225:6 242:18 244:5 248:5 249:8 267:7
**sentence** 35:20 153:22
**separate** 108:20
**September** 24:11 24:15,16 25:5 33:9 57:13 58:21 69:22,23 118:24 131:5 134:16 139:25 157:9,11 170:6 170:14 189:5,6 189:12 263:13
**series** 222:6
**serve** 57:8
**served** 25:22 171:23
**service** 94:14 130:2 179:23
**Services** 1:24
**serving** 79:16
**set** 37:16 44:12 56:24 304:6 313:15 316:8
**sets** 148:9
**Settimi** 2:20 10:16 39:17 40:5 105:2 146:14 165:2 230:22 278:6 278:11 290:14 303:2,5 304:22 307:7,16
**Settimi's** 40:24 314:16
**setting** 147:19
**set-alone** 54:2
**severance** 186:7 186:11,15
**Shah** 2:11 137:12 143:23 144:4,9 245:18
**share** 41:4 50:11 119:12 165:10 171:2 247:12 278:8 282:21
**shared** 41:5 108:4
**sharing** 43:21 245:2
**sharp** 309:18
**ship** 23:20
**shipment** 13:22 24:18,20
**shipped** 131:25 179:20,22
**shipping** 14:7 94:2
**shirt** 132:16
**shoes** 131:24 304:4
**shop** 106:12,19 108:6 130:16 249:7
**Shops** 31:14 46:18 50:19 137:10 152:5 242:18 244:5
**short** 177:5,22 182:11
**shortage** 133:17
**shorthand** 316:3
**shortly** 119:5 135:10
**show** 30:14 93:9 116:22 155:21 222:3 227:17 230:11 234:6 259:25 274:15
**showed** 67:20 78:21 79:4 116:3 229:13 236:16 267:24
**showing** 108:22 137:6,18
**shown** 227:11
**showroom** 90:18 90:20 91:20 93:6,22 102:2 116:21 121:23 200:19,22 201:15
**shows** 113:16
**shut** 31:6 182:11 184:24 194:14 305:3,16
**sic** 14:8 19:8 21:10 24:3 28:12 36:11,20 44:20 48:17 60:24 68:7 79:7 94:15 101:6 107:20,24 151:21 180:6 212:24 292:14 294:22 304:20
**side** 130:20 192:8 192:16 295:25
**sign** 53:6 81:18 97:8
**signatory** 164:25
**signature** 51:13 58:6 79:4 147:11 151:13 157:3
**signed** 11:19 51:4 52:2,5,7 58:7 135:12 136:5 138:21 147:14 149:11 150:18 151:15 212:2,7 212:11 263:23
**significant** 159:2 178:25 197:15
**signing** 81:24
**similar** 108:12 112:12
**Simon** 20:21 21:11 33:7,11 34:13 35:13 36:5,22 37:8 41:7,9 48:7 66:24 67:8,21 68:17 70:12,19 71:3,4 74:3,11 76:15,17,21,23 77:21 78:11,12 78:14 106:23 107:17 112:6,7 112:10 113:15 113:20 115:19 117:15 135:13 136:6,6 137:17 137:23 139:23 154:13,21 158:16,18,21 159:3 164:18 213:6,7,10,17 238:18,24 239:14 258:19 258:25 260:6 262:16 264:5 267:19 269:14 274:8,11,15 275:10 276:5 276:21 277:9 278:9,20 281:10,21 282:12,22 284:19,24 285:8,12,19,24 286:11 287:7 289:10 292:4
**Simon's** 25:23 107:24 114:3 116:20 175:19 175:20 274:5
**simply** 20:10 176:6 205:5 208:2 241:6
**Simultaneous**

180:20
**sincerely** 244:9
**single** 96:11
107:19 118:2
299:15
**sir** 8:21 30:20
33:17 50:12
51:14 52:16
82:16 84:4,12
85:18 88:24
99:20 103:3
121:16 150:25
156:5 175:5
184:21 206:8
211:15 214:10
222:5,9 223:8
223:23 225:22
233:13 248:18
250:16,20
252:23 265:3
266:16 277:22
278:23 283:14
288:24 294:6
305:7 308:5
**sit** 27:15,18 30:6
56:13 309:6,13
**site** 117:2,20
**sitting** 42:5 314:6
**situated** 106:18
**situation** 90:11
117:14 119:9
124:10 177:2
181:12,21
186:13 194:6
196:7 294:21
**situations** 120:19
**six** 28:13 29:9
30:23 94:4
100:24 130:9
132:13,14,25
134:18,19
263:16
**six-month** 36:8
36:10 258:18
258:23 259:15
262:14 264:3

264:18 265:4
265:12,18
266:3,9,14,18
266:22 267:2
267:10,12
**six-year** 258:17
**size** 128:17
**skeptical** 199:13
**slash** 10:24 11:8
11:20,23 13:23
**Slightly** 110:25
**slow** 246:25
**slowly** 14:16
**small** 46:21
195:13
**smiling** 185:8
**smooth** 169:13
**SOHIL** 2:11
**sold** 101:5 183:17
184:2 294:13
294:23 303:15
**sole** 118:6 263:4
**solely** 193:4
**solemnly** 84:4
**someone's**
229:19
**somewhat** 184:16
**soon** 6:16 89:25
**sorry** 7:24 33:10
44:6 49:9 52:4
87:8 98:15
103:4 127:8
144:23 157:10
160:11 167:2
185:7 188:2
206:14 230:2
250:14 262:6
273:2 286:14
306:18 310:5
**sort** 204:25 231:6
276:20 282:13
**sought** 74:10
143:9
**sound** 185:18,20
186:4 293:4
**sounds** 143:21

185:21
**source** 153:5,7
**space** 22:21
86:25 90:23,23
95:11 106:8,16
108:8 109:25
111:20,22
112:8,10,12,24
113:18 115:19
117:7 285:20
285:25 287:8
288:21 289:21
292:5
**Spano** 5:9 7:19
10:19 11:3 12:2
12:10 39:18
44:17 89:23
94:20 123:14
207:7,11,15
208:6,16,17
**Spano's** 6:6
207:4
**speak** 75:4 87:6
88:4 162:20
216:6 303:14
**speaking** 24:21
180:20
**specific** 29:16
38:25 39:11
67:11 93:23,24
94:25 141:7
143:3 198:11
198:20,22
199:6 238:21
271:10 290:13
304:18 306:6
311:24
**specifically** 30:8
68:8 305:12,14
**specified** 270:25
**speculation**
194:17
**speed** 314:16
**spell** 84:12 99:19
**spelled** 139:10,20
**spelling** 89:11

**spells** 149:11
**spend** 261:23
313:14
**spending** 220:15
**spent** 78:22
247:20
**spiral** 112:21
**split** 85:12 93:14
**spoke** 262:12
296:10
**spoken** 148:15
**spread** 194:12
**spreadsheet** 6:7
**spring** 11:10,14
12:6 13:23,24
22:23 23:9,24
93:11,17,18
131:16,20,22
131:23,25
**square** 246:17
**squared** 245:8
247:17
**SS** 10:21
**SS2015** 10:20
**staff** 161:8
**stage** 147:20
**stand** 83:25
**standalone** 65:22
**standard** 132:10
132:11
**standpoint** 16:24
132:9
**stand-alone**
54:10
**staples** 23:5
**start** 64:9 85:16
94:2 101:5
109:20 122:14
131:4,21,23
157:20 178:22
184:8 241:23
284:15 290:3
314:19
**started** 11:18
96:3 119:6
127:2 157:24

206:10 220:14
225:10 303:7
**starting** 71:14
205:8 244:17
**state** 1:17 44:24
163:17 244:17
316:5
**stated** 58:3 61:10
75:15 124:18
132:21 136:17
**statement** 19:18
30:15 36:4 54:4
54:13,15 65:13
66:15 67:16,18
68:12,23
110:22 249:25
**statements** 67:12
68:9
**states** 31:10 32:9
57:24 114:19
121:22 151:24
159:5 213:15
296:10
**stating** 125:16
148:12 169:9
**stay** 205:11
**stayed** 178:4
194:4
**Steen** 284:18
288:19
**step** 117:23
127:24 192:17
**Stephen** 2:15
175:23 185:10
185:11 202:22
**stepped** 158:15
189:7
**steps** 177:3
**Stewart** 296:23
**stick** 158:24
167:8 182:24
217:17,20
236:4
**stipulate** 80:19
81:13,20,21,22
82:12



**stipulated** 26:2,9
  37:18
**stipulating** 26:15
**stipulation** 52:20
  80:13 81:9,15
**stock** 128:16
  129:11
**stocked** 170:12
**stopped** 229:21
**store** 17:7 20:23
  21:4,12 22:9,16
  23:13,15 28:7,9
  28:10 31:4,5,14
  31:21,22 32:4
  32:12,22 34:15
  37:11 39:10
  45:2,3,8,18
  46:20 47:3
  48:15 49:3,22
  58:20 68:6
  69:18 71:24
  74:14,15,17
  76:9,17,22 77:5
  77:25 78:12,15
  78:17,19 90:13
  90:15 91:6,8,10
  91:21 92:10,17
  94:3,11,13,21
  94:23 96:8
  100:2,7,10
  101:4,10,23
  102:3,7 104:13
  105:19,22
  114:10,24
  115:18,24
  119:3,22 120:6
  120:8,14,17
  121:14,21,24
  122:8,12,18,25
  123:2,4,5 126:8
  126:12,19,22
  126:25 127:13
  128:6,8,21
  130:3,13
  131:17,21
  132:23 133:4,5

133:9,22
134:15,25
135:4,7,24
137:24 138:4,8
138:15 139:3
139:17,24
140:2 141:18
143:6 147:17
147:21 148:3,4
148:23 150:13
152:4,13
153:18 155:14
156:23,25
157:9,14,20,25
158:4,9,13,15
158:18 159:16
160:22 161:5,9
161:10,13,15
161:18 162:2
162:18 163:18
163:22 164:5
164:19 166:23
167:23 169:4
170:2,13,20
175:7,15
176:15 177:9
177:15,18,18
178:3,15,24
179:2,3 180:24
182:10 183:3
188:4 192:6,15
193:2,16 194:5
194:7,14,19,22
195:21 196:4
196:12,17
197:12,14
198:15 199:9
199:19,25
200:6 201:8
210:3,21
211:19 212:4,5
212:19 213:14
217:11,14,15
217:25 218:13
218:18 219:19
221:10,16,21

221:24 223:2
237:9 240:10
249:2 251:14
252:9,20
253:22,25
255:13,20
257:6,11,21
258:11,19,25
259:18 260:3,5
262:15 264:5
267:20 269:13
270:8,15,18,23
271:6,11,13,19
271:25 272:2,5
272:13 275:14
277:4 279:19
281:23 283:9
285:5,14 286:2
289:4,11,22,24
289:25 290:9
290:12,16,20
291:3 293:9
295:10,11
298:7,21
299:12,18
300:24 301:9
305:3,16,18
306:3,5,7
311:12,14,18
313:18
**stores** 110:18
  122:22 130:22
  133:11 199:22
  210:7,10,16
  216:11,24
  271:22 275:11
  276:8,17 297:3
  298:4,23
**store's** 105:16
**story** 230:8
**straight** 209:13
**strategic** 120:2
  122:6 123:22
  148:20
**strategy** 119:20
  122:16

**street** 42:13
  188:11
**strenuously**
  254:11
**stress** 101:14
**stricter** 203:5
**strike** 138:15
  169:11
**string** 71:13
  234:11 241:23
**stronger** 183:23
**structure** 187:24
  188:19 189:23
  311:4,19,22
**stuff** 105:23
  269:8
**style** 24:3 215:15
  215:16
**SUBH** 1:4
**subject** 38:24
  229:4
**submitted** 39:14
  41:12
**subsidiaries**
  88:21
**subsidiary** 152:2
**substance** 14:11
  167:16
**substantial**
  182:17
**sub-collection**
  93:14
**succeed** 100:4
  118:11 178:15
**successful** 111:18
  216:21 217:24
**successfully**
  217:10
**succinctly** 86:10
  203:20
**sufficient** 22:9,15
  128:5 134:13
  314:15
**suggest** 215:8
**suggested** 267:19
  269:15

**suggestion** 59:23
  82:5 112:4
  227:20
**SUHAD** 1:4
**suit** 132:15
**suitable** 292:7
**Suite** 2:9
**suits** 23:6 129:14
**sum** 14:10
**summarizing**
  269:20
**summer** 11:11,14
  12:7 13:24
  22:23 23:9
  93:12,17,19
  131:25 267:20
  268:11
**Sunday** 40:16
  41:14
**super** 111:15
**supply** 133:7,22
**support** 94:17
  98:18 214:20
**supported**
  240:14,19
**supportive** 126:4
**supposed** 188:21
**sure** 39:24 45:21
  68:10 79:24
  85:19 94:23
  100:9 117:23
  137:25 174:16
  178:8,10
  179:14 198:3
  202:24 210:17
  212:8 223:16
  230:8,11,15
  247:10 252:3,5
  252:11 261:15
  261:23 266:18
  272:9 275:18
  287:20 297:19
  297:23 304:19
**surface** 19:13
  21:7
**surrender** 35:4,8



**surrendered**
25:25 29:2
35:12 37:17
277:18,21
**surrendering**
30:9 48:9
**suspended**
284:24
**suspicion** 91:23
**sustain** 42:19
197:11
**sustained** 62:22
77:8 213:24
229:10 240:17
252:15 287:18
296:4
**swear** 84:4
**sworn** 86:16
316:8
**sync** 123:25
**system** 166:7
179:9
**S/S** 93:12

---

**T**

**T** 86:14 316:2,2
**table** 90:11
**tag** 127:8,8
**tailor** 161:11
296:23
**tailors** 177:20
**take** 15:7 20:21
21:12 42:20
43:23 48:14
53:16 57:9
58:20 59:5 64:6
64:14 66:7
74:13,14,16
80:20 83:7
87:19 88:2
100:20,20
101:11 119:2
120:20 126:19
127:24 129:20
132:18 134:15

139:24 140:2
147:16 156:22
162:2 163:20
166:23 167:22
168:14 171:5
174:17,17
176:24 177:4
188:21 195:15
202:8,13
213:18,23
222:25 240:10
246:25 248:25
253:17,21,24
254:19,20
255:19 257:6
257:11,21
258:15 262:20
263:6,17 284:4
290:23 309:16
309:17
**taken** 43:4 53:18
65:4 117:23
120:13 127:3
146:18 174:20
179:15 202:18
284:6 294:10
295:14 309:25
**takeover** 71:24
**takes** 100:16,21
100:24 132:13
132:18
**talk** 105:24
131:15 132:12
141:17 186:23
187:2 242:19
244:7 250:20
264:25 271:18
309:18
**talked** 20:16 54:8
71:19 222:20
287:8 289:22
**talking** 6:11 11:5
44:20 45:11,12
65:18 68:8
125:17 132:15
141:22 147:24

150:12 151:22
156:2,7 167:8
180:15 188:6
188:14,24
190:15 192:13
194:24 195:2,6
196:10 242:15
244:2 249:19
255:16 262:17
271:4,5 281:14
282:7 289:21
294:20 296:22
298:6,23
300:25 305:2
312:11,22
**talks** 79:18
**Tappan** 84:19
**target** 95:9 285:3
285:16
**task** 124:9
**tasks** 102:14
**team** 162:7
177:19
**teaming** 127:9
**technical** 244:23
**Technically**
162:6
**tedious** 101:8
**telephone** 229:20
**tell** 9:2 12:21
27:23 28:25
38:5 52:18
63:12 67:4 86:5
92:3 103:14,16
103:23 104:3
119:19 130:10
142:10 144:10
149:5 150:4
164:3 182:6
185:5,15 186:2
189:14 199:20
205:16 208:5
215:11 246:5
250:23 274:13
286:19 300:12
303:6,8 309:3

**telling** 88:15
155:11 162:13
205:2 248:2
**tells** 250:17
**temporary**
153:17
**ten** 41:10
**tenant** 70:13,19
71:5,23 72:13
73:2,14,17
76:16,22 77:23
78:13 106:7
135:14 136:7
154:22 221:24
222:25 223:7
223:19,24
224:13,22
225:3,8,14
231:12 234:23
235:16 236:3,6
236:14 237:9
239:15,18
240:9,24 241:8
242:3,19 244:6
248:5,9,14,25
249:8,9,15
251:11,17
252:7,20
284:25 285:9
287:10,24
288:3
**tenants** 268:13
282:3
**tents** 113:2
**tenure** 99:25
271:5,10
**term** 19:22 30:10
34:3,7,14 35:9
57:12 138:4,24
152:11 191:24
218:13 221:22
225:16 235:18
238:16 263:2,3
263:9,11,20
266:11 267:5
**terminate** 263:7

263:19
**terminated** 32:21
175:14
**termination**
66:18 167:21
**terms** 11:18
14:15,17 19:23
56:22 67:15
112:3 113:22
115:4 116:24
120:13 156:21
182:8 187:5,24
202:11 205:9
205:22 258:12
276:6 311:5
314:15
**terrible** 275:3
**test** 127:16
**testified** 4:17 5:2
5:17,25 20:4
59:25 67:6
68:17 86:17
102:9 136:14
140:10 142:15
207:15,24
208:6,17
210:23 211:6
212:16 231:11
231:20,22
238:17 239:4
248:8 252:2
267:17,23
269:14 275:8
275:18 277:7
279:10,19
281:5,20,24
296:5 301:5
302:12 303:10
305:24
**testifies** 190:10
**testify** 152:19
189:23 279:12
**testifying** 66:19
207:8 238:19
239:2 240:8
**testimony** 6:16



6:20 7:7,18 8:8
24:4 25:2 28:15
28:20 29:6
31:19 42:11
54:9 62:18
68:20 75:19
84:5 94:6 96:17
112:5 118:16
119:14 124:13
124:16 127:5
130:5 133:25
157:7,15 168:2
188:3 190:3
207:4,13,20
208:3,9,22
209:9 216:9
221:4 225:11
226:4,7 232:2
235:13,20
240:5 258:5
269:20 273:20
279:22 286:10
286:13,20
287:3,6 304:24
314:3,17 316:7
316:10
**text** 166:5
**thank** 4:23 13:10
21:15 27:10
43:8 65:2 82:10
82:18 88:9 92:2
135:2 165:7
172:19 174:11
174:24 187:2
198:5 201:22
202:2,7 205:12
206:2,9 209:24
222:17 247:8
247:16 258:7
259:18 271:7
297:13 306:25
313:21 314:2
**Thanksgiving**
131:8
**thee** 110:14
**theme** 313:6

**theory** 195:6
**thing** 27:2 65:20
105:17 107:8
107:22 132:12
187:8 232:22
233:5 238:3,10
239:22
**things** 19:3 49:24
95:21 101:22
102:10 191:17
197:7 213:12
228:9
**think** 5:15 20:5
20:22 21:19
22:2 24:15 28:3
28:4 37:14 38:4
41:5 42:13,18
45:19 50:23
53:2,9 54:7
55:16,17,19
56:10 59:16
60:23 62:6,10
68:6 69:4 72:22
74:8 75:13 77:9
77:13 81:5
87:11 89:6
99:15 100:23
106:22 111:2
113:14 135:3
139:20 140:19
140:22 143:20
144:13 146:4
149:10 159:20
161:7 162:22
162:24 163:5
167:24 168:3,9
173:15 174:4
174:14 179:13
181:12 189:25
204:3 207:23
208:22 213:25
215:11 219:23
220:17,20
225:23,24
228:14 232:17
235:7 243:20

246:8 268:21
270:24 271:2
291:14 294:12
294:18 296:19
296:24 297:6
298:12,20
307:15 309:7
313:2 314:14
**thinking** 102:6
148:21
**thinks** 21:19
250:22
**third** 24:9
**thorough** 155:20
**thought** 76:4
102:13 148:22
298:9
**thoughts** 42:25
53:13
**thread** 223:14
225:25 226:6
226:16 227:3,5
227:5 242:14
**three** 62:24 75:14
75:22 105:21
146:23 177:25
297:8
**threshold** 277:9
**thumb** 132:17
**tie** 166:24
**till** 100:25 158:5
**time** 1:11 9:24
10:5 11:10
12:21 13:7
14:20 15:15
20:19 24:5,21
25:21 31:24
34:8 43:4 44:18
45:20 47:5 48:2
48:12 49:17,17
51:21 53:18
55:5,6 56:16
58:17 59:3,8,16
59:20 60:16,21
61:8 64:6 65:4
72:21 73:24

74:12 78:23
80:20 82:25
89:16 90:5,17
91:3,7,9,12
93:25 96:5,23
97:13 98:10
100:8,16 101:3
114:7,14,22,22
114:25,25
117:19 118:4
122:10 123:14
124:19 126:21
126:23 128:15
128:23 129:16
130:14 132:22
134:12,20
135:9,22 136:5
138:14 139:15
142:11 147:19
148:15,24
149:4 152:9
155:11 158:14
159:9,14
160:13,13
161:4,19
165:15 166:20
167:12 170:10
170:11 171:21
172:14 174:5
174:20 175:5
176:13,18,19
178:5 183:5,18
188:8,16
195:13 202:8
202:18 205:2
213:18,23
214:2 220:15
235:4 242:20
244:7 247:20
249:10 254:19
256:17 259:19
260:25 261:23
267:18 268:14
270:25 271:3
273:13 283:5
283:11 284:6

294:5 302:18
315:8
**timeliness** 41:21
**timely** 42:16
**times** 12:13
22:10,16 28:12
62:24 99:11
105:14 130:7
176:3 203:25
**timing** 134:6
**title** 89:19
**today** 4:13 27:15
27:18 30:6
31:19 56:14
89:3 125:16
134:10 142:15
146:2 194:12
226:4 229:13
268:6,17
310:10
**told** 20:17 52:12
61:13 74:23
121:20 141:8
152:23 155:10
197:23 209:3
221:17
**tolerance** 180:11
**tomorrow** 269:3
304:22 308:22
308:23 309:9
314:7,22,25
315:5
**tone** 162:9
**tonight** 309:5,6
309:23 314:8
**top** 92:20 93:2
95:17 99:22
112:22 129:17
135:3 149:24
190:21 243:14
273:25 299:17
302:25
**topic** 174:6
**Torello** 71:20
72:4
**Torello-Viera**



| | | | | |
|---|---|---|---|---|
| 3:6,7,8 4:12 | 170:1 171:1 | 246:1 247:1,19 | **touch-ups** 105:23 | 17:6 22:13,19 |
| 52:6 54:19 | 172:1 173:1 | 247:24,25 | **tough** 205:22 | 24:19 31:17,18 |
| 72:11,20 83:5 | 174:1 175:1 | 248:1,14,23 | 308:20 | 31:25 32:7,25 |
| 83:18,20 84:17 | 176:1 177:1 | 249:1 250:1,13 | **track** 216:15 | 33:2 36:3,24 |
| 84:22 86:1 87:1 | 178:1 179:1 | 251:1 252:1,14 | **traffic** 110:7,8 | 45:7,16 47:25 |
| 87:6,20 88:1,18 | 180:1 181:1,16 | 253:1,5 254:1,5 | 111:25 115:25 | 63:21 66:21 |
| 89:1 90:1 91:1 | 182:1,25 183:1 | 255:1,10 256:1 | 131:3 | 76:14,19 |
| 92:1 93:1 94:1 | 184:1 185:1 | 257:1,9 258:1 | **transaction** | 169:15 209:3,5 |
| 95:1 96:1 97:1 | 186:1 187:1 | 259:1 260:1 | 196:22 199:6,7 | 238:13 239:11 |
| 98:1 99:1 100:1 | 188:1 189:1,22 | 261:1,25 262:1 | **transactions** | 316:10 |
| 101:1,20 102:1 | 190:1 191:1,6 | 263:1 264:1,17 | 198:11,21 | **truth** 84:7,8,9 |
| 102:9 103:1 | 192:1 193:1 | 265:1 266:1,5,8 | **transcribed** 1:16 | **try** 18:4 86:8 |
| 104:1 105:1 | 194:1 195:1 | 267:1,17 268:1 | **transcript** 151:20 | 158:23 182:24 |
| 106:1 107:1 | 196:1 197:1 | 268:15 269:1 | 233:19 316:9 | 195:7 203:12 |
| 108:1,24 109:1 | 198:1 199:1 | 270:1,17 271:1 | **transfer** 35:3,21 | 204:22 232:8 |
| 110:1 111:1 | 200:1 201:1 | 272:1 273:1 | 46:20 47:3 | 257:3 269:6 |
| 112:1 113:1 | 202:1,20,25 | 274:1 275:1,7 | **transformation** | 308:24 309:4 |
| 114:1 115:1 | 203:1 204:1 | 276:1,8 277:1 | 117:22 | **trying** 21:12 75:8 |
| 116:1 117:1 | 205:1 206:1,6 | 278:1,16 279:1 | **transition** 158:8 | 78:23 121:18 |
| 118:1 119:1 | 207:1 208:1 | 279:9 280:1,19 | 170:14 172:17 | 122:13 181:14 |
| 120:1 121:1 | 209:1,7,14 | 281:1,5,19 | **transitioned** | 183:21 233:25 |
| 122:1 123:1 | 210:1 211:1,13 | 282:1,11,20 | 157:25 | 236:3,6 253:11 |
| 124:1 125:1 | 211:23,25 | 283:1,6 284:1 | **transitioning** | 269:2 270:3,13 |
| 126:1 127:1 | 212:1,10 213:1 | 284:10 285:1 | 169:6 170:2 | 298:22 |
| 128:1 129:1 | 214:1 215:1 | 286:1 287:1 | **translation** 89:7 | **turn** 57:14 76:16 |
| 130:1 131:1 | 216:1,4 217:1 | 288:1 289:1,9 | **transpired** 173:8 | 76:22 78:12 |
| 132:1 133:1 | 217:19 218:1 | 290:1,24 291:1 | 200:20 | 137:24 139:17 |
| 134:1 135:1 | 219:1 220:1 | 291:15,22 | **transpiring** | 258:19 260:3,5 |
| 136:1,13,17 | 221:1 222:1,3 | 292:1 293:1 | 154:12 | 264:4 294:10 |
| 137:1 138:1 | 222:20,22 | 294:1 295:1,9 | **transportation** | 295:3 |
| 139:1 140:1,10 | 223:1,15 224:1 | 296:1,5 297:1 | 177:10 180:7 | **turned** 112:5 |
| 141:1 142:1 | 224:20,25 | 297:15 298:1 | 185:24 186:3 | 155:13 |
| 143:1 144:1 | 225:1 226:1,2 | 299:1 300:1 | **travel** 175:25 | **turning** 160:22 |
| 145:1 146:1 | 227:1,7,17 | 301:1 302:1,11 | 176:7 | 258:25 262:15 |
| 147:1 148:1 | 228:1 229:1 | 303:1 304:1 | **traveled** 172:10 | **turn-around** |
| 149:1,14 150:1 | 230:1 231:1,10 | 305:1 306:1,12 | 176:2 | 93:25 |
| 150:3 151:1 | 232:1 233:1,11 | 307:1,2 308:1 | **treasurer** 79:19 | **twice** 67:6 114:5 |
| 152:1,19 153:1 | 234:1,9 235:1 | 309:1 310:1 | **trial** 40:17 | 176:13 |
| 154:1 155:1 | 235:21,24 | 311:1 312:1,2 | 127:17 148:24 | **two** 13:22 44:16 |
| 156:1 157:1 | 236:1,12 237:1 | 313:1 314:2 | 149:9 228:24 | 91:23 92:7 |
| 158:1 159:1 | 238:1,13 239:1 | **Torello-Viera's** | **tricky** 113:16 | 93:10 94:6 95:7 |
| 160:1 161:1,3 | 239:12,20 | 229:15 | **tried** 117:16 | 126:14,15 |
| 162:1 163:1,15 | 240:1,22 241:1 | **total** 302:21 | **trim** 303:24 | 130:18 132:19 |
| 164:1 165:1 | 241:5,14,22 | **totally** 107:25 | **Triple** 33:4 38:12 | 132:24 145:23 |
| 166:1 167:1 | 242:1 243:1,24 | 113:3 215:20 | **trouble** 53:25 | 177:19,25 |
| 168:1 169:1 | 244:1 245:1 | 304:5 | **true** 9:23 14:6 | 230:15 253:5 |



two-on-one
245:17
two-way 42:13
type 65:19 92:7
105:17 112:12
304:6
types 98:11
T-O-R-E-L-L
84:18
_____
U
ulterior 301:3
ultimately
101:12 138:2
151:5
unclear 281:4
299:5
understand 7:6
8:20 9:5 19:15
40:14 89:4
121:18 122:13
145:23 159:15
172:11 184:10
208:8,13
232:21 235:9
243:15 247:21
256:20,23
258:22 259:2,5
270:18,20
271:12 272:6,8
281:3 294:24
295:5 298:8,22
understanding
8:24 15:9 58:23
58:25 59:6,10
59:18 60:4,7
66:22,23 67:5
70:17,23
104:16 105:7
108:7 139:14
139:19 164:13
214:21 232:18
285:23 286:9
289:10,14
understood 18:2
18:23 138:23

139:6
unexpected
134:24 176:25
unfortunate
186:13 193:22
200:24
unfortunately
44:25 118:3
177:12,24
186:10 194:8
United 121:22
213:14 296:10
unpleasant
176:25 196:6
unwilling 162:2
un-share 245:7
updated 22:25
upset 67:8
154:24 239:5
239:12
Upstate 106:25
107:2
USA 1:7 46:8
99:3 142:5
151:17,25
197:25 206:11
223:16 262:3
263:24
use 60:20,22
63:22 148:25
174:14 197:11
200:4 203:11
226:18 229:20
usually 61:24
93:24 100:21
131:23 181:2
190:18 304:3
utility 60:10
U.S 217:15 291:9
293:14 298:24
_____
V
vacate 175:15
vacating 176:15
vague 154:15
Valentino 99:24

value 180:14,16
182:3,8,13
184:18,22
187:4 273:4
variable 180:10
191:24 192:9
192:13 313:11
variables 300:7
varies 299:18,24
various 91:14
166:19 203:2
vast 268:12
303:19
Vegas 31:4,22
45:2,18 50:21
90:11,15 91:4,5
91:21 92:16
94:12 96:8
100:3 101:11
102:7 105:8,13
111:18 114:23
117:11 119:21
120:5,8 121:24
122:17 123:23
130:12,18,19
130:22,23
131:15,21
133:3 152:5
156:23 172:7,9
172:13 173:9
175:7,25 176:2
176:7,10
185:12 188:4
193:13 195:3,9
200:6,23
210:21 211:19
212:4,19 217:7
217:11,24
221:16 253:22
272:13 281:23
291:8 299:12
301:9 305:13
306:8 313:18
Veneruso 46:7
46:14,24 47:17
97:25

Venice 20:7
venture 97:12
100:3 101:10
199:5
verify 245:12
Versace 110:25
111:3,4 270:7
version 227:4,4
versus 87:13
303:17
Viera 101:18,19
101:21 125:14
view 100:2
186:17
VINCENT 2:16
Vinny 145:20
visibility 104:20
visit 176:21,22
V-I-E-R-A 84:18
_____
W
W 11:20,23
wait 25:12 78:3
151:20 164:2
waiting 202:21
223:25
waive 14:20
15:15 153:23
waived 12:12,23
13:18 20:3
waiver 15:22,23
16:17 17:25
18:2,22,24
walked 188:10
walking 116:11
want 4:23 6:15
13:13 16:14
35:13 53:14
64:8,9 65:5
68:10 70:5 73:8
81:12 82:15
85:12 91:18
93:19 97:17
103:6,8 107:10
107:12,14
108:17 119:2

127:24 129:3
129:22 130:12
130:17,23
131:3 141:23
145:25 156:10
165:11 173:25
184:15 187:2
189:13 203:15
203:18 204:2,7
204:16 211:21
219:18 221:9
226:18 228:16
229:17 230:11
234:16,19
242:11 244:20
245:12 246:2
253:17 255:5
258:8 261:14
261:22 269:4
288:11 289:19
291:23 296:14
298:7 308:22
309:3,17,20
314:8,9,12,25
315:2
wanted 17:6
58:17 59:3
100:9 111:23
116:22 117:22
142:21 146:21
179:14 288:14
wants 153:4
173:20 250:25
291:19 309:19
warehouse
178:12 179:16
179:21,23
180:5 184:4,7
wasn't 9:14
17:25 19:4
36:12 41:3
58:16 123:15
123:18,21
136:17 160:19
218:18 225:15
226:23 232:2



269:16 270:18
**watching** 68:17
**way** 21:9,10
  27:24 62:11
  75:14 77:14
  95:24 112:14
  112:17,18
  115:12 117:13
  117:24 142:15
  180:12 197:17
  209:15 215:15
  260:2,4 264:19
  284:16 316:15
**wealth** 107:18
**wear** 217:3
**weather** 131:22
**web** 196:16
**website** 109:7
  268:8
**week** 242:20
  244:8 249:10
**weeks** 44:16
**weigh** 62:16
  208:21
**welcome** 173:21
**wellness** 117:18
**went** 82:6,7
  161:22 167:5,5
  176:10,13
  193:15
**weren't** 123:14
  219:19 231:11
  248:15
**we'll** 64:24 156:8
  174:17 202:14
  215:18 219:6
  230:7 233:8
  246:24,25
  254:19 264:9
  265:25 283:4
  290:13 294:3
  309:13,14
**we're** 19:5 68:8
  69:7 87:9
  143:18 145:18
  147:2 151:22

174:3 180:15
190:15 192:4
202:21 203:5
215:13 220:13
220:14 221:2
230:25 233:25
244:16 245:16
246:6 247:17
254:3,20,21
280:6 294:20
298:10,14
300:25 307:3
309:13,21
312:11,22
314:24 315:5
**we've** 27:24,25
  29:2,13 118:15
  144:4 159:11
  217:19 232:20
  247:20 261:20
  264:17 288:9
**whatsoever**
  165:3
**white** 2:5,14
  112:19
**wholesale** 130:20
  191:3 192:8,18
  192:23 311:8
  311:12 312:21
**wholesaler**
  187:18 190:16
  190:19
**wife** 51:17 52:4,8
**win** 205:2
**wind** 14:16 174:2
  174:10
**windows** 93:23
**wine** 146:24
**winter** 11:25
  22:24 23:9,23
  25:4 93:11
  130:24 169:5
**wish** 169:12
**wit** 169:22
**withdraw** 125:5
  145:4 256:22

**withdrawal**
  137:16
**withdrawn**
  181:24 286:8
**withheld** 31:11
**withstanding**
  195:10
**witness** 3:3 7:13
  10:6,9 15:11,18
  16:4 18:9,16,19
  19:5 20:14
  28:24 29:24
  35:17 36:2 38:6
  38:21 42:5
  45:19 49:15
  50:3 55:2 56:19
  58:13 59:25
  60:8 64:20
  77:10,17 82:3
  82:19,22 83:3
  83:10,16,22
  84:10,16 86:15
  87:16,24 88:4,9
  99:20 102:18
  103:3,10 104:6
  120:4 122:19
  128:12 140:19
  140:22 141:11
  141:15 142:6
  142:18 144:18
  145:8,17
  146:13 150:10
  150:24 161:6
  161:15,21
  162:6 163:2,5
  163:21 164:21
  174:4 181:22
  183:4,8,14
  184:5,12 190:3
  191:9,15,20
  194:17 195:22
  196:5,18
  198:16,24
  199:10,20
  200:7 201:9
  202:21 203:7

208:5,20
209:21 211:14
213:11 219:9
221:5,12
226:21 234:7
235:11 236:7
237:25 241:10
250:9 251:4
255:6 257:4,12
257:17 258:2
260:21 264:15
265:7 268:21
271:2 273:5,14
276:9,23
278:22 282:8
282:15 291:24
293:23 294:7
300:2 301:11
301:17,20
306:14,18
307:21,24
309:5,15,23
314:4
**witnesses** 220:12
  254:8 307:5
**witness's** 7:7
  15:7 136:23
**Witness(es)**
  316:7,11
**wonder** 60:10
**wonderful** 275:2
**Woodbury**
  106:23,25
  107:2
**word** 16:10 86:3
  86:7 198:21
  205:14 207:11
  268:20
**words** 148:25
  199:2 200:4
  298:25 299:24
**work** 12:3 70:12
  70:18 71:4
  76:16,21 77:22
  84:15 113:23
  117:15 132:19

177:23 221:16
246:21 284:15
314:10,11
**worked** 32:3 92:4
  95:5,7 113:20
**working** 60:24
  89:23 116:24
  145:15 147:2
  177:14 186:8
  261:15
**works** 127:18
**world** 100:17
  201:3
**worldwide** 291:9
  291:12 298:23
**world-wide**
  102:4
**worry** 149:6
**worst** 276:16
**worth** 290:2
  293:5,6
**writ** 52:21,22
  53:6
**write** 11:3 72:24
  234:13 237:18
  242:13 243:24
  259:12,18
  260:2,8,12,20
  288:2
**writes** 46:14,24
  223:14 253:19
  258:12 285:19
**writing** 12:20
  13:16 15:23
  16:19 18:5,25
  19:4 20:11
  70:10 72:10
  74:23 115:9,14
  288:20
**writings** 19:3
**written** 35:5,23
  56:7 138:10
**wrong** 26:18
  104:22 105:3
  110:21 112:13
  134:18 141:4



**wrote** 55:13 57:19 169:15
**www.MagnaL...** 1:25

**X**

**X** 1:2,9 3:2

**Y**

**Yeah** 5:15 35:2 79:23 159:5 168:5 173:7
**year** 22:25 23:3 23:10 28:8 93:11 100:21 120:17 126:9 126:13 167:5 258:14 274:7 306:9 313:14
**years** 19:13 32:4 87:3 88:15,20 95:6,7 101:11 105:21 107:7 113:21 187:12 209:19 232:15 277:15 293:6
**yelling** 174:2,9
**yesterday** 68:16 110:19 127:16 240:5
**yesterday's** 68:20
**yes-or-no** 256:8 265:3 268:16 270:9
**York** 1:17 2:5,14 90:18 91:20 93:6 102:19,21 116:22 184:14 194:9 217:15 316:5
**Yup** 261:19

**Z**

**Zara** 95:22
**Zegmna** 88:22
**Zegna** 92:25 95:5 107:4 296:17
**Zileri** 22:20 31:3 31:14,21 32:11 32:22 39:10 45:2,8 49:2,6 57:14 66:25 69:18 71:21 88:23 91:5 95:4 95:14 96:7 97:9 99:23 100:2,4 100:12 101:10 106:3 107:22 109:25 111:24 113:5,11 116:23 117:20 121:5 132:21 133:3,6,9 143:6 152:4 156:23 168:12 170:20 196:24 216:16 216:22 222:23 250:18 251:13 253:21,24 255:19 257:5 289:11,25 291:9,12 297:2 297:10 298:4 298:21 311:14
**zoom** 1:15 83:6 112:16 173:3 246:24

**$**

**$100** 191:3
**$100,000** 290:2,9
**$12,600** 186:16
**$26,000** 185:16
**$38,000** 197:18 197:23 198:3
**$6,000** 186:4
**$60,000** 9:24 10:4
**$750,000** 305:22
**$90,000** 104:25
**$900,000** 12:11 15:16 18:3 19:20 20:3 168:7 312:23

**0**

**01-18-0000-6180** 1:6
**07648** 84:20

**1**

**1** 25:24 30:18 46:21 57:13 160:14 171:9 171:22 249:21 250:7 251:12 251:18 253:18 259:10 263:5 305:22
**1st** 25:22 51:2 126:19 132:2 158:12 257:22
**1:00** 145:7
**10** 32:4 95:6 107:7 129:12 145:7 156:18 181:2 182:15 182:20 301:21 309:17
**100** 155:3 192:22 303:22
**101** 30:19
**102** 54:6,7 65:15
**106** 3:8
**10601** 2:5,14
**11** 157:9
**11:00** 64:23
**11:15** 64:24
**110** 45:23
**114** 147:5
**12** 8:5 31:23 69:8 69:14 291:2 293:5 301:21
**12-month** 285:7
**120** 43:18 44:10 44:11 133:15
**126** 43:13
**13** 6:4 7:9,10 8:6 9:10,12,13,14 20:6 31:23 32:8 48:8,10,12,16 69:5,25 157:12
**14** 11:20 51:18 63:13 150:17
**15** 64:18 129:12 138:8 181:2 202:13 262:4,8 263:2 274:25 275:24 307:25
**15th** 132:3
**150** 2:9 50:10,14 51:10 300:19 301:12
**16** 61:12 72:24 73:5 135:11
**17** 5:9 54:14 149:24
**175** 3:7
**18** 41:25 138:5,25 147:17 148:5 157:2 186:20 194:19 263:2 263:12
**184** 168:13
**19** 186:20

**2**

**2.1** 262:20
**2.2** 157:18
**2:00** 146:16
**20** 6:12
**200** 2:5
**200,000** 300:19 301:13
**2010** 32:2 39:10
**2011** 24:11 30:25 31:13 33:24 39:11 45:10 69:22
**2012** 6:3,10 7:9 21:22 74:25 75:7 206:21 270:21 271:13
**2013** 5:9,19,21,24 6:7,9,22,25 11:20 13:23,24 30:24 31:20 69:23
**2014** 71:14 72:24 73:5,7 89:17 98:24 118:18 118:24 126:9 135:11 149:25 153:25 154:6 206:14 222:7 224:10 233:12 234:10 237:9 238:22,25 240:24 241:24 242:13 243:25 249:21 250:7 251:10,12,17 251:18 252:21 253:18 259:10 261:4 262:13 287:11,24 288:4 294:13 294:17 310:9
**2015** 11:15 12:7 46:17,22 54:22 61:6 69:18 91:3 114:13 134:11 137:9 138:8 139:25 165:15 262:4,8 263:2 267:21 268:5 268:11,18 271:19 272:14 273:24 284:20 285:20 286:2 287:8 288:21 289:4,12 290:2 290:5,10,16
**2016** 25:24 32:9 33:9 50:19 51:18 54:18 56:9 57:13 60:16 62:19 63:13,21 69:19 70:20 76:18 77:23 78:11,22

80:16 81:17
89:18 160:14
160:15,19
167:6 168:18
170:11 171:9
171:22 175:6
186:23 188:22
189:6,12,25
192:7 193:5
206:12 263:5
263:13 271:20
272:14 285:2
290:17 293:16
293:17 305:9
312:13
**2017** 186:19
**2018** 41:25
**2020** 1:10 316:25
**21** 5:4 181:4
**226** 50:9
**23** 73:7 154:5
238:22,25
**23rd** 153:24
166:12
**242** 170:25
**25** 50:19 54:18
56:9 78:22
80:15 81:17
87:3 88:15,20
113:21 134:11
160:14,19
293:6
**25th** 65:11,17
166:13
**250** 192:23
284:14
**28** 1:10 137:9
**29th** 167:20
**295** 117:5

---
**3**
---
**3PL** 179:22
**3rd** 259:13
**30** 99:6 104:2
187:12
**300** 165:13

**3000** 2:9
**302** 65:23 159:21
159:22
**304** 65:23
**305** 65:23
**307** 63:7
**31** 285:2
**310** 3:6,7
**328** 84:19

---
**4**
---
**4** 3:4 233:12
234:10 242:13
243:25 251:10
251:17
**45** 146:5,10
314:12

---
**5**
---
**5** 46:17 133:13
261:3
**5th** 90:24
**5.10** 33:18
**5.12** 34:25
**5:25** 309:16
**5:30** 307:3
**5:35** 309:21
**5:40** 315:8
**50** 125:2 190:20
190:21,23,25
191:4 192:22
193:9
**51** 241:18,19
244:25 245:14
247:4,11
**54** 119:13 125:4
222:16

---
**6**
---
**6th** 90:21 175:13
**60** 160:25 166:10
192:19 290:21
292:12
**60606** 2:9
**624-6221** 1:24
**66** 3:5

**68** 55:9

---
**7**
---
**7** 156:14
**7th** 262:5
**70** 99:7 104:2
**723** 247:11
**75** 190:22

---
**8**
---
**8** 71:14 132:2
156:15 222:7
241:24
**8th** 316:25
**80** 179:13
**86** 3:6
**866** 1:24

---
**9**
---
**9** 39:5 170:10
284:20
**9th** 262:6
**9:30** 315:4
**9:36** 1:11
**90** 132:18
**900** 18:20,24
19:12
**900,000** 105:5
**92** 133:13



Page 1

AMERICAN ARBITRATION ASSOCIATION
--------------------------------------X
In the Matter of the Arbitration of

SARAH LLC, HALA SUBH, SUHAD ALBASHA,
BACHAR HAMAD AND AMAR HAMAD,
                              CLAIMANT,

          -and-          Case No.:
                         01-18-0000-6180

FORALL USA, INC.,

                         RESPONDENT.
--------------------------------------X

              DATE: October 29, 2020

              TIME: 9:32 a.m.



          ARBITRATION in the above

entitled matter, held Via Zoom,

transcribed by Magdalena M. Artiles, a

Notary Public of the State of New York,

held before Eugene I. Farber,

Arbitrator.




              Magna Legal Services
                (866) 624-6221
                www.MagnaLS.com



Page 2

```
 1
 2   A P P E A R A N C E S:
 3
 4   EUGENE I. FARBER
         ARBITRATOR
 5     200 E. Post Road
       White Plains, New York 10601
 6     Efarber@farberadr.com
 7
 8   POLSINELLI
         Attorneys for the Claimants
 9     150 N Riverside Plz Suite 3000
       Chicago, Illinois 60606
10   BY: RODNEY L. LEWIS, ESQ.
             -and-
11     SOHIL M. SHAH, ESQ.
12
13   BLEAKLEY PLATT & SCHMIDT, LLP
         Attorneys for the Respondents
14     One North Lexington Ave
       White Plains, New York 10601
15   BY: STEPHEN J. BROWN, ESQ.
       SBrown@bpslaw.com
16             -and-
       VINCENT CROWE, ESQ.
17
18   ALSO PRESENT:
19   Amar Hamad
20   Palma Settimi
21   Sana'a Hussein
22   Chad Salsbery
23   Kevin Flaherty
24
              *   *   *
25
```

Page 3

```
 1
 2                I N D E X
 3   WITNESS       EXAMINATION BY   PAGE
 4   MS. SETTIMI   MR. BROWN        5
 5   MS. SETTIMI   MR. LEWIS        39
 6   MS. GIOFFRE   MR. CROWE        91, 128
 7   MS. GIOFFRE   MR. LEWIS        98
 8   MR. FLAHERTY  MR. CROWE        132, 208
 9   MR. FLAHERTY  MR. LEWIS        163
10   MR. SALSBERY  MR. LEWIS        218, 294
11   MR. SALSBERY  MR. CROWE        268
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1       DIRECT-EXAMINATION OF MS. SETTIMI
 2          THE ARBITRATOR:  Mr. Brown,
 3   who is our next witness?
 4          MR. BROWN:  Palma Settimi,
 5   sir.
 6          THE ARBITRATOR:  Ms.
 7   Settimi, could you stand for a
 8   moment, please.  I don't think
 9   she can hear me.
10          THE WITNESS:  I'm sorry.  I
11   got a message that my connection
12   is unstable, but I'm back.
13          THE ARBITRATOR:  Are you
14   alone in a room?
15          THE WITNESS:  Yes.
16          THE ARBITRATOR:  Could you
17   raise your right hand.  Do you
18   solemnly swear the testimony
19   you're about to give in this
20   arbitration proceeding will be
21   the truth, the whole truth, and
22   nothing but the truth?
23          THE WITNESS:  I do.
24          THE ARBITRATOR:  Could you
25   be seated, please.  Spell your
```

Page 5

```
 1       DIRECT-EXAMINATION OF MS. SETTIMI
 2   full name for me, and let me have
 3   an address, which could be either
 4   home or work.
 5          THE WITNESS:  It's Palma
 6   Settimi; P-A-L-M-A,
 7   S-E-T-T-I-M-I.
 8          THE ARBITRATOR:  Address,
 9   please.
10          THE WITNESS:  Yes.  7 Suttin
11   Place, Rooster, New York 10549.
12          THE ARBITRATOR:  Okay.  So,
13   Ms. Settimi, you sat through
14   the other witnesses.  So you know
15   my admonitions in connection with
16   the testimony.  I don't think I
17   have to repeat them.
18          Mr. Brown, why don't you
19   proceed.
20   P A L M A   S E T T I M I, the witness
21   herein, having been first duly sworn by
22   the arbitrator, was examined and
23   testified as follows:
24   DIRECT-EXAMINATION
25   BY MR. BROWN:
```



Page 6

DIRECT-EXAMINATION OF MS. SETTIMI
1
2     Q. Good morning, Ms. Settimi.
3 Thank you for joining us again.  You've
4 been present for the duration of the
5 testimony in this proceeding, correct?
6     A. Yes.
7     Q. And you're an officer of Forall
8 USA Inc.; is that correct?
9     A. That's correct.
10    Q. What's your title?
11    A. My title is Assistant Treasurer
12 and Secretary.
13    Q. And how long have you held that
14 position with Forall?
15    A. That's not a nice question,
16 Stephen.  30 plus years.
17    Q. The -- your office performs what
18 types of functions for Forall?
19    A. We are the back office for
20 Forall USA, so we do accounting, you
21 know, we manage all of their -- all of
22 their back office needs.  We represent
23 ourselves as Forall USA.  We are the
24 back office there.
25    Q. And for the duration of the time

Page 7

DIRECT-EXAMINATION OF MS. SETTIMI
1
2 period in question here, in this case,
3 I'll call it 2011 through today, have
4 you served in that capacity?
5     A. Yes, I have.
6     Q. And are you familiar with the
7 license agreement by and between Sarah
8 LLC and Forall that was executed in or
9 around March of 2011?
10    A. I am.
11    Q. And you've seen that document
12 put into evidence in this case?
13    A. Yes.
14    Q. And was that your signature in
15 that document?
16    A. Yes, it was.
17    Q. And were you familiar with --
18 during the time period that Sarah was
19 managing and operating and owning the
20 Pal Zileri store in Las Vegas, with the
21 terms of the license agreement?
22    A. Yes.
23    Q. And specifically -- and I will
24 pull it up on my screen so we are not
25 just talking off memory.  Bear with me

Page 8

DIRECT-EXAMINATION OF MS. SETTIMI
1
2 one second as I share my screen.
3     MR. BROWN:  I'm going to
4 Exhibit 1, everyone.
5     Q. Can you see my screen, Palma?
6     A. Yes, I can.
7     Q. And this is the document we are
8 referring to, right?
9     A. Yes.
10    Q. And while Sarah was running the
11 store in Las Vegas, did you have
12 occasion to look at the -- this
13 agreement and ensure compliance with
14 various obligations for both sides?
15    A. Yes.
16    Q. And specifically Section 4.2
17 which dealt with minimum purchase
18 requirements; do you recall that
19 provision?
20    A. Yes.
21    Q. And was that a provision that
22 you were familiar with and had to check
23 with at various points in time between
24 2011 and 2013?
25    A. Yes.

Page 9

DIRECT-EXAMINATION OF MS. SETTIMI
1
2     Q. And how about the Section 4.6
3 where Forall agreed to various
4 discounts for the early stages of this
5 agreement; do you recall this
6 provision?
7     A. Yes.
8     Q. Is that a provision you had to
9 refer to at that time?
10    A. Yes.
11    Q. And was this your -- your
12 position as when you did accounting
13 functions that you would make sure
14 these discounts were applied in an
15 appropriate manner to the Sarah
16 purchases?
17    A. Yes.
18    Q. And Section 5 -- do you recall
19 there was a build-out of store in Las
20 Vegas?
21    A. Yes.
22    Q. And were you familiar with the
23 construction costs and the various
24 allocations of those costs by and
25 between the party under this license



Page 10

1     DIRECT-EXAMINATION OF MS. SETTIMI
2   agreement?
3       A. Yes.
4       Q. And did you work at that time to
5   ensure that those construction costs
6   were applied pursuant to this
7   agreement?
8       A. Yes.
9       Q. And as you sit here today, do
10  you believe that Forall complied with
11  all of its obligations under this
12  agreement?
13      A. 100 percent.
14      Q. And with respect to advertising,
15  there were certain commitments made by
16  the various -- by the parties in this
17  agreement; isn't that correct?
18      A. That's correct.
19      Q. And do you recall being involved
20  in the allocation and those
21  expenditures at that time?
22      A. Yes.
23      Q. And specifically Section 8.4,
24  which is on my screen, did you have
25  occasion in -- between 2011 and 2013,

Page 11

1     DIRECT-EXAMINATION OF MS. SETTIMI
2   to refer to this provision to ensure
3   that Forall was meeting its obligations
4   under the agreement?
5       A. Yes.
6       Q. And did they, in fact, meet
7   those obligations during that time
8   period?
9       A. Above and beyond.
10      Q. Okay. I'm going to go -- one
11  other thing, Palma, the Section 15
12  deals with the right of first refusal.
13  I'm sorry. The section prior.
14      Do you recall that Sarah LLC
15  negotiated rights for a -- for stores
16  in New York and Chicago?
17      A. Yes.
18      Q. Did they ever open stores there?
19      A. No.
20      Q. But they had the right to do
21  that within a certain time period of
22  the license agreement that Forall
23  allowed them that, right?
24      A. Correct.
25      Q. Bear with me one moment. Okay.

Page 12

1     DIRECT-EXAMINATION OF MS. SETTIMI
2   I'm going to go to another agreement.
3   I'm just --
4       MR. BROWN: You guys can see
5       where I'm going, it's fine. I'm
6       going to Exhibit 142, everyone.
7       That's not it, but bear with me.
8       Q. Palma, can you see the document
9   that's on the screen?
10      A. Yes.
11      Q. And this is the license and its
12  full title is, "License Agreement
13  Internet Site and Sales of License
14  Products Between Forall USA and Sarah
15  LLC." Is this your signature on the
16  third page of this document?
17      A. Yes, it is.
18      Q. And did you execute a license
19  agreement allowing Sarah LLC to sell
20  Pal Zileri products on the internet in
21  the U.S.?
22      A. Yes.
23      Q. And to your knowledge, did Sarah
24  ever take advantage of these internet
25  sales by way of establishing an

Page 13

1     DIRECT-EXAMINATION OF MS. SETTIMI
2   E-commerce store that was selling to
3   the U.S.?
4       A. No.
5       Q. A lot's been made in the
6   testimony about a certain credit or
7   payment by and between Italnord and
8   Sarah; do you recall that testimony?
9       A. Absolutely.
10      Q. And are you familiar with the
11  circumstances surrounding that $38,000
12  payments? And by that I mean, when
13  Italnord took over the management of
14  the store under agreement with Sarah?
15      A. Yes.
16      Q. And did you see the -- that
17  provision -- strike that.
18      MR. BROWN: I'm going to go
19      to Exhibit 145, folks.
20      Q. And, Ms. Settimi, could you have
21  a look at this document?
22      A. Yes.
23      MR. BROWN: This is Forall
24      00213, Exhibit 145.
25      MR. LEWIS: Is this in



1       DIRECT-EXAMINATION OF MS. SETTIMI
2    evidence?
3         THE ARBITRATOR:  Is this in
4    evidence, Counselor?
5         MR. BROWN:  Yes, it is, sir.
6    You guys objected to it, but it's
7    in respondent's book and its come
8    in.
9    Q. Ms. Settimi, can you tell me
10   what this is?
11   A. It's a credit memo issued by
12   Forall to Italnord on February 12,
13   2014, in the amount of $38,000, and
14   there's a note that says, "Amount due
15   to Sarah.  Part of the transition and
16   deal made to this    amount -- I can't
17   read whatever it says there, but
18   carried over to Italnord."  It was per
19   the purchase asset agreement.
20   Q. And is this an agreement that
21   your office generated?
22   A. Yes.
23   Q. And this is similar to the
24   records your office maintains, correct?
25   A. Yes.

1       DIRECT-EXAMINATION OF MS. SETTIMI
2    Q. And is this -- does this credit
3    memo evidence the fact that Forall
4    applied a $38,000 to Italnord in
5    February of 2014?
6    A. Yes, it does.
7    Q. And upon your information and
8    belief, was this credit given to
9    Italnord because Italnord had paid
10   Sarah $38,000?
11   A. Yes.
12        THE ARBITRATOR:  How do you
13   know that?
14        THE WITNESS:  It's in the --
15   it was in the asset purchase
16   agreement, so we followed the
17   agreement.
18        THE ARBITRATOR:  And, also,
19   was notice of this credit memo
20   ever sent to Sarah?
21        THE WITNESS:  I don't know.
22   It was -- it was -- it was
23   Italnord's credit memo, so I
24   don't know.  I don't think so.
25        THE ARBITRATOR:  Is there

1       DIRECT-EXAMINATION OF MS. SETTIMI
2    anything on the document that
3    might refresh your memory one way
4    or the other?
5         THE WITNESS:  I don't think
6    so, no.  Am I allowed to speak or
7    say something?
8         THE ARBITRATOR:  Yeah, sure.
9    You're on direct.  If it's
10   relevant to the question I asked,
11   sure.
12        THE WITNESS:  My
13   responsibility was to carry out
14   the asset purchase agreement, and
15   it's right there.  I issued the
16   credit and that was all I had to
17   worry about, I believe.
18        THE ARBITRATOR:  And by "the
19   asset purchase agreement," you
20   mean the agreement between Sarah
21   and Italnord, right?
22        THE WITNESS:  Yes.
23        THE ARBITRATOR:  Okay.
24        MR. LEWIS:  Mr. Farber, I
25   just want to note an objection.

1       DIRECT-EXAMINATION OF MS. SETTIMI
2    Your question to Ms. Settimi was
3    how does she know that Italnord
4    made the payment, and her answer
5    was just that it was in the asset
6    purchase agreement.  I'm not sure
7    that's really responsive to how
8    she knows --
9         THE ARBITRATOR:  I'm aware
10   of what her answer was.  It's not
11   really an objection, but I heard
12   her question.  I got it.  You can
13   follow it up, of course,
14   Mr. Lewis, if you so desire.
15        Mr. Brown, go ahead.
16        MR. BROWN:  Okay.
17   Q. Ms. Settimi, did you ever
18   receive notice from Sarah that they had
19   not received $38,000 from Italnord as
20   part of their -- their agreement with
21   Italnord?
22   A. No.
23   Q. You never received anything in
24   writing or saw anything in writing from
25   Sarah saying, "We were not paid 38,000



Page 18

1      DIRECT-EXAMINATION OF MS. SETTIMI
2   as required under the asset purchase
3   agreement with Italnord"?
4      A. I did not.
5      Q. Okay.  This credit memo that's
6   on my screen is similar to -- strike
7   that.
8         You've heard some testimony
9   about rent and some -- some suggestions
10   that Forall paid its -- the rent late
11   and that may have led to Simon evicting
12   Forall.  Do you recall that testimony?
13      A. Yes.
14      Q. Did you -- were you involved in
15   the payment of rent by Forall during
16   its management period of the Las Vegas
17   store?
18      A. Yes.
19      Q. And you would receive the Simon
20   monthly rent statements from Sarah,
21   correct, during that time?
22      A. No.  They came to our New York
23   office.
24      Q. Okay.  So do you have an
25   understanding how the New York office

Page 19

1      DIRECT-EXAMINATION OF MS. SETTIMI
2   got it?
3      A. I would have to assume that they
4   came from Dr. Hamad.
5      Q. Okay.  Is your connection okay?
6   Does it show anything?
7      A. No.  Right now, it's good.  Can
8   you hear me?
9      Q. I can hear you now.  Your first
10   word or two was cut off.
11         Did Forall make its rent payment
12   of every month that it was at the store
13   in '15 and '16?
14      A. Yes.
15      Q. Yes?
16      A. Yes.
17      Q. And did you ever receive or see
18   a default notice from Simon to Sarah or
19   any other parties regarding the payment
20   of rent?
21      A. Never.
22      Q. And did you search your records
23   for such a default notice or anything
24   like that prior to your testimony?
25         In other words, you looked for

Page 20

1      DIRECT-EXAMINATION OF MS. SETTIMI
2   something and you didn't find anything?
3      A. I didn't find anything, no.  I
4   couldn't find anything.
5         THE ARBITRATOR:  Given your
6      position with the company, had
7      there been a default notice in
8      rent, would you have been aware
9      of it?
10         THE WITNESS:  Yes.
11         THE ARBITRATOR:  Okay.  Go
12      ahead.  Thank you.
13      Q. Okay.  There has been some
14   testimony about minimum purchases made
15   by Sarah, and you were present for
16   that, correct?
17      A. Yeah.
18      Q. The -- Mr. Spano had -- was
19   shown a document that he actually
20   created and was put on the screen and
21   put into evidence that showed various
22   construction cost s, construction costs
23   credited to Sarah, and then minimum --
24   some purchases made by Sarah.  Do you
25   recall that multi colored document?

Page 21

1      DIRECT-EXAMINATION OF MS. SETTIMI
2      A. I do.
3      Q. Let's go to it.  I'm going to
4   pull it up on my screen in a second.
5   Sorry.  Hold on.
6         And did Luca Spano work with
7   your office when he was compiling
8   figures and various records during the
9   Forall management of the store -- I
10   mean, during the Sarah management of
11   the Pal Zileri store?
12      A. Stephen, I -- my internet cut
13   out again.  You have to tell me the
14   question, please.
15      Q. All right.  Good.  It was a poor
16   question.  Bear with me one second.
17   I'm struggling to find it.
18         MR. BROWN:  This is
19      Exhibit 131.  Sorry for the
20      delay.  I'm sorry.  130.  I'm
21      going to share my screen.  Okay.
22      Q. Ms. Settimi, do you recognize
23   this e-mail from Luca to yourself and
24   others on February 27, 2014?
25      A. Yes.



1       DIRECT-EXAMINATION OF MS. SETTIMI
2       Q. And so this is in February 2014.
3   Do you recall whether Italnord was
4   operating the store at that point in
5   time?
6       A. Yes.
7       Q. And this says, "Dear, Michelle."
8   Who is Michelle?
9       A. Michelle is my inhouse
10  controller CPA.
11      Q. "Per our phone conversation
12  here, enclosed please find all the
13  spreadsheets with all the final numbers
14  for Sarah LLC."  Do you see that?
15      A. Yes.
16      Q. So Luca is doing a -- he's doing
17  calculations based on the final numbers
18  for Sarah during that period that they
19  ran the store from 2011 to
20  September 2013, correct?
21      A. That's correct.
22      Q. And it looks like there was some
23  clean-up work to be done, and that's
24  what this -- this e-mail is more or
25  less addressing with respect to certain

1       DIRECT-EXAMINATION OF MS. SETTIMI
2   credits; is that more or less the case?
3       A. Yes.  That's correct.
4       Q. Okay.  And I'm going to the next
5   page -- well, he says, "At the button,"
6   which I assume is a typo, perhaps, at
7   the bottom, "You can see the left-over
8   credit owed to Sarah that was
9   transferred to Italnord $38,289.15."
10  Do you see that?
11      A. Yes.
12      Q. And then he --
13          THE ARBITRATOR:  Counselor,
14  can I ask why we are doing this?
15  We had Mr. Spano here and we are
16  trying to avoid duplicative
17  testimony.
18          MR. BROWN:  To answer your
19  question, sir, I'm in the process
20  of confirming the numbers by way
21  of  Ms. Settimi because she has
22  that knowledge.
23          THE ARBITRATOR:  All right.
24  He didn't testify on the purchase
25  numbers.  If that's important,

1       DIRECT-EXAMINATION OF MS. SETTIMI
2   you can go ahead, but let's try
3   not to duplicate what he said
4   because I've heard it already.
5       Q. Ms. Settimi, I'm on the second
6   page of Luca's exhibit here, and I had
7   stepped him through and asked him about
8   whether or not that $38,000 was
9   actually owed to Sarah under the
10  license agreement; do you recall that
11  testimony?
12      A. Yes.
13      Q. And based upon these
14  calculations, construction cost
15  totalling 948,698, right?
16      A. Yup.
17      Q. Isn't it true that Forall's
18  responsibility for those costs was
19  50 percent by way of credit on
20  purchases; isn't that right?
21      A. Right.
22      Q. And that's under the license
23  agreement?
24      A. That's correct.
25      Q. And isn't 50 percent of the

1       DIRECT-EXAMINATION OF MS. SETTIMI
2   948,698 and actually 474,349?
3           THE ARBITRATOR:  Counsel,
4   once again, this is almost an
5   exact duplication, and we did it
6   with the author of the document,
7   so I'm not sure why we are doing
8   it with this witness.  Let's move
9   on.
10          MR. BROWN:  I'll move on.
11      Q. So, Ms. Settimi, there are
12  invoices received to date, figures down
13  below; do you see this in blue?
14      A. Yes.
15      Q. Do you believe these numbers to
16  be accurate based upon your records?
17      A. Yes.
18      Q. Do you know why there's a 2010,
19  2011 time frame given to the right of
20  this 1 million dollar number here?
21      A. I believe that's just an error
22  by Luca.  2010 has nothing to do with
23  it.
24      Q. Did Sarah make any purchases in
25  2010?



Page 26

1           DIRECT-EXAMINATION OF MS. SETTIMI
2      A. No.
3      Q. And this total figure,
4  2,202,649, is that the total purchases
5  made by Sarah during its operation of
6  the store in 2011 to 2013?
7      A. That's correct.
8      Q. Isn't it true that they
9  purchased more than the minimum
10 purchase required under the license
11 agreement in that time frame?
12     A. Yes.
13        MR. BROWN:  I'm going to
14 Exhibit 175, which is in
15 evidence.
16     Q. Palma, can you see my screen?
17     A. Yes, I can.
18        MR. BROWN:  And I'll zoom in
19 a little bit.  This is Forall
20 000357.
21     Q. Palma, what is this document?
22     A. That's a printout from one of
23 our AR modules, account receivable
24 modules.
25     Q. And these things --

Page 27

1           DIRECT-EXAMINATION OF MS. SETTIMI
2      A. It's a cumulative thing.  So if
3  you look at the headers -- see the
4  headers?  So the sales from 2011 to
5  2013, the payments, but these are net
6  sales, not gross, because the invoices
7  already came in.
8      Q. Before you go there, let's step
9  through --
10     A. Go ahead.
11     Q. All right.  So this document is
12 a summary page, right, and I'm going to
13 go to the next page, and can you tell
14 me what this represents?
15     A. Yeah.  That's the detail.
16     Q. Okay.  Detail of what?
17     A. Of net invoices.
18     Q. Okay.  And it provides -- and
19 who is the customer here?
20     A. Sarah LLC.
21     Q. And you have invoice numbers; do
22 those correspond with invoices that
23 were given to Sarah?
24     A. Yes.
25     Q. And there's invoice dates,

Page 28

1           DIRECT-EXAMINATION OF MS. SETTIMI
2  correct?
3      A. Yes.
4      Q. As well as -- it says, "Year and
5  season."  Tell me what that is?
6      A. So it's starting off with
7  year -- it says, "Year '12, fall,
8  winter '21, spring, summer '13," and so
9  on.
10     Q. Okay.  And as I scroll down, you
11 see what looks like '11 fall, winter
12 and etcetera.
13        Is this -- are these the
14 total -- is this the total set of
15 invoices that Sarah purchased?
16     A. Yes.
17     Q. This 1,862,879 figure at the
18 very bottom is the total of those
19 invoices, correct?
20     A. That's correct.
21     Q. But is a gross figure or a net
22 figure?
23     A. Net figure.
24     Q. Tell me how that corresponds to
25 Luca's $2.2 million?

Page 29

1           DIRECT-EXAMINATION OF MS. SETTIMI
2      A. You won't see it there because
3  that's not there.  It's just the net
4  figure.  How it corresponds is you --
5  we have to add back in the 20 percent
6  that we gave in year one, and the 10
7  percent that was given in year two,
8  then you would be able to do the math
9  backwards and come to approximately
10 2.2.
11     Q. And the purchase agreement,
12 $900,000 minimum purchase obligation,
13 that was a gross purchase dollar
14 amount, right?
15     A. That's correct.
16     Q. And I'm going to the next page
17 and this says, "Payments made," right?
18     A. Mm-hmm.
19     Q. Yes?
20     A. Yes.
21     Q. Okay.  And this provides the
22 detail of the payments made by Sarah,
23 correct?
24     A. Yes.
25     Q. And the next -- sorry.  And this



Page 30

1    DIRECT-EXAMINATION OF MS. SETTIMI
2  last page, which is --
3          MR. BROWN:  I'll give you a
4      bates label number 361, Forall
5      361.
6      Q. Tell me what this is, these
7  records?
8      A. That is, again, cumulative
9  listing of the credit memos issued to
10 Sarah for the various invoices.
11     Q. Okay.  And you had looked into
12 this $60,000 entry here right in the
13 middle of this credit memo, right?
14     A. Yes.
15     Q. And why did you -- you looked
16 into that as you heard some of the
17 testimony during this hearing, right?
18     A. Yes.
19     Q. What was that credit issued for?
20     A. Additional discount after a
21 meeting between Luca and Marco Baritza
22 in Italy to help the store.
23     Q. And was that meeting -- was that
24 the meeting that the doctors were
25 testifying about?

Page 31

1    DIRECT-EXAMINATION OF MS. SETTIMI
2      A. I'm not sure if it's the same
3  meeting.  I can't tell you that.
4      Q. But that -- so your records
5  indicate that that $60,000 was
6  additional discounts given at that
7  time?
8      A. That's correct.
9      Q. And that was above and beyond
10 what was set forth in the license
11 agreement?
12     A. Yes.
13     Q. And was that, to your knowledge,
14 a one-time discount given?
15     A. Yes.
16     Q. Were you ever told that Sarah
17 did not have to make the minimum
18 purchase requirement under the license
19 agreement?
20     A. Never.
21         MR. BROWN:  Mr. Farber, if I
22     could just take a couple of
23     moments.  I think I may be done.
24         THE ARBITRATOR:  All right.
25 I just want to ask one or two

Page 32

1    DIRECT-EXAMINATION OF MS. SETTIMI
2  questions.
3         MR. BROWN:  Okay.
4         THE ARBITRATOR:  So, first
5      of all, on the last item, Ms.
6      Settimi, so on a regular basis,
7      maybe at the end of every year or
8      some time thereafter, was a
9      notice sent to Sarah regarding
10     its obtaining or failing to
11     obtain or failing to place orders
12     meeting the minimum purchase
13     requirement?
14         THE WITNESS:  Never.
15         THE ARBITRATOR:  Why not?
16         THE WITNESS:  Because they
17 met the minimum purchase
18 requirement every season, every
19 year.
20         THE ARBITRATOR:  In the
21 second year they met the minimum
22 purchase requirement?
23         THE WITNESS:  Yes, they did.
24         THE ARBITRATOR:  The first
25 year was '12, right?

Page 33

1    DIRECT-EXAMINATION OF MS. SETTIMI
2         THE WITNESS:  The first year
3  was -- I mean, I don't know how
4  you want to look at it.  They
5  started with us in September of
6  2011, so are we going to fall,
7  winter, to spring, summer or --
8         THE ARBITRATOR:  Either way.
9  I don't know what you did.
10        THE WITNESS:  Am I allowed
11 to read off my notes, because I
12 have it right in front of me.  I
13 mean, I know what they did and it
14 corresponds to the 2.2 million.
15        THE ARBITRATOR:  Okay.  That
16 was the first year, right, '11,
17 '12?
18        THE WITNESS:  Yeah.
19        THE ARBITRATOR:  Okay.  Did
20 they meet it for '12, '13?
21        THE WITNESS:  Yes, they did.
22        THE ARBITRATOR:  All right.
23 And then '13, '14, really they
24 weren't there any more, right, so
25 I understand.



Page 34

1      DIRECT-EXAMINATION OF MS. SETTIMI
2          THE WITNESS:  It was four
3  seasons involved in Sarah.
4          THE ARBITRATOR:  Let me ask
5  you something else.  Are you
6  familiar with Forall's profit
7  margins?
8          THE WITNESS:  You know, yes
9  and no.  I'm not -- I'm not the
10  CPA on the account, but vaguely
11  familiar.
12          THE ARBITRATOR:  Do you
13  know, for example, on a
14  percentage basis what Forall's
15  costs of goods sold was, say in
16  '13?
17          THE WITNESS:  No, I don't
18  recall.
19          THE ARBITRATOR:  Is that
20  information available?
21          THE WITNESS:  Yeah.
22          THE ARBITRATOR:  What about
23  in '12 or '14, would you have
24  known that?
25          THE WITNESS:  Personally,

Page 35

1      DIRECT-EXAMINATION OF MS. SETTIMI
2  no.
3          THE ARBITRATOR:  Was Forall
4  a profitable company in, say,
5  '13.
6          THE WITNESS:  No.
7          THE ARBITRATOR:  Was it a
8  profitable company in '12?
9          THE WITNESS:  No.
10          THE ARBITRATOR:  '14?
11          THE WITNESS:  No.
12          THE ARBITRATOR:  Okay.  All
13  right.  You may want to take a
14  break at this point.  Let's take
15  that break.  Let's give Mr. Brown
16  five.  All right.
17          (Whereupon, a recess was
18  taken.)
19      Q. Palma, how long has Forall been
20  in operations?
21      A. 1989.
22      Q. And it's still in operations?
23      A. We are speaking of Forall USA,
24  correct?
25      Q. Yes.

Page 36

1      DIRECT-EXAMINATION OF MS. SETTIMI
2      A. Yes.
3      Q. And it's still an on-going
4  concern?
5      A. Yes.
6      Q. Mr. Farber was asking you about
7  cost of goods and margin numbers,
8  right?
9      A. Yes.
10      Q. Is there someone in your office
11  that does have and is intimately with
12  that information?
13      A. Yes.  That would be Michelle
14  Gioffre, our CPA.
15      Q. You have extensive experience in
16  the retail and wholesale business,
17  don't you?
18      A. Yes.
19      Q. Can you just give for, Mr.
20  Farber, some of your other clients'
21  names?
22      A. Yes.  Vernelo Cuccineli
23  (phonetic) for 20 years, Federico
24  (phonetic) for 22, Pasadiso Brachani
25  (phonetic) 24.  Is that enough?  I can

Page 37

1      DIRECT-EXAMINATION OF MS. SETTIMI
2  keep going.
3      Q. That's fine.  But these are
4  Italian manufacturers?
5      A. Yes.
6      Q. Based upon your experience in
7  this space, do you think that Pal
8  Zileri or Forall could have reasonably
9  reopened another store on the heels of
10  this closure of the eviction in August
11  of 2015?
12      A. Immediately?
13      Q. Yes.
14      A. No.
15      Q. Wouldn't that have taken a long
16  time to repair that damage?
17      A. Absolutely.
18      Q. How long would you estimate?
19      A. I mean, it would be a matter of
20  choice, but I personally would stay out
21  of that market for quite some time.
22      Q. Good number -- for a good number
23  of years, more than four, five, right?
24      A. Maybe, yes.
25          MR. BROWN:  I don't have any



1   DIRECT-EXAMINATION OF MS. SETTIMI
2   further questions.
3       THE ARBITRATOR:  Okay.  So
4   we are going to start now with
5   the cross.  Ms. Settimi, you know
6   my admonition to a party witness
7   on cross.  Just listen to
8   Mr. Lewis' questions, and respond
9   as directly and as succinctly as
10  you can.
11      And he's in charge of the
12  examination, so don't fight with
13  him, because he's going to always
14  win.  So just listen and respond
15  to his questions, unless
16  Mr. Brown says the word
17  "objection."
18      MR. CROWE:  Mr. Farber, if I
19  may, just if I can get, and,
20  obviously, we can't hold Mr.
21  Lewis to this, just an idea in
22  terms of ballpark how much time
23  so I can get the next witness
24  lined up?
25      THE ARBITRATOR:  Mr. Lewis,

1   CROSS-EXAMINATION OF MS. SETTIMI
2   do you have any idea?
3       MR. LEWIS:  I'm not sure.
4   Probably 45 minutes.
5       MR. CROWE:  Okay.  Thank
6   you.
7       THE ARBITRATOR:  Thanks.
8   Go ahead, Mr. Lewis.
9   CROSS-EXAMINATION
10  BY MR. LEWIS:
11      Q. Good morning, Ms. Settimi.
12      A. Good morning, Mr. Lewis.
13      Q. Ms. Settimi, you were not
14  present at the meeting in Italy in
15  November 2012 between the doctors and
16  Marco Baritza and Luca Spano, correct?
17      A. That's correct.
18      Q. So you don't have first-hand
19  knowledge of what was said and shared
20  at that meeting, right?
21      A. No.
22      Q. You testified that you had
23  reviewed records to support your
24  testimony to Mr. Brown's examination
25  about sales and purchases going back to

1   CROSS-EXAMINATION OF MS. SETTIMI
2   2011; is that true?
3       A. Yes.
4       Q. And you checked the entry of
5   $60,000 credit to answer Mr. Brown's
6   credit question about that, right?
7       A. Yes.
8       Q. And you were present for
9   Mr. Torello-Viera's testimony yesterday
10  where he said he reviewed sales figures
11  in preparation for his testimony; do
12  you recall that?
13      A. Yes.
14      Q. Did your office provide
15  Mr. Torello-Viera with those sales
16  figures?
17      A. I'm not sure if he was speaking
18  about store sales figures or purchase
19  figures.
20      Q. Did you provide documentation
21  for Mr. Torello-Viera to review?
22      A. No.
23      Q. Do you know if he provided any
24  figures for -- to his attorneys in
25  preparation for his testimony?

1   CROSS-EXAMINATION OF MS. SETTIMI
2       A. Meaning our attorneys, Forall's
3   attorney?
4       MR. BROWN:  I'm going to
5   object to that.  That would be
6   privileged.  Any -- I don't know
7   why he is  asking -- trying to
8   get into prep work.
9       THE ARBITRATOR:  Mr. Brown,
10  I think she can answer "yes" or
11  "no" as long as she doesn't say
12  anything about the substance of
13  it.
14      I think -- I think it does
15  not intrude upon the privilege
16  just to say that you delivered
17  something.
18      MR. BROWN:  No.  I would
19  disagree.  The -- what the
20  witness, Mr. Paolo, reviewed with
21  counsel in his prep.
22      THE ARBITRATOR:  He didn't
23  ask about review.  He just asked
24  about -- read the question,
25  Maggie.



Page 42

1    CROSS-EXAMINATION OF MS. SETTIMI
2        (Whereupon, the record was
3    read by the reporter.)
4        THE ARBITRATOR: Overruled.
5    You can say if you just provided
6    and that's a "yes" or "no".
7        A. I still don't understand the
8    question, because I don't know if I'm
9    being asked if I gave information to
10   Mr. Brown in terms of --
11       THE ARBITRATOR: Mr. Lewis,
12   rephrase. Go ahead. And, Mr.
13   Lewis, he's right. It's --
14   anything substantive, I'm going
15   to sustain an objection on
16   privilege.
17       Q. Did you provide information from
18   your office to Mr. Brown in preparation
19   for this arbitration?
20       A. Yes.
21       Q. Ms. Settimi, you are familiar
22   with the lease between Sarah and Simon
23   for the Las Vegas store?
24       A. Somewhat.
25       Q. You are familiar with the

Page 43

1    CROSS-EXAMINATION OF MS. SETTIMI
2    requirement for the stores -- for the
3    Las Vegas store to turn over monthly
4    sales reports to Simon each month,
5    correct?
6        A. Yes.
7        MR. BROWN: During what time
8    period?
9        THE ARBITRATOR: She's
10   answered already. So she said,
11   "yes." Go ahead. Next question.
12       Q. And did Forall turn over sales
13   to Simon pursuant to the lease in 2015?
14       MR. BROWN: Objection.
15       THE ARBITRATOR: What's the
16   objection?
17       MR. BROWN: He threw
18   "pursuant to the lease" in there.
19   I don't know what -- if this
20   witness has familiarity with that
21   or not.
22       THE ARBITRATOR: That's
23   exactly what she's going to tell
24   us. Overruled.
25       If you know, did you turn

Page 44

1    CROSS-EXAMINATION OF MS. SETTIMI
2    over these sales figures pursuant
3    to the lease? If you know.
4        THE WITNESS: We managed the
5    store. We provided the sales
6    figures, yes.
7        THE ARBITRATOR: Go ahead,
8    Mr. Lewis.
9        MR. LEWIS: I am, Mr.
10   Farber. Thank you.
11       THE ARBITRATOR: Okay.
12       Q. Ms. Settimi, can you see my
13   screen? It should be a red rectangle
14   here. Do you see that?
15       A. Yes.
16       Q. All right. Ms. Settimi, this is
17   the lease. There are certain
18   conditions of the lease, which I called
19   out to make it easier to read, but the
20   lease between Forum Shops, Simon, and
21   Sarah, do you see this Section 4.1?
22   Can you read that?
23       A. "Tenant consents and agrees to
24   pay landlord without notice or demand
25   at the remittance address, the minimum

Page 45

1    CROSS-EXAMINATION OF MS. SETTIMI
2    rent set forth in Article 1, in advance
3    upon the first day of each and every
4    month of the lease term."
5        Q. And then I've got another
6    section here. Section 4.3, can you
7    read that?
8        A. "Tenant shall not, later than
9    the 5th day after the close of each
10   calendar month, deliver to the landlord
11   at the center, office, a written
12   statement certified under oath by a
13   tenant or an officer of tenant showing
14   gross sales and adjusted gross sales
15   made in such calender month, and not
16   later than 30 days after the end of
17   each lease year or partial lease year,
18   deliver to landlord at the center
19   office a statement of gross sales, and
20   adjusted gross sales for such lease
21   year or partial lease year the credence
22   of which is certified by tenant or an
23   officer -- or officer of tenant."
24       Q. And you testified that while
25   Forall was operating the store, you



12 (Pages 42 to 45)

Page 46

CROSS-EXAMINATION OF MS. SETTIMI
1    CROSS-EXAMINATION OF MS. SETTIMI
2   adhered to the terms of the lease
3   agreement with Simon, correct?
4       A. Correct.
5           MR. BROWN: Objection. Her
6       testimony pertained to submitting
7       the -- the monthly sales
8       figures.
9           THE ARBITRATOR: She already
10      answered the question, so I'm not
11      sure what the objection is to.
12      Let's go to the next question.
13      Q. Ms. Settimi, are you aware of
14   the Las Vegas stores gross sales in
15   2016?
16      A. No.
17      Q. You're not aware now or -- let
18   me ask you -- were you responsible for
19   turning or were you part of -- was part
20   of your responsibility turning over the
21   sales figures to Simon in 2016?
22      A. My team did, yes.
23      Q. Your office participated in
24   that?
25      A. Yes.

Page 47

1    CROSS-EXAMINATION OF MS. SETTIMI
2       Q. You all performed back office
3   accounting for Sarah -- excuse me --
4   for Forall, so that would have been
5   part of your responsibility, correct?
6       A. Yes.
7       Q. And you testified earlier --
8   well, let me ask you this:  In August
9   of 2016, does sales of $38,320 for that
10   month, do you have any reason to doubt
11   that that was the sales for August of
12   2016 for the Las Vegas store?
13          MR. BROWN: Objection. I
14      mean, outside the scope, but
15      also --
16          THE ARBITRATOR:  In
17      arbitration we don't get too hung
18      up on scope because it's not like
19      court where -- you know, he'll
20      just say call her as his witness,
21      so it's kind of a waste of time.
22      So we don't do that.  So what's
23      the next objection?
24          MR. BROWN: He's reading
25      figures. She said she didn't

Page 48

1    CROSS-EXAMINATION OF MS. SETTIMI
2   know what they were, and now he's
3   asking does she dispute them.
4           THE ARBITRATOR: I don't
5       know what -- Mr. Lewis, she can
6       answer, but I don't know what
7       good it does me because, you
8       know, unless she knows what the
9       figures are, what's the
10      difference to me?
11          I mean, she could or could
12      not be surprised or dispute them.
13      She said she doesn't know the
14      figures. Don't we have the
15      figures in the record somewhere,
16      Mr. Lewis?
17          MR. LEWIS:  We don't, but we
18      should, Mr. Farber, and that's
19      what I'm going to do now is
20      placing in the record.
21          What we have been trying do
22      is lay a foundation so that we
23      can have the figures admitted
24      into evidence.
25          Mr. Brown has objected to

Page 49

1    CROSS-EXAMINATION OF MS. SETTIMI
2   that, and Mr. Farber said for now
3   we're going to leave them out and
4   see if we can lay a foundation.
5   I'm raising it again, so we can
6   have these admitted in the
7   record.
8           THE ARBITRATOR: Okay. Are
9       these documents that were on the
10      original list?
11          MR. LEWIS:  They were.
12          THE ARBITRATOR: And I think
13      you objected because you said you
14      didn't know who had prepared
15      them; is that it?
16          MR. BROWN: No. No. This
17      -- the -- it's been consistent
18      applying this rule. These
19      documents were not produced to me
20      at any point in time during
21      discovery. They were produced
22      only after I received their
23      proposed exhibits.
24          I said, "What are these
25      documents?  I didn't have these



Page 50

1  CROSS-EXAMINATION OF MS. SETTIMI
2  dates ranges." So, you know, 10
3  days before the arbitration, they
4  sent over what he's now referring
5  to, and I haven't been able to
6  get things in and on that basis,
7  and neither should he.
8      THE ARBITRATOR: So rather
9  than waste time, Mr. Lewis, you
10 know my ruling is going to be
11 consistent, why are we going down
12 this past, if that's what
13 occurred?
14     MR. LEWIS: Sure. These are
15 documents from Simon. Both sides
16 -- everyone that testified -- has
17 acknowledged that the lease
18 required the monthly reports to
19 Simon. This is a compilation of
20 those monthly reports from Simon.
21     These are documents that
22 Mr. Brown was seeking to get from
23 Simon, but was unable to get them
24 through the subpoena. We were
25 able to get them. We made them

Page 51

1  CROSS-EXAMINATION OF MS. SETTIMI
2  available to Mr. Brown in 10 days
3  --
4      THE ARBITRATOR: So why did
5  we wait so long?
6      MR. LEWIS: We had to get
7  them from Simon.
8      THE ARBITRATOR: When did
9  Simon send them to you?
10     MR. LEWIS: I don't have
11 that date in front of me, but we
12 shared things with Mr. Brown much
13 earlier than what Mr. Brown
14 shared things with us, but that's
15 not the point.
16     THE ARBITRATOR: It is the
17 point. If you got them from
18 Simon, you know, two weeks ago,
19 and you turned them over 10 days
20 ago, I might take a different
21 view of it.
22     But unless I have that
23 information -- because,
24 obviously, you couldn't do it
25 beforehand if that was the case.

Page 52

1  CROSS-EXAMINATION OF MS. SETTIMI
2  But absent you representing to me
3  that you got the information from
4  Simon just soon prior to when you
5  turned it over, the ruling is
6  going to be the same.
7      MR. BROWN: Your Honor, if I
8  also may be heard, this
9  arbitration was set to go in
10 March, we were 10 days out at
11 that point, I believe is the
12 timing of it, okay.
13     This was essential to their
14 case. They've had two years to
15 produce it, and you know, it's
16 not -- if this is so germane to
17 them -- I mean, what's the point
18 really that he's even trying to
19 establish?
20     THE ARBITRATOR: Counsel, at
21 this point prevailed in
22 connection with my ruling. So
23 let's see if Mr. Lewis wants to
24 push it.
25     I said I might take a

Page 53

1  CROSS-EXAMINATION OF MS. SETTIMI
2  different view if he just got
3  them from Simon. I would just
4  ask him why he didn't get them
5  sooner, if he has a decent
6  explanation, I'm going to let
7  them in. If there's no decent
8  explanation, it's going to stand.
9      Okay. Let's move on and
10 maybe Mr. Shah can check it while
11 you're proceeding with your
12 examination.
13     MR. LEWIS: We can do that,
14 Mr. Farber. I'd like to ask
15 you -- I still have the
16 opportunity to refresh the
17 witness's recollection with these
18 numbers, and that's what I'm
19 doing right now.
20     THE ARBITRATOR: You can do
21 that. Go ahead.
22 Q. Ms. Settimi, I asked you if
23 $38,320 for August sales in 2016, is
24 that consistent with your recollection
25 of the store's performance?



Page 54

1    CROSS-EXAMINATION OF MS. SETTIMI
2        A. I don't recall.
3        Q. What about $59,440 for July of
4    2016, is that consistent with your
5    recollection of the store's
6    performance?
7        MR. BROWN: Objection. This
8    isn't refreshing her
9    recollection.
10       THE ARBITRATOR: Do you have
11   any memory about the figures,
12   Ms. Settimi?  Is Settimi or
13   Settimi, by the way.  I didn't
14   catch it.
15       THE WITNESS: I have asked
16   everyone including my husband.  I
17   don't know.  I say Settimi.
18       THE ARBITRATOR: How do you
19   spell it?  With an M or an N?
20       THE WITNESS: It's an M, as
21   in Mary.  And I'm an Italian
22   language major, and I can't tell
23   you the answer.
24       THE ARBITRATOR: Ms.
25   Settimi, look, did you have a

Page 55

1    CROSS-EXAMINATION OF MS. SETTIMI
2    handle on the figures at the time
3    of what the monthly sales were
4    for in -- '16 for the store?
5        THE WITNESS: Mr. Farber,
6    I'm trying to answer his
7    question, as you said, as
8    precisely as possible.  I have a
9    team that did what they did.  I
10   don't want to just answer a
11   general "yes" or "no," so I'm
12   going to say I don't recall.
13       THE ARBITRATOR: All right.
14   Well it's up to Mr. Lewis if he
15   wants to try to refresh your
16   memory, he can do so.
17       Q. Ms. Settimi, would Michelle
18   Gioffre in your office, would she have
19   a closer connection to these numbers,
20   was she more involved than you?
21       A. Yeah.
22       Q. I'll ask you with the sales
23   figure $48,057 for June of 2016; does
24   that refresh your recollection as to
25   how the store performed in June 2016?

Page 56

1    CROSS-EXAMINATION OF MS. SETTIMI
2        MR. BROWN: Objection. This
3    is not appropriate means of --
4    this is reading something into
5    the record.  This isn't --
6        THE ARBITRATOR: I'm not
7    taking notes because the
8    testimony is the answers, not the
9    questions.  I know that.  So you
10   don't have to be concerned about
11   that, Mr. Brown.  It's a question
12   with an answer of "I don't know,"
13   doesn't mean anything to me.
14       Do you know Ms. Palma or
15   not?
16       THE WITNESS: I do not.
17       THE ARBITRATOR: Next
18   question.
19       Q. Do you have an understanding of
20   the average monthly sales for the Las
21   Vegas store while Forall operated the
22   store?
23       A. I do not.
24       Q. Would Ms. Gioffre be a person
25   that would have that information?

Page 57

1    CROSS-EXAMINATION OF MS. SETTIMI
2        A. On the top of her head right
3    this moment?
4        THE ARBITRATOR: Counsel, I
5    think she's going to be
6    testifying in about an hour or
7    so, so I don't know why we are
8    asking this witness if she'll
9    know it.  We can ask her if she
10   knows it.
11       MR. LEWIS: Well, I'm asking
12   Ms. Settimi if this is more under
13   Ms. Gioffre's purview.
14       THE ARBITRATOR: Do you know
15   if this is under her purview?
16       THE WITNESS: Yes.
17       THE ARBITRATOR: Okay.
18       Q. Ms. Settimi, you testified about
19   Forall making all of the rent payments
20   while it was operating the Las Vegas
21   store, correct?
22       A. Yes.
23       Q. Are you aware whether Forall
24   made all of the rent payments by the
25   first of each month?



Page 58

CROSS-EXAMINATION OF MS. SETTIMI

1    CROSS-EXAMINATION OF MS. SETTIMI
2         A. Not all of them.
3         Q. So on more than -- when you say,
4    "not always," was it at least on one
5    occasion when the rent was paid after
6    the first of the month?
7         A. Yes.
8         Q. Were there multiple occasions
9    when the rent was paid after the first
10   of the month?
11        A. Yes.  But always within the
12   grace period.
13        Q. I just asked you if your
14   testimony is that the rent was paid
15   after the first of the month on
16   multiple occasions?
17        A. Yes.
18        Q. Okay.  Were you aware that part
19   of -- are you aware whether the store's
20   performance -- sales performance
21   improve under Forall, and I mean
22   improved other than the numbers that
23   Italnord was able to produce?
24        MR. BROWN:  I'm going to
25   object to that question.  I don't

Page 59

CROSS-EXAMINATION OF MS. SETTIMI

1    CROSS-EXAMINATION OF MS. SETTIMI
2    really know what it means.
3         MR. LEWIS:  I'll ask it
4    differently.
5         Q. Ms. Settimi, are you aware of
6    how Italnord performed from the sales
7    perspective when it operated the store?
8         A. I don't recall.
9         Q. Would Ms. Gioffre be someone in
10   your office that would be aware of
11   Italnord's sales while it operated the
12   store?
13        A. Possibly.
14        Q. Do you have an appreciation for
15   whether the Forall store sold more
16   merchandise under Forall's operation
17   than it did under Italnord's operation?
18        A. I don't remember.
19        Q. Mr. Brown asked you about a
20   chart that's in Exhibit 130; do you
21   recall that?
22        You testified about a chart that
23   Mr. Brown showed you with inventory
24   purchases; do you recall that?
25        A. The color chart?

Page 60

CROSS-EXAMINATION OF MS. SETTIMI

1    CROSS-EXAMINATION OF MS. SETTIMI
2         Q. That's correct.
3         A. Yes.
4         MR. LEWIS:  Mr. Brown, the
5    Exhibit 130 that's in our book
6    does not have the chart attached,
7    it just has the e-mail.
8         MR. SHAH:  I'm going to jump
9    in, just to clarify for the
10   record.  The cover e-mail is 130
11   and then the chart is 131.
12        MR. BROWN:  Thank you.  I
13   have it up on my -- I can give
14   you the bates if you need it.
15        MR. LEWIS:  I have it.
16   Thank you.
17        Q. Ms. Settimi, can you see my
18   screen?
19        A. Yes.
20        Q. And you just testified about
21   this chart under Mr. Brown's
22   examination, right?
23        A. Yes.
24        Q. And, specifically, you testified
25   about the invoices received to date for

Page 61

CROSS-EXAMINATION OF MS. SETTIMI

1    CROSS-EXAMINATION OF MS. SETTIMI
2    -- while Sarah was operating the store,
3    right?
4         A. Yes.
5         Q. And Mr. Farber asked you whether
6    Sarah had met its minimum purchase
7    requirement each year while it was
8    operating the store; do you remember
9    that question?
10        A. Yes.
11        Q. You testified in the
12   affirmative.  But isn't it true that
13   Sarah over -- Sarah exceeded the
14   minimum purchase requirement in the
15   first year, right?
16        A. Yes.
17        Q. But they did not meet the
18   minimum purchase requirement in the
19   second year, right?
20        A. That's not what my records
21   reflect.
22        Q. Well, I mean you were
23   aggregating to testify that they met
24   minimum purchase requirement including
25   the overage in the first year; isn't



Page 62

CROSS-EXAMINATION OF MS. SETTIMI

1    CROSS-EXAMINATION OF MS. SETTIMI
2    that true?
3    A. Yes.
4    Q. And isn't it true that Italnord
5    actually paid for the merchandise in
6    2013?
7    A. No.  Italnord began to pay for
8    invoices -- our last shipment to Sarah
9    was dated May 30th and the invoice for
10   Sarah during spring summer '13 was the
11   total 500,000 --
12   Q. I understand about the invoices.
13   I asked you who actually paid for it.
14       MR. CROWE:  The witness
15   answered the question.
16       MR. LEWIS:  I'm sorry, we
17   have a lot of objections coming
18   from different attorneys.
19       THE ARBITRATOR:  Guys, it's
20   hard for me to hear.  Hold on.
21   Let's take one at a time.
22   Restate your question, Mr. Lewis.
23   If there's an objection, say it a
24   little louder so I can hear it.
25   Q. Doesn't this chart reflect

Page 63

CROSS-EXAMINATION OF MS. SETTIMI

1    CROSS-EXAMINATION OF MS. SETTIMI
2    invoices, Ms. Settimi?
3    A. Does the -- the chart in front
4    of me, the three line, yes.
5    Q. These don't reflect payments,
6    these reflect invoices; is that
7    correct?
8    A. Yes.
9    Q. I'm asking you -- isn't it true
10   that Italnord paid the 2013 invoices?
11   I'm asking if you're aware of that.
12   A. I don't know.
13   Q. Are you aware -- Ms. Settimi,
14   you're obviously aware of purchases
15   going back to 2011.  Are you aware
16   whether Italnord purchased any
17   additional merchandise while it
18   operated the store?
19   A. Yeah.
20   Q. And how much additional
21   merchandise did Italnord purchase?
22   A. For the fall, winter $736,000.
23   Q. May I ask you to say that again?
24   A. Approximately $736,000 for the
25   fall, winter of 2013.

Page 64

CROSS-EXAMINATION OF MS. SETTIMI

1    CROSS-EXAMINATION OF MS. SETTIMI
2    Q. They purchased any merchandise
3    in 2014?
4    A. Yes.
5    Q. How much?
6    A. Approximately $673,000.
7    Q. And that would be for the entire
8    -- for two seasons in 2014?
9    A. Up until -- when did they
10   finish? 2015, yes.
11   Q. So they did not -- and again,
12   was it your understanding -- was it
13   your understanding that Italnord was
14   purchasing under the same minimum
15   purchase requirement as Sarah?
16   A. Yes.
17   Q. Was there a separate contract
18   signed with Italnord between Forall and
19   Italnord?
20   A. No.
21   Q. You hesitated.  Are you sure
22   that there was no agreement signed
23   between Forall and Italnord pertaining
24   to the Las Vegas store?
25       MR. BROWN:  Objection.

Page 65

CROSS-EXAMINATION OF MS. SETTIMI

1    CROSS-EXAMINATION OF MS. SETTIMI
2    Asked and answered.
3        MR. LEWIS:  I'm asking --
4        THE ARBITRATOR:  She did
5    hesitate.
6        Do you remember for
7    sure, Ms. Settimi?
8        THE WITNESS:  Yes.  I'm just
9    trying to put all the dates
10   together in my head.
11       THE ARBITRATOR:  Okay.  Your
12   answer is, as far as she knows,
13   there was no separate agreement.
14   Q. So if the minimum -- and it is
15   Italnord or is it Italnord?
16   A. Italnord.
17   Q. Okay.  Italnord sounds better.
18   I'm going to go with that.
19       THE ARBITRATOR:  That one is
20   easy to figure out.  It's in
21   northern Italy.  Go ahead.
22       MR. LEWIS:  Fair enough.
23   Q. So they didn't reach the minimum
24   purchase requirement, correct, in 2014?
25   Ms. Settimi?



Page 66

1    CROSS-EXAMINATION OF MS. SETTIMI
2      A. Yes.
3      Q. Italnord did not meet the
4   minimum purchase requirement in 2014,
5   right?
6         MR. BROWN:  Objection.
7         THE ARBITRATOR:  What's the
8   objection?
9         MR. BROWN:  She gave the
10  numbers and they did.
11        THE ARBITRATOR:  Well, then
12  she'll say they did.  Overruled.
13     A. They absolutely did.
14     Q. Well, if I understand correctly,
15  you said there was a purchase in 2013
16  of 736 and you said for two seasons in
17  2014.  If I heard you correctly, you
18  said that there was 673; did I
19  misunderstand that?
20     A. Those are the two seasons I gave
21  you.
22     Q. Oh, you were -- I thought you
23  were testifying that there was three
24  seasons of 736 and then two seasons for
25  673?

Page 67

1    CROSS-EXAMINATION OF MS. SETTIMI
2      A. No.  Those are two season.
3      Q. I believe Mr. Farber may have
4   asked you something related, but what
5   was Forall's gross profit margins for
6   -- for the United States of America
7   2016?
8      A. I don't recall.
9      Q. Would Ms. Gioffre in your office
10  have that information?
11     A. Yes.
12     Q. Is your answer going to be the
13  same for 2015 from 2011?
14     A. Yeah.
15     Q. If I ask you about just the
16  store, the Las Vegas store's gross
17  profit margins, do you have that
18  information?
19     A. No.
20     Q. Again, would that be
21  something -- would Ms. Gioffre have
22  that information?
23     A. Probably.
24     Q. And the same -- your answer
25  would be the same for the other years

Page 68

1    CROSS-EXAMINATION OF MS. SETTIMI
2   2015, 2011?
3      A. Yes.
4      Q. Mr. Farber asked you if Forall
5   was a profitable company from 2012 to
6   2014, your answer was no, correct?
7      A. That's correct.
8      Q. Is your answer the same for
9   2015?
10     A. Correct.
11     Q. What about 2016?
12     A. Correct.
13     Q. What about 2017?
14     A. Correct.
15     Q. What about 2018?
16     A. Correct.
17     Q. What about 2019?
18     A. Correct.
19     Q. 2020, so far?
20     A. I can't tell you.
21     Q. How are we doing so far?
22        MR. BROWN:  Objection.
23        THE ARBITRATOR:  Overruled.
24  She may know.
25     A. I don't think anyone is doing

Page 69

1    CROSS-EXAMINATION OF MS. SETTIMI
2   very well with COVID.
3      Q. I think that's fair to say.
4   COVID is having an impact on all
5   businesses, right?
6      A. Thank you.
7         THE ARBITRATOR:  Let's move
8   on.
9      Q. Ms. Settimi, do you have audited
10  financial statements for Forall?
11     A. I have to say I don't know.
12     Q. Well, are you the head of the
13  company?
14        MR. BROWN:  Objection.
15  Mr. Farber --
16        THE ARBITRATOR:  She said
17  she's Assistant Treasurer and
18  Secretary.
19        MR. LEWIS:  I mean of the
20  account firm that she runs.  The
21  back office company she --
22        THE ARBITRATOR:  Let's let
23  him state the question, and then
24  we'll see if there's an
25  objection.



Page 70

1    CROSS-EXAMINATION OF MS. SETTIMI
2        Q. Ms. Settimi, the back office
3    company that you run, you're -- you're
4    the head of that company, correct?
5            MR. BROWN:  Objection.
6    Relevance.
7            THE ARBITRATOR:  Overruled.
8        You can answer.  You
9    have the question, Ms. Settimi?
10           THE WITNESS:  I'm sorry.  I
11   went out.
12           THE ARBITRATOR:  The
13   question is:  You do your work
14   through an independent company,
15   Ms. Settimi, is that right?
16           THE WITNESS:  Yes.
17           THE ARBITRATOR:  Because you
18   said you represented other
19   companies as well.
20           THE WITNESS:  Yes.
21           THE ARBITRATOR:  So counsel
22   is asking if you are the
23   controlling principal of your own
24   company?
25           THE WITNESS:  Yes.

Page 71

1    CROSS-EXAMINATION OF MS. SETTIMI
2            THE ARBITRATOR:  Okay.
3    Mr. Lewis, go ahead.
4        Q. So I'll ask you again, do you
5    -- does your company have audited
6    financial statements for Forall?
7            MR. BROWN:  Objection.
8    Relevance.
9        A. I don't --
10           THE ARBITRATOR:  Overruled.
11       A. I don't -- I don't know if they
12   are reviewed or audited statements.
13   There's different degrees of audits.
14   So I'm not -- I have a lot of clients.
15   I don't really remember, so I don't
16   want to say anything incorrect.
17           THE ARBITRATOR:  So leave
18   off the word audit, and do they
19   have an annual, maybe quarterly,
20   then annual financial statements?
21           THE WITNESS:  Yes.
22           THE ARBITRATOR:  And do you
23   know offhand if those financial
24   statements are the result of a
25   review?

Page 72

1    CROSS-EXAMINATION OF MS. SETTIMI
2            THE WITNESS:  They're
3    reviewed.
4            THE ARBITRATOR:  Okay.  All
5    right.
6        Q. Do you have those available?
7            MR. BROWN:  Objection.
8    Where are we going, Mr. Farber?
9            THE ARBITRATOR:  Overruled.
10       You can answer.  Do you
11   have those available?
12           THE WITNESS:  Yes.
13       Q. Would those -- do those reviewed
14   financial statements show gross margin
15   percentage?
16       A. I -- well, I'm sure you could
17   calculate it from there, but I don't
18   know.
19       Q. Do you have them available?  I'm
20   going to ask you to answer that for us,
21   if necessary, we can certainly wait for
22   you to review them.  Do they have gross
23   margin percentage?  Could you share
24   that with us?
25           MR. BROWN:  Objection.  This

Page 73

1    CROSS-EXAMINATION OF MS. SETTIMI
2    is not a discovery proceeding,
3    Mr. Farber.  This is a hearing.
4            THE ARBITRATOR:  Sustained.
5    Next question.
6        Q. The question is --
7            MR. LEWIS:  Well, Mr.
8    Farber, if I may be heard, Ms.
9    Settimi said she could not speak
10   to gross margin percentage, but
11   then she said there's a document
12   that would refresh her
13   recollection because it would
14   show gross margin percentage and
15   it's available to her.
16           MR. BROWN:  My witness is
17   not going into her office and
18   doing discovery.
19           THE ARBITRATOR:  But
20   Counselor, you're asking her -- I
21   don't know if she's sitting in
22   her office.  You're asking her to
23   go find documents right now and
24   look through her own documents
25   and this is something that could



1    CROSS-EXAMINATION OF MS. SETTIMI
2  have been done beforehand.
3       MR. LEWIS:  Mr. Farber, may
4  we ask for those to be produced?
5       THE ARBITRATOR:  I'll
6  consider that later on.  I'm not
7  going to say yes or no on that
8  point because I have read the
9  expert reports and that is
10  something that concerns me as
11  well, which is why I started
12  asking what I asked.  So I'm
13  going to hold on that one and
14  I'll hear argument on that one
15  later on.
16       Okay.  Anything else that
17  you have, Mr. Lewis?
18       MR. LEWIS:  Yes, Mr. Farber.
19  Thank you.
20  Q. Ms. Settimi, are you familiar
21  with Forall's cost structure?
22  A. No.
23  Q. Is Michelle Gioffre someone that
24  maybe is familiar with that?
25  A. Possibly.

1    CROSS-EXAMINATION OF MS. SETTIMI
2  Q. For marketing, Ms. Settimi, did
3  -- did Forall decide what percentage of
4  its sales it would devote to marking in
5  a certain jurisdiction -- let me ask
6  that differently.
7       You will recall that there's a
8  three percent allocation for marketing
9  and advertising in the license
10  agreement with Sarah, correct?
11  A. Yes.
12  Q. Okay.  And did that -- how was
13  that determined?
14  A. I don't know.
15  Q. You're not familiar with it?
16  Was that your answer?
17  A. I don't know how they determined
18  it.  I know what's in the agreement,
19  but I don't know how they came to that
20  percent.
21  Q. Do you know if that's a
22  percentage of sales or if it's -- if
23  it's a calculus that comes up with the
24  three percent?
25  A. It was a percent of sales in

1    CROSS-EXAMINATION OF MS. SETTIMI
2  that agreement.
3  Q. Okay.  So with three percent,
4  just doing the math backwards, and it
5  was $27,000 a year, that was the cap
6  27,000, correct?
7  A. Yes.
8  Q. And if that was three percent of
9  sales, then overall sales would have
10  been approximately 700 million range?
11       MR. BROWN:  Objection.  The
12  license agreement provision -- I
13  -- I'm just a little surprised by
14  the question, to be honest with
15  you.
16       MR. LEWIS:  I'll withdraw
17  it.
18  Q. Ms. Settimi, let's talk about
19  the wind down of the store in August of
20  2016.  Are you aware which date the
21  store actually closed?
22  A. No.  Not the actual date.
23       THE ARBITRATOR:  Ms.
24  Settimi, if you're looking at
25  some notes, please put them away.

1    CROSS-EXAMINATION OF MS. SETTIMI
2  All right?  Because we just want
3  your best memory.  We don't want
4  you reading any notes.
5  A. I know it closed in August.
6  Q. Did you hear Mr. Torello-Viera's
7  testimony that there was approximately
8  $700,000 worth of inventory in the
9  store when it closed?
10  A. I heard.
11  Q. Do you have an appreciation
12  whether that number is accurate?
13  A. I don't recall.
14  Q. Do you know whether that number,
15  accurate or not, do you know whether
16  Mr. Torello-Viera would have been
17  talking about gross number or -- or
18  would that have included markup?
19  A. I don't know.
20  Q. Do you have any evidence of any
21  opportunities that were lost as a
22  result of the store closing in August
23  of 2016?
24       Did you hear us Ms. Settimi?
25  A. No.



Page 78

1    CROSS-EXAMINATION OF MS. SETTIMI
2        MR. BROWN:  What was the
3    question?  I'm sorry.
4        Q. The question was whether you
5    have any evidence of any opportunities
6    that were lost as a result of the store
7    closing in August of 2016?
8        A. I mean, it's obvious, isn't it?
9    I mean, I'm not quite sure.
10       THE ARBITRATOR:  He's not
11   asking you about what might be
12   obvious.  He's asking if you know
13   of any particular opportunities
14   that were lost by Forall as a
15   result of the store closing in
16   August '15?
17       THE WITNESS:  I have -- I --
18   I have to say I don't know.
19       THE ARBITRATOR:  Okay.
20       Q. Are you aware that Forall had
21   informed Sarah that it was no longer
22   going to operate the store as of
23   September 1, 2016; you're aware of
24   that, right?
25       A. Say that again.

Page 79

1    CROSS-EXAMINATION OF MS. SETTIMI
2        Q. You're aware that Forall had
3    informed Sarah that Forall would no
4    longer operate the store after the term
5    expired in September -- September 1,
6    2016, right?
7        A. Yes.
8        Q. Forall had made that decision
9    that it wouldn't operate the store
10   going forward after that date, right?
11       MR. BROWN:  Objection.  What
12   date?
13       THE ARBITRATOR:  What's the
14   objection, Counselor?
15       MR. BROWN:  He said
16   June 1st, I think.
17       MR. LEWIS:  I did not.
18       THE ARBITRATOR:  No.  He
19   said September 1st.
20       MR. BROWN:  Okay.  Then I
21   withdraw my objection.
22       THE ARBITRATOR:  Go ahead.
23       Q. Do you remember the question,
24   Ms. Settimi?
25       A. No.

Page 80

1    CROSS-EXAMINATION OF MS. SETTIMI
2        Q. I said Forall had already made a
3    decision that they wouldn't continue to
4    operate the store after September 1,
5    2016, right?
6        If this is helpful,      Ms.
7    Settimi, you just testified if they had
8    informed Sarah of that.  I'm asking now
9    if they had made that decision that
10   they would not continue to operate the
11   store after September 1, 2016, right?
12       THE ARBITRATOR:  Can you
13   hear us, Ms. Settimi?
14       THE WITNESS:  Yes.
15       THE ARBITRATOR:  Is the
16   answer "yes," they had made that
17   decision?
18       THE WITNESS:  Yes.
19       THE ARBITRATOR:  Okay.  Go
20   ahead.
21       Q. So the store ended up closing
22   one month before Sarah was set to --
23   Forall was set to cease operation of
24   the store, right?
25       THE ARBITRATOR:  Counsel,

Page 81

1    CROSS-EXAMINATION OF MS. SETTIMI
2    can I ask the same thing?  I kind
3    of pushed Mr. Brown to truncate.
4    I mean, I know this from other
5    witnesses.  We could have a whole
6    argument.  Did they really decide
7    or did they want another 60 days.
8        I know all this testimony.
9    This is a financial person.  I'm
10   just not sure what we are
11   accomplishing with this witness
12   with this area that I don't
13   already know.
14       THE WITNESS:  Mr. Farber,
15   can I say something to you?
16       THE ARBITRATOR:  No.  Just
17   Mr. Lewis.
18       THE WITNESS:  Okay.
19       MR. LEWIS:  It really speaks
20   to -- Mr. Farber, I'm not going
21   to yell into the wind.  I
22   actually like that term and I'm
23   going to use it.  But does really
24   speaks to the degree of how much
25   they were impacted by a month,



Page 82

CROSS-EXAMINATION OF MS. SETTIMI
1    CROSS-EXAMINATION OF MS. SETTIMI
2    but, you know, what it's not
3    worth pursuing.  I've got another
4    line of questioning.
5         THE ARBITRATOR:  Let's move
6    on.
7    Q. Ms. Settimi, what efforts did
8    Forall do to find a new operator for
9    the Las Vegas store after August of
10   2016?
11   A. I don't know.  It wasn't my
12   responsibly.
13   Q. Whose responsibly would that
14   have been?  Ms. Settimi, whose
15   responsibility would that have been?
16   A. Headquarters, marketing.  Not a
17   back office.
18   Q. But are you aware whether Forall
19   made any efforts to find a new operator
20   for Las Vegas after August of 2016?
21   A. I don't know.
22   Q. Do you know whether Forall made
23   any efforts to pursue another location
24   in Las Vegas after August 2015?
25   A. I don't know.

Page 83

1    CROSS-EXAMINATION OF MS. SETTIMI
2    Q. Do you know whether Forall made
3    any efforts to pursue another location
4    in Chicago or New York after August of
5    2016?
6    A. Not to my knowledge.
7    Q. And you testified that Chicago
8    and New York were cities that the
9    doctors had been approved to open
10   stores back in the license agreement,
11   correct?
12   A. Yes.
13   Q. Do you know -- are you aware
14   that the doctors were pursuing or
15   inquiring about a Beverly Hills
16   location?  Are you aware of that?
17        MR. BROWN:  Objection.  She
18   sat through that testimony.
19   Maybe you can clarify.
20        THE ARBITRATOR:  Do you know
21   about it from other than the
22   testimony you heard?
23        THE WITNESS:  No.
24   Q. But are you aware of whether
25   Forall made any efforts to pursue a

Page 84

1    CROSS-EXAMINATION OF MS. SETTIMI
2    location in Beverly Hills after August
3    of 2016?
4    A. No, I'm not.
5    Q. Now, you said that it wouldn't
6    have been your responsibility as a back
7    office accounting person to make
8    decisions about where to open new
9    stores; you testified a few minutes ago
10   to that, correct?
11   A. Yes.
12   Q. But earlier in your testimony
13   you said that it would have taken some
14   time.  I believe Mr. Brown was -- was
15   offering you four to five years before
16   you would have opened a new store in
17   Las Vegas; do you remember testifying
18   as such?
19   A. Mr. Lewis, I have many different
20   responsibilities for all of my clients.
21   I do different things for different
22   people.  I'm speaking specific to
23   Forall.
24   Q. I completely understand.  I can
25   appreciate that.

Page 85

1    CROSS-EXAMINATION OF MS. SETTIMI
2    A. I'm only -- I'm trying to answer
3    as precisely as possible.
4    Q. You're doing a really good job.
5    Trust me, I'm just trying to ask these
6    last few questions to make sure I cover
7    all the bases.  Okay?
8    A. Okay.
9    Q. So you testified it would have
10   taken a few years before you were able
11   to reopen in Las Vegas; do you remember
12   testifying as such?
13   A. Yes.
14   Q. Now, what are you basing that
15   on, Ms. Settimi, if you're saying this
16   wasn't part of your responsibilities
17   whether and where to pursue
18   additional --
19   A. First of all, I know how long it
20   takes to just get all the furniture,
21   and fixtures, all the plans, all the
22   permits, all the set up.  I mean, it's
23   not going to be over night.  That's --
24   I know what it takes to set up a store.
25   Q. Okay.  Do you know whether



Page 86

```
1        CROSS-EXAMINATION OF MS. SETTIMI
2   Forall undertook any of those efforts
3   after August of 2016?
4        A. I do not.
5        Q. Ms. Settimi, is it your opinion
6   that it may have taken a while, but
7   would Forall have been able to open
8   another store in Las Vegas --
9   withdrawn.
10       Were you aware that Forall was
11  requiring a brokerage fee to bring in
12  an operator to operate the store in
13  2014?
14       A. No.
15       MR. BROWN:  Objection.
16       THE ARBITRATOR:  She
17  answered already.  She said,
18  "No."
19       MR. LEWIS:  Mr. Farber, may
20  I just have five minutes?  I may
21  not have anything further.
22       THE ARBITRATOR:  Mr. Brown,
23  are you going to have anything
24  further or do you want the same
25  five minutes?
```

Page 87

```
1            PROCEEDINGS
2        MR. BROWN:  We'll take the
3   five.  Well, remember you had the
4   witnesses take notes, so I want
5   to reserve the opportunity for
6   Ms. Settimi to talk to me.
7        THE ARBITRATOR:  Mr. Lewis,
8   do you have a problem to save
9   time with our speaking now to
10  Mr. Brown about any notes that
11  you took.
12       Did you take any notes?
13       THE WITNESS:  No.
14       THE ARBITRATOR:  She has no
15  notes.
16       MR. BROWN:  I won't talk to
17  her, but I do intend to ask one
18  or two follow-up questions.
19       THE ARBITRATOR:  Okay.  I
20  think we are ready for our mid
21  morning break.  I've got 11:10,
22  so let's come back at 11:25.
23  Let's finish this witness, and
24  we'll go to Ms. Gioffre.  Thank
25  you.
```

Page 88

```
1            PROCEEDINGS
2        (Whereupon, a recess was
3   taken at this time.)
4        THE ARBITRATOR:  Mr. Lewis,
5   anything further?
6        MR. LEWIS:  Nothing further.
7        THE ARBITRATOR:  Anything
8   further, Mr. Brown?
9        MR. BROWN:  No, sir.
10       THE ARBITRATOR:  Thank you
11  very much for your testimony.  We
12  appreciate it.  You're excused as
13  a witness.
14       Who is our next witness?
15       MR. BROWN:  Crowe is going
16  to handle this one.
17       MR. CROWE:  Mr. Farber, we
18  are going to call Michelle
19  Gioffre.
20       THE WITNESS:  Good morning.
21       THE ARBITRATOR:  Hi,
22  Ms. Gioffre.  Good morning.  Can
23  you please stand, but I still
24  want to be able to see your face?
25       THE WITNESS:  Okay.
```

Page 89

```
1            PROCEEDINGS
2        THE ARBITRATOR:  Great.
3   Okay.  And let's wait for -- we
4   want you to be alone in the room,
5   all right?
6        Ms. Gioffre, would you
7   raise your right hand, please.
8   Do you solemnly swear the
9   testimony you're about to give in
10  this arbitration proceeding will
11  be the truth, the whole truth,
12  and nothing but the truth?
13       THE WITNESS:  Yes.
14       THE ARBITRATOR:  Could you
15  be seated and spell your full
16  name for me, and can you please
17  give me an address, which can be
18  either home or work, your choice.
19       THE WITNESS:  My name is
20  Michelle Gioffre.  One second.
21  Excuse me.
22       THE ARBITRATOR:  How do you
23  spell "Gioffre"?
24       THE WITNESS:  G-I-O-F-F-R-E.
25       THE ARBITRATOR:  And what's
```



Page 90

1    PROCEEDINGS
2    an address, please?
3        THE WITNESS:  7 Suttin
4    Place, Bridge Burgh, New York
5    10509.
6        THE ARBITRATOR:  Miss
7    Gioffre, Mr. Crowe, the gentleman
8    in the blue shirt, is going to be
9    asking you some questions.  What
10   I'd like you to do is listen to
11   each question, pause and then
12   Mr. Lewis, who is wearing a white
13   shirt, is -- if he says the word
14   "objection," do not answer the
15   question until I tell you whether
16   or not you should do so.
17       Please be sure to pause
18   after each question that
19   Mr. Crowe enunciates so that
20   Mr. Lewis has the ability to say
21   the word "objection," all right?
22   Don't jump in right away with an
23   answer, okay.
24       Mr. Crowe, why don't you
25   proceed.

Page 91

1    DIRECT-EXAMINATION OF MS. SETTIMI
2        MR. CROWE:  Thank you.  I'm
3    going to be brief with this
4    witness.
5    M I C H E L L E   G I O F F R E, the
6    witness herein, having been first duly
7    sworn by the arbitrator, was examined
8    and testified as follows:
9    DIRECT-EXAMINATION
10   BY MR. CROWE:
11       Q. Ms. Gioffre, can you tell me by
12   whom are you employed?
13       A. I'm employed by Palma Settimi.
14       Q. And what are your job duties and
15   responsibilities?
16       A. I'm the inhouse CPA for the
17   company.  I review the work of the
18   staff and the accountants here.  I
19   assist in preparing their financial
20   statements for the clients that we work
21   for.  I kind of do it all.
22       Q. Okay.  That's good.  What type
23   of clientele do you -- do you work for?
24       A. They're all in the fashion
25   industry.

Page 92

1    DIRECT-EXAMINATION OF MS. SETTIMI
2        Q. Okay.  And how long have you
3    been doing this work?
4        A. I've been with Palma 20 years.
5        Q. And in the course of doing this
6    accounting work for clientele in the
7    Italian fashion industry, do you have
8    some understanding as to the financials
9    of these particular companies?
10       A. Yes.
11       Q. Okay.  So in connection with
12   that, do you understand the -- the term
13   margin or cost as its generally defined
14   in that industry?
15       A. Yes.
16       Q. And can you tell me what has
17   been your experience in terms of what
18   margin or cost is, generally, seen in
19   terms of wholesale, Italian menswear
20   companies?
21       MR. LEWIS:  Objection.
22   Vague question, Mr. Farber.
23       THE ARBITRATOR:  Overruled.
24   You can answer.
25       A. So in my experience, it usually

Page 93

1    DIRECT-EXAMINATION OF MS. SETTIMI
2    ranges that the cost of the product
3    would be between 35 and 40 percent.
4        Q. And then on top of the product,
5    that's the actual manufacturing cost,
6    it's a certain duty and freight that
7    might be added to that; is that
8    correct?
9        A. Yes, that is correct.  There's
10   duty and freight, and that makes up
11   your incoming cost.
12       THE ARBITRATOR:  Why don't
13   we get this in more detail?  If
14   one of your clients like Forall
15   sells a garment for $1,000 in the
16   accounting for that $1,000, how
17   much would be for cost of
18   production, how much would be for
19   other items?
20       THE WITNESS:  Okay.  So the
21   cost on 1,000 --
22       THE ARBITRATOR:  We lost
23   you.  You froze.
24       Q. Are you there, Ms. Gioffre?
25       THE ARBITRATOR:  Ms.



| Page 94 |
|---|

1      DIRECT-EXAMINATION OF MS. SETTIMI
2  Gioffre.
3          THE WITNESS: I'm here.
4          THE ARBITRATOR: Were you
5  able to hear my question?
6          THE WITNESS: I was.
7          THE ARBITRATOR: I wasn't
8  able to hear your answer, so
9  please repeat what you said.
10         THE WITNESS: The cost on
11 the product would range between
12 350 and $400.
13         THE ARBITRATOR: The cost to
14 produce the garment would be
15 between 350 and $400, all right,
16 except that Forall, the
17 hypothetical manufacturer here,
18 would also have other expenses,
19 right?
20         THE WITNESS: Correct. They
21 have incoming costs that would go
22 with that.
23         THE ARBITRATOR: And what
24 would be the usual profit margin?
25         THE WITNESS: It would

| Page 95 |
|---|

1      DIRECT-EXAMINATION OF MS. SETTIMI
2  probably be roughly 45 to
3  50 percent is usually the profit.
4          THE ARBITRATOR: That would
5  be gross profit?
6          THE WITNESS: Yes.
7          THE ARBITRATOR: So the
8  other 15 or 20 percent would be
9  for soft costs?
10         THE WITNESS: It should be.
11         MR. CROWE: Mr. Farber, I
12 wasn't following your question.
13         THE ARBITRATOR: I asked if
14 the other 15 or 20 percent would
15 be for soft cost.
16         MR. CROWE: Okay.
17         THE WITNESS: I believe so.
18 I'd have to look in detail at the
19 financial statements. I don't
20 remember offhand exactly what
21 they were.
22         THE ARBITRATOR: Okay. All
23 right, go ahead, sir, Mr. Crowe.
24 Q. Mr. Farber was asking about the
25 soft cost. Are we talking about the

| Page 96 |
|---|

1      DIRECT-EXAMINATION OF MS. SETTIMI
2  freight and duty in that circumstance
3  to get you up to 40, 45 to 50 or 55,
4  60; is that what you're talking about?
5  Do you understand?
6  A. I'm sorry. I didn't understand
7  the question.
8          THE ARBITRATOR: When I
9  asked about soft cost, what do
10 you understand I was referring
11 to?
12         THE WITNESS: I think it
13 would be the incoming cost.
14         THE ARBITRATOR: Like what?
15         MR. LEWIS: We ask the
16 witness to answer your question,
17 and not --
18         THE ARBITRATOR: I'm waiting
19 for her to answer. Like what?
20         THE WITNESS: Soft cost I
21 was presuming to be more like the
22 incoming cost, the freight, and
23 duty and transportation fees.
24         MR. CROWE: That's all I
25 have. Thank you.

| Page 97 |
|---|

1      DIRECT-EXAMINATION OF MS. SETTIMI
2          THE ARBITRATOR: Okay.
3  Mr. Lewis, do you have any
4  questions?
5          MR. LEWIS: Yes. Thank you,
6  Mr. Farber.
7          THE ARBITRATOR: Just hold
8  one second. So the numbers that
9  you're roughly giving me, were
10 these numbers, as far as you
11 know, numbers which -- before I
12 was using Forall as an example,
13 but now I want to ask you say for
14 the years '13, '14, were these
15 the actual numbers for Forall?
16         THE WITNESS: I -- I don't
17 recall off the top of my head.
18 I'd have to go back and look.
19 It's pretty standard. The
20 company has been pretty standard
21 over the time that I've worked
22 for them. They haven't deviated
23 much from their margins.
24         THE ARBITRATOR: You're
25 talking about the company being



1    DIRECT-EXAMINATION OF MS. SETTIMI
2    Forall, right?
3         THE WITNESS:  Forall,
4    correct.
5         THE ARBITRATOR:  And when
6    you say "it's pretty standard,"
7    you're talking about all the way
8    going back to how far?
9         THE WITNESS:  From what I
10   recall, from what I remember, I
11   -- there's no particular year
12   that would stand out as very
13   different for me.
14        THE ARBITRATOR:  No.  No.
15   What I'm asking is:  How long
16   have you done work for the Forall
17   account?
18        THE WITNESS:  Probably about
19   five, six years, seven years.
20        THE ARBITRATOR:  Okay.
21   Thank you, Ms. Gioffre.
22        All right, Mr. Lewis.
23        MR. LEWIS:  Thank you,
24   Mr. Farber.
25              * * *

1    CROSS-EXAMINATION OF MS. GIOFFRE
2    CROSS EXAMINATION BY
3    MR. LEWIS:
4         Q. Hello, Ms. Gioffre.  I'm going
5    to ask you about your role.  Were you
6    working with miss Settimi's firm in
7    2012?
8         A. I was.
9         Q. Okay.  And are you familiar with
10   the purchases that Forall -- excuse me
11   -- that Sarah made from Forall in 2012
12   or 2013?
13        A. Not specifically those
14   purchases.  I -- I work more on a
15   global standard.  I review the
16   financial statements.  I don't -- I
17   wouldn't review Sarah specifically.
18        Q. Okay.  Were you familiar with
19   the sales that the Las Vegas store was
20   doing, let's say from the time it was
21   open in 2011, are you familiar with
22   those figures?
23        A. I have to go back and look at
24   them per year, yes.  I don't remember
25   them off the top of my head.

1    CROSS-EXAMINATION OF MS. GIOFFRE
2         Q. Sure.  Do you have those
3    available?
4         MR. CROWE:  Objection,
5    Mr. Farber.  Again, it sounds
6    like my colleague is looking to
7    initiate a discovery proceeding
8    in the middle of the hearing, and
9    hopefully it will be the last day
10   of the hearing.
11        THE ARBITRATOR:  She can
12   answer if it's available, then
13   we'll see if it's a request, then
14   we'll figure out what we want to
15   do with it, if anything.
16        Are such figures available?
17        THE WITNESS:  I would have
18   to go back and look.  I believe
19   it would be available.  I have to
20   go check.  I don't know off the
21   top of my head.
22        MR. LEWIS:  All right.
23   Mr. Farber, Ms. Settimi, and not
24   to misquote her testimony at all,
25   but my takeaway was Ms. Gioffre

1    CROSS-EXAMINATION OF MS. GIOFFRE
2    was the one closer to the sales
3    figure and this is who we should
4    direct these questions to.
5         THE ARBITRATOR:  Her precise
6    answer was "possibly," when you
7    asked her if she had the
8    information.  She didn't know for
9    sure.  The testimony is what it
10   is.
11        Next question, Mr. Lewis.
12        Q. Ms. Gioffre, are sales figures
13   from the Las Vegas available to you?
14        MR. CROWE:  Objection,
15   available, again he's depending
16   on -- in the next hour, the next
17   30 days?
18        THE ARBITRATOR:  Hold on.
19   First of all, you're talking
20   about for the entire time of the
21   existence of the Las Vegas store,
22   Mr. Lewis?
23        MR. LEWIS:  Five years.
24        THE ARBITRATOR:  You're
25   talking about for the whole five



Page 102

```
1        CROSS-EXAMINATION OF MS. GIOFFRE
2    years?
3           MR. LEWIS:  Yes.
4           THE ARBITRATOR:  You can
5    answer if they're available.
6    Were they available to you?
7           THE WITNESS:  I don't
8    believe.  I'd have to check that
9    they're available for the full
10   five years, only the years that
11   we were, actually were in charge
12   of the store.
13   Q. So for 2015 and 2016, those
14   sales figures, are available to you?
15   A. I believe they are.
16   Q. Would that be difficult for you
17   to retrieve?
18          MR. CROWE:  Objection.
19   That's irrelative to term.
20   Difficult in the context of a
21   hearing.
22          THE ARBITRATOR:  Counselor,
23   it really doesn't matter.  The
24   overall point is, why wasn't this
25   done in discovery?  I mean, I
```

Page 103

```
1        CROSS-EXAMINATION OF MS. GIOFFRE
2    don't understand.  You know, if
3    you were interested in getting
4    these figures, you could have
5    either requested them directly
6    from Forall or if Forall said no,
7    then, you know, there could have
8    been a subpoena that was served.
9    I mean, I don't know where we're
10   going with this.
11          MR. LEWIS:  Well, Mr.
12   Farber, I'll be happy to explain
13   the answer to those questions.
14   We had discovery requests that
15   should have these listed, these
16   sales figures.  They were not
17   forthcoming from Forall, and then
18   we were able to receive them from
19   Simon, and we are making every
20   effort to get these as part of
21   the record.
22          And, again, in talking to
23   Ms. Settimi, my take away was
24   that Ms. Gioffre was the correct
25   witness to pose these questions
```

Page 104

```
1        CROSS-EXAMINATION OF MS. GIOFFRE
2    to.
3           THE ARBITRATOR:  She might
4    have been, but, you know, it's
5    not -- we are here today at the
6    trial of this matter, and you
7    know, if you and your client was
8    not able to get these figures
9    and, of course, your client
10   presumably had the figures for
11   the time period that it ran the
12   store, then there certainly was
13   an adequate opportunity to get
14   it.
15          But in any event, the
16   question that's pending is:  Is
17   it difficult for you to get?  You
18   can answer the question if it's
19   difficult to get.
20          THE WITNESS:  I'm -- I
21   believe I would be able to find
22   them with some time.
23          THE ARBITRATOR:  Okay.
24   Q. How much time would you need,
25   Ms. Gioffre?
```

Page 105

```
1        CROSS-EXAMINATION OF MS. GIOFFRE
2    A. I don't know.  A day, two days,
3    a week.  I have to actually go see what
4    we have.  I only ask -- I don't know if
5    they're on my server or if they're in
6    boxes on the warehouse stored away.
7    Q. Were you -- did you help provide
8    sales figures for Mr. Torello-Viera to
9    review for his testimony?
10   A. I did not.
11   Q. Do you know who did?
12   A. I don't.
13   Q. Did you provide any documents to
14   Mr. Brown or Mr. Crowe in preparation
15   for this arbitration?
16          MR. CROWE:  We would object
17   to, obviously, any kind of
18   testimony that involves
19   attorney-client conversation.
20          THE ARBITRATOR:  Fair
21   enough.
22          So, Ms. Gioffre, you can
23   answer.  Did you provide "yes,"
24   "no," you don't remember, but
25   don't tell us anything about the
```

MAGNA
LEGAL SERVICES

1    CROSS-EXAMINATION OF MS. GIOFFRE
2    nature of the documents.
3         THE WITNESS:  Yes.
4         THE ARBITRATOR:  Okay.
5    Q. Do you have an appreciation what
6    the sales were for the store while
7    Italnord operated?
8    A. No.
9    Q. Do you know whether there was an
10   agreement between Forall and Italnord
11   as it relates to the Las Vegas store?
12        MR. CROWE:  Can you repeat
13        that question?
14        THE ARBITRATOR:  Do you know
15        if there was an agreement between
16        Forall and Italnord regarding the
17        Las Vegas store?
18        MR. CROWE:  I'm sorry,
19        Mr. Farber, just note for the
20        record, I see the next witness
21        has joined us in the -- in the
22        proceeding here.
23        THE ARBITRATOR:  I do.
24   Mr. Flaherty, welcome.
25   A. I vaguely recall there was an

1    CROSS-EXAMINATION OF MS. GIOFFRE
2    operating agreement of sorts.
3         Q. You testified in your testimony
4    that there was an agreement between
5    Forall and Italnord?
6         THE ARBITRATOR:  No.  The
7         testimony was she vaguely
8         recalls.  Go ahead.
9         MR. LEWIS:  Is that go ahead
10        to my question, Mr. Farber, or
11        are you asking me to restate the
12        question?
13        THE ARBITRATOR:  Go right
14        ahead and ask your next question.
15   Q. Do you know if that agreement
16   was produced in the course of discovery
17   in this litigation?
18   A. I don't know.
19   Q. Are you familiar with the
20   contents of that agreement between
21   Forall and Italnord as it relates to
22   the Las Vegas store?
23   A. I don't.  No specific, no.
24   Q. Have you seen that agreement
25   yourself?

1    CROSS-EXAMINATION OF MS. GIOFFRE
2    A. As I said, I vaguely recall
3    there being one.  I would have to go
4    back and look for it.  I don't recall
5    off the top of my head.  I'm sorry.
6    Q. I appreciate it, but that vague
7    recollection, is that based on your
8    personal knowledge?  Did you see the
9    agreement?
10        MR. CROWE:  Objection.  I
11        think the witness has answered
12        the question.
13        THE ARBITRATOR:  No.  If the
14        witness says, "I have a vague
15        recollection," certainly, on
16        cross counsel is entitled to
17        probe and try to refresh her
18        memory with questions.  So
19        overruled.
20        You can answer.
21   A. Can you ask the question one
22   more time?  I'm sorry.
23        MR. LEWIS:  Ms. Artiles, can
24        you read it back?
25        (Whereupon, a portion of the

1    CROSS-EXAMINATION OF MS. GIOFFRE
2    record was read back.)
3         THE ARBITRATOR:  You can
4    answer.
5    A. I don't think -- no.  I don't
6    recall.  I really don't.  I don't
7    recall.
8    Q. Ms. Gioffre, what was Forall's
9    gross profit margins for the Las Vegas
10   store in 2016?
11   A. I don't recall off the top of my
12   head.  I'd have to go back and look.
13   Forall, Nevada?
14   Q. That's correct.
15   A. I don't know.  I don't recall.
16   Q. Did you prepare the financial
17   statements for Forall?
18   A. Yes.
19   Q. Did you review any documents for
20   your testimony?
21   A. Very little today.  I --
22   Q. I'm not talking specifically
23   about today.  Did you review documents
24   in preparation for your testimony?
25   A. I reviewed -- yes.



| Page 110 |
|---|

1        CROSS-EXAMINATION OF MS. GIOFFRE
2     Q. What documents were those?
3        MR. LEWIS:  If Mr. Brown
4   doesn't have an objection, I'd
5   ask --
6        THE ARBITRATOR:  I'm sorry.
7        MR. BROWN:  You know what, I
8   do have an objection.  My
9   objection, Mr. Farber, is I just
10  looked at the claimant's document
11  demands in this case and nowhere
12  in them do they request sales
13  reports between Forall and Simon.
14  They never asked for this stuff.
15       THE ARBITRATOR:  Mr. Brown,
16  I think we are beyond that.  The
17  question right now is:  Did she
18  review documents in preparation
19  for her testimony, not
20  necessarily today.  Do you have
21  any objection to that question?
22       MR. BROWN:  I have an
23  objection in how this is being
24  conducted, in that he's trying to
25  get to documents that he should

| Page 111 |
|---|

1        CROSS-EXAMINATION OF MS. GIOFFRE
2   have had already brought a motion
3   to compel or actually asked for.
4        THE ARBITRATOR:  Mr. Brown,
5   we're not there yet.  Let's go.
6   Mr. Lewis can run the exam how he
7   chose the same way you do and
8   Mr. Crowe does.  So the question
9   is:  Do you have an objection to
10  what's pending right now?
11       MR. BROWN:  If the objection
12  does stand that if she was shown
13  documents by counsel, she should
14  not be being asked about that,
15  but if she reviewed documents, I
16  guess --
17       MR. LEWIS:  That's
18  absolutely incorrect.  And, Mr.
19  Farber, let me also note that Mr.
20  Crowe --
21       THE ARBITRATOR:  Mr. Lewis,
22  when you win, you don't have to
23  argue further as you well know.
24       So you can answer the
25  question, Ms. Gioffre.

| Page 112 |
|---|

1        CROSS-EXAMINATION OF MS. GIOFFRE
2     A. I -- I reviewed some of the
3   Sarah accounts receivable papers, and I
4   looked at some of the Forall financial
5   statements for the years in question.
6     Q. What years were those?
7     A. I looked at 2015 and '16
8   briefly.
9        MR. LEWIS:  But before I go
10  on, Mr. Farber, just to make sure
11  that we are handling this
12  efficiently, I believe Mr. Crowe
13  presented this witness, so I'm
14  getting objection from both of
15  the attorneys, and I know --
16       THE ARBITRATOR:  Correct.
17  That's a fair point.  We are not
18  going to tag team.  We wouldn't
19  mind hearing from Mr. Shah; he is
20  probably pretty good, but we are
21  not going to tag team.  So it
22  will just be Mr. Crowe, all
23  right.
24       Next question.  Go ahead.
25     Q. When you reviewed Forall's

| Page 113 |
|---|

1        CROSS-EXAMINATION OF MS. GIOFFRE
2   financial statement from 2015, 2016,
3   did you specifically review the Las
4   Vegas stores financials?
5     A. No.
6     Q. Did you review the overall
7   company's financials?
8     A. Yes.
9     Q. What was Forall's gross profit
10  margin for 2015?
11       MR. CROWE:  Objection.
12  Relevance.  We're talking about a
13  store in Las Vegas.  This is a
14  company that sells worldwide.  I
15  don't follow the relevance, so I
16  know we are not limited by the
17  scope, but this seems to be
18  pretty far field about what the
19  controversy is about.
20       THE ARBITRATOR:  Overruled.
21       You can answer.
22     A. I don't recall.  I have to go
23  back and look at them.
24       MR. LEWIS:  Mr. Farber, in
25  this instance where Ms. Gioffre



Page 114

```
1    CROSS-EXAMINATION OF MS. GIOFFRE
2    testified that they reviewed this
3    document for her testimony.  She
4    even started off with "today."  I
5    would ask that she make those --
6    she reacquaints herself with
7    those documents and answer
8    questions.
9         MR. CROWE:  Objection.  It's
10   improper.  Directing the witness
11   to go back and look at some
12   documents so she can answer
13   questions in the middle of an
14   examination.
15        THE ARBITRATOR:  Ms.
16   Gioffre, you told me when I asked
17   you some questions before, that
18   consistently Forall was -- it had
19   a gross profit margin between 45
20   and 50 percent.  Was that the
21   case, to the best of your memory,
22   for '15 and '16 as well?
23        THE WITNESS:  Yes, sir.  It
24   was.
25        THE ARBITRATOR:  Okay.  The
```

Page 115

```
1    CROSS-EXAMINATION OF MS. GIOFFRE
2    objection is sustained.  Next
3    question.
4    Q. Are you aware of Forall's net
5    profit margins for those same years?
6         MR. CROWE:  I just renew my
7    objection in terms of relevance,
8    outside the scope, completely
9    immaterial.
10        THE ARBITRATOR:  It's
11   overruled.
12        You can answer.
13        A. The -- I don't recall the exact
14   amounts, the exact number.
15        THE ARBITRATOR:  Do you
16   recall a range, the way you did
17   for the gross profit margin?
18        THE WITNESS:  No, I don't.
19        THE ARBITRATOR:  What is
20   deducted when you change the
21   gross to net on profit?
22        THE WITNESS:  Really --
23   you're asking for -- for --
24   sorry.
25        THE ARBITRATOR:  We lost her
```

Page 116

```
1    CROSS-EXAMINATION OF MS. GIOFFRE
2    again.  There we go.  Okay.  I
3    think it's probably a weak
4    internet connection.  All right.
5    My question was:  What's the
6    difference between gross and net
7    when you do the profit
8    calculation on the financials?
9         THE WITNESS:  It would be
10   your operating expense.
11        THE ARBITRATOR:  Okay.  You
12   have a range?  You said gross was
13   between 45 and 50; what would the
14   range be for the net?
15        THE WITNESS:  I'd have to go
16   back and look at that specific
17   year.  They all range based on
18   different expenses that they
19   would have had.  I don't recall
20   Forall's specifically.
21        THE ARBITRATOR:  Okay.
22   Without a specific number, do you
23   recall a range for '15 to '16 for
24   Forall?
25        THE WITNESS:  I don't.
```

Page 117

```
1    CROSS-EXAMINATION OF MS. GIOFFRE
2         THE ARBITRATOR:  Okay.
3         Mr. Lewis, go ahead.
4    Q. Ms. Gioffre, what was the net
5    profit margin, do you recall, for the
6    Forall Nevada store?
7    A. I don't recall.  I didn't get
8    down to the net profits.  I don't
9    remember.
10   Q. Do you recall sufficiently to
11   give Mr. Farber a range?
12   A. I -- I believe I just said no, I
13   didn't recall.
14   Q. That's what I was asking for,
15   the specific number.  I was asking a
16   different question to see if you could
17   give us a range.
18        MR. CROWE:  Objection.
19   Asked that question.
20   Q. Is that a "yes" or "no," Ms.
21   Gioffre, are you able to give us a
22   range or not?
23   A. Not off the top of my head, sir.
24        THE ARBITRATOR:  Ms.
25   Gioffre, do you have a number --
```



Page 118

CROSS-EXAMINATION OF MS. GIOFFRE
1  CROSS-EXAMINATION OF MS. GIOFFRE
2  maybe we'll approach it a
3  different way -- do you have a
4  memory of what the operating
5  expense was as of percentage for
6  Forall, roughly, in the years we
7  are talking about?
8      THE WITNESS:  I don't.  I
9  don't know off the top of my head
10  what it would be.
11      THE ARBITRATOR:  You don't
12  have a memory if it was 25, 30
13  something like that, 40?
14      THE WITNESS:  Specifically,
15  no.  Industry standard would tell
16  me it would be roughly 20 percent
17  of the operating cost.
18      THE ARBITRATOR:  What's the
19  basis of that testimony?  How do
20  you know that?
21      THE WITNESS:  Well, my
22  experience with -- from my
23  experience, I -- you know,
24  there's rent, there's payroll
25  cost, there's all the other

Page 119

1  CROSS-EXAMINATION OF MS. GIOFFRE
2  operating cost.  It could range
3  between 20, 25 percent, maybe.  I
4  don't recall Forall specifically.
5      THE ARBITRATOR:  Okay.  Go
6  ahead, Mr. Lewis.
7      Q. Ms. Gioffre, were you involved
8  when Forall was winding down the store
9  in 2016?  Were you involved in that
10  process?
11      A. Somewhat, yes.
12      Q. Are you familiar with the amount
13  of inventory that was present at the
14  store in August of 2016?
15      A. I -- I believe there was
16  approximately $700,000.
17      THE ARBITRATOR:  I just want
18  to go back and approach this a
19  different way.  Look, Ms. Settimi
20  testified that to the best of her
21  knowledge, that Forall was not
22  profitable during the years that
23  we are talking about.
24      Do you have a memory from
25  the financial records of the

Page 120

1  CROSS-EXAMINATION OF MS. GIOFFRE
2  categories of expense that made
3  it not profitable?  I shouldn't
4  say expense, because it made a
5  depreciation, which is not an
6  expense so there may have been
7  other write-offs, and I'm not
8  necessarily talking about, you
9  know, taxable profits.
10      Do you have any information
11  in that regard that you can tell
12  me about?
13      MR. CROWE:  Mr. Farber, I'm
14  going to object.  You're asking
15  the witness about the global
16  operation for Forall?
17      THE ARBITRATOR:  Yes.
18      THE WITNESS:  There was --
19  certainly there was depreciation.
20  There may have been an inventory
21  write down that would have
22  possibly caused them to show a
23  non-cash expense -- loss, excuse
24  me.
25      THE ARBITRATOR:  Do you have

Page 121

1  CROSS-EXAMINATION OF MS. GIOFFRE
2  any memory of unusually high
3  operating expenses?
4      THE WITNESS:  I don't
5  recall.
6      THE ARBITRATOR:  Anything
7  else particularly high tax
8  liability or something?
9      THE WITNESS:  No.  They
10  should not have had a tax
11  liability.
12      THE ARBITRATOR:  Okay.
13  Thank you.
14      Mr. Lewis, go ahead.
15      Q. You testified Ms. Gioffre that
16  you thought there was approximately
17  $700,000 of merchandise in the store in
18  August of 2016, correct?
19      A. Yes.
20      Q. That was a gross value or that
21  included the mark-up?
22      A. No.  That -- that should have
23  been the value on the book.
24      Q. Do you have an appreciation for
25  how much Forall was able to sell that



Page 122

```
1        CROSS-EXAMINATION OF MS. GIOFFRE
2   merchandise for?
3        A. I don't.  I don't.
4        THE ARBITRATOR:  Well,
5     before the appreciation, do you
6     know that it was actually sold?
7        THE WITNESS:  I don't,
8     actually.
9        THE ARBITRATOR:  Okay.
10       Q. I believe Mr. Torello-Viera
11  testified that it was sold, but you
12  don't remember -- you don't recall
13  whether it was or not; is that your
14  testimony,     Ms. Gioffre?
15       A. That's correct.
16       Q. Do you have any evidence of
17  opportunities that were lost as a
18  result of the store closing in August
19  of 2016?
20       A. I wouldn't know that.
21       Q. Are you aware of any specific
22  efforts that Forall took to find and
23  open another store in the Las Vegas
24  market after August of 2016?
25       A. No.
```

Page 123

```
1        CROSS-EXAMINATION OF MS. GIOFFRE
2        Q. Are you familiar or do you have
3   any evidence of any efforts that Forall
4   took to establish a Forall -- excuse
5   me, a Pal Zileri store in any other
6   U.S. market after August of 2016?
7        A. No.
8        Q. Did you provide information to
9   Mr. Flaherty that he relied upon to
10  draft his expert report in this
11  arbitration?
12       A. Yes.
13       Q. And what did you provide to him?
14       A. We provided copies of the
15  invoices, some invoices, we provide, I
16  believe, all the mass masters, which
17  were the Forall's --
18       Q. Sorry.  When you say "masters,"
19  and I didn't hear you after that.
20       A. And those were the -- the
21  invoices, the purchase invoices, and we
22  -- I believe provided him with some
23  incoming cost documents, like the
24  utility bills and freight invoices, I
25  believe.  That's what I gave him.
```

Page 124

```
1        CROSS-EXAMINATION OF MS. GIOFFRE
2        Q. So we've got copies of invoices,
3   we've got masters, including purchase
4   invoices, and some incoming cost
5   documents relating to duty and freight;
6   did I hear that correctly?
7        A. Yes.  Masters and purchases are
8   the same.
9        Q. Yes.  I understand.
10       A. Yes.
11       Q. Anything else?
12       A. Not that I recall right now.  I
13  have to double-check.  Whatever he
14  asked me for, and I had, I would have
15  given to him.
16       Q. I understand.  Let me ask you
17  specifically about a reference to a
18  document called, "Simon Lost Margin
19  versus Sarah"; do you know what that
20  document is?
21       A. No.
22       THE ARBITRATOR:  Is this
23     something in evidence, Counselor?
24       MR. LEWIS:  This is
25     something that is listed on Mr.
```

Page 125

```
1        CROSS-EXAMINATION OF MS. GIOFFRE
2   Flaherty's report as being the
3   source of certain information.
4        THE ARBITRATOR:  Okay.  Go
5     ahead.
6        Q. Again, "Simon Cost Margin versus
7   Sarah," do you know what that is?
8        A. No.  I don't think so, no.
9        Q. This is not a document that you
10  provided to Mr. Flaherty?
11       A. I don't recall.  I have to see
12  it.  I don't recall.
13       Q. We'd like to see it, too.  Do
14  you recall being asked to create
15  something that was called "Simon cost
16  Margin versus Sarah?"
17       MR. LEWIS:  Mr. Farber, if
18     you're looking at the report,
19     it's in schedule -- we are going
20     to talk about it in just a little
21     bit, but it's in Schedule 3 of
22     Mr. Flaherty's report, and it's
23     towards the bottom of the
24     spreadsheet, and it says that the
25     source was, "Sample Loss Margin
```

Page 126

1    CROSS-EXAMINATION OF MS. GIOFFRE
2    Versus Sarah."
3    Q. Does that ring a bell,   Ms.
4  Gioffre?
5    A. No.
6    MR. CROWE:  Beating this
7  horse to death here.
8    THE ARBITRATOR:  I didn't
9  hear you, Mr. Crowe.
10    MR. CROWE:  I said this has
11  been covered.  Asked and
12  answered.
13    THE ARBITRATOR:  She
14  answered anyway, so I've got it.
15    Go ahead, next question.
16    Q. So when I had asked you if we
17  had exhausted what you had provided to
18  Mr. Flaherty, copies of invoices,
19  masters, which are the purchase
20  invoices, some incoming costs, the
21  documents related to duty and freight,
22  anything else?
23    MR. LEWIS:  Mr. Crowe, I'm
24  just waiting for the witness to
25  answer if there's anything else

Page 127

1  CROSS-EXAMINATION OF MS. GIOFFRE
2  that we've missed.
3    MR. CROWE:  Well, you've
4  asked her three times already.
5    THE ARBITRATOR:  Overruled.
6  She can answer.  Is there
7  anything else you provided that
8  you remember?
9    THE WITNESS:  Not that I
10  recall.
11    MR. LEWIS:  Mr. Farber, may
12  I just take a couple of minutes?
13  I may not have anything further.
14    THE ARBITRATOR:  Sure.  All
15  right.  Let's give him the
16  customary five and then hopefully
17  we can get started with
18  Mr. Flaherty.
19    (Whereupon, a recess was
20  taken.)
21    THE ARBITRATOR:  Mr. Lewis,
22  anything further?
23    MR. LEWIS:  Nothing further.
24    THE ARBITRATOR:  Mr. Crowe,
25  do you have anything further?

Page 128

1    RE-DIRECT EXAMINATION MS. GIOFFRE
2    MR. CROWE:  Yes, I do,
3  Mr. Farber.  I just want to
4  clarify a particular point.  It's
5  in context to a question you had
6  raised.
7  RE-DIRECT EXAMINATION
8  BY MR. CROWE:
9    Q. Miss, in the circumstance where
10  there's a $900,000 annual sale for this
11  store in Las Vegas, and assuming the 45
12  to 50 percent margin or cost for the
13  items that are sold, would it be fair
14  to say that there is a profit that
15  would be expected or anticipated on
16  each one of these annual sales of the
17  $900,000 to the Las Vegas store?
18    A. Yes.  Of course.
19    Q. Profit of $450,000 less
20  advertising expense?
21    A. Yes.  That would be reasonable,
22  yes.
23    MR. CROWE:  Okay.  Thank
24  you.  That's all.
25    THE ARBITRATOR:  Anything

Page 129

1    PROCEEDINGS
2  else, Mr. Lewis.  I can't hear
3  you, Mr. Lewis.
4    MR. LEWIS:  Do you hear me
5  now?
6    THE ARBITRATOR:  Yes.
7    MR. LEWIS:  Nothing further.
8    THE ARBITRATOR:  Ms.
9  Gioffre, thank you very much for
10  your testimony.  You're excused
11  as a witness.
12    THE WITNESS:  Thank you.
13    THE ARBITRATOR:  Thank you.
14  Okay.  Mr. Crowe, who is your
15  next witness?  I'm sorry.
16    MR. CROWE:  The next
17  witness, Mr. Farber, is Mr.
18  Flaherty, but in light of the
19  fact that we are approaching a
20  lunch time hour, maybe it makes
21  more sense if we could take lunch
22  to gather our notes and get this
23  presentation done quickly, and
24  efficient, and I think I'm going
25  to be probably a half --



Page 130

1        PROCEEDINGS
2    45 minutes top with this witness.
3        THE ARBITRATOR:  The problem
4    I have is the reason I always
5    tell people in the beginning that
6    lunch is 1:00 to 2:00 is because
7    I schedule other calls in other
8    cases, so have a call on another
9    case at 1:00, so I'd rather keep
10   going.
11       MR. CROWE:  That's fine.
12       THE ARBITRATOR:  So,
13   Mr. Flaherty, would you stand for
14   a minute, but let me still see
15   your face.  Could you raise your
16   right hand?  Do you solemnly
17   swear the testimony you're about
18   to give in this arbitration
19   proceeding will be the truth, the
20   whole truth, and nothing but the
21   truth?
22       THE WITNESS:  Yes.
23       THE ARBITRATOR:  Could you
24   be seated, sir, spell your full
25   name, and let us have an address,

Page 131

1        PROCEEDINGS
2    home or work.
3        THE WITNESS:  Kevin
4    Flaherty, F-L-A-H-E-R-T-Y.  And
5    my office address is 10 High
6    Street, Boston, Massachusetts.
7        THE ARBITRATOR:  I don't
8    know.  So far you don't have the
9    Boston accent.
10       THE WITNESS:  It might come
11   out.
12       THE ARBITRATOR:  We'll see.
13   Okay.  Mr. Crowe is going to ask
14   you some questions.  If Mr. Lewis
15   says the word "objection," don't
16   answer until I tell you whether
17   or not you should do so.
18       Mr. Crowe, why don't you
19   proceed.
20       THE WITNESS:  Before we
21   proceed, is it okay if I have a
22   copy of my report on my other
23   screen?
24       THE ARBITRATOR:  If you --
25   let Mr. Crowe -- if he wants to

Page 132

1    DIRECT-EXAMINATION MR. FLAHERTY
2    show it to you, he'll show it to
3    you.  All right?
4        THE WITNESS:  Okay.
5        MR. CROWE:  For purposes of
6    trying to move things along, I'm
7    going to ask that the report
8    prepared by Mr. Flaherty be
9    pulled up and made available to
10   the witness with the arbitrator's
11   permission.
12       THE ARBITRATOR:  Sure.
13   K E V I N  F L A H E R T Y, the witness
14   herein, having been first duly sworn by
15   the arbitrator, was examined and
16   testified as follows:
17   DIRECT-EXAMINATION
18   BY MR. CROWE:
19       Q. Good afternoon, Mr. Flaherty.
20       A. Good afternoon.
21       Q. So just to give everybody some
22   background, can you tell us your
23   education, your experience?
24       A. Sure.  I have a bachelor of
25   science and major in accounting from

Page 133

1    DIRECT-EXAMINATION MR. FLAHERTY
2    Babson College in 1988.  I am currently
3    the U.S. managing partner of MDD,
4    Matson Driscoll & Damico.  We are a
5    forensic accounting firm that
6    specializes in many things, but
7    including a substantial force being
8    measurement of damages.
9        I've been practicing in this
10   field for 30 years.  I've done
11   thousands if not tens of thousands of
12   damage calculations over that time.  I
13   have testified at trial on damage
14   calculations, arbitrations, mediations.
15   I have given presentations on damages
16   to law firms, insurance companies,
17   etcetera.
18       Q. Okay.
19       MR. CROWE:  With that in
20   mind, I just ask the gentleman be
21   qualified as a --
22       THE ARBITRATOR:  No need in
23   an arbitration, Mr. Crowe.
24       MR. CROWE:  Okay.
25       THE ARBITRATOR:  Go ahead.



Page 134

1    DIRECT-EXAMINATION MR. FLAHERTY
2    Q. Did there come a time where you
3  were retained by our law firm to review
4    the -- the allegations in this
5  controversy and to offer an opinion
6  with respect to the economic damages?
7    A. Yes.
8    Q. And do you recall, generally,
9  what was the scope of your retention?
10   A. Sure.  I was given brief
11 background on the dispute and then
12 asked to provide my opinion on how
13 damages should be measured.
14   Q. And were you provided certain
15 documents in order to assist you in
16 this endeavor?
17   A. Yes.
18   Q. Do you recall what you were
19 furnished?
20   A. Certainly, I may not recall the
21 entire list, but I had the complaints,
22 the legal proceedings, some of the
23 legal proceedings.  I had the -- a lot
24 of the contracts, leases.  For example,
25 the contract between Forall and Sarah,

Page 135

1    DIRECT-EXAMINATION MR. FLAHERTY
2  and some of the others.  I'm not going
3  to remember the specifics.
4    I was -- I was provided
5  financial documentation, invoices, you
6  know, to the extent I relied upon it, I
7  generally try to note it in my report.
8  And I'm sure I forgot to mention some
9  of the stuff I received and reviewed.
10   Q. And you ultimately prepared a
11 report with respect to your analysis?
12   A. I did.
13   Q. And that's the report you have
14 up on your screen and was ultimately
15 admitted into evidence in this
16 proceeding, I think as Exhibit 37 --
17 38?
18   A. Yes.
19       THE ARBITRATOR: It's 38.
20 Yeah.
21   Q. Okay.  And what -- just,
22 generally, can you tell me what was
23 your opinion and then we'll go back and
24 break it down in terms of detail?
25       What was your opinion as to the

Page 136

1    DIRECT-EXAMINATION MR. FLAHERTY
2  damages that flowed from the plaintiff
3  or claimant's breach of contract in
4  this circumstance?
5    A. Sure.  My opinion is that the
6  damages were $2,382,834 before --
7  before interest.  And that that -- go
8  ahead.
9    Q. I'm sorry.  I cut you off.  I
10 apologize.
11   A. And including interest
12 $2,723,716.
13   Q. That's statutory interest under
14 New York law of nine percent?
15   A. Correct.
16   Q. Let's -- let's go through this
17 and break that down if we can.
18 Mr. Brown is my technical assistant
19 here.  He's putting this up on the
20 screen for me.
21       What was the first item of
22 damage that you considered in this
23 context?
24   A. Sure.  The first items would be
25 what I would call "loss profits".

Page 137

1    DIRECT-EXAMINATION MR. FLAHERTY
2    Q. And how did you go about
3  calculating that?
4    A. Sure.  So there was a contract
5  in place between Forall and Sarah for
6  -- it was a ten-year contract that
7  expired in March 2021.  It was $900,000
8  a year contract.  And, actually, within
9  the contract, it was broken, actually,
10 into two seasons, and I don't remember
11 the specific details, but roughly 450
12 for the winter, spring season, and 450
13 for the summer, fall season.
14       So my damages are for the period
15 of 2016 through the period of 2021; the
16 end of that contract.  And I commenced
17 them in 2016, because in the summer of
18 2016, the store closed and no longer
19 was Forall receiving the inventory
20 purchases that were required under the
21 contract.
22       So if you look at my Schedule 3,
23 it would probably be easier for me to
24 explain it from there.
25   Q. We'll put on right now.



1    DIRECT-EXAMINATION MR. FLAHERTY
2    A. It's schedule two.  I said
3  three, but it's schedule two.
4        MR. BROWN:  Kevin, do you
5      have a specific page number?
6        THE WITNESS:  I don't have
7      it.  Mine says 48 of my PDF.  I
8      don't know that's always
9      consistent across platforms.  I
10     think if you go to the next one,
11     which is schedule two.
12     Q. Okay.  So this shows how you
13  breakdown the sales, loss cost, and
14  margin and so forth.  Can you elaborate
15  on that?
16     A. Sure.  So this is my calculation
17  of lost profits based on that contract.
18  I start in the year 2016, and there's
19  $450,000, and that is because the
20  contract between Forall and Sarah had
21  two distinct buying seasons split
22  approximately 450 each.
23     Since the summer -- the store
24  closed in the summer of '16, the last
25  buying season never took place, so I

1    DIRECT-EXAMINATION MR. FLAHERTY
2  used 450 thousand in 2016.
3        THE ARBITRATOR:  Hang on.
4  Did you read Mr. Salsbery's
5  report?
6        THE WITNESS:  I did.
7        THE ARBITRATOR:  So you know
8  that he criticizes this and says
9  it should be only four and a half
10  years.
11        THE WITNESS:  Yes.
12        THE ARBITRATOR:  Why do you
13  think he's wrong?
14        THE WITNESS:  I think he's
15  focused on calender, and what --
16  you have to look at that contract
17  with Sarah and Forall, which has
18  two distinct buying periods where
19  they're required to purchase
20  approximately 450 in buying
21  periods, so the store closing in
22  July or August, the second buying
23  period was -- never happened.
24     So I included that in -- I
25  included that in 2016 and I also

1    DIRECT-EXAMINATION MR. FLAHERTY
2  included the first buying period
3  in 2021.
4     Q. And so you come up with last
5  sales to Forall to four and a half
6  million dollars, correct?
7     A. Correct.
8        THE ARBITRATOR:  Let me just
9  do that again so that I
10  understand it.  Of course, I'm
11  going to ask    Mr. Salsbery
12  about it as well, but do you have
13  his report in front of you?
14        THE WITNESS:  Mr.
15  Salsbery's?
16        THE ARBITRATOR:  Yes.
17        THE WITNESS:  I do have it.
18        THE ARBITRATOR:  I want you
19  to look at Paragraph 17 of his
20  report.
21        THE WITNESS:  Sure.
22        THE ARBITRATOR:  And he
23  identifies dates as September of
24  '16, September 1st of '16 to
25  March of '21.

1    DIRECT-EXAMINATION MR. FLAHERTY
2        THE WITNESS:  Yes, I see
3  that.
4        THE ARBITRATOR:  Now, I, at
5  first blush, thought he made
6  sense that that would only be
7  four and a half years, not five,
8  because with the closing of the
9  store at the end of August of
10  '16, the first season of '16
11  would have been, you know, paid
12  for or would have been ordered.
13  So I don't understand why '16
14  should be two seasons and, of
15  course, '21, if it ended in
16  March, that would only be one
17  season, so I'm trying to
18  understand your position on this.
19        THE WITNESS:  Sure.  So if
20  we look at my schedule two, and
21  you look at the year 2016, I have
22  $450,000 in '16.  That's half a
23  year, because it's a buying
24  season.  So they missed out on
25  the second half of the buying



1   DIRECT-EXAMINATION MR. FLAHERTY
2   season.  And if you look in the
3   contract, it differentiates two
4   buys in the buying seasons,
5   around 450,000, so in '16 they
6   lost that second half.
7        THE ARBITRATOR:  So you're
8   saying that '16 is one season,
9   '21 is one season, and therefore
10  you have the other four years and
11  that way you came up with five
12  years?
13       THE WITNESS:  Correct.
14       THE ARBITRATOR:  Thank you.
15  Go ahead, Counselor.
16  Q. So the -- the difference in --
17  except what Mr. Salsbery's saying it
18  lost sales then are four million, fifty
19  thousand, right, because he's doing it
20  on a monthly basis, correct?
21  A. That's correct.
22  Q. Okay.  So now, after you --
23  after you -- and let me just note, in
24  your report earlier you did allot to
25  that possibility where -- I'll take you

1   DIRECT-EXAMINATION MR. FLAHERTY
2   to Page 4 of the body of your report.
3   You did note the possibility in
4   calculating that on a $4,050,000 --
5   A. Yes.
6   Q. -- value, right?
7   A. I did the report.  I read that
8   report before and, you know, in
9   preparing for this, and I think the
10  report is missing the next sentences or
11  two.
12       The report could have been
13  better explaining the difference
14  between that narrative and schedule
15  two.
16  Q. We understand.  And it's
17  nothing.  We all strive to be better.
18  Now, back to schedule two, the chart
19  says, "Less cost."  How did you
20  calculate the cost factor for the --
21  A. Yes.  So the -- the proper way
22  to measure damages in any economic loss
23  situation is the loss sales minus the
24  saved cost.  So the cost that the
25  company will not incur since they're

1   DIRECT-EXAMINATION MR. FLAHERTY
2   not earning the sales.
3        So what I deducted -- so what
4   I've deducted here is the cost of the
5   product, the cost of the inventory that
6   Forall would have incurred had they
7   shipped the $900,000 a year of
8   inventory to Sarah.
9   Q. And then you applied that cost
10  on a yearly basis, correct?
11  A. Right.
12  Q. So how did you -- let's drill
13  down.  How did you determine what the
14  cost that Forall, essentially, ordered
15  by not making these sales and then
16  applied to the sales?
17  A. Sure.  I think the easiest thing
18  is if we can refer to Schedule 3 now.
19  Q. Okay.
20  A. I can show you how I determined
21  the cost.
22  Q. Okay.
23  A. So we did -- we did a test of
24  sales between Forall and Sarah, and the
25  first column here is the selling price

1   DIRECT-EXAMINATION MR. FLAHERTY
2   to Sarah.  So that is verified to an
3   invoice that's exactly what Forall is
4   invoicing Sarah.
5   Q. Let me stop you right there.
6   You've done about -- you've looked at
7   eight or so products.  Now, obviously,
8   these are then representative.  You
9   didn't go through every single product
10  and every single invoice and calculate
11  these.  You had to go about it in this
12  fashion?
13  A. That's correct.  We did a test,
14  which was common for us to do a test.
15  So we did a test of these eight
16  products.
17  Q. Okay.  And that -- and how did
18  you go about figuring out what's
19  described as the margin calculation
20  there at the top?
21  A. Right.  So you start with the
22  selling price and then the next item,
23  the second column, you see the Forall
24  cost, and that is Forall's direct cost
25  of --

MAGNA▶
LEGAL SERVICES

| | |
|---|---|
| Page 146 | Page 147 |

**Page 146**

1       DIRECT-EXAMINATION MR. FLAHERTY
2    Q. Is that manufacturing cost, the
3  wool, the yarn or whatever they make --
4    A. It would be the manufacturing
5  cost or to the extent that it's a
6  purchased product, a purchase material,
7  that would be in there too, but it's
8  their cost -- their direct cost for the
9  product.
10    Q. Okay.  And then the next column
11  over is "additional cost"?
12    A. Right.  So, obviously, the
13  product comes from Italy.  So, you
14  know, duty and freight could be a
15  substantial cost in that situation.
16    So we -- we obtained four or
17  five specific invoices, and the duty
18  and freight that goes with those four
19  or five invoices, and determined an
20  average duty and freight cost as a
21  percentage, and that's what that is.
22    Q. And then from there you
23  calculate what the total product cost
24  is?
25    A. Right.  So the next column says

**Page 147**

1       DIRECT-EXAMINATION MR. FLAHERTY
2  "Total Forall product cost."  That is
3  the total of those two Forall cost and
4  the duty and freight, and then subtract
5  that from the selling price and it gets
6  you to your margin or your profit.
7    Q. And "margin" essentially means
8  how much money they're going to make on
9  each one of these invoices; is that
10  correct?
11    A. It's the incremental profit that
12  they would have made on these $900,000
13  of sales, yes, from these products.
14    Q. Now, this might be time to
15  address this because Mr. Farber had
16  asked you about Mr. Salsbery's report.
17    One of the criticisms he made is
18  that this was not a valid calculation
19  because you did not allow for certain
20  variable cost, and can you respond to
21  that?
22    A. Sure.  First of all,
23  Mr. Salsbery's report, I think he has a
24  sentence in there that specifically
25  says based on his review of the

| | |
|---|---|
| Page 148 | Page 149 |

**Page 148**

1       DIRECT-EXAMINATION MR. FLAHERTY
2  industry, the approximate 50 percent
3  that I use is a representative direct
4  cost or margin.
5    Q. He agreed with you.  But for
6  this criticism of the variable cost --
7    A. I know his argument is that
8  there are additional costs that must be
9  deducted from this.  And he points to
10  -- and he points to these public
11  companies in his report and he pulls --
12  can I bring up his report?
13    THE ARBITRATOR:  Sure.
14    MR. CROWE:  That's 38 in our
15  exhibit list and my colleague,
16  Mr. Brown, is going to make that
17  available to everybody.
18    THE ARBITRATOR:  And I think
19  you're roughly looking at
20  paragraph 25 in his report.
21    THE WITNESS:  But being a
22  number guys, I'm going to look at
23  Schedule 2.1, which is the
24  numbers and not the narrative
25  portion.  On my PDF it's 28.

**Page 149**

1       DIRECT-EXAMINATION MR. FLAHERTY
2    THE ARBITRATOR:  What page?
3    THE WITNESS:  28.  And it's
4  Schedule 2.1 in the upper
5  right-hand corner.
6    Q. Is that the right page?
7    A. Yes.
8    Q. Okay.
9    A. So the first column there, gross
10  profit margin, and these are obviously
11  for what he pulled as representative
12  companies.  That's the gross profit
13  margin and that's consistent with the
14  approximate 50 percent that I used in
15  my report based on my actual test of
16  Forall's activity with Sarah.
17    And that's -- that's where --
18  Mr. Salsbery indicates that that's
19  reasonable.  In any case, the next step
20  -- it says that -- if you look at the
21  middle column, divot margin.  He said
22  there are costs that are further
23  reduced, get down to the EBIT margin
24  that must be considered.
25    Q. But is that earnings before



Page 150

1      DIRECT-EXAMINATION MR. FLAHERTY
2    interests and facts?
3      A. That's what that stands for.
4    Earnings before interest and tax.  So
5    what this is deducting is what, in the
6    industry, we would refer to as G and A;
7    General and administrative expense.
8        These are non-product costs.
9    These are your -- your marketing
10   department, these are your accounting
11   department, your lease, your
12   depreciation; they're all the
13   non-direct product cost related to the
14   company.
15       And if you go -- if you Google
16   VS Corporation and get their financial
17   statement up online, they're a public
18   company, you'll see they go to sales,
19   they deduct costs of goods sold to get
20   this gross profit margin.  Costs of
21   good sold is the product cost, and then
22   their next deduction is called G and A
23   on their financial statement, general
24   and administrative.  And that gets you
25   down to EBIT margin.

Page 151

1      DIRECT-EXAMINATION MR. FLAHERTY
2        So I don't understand      Mr.
3    Salsbery's position that other costs
4    must be deducted after margin.  The
5    only thing below margin are general and
6    administrative costs.
7      Q. And those --
8      A. I'm sorry.  So in this scenario,
9    in this economic damages model, those
10   are fixed costs to Forall.  They didn't
11   get any savings in those cost as a
12   result of losing this contract.
13       THE ARBITRATOR:  Isn't that
14   -- isn't that really the nub of
15   your disagreement here, that some
16   of them are not fixed.
17       I mean, we had a witness
18   testify yesterday who said that a
19   couple of times a year he would
20   go to Las Vegas.  I mean, if the
21   store is closed, the expense of
22   him going to Las Vegas does not
23   exist.  And you know, presumably,
24   you know, there's other expenses
25   that is saved if the store is

Page 152

1      DIRECT-EXAMINATION MR. FLAHERTY
2    closed.
3        So maybe some portion of
4    the G and A ought to deduct the
5    same way freight was deducted.
6       THE WITNESS:  So the -- I
7    agree with the concept, right, to
8    the extent there's a saved cost,
9    it should be deducted.  I'll tell
10   you based on my experience, and,
11   again, you can Google VS
12   Corporation to get it.
13   99 percent of these costs are
14   going to be your fixed cost, and
15   have nothing to do with the Las
16   Vegas store.
17       They're your president
18   salary, your CFO salary, you
19   know, your rent for all your
20   facilities.  I mean, would a trip
21   be saved, maybe, but it is a
22   minuscule percentage.
23      Q. Right.  So the outlays by Forall
24   on a wholesale level are much different
25   than what we are dealing with at the

Page 153

1      DIRECT-EXAMINATION MR. FLAHERTY
2    store level, right, that Sarah is
3    incurring cost, but that has nothing to
4    do with Forall's profit calculation; is
5    that correct?
6      A. Yes.  This damage model isn't
7    related to the profit of the store.
8    Forall doesn't, you know, own the store
9    at this point.  It's the profit they
10   would have had on sending $900,000 of
11   inventory to Sarah.
12      Q. And that's what you're
13   calculating, correct?
14      A. Correct.
15      Q. That gets us back to schedule
16   two.  So there is another item they did
17   say fair enough, if calculated, the
18   reduction in the cost for advertising,
19   right [sic]?
20      A. Yeah.  The contract requires
21   Forall to match -- it's only a match --
22   but to the extent that Sarah spent
23   $27,000 on advertising, Forall would
24   have had to spend them.  So I made an
25   assumption that they would have spent



1    DIRECT-EXAMINATION MR. FLAHERTY
2  it and took it as a saving.
3    Q. So you took the lost sales in
4  the first column, applied the margin,
5  which you flesh out on the next
6  schedule, and we'll see how you do that
7  to come to a cost ratio of 48.9 percent
8  and then you come up with your loss
9  margin, right, and that's almost two
10  million three?
11    A. That's correct.
12    Q. And then you paid the
13  advertising, and you come up with --
14  you calculated as first component of
15  what we are talking about the loss
16  profits as a result of the doctor's
17  breach, right?
18    A. Correct.
19    Q. Okay.  And -- let's go to the
20  next item you've calculated in terms of
21  your damages, and that's what was
22  described as certain out-of-pocket cost
23  that the company, Forall, incurred as a
24  result of the sudden termination.
25    Are you familiar that the lease

1    DIRECT-EXAMINATION MR. FLAHERTY
2  came to a sudden screeching halt as a
3  result of certain --
4    A. That's my understanding.  It's
5  an abrupt end to the operation, yes.
6    Q. And did you list these items,
7  the out-of-pocket cost on a schedule?
8    THE ARBITRATOR:  Hang on,
9  Mr. Crowe.  Before you get to the
10  out-of-pocket items.  Let me just
11  ask Mr. Flaherty --
12    Do you have any
13  knowledge if there was product
14  that was manufactured and paid
15  for that was to be used in Las
16  Vegas and, you know, that was
17  intended to be used in Las Vegas
18  or shipped to Las Vegas or it was
19  not because of the closing of the
20  store?
21    In other words, is one
22  category of damage to consider,
23  you know, the way you're
24  calculating it on these numbers,
25  and I just want to know if

1    DIRECT-EXAMINATION MR. FLAHERTY
2  factually there was any sort of
3  out-of-pocket expense that you
4  know that Forall paid to -- to
5  get, you know, being prepared
6  maybe for the extra month.
7    MR. CROWE:  I'm sorry,
8  Mr. Farber, can I clarify?  Are
9  you referring to his 2016?
10    THE ARBITRATOR:  Absolutely.
11  I'm talking about '16.  Thanks,
12  Mr. Crowe.
13    MR. CROWE:  Okay.
14    THE ARBITRATOR:  Do you have
15  any information in that regard or
16  not?
17    THE WITNESS:  I'm not sure I
18  understand the question.  Could
19  you try again?  Are you talking
20  about stranded inventory in Italy
21  that was never delivered to the
22  store?
23    THE ARBITRATOR:  Yes.
24  Inventory that was produced or
25  maybe was on its way.  I have no

1    DIRECT-EXAMINATION MR. FLAHERTY
2  idea.
3    THE WITNESS:  The inventory
4  I'm aware of is inventory that
5  was already in the United States
6  in the store, and the costs
7  associated with liquidating
8  those.
9    I'm not aware of -- we
10  haven't included -- I'm not aware
11  of any costs related to stranding
12  of any inventory in Italy or
13  disruption to operations in Italy
14  due to the abrupt end.
15    THE ARBITRATOR:  That's
16  exactly what I was asking about.
17    Go ahead, Mr. Crowe.
18    Q. So getting back to the
19  Category 2, if you go ahead in your
20  report, out-of-pocket cost, you address
21  that in -- in the schedule there as
22  part of your report?
23    A. In Schedule 4, yes.
24    Q. And in that you -- you tally the
25  cost that are incurred by Forall as a



1        DIRECT-EXAMINATION MR. FLAHERTY
2    result of this controversy?
3        A. Correct.
4        Q. And where did you get that
5    information?
6        A. This information came from -- I
7    believe it was -- Michelle Gioffre sent
8    me this information.  It came from the
9    accounting department.  I believe it
10   came from Ms. Gioffre.
11       Q. Okay.  What did they tally in
12   terms of cost?  I see you break it down
13   by year.
14       First of all, let's look at
15   2016.  What was the cost then?
16       A. I think, yeah, on Schedule 4.
17   Why don't I explain this document
18   briefly.
19       Q. Yes, please.
20       A. So I asked -- I believe it was
21   Ms. Gioffre or Forall about costs
22   incurred related to this.  She provided
23   to me a -- a document that captured
24   those costs.
25       But what was important to me is

1        DIRECT-EXAMINATION MR. FLAHERTY
2    that it had an accounting background to
3    it.  Right.  This was not just a
4    slapped-together excel spreadsheet.  If
5    you look at the column source -- I mean
6    the first columns speak for themselves;
7    description, comments, date.  The next
8    column is "source," and these are --
9    these are from the accounting entries
10   made by the accounting firm.
11       So you'll see Nevada closing
12   trial balance.  So the source of that
13   is it came from their actual underlying
14   accounting document, their trial
15   balance.  You'll see the 2018 charges
16   maybe seven or eight down is $2,500.
17   And "JE" is a journal entry, meaning
18   they entered it into their accounting
19   system.
20       So I had -- what I would say is
21   accounting document to -- that I've
22   summarized here.
23       Q. Okay.  And that's -- that
24   follows all the way through on each
25   year?

1        DIRECT-EXAMINATION MR. FLAHERTY
2        A. Yes.
3        Q. And what is the grand total on
4    the out-of-pocket costs?
5        A. $128,353.  And that was,
6    obviously, the date of the -- the date
7    of the report.
8        Q. Going back to 2016 charges, what
9    did they relate to, if you can just --
10       A. I mean, their descriptions are
11   there.  You can see them.  "Cost
12   incurred from -- for legal claims of
13   Nevada is 25,838."  Charges to get to
14   Nevada to, I presume, deal with the
15   abrupt closing of the store and some
16   severance package relating to the
17   store.
18       Q. All right.  The last item you
19   have is something described as,
20   "Inventory on hand."  Can you explain
21   what you did in that calculation?
22       A. Yeah.  Again, the question was,
23   you know, what did you do with the
24   inventory?  It's my understanding,
25   based on speaking to the Forall

1        DIRECT-EXAMINATION MR. FLAHERTY
2    representatives, the inventory was
3    abruptly pulled out of the Las Vegas
4    store, so it couldn't be -- couldn't be
5    liquidated in your customary fashion.
6        I believe it was moved to a
7    warehouse in New Jersey.  And after
8    that I'm not sure if it went back to
9    Italy, to the liquidators, I'm not
10   really sure, but I know the inventory
11   value based on the reports I was
12   provided was around -- let me just get
13   this in front of me -- was around
14   $700,070, and Forall estimated that
15   they lost 10 percent in liquidating
16   that inventory.
17       So that would men cost related
18   to moving it, cost related to selling
19   it, you know, if they didn't get their
20   cost on the inventory back, they
21   estimated 10 percent.  That's the
22   77,381 that I have put into my report.
23       Q. So you totaled your damages in
24   -- what is that?  Schedule --
25   schedule --



Page 162

```
 1        DIRECT-EXAMINATION MR. FLAHERTY
 2     A. One.
 3     Q. One. Okay. And you have a
 4  total there for all three of these
 5  components and what was the number
 6  including the statutory nine?
 7     A. $2,723,716.
 8     Q. Okay. Thank you.
 9        MR. CROWE: That's all I
10  have.
11        THE ARBITRATOR: Okay.
12  Mr. Lewis, it's about 10 to. Do
13  you want to break for lunch now
14  or do you want to take a few
15  minutes and start?
16        MR. LEWIS: I think we can
17  break.
18        THE ARBITRATOR: Okay.
19  Everyone, I think we are doing
20  okay on time, so 2:00. All
21  right. We'll see you all at
22  2:00. Thank you all.
23        (Whereupon, a lunch break
24  was taken.)
25        THE ARBITRATOR: Okay.
```

Page 163

```
 1        CROSS-EXAMINATION MR. FLAHERTY
 2  Mr. Lewis, why don't you proceed
 3  with your cross? We've got an
 4  expert witness, so you can handle
 5  it as you see fit.
 6        Mr. Flaherty, just try
 7  to respond to his questions
 8  unless, of course, there's an
 9  objection by Mr. Crowe.
10  CROSS-EXAMINATION
11  BY MR. LEWIS:
12     Q. Good afternoon, Mr. Flaherty.
13     A. Good afternoon.
14     Q. I appreciate your time today.
15  In your report you make no accounting
16  for Forall's legal obligation to
17  mitigate the damages, right?
18     A. I'm not interpreting any legal
19  obligations.
20     Q. You make no accounting for any
21  mitigation, correct?
22     A. I don't think that's true.
23     Q. Why do you disagree with that
24  statement?
25        THE ARBITRATOR: Guys, both
```

Page 164

```
 1        CROSS-EXAMINATION MR. FLAHERTY
 2  of you please speak up louder.
 3     A. There is mitigation. There were
 4  years that after Sarah couldn't
 5  continue then Forall operated it and
 6  that was mitigation. I don't -- I
 7  think other companies, Italrod [sic],
 8  they operated it, so that's mitigation.
 9  So certainly there was mitigation
10  considered, because I'm only picking up
11  after those efforts.
12     Q. Mr. Flaherty, the store closed
13  in August of 2016 under the Forall's
14  operation, correct?
15     A. It closed while Forall was
16  managing the store, yes.
17     Q. Exactly. You start your
18  calculation from September 1st going
19  forward, right?
20     A. Correct.
21     Q. And so your report doesn't
22  account for any litigation that would
23  have taken place after that time,
24  right?
25     A. After that time, correct.
```

Page 165

```
 1        CROSS-EXAMINATION MR. FLAHERTY
 2     Q. And you're aware that Forall
 3  couldn't pursue another operator at
 4  some point after August 2016?
 5     A. No.
 6        MR. CROWE: Objection.
 7        THE ARBITRATOR: Mr.
 8  Flaherty, as you well know, you
 9  have to give Mr. Crowe a chance.
10  I heard the answer. Let's move
11  on.
12     Q. Mr. Flaherty, I'm trying to make
13  sure I understand. You're saying that
14  Forall could not have pursued another
15  operator after August of 2016; is that
16  your testimony?
17        MR. CROWE: Objection. When
18  you say "could have pursued
19  another operator," I don't know
20  what you're referring to.
21  Another operator in that store,
22  in the mall, Las Vegas, or
23  Nevada?
24        THE ARBITRATOR: Overruled.
25        You can answer.
```



Page 166

1    CROSS-EXAMINATION MR. FLAHERTY
2       A. The answer is no.
3       Q. The answer is no to what -- let
4    me try to be more clear.
5          Could Forall have pursued
6    another operator after August of 2016,
7    Mr. Flaherty?
8       A. I don't know.
9       Q. But you don't take into your
10   report any obligation to do so?
11      MR. CROWE: Objection. The
12   report speaks for itself.
13      THE ARBITRATOR: Overruled.
14   He can answer.
15      A. To the extent there was an
16   obligation that's a legal question that
17   I'm not opining on, and the report, as
18   I discussed before, does have
19   mitigation in it prior to 2016.
20      Q. Mr. Flaherty, my question is a
21   little different. Your report doesn't
22   reflect any effort or obligation to
23   pursue another operator after August of
24   2016; do you agree with that?
25      A. I don't know how to answer that.

Page 167

1    CROSS-EXAMINATION MR. FLAHERTY
2    I don't know how to comment. The
3    question is poorly worded. The report
4    had numbers in it and you're asking
5    about effort.
6       Q. Let me try it again. Does your
7    report account for Forall persuing and
8    securing a different operator after
9    August of 2016; is that in your report
10   anywhere?
11      A. No.
12      Q. Okay. Thank you. So you extend
13   the contract out at the full minimum
14   purchase requirement, the $900,000
15   through the term of the contract,
16   correct?
17      A. Yes.
18      Q. I understand that you make
19   certain reductions, but that's the
20   basis of the -- of the damages
21   calculation starts with the $900,000
22   through the term of the contract,
23   right?
24      A. Agreed.
25      Q. Now, Mr. Flaherty, what if the

Page 168

1    CROSS-EXAMINATION MR. FLAHERTY
2    contract extended to 2030? Do you
3    think it would be reasonable to just do
4    900,000 times 15 and start your damages
5    calculation that way?
6       A. I don't know. I'd have to see
7    what the facts and circumstances were
8    up to 2030.
9       Q. Would you agree that at some
10   point in time it becomes unreasonable
11   to just continue to do the math
12   $900,000 times a number?
13      MR. CROWE: Objection. He's
14   asking whether it's unreasonable.
15   Isn't that ultimately a question
16   of law?
17      THE ARBITRATOR: This
18   witness is not here to opine on
19   the reasonability of contract
20   provisions, which is what you're
21   asking him to do. So, I mean,
22   sustained. Next question.
23      MR. LEWIS: Mr. Farber, if I
24   may be heard because I didn't
25   have an opportunity to Mr. Crowe

Page 169

1    CROSS-EXAMINATION MR. FLAHERTY
2    --
3       THE ARBITRATOR: Fair
4    enough. Go ahead.
5       MR. LEWIS: My question is
6    more about the damages
7    calculation, and at some point in
8    time whether mitigation needs to
9    be included in the damages
10   calculation and he's the damages
11   expert.
12      THE ARBITRATOR: That's no
13   what he asked him.
14      MR. LEWIS: Mr. Crowe -- I'm
15   sorry.
16      THE ARBITRATOR: What you
17   asked him was: Is it reasonable
18   if the contract went for another
19   15 years, and it had this
20   provision in it, for him to do
21   that calculation. I mean, who
22   knows. You know, maybe those
23   parts would have said, "We don't
24   care if it goes for 80 years."
25   He's not a lawyer. It's a



CROSS-EXAMINATION MR. FLAHERTY

1  CROSS-EXAMINATION MR. FLAHERTY
2  contract provision.
3          I don't see that -- it's
4  really not going help me in terms
5  of what I have to decide whether
6  it would be reasonable for a
7  period of time after the
8  expiration of this contract.
9          We've got enough
10  problems just dealing with the
11  period of the contract, so I
12  sustained the objection and let's
13  move on.
14      Q. Mr. Flaherty, you will agree
15  with me that at some point in time you
16  would have to take into account
17  mitigation into your damages
18  calculation?
19          MR. CROWE:  Objection.
20          THE ARBITRATOR:  Sustained
21  [sic].  He can answer.
22          MR. LEWIS:  You mean
23  "overruled"?
24          THE ARBITRATOR:  I'm sorry.
25  I meant overruled.  That he can

1  CROSS-EXAMINATION MR. FLAHERTY
2  answer.
3      A. In a damages calculation, to the
4  extent mitigation is feasible, it
5  should be considered in a general
6  damages calculation.
7      Q. Okay.  So by that portion of
8  your testimony, are you testifying that
9  you excluded that because you don't
10  believe that mitigation was feasible?
11      A. I don't believe any mitigation
12  was possible or took place.  The
13  contract was never fulfilled by
14  anybody.  The whole $900,000 was lost
15  for the remainder of the contract.
16      Q. Including while Forall was
17  operating the store; isn't that true,
18  Mr. Flaherty?
19          MR. CROWE:  Objection.
20          THE ARBITRATOR:  "Even while
21  Forall was operating the store,"
22  I don't -- sustained.  I don't
23  understand the question.
24          It was -- say it again,
25  Mr. Lewis.

1  CROSS-EXAMINATION MR. FLAHERTY
2          MR. LEWIS:  Sure.  Mr.
3  Flaherty just said that no one
4  who was operating was able to
5  fulfill the obligation under the
6  contract.  My question was:  That
7  includes while Forall was
8  operating the store assuming, Mr.
9  Flaherty, is talking about
10  purchases of up to $900,000 per
11  year.
12          MR. CROWE:  Objection.
13  That's not what the witness said.
14          THE ARBITRATOR:  I agree
15  with Mr. Crowe.  I didn't quite
16  hear that.  So why don't you
17  restate it in a form of a full
18  question, Mr. Lewis.
19          I don't think I
20  necessarily agree with you that
21  that's what he testified to.  Go
22  ahead.
23          MR. LEWIS:  Fair enough,
24  Mr. Farber.
25      Q. So, Mr. Flaherty, you just said

1  CROSS-EXAMINATION MR. FLAHERTY
2  if mitigation is feasible, it should be
3  included in the damages calculation;
4  did I hear that correctly?
5      A. I think that's correct
6  paraphrasing, yes.
7      Q. I didn't mean to paraphrase.
8      A. Then we can read back the record
9  if we're not going to paraphrase.
10          THE ARBITRATOR:  Let's just
11  -- Mr. Flaherty, you're an old
12  handed testifier, so let's not
13  get into that, all right?
14          Here's the question,
15  look, as Mr. Lewis has pointed
16  out, you didn't take into account
17  anything on mitigation, we know
18  that, the question is:  Why not?
19  Tell me why not.
20          THE WITNESS:  Sure.  In my
21  opinion, there was no mitigation.
22  Nobody picked up this contract
23  after August of 2016.  And so
24  there was definitely no
25  mitigation.  As far as the legal



Page 174

1    CROSS-EXAMINATION MR. FLAHERTY
2  obligation to mitigate, that's
3  not my decision.
4         Whether there was even
5  an opportunity to mitigate, I
6  don't know if that's even
7  possible.  By the time the store
8  had operated, had gone out of
9  business, had closed abruptly,
10  and kind of ruined its
11  reputation, I think to assume
12  that Forall could find somehow to
13  mitigate, it's a reach if you're
14  going to do it on a theoretical.
15       THE ARBITRATOR:  Okay.
16       Go ahead, Mr. Lewis.
17  Q. So you excluded it because you
18  didn't believe mitigation was feasible
19  based on what you understood; is that
20  fair?
21  A. No.  I just testified as to why
22  I excluded it.
23       THE ARBITRATOR:  It actually
24  is pretty much what Mr. Lewis
25  said.  You didn't think that it

Page 175

1    CROSS-EXAMINATION MR. FLAHERTY
2  would happen, right?
3       THE WITNESS:  And more
4  importantly, it didn't happen.
5  There was no mitigation.
6  Q. I appreciate you pointing that
7  out.  Let me ask you a question so we
8  can move on from this.  What you're
9  saying is it's not in your report
10  because Forall didn't mitigate, so
11  there's nothing to account for because
12  there was no mitigation, you testified
13  as such, correct?
14       MR. CROWE:  Objection.  I
15  think the witness said this is
16  primarily a legal issue.  And
17  then factually, it does not
18  appear to be something that
19  occurred or may have been
20  feasible based on his knowledge.
21  I don't think it's any more
22  complicated than that.
23       THE ARBITRATOR:  Guys, this
24  isn't doing me any good.  All
25  right.  The bottom line here is I

Page 176

1    CROSS-EXAMINATION MR. FLAHERTY
2  know he didn't mitigate.  I know
3  the position of Mr. Salsbery is
4  that he should have mitigated.
5  He's given his reasons.
6       I'll hear from Salsbery.
7  We can dance around the words and
8  waste another 20 minutes.
9  Mr. Lewis, I get your point.  I
10  understand it.  It's up to you.
11  You want to pursue it -- I think
12  you should move on to the next
13  question.
14       MR. LEWIS:  Fair enough,
15  Mr. Farber.
16       THE ARBITRATOR:  Okay.
17  Let's go.
18  Q. Mr. Flaherty, you talked
19  about -- you testified to what you
20  reviewed in preparation for preparing
21  your report; do you recall that?
22  A. I don't recall that.  I don't
23  remember anybody asking me that.
24  Q. Well, they certainly did.  You
25  said you reviewed a complaint, you

Page 177

1    CROSS-EXAMINATION MR. FLAHERTY
2  reviewed legal proceedings, the
3  contracts, leases, invoices, etcetera;
4  do you recall that?
5  A. I think that question was what I
6  reviewed to prepare my report at the
7  time.
8  Q. That was my question, sir.  I
9  don't know if you didn't hear me.  I
10  said what did you review to prepare
11  your report?
12  A. Yes.  So --
13  Q. You testified that that was the
14  complaint, legal proceeding, contracts,
15  leases, invoices; do you recall that?
16  A. Yeah.  And some spreadsheets and
17  some other things that I said may be
18  referenced in my report that I didn't
19  list.
20  Q. Well, they wouldn't be
21  referenced in your report because you
22  said you may have forgotten to list
23  some additional items in your report;
24  that was your testimony.
25  A. No.  I think what I said was --



45 (Pages 174 to 177)

1    CROSS-EXAMINATION MR. FLAHERTY
2  when I was verbally responding to the
3  question, I may have forgotten to list
4  something.  However, there may be
5  things referenced in my report that I
6  did look at.
7     Q. Is everything that you relied
8  responsibly referenced in your report?
9     A. I don't know.
10    Q. Shouldn't it be, Mr. Flaherty?
11    A. I don't -- to the extent that it
12  was important to my opinions, it's in
13  there.  If you question me --
14    Q. I'm asking you based on your
15  many years of experience that you
16  testified about with Mr. Crowe under
17  his examination, shouldn't everything
18  that you relied upon be referenced in
19  your report, sir?
20    A. I'd say yes, generally, but
21  sometimes things don't get referenced,
22  but yes, generally they should be.
23    Q. Sometimes things don't get
24  referenced.  It goes to the credibility
25  and the reliability of the report,

1    CROSS-EXAMINATION MR. FLAHERTY
2  correct, sir?
3     A. Not necessarily.
4     Q. I'm going to take the answer to
5  the question was it should be in there,
6  correct, everything you relied upon
7  should be referenced in your report,
8  correct?
9     A. That is what I attempt to do,
10  yes.
11     MR. LEWIS:  Mr. Farber, you
12  have been really, really good in
13  instructing witnesses to do "yes"
14  or "no" when they can without --
15  I'll ask if that continues, if
16  perhaps Mr. Farber will help me
17  in that regard.
18     THE ARBITRATOR:  Well,
19  usually I'm pretty tough on party
20  witnesses.  Third-party witness
21  and experts, I don't -- I don't
22  usually impose what I -- what you
23  saw me do.
24     But, Mr. Flaherty, as
25  you know, it goes faster if you

1    CROSS-EXAMINATION MR. FLAHERTY
2  can possibly on cross respond
3  "yes," "no," "I don't remember,"
4  "I don't know," and that's fine,
5  and we'll leave it at.
6     THE WITNESS:  I'm happy to
7  do that, but the problem is when
8  you say "should be," things like
9  that, that make me have to -- I
10  can't respond yes or no.
11     THE ARBITRATOR:  To the
12  extent you can, try to respond
13  that way.
14     THE WITNESS:  Absolutely.
15     THE ARBITRATOR:  Go ahead,
16  Mr. Lewis.
17     MR. LEWIS:  Thank you.
18    Q. I'm going to put your report
19  back on the screen, Mr. Flaherty.  Are
20  you able to see my screen?
21    A. I am.
22     MR. CROWE:  Is there a
23  question pending?
24     MR. LEWIS:  There's not.
25     THE ARBITRATOR:  Not yet.

1    CROSS-EXAMINATION MR. FLAHERTY
2  He's just posting something on
3  the board.
4     MR. LEWIS:  Mr. Crowe, you
5  will hear me if I have a
6  question.
7     MR. CROWE:  That I will.
8     MR. BROWN:  We were having a
9  side bar with counsel.  We were
10  afraid we might have missed
11  something.  I've had plenty of
12  delays longer than you've taken.
13     MR. LEWIS:  I'm just trying
14  to find a sentence in this
15  report.  Thank you, though.  I
16  appreciate your indulgence.
17    Q. Mr. Flaherty, are you able to
18  see this?  I believe this is Schedule
19  3.  Is my screen showing okay?
20    A. Yes.
21     THE ARBITRATOR:  Mr. Lewis,
22  I see Schedule 3.
23     MR. CROWE:  I see it as
24  well.
25     MR. LEWIS:  Okay.



Page 182

CROSS-EXAMINATION MR. FLAHERTY
1
2    Q. Mr. Flaherty, I just want to ask
3    you this "Sample Loss Margin Versus
4    Sarah"; do you see that?
5        A. Yes.
6        Q. You list that as a source for
7    information that you're referencing
8    here; is that correct?
9        A. Yes.
10       Q. What is that document, sir?
11       A. It's an excel spreadsheet that
12   was provided to me that is the basis
13   for Schedule 3.
14       Q. Provided to you by whom?
15       A. I don't remember exactly who I
16   received it from.  I believe it
17   probably came through Ms. Gioffre, but
18   I'm not positively sure.
19       Q. You were listening to    Ms.
20   Gioffre when I asked her if she
21   provided you this document, you had
22   joined by then?
23       A. Yes.
24       Q. And she testified she did not,
25   correct?

Page 183

CROSS-EXAMINATION MR. FLAHERTY
1
2        A. My recollection is she said she
3    wasn't sure.  She'd have to go back and
4    check to see everything she sent me,
5    and I'm not sure that she sent it to me
6    either.  I'm not exactly sure through
7    which channel I got this.
8        Q. I beg to differ with you.  Ms.
9    Gioffre said she was not even aware of
10   this document, sir.
11           MR. CROWE:  Objection.
12       Q. So I'll ask you again.  Who
13   provided this document to you,
14   Mr. Flaherty?
15       A. I am not sure.  I can go back
16   and check my records.  I'm not sure
17   exactly what distribution channel it
18   came to me through.  I was dealing with
19   Ms. Gioffre on most things, so I assume
20   it was her, but I could be wrong.
21       Q. And you said this is what you
22   support your calculation in Schedule 3
23   on, this document, right?
24       A. It is the support for the Forall
25   cost column.

Page 184

CROSS-EXAMINATION MR. FLAHERTY
1
2        Q. Do you have a footnote by the
3    Forall cost column which is indicating
4    that that's the only data that's
5    supported by this document?
6           MR. CROWE:  Did you say "is
7    there a footnote?"
8        Q. Mr. Flaherty, is there something
9    that's on Schedule 3 where you indicate
10   that the only data that's supported by
11   the sample loss margin is Forall costs?
12   Is there such an indication in your
13   report?
14       A. I don't understand the question.
15   The source is the sample loss margin
16   for this report.  The selling price to
17   Sarah, the Forall cost, the Forall duty
18   and freight, is on that spreadsheet.
19       Q. Well, Mr. Flaherty, you just
20   testified that the only column that was
21   supported by the Sample Loss Margin
22   Versus Sarah was Forall cost?
23       A. The selling price to Sarah
24   column has invoices.  The duty and
25   freight -- Forall duty and freight has

Page 185

CROSS-EXAMINATION MR. FLAHERTY
1
2    invoices.
3        Q. But all of these columns are
4    included on this Sample Loss Margin
5    Versus Sarah?
6        A. I believe so.
7        Q. Where is that document, sir?
8        A. It would be on my server.
9        Q. Why isn't it in your report,
10   sir?
11       A. I -- I don't know.  I summarized
12   it here.
13       Q. There's no way to test this
14   without having that document, then I
15   say there's probably no way to test
16   what's on that document without having
17   its support, but why wouldn't you at
18   least include the document that you
19   referenced as the source for this
20   calculation in your report?
21           MR. CROWE:  Objection.
22       A. I don't --
23           THE ARBITRATOR:  Hang on.
24   There's an objection.
25           What is the objection,



Page 186

```
1        CROSS-EXAMINATION MR. FLAHERTY
2      Mr. Crowe.
3         MR. CROWE:  Counsel's
4    statement in terms of what can be
5    tested -- it sounds like he's
6    testifying as opposed to asking
7    questions.  He's incorporating
8    facts which haven't been
9    established.
10        THE ARBITRATOR:  That was a
11    bit of a creative one, Mr. Crowe.
12    Overruled.  He can answer.
13      A. My answer, to the best I
14    remember the question, is that I don't
15    always attach every underlining source
16    document to my expert report.  I
17    properly footnote where it came from.
18    I guess to the extent that counsel
19    wanted it, they could have requested it
20    and it would have been --
21        THE ARBITRATOR:  You've
22    answered.  You don't have to tell
23    us what counsel can do.  All
24    right.  You've answered the
25    question.
```

Page 187

```
1        CROSS-EXAMINATION MR. FLAHERTY
2      Go ahead.
3      Q. Mr. Flaherty, you stated you
4    don't always attach the supporting
5    information.  You attached pages and
6    pages of invoices; do you not?
7      A. There are pages of invoices
8    there, yes.
9      Q. Yet you failed to attach the
10    document that you attribute to being
11    the source for this very important
12    schedule that you have here, and you
13    failed to attach this document to your
14    report, the Sample Loss Margin Versus
15    Sarah, correct?
16      A. No.  I disagree.  I didn't fail.
17    There's many source documents that are
18    in this report that are referenced but
19    are not attached to the report, many of
20    them.
21        THE ARBITRATOR:  Flaherty,
22    we don't have to argue about
23    everything.  The fact of the
24    matter is, you did not include
25    it, and I know that, and that's
```

Page 188

```
1        CROSS-EXAMINATION MR. FLAHERTY
2      it.  Let's move on.
3      Q. Mr. Flaherty, what did you do to
4    test the loss costs that you list in
5    lost -- the less cost column in this
6    schedule?
7      A. I -- so first I -- I discussed
8    with Forall the -- the cost that should
9    be provided, the type of costs, and how
10    to provide me that information.  Then I
11    tested it to purchase invoices from
12    Forall to Sarah that would show me the
13    selling price that Forall -- that may
14    not answer your question.  You may just
15    have been asking about cost, so I
16    apologize on that.
17        And so as far as the cost --
18    your question was just on the cost.
19    I'm sorry, Mr. Lewis.
20      Q. I was going to ask you a
21    follow-up, but my question was on the
22    costs.
23      A. So on the costs, I interviewed
24    with Forall, told them the type of cost
25    that should be provided, how -- how and
```

Page 189

```
1        CROSS-EXAMINATION MR. FLAHERTY
2    what should be included in those costs,
3    and they provided that to me.
4      Q. When you say, "They provided
5    that," they provided that to you
6    verbally, or what do you mean by, "They
7    provided that"?
8      A. On the source reference Sample
9    Loss Margin Versus Sarah, that's where
10    it was provided.
11      Q. Again, I'm going to ask you by
12    whom?  Does that refresh your
13    recollection as to who provided that to
14    you?
15      A. I'm sorry.  It doesn't.
16      Q. You said you interviewed Forall.
17    You said what you needed to support
18    this less cost column, what you needed,
19    and they provided that, and that
20    doesn't refresh your recollection as to
21    who provided it?
22      A. No.
23      Q. Who all did you interview?
24        MR. CROWE:  Objection.
25        THE ARBITRATOR:  What's the
```



Page 190

1    CROSS-EXAMINATION MR. FLAHERTY
2    objection?
3         MR. CROWE:  "Who all," can
4    you ask him who he interviewed?
5         THE ARBITRATOR:  I think he
6    did.  Overruled.  You can answer.
7              Who did you interview?
8         THE WITNESS:  I don't
9    remember who was on the call.  I
10   was dealing with their accounting
11   group, Michelle and her
12   colleague, and I -- I can't
13   remember if I was going through
14   them on everything or if I had
15   people from Forall on the phone
16   as well.  I don't remember.
17        Q. Approximately how many times did
18   you speak with Forall or its accounting
19   group in preparation for preparing your
20   report?
21        A. So I consider Michelle's group,
22   Gioffre's group, to be their accounting
23   group.  I don't know.  By e-mail, by
24   telephone, I'll ballpark it, either 10
25   times, 6 to 10 times.

Page 191

1    CROSS-EXAMINATION MR. FLAHERTY
2         Q. Were documents provided to you
3    on different occasions or did they come
4    together?
5         A. Different occasions.
6         Q. And do you recall from whom you
7    received the documents?
8         A. No.  As I said, my recollection
9    of my primary contact was Michelle.
10   Not to say I didn't get things directly
11   in another way.
12        Q. Okay.  Mr. Flaherty, did you
13   review your report in preparation for
14   your testimony today?
15        A. Yes.
16        Q. Did you review your source
17   documents in preparation for your
18   testimony today?
19        A. Yes.
20        Q. Can you share with us the Sample
21   Loss Margin Versus Sarah document?
22        MR. CROWE:  Objection.  Is
23   he calling for discovery at this
24   stage in proceeding?
25        THE ARBITRATOR:  Counsel,

Page 192

1    CROSS-EXAMINATION MR. FLAHERTY
2    what do you mean, can he share
3    with you?
4         MR. LEWIS:  Well, he shared
5    with us invoices, etcetera.  I'm
6    asking Mr. Flaherty if he can
7    share with us what this document
8    is that he supports Schedule 3
9    with.
10        MR. CROWE:  I'm going to
11   note an objection.  The gentleman
12   prepared his report as he deemed
13   appropriate.  This gentleman is
14   entitled to cross examine him,
15   but to ask him now "I want you to
16   re-jigger this to my
17   specifications," is not
18   appropriate for adversary counsel
19   in the middle of a hearing to
20   say, "Let's come up with a better
21   report or I want you to furnish X
22   Y and Z."
23        MR. LEWIS:  That's not what
24   I'm asking.
25        THE ARBITRATOR:  Mr. Crowe,

Page 193

1    CROSS-EXAMINATION MR. FLAHERTY
2    that was not the question.  The
3    question was simply could he
4    provide this.
5              But Mr. Lewis, I'm not
6    sure where we are going with
7    this.  I mean, the date of this
8    report is February 12, 2020.  We
9    had a schedule.  We had a
10   discovery schedule.  I don't
11   remember right now when this was
12   served, but I believe it was back
13   in early 2020.  And there was
14   plenty of time to ask for this
15   sample loss margin against Sarah
16   or any other document.
17             I'm not understanding,
18   you know, why a request is being
19   made now at the hearing rather
20   than having this being done
21   earlier.  I'm not going to
22   interrupt the hearing to have the
23   witness begin searching around
24   for documents.
25             So on that basis, I

MAGNA
LEGAL SERVICES

Page 194

```
1       CROSS-EXAMINATION MR. FLAHERTY
2   think the objection is sustained.
3   Next question.
4        MR. LEWIS:  To the extent
5   that document is with Mr.
6   Flaherty, may we question him
7   about it?  May I examine him
8   about the document?
9        MR. CROWE:  Objection.
10       THE ARBITRATOR:  Do you have
11  the document with you, Mr.
12  Flaherty?
13       THE WITNESS:  I'm on a
14  computer.  I could get on my
15  server and get to it at some
16  point.
17       THE ARBITRATOR:  It's not
18  with him.  He'd have to go at
19  some point to find it.  You just
20  heard the answer.  Let's move on.
21       MR. LEWIS:  Thank you.
22       THE ARBITRATOR:  Mr. Lewis,
23  I'm not sure you want me to see
24  that.
25  Q. Mr. Flaherty, you were asked
```

Page 195

```
1       CROSS-EXAMINATION MR. FLAHERTY
2   during your direct-examination about
3   this paragraph, "Minimal Inventory
4   Purchases."  Do you recall that?
5        A. Yes.
6        Q. Do you recall testifying about
7   how you -- in this paragraph it states
8   you're calculating for four and a half
9   years of damages, but in the actual
10  report you use five years of damages;
11  do you recall that?
12       A. The report is five years, yes.
13       Q. My question, again, is:  Do you
14  recall testifying about how, in this
15  paragraph, you say that you're
16  calculating 4.5 years of damages and
17  $4,050,000; do you recall that?
18       A. Yes, I agree.  The sentence
19  says, "Four and a half years for
20  400,050,000," the calculation is
21  because of the seasonal obligations
22  under the contract.  It was four
23  million five, yes.
24       Q. Do you recall whether Forall had
25  already made the spring -- had already
```

Page 196

```
1       CROSS-EXAMINATION MR. FLAHERTY
2   made the second purchase in 2016 for
3   that year?
4        A. I don't believe they did.
5        Q. What do you base that on?
6        A. I'm just thumbing through my
7   report here on the other screen so bear
8   with me.  If you go to Attachment 1,
9   Page 204 on my PDF, it's Page 13, if
10  that helps.
11       Q. It's after your Attachment D?
12       A. Yes.  Next page, I believe.
13       Q. All right.
14       A. Next page after that.  There you
15  go.  Scroll back up to the top.  The
16  top of that page.  Okay.
17       What I did was I looked at the
18  seasonal buying patents, and what these
19  invoices that we had for 2011.
20       Q. Okay.
21       A. You can see that those purchases
22  were September, October seasonal
23  purchases, not June.
24       Q. So this is through 2012 that you
25  have listed here.  Am I missing --
```

Page 197

```
1       CROSS-EXAMINATION MR. FLAHERTY
2        A. No, that's it.
3        Q. So you didn't take into account
4   '13, '14, '15 or '16 here?
5        A. Well, what I determined is that
6   they had not made the seasonal purchase
7   as of June when the store shut down,
8   and they had not made the seasonal
9   purchase because I looked back to the
10  previous year and the seasonal purchase
11  were September, October purchases.
12       Q. Mr. Flaherty, did someone
13  provide you with this historical
14  purchasing information here, the dates
15  of this historical purchases?
16       A. Yes.
17       Q. Someone at Forall or their
18  accounting department provided you that
19  historical information, right?
20       A. Yes.
21       Q. Why wouldn't you just ask them
22  to provide you the data for 2016 so you
23  could determine in actuality whether
24  Forall had made the purchase in 2016?
25       A. I didn't do that.
```



Page 198

1    CROSS-EXAMINATION MR. FLAHERTY
2    Q. Mr. Flaherty, you would include
3  information from 2011 and 2012 to
4  support what you're relying on that now
5  to support an inference that Forall did
6  not make the second purchase of 2016,
7  when you had that information available
8  to you.
9        THE ARBITRATOR: Is that a
10    question, Counselor?
11        MR. LEWIS: Yes, it is,
12    Mr. Farber.
13    Q. Is that your testimony,
14  Mr. Flaherty?
15        THE ARBITRATOR: That's a
16    question.  Go ahead.
17    A. Yes.  I utilized this to
18  demonstrate that the seasonal buying
19  patterns are after June.
20    Q. But, Mr. Flaherty, you
21  understand that an expert's report has
22  got to be reliable, and you had the
23  information for 2016 from Forall's
24  accounting people, but instead you
25  chose to rely on 2011 and 2012?

Page 199

1    CROSS-EXAMINATION MR. FLAHERTY
2        MR. CROWE:  Objection.
3    Q. Why would you do that?
4        THE ARBITRATOR:  Hang on.
5    Why don't you recast it as a
6    question.  "You had the
7    information, but instead you
8    relied on," that's a statement.
9    It may be a correct argument, but
10    if you want to make it a question
11    do that, Mr. Lewis.
12        MR. LEWIS:  Thank you,
13    Mr. Farber.
14    Q. Mr. Flaherty, why would you rely
15  on 2012 and 2011 data when you had the
16  2016 data available to you?
17    A. I didn't have the 2016 data.
18    Q. Mr. Flaherty, you just said that
19  Forall's accounting people provided
20  this historical data to you.  Of course
21  you had 2016 available to you.
22        MR. CROWE:  Objection.
23        THE ARBITRATOR:  What's the
24    objection?
25        MR. CROWE:  It's -- it

Page 200

1    CROSS-EXAMINATION MR. FLAHERTY
2  assumes that this was available
3  to him, and it -- it constitutes
4  a statement of counsel and that's
5  not a question.
6        THE ARBITRATOR:  Overruled.
7        You can answer it,
8    Mr. Flaherty.
9    A. So the document we are looking
10  at is -- is a document that was already
11  prepared back in 2011 and '12, and it
12  was related to the Forall incurring and
13  the build out costs related to the new
14  location.  Okay.  I never received
15  daily sales from Forall to Sarah.  I
16  didn't have that information.
17    Q. Mr. Flaherty, you understand
18  that's not what I'm asking you at all.
19  What we are talking about is whether
20  Forall made the second season purchase
21  in 2016, and you said you don't believe
22  they did.  I asked you why do you not
23  believe so and you took me to this
24  page.
25        So, Mr. Flaherty, my question to

Page 201

1    CROSS-EXAMINATION MR. FLAHERTY
2  you is:  Why would you rely on 2011 and
3  2012 data to determine that Forall
4  didn't make the second season purchase
5  in 2016 instead of relying on the
6  actual data in 2016?
7    A. I feel like I've answered this.
8  I didn't have the 2016 data.
9    Q. Mr. Flaherty, to whom did you
10  ask for it?  Who did you ask for it?
11    A. I don't believe I did.
12    Q. Mr. Flaherty, you are making a
13  determination, this is $450,000
14  determination that Forall had not made
15  the second season purchase in 2016, and
16  you didn't bother to ask Forall whether
17  they did or not?
18        MR. CROWE:  Objection.
19        THE ARBITRATOR:  Guys.
20    Guys.  Mr. Flaherty, do you know
21    right   now -- what is your best
22    information as to whether or not
23    the second season '16 was
24    ordered, I guess, it would have
25    been ordered by Forall, itself,



Page 202

CROSS-EXAMINATION MR. FLAHERTY
1   CROSS-EXAMINATION MR. FLAHERTY
2   because Forall, itself, was the
3   one who was running the store
4   then.  It's your information that
5   it was ordered or was not
6   ordered?
7       THE WITNESS:  I don't know.
8       THE ARBITRATOR:  You don't
9   know.  Okay.  Okay.  Next
10  question.
11  Q. Mr. Flaherty, you don't know but
12  yet you included that $450,000 in your
13  damages calculation; is that true?
14      MR. CROWE:  Objection.
15  A. That is true.
16      THE ARBITRATOR:  Overruled.
17      He can answer.
18  A. Yes, that is true.
19  Q. Mr. Flaherty, I know we've gone
20  over this ad nauseam.  What documents
21  you were provided and what you relied
22  upon.  Through the course of your
23  testimony, did anything else come to
24  mind, anything else you recall
25  reviewing now?

Page 203

1   CROSS-EXAMINATION MR. FLAHERTY
2       THE ARBITRATOR:  Anything
3   else he relied upon, Mr. Lewis?
4       MR. LEWIS:  That's correct,
5   Mr. Farber.
6   A. I don't think anything comes to
7   mind.  No.  Nothing comes to mind.
8   Q. Okay.  Now, the operating
9   agreements that -- you didn't review
10  those?
11  A. I --
12  Q. I misspoke.  Not the financial
13  statements; you didn't review those?
14      MR. CROWE:  Objection.
15  Whose financial statements?  Why
16  is it relevant?
17      MR. LEWIS:  Mr. Crowe,
18  that's not an objection.  I'm
19  asking Mr. Flaherty if he
20  reviewed financial statements.
21  You've got a long list from
22  several witnesses now.
23  Q. Mr. Flaherty, am I correct that
24  you did not review financial
25  statements?

Page 204

1   CROSS-EXAMINATION MR. FLAHERTY
2   A. I believe that is correct.
3   Q. Okay.  Mr. Flaherty, you were
4   testifying - I admit here, I just want
5   to get clarification for what your
6   testimony was - you were talking about
7   these documents here and you said that
8   you -- you gave them -- and I'm
9   paraphrasing -- more credence because
10  they were accounting documents; is that
11  a fair summary?
12  A. I gave them credence because
13  they were accounting documents, yeah.
14  Q. And that was because of these
15  references here under source?
16  A. What I was trying to demonstrate
17  is that -- when I requested this
18  information, I just didn't get an excel
19  document prepared at that time.  This
20  was a document that it was sourced to
21  contemporaneous accounting entries back
22  in '16, '17, '18, '19.
23  Q. Okay.  When you say "it was
24  sourced to that," did you receive the
25  actual accounting data or did you

Page 205

1   CROSS-EXAMINATION MR. FLAHERTY
2   receive the summary referencing that
3   sourced data like we see here in your
4   report?
5   A. It's a summary referencing that
6   data.
7   Q. Okay.  What did you do to test
8   the accuracy of this data?
9   A. Other than, you know, discussing
10  with the accounting group and determine
11  that they were very professional and
12  that these were coming from real
13  accounting entries, I didn't test.
14  Q. You just took Forall's word for
15  it?
16  A. The accounting documents for it.
17  Q. You took their word for the
18  veracity of the documents dated
19  therein, correct?
20  A. Correct.
21      MR. CROWE:  Objection.
22  Q. You didn't test it yourself,
23  correct?
24  A. Correct.
25      MR. LEWIS:  Mr. Farber, if I



Page 206

1    CROSS-EXAMINATION MR. FLAHERTY
2  may just collect my thoughts, I
3  may not have anything further.
4        THE ARBITRATOR:  All right.
5  Sure.
6        MR. LEWIS:  Can we take the
7  customary five?
8        THE ARBITRATOR:  Okay.
9  Let's take five.
10        (Whereupon, a recess was
11  taken at this time.)
12        THE ARBITRATOR:  Anything
13  further, Mr. Lewis?
14        MR. LEWIS:  Just one more
15  thing.
16        THE ARBITRATOR:  All right.
17     Q. Mr. Flaherty, can you see my
18  screen?
19     A. Yes.
20     Q. Just drawing your attention to
21  inventory on-hand, you reported at the
22  time of the store closing there were
23  $773,811 of inventory at the store; do
24  you see that?
25     A. Yes.

Page 207

1    CROSS-EXAMINATION MR. FLAHERTY
2     Q. And what did you do to test that
3  number?
4     A. Again, I received an accounting
5  document from the accounting group that
6  had that number.  I accepted it.
7     Q. You accepted it.  You didn't do
8  any independent testing of the accuracy
9  of that number?
10     A. I did not.
11     Q. What about Forall's estimate
12  that the cost of losses on such was 10
13  percent; did you do anything to test
14  that estimation?
15     A. I didn't do any test other than
16  to understand the reason for it being
17  that the inventory had to be pulled and
18  moved to New Jersey or either back to
19  Jersey or liquidator all I did.
20     Q. You had not tested the starting
21  point, the 773,811 number, you did not
22  -- you did not support or -- you have
23  no basis for this number being in your
24  report other than the fact that Forall
25  told you; is that safe to say?

Page 208

1    RE-DIRECT EXAMINATION MR. FLAHERTY
2     A. That's true.
3        MR. LEWIS:  Nothing further,
4  Mr. Farber.
5        THE ARBITRATOR:  Mr. Crowe,
6  anything further?
7        MR. CROWE:  Just a couple of
8  points, Mr. Farber.
9  RE-DIRECT EXAMINATION
10  BY MR. CROWE:
11     Q. There was just a great deal of
12  back and forth and questions about this
13  $450,000 in the fall of 2016 that's
14  included in your report, Mr. Flaherty.
15        Did you -- did you ever hear
16  that Sarah made any purchases in 2016
17  as opposed to Forall?  In other words,
18  do you know whose obligation it was to
19  make those purchases under the contract
20  in 2016?
21        MR. LEWIS:  Objection.
22        THE ARBITRATOR:  Sustained,
23  Mr. Crowe.  That's two questions
24  that are very different.
25        MR. CROWE:  Okay.

Page 209

1    RE-DIRECT EXAMINATION MR. FLAHERTY
2        THE ARBITRATOR:  I mean.
3  You ought to break them up.  One,
4  you're asking about a legal
5  obligation.  Another one you're
6  asking if something happened.  Go
7  ahead.
8     Q. Do you know who under the
9  contract was required to make those
10  purchases in fall 2016 to shelve the
11  inventory?
12        MR. LEWIS:  Objection.
13        THE ARBITRATOR:  What's the
14  objection?
15        MR. LEWIS:  That calls for a
16  legal determination as part of
17  what we are here for today.
18        THE ARBITRATOR:  No.
19  Overruled.  I'm not talking it as
20  a legal conclusion.  The question
21  is just the witness's knowledge
22  for whatever that is worth to me
23  because I have the contract.
24        But go ahead.  Do you
25  know?



RE-DIRECT EXAMINATION MR. FLAHERTY

1   RE-DIRECT EXAMINATION MR. FLAHERTY
2      A. My understanding was that it
3   would be Sarah that would be
4   responsible.
5      Q. So isn't it true that all the
6   questions by colleague, Mr. Lewis, as
7   to what Forall bought or what Forall
8   may have purchased and may have
9   supplied are of no consequence under
10  the analysis?
11         THE ARBITRATOR: Is there an
12  objection to that question?
13         MR. LEWIS: Yes.
14         THE ARBITRATOR: Sustained.
15  That's for me to decide whether
16  Mr. Lewis's questions are of
17  consequence. Not for this
18  witness. Next question, if any.
19      Q. There was also a good deal of
20  discussion about the source material
21  for your -- your margin calculation.
22  You remember Mr. Lewis's questions in
23  that regard?
24      A. Yes.
25      Q. Isn't it true that the source

1   RE-DIRECT EXAMINATION MR. FLAHERTY
2   material for the margin calculation
3   amounts to a hill of beans when your
4   colleague, Mr. Salsbery, agrees with
5   you on the calculation in the industry
6   of 50 percent?
7         THE ARBITRATOR: Counsel, I
8   think that's for me to decide.
9      Q. Did your colleague,     Mr.
10  Salsbery, agree with you as to what the
11  appropriate margin calculation is in
12  his report?
13      A. Yes. He agreed that the margin
14  calculation was reasonable compared to
15  the industry.
16      Q. Okay. And he only called
17  qualmed with you on the variable, but
18  he did by in large, you did a swell job
19  on that issue of margin, right?
20         MR. LEWIS: Objection.
21         THE ARBITRATOR: I've read
22  both reports, so I know about
23  that. Sustained.
24         MR. CROWE: One second,
25  please. Very good. That's all I

1   RE-DIRECT EXAMINATION MR. FLAHERTY
2   have.
3         THE ARBITRATOR: Anything
4   further, Mr. Lewis?
5         MR. LEWIS: Nothing further.
6         THE ARBITRATOR: Mr.
7   Flaherty, thank you very much.
8   Your testimony as a witness is
9   excused. Thank you.
10         THE WITNESS: Thank you.
11         THE ARBITRATOR: Who's our
12  next witness? Well, let me ask
13  Mr. Brown, do you have any
14  further witnesses?
15         MR. BROWN: No, sir.
16         THE ARBITRATOR: Mr. Lewis,
17  you have something in rebuttal, I
18  think?
19         MR. LEWIS: I do. And I
20  apologize, I know we are just
21  coming off the short break, but I
22  know Mr. Salsbery -- well, I'll
23  ask him.
24         Would you like to take
25  five before we get started, Mr.

1   RE-DIRECT EXAMINATION MR. FLAHERTY
2   Salsbery?
3         THE WITNESS: Yes. If
4   that's okay, please.
5         THE ARBITRATOR: All right.
6   How long do you think your
7   testimony is -- your questioning
8   is going to be with Mr. Salsbery?
9         MR. LEWIS: I don't think we
10  are going to need to do much.
11         THE ARBITRATOR: Okay.
12         MR. CROWE: Mr. Salsbery --
13         THE ARBITRATOR: Gentlemen,
14  what I'd like you to do, all
15  right, I'm going to make this
16  break 10 minutes, because I want
17  you to talk to each other in this
18  respect: When I end a case like
19  this -- and look, this a
20  significant matter. There's a
21  significant claim here, you know,
22  and I recognize that, and I have
23  to make a significant decision
24  here.
25         So my thought is not to



1    RE-DIRECT EXAMINATION MR. FLAHERTY
2    have closing argument this
3    afternoon.  But to give each side
4    an opportunity to review the
5    transcript, give me a closing
6    brief, and then and it's
7    certainly not going to take more
8    than one or two hours, have
9    closing argument in another Zoom
10   session, where you can -- just
11   one brief each.  I don't like
12   answering briefs because they get
13   expensive.
14        And that's -- you know,
15   that's my preference, but I'm
16   willing to hear argument to
17   either counsel as to how to end
18   this matter.  And you know, what
19   I'd like you to do in the next
20   few minutes is talk to each
21   other, and if you agree that
22   that's the way to go, then look
23   at your calendars, and give me
24   dates.
25        You know, obviously, we

1    RE-DIRECT EXAMINATION MR. FLAHERTY
2    are coming up on holidays, and I
3    don't want to intrude on anyone's
4    holiday.  On the other hand, we
5    -- you know, this has been going
6    on a long time.  The store closed
7    here in 2016.  And I'm pretty
8    quick about getting out
9    decisions, so I will get out a
10   decision pretty quickly.
11        But I -- I want to
12   facilitate your calendars,
13   Counselor, particularly, all
14   right.  So think about what I've
15   said, and take your five minutes
16   and then take another five and
17   talk to each other, all right?
18        I've got 3:00.  Tell you
19   what, since this witness is going
20   to be short, why don't we make it
21   15 minutes, we'll come back at
22   3:15.  Thank you all.
23        (Whereupon, a recess was
24   taken.)
25        THE ARBITRATOR:  Mr.

1         PROCEEDINGS
2    Salsbery, if you can stand, raise
3    your right hand.  Do you solemnly
4    swear the testimony you're about
5    to give in this arbitration
6    proceeding will the truth, the
7    whole truth, and nothing but the
8    truth?
9         THE WITNESS:  Yes.
10        THE ARBITRATOR:  Could you
11   be seated, spell your full name
12   and address, please?
13        THE WITNESS:  Chad, C-H-A-D;
14   Salsbery, S-A-L-S-B-E-R-Y.  My
15   address is 50 News Street, North
16   West 3405, Grand Rapids, Michigan
17   49503.
18        THE ARBITRATOR:  Mr.
19   Salsbery, you patiently sat
20   through a number of witnesses, so
21   you know the protocols that are
22   used in connection with the
23   testimony.
24        Mr. Crowe is going to
25   ask you some questions, pause, if

1         PROCEEDINGS
2    Mr. Lewis says the word
3    "objection," then don't answer
4    until I tell you.  And I have
5    read your report, as I've read
6    the other report.
7         I'm sorry.  I got it
8    wrong.  Mr. Lewis is going to ask
9    you questions.  Wait until -- to
10   see if Mr. Crowe says the word
11   "objection."
12        Mr. Lewis, why don't you
13   proceed.
14        MR. LEWIS:  Who is going to
15   handle this witness on behalf of
16   Forall?
17        MR. CROWE:  I'm sorry.
18        MR. LEWIS:  Who is handling
19   on behalf of Forall?  Crowe,
20   okay.
21   C H A D   S A L S B E R Y, the witness
22   herein, having been first duly sworn by
23   the arbitrator, was examined and
24   testified as follows:
25   DIRECT-EXAMINATION



Page 218

1     DIRECT-EXAMINATION MR. SALSBERY
2  BY MR. LEWIS:
3     Q. Mr. Salsbery, you sounded a
4  little faint.
5     A. Can you hear me now?
6        THE ARBITRATOR:  Mr. Lewis,
7     I'm having a little trouble
8     hearing you.
9        MR. LEWIS:  Mr. Farber,
10    you're saying you're having
11    trouble hearing me as well?
12       THE ARBITRATOR:  Better now.
13    Go ahead.
14    A. Can you hear me?
15    Q. It sounds a little faint.  What
16 about for everyone else?
17       MR. CROWE:  It sounds like
18    an echo or it's a very bad
19    connection somehow.  I mean, I
20    can make it out.
21    A. I apologize.  If I sound like
22 I'll yelling.  I'm going to be trying
23 to make sure that you can hear me, so I
24 apologize.
25    Q. Mr. Salsbery, thanks for

Page 219

1     DIRECT-EXAMINATION MR. SALSBERY
2  testifying today and for your patience.
3  You heard Mr. Flaherty's testimony,
4  correct?
5     A. Correct.
6     Q. Before we get started, I want to
7  share with Mr. Farber a little bit
8  about your background.
9     A. Sure.  Yeah.  So I have been
10 working doing economic damages for over
11 20 years.  That -- that work includes
12 work related to the scope of my
13 testimony today.
14    I've worked on projects
15 determining damages, including lost
16 profits, lost business value, business
17 interruption and lost earnings.
18    I have a degree from Indiana
19 University in finance and I am a
20 certified valuation analyst.  I've
21 worked on hundreds of cases dealing
22 with lost profit, and I've been
23 retained as an expert on well over
24 25 cases.
25    Q. Mr. Salsbery, you've listened to

Page 220

1     DIRECT-EXAMINATION MR. SALSBERY
2  the entirety of Mr. Flaherty's
3  testimony?
4     A. I did.
5     Q. And you reviewed Mr. Flaherty's
6  report?
7     A. I did.
8     Q. You prepared a rebuttal report?
9     A. That's correct.
10    Q. Do you believe that Mr. Flaherty
11 has sufficiently supported his damages
12 calculation in this matter?
13    A. I do not.  In my opinion, Mr.
14 Flaherty has failed to provide
15 sufficient support for his
16 calculations.  The data that he is
17 relying upon, in my opinion, is
18 unreliable.  And based upon his
19 testimony, he hasn't done the level of
20 due diligence that's necessary to opine
21 on damages.
22    And I'll just say this:  In the
23 23 years that I've been doing economic
24 damages, I have never seen an expert
25 put forth a lost profit calculation

Page 221

1     DIRECT-EXAMINATION MR. SALSBERY
2  without reviewing the other party's
3  financial statements.
4     In my opinion, based on the fact
5  that these damages haven't been
6  supported, I don't think they've met
7  the burden to justify any damages for
8  Forall.
9        MR. CROWE:  Objection.  The
10    witness's determination --
11       THE ARBITRATOR:  Hang on.
12    There's no pending question.
13    Let's wait for a question before
14    we hear an objection.
15       Go ahead.
16    Q. Do you recall Mr. Flaherty
17 including in his report a damages
18 calculation over a -- in one section he
19 says four-and-a-half-year period,
20 another section he says a five-year
21 period; do you recall that?
22    A. I do.  I do.
23    Q. And what is your opinion as to
24 what would be a proper damage
25 calculation if Forall was entitled to



Page 222

1       DIRECT-EXAMINATION MR. SALSBERY
2  any -- the time frame for damages
3  calculation if Forall was entitled to
4  damages?
5       A. Sure.
6       Q. Let me withdraw that question.
7       You heard that Mr. Flaherty
8  testified that in his report he's got
9  four and a half years, but he actually
10 calculated over five years, right?
11      A. Correct.
12      Q. What are your thoughts about the
13 difference between those two and which
14 one would be more?
15      A. In my opinion, again, assuming
16 that they provided the relevant
17 information, everything that I say is
18 assuming that, the appropriate period
19 is -- and again, this isn't taking
20 mitigation into account.  The
21 appropriate period would be four and a
22 half years.
23      And the reason why I believe
24 that -- I heard his testimony, and I
25 believe that he had a period of time

Page 223

1       DIRECT-EXAMINATION MR. SALSBERY
2  from September through the -- through
3  the end of 2015, the $450,000, I don't
4  believe that's an appropriate loss
5  sales amount.
6       And I base that on a number of
7  things.  One, I have significant
8  experience in the retail business.
9  I've worked on a number of matters for
10 K Mart.  I worked on the K Mart
11 bankruptcy.  So I understand purchasing
12 and when company makes purchases.  In
13 fact, my own family has their own
14 retail operation.  Nowhere near the
15 size of Forall.
16      But as of August -- when you're
17 buying merchandise in the retail
18 business for that winter season, you
19 bought it well in advance of August.
20 Because if you haven't bought in
21 advance -- if you're buying it in
22 September, by the time you buy it or
23 get it shipped and delivered, you're
24 going to miss the holiday season.
25      So when I worked, for example,

Page 224

1       DIRECT-EXAMINATION MR. SALSBERY
2  on the K Mart, they bought most of
3  their inventory for the winter back in
4  May, spring, early summer.  So in my
5  opinion, that $450,000 that he
6  concludes in 2015 is inappropriate, and
7  the fact that he didn't look to see if
8  they actually made the buy, it goes to
9  my point that his opinion is unreliable
10 and unsupported.
11      So I think the $4,050,000 before
12 mitigation is the appropriate loss
13 sales amount.
14      THE ARBITRATOR:  Mr.
15 Salsbery, let's assume that
16 you're right, and that the buy
17 for '16, '17, should have already
18 been made by September of '16,
19 wouldn't there still be damage as
20 a result of the fact that there
21 was no ability to sell because
22 the store shut down, and that the
23 retail outlet, therefore,
24 couldn't realize profit as -- in
25 connection with the purchase of

Page 225

1       DIRECT-EXAMINATION MR. SALSBERY
2  that product?
3       THE WITNESS:  Potentially,
4  Mr. Farber, and one of the things
5  -- I'd have to see data to
6  understand how to determine those
7  damages.  For one, if that
8  inventory was purchased, let's
9  just say May or June, that might
10 be the inventory they're claiming
11 that was in the store at the
12 time.
13      So I don't know because
14 I don't have the data.  They
15 didn't provide that to determine
16 how much of that -- that buy for
17 that season is already being kind
18 of requested as a loss, because
19 they had that inventory in the
20 store and they're requesting a
21 loss on it.
22      And, then, secondly,
23 assuming that they made a
24 purchase that it wasn't
25 delivered, I'd have to see what

Page 226

```
1       DIRECT-EXAMINATION MR. SALSBERY
2    they did with that merchandise;
3    were they able to sell it to some
4    other party, or did they also
5    lose on that.
6          They didn't make the
7    claim, so I'm not sure.  So to
8    answer your question, it's
9    possible, but --
10         THE ARBITRATOR:  Just one
11   other question about which I
12   heard some testimony, and that is
13   other witnesses have testified
14   that the usual timing of seasons
15   does not necessarily apply to the
16   Las Vegas market because of the
17   extreme heat in the summer, and
18   the seasons are somewhat off; did
19   you take that into account when
20   you responded earlier to what Mr.
21   Lewis was asking you about?
22         THE WITNESS:  Well, I did
23   consider that.  And again, when
24   people -- I understand the shops
25   are at Caesars Palace in the
```

Page 227

```
1       DIRECT-EXAMINATION MR. SALSBERY
2    Forum, and so a lot of people
3    that go there aren't necessarily
4    people from Las Vegas.
5          It could be somebody
6    like me, from Michigan.  The fact
7    that it's warm or not -- I don't
8    know how the weather in Las Vegas
9    would affect somebody like me if
10   I'm going back to a cold weather
11   city.
12         So if it does have an
13   effect, I don't know what the
14   impact is, but I could also see
15   --
16         THE ARBITRATOR:  Go ahead,
17   Mr. Lewis.
18   Q. Mr. Salsbery, are you able to
19   see my screen?
20   A. I am.
21   Q. Is this the rebuttal report that
22   you prepared in this matter?
23   A. Yes, it is.
24   Q. I'm going to leave it up and I'm
25   going to ask you to just direct me
```

Page 228

```
1       DIRECT-EXAMINATION MR. SALSBERY
2    where you want to go.  The next piece I
3    want to ask you about is the mitigation
4    period.
5    A. Yes.  If you could go to -- and
6    I'm sorry if I'm looking down, and I
7    want to make sure I get the right page
8    number here, but if you look at Page 7
9    of my report.
10         Actually, let's flip back to
11   page -- right there.  Let's go down
12   there.  Paragraph 18.
13         THE ARBITRATOR:  This is
14   where you opine that they could
15   have found someone else in
16   18 months?
17         THE WITNESS:  That's
18   correct, Mr. Farber.
19   A. I just want to make a point.
20   Mr. Flaherty made a point about this
21   duty to mitigate.  And so I understand
22   that there's a legal issue with that,
23   but in my history and my experience of
24   doing economic damages, and I've
25   provided this support here, there are
```

Page 229

```
1       DIRECT-EXAMINATION MR. SALSBERY
2    certain treatises that I rely upon.
3    That I think a lot of damages experts
4    rely upon.
5          And so I just want to point this
6    out.  If you look at the point that I
7    make.  I say, "I understand that Forall
8    is required to act reasonably to
9    mitigate its incremental lost profits.
10   The mitigation is the action taken by
11   Forall to avoid or reduce its damages."
12         That's not just my opinion.
13   That's the opinion of -- there's a
14   number of books that I reference here.
15   One is called, "The Litigation Services
16   Handbook," that's a very well known --
17   it's a book that I rely upon.  The
18   second one is another book by Robert
19   Dunn.  It's called, "Recovery of
20   Damages For Lost Profits."
21         And so there may be a legal
22   aspect.  I'm not trying to opine on
23   that, but on the standpoint of putting
24   together a damages calculation, it is
25   my opinion that the harmed party does
```



Page 230

DIRECT-EXAMINATION MR. SALSBERY

1  DIRECT-EXAMINATION MR. SALSBERY
2  have a duty to mitigate.  And just
3  because they don't actually mitigate,
4  doesn't rule out mitigation.  And I
5  just want to make that point first.
6          And then, if we want to go to
7  Mr. Farber's question, if you go to the
8  next paragraph, the next section, 19.
9  So that's exactly right.  So the
10 question is:  How did I come up with
11 the 18-month period?  And I recognize
12 that Forall didn't actually go out and
13 find an operator, so what I wanted to
14 do was I went back and looked at the
15 discovery record to see, well, had this
16 kind of circumstance had ever occurred
17 during the course of performance of
18 this agreement; and as we've been
19 discussing through this arbitration,
20 I've heard different discussions about
21 it.  They in fact did.
22          So in order to determine the
23 18-month period, there is two things
24 that I looked at:  One, what the time
25 frame that it would have taken -- could

Page 231

1  DIRECT-EXAMINATION MR. SALSBERY
2  have taken, Forall, if they were
3  actively trying to find a new operator.
4  And I made the determination that --
5  it's there on Paragraph 20 -- that
6  Sarah was running into problems and
7  they wanted to find somebody else to
8  take over the operation.  Forall
9  assisted them and they found Italnord
10 to take over that operation, and it
11 took them seven months to identify
12 them.  That's the first part.
13          Second part is:  We have to find
14 a store, and you have to build that
15 out.  So I went and I looked -- and if
16 you look at Paragraph 21, Mr. Lewis, if
17 you scroll down.  I went and looked and
18 said, "In 2011, it took Sarah six
19 months from the time period that they
20 signed the agreement to open the store
21 in Las Vegas."  So I took the seven
22 months, plus the six months, and I came
23 up with 13 months.
24          And to be conservative, I added
25 another five months on to that and

Page 232

1  DIRECT-EXAMINATION MR. SALSBERY
2  that's how I came up with the 18-month
3  time period.
4          Q. And Mr. Salsbery, would the
5  store that could have been pursued and
6  opened to mitigate damages, would that
7  have had to have been in Las Vegas?
8          A. My understanding is that per the
9  agreement there could have been a
10 store in Las Vegas.  I understand there
11 was discussions of a store in Beverly
12 Hills, and there was also a discussion
13 to a store in Chicago.
14          To my understanding and it's
15 just, again, an understanding, I don't
16 know if this is legally accurate.  Is
17 that operator just needed to purchase
18 $900,000 of merchandise, whether the
19 store was in Vegas, Beverly Hills, or
20 Chicago.
21          Q. So in terms of the mitigation,
22 you are not specifically targeting or
23 suggesting that there would have been
24 another Las Vegas, just another U.S.
25 presence?

Page 233

1  DIRECT-EXAMINATION MR. SALSBERY
2          A. Correct.  And I would say that
3  it could have been in Las Vegas and it
4  could have been in any other of those
5  other cities.  And I will note --
6  because I'm sure this is going to be a
7  question that comes up and I might as
8  well address it  now -- is that I heard
9  that the store closed and that there --
10 there's an issue as to who's at fault
11 as to why the store closed.
12          And that that had a negative
13 impact on Forall's reputation.  And
14 that would make it harder for them to
15 open up a store.  A couple of things, I
16 took that into consideration when I
17 heard that testimony.  I think it was
18 yesterday and maybe even today.
19          And I'll note that I have not
20 seen anything in the discovery records
21 that indicate that they were having
22 issues finding a new operator.  I
23 didn't find any issues.  I went online,
24 again, this was  not -- I didn't see any
25 news articles or anything like that



Page 234

1    DIRECT-EXAMINATION MR. SALSBERY
2   that were negative. And if there was,
3   in fact, any negative -- because I can
4   understand, there may be some neglect
5   views because your store closed down.
6   I would think that difficulty would be
7   covered by that additional five months
8   that I added on.
9        Because remember, I said seven
10  months, plus six months, then I gave an
11  additional five months. So if there
12  was an additional difficulty, I think
13  it would be captured in that additional
14  five months in my calculation.
15        THE ARBITRATOR: Mr.
16  Salsbery, let me ask you two
17  things in following on what
18  you're now testifying about.
19        Number one, do you know
20  factually if since 2016 as a
21  result of whatever research
22  you've done, if Forall has opened
23  another store in the United
24  States?
25        THE WITNESS: It was unclear

Page 235

1    DIRECT-EXAMINATION MR. SALSBERY
2   to me. I did not see another
3   store mentioned when I did my
4   search. I did not see that.
5        THE ARBITRATOR: Now, you
6   posting 18 months, and you gave
7   your reasons for posting
8   18 months, but what are you
9   attribute -- how -- what factors,
10  if any -- let me rephrase that.
11        I mean, I've got a
12  situation here where I had three
13  different operators who had a
14  very prime location next to a
15  bunch of other very up-scale
16  outlets in the Forum Mall at
17  Caesars.
18        Sarah, you know, looked
19  for help; they went out and found
20  Italnord. Sarah was not being
21  profitable and wanted out,
22  presumably, and that's why they
23  got Italnord.
24        Italnord did not
25  continue. By all indications,

Page 236

1    DIRECT-EXAMINATION MR. SALSBERY
2   that was an experienced operator;
3   although, his experience was in
4   Mexico, principally. They didn't
5   make it.
6        Then I had Forall. And
7   now there's a lot of disagreement
8   as to, you know, should -- was
9   there a possibility that Forall
10  could have continued if there
11  would have been a response to a
12  request for an extension, maybe
13  they would have reconsidered, but
14  certainly there was no notice
15  given for six months, and,
16  therefore, by September 1st --
17  not -- by September 30th, not
18  August 30th or 31st, they would
19  have been out also.
20        And by all indications, they
21  also didn't make it.
22        So you're going to have
23  a situation where -- sure, it
24  might be a different city, but
25  anyone looking at a track record

Page 237

1    DIRECT-EXAMINATION MR. SALSBERY
2   is going to see three different
3   operators haven't made it with
4   this store, in a pretty good
5   location, in a pretty good mall.
6   Now, I should accept, despite
7   that there should be mitigation
8   because in 18 months Forall would
9   be successful in finding a fourth
10  entity.
11        How do you respond? I
12  know that is a rambling question,
13  but I think you get the essence
14  of my ramble.
15        THE WITNESS: I do, Mr.
16  Farber, and it's a good question.
17  The one -- the one point that
18  I've heard in the testimony of
19  the last few days, I think it
20  might have been this morning,
21  that Forall was recovering. I
22  think one of the witnesses
23  testified that they were
24  recovering.
25        So I don't know if the



Page 238

DIRECT-EXAMINATION MR. SALSBERY

1 situation -- the reason why Sarah
2 failed in the time that they
3 operated, Italnord failed, and
4 then Forall failed, was because
5 the company, I understand, had
6 its own operating also losses.
7           But I do remember that
8 one of the witnesses earlier
9 today, I believe, said that they
10 were recovering.  So I guess my
11 point is:  If you have this
12 brand, that's -- from what I
13 heard from the Forall people --
14 is very profitable, you know,
15 their competitors are all these
16 top end providers.  If they're
17 covering, maybe someone can get
18 in early on them.
19          I don't know.  I'm just
20 giving you my rational as to why
21 someone would take over the
22 store.  I haven't done the
23 research.  I'm just letting you
24 know that would be one of the

Page 239

DIRECT-EXAMINATION MR. SALSBERY

1 reasons why I could see someone
2 wanting to come in and take over
3 the operations.
4          THE ARBITRATOR:  All right.
5          Go ahead, Mr. Lewis.
6     Q. Mr. Salsbery, I can't recall
7 when you began listening on testimony.
8 Do you remember testimony about a
9 fourth operator being identified in
10 November of 2014?
11     A. I do not.  I do not, Mr. Lewis.
12     Q. Let's go back to your report.
13 In the next piece -- well, do you want
14 to speak more about the mitigation or
15 do you want to go to the next topic
16 which will be the cost and margin?
17     A. The last point I would just like
18 to make on the mitigation is --
19     Q. Let me bring your report back up
20 then, please.
21     A. Sure.  And again, this is
22 just -- it's, again, based upon what's
23 been testified in the last day or two.
24 I haven't heard anybody testify to say

Page 240

DIRECT-EXAMINATION MR. SALSBERY

1 that Forall tried to find somebody to
2 take over the operation.
3          Because, Mr. Farber, to your
4 point, if they had tried and you show
5 record of them out there in the
6 marketplace of them trying and it just
7 failed, then I would agree.  There
8 would be no mitigation, right?
9          Because if -- if someone showed
10 me -- "Mr. Salsbery, here's all the
11 efforts we did and tried, and it
12 failed," then I wouldn't say that you
13 have to have mitigation.  You have to
14 at least have an effort.
15          And I just want to point out, I
16 understand that it took Forall
17 approximately, I want to say, 15 months
18 after the time the store closed to give
19 notice that the minimum purchases
20 weren't being met.  And I just want to
21 say that's a significant fact to me,
22 because -- two things:  One, to me --
23 and this is just my opinion -- it
24 indicates that Forall wasn't even

Page 241

DIRECT-EXAMINATION MR. SALSBERY

1 attempting to mitigate.  And secondly,
2 by putting Sarah on notice right after
3 the store closes, it would give them an
4 opportunity to assist Forall in trying
5 to mitigate, similar to how they -- my
6 understanding was how they helped to
7 try to find Italnord.
8          So Forall's lack of just even
9 notice -- it wasn't the fact that they
10 weren't trying to mitigate, and didn't
11 give Sarah the opportunity to say
12 they'll go out and try to find another
13 party to help assist and get the
14 operator.
15          THE ARBITRATOR:  All right.
16          Go ahead, Mr. Lewis.
17     Q. Is there somewhere else you'd
18 like to take us on mitigation?
19     A. Yes.  The next point is:  So
20 when you do loss profits, right, the
21 first line is the damage period.  So
22 we've talked and this is my opinion,
23 that the four-and-a-half-year period is
24 appropriate, which is really 54 months.



DIRECT-EXAMINATION MR. SALSBERY

1    DIRECT-EXAMINATION MR. SALSBERY
2  And if that's the period, then it would
3  be 4,050,000.
4        But in my opinion, it's
5  18 months.  So the 18-month period
6  would translate into, assuming, the
7  $900,000 per year, would translate into
8  loss sales of -- right here.  Thank
9  you.  $1,350,000.
10       So how you do loss profit, the
11  next thing -- once you have your damage
12  period, then you determine the sales
13  for that damage period.  Considering
14  mitigation, the next thing you do is
15  you determine what are the incremental
16  costs that have to be offset against
17  the loss sales group.
18       And so I understand -- and I
19  think counsel for Forall made the point
20  at the very end of the last session
21  that I agreed with Mr. Flaherty's
22  margin percentages, and that couldn't
23  be any farther from the truth.
24       You've read my report.  I
25  completely disagree with his margin

1    DIRECT-EXAMINATION MR. SALSBERY
2  percentages.  What I tried to do when I
3  identified the letter company was to
4  show that he was doing loss profit on a
5  gross margin base.  Which, from my
6  experience, and from, again, all the
7  treatise that I can point to, that's
8  not appropriate.
9        The reason why gross margin
10  percentage is not the right measure --
11  and we'll stop right there.  Thank you
12  for doing that -- is that that's only a
13  portion in the variable cost, and that
14  there are costs below the gross margin
15  line that are variable operating
16  expense that you must take into account
17  in order to come up with an incremental
18  profit margin.
19       The reason why when I first said
20  I've never seen an expert put together
21  a lost profits calculation without
22  having reviewing financial statements
23  is:  Determining what the variable
24  operating cost is the testimony of an
25  expert witness.

1    DIRECT-EXAMINATION MR. SALSBERY
2        If you look at a company's
3  financial statements and operating
4  cost, operating costs are traditionally
5  either variable or fixed or there are
6  certain types of operating costs that
7  have components of those fixed end
8  variables.
9        So you have to look at that, and
10  you have to analyze that.  You have to
11  see if sales go up, did cost go up or
12  did they stay flat.  And so the fact
13  that he hasn't included a variable
14  operating cost and he just stopped at
15  the gross profit margin shows me that
16  his calculation is improper.
17    Q. Don't let me interrupt you.
18    A. Sure.  So Mr. Flaherty made a
19  statement, which, in my opinion was
20  shocking.  I was actually very
21  surprised.  When he made the point that
22  -- and I apologize if someone wants to
23  correct me, but I have notes down here
24  that he said variable operating cost
25  are -- I think he said 99 percent or

1    DIRECT-EXAMINATION MR. SALSBERY
2  almost all fixed.
3        MR. CROWE:  What was the
4  answer?
5        THE ARBITRATOR:  I'm sorry.
6        MR. CROWE:  I didn't hear
7  the witness.
8        THE ARBITRATOR:  He's
9  telling me about Mr. Flaherty's
10  testimony that he felt that the
11  operating cost here were
12  99 percent fixed.
13       Go ahead, sir.
14    A. And so when he said that, he
15  identified one of the companies that
16  was in my -- my sample of 11 companies.
17  I think it was the VF Corporation.  And
18  he said, "Look, if you look at Mr.
19  Salsbery's document that he provided,"
20  which that document came from the
21  source that's called S & P Capital IQ,
22  and you pull out all the company's
23  financial information, it just gives
24  you kind of the numbers.  It doesn't
25  necessarily give you the description

Page 246

1          DIRECT-EXAMINATION MR. SALSBERY
2    behind those numbers.
3          So while we were on break,
4    because every company I ever worked on
5    and looked at, when you look at their
6    operating expenses, they have a portion
7    of their operating expenses are
8    variables.
9          Now, it depends on the company
10   because every company has their own
11   cost structure.  Every company has
12   their own accounting structure.
13         So I wanted to look, because he
14   made the point of VF Corporation, I
15   just want to note, Mr. Farber, and I
16   went and looked at VF Corporation 10 K
17   for 2020, because he identified that
18   specific company, and he said that's an
19   example that all of these are SG&A
20   costs.
21         And when I went and looked at
22   that, I pulled up their 10k, and it's
23   available, publicly, online to see.
24   They have a description of all the
25   types of cost that VF Corporation

Page 247

1          DIRECT-EXAMINATION MR. SALSBERY
2    includes in their SG&A.
3          And it is called SG&A, but you
4    have to see what are the facts of cost
5    in here.  So we're talking about VF
6    Corporation, and if it's all right, I'm
7    going to go ahead and read what those
8    costs are if that's okay.
9          THE ARBITRATOR:  You can
10   proceed.
11         A. So this is from VF Corporation
12   March 2020, 10K, which is available
13   online, and this is a PDF that's
14   210 pages long and this is Page 73.  It
15   states, "Selling generally and
16   administrative expenses included cost
17   of product development, selling,
18   marketing, and advertising, VF operated
19   retail stores, concession retail
20   stores, warehousing, distributions,
21   shipping, handling, licensing and
22   administration."
23         The reason why I bring this up
24   is that there are variable costs in
25   some -- in those categories,

Page 248

1          DIRECT-EXAMINATION MR. SALSBERY
2    specifically warehousing and
3    distribution.  And the reason why I
4    bring those up is:  Yesterday there was
5    a discussion of the inventory that was
6    in the store and then it shut down in
7    September that had to be shipped back,
8    and I understand it was shipped back to
9    Secaucus, New Jersey to the warehouse.
10         In a warehouse and in a
11   distribution center, there are variable
12   costs.  You've got the cost of the
13   employees that are driving the
14   forklift, getting the stuff off putting
15   them on trucks.  There are components
16   of variable costs in those warehouses.
17   And my point is in bringing this up is:
18   By only focusing on the product cost,
19   Mr. Flaherty has missed out on all
20   these different types of variable costs
21   -- operating cost that I believe, if I
22   had Forall's financial statements, I
23   would be able to show.
24         I don't have those, so I have
25   to -- we are talking about another

Page 249

1          DIRECT-EXAMINATION MR. SALSBERY
2    company.  But I don't think that other
3    company is similar to Forall, so
4    therefore, I believe that Forall would
5    have variable operating expenses that
6    should be deducted.
7          And then, secondly, I think that
8    was further supported by Ms. Gioffre's
9    testimony this morning.  Which she said
10   a couple of things which I think
11   supported my margin percentages.  And
12   if somebody wants to correct me, but my
13   understanding of what her testimony
14   was:  First she said that the gross
15   profit was 45 to 50 percent, so I think
16   we are all on board with that.  That's
17   consistent with what Mr. Flaherty
18   stated.
19         However, she also said there are
20   15 to 20 percent of what's called "soft
21   cost," which would be freight, duty,
22   and transportation.  And so if you just
23   take the 45 to 50 that she mentioned,
24   take off that additional 15 to
25   20 percent of soft cost, now you're

MAGNA
LEGAL SERVICES

Page 250

```
1          DIRECT-EXAMINATION MR. SALSBERY
2    down to 25 to 35 percent, which I would
3    call incremental costs.
4          Now, I would pause there because
5    she didn't mention in her discussion,
6    in her description, that there was the
7    additional variable operating cost,
8    which we just discussed that VF
9    Corporation had with the warehouse
10   operators and any variable cost within
11   the warehouse.
12         If you were to take those under
13   consideration, it would further reduce
14   the margin, incremental margin.  And in
15   my opinion, that testimony, the VF
16   Corporation, supports at least the
17   range of profits that I've included in
18   my report, which is down here where
19   it's, like, about 11.96 percent, which
20   I used because counsel asked me to, to
21   say, "Hey, could you just kind of
22   estimate what you think the incremental
23   profit percentages would be?"
24         And Rod, if you could go --
25   scroll up a bit to where we get to the
```

Page 251

```
1          DIRECT-EXAMINATION MR. SALSBERY
2    damages.  Right here.  So these are the
3    incremental profit percentages.  And,
4    again, this is not based upon Forall.
5    I would like to have Forall, to see
6    what their actual incremental profit
7    percentage is.  I don't have that.
8          So I've come up with a range of
9    12 and a half to 22 percent incremental
10   profit margin, which, in my opinion, is
11   consistent with what Ms. Gioffre
12   testified to this morning.
13         THE ARBITRATOR:  All right.
14    Q.  And let me know where you'd like
15   to go next in your report if you're
16   finished with this point?
17    A.  Yeah.  I think we've covered
18   that.  I think the next point -- if we
19   could scroll back to my report.  And I
20   apologize, I'm just flipping through my
21   report to make sure.  Can we go to Page
22   10 of my report?
23         So as Mr. Lewis is scrolling up,
24   I just want to summarize.  So again, my
25   opinion is that lost profit damages
```

Page 252

```
1          DIRECT-EXAMINATION MR. SALSBERY
2    have not been proven because the
3    information that I think is necessary
4    to support the damages, but also to
5    allow the apposing side to test it.
6    And Mr. Flaherty -- in fact, can we
7    pause?  I'm sorry, Rod.  Can you go to
8    Mr. Flaherty's report.  Can you bring
9    that up?
10    Q.  Certainly.
11    A.  And go to Schedule 3.
12    Q.  Absolutely.
13    A.  So the point I want to make is
14   -- two things, so even assuming that
15   all this -- all the cost information in
16   this schedule is accurate.  I have a
17   couple of points on this I'd like to
18   point out.
19         There's eight products on here,
20   and we've identified one of Sarah's
21   purchase orders that was provided in
22   the discovery record, and Sarah
23   purchased a lot more than just, I
24   guess, eight products whatever these
25   are.  They purchased a significantly
```

Page 253

```
1          DIRECT-EXAMINATION MR. SALSBERY
2    larger of amount of products than just
3    these eight.
4          These eight products
5    represented, I think, six percent of
6    the purchases that Sarah made on this
7    one purchase order, and that purchase
8    was for $466,000.
9          So I don't think this is a
10   representative sample, one.  Two, I've
11   heard testimony that Forall
12   self-manufactures some product and also
13   buys from third parties.
14         I don't know if these products
15   are products that are manufactured by
16   Forall or bought by a third-party,
17   because I would imagine they have
18   different cost structures.  I don't
19   know if that -- how that plays into it.
20         And then my last point about
21   this is -- actually, there's two more
22   points.  My third point is this:  A
23   snapshot in time.  It's just one period
24   of time.  So even this was correct, how
25   do their margin fluctuate over time.
```



Page 254

1    DIRECT-EXAMINATION MR. SALSBERY
2         And the last point is his source
3    document, which I haven't seen.  I
4    would really like to see this.  But
5    I'll just note -- and, again, I'm just
6    basing this off on what the description
7    is.  It says, "Sample Loss Margin
8    Versus Sarah".
9         In my experience, what you want
10   to use when you're putting together a
11   damage calculation is you want to use
12   contemporaneous documents.  This source
13   file is a file that was developed for
14   this arbitration.  So in my mind, that
15   causes me to question how reliable that
16   data is.
17        And it was put together by
18   accounting people.  And I'm not
19   questioning those individual's
20   accounting expertise.  By no means am I
21   saying anything about that.  However, I
22   do question whether or not they had
23   experience putting together damages
24   calculations.
25        I personally have gone through

Page 255

1    DIRECT-EXAMINATION MR. SALSBERY
2    significant amount of training to
3    identify what cost should be added and
4    incorporated.  I understand Mr.
5    Flaherty just had some kind of
6    conversation with them saying, "Hey,
7    give me these costs," and then they
8    went off to do that.
9         Again, they may be the greatest
10   accounting people.  I'm not questioning
11   them.  But I don't know how much
12   training they have in identifying what
13   would be the appropriate cost that
14   should be offset in a lost profits
15   calculation.  So, therefore, that's
16   another reason why I think this is
17   unreliable.
18        THE ARBITRATOR:  All right.
19   A.  Sorry.  So then back to my
20   report.  And I just have a couple of
21   more points.  That's all I have on loss
22   profits, Mr. Lewis, unless you or Mr.
23   Farber have any other questions.
24        THE ARBITRATOR:  No.  I'm
25   okay.

Page 256

1    DIRECT-EXAMINATION MR. SALSBERY
2    A.  Can we go to page 10?
3         MR. CROWE:  Mr. Farber, can
4    I ask this, is there going to be
5    direct-examination by Mr. Lewis,
6    or is this just a narrative
7    argument by Mr. Salsbery?
8         THE ARBITRATOR:  Let's have
9    a question.  Go ahead, Mr. Lewis.
10        MR. LEWIS:  Let me just get
11   on the page that we are trying to
12   --
13        THE ARBITRATOR:  Do you
14   disagree with the 10 percent that
15   Mr. Flaherty used?
16        THE WITNESS:  Mr. Farber, I
17   have no basis to agree or
18   disagree with it.  There's no
19   support that was provided for me
20   to test it.
21        Again, in my opinion,
22   that's standard to put together a
23   damage calculation.  In my
24   opinion, its claim for inventory
25   on hand should be thrown out.  I

Page 257

1    DIRECT-EXAMINATION MR. SALSBERY
2    mean, I just have no basis.
3         I understand he
4    discussed and other witnesses
5    have said, "Well, we have the
6    cost to bring it back, and we had
7    to sell it," but I don't know if
8    that 10 percent is appropriate.
9    I don't know if they even had a
10   loss on the inventory.
11        I know it makes sense to
12   say they may have had a loss, but
13   again, I don't know that.  First
14   off, I don't know what the basis
15   for the 773,811 --
16        MR. CROWE:  Objection.
17   Mr. Farber, this gentleman is
18   making closing argument here as
19   opposed to an economic analysis.
20        THE ARBITRATOR:  No.  I
21   think he is simply telling me and
22   recapping his report and has used
23   appropriate testimony, so he can
24   go on.  And you know, we are --
25   we are not abiding by the

DIRECT-EXAMINATION MR. SALSBERY

1  structures of a court
2  presentation.
3          So Mr. Flaherty -- in
4  terms of the amount that Mr.
5  Flaherty used     to -- as a
6  damage in connection of the
7  closing of the store, why do you
8  disagree with that, if you do?
9          THE WITNESS: I'm sorry.
10  Are we talking about inventory or
11  closing?
12          THE ARBITRATOR: I'm
13  finished with the inventory.  I
14  understand your position.  I
15  understand his position.
16          THE WITNESS:  On the
17  out-of-pocket cost?
18          THE ARBITRATOR:  Correct.
19          THE WITNESS:  I'm not trying
20  to argue that the costs didn't
21  occur, and I'll note I didn't see
22  any receipts, but that's fine.  I
23  understand he got it out their
24  accounting records.

DIRECT-EXAMINATION MR. SALSBERY

1          And I'll agree with him,
2  I have done this before.  If I
3  get information, I don't -- a
4  company's accounting records, I
5  don't always go back and try to
6  test it.  So I'm not trying to
7  dispute that.
8          However, I will dispute
9  -- a couple of points I want to
10  make.  His $84,000 from '18 to
11  '20, it appears those are legal
12  costs for this arbitration.  And
13  so when I've ever done damages, I
14  don't put in the cost of the
15  actual arbitration into damages.
16  That's up to you, Mr. Farber if
17  you want to award those.  That's,
18  to me, not testimony for an
19  expert.
20          In fact, you if look at
21  the sheet itself, the last entry
22  is $5,000 for his own company's
23  retainer.  So he's trying to
24  claim damages for his own fees.

DIRECT-EXAMINATION MR. SALSBERY

1  I don't think that -- in my
2  opinion, that's for you to
3  decide, not for an expert to put
4  in as damages.
5          Secondly, if you look at
6  the cost, that $44,000, that was
7  incurred in 2015.  Again, the
8  largest is the 25,828.  I can see
9  an argument that that cost is,
10  again, related to the litigation.
11  I know it was a little bit
12  earlier, and that's why I break
13  it out.
14          But if it was determined
15  that that's really part of it to
16  kick-off of the arbitration, then
17  I would say that's not
18  appropriate to include it in.
19          And then lastly, the
20  remaining cost or the majority of
21  the remaining cost for a trip out
22  to Las Vegas,   Mr. Farber, I
23  think you've mentioned that if
24  that trip -- the reason why I

DIRECT-EXAMINATION MR. SALSBERY

1  believe that's an appropriate
2  damage is if they go out there
3  every month as part of their
4  normal operations, then that cost
5  would have been whether or not
6  the store closed or not.  You
7  have to show it was incremental.
8          Now, if they went there
9  and they normally never go out
10  there, then yeah, that would be
11  appropriate damages.  Again, I
12  can't test it.  - I don't -- what
13  I would need is to say let me see
14  where that account came in.
15          He shows you just an
16  entry for that account, but I
17  would want to see the history for
18  that account.  And said yes, I
19  see zero, zero, zero, I see a
20  spike, that's a zero.  I don't
21  have that information.  So if
22  those costs are not incremental,
23  I don't think they should be
24  awarded as damages.  If they are

Page 262

```
1        DIRECT-EXAMINATION MR. SALSBERY
2   incremental, then they are
3   appropriate for damages.
4        THE ARBITRATOR:  All right.
5          Mr. Lewis, anything
6   else?
7        MR. LEWIS:  Yes.
8   Q. Mr. Salsbery, you understand
9   that Mr. Flaherty calculated damages
10  through 2021, right?
11       A. That's correct.
12       Q. And to Mr. Flaherty's credit or
13  to his defense, he could not have
14  foreseen what would have happened in
15  2020, I mean the COVID pandemic, right?
16       A. Correct.
17       Q. However, since these reports
18  have been exchanged, we have been
19  besieged with this pandemic; do you
20  think that needs to be taken into
21  account for any damages analysis?
22       MR. CROWE:  Objection.
23       THE WITNESS:  What's the
24  objection?
25       MR. CROWE:  The spear of
```

Page 263

```
1        DIRECT-EXAMINATION MR. SALSBERY
2   expert testimony on subsequent
3   events in terms of the
4   anticipating profits in this
5   transaction because the national
6   market of the economy doesn't
7   factor into a purchasing
8   requirement.
9        They were going to have
10  to purchase this product and
11  incur cost no matter which way
12  the economy was going.
13       THE ARBITRATOR:  Was there a
14  force majeure clause in the
15  license agreement, Counselor?
16       MR. LEWIS:  I believe there
17  is. I'll ask Mr. Shah to give us
18  that provision.
19       But despite Mr. Crowe's
20  testimony there, there was an
21  objection.  That's something he
22  can cover in cross-examination.
23       THE ARBITRATOR:  Hold on one
24  minute, though, as long as we are
25  on the point.  I don't remember a
```

Page 264

```
1        DIRECT-EXAMINATION MR. SALSBERY
2   force majeure clause, but I may
3   have missed it.
4        MR. BROWN:  There was not --
5   I'll have that for you in one
6   second, Mr. Farber, but --
7        THE ARBITRATOR:  Ordinarily,
8   it would be in Article 17, which
9   is the general provisions.
10       MR. SHAH:  Mr. Farber, I
11  don't believe there is one.
12       MR. BROWN:  There is not
13  one, Mr. Farber.  And in any
14  respect, neither are any of the
15  case that one has seen coming
16  down and leading to the pandemic
17  and COVID arising to the level of
18  a force majeure.  That's what we
19  are seeing consistently.
20       MR. LEWIS:  Again, what we
21  were dealing with was Mr. Crowe's
22  objection.
23       THE ARBITRATOR:  This is
24  going to be a kind of legal
25  argument that you guys might want
```

Page 265

```
1        DIRECT-EXAMINATION MR. SALSBERY
2   to make, but I actually looked to
3   see if there was a force majeure
4   clause, and I didn't see one, and
5   I think I'm being told by counsel
6   that I was right in not observing
7   one.
8        Look, when you do a
9   damage analysis, usually you do
10  it as of the date of the breach,
11  and you look forward.  So why
12  should I take into account the
13  pandemic, Mr. Salsbery?
14       THE WITNESS:  If there's not
15  a force majeure clause, you're
16  right, you would look at from the
17  time of the breach going forward.
18       I will note, and if you
19  use the $900,000 per the
20  contract, then you're correct,
21  Mr. Farber, there would be no
22  impact from the pandemic.
23       However, if you were to
24  determine that -- and again, I
25  understand this is up for dispute
```

MAGNA
LEGAL SERVICES

Page 266

DIRECT-EXAMINATION MR. SALSBERY
1
2   whether or not they met the
3   minimum purchase requirement, but
4   assume that they didn't meet the
5   minimum purchase, and you look
6   more at what they actually were
7   purchasing every period, then I
8   think there is an argument to be
9   made that if the damages go out
10  to the period of 2020 and 2021,
11  which, again, is beyond what I
12  think is a reasonable damage
13  period, I think you should at
14  least take into account that.
15  For example, Caesars Palace,
16  through my research, was closed
17  from March 17th to May 29th.
18          It's just a factor that
19  you would consider, but I think
20  you would have to go outside the
21  four corners of the agreement and
22  say the $900,000 purchase is not
23  required because they didn't meet
24  it.  That's the only point I make
25  on that.

Page 267

DIRECT-EXAMINATION MR. SALSBERY
1
2       MR. CROWE:  Objection.
3       THE ARBITRATOR:  Anything
4   else, Mr. Lewis.
5       MR. LEWIS:  Nothing for now.
6   Let's see if I need to do any
7   re-direct.
8       THE ARBITRATOR:  Mr. Crowe,
9   you need a few moments or you
10  ready to go?
11      MR. CROWE:  We are ready to
12  go.
13      THE ARBITRATOR:  Look,
14  Mr. Salsbery, don't argue with
15  Mr. Crowe.  Just try to respond
16  to his questions, all right?
17          You're certainly very
18  well spoken and -- but Mr. Crowe
19  is better spoken, so just listen
20  to his question and try to
21  respond to his question directly
22  and succinctly, unless you hear
23  Mr. Lewis object.
24      Mr. Crowe, why don't you
25  proceed.

Page 268

CROSS-EXAMINATION MR. SALSBERY
1
2   CROSS-EXAMINATION
3   BY MR. CROWE:
4       Q. Good afternoon, Mr. Salsbery.
5       A. Good afternoon, Mr. Crowe.
6       Q. I heard you mention you had some
7   experience in the retail business, your
8   family is the in retail business as
9   well?
10      A. That's correct.
11      Q. Have you had experience in the
12  fashion luxury brand that you've worked
13  on or consulted, particularly Italian
14  menswear?
15      A. No.
16      Q. Or any high-end fashion?
17      A. Not that I can recall.
18      Q. Is it fair margins are different
19  in different industries; do you agree
20  with me on that?
21      A. I would agree.
22      Q. Now, let's talk about this
23  mitigation theory.  Do you know, was
24  there an obligation by Forall to incur
25  certain build-out cost at the

Page 269

CROSS-EXAMINATION MR. SALSBERY
1
2   initiation of this contract?
3       A. There was.
4       Q. And do you know what that amount
5   was?
6       A. I believe -- give me one second.
7   I think Mr. Flaherty actually mentioned
8   it.  It was -- I'm using his report,
9   and this is Page 3 of his report.
10          I think he mentioned that Forall
11  paid -- I want to say 500 -- about
12  $512,000; is that what you're referring
13  to?
14      Q. Yes.  A substantial amount, half
15  a million dollars is a substantial
16  amount.
17      A. I would agree.
18      Q. And did you -- did you consider
19  that in your analysis that there was
20  going to be an operator that was going
21  to come down the pike and open up a
22  shop at the behest of Forall in Las
23  Vegas or some other location to replace
24  the sales that you say they're not
25  entitled to?



Page 270

1       CROSS-EXAMINATION MR. SALSBERY
2       A. Did I take into account that
3   there would be an additional, let's
4   just say, $500,000 that Forall would
5   have to incur again; is that what
6   you're asking?
7       Q. Million dollars total, someone
8   is going to have to spend, the new
9   operator, Forall, and so you say that's
10  not a big deal.  Go get somebody else
11  to sell the clothes.  So my question
12  is --
13      THE ARBITRATOR:  Hang on.  I
14      don't think he quite said that,
15      Mr. Crowe, but this there is --
16      the notion that this money was
17      spent both by Sarah and on the
18      50/50 basis by Forall, with the
19      idea that it would be used over
20      10 years, and it was not.
21          So, arguably, Forall
22      could have said I have additional
23      damage there, and I think that's
24      the important of what Mr. Crowe
25      is asking about.

Page 271

1       CROSS-EXAMINATION MR. SALSBERY
2       THE WITNESS:  Correct.
3   There's your kind of your
4   question, Mr. Farber --
5       THE ARBITRATOR:  I'm going
6       to let Mr. Crowe rephrase it as
7       he sees fit.
8          Go ahead.  I didn't hear
9       you, Mr. Crowe.
10      Q. I'll adopt Mr. Farber's question
11  in terms of the additional cost that
12  Forall incurred as a result of this.
13      A. Sure.  That -- I did not address
14  that $512,000.  I actually have a note
15  on here, because it wasn't put forth as
16  a damage claim.  But I understand.
17  I've done that before.  I've done a lot
18  of government contract work.  And what
19  you're referring to is unabsorbed
20  overhead, right.
21          So, for example, that $512,000
22  -- and again, I'm almost making the
23  argument for Forall, but what Mr.
24  Farber is trying to question is:  Did I
25  consider the unabsorbed overhead

Page 272

1       CROSS-EXAMINATION MR. SALSBERY
2   portion because the store was shut down
3   early, I did not, because it was not a
4   component of Mr. Flaherty's damage
5   calculation.
6       Q. You would agree there is damaged
7   sustained by Forall as a result of this
8   breach?
9       MR. LEWIS:  Objection.
10      THE ARBITRATOR:  Say it
11      again, Mr. Crowe.  I didn't hear
12      it.
13      Q. You would agree with me that
14  according to your experience this is
15  damages that they've sustained as a
16  result of the breach by the doctors?
17      MR. LEWIS:  Objection.
18      A. I would agree that if they --
19      THE ARBITRATOR:  Hang on,
20      Mr. Salsbery.  I've got to hear
21      the objection.
22          Go ahead, Mr. Lewis.
23      MR. LEWIS:  It's not a
24      damage component because it
25      hasn't been claimed as damages.

Page 273

1       CROSS-EXAMINATION MR. SALSBERY
2   Mr. Salsbery said he had seen it
3   claimed as damages in other
4   instances.
5       THE ARBITRATOR:  I think
6       that has to be sustained because
7       there is no claim for that.  So I
8       was    simply -- I raised it
9       because I was recasting your
10      question, Mr. Crowe.
11          Let's move on.
12      MR. CROWE:  I think it
13      naturally flows from the facts
14      and circumstances, so be that as
15      it may.
16      Q. My question is:  In terms of
17  mitigating the damages in your theory
18  that another store is going to be
19  feasible in 18 months, did you consider
20  that it would be much more difficult to
21  accomplish that with the million dollar
22  cost having to be absorbed by the
23  contracting parties in that
24  circumstance?
25      A. I did not take into account the



Page 274

1        CROSS-EXAMINATION MR. SALSBERY
2   additional -- any additional cost that
3   may be incurred to open up a new store.
4        Q. And your opinion as to the
5   damage or lack thereof to the brand
6   market in Las Vegas, was based on this
7   cursory internet search a few minutes
8   ago?
9        A. No.
10       Q. So do you have any knowledge of
11  the luxury menswear market in Las Vegas
12  in 2016 following this incident?
13       A. My apologies.  I'm not trying to
14  argue with you.  You asked two
15  questions; do you want me to answer the
16  first question or the second question?
17       Q. You answered the first question.
18  You said it was not limited to the
19  internet search.  My second question
20  is:  You don't have any firsthand
21  knowledge or any knowledge in
22  particular as to what was happening in
23  2016 in Las Vegas following this abrupt
24  eviction of this luxury store in the
25  mall, correct?

Page 275

1        CROSS-EXAMINATION MR. SALSBERY
2        A. That's correct.
3        Q. But you weren't able to analyze
4   to what extent this damage may have
5   factored in the ability to inability of
6   Forall to open a new store in Las
7   Vegas, or for that matter in any place
8   in Nevada, correct?
9        A. I didn't see anything claimed by
10  Forall in Mr. Flaherty's report that
11  suggested there was damage that went
12  beyond just lost sales under the
13  $900,000.  If that was the case, I
14  would have studied it.  There was claim
15  for that.
16       Q. You weren't here for the entire
17  arbitration, right, so you didn't hear
18  testimony from a gentleman on behalf of
19  Forall who testified as to the damage
20  of the brand and the resulting impact
21  on the ability to open a new store;
22  were you here for that testimony?
23       A. No.  As I stated, my testimony
24  is specifically related to the damages
25  quantified by Mr. Flaherty, and he had

Page 276

1        CROSS-EXAMINATION MR. SALSBERY
2   no damage category for impact to the
3   brand, so I didn't study that.
4        Q. Maybe you're missing the point
5   of my question, Mr. Salsbery.  I'm
6   asking your theory is that they could
7   have opened a new store, right, in Las
8   Vegas or some other place?
9        A. Correct.
10       Q. And I'm telling you, assuming
11  that there's testimony that there was
12  substantial damage to the brand name in
13  Las Vegas, and testimony further that
14  that would inhibit an operator from
15  opening a new store, that would impact
16  your analysis in your conclusions,
17  correct?
18       A. No.
19       Q. It would not?
20       A. I would -- I -- I would -- I
21  would -- I'm sorry.  I didn't mean to
22  talk over you.
23       Q. Okay.  My question is:  Not --
24  so you're saying that would not impact
25  your analysis.  You would adhere to the

Page 277

1        CROSS-EXAMINATION MR. SALSBERY
2   notion that they could have opened a
3   store in 18 months, notwithstanding
4   testimony from somebody on the grounds
5   that as a result of this midnight
6   eviction, their name and reputation was
7   damaged in the Las Vegas market; that's
8   what you're telling us?
9        MR. LEWIS:  Objection.
10       THE ARBITRATOR:  Hang on.
11  Sustained.  I'm not aware that it
12  was a midnight eviction.
13       Q. Would you agree with me it was
14  an abrupt eviction in the context of
15  the retail business?
16       THE ARBITRATOR:  Mr. Crowe,
17  I got a handle on when it took
18  place.  We don't need this expert
19  to give us an opinion on whether
20  an eviction was abrupt.
21       MR. CROWE:  My point,
22  Mr. Farber, is that his testimony
23  that the nature of this
24  proceeding, this eviction,
25  impacted the name and reputation



Page 278

CROSS-EXAMINATION MR. SALSBERY

1 of the manufacturer in this local
2 market, and so --
3     THE ARBITRATOR:  And I think
4 that Mr. Crowe is asking if you
5 took any of that into account in
6 your 18-month analysis?
7     THE WITNESS:  You want a
8 yes-or-no question, the answer is
9 no.
10    Q. Are you aware that Forall
11 notified Sarah in March of 2016 that
12 they needed to make a buy for the fall,
13 winter 2016 season?
14    A. I recall that being discussed.
15 I don't know if I heard it in this
16 arbitration or in a document.  If you
17 have something can show me, I'd be
18 happy to look at it, but I don't have a
19 clear recollection of what you're
20 speaking of.
21    Q. You've ever heard of a concept
22 called "lost volume sales"?
23    A. I'm sorry.
24    Q. Are you familiar with the

Page 279

CROSS-EXAMINATION MR. SALSBERY

1 concept of lost volume sales?
2    A. I am not.
3    Q. So you don't know the Uniform
4 Commercial Code in the applicability in
5 the mitigation of damage theory that
6 you're posting?
7    A. Well, I do use -- I understand
8 that's actually one of the documents I
9 talk about that discusses the code.
10 That -- that's discussed in the Dunn
11 book that I have, but specifically to
12 the lost volume and that definition, if
13 you have something to show me -- maybe
14 I just called it something differently
15 or maybe I don't know, but if you have
16 something to show me, I'd be happy to
17 look at it.
18    Q. That's all right.  I'm not going
19 to show you anything.  Let's talk about
20 this gross margin theory and your
21 difference with Mr. Flaherty, okay?
22    I have your report.  And in
23 particular, I want to go to Paragraph
24 26.  Do you have the report handy?

Page 280

CROSS-EXAMINATION MR. SALSBERY

1    A. I do.
2    Q. Now, you -- you talk about -- we
3 talked about -- you agree whether the
4 margin or what you call the gross
5 margin that Mr. Flaherty calculated,
6 and there's been a lot of testimony as
7 roughly 50 percent is -- is consistent
8 with your understanding, correct?
9    A. Directionally, I'll say yes.
10 But again, I do not have Forall's
11 financial statement to verify that
12 their gross margin is 50 percent.
13    Q. No.
14    A. Another witness said 45 to 50.
15 I'm just saying, he said 50.
16 Directionally, it seems the range.  I'm
17 not sure what Forall's actual gross
18 margin is.  That's my opinion.
19    Q. And you'd agree that --
20 withdrawn.
21    In this paragraph, the last
22 sentence, you describe some of the
23 variable operating expenses that you
24 would have applied in the circumstance,

Page 281

CROSS-EXAMINATION MR. SALSBERY

1 correct, to make a different
2 calculation.  Did I read that
3 accurately?
4    A. No, you don't.  What that last
5 sentence is trying to say are -- for
6 certain types of businesses -- because
7 every business has their on cost
8 structure, and this kind of costs for
9 some businesses may be variables.
10    Now, I heard testimony earlier
11 today or yesterday that they didn't
12 have commissions, so maybe those costs
13 aren't part of Forall's, but I don't
14 have Forall's own statement to see
15 which one of these costs go to their
16 financial statement, and which ones of
17 these are variable or fixed.
18    So these are just more generally
19 speaking, because I don't know what
20 costs Forall's incurring.
21    Q. Well, credit card fees you
22 mentioned here, isn't that something a
23 railer typically operates or is that
24 something a wholesaler is going to



Page 282

1    CROSS-EXAMINATION MR. SALSBERY
2  absorb?
3         MR. LEWIS:  Objection.
4         THE ARBITRATOR:  What's the
5  objection?
6         MR. LEWIS:  Mr. Salsbery
7   just testified that he listed
8   general categories.  He was not
9   saying that these were Forall's.
10        THE ARBITRATOR:  Overruled.
11   You can answer it.
12   A. Again, you're right.  Would
13  credit cards be more traditional of a
14  retailers, yes.  Does it mean that
15  Forall doesn't take purchases through
16  credit card, I don't know.
17       I don't know.  Because again, I
18  don't have their financial statement to
19  review, but I would agree with your
20  premiss, that typically speaking, those
21  types of cost are retailers, and not a
22  company like Forall, but I would need
23  to see their financial statement to see
24  if they have any of those types of
25  costs.

Page 283

1    CROSS-EXAMINATION MR. SALSBERY
2   Q. Now, you referenced a witness's
3  testimony this morning.  This young
4  lady by the name of Michelle.  And in
5  fact, she referenced 35 to 40 percent
6  margin, and then credited additional
7  cost to freight and duty of 15 to
8  20 percent.
9       So if you add on the high end,
10  your calculation of -- would be
11  60 percent, right, margin?
12   A. No.
13   Q. Well, you said --
14   A. I think that would be opposite
15  of what you're doing.  I think what she
16  said was the gross profit was 45 to 50
17  and then soft cost would be 15 to 20,
18  and so the way I understood what she
19  said was you would subtract that
20  percentage from the gross margin, so it
21  wouldn't go up, it would go down.
22       So in my view, that would bring
23  the range down to 25 to 30 percent.
24  But again, this is a known and knowable
25  fact.  If we had Forall's financial

Page 284

1    CROSS-EXAMINATION MR. SALSBERY
2  statements we could see this.  We don't
3  know.  The way I understand her
4  testimony was: It's not added, it's a
5  subtracter.  So I look at it
6  differently than you do.
7   Q. Okay.  Well, if she -- if a
8  witness on behalf of Forall testified
9  that the cost of manufacturing the
10  product is 35 to 40 percent, and then
11  there's additional cost incurred in
12  freight and duty of 15 percent,
13  approximately, or 20 percent on the
14  high end, do you have any reason to
15  disagree with that assessment?
16       MR. LEWIS:  Objection.  It's
17   a hypothetical.  It is not
18   testimony that Mr. Salsbery has
19   heard.
20       THE ARBITRATOR:  First of
21   all, I'm not sure I agree with
22   you that that's not testimony he
23   heard, and second of all, there's
24   nothing wrong with an expert
25   dealing with hypothetical.  So

Page 285

1    CROSS-EXAMINATION MR. SALSBERY
2  overruled.
3       You can answer the
4   question.
5       THE WITNESS:  Can you just
6   say that again?  It's a
7   hypothetical, but can you exactly
8   -- I just want to make sure I
9   understand and then I'll answer
10   your question if that's okay.
11       MR. CROWE:  I'm going to ask
12   the court reporter to read that
13   back, if that's okay.
14       (Whereupon, a portion of the
15   record was read back.)
16   A. So if I understand this correct,
17  that would indicate a margin of
18  40 percent.
19   Q. A margin of 40 percent on the
20  low end, up to the 50 percent which was
21  mentioned earlier today.
22   A. The reason why it stopped -- I
23  have no reason to dispute those.  I
24  don't have the financials to say that's
25  right or wrong.



Page 286

1    CROSS-EXAMINATION MR. SALSBERY
2        I would note that what she
3    described, again, was the cost of the
4    product, the freight, the duty, the
5    transportation.  What that doesn't
6    included is the variable cost for that
7    warehouse in Secaucus, New Jersey.
8    That needs to be factored in.
9        So I'm not saying that -- as you
10   work down, you can stop there, like you
11   can stop at that.  But what I'm saying
12   is:  There's costs below that -- that
13   she didn't mention.  And I'm not saying
14   she was trying to avoid it.  She just
15   didn't discuss it.
16       So I'm not disputing that margin
17   percentage, but it gets back to the
18   same thing I have an issue with
19   Mr. Flaherty that there's cost below
20   that you would have to analyze that are
21   variable.
22       Q. Well, one of the cost, quote,
23   below that I think you mentioned was
24   transportation cost; isn't that
25   encompassed within the term "freight"?

Page 287

1    CROSS-EXAMINATION MR. SALSBERY
2        A. 100 percent.  That could be in
3    there.  I agree with that.  But one of
4    the big costs that we haven't discussed
5    are the warehouse -- in the warehouse.
6    In the distribution.
7        So you get that product from
8    Italy.  I understand it comes into New
9    York or New Jersey.  There's costs
10   associated with that before it gets
11   shipped out to Las Vegas.  There's been
12   no accounting for what are the variable
13   costs at that location.
14       Q. Well, you don't know that.  In
15   fact, freight, as it's commonly
16   understood, includes those
17   distributions, do you not?
18       A. That's not a freight cost.
19   That's the forklift driver, you know.
20   I would imagine that -- I haven't been
21   to the Secaucus warehouse, but I've had
22   projects and I've had to work in
23   warehouses.
24       There are operators that are in
25   there, but I wouldn't clarify those as

Page 288

1    CROSS-EXAMINATION MR. SALSBERY
2    transportation or distribution.  Those
3    are warehouse costs.  So I can't sit
4    here today and say -- I disagree to say
5    that that would be in -- but it may be
6    for Forall if we have the financial
7    statements.
8        Again, this is known or
9    knowable.  We can look at them.  We can
10   see them.  We don't have them.
11       Q. It sounds to me like,
12   Mr. Salsbery, your biggest complaint is
13   you just don't know enough, but the
14   person who does know has a different
15   opinion.
16       So you would agree with me that
17   it would be reasonable to listen to the
18   person that has more information,
19   correct?
20       A. I disagree.
21       Q. Okay.  There's a section in your
22   report here, I think it's -- where is
23   it?  Right at the end.  Paragraph 2,
24   and you talk about a set-off from
25   Forall's purported damages.  Did you

Page 289

1    CROSS-EXAMINATION MR. SALSBERY
2    repair that section?
3        A. I did.
4        Q. And on what basis did you
5    indicate that Sarah would be required
6    to pay -- withdrawn -- that Forall
7    would have to have a set-off for
8    Forall's legal cost -- I'm sorry, that
9    Sarah would be entitled to a set-off
10   for its own legal costs?
11       A. First off, my understanding, and
12   I looked at that document, and I -- I
13   recall this was back in January or
14   February when I wrote my report.
15       My understanding was that was a
16   settlement.  That was an amount that
17   was paid to the Forum Shops of $31,000.
18   I saw that payment.  And the point of
19   that is if there are damages that are
20   determined to be awarded to Forall that
21   these costs were that incurred by Sarah
22   should be an offset, and I would say if
23   it's determined that these costs are
24   the result of the action of Forall.
25       Q. The costs of Forall in being



Page 290

```
1        CROSS-EXAMINATION MR. SALSBERY
2   evicted and taking eight days or nine
3   days to get out when the doctors sent
4   them the letter in early July, is that
5   what you're talking about?
6       A. I understand that's in dispute.
7       All I'm saying is: If it's
8   decided that it's Forall's
9   responsibility and they are the ones
10  that are the cause of that eviction or
11  however you want to say, whatever
12  terminology you want to use, then I
13  would say if damages are awarded, that
14  would be considered as an offset.
15  That's the extent of my opinion on
16  that.
17      MR. CROWE: Can I have two
18  minutes, Mr. Farber?
19      THE ARBITRATOR: Yes. Do
20  you want to take the ordinary
21  five?
22      MR. CROWE: Yes.
23      (Whereupon, a recess was
24  taken.)
25      THE ARBITRATOR: Anything
```

Page 291

```
1        CROSS-EXAMINATION MR. SALSBERY
2   further, Mr. Crowe?
3       MR. CROWE: Just a couple of
4   questions. I'll be quick.
5       THE ARBITRATOR: Okay.
6   Q. Mr. Salsbery, just a few
7   questions here.
8       On the question of advertising
9   as a variable operating cost, you also
10  mentioned -- were you aware that the
11  contract provision included a statement
12  that Forall would have to reimburse
13  advertising expenses on a dollar for
14  dollar basis with this particular
15  operator, Sarah?
16      A. Yes.
17      Q. And were you aware that they did
18  in fact do that?
19      A. Yes.
20      Q. And so that was a known cost and
21  factored into this calculation,
22  correct?
23      A. That portion.
24      Q. So there's some unknown
25  advertising expense that you're worried
```

Page 292

```
1        CROSS-EXAMINATION MR. SALSBERY
2   about, that's what I'm hearing about,
3   is that correct?
4       A. Yes.
5       THE ARBITRATOR: Hang on,
6   Mr. Lewis. You're on mute.
7       MR. CROWE: I think he's
8   self-muting.
9       MR. LEWIS: I wish I could
10  be proactive in my muting to New
11  York, sometimes. I was objecting
12  to that question.
13      MR. CROWE: Anybody in
14  particular you'd like to mute?
15      THE ARBITRATOR: All right,
16  guys. Come on.
17      MR. LEWIS: I was objection
18  to the question. Why don't you
19  rephrase the question?
20      MR. CROWE: For the most
21  part, most of us are in New York,
22  so we probably are all subject to
23  this.
24      Q. Now, getting back to your
25  report, Mr. Salsbery, in that last
```

Page 293

```
1        CROSS-EXAMINATION MR. SALSBERY
2   paragraph, it's the second to last,
3   Paragraph 33, you mention Sarah had
4   incurred $244,000 in legal fees. I see
5   that; do you notice that?
6       A. Yes.
7       Q. What is the -- what is the
8   relevance of that in your analysis?
9   Why is that included?
10      A. I included that because
11  Mr. Flaherty included the cost for your
12  litigation in his calculation, even
13  though I don't put that as an offset, I
14  just wanted to point that out.
15      Q. Did you notice in the contracts
16  whether or not there was any attorney's
17  fee provision that would run in favor
18  of Sarah?
19      A. I did not review that.
20      Q. Okay.
21      MR. LEWIS: I think that's
22  all I have, Mr. Farber.
23      THE ARBITRATOR: Mr. Lewis,
24  anything else?
25      MR. LEWIS: Briefly, yes.
```



Page 294

1    RE-DIRECT EXAMINATION MR. SALSBERY
2    RE-DIRECT EXAMINATION
3    BY MR. LEWIS:
4        Q. Mr. Salsbery, Mr. Crowe asked
5    you whether you took into account the
6    cost to build out a store, and he
7    mentioned that Sarah had to come up
8    with $500,000 and Forall matched that;
9    do you recall?
10       A. Yes.
11       Q. Okay.  And you suggested that
12   that would be an impediment to finding
13   a new operator, right?
14       A. Yes.
15       Q. However, the two doctors honed
16   down their savings, were able to come
17   with up with this initial financial
18   investment to build out the store in
19   Vegas, right?
20          THE ARBITRATOR:  Counselor,
21       this is re-cross.  You think I
22       don't know that already?
23       Q. So does that give you -- does
24   that give you any indication, Mr.
25   Salsbery, that it wouldn't have been --

Page 295

1    RE-DIRECT EXAMINATION MR. SALSBERY
2    it wouldn't have been possible to find
3    an operator because it would have
4    required an initial investment?
5        A. I don't think that -- I don't
6    think that would be a factor,
7    necessarily, would stop -- could cause
8    Forall to not be able to find another
9    operator.
10       Q. And I think you testified about
11   this before, would the store have been
12   in Las Vegas?
13          THE ARBITRATOR:  I got it.
14       He did testify about it before.
15       Okay.
16       Q. And then you were asked about
17   some testimony you weren't present for.
18   It was Mr. Torello-Viera talking about
19   impact to the brand.  Do you remember
20   being questioned about that?
21       A. Yes.
22       Q. Now, you did include an
23   additional five months in your damages
24   period to account for unknown; is that
25   right?

Page 296

1    RE-DIRECT EXAMINATION MR. SALSBERY
2        A. That's correct, yeah.
3        Q. And when you -- Mr. Crowe asked
4    you about whether Forall had given
5    Sarah notice in March of 2016 that it
6    was required to make some merchandise
7    purchases, when you were testifying
8    about 15 months, but there was no
9    communication from Forall to Sarah that
10   began in August of 2016, right?
11       A. That's correct.
12       Q. That's the 15 month period after
13   the store closed when there was no
14   notice?
15       A. That's what I was referring to.
16       Q. And there was considerable time
17   spent with Mr. Crowe poking at the
18   general costs that you had included in
19   your report when you were calling out
20   some general costs.
21          Are there some costs that you
22   would expect -- excuse me -- some
23   variable costs that you would expect to
24   see had you had an opportunity to
25   review Forall's operating -- excuse me

Page 297

1    RE-DIRECT EXAMINATION MR. SALSBERY
2    -- financial statement.
3        A. Yes.  That would be the cost of
4    the warehouse.  That's a significant
5    portion --
6          THE ARBITRATOR:  Guys, this
7       is re-cross.  I've heard this.
8       This is now the fourth time I've
9       heard it.  I got it.  Let's move
10      on.
11         MR. LEWIS:  I've just got a
12      couple more questions.
13      Q. Mr. Crowe was asking you as if
14   we had heard the gospel from Michelle
15   Gioffre; were you present for that
16   testimony?
17      A. Yes.
18      Q. Did Ms. Gioffre have to be
19   pushed to give a range after she said
20   she didn't recall?
21         THE ARBITRATOR:  Hang on.
22      Sustained.  I don't need a
23      damages expert to testify to me
24      about pushing witnesses.  I see
25      it for a living.  Next question.



Page 298

RE-DIRECT EXAMINATION MR. SALSBERY
1
2      Q. Mr. Crowe asked you a question
3  and you started answering pretty
4  quickly. Mr. Crowe asked you, and I'm
5  paraphrasing, Mr. Crowe, your biggest
6  argument or your biggest concern is
7  that you didn't have enough
8  information. Is it more appropriate to
9  listen to the person that had the
10 information; do you recall being asked
11 that?
12     A. I do.
13     THE ARBITRATOR: Okay. I do
14 also.
15     A. I thought my answer was --
16     THE ARBITRATOR: Mr.
17 Salsbery, I got it. I got it.
18 Next question.
19     MR. LEWIS: Mr. Farber, he
20 wanted to clear up the record on
21 his answer. That's what
22 re-direct is. Really the main
23 question he wanted to clear the
24 record on that.
25     THE WITNESS: I want --

Page 299

RE-DIRECT EXAMINATION MR. SALSBERY
1
2      THE ARBITRATOR: The essence
3  of your testimony, Mr. Salsbery,
4  is that you believe that Mr.
5  Flaherty should have seen more
6  documents, done some testing of
7  some of his conclusions, and you
8  feel he did not do that
9  adequately, right?
10     THE WITNESS: Correct. And
11 Mr. Crowe was trying to make the
12 point that I should just listen
13 to the witness, and I believe
14 there's different levels of
15 evidence.
16     THE ARBITRATOR: All right.
17 I kind of have that. I -- I have
18 been doing that work for about
19 40 years. So I -- I get a handle
20 on it.
21     Let's go. Next. Go
22 ahead.
23     MR. LEWIS: Last two
24 questions.
25     Q. Mr. Salsbery, did you believe

Page 300

RE-DIRECT EXAMINATION MR. SALSBERY
1
2  that Mr. Flaherty's use of gross
3  profits to term the lost profit damages
4  in this instance was correct?
5      A. I categorically disagree. I've
6  never seen someone do a lost profit
7  calculation based on gross profit
8  manager.
9      MR. CROWE: I think we
10 covered this earlier.
11     THE ARBITRATOR: We did.
12     MR. LEWIS: With all due
13 respect, Mr. Crowe, this expert
14 is --
15     THE ARBITRATOR: If you're
16 both going to talk, I won't
17 listen to either of you. There's
18 an objection to the question.
19 It's almost an exact duplication
20 of what I heard. He said that in
21 all his time he never saw this
22 before. I understand that.
23     He would add certain
24 additional deducts, and do a
25 different kind of analysis. And

Page 301

PROCEEDINGS
1
2  I think I may have scared Mr.
3  Salsbery, because I -- oh, no.
4  There he is. I thought we lost
5  you.
6      Guys, I really do have a
7  bit of a handle on this. All
8  right?
9      MR. LEWIS: No further
10 questions.
11     THE ARBITRATOR: Anything
12 else, Mr. Lewis?
13     MR. LEWIS: Nothing further.
14     THE ARBITRATOR:
15 Mr. Salsbery, thank you very much
16 for your testimony. You're
17 excused as a witness.
18     Let me start with
19 claimant. And Mr. Lewis, do you
20 have any comment on a schedule
21 for concluding this matter?
22     THE WITNESS: Sure. I spoke
23 with my colleagues, Mr. Brown,
24 Mr. Crowe, and I think we are in
25 agreement that we think it's best



Page 302

PROCEEDINGS
1
2  to follow your recommendation and
3  submit post arb briefings.  And
4  we believe November 9th is the
5  date, based on our calenders,
6  that we thought would be
7  appropriate to submit those to
8  Mr. Farber.
9       MR. CROWE:  I think we said
10  December 9th.
11      MR. LEWIS:  I'm sorry.
12  Absolutely.
13      THE ARBITRATOR:  So here's
14  what I want you to give me then
15  on December 9th, that's fine, and
16  I'm going to want you to give me
17  a brief, no more than 20 pages,
18  double spaced, no footnotes, and
19  I'll do a procedural order on,
20  probably, Monday.  And you'll see
21  this in case you don't catch any
22  of it now.
23      I want copies of
24  authorities.  I'm going to come
25  back to that in a minute.  And I

Page 303

PROCEEDINGS
1
2  want you to give me a draft
3  award, not the substance of it,
4  not the reasons, but how you
5  think an award should read.  And
6  I take that because I like to
7  check off the different numbers
8  to be sure I covered everything.
9  So give me what you believe
10  should be a draft award, assuming
11  that you're client has prevailed
12  in this matter.
13      Now, something else,
14  there is a prevailing party
15  attorney's fees clause here.
16  It's in the arbitration clause.
17  I do not like dragging out
18  arbitrations.  I know that some
19  arbitrators do this differently,
20  and this is what I want you to
21  do.
22      I want you to give me as
23  though you were in bankruptcy
24  court putting in an affidavit of
25  services, give me the detail

Page 304

PROCEEDINGS
1
2  about your attorney's fees and
3  costs.  Some people say, "Well,
4  why do you do this, because then
5  the loser has to do this," the
6  reason is because the loser's
7  attorney's cost and fees informs
8  me as to how much I should give,
9  if anything, to the winner.  But
10  there is such a clause here.
11      MR. BROWN:  Mr. Farber, I
12  actually -- I beg to differ on
13  that.  And maybe it's subject to
14  the briefing, but our position is
15  there's a provision here that
16  allows for recovery of costs by
17  Sarah.  There is not one that is
18  -- by Forall, I'm sorry.  There
19  is -- there is not an equal and
20  mirror image one that provides
21  one for Sarah.
22      The prevailing provision
23  there that I think you're
24  referring to has to do if anyone
25  were to challenge the

Page 305

PROCEEDINGS
1
2  appropriateness of the
3  arbitration and/or bring
4  litigation and --
5       THE ARBITRATOR:  All right.
6  You're right.  It's the last
7  paragraph and I misremembered it.
8  It says, "If either party brings
9  legal action to vacate or modify
10  the award, then you have
11  attorneys's fees and expenses."
12      Where is the provision
13  regarding the -- okay.  Let me
14  just see.
15      MR. BROWN:  174 is the
16  attorney's provision benefitting
17  Forall not Sarah.
18      MR. LEWIS:  Mr. Farber, may
19  I make a recommendation that we
20  release the witnesses and --
21      THE ARBITRATOR:  Absolutely.
22  The witnesses can go or stay as
23  they see fit.
24      Actually, Dr. Hamad, are
25  you still on?



Page 306

```
 1              PROCEEDINGS
 2       DR. HAMAD:  Yes, sir.
 3       THE ARBITRATOR:  And if
 4  Palma wants to stay on as well--
 5       MR. BROWN:  She already
 6  dropped.
 7       THE ARBITRATOR:  Why don't
 8  you throw her a text, because I
 9  do want to say something before
10  I'm finished.
11       Well, let me ask you,
12  we're on the record, Mr. Lewis,
13  do you agree with what Counsel
14  has just told me.  I am reading
15  the end of 174, and he has a
16  point.  Maybe this is only in
17  favor of Forall.  Do you agree
18  with that or not?
19       MR. LEWIS:  I think that we
20  know that the doctors did not get
21  the benefit of the bargain in
22  drafting these contracts.  It's
23  pretty one-sided.  That we've all
24  been able to learn through this
25  arbitration.
```

Page 307

```
 1              PROCEEDINGS
 2       So I know there a one
 3  sided attorney's fee provision
 4  contractually, but I thought
 5  Mr. Farber was talking more about
 6  Triple A rules, and that whoever
 7  prevails in the arbitration would
 8  be able to recover fees, and not
 9  having those rules in front of
10  me, I can't comment on it.
11       THE ARBITRATOR:  Triple A
12  rules do not overcome a clause.
13  The clause will overcome Triple A
14  rules.  So here's what we are
15  going to do, in light of my
16  reading of 17.4, if Forall wants
17  to put in something in the nature
18  of an affidavit of services, you
19  are free to do so.
20       And I'm going to leave
21  it in your lap, Mr. Lewis and
22  Mr. Shah, if there is some basis
23  that you feel that you could
24  recover attorney's fees if your
25  clients prevail, then you can put
```

Page 308

```
 1              PROCEEDINGS
 2  in an affidavit of services.
 3  That's up to you.
 4       If you want to argue
 5  that as a matter of some rule or
 6  something, that I should not
 7  award attorney's fees, if I find
 8  in favor of Forall, then you can
 9  so argue in your brief.
10       And same thing on your
11  part, Mr. Brown and Mr. Crowe,
12  all right.  So I'm going to leave
13  it up to both sides, but I do
14  know Mr. Brown's argument, and I
15  appreciate it.  Okay.  Okay.
16       So what I'm looking for
17  then is the brief, a draft award,
18  cases, and the -- what I just
19  said about attorney's fees.
20       And I want to say
21  something else, look, you'd both
22  seen your cases.
23       Dr. Hamad, you can come
24  on so I can see you also.
25       You know, no case is
```

Page 309

```
 1              PROCEEDINGS
 2  perfect.  From the perspective of
 3  Sarah, I mean there are some real
 4  questions here about liability
 5  and there's no mistery here.  I
 6  mean, Mr. Lewis, you and Mr. Shah
 7  have talked about some legal
 8  doctrines and waivers and
 9  estoppel, but you've got a
10  contract, and the contract is
11  pretty clear.  Both sides had
12  counsel when the contract was
13  drafted.  I'm talking about the
14  license agreement.
15       And even if something
16  was not enforced, and I'm not
17  sure the record bears that your,
18  but even if something was not
19  enforced, you've got issues
20  about -- you know, you have a
21  waiver clause in the contract.
22  It's right there.  It says what
23  it says.
24       Forall, you've got some
25  damages issues.  You know, there
```



Page 310

```
1                 PROCEEDINGS
2   -- there are some items that
3   you've got to consider.  They
4   were brought out by the last
5   witness.  There are issues about,
6   you know, a company that's not
7   been profitable that's trying to
8   collect moneys as lost profits.
9         Now, maybe that's
10  possible, but there are issues
11  about what the profit margin
12  should be, and you know, there
13  are some additional expenses
14  there, how long a period of time
15  should it have gone, the points
16  that are raised.
17        Look, you do think --
18  and I do this, you know, some
19  arbitrator's sit stoned faced,
20  and they don't tell you what
21  they're thinking.  I've been
22  carefully listening for four
23  days.  I don't abide by that.  I
24  think the arbitrator should give
25  some thought as to what he or she
```

Page 311

```
1                 PROCEEDINGS
2   is thinking, and that's what I
3   just did.
4         So there are some issues
5   here.  Now, we arbitrators are
6   forbidden from getting involved
7   with settlement discussions.  And
8   therefore, I will not get
9   involved with settlement
10  discussions.  But no case is
11  perfect.   There are strengths
12  and weaknesses on both sides
13  here.  I've just pointed some of
14  them out.  If you have not talked
15  to each other, you're well
16  advised to do so.  And I'm going
17  to leave it at that.
18        Maybe you did so this
19  morning.  I don't want to hear
20  about it, but you're well advised
21  to talk to each other.  I have no
22  problem making decisions.  I do
23  that for a living, and so I'm not
24  saying this because I'd like to
25  diminish the work that I have to
```

Page 312

```
1                 PROCEEDINGS
2   do.  That doesn't bother me at
3   all.
4         I think you should talk
5   to each other.  A lot of people
6   say that, you know, a bad
7   settlement is better than a good
8   decision.  You know, I have
9   feelings about this matter and
10  let me say this:  The briefs are
11  important.
12        I force myself not to
13  make a final decision until I
14  really read the briefs, heard the
15  closing argument from everybody,
16  but obviously I have feelings
17  about some of these matters
18  because I've heard the testimony.
19        So I want you to spend
20  the time on doing that and I urge
21  you to talk to each other again.
22  And sometimes there's a fear.
23  They're going to think I'm weak
24  if I'm the one who calls first.
25  You can blame me for the fear.
```

Page 313

```
1                 PROCEEDINGS
2   You don't have to worry about
3   that.
4         And, you know, then you
5   get collection issues, you get
6   other kinds of issues, all kinds
7   of issues which a settlement
8   would avoid.  So I want to say
9   that.
10        I want to go back to the
11  schedule and then I only have one
12  other thing I want to say.  If
13  those briefs are due
14  December 19th --
15      MR. BROWN:  9th.
16      THE ARBITRATOR:
17  December 9th, let's open our
18  calenders when we could have our
19  closing argument.
20      MR. LEWIS:  We were talking
21  about that and I don't want to
22  speak out of terms, I think my
23  colleagues and I were wondering
24  whether Mr. Farber would still
25  require closing arguments after
```



Page 314

1           PROCEEDINGS
2   the briefing.
3           THE ARBITRATOR:  I think
4   it's a very good idea to schedule
5   it, and if I decide I don't need
6   it, we'll cancel it.  We do it by
7   Zoom, so it shouldn't take more
8   than an hour or so.
9           Also, you may want to
10  comment on comments in the
11  adversaries' brief, and that --
12  it's cheaper to do it through a
13  two-hour argument than to say,
14  "You guys have permission to put
15  in another brief," and I'm still
16  mindful this has already been a
17  very expensive process.
18  Although, I'm glad that we
19  finished in the four days.
20          So look at -- assuming
21  that I get it on the 9th -- this
22  is pushing it.  Are you guys
23  working earlier in the Christmas
24  week, because that would give me
25  about a week to look at it.  Like

Page 315

1           PROCEEDINGS
2   that Monday, maybe, how does that
3   look for you, 21st or 22nd, at
4   2:00 in the afternoon.
5           Because if I get it on
6   the 9th, I'm going to need time
7   to go through it all.  And
8   remember guys, serve me by e-mail
9   and an extra copy, hard copy by
10  overnight mail because I'm an
11  under-liner.
12          So let me propose right
13  now.  How does the 22nd at
14  2:00 p.m. for closing argument,
15  how does that work?  How does
16  that work for you, Mr. Lewis,
17  Mr. Shah?
18          MR. BROWN:  I just don't
19  want to push this to January.
20          MR. LEWIS:  I prefer the
21  22nd.
22          THE ARBITRATOR:  Okay.  We
23  can accommodate that.  Mr. Brown,
24  Mr. Crowe, how about you?
25          MR. BROWN:  It's -- it's not

Page 316

1           PROCEEDINGS
2   ideal.  I have to say.  I have a
3   joint pretrial statement due that
4   day.  Christmas is right there.
5   I'm -- I don't love it.
6           THE ARBITRATOR:  Well, then
7   you want to push it?
8           MR. BROWN:  I don't want to
9   push it either.
10          THE ARBITRATOR:  I got to
11  have, you know, 10 days to review
12  what you've given me, so.
13          MR. BROWN:  It's just an
14  oral argument.  I know these
15  issues well.  We can do it on the
16  -- 2:00, you said?
17          THE ARBITRATOR:  2:00 on the
18  22nd, does that work?
19          MR. BROWN:  Okay.
20          THE ARBITRATOR:  So
21  December 22, at 2:00 p.m. by
22  Zoom.  And it's up to you guys if
23  you want to have the closing
24  argument reported, you know, have
25  the court reporter undertake it.

Page 317

1           PROCEEDINGS
2           My suggestion is that
3   you let our case manager know.
4   If you decide you don't want to
5   have the expense of the court
6   reporter, of Maggie, for the
7   closing argument because it's not
8   evidence, then I can easily send
9   out a Zoom notice for the closing
10  argument.  All right?  So you
11  guys let me know what you want to
12  do on that.
13          I only have one other
14  thing to say, and I really mean
15  this, you know, we got to do a
16  few wrangles, but I get a lot of
17  lawyers who appear before me, and
18  I wanted the clients to stay on
19  the line particularly for this,
20  and also for what I said about
21  settlement.
22          Your lawyers have really
23  worked hard.  They -- both sets
24  are really good and they really
25  are.  You know, Mr. Lewis, and I



Page 318

PROCEEDINGS

1
2 didn't hear enough from Mr. Shah,
3 but Mr. Lewis really knows his
4 business.  There's no question
5 about that, and you've worked
6 very hard and I appreciate it.
7         Mr. Brown, you and Mr.
8 Crowe have equally worked very
9 hard, and   I -- I appreciate
10 you both -- both sides.  You're
11 really professional.
12       Whatever happens, both
13 sets of clients should know that
14 you've been well served by your
15 counsel, and that's good.  And I
16 really thank you, both of you,
17 for your professionalism, and the
18 way you've handled this matter.
19       This a difficult matter,
20 and there's a lot at stake here,
21 and the lawyers were really good.
22       So Mr. Lewis, thanks.
23 Mr. Brown, Mr. Shah, Mr. Crowe,
24 thank you very much.
25       DR. HAMAD:  Can I say

Page 319

PROCEEDINGS

1
2 something, Your Honor?
3         THE ARBITRATOR:  No.  Not
4 necessary.  It's okay.
5         THE WITNESS:  I want to
6 thank you for being fair --
7         THE ARBITRATOR:  It's okay.
8 It's okay.
9         Does anyone else have
10 anything else, counsel, that you
11 would like to say?  First Mr.
12 Lewis, Mr. Shah.
13       MR. LEWIS:  Nothing on my
14 end, Mr. Farber.
15       THE ARBITRATOR:  Mr. Brown,
16   Mr. Crowe.
17       MR. BROWN:  Just I would
18 like to, you know, just thank you
19       Mr. Farber for your time on
20 the matter.  Thank you Rod, thank
21 you Sohil.  It's been a pleasure.
22       THE ARBITRATOR:  Thank you
23 very much.  All right, guys.
24 You'll get a procedural order
25 from me on Monday.

Page 320

PROCEEDINGS

1
2       We're adjourned
3 everyone.  Thank you all very
4 much.  Have a good weekend.
5     (Time noted:  4:59 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 321

1
2       C E R T I F I C A T E
3   I, MAGDALENA M. ARTILES, a shorthand
4 reporter and Notary Public within and
5 for the State of New York, do hereby
6 certify:
7   That the Witness(es) whose testimony
8 is hereinbefore set forth was duly sworn
9 by me, and the foregoing transcript is a
10 true record of the testimony given by
11 such Witness(es).
12   I further certify that I am not
13 related to any of the parties to this
14 action by blood or margin, and that I am
15 in no way interested in the outcome of
16 this matter.
17
18
19
20
21
22
23
24   Magdalena M. Artiles, a Court
     Reporter and Notary Public
25   Date:  November 10th, 2020



**A**

**abide** 310:23
**abiding** 257:25
**ability** 90:20 224:21 275:5 275:21
**able** 29:8 50:5,25 58:23 85:10 86:7 88:24 94:5 94:8 103:18 104:8,21 117:21 121:25 172:4 180:20 181:17 226:3 227:18 248:23 275:3 294:16 295:8 306:24 307:8
**abrupt** 155:5 157:14 160:15 274:23 277:14 277:20
**abruptly** 161:3 174:9
**absent** 52:2
**absolutely** 13:9 37:17 66:13 111:18 156:10 180:14 252:12 302:12 305:21
**absorb** 282:2
**absorbed** 273:22
**accent** 131:9
**accept** 237:6
**accepted** 207:6,7
**accommodate** 315:23
**accomplish** 273:21
**accomplishing** 81:11
**account** 26:23 34:10 69:20 98:17 164:22 167:7 170:16 173:16 175:11 197:3 222:20 226:19 243:16 261:15,17,19 262:21 265:12 266:14 270:2 273:25 278:6 294:5 295:24
**accountants** 91:18
**accounting** 6:20 9:12 47:3 84:7 92:6 93:16 132:25 133:5 150:10 158:9 159:2,9,10,14 159:18,21 163:15,20 190:10,18,22 197:18 198:24 199:19 204:10 204:13,21,25 205:10,13,16 207:4,5 246:12 254:18,20 255:10 258:25 259:5 287:12
**accounts** 112:3
**accuracy** 205:8 207:8
**accurate** 25:16 77:12,15 232:16 252:16
**accurately** 281:4
**acknowledged** 50:17
**act** 229:8
**action** 229:10 289:24 305:9 321:14
**actively** 231:3
**activity** 149:16
**actual** 76:22 93:5 97:15 149:15 159:13 195:9 201:6 204:25 251:6 259:16 280:18
**actuality** 197:23
**ad** 202:20
**add** 29:5 283:9 300:23
**added** 93:7 231:24 234:8 255:3 284:4
**additional** 30:20 31:6 63:17,20 85:18 146:11 148:8 177:23 234:7,11,12,13 249:24 250:7 270:3,22 271:11 274:2,2 283:6 284:11 295:23 300:24 310:13
**address** 5:3,8 44:25 89:17 90:2 130:25 131:5 147:15 157:20 216:12 216:15 233:8 271:13
**addressing** 22:25
**adequate** 104:13
**adequately** 299:9
**adhere** 276:25
**adhered** 46:2
**adjourned** 320:2
**adjusted** 45:14 45:20
**administration** 247:22
**administrative** 150:7,24 151:6 247:16
**admit** 204:4
**admitted** 48:23 49:6 135:15
**admonition** 38:6
**admonitions** 5:15
**adopt** 271:10
**advance** 45:2 223:19,21
**advantage** 12:24
**adversaries** 314:11
**adversary** 192:18
**advertising** 10:14 75:9 128:20 153:18,23 154:13 247:18 291:8,13,25
**advised** 311:16 311:20
**affect** 227:9
**affidavit** 303:24 307:18 308:2
**affirmative** 61:12
**afraid** 181:10
**afternoon** 132:19 132:20 163:12 163:13 214:3 268:4,5 315:4
**aggregating** 61:23
**ago** 51:18,20 84:9 274:8
**agree** 152:7 166:24 168:9 170:14 172:14 172:20 195:18 211:10 214:21 240:8 256:17 259:2 268:19 268:21 269:17 272:6,13,18 277:13 280:4 280:20 282:19 284:21 287:3 288:16 306:13 306:17
**agreed** 9:3 148:5 167:24 211:13 242:21
**agreement** 7:7,21 8:13 9:5 10:2,7 10:12,17 11:4 11:22 12:2,12 12:19 13:14 14:19,20 15:16 15:17 16:14,19 16:20 17:6,20 18:3 24:10,23 26:11 29:11 31:11,19 46:3 64:22 65:13 75:10,18 76:2 76:12 83:10 106:10,15 107:2,4,15,20 107:24 108:9 230:18 231:20 232:9 263:15 266:21 301:25 309:14
**agreements** 203:9
**agrees** 44:23 211:4
**ahead** 17:15 20:12 24:2 27:10 39:8 42:12 43:11 44:7 53:21 65:21 71:3 79:22 80:20 95:23 107:8,9 107:14 112:24 117:3 119:6 121:14 125:5 126:15 133:25 136:8 142:15 157:17,19 169:4 172:22 174:16 180:15 187:2 198:16 209:7,24 218:13 221:15 227:16 239:6 241:17 245:13 247:7 256:9 271:8 272:22

299:22
**ALBASHA** 1:4
**allegations** 134:4
**allocation** 10:20
  75:8
**allocations** 9:24
**allot** 142:24
**allow** 147:19
  252:5
**allowed** 11:23
  16:6 33:10
**allowing** 12:19
**allows** 304:16
**Amar** 1:4 2:19
**America** 67:6
**AMERICAN** 1:2
**amount** 14:13,14
  14:16 29:14
  119:12 223:5
  224:13 253:2
  255:2 258:5
  269:4,14,16
  289:16
**amounts** 115:14
  211:3
**analysis** 135:11
  210:10 257:19
  262:21 265:9
  269:19 276:16
  276:25 278:7
  293:8 300:25
**analyst** 219:20
**analyze** 244:10
  275:3 286:20
**and/or** 305:3
**annual** 71:19,20
  128:10,16
**answer** 17:4,10
  23:18 40:5
  41:10 48:6
  54:23 55:6,10
  56:12 65:12
  67:12,24 68:6,8
  70:8 72:10,20
  75:16 80:16
  85:2 90:14,23

92:24 94:8
96:16,19
100:12 101:6
102:5 103:13
104:18 105:23
108:20 109:4
111:24 113:21
114:7,12
115:12 126:25
127:6 131:16
165:10,25
166:2,3,14,25
170:21 171:2
179:4 186:12
186:13 188:14
190:6 194:20
200:7 202:17
217:3 226:8
245:4 274:15
278:9 282:11
285:3,9 298:15
298:21
**answered** 43:10
46:10 62:15
65:2 86:17
108:11 126:12
126:14 186:22
186:24 201:7
274:17
**answering**
214:12 298:3
**answers** 56:8
**anticipated**
128:15
**anticipating**
305:2
**anybody** 171:14
176:23 239:25
292:13
**anyone's** 215:3
**anyway** 126:14
**apologies** 274:13
**apologize** 136:10
188:16 212:20
218:21,24
244:22 251:20

**appear** 175:18
  317:17
**appears** 259:12
**applicability**
  279:5
**applied** 9:14 10:6
  15:4 144:9,16
  154:4 280:25
**apply** 226:15
**applying** 49:18
**apposing** 252:5
**appreciate** 84:25
  88:12 108:6
  163:14 175:6
  181:16 308:15
  318:6,9
**appreciation**
  59:14 77:11
  106:5 121:24
  122:5
**approach** 118:2
  119:18
**approaching**
  129:19
**appropriate** 9:15
  56:3 192:13,18
  211:11 222:18
  222:21 223:4
  224:12 241:25
  243:8 255:13
  257:8,23
  260:19 261:2
  261:12 262:3
  298:8 302:7
**appropriateness**
  305:2
**approved** 83:9
**approximate**
  148:2 149:14
**approximately**
  29:9 63:24 64:6
  76:10 77:7
  119:16 121:16
  138:22 139:20
  190:17 240:10
  284:13

**AR** 26:23
**arb** 302:3
**arbitration** 1:2,3
  1:14 4:20 42:19
  47:17 50:3 52:9
  89:10 105:15
  123:11 130:18
  133:23 216:5
  230:19 254:14
  259:13,16
  260:17 275:17
  278:17 303:16
  305:3 306:25
  307:7
**arbitrations**
  133:14 303:18
**arbitrator** 1:19
  2:4 4:2,6,13,16
  4:24 5:8,12,22
  14:3 15:12,18
  15:25 16:8,18
  16:23 17:9 20:5
  20:11 23:13,23
  25:3 31:24 32:4
  32:15,20,24
  33:8,15,19,22
  34:4,12,19,22
  35:3,7,10,12
  38:3,25 39:7
  41:9,22 42:4,11
  43:9,15,22 44:7
  44:11 46:9
  47:16 48:4 49:8
  49:12 50:8 51:4
  51:8,16 52:20
  53:20 54:10,18
  54:24 55:13
  56:6,17 57:4,14
  57:17 62:19
  65:4,11,19 66:7
  66:11 68:23
  69:7,16,22 70:7
  70:12,17,21
  71:2,10,17,22
  72:4,9 73:4,19
  74:5 76:23

78:10,19 79:13
79:18,22 80:12
80:15,19,25
81:16 82:5
83:20 86:16,22
87:7,14,19 88:4
88:7,10,21 89:2
89:14,22,25
90:6 91:7 92:23
93:12,22,25
94:4,7,13,23
95:4,7,13,22
96:8,14,18 97:2
97:7,24 98:5,14
98:20 100:11
101:5,18,24
102:4,22 104:3
104:23 105:20
106:4,14,23
107:6,13
108:13 109:3
110:6,15 111:4
111:21 112:16
113:20 114:15
114:25 115:10
115:15,19,25
116:11,21
117:2,24
118:11,18
119:5,17
120:17,25
121:6,12 122:4
122:9 124:22
125:4 126:8,13
127:5,14,21,24
128:25 129:6,8
129:13 130:3
130:12,23
131:7,12,24
132:12,15
133:22,25
135:19 139:3,7
139:12 140:8
140:16,18,22
141:4 142:7,14
148:13,18



| | | | | |
|---|---|---|---|---|
| 149:2 151:13 | 264:7,23 267:3 | 313:25 | **aspect** 229:22 | 307:24 308:7 |
| 155:8 156:10 | 267:8,13 | **arising** 264:17 | **assessment** | 308:19 |
| 156:14,23 | 270:13 271:5 | **Article** 45:2 | 284:15 | **attorney-client** |
| 157:15 162:11 | 272:10,19 | 264:8 | **asset** 14:19 15:15 | 105:19 |
| 162:18,25 | 273:5 277:10 | **articles** 233:25 | 16:14,19 17:5 | **attribute** 187:10 |
| 163:25 165:7 | 277:16 278:4 | **Artiles** 1:16 | 18:2 | 235:9 |
| 165:24 166:13 | 282:4,10 | 108:23 321:3 | **assist** 91:19 | **audit** 71:18 |
| 168:17 169:3 | 284:20 290:19 | 321:24 | 134:15 241:5 | **audited** 69:9 71:5 |
| 169:12,16 | 290:25 291:5 | **asked** 16:10 24:7 | 241:14 | 71:12 |
| 170:20,24 | 292:5,15 | 41:23 42:9 | **assistant** 6:11 | **audits** 71:13 |
| 171:20 172:14 | 293:23 294:20 | 53:22 54:15 | 69:17 136:18 | **August** 37:10 |
| 173:10 174:15 | 295:13 297:6 | 58:13 59:19 | **assisted** 231:9 | 47:8,11 53:23 |
| 174:23 175:23 | 297:21 298:13 | 61:5 62:13 65:2 | **associated** 157:7 | 76:19 77:5,22 |
| 176:16 179:18 | 298:16 299:2 | 67:4 68:4 74:12 | 287:10 | 78:7,16 82:9,20 |
| 180:11,15,25 | 299:16 300:11 | 95:13 96:9 | **ASSOCIATION** | 82:24 83:4 84:2 |
| 181:21 185:23 | 300:15 301:11 | 101:7 110:14 | 1:2 | 86:3 119:14 |
| 186:10,21 | 301:14 302:13 | 111:3,14 | **assume** 19:3 23:6 | 121:18 122:18 |
| 187:21 189:25 | 305:5,21 306:3 | 114:16 117:19 | 174:11 183:19 | 122:24 123:6 |
| 190:5 191:25 | 306:7 307:11 | 124:14 125:14 | 224:15 266:4 | 139:22 141:9 |
| 192:25 194:10 | 310:24 313:16 | 126:11,16 | **assumes** 200:2 | 164:13 165:4 |
| 194:17,22 | 314:3 315:22 | 127:4 134:12 | **assuming** 128:1 | 165:15 166:6 |
| 198:9,15 199:4 | 316:6,10,17,20 | 147:16 158:20 | 172:8 222:15 | 166:23 167:9 |
| 199:23 200:6 | 319:3,7,15,22 | 169:13,17 | 222:18 225:23 | 173:23 223:16 |
| 201:19 202:8 | **arbitrators** | 182:20 194:25 | 242:6 252:14 | 223:19 236:18 |
| 202:16 203:2 | 303:19 311:5 | 200:22 250:20 | 276:10 303:10 | 296:10 |
| 206:4,8,12,16 | **arbitrator's** | 274:14 294:4 | 314:20 | **author** 25:6 |
| 208:5,22 209:2 | 132:10 310:19 | 295:16 296:3 | **assumption** | **authorities** |
| 209:13,18 | **area** 81:12 | 298:2,4,10 | 153:25 | 302:24 |
| 210:11,14 | **arguably** 270:21 | **asking** 36:6 41:7 | **attach** 186:15 | **available** 34:20 |
| 211:7,21 212:3 | **argue** 111:23 | 48:3 57:8,11 | 187:4,9,13 | 51:2 72:6,11,19 |
| 212:6,11,16 | 187:22 258:21 | 63:9,11 65:3 | **attached** 60:6 | 73:15 100:3,12 |
| 213:5,11,13 | 267:14 274:14 | 70:22 73:20,22 | 187:5,19 | 100:16,19 |
| 215:25 216:10 | 308:4,9 | 74:12 78:11,12 | **Attachment** | 101:13,15 |
| 216:18 217:23 | **argument** 74:14 | 80:8 90:9 95:24 | 196:8,11 | 102:5,6,9,14 |
| 218:6,12 | 81:6 148:7 | 98:15 107:11 | **attempt** 179:9 | 132:9 148:17 |
| 221:11 224:14 | 199:9 214:2,9 | 115:23 117:14 | **attempting** 241:2 | 198:7 199:16 |
| 226:10 227:16 | 214:16 256:7 | 117:15 120:14 | **attention** 206:20 | 199:21 200:2 |
| 228:13 234:15 | 257:18 260:10 | 157:16 167:4 | **attorney** 41:3 | 246:23 247:12 |
| 235:5 239:5 | 264:25 266:8 | 168:14,21 | **attorneys** 2:8,13 | **Ave** 2:14 |
| 241:16 245:5,8 | 271:23 298:6 | 176:23 178:14 | 40:24 41:2 | **average** 56:20 |
| 247:9 251:13 | 308:14 312:15 | 186:6 188:15 | 62:18 112:15 | 146:20 |
| 255:18,24 | 313:19 314:13 | 192:6,24 | **attorneys's** | **avoid** 23:16 |
| 256:8,13 | 315:14 316:14 | 200:18 203:19 | 305:11 | 229:11 286:14 |
| 257:20 258:13 | 316:24 317:7 | 209:4,6 226:21 | **attorney's** 293:16 | 313:8 |
| 258:19 262:4 | 317:10 | 270:6,25 276:6 | 303:15 304:2,7 | **award** 259:18 |
| 263:13,23 | **arguments** | 278:5 297:13 | 305:16 307:3 | 303:3,5,10 |



305:10 308:7
308:17
**awarded** 261:25
289:20 290:13
**aware** 17:9 20:8
46:13,17 57:23
58:18,19 59:5
59:10 63:11,13
63:14,15 76:20
78:20,23 79:2
82:18 83:13,16
83:24 86:10
115:4 122:21
157:4,9,10
165:2 183:9
277:11 278:11
291:10,17
**a.m** 1:11

**B**

**B** 217:21
**Babson** 133:2
**BACHAR** 1:4
**bachelor** 132:24
**back** 4:12 6:19
6:22,24 29:5
39:25 47:2
63:15 69:21
70:2 82:17
83:10 84:6
87:22 97:18
98:8 99:23
100:18 108:4
108:24 109:2
109:12 113:23
114:11 116:16
119:18 135:23
143:18 153:15
157:18 160:8
161:8,20 173:8
180:19 183:3
183:15 193:12
196:15 197:9
200:11 204:21
207:18 208:12
215:21 224:3

227:10 228:10
230:14 239:13
239:20 248:7,8
251:19 255:19
257:6 259:6
285:13,15
286:17 289:13
292:24 302:25
313:10
**background**
132:22 134:11
159:2 219:8
**backwards** 29:9
76:4
**bad** 218:18 312:6
**balance** 159:12
159:15
**ballpark** 38:22
190:24
**bankruptcy**
223:11 303:23
**bar** 181:9
**bargain** 306:21
**Baritza** 30:21
39:16
**base** 196:5 223:6
243:5
**based** 22:17
24:13 25:16
37:6 108:7
116:17 138:17
147:25 149:15
152:10 160:25
161:11 174:19
175:20 178:14
220:18 221:4
239:23 251:4
274:6 300:7
302:5
**bases** 85:7
**basing** 85:14
254:6
**basis** 32:6 34:14
50:6 118:19
142:20 144:10
167:20 182:12

193:25 207:23
256:17 257:2
257:14 270:18
289:4 291:14
307:22
**bates** 30:4 60:14
**beans** 211:3
**bear** 7:25 11:25
12:7 21:16
196:7
**bears** 309:17
**Beating** 126:6
**beg** 183:8 304:12
**began** 62:7 239:8
296:10
**beginning** 130:5
**behalf** 217:15,19
275:18 284:8
**behest** 269:22
**belief** 15:8
**believe** 10:10
16:17 25:15,21
52:11 67:3
84:14 95:17
100:18 102:8
102:15 104:21
112:12 117:12
119:15 122:10
123:16,22,25
158:7,9,20
161:6 171:10
171:11 174:18
181:18 182:16
185:6 193:12
196:4,12
200:21,23
201:11 204:2
220:10 222:23
222:25 223:4
238:10 248:21
249:4 261:2
263:16 264:11
269:6 299:4,13
299:25 302:4
303:9
**bell** 126:3

**benefit** 306:21
**benefitting**
305:16
**besieged** 262:19
**best** 77:3 114:21
119:20 186:13
201:21 301:25
**better** 65:17
143:13,17
192:20 218:12
267:19 312:7
**Beverly** 83:15
84:2 232:11,19
**beyond** 11:9 31:9
110:16 266:11
275:12
**big** 270:10 287:4
**biggest** 288:12
298:5,6
**bills** 123:24
**bit** 26:19 125:21
186:11 219:7
250:25 260:12
301:7
**blame** 312:25
**BLEAKLEY**
2:13
**blood** 321:14
**blue** 25:13 90:8
**blush** 141:5
**board** 181:3
249:16
**body** 143:2
**book** 14:7 60:5
121:23 229:17
229:18 279:12
**books** 229:14
**Boston** 131:6,9
**bother** 201:16
312:2
**bottom** 23:7
28:18 125:23
175:25
**bought** 210:7
223:19,20
224:2 253:16

**boxes** 105:6
**Brachani** 36:24
**brand** 238:13
268:12 274:5
275:20 276:3
276:12 295:19
**breach** 136:3
154:17 265:10
265:17 272:8
272:16
**break** 35:14,15
87:21 135:24
136:17 158:12
162:13,17,23
209:3 212:21
213:16 246:3
260:13
**breakdown**
138:13
**Bridge** 90:4
**brief** 91:3 134:10
214:6,11
302:17 308:9
308:17 314:11
314:15
**briefing** 304:14
314:2
**briefings** 302:3
**briefly** 112:8
158:18 293:25
**briefs** 214:12
312:10,14
313:13
**bring** 86:11
148:12 239:20
247:23 248:4
252:8 257:6
283:22 305:3
**bringing** 248:17
**brings** 305:8
**broken** 137:9
**brokerage** 86:11
**brought** 111:2
310:4
**Brown** 2:15 3:4
4:2,4 5:18,25



8:3 12:4 13:18
13:23 14:5
17:15,16 21:18
23:18 25:10
26:13,18 30:3
31:21 32:3
35:15 37:25
38:16 41:4,9,18
42:10,18 43:7
43:14,17 46:5
47:13,24 48:25
49:16 50:22
51:2,12,13 52:7
54:7 56:2,11
58:24 59:19,23
60:4,12 64:25
66:6,9 68:22
69:14 70:5 71:7
72:7,25 73:16
76:11 78:2
79:11,15,20
81:3 83:17
84:14 86:15,22
87:2,10,16 88:8
88:9,15 105:14
110:3,7,15,22
111:4,11
136:18 138:4
148:16 181:8
212:13,15
264:4,12
301:23 304:11
305:15 306:5
308:11 313:15
315:18,23,25
316:8,13,19
318:7,23
319:15,17
**Brown's** 39:24
40:5 60:21
308:14
**build** 200:13
231:14 294:6
294:18
**build-out** 9:19
268:25

**bunch** 235:15
**burden** 221:7
**Burgh** 90:4
**business** 36:16
174:9 219:16
219:16 223:8
223:18 268:7,8
277:15 281:8
318:4
**businesses** 69:5
281:7,10
**button** 23:5
**buy** 223:22 224:8
224:16 225:16
278:13
**buying** 138:21,25
139:18,20,22
140:2 141:23
141:25 142:4
196:18 198:18
223:17,21
**buys** 142:4
253:13

——————
**C**
**C** 2:2 91:5 217:21
321:2,2
**Caesars** 226:25
235:17 266:15
**calculate** 72:17
143:20 145:10
146:23
**calculated**
153:17 154:14
154:20 222:10
262:9 280:6
**calculating** 137:3
143:4 153:13
155:24 195:8
195:16
**calculation** 116:8
138:16 145:19
147:18 153:4
160:21 164:18
167:21 168:5
169:7,10,21

170:18 171:3,6
173:3 183:22
185:20 195:20
202:13 210:21
211:2,5,11,14
220:12,25
221:18,25
222:3 229:24
234:14 243:21
244:16 254:11
255:15 256:23
272:5 281:3
283:10 291:21
293:12 300:7
**calculations**
22:17 24:14
133:12,14
220:16 254:24
**calculous** 75:23
**calendar** 45:10
**calendars** 214:23
215:12
**calender** 45:15
139:15
**calenders** 302:5
313:18
**call** 7:3 47:20
88:18 130:8
136:25 190:9
250:3 280:5
**called** 44:18
124:18 125:15
150:22 211:16
229:15,19
245:21 247:3
249:20 278:23
279:15
**calling** 191:23
296:19
**calls** 130:7
209:15 312:24
**cancel** 314:6
**cap** 76:5
**capacity** 7:4
**Capital** 245:21
**captured** 158:23

234:13
**card** 281:22
282:16
**cards** 282:13
**care** 169:24
**carefully** 310:22
**carried** 14:18
**carry** 16:13
**case** 1:6 7:2,12
23:2 51:25
52:14 110:11
114:21 130:9
149:19 213:18
264:15 275:13
302:21 308:25
311:10 317:3
**cases** 130:8
219:21,24
308:18,22
**catch** 54:14
302:21
**categorically**
300:5
**categories** 120:2
247:25 282:8
**category** 155:22
157:19 276:2
**cause** 290:10
295:7
**caused** 120:22
**causes** 254:15
**cease** 80:23
**center** 45:11,18
248:11
**certain** 10:15
11:21 13:6
22:25 44:17
75:5 93:6 125:3
134:14 147:19
154:22 155:3
167:19 229:2
244:6 268:25
281:7 300:23
**certainly** 72:21
104:12 108:15
120:19 134:20

164:9 176:24
214:7 236:14
252:10 267:17
**certified** 45:12
45:22 219:20
**certify** 321:6,12
**CFO** 152:18
**Chad** 2:22
216:13
**challenge** 304:25
**chance** 165:9
**change** 115:20
**channel** 183:7,17
**charge** 38:11
102:11
**charges** 159:15
160:8,13
**chart** 59:20,22,25
60:6,11,21
62:25 63:3
143:18
**cheaper** 314:12
**check** 8:22 53:10
100:20 102:8
183:4,16 303:7
**checked** 40:4
**Chicago** 2:9
11:16 83:4,7
232:13,20
**choice** 37:20
89:18
**chose** 111:7
198:25
**Christmas**
314:23 316:4
**circumstance**
96:2 128:9
136:4 230:16
273:24 280:25
**circumstances**
13:11 168:7
273:14
**cities** 83:8 233:5
**city** 227:11
236:24
**claim** 213:21



226:7 256:24
259:25 271:16
273:7 275:14
**claimant** 1:5
301:19
**Claimants** 2:8
**claimant's**
110:10 136:3
**claimed** 272:25
273:3 275:9
**claiming** 225:10
**claims** 160:12
**clarification**
204:5
**clarify** 60:9
83:19 128:4
156:8 287:25
**clause** 263:14
264:2 265:4,15
303:15,16
304:10 307:12
307:13 309:21
**clean-up** 22:23
**clear** 166:4
278:20 298:20
298:23 309:11
**client** 104:7,9
303:11
**clientele** 91:23
92:6
**clients** 36:20
71:14 84:20
91:20 93:14
307:25 317:18
318:13
**close** 45:9
**closed** 76:21 77:5
77:9 137:18
138:24 151:21
152:2 164:12
164:15 174:9
215:6 233:9,11
234:5 240:19
261:7 266:16
296:13
**closer** 55:19

101:2
**closes** 241:4
**closing** 77:22
78:7,15 80:21
122:18 139:21
141:8 155:19
159:11 160:15
206:22 214:2,5
214:9 257:18
258:8,12
312:15 313:19
313:25 315:14
316:23 317:7,9
**closure** 37:10
**clothes** 270:11
**code** 279:5,10
**cold** 227:10
**colleague** 100:6
148:15 190:12
210:6 211:4,9
**colleagues**
301:23 313:23
**collect** 206:2
310:8
**collection** 313:5
**College** 133:2
**color** 59:25
**colored** 20:25
**column** 144:25
145:23 146:10
146:25 149:9
149:21 154:4
159:5,8 183:25
184:3,20,24
188:5 189:18
**columns** 159:6
185:3
**come** 14:7 29:9
87:22 131:10
134:2 140:4
154:7,8,13
191:3 192:20
202:23 215:21
230:10 239:3
243:17 251:8
269:21 292:16

294:7,16
302:24 308:23
**comes** 75:23
146:13 203:6,7
233:7 287:8
**coming** 62:17
205:12 212:21
215:2 264:15
**commenced**
137:16
**comment** 167:2
301:20 307:10
314:10
**comments** 159:7
314:10
**Commercial**
279:5
**commissions**
281:13
**commitments**
10:15
**common** 145:14
**commonly**
287:15
**communication**
296:9
**companies** 70:19
92:9,20 133:16
148:11 149:12
164:7 245:15
245:16
**company** 20:6
35:4,8 68:5
69:13,21 70:3,4
70:14,24 71:5
91:17 97:20,25
113:14 143:25
150:14,18
154:23 223:12
238:6 243:3
246:4,9,10,11
246:18 249:2,3
282:22 310:6
**company's** 113:7
244:2 245:22
259:5,23

**compared** 211:14
**compel** 111:3
**competitors**
238:16
**compilation**
50:19
**compiling** 21:7
**complaint** 176:25
177:14 288:12
**complaints**
134:21
**completely** 84:24
115:8 242:25
**compliance** 8:13
**complicated**
175:22
**complied** 10:10
**component**
154:14 272:4
272:24
**components**
162:5 244:7
248:15
**computer** 194:14
**concept** 152:7
278:22 279:2
**concern** 36:4
298:6
**concerned** 56:10
**concerns** 74:10
**concession**
247:19
**concludes** 224:6
**concluding**
301:21
**conclusion**
209:20
**conclusions**
276:16 299:7
**conditions** 44:18
**conducted**
110:24
**confirming** 23:20
**connection** 4:11
5:15 19:5 52:22
55:19 92:11

116:4 216:22
218:19 224:25
258:7
**consents** 44:23
**consequence**
210:9,17
**conservative**
231:24
**consider** 74:6
155:22 190:21
226:23 266:19
269:18 271:25
273:19 310:3
**considerable**
296:16
**consideration**
233:16 250:13
**considered**
136:22 149:24
164:10 171:5
290:14
**Considering**
242:13
**consistent** 49:17
50:11 53:24
54:4 138:9
149:13 249:17
251:11 280:8
**consistently**
114:18 264:19
**constitutes** 200:3
**construction**
9:23 10:5 20:22
20:22 24:14
**consulted** 268:13
**contact** 191:9
**contemporane...**
204:21 254:12
**contents** 107:20
**context** 102:20
128:5 136:23
277:14
**continue** 80:3,10
164:5 168:11
235:25
**continued** 236:10



continues 179:15
contract 64:17
  134:25 136:3
  137:4,6,8,9,16
  137:21 138:17
  138:20 139:16
  142:3 151:12
  153:20 167:13
  167:15,22
  168:2,19
  169:18 170:2,8
  170:11 171:13
  171:15 172:6
  173:22 195:22
  208:19 209:9
  209:23 265:20
  269:2 271:18
  291:11 309:10
  309:10,12,21
contracting
  273:23
contracts 134:24
  177:3,14
  293:15 306:22
contractually
  307:4
controller 22:10
controlling 70:23
controversy
  113:19 134:5
  158:2
conversation
  22:11 105:19
  255:6
copies 123:14
  124:2 126:18
  302:23
copy 131:22
  315:9,9
corner 149:5
corners 266:21
Corporation
  150:16 152:12
  245:17 246:14
  246:16,25
  247:6,11 250:9

250:16
correct 6:5,8,9
  10:17,18 11:24
  14:24 18:21
  20:16 22:20,21
  23:3 24:24 26:7
  28:2,19,20
  29:15,23 31:8
  35:24 39:16,17
  43:5 46:3,4
  47:5 57:21 60:2
  63:7 65:24 68:6
  68:7,10,12,14
  68:16,18 70:4
  75:10 76:6
  83:11 84:10
  93:8,9 94:20
  98:4 103:24
  109:14 112:16
  121:18 122:15
  136:15 140:6,7
  142:13,20,21
  144:10 145:13
  147:10 153:5
  153:13,14
  154:11,18
  158:3 163:21
  164:14,20,25
  167:16 173:5
  175:13 179:2,6
  179:8 182:8,25
  187:15 199:9
  203:4,23 204:2
  205:19,20,23
  205:24 219:4,5
  220:9 222:11
  228:18 233:2
  244:23 249:12
  253:24 258:19
  262:11,16
  265:20 268:10
  271:2 274:25
  275:2,8 276:9
  276:17 280:9
  281:2 285:16
  288:19 291:22

292:3 296:2,11
  299:10 300:4
correctly 66:14
  66:17 124:6
  173:4
correspond
  27:22
corresponds
  28:24 29:4
  33:14
cost 20:22 24:14
  36:7 74:21
  92:13,18 93:2,5
  93:11,17,21
  94:10,13 95:15
  95:25 96:9,13
  96:20,22
  118:17,25
  119:2 123:23
  124:4 125:6,15
  128:12 138:13
  143:19,20,24
  143:24 144:4,5
  144:9,14,21
  145:24,24
  146:2,5,8,8,11
  146:15,20,23
  147:2,3,20
  148:4,6 150:13
  150:21 151:11
  152:8,14 153:3
  153:18 154:7
  154:22 155:7
  157:20,25
  158:12,15
  160:11 161:17
  161:18,20
  183:25 184:3
  184:17,22
  188:5,8,15,17
  188:18,24
  189:18 207:12
  239:17 243:13
  243:24 244:4
  244:11,14,24
  245:11 246:11

246:25 247:4
  247:16 248:12
  248:18,21
  249:21,25
  250:7,10
  252:15 253:18
  255:3,13 257:6
  258:18 259:15
  260:7,10,21,22
  261:5 263:11
  268:25 271:11
  273:22 274:2
  281:8 282:21
  283:7,17 284:9
  284:11 286:3,6
  286:19,22,24
  287:18 289:8
  291:9,20
  293:11 294:6
  297:3 304:7
costs 9:23,24
  10:5 20:22
  24:18 34:15
  94:21 95:9
  126:20 148:8
  149:22 150:8
  150:19,20
  151:3,6,10
  152:13 157:6
  157:11 158:21
  158:24 160:4
  184:11 188:4,9
  188:22,23
  189:2 200:13
  242:16 243:14
  244:4,6 246:20
  247:8,24
  248:12,16,20
  250:3 255:7
  258:21 259:13
  261:23 281:9
  281:13,16,21
  282:25 286:12
  287:4,9,13
  288:3 289:10
  289:21,23,25

296:18,20,21
  296:23 304:3
  304:16
counsel 25:3
  41:21 52:20
  57:4 70:21
  80:25 108:16
  111:13 181:9
  186:18,23
  191:25 192:18
  200:4 211:7
  214:17 242:19
  250:20 265:5
  306:13 309:12
  318:15 319:10
Counselor 14:4
  23:13 73:20
  79:14 102:22
  124:23 142:15
  198:10 215:13
  263:15 294:20
Counsel's 186:3
couple 31:22
  127:12 151:19
  208:7 233:15
  249:10 252:17
  255:20 259:10
  291:3 297:12
course 17:13
  92:5 104:9
  107:16 128:18
  140:10 141:15
  163:8 199:20
  202:22 230:17
court 47:19
  258:2 285:12
  303:24 316:25
  317:5 321:24
cover 60:10 85:6
  263:22
covered 126:11
  234:7 251:17
  300:10 303:8
covering 238:18
COVID 69:2,4
  262:15 264:17



**CPA** 22:10 34:10
36:14 91:16
**create** 125:14
**created** 20:20
**creative** 186:11
**credence** 45:21
204:9,12
**credibility**
178:24
**credit** 13:6 14:11
15:2,8,19,23
16:16 18:5 23:8
24:19 30:9,13
30:19 40:5,6
262:12 281:22
282:13,16
**credited** 20:23
283:6
**credits** 23:2
**criticism** 148:6
**criticisms** 147:17
**criticizes** 139:8
**cross** 38:5,7 99:2
108:16 163:3
180:2 192:14
**cross-examinat...**
39:1,9 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1 81:1 82:1
83:1 84:1 85:1
86:1 99:1 100:1
101:1 102:1
103:1 104:1
105:1 106:1

107:1 108:1
109:1 110:1
111:1 112:1
113:1 114:1
115:1 116:1
117:1 118:1
119:1 120:1
121:1 122:1
123:1 124:1
125:1 126:1
127:1 163:1,10
164:1 165:1
166:1 167:1
168:1 169:1
170:1 171:1
172:1 173:1
174:1 175:1
176:1 177:1
178:1 179:1
180:1 181:1
182:1 183:1
184:1 185:1
186:1 187:1
188:1 189:1
190:1 191:1
192:1 193:1
194:1 195:1
196:1 197:1
198:1 199:1
200:1 201:1
202:1 203:1
204:1 205:1
206:1 207:1
263:22 268:1,2
269:1 270:1
271:1 272:1
273:1 274:1
275:1 276:1
277:1 278:1
279:1 280:1
281:1 282:1
283:1 284:1
285:1 286:1
287:1 288:1
289:1 290:1
291:1 292:1

293:1
**Crowe** 2:16 3:6,8
3:11 38:18 39:5
62:14 88:15,17
90:7,19,24 91:2
91:10 95:11,16
95:23 96:24
100:4 101:14
102:18 105:14
105:16 106:12
106:18 108:10
111:8,20
112:12,22
113:11 114:9
115:6 117:18
120:13 126:6,9
126:10,23
127:3,24 128:2
128:8,23
129:14,16
130:11 131:13
131:18,25
132:5,18
133:19,23,24
148:14 155:9
156:7,12,13
157:17 162:9
163:9 165:6,9
165:17 166:11
168:13,25
169:14 170:19
171:19 172:12
172:15 175:14
178:16 180:22
181:4,7,23
183:11 184:6
185:21 186:2,3
186:11 189:24
190:3 191:22
192:10,25
194:9 199:2,22
199:25 201:18
202:14 203:14
203:17 205:21
208:5,7,10,23
208:25 211:24

213:12 216:24
217:10,17,19
218:17 221:9
245:3,6 256:3
257:16 262:22
262:25 267:2,8
267:11,15,18
267:24 268:3,5
270:15,24
271:6,9 272:11
273:10,12
277:16,21
278:5 285:11
290:17,22
291:2,3 292:7
292:13,20
294:4 296:3,17
297:13 298:2,4
298:5 299:11
300:9,13
301:24 302:9
308:11 315:24
318:8,23
319:16
**Crowe's** 263:19
264:21
**Cuccineli** 36:22
**cumulative** 27:2
30:8
**currently** 133:2
**cursory** 274:7
**customary**
127:16 161:5
206:7
**customer** 27:19
**cut** 19:10 21:12
136:9
**C-H-A-D** 216:13

———————
**D**
———————
**D** 3:2 196:11
217:21
**daily** 200:15
**damage** 37:16
133:12,13
136:22 153:6

155:22 221:24
224:19 241:22
242:11,13
254:11 256:23
258:7 261:3
265:9 266:12
270:23 271:16
272:4,24 274:5
275:4,11,19
276:2,12 279:6
**damaged** 272:6
277:7
**damages** 133:8
133:15 134:6
134:13 136:2,6
137:14 143:22
151:9 154:21
161:23 163:17
167:20 168:4
169:6,9,10
170:17 171:3,6
173:3 195:9,10
195:16 202:13
219:10,15
220:11,21,24
221:5,7,17
222:2,4 225:7
228:24 229:3
229:11,20,24
232:6 251:2,25
252:4 254:23
259:14,16,25
260:5 261:12
261:25 262:3,9
262:21 266:9
272:15,25
273:3,17
275:24 288:25
289:19 290:13
295:23 297:23
300:3 309:25
**Damico** 133:4
**dance** 176:7
**data** 184:4,10
197:22 199:15
199:16,17,20



201:3,6,8
204:25 205:3,6
205:8 220:16
225:5,14
254:16
**date** 1:10 25:12
51:11 60:25
76:20,22 79:10
79:12 159:7
160:6,6 193:7
265:10 302:5
321:25
**dated** 62:9
205:18
**dates** 27:25 50:2
65:9 140:23
197:14 214:24
**day** 45:3,9 100:9
105:2 239:24
316:4
**days** 45:16 50:3
51:2,19 52:10
81:7 101:17
105:2 237:19
290:2,3 310:23
314:19 316:11
**deal** 14:16
160:14 208:11
210:19 270:10
**dealing** 152:25
170:10 183:18
190:10 219:21
264:21 284:25
**deals** 11:12
**dealt** 8:17
**Dear** 22:7
**death** 126:7
**December**
302:10,15
313:14,17
316:21
**decent** 53:5,7
**decide** 75:3 81:6
170:5 210:15
211:8 260:4
314:5 317:4

**decided** 290:8
**decision** 79:8
80:3,9,17 174:3
213:23 215:10
312:8,13
**decisions** 84:8
215:9 311:22
**deduct** 150:19
152:4
**deducted** 115:20
144:3,4 148:9
151:4 152:5,9
249:6
**deducting** 150:5
**deduction** 150:22
**deducts** 300:24
**deemed** 192:12
**default** 19:18,23
20:7
**defense** 262:13
**defined** 92:13
**definitely** 173:24
**definition** 279:13
**degree** 81:24
219:18
**degrees** 71:13
**delay** 21:20
**delays** 181:12
**deliver** 45:10,18
**delivered** 41:16
156:21 223:23
225:25
**demand** 44:24
**demands** 110:11
**demonstrate**
198:18 204:16
**department**
150:10,11
158:9 197:18
**depending**
101:15
**depends** 246:9
**depreciation**
120:5,19
150:12
**describe** 280:23

**described** 145:19
154:22 160:19
286:3
**description** 159:7
245:25 246:24
250:6 254:6
**descriptions**
160:10
**desire** 17:14
**despite** 237:6
263:19
**detail** 27:15,16
29:22 93:13
95:18 135:24
303:25
**details** 137:11
**determination**
201:13,14
209:16 221:10
231:4
**determine**
144:13 197:23
201:3 205:10
225:6,15
230:22 242:12
242:15 265:24
**determined**
75:13,17
144:20 146:19
197:5 260:15
289:20,23
**determining**
219:15 243:23
**developed** 254:13
**development**
247:17
**deviated** 97:22
**devote** 75:4
**differ** 183:8
304:12
**difference** 48:10
116:6 142:16
143:13 222:13
279:22
**different** 51:20
53:2 62:18

71:13 84:19,21
84:21 98:13
116:18 117:16
118:3 119:19
152:24 166:21
167:8 191:3,5
208:24 230:20
235:13 236:24
237:2 248:20
253:18 268:18
268:19 281:2
288:14 299:14
300:25 303:7
**differentiates**
142:3
**differently** 59:4
75:6 279:15
284:6 303:19
**difficult** 102:16
102:20 104:17
104:19 273:20
318:19
**difficulty** 234:6
234:12
**diligence** 220:20
**diminish** 311:25
**direct** 16:9 101:4
145:24 146:8
148:3 227:25
**Directing** 114:10
**Directionally**
280:10,17
**directly** 38:9
103:5 191:10
267:21
**direct-examina...**
4:1 5:1,24 6:1
7:1 8:1 9:1 10:1
11:1 12:1 13:1
14:1 15:1 16:1
17:1 18:1 19:1
20:1 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1
32:1 33:1 34:1

35:1 36:1 37:1
38:1 91:1,9
92:1 93:1 94:1
95:1 96:1 97:1
98:1 132:1,17
133:1 134:1
135:1 136:1
137:1 138:1
139:1 140:1
141:1 142:1
143:1 144:1
145:1 146:1
147:1 148:1
149:1 150:1
151:1 152:1
153:1 154:1
155:1 156:1
157:1 158:1
159:1 160:1
161:1 162:1
195:2 217:25
218:1 219:1
220:1 221:1
222:1 223:1
224:1 225:1
226:1 227:1
228:1 229:1
230:1 231:1
232:1 233:1
234:1 235:1
236:1 237:1
238:1 239:1
240:1 241:1
242:1 243:1
244:1 245:1
246:1 247:1
248:1 249:1
250:1 251:1
252:1 253:1
254:1 255:1
256:1,5 257:1
258:1 259:1
260:1 261:1
262:1 263:1
264:1 265:1
266:1 267:1



disagree 41:19
  163:23 187:16
  242:25 256:14
  256:18 258:9
  284:15 288:4
  288:20 300:5
disagreement
  151:15 236:7
discount 30:20
  31:14
discounts 9:4,14
  31:6
discovery 49:21
  73:2,18 100:7
  102:25 103:14
  107:16 191:23
  193:10 230:15
  233:20 252:22
discuss 286:15
discussed 166:18
  188:7 250:8
  257:4 278:15
  279:11 287:4
discusses 279:10
discussing 205:9
  230:19
discussion
  210:20 232:12
  248:5 250:5
discussions
  230:20 232:11
  311:7,10
dispute 48:3,12
  134:11 259:8,9
  265:25 285:23
  290:6
disputing 286:16
disruption
  157:13
distinct 138:21
  139:18
distribution
  183:17 248:3
  248:11 287:6
  288:2
distributions

247:20 287:17
divot 149:21
doctors 30:24
  39:15 83:9,14
  272:16 290:3
  294:15 306:20
doctor's 154:16
doctrines 309:8
document 7:11
  7:15 8:7 12:8
  12:16 13:21
  16:2 20:19,25
  25:6 26:21
  27:11 73:11
  110:10 114:3
  124:18,20
  125:9 158:17
  158:23 159:14
  159:21 182:10
  182:21 183:10
  183:13,23
  184:5 185:7,14
  185:16,18
  186:16 187:10
  187:13 191:21
  192:7 193:16
  194:5,8,11
  200:9,10
  204:19,20
  207:5 245:19
  245:20 254:3
  278:17 289:12
documentation
  40:20 135:5
documents 49:9
  49:19,25 50:15
  50:21 73:23,24
  105:13 106:2
  109:19,23
  110:2,18,25
  111:13,15
  114:7,12
  123:23 124:5
  126:21 134:15
  187:17 191:2,7
  191:17 193:24

202:20 204:7
  204:10,13
  205:16,18
  254:12 279:9
  299:6
doing 22:16,16
  23:14 25:7
  53:19 68:21,25
  73:18 76:4 85:4
  92:3,5 99:20
  142:19 162:19
  175:24 219:10
  220:23 228:24
  243:4,12
  283:15 299:18
  312:20
dollar 25:20
  29:13 273:21
  291:13,14
dollars 140:6
  269:15 270:7
double 302:18
double-check
  124:13
doubt 47:10
Dr 19:4 305:24
  306:2 308:23
  318:25
draft 123:10
  303:2,10
  308:17
drafted 309:13
drafting 306:22
dragging 303:17
drawing 206:20
drill 144:12
Driscoll 133:4
driver 287:19
driving 248:13
dropped 306:6
due 14:14 157:14
  220:20 300:12
  313:13 316:3
duly 5:21 91:6
  132:14 217:22
  321:8

Dunn 229:19
  279:11
duplicate 24:3
duplication 25:5
  300:19
duplicative 23:16
duration 6:4,25
duties 91:14
duty 93:6,10 96:2
  96:23 124:5
  126:21 146:14
  146:17,20
  147:4 184:17
  184:24,25
  228:21 230:2
  249:21 283:7
  284:12 286:4

___

**E**

E 2:2,2,5 3:2 5:20
  91:5,5,5 132:13
  132:13 217:21
  321:2,2
earlier 47:7
  51:13 84:12
  142:24 193:21
  226:20 238:9
  260:13 281:11
  285:21 300:10
  314:23
early 9:4 193:13
  224:4 238:19
  272:3 290:4
earning 144:2
earnings 149:25
  150:4 219:17
easier 44:19
  137:23
easiest 144:17
easily 317:8
easy 65:20
EBIT 149:23
  150:25
echo 218:18
economic 134:6
  143:22 151:9

219:10 220:23
  228:24 257:19
economy 263:6
  263:12
education 132:23
Efarber@farb...
  2:6
effect 227:13
efficient 129:24
efficiently 112:12
effort 103:20
  166:22 167:5
  240:15
efforts 82:7,19,23
  83:3,25 86:2
  122:22 123:3
  164:11 240:12
eight 145:7,15
  159:16 252:19
  252:24 253:3,4
  290:2
either 5:3 33:8
  89:18 103:5
  183:6 190:24
  207:18 214:17
  244:5 300:17
  305:8 316:9
elaborate 138:14
employed 91:12
  91:13
employees
  248:13
enclosed 22:12
encompassed
  286:25
endeavor 134:16
ended 80:21
  141:15
enforced 309:16
  309:19
ensure 8:13 10:5
  11:2
entered 159:18
entire 64:7
  101:20 134:21
  275:16



**entirety** 220:2
**entitled** 1:15
  108:16 192:14
  221:25 222:3
  269:25 289:9
**entity** 237:10
**entries** 159:9
  204:21 205:13
**entry** 30:12 40:4
  159:17 259:22
  261:17
**enunciates** 90:19
**equal** 304:19
**equally** 318:8
**error** 25:21
**ESQ** 2:10,11,15
  2:16
**essence** 237:13
  299:2
**essential** 52:13
**essentially**
  144:14 147:7
**establish** 52:19
  123:4
**established** 186:9
**establishing**
  12:25
**estimate** 37:18
  207:11 250:22
**estimated** 161:14
  161:21
**estimation**
  207:14
**estoppel** 309:9
**etcetera** 28:12
  133:17 177:3
  192:5
**Eugene** 1:18 2:4
**event** 104:15
**events** 263:3
**everybody**
  132:21 148:17
  312:15
**evicted** 290:2
**evicting** 18:11
**eviction** 37:10

274:24 277:6
277:12,14,20
277:24 290:10
**evidence** 7:12
  14:2,4 15:3
  20:21 26:15
  48:24 77:20
  78:5 122:16
  123:3 124:23
  135:15 299:15
  317:8
**exact** 25:5 115:13
  115:14 300:19
**exactly** 43:23
  95:20 145:3
  157:16 164:17
  182:15 183:6
  183:17 230:9
  285:7
**exam** 111:6
**examination** 3:3
  38:12 39:24
  53:12 60:22
  99:2 114:14
  128:1,7 178:17
  208:1,9 209:1
  210:1 211:1
  212:1 213:1
  214:1 215:1
  294:1,2 295:1
  296:1 297:1
  298:1 299:1
  300:1
**examine** 192:14
  194:7
**examined** 5:22
  91:7 132:15
  217:23
**example** 34:13
  97:12 134:24
  223:25 246:19
  266:15 271:21
**exceeded** 61:13
**excel** 159:4
  182:11 204:18
**exchanged**

262:18
**excluded** 171:9
  174:17,22
**excuse** 47:3
  89:21 99:10
  120:23 123:4
  296:22,25
**excused** 88:12
  129:10 212:9
  301:17
**execute** 12:18
**executed** 7:8
**exhausted** 126:17
**exhibit** 8:4 12:6
  13:19,24 21:19
  24:6 26:14
  59:20 60:5
  135:16 148:15
**exhibits** 49:23
**exist** 151:23
**existence** 101:21
**expect** 296:22,23
**expected** 128:15
**expenditures**
  10:21
**expense** 116:10
  118:5 120:2,4,6
  120:23 128:20
  150:7 151:21
  156:3 243:16
  291:25 317:5
**expenses** 94:18
  116:18 121:3
  151:24 246:6,7
  247:16 249:5
  280:24 291:13
  305:11 310:13
**expensive** 214:13
  314:17
**experience** 36:15
  37:6 92:17,25
  118:22,23
  132:23 152:10
  178:15 223:8
  228:23 236:3
  243:6 254:9,23

268:7,11
272:14
**experienced**
  236:2
**expert** 74:9
  123:10 163:4
  169:11 186:16
  219:23 220:24
  243:20,25
  259:20 260:4
  263:2 277:18
  284:24 297:23
  300:13
**expertise** 254:20
**experts** 179:21
  229:3
**expert's** 198:21
**expiration** 170:8
**expired** 79:5
  137:7
**explain** 103:12
  137:24 158:17
  160:20
**explaining**
  143:13
**explanation** 53:6
  53:8
**extend** 167:12
**extended** 168:2
**extension** 236:12
**extensive** 36:15
**extent** 135:6
  146:5 152:8
  153:22 166:15
  171:4 178:11
  180:12 186:18
  194:4 275:4
  290:15
**extra** 156:6 315:9
**extreme** 226:17
**E-commerce**
  13:2
**e-mail** 21:23
  22:24 60:7,10
  190:23 315:8

| F |
| --- |

**F** 91:5,5 132:13
  321:2
**face** 88:24 130:15
**faced** 310:19
**facilitate** 215:12
**facilities** 152:20
**fact** 11:6 15:3
  129:19 187:23
  207:24 221:4
  223:13 224:7
  224:20 227:6
  230:21 234:3
  240:22 241:10
  244:12 252:6
  259:21 283:5
  283:25 287:15
  291:18
**factor** 143:20
  263:7 266:18
  295:6
**factored** 275:5
  286:8 291:21
**factors** 235:9
**facts** 150:2 168:7
  186:8 247:4
  273:13
**factually** 156:2
  175:17 234:20
**fail** 187:16
**failed** 187:9,13
  220:14 238:3,4
  238:5 240:8,13
**failing** 32:10,11
**faint** 218:4,15
**fair** 65:22 69:3
  105:20 112:17
  128:13 153:17
  169:3 172:23
  174:20 176:14
  204:11 268:18
  319:6
**fall** 28:7,11 33:6
  63:22,25
  137:13 208:13



209:10 278:13
**familiar** 7:6,17
  8:22 9:22 13:10
  34:6,11 42:21
  42:25 74:20,24
  75:15 99:9,18
  99:21 107:19
  119:12 123:2
  154:25 278:25
**familiarity** 43:20
**family** 223:13
  268:8
**far** 65:12 68:19
  68:21 97:10
  98:8 113:18
  131:8 173:25
  188:17
**Farber** 1:18 2:4
  16:24 31:21
  36:6,20 38:18
  44:10 48:18
  49:2 53:14 55:5
  61:5 67:3 68:4
  69:15 72:8 73:3
  73:8 74:3,18
  81:14,20 86:19
  88:17 92:22
  95:11,24 97:6
  98:24 100:5,23
  103:12 106:19
  107:10 110:9
  111:19 112:10
  113:24 117:11
  120:13 125:17
  127:11 128:3
  129:17 147:15
  156:8 168:23
  172:24 176:15
  179:11,16
  198:12 199:13
  203:5 205:25
  208:4,8 218:9
  219:7 225:4
  228:18 237:16
  240:4 246:15
  255:23 256:3

256:16 257:17
  259:17 260:23
  264:6,10,13
  265:21 271:4
  271:24 277:22
  290:18 293:22
  298:19 302:8
  304:11 305:18
  307:5 313:24
  319:14,19
**Farber's** 230:7
  271:10
**farther** 242:23
**fashion** 91:24
  92:7 145:12
  161:5 268:12
  268:16
**faster** 179:25
**fault** 233:10
**favor** 293:17
  306:17 308:8
**fear** 312:22,25
**feasible** 171:4,10
  173:2 174:18
  175:20 273:19
**February** 14:12
  15:5 21:24 22:2
  193:8 289:14
**Federico** 36:23
**fee** 86:11 293:17
  307:3
**feel** 201:7 299:8
  307:23
**feelings** 312:9,16
**fees** 96:23 259:25
  281:22 293:4
  303:15 304:2,7
  305:11 307:8
  307:24 308:7
  308:19
**felt** 245:10
**field** 113:18
  133:10
**fifty** 142:18
**fight** 38:12
**figure** 26:3 28:17

28:21,22,23
  29:4 55:23
  65:20 100:14
  101:3
**figures** 21:8
  25:12 40:10,16
  40:18,19,24
  44:2,6 46:8,21
  47:25 48:9,14
  48:15,23 54:11
  55:2 99:22
  100:16 101:12
  102:14 103:4
  103:16 104:8
  104:10 105:8
**figuring** 145:18
**file** 254:13,13
**final** 22:13,17
  312:13
**finance** 219:19
**financial** 69:10
  71:6,20,23
  72:14 81:9
  91:19 95:19
  99:16 109:16
  112:4 113:2
  119:25 135:5
  150:16,23
  203:12,15,20
  203:24 221:3
  243:22 244:3
  245:23 248:22
  280:12 281:17
  282:18,23
  283:25 288:6
  294:17 297:2
**financials** 92:8
  113:4,7 116:8
  285:24
**find** 20:2,3,4
  21:17 22:12
  73:23 82:8,19
  104:21 122:22
  174:12 181:14
  194:19 230:13
  231:3,7,13

233:23 240:2
  241:8,13 295:2
  295:8 308:7
**finding** 233:22
  237:9 294:12
**fine** 12:5 37:3
  130:11 180:4
  258:23 302:15
**finish** 64:10
  87:23
**finished** 251:16
  258:14 306:10
  314:19
**firm** 69:20 99:6
  133:5 134:3
  159:10
**firms** 133:16
**first** 5:21 11:12
  19:9 32:4,24
  33:2,16 45:3
  57:25 58:6,9,15
  61:15,25 85:19
  91:6 101:19
  132:14 136:21
  136:24 140:2
  141:5,10
  144:25 147:22
  149:9 154:4,14
  158:14 159:6
  188:7 217:22
  230:5 231:12
  241:22 243:19
  249:14 257:13
  274:16,17
  284:20 289:11
  312:24 319:11
**firsthand** 274:20
**first-hand** 39:18
**fit** 163:5 271:7
  305:23
**five** 35:16 37:23
  84:15 86:20,25
  87:3 98:19
  101:23,25
  102:10 127:16
  141:7 142:11

146:17,19
  195:10,12,23
  206:7,9 212:25
  215:15,16
  222:10 231:25
  234:7,11,14
  290:21 295:23
**five-year** 221:20
**fixed** 151:10,16
  152:14 244:5,7
  245:2,12
  281:18
**fixtures** 85:21
**Flaherty** 2:23 3:8
  3:9 106:24
  123:9 125:10
  126:18 127:18
  129:18 130:13
  131:4 132:1,8
  132:19 133:1
  134:1 135:1
  136:1 137:1
  138:1 139:1
  140:1 141:1
  142:1 143:1
  144:1 145:1
  146:1 147:1
  148:1 149:1
  150:1 151:1
  152:1 153:1
  154:1 155:1,11
  156:1 157:1
  158:1 159:1
  160:1 161:1
  162:1 163:1,6
  163:12 164:1
  164:12 165:1,8
  165:12 166:1,7
  166:20 167:1
  167:25 168:1
  169:1 170:1,14
  171:1,18 172:1
  172:3,9,25
  173:1,11 174:1
  175:1 176:1,18
  177:1 178:1,10



179:1,24 180:1
180:19 181:1
181:17 182:1,2
183:1,14 184:1
184:8,19 185:1
186:1 187:1,3
187:21 188:1,3
189:1 190:1
191:1,12 192:1
192:6 193:1
194:1,6,12,25
195:1 196:1
197:1,12 198:1
198:2,14,20
199:1,14,18
200:1,8,17,25
201:1,9,12,20
202:1,11,19
203:1,19,23
204:1,3 205:1
206:1,17 207:1
208:1,14 209:1
210:1 211:1
212:1,7 213:1
214:1 215:1
220:10,14
221:16 222:7
228:20 244:18
248:19 249:17
252:6 255:5
256:15 258:4,6
262:9 269:7
275:25 279:22
280:6 286:19
293:11 299:5
**Flaherty's** 125:2
125:22 219:3
220:2,5 242:21
245:9 252:8
262:12 272:4
275:10 300:2
**flat** 244:12
**flesh** 154:5
**flip** 228:10
**flipping** 251:20
**flowed** 136:2

**flows** 273:13
**fluctuate** 253:25
**focused** 139:15
**focusing** 248:18
**folks** 13:19
**follow** 17:13
113:15 302:2
**followed** 15:16
**following** 95:12
234:17 274:12
274:23
**follows** 5:23 91:8
132:16 159:24
217:24
**follow-up** 87:18
188:21
**footnote** 184:2,7
186:17
**footnotes** 302:18
**Forall** 1:7 6:7,14
6:18,20,23 7:8
9:3 10:10 11:3
11:22 12:14
13:23 14:12
15:3 18:10,12
18:15 19:11
21:9 26:19 30:4
35:3,19,23 37:8
43:12 45:25
47:4 56:21
57:19,23 58:21
59:15 64:18,23
68:4 69:10 71:6
75:3 78:14,20
79:2,3,8 80:2
80:23 82:8,18
82:22 83:2,25
84:23 86:2,7,10
93:14 94:16
97:12,15 98:2,3
98:16 99:10,11
103:6,6,17
106:10,16
107:5,21
109:13,17
110:13 112:4

114:18 116:24
117:6 118:6
119:4,8,21
120:16 121:25
122:22 123:3,4
134:25 137:5
137:19 138:20
139:17 140:5
144:6,14,24
145:3,23 147:2
147:3 151:10
152:23 153:8
153:21,23
154:23 156:4
157:25 158:21
160:25 161:14
164:5,15 165:2
165:14 166:5
167:7 171:16
171:21 172:7
174:12 175:10
183:24 184:3
184:11,17,17
184:22,25
188:8,12,13,24
189:16 190:15
190:18 195:24
197:17,24
198:5 200:12
200:15,20
201:3,14,16,25
202:2 207:24
208:17 210:7,7
217:16,19
221:8,25 222:3
223:15 229:7
229:11 230:12
231:2,8 234:22
236:6,9 237:8
237:21 238:5
238:14 240:2
240:17,25
241:5 242:19
249:3,4 251:4,5
253:11,16
268:24 269:10

269:22 270:4,9
270:18,21
271:12,23
272:7 275:6,10
275:19 278:11
282:15,22
284:8 288:6
289:6,20,24,25
291:12 294:8
295:8 296:4,9
304:18 305:17
306:17 307:16
308:8 309:24
**Forall's** 24:17
34:6,14 41:2
59:16 67:5
74:21 109:8
112:25 113:9
115:4 116:20
123:17 145:24
149:16 153:4
163:16 164:13
198:23 199:19
205:14 207:11
233:13 241:9
248:22 280:11
280:18 281:14
281:15,21
282:9 283:25
288:25 289:8
290:8 296:25
**forbidden** 311:6
**force** 133:7
263:14 264:2
264:18 265:3
265:15 312:12
**foregoing** 321:9
**forensic** 133:5
**foreseen** 262:14
**forgot** 135:8
**forgotten** 177:22
178:3
**forklift** 248:14
287:19
**form** 172:17
**forth** 31:10 45:2

138:14 208:12
220:25 271:15
321:8
**forthcoming**
103:17
**Forum** 44:20
227:2 235:16
289:17
**forward** 79:10
164:19 265:11
265:17
**found** 228:15
231:9 235:19
**foundation** 48:22
49:4
**four** 34:2 37:23
84:15 139:9
140:5 141:7
142:10,18
146:16,18
195:8,19,22
222:9,21
266:21 310:22
314:19
**fourth** 237:9
239:10 297:8
**four-and-a-hal...**
221:19 241:24
**frame** 25:19
26:11 222:2
230:25
**free** 307:19
**freight** 93:6,10
96:2,22 123:24
124:5 126:21
146:14,18,20
147:4 152:5
184:18,25,25
249:21 283:7
284:12 286:4
286:25 287:15
287:18
**front** 33:12 51:11
63:3 140:13
161:13 307:9
**froze** 93:23



**fulfill** 172:5
**fulfilled** 171:13
**full** 5:2 12:12
  89:15 102:9
  130:24 167:13
  172:17 216:11
**functions** 6:18
  9:13
**furnish** 192:21
**furnished** 134:19
**furniture** 85:20
**further** 38:2
  86:21,24 88:5,6
  88:8 111:23
  127:13,22,23
  127:25 129:7
  149:22 206:3
  206:13 208:3,6
  212:4,5,14
  249:8 250:13
  276:13 291:2
  301:9,13
  321:12
**F-L-A-H-E-R-...**
  131:4

**G**

**G** 91:5 150:6,22
  152:4
**garment** 93:15
  94:14
**gather** 129:22
**general** 55:11
  150:7,23 151:5
  171:5 264:9
  282:8 296:18
  296:20
**generally** 92:13
  92:18 134:8
  135:7,22
  178:20,22
  247:15 281:19
**generated** 14:21
**gentleman** 90:7
  133:20 192:11
  192:13 257:17

275:18
**Gentlemen**
  213:13
**germane** 52:16
**getting** 103:3
  112:14 157:18
  215:8 248:14
  292:24 311:6
**Gioffre** 3:6,7
  36:14 55:18
  56:24 59:9 67:9
  67:21 74:23
  87:24 88:19,22
  89:6,20,23 90:7
  91:11 93:24
  94:2 98:21 99:1
  99:4 100:1,25
  101:1,12 102:1
  103:1,24 104:1
  104:25 105:1
  105:22 106:1
  107:1 108:1
  109:1,8 110:1
  111:1,25 112:1
  113:1,25 114:1
  114:16 115:1
  116:1 117:1,4
  117:21,25
  118:1 119:1,7
  120:1 121:1,15
  122:1,14 123:1
  124:1 125:1
  126:1,4 127:1
  128:1 129:9
  158:7,10,21
  182:17,20
  183:9,19
  251:11 297:15
  297:18
**Gioffre's** 57:13
  190:22 249:8
**give** 4:19 30:3
  35:15 36:19
  60:13 89:9,17
  117:11,17,21
  127:15 130:18

132:21 165:9
  214:3,5,23
  216:5 240:19
  241:4,12
  245:25 255:7
  263:17 269:6
  277:19 294:23
  294:24 297:19
  302:14,16
  303:2,9,22,25
  304:8 310:24
  314:24
**given** 15:8 20:5
  25:19 27:23
  29:7 31:6,14
  124:15 133:15
  134:10 176:5
  236:15 296:4
  316:12 321:10
**gives** 245:23
**giving** 97:9
  238:21
**glad** 314:18
**global** 99:15
  120:15
**go** 11:10 12:2
  13:18 17:15
  20:11 21:3 24:2
  27:8,10,13 39:8
  42:12 43:11
  44:7 46:12 52:9
  53:21 65:18,21
  71:3 73:23
  79:22 80:19
  87:24 94:21
  95:23 97:18
  99:23 100:18
  100:20 105:3
  107:8,9,13
  108:3 109:12
  111:5 112:9,24
  113:22 114:11
  116:2,15 117:3
  119:5,18
  121:14 125:4
  126:15 133:25

135:23 136:7
  136:16 137:2
  138:10 142:15
  145:9,11,18
  150:15,18
  151:20 154:19
  157:17,19
  169:4 172:21
  174:16 176:17
  180:15 183:3
  183:15 187:2
  194:18 196:8
  196:15 198:16
  209:6,24
  214:22 218:13
  221:15 227:3
  227:16 228:2,5
  228:11 230:6,7
  230:12 239:6
  239:13,16
  241:13,17
  244:11,11
  245:13 247:7
  250:24 251:15
  251:21 252:7
  252:11 256:2,9
  257:24 259:6
  261:3,10 266:9
  266:20 267:10
  267:12 270:10
  271:8 272:22
  279:24 281:16
  283:21,21
  299:21,21
  305:22 313:10
  315:7
**goes** 146:18
  169:24 178:24
  179:25 224:8
**going** 8:3 11:10
  12:2,5,6 13:18
  21:3,21 23:4
  26:13 27:12
  29:16 33:6 37:2
  38:4,13 39:25
  41:4 42:14

43:23 48:19
  49:3 50:10,11
  52:6 53:6,8
  55:12 57:5
  58:24 60:8
  63:15 65:18
  67:12 72:8,20
  73:17 74:7,13
  78:22 79:10
  81:20,23 85:23
  86:23 88:15,18
  90:8 91:3 98:8
  99:4 103:10
  112:18,21
  120:14 125:19
  129:24 130:10
  131:13 132:7
  135:2 140:11
  147:8 148:16
  148:22 151:22
  152:14 160:8
  164:18 170:4
  173:9 174:14
  179:4 180:18
  188:20 189:11
  190:13 192:10
  193:6,21 213:8
  213:10,15
  214:7 215:5,19
  216:24 217:8
  217:14 218:22
  223:24 227:10
  227:24,25
  233:6 236:22
  237:2 247:7
  256:4 263:9,12
  264:24 265:17
  269:20,20
  270:8 271:5
  273:18 279:19
  281:25 285:11
  300:16 302:16
  302:24 307:15
  307:20 308:12
  311:16 312:23
  315:6



MAGNA
LEGAL SERVICES

**good** 6:2 19:7
21:15 37:22,22
39:11,12 48:7
85:4 88:20,22
91:22 112:20
132:19,20
150:21 163:12
163:13 175:24
179:12 210:19
211:25 237:4,5
237:16 268:4,5
312:7 314:4
317:24 318:15
318:21 320:4
**goods** 34:15 36:7
150:19
**Google** 150:15
152:11
**gospel** 297:14
**government**
271:18
**grace** 58:12
**grand** 160:3
216:16
**great** 89:2 208:11
**greatest** 255:9
**gross** 27:6 28:21
29:13 45:14,14
45:19,20 46:14
67:5,16 72:14
72:22 73:10,14
77:17 95:5
109:9 113:9
114:19 115:17
115:21 116:6
116:12 121:20
149:9,12
150:20 243:5,9
243:14 244:15
249:14 279:21
280:5,13,18
283:16,20
300:2,7
**grounds** 277:4
**group** 190:11,19
190:21,22,23

205:10 207:5
242:17
**guess** 111:16
186:18 201:24
238:11 252:24
**guys** 12:4 14:6
62:19 148:22
163:25 175:23
201:19,20
264:25 292:16
297:6 301:6
314:14,22
315:8 316:22
317:11 319:23
**G-I-O-F-F-R-E**
89:24

———————
**H**
———————
**H** 91:5 132:13
217:21
**HALA** 1:4
**half** 129:25 139:9
140:5 141:7,22
141:25 142:6
195:8,19 222:9
222:22 251:9
269:14
**halt** 155:2
**Hamad** 1:4,4
2:19 19:4
305:24 306:2
308:23 318:25
**hand** 4:17 89:7
130:16 160:20
215:4 216:3
256:25
**Handbook**
229:16
**handed** 173:12
**handle** 55:2
88:16 163:4
217:15 277:17
299:19 301:7
**handled** 318:18
**handling** 112:11
217:18 247:21

**handy** 279:25
**Hang** 139:3
155:8 185:23
199:4 221:11
270:13 272:19
277:10 292:5
297:21
**happen** 175:2,4
**happened** 139:23
209:6 262:14
**happening**
274:22
**happens** 318:12
**happy** 103:12
180:6 278:19
279:17
**hard** 62:20 315:9
317:23 318:6,9
**harder** 233:14
**harmed** 229:25
**head** 57:2 65:10
69:12 70:4
97:17 99:25
100:21 108:5
109:12 117:23
118:9
**headers** 27:3,4
**Headquarters**
82:16
**hear** 4:9 19:8,9
62:20,24 74:14
77:6,24 80:13
94:5,8 123:19
124:6 126:7
129:2,4 172:16
173:4 176:6
177:9 181:5
208:15 214:16
218:5,14,23
221:14 245:6
267:22 271:8
272:11,20
275:17 311:19
318:2
**heard** 17:11 18:8
24:4 30:16 52:8

66:17 73:8
77:10 83:22
165:10 168:24
194:20 219:3
222:7,24
226:12 230:20
233:8,17
237:18 238:14
239:25 253:11
268:6 278:16
278:22 281:11
284:19,23
297:7,9,14
300:20 312:14
312:18
**hearing** 30:17
73:3 100:8,10
102:21 112:19
192:19 193:19
193:22 218:8
218:11 292:2
**heat** 226:17
**heels** 37:9
**held** 1:15,18 6:13
**Hello** 99:4
**help** 30:22 105:7
170:4 179:16
235:19 241:14
**helped** 241:7
**helpful** 80:6
**helps** 196:10
**hereinbefore**
321:8
**hesitate** 65:5
**hesitated** 64:21
**Hey** 250:21 255:6
**he'll** 47:19 132:2
**Hi** 88:21
**high** 121:2,7
131:5 283:9
284:14
**high-end** 268:16
**hill** 211:3
**Hills** 83:15 84:2
232:12,19
**historical** 197:13

197:15,19
199:20
**history** 228:23
261:18
**hold** 21:5 38:20
62:20 74:13
97:7 101:18
263:23
**holiday** 215:4
223:24
**holidays** 215:2
**home** 5:4 89:18
131:2
**honed** 294:15
**honest** 76:14
**Honor** 52:7
319:2
**hopefully** 100:9
127:16
**horse** 126:7
**hour** 57:6 101:16
129:20 314:8
**hours** 214:8
**hundreds** 219:21
**hung** 47:17
**husband** 54:16
**Hussein** 2:21
**hypothetical**
94:17 284:17
284:25 285:7

———————
**I**
———————
**idea** 38:21 39:2
157:2 270:19
314:4
**ideal** 316:2
**identified** 239:10
243:3 245:15
246:17 252:20
**identifies** 140:23
**identify** 231:11
255:3
**identifying**
255:12
**Illinois** 2:9
**image** 304:20


MAGNA
LEGAL SERVICES

imagine 253:17
287:20
immaterial 115:9
Immediately
37:12
impact 69:4
227:14 233:13
265:22 275:20
276:2,15,24
295:19
impacted 81:25
277:25
impediment
294:12
important 23:25
158:25 178:12
187:11 270:24
312:11
importantly
175:4
impose 179:22
improper 114:10
244:16
improve 58:21
improved 58:22
inability 275:5
inappropriate
224:6
incident 274:12
include 185:18
187:24 198:2
260:19 295:22
included 77:18
121:21 139:24
139:25 140:2
157:10 169:9
173:3 185:4
189:2 202:12
208:14 244:13
247:16 250:17
286:6 291:11
293:9,10,11
296:18
includes 172:7
219:11 247:2
287:16

including 54:16
61:24 124:3
133:7 136:11
162:6 171:16
219:15 221:17
incoming 93:11
94:21 96:13,22
123:23 124:4
126:20
incorporated
255:4
incorporating
186:7
incorrect 71:16
111:18
incremental
147:11 229:9
242:15 243:17
250:3,14,22
251:3,6,9 261:8
261:23 262:2
incur 143:25
263:11 268:24
270:5
incurred 144:6
154:23 157:25
158:22 160:12
260:8 271:12
274:3 284:11
289:21 293:4
incurring 153:3
200:12 281:21
independent
70:14 207:8
Indiana 219:18
indicate 31:5
184:9 233:21
285:17 289:5
indicates 149:18
240:25
indicating 184:3
indication 184:12
294:24
indications
235:25 236:20
individual's

254:19
indulgence
181:16
industries 268:19
industry 91:25
92:7,14 118:15
148:2 150:6
211:5,15
inference 198:5
information 15:7
34:20 36:12
42:9,17 51:23
52:3 56:25
67:10,18,22
101:8 120:10
123:8 125:3
156:15 158:5,6
158:8 182:7
187:5 188:10
197:14,19
198:3,7,23
199:7 200:16
201:22 202:4
204:18 222:17
245:23 252:3
252:15 259:4
261:22 288:18
298:8,10
informed 78:21
79:3 80:8
informs 304:7
inhibit 276:14
inhouse 22:9
91:16
initial 294:17
295:4
initiate 100:7
initiation 269:2
inquiring 83:15
instance 113:25
300:4
instances 273:4
instructing
179:13
insurance 133:16
intend 87:17

intended 155:17
interest 136:7,11
136:13 150:4
interested 103:3
321:15
interests 150:2
internet 12:13,20
12:24 21:12
116:4 274:7,19
interpreting
163:18
interrupt 193:22
244:17
interruption
219:17
interview 189:23
190:7
interviewed
188:23 189:16
190:4
intimately 36:11
intrude 41:15
215:3
inventory 59:23
77:8 119:13
120:20 137:19
144:5,8 153:11
156:20,24
157:3,4,12
160:20,24
161:2,10,16,20
195:3 206:21
206:23 207:17
209:11 224:3
225:8,10,19
248:5 256:24
257:10 258:11
258:14
investment
294:18 295:4
invoice 27:21,25
62:9 145:3,10
invoices 25:12
27:6,17,22
28:15,19 30:10
60:25 62:8,12

63:2,6,10
123:15,15,21
123:21,24
124:2,4 126:18
126:20 135:5
146:17,19
147:9 177:3,15
184:24 185:2
187:6,7 188:11
192:5 196:19
invoicing 145:4
involved 10:19
18:14 34:3
55:20 119:7,9
311:6,9
involves 105:18
IQ 245:21
irrelative 102:19
issue 175:16
211:19 228:22
233:10 286:18
issued 14:11
16:15 30:9,19
issues 233:22,23
309:19,25
310:5,10 311:4
313:5,6,7
316:15
Italian 37:4
54:21 92:7,19
268:13
Italnord 13:7,13
14:12,18 15:4,9
15:9 16:21 17:3
17:19,21 18:3
22:3 23:9 58:23
59:6 62:4,7
63:10,16,21
64:13,18,19,23
65:15,15,16,17
66:3 106:7,10
106:16 107:5
107:21 231:9
235:20,23,24
238:4 241:8
Italnord's 15:23


MAGNA
LEGAL SERVICES

59:11,17
**Italrod** 164:7
**Italy** 30:22 39:14
65:21 146:13
156:20 157:12
157:13 161:9
287:8
**item** 32:5 136:21
145:22 153:16
154:20 160:18
**items** 93:19
128:13 136:24
155:6,10
177:23 310:2

**J**

**J** 2:15
**January** 289:13
315:19
**JE** 159:17
**Jersey** 161:7
207:18,19
248:9 286:7
287:9
**job** 85:4 91:14
211:18
**joined** 106:21
182:22
**joining** 6:3
**joint** 316:3
**journal** 159:17
**July** 54:3 139:22
290:4
**jump** 60:8 90:22
**June** 55:23,25
79:16 196:23
197:7 198:19
225:9
**jurisdiction** 75:5
**justify** 221:7

**K**

**K** 132:13 223:10
223:10 224:2
246:16
**keep** 37:2 130:9

**Kevin** 2:23 131:3
138:4
**kick-off** 260:17
**kind** 47:21 81:2
91:21 105:17
174:10 225:17
230:16 245:24
250:21 255:5
264:24 271:3
281:9 299:17
300:25
**kinds** 313:6,6
**know** 5:14 6:21
15:13,21,24
17:3 25:18 33:3
33:9,13 34:8,13
38:5 40:23 41:6
42:8 43:19,25
44:3 47:19 48:2
48:5,6,8,13
49:14 50:2,10
51:18 52:15
54:17 56:9,12
56:14 57:7,9,14
59:2 63:12
68:24 69:11
71:11,23 72:18
73:21 75:14,17
75:18,19,21
77:5,14,15,19
78:12,18 81:4,8
81:13 82:2,11
82:21,22,25
83:2,13,20
85:19,24,25
97:11 100:20
101:8 103:2,7,9
104:4,7 105:2,4
105:11 106:9
106:14 107:15
107:18 109:15
110:7 111:23
112:15 113:16
118:9,20,23
120:9 122:6,20
124:19 125:7

131:8 135:6
138:8 139:7
141:11 143:8
146:14 148:7
151:23,24
152:19 153:8
155:16,23,25
156:4,5 160:23
161:10,19
165:8,19 166:8
166:25 167:2
168:6 169:22
173:17 174:6
176:2,2 177:9
178:9 179:25
180:4 185:11
187:25 190:23
193:18 201:20
202:7,9,11,19
205:9 208:18
209:8,25
211:22 212:20
212:22 213:21
214:14,18,25
215:5 216:21
225:13 227:8
227:13 232:16
234:19 235:18
236:8 237:12
237:25 238:15
238:20,25
251:14 253:14
253:19 255:11
257:7,9,11,13
257:14,24
260:12 268:23
269:4 278:16
279:4,16
281:20 282:16
282:17 284:3
287:14,19
288:13,14
294:22 303:18
306:20 307:2
308:14,25
309:20,25

310:6,12,18
312:6,8 313:4
316:11,14,24
317:3,11,15,25
318:13 319:18
**knowable** 283:24
288:9
**knowledge** 12:23
23:22 31:13
39:19 83:6
108:8 119:21
155:13 175:20
209:21 274:10
274:21,21
**known** 34:24
229:16 283:24
288:8 291:20
**knows** 17:8 48:8
57:10 65:12
169:22 318:3

**L**

**L** 2:10 5:20 91:5
91:5 132:13
217:21
**label** 30:4
**lack** 241:9 274:5
**lady** 283:4
**landlord** 44:24
45:10,18
**language** 54:22
**lap** 307:21
**large** 211:18
**larger** 253:2
**largest** 260:9
**Las** 7:20 8:11
9:19 18:16
42:23 43:3
46:14 47:12
56:20 57:20
64:24 67:16
82:9,20,24
84:17 85:11
86:8 99:19
101:13,21
106:11,17

107:22 109:9
113:3,13
122:23 128:11
128:17 151:20
151:22 152:15
155:15,17,18
161:3 165:22
226:16 227:4,8
231:21 232:7
232:10,24
233:3 260:23
269:22 274:6
274:11,23
275:6 276:7,13
277:7 287:11
295:12
**lastly** 260:20
**late** 18:10
**law** 133:16 134:3
136:14 168:16
**lawyer** 169:25
**lawyers** 317:17
317:22 318:21
**lay** 48:22 49:4
**leading** 264:16
**learn** 306:24
**lease** 42:22 43:13
43:18 44:3,17
44:18,20 45:4
45:17,17,20,21
46:2 50:17
150:11 154:25
**leases** 134:24
177:3,15
**leave** 49:3 71:17
180:5 227:24
307:20 308:12
311:17
**led** 18:11
**left-over** 23:7
**legal** 1:24 134:22
134:23 160:12
163:16,18
166:16 173:25
175:16 177:2
177:14 209:4



209:16,20
228:22 229:21
259:12 264:24
289:8,10 293:4
305:9 309:7
**legally** 232:16
**letter** 243:3
290:4
**letting** 238:24
**let's** 21:3 24:2
25:8 27:8 35:14
35:15 46:12
52:23 53:9
62:21 69:7,22
76:18 82:5
87:22,23 89:3
99:20 111:5
127:15 136:16
136:16 144:12
154:19 158:14
165:10 170:12
173:10,12
176:17 188:2
192:20 194:20
206:9 221:13
224:15 225:8
228:10,11
239:13 256:8
267:6 268:22
270:3 273:11
279:20 297:9
299:21 313:17
**level** 152:24
153:2 220:19
264:17
**levels** 299:14
**Lewis** 2:10 3:5,7
3:9,10 13:25
16:24 17:14
38:8,21,25 39:3
39:8,10,12
42:11,13 44:8,9
48:5,16,17
49:11 50:9,14
51:6,10 52:23
53:13 55:14

57:11 59:3 60:4
60:15 62:16,22
65:3,22 69:19
71:3 73:7 74:3
74:17,18 76:16
79:17 81:17,19
84:19 86:19
87:7 88:4,6
90:12,20 92:21
96:15 97:3,5
98:22,23 99:3
100:22 101:11
101:22,23
102:3 103:11
107:9 108:23
110:3 111:6,17
111:21 112:9
113:24 117:3
119:6 121:14
124:24 125:17
126:23 127:11
127:21,23
129:2,3,4,7
131:14 162:12
162:16 163:2
163:11 168:23
169:5,14
170:22 171:25
172:2,18,23
173:15 174:16
174:24 176:9
176:14 179:11
180:16,17,24
181:4,13,21,25
188:19 192:4
192:23 193:5
194:4,21,22
198:11 199:11
199:12 203:3,4
203:17 205:25
206:6,13,14
208:3,21
209:12,15
210:6,13
211:20 212:4,5
212:16,19

213:9 217:2,8
217:12,14,18
218:2,6,9
226:21 227:17
231:16 239:6
239:12 241:17
251:23 255:22
256:5,9,10
262:5,7 263:16
264:20 267:4,5
267:23 272:9
272:17,22,23
277:9 282:3,6
284:16 292:6,9
292:17 293:21
293:23,25
294:3 297:11
298:19 299:23
300:12 301:9
301:12,13,19
302:11 305:18
306:12,19
307:21 309:6
313:20 315:16
315:20 317:25
318:3,22
319:12,13
**Lewis's** 210:16
210:22
**Lexington** 2:14
**liability** 121:8,11
309:4
**license** 7:7,21
9:25 11:22
12:11,12,13,18
24:10,22 26:10
31:10,18 75:9
76:12 83:10
263:15 309:14
**licensing** 247:21
**light** 129:18
307:15
**limited** 113:16
274:18
**line** 63:4 82:4
175:25 241:22

243:15 317:19
**lined** 38:24
**liquidated** 161:5
**liquidating** 157:7
161:15
**liquidator** 207:19
**liquidators** 161:9
**list** 49:10 134:21
148:15 155:6
177:19,22
178:3 182:6
188:4 203:21
**listed** 103:15
124:25 196:25
282:7
**listen** 38:7,14
90:10 267:19
288:17 298:9
299:12 300:17
**listened** 219:25
**listening** 182:19
239:8 310:22
**listing** 30:9
**litigation** 107:17
164:22 229:15
260:11 293:12
305:4
**little** 26:19 62:24
76:13 109:21
125:20 166:21
218:4,7,15
219:7 260:12
**living** 297:25
311:23
**LLC** 1:4 7:8
11:14 12:15,19
22:14 27:20
**LLP** 2:13
**local** 278:2
**location** 82:23
83:3,16 84:2
200:14 235:14
237:5 269:23
287:13
**long** 6:13 35:19
37:15,18 41:11

51:5 85:19 92:2
98:15 203:21
213:6 215:6
247:14 263:24
310:14
**longer** 78:21 79:4
137:18 181:12
**look** 8:12 13:21
27:3 33:4 54:25
73:24 95:18
97:18 99:23
100:18 108:4
109:12 113:23
114:11 116:16
119:19 137:22
139:16 140:19
141:20,21
142:2 148:22
149:20 158:14
159:5 173:15
178:6 213:19
214:22 224:7
228:8 229:6
231:16 244:2,9
245:18,18
246:5,13
259:21 260:6
265:8,11,16
266:5 267:13
278:19 279:18
284:5 288:9
308:21 310:17
314:20,25
315:3
**looked** 19:25
30:11,15
110:10 112:4,7
145:6 196:17
197:9 230:14
230:24 231:15
231:17 235:18
246:5,16,21
265:2 289:12
**looking** 76:24
100:6 125:18
148:19 200:9



228:6 236:25
308:16
**looks** 22:22 28:11
**lose** 226:5
**loser** 304:5
**loser's** 304:6
**losing** 151:12
**loss** 120:23
125:25 136:25
138:13 143:22
143:23 154:8
154:15 182:3
184:11,15,21
185:4 187:14
188:4 189:9
191:21 193:15
223:4 224:12
225:18,21
241:21 242:8
242:10,17
243:4 254:7
255:21 257:10
257:12
**losses** 207:12
238:7
**lost** 77:21 78:6,14
93:22 115:25
122:17 124:18
138:17 142:6
142:18 154:3
161:15 171:14
188:5 219:15
219:16,17,22
220:25 229:9
229:20 243:21
251:25 255:14
275:12 278:23
279:2,13 300:3
300:6 301:4
310:8
**lot** 62:17 71:14
134:23 227:2
229:3 236:7
252:23 271:17
280:7 312:5
317:16 318:20

**lot's** 13:5
**louder** 62:24
164:2
**love** 316:5
**low** 285:20
**Luca** 21:6,23
22:16 25:22
30:21 39:16
**Luca's** 24:6
28:25
**lunch** 129:20,21
130:6 162:13
162:23
**luxury** 268:12
274:11,24

——————

**M**

**M** 1:16 2:11 5:20
5:20 54:19,20
91:5 321:3,24
**Magdalena** 1:16
321:3,24
**Maggie** 41:25
317:6
**Magna** 1:24
**mail** 315:10
**main** 298:22
**maintains** 14:24
**majeure** 263:14
264:2,18 265:3
265:15
**major** 54:22
132:25
**majority** 260:21
**making** 57:19
103:19 144:15
201:12 257:18
271:22 311:22
**mall** 165:22
235:16 237:5
274:25
**manage** 6:21
**managed** 44:4
**management**
13:13 18:16
21:9,10

**manager** 300:8
317:3
**managing** 7:19
133:3 164:16
**manner** 9:15
**manufactured**
155:14 253:15
**manufacturer**
94:17 278:2
**manufacturers**
37:4
**manufacturing**
93:5 146:2,4
284:9
**March** 7:9 52:10
137:7 140:25
141:16 247:12
266:17 278:12
296:5
**Marco** 30:21
39:16
**margin** 36:7
72:14,23 73:10
73:14 92:13,18
94:24 113:10
114:19 115:17
117:5 124:18
125:6,16,25
128:12 138:14
145:19 147:6,7
148:4 149:10
149:13,21,23
150:20,25
151:4,5 154:4,9
182:3 184:11
184:15,21
185:4 187:14
189:9 191:21
193:15 210:21
211:2,11,13,19
239:17 242:22
242:25 243:5,9
243:14,18
244:15 249:11
250:14,14
251:10 253:25

254:7 279:21
280:5,6,13,19
283:6,11,20
285:17,19
286:16 310:11
321:14
**margins** 34:7
67:5,17 97:23
109:9 115:5
268:18
**market** 37:21
122:24 123:6
226:16 263:6
274:6,11 277:7
278:3
**marketing** 75:2,8
82:16 150:9
247:18
**marketplace**
240:7
**marking** 75:4
**markup** 77:18
**mark-up** 121:21
**Mart** 223:10,10
224:2
**Mary** 54:21
**mass** 123:16
**Massachusetts**
131:6
**masters** 123:16
123:18 124:3,7
126:19
**match** 153:21,21
**matched** 294:8
**material** 146:6
210:20 211:2
**math** 29:8 76:4
168:11
**Matson** 133:4
**matter** 1:3,15
37:19 102:23
104:6 187:24
213:20 214:18
220:12 227:22
263:11 275:7
301:21 303:12

308:5 312:9
318:18,19
319:20 321:16
**matters** 223:9
312:17
**MDD** 133:3
**mean** 13:12
16:20 21:10
33:3,13 37:19
47:14 48:11
52:17 56:13
58:21 61:22
69:19 78:8,9
81:4 85:22
102:25 103:9
151:17,20
152:20 159:5
160:10 168:21
169:21 170:22
173:7 189:6
192:2 193:7
209:2 218:19
235:11 257:2
262:15 276:21
282:14 309:3,6
317:14
**meaning** 41:2
159:17
**means** 56:3 59:2
147:7 254:20
**meant** 170:25
**measure** 143:22
243:10
**measured** 134:13
**measurement**
133:8
**mediations**
133:14
**meet** 11:6 33:20
61:17 66:3
266:4,23
**meeting** 11:3
30:21,23,24
31:3 32:12
39:14,20
**memo** 14:11 15:3



15:19,23 18:5
30:13
**memory** 7:25
16:3 54:11
55:16 77:3
108:18 114:21
118:4,12
119:24 121:2
**memos** 30:9
**men** 161:17
**menswear** 92:19
268:14 274:11
**mention** 135:8
250:5 268:6
286:13 293:3
**mentioned** 235:3
249:23 260:24
269:7,10
281:23 285:21
286:23 291:10
294:7
**merchandise**
59:16 62:5
63:17,21 64:2
121:17 122:2
223:17 226:2
232:18 296:6
**message** 4:11
**met** 32:17,21
61:6,23 221:6
240:21 266:2
**Mexico** 236:4
**Michelle** 22:7,8,9
36:13 55:17
74:23 88:18
89:20 158:7
190:11 191:9
283:4 297:14
**Michelle's**
190:21
**Michigan** 216:16
227:6
**mid** 87:20
**middle** 30:13
100:8 114:13
149:21 192:19

**midnight** 277:5
277:12
**million** 25:20
28:25 33:14
76:10 140:6
142:18 154:10
195:23 269:15
270:7 273:21
**mind** 112:19
133:20 202:24
203:7,7 254:14
**mindful** 314:16
**Mine** 138:7
**Minimal** 195:3
**minimum** 8:17
20:14,23 26:9
29:12 31:17
32:12,17,21
44:25 61:6,14
61:18,24 64:14
65:14,23 66:4
167:13 240:20
266:3,5
**minus** 143:23
**minuscule**
152:22
**minute** 130:14
263:24 302:25
**minutes** 39:4
84:9 86:20,25
127:12 130:2
162:15 176:8
213:16 214:20
215:15,21
274:7 290:18
**mirror** 304:20
**misquote** 100:24
**misremembered**
305:7
**missed** 127:2
141:24 181:10
248:19 264:3
**missing** 143:10
196:25 276:4
**misspoke** 203:12
**mistery** 309:5

**misunderstand**
66:19
**mitigate** 163:17
174:2,5,13
175:10 176:2
228:21 229:9
230:2,3 232:6
241:2,6,11
**mitigated** 176:4
**mitigating**
273:17
**mitigation**
163:21 164:3,6
164:8,9 166:19
169:8 170:17
171:4,10,11
173:2,17,21,25
174:18 175:5
175:12 222:20
224:12 228:3
229:10 230:4
232:21 237:7
239:15,19
240:9,14
241:19 242:14
268:23 279:6
**Mm-hmm** 29:18
**model** 151:9
153:6
**modify** 305:9
**modules** 26:23
26:24
**moment** 4:8
11:25 57:3
**moments** 31:23
267:9
**Monday** 302:20
315:2 319:25
**money** 147:8
270:16
**moneys** 310:8
**month** 19:12
43:4 45:4,10,15
47:10 57:25
58:6,10,15
80:22 81:25

156:6 261:4
296:12
**monthly** 18:20
43:3 46:7 50:18
50:20 55:3
56:20 142:20
**months** 228:16
231:11,19,22
231:22,23,25
234:7,10,10,11
234:14 235:6,8
236:15 237:8
240:18 241:25
242:5 273:19
277:3 295:23
296:8
**morning** 6:2
39:11,12 87:21
88:20,22
237:20 249:9
251:12 283:3
311:19
**motion** 111:2
**move** 25:8,10
53:9 69:7 82:5
132:6 165:10
170:13 175:8
176:12 188:2
194:20 273:11
297:9
**moved** 161:6
207:18
**moving** 161:18
**multi** 20:25
**multiple** 58:8,16
**mute** 292:6,14
**muting** 292:10

———————
**N**
———————
**N** 2:2,9 3:2 54:19
132:13
**name** 5:2 89:16
89:19 130:25
216:11 276:12
277:6,25 283:4
**names** 36:21

**narrative** 143:14
148:24 256:6
**national** 263:5
**naturally** 273:13
**nature** 106:2
277:23 307:17
**nauseam** 202:20
**near** 223:14
**necessarily**
110:20 120:8
172:20 179:3
226:15 227:3
245:25 295:7
**necessary** 72:21
220:20 252:3
319:4
**need** 60:14
104:24 133:22
213:10 261:14
267:6,9 277:18
282:22 297:22
314:5 315:6
**needed** 189:17,18
232:17 278:13
**needs** 6:22 169:8
262:20 286:8
**negative** 233:12
234:2,3
**neglect** 234:4
**negotiated** 11:15
**neither** 50:7
264:14
**net** 27:5,17 28:21
28:23 29:3
115:4,21 116:6
116:14 117:4,8
**Nevada** 109:13
117:6 159:11
160:13,14
165:23 275:8
**never** 17:23
19:21 31:20
32:14 110:14
138:25 139:23
156:21 171:13
200:14 220:24



243:20 261:10
300:6,21
**new** 1:17 2:5,14
5:11 11:16
18:22,25 82:8
82:19 83:4,8
84:8,16 90:4
136:14 161:7
200:13 207:18
231:3 233:22
248:9 270:8
274:3 275:6,21
276:7,15 286:7
287:8,9 292:10
292:21 294:13
321:5
**news** 216:15
233:25
**nice** 6:15
**night** 85:23
**nine** 136:14
162:6 290:2
**non-cash** 120:23
**non-direct**
150:13
**non-product**
150:8
**normal** 261:5
**normally** 261:10
**North** 2:14
216:15
**northern** 65:21
**Notary** 1:17
321:4,24
**note** 14:14 16:25
106:19 111:19
135:7 142:23
143:3 192:11
233:5,19
246:15 254:5
258:22 265:18
271:14 286:2
**noted** 320:5
**notes** 33:11 56:7
76:25 77:4 87:4
87:10,12,15

129:22 244:23
**notice** 15:19
17:18 19:18,23
20:7 32:9 44:24
236:14 240:20
241:3,10 293:5
293:15 296:5
296:14 317:9
**notified** 278:12
**notion** 270:16
277:2
**notwithstanding**
277:3
**November** 39:15
239:11 302:4
321:25
**nub** 151:14
**number** 25:20
30:4 37:22,22
77:12,14,17
115:14 116:22
117:15,25
138:5 148:22
162:5 168:12
207:3,6,9,21,23
216:20 223:6,9
228:8 229:14
234:19
**numbers** 22:13
22:17 23:20,25
25:15 27:21
36:7 53:18
55:19 58:22
66:10 97:8,10
97:11,15
148:24 155:24
167:4 245:24
246:2 303:7

---

**O**

**O** 91:5
**oath** 45:12
**object** 41:5 58:25
105:16 120:14
267:23
**objected** 14:6

48:25 49:13
**objecting** 292:11
**objection** 16:25
17:11 38:17
42:15 43:14,16
46:5,11 47:13
47:23 54:7 56:2
62:23 64:25
66:6,8 68:22
69:14,25 70:5
71:7 72:7,25
76:11 79:11,14
79:21 83:17
86:15 90:14,21
92:21 100:4
101:14 102:18
108:10 110:4,8
110:9,21,23
111:9,11
112:14 113:11
114:9 115:2,7
117:18 131:15
163:9 165:6,17
166:11 168:13
170:12,19
171:19 172:12
175:14 183:11
185:21,24,25
189:24 190:2
191:22 192:11
194:2,9 199:2
199:22,24
201:18 202:14
203:14,18
205:21 208:21
209:12,14
210:12 211:20
217:3,11 221:9
221:14 257:16
262:22,24
263:21 264:22
267:2 272:9,17
272:21 277:9
282:3,5 284:16
292:17 300:18
**objections** 62:17

**obligation** 29:12
163:16 166:10
166:16,22
172:5 174:2
208:18 209:5
268:24
**obligations** 8:14
10:11 11:3,7
163:19 195:21
**observing** 265:6
**obtain** 32:11
**obtained** 146:16
**obtaining** 32:10
**obvious** 78:8,12
**obviously** 38:20
51:24 63:14
105:17 145:7
146:12 149:10
160:6 214:25
312:16
**occasion** 8:12
10:25 58:5
**occasions** 58:8,16
191:3,5
**occur** 258:22
**occurred** 50:13
175:19 230:16
**October** 1:10
196:22 197:11
**offer** 134:5
**offering** 84:15
**offhand** 71:23
95:20
**office** 6:17,19,22
6:24 14:21,24
18:23,25 21:7
36:10 40:14
42:18 45:11,19
46:23 47:2
55:18 59:10
67:9 69:21 70:2
73:17,22 82:17
84:7 131:5
**officer** 6:7 45:13
45:23,23
**offset** 242:16

255:14 289:22
290:14 293:13
**oh** 66:22 301:3
**okay** 5:12 11:10
11:25 16:23
17:16 18:5,24
19:5,5 20:11,13
21:21 23:4
27:16,18 28:10
29:21 30:11
32:3 33:15,19
35:12 38:3 39:5
44:11 49:8
52:12 53:9
57:17 58:18
65:11,17 71:2
72:4 74:16
75:12 76:3
78:19 79:20
80:19 81:18
85:7,8,25 87:19
88:25 89:3
90:23 91:22
92:2,11 93:20
95:16,22 97:2
98:20 99:9,18
104:23 106:4
114:25 116:2
116:11,21
117:2 119:5
121:12 122:9
125:4 128:23
129:14 131:13
131:21 132:4
133:18,24
135:21 138:12
142:22 144:19
144:22 145:17
146:10 149:8
154:19 156:13
158:11 159:23
162:3,8,11,18
162:20,25
167:12 171:7
174:16 176:16
181:19,25



191:12 196:16
196:20 200:14
202:9,9 203:8
204:3,23 205:7
206:8 208:25
211:16 213:4
213:11 217:20
247:8 255:25
276:23 279:22
284:7 285:10
285:13 288:21
291:5 293:20
294:11 295:15
298:13 305:13
308:15,15
315:22 316:19
319:4,7,8
**old** 173:11
**once** 25:4 242:11
**ones** 281:17
290:9
**one-sided** 306:23
**one-time** 31:14
**online** 150:17
233:23 246:23
247:13
**on-going** 36:3
**on-hand** 206:21
**open** 11:18 83:9
84:8 86:7 99:21
122:23 231:20
233:15 269:21
274:3 275:6,21
313:17
**opened** 84:16
232:6 234:22
276:7 277:2
**opening** 276:15
**operate** 78:22
79:4,9 80:4,10
86:12
**operated** 56:21
59:7,11 63:18
106:7 164:5,8
174:8 238:4
247:18

**operates** 281:24
**operating** 7:19
22:4 45:25
57:20 61:2,8
107:2 116:10
118:4,17 119:2
121:3 171:17
171:21 172:4,8
203:8 238:7
243:15,24
244:3,4,6,14,24
245:11 246:6,7
248:21 249:5
250:7 280:24
291:9 296:25
**operation** 26:5
59:16,17 80:23
120:16 155:5
164:14 223:14
231:8,10 240:3
**operations** 35:20
35:22 157:13
239:4 261:5
**operator** 82:8,19
86:12 165:3,15
165:19,21
166:6,23 167:8
230:13 231:3
232:17 233:22
236:2 239:10
241:15 269:20
270:9 276:14
291:15 294:13
295:3,9
**operators** 235:13
237:3 250:10
287:24
**opine** 168:18
220:20 228:14
229:22
**opining** 166:17
**opinion** 86:5
134:5,12
135:23,25
136:5 173:21
220:13,17

221:4,23
222:15 224:5,9
229:12,13,25
240:24 241:23
242:4 244:19
250:15 251:10
251:25 256:21
256:24 260:3
274:4 277:19
280:19 288:15
290:15
**opinions** 178:12
**opportunities**
77:21 78:5,13
122:17
**opportunity**
53:16 87:5
104:13 168:25
174:5 214:4
241:5,12
296:24
**opposed** 186:6
208:17 257:19
**opposite** 283:14
**oral** 316:14
**order** 134:15
230:22 243:17
253:7 302:19
319:24
**ordered** 141:12
144:14 201:24
201:25 202:5,6
**orders** 32:11
252:21
**Ordinarily** 264:7
**ordinary** 290:20
**original** 49:10
**ought** 152:4
209:3
**outcome** 321:15
**outlays** 152:23
**outlet** 224:23
**outlets** 235:16
**outside** 47:14
115:8 266:20
**out-of-pocket**

154:22 155:7
155:10 156:3
157:20 160:4
258:18
**overage** 61:25
**overall** 76:9
102:24 113:6
**overcome** 307:12
307:13
**overhead** 271:20
271:25
**overnight** 315:10
**overruled** 42:4
43:24 66:12
68:23 70:7
71:10 72:9
92:23 108:19
113:20 115:11
127:5 165:24
166:13 170:23
170:25 186:12
190:6 200:6
202:16 209:19
282:10 285:2
**owed** 23:8 24:9
**owning** 7:19

——————
**P**
**P** 2:2,2 5:20
245:21
**package** 160:16
**page** 3:3 12:16
23:5 24:6 27:12
27:13 29:16
30:2 138:5
143:2 149:2,6
196:9,9,12,14
196:16 200:24
228:7,8,11
247:14 251:21
256:2,11 269:9
**pages** 187:5,6,7
247:14 302:17
**paid** 15:9 17:25
18:10 58:5,9,14
62:5,13 63:10

141:11 154:12
155:14 156:4
269:11 289:17
**Pal** 7:20 12:20
21:11 37:7
123:5
**Palace** 226:25
266:15
**Palma** 2:20 4:4
5:5 8:5 11:11
12:8 26:16,21
35:19 56:14
91:13 92:4
306:4
**pandemic** 262:15
262:19 264:16
265:13,22
**Paolo** 41:20
**papers** 112:3
**paragraph**
140:19 148:20
195:3,7,15
228:12 230:8
231:5,16
279:24 280:22
288:23 293:2,3
305:7
**paraphrase**
173:7,9
**paraphrasing**
173:6 204:9
298:5
**part** 14:15 17:20
46:19,19 47:5
58:18 85:16
103:20 157:22
209:16 231:12
231:13 260:16
261:4 281:14
292:21 308:11
**partial** 45:17,21
**participated**
46:23
**particular** 78:13
92:9 98:11
128:4 274:22



279:24 291:14
292:14
**particularly**
121:7 215:13
268:13 317:19
**parties** 10:16
19:19 253:13
273:23 321:13
**partner** 133:3
**parts** 169:23
**party** 9:25 38:6
179:19 226:4
229:25 241:14
303:14 305:8
**party's** 221:2
**Pasadiso** 36:24
**patents** 196:18
**patience** 219:2
**patiently** 216:19
**patterns** 198:19
**pause** 90:11,17
216:25 250:4
252:7
**pay** 44:24 62:7
289:6
**payment** 13:7
17:4 18:15
19:11,19
289:18
**payments** 13:12
27:5 29:17,22
57:19,24 63:5
**payroll** 118:24
**PDF** 138:7
148:25 196:9
247:13
**pending** 104:16
111:10 180:23
221:12
**people** 84:22
130:5 190:15
198:24 199:19
226:24 227:2,4
238:14 254:18
255:10 304:3
312:5

**percent** 10:13
24:19,25 29:5,7
75:8,20,24,25
76:3,8 93:3
95:3,8,14
114:20 118:16
119:3 128:12
136:14 148:2
149:14 152:13
154:7 161:15
161:21 207:13
211:6 244:25
245:12 249:15
249:20,25
250:2,19 251:9
253:5 256:14
257:8 280:8,13
283:5,8,11,23
284:10,12,13
285:18,19,20
287:2
**percentage** 34:14
72:15,23 73:10
73:14 75:3,22
118:5 146:21
152:22 243:10
251:7 283:20
286:17
**percentages**
242:22 243:2
249:11 250:23
251:3
**perfect** 309:2
311:11
**performance**
53:25 54:6
58:20,20
230:17
**performed** 47:2
55:25 59:6
**performs** 6:17
**period** 7:2,18
11:8,21 18:16
22:18 43:8
58:12 104:11
137:14,15

139:23 140:2
170:7,11
221:19,21
222:18,21,25
228:4 230:11
230:23 231:19
232:3 241:22
241:24 242:2,5
242:12,13
253:23 266:7
266:10,13
295:24 296:12
310:14
**periods** 139:18
139:21
**permission**
132:11 314:14
**permits** 85:22
**person** 56:24
81:9 84:7
288:14,18
298:9
**personal** 108:8
**personally** 34:25
37:20 254:25
**perspective** 59:7
309:2
**persuing** 167:7
**pertained** 46:6
**pertaining** 64:23
**phone** 22:11
190:15
**phonetic** 36:23
36:24,25
**picked** 173:22
**picking** 164:10
**piece** 228:2
239:14
**pike** 269:21
**place** 5:11 32:11
90:4 137:5
138:25 164:23
171:12 275:7
276:8 277:18
**placing** 48:20
**Plains** 2:5,14

**plaintiff** 136:2
**plans** 85:21
**platforms** 138:9
**PLATT** 2:13
**plays** 253:19
**please** 4:8,25 5:9
21:14 22:12
76:25 88:23
89:7,16 90:2,17
94:9 158:19
164:2 211:25
213:4 216:12
239:21
**pleasure** 319:21
**plenty** 181:11
193:14
**plus** 6:16 133:10
231:22 234:10
**Plz** 2:9
**point** 22:4 35:14
49:20 51:15,17
52:11,17,21
74:8 102:24
112:17 128:4
153:9 165:4
168:10 169:7
170:15 176:9
194:16,19
207:21 224:9
228:19,20
229:5,6 230:5
237:17 238:12
239:18 240:5
240:16 241:20
242:19 243:7
244:21 246:14
248:17 251:16
251:18 252:13
252:18 253:20
253:22 254:2
263:25 266:24
276:4 277:21
289:18 293:14
299:12 306:16
**pointed** 173:15
311:13

**pointing** 175:6
**points** 8:23 148:9
148:10 208:8
252:17 253:22
255:21 259:10
310:15
**poking** 296:17
**POLSINELLI**
2:8
**poor** 21:15
**poorly** 167:3
**portion** 108:25
148:25 152:3
171:7 243:13
246:6 272:2
285:14 291:23
297:5
**pose** 103:25
**position** 6:14
9:12 20:6
141:18 151:3
176:3 258:15
258:16 304:14
**positively** 182:18
**possibility**
142:25 143:3
236:9
**possible** 55:8
85:3 171:12
174:7 226:9
295:2 310:10
**possibly** 59:13
74:25 101:6
120:22 180:2
**post** 2:5 302:3
**posting** 181:2
235:6,7 279:7
**Potentially** 225:3
**practicing** 133:9
**precise** 101:5
**precisely** 55:8
85:3
**prefer** 315:20
**preference**
214:15
**premiss** 282:20



prep 41:8,21
preparation
   40:11,25 42:18
   105:14 109:24
   110:18 176:20
   190:19 191:13
   191:17
prepare 109:16
   177:6,10
prepared 49:14
   132:8 135:10
   156:5 192:12
   200:11 204:19
   220:8 227:22
preparing 91:19
   143:9 176:20
   190:19
presence 232:25
present 2:18 6:4
   20:15 39:14
   40:8 119:13
   295:17 297:15
presentation
   129:23 258:3
presentations
   133:15
presented 112:13
president 152:17
presumably
   104:10 151:23
   235:22
presume 160:14
presuming 96:21
pretrial 316:3
pretty 97:19,20
   98:6 112:20
   113:18 174:24
   179:19 215:7
   215:10 237:4,5
   298:3 306:23
   309:11
prevail 307:25
prevailed 52:21
   303:11
prevailing
   303:14 304:22

prevails 307:7
previous 197:10
price 144:25
   145:22 147:5
   184:16,23
   188:13
primarily 175:16
primary 191:9
prime 235:14
principal 70:23
principally 236:4
printout 26:22
prior 11:13 19:24
   52:4 166:19
privilege 41:15
   42:16
privileged 41:6
proactive 292:10
probably 39:4
   67:23 95:2
   98:18 112:20
   116:3 129:25
   137:23 182:17
   185:19 292:22
   302:20
probe 108:17
problem 87:8
   130:3 180:7
   311:22
problems 170:10
   231:6
procedural
   302:19 319:24
proceed 5:19
   90:25 131:19
   131:21 163:2
   217:13 247:10
   267:25
proceeding 4:20
   6:5 53:11 73:2
   89:10 100:7
   106:22 130:19
   135:16 177:14
   191:24 216:6
   277:24
proceedings 87:1

88:1 89:1 90:1
   129:1 130:1
   131:1 134:22
   134:23 177:2
   216:1 217:1
   301:1 302:1
   303:1 304:1
   305:1 306:1
   307:1 308:1
   309:1 310:1
   311:1 312:1
   313:1 314:1
   315:1 316:1
   317:1 318:1
   319:1 320:1
process 23:19
   119:10 314:17
produce 52:15
   58:23 94:14
produced 49:19
   49:21 74:4
   107:16 156:24
product 93:2,4
   94:11 144:5
   145:9 146:6,9
   146:13,23
   147:2 150:13
   150:21 155:13
   225:2 247:17
   248:18 253:12
   263:10 284:10
   286:4 287:7
production 93:18
products 12:14
   12:20 145:7,16
   147:13 252:19
   252:24 253:2,4
   253:14,15
professional
   205:11 318:11
professionalism
   318:17
profit 34:6 67:5
   67:17 94:24
   95:3,5 109:9
   113:9 114:19

115:5,17,21
   116:7 117:5
   128:14,19
   147:6,11
   149:10,12
   150:20 153:4,7
   153:9 219:22
   220:25 224:24
   242:10 243:4
   243:18 244:15
   249:15 250:23
   251:3,6,10,25
   283:16 300:3,6
   300:7 310:11
profitable 35:4,8
   68:5 119:22
   120:3 235:21
   238:15 310:7
profits 117:8
   120:9 136:25
   138:17 154:16
   219:16 229:9
   229:20 241:21
   243:21 250:17
   255:14,22
   263:4 300:3
   310:8
projects 219:14
   287:22
proper 143:21
   221:24
properly 186:17
propose 315:12
proposed 49:23
protocols 216:21
proven 252:2
provide 40:14,20
   42:17 105:7,13
   105:23 123:8
   123:13,15
   134:12 188:10
   193:4 197:13
   197:22 220:14
   225:15
provided 40:23
   42:5 44:5

123:14,22
   125:10 126:17
   127:7 134:14
   135:4 158:22
   161:12 182:12
   182:14,21
   183:13 188:9
   188:25 189:3,4
   189:5,7,10,13
   189:19,21
   191:2 197:18
   199:19 202:21
   222:16 228:25
   245:19 252:21
   256:19
providers 238:17
provides 27:18
   29:21 304:20
provision 8:19,21
   9:6,8 11:2
   13:17 76:12
   169:20 170:2
   263:18 291:11
   293:17 304:15
   304:22 305:12
   305:16 307:3
provisions
   168:20 264:9
public 1:17
   148:10 150:17
   321:4,24
publicly 246:23
pull 7:24 21:4
   245:22
pulled 132:9
   149:11 161:3
   207:17 246:22
pulls 148:11
purchase 8:17
   14:19 15:15
   16:14,19 17:6
   18:2 23:24
   26:10 29:11,12
   29:13 31:18
   32:12,17,22
   40:18 61:6,14



61:18,24 63:21
64:15 65:24
66:4,15 123:21
124:3 126:19
139:19 146:6
167:14 188:11
196:2 197:6,9
197:10,24
198:6 200:20
201:4,15
224:25 225:24
232:17 252:21
253:7,7 263:10
266:3,5,22
**purchased** 26:9
28:15 63:16
64:2 146:6
210:8 225:8
252:23,25
**purchases** 9:16
20:14,24 24:20
25:24 26:4
39:25 59:24
63:14 99:10,14
124:7 137:20
172:10 195:4
196:21,23
197:11,15
208:16,19
209:10 223:12
240:20 253:6
282:15 296:7
**purchasing** 64:14
197:14 223:11
263:7 266:7
**purported**
288:25
**purposes** 132:5
**pursuant** 10:6
43:13,18 44:2
**pursue** 82:23
83:3,25 85:17
165:3 166:23
176:11
**pursued** 165:14
165:18 166:5

232:5
**pursuing** 82:3
83:14
**purview** 57:13,15
**push** 52:24
315:19 316:7,9
**pushed** 81:3
297:19
**pushing** 297:24
314:22
**put** 7:12 20:20,21
65:9 76:25
137:25 161:22
180:18 220:25
243:20 254:17
256:22 259:15
260:4 271:15
293:13 307:17
307:25 314:14
**putting** 136:19
229:23 241:3
248:14 254:10
254:23 303:24
**P-A-L-M-A** 5:6
**p.m** 315:14
316:21 320:5

_____Q_____

**qualified** 133:21
**qualmed** 211:17
**quantified**
275:25
**quarterly** 71:19
**question** 6:15 7:2
16:10 17:2,12
21:14,16 23:19
40:6 41:24 42:8
43:11 46:10,12
55:7 56:11,18
58:25 61:9
62:15,22 69:23
70:9,13 73:5,6
76:14 78:3,4
79:23 90:11,15
90:18 92:22
94:5 95:12 96:7

96:16 101:11
104:16,18
106:13 107:10
107:12,14
108:12,21
110:17,21
111:8,25 112:5
112:24 115:3
116:5 117:16
117:19 126:15
128:5 156:18
160:22 166:16
166:20 167:3
168:15,22
169:5 171:23
172:6,18
173:14,18
175:7 176:13
177:5,8 178:3
178:13 179:5
180:23 181:6
184:14 186:14
186:25 188:14
188:18,21
193:2,3 194:3,6
195:13 198:10
198:16 199:6
199:10 200:5
200:25 202:10
209:20 210:12
210:18 221:12
221:13 222:6
226:8,11 230:7
230:10 233:7
237:12,16
254:15,22
256:9 267:20
267:21 270:11
271:4,10,24
273:10,16
274:16,16,17
274:19 276:5
276:23 278:9
285:4,10 291:8
292:12,18,19
297:25 298:2

298:18,23
300:18 318:4
**questioned**
295:20
**questioning** 82:4
213:7 254:19
255:10
**questions** 32:2
38:2,8,15 56:9
85:6 87:18 90:9
97:4 101:4
103:13,25
108:18 114:8
114:13,17
131:14 163:7
186:7 208:12
208:23 210:6
210:16,22
216:25 217:9
255:23 267:16
274:15 291:4,7
297:12 299:24
301:10 309:4
**quick** 215:8
291:4
**quickly** 129:23
215:10 298:4
**quite** 37:21 78:9
172:15 270:14
**quote** 286:22

_____R_____

**R** 2:2 91:5 132:13
217:21 321:2
**railer** 281:24
**raise** 4:17 89:7
130:15 216:2
**raised** 128:6
273:8 310:16
**raising** 49:5
**ramble** 237:14
**rambling** 237:12
**ran** 22:19 104:11
**range** 76:10
94:11 115:16
116:12,14,17

116:23 117:11
117:17,22
119:2 250:17
251:8 280:17
283:23 297:19
**ranges** 50:2 93:2
**Rapids** 216:16
**ratio** 154:7
**rational** 238:21
**reach** 65:23
174:13
**reacquaints**
114:6
**read** 14:17 33:11
41:24 42:3
44:19,22 45:7
74:8 108:24
109:2 139:4
143:7 173:8
211:21 217:5,5
242:24 247:7
281:3 285:12
285:15 303:5
312:14
**reading** 47:24
56:4 77:4
306:14 307:16
**ready** 87:20
267:10,11
**real** 205:12 309:3
**realize** 224:24
**really** 17:7,11
33:23 52:18
59:2 71:15 81:6
81:19,23 85:4
102:23 109:6
115:22 151:14
161:10 170:4
179:12,12
241:25 254:4
260:16 298:22
301:6 312:14
317:14,22,24
317:24 318:3
318:11,16,21
**reason** 47:10



130:4 207:16
222:23 238:2
243:9,19
247:23 248:3
255:16 260:25
284:14 285:22
285:23 304:6
**reasonability**
168:19
**reasonable**
128:21 149:19
168:3 169:17
170:6 211:14
266:12 288:17
**reasonably** 37:8
229:8
**reasons** 176:5
235:7 239:2
303:4
**rebuttal** 212:17
220:8 227:21
**recall** 8:18 9:5,18
10:19 11:14
13:8 18:12
20:25 22:3
24:10 34:18
40:12 54:2
55:12 59:8,21
59:24 67:8 75:7
77:13 97:17
98:10 106:25
108:2,4 109:6,7
109:11,15
113:22 115:13
115:16 116:19
116:23 117:5,7
117:10,13
119:4 121:5
122:12 124:12
125:11,12,14
127:10 134:8
134:18,20
176:21,22
177:4,15 191:6
195:4,6,11,14
195:17,24

202:24 221:16
221:21 239:7
268:17 278:15
289:13 294:9
297:20 298:10
**recalls** 107:8
**recapping** 257:22
**recast** 199:5
**recasting** 273:9
**receipts** 258:23
**receivable** 26:23
112:3
**receive** 17:18
18:19 19:17
103:18 204:24
205:2
**received** 17:19
17:23 25:12
49:22 60:25
135:9 182:16
191:7 200:14
207:4
**receiving** 137:19
**recess** 35:17 88:2
127:19 206:10
215:23 290:23
**recognize** 21:22
213:22 230:11
**recollection**
53:17,24 54:5,9
55:24 73:13
108:7,15 183:2
189:13,20
191:8 278:20
**recommendation**
302:2 305:19
**reconsidered**
236:13
**record** 42:2
48:15,20 49:7
56:5 60:10
103:21 106:20
109:2 173:8
230:15 236:25
240:6 252:22
285:15 298:20

298:24 306:12
309:17 321:10
**records** 14:24
19:22 21:8
25:16 30:7 31:4
39:23 61:20
119:25 183:16
233:20 258:25
259:5
**recover** 307:8,24
**recovering**
237:21,24
238:11
**recovery** 229:19
304:16
**rectangle** 44:13
**red** 44:13
**reduce** 229:11
250:13
**reduced** 149:23
**reduction** 153:18
**reductions**
167:19
**refer** 9:9 11:2
144:18 150:6
**reference** 124:17
189:8 229:14
**referenced**
177:18,21
178:5,8,18,21
178:24 179:7
185:19 187:18
283:2,5
**references**
204:15
**referencing**
182:7 205:2,5
**referring** 8:8
50:4 96:10
156:9 165:20
269:12 271:19
296:15 304:24
**reflect** 61:21
62:25 63:5,6
166:22
**refresh** 16:3

53:16 55:15,24
73:12 108:17
189:12,20
**refreshing** 54:8
**refusal** 11:12
**regard** 120:11
156:15 179:17
210:23
**regarding** 19:19
32:9 106:16
305:13
**regular** 32:6
**reimburse**
291:12
**relate** 160:9
**related** 67:4
126:21 150:13
153:7 157:11
158:22 161:17
161:18 200:12
200:13 219:12
260:11 275:24
321:13
**relates** 106:11
107:21
**relating** 124:5
160:16
**release** 305:20
**relevance** 70:6
71:8 113:12,15
115:7 293:8
**relevant** 16:10
203:16 222:16
**reliability** 178:25
**reliable** 198:22
254:15
**relied** 123:9
135:6 178:7,18
179:6 199:8
202:21 203:3
**rely** 198:25
199:14 201:2
229:2,4,17
**relying** 198:4
201:5 220:17
**remainder**

171:15
**remaining**
260:21,22
**remember** 59:18
61:8 65:6 71:15
79:23 84:17
85:11 87:3
95:20 98:10
99:24 105:24
117:9 122:12
127:8 135:3
137:10 176:23
180:3 182:15
186:14 190:9
190:13,16
193:11 210:22
234:9 238:8
239:9 263:25
295:19 315:8
**remittance** 44:25
**renew** 115:6
**rent** 18:9,10,15
18:20 19:11,20
20:8 45:2 57:19
57:24 58:5,9,14
118:24 152:19
**reopen** 85:11
**reopened** 37:9
**repair** 37:16
289:2
**repeat** 5:17 94:9
106:12
**rephrase** 42:12
235:10 271:6
292:19
**replace** 269:23
**report** 123:10
125:2,18,22
131:22 132:7
135:7,11,13
139:5 140:13
140:20 142:24
143:2,7,8,10,12
147:16,23
148:11,12,20
149:15 157:20



157:22 160:7
161:22 163:15
164:21 166:10
166:12,17,21
167:3,7,9 175:9
176:21 177:6
177:11,18,21
177:23 178:5,8
178:19,25
179:7 180:18
181:15 184:13
184:16 185:9
185:20 186:16
187:14,18,19
190:20 191:13
192:12,21
193:8 195:10
195:12 196:7
198:21 205:4
207:24 208:14
211:12 217:5,6
220:6,8 221:17
222:8 227:21
228:9 239:13
239:20 242:24
250:18 251:15
251:19,21,22
252:8 255:20
257:22 269:8,9
275:10 279:23
279:25 288:22
289:14 292:25
296:19
**reported** 206:21
316:24
**reporter** 42:3
285:12 316:25
317:6 321:4,24
**reports** 43:4
50:18,20 74:9
110:13 161:11
211:22 262:17
**represent** 6:22
**representative**
145:8 148:3
149:11 253:10

**representatives**
161:2
**represented**
70:18 253:5
**representing**
52:2
**represents** 27:14
**reputation**
174:11 233:13
277:6,25
**request** 100:13
110:12 193:18
236:12
**requested** 103:5
186:19 204:17
225:18
**requesting**
225:20
**requests** 103:14
**require** 313:25
**required** 18:2
26:10 50:18
137:20 139:19
209:9 229:8
266:23 289:5
295:4 296:6
**requirement**
31:18 32:13,18
32:22 43:2 61:7
61:14,18,24
64:15 65:24
66:4 167:14
263:8 266:3
**requirements**
8:18
**requires** 153:20
**requiring** 86:11
**research** 234:21
238:24 266:16
**reserve** 87:5
**respect** 10:14
22:25 134:6
135:11 213:13
264:14 300:13
**respond** 38:8,14
147:20 163:7

180:2,10,12
237:11 267:15
267:21
**responded**
226:20
**RESPONDENT**
1:8
**Respondents**
2:13
**respondent's**
14:7
**responding** 178:2
**response** 236:11
**responsibilities**
84:20 85:16
91:15
**responsibility**
16:13 24:18
46:20 47:5
82:15 84:6
290:9
**responsible**
46:18 210:4
**responsibly**
82:12,13 178:8
**responsive** 17:7
**restate** 62:22
107:11 172:17
**result** 71:24
77:22 78:6,15
122:18 151:12
154:16,24
155:3 158:2
224:20 234:21
271:12 272:7
272:16 277:5
289:24
**resulting** 275:20
**retail** 36:16
223:8,14,17
224:23 247:19
247:19 268:7,8
277:15
**retailers** 282:14
282:21
**retained** 134:3

219:23
**retainer** 259:24
**retention** 134:9
**retrieve** 102:17
**review** 40:21
41:23 71:25
72:22 91:17
99:15,17 105:9
109:19,23
110:18 113:3,6
134:3 147:25
177:10 191:13
191:16 203:9
203:13,24
214:4 282:19
293:19 296:25
316:11
**reviewed** 39:23
40:10 41:20
71:12 72:3,13
109:25 111:15
112:2,25 114:2
135:9 176:20
176:25 177:2,6
203:20 220:5
**reviewing** 202:25
221:2 243:22
**re-cross** 294:21
297:7
**re-direct** 128:1,7
208:1,9 209:1
210:1 211:1
212:1 213:1
214:1 215:1
267:7 294:1,2
295:1 296:1
297:1 298:1,22
299:1 300:1
**re-jigger** 192:16
**right** 4:17 8:8
11:12,20,23
16:15,21 19:7
21:15 23:23
24:15,20,21
25:19 27:11,12
29:14,17 30:12

30:13,17 31:24
32:25 33:12,16
33:22,24 35:13
35:16 36:8
37:23 39:20
40:6 42:13
44:16 53:19
55:13 57:2
60:22 61:3,15
61:19 66:5 69:5
70:15 72:5
73:23 77:2
78:24 79:6,10
80:5,11,24 89:5
89:7 90:21,22
94:15,19 95:23
98:2,22 100:22
107:13 110:17
111:10 112:23
116:4 124:12
127:15 130:16
132:3 137:25
142:19 143:6
144:11 145:5
145:21 146:12
146:25 149:6
152:7,23 153:2
153:19 154:9
154:17 159:3
160:18 162:21
163:17 164:19
164:24 167:23
173:13 175:2
175:25 183:23
186:24 193:11
196:13 197:19
201:21 206:4
206:16 211:19
213:5,15
215:14,17
216:3 222:10
224:16 228:7
228:11 230:9
239:5 240:9
241:3,16,21
242:8 243:10



243:11 247:6
251:2,13
255:18 262:4
262:10,15
265:6,16
267:16 271:20
275:17 276:7
279:19 282:12
283:11 285:25
288:23 292:15
294:13,19
295:25 296:10
299:9,16 301:8
305:5,6 308:12
309:22 315:12
316:4 317:10
319:23
**rights** 11:15
**right-hand** 149:5
**ring** 126:3
**Riverside** 2:9
**Road** 2:5
**Robert** 229:18
**Rod** 250:24
252:7 319:20
**RODNEY** 2:10
**role** 99:5
**room** 4:14 89:4
**Rooster** 5:11
**roughly** 95:2
97:9 118:6,16
137:11 148:19
280:8
**ruined** 174:10
**rule** 49:18 230:4
308:5
**rules** 307:6,9,12
307:14
**ruling** 50:10 52:5
52:22
**run** 70:3 111:6
293:17
**running** 8:10
202:3 231:6
**runs** 69:20

---

## S

**s** 2:2 5:20 20:22
217:21,21
245:21
**safe** 207:25
**salary** 152:18,18
**sale** 128:10
**sales** 12:13,25
27:4,6 39:25
40:10,15,18
43:4,12 44:2,5
45:14,14,19,20
46:7,14,21 47:9
47:11 53:23
55:3,22 56:20
58:20 59:6,11
75:4,22,25 76:9
76:9 99:19
101:2,12
102:14 103:16
105:8 106:6
110:12 128:16
138:13 140:5
142:18 143:23
144:2,15,16,24
147:13 150:18
154:3 200:15
223:5 224:13
242:8,12,17
244:11 269:24
275:12 278:23
279:2
**Salsbery** 2:22
3:10,11 140:11
149:18 176:3,6
211:4,10
212:22 213:2,8
213:12 216:2
216:14,19
218:1,3,25
219:1,25 220:1
221:1 222:1
223:1 224:1,15
225:1 226:1
227:1,18 228:1

---

229:1 230:1
231:1 232:1,4
233:1 234:1,16
235:1 236:1
237:1 238:1
239:1,7 240:1
240:11 241:1
242:1 243:1
244:1 245:1
246:1 247:1
248:1 249:1
250:1 251:1
252:1 253:1
254:1 255:1
256:1,7 257:1
258:1 259:1
260:1 261:1
262:1,8 263:1
264:1 265:1,13
266:1 267:1,14
268:1,4 269:1
270:1 271:1
272:1,20 273:1
273:2 274:1
275:1 276:1,5
277:1 278:1
279:1 280:1
281:1 282:1,6
283:1 284:1,18
285:1 286:1
287:1 288:1,12
289:1 290:1
291:1,6 292:1
292:25 293:1
294:1,4,25
295:1 296:1
297:1 298:1,17
299:1,3,25
300:1 301:3,15
**Salsbery's** 139:4
140:15 142:17
147:16,23
151:3 245:19
**sample** 125:25
182:3 184:11
184:15,21

---

185:4 187:14
189:8 191:20
193:15 245:16
253:10 254:7
**Sana'a** 2:21
**Sarah** 1:4 7:7,18
8:10 9:15 11:14
12:14,19,23
13:8,14 14:15
15:10,20 16:20
17:18,25 18:20
19:18 20:15,23
20:24 21:10
22:14,18 23:8
24:9 25:24 26:5
27:20,23 28:15
29:22 30:10
31:16 32:9 34:3
42:22 44:21
47:3 61:2,6,13
61:13 62:8,10
64:15 75:10
78:21 79:3 80:8
80:22 99:11,17
112:3 124:19
125:7,16 126:2
134:25 137:5
138:20 139:17
144:8,24 145:2
145:4 149:16
153:2,11,22
164:4 182:4
184:17,22,23
185:5 187:15
188:12 189:9
191:21 193:15
200:15 208:16
210:3 231:6,18
235:18,20
238:2 241:3,12
252:22 253:6
254:8 270:17
278:12 289:5,9
289:21 291:15
293:3,18 294:7
296:5,9 304:17

---

304:21 305:17
309:3
**Sarah's** 252:20
**sat** 5:13 83:18
216:19
**save** 87:8
**saved** 143:24
151:25 152:8
152:21
**saving** 154:2
**savings** 151:11
294:16
**saw** 17:24 179:23
289:18 300:21
**saying** 17:25
85:15 142:8,17
165:13 175:9
218:10 254:21
255:6 276:24
280:16 282:9
286:9,11,13
290:7 311:24
**says** 14:14,17
22:7 23:5 28:4
28:7 29:17
38:16 90:13
108:14 125:24
131:15 138:7
139:8 143:19
146:25 147:25
149:20 195:19
217:2,10
221:19,20
254:7 305:8
309:22,23
**SBrown@bpsl...**
2:15
**scared** 301:2
**scenario** 151:8
**schedule** 125:19
125:21 130:7
137:22 138:2,3
138:11 141:20
143:14,18
144:18 148:23
149:4 153:15



154:6 155:7
157:21,23
158:16 161:24
161:25 181:18
181:22 182:13
183:22 184:9
187:12 188:6
192:8 193:9,10
252:11,16
301:20 313:11
314:4
**SCHMIDT** 2:13
**science** 132:25
**scope** 47:14,18
113:17 115:8
134:9 219:12
**screeching** 155:2
**screen** 7:24 8:2,5
10:24 12:9 18:6
20:20 21:4,21
26:16 44:13
60:18 131:23
135:14 136:20
180:19,20
181:19 196:7
206:18 227:19
**scroll** 28:10
196:15 231:17
250:25 251:19
**scrolling** 251:23
**search** 19:22
235:4 274:7,19
**searching** 193:23
**season** 28:5
32:18 67:2
137:12,13
138:25 141:10
141:17,24
142:2,8,9
200:20 201:4
201:15,23
223:18,24
225:17 278:14
**seasonal** 195:21
196:18,22
197:6,8,10

198:18
**seasons** 34:3 64:8
66:16,20,24,24
137:10 138:21
141:14 142:4
226:14,18
**seated** 4:25 89:15
130:24 216:11
**Secaucus** 248:9
286:7 287:21
**second** 8:2 21:4
21:16 24:5
32:21 61:19
89:20 97:8
139:22 141:25
142:6 145:23
196:2 198:6
200:20 201:4
201:15,23
211:24 229:18
231:13 264:6
269:6 274:16
274:19 284:23
293:2
**secondly** 225:22
241:2 249:7
260:6
**Secretary** 6:12
69:18
**section** 8:16 9:2
9:18 10:23
11:11,13 44:21
45:6,6 221:18
221:20 230:8
288:21 289:2
**securing** 167:8
**see** 8:5 12:4,8
13:16 19:17
22:14 23:7,10
25:13 26:16
27:3 28:11 29:2
44:12,14,21
49:4 52:23
60:17 69:24
88:24 100:13
105:3 106:20

108:8 117:16
125:11,13
130:14 131:12
141:2 145:23
150:18 154:6
158:12 159:11
159:15 160:11
162:21 163:5
168:6 170:3
180:20 181:18
181:22,23
182:4 183:4
194:23 196:21
205:3 206:17
206:24 217:10
224:7 225:5,25
227:14,19
230:15 233:24
235:2,4 237:2
239:2 244:11
246:23 247:4
251:5 254:4
258:22 260:9
261:14,18,20
261:20 265:3,4
267:6 275:9
281:15 282:23
282:23 284:2
288:10 293:4
296:24 297:24
302:20 305:14
305:23 308:24
**seeing** 264:19
**seeking** 50:22
**seen** 7:11 92:18
107:24 220:24
233:20 243:20
254:3 264:15
273:2 299:5
300:6 308:22
**sees** 271:7
**self-manufactu...**
253:12
**self-muting**
292:8
**sell** 12:19 121:25

224:21 226:3
257:7 270:11
**selling** 13:2
144:25 145:22
147:5 161:18
184:16,23
188:13 247:15
247:17
**sells** 93:15
113:14
**send** 51:9 317:8
**sending** 153:10
**sense** 129:21
141:6 257:11
**sent** 15:20 32:9
50:4 158:7
183:4,5 290:3
**sentence** 147:24
181:14 195:18
280:23 281:6
**sentences** 143:10
**separate** 64:17
65:13
**September** 22:20
33:5 78:23 79:5
79:5,19 80:4,11
140:23,24
164:18 196:22
197:11 223:2
223:22 224:18
236:16,17
248:7
**serve** 315:8
**served** 7:4 103:8
193:12 318:14
**server** 105:5
185:8 194:15
**services** 1:24
229:15 303:25
307:18 308:22
**session** 214:10
242:20
**set** 28:14 31:10
45:2 52:9 80:22
80:23 85:22,24
321:8

**sets** 317:23
318:13
**Settimi** 2:20 3:4
3:5 4:1,4,7 5:1
5:6,13 6:1,2 7:1
8:1 9:1 10:1
11:1 12:1 13:1
13:20 14:1,9
15:1 16:1 17:1
17:2,17 18:1
19:1 20:1 21:1
21:22 22:1 23:1
23:21 24:1,5
25:1,11 26:1
27:1 28:1 29:1
30:1 31:1 32:1
32:6 33:1 34:1
35:1 36:1 37:1
38:1,5 39:1,11
39:13 40:1 41:1
42:1,21 43:1
44:1,12,16 45:1
46:1,13 47:1
48:1 49:1 50:1
51:1 52:1 53:1
53:22 54:1,12
54:12,13,17,25
55:1,17 56:1
57:1,12,18 58:1
59:1,5 60:1,17
61:1 62:1 63:1
63:2,13 64:1
65:1,7,25 66:1
67:1 68:1 69:1
69:9 70:1,2,9
70:15 71:1 72:1
73:1,9 74:1,20
75:1,2 76:1,18
76:24 77:1,24
78:1 79:1,24
80:1,7,13 81:1
82:1,7,14 83:1
84:1 85:1,15
86:1,5 87:6
91:1,13 92:1
93:1 94:1 95:1



96:1 97:1 98:1
100:23 103:23
119:19
**Settimi's** 99:6
**settlement**
289:16 311:7,9
312:7 313:7
317:21
**set-off** 288:24
289:7,9
**seven** 98:19
159:16 231:11
231:21 234:9
**severance** 160:16
**SG&A** 246:19
247:2,3
**Shah** 2:11 53:10
60:8 112:19
263:17 264:10
307:22 309:6
315:17 318:2
318:23 319:12
**share** 8:2 21:21
72:23 191:20
192:2,7 219:7
**shared** 39:19
51:12,14 192:4
**sheet** 259:22
**shelve** 209:10
**She'd** 183:3
**she'll** 57:8 66:12
**shipment** 62:8
**shipped** 144:7
155:18 223:23
248:7,8 287:11
**shipping** 247:21
**shirt** 90:8,13
**shocking** 244:20
**shop** 269:22
**shops** 44:20
226:24 289:17
**short** 212:21
215:20
**shorthand** 321:3
**show** 19:6 72:14
73:14 120:22

132:2,2 144:20
188:12 240:5
243:4 248:23
261:8 278:18
279:14,17,20
**showed** 20:21
59:23 240:10
**showing** 45:13
181:19
**shown** 20:19
111:12
**shows** 138:12
244:15 261:16
**shut** 197:7
224:22 248:6
272:2
**sic** 153:19 164:7
170:21
**side** 181:9 214:3
252:5
**sided** 307:3
**sides** 8:14 50:15
308:13 309:11
311:12 318:10
**signature** 7:14
12:15
**signed** 64:18,22
231:20
**significant**
213:20,21,23
223:7 240:22
255:2 297:4
**significantly**
252:25
**similar** 14:23
18:6 241:6
249:3
**Simon** 18:11,19
19:18 42:22
43:4,13 44:20
46:3,21 50:15
50:19,20,23
51:7,9,18 52:4
53:3 103:19
110:13 124:18
125:6,15

**simply** 193:3
257:21 273:8
**single** 145:9,10
**sir** 4:5 14:5 23:19
88:9 95:23
114:23 117:23
130:24 177:8
178:19 179:2
182:10 183:10
185:7,10
212:15 245:13
306:2
**sit** 10:9 288:3
310:19
**Site** 12:13
**sitting** 73:21
**situation** 143:23
146:15 235:12
236:23 238:2
**six** 98:19 231:18
231:22 234:10
236:15 253:5
**size** 223:15
**slapped-together**
159:4
**snapshot** 253:23
**soft** 95:9,15,25
96:9,20 249:20
249:25 283:17
**Sohil** 2:11 319:21
**sold** 34:15 59:15
122:6,11
128:13 150:19
150:21
**solemnly** 4:18
89:8 130:16
216:3
**somebody** 227:5
227:9 231:7
240:2 249:12
270:10 277:4
**somewhat** 42:24
119:11 226:18
**soon** 52:4
**sooner** 53:5
**sorry** 4:10 11:13

21:5,19,20
29:25 62:16
70:10 78:3 96:6
106:18 108:5
108:22 110:6
115:24 123:18
129:15 136:9
151:8 156:7
169:15 170:24
188:19 189:15
217:7,17 228:6
245:5 252:7
255:19 258:10
276:21 278:24
289:8 302:11
304:18
**sort** 156:2
**sorts** 107:2
**sound** 218:21
**sounded** 218:3
**sounds** 65:17
100:5 186:5
218:15,17
288:11
**source** 125:3,25
159:5,8,12
182:6 184:15
185:19 186:15
187:11,17
189:8 191:16
204:15 210:20
210:25 245:21
254:2,12
**sourced** 204:20
204:24 205:3
**space** 37:7
**spaced** 302:18
**Spano** 20:18 21:6
23:15 39:16
**speak** 16:6 73:9
159:6 164:2
190:18 239:15
313:22
**speaking** 35:23
40:17 84:22
87:9 160:25

278:21 281:20
282:20
**speaks** 81:19,24
166:12
**spear** 262:25
**specializes** 133:6
**specific** 84:22
107:23 116:16
116:22 117:15
122:21 137:11
138:5 146:17
246:18
**specifically** 7:23
8:16 10:23
60:24 99:13,17
109:22 113:3
116:20 118:14
119:4 124:17
147:24 232:22
248:2 275:24
279:12
**specifications**
192:17
**specifics** 135:3
**spell** 4:25 54:19
89:15,23
130:24 216:11
**spend** 153:24
270:8 312:19
**spent** 153:22,25
270:17 296:17
**spike** 261:21
**split** 138:21
**spoke** 301:22
**spoken** 267:18,19
**spreadsheet**
125:24 159:4
182:11 184:18
**spreadsheets**
22:13 177:16
**spring** 28:8 33:7
62:10 137:12
195:25 224:4
**staff** 91:18
**stage** 191:24
**stages** 9:4



**stake** 318:20
**stand** 4:7 53:8
　88:23 98:12
　111:12 130:13
　216:2
**standard** 97:19
　97:20 98:6
　99:15 118:15
　256:22
**standpoint**
　229:23
**stands** 150:3
**start** 38:4 138:18
　145:21 162:15
　164:17 168:4
　301:18
**started** 33:5
　74:11 114:4
　127:17 212:25
　219:6 298:3
**starting** 28:6
　207:20
**starts** 167:21
**state** 1:17 69:23
　321:5
**stated** 187:3
　249:18 275:23
**statement** 45:12
　45:19 113:2
　150:17,23
　163:24 186:4
　199:8 200:4
　244:19 280:12
　281:15,17
　282:18,23
　291:11 297:2
　316:3
**statements** 18:20
　69:10 71:6,12
　71:20,24 72:14
　91:20 95:19
　99:16 109:17
　112:5 203:13
　203:15,20,25
　221:3 243:22
　244:3 248:22

　284:2 288:7
**states** 67:6 157:5
　195:7 234:24
　247:15
**statutory** 136:13
　162:6
**stay** 37:20 244:12
　305:22 306:4
　317:18
**step** 27:8 149:19
**Stephen** 2:15
　6:16 21:12
**stepped** 24:7
**stoned** 310:19
**stop** 145:5
　243:11 286:10
　286:11 295:7
**stopped** 244:14
　285:22
**store** 7:20 8:11
　9:19 13:2,14
　18:17 19:12
　21:9,11 22:4,19
　26:6 30:22 37:9
　40:18 42:23
　43:3 44:5 45:25
　47:12 55:4,25
　56:21,22 57:21
　59:7,12,15 61:2
　61:8 63:18
　64:24 67:16
　76:19,21 77:9
　77:22 78:6,15
　78:22 79:4,9
　80:4,11,21,24
　82:9 84:16
　85:24 86:8,12
　99:19 101:21
　102:12 104:12
　106:6,11,17
　107:22 109:10
　113:13 117:6
　119:8,14
　121:17 122:18
　122:23 123:5
　128:11,17

　137:18 138:23
　139:21 141:9
　151:21,25
　152:16 153:2,7
　153:8 155:20
　156:22 157:6
　160:15,17
　161:4 164:12
　164:16 165:21
　171:17,21
　172:8 174:7
　197:7 202:3
　206:22,23
　215:6 224:22
　225:11,20
　231:14,20
　232:5,10,11,13
　232:19 233:9
　233:11,15
　234:5,23 235:3
　237:4 238:23
　240:19 241:4
　248:6 258:8
　261:7 272:2
　273:18 274:3
　274:24 275:6
　275:21 276:7
　276:15 277:3
　294:6,18
　295:11 296:13
**stored** 105:6
**stores** 11:15,18
　43:2 46:14
　83:10 84:9
　113:4 247:19
　247:20
**store's** 53:25
　54:5 58:19
　67:16
**stranded** 156:20
**stranding** 157:11
**Street** 131:6
　216:15
**strengths** 311:11
**strike** 13:17 18:6
**strive** 143:17

**structure** 74:21
　246:11,12
　281:9
**structures**
　253:18 258:2
**struggling** 21:17
**studied** 275:14
**study** 276:3
**stuff** 110:14
　135:9 248:14
**SUBH** 1:4
**subject** 292:22
　304:13
**submit** 302:3,7
**submitting** 46:6
**subpoena** 50:24
　103:8
**subsequent** 263:2
**substance** 41:12
　303:3
**substantial** 133:7
　146:15 269:14
　269:15 276:12
**substantive**
　42:14
**subtract** 147:4
　283:19
**subtracter** 284:5
**successful** 237:9
**succinctly** 38:9
　267:22
**sudden** 154:24
　155:2
**sufficient** 220:15
**sufficiently**
　117:10 220:11
**suggested** 275:11
　294:11
**suggesting**
　232:23
**suggestion** 317:2
**suggestions** 18:9
**SUHAD** 1:4
**Suite** 2:9
**summarize**
　251:24

**summarized**
　159:22 185:11
**summary** 27:12
　204:11 205:2,5
**summer** 28:8
　33:7 62:10
　137:13,17
　138:23,24
　224:4 226:17
**supplied** 210:9
**support** 39:23
　183:22,24
　185:17 189:17
　198:4,5 207:22
　220:15 228:25
　252:4 256:19
**supported** 184:5
　184:10,21
　220:11 221:6
　249:8,11
**supporting** 187:4
**supports** 192:8
　250:16
**sure** 9:13 16:8,11
　17:6 25:7 31:2
　39:3 40:17
　46:11 50:14
　64:21 65:7
　72:16 78:9
　81:10 85:6
　90:17 100:2
　101:9 112:10
　127:14 132:12
　132:24 134:10
　135:8 136:5,24
　137:4 138:16
　140:21 141:19
　144:17 147:22
　148:13 156:17
　161:8,10
　165:13 172:2
　173:20 182:18
　183:3,5,6,15,16
　193:6 194:23
　206:5 218:23
　219:9 222:5



226:7 228:7
233:6 236:23
239:22 244:18
251:21 271:13
280:18 284:21
285:8 301:22
303:8 309:17
**surprised** 48:12
76:13 244:21
**surrounding**
13:11
**sustain** 42:15
**sustained** 73:4
115:2 168:22
170:12,20
171:22 194:2
208:22 210:14
211:23 272:7
272:15 273:6
277:11 297:22
**Suttin** 5:10 90:3
**swear** 4:18 89:8
130:17 216:4
**swell** 211:18
**sworn** 5:21 91:7
132:14 217:22
321:8
**system** 159:19
**S-A-L-S-B-E-...**
216:14
**S-E-T-T-I-M-I**
5:7

---

**T**

**T** 5:20,20 132:13
321:2,2
**tag** 112:18,21
**take** 12:24 31:22
35:13,14 51:20
52:25 62:21
87:2,4,12
103:23 127:12
129:21 142:25
162:14 166:9
170:16 173:16
179:4 197:3

206:6,9 212:24
214:7 215:15
215:16 226:19
231:8,10
238:22 239:3
240:3 241:19
243:16 249:23
249:24 250:12
265:12 266:14
270:2 273:25
282:15 290:20
303:6 314:7
**takeaway** 100:25
**taken** 35:18
37:15 84:13
85:10 86:6 88:3
127:20 162:24
164:23 181:12
206:11 215:24
229:10 230:25
231:2 262:20
290:24
**takes** 85:20,24
**talk** 76:18 87:6
87:16 125:20
213:17 214:20
215:17 268:22
276:22 279:10
279:20 280:3
288:24 300:16
311:21 312:4
312:21
**talked** 176:18
241:23 280:4
309:7 311:14
**talking** 7:25
77:17 95:25
96:4 97:25 98:7
101:19,25
103:22 109:22
113:12 118:7
119:23 120:8
154:15 156:11
156:19 172:9
200:19 204:6
209:19 247:5

248:25 258:11
290:5 295:18
307:5 309:13
313:20
**tally** 157:24
158:11
**targeting** 232:22
**tax** 121:7,10
150:4
**taxable** 120:9
**team** 46:22 55:9
112:18,21
**technical** 136:18
**telephone** 190:24
**tell** 14:9 21:13
27:13 28:5,24
30:6 31:3 43:23
54:22 68:20
90:15 91:11
92:16 105:25
118:15 120:11
130:5 131:16
132:22 135:22
152:9 173:19
186:22 215:18
217:4 310:20
**telling** 245:9
257:21 276:10
277:8
**tenant** 44:23 45:8
45:13,13,22,23
**tens** 133:11
**ten-year** 137:6
**term** 45:4 79:4
81:22 92:12
102:19 167:15
167:22 286:25
300:3
**termination**
154:24
**terminology**
290:12
**terms** 7:21 38:22
42:10 46:2
92:17,19 115:7
135:24 154:20

158:12 170:4
186:4 232:21
258:5 263:3
271:11 273:16
313:22
**test** 144:23
145:13,14,15
149:15 185:13
185:15 188:4
205:7,13,22
207:2,13,15
252:5 256:20
259:7 261:13
**tested** 186:5
188:11 207:20
**testified** 5:23
39:22 45:24
47:7 50:16
57:18 59:22
60:20,24 61:11
80:7 83:7 84:9
85:9 91:8 107:3
114:2 119:20
121:15 122:11
132:16 133:13
172:21 174:21
175:12 176:19
177:13 178:16
182:24 184:20
217:24 222:8
226:13 237:23
239:24 251:12
275:19 282:7
284:8 295:10
**testifier** 173:12
**testify** 23:24
61:23 151:18
239:25 295:14
297:23
**testifying** 30:25
57:6 66:23
84:17 85:12
171:8 186:6
195:6,14 204:4
219:2 234:18
296:7

**testimony** 4:18
5:16 6:5 13:6,8
18:8,12 19:24
20:14 23:17
24:11 30:17
39:24 40:9,11
40:25 46:6 56:8
58:14 77:7 81:8
83:18,22 84:12
88:11 89:9
100:24 101:9
105:9,18 107:3
107:7 109:20
109:24 110:19
114:3 118:19
122:14 129:10
130:17 165:16
171:8 177:24
191:14,18
198:13 202:23
204:6 212:8
213:7 216:4,23
219:3,13 220:3
220:19 222:24
226:12 233:17
237:18 239:8,9
243:24 245:10
249:9,13
250:15 253:11
257:23 259:19
263:2,20
275:18,22,23
276:11,13
277:4,22 280:7
281:11 283:3
284:4,18,22
295:17 297:16
299:3 301:16
312:18 321:7
321:10
**testing** 207:8
299:6
**text** 306:8
**thank** 6:3 20:12
39:5 44:10
60:12,16 69:6



74:19 87:24
88:10 91:2
96:25 97:5
98:21,23
121:13 128:23
129:9,12,13
142:14 162:8
162:22 167:12
180:17 181:15
194:21 199:12
212:7,9,10
215:22 242:8
243:11 301:15
318:16,24
319:6,18,20,20
319:22 320:3
**thanks** 39:7
156:11 218:25
318:22
**theoretical**
174:14
**theory** 268:23
273:17 276:6
279:6,21
**thereof** 274:5
**thing** 11:11 27:2
81:2 144:17
151:5 206:15
242:11,14
286:18 308:10
313:12 317:14
**things** 26:25 50:6
51:12,14 84:21
132:6 133:6
177:17 178:5
178:21,23
180:8 183:19
191:10 223:7
225:4 230:23
233:15 234:17
240:23 249:10
252:14
**think** 4:8 5:16
15:24 16:5
31:23 37:7
41:10,14,14

49:12 57:5
68:25 69:3
79:16 87:20
96:12 108:11
109:5 110:16
116:3 125:8
129:24 135:16
138:10 139:13
139:14 143:9
144:17 147:23
148:18 158:16
162:16,19
163:22 164:7
168:3 172:19
173:5 174:11
174:25 175:15
175:21 176:11
177:5,25 190:5
194:2 203:6
211:8 212:18
213:6,9 215:14
221:6 224:11
229:3 233:17
234:6,12
237:13,19,22
242:19 244:25
245:17 249:2,7
249:10,15
250:22 251:17
251:18 252:3
253:5,9 255:16
257:21 260:2
260:24 261:24
262:20 265:5
266:8,12,13,19
269:7,10
270:14,23
273:5,12 278:4
283:14,15
286:23 288:22
292:7 293:21
294:21 295:5,6
295:10 300:9
301:2,24,25
302:9 303:5
304:23 306:19

310:17,24
312:4,23
313:22 314:3
**thinking** 310:21
311:2
**third** 12:16
253:13,22
**third-party**
179:20 253:16
**thought** 66:22
121:16 141:5
213:25 298:15
301:4 302:6
307:4 310:25
**thoughts** 206:2
222:12
**thousand** 139:2
142:19
**thousands**
133:11,11
**three** 63:4 66:23
75:8,24 76:3,8
127:4 138:3
154:10 162:4
235:12 237:2
**threw** 43:17
**throw** 306:8
**thrown** 256:25
**thumbing** 196:6
**time** 1:11 6:25
7:18 8:23 9:9
10:4,21 11:7,21
18:21 22:5
25:19 26:11
31:7 32:8 37:16
37:21 38:22
43:7 47:21
49:20 50:9 55:2
62:21 84:14
87:9 88:3 97:21
99:20 101:20
104:11,22,24
108:22 129:20
133:12 134:2
147:14 162:20
163:14 164:23

164:25 168:10
169:8 170:7,15
174:7 177:7
193:14 204:19
206:11,22
215:6 222:2,25
223:22 225:12
230:24 231:19
232:3 238:3
240:19 253:23
253:24,25
265:17 296:16
297:8 300:21
310:14 312:20
315:6 319:19
320:5
**times** 127:4
151:19 168:4
168:12 190:17
190:25,25
**timing** 52:12
226:14
**title** 6:10,11
12:12
**today** 7:3 10:9
104:5 109:21
109:23 110:20
114:4 163:14
191:14,18
209:17 219:2
219:13 233:18
238:10 281:12
285:21 288:4
**told** 31:16 114:16
188:24 207:25
265:5 306:14
**top** 57:2 93:4
97:17 99:25
100:21 108:5
109:11 117:23
118:9 130:2
145:20 196:15
196:16 238:17
**topic** 239:16
**Torello-Viera**
40:15,21 77:16

105:8 122:10
295:18
**Torello-Viera's**
40:9 77:6
**total** 26:3,4 28:14
28:14,18 62:11
146:23 147:2,3
160:3 162:4
270:7
**totaled** 161:23
**totalling** 24:15
**tough** 179:19
**track** 236:25
**traditional**
282:13
**traditionally**
244:4
**training** 255:2,12
**transaction**
263:5
**transcribed** 1:16
**transcript** 214:5
321:9
**transferred** 23:9
**transition** 14:15
**translate** 242:6,7
**transportation**
96:23 249:22
286:5,24 288:2
**Treasurer** 6:11
69:17
**treatise** 243:7
**treatises** 229:2
**trial** 104:6
133:13 159:12
159:14
**tried** 240:2,5,12
243:2
**trip** 152:20
260:22,25
**Triple** 307:6,11
307:13
**trouble** 218:7,11
**trucks** 248:15
**true** 24:17 26:8
40:2 61:12 62:2



62:4 63:9
163:22 171:17
202:13,15,18
208:2 210:5,25
321:10
**truncate** 81:3
**Trust** 85:5
**truth** 4:21,21,22
89:11,11,12
130:19,20,21
216:6,7,8
242:23
**try** 24:2 55:15
108:17 135:7
156:19 163:6
166:4 167:6
180:12 241:8
241:13 259:6
267:15,20
**trying** 23:16 41:7
48:21 52:18
55:6 65:9 85:2
85:5 110:24
132:6 141:17
165:12 181:13
204:16 218:22
229:22 231:3
240:7 241:5,11
256:11 258:20
259:7,24
271:24 274:13
281:6 286:14
299:11 310:7
**turn** 43:3,12,25
**turned** 51:19
52:5
**turning** 46:19,20
**two** 19:10 29:7
31:25 51:18
52:14 64:8
66:16,20,24
67:2 87:18
105:2 137:10
138:2,3,11,21
139:18 141:14
141:20 142:3

143:11,15,18
147:3 153:16
154:9 208:23
214:8 222:13
230:23 234:16
239:24 240:23
252:14 253:10
253:21 274:14
290:17 294:15
299:23
**two-hour** 314:13
**type** 91:22 188:9
188:24
**types** 6:18 244:6
246:25 248:20
281:7 282:21
282:24
**typically** 281:24
282:20
**typo** 23:6

___
### U
**ultimately**
135:10,14
168:15
**unable** 50:23
**unabsorbed**
271:19,25
**unclear** 234:25
**underlining**
186:15
**underlying**
159:13
**understand**
33:25 42:7
62:12 66:14
84:24 92:12
96:5,6,10 103:2
124:9,16
140:10 141:13
141:18 143:16
151:2 156:18
165:13 167:18
171:23 176:10
184:14 198:21
200:17 207:16

223:11 225:6
226:24 228:21
229:7 232:10
234:4 238:6
240:17 242:18
248:8 255:4
257:3 258:15
258:16,24
262:8 265:25
271:16 279:8
284:3 285:9,16
287:8 290:6
300:22
**understanding**
18:25 56:19
64:12,13 92:8
155:4 160:24
193:17 210:2
232:8,14,15
241:7 249:13
280:9 289:11
289:15
**understood**
174:19 283:18
287:16
**undertake**
316:25
**undertook** 86:2
**under-liner**
315:11
**Uniform** 279:4
**United** 67:6
157:5 234:23
**University**
219:19
**unknown** 291:24
295:24
**unreasonable**
168:10,14
**unreliable**
220:18 224:9
255:17
**unstable** 4:12
**unsupported**
224:10
**unusually** 121:2

**upper** 149:4
**up-scale** 235:15
**urge** 312:20
**USA** 1:7 6:8,20
6:23 12:14
35:23
**use** 81:23 148:3
195:10 254:10
254:11 265:19
279:8 290:12
300:2
**usual** 94:24
226:14
**usually** 92:25
95:3 179:19,22
265:9
**utility** 123:24
**utilized** 198:17
**U.S** 12:21 13:3
123:6 133:3
232:24

___
### V
**V** 132:13
**vacate** 305:9
**vague** 92:22
108:6,14
**vaguely** 34:10
106:25 107:7
108:2
**valid** 147:18
**valuation** 219:20
**value** 121:20,23
143:6 161:11
219:16
**variable** 147:20
148:6 211:17
243:13,15,23
244:5,13,24
247:24 248:11
248:16,20
249:5 250:7,10
280:24 281:18
286:6,21
287:12 291:9
296:23

**variables** 244:8
246:8 281:10
**various** 8:14,23
9:3,23 10:16
20:21 21:8
30:10
**Vegas** 7:20 8:11
9:20 18:16
42:23 43:3
46:14 47:12
56:21 57:20
64:24 67:16
82:9,20,24
84:17 85:11
86:8 99:19
101:13,21
106:11,17
107:22 109:9
113:4,13
122:23 128:11
128:17 151:20
151:22 152:16
155:16,17,18
161:3 165:22
226:16 227:4,8
231:21 232:7
232:10,19,24
233:3 260:23
269:23 274:6
274:11,23
275:7 276:8,13
277:7 287:11
294:19 295:12
**veracity** 205:18
**verbally** 178:2
189:6
**verified** 145:2
**verify** 280:12
**Vernelo** 36:22
**versus** 124:19
125:6,16 126:2
182:3 184:22
185:5 187:14
189:9 191:21
254:8
**VF** 245:17



246:14,16,25
247:5,11,18
250:8,15
view 51:21 53:2
283:22
views 234:5
VINCENT 2:16
volume 278:23
279:2,13
VS 150:16
152:11

_____
W

wait 51:5 72:21
89:3 217:9
221:13
waiting 96:18
126:24
waiver 309:21
waivers 309:8
want 16:25 31:25
33:4 35:13
55:10 71:16
77:2,3 81:7
86:24 87:4
88:24 89:4
97:13 100:14
119:17 128:3
140:18 155:25
162:13,14
176:11 182:2
192:15,21
194:23 199:10
204:4 213:16
215:3,11 219:6
228:2,3,7,19
229:5 230:5,6
239:14,16
240:16,18,21
246:15 251:24
252:13 254:9
254:11 259:10
259:18 261:18
264:25 269:11
274:15 278:8
279:24 285:8

290:11,12,20
298:25 302:14
302:16,23
303:2,20,22
306:9 308:4,20
311:19 312:19
313:8,10,12,21
314:9 315:19
316:7,8,23
317:4,11 319:5
wanted 186:19
230:13 231:7
235:21 246:13
293:14 298:20
298:23 317:18
wanting 239:3
wants 52:23
55:15 131:25
244:22 249:12
306:4 307:16
warehouse 105:6
161:7 248:9,10
250:9,11 286:7
287:5,5,21
288:3 297:4
warehouses
248:16 287:23
warehousing
247:20 248:2
warm 227:7
wasn't 82:11
85:16 94:7
95:12 102:24
183:3 225:24
240:25 241:10
271:15
waste 47:21 50:9
176:8
way 12:25 16:3
23:20 24:19
33:8 54:13 98:7
111:7 115:16
118:3 119:19
142:11 143:21
152:5 155:23
156:25 159:24

168:5 180:13
185:13,15
191:11 214:22
263:11 283:18
284:3 318:18
321:15
weak 116:3
312:23
weaknesses
311:12
wearing 90:12
weather 227:8,10
week 105:3
314:24,25
weekend 320:4
weeks 51:18
welcome 106:24
went 70:11 161:8
169:18 230:14
231:15,17
233:23 235:19
246:16,21
255:8 261:9
275:11
weren't 33:24
240:21 241:11
275:3,16
295:17
West 216:16
we'll 69:24 87:2
87:24 100:13
100:14 118:2
131:12 135:23
137:25 154:6
162:21 180:5
215:21 243:11
314:6
we're 49:3 103:9
111:5 113:12
173:9 247:5
306:12 320:2
we've 124:2,3
127:2 163:3
170:9 202:19
230:18 241:23
251:17 252:20

306:23
white 2:5,14
90:12
wholesale 36:16
92:19 152:24
wholesaler
281:25
willing 214:16
win 38:14 111:22
wind 76:19 81:21
winding 119:8
winner 304:9
winter 28:8,11
33:7 63:22,25
137:12 223:18
224:3 278:14
wish 292:9
withdraw 76:16
79:21 222:6
withdrawn 86:9
280:21 289:6
witness 3:3 4:3
4:10,15,23 5:5
5:10,20 15:14
15:21 16:5,12
16:22 20:10
25:8 32:14,16
32:23 33:2,10
33:18,21 34:2,8
34:17,21,25
35:6,9,11 38:6
38:23 41:20
43:20 44:4
47:20 54:15,20
55:5 56:16 57:8
57:16 62:14
65:8 70:10,16
70:20,25 71:21
72:2,12 73:16
78:17 80:14,18
81:11,14,18
83:23 87:13,23
88:13,14,20,25
89:13,19,24
90:3 91:4,6
93:20 94:3,6,10

94:20,25 95:6
95:10,17 96:12
96:16,20 97:16
98:3,9,18
100:17 102:7
103:25 104:20
106:3,20
108:11,14
112:13 114:10
114:23 115:18
115:22 116:9
116:15,25
118:8,14,21
120:15,18
121:4,9 122:7
126:24 127:9
129:11,12,15
129:17 130:2
130:22 131:3
131:10,20
132:4,10,13
138:6 139:6,11
139:14 140:14
140:17,21
141:2,19
142:13 148:21
149:3 151:17
152:6 156:17
157:3 163:4
168:18 172:13
173:20 175:3
175:15 179:20
180:6,14 190:8
193:23 194:13
202:7 210:18
212:8,10,12
213:3 215:19
216:9,13
217:15,21
225:3 226:22
228:17 234:25
237:15 243:25
245:7 256:16
258:10,17,20
262:23 265:14
271:2 278:8



280:15 284:8
285:5 298:25
299:10,13
301:17,22
310:5 319:5
**witnesses** 5:14
81:5 87:4
179:13,20
203:22 212:14
216:20 226:13
237:22 238:9
257:4 297:24
305:20,22
**witness's** 53:17
209:21 221:10
283:2
**Witness(es)**
321:7,11
**wondering**
313:23
**wool** 146:3
**word** 19:10 38:16
71:18 90:13,21
131:15 205:14
205:17 217:2
217:10
**worded** 167:3
**words** 19:25
155:21 176:7
208:17
**work** 5:4 10:4
21:6 22:23 41:8
70:13 89:18
91:17,20,23
92:3,6 98:16
99:14 131:2
219:11,12
271:18 286:10
287:22 299:18
311:25 315:15
315:16 316:18
**worked** 97:21
219:14,21
223:9,10,25
246:4 268:12
317:23 318:5,8

**working** 99:6
219:10 314:23
**worldwide**
113:14
**worried** 291:25
**worry** 16:17
313:2
**worth** 77:8 82:3
209:22
**wouldn't** 37:15
79:9 80:3 84:5
99:17 112:18
122:20 177:20
185:17 197:21
224:19 240:13
283:21 287:25
294:25 295:2
**wrangles** 317:16
**write** 120:21
**write-offs** 120:7
**writing** 17:24,24
**written** 45:11
**wrong** 139:13
183:20 217:8
284:24 285:25
**wrote** 289:14
**www.MagnaL...**
1:25

---

**X**

**X** 1:2,9 3:2
192:21

---

**Y**

**Y** 132:13 192:22
217:21
**yarn** 146:3
**yeah** 16:8 20:17
27:15 33:18
34:21 55:21
63:19 67:14
135:20 153:20
158:16 160:22
177:16 204:13
219:9 251:17
261:11 296:2

**year** 28:4,7,7
29:6,7 32:7,19
32:21,25 33:2
33:16 45:17,17
45:21,21 61:7
61:15,19,25
76:5 98:11
99:24 116:17
137:8 138:18
141:21,23
144:7 151:19
158:13 159:25
172:11 196:3
197:10 242:7
**yearly** 144:10
**years** 6:16 36:23
37:23 52:14
67:25 84:15
85:10 92:4
97:14 98:19,19
101:23 102:2
102:10,10
112:5,6 115:5
118:6 119:22
133:10 139:10
141:7 142:10
142:12 164:4
169:19,24
178:15 195:9
195:10,12,16
195:19 219:11
220:23 222:9
222:10,22
270:20 299:19
**yell** 81:21
**yelling** 218:22
**yesterday** 40:9
151:18 233:18
248:4 281:12
**yes-or-no** 278:9
**York** 1:17 2:5,14
5:11 11:16
18:22,25 83:4,8
90:4 136:14
287:9 292:11
292:21 321:5

**young** 283:3
**Yup** 24:16

---

**Z**

**Z** 192:22
**zero** 261:20,20
261:20,21
**Zileri** 7:20 12:20
21:11 37:8
123:5
**zoom** 1:15 26:18
214:9 314:7
316:22 317:9

---

**$**

**$1,000** 93:15,16
**$1,350,000** 242:9
**$128,353** 160:5
**$2,382,834** 136:6
**$2,500** 159:16
**$2,723,716**
136:12 162:7
**$2.2** 28:25
**$244,000** 293:4
**$27,000** 76:5
153:23
**$31,000** 289:17
**$38,000** 13:11
14:13 15:4,10
17:19 24:8
**$38,289.15** 23:9
**$38,320** 47:9
53:23
**$4,050,000** 143:4
195:17 224:11
**$400** 94:12,15
**$44,000** 260:7
**$450,000** 128:19
138:19 141:22
201:13 202:12
208:13 223:3
224:5
**$466,000** 253:8
**$48,057** 55:23
**$5,000** 259:23
**$500,000** 270:4

294:8
**$512,000** 269:12
271:14,21
**$59,440** 54:3
**$60,000** 30:12
31:5 40:5
**$673,000** 64:6
**$700,000** 77:8
119:16 121:17
**$700,070** 161:14
**$736,000** 63:22
63:24
**$773,811** 206:23
**$84,000** 259:11
**$900,000** 29:12
128:10,17
137:7 144:7
147:12 153:10
167:14,21
168:12 171:14
172:10 232:18
242:7 265:19
266:22 275:13

---

**0**

**000357** 26:20
**00213** 13:24
**01-18-0000-6180**
1:6

---

**1**

**1** 8:4 25:20 45:2
78:23 79:5 80:4
80:11 196:8
**1st** 79:16,19
140:24 164:18
236:16
**1,000** 93:21
**1,862,879** 28:17
**1:00** 130:6,9
**10** 29:6 50:2 51:2
51:19 52:10
131:5 161:15
161:21 162:12
190:24,25
207:12 213:16



**246:16** 251:22
256:2,14 257:8
270:20 316:11
**10k** 246:22
247:12
**10th** 321:25
**100** 10:13 287:2
**10509** 90:5
**10549** 5:11
**10601** 2:5,14
**11** 28:11 33:16
245:16
**11.96** 250:19
**11:10** 87:21
**11:25** 87:22
**12** 14:12 28:7
32:25 33:17,20
34:23 35:8
193:8 200:11
251:9
**128** 3:6
**13** 28:8 33:20,23
34:16 35:5
62:10 97:14
196:9 197:4
231:23
**130** 21:20 59:20
60:5,10
**131** 21:19 60:11
**132** 3:8
**14** 33:23 34:23
35:10 97:14
197:4
**142** 12:6
**145** 13:19,24
**15** 11:11 19:13
78:16 95:8,14
114:22 116:23
168:4 169:19
197:4 215:21
240:18 249:20
249:24 283:7
283:17 284:12
296:8,12
**150** 2:9
**16** 19:13 55:4

112:7 114:22
116:23 138:24
140:24,24
141:10,10,13
141:22 142:5,8
156:11 197:4
201:23 204:22
224:17,18
**163** 3:9
**17** 140:19 204:22
224:17 264:8
**17th** 266:17
**17.4** 307:16
**174** 305:15
306:15
**175** 26:14
**18** 204:22 228:12
228:16 235:6,8
237:8 242:5
259:11 273:19
277:3
**18-month** 230:11
230:23 232:2
242:5 278:7
**19** 204:22 230:8
**19th** 313:14
**1988** 133:2
**1989** 35:21

**2**

**2** 157:19 288:23
**2,202,649** 26:4
**2.1** 148:23 149:4
**2.2** 29:10 33:14
**2:00** 130:6
162:20,22
315:4,14
316:16,17,21
**20** 29:5 36:23
92:4 95:8,14
118:16 119:3
176:8 219:11
231:5 249:20
249:25 259:12
283:8,17
284:13 302:17

**200** 2:5
**2010** 25:18,22,25
**2011** 7:3,9 8:24
10:25 22:19
25:19 26:6 27:4
33:6 40:2 63:15
67:13 68:2
99:21 196:19
198:3,25
199:15 200:11
201:2 231:18
**2012** 39:15 68:5
99:7,11 196:24
198:3,25
199:15 201:3
**2013** 8:24 10:25
22:20 26:6 27:5
62:6 63:10,25
66:15 99:12
**2014** 14:13 15:5
21:24 22:2 64:3
64:8 65:24 66:4
66:17 68:6
86:13 239:11
**2015** 37:11 43:13
64:10 67:13
68:2,9 82:24
102:13 112:7
113:2,10 223:3
224:6 260:8
**2016** 46:15,21
47:9,12 53:23
54:4 55:23,25
67:7 68:11
76:20 77:23
78:7,23 79:6
80:5,11 82:10
82:20 83:5 84:3
86:3 102:13
109:10 113:2
119:9,14
121:18 122:19
122:24 123:6
137:15,17,18
138:18 139:2
139:25 141:21

156:9 158:15
160:8 164:13
165:4,15 166:6
166:19,24
167:9 173:23
196:2 197:22
197:24 198:6
198:23 199:16
199:17,21
200:21 201:5,6
201:8,15
208:13,16,20
209:10 215:7
234:20 274:12
274:23 278:12
278:14 296:5
296:10
**2017** 68:13
**2018** 68:15
159:15
**2019** 68:17
**2020** 1:10 68:19
193:8,13
246:17 247:12
262:15 266:10
321:25
**2021** 137:7,15
140:3 262:10
266:10
**2030** 168:2,8
**204** 196:9
**208** 3:8
**21** 28:8 140:25
141:15 142:9
231:16
**21st** 315:3
**210** 247:14
**218** 3:10
**22** 36:24 251:9
316:21
**22nd** 315:3,13,21
316:18
**23** 220:23
**24** 36:25
**25** 118:12 119:3
148:20 219:24

250:2 283:23
**25,828** 260:9
**25,838** 160:13
**26** 279:25
**268** 3:11
**27** 21:24
**27,000** 76:6
**28** 148:25 149:3
**29** 1:10
**29th** 266:17
**294** 3:10

**3**

**3** 125:21 137:22
144:18 181:19
181:22 182:13
183:22 184:9
192:8 252:11
269:9
**3:00** 215:18
**3:15** 215:22
**30** 6:16 45:16
101:17 118:12
133:10 283:23
**30th** 62:9 236:17
236:18
**3000** 2:9
**31st** 236:18
**33** 293:3
**3405** 216:16
**35** 93:3 250:2
283:5 284:10
**350** 94:12,15
**361** 30:4,5
**37** 135:16
**38** 135:17,19
148:14
**38,000** 17:25
**39** 3:5

**4**

**4** 143:2 157:23
158:16
**4,050,000** 242:3
**4.1** 44:21
**4.2** 8:16



**4.3** 45:6
**4.5** 195:16
**4.6** 9:2
**4:59** 320:5
**40** 93:3 96:3
   118:13 283:5
   284:10 285:18
   285:19 299:19
**400,050,000**
   195:20
**45** 39:4 95:2 96:3
   114:19 116:13
   128:11 130:2
   249:15,23
   280:15 283:16
**450** 137:11,12
   138:22 139:2
   139:20
**450,000** 142:5
**474,349** 25:2
**48** 138:7
**48.9** 154:7
**49503** 216:17

---
**5**

**5** 3:4 9:18
**5th** 45:9
**50** 24:19,25 95:3
   96:3 114:20
   116:13 128:12
   148:2 149:14
   211:6 216:15
   249:15,23
   280:8,13,15,16
   283:16 285:20
**50/50** 270:18
**500** 269:11
**500,000** 62:11
**54** 241:25
**55** 96:3

---
**6**

**6** 190:25
**60** 81:7 96:4
   283:11
**60606** 2:9

**624-6221** 1:24
**673** 66:18,25

---
**7**

**7** 5:10 90:3 228:8
**700** 76:10
**73** 247:14
**736** 66:16,24
**77,381** 161:22
**773,811** 207:21
   257:15

---
**8**

**8.4** 10:23
**80** 169:24
**866** 1:24

---
**9**

**9th** 302:4,10,15
   313:15,17
   314:21 315:6
**9:32** 1:11
**900,000** 168:4
**91** 3:6
**948,698** 24:15
   25:2
**98** 3:7
**99** 152:13 244:25
   245:12

